Jeremiah A. Lowe (CA SBN 239166)
jeremiah@lowelazarlaw.com
Victoria J. Lazar (CA SBN 298668)
victoria@lowelazarlaw.com
Lowe Lazar Law, LLP
402 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone:    (619) 878-2725
Facsimile:    (619) 878-2737

**Attorneys for Plaintiff**
**JUSTINO RUPARD and the Estate of Lonnie Rupard**

Daniel M. Gilleon (CA SBN 195200)
dan@gilleon.com
The Gilleon Law Firm
1320 Columbia St., Suite 200
San Diego, CA 92101
Telephone:    (619) 702-8623
Facsimile:    (619) 702-6337

**Attorneys for Plaintiff**
**RONNIE RUPARD and the Estate of Lonnie Rupard**

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST JUSTINO RUPARD & RONNIE RUPARD; JUSTINO RUPARD INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR IN INTEREST; AND RONNIE RUPARD INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR IN INTEREST

                                    Plaintiff,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVDIUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE OF CALIFORNIA, INC; CHRISTINA

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No: 23CV1357 CAB BLM

**SECOND AMENDED COMPLAINT FOR DAMAGES FOR:**

1. **U.S.C. § 1983: Deliberate Indifference of Serious Medical Needs;**
2. **42 U.S.C. § 1983: *Monell* Municipal Liability Civil Rights Action;**
3. **42 U.S.C. § 1983: Right of Association**
4. **42 U.S.C. § 1983: Failure to Properly Train and Supervise**
5. **Cal. Gov. Code § 845.6 (Failure to Summon Medical Care);**
6. **Cal. Gov. Code § 52.1 (Bane Act);**
7. **Dependent Adult Neglect**

LOWE LAZAR LAW, LLP

SECOND AMENDED COMPLAINT.

ANOSIKE, IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; AGUILERA, M., VILADIU, J. MARTINEZ, G., SCHMITZ, D., AMADO, J., MACE, T., ACKERMAN, M., KEY, K., MOSER, M., AGUIRRE, E., JAMES, T., ROMERO, B., JOHNSON, M., TORRES, A., DELANEY, C., TREYVONNE, J., EVERSOLL, T., WERESKI, A., ROMANS, B., GUTIERREZ, L. IN THEIR INDIVIDUAL CAPACITIES, DEFENDANT DEPUTIES DOES 1-20, DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**8. Wrongful Death**
**9. Negligence**


**DEMAND FOR JURY TRIAL**

Defendants,

Plaintiffs JUSTINO RUPARD and RONNIE RUPARD, individually and on behalf of the Estate of LONNIE RUPARD hereby allege as follows:

## INTRODUCTION

1.      Plaintiffs Justino Rupard and Ronnie Rupard individually, and in their capacities as successors-in-interest to the estate of Lonnie Rupard (hereinafter "Plaintiffs") sue to seek justice and recover damages arising from the wrongful death of their father, Lonnie Rupard, (hereafter "Lonnie") while he was in the care and custody of the County at the San Diego Central Jail (hereafter "SDCJ").

2.      On March 17, 2022, Lonnie died at the age of 46 while in custody at the SDCJ due to neglect.

3.      Lonnie suffered from schizophrenia, and he was dependent on others for his wellbeing.

4.      While in custody at the SDCJ, County employees neglected his schizophrenia and basic care needs despite obvious signs that he was in medical distress requiring medical care.

5.      During the approximately three months he was in custody at SDCJ, Lonnie lost 60 pounds amounting to a loss of over one third of his total body weight.

6.      According to the medical examiner, Lonnie ultimately died from pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia.

7.      While at the SDCJ, Lonnie did not receive even the most basic level of human dignity and care.

8.      The neglect surrounding his care was so egregious that the Medical Examiner ruled his manner of death to be a homicide.

9.      Plaintiffs request a jury trial.

## **JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert causes of action for constitutional violations arising under 42 U.S.C. § 1983.

11.     The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

12.     At all times relevant to this complaint, decedent Lonnie Rupard was an individual residing in San Diego County, California.

13.     The County of San Diego's Medical Examiner ("ME") disclosed its findings on the cause of death until March 2, 2023. In accordance with the requirements of the California Tort Claims Act (Cal. Gov. Code §§ 810-996.6).

14.     On March 9, 2023, Plaintiff Justino Rupard served a timely tort claim against the County of San Diego and its employees under Cal. Gov. Code § 900.4, and resubmitted the claim on March 14, 2023, along with an application for leave to file a late claim pursuant to Cal. Gov. Code § 911.4.

15.     On March 10, 2023, Plaintiff Ronnie Rupard served a timely tort claim against the County of San Diego and its employees under Cal. Gov. Code § 900.4 along with an application for leave to file a late claim pursuant to Cal. Gov. Code § 911.4.

16.    Plaintiffs' claims were timely because the accrual date for presenting a government tort Claim against the County of San Diego ("County") for their father's death was March 2, 2023, when the County first released its Medical Examiner's ("ME") report ruling Lonnie's death a homicide. Under the Delayed Discovery Doctrine, accrual of the cause of action is postponed until the plaintiff discovers, or has reason to discover, the cause of action. Plaintiffs did not know, and had no way of knowing, the cause of action stemming from Lonnie's death on March 17, 2022, until the ME report was released on March 2, 2023.

17.    Prior to the release of the ME report on March 2, 2023, Plaintiffs were only provided with a death certificate which stated, "PENDING" for the cause of their father's death. Plaintiffs received no additional information from the County until March 2, 2023, when the attached autopsy report was published revealing substantial evidence of neglect.

18.    The County of San Diego had exclusive control of all information necessary for Plaintiffs to determine the facts relevant to the accrual of a cause of action.

19.    However, the County withheld, and even misstated, information concerning the details of Rupard's death until March 2, 2023. As such, the County is estopped from raising untimeliness as a defense. "It is well settled that a public entity may be estopped from asserting the limitations of the claims statute where … (1) the public entity was apprised of the facts, (2) it intended its conduct to be acted upon, (3) the plaintiff was ignorant of the true state of facts, and (4) relied upon the conduct to his detriment." *K.J. v. Arcadia Unified School Dist.* (2009) 172 Cal.App.4th 1229, 1239-1240.

20.    Even following the eventual release of the autopsy report, the County Sheriff Department continued to publish misleading information. Specifically, on March 2, 2023, the Sheriff published a news release which deliberately omitted the words "neglected schizophrenia" from its report regarding the ME's findings.

21.    The ME's report ends with even more detail regarding the "neglect," which the Sheriff willfully omitted from its news release:

"Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide."

22.    Even if the accrual date was the date of Lonnie's death on March 17, 2022, as the County claims, which it is not, Plaintiffs timely sought leave to file a late claim for failure to present a claim within six months of Lonnie's death on account of inadvertence, surprise, and excusable neglect. Plaintiffs had no way of knowing there was any cause of action related to Lonnie Rupard's death until March 2, 2023, when the San Diego County ME disclosed the findings that Lonnie's death was due to pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, ruling the death a homicide.

23.    Prior to the ME's announcement, the County prevented Plaintiffs from discovering the facts giving rise to a cause of action by publishing incomplete and false information including, but not limited to, completely omitting all relevant facts and findings consistent with the ultimate cause of death disclosed on March 2, 2023, including dehydration, malnutrition, and neglected schizophrenia.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiffs' claims arise out of events and omissions occurring in the County of San Diego, which is situated in the Southern District of California.

## **PARTIES**

25.    Plaintiffs are the biological children of Lonnie Rupard.

26.    Plaintiffs are, and have at all times relevant to this Complaint, residing in San Diego, California.

27.    In addition to suing individually for personal damages arising from losing their father, Plaintiffs sue as Lonnie's successors-in-interest to prosecute all claims surviving Lonnie's death pursuant to Cal. Civ. Code § 377.30.

28.    No other person has a superior right to commence the action or proceeding or to be substituted for the decedent in the pending action or proceeding. See Exhibit A, Declaration by Justino Rupard; Exhibit B, Death Certificate.

29.    Defendant County of San Diego (hereinafter "County") is a governmental entity organized and existing under the laws of the State of California.

30.    Defendant Bill Gore (hereinafter "Gore") was the San Diego County Sheriff during a portion of the relevant timeframe of Lonnie Rupard's incarceration, and he retired on February 3, 2022. In his capacity as Sheriff, Gore was a final policymaker for the Sheriff's Department and for the County on matters relating to the Sheriff's Department, the SDCJ, and its deputies, employees, and agents. He was also responsible for the County's compliance with state and federal laws and constitutions and for the training and supervision of County employees and agents.

