1
2
3
4
5
6
7
8
9

10

UNITED STATES DISTRICT COURT

11

SOUTHERN DISTRICT OF CALIFORNIA

12

13
14
15

ESTATE OF LONNIE RUPARD BY AND THROUGH HIS SUCCESSORS-IN-INTEREST JUSTINO RUPARD & RONNIE RUPARD, et al,

16

Plaintiffs,

17

v.

18

COUNTY OF SAN DIEGO, et al,

19

Defendants.

20
21

Case No.:  23-cv-1357-CAB-BLM

**ORDER (1) DENYING MOTION TO SUBSTITUTE; (2) DISMISSING SURVIVAL CLAIMS; and (3) DENYING-IN-PART AND GRANTING-IN-PART MOTIONS TO DISMISS**

**[Doc. Nos. 89, 119, 121]**

22
23
24
25
26
27
28

This case concerns the death of decedent Lonnie Rupard ("Decedent") on March 17, 2022 while in custody at the San Diego Central Jail.  Presently before the court is (1) a motion to dismiss the second amended complaint ("SAC") filed by Correctional Healthcare Partners [Doc. No. 89], (2) a motion to dismiss filed by the County Defendants [Doc. No. 119], and (3) an *ex parte* motion to substitute representative of the Estate of Lonnie Rupard filed by Plaintiffs Justino Rupard and Ronnie Rupard [Doc. No. 121].  Each motion has been fully briefed, and the Court finds them suitable for determination on the papers.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.     ALLEGATIONS IN THE SAC

On December 19, 2021, decedent Lonnie Rupard ("Decedent") was arrested by National City Police for a parole violation and booked in San Diego Central Jail (the "Jail"). [SAC at ¶ 52].   The arresting officer allegedly reported that Decedent "had a history of psychotic disorders and was being combative."  [SAC at ¶ 54].  On the day of the arrest, Defendant Nurses Ben Samonte and May Ng conducted a medical clearance screening, where Decedent was verbally abusive and not fully oriented.  [SAC at ¶ 56].  Following this initial screening, Decedent was housed in the general population as opposed to the Jail's "Psychiatric Stabilization Unit."  [SAC at ¶ 60].  On December 29, 2021, Decedent underwent a psychiatric evaluation by Defendant Anthony Cruz, MD.  [SAC at ¶ 64]. Decedent was allegedly prescribed psychiatric medications by Defendant Cruz, a doctor for Defendant Liberty Healthcare Partners.  [SAC at ¶ 67].   After Defendant Cruz prescribed these medications, multiple nurses "documented that [Decedent] refused to take his medications . . . and was unable to sign the medical consent form on multiple occasions between December 20, 2021 – January 20, 2022."  [SAC at ¶ 68].  On January 20, 2022, Defendant Cruz allegedly discontinued Decedent's prescriptions.  [SAC at ¶ 69].

Throughout his time at the Jail, Decedent allegedly "deteriorate[d] mentally and physically."  [SAC at ¶ 72].  At least four "sick calls" were made for Decedent during his time at the Jail, and his vital signs were not taken during these calls as purportedly required by the San Diego Sheriff's Department Medical Services Division Policies and Procedures Manual.  [SAC at ¶ 108].  On February 1, 2022, Jail staff requested Decedent be seen by a qualified mental health professional.  [SAC at ¶ 75].  On February 9, 2022, Defendant Christina Anosike completed a wellness check on Decedent in response to this request.  At the wellness check, Decedent "was not able to be fully assessed due to his refusal and/or inability to cooperate."  [SAC at ¶ 78].  On February 20, 2022, Decedent was placed on lockdown due to his psychotic state.  [SAC at ¶ 82].  On February 22, 2022, Decedent was seen again by Defendant Cruz and at this visit Decedent "purportedly did not answer questions, rambled incoherently, and became verbally aggressive."  [SAC ¶ 84].

On February 23, 2022, staff allegedly requested for a second time for Decedent to be seen by a qualified mental health professional for a wellness check. [SAC at ¶ 89]. No wellness check was performed from February 23, 2022 up until Decedent's death on March 17, 2022. [SAC at ¶ 90]. On March 14, 2022, a court-ordered psychiatrist allegedly conducted an examination of mental competency to stand trial and observed that Decedent's cell was dirty, with "feces on the floor and food smeared on the walls." [SAC at ¶ 93]. At this examination, Decedent was incoherent and the psychiatrist determined he was not competent to stand trial. [SAC at ¶ 100]. This psychiatrist allegedly recommended referral to a state hospital and that Decedent be given antipsychotic medication involuntarily. [SAC at ¶ 101]. No action was taken, and Decedent was found unresponsive inside of his cell on March 17, 2022. [SAC at ¶ 111]. He was declared dead the same day. [SAC at ¶ 111].

