1  EUGENE G. IREDALE: SBN 75292
   JULIA YOO: SBN 231163
2  SARAH MUSUMECI: SBN 328306
   IREDALE & YOO, APC
3  105 West F Street, Fourth Floor
   San Diego, CA 92101-6036
4  Telephone: (619) 233-1525
   Fax: (619) 233-3221

JEREMIAH A. LOWE (CA SBN 239166)
jeremiah@lowelawapc.com
Lowe Law, APC
402 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 878-2725
Fax: (619) 878-2737

5

6  **Attorneys for Plaintiffs**
   **JUSTINO RUPARD and the ESTATE OF LONNIE RUPARD**

7

8  **UNITED STATES DISTRICT COURT**
   **SOUTHERN DISTRICT OF CALIFORNIA**

9  ESTATE OF LONNIE RUPARD,
   THROUGH ITS COURT-
10 APPOINTED ADMINISTRATOR
   TERRI LOPEZ; AND JUSTINO
11 RUPARD,

12            Plaintiffs,

13 vs.

14 COUNTY OF SAN DIEGO; BILL
   GORE, IN HIS INDIVIDUAL
15 CAPACITY; KELLY MARTINEZ, IN
   HER INDIVDIUAL CAPACITY; JON
16 MONTGOMERY, DO, IN HIS
   INDIVIDUAL CAPACITY;
17 LIBERTY HEALTHCARE OF
   CALIFORNIA, INC; CHRISTINA
18 ANOSIKE, IN HER INDIVIDUAL
   CAPACITY; ANTHONY CRUZ, MD,
19 IN HIS INDIVIDUAL CAPACITY;
   AGUILERA, M., VILADIU,
20 J. MARTINEZ, G., AMADO, J.,
   MACE, T., AGUIRRE, E., JAMES, T.,
21 ROMERO, B., JOHNSON, M.,
   TORRES, A., TREYVONNE, J., ,
22 WERESKI, A., ROMANS, B.,
   GUTIERREZ, L. IN THEIR
23 INDIVIDUAL CAPACITIES,
   DEFENDANT DEPUTIES DOES 15-
24 20, DEFENDANT MEDICAL
   PROVIDERS DOES 1-10;
25 DEFENDANT SUPERVISOR DOES;
   1-10,
26

27            Defendants.

28

Case No: 23CV1357 CAB BLM

**THIRD AMENDED COMPLAINT**
**FOR DAMAGES FOR:**

1.  **U.S.C. § 1983: Deliberate**
    **Indifference of Serious Medical**
    **Needs;**
2.  **42 U.S.C. § 1983: Right of**
    **Association;**
3.  **42 U.S.C. § 1983: Failure to**
    **Properly Train and Supervise;**
4.  **42 U.S.C. § 1983:** *Monell*
    **Municipal Liability Civil Rights**
    **Action;**
5.  **Cal. Gov. Code § 52.1 (Bane Act);**
6.  **Negligence Survival Claim (CCP**
    **§ 377.30);**
7.  **Dependent Adult Neglect; and**
8.  **Wrongful Death**


**DEMAND FOR JURY TRIAL**

-1-

Plaintiffs ESTATE OF LONNIE RUPARD, through its administrator Terri Lopez, and JUSTINO RUPARD hereby allege as follows:

## INTRODUCTION

1.    Plaintiffs the Estate of Lonnie Rupard, through its administrator Terri Lopez, and Justino Rupard (hereinafter "Plaintiffs") sue to seek justice and recover damages arising from the wrongful death of Lonnie Rupard (hereinafter "Lonnie") while he was in the care and custody of the County of San Diego at the San Diego Central Jail (hereinafter "SDCJ").

2.    Lonnie suffered from schizophrenia.  On March 17, 2022, Lonnie died a slow painful death at the age of 46 while in custody at the SDCJ after months of neglect.

3.    While in custody at the SDCJ, County employees neglected his schizophrenia and basic needs despite obvious signs that he was in acute psychosis. They discontinued his antipsychotic medication.  During the approximately three months he was in custody at SDCJ, Lonnie lost 60 pounds, more than one third of his total body weight.  Lonnie was six feet tall and weighed 105 pounds at his death.

4.    In his final days, Lonnie ate nothing.  He was never let out of his cell.  He never bathed.  He never saw sunlight.  Deputies, who saw Lonnie in a mountain of trash and maggots in his food and his body caked in feces, left him to die.

5.    According to the medical examiner, Lonnie died from pneumonia, malnutrition, and dehydration.  The Medical Examiner ruled his death to be a homicide, meaning Lonnie died at the hands of the Jail staff.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert causes of action for constitutional violations arising under 42 U.S.C. § 1983.

7.    The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

THIRD AMENDED COMPLAINT

8.    At all times relevant to this complaint, decedent Lonnie Rupard was an individual residing in San Diego County, California.

9.    The County of San Diego's Medical Examiner ("ME") did not disclose its findings on the cause of death until March 2, 2023. In accordance with the requirements of the California Tort Claims Act (Cal. Gov. Code §§ 810-996.6), Plaintiffs filed a timely government claim.

10.    Plaintiffs properly complied with the Government Claim Act. Plaintiff Justino Rupard submitted claims on behalf of the Estate of Lonnie Rupard and himself as an individual on March 9, 2023. The claims were submitted against the County of San Diego and its employees under Cal. Gov. Code § 900.4. (See **Exhibit A**, attached hereto).

11.    On March 14, 2023, Plaintiff Justino Rupard resubmitted the claims, along with an application for leave to file a late claim pursuant to Cal. Gov. Code § 911.4. (See **Exhibit B**, attached hereto).

12.    On March 10, 2023, Plaintiff Ronnie Rupard served a timely tort claim against the County of San Diego and its employees under Cal. Gov. Code § 900.4 along with an application for leave to file a late claim pursuant to Cal. Gov. Code § 911.4. (See **Exhibit C**, attached hereto).

13.    Plaintiffs' claims were timely because the accrual date for presenting a government tort claim against the County of San Diego ("County") for their father's death was March 2, 2023, when the County first released its Medical Examiner's ("ME") report ruling Lonnie's death a homicide. Under the Delayed Discovery Doctrine, accrual of the cause of action is postponed until the plaintiff discovers, or has reason to discover, the cause of action. Plaintiffs did not know, and had no way of knowing, the cause of action stemming from Lonnie's death on March 17, 2022, until the ME report was released on March 2, 2023.

14.    Until March 2, 2023, the Medical Examiner's report was unavailable to the public, including Lonnie's family.

15.     Prior to the release of the ME report on March 2, 2023, Plaintiffs were only provided with a death certificate which stated, "PENDING" for the cause of their father's death. Plaintiffs received no additional information from the County until March 2, 2023, when the autopsy report, attached hereto as **Exhibit D**, was published revealing substantial evidence of neglect.

16.     The County of San Diego had exclusive control of all information necessary for Plaintiffs to determine the facts relevant to the accrual of a cause of action. The County released no information to Lonnie's family or the public regarding how Lonnie died until after March 2, 2023.  There was no mechanism for Justino to discover the facts and circumstances surrounding his father's death while the homicide investigation was pending.

17.     The County withheld, and even misstated, information concerning the details of Rupard's death until March 2, 2023. As such, the County is estopped from raising untimeliness as a defense. "It is well settled that a public entity may be estopped from asserting the limitations of the claims statute where . . . (1) the public entity was apprised of the facts, (2) it intended its conduct to be acted upon, (3) the plaintiff was ignorant of the true state of facts, and (4) relied upon the conduct to his detriment." *K.J. v. Arcadia Unified School Dist.* (2009) 172 Cal.App.4th 1229, 1239-40.

18.     Even following the eventual release of the autopsy report, the County Sheriff Department continued to publish misleading information. Specifically, on March 2, 2023, the Sheriff published a news release which deliberately omitted the words "neglected schizophrenia" from its report regarding the ME's findings.

19.     The ME's report ends with even more detail regarding the "neglect," which the Sheriff willfully omitted from its news release:

> "Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records

document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide."

20.    Even if the accrual date was the date of Lonnie's death of March 17, 2022, Plaintiffs timely sought leave to file a late claim for failure to present a claim within six months of Lonnie's death on account of inadvertence, surprise, and excusable neglect. Plaintiffs had no way of knowing there was any cause of action related to Lonnie Rupard's death until March 2, 2023, when the San Diego County ME disclosed the findings that Lonnie's death was due to pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, ruling the death a homicide.

21.    Prior to the ME's announcement, the County prevented Plaintiffs from discovering the facts giving rise to a cause of action by publishing incomplete, misleading and false information including, but not limited to, completely omitting all relevant facts and findings consistent with the ultimate cause of death disclosed on March 2, 2023, including dehydration, malnutrition, and neglected schizophrenia.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiffs' claims arise out of events and omissions occurring in the County of San Diego, which is situated in the Southern District of California.

## PARTIES

23.    All Plaintiffs are, and have at all times relevant to this Complaint, residing in San Diego, California.

24.    Justino Rupard and Ronnie Rupard are the only biological children of Lonnie Rupard.  (See Declaration of Justino Rupard, attached hereto as **Exhibit E**, at ¶¶ 2-3).

25.    Lonnie Rupard did not leave behind any will. He did not leave behind any testamentary instrument or other written document designating any heir or beneficiary

THIRD AMENDED COMPLAINT

or making any donative transfer of property. As such, Lonnie Rupard died intestate. (*Id.* at ¶ 5).

26.    When this lawsuit was commenced on July 26, 2023, no proceeding was pending in the State of California for the administration of Lonnie Rupard's estate. At the time this lawsuit was commenced, no probate proceeding was pending in any other state or country for the administration of Lonnie Rupard's estate. (*Id.* at ¶ 8).

27.    At the time of his death, Lonnie Rupard was not married. (*Id.* at ¶ 9).

28.    Because Lonnie Rupard is Justino Rupard's and Ronnie Rupard's biological father, at the time of the filing of this lawsuit, they were the successors in interest (as defined in Section 377.11 of the California Code of Civil Procedure) to decedent Lonnie Rupard and succeeded to Lonnie's interests in the action or proceeding. (*Id.* at ¶ 9).

29.    At the time of the filing of this lawsuit on July 26, 2023, no other person had a superior right to commence the action or proceeding or to be substituted for decedent in the action. (*Id.* at ¶ 11). Justino filed a declaration of standing at that time.

30.    When the first amended complaint was filed on November 21, 2023, no other person had a superior right to commence the action or proceeding or to be substituted for the decedent in the action. (*Id.* at ¶ 12). Justino filed a declaration of standing at that time.

31.    On December 4, 2023, Plaintiff Justino Rupard filed a petition to open an Estate for Lonnie Rupard, seeking to be appointed administrator of the Estate. (*Id.* at ¶ 13).

32.    On February 21, 2024, Plaintiff Justino Rupard filed a nomination of Terri Lopez to serve as the administrator of Lonnie Rupard's estate. Terri Lopez is Justino Rupard's grandmother. (*Id.* at ¶¶ 14-15).

33.    Ronnie Rupard did not object to the nomination. (*Id.* at ¶ 22).

34.    On April 15, 2024, the probate court appointed Terri Lopez to serve as the administrator of Lonnie Rupard's estate. (*Id.* at ¶ 21. See also Declaration of Terri

Lopez, attached hereto as **Exhibit F**, at ¶ 6). The probate court issued letters of administration on May 17, 2024. (*Id*).

35.    While there was no personal representative for the Estate of Lonnie Rupard at the time of the filing of the original complaint and the first amended complaint, one has since been appointed by the probate court. Accordingly, Ms. Lopez has standing to continue to prosecute this lawsuit on the Estate's behalf and the Estate's claims have not been abandoned.

36.    The personal representative claims are categorized as claims that accrued to Lonnie Rupard and survives his death, rather than claims for injuries Terri Lopez herself has suffered. *Quiroz v. Seventh Ave. Ctr.,* 140 Cal.App.4th 1256, 1264-65 (2006) ("Unlike a cause for wrongful death, a survivor cause of action is not a new cause of action that vests in the heirs on the death of the decedent. It is instead a separate and distinct cause of action which belonged to the ***decedent*** before death but, by statute, survives that event").

37.    Although the Estate claims are pursued through Terri Lopez, the claims are maintained by the Estate as the party because the cause of action belongs to the decedent, Lonnie Rupard.  Terri Lopez is merely the court appointed administrator pursuing them on behalf of the Estate. *See Knox v. City of Fresno*, No. 1:14-cv-00799-GSA, 2015 WL 5923531, at *7 (E.D. Cal. Oct. 9, 2015)

38.    Terri Lopez's addition is "more aptly characterized as a substitution, rather than the addition of a new party." (*Id*., citing *San Diego Gas & Elec. Co. v. Superior Court*, 146 Cal.App.4th 1545, 1553 (2007).

39.    The relation back doctrine applies because Terri Lopez's substitution does not give rise to a wholly distinct and different legal obligation against the defendants. (*Id*. at *8, citing *Branick v. Downey Savings & Loan Assn.*, 39 Cal.4th 235, 243 (2006)) The Estate's causes of action rest on the same general set of facts, involve the same injury (*e.g.*, the suffering and death of Lonnie Rupard), and refer to the same

instrumentality (*e.g.*, Lonnie's treatment while in the custody of the County of San Diego Sheriff's Department) as the initial complaint. (*Id*. See also **Exhibit F** at ¶ 9).

40.    Because Plaintiff Justino Rupard properly and timely submitted a claim on behalf of the Estate and because the relation back doctrine can be applied to the claims, Terri Lopez can step into the case as the personal representative of the Estate's (*i.e.*, Lonnie Rupard's) claims.

41.    Defendant County of San Diego (hereinafter "County") is a governmental entity organized and existing under the laws of the State of California. The San Diego County Sheriff's Department is an agency operating under the County of San Diego's authority. The Sheriff's Department owns, operates and manages the San Diego Central Jail ("SDCJ") and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures, practices/customs of SDCJ, and its respective employees, contractors and/or agents who staff the SDCJ.

42.    Defendant Bill Gore (hereinafter "Gore") was the San Diego County Sheriff during a portion of the relevant timeframe of Lonnie Rupard's incarceration, and he retired on February 3, 2022. In his capacity as Sheriff, Gore was a final policymaker for the Sheriff's Department and for the County on matters relating to the Sheriff's Department, the SDCJ, and its deputies, employees, agents, medical staff, contractors and Doe Defendants, including the hiring, screening, training, retention, supervision, discipline, counseling of such personnel.

43.    He was also responsible for the County's compliance with state and federal laws and constitutions. Defendant Gore was the Title 15 officer and also responsible for the noncompliance with California state law. Having had the opportunity to comply with state law, he failed to do so. He was responsible for the supervision and control of officers who are or were employed by the Sheriff's Department, who were under his command and/or who reported to him, including the Defendants to be named.

44.    Defendant Kelly Martinez (hereinafter "Martinez") was the Undersheriff for the San Diego County Sheriff's Department prior to Lonnie's death and the Acting

Sheriff at the time of Lonnie's death, from February 3, 2022 to April 5, 2022. In her capacity as Undersheriff and Acting Sheriff, Martinez was a final policymaker for the Sheriff's Department and for the County on matters relating to the Sheriff's Department, the SDCJ, and its deputies, employees, agents, medical staff, contractors and Doe Defendants, including the hiring, screening, training, retention, supervision, discipline, counseling of such personnel. She was also responsible for the County's compliance with state and federal laws and constitutions. Martinez was responsible for the supervision and control of officers who are or were employed by the Sheriff's Department, who were under her command and/or who reported to her, including the Defendants to be named.

45.    After Martinez was sworn in as Sheriff, it was her duty and her responsibility to ensure proper investigation and discipline of all staff employed by the County of San Diego.  Martinez became the Title 15 officer and final policy maker for the Department.

46.    Defendant Medical Providers Does 1-10 (hereinafter "Doe Medical Providers") are all employees, agents, or contractors of the County and/or Liberty Healthcare of California, Inc. working within the Sheriff's Department Medical Services Division who were responsible for Lonnie's medical care, including screening, follow-up assessments, and referrals for further treatment, whether or not they actually provided Lonnie with any medical care. Doe Medical Providers include all Qualified Mental Health Providers. On information and belief, one of the Doe Medical Providers (hereinafter "Doe Medical Supervisor") is the Chief Medical Officer or other supervisory official employed by Liberty Healthcare of California, Inc. who was responsible for training and supervising all Liberty Healthcare employees, including Defendant Anthony Cruz, MD, in their provision of medical services to the San Diego County Sheriff's Department. Doe Medical Providers were acting under color of law and within the scope of their employment at all times relevant to the events described in this Complaint.

47.    All staff worked under the direction and supervision of Defendants Gore and Martinez who set policies and procedures with respect to all services and programs of the County Jails.

