# EXHIBIT 2

# Deposition Transcript

Case Number: 23CV1357 CAB BLM
Date: September 25, 2026

In the matter of:

# ESTATE OF LONNIE RUPARD, et al. v COUNTY OF SAN DIEGO, et al.

# MACE BECKSON, MD

CERTIFIED COPY

Reported by:
Sean Sampson

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

you. I don't consider you to be involved in any leisure domain of any kind unlike some of these other psychiatrists.

THE WITNESS: I'm not going to make a comment.

MR. IREDALE: And none is asked. Thank you so much. I have no further questions.

MR. MURPHY: Doctor, how are you doing? Would you like to take a break or power through?

THE WITNESS: I'm good.

MR. MURPHY: Okay. All right.

EXAMINATION

BY MR. MURPHY:

Q. My name is Jerome Murphy. I represent Dr. Cruz in this matter.

A. Nice to meet you.

Q. Nice to meet you, Doctor.

Your report states, and I'm quoting it exactly, "As a psychiatry expert I defer to the medical and pathology experts regarding cause of death."

Doctor, did I read that correctly?

A. Yes.

Q. And you're not a forensic pathologist, and you did not perform or participate in the autopsy of Mr. Rupard, correct?

A. Yes.

Q. So the actual medical cause of death identified by the medical examiner in this case, you defer entirely to the pathologist's findings, not your own; is that true?
A. True.
Q. And your report also states while not the sole cause, Dr. Cruz's failure to meet the standard of care substantially contributed to Mr. Rupard's demise. That's your opinion in your own words. Is that true, Doctor?
A. Yes.
Q. So by your own opinion there's at least one other cause of Mr. Rupard's death beyond anything that Dr. Cruz did or did not do; is that true?
A. Yes, that's the nature of contribution versus sole cause.
Q. Understood. And you can't tell the jury to a reasonable degree of medical probability that different psychiatric management by Dr. Cruz would have prevented the specific medical causes of death the medical examiner identified, and by that I mean pneumonia, malnutrition, dehydration; is that true?
A. My opinion is that had he been treated appropriately he would never have been in that cell, contracted aspiration pneumonia, become dehydrated, et

12:42 cetera, because he would have been getting treated or would have been already improved by then and capable of functioning. I think that the, you know, the nature of his psychosis interfered with his capacity to make use of readily available medical services.

12:42 Q. What other causes -- whether it be medical, nursing, custody, or Mr. Rupard's own self-negligence -- do you personally acknowledge contributed to his death?

12:42 A. Well, the contribution of the -- from the mental health end refers to his capacity to make use of and receive appropriate medical intervention.

12:43 You know, as we know, there's no evidence other than what he said to Dr. Badre that he was asking for anything, that he was complaining about anything. No one noted that he looked badly, although he looked badly when Dr. Badre saw him and he was, I believe, asking for water.

12:43 So, you know, the ultimate cause of death were medical causes, but his lack of capacity to provide for his own treatment of his medical issues is what was recently incorporated in the new statute pertaining to defining gravely disabled due to a mental disorder.

12:44 Q. Doctor, you're aware that Dr. Schaber, the medical examiner who performed the autopsy, testified

12:48 MR. COLLETTI: Objection to the extent it's outside his scope of expertise. You can answer if you understand the question.
12:49 THE WITNESS: Could you repeat it, please? I'm sorry.
12:49 Q. (By Mr. Murphy) Sure, yes. Dr. Schaber's report also states, while elements of self-neglect were present, ultimately this decedent was dependent upon others for his care.
12:49 My question to you, Dr. Beckson, is that is a finding about the overall system of care surrounding Mr. Rupard and not a finding that isolates Dr. Cruz individually. Is that your understanding?
12:49 MR. COLLETTI: Same objections. Outside the scope of this witness's inquiry and expertise.
12:49 THE WITNESS: Yeah, well, it's inclusive of Dr. Cruz's negligence, obviously, because she's talking about negligent treatment.
12:49 The systems issues I have not been asked to explore, so I could agree that she doesn't in that sentence specifically name Dr. Cruz. Dr. Cruz's negligence is part of what she's talking about.
12:50 Q. (By Mr. Murphy) Doctor, are you aware that the County retained a forensic pathologist, Dr. Hiserodt, who reviewed the same autopsy findings

and concluded that the cause of death was, in his words, "Simply acute pneumonia, aspiration-type, and a background of pulmonary emphysema"?

