# EXHIBIT 4

# Deposition Transcript

**Case Number: 23CV1357 CAB BLM**
**Date: September 8, 2026**

**In the matter of:**

# ESTATE OF LONNIE RUPARD, et al. v COUNTY OF SAN DIEGO, et al.

# PAUL CAPITELLI

CERTIFIED COPY

Reported by:
Tammy Bales

**Steno**
**Agency, Inc.**

**315 West 9th Street**
**Suite 807**
**Los Angeles, CA 90015**
**concierge@steno.com**
**(888) 707-8366**
**NV: Firm #108F**

11:17 If that cell had been like that for a week, would that affect your opinion that you wrote in this report?

MR. COLLETTI: Same objections.

11:17 THE WITNESS: I believe my opinion in the report was that I acknowledged the cell was dirty, but I did not see a direct connection between his cause of death and the cell being dirty.

11:17 BY MR. IREDALE:

Q. Well, now, cause of death. You're not a doctor, are you?

A. No, I'm not.

Q. You're not a forensic pathologist, right?

11:18 A. That's correct. I am not, sir.

Q. You're not a doctor who studies infections or how sanitary conditions might weaken the human body or cause sepsis. You're not that kind of person, right?

11:18 A. No.

Q. Right?

A. No, I'm -- I'm not. I don't -- I don't profess to be a medical expert, sir. It's outside of my expertise.

11:18 Q. So you have no expertise on whether the

A. Only to the extent that I saw his name in the report, but I -- I'm not familiar with Dr. Cruz. I've never met him.
Q. Do you understand what his position was at the time? That he was a psychiatrist offering services at the jail through Liberty Health Care?
A. I believe that my knowledge of him was that he had some role in oversight, but I did not review any of the medical aspects of this case. It was not within my -- my scope and/or expertise.
Q. Okay. So just -- but to be clear, you do know that he was not a member of the sheriff's department or custody staff?
A. Yeah. To my knowledge, he was not an employee of the sheriff's department. I believe I was told or I read that he was on a contract or something of that nature, but I do --
Q. Yes. He -- sorry. He was under contract with Liberty Health care. Did you review his deposition testimony when preparing your report?
A. Yes, I did.
Q. Okay. And earlier, I believe you testified something to the effect that custody did not need to report that Mr. Rupard's cell was dirty because mental health personnel already knew he was

mentally ill. Is that correct, or is that along the correct lines?

MR. COLLETTI: Objection to the extent it misstates his testimony. You can answer.

THE WITNESS: My testimony is this: When you're working in the jail, and you have a person who you know has documented on their chart that they have some aspect of mental illness, it is not your place as a custody person, to make assessments about their health. Your -- your job is to check on them to make sure they're alive and they're not in immediate medical distress. But your job is not to continually call and say, are you asking -- are you checking on this person? Are you checking on this person? That's not their -- their case. Also, if you refer to my report, I have a training slide in there that indicates that deputies are instructed not to do that, not to -- to make medical assessments.

BY MS. SENNET:

Q. Okay. And when you refer to mental health personnel, you're speaking generally, you're not speaking about Dr. Cruz, correct?

A. Well, using Mr. Iredale's example, the

12:43 medical director or the chief psychiatrist is -- has the oversight, just as the sheriff has oversight in the jail. So I would say that the -- the policies, the conditions and everything that the doctor sets
12:43 forth would be something that the staff would -- would adhere to or would be required to adhere to. That's generally the way it works. But again, this is outside of my scope -- scope of expertise. I really don't want to go too far into this.

12:43 Q. And you -- you aren't a psychiatrist, correct?

A. I'm not. No, ma'am, I'm not a psychiatrist.

Q. Okay. Thank you. And so based -- let's
12:43 see -- on the -- give me one moment here. So the fact that talked -- Dr. Cruz knew Mr. Rupard had a mental illness does not establish that he knew the condition of the cell on any particular day; is that correct?

12:44 A. I would refer to Dr. Cruz's testimony, number one. And number two, this is outside of my scope of expertise.

Q. Based on any materials you've reviewed, did you know that Dr. Cruz would have access to his
12:44 cell and view the cell daily? Was that in your

purview in any of the materials you reviewed?

A. I -- again, I did not review medical documents related to this. I did review Dr. Cruz's testimony. I saw what he said, but I don't have an opinion about his testimony because I'm not a medical expert.

Q. And you are aware that his -- the last time he saw Mr. Rupard was February 22nd, 2022, correct?

A. I don't recall the date. I know that he had seen him sometime prior to his death. That's all I recall.

Q. So a general tendency of mentally ill inmates to have dirty cells does not establish whether a particular cell has materially worsened or has gotten dirtier over time?

A. Could you reframe that for me, please? I'm -- I'm -- so I could follow it better.

Q. If a mentally ill inmate has a dirty cell, can -- you know, you had said they don't need to necessarily report if the cell is dirty, correct? That custody doesn't have to report if the cell is dirty?

MR. COLLETTI: Misstates the witness' testimony.

12:50 believe I've already answered that question, ma'am.

Q. Can you repeat one more time, just so I'm clear. I know you said suicidal ideations. Is there any other time that they should interact with

12:51 mental health or health staff?

A. Well, as I said, if there's a suicidal ideation, an attempted suicide, maybe perhaps something where somebody is not involved, or is withdrawn, or things of that nature, but that

12:51 certainly wasn't the case with Mr. Rupard. He was -- he was communicative.

Q. Okay. And how -- and in what ways was he communicative?

A. I'd have to refer to the exact report.

12:51 But if you look at the details in the days that preceded his death, he was communicative -- communicative and involved with various people up to and including the -- the court-appointed psychiatrist. So it's not like he was laying in the

12:51 cell for days on end without -- without moving. That wasn't the case.

Q. Okay. And you're not offering an opinion that Dr. Cruz personally knew about any worsening cell condition or acute deterioration before

12:52 Mr. Rupard's death, correct?

A. Ma'am, as I stated repeatedly, I'm not offering any opinions with respect to Dr. Cruz.

MS. SENNET: Okay. That's all the questions I have. Thank you.

MR. IREDALE: Yes, I have --

VIDEOGRAPHER: Any further questions?

MR. IREDALE: Yes.

REDIRECT EXAMINATION

BY MR. IREDALE:

Q. Just one area that I need to touch upon that was opened in Ms. Sennet's discussion. You referred, sir, to an attachment regarding, I believe, medical issues and universal precautions that you appended to your report. Do you recall that?

A. Are you talking about the training materials, sir?

Q. The -- let me ask you, if you would mind going to your report, and you'll see that just after safety checks, policy and procedure, there's something that says Class 8.1 medical issues and universal precautions. And I believe you were alluding to the role or the obligation or lack of it, of deputies with respect to medical communication. Do you recall alluding to that when

CERTIFICATE OF REPORTER

I, Tammy L. Bales, CCR, CVR, do hereby declare:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

__XX__ That the witness requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

______ Signature is waived.

______ The changes made by the witness are appended to the transcript.

______ No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this 17th day of September, 2026.

______________________________

Tammy L. Bales, CCR, CVR