# EXHIBIT 6

# Deposition Transcript

Case Number: 23CV1357 CAB BLM
Date: October 1, 2026

In the matter of:

# ESTATE OF LONNIE RUPARD, et al. v COUNTY OF SAN DIEGO, et al.

# KATHRYN J. WILD, RN, MPA, CCHP-RN

CERTIFIED COPY

Reported by:
Misti C. Gilbert

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

practiced as a nurse in California?

A. 2013.

Q. When is the last time you were engaged in, like, hands-on patient care?

A. I would say during the time I was -- second time I was with the Orange County Health Care Agency, I -- was around 2010.

MR. COLLETTI: I'm just going to make a belated objection, vague and ambiguous as to hands-on patient care, but I didn't want to interrupt.

BY MR. LOWE:

Q. When's the last time that you would have personally performed any type of nursing assessment on a patient in a jail setting?

A. 2010.

Q. Have you ever held a position as a QMHP?

A. No.

Q. Do you hold any license or certification with respect to mental health clinician?

A. No.

Q. Have you ever been LPS designated or 5150 certified?

A. I have not.

Q. And you are not a physician, correct?

A. That is correct.

Dr. Cruz, who is also a qualified mental health professional, based on the definition.

Q. Okay. Again, I'm trying to get an answer to my question. I appreciate your elaborating, but I want to re-ask the question.

It says Mr. Rupard appeared on a sick call list for February 23, 2022, correct?

A. Right.

Q. Okay. And no county QMHP saw Mr. Rupard on February 20 -- 20 -- February 23rd or at any time before his death, true?

A. That is true.

Q. And it's my understanding from reading your report that your report excuses the missed check because Dr. Cruz saw him on February 22nd, correct?

A. Right. He falls into that definition of a qualified mental health professional.

Q. Between February 9th and March 17th -- that would be 36 days -- fair to say, no county QMHP laid eyes on Mr. Rupard. Is that true?

MR. COLLETTI: Incomplete hypothetical, assumes facts not in evidence. You can answer.

A. I believe so. There's no other documentation in his record that he was seen.

BY MR. LOWE:

Q. And could a deputy make that referral?
A. For nursing to see a patient? Yes, they do that all the time.
Q. So for the time that you were the health services administrator for San Bernardino in the 15 years, did you just solely rely on the custody classification flag for determining if -- or for ensuring that a segregated and seriously mentally ill inmate received their health rounds?
A. For notifying medical that they needed to do health rounds.
Q. And would you, as an HSA, accept a system in which such a patient with serious mental illness would go 36 days without any QMHP contact and 47 days without any in-person nursing assessment?
A. Well, but he was seen by a qualified mental health professional. He was seen by Dr. Cruz on the 22nd, which was, I believe, about three weeks before he passed.
Q. All right. Would you accept as an HSA a system in which a patient would go 47 days without any in-person nursing assessment who is severely mentally ill?
MR. COLLETTI: Assumes facts not in evidence, argumentative, asked and answered. You can answer.
A. Yeah, I'm not sure how to answer that, because, you know, there are a variety of ways patients get referred to nursing, but if nurses didn't know this was a patient that

asked if you were offering expert opinion on Dr. Cruz's standard of care. You remember that testimony?
A. Yes.
Q. And as I understand it, you stated that you were not offering opinion testimony as to Dr. Cruz's specific standard of care, whether or not he fell below that. Is that true?
A. Right. His clinical decision-making, that's outside my scope.
Q. Is it fair to say, though, that you are offering an overall opinion as to the psychiatric care plan and -- and what was put into operation by Dr. Cruz?
A. Right. I mean, as part of his psychiatric care plan, he could have ordered certain follow-up appointments with nursing or -- or other individuals.
Q. Understood.
MR. COLLETTI: I don't believe I have any other questions.
MR. LOWE: Just one follow-up.

EXAMINATION

BY MR. LOWE:
Q. Do you believe that Dr. Cruz should have ordered more follow-up than he did?
MS. SENNET: Objection, outside of the scope.
A. Again, I don't want to make comments on his

clinical decision-making, because that's outside my scope, but there was no treatment plan that he created that had nursing or mental health clinicians seeing him with any regularity.
BY MR. LOWE:
Q. And based on the full clinical picture of Mr. Rupard, is that something that you would have expected to have been done?
MS. SENNET: Objection, outside of scope.
A. Yeah. Again, I'm not -- I'm not a psychiatrist, and I'm not comfortable giving an opinion there.
BY MR. LOWE:
Q. Yeah, I just -- maybe I was unclear, because when Mr. Colletti asked you about your -- your offering opinions with respect to Dr. Cruz -- maybe I'm -- what opinions are you offering as to Dr. Cruz, then? Because I didn't understand.
A. Well, I -- I think the issue was -- because you had asked me earlier on this morning about so many days went by and he didn't see anybody, but he did see the treating psychiatrist on February 22nd, and he didn't develop a treatment plan that included monitoring by nursing or mental health clinicians. I guess that was --
Q. Right, but what -- but what opinions -- and that -- that's a fact, but what are your opinions? Are you

intending to offer opinions as to Dr. Cruz?
MS. SENNET: I'm going to say objection again, outside the scope.
MR. COLLETTI: You can answer.
A. No.
BY MR. LOWE:
Q. Okay.
MR. LOWE: All right. That's all.
THE WITNESS: Do you --
THE VIDEOGRAPHER: If that's the conclusion --
MR. LOWE: Yeah --
THE VIDEOGRAPHER: -- for today, I'd like to get some orders on the record before we leave, please.
Mr. Lowe, are you wanting transcripts or expedited transcripts?
MR. LOWE: Not expedited but just standard -- standard transcript, and I think -- it would actually -- let's be -- let me make sure I'm clear. It's only one, so -- I think the Iredale firm noticed it, so it goes to Iredale. I'm not requesting a separate transcript for my office. So if -- if it's -- whoever pays for it, it goes to them. Does that make sense?
THE VIDEOGRAPHER: That's for transcripts. That's for Madam Court Reporter.
MR. LOWE: Yeah, I'm not asking for -- I'm not

STATE OF GEORGIA
COUNTY OF HARRIS

CERTIFICATE

I hereby certify that the foregoing transcript was taken down, and the questions and answers thereto were reduced to typewriting under my direction; that pages 4 through 115 represent a true, complete, and correct transcript of the evidence given upon said deposition; that I am not a relative, employee, attorney, or counsel for any of said parties in the case; that I have no financial interest in the action; and that before completion of the proceedings, review of the transcript was not requested.

Before the deposition began and pursuant to Article 10.B of the Rules and Regulations of the Georgia Board of Court Reporting, Georgia, I made the following disclosures:

I am a Georgia Certified Court Reporter here as a representative of Accredited Court Reporters (ACR). ACR was contacted by the offices of Steno to provide court reporting services for this proceeding. ACR will not be taking this proceeding under any contract that is prohibited by Georgia law.

This 12th day of October, 2026.

Misti C. Gilbert

Misti C. Gilbert, CCR No. 2705