31.    Defendant Kelly Martinez (hereinafter "Martinez") was the Undersheriff for the San Diego County Sheriff's Department prior to Lonnie's death and the Acting Sheriff at the time of Lonnie's death, from February 3, 2022 to April 5, 2022. In her capacity as Undersheriff and Acting Sheriff, Martinez was a final policymaker for the Sheriff's Department and for the County on matters relating to the Sheriff's Department, the SDCJ, and its deputies, employees, and agents. She was also responsible for the County's compliance with state and federal laws and constitutions and for the training and supervision of County employees and agents.

32.    Defendant Medical Providers Does 1-10 (hereinafter "Doe Medical Providers") are all County employees, agents, or contractors working within the Sheriff's Department Medical Services Division who were responsible for Lonnie's medical care,

including screening, follow-up assessments, and referrals for further treatment, whether or not they actually provided Lonnie with any medical care. Doe Medical Providers include all Qualified Mental Health Providers. Doe Medical Providers were acting under color of law and within the scope of their employment at all times relevant to the events described in this Complaint.

33.    All medical staff worked under the direction and supervision of Defendants Gore and Martinez who set policies and procedures with respect to medical services.

34.    Defendant Dr. Jon Montgomery, DO (hereinafter "Montgomery") was, at all times relevant, the Chief Medical Officer for the Sheriff's Department and was responsible for overseeing the Medical Services Division at the SDCJ. He was responsible for and oversaw the development and implementation of quality assurance and utilization review policies and procedures. All medical and psychiatric doctors and staff at the SDCJ worked under Dr. Montgomery's direction. He is sued in his individual capacity for his failure to properly treat Lonnie, failure to properly oversee Lonnie's care, and failure to supervise other medical staff in caring for Lonnie.

35.    On information and belief, Dr. Montgomery was responsible for supervising medical staff at the SDCJ, including Defendant Medical Provider Does 1-10. He was also responsible for overseeing the implementation of quality assurance and the development and implementation of policies and procedures.

36.    On information and belief, Correctional Healthcare Partners ("CHP") was a third-party contractor to the San Diego County Sheriff's Department and employed, supervised, and/or trained Defendant Medical Provider Does 1-10.

37.    Christina Anosike, LMFT (hereinafter "Anosike") was a medical provider employed by the County and/or a contractor of the County working within the Sheriff's Department Medical Services Division who was responsible for Lonnie's medical care, including follow-up assessments and referrals for further treatment.

38.    Anthony Cruz, MD was a medical provider employed by the County and/or a

contractor of the County working within the Sheriff's Department Medical Services Division who were responsible for Lonnie's medical care, including follow-up assessments and referrals for further treatment.

39.    Ben Samonte RN was a medical provider employed by the County working within the Sheriff's Department Medical Services Division who was responsible for Lonnie's initial screening, assessment, follow-up assessments and referrals for further treatment.

40.    May Ng RN was a medical provider employed by the County working within the Sheriff's Department Medical Services Division who was responsible for Lonnie's initial screening, assessment, follow-up assessments and referrals for further treatment.

41.    On information and belief, Liberty Healthcare of California Inc was a third-party contractor to the San Diego County Sheriff's Department and employed, supervised, and trained Cruz, and Defendant Medical Provider Does 1-10.

42.    The following San Diego County Deputies, hereafter "Defendant Deputies", worked shifts in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and were each responsible for summoning medical or mental healthcare, monitoring, conducting cell checks, and/or conducting wellness and/or safety checks on Lonnie: Aguilera, M. #0163, Viladiu, J. #0659, Martinez, G. #3629, Schmitz, D. #3787, Amado, J. #4193, Mace, T. #4324, Ackerman, M. #5994, Key, K. #3929, Moser, M. #0525, Aguirre, E. #3322, James, T. #4309, Romero, B. #4284, Johnson, M. #0568, Torres, A. #3208, Delaney, C. #0749, Treyvonne, J., Eversoll, T. #3669, Wereski, A. #4047, Romans, B. #4011, Gutierrez, L. #0928.

43.    Defendant Deputy Does 1-20 are all Sheriff's Department deputies who were responsible for summoning medical or mental health care, observing any audio or video monitors, or conducting wellness or safety checks on Lonnie in any housing unit in which Lonnie was housed leading up to his death on March 17, 2022, including but not limited to deputies in the housing unit "7D" or Module D on the seventh floor.

44.    Defendant Deputy Does 1-20 will hereinafter be referred to collectively as "Doe

Deputies" unless otherwise noted. Doe Deputies were acting under color of law and within the scope of their employment at all times relevant to the events described in this Complaint.

45.    Defendant Deputy Supervisor Does 1-10 (hereinafter "Doe Deputy Supervisors") are Sheriff's Department deputies who were responsible for training and supervising Doe Deputies. Doe Deputy Supervisors were acting under color of law and within the scope of their employment at all times relevant to the events described in this Complaint.

46.    Doe Deputies and Doe Medical Providers are sued in their individual capacities for the purposes of claims arising under § 1983 and as County employees for the purposes of claims arising under state law.

47.    Plaintiffs are ignorant of the true names of all Doe Deputies, Doe Deputy Supervisors, and Doe Medical Providers despite due diligence and will amend the Complaint to add their true names upon learning them.

48.    The SDCJ is owned and operated by Defendant County and staffed by County employees, agents, and contractors.

## FACTUAL ALLEGATIONS

**A.  Defendants were deliberately indifferent to Lonnie Rupard's Constitutional Rights.**

49.    Lonnie Rupard died while in custody the SDCJ on March 17, 2022, from pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia.

50.    As of March 17, 2022, Lonnie had lost approximately 60-pounds, or 36% of his total body weight, since the time of his arrest on December 19, 2021, approximately 3 months earlier.

51.    Lonnie's basic care needs were so severely neglected by deputies and other staff while in custody despite obvious signs that he needed medical care that <u>his death was classified as a homicide</u> by the medical examiner.

SECOND AMENDED COMPLAINT.

52.    According to the medical examiner's report, on the morning of December 19, 2021, Lonnie Rupard was arrested by National City Police for a parole violation and booked in San Diego Central Jail.

53.    At the time of his death, Lonnie was a pre-trial detainee because he had not yet been convicted of a parole violation, and was still awaiting trial.

54.    The arresting officer reported that Lonnie had a history of psychotic disorders and was being combative.

55.    Despite is known history of psychotic disorders and combative presentation, Lonnie was not evaluated by the Psychiatric Emergency response Team (PERT).

56.    On December 19, 2021 a medical clearance screening was completed by Ben Samonte, RN and May Ng, RN, in which Lonnie was unwilling or unable to sign to the screening or general informed consent form, was not fully (oriented x 2), and was verbally abusive.

57.    Based on Lonnie's presentation and psychiatric history it should have been obvious to Ben Samonte, May Ng, and Medical Provider Does 1-10 at the intake screening that he required housing at the PSU for his safety and wellbeing.

58.    Despite Lonnie's history and psychiatric presentation, he was not screened by a medical doctor at intake.

59.    Despite Lonnie's combative presentation and known psychiatric history, Lonnie was never evaluated by the Psychiatric Stabilization Unit (PSU).

60.    Despite the well-documented history of psychotic disorders and prior treatment requiring psychiatric medication management, Lonnie was housed in their general population as opposed to their PSU.

61.    Lonnie was scheduled to have an initial psych evaluation on December 20, 2021, which did not occur. It was noted that Lonnie was not able to be seen due to "time constraints."

62.    Lonnie was re-scheduled to have his initial psych evaluation performed on

December 24, 2021, which did not occur. It was again noted that Lonnie was not able to be seen due to "time constraints."

63.    Lonnie was yet again re-scheduled to have his initial psych evaluation performed on December 28, 2021. It was noted yet again that Lonnie was not able to be seen due to "time constraints."

64.    On December 29, 2021, Lonnie finally underwent a psychiatric evaluation by Anthony Cruz, MD.

65.    Dr. Cruz was aware Lonnie had a history of unspecified schizophrenia and other psychotic disorders.

66.    Dr. Cruz noted a documented a history of psychiatric illness, extensive medications, prior treatment at Patton State Hospital, and maintenance on medications during previous incarceration.

67.    Dr. Cruz' prescribed Lonnie psychiatric medications he had previously been prescribed including Haldol, Cogenti, and Valproic acid.

68.    The following nurses (RNs and LVNs) documented that Lonnie refused to take his medications, including psych medications, and was unable to sign the medical consent form on multiple occasions between December 20, 2021 through January 20, 2022: Jocelyn Atienza (RN), Ryan Fullenwiley-Jones (RN), Stephen Yi (RN), Christopher Yap (RN), Jameelyn Barrera (RN), Catherine Banguilan (RN), Christopher Green (RN), Tina Greco (RN), Analiza Roxas (LVN); Alexis Co, Terri Hidreth (LVN), Brooke Snyder (LVN), Zaldy Benos (LVN), James Obispo (RN), and Nataly Jimenez (LVN).