An autopsy was performed on March 19, 2022 and, upon reviewing the circumstances of Decedent's death including his physical condition, the medical examiner allegedly determined Decedent's "manner of death is classified as homicide." [SAC at ¶ 128]. The autopsy, released on March 2, 2023, found that Decedent weighed 105 pounds at the time of his death, a weight loss of 60 pounds between December 20, 2021 to March 17, 2022. The autopsy found that the cause of Decedent's death was a combination of "pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with Covid-19 viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing condition." [SAC at ¶ 127]. The medical examiner concluded that "while elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide." [SAC at ¶ 128].

In the SAC, Plaintiffs additionally assert that the County has a long history of deliberate indifference to the medical needs of pre-trial detainees. Prior to Decedent's death, the County of San Diego Sheriff's Department never achieved certification by the National Commission on Correctional Health Care, with the Commission finding that the County "failed to meet 26 of 38 'essential standards.'" [SAC at ¶ 159-160]. Immediately

prior to Decedent's death, the State of California performed an audit of 815 deaths in the County of San Diego jails.  In February 2022, the state produced a 126-page report detailing the "deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths."  [SAC at ¶ 171]. The SAC highlights a section in the report that allegedly documents the inconsistent follow up with inmates with medical and mental health needs.  [SAC at ¶¶ 174-176].

## II.   PROCEDURAL HISTORY

On July 26, 2023, Plaintiffs Justino Rupard and Ronnie Rupard filed the original complaint in this Court individually as Decedent's biological children and successors in interest representing the Estate of Lonnie Rupard.  All claims in the SAC arise from the circumstances leading up to Decedent's death and are filed against the County, County officials, Jail employees, and contracted medical staff involved in the oversight of Decedent during his time at the Jail.

On November 21, 2023, Plaintiffs filed the first amended complaint ("FAC"), attaching Justino Rupard's notarized successor in interest affidavit pursuant to California Code of Civil Procedure § 377.32(a) asserting that "there are no probate proceedings pending at this time.  However, I intend to file a Petition for Appointment as Administrator of the Estate of Lonnie Rupard." [Doc No. 30-1].  On December 4, 2023, Plaintiff Justino Rupard filed a Petition for Probate seeking to name Terri Lopez as Personal Representative and Administrator of the Estate. [Doc. No. 121 at 4].   On March 7, 2024, after receiving leave from the Court to add the identities of Doe Deputy Defendants allegedly assigned to oversee Decedent in the days preceding his death,[1] Plaintiffs filed the second amended complaint.  [Doc. No. 79].  Defendants Cruz and Liberty Healthcare Corporation answered the SAC.

---

[1] Since the filing of the pending motions, Plaintiffs have voluntarily dismissed Deputies K. Key, M. Ackerman, D. Schmitz, C. Delaney, and T. Eversoll.   [Doc. Nos. 128-132].

On March 25, 2024, Defendant Correctional Healthcare Partners ("CHP") filed a motion to dismiss the SAC.  [Doc. No. 89].  On May 14, 2024, Defendants County of San Diego and County employee Defendants filed a motion to dismiss the SAC. [Doc. No. 119].  On May 30, 2024, Plaintiffs Justino and Ronnie Rupard filed an *ex parte* motion to substitute representative of the Estate of Lonnie Rupard. [Doc. No. 121].

## III.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted"— generally referred to as a motion to dismiss.  The Court evaluates whether a complaint states a recognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Although Rule 8 "does not require 'detailed factual allegations,' . . . it [does] demand . . . more than unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P, 12(b)(6).  A claim is facially plausible when the collective facts pled "allow . . . the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  Facts "merely consistent with a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557).  The Court need not accept as true "legal conclusions" contained in the complaint, *id.*, or other "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

## IV.   DISCUSSION

The SAC asserts, pursuant to 42 U.S.C. § 1983, claims of deliberate indifference to serious medical need and right to familial association.  Both claims are brought against individual medical providers, Jail staff, County supervisors and the County of San Diego pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978)—with the deliberate indifference claim asserted by the Estate and the right to association claim brought by individual Plaintiffs Justino and Ronnie Rupard.  The SAC also asserts four causes of action under California state law on behalf of the Estate: (1) failure to summon medical care in violation of California Government Code § 845.6; (2) violation of the California Bane Act; (3) dependent adult neglect; and (4) negligence.  The final cause of action brought by Plaintiffs Justino and Ronnie individually is wrongful death.