48.    Defendant Dr. Jon Montgomery, DO (hereinafter "Montgomery") was, at all times relevant, the Chief Medical Officer for the Sheriff's Department and was responsible for overseeing the Medical Services Division at the SDCJ. He was responsible for and oversaw the development and implementation of quality assurance and utilization review policies and procedures. All medical and psychiatric doctors and staff at the SDCJ worked under Dr. Montgomery's direction. He is sued in his individual capacity for his failure to properly oversee the implementation of policies and procedures involving the care that was ultimately provided to Lonnie, and his failure to supervise other medical staff who were charged with providing care for Lonnie.

49.    On information and belief, Dr. Montgomery was responsible for supervising medical staff at the SDCJ, including Defendant Medical Provider Does 1-10. He was also responsible for overseeing the implementation of quality assurance and the development and implementation of policies and procedures.

50.    Christina Anosike, LMFT (hereinafter "Anosike") was a medical provider employed by the County and/or a contractor of the County working within the Sheriff's Department Medical Services Division who was responsible for Lonnie's medical care, including follow-up assessments and referrals for further treatment.

51.    Anthony Cruz, MD was a medical provider believed to be an employee of Liberty Healthcare of California, Inc.  He was responsible for Lonnie's medical care, including follow-up assessments and referrals for further treatment.

52.    On information and belief, Liberty Healthcare of California Inc. was a third-party contractor to the San Diego County Sheriff's Department and employed, supervised, and trained Cruz, and one or more Defendant Medical Provider Does 1-10.

53.    DEFENDANT DEPUTY DOE 1 has been identified as Aguilera, M. #0163 At all times relevant to this complaint, Aguilera was a San Diego County Sheriff's

deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022 and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

54.    DEFENDANT DEPUTY DOE 2 has been identified as Jason Viladiu #0659. At all times relevant to this complaint, Viladiu was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

55.    DEFENDANT DEPUTY 3 has been identified as Martinez, G. #3629. At all times relevant to this complaint, G. Martinez was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

56.    DEFENDANT DEPUTY DOE 4 has been identified as Amado, J. #4193 At all times relevant to this complaint, Amado was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

57.    DEFENDANT DEPUTY DOE 5 has been identified as Mace, T #4324. At all times relevant to this complaint, Mace was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

THIRD AMENDED COMPLAINT

58.    DEFENDANT DEPUTY DOE 6 has been identified as Aguirre, E #3322. At all times relevant to this complaint, Aguirre was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

59.    DEFENDANT DEPUTY DOE 7 has been identified as James, T. #4309. At all times relevant to this complaint, James was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

60.    DEFENDANT DEPUTY DOE 8 has been identified as Romero, T. #4309. At all times relevant to this complaint, Romero was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

61.    DEFENDANT DEPUTY DOE 9 has been identified as Johnson, M #0568. At all times relevant to this complaint, Johnson was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

62.    DEFENDANT DEPUTY DOE 10 has been identified as Torres, A #3208. At all times relevant to this complaint, Torres was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or

mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

63.     DEFENDANT DEPUTY DOE 11 has been identified as James Treyvonne. At all times relevant to this complaint, Trayvonne was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

64.     DEFENDANT DEPUTY DOE 12 has been identified as Allan Wereski #4047. At all times relevant to this complaint, Wereski was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

65.     DEFENDANT DEPUTY DOE 13 has been identified as Romans, B. #4011. At all times relevant to this complaint, Romans was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

66.     DEFENDANT DEPUTY DOE 14 has been identified as Gutierrez, L. #0928. At all times relevant to this complaint, Gutierrez was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

67.     Defendant Deputy Does 15-20 are all Sheriff's Department deputies who were responsible for summoning medical or mental health care, observing any audio or

video monitors, or conducting wellness or safety checks on Lonnie in any housing unit in which Lonnie was housed leading up to his death on March 17, 2022, including but not limited to deputies in the housing unit "7D" or Module D on the seventh floor.

68.    Defendant Deputy Does 15-20 will hereinafter be referred to collectively as "Doe Deputies" unless otherwise noted. Doe Deputies were acting under color of law and within the scope of their employment at all times relevant to the events described in this Complaint.

69.    Defendant Deputy Supervisor Does 1-10 (hereinafter "Doe Deputy Supervisors") are Sheriff's Department deputies who were responsible for training and supervising Doe Deputies. Doe Deputy Supervisors were acting under color of law and within the scope of their employment at all times relevant to the events described in this Complaint.

70.    Doe Deputies and Doe Medical Providers are sued in their individual capacities for the purposes of claims arising under § 1983 and as County employees for the purposes of claims arising under state law.

71.    Plaintiffs are ignorant of the true names of all Doe Deputies, Doe Deputy Supervisors, and Doe Medical Providers despite due diligence and will amend the Complaint to add their true names upon learning them.

72.    The SDCJ is owned and operated by Defendant County and staffed by County employees, agents, and contractors.

## FACTUAL ALLEGATIONS

**A.    Defendants Were Deliberately Indifferent to Lonnie Rupard's Constitutional Rights**

73.    Lonnie Rupard died while in custody the SDCJ on March 17, 2022, from pneumonia, malnutrition, and dehydration from untreated schizophrenia.

74.    As of March 17, 2022, Lonnie had lost approximately 60-pounds, or 36% of his total body weight, since the time of his arrest on December 19, 2021, approximately 3 months earlier.

THIRD AMENDED COMPLAINT

75.    At the time of his death, Lonnie was six feet tall and weighed 105 pounds.

76.    Lonnie's basic care needs were so severely neglected by deputies and other staff while in custody despite obvious signs that he needed medical care that <u>his death was classified as a homicide</u> by the medical examiner.

77.    According to the medical examiner's report, on the morning of December 19, 2021, Lonnie Rupard was arrested by National City Police for a parole violation and booked in San Diego Central Jail.

78.    At the time of his death, Lonnie was a pre-trial detainee because he had not yet been convicted of a parole violation, and was still awaiting trial.

79.    The arresting officer knew that Lonnie had a history of psychotic disorders, information that was relayed to the Jail.

80.    On December 19, 2021, Lonnie's medical clearance screening at the SDCJ was completed by Ben Samonte, RN and May Ng, RN.

81.    At intake, Lonnie weighed 165 pounds.

82.    At intake, Lonnie was scheduled for a second stage nursing evaluation, after which he was housed in SDCJ's general population.

83.    On December 20, 2021, a request was entered for Lonnie to have an initial psychiatric evaluation. The request for the psychiatric evaluation noted that Lonnie had a "H/O (history of) extensive meds, Patton (history of treatment at Patton State Hospital)."

84.    The initial psychiatric evaluation was scheduled for December 24, 2021.  It did not occur.

85.    Defendant Anthony Cruz documented that Lonnie was not to be seen due to "time constraints."  This was five days after Lonnie was booked into the jail with clear and obvious symptoms of serious mental illness.

86.    Lonnie was again re-scheduled to have his initial psychiatric evaluation performed on December 28, 2021.  Again, there was no evaluation.

THIRD AMENDED COMPLAINT

87.     Cruz documented once again Lonnie was not to be seen due to "time constraints."

88.     On December 29, 2021, ten days after he was booked into SDCJ, Lonnie finally underwent a psychiatric evaluation. The psychiatric evaluation was performed by Cruz.

89.     Cruz documented that Lonnie was seen for a psychiatric sick call during a previous incarceration in 2020. Cruz noted that during the previous sick call, Lonnie was diagnosed with a myriad of serious psychiatric issues, including unspecified schizophrenia spectrum and other psychiatric disorders and antisocial personality disorders.

90.     Cruz documented that Lonnie had previously been treated with Haldol (an antipsychotic), Depakene (valproic acid used to treat seizure disorders and mental conditions), Zyprexa (an antipsychotic) and Klonipin (a benzodiazepine).

91.     Cruz documented that Lonnie had been hospitalized at Patton State Hospital until just a month prior.

92.     Cruz spoke to Lonnie through Lonnie's cell window. In response, Lonnie rambled incoherently and was verbally aggressive. Lonnie was a poor historian.

93.     Cruz deemed him to be "uncooperative."

94.     Rather than send him to the PSU, Cruz prescribed Lonnie psychiatric medications, including Haldol, Cogenti, and Valproic acid, "due to [Lonnie's] presentation, psychiatric hx (history) and **potential for decompensation**."

95.     The PSU is a Lanterman-Petris-Short (LPS) licensed acute psychiatric care facility that offers 24-hour mental health treatment on a voluntary and involuntary basis. The Sheriff's Department operates two PSUs – one at the Central Jail for men, and one at the Las Colinas Detention Reentry Facility for women.

96.     The PSU at the Central Jail functions as an inpatient psychiatric hospital that is regulated by the Health and Human Services Administration.

THIRD AMENDED COMPLAINT

97.    The function of the PSU is to treat mentally ill patients who need hospitalization.

98.    The PSU is supposed to have three registered nurses per shift to provide medical care to those housed in the PSU.

99.    The only staff members of the jail who are permitted to admit patients into the PSU are psychiatrists.

100.    Involuntary admission into the PSU is permitted for patients who are a danger to themselves or others.

101.    In 2015, a schizophrenic patient Ruben Nunez died after psychiatrists failed to place him in the PSU where he could be monitored.  A psychiatrist saw Ruben through a food flap in his cell and deemed Ruben to be "uncooperative" when Ruben spoke in gibberish to a wall.

102.    *The Estate of Ruben Nunez, et al. v. County of San Diego, et al.*, No. 16-cv-1412-BEN-MDD, placed the County on ample notice that it was failing to train their psychiatrists on how and when mentally ill patients should be placed into the PSU.

103.    Between December 20, 2021 and January 20, 2022, Lonnie refused to take his medications, including psychiatric medications, and was unable to sign the medical consent form on multiple occasions.

104.    On January 20, 2022, Cruz performed a psychiatric chart review and noted that Lonnie was consistently refusing psychiatric medications. Despite Cruz's well-documented awareness of Lonnie's psychiatric history including hospitalization, his knowledge that Lonnie had refused his medications for the previous month and his knowledge of Lonnie's potential for decompensation, Cruz did nothing.

105.    Rather than refer him to the PSU or take any other steps to ensure Lonnie's compliance with his medication regime, Cruz and Medical Provider Does 1-10 discontinued Lonnie's prescribed medications, including his antipsychotic medications.

106.    Cruz and Medical Provider Does 1-10 did not refer Lonnie to the PSU as was required for his medical needs.

THIRD AMENDED COMPLAINT

107.    As a result, Lonnie remained in general population where he could not be monitored or medicated.

108.    Cruz's and Medical Provider Does 1-10's decision to discontinue Lonnie's psychiatric medications without a referral to PSU presented a substantial risk to Lonnie of further mental and physical deterioration and constituted deliberate indifference to Lonnie's serious medical needs.

109.    Without his medication, the enhanced monitoring of his psychiatric wellbeing or the frequent assessments provided in the PSU, and without intervention from any qualified health professional, Lonnie predictably continued to precipitously deteriorate mentally and physically.

110.    On January 29, 2022, Lonnie was observed laying on the housing floor following use of force by deputies.  While no one documented why deputies would use force on a vulnerable and mentally ill patient, it is believed that it was the result of Lonnie's psychosis.

111.    Lonnie sustained injuries to his head and face, yet he vehemently refused medical care.

112.    Upon information and belief, the deputies who entered the cell to used force on Lonnie observed the grave state of his mental and physical deterioration. The state of his tall, starving body and his psychotic delusions would be evident to the responding deputies.  These deputies went inside the cell where the deteriorating living condition would have been obvious.  Despite this, the deputies did not take any action to provide food or sanitation.  They failed to notify their supervisors.

113.    On February 1, 2022, SDCJ staff reportedly asked to have Lonnie seen by a qualified mental health professional (QMHP).

114.    Eight days later, on February 9, 2022, a QHMP wellness check was performed by Christina Anosike, a mental health clinician.  Anosike is a marriage and family counselor.

THIRD AMENDED COMPLAINT

115.   As noted in the QMHP report on February 9, 2022, completed by Christina Anosike, Deputies on the 7th floor reported that Lonnie often spoke to himself in unintelligible words.

116.   Anosike noted throughout the QMHP that Lonnie was not able to be fully assessed due to his refusal and/or inability to cooperate. Lonnie displayed impoverished thought and spoke to Anosike in unintelligible words.

117.   These were classic symptoms of psychosis.

118.   Upon information and belief, at the time Anosike conducted her wellness check, Lonnie showed clear and obvious signs of weight loss and decompensation.

119.   Despite Lonnie's psychotic presentation, obvious weight loss and overall deteriorating physical health, he was not referred by Anosike or Medical Provider Does 1-10 to be assessed by a medical doctor, as was required for his obvious medical needs.

120.   No one made a request for vital signs be taken.  No one took his vital signs.

121.   Despite his known and obviously visible weight loss, neither Anosike, Cruz nor Medical Provider Does 1-10 ordered that Lonnie be weighed.

122.   It was obvious to all Jail staff, including Does, that Lonnie was not eating his food because they could see uneaten food in Lonnie's cell each day.

123.   No one ever made a request for a nutritionist to make an assessment.

124.   Despite Lonnie's extensive psychiatric history and obviously psychotic presentation during the QMHP wellness check, Christina Anosike determined Lonnie did not require a referral to PSU. Such a decision was in direct contradiction to Lonnie's obvious and serious medical needs.

125.   Anosike took no action to provide psychiatric care to Lonnie.  She made no referral for a higher level of care.  She made no effort to obtain psychiatric medication. She made no effort to refer Lonnie for medical care.  She made no effort to weigh Lonnie.  She made no effort to comply with the policy on hunger strikes.

126.   On February 20, 2022, Lonnie was placed on lockdown due to his psychotic state.

THIRD AMENDED COMPLAINT

127.    On February 22, 2022, almost two months after his initial psychiatric sick call with Lonnie, Defendant Cruz saw Lonnie again.  Cruz documented that Lonnie was not presently prescribed psychotropic medications, noting that they were discontinued due to Lonnie's consistent refusals to take the medications.

128.    Lonnie did not engage with Cruz, was unable to answer questions, rambled incoherently and became verbally aggressive.

129.    At the February 22, 2022, visit with Cruz, Lonnie was noted to be uncooperative, and oriented to person only (not oriented to place, time or event).  He was verbally aggressive, rambling incoherently at times, with disorganized thought.

130.    Cruz noted that Lonnie's cell was only "relatively clean" and that the toilet seat was covered with a cloth.  Cruz made no observation as to why someone would cover a toilet with a cloth or whether that may be a symptom of a psychiatric condition.

131.    Cruz noted that Lonnie had "potential for decompensation."  This observation for a "potential" was made despite the fact that Cruz was visiting Lonnie two days *after* placement in lockdown for his full-blown psychosis.

132.    On information and belief, at the time Cruz saw Lonnie, Lonnie showed clear and obvious signs of dramatic weight loss.

133.    It was obvious on this date that Lonnie was gravely disabled and had no ability to make rational decisions for himself.  He was so gravely disabled that he needed to be involuntarily medicated.

134.    In the PSU, jail staff are permitted to administer medication to individuals involuntarily. Involuntary administration of medication is not permitted outside of the PSU.

135.    As of February 22, 2022, despite Lonnie's psychotic presentation, obvious signs of physical deterioration including, but not limited to, dangerous weight loss, he was not transferred to the PSU nor did he have his vital signs or weight assessed.

136.    As of February 22, 2022, based on Lonnie's presentation including, but not limited to, the substantial weight loss, lack of orientation, and disorganized thought, it

1  would have been obvious to Cruz and all who interacted with Lonnie, that he was in
2  need of urgent medical care.

3      137.   Despite Lonnie's presentation of severe physical decompensation and
4  being in an ongoing state of psychosis, along with his extensive psychiatric history,
5  creating a significant risk for further decompensation, Cruz indicated Lonnie did not
6  require immediate psychiatric intervention at that time. Rather, the reported plan was
7  simply to continue to monitor him and offer treatment with follow up in six to seven
8  weeks or sooner if needed. By this time, Lonnie had not taken his psychiatric
9  medications for over a month.

10      138.   Cruz and Medical Provider Does 1-10 failed to refer Lonnie to PSU and for
11  a full psychiatric evaluation as was required for his safety, despite knowledge that
12  Lonnie's presentation of substantial weight loss, lack of orientation and overall
13  psychosis required such medical care. Instead of taking any meaningful steps to ensure
14  Lonnie's health, safety, well-being and compliance with his psychiatric medication
15  regime, Defendants adopted a "try again later" mentality.

16      139.   On February 23, 2022, staff again requested that Lonnie be seen by a
17  qualified mental health professional for a wellness check. This was a highly unusual
18  event.  Deputies do not request mental health professionals on behalf of inmates.  When
19  an inmate appears to be in need of medical care, deputies refer them to the process for
20  the inmates to fill out a form for medical care.

21      140.   Sworn staff would make a request for a wellness check if there was a dire
22  need for medical attention.

23      141.   This urgent request would go unanswered.

24      142.   Despite the repeated and escalating request for a wellness check, no further
25  wellness checks would be performed prior to Lonnie's death on March 17, 2022.

26      143.   Had a wellness check been done following the request on February 23,
27  2022, it would have been obvious to anyone who examined Lonnie that he needed
28  immediate medical care and a referral to the PSU for psychiatric intervention.