A. I believe I'm aware of that, and it doesn't really change my opinion at all, because as I pointed out, you know, while emphysema will be a preexisting condition that increases your likelihood of a bad outcome if you have aspiration pneumonia, you have to also think about why does this otherwise medically intact person get aspiration pneumonia?

So typically, you know -- and again, I'm not a pulmonologist, and a pulmonologist could give you the ultimate expert opinion, but I've treated many people in the medical capacity as well, and, you know, typically people who have aspiration pneumonia have lost control of their airway and are often either unconscious or otherwise incapacitated.

So the fact that it's aspiration pneumonia, that's a loaded term. He didn't die of staphylococcal pneumonia; he died of aspiration pneumonia. Why did he aspirate? She doesn't get into that, but obviously a pneumonia in someone with emphysema is very dangerous, and if it doesn't get treated when the person doesn't receive adequate medical support, that person could die. I think that's all I'm getting at of what the

other forensic pathologist states.

Q. Okay. Dr. Hiserodt specifically disputes that malnutrition played any role, writing that Mr. Rupard -- writing that the doctor is not convinced malnutrition had any role in Mr. Rupard's death.

Is that your understanding?

A. That's my understanding.

Q. And Dr. Hiserodt also concluded the dehydration finding rests on unreliable testing and should be interpreted with significant caution, and that COVID-19 should have been deleted as a contributory factor altogether.

Is that your understanding?

A. That's my understanding of what he concluded in his report, but I also have documentation that he requested water from Dr. Badre a few days before his death. So I assume he was thirsty, but I have nothing to contest Dr. -- the forensic pathologist's statement at all.

Q. So, Doctor, of the four conditions the medical examiner listed alongside pneumonia, including malnutrition, dehydration, COVID-19, and neglected schizophrenia, the County's retained pathologist disputes at least three of them.

You don't have the pathology training to

12:53 reconcile that dispute, do you?
12:53 A. No, I don't.
12:53 Q. And, Dr. Beckson, you're also aware that defense counsel retained a board-certified gastroenterologist, Dr. Bedford, to review the same autopsy and toxicology findings; is that correct?
12:53 A. I'm aware of that. I don't recall exactly what was said, but I have a notion in my memory of what he said.
12:54 Q. Okay. And are you aware that Dr. Bedford's opinion is that a brief noncontact visual assessment through a cell door window of an uncooperative partially clothed patient without palpation or weight measurement has recognized limitations in detecting early to moderate malnutrition?
12:54 A. Oh, I don't have any dispute with that.
12:54 Q. Okay. Dr. Bedford goes on to opine that Dr. Cruz's February 22nd, 2022, documentation that Mr. Rupard did not appear emaciated is not, by itself, inconsistent with those limitations.
12:54 Doctor, you've no basis in gastroenterology or nutrition medicine to dispute that, do you?
12:54 A. Not in this case, no.
12:55 Q. Dr. Bedford also opines that the severe decline reflected in the March 19th autopsy is

corroborated by an independent source. The March 14th competency evaluation, which documented a markedly deteriorated presentation only 3 days before death and 20 days after Dr. Cruz's last assessment.

So my question to you, Dr. Beckson, is on Dr. Bedford's timeline, the visible decline shows up in the record only in that final 20-day window after Dr. Cruz had already seen Rupard. Is that your understanding?

A. I thought you were referring to the 3-day window between Dr. Badre doing a cell-side and the finding of Mr. Rupard unresponsive.

The 20 days refers to what, the difference between February 29th and March 17th? Is that what you're referring to as 20 days?

Q. Yes. Dr. Bedford's timeline, the visible decline shows up in the record only in the final 20-day window after Dr. Cruz had already seen him.

A. Yeah, my impression is that the final fatal pathway was toward the end, and was not obvious on the 29th because, as I said, at the second visit by Dr. Cruz the -- based on the records and his testimony, he saw about the same guy as he saw back in December. So he's, you know, so I don't think he's dying in February.

12:56 At a certain point he aspirated; that led to a pneumonia, and it's frequently the case that people who create a lot of ruckus get attention and people who quitely expire don't get attention and, you know, Dr. Badre, I think, didn't understand what Mr. Rupard was even saying to him at that final visit, but obviously he was on his way out at that point. So that's 3 days before he died.