69.    On January 20, 2022, Dr. Cruz performed a psych chart review and noted that Lonnie was consistently refusing psych meds, at which point Dr. Cruz discontinued Lonnie's prescribed medications, including his psych meds.

70.    Despite being aware of Lonnie's extensive psychiatric history, knowledge that

LOWE LAZAR LAW, LLP

SECOND AMENDED COMPLAINT.

Lonnie was refusing his medications for the previous month, and knowledge that he was unable to sign medical consent forms, Dr. Cruz and Medical Provider Does 1-10 did not refer Lonnie to the PSU as was required for his medical needs.

71.    Dr. Cruz's decision to discontinue Lonnie's psych medications without a referral to PSU presented a substantial risk to Lonnie of further mental and physical deterioration.

72.    Lonnie predictably continued to deteriorate mentally and physically.

73.    On January 29, 2022, according to nursing progress notes, Lonnie was observed laying on the housing floor following use of force by deputies.

74.    Despite obvious physical injuries to his head and face following the use of force by deputies, Lonnie was not referred to the PSU.

75.    On February 1, 2022, SDCJ staff reportedly asked to have Lonnie seen by a qualified mental health professional (QMHP).

76.    On February 9, 2022, a QHMP wellness check was reportedly performed by Christina Anosike, LMFT.

77.    As noted in the QMHP report on February 9, 2022, completed by Christina Anosike, LMFT, Deputies on the 7th floor reported that Lonnie often spoke to himself in unintelligible words.

78.    It was noted throughout the QMHP that Lonnie was not able to be fully assessed due to his refusal and/or inability to cooperate. He was also noted to have impoverished thought.

79.    Despite Lonnie's psychotic presentation, obvious weight loss and overall deteriorating physical health, he was not referred by Anosike and Medical Provider Does 1-10 to be assessed by a medical doctor, as was required for his medical needs.

80.    Despite Lonnie's psychotic presentation, obvious weight loss and overall deteriorating physical health, Anosike, Cruz, and Medical Provider Does 1-10 did not request Lonnie be assessed by a medical doctor, or even request vital signs be taken.

81.    Despite Lonnie's extensive psychiatric history and psychotic presentation during the QMHP, Christina Anosike determined Lonnie did not require a referral to PSU. Such a decision was in direct contradiction to Lonnie's obvious medical needs.

82.    On February 20, 2022, Lonnie was placed on lockdown due to his psychotic state.

83.    On February 22, 2022, it was reported that Lonnie was again seen by psychiatrist, Anthony Cruz, MD, who purportedly made multiple attempts to engage in conversation with Lonnie. Lonnie purportedly did not answer questions, rambled incoherently, and became verbally aggressive.

84.    At the February 22, 2022, visit with Dr. Cruz, Lonnie was noted to be irritable, uncooperative, oriented to person only (not oriented to place, time or event), verbally aggressive, rambling incoherently at times, with disorganized thought.

85.    As of February 22, 2022, despite Lonnie's psychotic presentation, obvious signs of physical deterioration including, but not limited to, significant weight loss, he was not transferred to the PSU nor did he have his vital signs or weight assessed.

86.    As of February 22, 2022, based on Lonnie's presentation including, but not limited to, the substantial weight loss, lack of orientation, and disorganized thought, it would have been obvious to Dr. Cruz and all who interacted with Lonnie, that he was in need of medical care.

87.    Despite Lonnie's presentation of severe physical decompensation and being in an ongoing state of psychosis, along with his extensive psychiatric history, creating a significant risk for further decompensation, Dr. Cruz, reportedly indicated Lonnie did not require immediate psychiatric intervention at that time. Rather, the reported plan was simply to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner if needed.

88.    Dr. Cruz and Medical Provider Does 1-10 failed to refer Lonnie to PSU and for a full medical evaluation as was required for his safety, despite knowledge that Lonnie's presentation of substantial weight loss, lack of orientation and overall psychosis required such medical care.

89.    On February 23, 2022, staff reportedly requested again that Lonnie be seen by a qualified mental health professional for a wellness check.

90.    Despite the request for a QMHP wellness check on February 23, 2022, no further wellness checks were performed prior to Lonnie's death on March 17, 2022.

91.    Had a wellness check been done following the request on February 23, 2022, it would have been obvious to anyone who examined Lonnie that he needed immediate medical care.

92.    On March 14, 2022, three days prior to his death, Lonnie was reportedly seen by a court-ordered psychiatrist, Nicolas Badre, MD, for examination of mental competency to stand trial.

93.    The psychiatrist, Dr. Badre, noted that Lonnie's cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There were feces on the floor and food smeared on the walls.

94.    Lonnie was observed to be unkempt and dirty.

95.    During the exam, Dr. Badre observed Lonnie lying in bed in an uncomfortable manner with a blanket over his head.

96.    When asked why he was incarcerated, Lonnie responded, "water dog."

97.    When asked about his charges, he answered, "dog."

98.    Lonnie was unable to answer questions regarding his orientation during the March 14, 2022, examination.

99.    Lonnie's speech was noted to be pressured and mostly incoherent when he spoke.

100.    The psychiatrist, Dr. Badre, opined that Lonnie suffered from severe mental illness and was not competent to stand trial.

101.    The psychiatrist, Dr. Badre, recommended referral to a state hospital and that Lonnie be given antipsychotic medication involuntarily as allowed by law.

102.    Lonnie was not, however, referred to a state hospital, and was not given antipsychotic medications involuntarily as allowed by law.

103.    The Defendant Deputies identified below were each responsible for summoning

medical or mental health care, monitoring, conducting cell checks, and/or conducting wellness and/or safety checks on Lonnie, which they each failed to do during the time Lonnie was dying in his cell from malnutrition and dehydration leading up to his death: Aguilera, M. #0163, Viladiu, J. #0659, Martinez, G. #3629, Schmitz, D. #3787, Amado, J. #4193, Mace, T. #4324, Ackerman, M. #5994, Key, K. #3929, Moser, M. #0525, Aguirre, E. #3322, James, T. #4309, Romero, B. #4284, Johnson, M. #0568, Torres, A. #3208, Delaney, C. #0749, Treyvonne, J., Eversoll, T. #3669, Wereski, A. #4047, Romans, B. #4011, Gutierrez, L. #0928.

104.    Had Defendant Deputies monitored Lonnie in the days leading up to his death as they were required to do, it would have been abundantly clear that he needed immediate medical and/or mental healthcare.

105.    During his incarceration, Lonnie was never transferred to PSU for evaluation or treatment.

106.    Pursuant to San Diego County Sheriff's Department Medical Services Division Policy and Procedure Manual for "sick calls", RN duties include, but are not limited to obtaining a full set of vital signs, including weight at the time of the appointment.

107.    Psychiatry "sick calls" were reportedly requested for Lonnie on 12/20/21, 12/29/21, 2/2/22, 2/9/22.

108.    Lonnie's vital signs were not recorded at any point following December 19, 2021, despite his deteriorating condition and multiple sick calls.

109.    Lonnie's weight was not recorded at any point following December 19, 2021, despite his deteriorating condition and multiple sick calls.

110.    Lonnie was reportedly last seen alive during cell checks on March 17, 2022 at approximately 2146.

111.    At 2248 on March 17, 2022, Lonnie was reportedly found to be unresponsive in his bunk covered with a blanket and not breathing.

112.    At the time Lonnie was found unresponsive, he was noted to already be cold to

LOWE LAZAR LAW, LLP

SECOND AMENDED COMPLAINT.

1    the touch, indicating that he was likely deceased long before he was found

2    unresponsive.

3    113.    Lonnie's cell was soiled with feces. Old food with insect larvae was also found in

4    his cell.

5    114.    While an autopsy was performed on March 19, 2022, the medical examiner's

6    report was not released until March 2, 2023.

7    115.    At the time of the autopsy, Lonnie was 105 lbs, representing a 60-pound weight

8    loss, or 36% of his total body weight, since the time of his arrest.

9    116.    Between the time of his arrest on December 20, 2021, and the time of his death

10    on March 17, 2022, despite his refusal of medications, obvious signs of psychosis, and

11    significant weight loss, Lonnie never had his vital signs taken.

12    117.    Between the time of his arrest on December 20, 2021, and the time of his death

13    on March 17, 2022, despite his refusal of medications, obvious signs of psychosis, and

14    significant weight loss, Lonnie was never weighed.