### a.  Plaintiffs' Motion to Substitute and Standing for Survival Claims

On May 30, 2024, Plaintiffs Justino and Ronnie Rupard filed an *ex parte* motion to substitute Terri Lopez as the representative of the Estate of Lonnie Rupard.  [Doc. No. 121].  The County Defendants filed an opposition, raising an argument regarding the lack of Plaintiffs' initial standing to bring claims as successors in interest on behalf of the Estate.  The County Defendants' opposition is also related to its standing argument brought in its motion to dismiss.  Because the decision of this motion to substitute concerns standing of Plaintiffs to bring survival claims, the Court addresses it first.

California Code of Civil Procedure § 337.30 sets forth California's statutory requirements for standing to bring a survivor action.  "A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest . . ., and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest." *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1129 (9th Cir. 2013) (internal quotations and citations omitted).  "Where there is no personal representative for the estate, the decedent's 'successor in interest' may prosecute the survival action if the person purporting to act as successor in interest satisfies the requirements of California law . . . ." *Id.*  Pursuant to California Code

of Civil Procedure § 377.32, a survival action brought by a successor in interest in California must be accompanied by an affidavit including, among other things, "[i]f the decedent's estate was administered, a copy of the final order showing the distribution of the decedent's cause of action to the successor in interest," along with facts supporting statements that the affiant is either the decedent's successor in interest or is authorized to act on the successor in interest's behalf, in the action. Cal. Civ. Proc. Code § 377.32(4)-(5). The required affidavit provides, in part, that "[n]o other person has a superior right to commence the action or proceeding or to be substituted for the decedent in the pending action or proceeding." Cal. Civ. Proc. Code § 377.32(5)(B)(g).

"Standing must 'persist throughout all stages of the litigation.'" *Magadia v. Wal-Mart Assocs., Inc.*, 999 F.3d 668, 674 (9th Cir. 2021) (citing *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013)). "At its core, standing concerns a specific party's interest in the outcome of a lawsuit." *Turner v. Victoria*, 15 Cal. 5th 99, 111 (2023).

Here, Plaintiff Justino Rupard filed the required affidavit alongside the first amended complaint. However, in his required affidavit, he stated that he intended to open a proceeding in probate for the Estate of Lonnie Rupard. [2] On December 4, 2023, Justino filed the petition for probate with the Probate Court. This action immediately created a dispute over who has the superior right to commence survival actions on behalf of Decedent pursuant to § 377.32, and the purported successors in interest lost standing to file any action on behalf of the Decedent. Furthermore, Plaintiffs did not petition for one of themselves to be the administrators of the Estate, they requested a different relative entirely. Terri Lopez was not appointed as administrator of the Estate until May 17, 2024. [Doc. No. 121 at 4]. Therefore, standing did not exist when Plaintiffs filed the SAC on March 7, 2024. Due to the lack of standing to file the SAC in the first instance, the motion

---

[2] There is no evidence on the docket that Ronnie Rupard filed the required affidavit. Therefore, even ignoring Justino Rupard's decision to open the probate proceedings prior to filing the SAC, there exists additional uncertainty as to Ronnie's status as successor in interest and standing to bring survival claims.

to substitute is **DENIED.**   The Estate is **DISMISSED** from this action as a Plaintiff, and all survival claims against all Defendants are **DISMISSED WITHOUT PREJUDICE** to being re-asserted by the appropriate representative of the Estate.[3]  In light of the dismissal of the survival claims, the remainder of this Order defines "Plaintiffs" as solely Justino and Ronnie Rupard.

### b.  The County Defendants' Motion to Dismiss

The remaining federal claim brought pursuant to 42 U.S.C. § 1983 alleges a violation of Plaintiffs' individual Fourteenth Amendment substantive due process rights to familial association.  This claim is brought against all Defendants and is based on the allegations in the SAC that members of the custodial, medical, and supervisory staff at the Jail were deliberately indifferent to Decedent's serious medical need during his time at the Jail leading up to his death. "To state a claim under section 1983, a plaintiff must allege the violation of a right secured by the constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

### i.  Right to Association

Plaintiffs allege that Defendants' deliberate indifference to the life of Decedent while in custody caused a violation of Plaintiffs' substantive due process rights and deprived them of their liberty interests in the family relationship.  [SAC at ¶¶ 232, 235.] In their motion, the County Defendants argue that Plaintiffs have "failed to provide sufficient factual allegations that the County Defendants were deliberately indifferent to decedent's serious medical need" to assert a right to familial association.  [Doc. No. 119 at 18.].  The County Defendants further argue that any alleged deliberate indifference would not be conduct that "shocks the conscience" to amount to a due process violation.

---

[3] The Court takes no position on whether a newly filed case would be barred by the applicable statute of limitations.

"Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013). Such a claim "is not a survivorship claim." *Miles v. Cnty. of Alameda*, No. 3:22-CV-06707-WHO, 2023 WL 8853717, at *6 (N.D. Cal. Dec. 21, 2023). "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). To assess whether the County Defendants engaged in conduct that "shocks the conscience" to violate Plaintiffs' individual rights, the Court must examine the circumstances leading to Decedent's death and decide whether the County Defendants actions amount to deliberate indifference to Decedent's serious medical need. *See id.* ("The parties mistakenly suggest that the choice is between 'shocks the conscience' and 'deliberate indifference' as the governing standard, when in fact the latter is a subset of the former").

Indeed, the "shocks the conscience" standard in the context of pretrial detainee deaths can be met by a showing of deliberate indifference, "so long as prison officials had time to deliberate before acting or failing to act in a deliberately indifferent manner." *Lemire*, 726 F.3d at 1075; *see also Porter*, 546 F.3d at 1137. Indifference can be truly shocking where "extended opportunities to do better are teamed with protracted failure to even care." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998).

The Ninth Circuit has found that the inquiry into deliberate indifference is an objective one. The components of this inquiry are:

> (i) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

The Ninth Circuit further explained:

> "with respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn on the facts and circumstances of each particular case.'" . . . The mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment. Thus, the plaintiff must prove more than negligence but less than subjective intent—something akin to reckless disregard.

*Id.*

When assessing a defendant's deliberate indifference to the serious medical need of a prisoner, the Ninth Circuit has provided a two-part test. *See Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). First, the plaintiff "must show a 'serious medical need' by demonstrating that 'failure to treat prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* The Court finds that the allegations of Decedent's pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia qualify as serious medical needs. *See, e.g., Wilhem v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (finding prisoner's hernia was a serious medical need in the context of lack of follow-up).

Next, the plaintiff must show "the defendant's response to the need was deliberately indifferent" by showing "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) the harm caused by the indifference." *Wilhem*, 680 F.3d at 1122. "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment . . ." *Jett*, 439 F.3d at 1096. As alleged, the County Defendants engaged in deliberate indifference to Decedent's serious medical need by

> o The alleged failure of Doe Medical Providers to adhere to the San Diego Sherriff's Department Medical Services Manual when they did not record Decedent's vital signs or weight during at least four "sick calls" after December 19, 2021.

○ The alleged failure of Defendant Christina Anosike to refer Decedent to a medical doctor despite his "psychotic presentation, obvious weight loss, and overall deteriorating physical health" after an incomplete wellness check on February 9, 2022.  [SAC at ¶¶ 76-80]

○ The alleged failure of Defendant Deputies to monitor Decedent and by the nurses to complete a wellness check between February 23, 2022 – March 17, 2022.   This failure is detailed by the court-appointed psychiatrist's observation of the Decedent's cell as "as dirty with trash throughout.  The toilet was full of excrement and the room was malodorous.  There were feces on the floor and food smeared on the walls" at his March 14, 2022 examination.  [SAC at ¶ 93].

○ The alleged failure of the County Defendants to send Decedent to a state hospital or forcibly administer antipsychotic medications as required by law following the court-ordered psychiatrist's recommendation.  [SAC at ¶¶ 101-102].

Ultimately, the totality of the circumstances leading to Decedent's death adequately pleads deliberate indifference to the Decedent's serious medical needs.  However, because the inquiry does not stop here for a violation of Plaintiffs' right to association, the Court must assess whether the SAC adequately alleges that each individual County Defendant's deliberately indifferent actions rose to the level of "conscience shocking" to violate the Fourteenth Amendment.

### 1. Ben Samonte and May Ng

Plaintiffs allege in the SAC that Ben Samonte and May Ng were the nurses who completed the Decedent's medical clearance screening on December 19, 2021. The only facts alleged pertaining to Samonte and Ng are that at the conclusion of this screening, they failed to refer him be housed at the Psychiatric Stabilization Unit despite the Decedent being "unwilling or unable to sign the screening or general informed consent form, was not fully orientated, and was verbally abusive."  [SAC at ¶ 56].  There are no further facts

alleged involving Samonte or Ng as it relates to Decedent's time at the Jail. The failure to assign Decedent to the Psychiatric Stabilization Unit upon intake is not deliberate indifference that "shocks the conscience" to amount to a substantive due process violation. The motion to dismiss Samonte and Ng is granted.

### 2. Christina Anosike

Plaintiffs allege in the SAC that Christina Anosike was the qualified mental health professional assigned to assess Decedent on February 9, 2022, almost two months after he was booked in the Jail. Unlike the initial intake meeting with Samonte and Ng, Anosike observed that Decedent had "impoverished thought," observed his physical condition, and heard from Deputies that he routinely talked to himself. There were allegedly four sick calls made for Decedent prior to Anosike's wellness check and Decedent also allegedly suffered physical injuries from force by Deputies. In the days following this visit, Decedent was placed on lockdown due to his psychotic state. A reasonable medical professional likely would have appreciated the risk of failing to recommend Decedent further medical care. These facts adequately allege a reckless disregard for Decedent's schizophrenia rising to the level of conscience shocking that cannot be dismissed at this stage in the litigation. The motion to dismiss Anosike is denied.