144.    On March 14, 2022, three days prior to his death, Lonnie was seen by a court-ordered psychiatrist, Nicolas Badre, MD, for examination of his mental competency to stand trial.

145.    Dr. Badre, noted that Lonnie's cell was dirty with trash throughout. The toilet was full of excrement and the room was very malodorous. There were feces on the floor and food smeared on the walls.

146.    Lonnie was unkempt and dirty. Dr. Badre observed Lonnie lying in bed in an uncomfortable manner with a blanket over his head. Dr. Badre used the food flap and a very loud introduction to get Lonnie's attention.

147.    When Dr. Badre asked Lonnie why he was incarcerated, Lonnie responded, "water dog." Dr. Badre explained to Lonnie that he was there to evaluate him for competency and Lonnie replied, "I am home, dog."

148.    Dr. Badre asked Lonnie about the charges against him. Lonnie answered, "dog."

149.    Lonnie was unable to answer questions regarding his orientation during the March 14, 2022, examination.

150.    Lonnie's speech was pressured and mostly incoherent. His mood was down and his affect was flat. His thought content was impoverished and his thought process was disorganized. Dr. Badre noted that Lonnie's insight and judgement were poor.

151.    Dr. Badre opined that Lonnie suffered from severe mental illness and was not competent to stand trial. Dr. Badre noted, "While the defendant's lack of cooperation is likely in part volitional. I think that it is motivated by underlying disorganization of thought, which would be consistent with prior evaluation that diagnosed him to be psychotic."

152.    Dr. Badre further elaborated in his report, "The defendant suffers from mental illness, displaying active signs of mental illness, including diagnosed thinking. Those symptoms of mental illness disable the defendant from being able to have a rational legal understanding of the charges and assist legal counsel."

153.   Dr. Badre recommended referral to a state hospital and that Lonnie be given antipsychotic medication involuntarily as allowed by law.

154.   Upon information and belief, Defendants, including Cruz and Anosike, Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre, James, Romero, Johnson, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Defendant Doe Deputies 15-20, and Doe Defendants, including Medical Provider Does 1-10, had access to and were aware of Dr. Badre's observations, diagnoses, impressions and recommendations made after his assessment of Lonnie.  These defendants saw what Dr. Badre saw, which was a person living in filth, covered in fecal matter, dying a slow painful death from starvation.  Yet, they did nothing.

155.   Despite their collective knowledge, none of the Defendants, including Cruz and Anosike, nor the Medical Provider Does 1-10 heeded Dr. Badre's recommendations and failed to refer Lonnie to a state hospital. Defendants and Medical Provider Doe Defendants did not take any action to administer Lonnie's antipsychotic medications involuntarily, as allowed by law.

156.   Despite their collective knowledge of Dr. Badre's observations, diagnoses, impressions and recommendations, none of the Defendants, including Cruz and Anosike, Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre, James, Romero, Johnson, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Defendant Doe Deputies 15-20, or the Medical Provider Does 1-10, made any effort to refer Lonnie to the PSU for emergency psychiatric intervention or request medical attention. No one attempted to feed Lonnie.  No one arranged for Lonnie to leave his cell even for a moment to have exercise or yard time or socialization with another person.

157.   There is no indication that Lonnie Rupard ever left his cell.

158.   The observations made by Dr. Badre were the same conditions that were present when each of the Defendants interacted with him.  These were the same conditions in Lonnie's cell that each medical care professional and deputies encountered.

THIRD AMENDED COMPLAINT

159.    The Defendant Deputies identified below were each responsible for summoning medical or mental health care, monitoring, conducting cell checks, and/or conducting wellness and/or safety checks on Lonnie, which they each failed to do during the time Lonnie was dying in his cell from malnutrition and dehydration leading up to his death on March 17, 2022: Aguilera, M. #0163, Viladiu, J. #0659, Martinez, G. #3629, Amado, J. #4193, Mace, T. #4324, Aguirre, E. #3322, James, T. #4309, Romero, B. #4284, Johnson, M. #0568, Torres, A. #3208, Treyvonne, J., Wereski, A. #4047, Romans, B. #4011, Gutierrez, L. #0928.

160.    Title 15 section 1027.5 requires safety checks to be conducted at a minimum of 60-minute intervals.

161.    For the two days leading up to Lonnie's death, deputies repeatedly failed to conduct Constitutionally adequate cell checks. At least four cell checks were conducted past the 60-minute time-frame required by law, with one conducted 79 minutes after the previous check. They violated California state law, Title 15, a total of five times over a two-day period. Over two dozen of the checks into Lonnie's cell lasted between one and five seconds, with eleven checks lasting only one second. Another eleven cell checks lasted only three seconds. Each of these deputies saw with their own eyes the condition of Lonnie and his cell. They observed a man dying in abject filth. These checks were grossly deficient to check Lonnie's wellbeing.

162.    The last two days of Lonnie's life were captured on surveillance camera which was accessible to the deputies in the control tower. The deputies in the control tower and those who entered the module knew that Lonnie had refused to eat. Unlike other inmates, who would approach their food slots, retrieve their meals and discard their trash afterward, Lonnie's food remained untouched in his food slot. The 7D module footage clearly shows Lonnie's food slot left open, a stark contrast to the routine of other inmates. All the deputies walking past his cell saw his uneaten food remaining in the food slot. They ignored it.

163.    Lonnie's starvation and refusal to eat lasted for weeks. Rather than ensuring Lonnie ate and reporting it as required, deputies stood by as Lonnie rapidly lost over 60 pounds.

164.    At no point does anyone enter his cell to check on him. At no point does he come out of his cell. And at no point is he even seen through the windows in his door. All other inmates are seen moving around their cells, responding to deputies and engaging them in conversation. They are seen coming to the door to pick up their food and put their trash through the food flap. Lonnie is never seen for days.

165.    While all other inmates are allowed out of their cells for "day break" into the common area, Lonnie was never seen outside of his cell. Lonnie never showered. There was no indication in any of the records that Lonnie was taken to the shower to clean himself. There is no record that anyone ever cleaned his cell the entire time he was incarcerated.

166.    During his final days, no deputy ever entered his cell to conduct a hard count or to check on him. A hard count is required to be done twice a day, once every 12-hour shift.  It does not appear that deputies conducted hard count of Lonnie Rupard.

167.    Had Defendant Deputies monitored Lonnie in the days leading up to his death, as they were required to do, it would have been abundantly clear that he needed immediate medical and/or mental healthcare.

168.    During his incarceration, despite his clear and obvious signs of weight loss, decline in both mental and physical health and severe decompensation, Lonnie was never transferred to PSU for evaluation or treatment.

169.    Pursuant to San Diego County Sheriff's Department Medical Services Division Policy and Procedure Manual for "sick calls," RN duties include, but are not limited to, obtaining a full set of vital signs, including weight at the time of the appointment.

170.    Psychiatry "sick calls" were reportedly requested for Lonnie on 12/20/21, 12/29/21, 2/2/22, 2/9/22.

171.   There is no indication that Lonnie's vital signs were taken at any point following December 19, 2021, despite his deteriorating condition and multiple sick calls.

172.   There is no indication that Lonnie's weight was ever taken at any point following December 19, 2021, despite his deteriorating condition and multiple sick calls.

173.   By March, it was visible to anyone who saw Lonnie that he had lost 60 pounds of body weight.  He had been starving.  He was dying.

174.   Not a single person initiated a protocol for hunger strikes as required by their own policy.

175.   On information and belief, San Diego County Sheriff's Department Medical Services Division Policy MSD.H.12 was in place throughout Lonnie's incarceration. The policy provided that, "patients who refuse to eat and state they are on a hunger strike will be monitored medically."

176.   Policy MSD.H.12 listed the myriad of individuals who were responsible for notifying medical staff of an inmate's hunger strike: the inmate/patient himself; sworn staff; counselor; religious leaders; and referrals from family members or attorneys.

177.   On information and belief, and per policy, all sworn staff who were responsible for monitoring Lonnie throughout his incarceration, including the sworn staff present during meal handouts, were required to inform medical staff that Lonnie was not eating. Lonnie's starvation was or should have been obvious to Defendants, including Defendant Deputies Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre James, Romero, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Does 15-20, by his visible 60-pound weight loss and his refusal of, or failure to eat, his meal trays.

178.   The policy provides that the following individuals were to be notified of the hunger strike: the chief medical officer (in this case, Defendant Jon Montgomery); the director of nursing services; the facility supervisor; the facility charge nurses, the

THIRD AMENDED COMPLAINT

facility Captain, all four facility watch commanders; and the dietician (collectively, "the Supervisors").

179. Upon notification of the hunger strike, medical staff were required to evaluate Lonnie's medical and psychiatric history. This assessment was to include weight and vital signs. Per policy, Lonnie should have been scheduled for a psychiatric sick call.

180. Per policy, Lonnie should have been scheduled for a registered nurse sick call *daily* to monitor weight, medical condition and hydration status.

181. Per policy, Lonnie should have been scheduled for a medical doctor sick call to assess for any acute and chronic medical conditions weekly and as needed.

182. Per policy, Lonnie should have been assessed by the jail population management unit for specialized housing to closely monitor his condition.

183. Per policy, deputies should have continued to offer Lonnie food and were required to record his responses.

184. Upon information and belief, either Defendants, including Deputies Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre James, Romero, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Doe Deputy Defendants 15-20, failed to communicate to medical staff that Lonnie was not eating or the medical provider defendants, including Medical Provider Does 1-10 were informed of the strike and failed to act according to the policy. They did not weigh Lonnie nor did they take his vitals. They did not monitor his medical condition and hydration status. They did not schedule Lonnie for the required sick calls. Sworn staff, including Deputies Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre James, Romero, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Doe Deputy Defendants 15-20, did not assess Lonnie for alternative specialized housing and did not document Lonnie's responses to being offered food.

185. Upon information and belief, either Defendants, including Deputies Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre James, Romero, Torres,

Treyvonne, Wereski, Romans, Gutierrez, and Doe Deputy Defendants 15-20 and Medical Provider Does 1-10, failed to notify Defendant Jon Montgomery and other Supervisors, that Lonnie was not eating, or Montgomery and the other Supervisors, including Defendant Supervisor Does 1-20, were informed of the strike and failed to act, including by failing to ensure medical and sworn staff were adhering to the hunger strike policy.

186.   Either Defendants failed to follow the policy of the San Diego County Jail or the policy itself was facially deficient for excluding psychiatric patients like Lonnie Rupard who lacked mental capacity to verbalize that he was on a hunger strike.

187.   As of March 14, when Dr. Badre noted that he saw Lonnie in a filthy cell covered in feces until March 17, 2022, no one took any action to medicate Lonnie.  No one referred him to a higher level of care.  No one took his vitals.  No one weighed him. No one made an attempt to clean his cell.  For these three days, County officials left him to languish and die in filth.

188.   Lonnie was reportedly last seen alive during cell checks on March 17, 2022 at approximately 21:46.

189.   On March 17, 2022, the last day of Lonnie's life, two deputies began to conduct a cell check of Module 7D at 22:12:12. This cell check started 79 minutes after the last safety check. This was 19 minutes past what is permitted under California Law, which requires at a minimum a safety visual check once every 60 minutes. When the deputy conducting the cell check reached Lonnie's cell, he looked inside for approximately 12 seconds before walking away. This is a stark contrast to the same deputy spending substantially less time looking into all other cells. On the video footage it appears that the deputy is looking at Lonnie, presumably unconscious or dying in his cell.  The deputy watched Lonnie, then walked away. He did nothing to render aid. He did nothing to come back to check on Lonnie. He did not enter the cell. He did not notify any medical professionals.

THIRD AMENDED COMPLAINT

190.   These two deputies are believed to be Deputies Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre James, Romero, Torres, Treyvonne, Wereski, Romans, and/or Gutierrez.

191.   Once they discovered Lonnie dead, deputies struggled to enter and walk through Lonnie's cell due to the state of squalor he was living in. Multiple deputies kicked trash out of the way to wade through the cell. The condition was so bad that a deputy had to use a broom to drag a mountain of toilet paper, feces and rotten food out of Lonnie's cell just so that they could access Lonnie's unresponsive body.

192.   Once medics finally arrived to Module 7D, they dragged Lonnie's lifeless body through the floor of his filthy cell using a blanket. Once the life-saving measures did commence, it was too late to save Lonnie's life.

193.   The effect of Lonnie's starvation was evidenced even on CCTV footage that was taken from a distance. His ribs, chest and arm bones were visible and pronounced through his thin skin. His face was gaunt. Lonnie's body was yellow and graying in color.

194.   He was already be cold to the touch, indicating that he was likely dead long before he was found unresponsive.

195.   Lonnie's cell was soiled with feces. Old food with insect larvae was found in his cell.  This food had been rotting for several days.

196.   The San Diego Citizens' Law Enforcement Review Board ("CLERB") conducted an investigation into Lonnie's death. The CLERB findings noted that despite the SDCJ green sheet stating the hygiene inspections for Lonnie's module should be conducted on Saturdays, CLERB was unable to determine if the inspections were conducted weekly: "Through the course of investigation, CLERB discovered hygiene inspection for Rupard's module may not have occurred."

197.   Per CLERB, "The green sheet also states, 'SDCJ health staff will be notified of any incarcerated persons exhibiting extremely poor hygiene, self-neglect or the inability to take care for oneself. A health exam should be conducted by health staff

to check on the individual's wellbeing . . . .'" CLERB concluded, "It is incumbent by the entire SDSD to take responsibility to care for those in their custody and identify and facilitate a higher level of care when needed. While CLERB does not currently have jurisdiction of medical personnel, the evidence showed an egregious neglect of care and ultimate failure of the system."

198.    CLERB further found that hygiene inspection results for the period of December 22, 2021 to March 17, 2022, the time of Lonnie's incarceration, were not maintained by the Sheriff's Department, in contravention of Department policy. In response, CLERB recommended that the Sheriff's Department update policy L.2, titled Sanitation and Hygiene Inspections, to retain hard copies of the weekly inspections for a period of two years as required by County of San Diego Retention Policy Schedule.

199.    While Lonnie's autopsy was performed on March 19, 2022, the medical examiner's report was not released until March 2, 2023.

200.    At the time of the autopsy, Lonnie weighed 105 pounds representing a 60-pound weight loss, or 36% of his total body weight, since the time of his arrest.

201.    Between the time of his arrest on December 20, 2021, and the time of his death on March 17, 2022, despite his refusal of medications, obvious signs of psychosis, decompensation, and significant weight loss, Lonnie never had his vital signs taken.

202.    Between the time of his arrest on December 20, 2021, and the time of his death on March 17, 2022, despite his refusal of medications, obvious signs of psychosis, decompensation, and significant weight loss, Lonnie was never weighed.

203.    The autopsy findings revealed that Lonnie had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration.

204.    The autopsy findings further revealed that he had pulmonary congestion and edema, with acute bilateral bronchopneumonia.

THIRD AMENDED COMPLAINT

205.    The autopsy findings further revealed that Lonnie's right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material.

206.    Postmortem nasopharyngeal swab for Covid-19 was positive.

207.    Lonnie had no significant cardiovascular disease, liver disease, or kidney disease.

208.    Lonnie also had several superficial pressure sores on his torso and extremity.

209.    Neuropathology consultation of the brain documented a remote small cortical contusion on the right orbital frontal region.

210.    Toxicology testing was negative for alcohol, common drugs of abuse, and medications.

211.    The autopsy report describes in detail the abysmal condition Lonnie died in. He was caked in fecal matter. The autopsy report details that an "abundant" dry brown fecal matter was found on his posterior extremities. Fecal matter was also found on Lonnie's thumb and index fingers and the soles of his feet were covered in feces.

212.    The Deputy Medical Examiner concluded based on the autopsy findings and circumstances of death that "the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with Covid-19 viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions."

213.    The Deputy Medical Examiner concluded:

Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

**B.    *MONELL* Entity and Supervisory Liability Allegations**

    **1.    The San Diego County Sheriff's Department Has a Higher Rate of In-Custody Deaths than Any Other Large County in California**

214.    In 2019, the Union Tribune published a series of articles regarding its 6-month investigation of in-custody deaths at San Diego County jails entitled, Dying Behind Bars. Jeff McDonald, Kelly Davis, and Lauryn Schroeder, Rate of jail inmate deaths in San Diego County far exceeds other large California counties, THE SAN DIEGO UNION TRIBUNE, September 20, 2019, available at:

https://www.sandiegouniontribune.com/news/watchdog/story/2019-09-19/dying-behind-bars-san-diego-county-jail-deaths.

215.    The article begins by observing, "At least 140 people have died in San Diego County jails since 2009, the year Bill Gore took over as sheriff. That's an average higher than one inmate per month, every month, over the past 10 years. . . .  A six-month investigation by The San Diego Union-Tribune shows that the county's jail mortality rate is the highest among California's largest county jail systems. The grim history shows no sign of waning."