12:57 And I think when he became physically incapacitated, that's probably when everything started accumulating in the cell and, you know, trash, feces and so forth. So Dr. Badre saw him on his way toward death is my inference.

12:57 Q. Dr. Bedford further opines that the autopsy confirmed bronchopneumonia, aspiration, and SARS-CoV-2 infection are within a reasonable medical probability physiologically capable of producing rapid, severe nutritional and fluid decline over a period of days to a few weeks when superimposed on chronic reduced oral intake.

12:58 So he provided, in his own words, "A medically grounded autopsy-supported explanation for the change between the February 22nd, 2022, assessment and Mr. Rupard's condition at death, without requiring an inference that clinically apparent malnutrition existed

and was overlooked on February 22nd, 2022."

So my question to you, Doctor, is do you have any medical basis to dispute that mechanism?

A. Okay. I'll just correct myself. I think I said the 29th of February was the second visit by Dr. Cruz, and it's the 22nd.

No, I have -- I am aware that dehydration can happen rapidly, especially in people who are very sick and possibly even febrile and poor PO intake. So it's a concerning situation that can develop rapidly.

The malnutrition part, you know, I don't have any comment on because I haven't really treated patients with malnutrition. So I don't have clinical experience, and I don't have the expertise to differ in that.

Q. And within his gastroenterological scope, Dr. Bedford's conclusion is that the materials do not identify any act or omission by Dr. Cruz that caused or contributed to a gastrointestinal injury, complication, or nutritional harm independent of the underlying disease process.

Is that your understanding?

MR. COLLETTI: Are you asking him if that's his understanding of what happened or if that's his understanding of what Bedford said?

MR. MURPHY: Correct as to the latter, Nick.
MR. COLLETTI: Thank you.
THE WITNESS: I understand that's the GI specialist's opinion. And again, my perspective is -- has to do with being so greatly disabled that you can't obtain medical necessity, and that contributed to the final outcome.
Q. (By Mr. Murphy) And, Dr. Beckson, I notice that Dr. Bedford's report isn't listed anywhere in Appendix A of your report. I'm just wondering if you reviewed it and relied upon it to formulate your opinions in this case?
A. I didn't as far as my report goes. I think I -- and again, I don't have a clear recollection of ever reading his report in detail.
Q. Okay. After Dr. Cruz's February 22nd, 2022, visit, can you identify a single piece of information communicated to Dr. Cruz by anyone that would have alerted him to an acute physical illness in Mr. Rupard?
A. No.
Q. You reviewed the custody and nursing records for the period between February 22nd and March 17th, 2022, correct?
A. Correct.
Q. Do those records to you, Dr. Beckson, show any

custody officer or nurse reporting physical symptoms, weight loss, vomiting, or refusal to eat to Dr. Cruz specifically?

A. No.

Q. Nowhere in your report, Dr. Beckson, do you identify a custody or nursing referral of Mr. Rupard's physical decline to Dr. Cruz, true?

A. True.

Q. If Dr. Cruz had placed Mr. Rupard on a 5150 hold, let's say in early February 2022, what specific medical treatment for pneumonia or dehydration would that hold have authorized that was not already available to him in County custody?

A. Well, first of all, no one's established to my satisfaction that in the beginning of February he was dehydrated or malnourished. So that's issue No. 1.

Had he been put on a 5150 and transferred to the PSU I don't think we'd have gone down this road just because of that transfer and the different care he would receive in a hospital setting than as an outpatient. So that's all I can say.

Q. Doctor, a 5150 hold is a mental health hold. By itself it does not diagnose or treat an ulcer or bilateral pneumonia, true?

A. True.

01:03 Q. What specifically is the medical mechanism by which you contend antipsychotic medication would have prevented Mr. Rupard's aspiration pneumonia?

01:03 A. I believe that Mr. Rupard would have become progressively more functional as he was treated with antipsychotic medication. He had done well at Patton on two separate occasions. He had done well in other hospitals in San Diego County on multiple occasions. I think he would have done well in the PSU, and he would be up, out, and about, probably doing group therapy and talking with the social worker and taking his medication ultimately voluntarily, and he would not have been in some incapacitated physical state where he's aspirating and contracting pneumonia.