15    118.    The autopsy findings revealed that Lonnie had decreased skin turgor and

16    postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea

17    nitrogen levels, altogether indicating dehydration.

18    119.    The autopsy findings further revealed that he had pulmonary congestion and

19    edema, with acute bilateral bronchopneumonia.

20    120.    The autopsy findings further revealed that his right lung showed evidence of prior

21    aspiration of gastric content with foreign body giant cells surrounding plant material.

22    121.    Postmortem nasopharyngeal swab for Covid-19 was positive.

23    122.    Lonnie had no significant cardiovascular disease, liver disease, or kidney disease.

24    123.    A 2.5 cm by 2 cm ulcer was noted in the proximal duodenum.

25    124.    Lonnie also had several superficial pressure sores on his torso and extremity.

26    125.    Neuropathology consultation of the brain documented a remote small cortical

27    contusion on the right orbital frontal region.

28    126.    Toxicology testing was negative for alcohol, common drugs of abuse, and

medications.

127.   The Deputy Medical Examiner concluded based on the autopsy findings and circumstances of death that "the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with Covid-19 viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions."

128.   The Deputy Medical Examiner concluded:

> Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

**B. The County's Long History of Deliberate Indifference to Detainees' Health, Mental Health, and Constitutional Rights**

129.   From 2006 through 2020, a total of 185 people died in San Diego County's jails—a rate higher than any other large county across the State.

130.   Since 2018, a total of at least 86 people reportedly died in San Diego County jails.

131.   In both 2021 and 2022, the infamous Rikers Island jail had fewer deaths despite a far larger jail population.

132.   In February 2022, the California State Auditor completed its audit of the San Diego County Sheriff's Department to determine the cause of the high rate of in-custody

SECOND AMENDED COMPLAINT.

deaths in San Diego County jails and to identify any steps that the Sheriff's Department took in response to those deaths.[1]

133.   The Auditor reviewed data over a 15-year period.

134.   The Auditor found deficiencies in caring for and protecting individuals, which likely contributed to in-custody deaths.

135.   Also, these were not limited occurrences—the audit's findings "suggest[ed] that the problems with the Sheriff's Department's care for incarcerated individuals are systemic."

136.   Specifically, the Auditor found the following deficiencies:

a. Inadequate and inconsistent provision of medical and mental health care;

b. Inadequate and inconsistent follow-up regarding medical and mental health needs;

c. Inadequate and inconsistent performance of visual checks to ensure the health and safety of detainees;

d. Failure to implement meaningful corrective action to guard against future deaths when deaths have occurred;

e. Failure to adequately investigate and review in-custody deaths;

f. Failure to implement key recommendations from external entities related to detainees' welfare and safety; and

g. Inadequate policies.

137.   State auditors found that the department had yet to meaningfully implement recommendations made by independent experts over the last several years.

138.   The San Diego Citizens' Law Enforcement Review Board (CLERB) also conducted an analysis of data regarding in-custody deaths in San Diego County jails over the past 10 years, the results of which were released in April 2022.

---

[1] Plaintiffs incorporate herein by reference the State Auditor's report: https://www.auditor.ca.gov/pdfs/reports/2021-109.pdf.

LOWE LAZAR LAW, LLP

SECOND AMENDED COMPLAINT.

139. CLERB made the following findings, in pertinent part:

    a. Residents of San Diego County are no more likely to die than residents of other California counties;

    b. San Diego jails have the highest number of unexplained deaths compared with all other California counties when controlling for jail population;

    c. The risk of overdose/accidental deaths is the greatest in San Diego jails;

    d. Elevated risk of death appears to be isolated to the unsentenced jail population;

140. At the time of Lonnie's death, the County had de facto policies or widespread, longstanding practices or customs including but not limited to:

    a.    Failing to properly house individuals to ensure their safety and wellbeing;

    b.    Leaving individuals unattended in their cells for extended periods despite signs of medical or mental distress;

    c.    Failing to summon medical or mental health care when obviously necessary;

    d.    Failing to coordinate, share, or update internal information systems with critical medical or mental health information;

    e.    Failing to provide critical medical treatment to individuals suffering from dehydration;

    f.    Failing to provide medical or mental health treatment to individuals suffering from mental health conditions; and

    g.    Failing to adequately staff the medical services division;[2]

141. The myriad of jail deaths and wrongful death cases demonstrate the County's de facto policies or widespread, longstanding practices or customs described herein.

142. For example, Hayden Schuck died on March 16, 2022—just one day before Lonnie.

---

[2] Unionized health care workers stated that understaffing created "dangerous and inhumane" conditions for people in custody and medical staff. In June 2022, 199 medical division positions were vacant. See Jeff McDonald, Kelly Davis, Persistent medical staffing shortages in San Diego jails are causing lapses in care, driving down morale, San Diego Union-Tribune, Sept. 4, 2022,

SECOND AMENDED COMPLAINT.

LOWE LAZAR LAW, LLP

143.   According to the complaint filed on 4/28/23, Case number 23CV0785-DMS-AHG, incorporated by reference, Hayden Schuck (hereafter "Hayden") exhibited similar symptoms of medical distress during his time in custody and died in large part due to dehydration and neglect.

144.   Hayden had similarly elevated levels of sodium, chloride, and urea nitrogen.

145.   Hayden, like Lonnie, had pneumonia, a duodenal ulcer, and pressure sores.

146.   Hayden and Lonnie were also reportedly being housed in the same housing unit, 7D.

147.   Despite Hayden's death one day prior, Defendant Deputies, DOE Deputies and DOE Medical Providers still did not check on Lonnie's wellbeing.

148.   Hayden's death alerted Defendant Deputies, DOE Deputies, and DOE Medical Providers that the wellbeing of the other inmates in the same unit as Hayden, including Lonnie, required adequate cell checks, monitoring, and/or wellness checks.

149.   Lonnie did not receive any adequate cell checks, monitoring, and/or wellness checks following the death of Hayden Schuck the day prior, despite Lonnie's observable deteriorating condition and unsanitary living conditions.

150.   Had any of the Defendant Deputies, DOE Deputies, and DOE medical providers performed adequate cell checks, monitoring, and/or wellness checks on Lonnie, it would been evident that Lonnie needed emergency medical care for his safety.

151.   Further, Plaintiffs specifically incorporate by reference the Third Amended Civil Class Action Complaint for Declaratory and Injunctive Relief, Doc. No. 231, in *Dunsmore v. San Diego County Sheriff's Department et al, 20cv00406-AJB*.

152.   The Dunsmore plaintiffs are a class of individuals who are or were in custody in the San Diego County jails who are collectively suing, in pertinent part, for the County's failure to adequately staff the medical division, including mental health professionals, interference by deputies with the delivery of medical and mental health care, failure to identify and treat medical and mental health conditions at intake, failure

to provide adequate medical care for individuals with substance use disorders and/or who are under the influence at intake, failure to continue medically necessary medications and treatments upon arrival, failure to maintain adequate, accurate, and complete medical records, failure to adequately diagnose individuals and refer them to outside specialists where needed, failure to provide adequate follow-up medical treatment, and failure to implement and maintain quality assurance and improvement processes to ensure adequate care.

153.   Plaintiffs further specifically incorporate by reference the declarations by plaintiffs as well as experts filed in the Dunsmore case at *Doc. No.119 and Doc. No. 162.*

154.   Additionally, San Diego County's belated implementation of programs and policy changes after Lonnie's death despite the prior numerous deaths in its jails serve to demonstrate the Sheriff's Department's knowledge of and past apathy regarding its failures.

155.   For example, in June 2022, the SDCJ purportedly implemented "wellness checks" which require recurring visits to higher risk and vulnerable individuals in the jail.

156.   Those new checks require a multidisciplinary team of sworn deputies, medical staff, mental health staff, and reentry services representatives to visit individuals in their cells.

157.   Additionally, the County reportedly has begun holding collaborative multi-disciplinary group meetings to discuss individuals who may need additional care and/or are at a higher risk of harm.

158.   Further, the County purports to be implementing updated protocols for when someone refuses medical or mental health care.

159.   The Sheriff's Department / County jails have never successfully achieved National Commission on Correctional Health Care (NCCHC) certification.

160.   In 2017, NCCHC reviewed the practices of San Diego County jails and found they failed to meet 26 of 38 "essential standards."

161.   Had the County addressed known deficiencies within its jails and made changes in order to comply with NCCHC standards earlier, these changes could have saved lives, including Lonnie's.

162.   There had been a systemic failure in San Diego County to investigate incidents of medical neglect, staff misconduct, and deaths in the Jail.

163.   At the time of Lonnie Rupard's death, there had been a long-standing custom and practice of improper and inadequate investigations; cover-up of misconduct; and failure to discipline and train deputies and medical staff.