### 3. Deputy Defendants

The County argues that the named Deputy Defendants should be removed from Plaintiffs' § 1983 claims because they "fail to tie their allegations to any particular defendant." [Doc. No. 119 at 16]. Plaintiffs' state their § 1983 claim against those Deputies working shifts in housing unit 7D between March 14, 2022 and March 17, 2022: the three critical days after the court-ordered psychiatrist allegedly recommended Decedent be sent to a hospital and be involuntarily medicated by law (and before Decedent's death). [SAC at ¶ 43]. When assessing the conscience shocking standard, the alleged lack of action pertaining to Decedent's needs by the Deputy Defendants during these three days, considering the assertion that the symptoms of his pneumonia, malnutrition, and

dehydration were clear, is sufficient to state a claim.  Therefore, the motion to dismiss the Deputy Defendants is denied.

### 4. Bill Gore, Kelly Martinez, Jon Montgomery

While the caption of the complaint alleges that Defendants Bill Gore, Kelly Martinez, and Jon Montgomery are being sued in their official capacities, the allegations against those three Defendants are properly pled in the text of the complaint as claims against them in their official capacities as Sheriff, Undersheriff, and Chief Medical Officer of the San Diego Sheriff's Department at the time Decedent was in custody.[4]  The Parties do not appear to dispute that these three are properly pled as supervisors.  The County of San Diego argues that these Defendants cannot be held liable as supervisors here because "no information is provided [in the SAC] as to how Sheriffs Gore or Martinez or Chief Medical Officer Dr. Montgomery failed to properly supervise County subordinates, or allegedly set in motion a series of acts that he or she knew would result in a constitutional deprivation." [Doc. No. 119 at 14].

To be liable as a supervisor under § 1983, (1) a defendant must have been personally involved in the constitutional deprivation, or (2) there must be a sufficient causal connection between the defendant supervisor's wrongful conduct and the constitutional violation. *See Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011).  The causal connection can include "1) the supervisor's own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; 3) their conduct showed a reckless or callous indifference to the rights of others." *Lemire*, 726 F.3d at 1085 (internal citations and quotations omitted). Thus, to state a claim based on supervisory liability, a complaint must allege that "the supervisor

---

[4] The County additionally argues that Gore should be dismissed "because there is no causal link alleged between Sheriff Gore who retired on February 3, 2022, and any alleged failures resulting in decedent's death on March 17, 2022." [Doc. No. 1119 at 15].  The Court believes this argument is premature without further information concerning the state of Decedent throughout his time at the Jail from December 20, 2021 to March 17, 2022.  Therefore, this argument is denied without prejudice and may be raised at a later juncture.

breached a duty to plaintiff which was the proximate cause of the injury." *Starr*, 652 F.3d at 1207 (internal citation omitted).

Here, Plaintiffs allege that the supervisor Defendants' failure to train those County employees responsible with the oversight of Decedent during his time at the Jail caused the constitutional deprivation in this case, specifically the Plaintiffs' substantive due process right to familial association and companionship.   The complaint alleges that County employees under the supervision of Gore, Martinez, and Montgomery at the time of Decedent's time of custody and death:

- Did not know how to use JMIS, the only system used in the Jails to communicate the medical needs of inmates. [SAC at ¶ 167-168]
- Did not comply with the policies and procedures of the San Diego Sherriff's Department Medical Services Manual by failing to take vital signs at wellness checks and during sick calls.
- Failed to provide medical treatment to individuals suffering from mental health conditions such as schizophrenia.

Plaintiffs allege that the failure to train these employees directly caused the conscience-shocking actions of their subordinates and subsequent constitutional violations in this case. The State Audit of the 815 deaths of inmates in custody, released a month prior to Decedent's demise, Plaintiffs contend further demonstrates that these supervisors were aware they needed to take steps to act and prevent these deaths.   Therefore, the SAC sufficiently alleges a failure to train and inaction to find that Gore, Martinez, and Montgomery can be held liable as the supervisors for the constitutional violations of their subordinates.

### 5.  Qualified Immunity of Individual Defendants

The County argues that, even if Plaintiffs could state a § 1983 claim against the individual County Defendants, all individual County Defendants are exempt from that claim due to qualified immunity.

14

When Defendants assert qualified immunity in a motion to dismiss under Rule 12(b)(6), "dismissal is not appropriate unless [the Court] can determine, based on the complaint itself that qualified immunity applies." *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001). "Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Krainski v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ.*, 616 F.3d 963, 970 (9th Cir. 2010) (citation and internal quotation marks omitted).