216.    In response to the Union Tribune's series Dying Behind Bars, Sheriff Gore wrote an op-ed that blamed the number of in-custody deaths on the inmates. William Gore, Sheriff Bill Gore: What U-T's coverage of jail deaths left out, THE SAN DIEGO UNION TRIBUNE, September 27, 2019, available at:

https://www.sandiegouniontribune.com/opinion/story/2019-09-27/sheriff-gore-jail-deaths-coverage.

217.    Gore wrote in the op-ed that the jail population has a high percentage of inmates with serious mental illness, and people that engage in extremely self-destructive behavior.  Gore then challenged the Union Tribune's methodology in comparing statistics among counties and explained that the Union Tribune's statistics were wrong because it did not account for counties that have city lockups.

218.   In response to Gore's criticism, the Union Tribune then revisited the death rates of inmates in California using California Department of Justice statistics from 2009 to 2018 and taking into account deaths in city jails. The UT published the following statistics:

## Mortality rate with city deaths

Deaths per 100,000 inmates

| County | Average daily population | 10-year average deaths | 10-year mortality rate |
|---|---|---|---|
| San Diego | 5,211.9 | 12.8 | 245.6 |
| Los Angeles | 17,060.6 | 30 | 175.8 |
| San Bernardino | 5,643.5 | 8.9 | 157.7 |
| Santa Clara | 3,702.3 | 5.4 | 145.9 |
| Orange | 5,928.6 | 8.1 | 136.6 |
| Sacramento | 3,942.2 | 3.7 | 93.9 |

## Mortality rate without city deaths

Deaths per 100,000 inmates

| County | Average daily population | 10-year average deaths | 10-year mortality rate |
|---|---|---|---|
| San Diego | 5,211.9 | 12.7 | 243.7 |
| Los Angeles | 17,060.6 | 25.5 | 149.5 |
| San Bernardino | 5,643.5 | 8.8 | 155.9 |
| Santa Clara | 3,702.3 | 5.4 | 145.9 |
| Orange | 5,928.6 | 7 | 118.1 |
| Sacramento | 3,942.2 | 3.7 | 93.9 |

Source: California Department of Justice                                U-T

Lauryn Schroeder, San Diego has highest jail mortality rate among largest counties, even with new data, THE SAN DIEGO UNION TRIBUNE, November 24, 2019, available at: https://www.sandiegouniontribune.com/news/watchdog/story/2019-11-24/san-diego-has-highest-jail-mortality-rate-among-largest-counties-even-with-new-data.

219.   Schroeder noted that both the method advocated by Gore or by the UT showed San Diego County had the highest death rate.

220.   According to the state Department of Justice data, San Diego County's death rate over the past 10 years was 50 percent higher than Los Angeles County's and two-and-a-half times the Orange County rate.

THIRD AMENDED COMPLAINT

221. Given Gore's numerous responses to public criticism, it is obvious that he was made aware of the persistent problems with the lack of medical care in the Jails.

222. On information and belief, Defendant Martinez was aware of the exceptionally high rates of in-custody deaths even prior to her appointment as Sheriff by virtue of her previous role as Undersheriff and decades with the Sheriff's Department.

223. County officials acknowledged at least as of 2019, ***three years before Lonnie Rupard's death***, that their Jails had a large population of vulnerable people with mental illnesses who engaged in self-destructive behavior.

**2. External Audits and Reports Warn Gore, Martinez, the County and the Sheriff's Department of Pervasive Failure to Adequately Supervise Subordinates**

224. On November 8, 2016, the San Diego Sheriff's Department contracted with the National Commission on Correctional Health Care ("NCCHC") for assistance regarding compliance with Standards for Health Services in Jails. This was to receive NCCHC accreditation.

225. The County paid NCCHC one hundred thousand ($100,000) for the review of its Jails.

226. In January 2017, five years before Lonnie's death, the NCCHC provided a report to the San Diego Sheriff's Department after reviewing the practices of its Jails.

227. Of the 38 "essential standards" all of which must be met in order to attain accreditation, the Central Jail ***failed to meet 26 essential standards***.

228. NCCHC found that there was no specifically designated on-site responsible physician to serve as the responsible health authority.

229. NCCHC found there was ***no formal peer review process in place for physicians, psychiatrists, or psychologists who are contracted employees, or for nurses***.

230.   NCCHC found that missing in the screening form was the "disposition" of the inmate, which would communicate to the next health care provider where the patient would be housed.

231.   NCCHC found that there was *a system of episodic care, instead of continuity of care*, with most appointments being made after a request for care was submitted by the patient.

232.   NCCHC found there is an *insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill*, and the *number of mental health clinics in the facility is insufficient* to meet the needs.

233.   In October of 2019, three years after the County paid NCCHC for the study, the Union Tribune reported that it would be difficult to win accreditation by 2020, the timeline the Jail officials had outlined.

234.   Indeed, as of today's date, over five years later, there has never been accreditation.[1]

235.   The UT wrote that mentally ill inmates were kept in isolation, with little evidence of monitoring for "mental condition, hygiene, orientation or how they were adjusting."

236.   According to the article, jails had significant backlogs of requests for medical care. According to the article, "at the central jail, where 73 inmates have died since 2009, the report said the staff needed to do a better job looking into and communicating what caused an inmate's death so they can prevent similar incidents in the future, the consultants said."

---

[1]In failing to achieve accreditation, NCCHC found the County had no program to ensure inmates receive an initial health assessment within 14 days of incarceration, and no 14 day screening by a qualified mental health care professional after the receiving screening is completed.  In February of 2022, when the Department revised its policy, it placed a 30 day requirement for the health assessment, thereby continuing to ignore the NCCHC findings of failure.

237.    In another pending lawsuit, the County officials admitted that the Medical Director and the Medical Administrator, the chief of the medical department, never read the NCCHC report.

238.    Sheriff Gore declined to be interviewed for the article but his staff told the UT that there were many NCCHC standards that needed to be met.

239.    Although the County of San Diego and Gore were aware of Constitutional deficiencies in the delivery of seriously needed medical and psychiatric care due to the NCCHC audit, and the high number of deaths and injuries suffered by inmates, they took no steps to provide additional supervision of their subordinates. The failure to provide additional supervision of their subordinates was a moving force causing the ultimate injury to decedent Lonnie Rupard.

### 3.    The California State Auditor Issues a Scathing Report on the Deficiencies of the San Diego County Jail

240.    In February 2022, one month before Lonnie Rupard died, the California State Auditor made available to the public a scathing report that San Diego County jails are so unsafe and deficient that state lawmakers should intervene by forcing the Sheriff's Department to change course.

241.    This should have been a wakeup call to the County and Liberty Healthcare.

242.    The deficiencies outlined in the report were ongoing during the time Liberty was providing services to the County.

243.    After the state of California performed an audit of 815 deaths in the County Jails, Michael Tilden, acting state auditor, wrote: "Our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths."

244.    "These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody."

THIRD AMENDED COMPLAINT

245.    Mirroring what the community members and experts have repeatedly told the Sheriff over the past decade, the Auditor wrote: "The high rate of deaths in San Diego County's jails (as) compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices."

246.    The audit said the Sheriff's Department "did not consistently follow up with" inmates who needed medical and mental health services, and concluded that lack of attention may have contributed to their deaths.

247.    The report noted that when deputies did check up on inmates, these "safety checks" often amounted to inadequate glances that sometimes missed inmates in distress.

248.    "In our review of 30 in-custody deaths ... based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module," the audit said. "When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours."

249.    The auditors said San Diego County jails can only be fixed by legislation requiring the Sheriff's Department to implement a series of recommendations spelled out in the 126-page report.

250.    "In fact, our review identified deficiencies with how the sheriff's department provides care for and protects incarcerated individuals (that) likely contributed to in-custody deaths. . . ."

251.    State auditors found that the department has yet to meaningfully implement recommendations made by independent experts over the last several years.

252.    "Given the ongoing risk to the safety of incarcerated individuals, the Sheriff's Department's inadequate response to deaths and the lack of effective independent oversight, we believe the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes," the report said.

### 4. Defendants County and Gore Admitted to the Deficiencies in Their Policies

253.    On January 14, 2022, two months before Lonnie Rupard died, Gore and the Department submitted a written response to the Auditor's findings.  The response stated in part:

> *CSA Recommendation:*
>
> *Revise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity rating as it assigns to individuals to all detentions staff overseeing them.*

Sheriff's Response: The Sheriff's Department concurs with the auditor's assessment that Qualified Mental Health Providers (QMHP) are the more appropriate staff to conduct the mental health screening portion of the intake process.  The Medical Services Division (MSD) received funding for additional staffing in July 2021 and is currently in the process of recruiting and hiring from a limited pool of candidates.  Additional staffing will allow us to provide a comprehensive screening process utilizing the electronic health record, in accordance with National Commission for Correctional Health Care (NCCHC) standards.

> *CSA Recommendation:*
>
> *Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.*

Sheriff's Response: The Sheriff's Department concurs with the auditors' assessment that a revision is necessary to address the process for medical/mental health referral after two requests.  The Sheriff's Medical Services Division intends to implement a health care requests and services process in accordance with NCCHC standards.  Patients will be referred to a provider to be evaluated.  When a patient presents for health care services more than two times with the same complaint and has not seen a provider, they will receive an appointment to do so.  Some mental health patients need

THIRD AMENDED COMPLAINT

assistance with advocating for their medical care. Regular follow-up and ongoing engagement with QMHPs is essential to identifying patients who face these challenges.

> *CSA Recommendation:*
>
> *Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request. Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care.*

Sheriff's Response: The Sheriff's Department concurs a timely medical response to patient concerns is extremely important, and that repetitive patient refusals or an abject delay in follow-on scheduling of medical care are concerning issues and could potentially precipitate an adverse condition or event.

### 5. Defendants Were Made Aware of a Persistent and Recurring Pattern of Preventable Deaths and Serious Injuries Caused by the Sheriff's Department's Misconduct, Apathy and Neglect

254. There have been countless complaints made by inmates, family members, community members and the Jail's own staff regarding injuries caused by medical neglect and staff misconduct.

255. At the time of Lonnie Rupard's death, there had been a long-standing custom and practice of improper and inadequate investigations; refusals to sanction and discipline subordinate misconduct; and failures to further supervise and train both deputies and medical staff.

256. County Defendants were aware of the following examples of failure by Jail staff at County Jails leading to inmate deaths or serious injuries, including failures to coordinate and share critical information among personnel, failures to conduct adequate cell checks and failures to provide critical treatment to inmate-patients who Jail knew suffered from serious mental health disorders and/or developmental disabilities. These examples include:

a.  In 2014, Christopher Carroll, who was mentally ill, was placed in segregation. He was found dead with a noose around his neck. Mr. Carroll had speared blood on the wall of his cell. He had urinated on the floor and food and feces were stuck to the ceiling. Deputies had failed to conduct proper cell checks to monitor his wellbeing despite Mr. Carroll's known condition.

b.  In 2015, Ruben Nunez, a schizophrenic mental health patient transferred from Patton State Hospital, died when jail doctors failed to treat a potentially lethal condition for water intoxication. The psychiatrists treating Mr. Nunez failed to read his medical records and failed to input critical medical information in JIMS. One of the psychiatrists testified that she did not know how to use JIMS to add "alerts," meaning the most critical information regarding a patient's care. She testified that she was never trained. Despite the medical records from Patton Hospital reflecting hyponatremia, a condition caused by overconsumption of water, a nurse noted in Mr. Nunez's chart: "Informed I/P that he will be seen [sic] by psych for f/u. Exercise as tolerated and *drink plenty of water*. I/P verbalized understanding and agrees to plan." (Emphasis added). This nurse failed to document Mr. Nunez's medical records, leaving nearly the entire seven pages of an intake form blank. According to one of the nursing staff, intake nurses do not have sufficient time to read medical records or to conduct a thorough intake because of the number of inmates being booked at once. The intake nurses only have sufficient time to look to whether the Jail will book the person into jail.

c.  In February 2018, Paul Silva died in Central Jail after deputies pepper sprayed, tased, and beat Paul to death in his cell. The Central Jail staff knew Paul suffered from schizophrenia as it was well documented in

THIRD AMENDED COMPLAINT

the Jail's database system. Law enforcement encountered Paul after his mother requested Paul be hospitalized because he refused to take his schizophrenia medication. Paul was obedient with police officers at all times. Jail staff classified Paul as a "book and release" meaning he was supposed to be released after 8 hours. Instead, Paul decompensated as he stayed in temporary holding cells with little food, no blankets, no bed, and with constant light and noise for almost 36 hours. The staff failed to communicate Paul's critical medical condition and failed to monitor him. After he went without food, sleep, and any medication, Paul began acting bizarrely. He could not comprehend deputies' commands and questions. A nurse practitioner did not check Paul's medical record or review his medical history to determine whether he needed psychiatric care. She did not consult a medical doctor or psychiatrist. Instead, deputies killed Paul Silva after they entered his jail cell.

d.    In August 2019, Jose Sevilla was discovered in his cell, unresponsive after overdosing. By the time they discovered Mr. Sevilla, rigor mortis had already set in with ants on his body.

e.    On March 16, 2022, one day before the death of Lonnie, Hayden Schuck exhibited similar symptoms of medical distress during his time in custody and died in large part due to dehydration and neglect. Hayden had similarly elevated levels of sodium, chloride, and urea nitrogen. Hayden, like Lonnie, had pneumonia, a duodenal ulcer, and pressure sores. Hayden and Lonnie were housed in the same housing unit.  As of March 16, 2022, the Jail staff was made aware that their neglect had killed a person.  Even after Hayden died, deputies failed to conduct proper cell checks.

THIRD AMENDED COMPLAINT

### 6. The County's Policy on Medicating Gravely Mentally Ill Patients Is Grossly Deficient

257.   California Code of Regulation Title 15, § 1050 requires:

"[a]dministrators to develop and implement a written classification plan designed to properly assign inmates to housing units and activities according to the categories of … physical or mental health needs … The written classification plan shall be based on objective criteria and include receiving screening performed at the time of intake by trained personnel, and a record of each inmate's classification level, housing restrictions, and housing assignments."

258.   The Sheriff's Medical Services Division's policy no. MSD.I.3 regarding "Intake Receiving/Screening Assessment" states that for psychiatric housing, admission to the Psychiatric Security Unit (PSU) "must be upon an order from a psychiatrist [.]"

259.   By failing to provide Lonnie with a psychiatric assessment which would obviate his need for placement in the PSU, County Defendants failed to implement a classification plan which would have provided adequate medical intervention for Lonnie.

260.   To adhere with the standards set by § 1050, the jail was required to meaningfully assess Lonnie's mental health needs to house him appropriately.  As a result of the jail's failure, Lonnie further decompensated in the squalor of his filthy cell without medication and without adequate nutrition.

261.   The PSU is the only facility in the jail where patients may be involuntarily medicated, and by failing to place severely mentally ill patients in the PSU, it places vulnerable incarcerated people at risk of injury and death.

262.   The PSU exists specifically for patients like Lonnie Rupard who are unable to make medical decisions or to care for their basic needs.  The process under 5150 exists to prevent the predictable harm from psychotic patients' refusal to take their medication.

263.   The PSU was equipped for monitoring and more frequent cell checks than in the general population.  General population is not a safe environment for people like

THIRD AMENDED COMPLAINT

1  Lonnie because the deputies have no medical training and lack the ability to understand

2  and deal with serious mental illnesses.

3      264.  Psychotic patients lack legal capacity to make medical decisions.  In order

4  for these patients to be involuntarily medicated, they are required to first be placed in

5  the PSU.

6      265.  By failing to place Lonnie in the PSU, County Defendants failed to

7  medicate a gravely mentally ill patient who would fully decompensate.

8      266.  The gravity of Lonnie's illness was evident to defendants because Lonnie

9  had just been released a month prior from Patton State Hospital, which involuntarily

10  medicates its patients who lack capacity to make decisions for themselves.

11      267.  At the time of Lonnie Rupard's death, there had been a long-standing

12  policy and practice of failure to medicate gravely mentally ill patients.

13      268.  County Defendants were aware of their failure to medicate gravely

14  mentally ill patients in their custody. For example, in the case of *The Estate of Ruben*

15  *Nunez, et al. v. County of San Diego, et al.*, No. 16-cv-1412-BEN-MDD, a mentally ill

16  man in San Diego Central Jail died after failing to be transferred to the PSU.  After a

17  judge found that Ruben lacked the capacity to make decisions regarding antipsychotic

18  medication, and that serious harm was the probable result of Ruben not being

19  medicated, San Diego Central Jail providers failed to admit Ruben to the PSU.  As a

20  result, Ruben did not receive his medication or proper monitoring, and Ruben died a

21  few days later.

### 7.    The County's Policy on Weighing Patients and Taking Vital Signs Is Grossly Deficient

22

23      269.  At the time of Lonnie Rupard's death, there had been a long-standing

24  policy and practice of failing to take the vital signs and weigh patients in County jails.

25      270.  By failing to track these important health indicators for detainees in their

26  custody, and more importantly, the changes thereof, this placed patients at risk of injury

27  or death.