01:04 Q. And what do you base that belief on, Doctor?

01:04 A. Having treated many people just like our subject, Mr. Rupard, and his extensive medical records that demonstrate his history.

01:04 Q. Antipsychotic medication doesn't necessarily prevent aspiration, does it?

01:05 A. It is not -- it doesn't directly prevent it. It improves the individual's mental state, and if that mental state is contributing to the development of aspiration pneumonia you could, I suppose, say that the antipsychotic medication would have prevented him from

01:05 contracting aspiration pneumonia. That's a psychiatric opinion.
01:05 Q. Would you be speculating to make that opinion, Doctor?
01:05 A. No, I think it's more likely than not had he been transferred to the PSU, had he been treated appropriately he would not have died in the jail.
01:05 Q. And what's the basis for that opinion?
01:05 A. The fact that he wasn't treated. He was left to languish. He became so incapacitated he aspirated and couldn't even access the medical services that any inmate generally can access, either by requesting sick call or being seen in the medical clinic or being sent out to the emergency room at the local hospital.
01:06 So in the absence of reasonable treatment and recovery, he languished and he passed.
01:06 Q. Dr. Beckson, the autopsy report found that the right lung showed evidence of prior aspiration of gastric content with foreign body giant cell surrounding plant material.
01:06 Do you agree with me that that's a finding of an actual physical food aspiration event and not a psychiatric symptom?
01:06 A. Well, the -- what I'm not clear about from what you read is whether that's a chronic or an acute

01:27 offering two things that are opposite in nature and saying, "Are they the same?" It's like an SAT question.

01:28 No, they're not the same.

01:28 Q. Okay. I presume you agree then, Doctor, correct?

01:28 A. I agree they're not the same.

01:28 Q. Okay. We touched upon this briefly, but you're not a forensic pathologist and you're not an actuary, correct?

01:28 A. That's correct.

01:28 Q. And your report acknowledges that an average life expectancy calculated for a large group or population is not a prediction of how long a specific individual will live, and that a specific individual's age at death cannot be predicted accurately. That's your own language, isn't it, doctor?

01:28 A. That's my language about the limitations of those study results, correct.

01:28 Q. And you also acknowledge that there are no published research studies examining the effect of the particular combination of mental health disorders Mr. Rupard had on life expectancy, true?

01:28 A. True.

01:28 Q. And you personally performed no individualized

01:29 actuarial assessment of Mr. Rupard specifically and, more specifically, your life expectancy opinion is drawn entirely from group statistics.

01:29 Do you agree with that?

01:29 A. Yes.

01:29 Q. Dr. Beckson, you're aware that even Dr. Glindmeyer reached the same conclusion in her own words, namely that the available evidence does not support a reliable determination of an individual person's life expectancy based solely on these diagnoses.

01:29 Is that your understanding?

01:29 A. It's what I say in my report as well.

01:29 Q. Okay. So that's not a point anyone in this case actually disputes, is it?

01:29 A. I don't know what Dr. Abrams has to say. I know that he agreed with my last two opinions, the last one being life expectancy. So I don't want to speak for him.

01:30 I know Dr. Glindmeyer is making the point which I point out as well, that you get a general idea based on a meta analysis of multiple studies of large groups of people with a particular diagnosis. That doesn't give you an individual's life expectancy, and you can't use that to predict how long they're going to

REPORTER'S CERTIFICATE

STATE OF UTAH )
) ss.
COUNTY OF SALT LAKE )

I, Sean Sampson, Registered Professional Reporter, do hereby certify:

That prior to being examined, the witness, Mace Beckson, MD, was by me duly sworn to tell the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in stenotype on September 25, 2026, at the place herein named, and was thereafter transcribed and that a true and correct transcription of said testimony is set forth in the preceding pages.

I further certify that, in accordance with Rule 30(e), a request having been made to review the transcript, a reading copy was sent to Mr. Colletti for the witness to read and sign and then return to me for filing with Mr. Iredale.

I further certify that I am not of kin or otherwise associated with any of the parties of said cause of action and that I am not interested in the event thereof.

WITNESS MY HAND this 13th day of October 2026.

*Sean Sampson*

SEAN PATRICK SAMPSON, RPR

WA CCR License No. 26003474
UT CCR License No. 14102003-7801