164.   Defendants were well aware of these problems before Lonnie's death.

165.   Defendant County of San Diego, and individual Defendants Gore, Martinez, and Montgomery were aware from both internal and external audits and reports that there was a systemic pattern of deficiencies in the delivery of needed medical and psychiatric care to inmates, leading to numerous preventable deaths in the SDCJ. Despite this specific knowledge, Defendants failed to take any appropriate action to correct the deficiencies prior to Lonnie Rupard's death.

166.   The County and its officials were well aware of the problems of the jail staff failing to use JIMS. The Grand Jury in 2016 took issue with the Jail Information Management System (JIMS), a database used for maintaining inmate records. According to jail staff who commented to jurors for the report, the staff have trouble sorting and retrieving information and the eleven-year-old software was in need of an update. See https://www.nbcsandiego.com/investigations/Grand-Jury-Report-Criticizes-San-Diego-County-Jail-Facilities-381590761.html

167.   The Jail staff did not know how to use JIMS, the only system used in the Jails to communicate the medical needs of inmates. The medical staff did not know how to use JIMS to input critical information and they had not been trained on how to use JIMS to obtain patient information.

168.   Based in information and belief at the time of Lonnie Rupard's death, jail nurses

still did not know where in JIMS to input critical medical information which the sworn staff or housing deputies can access. As a result, deputies did not know that the patients were suffering from serious medical conditions.

169.   Upon information and belief, Defendants did not properly document or communicate Lonnie's condition to each other in the JIMS system.

170.   On February 3, 2022, after a seven-month review, the California State Auditor said in a scathing report that San Diego County jails are so unsafe and deficient that state lawmakers should intervene by forcing the Sheriff's Department to change course. On this same date, Gore took early retirement, nearly a year before his term was to expire.

171.   After the state of California performed an audit of 815 deaths in the County Jails, Michael Tilden, acting state auditor, wrote: "Our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths."

172.   "These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody."

173.   Mirroring what the community members and experts have repeatedly told the Sheriff over the past decade, the Auditor wrote: "The high rate of deaths in San Diego County's jails (as compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices."

174.   The audit said the Sheriff's Department "did not consistently follow up with" inmates who needed medical and mental health services, and concluded that lack of attention may have contributed to their deaths.

175.   The report noted that when deputies did check up on inmates, these "safety checks" often amounted to inadequate glances that sometimes missed inmates in distress.

176.   "In our review of 30 in-custody deaths ... based on our review of video

recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module," the audit said. "When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours."

177.   The auditors said San Diego County jails can only be fixed by legislation requiring the Sheriff's Department to implement a series of recommendations spelled out in the 126-page report.

178.   "In fact, our review identified deficiencies with how the sheriff's department provides care for and protects incarcerated individuals (that) likely contributed to in-custody deaths..."

179.   State auditors found that the department has yet to meaningfully implement recommendations made by independent experts over the last several years.

180.   The audit goes on to note that "Given the ongoing risk to the safety of incarcerated individuals, the Sheriff's Department's inadequate response to deaths and the lack of effective independent oversight, we believe the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes".

181.   Despite the County knowing of the alarming findings from the February 2022 state audit regarding the deficiencies of care at the SDCJ, within 45 days of that report, Lonnie Rupard died from dehydration and malnutrition in the setting of neglected schizophrenia, losing 36% of his body weight in three months. The conditions of his death so egregious that the medical examiner ruled it a homicide due to neglect.

182.   In sum, Defendant County of San Diego, and individual Defendants Gore, Martinez,  and Montgomery were aware of a perpetual pattern of preventable in custody deaths caused by the Sheriff's Department's systemic and wide-ranging misconduct, negligence, and failures, but took no action to prevent further constitutional violations, including those committed against Lonnie Rupard.

///

# I.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983: Deliberate Indifference of Serious Medical Needs

### (By the Estate of Lonnie Rupard Against Defendants Montgomery, Gore, Martinez, CHP, Liberty Healthcare of California Inc, Anosike, Cruz, Samonte, Ng, Defendant Deputies, Doe Deputies, Doe Medical Providers, Doe Deputy Supervisors.)

183.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

184.   Plaintiffs allege this cause of action as Lonnie's successors in interest.

185.   By virtue of both the Eighth Amendment and Fourteenth Amendment to our Constitution, the government has an obligation to provide medical care for those whom it is punishing by incarceration.

186.   Deliberate indifference is the recognized standard of protection afforded to both convicted prisoners and pretrial detainees under the Eighth and Fourteenth Amendments respectively.

187.   Plaintiff was a pretrial detainee awaiting trial following his arrest for probation violation and is thus protected by the Fourteenth Amendment right to due process. The Due Process Clause of the Fourteenth Amendment applies to pretrial detainees' claims of inadequate medical care.

188.   In the alternative, if Lonnie is not determined to be a pre-trial detainee for which the Fourteenth Amendment would apply, The Eighth Amendment would apply, which protects Lonnie from cruel and unusual punishment.

189.   Whether analyzed under the Fourteenth Amendment or Eighth Amendment deliberate indifference standard, each of Defendants' conduct as set forth above amounts to both objective and subjective deliberate indifference of Lonnie's serious medical needs pertaining to his need for treatment related to his schizophrenia, psychosis, malnourishment, and dehydration, which ultimately resulted in his death

from malnutrition and dehydration in the setting of neglected schizophrenia. The conduct was so egregious that the medical examiner ruled the manner of death to be a homicide.

190.   Deliberate indifference is demonstrated by the way in which Defendants failed to provide (1) medical care in the form of medications, psychiatric treatment, medical treatment for malnourishment, as well as medical monitoring of vital signs and weight; (2)  chose a medically unacceptable course of treatment under the circumstances to house Lonnie in a general population as opposed to the PSU and not adequately monitor him; and (3) Chose this course in conscious disregard to the excessive risk to Lonnie's health when it was known that Lonnie was not taking his psych medications, demonstrating psychosis, and was objectively malnourished.

191.   Deliberate indifference is highlighted by the fact that Lonnie did not even have his vital signs checked, nor was he weighed, a single time between December 20, 2021 and the time of his death on March 17, 2022, during which time Defendants knew that Lonnie was not taking his prescribed psychiatric medications, was demonstrating psychosis, and was malnourished, ultimately losing 60 pounds (over 1/3 of his body weight) in less than three months.

192.   Each of the above-named defendants made intentional decisions and omissions regarding Lonnie's conditions of confinement and the denial of adequate medical care, which amount to a deliberate indifference, including but not limited to:

      a.  Failing to house Lonnie in a Psychiatric Stabilization Unit (PSU) despite knowledge that Lonnie was refusing his prescribed psych medications, psychotic, and ultimately malnourished.

      b.  Failing to summon medical care in the face of obvious signs that Lonnie's health was deteriorating dangerously including, but not limited to, rambling incoherently with altered thought process, unkempt and dirty appearance with an unclean cell with feces and contaminated food with larvae, lying down appearing uncomfortable.

     d.  Failing to timely and adequately document information regarding Lonnie's deteriorating condition in the jail information system; and

     e.  Failing to take appropriate measures to ensure Lonnie was receiving adequate and prompt medical care, particularly when he exhibited gravely concerning signs of illness.

     f.  Failing to take vital signs and obtain weight measurements for an individual who was obviously malnourished and in need of medical attention.

     g.  Failing to timely and adequately check on Lonnie's safety and wellbeing while he was in his cell despite knowledge that he was disoriented in a state of psychosis, malnourished, observed to be asking for water and uncomfortable in his cell. It is especially egregious that Lonnie was still not adequately checked on after Defendants were made aware that another inmate in the same housing unit had died the day prior.

193.   Defendants' intentional decisions and omissions put Lonnie at substantial risk of suffering serious harm.

194.   Defendants did not take reasonable available measures to abate or reduce the risk of serious harm, even though a reasonable officer or employee under the circumstances would have understood the high degree of risk involved—making the consequences of the defendants' conduct obvious.

195.   As alleged above, Defendants' conduct and omissions constituted various policy violations.

196.   While Lonnie was in their custody and care, Defendants had adequate time to reflect and reason prior to acting or failing to act. Because Lonnie's health deteriorated over the span of several days, if not weeks or months, actual deliberation was practical.

197.   The actions and omissions by Defendants constituted objective and subjective deliberate indifference to Lonnie's medical needs and unsafe conditions of confinement. Defendants' actions and omissions violated the due process clause of the Fourteenth

1  Amendment, or in the alternative constituted cruel and unusual punishment under the

2  Eighth Amendment.

3  198.   Defendants' actions and omissions constituted both objective and subjective

4  deliberate indifference to Lonnie's medical needs and unsafe conditions of

5  confinement.