The Court has already found that Plaintiffs have sufficiently pled violations of a constitutional right to familial association by at least Defendant Anosike and the Deputy Defendants, thus the Court will only inquire whether the right to familial association in this context was clearly established. "This 'clearly established law' test requires more than an alleged 'violation of extremely abstract rights.'" *Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 324 (9th Cir. 1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

The Ninth Circuit "has recognized that a child has a constitutionally protected liberty interest under the Fourteenth Amendment in the 'companionship and society' of her father." *Hayes*, 736 F.3d at 1229-30. Most cases before the Ninth Circuit addressing a child's assertion of the right of familial association focus on the child's liberty interest in the context of claims relating to parents killed by law enforcement officers. *See id.*; *see also Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998), *as amended* (Nov. 24, 1998) ("[T]his substantive due process claim may be asserted by both parents and children killed by law enforcement officers[.]"). District courts in this Circuit have additionally explained that right to familial association extends to family members of pretrial detainees who died in custody. *See McGinnis v. Cnty. of Sonoma*, No. 21-CV-09499 SI, 2023 WL 2743578, at * 2 (N.D. Cal. Mar. 30, 2023) ("a decedent's survivor . . . can bring a *Monell* claim based on the [survivor's] Fourteenth Amendment right to familial

association"); *see also Miles*, 2023 WL 8853717, at *6.  A case in this District has also made it unequivocally clear that where a child brought a familial association case for the death of her father in custody, the failure of the County "to provide sufficient medical care violated [the child's] due process rights." *K.C.A. By & Through Purvis v. Cnty. of San Diego*, No. 20-CV-2504 W (BLM), 2021 WL 3370790, at *5 (S.D. Cal. Aug. 3, 2021).

In light of the Ninth Circuit case law clearly recognizing children's rights to familial association, the Court does not find qualified immunity bars liability of the individual Defendants.   The Fourteenth Amendment substantive due process right to familial association is a well-litigated right and has been directly recognized in the context of in-custody deaths caused by an alleged failure to address the serious medical needs. *See K.C.A.*, 2021 WL 3370790, at *5.  As alleged, both Defendant Anosike and the Deputy Defendants could have recognized at the time of Decedent's wellness check and the three days leading up to his death that Decedent had serious medical needs that could cause his death.  The Court finds that the failure to address those needs may result in a violation of Decedent's children's rights. Accordingly, the motion to dismiss based on qualified immunity is denied.

### 6.  County of San Diego (*Monell*)

Following *Monell v. Department of Social Services,* 436 U.S. 658 (1978), "it is well-settled that in claims brought under 42 U.S.C. § 1983, municipalities are liable only for constitutional violations resulting from an official 'policy or custom.'" *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1216 (9th Cir. 1996), *overruled on other grounds by Yoshikawa v. Seguirant*, 74 F.4th 1042 (9th Cir. 2023) (quoting *Monell*, 436 U.S. at 694).   "[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. A government entity cannot be held vicariously liable for the acts of its employees under § 1983 unless a plaintiff can show that the entity's policy, practice, or custom caused the constitutional violation.   *See id.*  A "custom or policy of inaction, however, must be the result of a conscious or deliberate

choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (internal citations and quotations omitted). When alleging a failure to train as a *Monell* violation, "a plaintiff must show that his or her constitutional injury would have been avoided had the government entity properly trained its employees." *Id.* (internal quotations omitted). "[M]ere negligence in training or supervision . . . does not give rise to a *Monell* claim." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

"The 'first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1075 (9th Cir.2 016) (en banc) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989)). The specific elements of a *Monell* claim are: (1) the plaintiff was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy was the moving force behind the constitutional violation. *See Dougherty*, 654 F.3d at 900. "A policy can be one of action or inaction." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

Plaintiffs filed their right to association claim against the County; thus, this Court must assess the County's liability pursuant to *Monell* jurisprudence. As asserted in the SAC, the *Monell* claim is based on the violation of Plaintiffs' substantive due process rights under the Fourteenth Amendment to the right of association caused by the County's deliberate indifference to Decedent's serious medical needs. As explained, Plaintiffs have pled deliberate indifference by County employees that "shocks the conscience." Therefore, the proper inquiry is whether there is a sufficient causal link between the County's alleged inaction or failure to train and the violation of Plaintiffs' rights. Plaintiffs do not allege a specific custom or policy made by the County to ignore serious medical need of pretrial detainees, the SAC however sufficiently alleges that the County was on notice of multiple instances of insufficient care of dependent pretrial detainees leading to in-custody deaths

from at least 2017, when the National Commission on Correctional Health Care found that the County failed to meet 26 of 38 essential health care standards, to February 2022 when the State Audit report of 815 deaths in the County of San Diego Jails was released.