28

THIRD AMENDED COMPLAINT

271.   Had Lonnie's weight been adequately recorded for the duration of his incarceration, it would be evident that he was severely unwell.

272.   Despite Lonnie's refusal to eat food, hunger strike protocols were never initiated by anyone in the jail.

273.   San Diego County Sheriff's Department Medical Services Division Policy MSD.H.12 requires that sworn staff who are responsible for monitoring a patient who refuses to eat were required to inform medical staff that Lonnie was on a hunger strike.

274.   Per the policy, numerous forms of medical intervention were meant to occur, such as a psychiatric sick call, a daily registered nurse sick call to monitor his weight, medical condition, and hydration status, a medical doctor sick call to assess for acute and chronic medical conditions weekly, an assessment by the jail population management unit for specialized housing to closely monitor his condition, and recording of his responses to deputies who were to offer him food.  None of these interventions occurred.

275.   County Defendants were aware of their failure to weigh patients and take their vitals causing deaths, demonstrated by the following cases:

    a.   The failure to weigh Ruben Nunez and limit his water intake despite knowing of his potentially lethal overconsumption of water resulted in his death from psychogenic polydipsia.

    b.   In February 2019, Michael Wilson collapsed in his cell and passed away. Mr. Wilson suffered from hypertrophic cardiomyopathy and regularly took medication that allowed him to live. Without the medication, Mr. Wilson's lungs would fill with fluids. Jail staff did not give Mr. Wilson his medication. Despite their knowledge that Mr. Wilson was not receiving his medication and despite weight increase being an indicator of lungs filling with fluid, jail staff failed to weigh Mr. Wilson.

c.    In November 2019, Elisa Serna died in Las Colinas. She has
suffered from withdrawal and continued to vomit for days. She was
placed on the standard nursing protocol for dehydration, which
required Elisa to be weighed regularly. Jail staff did not weigh Elisa.

276.   The need to implement a policy on maintaining and communicating a
patient's weight was obvious given that hunger strikes were so common in the jails that
there was a written policy to address it.  The County was on notice of the risks posed to
inmates undergoing hunger strikes and the need to closely monitor their weight and
vitals due to the risk of adverse health events due to lack of nutrition.

**8.    The San Diego County Sheriff's Department's Policy on
Cell Checks Is Facially Deficient**

277.   California state law, Title 15 section 1027.5, requires safety checks to be
conducted at a minimum of 60-minute intervals. "Safety checks" is defined as "direct,
visual observation performed at random intervals within timeframes prescribed in these
regulations to provide for the health and welfare of inmates."

278.   Title 15 requires that a safety check be conducted hourly and requires a
written plan that includes the documentation of routine safety checks.

279.    This statute was intended to protect against the kind of risk suffered by the
plaintiff. Title 15 § 1027.5 was implemented for the "safety and well-being of
individuals" in custody.

280.   The County failed to implement "a written plan that includes the
documentation of all safety checks. Documentation shall include: (1) the actual time at
which each individual safety check occurred; (2) the location where each individual
safety check occurred, such as a cell, module, or dormitory number…."  The County's
policy violates Title 15 because it fails to document "the location where each individual
safety check occurred, such as a cell, module, or dormitory number."

281.   The County's policy violates Title 15 because it fails to document
"employee identification number of staff who completed the safety check(s)"

THIRD AMENDED COMPLAINT

1   The County only tracks the start time of the safety check, not the completion time.

2       282.   The County's policy violates Title 15 because it fails to document a

3   process where safety checks are "review[ed] at regular defined intervals by a

4   supervisor…."

5       283.   The County of San Diego violates Title 15 because it tracks only the time a

6   deputy starts the round of checks of the module, instead of the cell or the inmates.

7       284.   By contrast, the County of Los Angeles Safety checks are performed to see

8   if an inmate needs any medical treatment, to ensure that inmates do not pass away, and

9   to check on their well-being, including their health/signs of life/breathing. By way of

10  these safety checks, deputies are to visually inspect each inmate's body for signs of

11  life – breathing, talking, movement – even when inmates are sleeping.

12      285.   Section 1027.5 of the California Code of Regulations requires safety

13  checks at least hourly. According to LASD policy, however, safety checks for

14  inmates in Los Angeles are to be conducted every thirty (30) minutes.

15      286.   In Los Angeles, there is also a specific sergeant assigned on each shift to

16  ensure that deputies comply with Title 15 and LASD safety-check policy.  This "Title

17  15 Sergeant" monitors the electronic system that logs every safety check performed by

18  deputies.

19      287.    In Los Angeles, each safety check is tracked and logged electronically by

20  recording scanned-barcodes. When performing a safety check, a deputy scans a barcode

21  located at each cell with a handheld device to log the exact time the deputy checked on

22  the welfare of each inmate.

23      288.   The County of San Diego has none of these safeguards.  There is no such

24  thing as a barcode in San Diego jail cells.  In violation of Title 15, no log is kept of the

25  safety checks of the individual cells.

26      289.    At some point during Sheriff Gore's administration, the County of San

27  Diego got rid of the policy and the mechanism in which deputies were required to log in

28

THIRD AMENDED COMPLAINT

the time that the safety check was completed. The only entry into JIMS is when a safety check round started.

290.   There is no policy, mechanism or requirement that supervisors review the tapes of the cell checks for compliance.

291.   As a result, when deputies fail to complete the round of checks or abandon their posts, there is no mechanism for anyone to find out about the deficient checks unless someone dies and a homicide investigator reviews the footage of the checks.

### 9.    The County Maintains a *De Facto* Policy of Failing to Conduct Proper Cell Checks

292.   Defendants have failed to implement proper policies and procedures with respect to monitoring detainees despite specific knowledge that their deputies were repeatedly failing to conduct proper cell checks.

293.   For the three days preceding Lonnie's death, no deputy entered his cell to conduct a hard count. A "hard count" requires a deputy to scan the inmate's bracelet and verify proof of life.  If an inmate is unable to come to the door to show the bracelet, deputies enter the cells to check for proof of life.

294.   Upon information and belief, the County's written policy requires deputies to conduct hard counts twice per day, once every twelve hour shift.

295.   Upon information and belief, the County's written policy requires deputies get verbal or physical acknowledgment from each incarcerated person.

296.   In the three days preceding Lonnie's death, no deputy entered Lonnie's cell, or any cell in the 7D module, to conduct a hard count. Six hard counts were completely missed. It is clear that there is a custom of failing to conduct proper cell checks and follow policies because, during these three days, no action was taken to ensure deputies were conducting hard counts.

297.   Additionally, Defendants were made aware by a series of deaths and catastrophic injuries that deputies were not monitoring detainees on camera and walking by cells without actually checking on the inmates.

THIRD AMENDED COMPLAINT

298.  Defendants knew of a long history of subordinates failing to conduct proper cells checks or failing to follow jail policies regarding care and monitoring of seriously ill inmates, including these prior cases:

a.  On June 25, 2011, Daniel Sisson died from an acute asthma attack made worse by drug withdrawal. The San Diego County Medical Examiner estimated in an autopsy report that Sisson had been dead for several hours when a fellow inmate found him. Deputies had failed to check on Mr. Sisson for hours. Mr. Sisson later died during a drug withdrawal.

b.  In 2012, as Mr. Victorianne laid on the floor of his cell, naked and unconscious, none of the deputies conducted proper security checks, soft counts or hard counts, which requires the deputies to scan the wrist band of each inmate. One deputy was told by an inmate that Mr. Victorianne was not breathing. This deputy kicked Mr. Victorianne; stated that Mr. Victorianne "twitched"; and left him to die in his cell. These deputies failed to conduct proper checks then lied about it to investigators.

c.  In 2014, Christopher Carroll, who was mentally ill, was placed in segregation. He was found dead with a noose around his neck. Mr. Carroll had smeared blood on the wall of his cell. He had urinated on the floor and food and feces were stuck to the ceiling. Deputies had failed to conduct proper cell checks to check for his wellbeing despite Mr. Carroll's known condition.

d.  In Ruben Nunez's case in 2015, a deputy saw Mr. Nunez in his cell sitting in his own vomit, blood and urine. A nurse told this deputy to take Mr. Nunez to Medical. Despite seeing Mr.

Nunez twice in this condition, this deputy failed to summon help or take Mr. Nunez to Medical as directed. The deputy left Mr. Nunez in his cell to die.

e.  In February of 2016, Richard Boulanger hung himself in his cell at the Central Jail. His cellmate pressed the emergency call button, but no deputy came to the cell for approximately 20 minutes. A subsequent investigation revealed that one of the deputies did not break stride or look into Mr. Boulanger's cell during a cell check. The investigation revealed that during cell checks, the deputy peered into each cell for approximately one second in violation of policy. The investigation which followed revealed a practice in which the deputies were turning off the sound of the emergency call buttons, lowering the volume, or muting the inmate intercom system so that no sound could be heard. Call buttons in many of the housing units did not function, which made no sound when pressed. The audio for the monitor in the jail tower did not function well so that it was difficult to hear tones and sounds from the monitor even when the volume was turned to the maximum level. Deputy Dixon at the Central Jail admitted that he had failed to timely respond to multiple inmates' calls for help through the emergency intercom system because the "audio alert function of the inmate intercom system had been 'muted' and was turned all the way down in volume[.]" When Deputy Dixon started his shift on February 12, 2016, he walked into the control tower room and turned everything off.

f.  On Christmas eve, 2017, at 3:50 am, Joseph Carroll Horsey was found dead in his cell. CLERB issued a finding in June of

THIRD AMENDED COMPLAINT

2020 that Mr. Horsey had been dead for hours when he was discovered. CLERB found that deputies at the Central Jail violated policies for inmate count and security checks of housing units and housing cells. The jail surveillance video recordings did not reveal any deputy entering the module to conduct a Hard Count; counting inmates with the use of a Bar Code Reader, an Emergency Evacuation List, Face Cards or Floor Sheets to confirm the identity. Deployment logs confirmed that Deputies 1, 2, and 3 were assigned/responsible for performing and logging in all security and safety checks. Three deputies had made entries into the JIMS system that they had properly conducted safety checks.

g.   In January 2018, Frankie Greer was booked into Jail and requested his anti-seizure medication. The medical staff failed to provide it to him. He was required to be placed on the bottom bunk due to his seizure disorder. The housing staff placed Mr. Greer on top of the triple bunk. Mr. Greer suffered a seizure and fell approximately seven feet onto his head and face onto the cement ground. Mr. Greer's cellmates and the other inmates in the unit were screaming for help and frantically pounding on the emergency call button as Mr. Greer continued to have more seizures and bleed out. The deputies in the control tower had turned off the sound of the panic buttons. The deputies did not respond for approximately 45 minutes after the fall. Mr. Greer was in a medically induced coma and the doctors were forced to drill a hole in his head to relieve the pressure in his brain. Mr. Greer has a permanent and irreversible damage to his brain.

h.    In March of 2018, Paul Silva who was going through a mental health crisis was booked into jail. For 36 hours he was left in temporary cells. The cells had no bed and nowhere Paul could sit other than a metal bench. Paul was denied medication for his schizophrenia and continued to decompensate. No deputy checked on Paul for 36 hours. Paul Silva died when he suffered a psychotic break and the deputies used force in extracting Paul from his cell.

i.    In April of 2018, sheriff's deputies saw Colleen Garot with a black eye and contusions to her face. Instead of taking her to the hospital, they booked her in jail on an outstanding warrant for a failure to appear in court. Ms. Garot was agitated, and disoriented, making nonsensical statements. She had multiple bruises on her face and periorbital swelling. Instead of providing medical care, deputies placed her in a safety cell. She had no clothes. There was a video camera in the safety cell. Deputies could see that Ms. Garot was attempting to climb the wall. Ms. Garot suffered a seizure, fell to the ground and laid there. By the time someone noticed, Ms. Garot was foaming at the mouth. Ms. Garot was suffering from a skull fracture, and a traumatic brain injury. Either the deputies were failing to watch and monitor the video in the safety cell or they ignored a woman in medical crisis for approximately ten hours.

j.    In March of 2019, Ivan Ortiz told the staff that he was suicidal. They placed him in the psychiatric unit so he could be observed. They failed to observe him and left him with a plastic bag, with which he suffocated himself to death.

THIRD AMENDED COMPLAINT

k.    In November of 2019, Elisa Serna was going through withdrawal and continued to vomit for days. Elisa was placed in a cell where she was supposed to be monitored. A deputy and a nurse witnessed Elisa suffer a seizure, fall to the ground and lose consciousness. The nurse and the deputy turned around, walked outside, and closed the door behind them. There was no cell check. The deputies either did not look at the video showing Elisa Serna on the floor urinating on herself or they chose to ignore it. By the time a deputy went inside the cell, rigor mortis had started to set in. The nurse in this case has been charged with manslaughter.

l.    In January of 2020, deputies failed to conduct a mandatory safety check on Blake Wilson who was struggling with drug addiction. CLERB found that the deputy who was supposed to conduct "proof of life" checks in Blake Wilson's module spent "approximately one second" looking into Wilson's three-person cell. More than eight hours passed between the time Wilson was last seen alive and when he was found dead.

m.    In February of 2020, Anthony Chon had trouble breathing. CLERB found that the deputies violated Sheriff's Department policies by not immediately ensuring that Anthony Chon received medical attention. One of the deputies who had been told that Mr. Chon could not breathe decided not to take him to Medical because some inmates suffer from anxiety.

n.    On November 22, 2020, Lazaro Alvarez was found dead at the San Diego Central Jail. After an investigation, it was determined that Mr. Alvarez had suffered a heart attack caused by methamphetamine and fentanyl. Mr. Alvarez was last seen

alive at approximately 11:20 PM on November 21, 2020. Despite hourly "safety checks," nobody rendered aid to Mr. Alvarez until after 3AM. After this incident, CLERB recommended that the San Diego County Sheriff's Department revise its policies to mandate proof of life verification through visual checks every 60 minutes during the booking process. Safety checks did not require proof of life, which is why no one noticed he was dead for over three hours. Even after Mr. Avarez was discovered, deputies chose not to conduct CPR.

o. On January 6, 2021, Omar Moreno was found dead at the San Diego Central Jail. Deputies performed safety checks late on Omar's cell and missed a crucial safety check. Safety checks that were performed were woefully inadequate, consisting of deputies peeking in to briefly check the safety of inmates for 1-2 seconds. The supervisors and deputes at the Central Jail referred to safety checks "power walks" and "dead walks" because they find so many dead bodies.

299. Defendants were on notice that deputies were failing to conduct proper cell checks. A working group of sheriff's officials convened as a result of Mr. Alvarez' death, which recommended that the Jail conduct 30-minute safety checks in intake, processing, and release areas. The working group recommended that the County revise its policies and implement training regarding the 30-minute safety checks for these areas. The working group recommended that facility commanders submit a written report 30 days post-implementation to discuss operational impacts of these changes.

300. Not a single one of these recommendations was ever implemented.

301. It was no mystery to the County defendants that their employees were failing and needed to be trained and supervised. In the 12 months before Omar

Moreno's death, deputies at the Central Jail self-reported over 600 times in which they failed to start the cell check of the floor late or failed to properly log in their start time. These are only the self-reported violations of state law. These involved ***374 separate instances*** in which deputies self-reported that they violated California state law by not starting their cell check rounds of the floor on time.

302.   It is not possible for anyone to know how many unreported cell check failures occurred during this period because there is no system or policy in place to verify that cell checks were actually conducted.

303.   On July 20, 2021, Saxon Rodriguez died at the Central Jail after overdosing on fentanyl and methamphetamine. CLERB's investigation revealed that a safety check had not been conducted timely. CLERB again found that the County violates Title 15 policies on safety checks.

304.   According to CLERB:

> The San Diego Sheriff's Department's practice is to start safety checks within the 60-minute time-period but not necessarily to directly visualize each incarcerated person within that time-period, thus resulting in innumerable instances where incarcerated persons are not directly visually observed within statutorily mandated time periods.  SDSD considers the resulting safety checks to be completed within statute and policy. For example, if a safety check of a module is started within 55 minutes of the last safety check start time, SDSD considers the safety checks occurring during that check as within statute and policy, even if the actual time between direct visualization of an incarcerated person is just a few minutes over 60 minutes or many minutes over 60 minutes. When it comes to the safety of incarcerated persons and the prevention of deaths or negative physical or mental health outcomes, every minute counts.

305.   CLERB recommended to San Diego Sheriff's Department:

> Take all necessary measures to change its current practice to conform with statute and its own existing policy by mandating that every incarcerated person be directly observed by sworn staff at random intervals not to exceed 60 minutes (30 minutes for Medical Observation Beds and

in Psychiatric Stabilization Units and 15 minutes for safety cells), as opposed to simply ensuring the safety checks start within the mandated time-period.

306.    The Sheriff's Department refused to implement the changes recommended by CLERB.

307.    Gore, Martinez and the County of San Diego had been advised repeatedly that the deputies were failing to conduct proper cell checks and failing to monitor the cells. Despite this specific knowledge, defendants failed to take appropriate action.