6  199.   Defendants' deliberate indifference was an actual and proximate cause of

7  Plaintiffs' damages including both Lonnie's pain and suffering prior to his death and his

8  death. Plaintiffs seek compensatory damages.

9  200.   Defendants Gore, and Martinez knew of a substantial risk that its

10  polices, customs, and longstanding practices were inadequate to prevent civil rights

11  violations of law by its employees and agents. Defendant County was deliberately

12  indifferent to this risk and the well-documented history of widespread unconstitutional

13  acts by employees and agents at the SDCJ. Yet, Defendant County failed to set forth

14  appropriate policies regarding the treatment of detainees.

15  201.   Defendants CHP and Liberty Healthcare Corporation are vicariously liable for the

16  conduct of their employees, agents, and contractors because they were acting within the

17  scope of their employment.

18  202.   Defendants CHP, and Liberty Healthcare Corporation also liable for their failure

19  to train their employees, agents, and contractors.

20  203.   Plaintiffs also seek punitive damages on the grounds that Defendants acted with

21  deliberate and reckless disregard of Lonnie's constitutional rights.

22  204.   Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to

23  42 U.S.C.§ 1988.

## II.

## SECOND CAUSE OF ACTION

## 42 U.S.C. § 1983:  *Monell* Municipal Liability For

## Deliberate Indifference of Serious Medical Needs

LOWE LAZAR LAW, LLP

SECOND AMENDED COMPLAINT.

**(By all Plaintiffs Against Defendant County and Liberty Healthcare of California Inc.)**

205.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

206.   A municipality may be liable under § 1983 when execution of a policy or custom inflicts plaintiff's injury. *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). The policy may be one of "inaction" that amounts to the "functional equivalent of a decision by the city itself to violate the Constitution." *City of Canton, Ohio v. Harris* ("Canton"), 489 U.S. 378, 394-95 (1989).

207.   The County is liable under § 1983 for its customs of inaction and its failure to promulgate adequate policies related to treatment of individuals, such as Lonnie, who have known psychiatric illness.

208.   In February 2022, the California State audit highlighted customs of inaction related to among other things, inadequate and inconsistent provision of medical and mental health care as well as inadequate and inconsistent follow-up regarding medical and mental health.

209.   Despite an extensive history of inaction regarding treatment of medical and mental health needs, the County, by and through Gore and Martinez, continued to adhere to an approach that they knew or should have known has failed to prevent tortious conduct by their employees.

210.   The County failed to promulgate adequate policies including, but not limited to:

    a.   Screening individuals with schizophrenia who refuse medications for housing in their PSU;

    b.   Referral of individuals who are refusing psych medications and demonstrating psychosis to their PSU;

    c.   Taking vital signs and weight measurements for individuals who are obviously malnourished;

SECOND AMENDED COMPLAINT.

      d.  Summoning medical or mental health care for individuals when individuals are identified to be psychotic and/or malnourished;

      e.  Coordinating and sharing critical medical or mental health information regarding individuals with mental illness who are refusing psych medications;

      f.  Providing medical treatment to individuals suffering from malnutrition and/or dehydration:

      g.  Providing medical or mental health treatment to individuals suffering from mental health conditions including schizophrenia; and

      h.   Staffing of the medical services division;

211.   Defendant County was acting under color of state law because its employees, agents were acting or purporting to act in the performance of their official duties as deputies and employees of the County.

212.   As alleged above, Defendant County, by and through its employees and agents, deprived Lonnie of his constitutional rights prohibiting deprivation of life without due process of law, and also amounted to cruel and unusual punishment.

213.   Despite Defendant County employees and agents knowing that Lonnie had schizophrenia, was refusing was refusing his required medications, was not fully oriented with disorganized thought and in a psychotic state for an extended period of weeks and months, and losing excessive amounts of weight from a lack of eating, nobody referred Lonnie to their PSU, or even took Lonnie's vital signs or weighed him. And nobody checked on him for an extended period of time as evidenced by the fact that he was already cold to the touch when he was found unresponsive.

214.   There were longstanding and systemic deficiencies in San Diego jails' treatment of inmates that was extensively documented through audits, litigation, and public reporting, which was well known to the County. The documented systemic deficiencies included, but were not limited to, the failure to render medical care, improper cell checks, improper housing assignments, inadequate medical staffing, lack of required

training on screening, lack of communication of necessary and critical medical information among staff, and non-compliant medical policies and procedures.

215.   Upon information and belief, the permanent, widespread, well-settled practice or custom of defendant County was to deny treatment to inmates in serious medical distress and to place inmates in administrative segregation or general population instead of the medical ward despite inmates being in obvious need of medical care.

216.   Defendant County, by and through its employees and agents, acted pursuant to the following official policies, or widespread or longstanding practices or customs, of Defendant County:

a. Failing to recognize when a detainee has serious medical needs;

b. Failing to communicate detainees' medical needs between medical staff and deputies;

c. Providing insufficient medical care to detainees;

d. Failing to transfer detainees to the hospital when medically necessary;

e. Failing to respond properly or timely to serious medical needs of detainees;

f. Failing to conduct timely safety checks;

g. Failing to monitor live video feeds for signs of medical distress;

h. Failing to recognize when a detainee has serious medical needs during safety checks;

i. Failing to meet accepted community standards of care with respect to medical care of detainees;

j. Failing to properly investigate in-custody deaths and properly respond to the results of those investigations to prevent further deaths;

k. Failing to adequately screen inmates for medical care and treatment.

l.  Failing to communicate the medical needs of inmates between the medical staff and deputies.

m. Failing to check on the welfare of inmates, even those inmates known to have serious medical needs.

n. Failing to conduct proper cell checks as required by the County's own written policies.

217. The misconduct and inaction by the Defendant Deputies, DOE Deputies, and DOE medical staff amounts to collective inaction on behalf of the County based on the following:

    a. There was a de facto custom of ignoring critical medical information and not properly checking on the welfare of patients, even those known to have serious medical needs.

    b. There was a de facto custom of not ensuring that deputies follow the policies and procedures with respect to emergency situations within Housing units.

    c. There was a de facto custom of failing to conduct proper cell checks or monitoring, as required by the County's own written policies.

    d. Defendants' failure to train its deputies and medical staff gives inference of a municipal custom that authorized or condoned deputy misconduct.

    e. There has been a longstanding pattern of failing to provide adequate medical care and adequate monitoring of seriously ill inmates, causing a series of preventable and tragic deaths that placed Defendants on notice.

218. Lonnie's constitutional deprivations were not only caused by the conduct of individual deputies and medical staff, but also by the system failure resulting in a collective inaction of many within the San Diego County Sheriff's Department. Lonnie's constitutional deprivations were caused by the subordinates' adherence to customs and practices as alleged herein. See *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002); see also *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019

219. The cumulative and persistent failures and misdeeds of the entire Sheriff's Department at the Central Jail caused the ultimate injury and harm suffered by decedent Lonnie Rupard and Plaintiffs.

220.   Defendant County through Gore, and Martinez knew of a substantial risk that its polices, customs, and longstanding practices were inadequate to prevent civil rights violations of law by its employees and agents. Defendant County was deliberately indifferent to this risk and the well-documented history of widespread unconstitutional acts by employees and agents at the SDCJ. Yet, Defendant County failed to set forth appropriate policies regarding the treatment of detainees.

221.   Defendant County, by and through Gore and Martinez, had ample notice of the following: that San Diego County Jail had the highest mortality rate among California largest jail systems; that there had been countless complaints made by inmates, family members, community members and the SDCJ's own staff regarding injuries caused by medical neglect and staff misconduct; and that failures to communicate critical medical information to coordinate care for inmate-patients with serious medical and psychiatric needs led to the preventable deaths and serious injuries of Richard Diaz, Adrian Correa, Daniel Sisson, Bernard Victorianne, Ronnie Sandoval, Heron Moriarty, Kristopher NeSmith, Jerry Cochran, Ruben Nunez, Frankie Greer, George Gallegos, Michael Wilson, Tanya Suarez and many other inmates.

222.   Lonnie Rupard's death was also the result of the County's failure to train employees to properly evaluate the health of and risks to detainees at intake and while in custody, to determine proper and adequate courses of treatment for detainees in need of medical treatment, and summon and provide adequate medical care when necessary.

223.   The County knew their failure to adequately train their staff made it highly foreseeable that its employees and agents would engage in conduct that would deprive detainees, including Lonnie Rupard, of constitutionally protected rights and result in additional inmate deaths. The County was deliberately indifferent to the rights of individuals in their custody and care as evidenced by their knowledge of disparately high rates of in-custody deaths, systemic failures, and the fact that the individual deputies and medical providers who they failed to properly train would come into

LOWE LAZAR LAW, LLP

SECOND AMENDED COMPLAINT.