Accordingly, the motion to dismiss the *Monell* claim as it applies to the § 1983 right to association is denied.

### ii.  Wrongful Death

The remaining claim brought individually by Plaintiffs is a state law wrongful death claim.  The County Defendants argue that Justino and Ronnie lack standing to bring the wrongful death claim because the recently appointed representative of the Estate "has statutory rank." [Doc. No. 119 at 9].  There is no support for this assumption.  California Code of Civil Procedure § 377.60 states "a cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by [the Decedent's] children *or* by the decedent's personal representative on their behalf."  Cal. Civ. Proc. Code § 377.60(a) (emphasis added); *see also Adams v. Superior Ct.*, 196 Cal. App. 4th 71, 78-79 (2011) ("either the decedent's personal representative on behalf of the specified heirs or the specified heirs . . . may assert the wrongful death claim—but not both.").  There is no statutory rank requirement upon a plain reading of the code and the applicable California case law.  Therefore, the County's motion to dismiss the wrongful death cause of action based on the assumption that the Estate representative outranks the Plaintiffs as Decedent's heirs is denied.

The County Defendants further argue that the wrongful death claim is procedurally barred because the statutorily required government claims against the County were filed more than six months after Decedent's death on March 17, 2022, in violation of California Government Code § 911.2.[5]  Plaintiffs argue that they were unaware of their causes of

---

[5] The County Defendants attached a request for judicial notice ("RJN") to their motion to dismiss that includes, *inter alia*, the individual Plaintiffs' government tort claims with the County.  Plaintiffs do not oppose the RJN.  The RJN is hereby **GRANTED.**

action until Decedent's autopsy was released on March 2, 2023, which classified Decedent's death as a homicide due to neglect, and the delayed discovery rule should apply.

A party seeking damages from a public entity or its employees must file a claim with the entity before filing suit in court. Cal. Govt. Code §§ 905, 950.2. Under California Government Code Section 911.2(a), "[a] claim relating to a cause of action for death or forth injury to a person . . . shall be presented . . . not later than six months after the cause of action." If a claim is filed later than the six-month presentment requirement, the party files an additional application to file an untimely claim with the public entity pursuant to California Government Code Section 911.4.

"A plaintiff suing the state or a local public entity must allege facts demonstrating either compliance with the claim presentation requirement or an excuse for noncompliance as an essential element of the cause of action." *Ovando v. Cnty. of Los Angeles*, 159 Cal. App. 4th 42, 65 (2008). In the SAC, plaintiffs allege that "[p]rior to the release of the [Medical Examiner's] report on March 2, 2023, Plaintiffs were only provided with a death certificate which stated 'PENDING' for the cause of their father's death. Plaintiffs received no additional information from the County until March 2, 2023, when the . . . autopsy report was published." [SAC at ¶ 16]. Plaintiff Justino Rupard filed his tort claim against the County of San Diego and its employees on March 9, 2023 and an application for leave to file a late claim on March 14, 2023. [SAC at ¶ 14; RJN Exhibit 1]. Plaintiff Ronnie Rupard filed his tort claim along with an application for leave to file a late claim on March 10, 2023. [SAC at ¶ 15; RJN Exhibit 2]. Both claims were filed within two weeks of the release of the autopsy report and were accompanied by an application to file a late claim with the public entity as required by California Government Code Section 911.4 due to the delay in receiving the Medical Examiner's report. As alleged in the SAC, Plaintiffs complied with the California Government Tort Claims Act prior to filing their complaint in this Court. Therefore, the County Defendant's argument that the government claims

were filed more than six months after Decedent's death is mooted by the proper pleading of compliance with the California Government Tort Claims Act.

Finally, the County Defendants make a blanket argument that all County Defendants are immune from Plaintiffs' state law causes of action pursuant to California Government Code sections 844.6 and 845.6.

California Government Code section 844.6 states that "[a] public entity is not liable for an injury to any prisoner."  Cal. Gov't Code § 844.6(a)(2).  California Government Code section 845.6 states that "neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody."  However, there is an exception to this immunity rule: "the public entity where the employee is acting within the scope of his employment, *is liable* if the employee knows or has reason to know that the prisoner is in need of medical care and he fails to take reasonable action to summon such medical care."  Cal. Gov't Code § 845.6 (emphasis added).

> Taken together, this California statutory scheme stands for the proposition that: public entities cannot be held liable for wrongfully or negligently injuring prisoners but public employees can be; unless (2) the prisoner's injury resulted from a failure to furnish medical care (in which case, neither the public employee or public entity are liable) except (3) when the public employee knew or had reason to know that the injured prisoner was in need of immediate medical care and failed to take reasonable action to summon such medical care (in which case, both the public employee and the public entity are liable).

*Bousman v. Cty. of San Diego*, No. 3:23-CV-1648-W-JLB, 2024 WL 1496220, at *11 (S.D. Cal. Apr. 5, 2024).

Plaintiffs base their wrongful death claim on allegations of deliberate indifference by County employees to Decedent's serious medical need and additionally those employees' failure to summon medical care pursuant to California Government Code section 845.6.  The SAC adequately alleges facts sufficient to demonstrate that at least Defendant Anosike and the Deputy Defendants allegedly "knew or had reason to know"

that the Decedent was in need of immediate medical care and failed to act, invoking the exception of section 845.6. Due to the nature of the allegations, there is no statutory immunity for the wrongful death claim. The County Defendants' motion to dismiss the wrongful death claim is denied.[6]

### c. Correctional Healthcare Partners' Motion to Dismiss

Correctional Healthcare Partners ("CHP") also filed a motion to dismiss the claims against it. For the reasons stated above, the survival claims are dismissed from this case for lack of standing. Therefore, the sole remaining claims against CHP are the § 1983 claim for right to association and wrongful death. CHP argues that Plaintiffs fail to state a claim under § 1983 because they fail to identify times where Decedent would have interactions with CHP staff or that CHP was even aware of Decedent and his condition.

CHP is described in the SAC as a "third-party contractor to the San Diego County Sheriff's Department and employed, supervised, and/or trained Defendant Medical Provider Does 1-10. [SAC at ¶ 36]. The Doe Medical Providers are described as "all County employees, agents, or contractors working within the Sheriff's Department Medical Services Division who were responsible for [Decedent's] medical care, including screening, follow-up assessment, and referrals for further treatment, whether or not they actually provided [Decedent] with any medical care." [SAC at ¶ 32].

To date, Plaintiffs have not identified said Does. While Plaintiffs may refer to unknown defendants as "Does" at this stage, they must nevertheless "allege specific facts showing how each particular doe defendant violated [their] rights." *Keavney v. Cnty. of San Diego*, No. 3:19-cv-01947-AJB-BGS, 2020 WL 4192286, at *4 (S.D. Cal. July 21, 2020) (internal citations omitted); *see Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1998) (a plaintiff must "set forth specific facts" as to each individual defendant's wrongdoing). Indeed, the SAC does not indicate where a CHP staff member would be involved in

---

[6] As previously described above, Plaintiffs fail to state a claim of deliberate indifference as to Samonte and Ng, so those Defendants are necessarily also dismissed from their wrongful death claim.

conscience shocking levels of deliberate indifference to assert a right to association § 1983 claim.  While the SAC includes generalized statements that Doe Medical Providers 1-10 should have known of Decedent's medical condition and failed to take action, it does not state whether a Doe Medical Provider was present at the time of Defendant Anosike's wellness check or during the three days after the court-appointed psychiatrist referred Decedent be placed in a hospital and given medication involuntarily.

While the Court can acknowledge that many of the facts of the case will not be revealed until discovery, the present state of the complaint is not pled with particularity against the Doe Medical Providers to hold CHP liable for Plaintiffs' right to association and wrongful death causes of action.  Accordingly, CHP's motion to dismiss is granted.

## V.   CONCLUSION

For the reasons stated above, the Court hereby **ORDERS**:

a. Plaintiffs' motion for substitution is **DENIED.**  All survival claims are **DISMISSED WITHOUT PREJUDICE** to being re-filed, in a new action, by the assigned administrator of the Estate.  The Clerk of Court shall update the docket to remove the Estate as a Plaintiff.

b. The County Defendants' motion to dismiss as it pertains to the sole remaining § 1983 right to familial association claim is **DENIED-IN-PART AND GRANTED-IN-PART.**

   i. The motion to dismiss as to Ben Samonte and May Ng is **GRANTED WITH LEAVE TO AMEND** to assert how each Defendant engaged in conscience-shocking activity to give rise to a familial association claim.

   ii. The motion to dismiss Christina Anosike is **DENIED.**

   iii. The motion to dismiss the Deputy Defendants is **DENIED.**

   iv. The motion to dismiss the Supervisor Defendants is **DENIED.**

   v. The motion to dismiss the *Monell* claim against the County is **DENIED.**

    **c.** The County Defendants' motion to dismiss as it pertains to the wrongful death claim is **DENIED.**

    **d.** CHP's motion to dismiss is **GRANTED WITH LEAVE TO AMEND** to assert how each Doe Medical Provider was personally involved in the circumstances leading to Decedent's death and arising to conscience shocking levels.

Plaintiffs shall have until **<u>September 6, 2024</u>** to either file a third amended complaint or state they will proceed on the SAC in accordance with this Order.

    It is **so ORDERED.**

Dated:  August 21, 2024

Hon. Cathy Ann Bencivengo
United States District Judge

23

23-cv-1357-CAB-BLM