308.    The Citizens Law Enforcement Review Board ("CLERB") also conducted an analysis of data regarding in-custody deaths in San Diego County jails over the past 10 years, the results of which were released in April 2022.

309.    CLERB made the following findings, in pertinent part:

    a.    Residents of San Diego County are no more likely to die than residents of other California counties;

    b.    San Diego jails have the highest number of unexplained deaths compared with all other California counties when controlling for jail population;

    c.    The risk of overdose/accidental deaths is the greatest in San Diego jails;

    d.    Elevated risk of death appears to be isolated to the unsentenced jail population.

310.    Despite their awareness of the need to take concrete actions to address a crisis of soaring jail deaths in San Diego County facilities, Gore and the County have avoided responsibility; resisted transparency; refused to conduct transparent investigations to determine wrongdoing; refused to hold individual deputies and medical staff accountable; and refused to discipline these individual staff members who commit misconduct that kills inmates. This has created a culture of apathy and impunity at the Sheriff's Department. As the Union-Tribune's Editorial Board noted, Gore's cavalier attitude toward inmate deaths reflects the attitude of his subordinates. Because it is

1  impossible for any individual Sheriff's Department subordinate to suffer discipline,

2  there is a custom of encouraging neglect and abuse of seriously ill inmates, and Jail staff

3  are permitted to act with impunity. Thus, the failure to investigate and discipline

4  subordinates was the moving force that caused the ultimate injury to decedent Lonnie

5  Rupard.

**10.   Jail Defendants and Liberty Healthcare Systemically Fail
to Maintain Sufficient Numbers of Deputies and Health
Care Professionals**

8       311.   Defendants maintain insufficient numbers of health care professionals to

9  provide minimally adequate care to the approximately 4,000 incarcerated people in the

10 Jail. In July 2021, the Sheriff's Department had 233 medical staff vacancies and only

11 287 medical staff. There are not sufficient health care staff to timely respond to

12 incarcerated people's requests for medical care, to adequately screen, monitor, and

13 provide follow-up care to incarcerated people who have serious and chronic illnesses, or

14 to treat incarcerated people when medical emergencies occur. Jail Defendants have long

15 been aware that the Jail's medical staffing is deficient and jeopardizes patient safety.

16 The NCCHC Report found that medical understaffing may be contributing to untimely

17 medical care at the Jail. After the NCCHC Report, the Sheriff's Department publicly

18 acknowledged that it needed to hire more medical staff to provide adequate care and

19 comply with NCCHC standards. Jeff McDonald, Kelly Davis, *Sheriff has a ways to go*

20 *to meet 'gold standard' of jail accreditation*, San Diego Union-Tribune, Oct. 13, 2019,

21 https://www.sandiegouniontribune.com/news/watchdog/story/2019-10-13/sheriffs-

22 quest-for-jail-accreditation-to-take-time-money-and-culture-shift.

23      312.   Understaffing of health care professionals translates to dangerous

24 conditions and inadequate medical care for incarcerated people. In December 2020,

25 understaffing prompted nursing staff at Vista to write a desperate plea to Jail command

26 staff for "any kind of help we can get." The nurses' letter explained that during certain

27 shifts, Vista had only two registered nurses available—one permanently stationed at

28 intake—for the 600 people incarcerated at the facility. As a result, the nurses wrote,

"this environment for patient care is not even close to standard," and "[p]atients are being neglected and not being given the care that they need and deserve." The nurses implored command staff to "understand that people's lives are put at risk" by the dangerous understaffing at the Jail.

313.    Due to understaffing, the Sheriff's Department improperly allows untrained nurses to perform mental health evaluation gatekeeping functions. Many nurses are uncomfortable being asked to serve this role. An October 2021 letter from the Service Employees International Union ("SEIU") Local 221, which represents Jail health care workers, to the Citizens Law Enforcement Review Board ("CLERB") explained that understaffing created "dangerous and inhumane" conditions for incarcerated people and medical staff alike.

314.    Because of its failure to hire and retain sufficient medical staff, the Sheriff's Department relies on a system of mandatory overtime, which causes medical staff burnout, results in high turnover, and places incarcerated people at further risk of harm. The Sheriff's Department's medical employees have been on mandatory overtime because of chronic staffing deficits. Medical staff often call in sick due to burnout, which leaves incarcerated people with even fewer medical professionals available to provide care. Mandatory overtime and other workplace stressors are so severe that medical staff often quit. Even when the Sheriff's Department hires new medical staff, it is unable to retain new employees due to these impossible working conditions. The failure to maintain sufficient medical staff causes disruptions and delays in the care of incarcerated people's serious medical needs. Many of the systematic and dangerous practices in the Jail outlined in this complaint stem from Jail Defendants' failure to maintain sufficient numbers of health care staff and contractors in the Jail.

315.    There was a persistent pattern of understaffing the jails so that it was nearly impossible for staff to conduct random safety checks or to have cover officers when there was a delay or problem in conducting checks.

THIRD AMENDED COMPLAINT

316.    The Jail was notified by its own employees that the pattern of understaffing the Jails was dangerous for both deputies and inmates.

317.    The Jail, Gore and Martinez were notified by their own staff that their morale was low because they were being forced to work overtime as a result of understaffing, causing exhaustion and mistakes.

318.    On any given shift, there were multiple absent deputies and supervisors were not able to staff the shift with sufficient numbers of deputies to perform their duties.

319.    Defendants were well aware that cell checks were not being conducted properly because there was insufficient staffing to perform each check in compliance with Title 15.

320.    The Jail's response to this serious problem was to change its policy so that deputies would not have to self-report failed or delayed cell checks.

## 11.    The County of San Diego and Liberty Healthcare Had a Policy of Overscheduling Their Providers, Making It Impossible to Deliver Medical Services

321.    Liberty Healthcare as a third-party provider, was responsible to providing sufficient staffing to meet the needs of psychiatric patients.

322.    Liberty Healthcare, as a policy, failed to staff a sufficient number of providers at the Central Jail as a policy.  Liberty Healthcare knew that its' staffing, while saving costs and increasing revenue, was dangerous to the patients in its care.

323.    As a result of its failure to properly staff the Central Jail, Lonnie Rupard was denied treatment on multiple occasions.

## 12.    Liberty Healthcare Failed to Train Its Medical Staff on the Recurring Situation of Treating Psychotic Inmates and Procedures for Admission to PSU

324.    Liberty Healthcare failed to adequately train Defendant Cruz on treating psychotic inmates and assessing the need for patients to be transferred to a higher level of medical care, including admission to the PSU.

325.    Liberty Healthcare failed to adequately train Cruz on how and when to place a patient in the PSU.

THIRD AMENDED COMPLAINT

326. Liberty Healthcare's failure to adequately train Cruz amounts to deliberate indifference.

327. Cruz' failure to place Lonnie – who was rambling incoherently and verbally aggressive – into the PSU is a constitutional violation that is so patently obvious as to implicate Liberty Healthcare's failure to provide him adequate training.

328. In *Bd. of Cnty. Commissioners v. Brown*, 520 U.S. 397, 409 (1997), the Supreme Court stated a pattern of similar violations is not that a failure to train claim may be proven where "a violation of federal rights may be a highly predictable consequence of a failure to equip [the employees] with specific tools to handle recurring situations."

329. In *The Estate of Ruben Nunez, et al. v. County of San Diego, et al.*, the court specifically held the death of mentally ill patients who were not placed into the PSU was a highly predictable consequence of a recurring situation for Jail officials pursuant to *Brown*: "The 'highly predictable consequence' of failing to equip CPMG doctors with knowledge about how to place critically ill patients in the PSU or that it was their responsibility to order transferred patients' housing in the PSU, is that critically ill transferred patients would not be placed in the PSU and would not receive the level of psychiatric care and monitoring required by the U.S. Constitution." (ECF. No. 414 at 12).

330. The same rings true today. The proper housing and classification of mentally ill people within the jail is a recurring situation that happens every day at the San Diego Central Jail.

331. By failing to place Lonnie into the PSU, his death was a highly predictable consequence of the failure to train Jail staff how to properly admit mentally ill patients into the PSU.

332. This failure to train and supervise Cruz constitutes deliberate indifference to the substantial risk its policies and procedures were inadequate.

/ / /

/ / /

THIRD AMENDED COMPLAINT

### 13.    The County and Liberty Healthcare Ratified the Misconduct of Their Employees

333.    Defendants have a widespread history of ratifying employee misconduct by failing to conduct appropriate investigations. Instead of supervising his deputies, Gore chose to defend and deny their misconduct thereby encouraging further bad behavior.  Martinez continued to ratify the actions of her employees when she became the Sheriff.  Upon information and belief, Montgomery ratified the actions of the medical staff by failing to take action to discipline them or terminate their employment.

334.    Defendant County condoned and acquiesced in the abusive behavior of its subordinates by refusing to retrain them, discipline them, or correct their abusive behaviors.

335.    The County ratified the actions of the individual defendants by failing to take any action after Lonnie's death.

336.    Defendant County was, or should have been, aware that the program regarding supervision and discipline of subordinates, who violated the civil rights of inmates or citizens, was so inadequate that it was obvious that a failure to correct it would result in further incidents or dangerous or lawless conduct perpetrated by their subordinates.

337.    Liberty Healthcare condoned the conduct of its employees, including Cruz. Upon information and belief, Liberty failed to take action to discipline him or terminate his contract.

# I.
# FIRST CAUSE OF ACTION
## 42 U.S.C. § 1983: Deliberate Indifference of Serious Medical Needs
### (By the Estate of Lonnie Rupard Against Defendants Anosike, Cruz, Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre, James, Romero, Johnson, Torres, Treyvonne, Wereski, Romans, Gutierrez, Doe Deputies 15-20 and Doe Medical Providers)

338.    Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

339.   By virtue of both the Eighth Amendment and Fourteenth Amendment to our Constitution, the government has an obligation to provide medical care for those whom it is punishing by incarceration.

340.   Deliberate indifference is the recognized standard of protection afforded to both convicted prisoners and pretrial detainees under the Eighth and Fourteenth Amendments respectively.

341.   Plaintiff was a pretrial detainee awaiting trial following his arrest for probation violation and is thus protected by the Fourteenth Amendment right to due process. The Due Process Clause of the Fourteenth Amendment applies to pretrial detainees' claims of inadequate medical care.

342.   In the alternative, if Lonnie is not determined to be a pre-trial detainee for which the Fourteenth Amendment would apply, the Eighth Amendment would apply, which protects Lonnie from cruel and unusual punishment.

343.   Whether analyzed under the Fourteenth Amendment or the Eighth Amendment deliberate indifference standard, each of Defendants' conduct as set forth above amounts to both objective and subjective deliberate indifference of Lonnie's serious medical needs pertaining to his need for treatment related to his schizophrenia, psychosis, malnourishment, and dehydration, which ultimately resulted in his death from malnutrition and dehydration in the setting of neglected schizophrenia. The conduct was so egregious that the medical examiner ruled the manner of death to be a homicide.

344.   Deliberate indifference is demonstrated by the way in which Defendants failed to: (1) provide medical care in the form of medications, psychiatric treatment, medical treatment for malnourishment, as well as medical monitoring of vital signs and weight; (2) chose a medically unacceptable course of treatment under the circumstances to house Lonnie in a general population as opposed to the PSU and not adequately monitor him; and (3) chose this course in conscious disregard to the excessive risk to

Lonnie's health when it was known that Lonnie was not taking his psych medications, demonstrating psychosis, and was objectively malnourished.

345.   Deliberate indifference is highlighted by the fact that Lonnie did not even have his vital signs checked, nor was he weighed, a single time between December 20, 2021 and the time of his death on March 17, 2022, during which time Defendants knew that Lonnie was not taking his prescribed psychiatric medications, was demonstrating psychosis, severe decompensation, and was obviously and severely malnourished, ultimately losing 60 pounds (over 1/3 of his body weight) in less than three months.

346.   Each of the above-named defendants made intentional decisions and omissions regarding Lonnie's conditions of confinement and the denial of adequate medical care, which amount to a deliberate indifference, including, but not limited to:

a.   Failing to house Lonnie in a Psychiatric Stabilization Unit (PSU) despite knowledge that Lonnie was refusing his prescribed psych medications, psychotic, unable to care for himself and ultimately starved to death;

b.   Failing to provide assessment or to summon medical care in the face of obvious signs that Lonnie's health was deteriorating dangerously including, but not limited to, rambling incoherently with altered thought process, unkempt and dirty appearance with an unclean cell with feces and contaminated food with larvae;

d.   Failing to timely and adequately document information regarding Lonnie's deteriorating condition in the jail information system;

e.   Failing to take appropriate measures to ensure Lonnie was receiving adequate and prompt medical care, particularly when he exhibited gravely concerning signs of illness;

f.   Failing to take vital signs and obtain weight measurements for an individual who was obviously starving to death and in need of medical attention; and

g.    Failing to timely and adequately check on Lonnie's safety and wellbeing while he was in his cell despite knowledge that he was disoriented in a state of complete psychosis, and visibly emaciated with a rapid weight loss of a third of his body weight. It is especially egregious that Lonnie was still not adequately checked on after Defendants were made aware that another inmate in the same housing unit had died the day prior.

347.    Defendants made an intentional decision to deny him the basic services of the Jail such as a hygiene check, a shower, or time outside his cell.

348.    Defendants' intentional decisions and omissions put Lonnie at substantial risk of suffering serious harm.

349.    Defendants did not take reasonable available measures to abate or reduce the risk of serious harm, even though a reasonable officer or employee under the circumstances would have understood the high degree of risk involved – making the consequences of the Defendants' conduct obvious.

350.    As alleged above, Defendants' conduct and omissions constituted various policy violations.

351.    While Lonnie was in their custody and care, Defendants had adequate time to reflect and reason prior to acting or failing to act. Because Lonnie's health deteriorated over the span of several days, if not weeks or months, actual deliberation was practical.

352.    Defendant Cruz was aware Lonnie had been seen for a psychiatric sick call during his previous incarceration in 2020. He knew he had been previously treated with antipsychotic medications, and that he had been hospitalized at Patton State Hospital until prior. Indeed, after finally seeing Lonnie for a psychiatric evaluation, Cruz noted Lonnie **had a potential for decomposition.** Even after noting this in his December 29, 2021 evaluation, Cruz still permitted Lonnie to deny medication. Cruz refused to perform more frequent evaluations to ensure the potential decomposition did not occur.

Cruz refused to refer or involuntarily admit Lonnie to the PSU. Cruz stood by as
Lonnie's predictable decomposition occurred and did nothing to stop it.

353.    Defendant Christina Anosike, a mental health clinician, performed a
wellness check on Lonnie on February 9, 2022. Deputies informed Anosike that Lonnie
often spoke to himself unintelligibly. She was aware and noted that Lonnie displayed
impoverished thoughts and talked to himself in unintelligible words. Despite this
knowledge of Lonnie's psychotic presentation, obvious weight loss, and overall
deteriorating physical health, he was not referred by Anosike. She made no effort to
take Lonnie's vitals, take his weight, or refer him to PSU or a medical doctor.

354.    For at least three days prior to Lonnie's death, Aguilera, Viladiu, G.
Martinez, Amado, Mace, Aguirre James, Romero, Torres, Treyvonne, Wereski,
Romans, Gutierrez, and Doe Deputy Defendants 15-20 watched as Lonnie refused food,
medication, a shower, and day break time. They watched as Lonnie's food rotted in his
cell and began growing maggots and larvae. They watched as Lonnie's cell became
piled with feces and toilet paper to the point where the floor was unmovable. While
observing Lonnie become more and more emaciated and succumb to his maladies,
Deputies refused to provide the most basic level of care and human decency. They
watched a man dying in his own filth and turned a blind eye to Lonnie's
suffering.  Deputies relegated Lonnie to a subclass of human existence, denying him of
his most basic human needs in the process.

355.    With this knowledge, they violated Title 15 by failing to perform cell
checks to ensure that Lonnie was alive.  Deputies are required by the County's own
policy to check for environmental factors such as odors and cleanliness during each
safety check.  No deputy satisfied this requirement.

356.    Defendant deputies failed to perform proper cell checks even after another
person died in the same module from neglect.  They failed to perform proper cell checks
even after the state auditor faulted them for deficient cell checks and misconduct
causing deaths of inmates.

357.   Doe Medical Providers had access to and were aware of Dr. Badre's report on Lonnie. Doe Medical Providers failed to refer Lonnie to a state hospital, and they did not make any effort to refer Lonnie to the PSU for emergency psychiatric intervention. The Medical Provider Does either failed to notify Defendant Montgomery and other supervisors that Lonnie was not eating or Montgomery or Montgomery and the other Supervisors were informed of Lonnie's hunger strike and failed to act according to the hunger strike policy.

358.   The Medical Provider Does failed to monitor his condition hydration status or take his vitals.  These Does were personally aware of the condition Lonnie was living in, yet failed to provide a medical assessment.  They failed to weigh him.  They failed to document the calls from sworn staff for a medical evaluation.  They failed to schedule a medical doctor sick call so that Lonnie could be treated for starvation and malnutrition.