1  contact with detainees. The inadequacy of the County's training caused Lonnie's

2  constitutional deprivations.

3  224.   Defendant County also acted through and is liable by virtue of their final

4  policymakers, such as Gore and Martinez, and/or their subordinates who had been

5  delegated final policymaking authority. Defendant County's final policymakers,

6  including Gore and Martinez, and/or their subordinates were acting under color of state

7  law. Their final policymaking authority concerned all constitutional violations described

8  in this Complaint.

9  225.   Defendant County is also liable based on Gore's and Martinez's failure to enact

10  new and different policies despite their knowledge of woefully inadequate care of past

11  detainees, a high rate of substance use prior to booking, and a high rate of in-custody

12  deaths at the SDCJ.

13  226.   Defendant County is also liable based on their ratification and approval of the

14  constitutional, statutory, and other law violations as alleged in this Complaint.

15  227.   Defendant County's policies, customs, or practices, actions and failures to act by

16  final policymakers, ratification of constitutional and law violations, and failure to train

17  its employees, caused Lonnie's deprivation of rights by the individual defendants. That

18  is, the County's policies, customs, or practices, actions and failures to act by final

19  policymakers, ratification of constitutional and law violations, and failure to train its

20  employees were so closely related to Lonnie's deprivation of rights that they were the

21  moving force causing Lonnie's injury and death.

22  228.   Defendant County's actions and omissions actually and proximately caused

23  Plaintiffs' economic and non-economic damages including funeral expenses, loss of

24  love, companionship, society, comfort, care, assistance, protection, and moral support.

25  Plaintiffs seek compensatory damages.

26  229.   Plaintiffs also seek punitive damages on the grounds that Defendants acted with

27  deliberate and reckless disregard of Lonnie's constitutional rights.

28

230.   Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

## III.

## THIRD CAUSE OF ACTION

## 42 U.S.C. § 1983: Right of Association

**(By Justino Rupard and Ronnie Rupard individually Against Defendants County, Montgomery, Gore, Martinez, CHP, Liberty Healthcare Corporation, Anosike, Cruz, Samonte, Ng, Defendant Deputies, Doe Deputies, Doe Medical Providers, Doe Deputy Supervisors.)**

231.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

232.   Plaintiffs Justino Rupard and Ronnie Rupard, as individuals, allege this Fourteenth Amendment substantive due process claim, or in the alternative Eighth Amendment claim for cruel and unusual punishment against Defendants for depriving them of their rights to love, companionship, and society with their father, Lonnie Rupard.

233.   Defendants deprived Lonnie Rupard of his rights under the United States Constitution to be free from denial of medical care and denial of due process.

234.   Defendants' deliberate indifference was an actual and proximate cause of Plaintiffs' economic and non-economic damages including funeral expenses, loss of love, companionship, society, comfort, care, assistance, protection, and moral support. Plaintiffs seek compensatory damages.

235.   The aforementioned acts and/or omissions of Defendants in being deliberately indifferent to serious medical needs, health, and safety, which caused the untimely and wrongful death of Lonnie Rupard; violating Lonnie Rupard's civil rights; and deprived Plaintiffs Justino Rupard and Ronnie Rupard of their liberty interests in the family relationship in violation of their substantive due process rights as defined by the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

236.   Defendants CHP and Liberty Healthcare Corporation are vicariously liable for the conduct of their employees, agents, and contractors because they were acting within the scope of their employment.

237.   Defendants CHP and Liberty Healthcare Corporation are also liable for their failure to train their employees, agents, and contractors.

238.   Plaintiffs also seek punitive damages on the grounds that Defendants acted with deliberate and reckless disregard of Lonnie's constitutional rights.

239.   Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

## IV.

## FOURTH CAUSE OF ACTION

## Failure to Properly Train (42 U.S.C. § 1983)

**(By The Estate of Lonnie Rupard Against Defendants Montgomery, Gore, Martinez, CHP, Liberty Healthcare Corporation, Anosike, Cruz, Samonte, Ng, Defendant Deputies, Doe Deputies, Doe Medical Providers, Doe Deputy Supervisors.)**

240.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

241.   Plaintiffs allege this claim as successors in interest pursuant to Cal. Civ. Proc. § 377.30.

242.   Defendants had a duty to use reasonable care in the training and supervision of its employees, deputies, sworn staff, contractors, and agents.

243.   Defendants had a duty to properly train and supervise its employees to use reasonable care in evaluating the health of and risks to detainees and determining the proper and adequate course of treatment for detainees in need of medical treatment.

244.   Defendants had a duty to properly train and supervise its employees to summon medical care for detainees whom they knew, or had reason to know, required medical care.

245.   Defendants failed to properly train their employees with regard to the need to communicate critical medical information to each other.

246.   Defendants failed to properly train their employees with regard to the treatment of schizphrenia.

247.   Defendants failed to properly train their employees with regard to the treatment of dehydration.

248.   Defendants breached their duty of care such that Lonnie's prolonged health crisis was deliberately ignored and Lonnie endured pain and suffering and ultimately died as a result.

249.   The County and Defendants CHP and Liberty Healthcare Corporation, are vicariously liable for the conduct of individual defendants in supervisory and Defendants Montgomery, Gore, Martinez, and Doe Deputy Supervisors.

250.   Gore, Martinez, Montgomery, and Supervisor Doe defendants had a non-delegable duty to ensure that all contract employees were properly trained to meet the needs of their patients.

251.   Defendants Gore and Martinez knew that their deputies were consistently failing to conduct proper cell checks, leading to numerous deaths and serious injuries. Gore and Martinez knew that their housing deputies were failing to place patients and inmates in proper housing units where they could be monitored for their serious medical needs. Despite this knowledge, Gore and Martinez failed to train their staff on conducting proper cell checks on medically vulnerable patients, including but not limited to Lonnie Rupard.

252.   Defendants Gore and Martinez have systemically failed to maintain adequate and proper training necessary to educate deputies and medical staff as to the Constitutional rights of inmates; and to prevent the consistent and systematic failure to provide medical care.

253.   Defendants Gore, Martinez, and Montgomery failed train medical doctors and nurses on the necessary care of inmates suffering from serious medical conditions

including unmanaged schizophrenia and dehydration, and they failed to implement policies and procedures with respect to communicating such sensitive and critical information to ensure that inmates will be cared for.

254.   Despite specific knowledge that critical medical information was not being communicated from the medical staff to sworn staff, Defendants took no action.

255.   Despite their knowledge of previous instances of wrongful deaths in the jails as a result of the failure to communicate critical medical conditions, Defendants failed to properly train or retrain their deputies and medical staff to prevent deaths of inmates.

256.   As a direct, proximate, and foreseeable result of Defendants' breaching their duty to train their subordinates, Lonnie Rupard's medical needs were not properly addressed and he was not properly monitored.

257.   As a direct and proximate result, Lonnie Rupard suffered unconstitutional and inhumane treatment, and ultimate died while in jail.

258.   Plaintiffs seek damages in an amount according to proof at the time of trial. Plaintiffs, as Lonnie's successors-in-interest, seek compensatory damages including for Lonnie's pain and suffering prior to his death pursuant to Cal. Civ. Proc. § 377.34(b).

**V.**

**FIFTH CAUSE OF ACTION**

**Cal. Gov. Code § 845.6 (Failure to Summon Medical Care)**

**(By the Estate of Lonnie Rupard Against Defendants County, Montgomery, Gore, Martinez, CHP, Liberty Healthcare Corporation, Anosike, Cruz, Samonte, Ng, Defendant Deputies, Doe Deputies, Doe Medical Providers, Doe Deputy Supervisors)**

259.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

260.   Plaintiffs assert this claim as successors-in-interest pursuant to Cal. Civ. Proc. § 377.30.

261.  Pursuant to Cal. Gov. Code §§ 845.6 and 815.2, Defendant County is liable because, while acting within the scope of their employment, Defendants Montgomery, Gore, Martinez, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors:

    a.  Knew or had reason to know that Lonnie required medical care;

    b.  Knew or had reason to know that Lonnie's need for medical care was immediate; and

    c.  Failed to take reasonable action to summon medical care.

262.  Regarding (a), Defendant County, Defendants Montgomery, Gore, Martinez, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors knew or had reason to know that Lonnie required medical care for a multitude of reasons including, but not limited to: low BMI, malnutrition, disorganized thinking, confusion, incoherence, and altered thought process, disheveled appearance and improper dress, an unclean cell, non-responsiveness toward staff, and the appearance of obvious wounds.