359.   Over these days and weeks, each Defendant watched Lonnie steadily deteriorate and ignored his clear symptoms of inanition.  Watching a grown adult shrink down to 105 pounds, these Defendants chose not to weigh Lonnie.

360.   The actions and omissions by Defendants constituted objective and subjective deliberate indifference to Lonnie's medical needs and unsafe conditions of confinement. Defendants' actions and omissions violated the due process clause of the Fourteenth Amendment, or in the alternative constituted cruel and unusual punishment under the Eighth Amendment.

361.   Defendants' actions and omissions constituted both objective and subjective deliberate indifference to Lonnie's medical needs and unsafe conditions of confinement.

362.   Defendants' deliberate indifference was an actual and proximate cause of Plaintiffs' damages including both Lonnie's pain and suffering prior to his death and his death. Plaintiffs seek compensatory damages.

363.   Plaintiffs also seek punitive damages on the grounds that Defendants acted with deliberate and reckless disregard of Lonnie's constitutional rights.

364.    Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to 42 U.S.C.§ 1988.

## II.
## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983: Right of Association

**(By Justino Rupard Against Defendants Anosike, Cruz, Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre, James, Romero, Johnson, Torres, Treyvonne, Wereski, Romans, Gutierrez, Defendant Doe Deputies 15-20, and Doe Medical Providers)**

365.    Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

366.    Plaintiff Justino Rupard alleges this substantive due process claim against Defendants for depriving him of his rights to love, companionship, and society with his father, Lonnie Rupard.

367.    The aforementioned acts and/or omissions of Anosike, Cruz, Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre, James, Romero, Johnson, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Defendant Doe Deputies 15-20, caused the untimely, preventable, and wrongful death of Lonnie Rupard and deprived Plaintiff Justino Rupard of his liberty interest in his relationship with his father, in violation of his substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

368.    There was no legitimate penological interest in failing to medicate and treat Lonnie Rupard.

369.    There was no legitimate penological interest in failing to communicate critical medical information and denying access to medical care to an inmate in severe and obvious medical danger and distress. There was no legitimate reason for failing to place Lonnie Rupard in PSU.

370.    There was no legitimate penological interest in failing to provide food and basic hygiene or leaving a man to die in his own filth.

THIRD AMENDED COMPLAINT

371.   There was no legitimate penological interest in failing to call for help while watching a man starve to death.

372.   The deprivation of the rights alleged above has destroyed the constitutional rights of Justino Rupard to the society and companionship of his father which is protected by the substantive due process clause of the Fourteenth Amendment.

373.   A substantive due process claim of impermissible interference with familial association arises when a state official harms a parent or child in a manner that shocks the conscience. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation. *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

374.   "There are two tests used to decide whether officers' conduct 'shocks the conscience.'" *Id.* at 1056.  A state official's conduct may shock the conscience if (1) the official acted with a "purpose to harm" the victim for reasons unrelated to legitimate law enforcement objectives; *or* (2) the official acted with "deliberate indifference" to the victim.  *Id.* at 1137 (emphasis added).  Which test applies turns on the specific circumstances of the underlying events in each case.  If the encounter at issue escalated so quickly that the officer had to make a snap judgment, the plaintiff must show the officer acted with a "purpose to harm."  See *id.*  However, if the situation evolved within a time frame that allowed officers to reflect before acting, the plaintiff must show the officer acted with "deliberate indifference."  See *id.*

375.   Here, in a situation that spans days, weeks and months, defendants had ample opportunity to deliberate.  Allegations that they acted with deliberate indifference satisfies the "shocks the conscience" standard under the Fourteenth Amendment because they mean the same thing.

376.   Defendants' deliberate indifference was an actual and proximate cause of Plaintiff's damages.

THIRD AMENDED COMPLAINT

377.   The conduct alleged herein violated Plaintiff's rights as alleged above, thereby legally, proximately, foreseeably and actually causing Plaintiff Justino Rupard to suffer damages all to be shown in an amount according to proof at the time of trial.

378.   Plaintiff also seeks punitive damages on the grounds that Defendants acted with deliberate and reckless disregard of Lonnie's constitutional rights.

379.   Plaintiff is entitled to costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

## III.
## THIRD CAUSE OF ACTION
### Failure to Properly Train and Supervise (42 U.S.C. § 1983)
### (By The Estate of Lonnie Rupard Against Defendants Montgomery, Gore, Kelly Martinez, Doe Medical Providers and Doe Supervisors)

380.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

381.   Defendants had a duty to use reasonable care in the training and supervision of its employees, deputies, sworn staff, contractors, and agents.

382.   Defendants had a duty to properly train and supervise its employees in determining the proper and adequate course of treatment for detainees in need of medical treatment.

383.   Defendants had a duty to properly train and supervise its employees to summon medical care for detainees whom they knew, or had reason to know, required medical care.

384.   Defendants failed to properly train their employees with regard to the need to communicate critical medical information to each other.

385.   Defendants failed to properly train their employees with regard to the treatment of schizophrenia and psychosis.

386.   Defendants failed to properly train their employees with regard to the treatment of dehydration and starvation.

387.   Defendants failed to properly train their employees with regard to conducting cell checks.

388.   Defendants failed to properly train their employees with regard to hunger strike protocol.

389.   Defendants failed to properly train their employees with regard to responding to staff requests for wellness checks.

390.   Defendants failed to properly train their employees with regard to placing gravely ill patients in the PSU.

391.   Defendants failed to properly train their employees with regard to sanitation and hygiene.

392.   Montgomery, as the person in charge of medical services, had the duty to train all medical staff including the medical care providers who failed to properly treat Lonnie Rupard.  He failed to train them in the following respects: (1) weighing patients who are starving; (2) taking vitals of patients in deteriorating medical condition; (3) following the hunger strike protocol for people dying of starvation; (4) placement of gravely ill patients in the PSU; and (5) timely responding to requests for wellness checks.

393.   Gore and Kelly Martinez, as the decisionmakers for the Department, had the duty to train their employees in conducting proper cell checks and proper staffing to meet the basic needs of the people in custody.  They had the duty to train their employees to respond to starvation and hunger strikes and to provide basic sanitation and hygiene.

394.   Upon information and belief, the Doe Medical Supervisors employed by Liberty Healthcare failed to train and supervise their employees on: (1) placing patients in the PSU; (2) properly assessing patients who are decompensating; and (3) properly scheduling and seeing patients to be sufficiently examined instead of rushing through a cursory "examination".

395.   The Doe Medical Supervisors employed by Liberty Healthcare had a duty and obligation to oversee their providers, including Defendant Cruz, to ensure that they were providing minimally adequate care.  They had an obligation to conduct chart checks and periodic reviews to ensure that Liberty's providers were not committing malpractice.  Liberty's Doe Medical Supervisors failed to take any action to supervise and discipline their providers and ratified their actions after the death of Lonnie Rupard.

396.   As a result of the failure of Liberty's Doe supervisors' failures, Cruz failed to provide any care to Lonnie by failing to see him at all for unspecified "time constraints."  When Cruz did show up to see Lonnie, Cruz did nothing to treat Lonnie, only documenting that a patient who was decompensating was "uncooperative."

397.   All defendants breached their duty of care such that Lonnie's prolonged health crisis was deliberately ignored and Lonnie endured pain and suffering and ultimately died as a result.

398.   Defendants knew that deputies were consistently failing to conduct proper cell checks, leading to numerous deaths and serious injuries. Gore and Martinez knew that their housing deputies were failing to place patients and inmates in proper housing units where they could be monitored for their serious medical needs. Despite this knowledge, Gore and Martinez failed to train and supervise their staff on conducting proper cell checks on medically vulnerable patients, including but not limited to Lonnie Rupard.

399.   Their failure to train and supervise their deputies on Title 15 cell checks led to hundreds of violations each year, causing deaths and serious injuries.

400.   Defendants Gore and Martinez, who were responsible for implementing proper training, have systemically failed to maintain adequate and proper training necessary to educate deputies and medical staff as to the Constitutional rights of inmates, and to prevent the consistent and systematic failure to provide medical care.

401.   Defendants Gore, Martinez, and Montgomery failed train and supervise staff on the necessary care and assessments of inmates suffering from serious medical

THIRD AMENDED COMPLAINT

conditions including unmanaged schizophrenia and starvation, and they failed to implement policies and procedures with respect to communicating such sensitive and critical information to ensure that inmates will be cared for.

402.    Despite specific knowledge that critical medical information was not being communicated between the medical staff to sworn staff, Defendants took no action.

403.    Despite their knowledge of previous instances of wrongful deaths in the jails as a result of the failure to communicate critical medical conditions, Defendants failed to properly train or retrain their deputies and medical staff to prevent deaths of inmates.

404.    As a direct, proximate, and foreseeable result of Defendants' breaching their duty to train their subordinates, Lonnie Rupard's medical needs were not properly addressed and he was not properly monitored.

405.    As a direct and proximate result, Lonnie Rupard suffered unconstitutional and inhumane treatment, and ultimate died while in jail.

406.    Plaintiffs seek damages in an amount according to proof at the time of trial.

## IV.
## FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983:  *Monell* **Municipal Liability**

### (By Plaintiffs Against Defendant County and Liberty Healthcare of California Inc.)

407.    Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

408.    A municipality may be liable under § 1983 when execution of a policy or custom inflicts plaintiff's injury. *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). The policy may be one of "inaction" that amounts to the "functional equivalent of a decision by the city itself to violate the Constitution." *City of Canton, Ohio v. Harris* ("Canton"), 489 U.S. 378, 394-95 (1989).

THIRD AMENDED COMPLAINT

409.    The County and Liberty Healthcare are liable under § 1983 for its customs of inaction and its failure to promulgate adequate policies related to treatment of individuals, such as Lonnie, who have known psychiatric illness.

410.    In February 2022, the California State audit highlighted customs of inaction related to among other things, inadequate and inconsistent provision of medical and mental health care as well as inadequate and inconsistent follow-up regarding medical and mental health.

411.    Despite an extensive history of inaction regarding treatment of medical and mental health needs, the County, by and through Gore and Martinez, continued to adhere to an approach that they knew or should have known has failed to prevent tortious conduct by their employees.

412.    The County failed to promulgate adequate policies including, but not limited to:

    a.    Identifying critical and obvious medical and mental health needs at intake and properly housing them;

    b.    Screening individuals with schizophrenia who refuse medications for housing in the PSU;

    c.    Referral of individuals who are refusing psych medications and demonstrating psychosis to the PSU;

    d.    Taking vital signs and weight measurements for individuals who are dangerously malnourished;

    e.    Summoning medical or mental health care for individuals when individuals are identified to be psychotic and/or malnourished;

    f.    Coordinating and sharing critical medical or mental health information regarding individuals with mental illness who are refusing psych medications;

    g.    Providing medical treatment to individuals suffering from malnutrition and/or dehydration;

h.    Responding to request for medical assessment by medical staff in a timely fashion;

i.    Providing medical or mental health treatment to individuals suffering from mental health conditions including schizophrenia;

j.    Complying with Title 15 cell checks; and

k.    Staffing of the medical services division.

413.    Defendant County was acting under color of state law because its employees, agents were acting or purporting to act in the performance of their official duties as deputies and employees of the County.

414.    As alleged above, Defendant County, by and through its employees and agents, deprived Lonnie of his constitutional rights prohibiting deprivation of life without due process of law, and also amounted to cruel and unusual punishment.

415.    Despite Defendant County's and Liberty's employees and agents knowing that Lonnie had schizophrenia, was refusing was refusing his required medications, was not fully oriented with disorganized thought and in a psychotic state for an extended period of weeks and months, and losing excessive amounts of weight from a lack of eating, nobody referred Lonnie to their PSU, or even took Lonnie's vital signs or weighed him. And nobody checked on him for an extended period of time as evidenced by the fact that he was already cold to the touch when he was found unresponsive. Deputies who saw Lonnie in distress left him there to die.

416.    There were longstanding and systemic deficiencies in San Diego jails' treatment of inmates that was extensively documented through audits, litigation, and public reporting, which was well known to the County. The documented systemic deficiencies included, but were not limited to, the failure to render medical care, improper cell checks, improper housing assignments, inadequate medical staffing, lack of required training on screening, lack of communication of necessary and critical medical information among staff, and non-compliant medical policies and procedures.

THIRD AMENDED COMPLAINT

417.   Upon information and belief, the permanent, widespread, well-settled practice or custom of defendant County was to deny treatment to inmates in serious medical distress and to place inmates in administrative segregation or general population instead of the medical ward despite inmates being in obvious need of medical care.

418.   Defendant County, by and through its employees and agents, acted pursuant to the following official policies, or widespread or longstanding practices or customs, of Defendant County:

a.   Failing to recognize when a detainee has serious medical needs;

b.   Failing to communicate detainees' medical needs between medical staff and deputies;

c.   Providing insufficient medical care to detainees;

d.   Failing to transfer detainees to the hospital when medically necessary;

e.   Failing to respond properly or timely to serious medical needs of detainees;

f.   Failing to conduct timely safety checks;

g.   Failing to monitor live video feeds for signs of medical distress;

h.   Failing to recognize when a detainee has serious medical needs during safety checks;

i.   Failing to meet accepted community standards of care with respect to medical care of detainees;

j.   Failing to properly investigate in-custody deaths and properly respond to the results of those investigations to prevent further deaths;

k.   Failing to adequately screen inmates for medical care and treatment;

l.   Failing to communicate the medical needs of inmates between the medical staff and deputies;

-74-

m.  Failing to check on the welfare of inmates, even those inmates
known to have serious medical needs; and

n.  Failing to conduct proper cell checks as required by the County's
own written policies.

419.  The misconduct and inaction by the Defendant Deputies, Doe Deputies,
and Doe Medical Providers amounts to collective inaction on behalf of the County
based on the following:

a.  There was a *de facto* custom of ignoring critical medical information
and not properly checking on the welfare of patients, even those
known to have serious medical needs.

b.  There was a *de facto* custom of not ensuring that deputies follow the
policies and procedures with respect to emergency situations within
Housing units.

c.  There was a *de facto* custom of failing to conduct proper cell checks
or monitoring, as required by the County's own written policies.

d.  Defendants' failure to train its deputies and medical staff gives
inference of a municipal custom that authorized or condoned deputy
misconduct.

e.  There has been a longstanding pattern of failing to provide adequate
medical care and adequate monitoring of seriously ill inmates,
causing a series of preventable and tragic deaths that placed
Defendants on notice.

420.  Lonnie's constitutional deprivations were not only caused by the conduct
of individual deputies and medical staff, but also by the system failure resulting in a
collective inaction of many within the San Diego County Sheriff's Department.
Lonnie's constitutional deprivations were caused by the subordinates' adherence to
customs and practices as alleged herein.  See *Fairley v. Luman*, 281 F.3d 913, 917 (9th

Cir. 2002); see also *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019.

421.    The cumulative and persistent failures and misdeeds of the entire Sheriff's Department at the SDCJ caused the ultimate injury and harm suffered by decedent Lonnie Rupard and Plaintiffs.

422.    Defendant County through Gore, and Martinez knew of a substantial risk that its polices, customs, and longstanding practices were inadequate to prevent civil rights violations of law by its employees and agents. Defendant County was deliberately indifferent to this risk and the well-documented history of widespread unconstitutional acts by employees and agents at the SDCJ. Yet, Defendant County failed to set forth appropriate policies regarding the treatment of detainees.

423.    Defendant County, by and through Gore and Martinez, had ample notice of the following: that San Diego County Jail had the highest mortality rate among California largest jail systems; that there had been countless complaints made by inmates, family members, community members and the SDCJ's own staff regarding injuries caused by medical neglect and staff misconduct; and that failures to communicate critical medical information to coordinate care for inmate-patients with serious medical and psychiatric needs led to the preventable deaths and serious injuries of Richard Diaz, Adrian Correa, Daniel Sisson, Bernard Victorianne, Ronnie Sandoval, Heron Moriarty, Kristopher NeSmith, Jerry Cochran, Ruben Nunez, Frankie Greer, George Gallegos, Michael Wilson, Tanya Suarez and many other inmates.

424.    Lonnie Rupard's death was also the result of the County's failure to train employees to properly evaluate the health of and risks to detainees at intake and while in custody, to determine proper and adequate courses of treatment for detainees in need of medical treatment, and summon and provide adequate medical care when necessary.

425.    The County knew their failure to adequately train their staff made it highly foreseeable that its employees and agents would engage in conduct that would deprive detainees, including Lonnie Rupard, of constitutionally protected rights and result in

additional inmate deaths. The County was deliberately indifferent to the rights of
individuals in their custody and care as evidenced by their knowledge of disparately
high rates of in-custody deaths, systemic failures, and the fact that the individual
deputies and medical providers who they failed to properly train would come into
contact with detainees. The inadequacy of the County's training caused Lonnie's
constitutional deprivations.

426.   Defendant County also acted through and is liable by virtue of their final
policymakers, such as Gore and Martinez, and/or their subordinates who had been
delegated final policymaking authority. Defendant County's final policymakers,
including Gore and Martinez, and/or their subordinates were acting under color of state
law. Their final policymaking authority concerned all constitutional violations described
in this Complaint.

427.   Defendant County is also liable based on Gore's and Martinez's failure to
enact new and different policies despite their knowledge of woefully inadequate care of
past detainees, a high rate of substance use prior to booking, and a high rate of in-
custody deaths at the SDCJ.

428.   Defendant County is liable because their written policy on cell checks
violates Title 15 as alleged in this Complain.

429.   Defendant Liberty is liable because it maintained an unconstitutional policy
on systemically understaffing the Jails to turn a profit, making it impossible for its
providers to see their patients in a timely manner nor to provide sufficient level of care.
Liberty failed to establish a policy and procedure for its providers to see patients timely,
which resulted in Cruz failing to see Lonnie Rupard on multiple occasions as a result of
Cruz' "time constraints."  Liberty's providers seeing patients in the jails is a daily
occurrence.

430.   Liberty failed to establish a policy and procedure on how and when to
admit a patient into the PSU despite the fact that only Liberty employees had the legal
authority to admit patients into the PSU.  Admitting patients into the PSU is a recurring

1 situation on a daily basis and the failure to implement a guideline and to properly train

2 its providers was a done in reckless disregard of the rights of those patients.

3     431.   Defendant County and Liberty are liable based on their ratification and

4 approval of the constitutional, statutory, and other law violations as alleged in this

5 Complaint.

6     432.   Defendant County's and Liberty's policies, customs, or practices, actions

7 and failures to act by final policymakers, ratification of constitutional and law

8 violations, and failure to train its employees, caused Lonnie's deprivation of rights by

9 the individual defendants. That is, their policies, customs, or practices, actions and

10 failures to act by final policymakers, ratification of constitutional and law violations,

11 and failure to train its employees were so closely related to Lonnie's deprivation of

12 rights that they were the moving force causing Lonnie's injury and death.

13     433.   Defendant County's and Liberty's actions and omissions actually and

14 proximately caused Plaintiffs' economic and non-economic damages including funeral

15 expenses, loss of love, companionship, society, comfort, care, assistance, protection,

16 and moral support. Plaintiffs seek compensatory damages.

17     434.   Plaintiffs also seek punitive damages against Liberty Healthcare.

18     435.   Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to

19 42 U.S.C. § 1988.

## V.
## FIFTH CAUSE OF ACTION
### Cal. Gov. Code § 52.1 (Bane Act)

**(By the Estate of Lonnie Rupard Against Defendants County of San Diego, Anosike, Cruz, Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre, James, Romero, Johnson, Torres, Treyvonne, Wereski, Romans, Gutierrez, Doe Deputies 15-20, and Doe Medical Providers)**

25     436.   Plaintiffs allege and incorporate herein by reference each and every

26 allegation contained in the preceding paragraphs.

27 / / /

28 / / /

P

THIRD AMENDED COMPLAINT

437.   Plaintiff Estate of Lonnie Rupard brings the claim in this cause of action as survival claims permissible under California Law, including Cal. Code of Civil Procedure § 377.20 et. seq.

438.   By their acts, omissions, and policies, Defendants, as described above, interfered with Lonnie Rupard's rights to receive adequate medical care.

439.   By their acts, omissions, customs and policies, Defendants, acting in concert/conspiracy, by threat, intimidation, and/or coercion, interfered with, attempted to interfere with, and violated Lonnie Rupard's rights under California Civil Code § 52.1 and under the United States and California Constitutions as follows:

    a. The right to be free from objectively unreasonable treatment and deliberate indifference to Lonnie Rupard's medical needs while in custody, as secured by either the Fourth, Eighth, and/or Fourteenth Amendment to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13;

    b. The right to enjoy and defend life and liberty, acquire, possess, and protect property, and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1;

    c. The right to protection from bodily restraint, harm, or personal insult as secured by California Civil Code § 43;

    d. The right to emergency medical care as required by California Government Code § 845.6; and

    e. The right to safety pursuant to Title 15.

440.   These acts herein were coercive because they occurred while Lonnie Rupard was in the custody of the San Diego Sheriff's Department, an inherently coercive setting.

441.   The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of Decedent's rights, or to any legitimate and lawful jail or law enforcement activity.

442.    All Defendants' violations of decedent Lonnie Rupard's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.

443.    All Defendants' violations of duties and rights, and coercive conduct described herein were volitional acts; none was accidental or merely negligent.

444.    Refusing medical care to a patient in custody and letting him starve to death in a filthy cell is coercive and intimidating. It was done with reckless disregard for Lonnie Rupard's rights.

445.    Each Defendant violated decedent Lonnie Rupard's rights with the specific intent and purpose to deprive him of his enjoyment of those rights and of the interests protected by those rights. Each defendant acted with reckless disregard for Lonnie Rupard's rights.

446.    When there is actual or constructive knowledge of a need for immediate medical care, a duty of 'reasonable action to summon' medical care is created." (*Hart v. County of Orange* (1967) 254 Cal.App.2d 302, 306, 62 Cal.Rptr. 73.) Section 845.6 creates "a newly-defined duty not applicable to private persons, created by the Legislature as a special burden to be borne by public entities under limited circumstances."

447.    Defendants Cruz, Anosike, Doe Medical Providers, the named Deputy Defendants and Doe Deputies 15-20 had actual knowledge of Lonnie's need for immediate medical care through their personal interactions and observations of Lonnie's deteriorating physical and mental state. These Defendants breached their duty to summon medical care by failing to assist Lonnie in receiving life-saving medical intervention.

448.    Under California Government Code Section 845.6, the public entity is liable if its employee knows or has reason to know that the prisoner is in need of immediate medical care and fails to take reasonable action to summon such medical care.

449.   Defendant County of San Diego is also vicariously liable for the violations of rights by their employees and agents. Defendant County of San Diego is vicariously liable pursuant to California Government Code § 815.2.

450.   As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of decedent Lonnie Rupard's rights under the United States and California Constitutions, Plaintiff sustained injuries and damages. Against each and every Defendant, Plaintiff is entitled to relief as set forth above, including punitive damages against all individual defendants, and all damages allowed by California Civil Code §§52 and 52.1 and California law, not limited to costs, attorneys' fees, treble damages and civil penalties.

451.   The named Deputy Defendants also violated Title 15, a California statute which required a safety check conducted at random intervals and at a minimum every 60 minutes. The named Deputy Defendant's violation of Title 15 caused the untimely and wrongful death of Lonnie Rupard.

## VI.
## SIXTH CAUSE OF ACTION
## Negligence Survival Claim (CCP § 377.30)

### (By the Estate of Lonnie Rupard Against All Defendants)

452.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

453.   Defendants had a duty to Lonnie Rupard to act with ordinary care and prudence so as not to cause harm or injury to another.

454.   Section 1714 of the California Civil Code sets forth that each person has "a legal duty to act reasonably and with due care under the circumstances with respect to their own actions"—i.e., not to act negligently.

455.   Gov. Code § 820 clarifies that the general duty of care extends to public employees to the same extent as a private person: "except as provided by statute, a public employee is liable for injury caused by his/her act or omission to the same extent as a private person, and said liability is subject to any defenses that would be available

to a public employee if he/she were a private person." California statutory scheme stands for the proposition that: (1) public entities cannot be held liable for wrongfully or negligently injuring prisoners but public employees can be; unless (2) the prisoner's injury resulted from a failure to furnish medical care (in which case, neither the public employee or public entity are liable); except (3) when the public employee knew or had reason to know that the injured prisoner was in need of immediate medical care and failed to take reasonable action to summon such medical care (in which case, both the public employee and the public entity are liable).Under Gov. Code § 815.2, 'a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would… have given rise to the cause of action against that employee or his personal representative.' *Bousman v. Cnty of San Diego*, No. 3:23-cv-1648-W-JLB, 2024 WL 1496220, at *10 (S.D. Cal. Apr. 5, 2024).

456.   Gov. Code § 845.6 is an exception to the general rule that a public entity is not liable for an injury proximately caused by any prisoner or an injury to any prisoner. Gov. Code § 845.6 provides liability to public entities and employees if "the employee knows or has reason to know that the prisoner is in need of immediate medical care and [] fails to take reasonable action to summon such medical care."

457.   Lonnie was in need of immediate medical care. Deputy and Medical Defendants knew that Lonnie had lost a dangerous amount of weight, he was living in filth, and he was incapable of communicating his dire health needs. Medical and Deputy Defendants knew that Lonnie was in medical and psychiatric crisis and needed immediate medical attention.

458.   Defendants improperly, negligently, wrongfully, and recklessly delayed and failed to summon medical care to Lonnie Rupard who was in obvious physical distress and in acute need of urgent medical care by failing to conduct proper cell checks.

/ / /

THIRD AMENDED COMPLAINT

459.    Deputy Defendants and Defendant Doe Deputies 15-20 were legally mandated by Cal. Code Regs. Title 15 to conduct cell checks on Lonnie's cell at least once every 60 minutes.

460.    Deputy Defendants and Defendant Doe Deputies 15-20 are liable for negligence per se because they violated the duty imposed upon them by Title 15 by failing to conduct cell checks at random intervals and at a minimum of every 60 minutes. Defendants' breach of the their legally mandated duty was a substantial factor in Lonnie's death.

461.    Deputy defendants negligently, wrongfully and recklessly left Lonnie Rupard in a cell covered in trash and rotten food for days without taking any action despite the requirement that they check for the condition of the cell at every safety check.

462.    Deputy defendants negligently, wrongfully and recklessly used use of force on Lonnie knowing that Lonnie was not capable of complying with orders as a result of his mental illness, thereby assaulting and battering Lonnie.

463.    Both Medical Defendants and Deputy Defendants improperly, negligently, wrongfully, and recklessly failed to communicate Lonnie's serious medical need and Lonnie's failure to eat to each other and all jail staff.

464.    Both Medical Defendants and Deputy Defendants improperly, negligently, wrongfully, and recklessly failed to take appropriate action to render medical care to Lonnie Rupard who was in obvious psychical distress and in acute need of medical care and intervention.

465.    The County, Gore, Martinez, and Doe Deputy Supervisors are liable for their own negligent conduct pursuant to § 845.6, which permits claims against officials for negligent training as to when to summon medical care.

466.    The County of San Diego are responsible for the acts of individuals and Doe Defendants under the theory of *respondeat superior*.

THIRD AMENDED COMPLAINT

467.    Defendants Gore and Martinez, as the Sheriff and Undersheriff, owe the inmates/patients in their care a duty to protect them from foreseeable harm, whether stated specifically in terms of a "special relationship" or otherwise. See *Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 252 (2008). California law recognized that jailers owe a duty of care to the prisoner who is deprived of the normal opportunity to protect himself from harm inflicted by others.

468.    Supervisory Defendants improperly, negligently, wrongfully, and recklessly failed to train regarding the monitoring of psychiatric patients, proper cell check procedure, communication of an inmate's deteriorating condition between medical personnel and the proper treatment and placement of severely mentally ill inmates into the PSU.

469.    The individual Defendants' failure to respond promptly to Lonnie's immediate medical need was a result of the supervisory Defendant's failure to train.

470.    Defendant Liberty Health Corporation improperly, negligently, wrongfully and recklessly failed to set forth policies regarding medical treatment of inmates suffering from serious mental health conditions.

471.    Defendant Liberty Health Corporation improperly, negligently, wrongfully and recklessly failed to set forth policies regarding proper screening, evaluation, treatment, and transfer into the PSU of inmates suffering from a serious mental health condition.

472.    Defendant Liberty Health Corporation is vicariously responsible for the acts of its individual agents and employees, including Doe Defendants.

473.    By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Lonnie Rupard.

474.    As a direct and proximate result of the Defendants' negligent conduct as herein described, Lonnie Rupard suffered damages in an amount to be shown according to proof at the time of trial.

THIRD AMENDED COMPLAINT

475.  As a direct and proximate result of the Defendants' negligent conduct as described herein, Lonnie Rupard died.

## VII.
## SEVENTH CAUSE OF ACTION
### Dependent Adult Neglect

**(By the Estate of Lonnie Rupard Against Defendants Montgomery, Liberty Healthcare Corporation, Anosike, Cruz and Doe Medical Providers)**

476.  Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

477.  Lonnie Rupard had physical and mental limitations that restricted his ability to carry out normal activities or protect his own rights. Defendants had a substantial caretaking and custodial relationship with Lonnie, involving ongoing responsibility for his basic needs.

478.  San Diego County had a custodial relationship with Lonnie during the time he was in custody at the SDCJ.

479.  Defendants had an ongoing responsibility for Lonnie's basic needs, which an able-bodied and fully competent adult would ordinarily be capable of managing without assistance.

480.  Lonnie was a dependent adult during the time he was in custody at the SDCJ.

481.  Defendants failed to use the degree of care that a reasonable person/entity in the same situation would have used in providing for Lonnie's basic needs including, but not limited to:

    a.  Failing to assist Lonnie with his personal hygiene;

    b.  Failing to provide Lonnie with food;

    c.  Failing to protect Lonnie from the health and safety hazards present in his filthy cell;

    d.  Failing to provide Lonnie with medical care for his physical and/or mental needs;

THIRD AMENDED COMPLAINT

e.  Failing to prevent malnutrition; and

f.  Failing to prevent dehydration.

482.    These failures constitute neglect that resulted in physical harm, pain, and mental suffering.

483.    Defendants' conduct was a substantial factor in causing Lonnie's death.

484.    Defendants and their employees/agents acted with recklessness in neglecting Lonnie.

## VIII.
## EIGHTH CAUSE OF ACTION
### Wrongful Death

### (By Justino Rupard against All Defendants)

485.    Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

486.    As set forth in the preceding paragraphs, Defendants committed wrongful acts which proximately caused the death of Lonnie Rupard.

487.    California Government Code § 845.6 provides that "a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care."

488.    As alleged above, Anosike, Cruz and Medical Provider Does 1-10 had a duty of care to provide medical and psychiatric care to Lonnie. They owed a duty of care pursuant to California Government Code § 845.6 and that duty was breached. The breach of that duty was a substantial factor in Lonnie Rupard's death.

489.    Defendants Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre, James, Romero, Johnson, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Defendant Doe Deputies 15-20 had duties of care (including the duty to obtain medical care) arising from the special relationship between a jailer and a prisoner and from the safety-check related statutory/regulatory obligation imposed by 15 C.C.R. § 1027.5. They had a duty

imposed by Title 15 to conduct cell checks which was required in order to ensure people in custody in critical medical conditions would receive prompt attention. By failing their mandatory duty, they violated § 845.6 in denying medical care. These defendants "had reason to know of that condition" precisely because of their obligation to perform timely safety checks.

490.   The supervisory defendants, including Gore, Martinez, Montgomery and Supervisor Does 1-10 had a duty to supervise and train their subordinates on their duties pursuant to § 845.6 and their actions or inactions proximately caused Lonnie Rupard's death.

491.   Gore, Martinez and Supervisor Does 1-10 also had an obligation under Title 15 to ensure their subordinates were complying with state law by conducting proper safety checks. As a result of their failures to supervise Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre, James, Romero, Johnson, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Defendant Doe Deputies 15-20, Lonnie was left dying on the floor of his cell during the last few days of his life, a critical period in which he was suffering a medical emergency

492.   Defendant Liberty Healthcare Corporation is vicariously responsible for the acts of its individual agents and employees, including Doe Defendants.

493.   The County of San Diego is responsible for the acts of individual and Doe Defendants under the theory of *respondeat superior*.

494.   Plaintiff is entitled to compensation for his severe emotional distress, the loss of love, companionship, comfort, care, assistance, moral support, society and protection and further economic and non-economic damages according to proof at trial.

## REQUEST FOR A JURY TRIAL

Plaintiffs hereby request a jury trial.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants as follows:

THIRD AMENDED COMPLAINT

a.    General and compensatory damages in an amount according to proof;

b.    Punitive and exemplary damages against all individual defendants and Liberty Healthcare;

c.    Civil penalties as provided by law;

d.    Attorney fees pursuant to Cal. Civil Code § 52.1(b), Cal. Civil Code § 52, and Welf. & Inst. Code, §15657;

e.    Costs and reasonable attorney fees and costs pursuant to 42 U.S.C. §1988;

f.    All other damages, penalties, costs, and fees as allowed by Cal. Civ. Proc. §§ 377.20, 377.60, 1021.5; and

h.    For all other and further relief as the Court may deem proper.

Dated: February 19, 2025                    Respectfully submitted,

                                            **IREDALE & YOO, APC**

                                            By: /s/ Julia Yoo
                                                Julia Yoo and Sarah Musumeci
                                                Attorneys for Plaintiffs Justino Rupard and the
                                                Estate of Lonnie Rupard

Dated: February 19, 2025                    **LOWE LAW, APC**

                                            By: /s/ Jeremiah Lowe
                                                Jeremiah Lowe
                                                Attorney for Plaintiffs Justino Rupard and the
                                                Estate of Lonnie Rupard

THIRD AMENDED COMPLAINT