263.  Regarding (b), Defendant County, Defendants Montgomery, Gore, Martinez, The County, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors knew Lonnie's need for medical care was immediate because of all of the above circumstances and symptoms.

264.  Regarding (c), Defendant County, Defendants Montgomery, Gore, Martinez, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors failed to take reasonable action to summon medical care by choosing not to house Lonnie in a medical observation cell, or psychiatric cell, and by failing to summon medical care throughout his time in custody despite grave signs of illness.

265.  Defendant County, Defendants Gore and Martinez are liable for Doe Deputies' failure to summon medical care, as described above, and due to their negligent supervision and training of employees regarding when to summon medical care.

266.  Defendants CHP and Liberty Healthcare Corporation are vicariously liable for the conduct of their employees, agents, and contractors who were acting within the scope of their employment and failed to summon medical care.

LOWE LAZAR LAW, LLP

-39-

SECOND AMENDED COMPLAINT.

267.   Defendants' conduct was an actual and proximate cause of Lonnie's pain, suffering, and death, which were direct and foreseeable results of Defendants' conduct.

268.   The Estate of Lonnie Rupard seeks compensatory damages for Lonnie's pain and suffering prior to his death, see Cal. Civ. Proc. § 377.34(b), as well as damages for his death.

## VI.

## SIXTH CAUSE OF ACTION

### Cal. Gov. Code § 52.1 (Bane Act)

**(By the Estate of Lonnie Rupard Against Defendants County, Montgomery, Gore, Martinez, CHP, Liberty Healthcare Corporation, Anosike, Cruz, Samonte, Ng, Defendant Deputies, Doe Deputies, Doe Medical Providers, Doe Deputy Supervisors)**

269.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

270.   Pursuant to Cal. Gov. Code § 377.30, Plaintiffs Justino Rupard and Ronnie Rupard assert this claim as successors-in-interest.

271.   As alleged above, Defendants acted, or failed to act, with deliberate indifference to the substantial risk to Lonnie's health and safety while he was in their custody and care. Defendants' due process violations are sufficient in and of themselves to constitute violations of the Bane Act.

272.   As alleged above, Defendants knowingly deprived Lonnie of constitutionally protected rights through inherently coercive and threatening acts and omissions such as when they chose to house Lonnie in a cell other than a Psychiatric Stabilization Unit, failed to summon medical care, failed to provide Lonnie with adequate medical care, and failed to conduct adequate and timely safety checks.

273.   Defendants' deliberate indifference was an actual and proximate cause of Lonnie's pain, suffering, and death, which were a direct and foreseeable result of Defendants' actions and inaction.

274.   Plaintiffs seek compensatory damages including for the pain and suffering Lonnie was subjected to prior to his death pursuant to Cal. Civ. Proc. §377.34(b). Plaintiffs also seek all statutory remedies available pursuant to Cal. Civ. Code § 52 and 52.1 including civil penalties, treble damages, and attorneys' fees.

275.   Pursuant to Cal. Gov. Code § 815.2, the County is vicariously liable for the actions and/or omissions of its employees, Defendants Montgomery, Gore, Martinez, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors because they were acting within the scope of their employment.

276.   Defendants CHP and Liberty Healthcare Corporation are vicariously liable for the conduct of their employees, agents, and contractors because they were acting within the scope of their employment.

## VII.

### SEVENTH CAUSE OF ACTION

### Wrongful Death

### (By Plaintiffs as Individuals Against All Defendants)

277.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

278.   Plaintiffs, as Lonnie's children, have standing to assert a claim for wrongful death. See Cal. Civ. Proc. § 377.60; Ex. A.

279.   As alleged above, Defendants violated Gov. Code § 845.6, which constitutes "wrongful acts" within the meaning of § 377.60.

280.   As alleged above, Defendants violated § 1983 by showing deliberate indifference to Lonnie's medical needs.

281.   Defendants' conduct was an actual and proximate cause of Lonnie's pain, suffering, and death, which were direct and foreseeable results of Defendants' conduct.

282.   Defendant County is liable for the conduct of the individual defendants who were

acting within the scope of their employment with the County. See Cal. Gov. Code §§ 815.2, 845.6.

283.    Defendants CHP, and Liberty Healthcare Corporation are vicariously liable for the conduct of their employees, agents, and contractors who were acting within the scope of their employment.

284.    Plaintiffs Justino Rupard and Ronnie Rupard seek economic and non-economic damages in an amount to be proven, including compensatory damages which include, but are not limited to, any coroner's fees and funeral expenses, emotional distress, loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

## VII.

## SEVENTH CAUSE OF ACTION

### Dependent Adult Neglect

**(By the Estate of Lonnie Rupard Against Defendants Montgomery, CHP, Liberty Healthcare Corporation, Anosike, Cruz, Samonte, Ng, Doe Medical Providers)**

285.    Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

286.    Lonnie Rupard had physical and mental limitations that restricted his ability to carry out normal activities or protect his own rights. Defendants had a substantial caretaking and custodial relationship with Lonnie, involving ongoing responsibility for his basic needs.

287.    San Diego County had a custodial relationship with Lonnie during the time he was in custody at the SDCJ.

288.    Defendants had an ongoing responsibility for Lonnie's basic needs, which an able-bodied and fully competent adult would ordinarily be capable of managing without assistance.

289.    Lonnie was a dependent adult during the time he was in custody at the SDCJ.

290.    Defendants failed to use the degree of care that a reasonable person/entity in the

same situation would have used in providing for Lonnie's basic needs including, but not limited to:

    a. Failing to provide Lonnie with food;

    b. Failing to provide Lonnie with medical care for his physical and/or mental needs;

    c. Failing to prevent malnutrition;

    d. Failing to prevent dehydration;

291.   Defendants' conduct was a substantial factor in causing Lonnie's death.

292.   Defendants and their employees/agents acted with recklessness in neglecting Lonnie.

## VIII.

## EIGHTH CAUSE OF ACTION

### Negligence

**(By the Estate of Lonnie Rupard Against Defendants Montgomery, CHP, Liberty Healthcare Corporation, Anosike, Cruz, Samonte, Ng, Doe Medical Providers)**

293.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

294.   Plaintiffs allege this claim as successors in interest pursuant to Cal. Civ. Proc. § 377.30.

295.   All individual defendants owed Lonnie a duty of reasonable care with an understanding that Lonnie was in a position of vulnerability and dependence on them in the jail context.

296.   All individual defendants failed to avoid violating Plaintiff's constitutional rights as set forth above, and failed to use reasonable care in proving for Lonnie's medical needs including, but not limited to:

    a. Failing to provide Lonnie with food;

  b.  Failing to provide Lonnie with medical care for his physical and/or mental needs;

  c.  Failing to prevent malnutrition;

  d.  Failing to prevent dehydration;

297.  Each of the named defendants are vicariously liable for the conduct of their employees and agents.

298.  Pursuant to Gov. Code § 855.8, the individual defendants, who were acting within the scope of their employment, are liable for failing to use due care and proximately causing Lonnie's injuries due to their negligence and wrongful acts and omissions in providing such treatment.

299.  Lonnie's injury and death were foreseeable results of Defendants' negligence.

300.  Defendants' negligence was the actual and proximate cause of Lonnie's pain, suffering, and ultimate death.

301.  Plaintiffs, Lonnie's successors-in-interest, seek compensatory damages including for Lonnie's pain and suffering prior to his death pursuant to Cal. Civ. Proc. §377.34(b).

**PRAYER FOR RELIEF**

Plaintiffs pray for judgment against Defendants as follows:

  a. General and compensatory damages in an amount according to proof;

  b. Punitive and exemplary damages against all individual defendants;

  c. Civil penalties as provided by law;

  d. Attorney fees pursuant to Cal. Civil Code § 52.1(b), Cal. Civil Code § 52, and Welf & Inst. Code, §15657;

  e. Costs and reasonable attorney fees pursuant to 42 U.S.C. §1988;

  f. All other damages, penalties, costs, and fees as allowed by Cal. Civ. Proc. §§ 377.20, 377.60, 1021.5

  g. Costs;

  h. And for all other and further relief as the Court may deem proper.

1

2

3    Dated: March  5, 2024                    LOWE LAZAR LAW, LLP

4

5

6                                            By: /s/ Jeremiah Lowe
                                             Jeremiah Lowe and Victoria Lazar,
7                                            Attorneys for Plaintiffs Justino Rupard and the
                                             Estate of Lonnie Rupard
8

9

10   Dated:  March 5,  2024                  GILLEON LAW FIRM, APC

11

12

13                                           By:  /s/ Daniel Gilleon
                                             Daniel M. Gilleon, Attorneys for Plaintiffs
14                                           Ronnie Rupard and the Estate of Lonnie Rupard

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT.