# EXHIBIT 9

**Review of Care for Lonnie Rupard in the San Diego County Jail**

**Introduction and Qualifications**

I am a physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. This work included and resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous individual cases of medical release, the formulation of health-related policies, as well as testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

After my fellowship training, I became the Deputy Medical Director of the Correctional Health Services of New York City. This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care. I was subsequently promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer of the New York City jails. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, substance use treatment, quality improvement, re-entry and morbidity and mortality reviews, as well as all training and oversight of physicians, nursing, and pharmacy staff. In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices, including correctional officer responses to patients in distress, assessment after use of force injuries and medical observation and care for people in solitary confinement/segregation settings. My responsibilities during this time included review and approval of all medical and mental health policies, including those relating to intake health assessments, chronic care and sick call, emergency responses, mental health and substance abuse care, infirmary care, and transfer of patients for higher levels of care.

During this time, I worked closely with correctional leadership to provide training to correctional staff on traumatic brain injuries and other common injuries that occur during use of force. I have provided input on security policies and provided training for security staff relating to how correctional staff should recognize signs of illness and injury among incarcerated people. Part of my work in leading a jail health service has been to provide training to both health and security staff on how to safeguard patient confidentiality and ensure the delivery of care to patients in

both general population and solitary confinement/segregation housing areas. These trainings have included topics ranging from how security staff should recognize and urgently report health concerns to the medical staff, and how medical staff should work with security staff on provision of care and monitoring of high-risk patients.

In March 2017, I left Correctional Health Services of New York City to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges, and law enforcement staff on forensic evaluation and documentation, analysis of mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

Between December 2018 and April 2020, I served as the Senior Health Fellow and President of Community Oriented Correctional Health Services ("COCHS"), a nonprofit organization that promotes evidence-based improvements to correctional practices across the United States.

I have worked as a medical expert in cases involving correctional health since 2017. Several of the cases I have offered expert reports for relate to deaths that have occurred in the San Diego Jails.

During the COVID-19 pandemic, I worked on numerous COVID-19 responses in detention settings. During this time, I have conducted dozens of court-ordered inspections of detention facilities to assess the adequacy of their COVID-19 responses in ICE detention centers, county jails, and state and federal prisons. I was named as an independent monitor for COVID-19 response for both the Connecticut State Prisons and the Hawaii Department of Corrections, and I was named as COVID-19 inspector by a Federal Court for the Bureau of Prisons facility in Lompoc, California.

I have been named as Federal Court-appointed monitor for the health services in the Santa Barbara, California County Jail, the Fluvanna Prison for Women in the Virginia Department of Corrections and the Criminal Justice Complex in St. Thomas, United States Virgin Islands and the Cumberland County Jail. I have been retained by the U.S. Department of Justice and several State Attorney General's offices in their investigations into the adequacy of health services in jail and prison settings.

I have published two books on correctional health, both published by Johns Hopkins University Press; *Life and Death in Rikers Island (2019*) and *Outbreak Behind Bars* (2025).

**Role and Methods**

I have been retained by the Estate of Mr. Rupard to assess the adequacy of care he received in the San Diego Jail leading up to his death in 2022. I have also been retained to assess whether any failures to deliver the standard of care to Mr. Rupard reflect potentially systemic problems with

care in this facility. In order to formulate my opinions in this case I have reviewed the following information:

- San Diego County Jail medical records (COSD 000026-000150, 0026887-002801)for Mr. Rupard.
- Medical Examiner's report and autospyon the death of Mr. Rupard.
- Floor evacuation list for Module 7B on 3/18/22.
- Deposition testimony of Jon Mongomery, initial and follow up.
- Deposition testimony of Anthony Cruz
- Deposition testimony of Serina Rognlien-Hood
- Deposition testimony of Melissa Quiroz
- Deposition testimony of Michael Johnson
- Deposition testimony of Francis Ysla
- Deposition testimony of Dr. Sandeep Jouhal.
- Deposition testimony of Dr. Jean Kloker
- Complaint in Case No: 23CV1357 CAB BLM.
- Incident and Hearing Reports from 1/29/22 incident (COSD 000670-672, 000904-913) and 2/19/22 incident (COSD 000443-445)
- Job postings for San Diego Sheriff's Chief Medical Officer and Medical Services Administrator roles.
- San Diego Sheriff's Classification Navigator Report for Mr. Rupard.
- San Diego Sheriff's Department Policies;
    - "Segregated Inmates", G.2.1, 10/30/20.
    - "Refusal Procedures", MSD.R.5 1/6/22 and 7/14/16.
    - "Psychiatric Stabilization Unit (PSU)", MSD.P.8, dated 10/2/19 and1/24/22.
    - Psychiatric Stabilization Units" M25 dated 3/27/20.
    - "Psych Stabilization Unit-Admission Types" MSDP.15 dated 1/31/22.
    - Mental Health Evaluation and Screen MDS.E.5.1 dated 6/23/20.

- San Diego Sheriff's Follow-up Investigative Reports (I, II, III) regarding Mr. Rupard's death, from Det. Blumenshine.
- Dr. Montgomery's notes regarding Mr. Rupard's death.
- DOJ Death in Custody Reporting Form for Mr. Rupard.
- Contract between Liberty Healthcare and San Diego County (555357)
- California State Auditor's Report on San Diego County Sheriff's Department, February 2022.

CAUSE OF DEATH: PNEUMONIA, MALNUTRITION, AND DEHYDRATION
IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Even the initial summary of findings by Dr. Schaber clearly identifies these three causes of death, on p11 of the report.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting

These three causes of death reflect medical problems that likely occurred over a range of days to weeks. The malnutrition and muscle wasting likely occurred over weeks while acute viral pneumonia was a likely a much more acute process.[12] Patients who are malnourished have a higher risk of death from COVID-19 complications including pneumonia.[13] The Medical Examiner clearly identified these processes as actual causes of Mr. Rupard's death and I do not understand why Dr. Montgomery was unable or unwilling to agree with those findings. The more acute phase of Mr. Rupard's decline and death is relevant because of the failure of health staff conduct the required weekly mental health checks and three times per week nursing checks.

The physical decline of Mr. Rupard was completely detectable and addressable but it required nursing and medical staff to check on his wellbeing, assess him and follow the most basic standard of care including ensuring that he was eating, drinking, not injured and not suffering from untreated injuries or new medical problems. If staff felt unable to care for Mr. Rupard, or felt unable to assess him, they were obliged to transfer him to the hospital for assessment and treatment. But his medical records indicate a complete lack of nursing or medical assessments after his brief injury note until the day he died.

Failure of Dr. Montgomery and San Diego to conduct basic peer review of jail health staff.

One essential standard of care in correctional settings is to conduct peer review or clinician to clinician review of work conducted by all health professionals. This essential function is described in the NCCHC J-C-02 and details two levels of review; one for routine review the work conducted for all health staff by another health professional with equal or greater level of training, and another process that is discipline-specific and is initiated and overseen by the

[12] https://www.npr.org/sections/goatsandsoda/2016/01/20/463710330/what-happens-to-the-body-and-mind-when-starvation-sets-in and chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://pmc.ncbi.nlm.nih.gov/articles/PMC11065092/pdf/rmmj-15-2-e0010.pdf and chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://pmc.ncbi.nlm.nih.gov/articles/PMC11065092/pdf/rmmj-15-2-e0010.pdf.
[13] https://pmc.ncbi.nlm.nih.gov/articles/PMC11537834/ and https://pmc.ncbi.nlm.nih.gov/articles/PMC12348880/.

Responsible Health Authority.[14] Dr Montgomery testified that he worked in the role of the Responsible Health Authority during the time Mr. Rupard was held in the jail. He testified that no peer to peer review process had been implemented in the jail. This is an example of a gross systemic deficiency that increases the likelihood that health staff who do not follow basic policies and procedures will repeat their errors without any intervention. In the case of Mr. Rupard, it is clear that no health staff were conducting the required nursing and mental health encounters representing failures by two different disciplines of the health care team.

<u>Failure to conduct a clinical mortality review</u>

None of the information I have reviewed in this case indicates that the County has conducted a clinical mortality review of Mr. Rupard's death. When a person dies in a jail setting, one of the essential steps that must be taken is for a physician who was not part of the patient's care to lead a clinical mortality review. This process is separate from the administrative review and when indicated, the psychological autopsy. The NCCHC standard for this task (Procedures in the Event of Inmate Death) mandates that the clinical mortality review should physician led and must review the appropriateness of care.[15] This standard clearly establishes that the clinical mortality review should occur within 30 days and be part of the health system's quality improvement process because it is essential to disseminate findings and corrective actions to staff and track implementation in the facility's quality committee. The standard also includes three questions that should be answered in the clinical mortality review;

- Could the medical response at the time of death be improved?
- Was an earlier intervention possible?
- Independent of the cause of death, is there a way to improve care?

The standard includes the following; "Corrective actions identified through the review process are implemented and monitored through the quality improvement program for systemic issues and through the patient safety program for staff-related issues."

I have reviewed a brief set of notes reviewing Mr. Rupard's timeline that were created by Dr. Montgomery but that do not represent a clinical mortality review. These notes lack documentation of a meeting that includes records of attendees, documentation of findings and corrective actions with the timelines for implementation and names of health leadership that will take on the responsibilities for tracking and implementation of corrective actions. I have reviewed the DOJ reporting form which communicates some demographic and other information about Mr. Rupard to the U.S. Department of Justice but likewise does not constitute a mortality review. Neither of these represents a clinical mortality review.

During his deposition, Dr. Montgomery was asked whether nursing staff and mental health clinicians had conducted their required assessments of Mr. Rupard as per the segregation policy

---

[14] NCCHC J-C-02 Clinical Performance Enhancement. Standards for Health Services in Jails. 2018.
[15] NCCHC J-A-10 2014.

requirements. He was unable to simply state yes or no to these questions and gave the following response:

"As we commented on, is that the nursing review has been conducted by nursing staff. And the mental health element of the review that would be in a position to evaluate the actions of the QMHPS, was conducted. I was not involved in that part."

This lack of required checks by health staff is a very simple deficiency to see in Mr. Rupard's medical records, whether during his weeks in segregation he received three nursing assessments and one mental health clinician assessment per week documented in his medical records. In addition, the notes that Dr. Montgomery compiled appear to list each of the very few health contacts that Mr. Rupard had, and there is no record of the required three times per week nursing and weekly mental health clinician assessments in his notes.

In some County and State level systems, an oversight body may conduct a review of deaths in a jail or prison. In other settings, a legal or administrative investigation may occur that is internal and reviews multiple areas of the death case. None of these various reviews replaces the need for a clinical mortality review within 30 days if they are not physician-led, if they are not part of the quality improvement committee of the facility, and if they do not produce findings and corrective actions that are disseminated among staff and tracked in the quality improvement committee. I have not seen any document that represents a basic clinical mortality review for Mr. Rupard's case. In addition, the testimony of Dr. Ysla, the head psychiatrist for Liberty Healthcare, further indicates that the County was not conducting clinical mortality reviews. Dr. Ysla testified that he discussed approximately eight jail deaths of jail patients with his "corporate headquarters" in the final year of the contract with San Diego Jail (ended in June 2022 per his testimony) but also testified that he never discussed deaths with Dr. Montgomery, the County's Chief Medical Officer for the jail. Mr. Rupard died in March 2022, and a clinical mortality review would have occurred win 30 days and would have also identified findings and corrective actions that were then linked to the facility QI/QA process. Dr. Ysla testified that not only did he not discuss any of the jail deaths with Dr. Mongomery; he was not even aware of Mr. Rupard's death until much later when he was notified about the lawsuit. This indicates that Dr. Ysla spent the months of March-June not even aware that a patient in his care died. This reflects parallel failures of the County for failing to conduct a clinical mortality review that included the staff who provided care and linked back to the QI/QA apparatus of the jail, but it is also a stunning failure of Liberty Healthcare's leadership, admitting they were unaware that one of their own patients with serious mental illness had died.

The goal of clinical mortality review is to identify gaps in care or areas of improvement and prevent future deaths via corrective action plans. The failure of San Diego County to conduct a clinical mortality review for Mr. Rupard's death is even more stunning in the context that another patient with serious mental illness had also recently died in the San Diego Jail in a very similar manner. Publicly available press reports indicate that Daniel Marroquin was a patient with serious mental illness who died from excessive water intake while locked in a San Diego Jail cell in May 2021, a time when Liberty Healthcare was providing psychiatric care.[16] I have not

[16] https://www.sandiegouniontribune.com/2025/08/05/san-diego-county-to-pay-4m-to-mother-of-man-who-died-by-suicide-in-jail/.

reviewed any records in that case, but if it is true that this man did have serious mental illness, that he died from lack of nutrition or excessive water intake and that he was held in segregation, the testimony of Dr. Ysla that he had not discussed any deaths with Dr. Montgomery in the final year of the Liberty contract is a damning admission of negligence by both the County and Liberty Healthcare. In addition, Dr. Ysla's testimony that no QI/QA audits of any psychiatric care occurred in the final year of the Liberty contract is further evidence of the lack of attention paid to the most vulnerable patients in the jail system by both Liberty Healthcare and the County.

Dr. Montgomery's second deposition clarified the systemic failures in the jail's clinical mortality review process. He testified that he created some initial notes but that he was essentially not involved in any further process to determine failures and corrective action plans in response to Mr. Rupard's death and implement them in the jail. He testified that the confidential CIRB process did not yield any feedback to him after that process was completed. This shows a total breakdown of the most essential part of a clinical mortality review that findings and corrective actions be connected into the jail quality committee.

My own findings of gross deficiency in the San Diego Jail's approach to reviewing patient deaths is consistent with the findings in the State Auditor's Report. This report included the following: "For 22 of the 30 cases we reviewed, the Sheriff's Department was unable to provide us with documentation from these reviews that detailed any findings or conclusions about the clinical care given, identified whether any concerns required further study, or stated whether changes to policies, procedures, or practices are warranted. We believe that if the Sheriff's Department properly documented the 30-day medical reviews, it could better identify and track instances when it did not provide sufficient medical and mental health follow up care before an individual's death, such as those we discuss in Chapter 1."

**Summary**

The death of Mr. Rupard was not only preventable, but the information I have reviewed in his case indicates that both individual and systemic errors caused his death in the San Diego Jail. While the findings and opinions I present here are my own, they are very consistent with the alarming findings of the State Auditor in review of multiple cases, "Throughout Chapter 1 we provide numerous examples of deficiencies in the department's policies and procedures that likely contributed to the deaths of some incarcerated individuals and how these policies and procedures do not align with certain best practices used by comparable counties and other entities. Specifically, in the examples on pages 21 through 24, we describe how the Sheriff's Department did not consistently follow up with individuals who needed medical and mental health services, and that lack of attention may have contributed to their deaths."

The failures I have identified by the San Diego Sheriff's Department and their vendor Liberty Healthcare resulted in Mr. Rupard being locked in a cell for almost 90 days and not receiving any medication or a single completed or confidential psychiatric assessment. During this time, he

became ill and experienced malnutrition, eventually dying from a combination of pneumonia, malnutrition and dehydration. One of the Liberty psychiatrists who worked in the PSU testified that she was not surprised when she learned of Mr. Rupard's death "given the conditions of the jail". When asked to explain this lack of surprise, she cited another death of a patient before Mr. Rupard died who had not been eating or drinking and was found dead in his cell by custody staff. She testified that "A few months prior to this news, while I was working, I don't recall any names or anything, but an inmate had died in George Bailey Detention Facility. He had not been eating and drinking, and three days later, the custody found him dead. So that was a reflection of the kind of care."

These gross deviations from correctional health standards of care include failures by the San Diego Sheriff's Department and their vendor, Liberty Healthcare. One set of failures involved the denial of basic mental health care to Mr. Rupard including delays in his psychiatric assessment, inadequate assessment via incomplete and nonconfidential cell-side encounters and failures to review prior medical records. Jail medical records clearly identified that Mr. Rupard had required involuntary medication and Patton State Hospital during a recent incarceration but the testimony of Dr. Cruz revealed that these records were not part of the historical information he used despite being unable to complete his assessments of Mr. Rupard in 2022. A second set of failures include a lack of basic medical care and monitoring including lack of segregation rounds by nursing and mental health staff as clearly required by standards of care and the County's own policies. A third gross failure involved a complete lack of peer review, resulting in the Responsible Health Authority, Dr. Montgomery, not monitoring the adequacy of care provided by jail health professionals.

A final set of failures relate to the lack of any clinical mortality review which should have occurred within 30 days of Mr. Rupard's death should have connected and corrective action plans to the facility quality improvement process and should have been led by a physician. Instead, the head psychiatrist for Liberty Healthcare testified that he never discussed any of the deaths in the final year of their contract for jail psychiatric services with the Sheriff Department's Chief Medical Officer and Responsible Health Authority, Dr. Montgomery.

Executed on this 14th of July, 2026 in Port Washington, New York.

____________________________

Homer Venters, MD, MS

**Dr. Homer D. Venters**
hventers@gmail.com

*Professional Profile*

- Physician / epidemiologist focused on the intersection of health, criminal justice and human rights.
- Leader in provision and improvement of health services to patients with criminal justice involvement.
- Successful implementer of nations' first large jail electronic health record.
- Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

*Professional Experience*

**Correctional Health Expert**, 3/2016-present
- Independent correctional health monitor/expert
  - Cumberland County Jail, NJ (ongoing). Serve as independent, court-appointed monitor of health services in a County Jail.
  - Fluvanna Women's Correctional Center, VA (ongoing). Serve as independent, court-appointed health services monitor in a women's prison.
  - Santa Barbara County Jail, CA (ongoing). Serve as independent, court-appointed monitor of health services in a County Jail Complex.
  - VI Department of Corrections (ongoing). Serve as independent, court-appointed monitor of health services in St. Thomas detention facility.
  - U.S. District Court Eastern District of NY, Case No. 1:22-cr-00486, 2025.
  - U.S. District Court Central District of CA, Case No. 2:20-cv-04450 (COVID-19, 2020-2022).
  - HI Department of Corrections (COVID-19, 2021-2022).
  - CT Corrections Department (COVID-19, 2020).
- U.S. Department of Justice, Civil Rights Investigations medical expert, 2019-present. Work with the USDOJ to investigate correctional health conditions and provide recommendations for addressing.
- State Attorney's General, provide expert consultation and investigation regarding correctional Health (CA, NY, IL).
- Other litigation, see testimony below.

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-4/30/20.
- Lead COCHS efforts to provide technical assistance, policy guidance.
- Oversee operations and programmatic development of COCHS.
- Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018
- Lead COCHS efforts to expand Health Services in Jails.
- Develop strategy for non-profit models of jail diversion/health care.

**Director of Programs,** Physicians for Human Rights, 3/17-11/18.
- Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
- Expand forensic documentation of mass killings and war crimes.
- Develop and support sexual violence capacity development with physicians, nurses and judges.

- Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.

- Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.
- Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.
- Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).
- Reduced overall mortality in the nation's second largest jail system.
- Increased operating budget from $140 million to $160 million.
- Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.

- Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
- Implemented nation's first large jail electronic medical record for 1,400 staff and 75,000 patients in a jail.
- Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.
- Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.

- Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
- Direct all aspects of response to infectious outbreaks of H1N1, Legionella, Clostridium Difficile.
- Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.

- Developed training program with Montefiore Social internal medicine residency program.
- Directed and delivered health services in multiple jail settings.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

*Education and Training*

**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.

**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert Einstein University7/2004-5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

*Academic Appointments, Licensure*

Adjunct Faculty, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D. New York (2007-present).

*Print articles and public testimony (last 15 years)*

Testimony: United States House of Representatives Subcommittee on Crime, Terrorism, and Homeland Security, Judiciary Committee 1/21/22.

Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails, New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction. NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

*Peer Reviewed Publications (last 15 years)*

**Venters H.** Preventing Another Fifty Years of Mass Incarceration: How Bioethics Can Help. *Hastings Center Report*. 2023 April; 53(6).

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. *Lancet Planet Health*. 2019 Mar;3(3):e144-e153.

K. Parmar, Jennifer Leigh, Ernest Thomas, Douglass Curry, **Homer Venters**, Andra Gilbert, Tamaryn Nelson, Ed Lester. Qualitative evidence of crimes against humanity: the August 2017 attacks on the Rohingya in northern Rakhine State, Myanmar *Confl Health*. 2019; 13: 41. Published online 2019 Sep 16.

Messner N, Woods A, Petty A, Parmar PK, Leigh J, Thomas E, Curry D, **Venters H**, Gilbert A, Nelson T, Lester E. Qualitative evidence of crimes against humanity: the August 2017 attacks on the Rohingya in northern Rakhine State, Myanmar. Confl Health. 2019 Sep 16;13:41.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated. *J Health Care Poor Underserved*. 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**. Feasibility of Treating Hepatitis C in a Transient Jail Population. *Open Forum Infect Dis*. 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care*. 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health*. April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, **Venters H.** Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

Granski M, Keller A, **Venters H**. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health*. 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health*. 2015. 9/17/15.

Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization*. 2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters**. Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved.* 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care.* 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health: Patient safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

*Honors and Presentations (past 15 years)*

**Invited Presentation,** National Association of County & City Health Officials. Outbreaks Behind Bars, together with the Centers for Disease Control, 6/17/26, Webinar. Johns Hopkins School of Public Health,

**Invited Presentation,** Johns Hopkins School of Public Health, Health in Prisons lecture. Baltimore, MD, 4/27/26.
**Invited Presentation,** Tulane University Book Festival, Outbreak Behind Bars. New Orleans, LA, 3/27/26.

**Invited Presentation,** University of North Carolina, Institute for Global Health and Infectious Diseases, Outbreak Behind Bars, Raleigh NC, 1/16/26.

**Invited Presentation,** Duke University School of Law and School of Medicine, Correctional Health and Outbreak Prevention, Durham, NC 1/15/26.

**Invited presentation,** Yale Law School/Liman Colloquium, Punishment and Health. Yale Law School, New Haven, CT. 11/6/25.

**Invited Presentation,** Johns Hopkins Bloomberg School of Public Health, Outbreaks and Dual Loyalty Behind Bars, Baltimore MD. 5/5/25.

**Invited presentation,** University of Texas LBJ School of Public Affairs, Conference on Deaths in Custody, Austin Tx. 11/15/24.

**Invited presentation,** Yale Law School/Liman Colloquium, Death investigation and models of carceral care. Yale Law School, New Haven, CT. 4/9/24.

**Invited presentation,** United Nations Office of Drugs and Crime, Presentation on Custodial Death Investigation. Malina, Philippines (remote), 3/18/24.

**Invited presentation,** Jail and Prison Health and Human Rights, Oklahoma University School of Health Sciences, 2/13/22.

**Invited presentation,** COVID-19 and Carceral Health, Stanford University Schools of Engineering and Public Health, 2/23/22.

**Invited presentation,** Screening and treatment for sexually transmitted infections in justice. National Academy of Sciences Committee on Law and Justice, remote, September14th, 2020.

**Invited presentation,** Vaccination for COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, August 20th, 2020.

**Invited Presentation,** Documenting Deaths in Custody, National Association for Civilian Oversight of Law Enforcement (NACOLE), remote, August 3rd, 2020.

**Invited Presentation,** Decarceration and Health. Radcliffe Institute/Harvard University. Policy Series. Remote. 6/23/20.

**Invited presentation,** COVID-19 in correctional settings. Briefing for U.S. Senate Staff, sponsored by The Sentencing Project, remote, May 29, 2020

**Invited presentation,** COVID-19 in correctional settings. Briefing for Long Island Voluntary Organizations Active in Disaster , sponsored by The Health & Welfare Council of Long Island, remote, May 29, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, May 12, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Association of Counties, Justice and Public Safety Committee, remote, April 1, 2020.

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina, postponed.

**TedMed Presentation**, Correctional Health, Boston MA, March 15, 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American*

*Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

*Teaching & Other Health & Activities*

**Reviewer, Deaths in Custody Report,** National Academies of Sciences, Engineering and Medicine, Published 12/2025.

**Member, Biden-Harris COVID-19 Health Equity Task Force,** 2/26/21-10/31/21
Work with Task Force members to provide President Biden with interim recommendations to address COVID-19 Health inequities.

**United Nations Office of the High Commissioner of Human Rights,** Istanbul Protocol, contributor to 2022 updated protocol.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-2020.

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Draconculiasis Eradication, Togo West Africa, June 1990- December 1991.

*Books*

**Venters H.** *Outbreaks Behind Bars.* Johns Hopkins University Press. 4/2025.

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/2019.

*Chapters in Books*

Beichner-Thomas and **Venters H**. Worldwide Incarceration of Women. In ***Global Women's Health: Advancing Health Equity with Public Health Approaches.*** Springer Press, Expected 10/25.

**Venters H.** COVID-19 and the Struggle for Health Behind Bars. In *Excessive Punishment*. Columbia University Press, 2024.

**Venters H.** Asylum Evaluation in Detention Settings. In *Asylum Medicine: A Clinician's Guide*. Springer Publishing 2022.

**Venters H.** Mythbusting Solitary Confinement in Jail. In *Solitary Confinement Effects, Practices, and Pathways toward Reform*. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In *Decarceration*. Ernest Drucker, New Press, 2017.

*Prior Testimony and Deposition (Since 7/15/2022)*

- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 11/14/22 (Video testimony).
- Derrick Jones et al. v. City of St. Louis, Missouri et al., Case No. 4:21-cv-600. 3/17/23 Expert for Plaintiffs (Video deposition).
- Wilson v. San Diego, CA., Case No. 3:20-cv-0457-BAS-DEB. Expert for plaintiffs 5/8/23 (Video deposition).
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 5/30/23 (Video testimony).
- Harris v. Georgia DOC, Case No. 5:18-CV-365-TES. Expert for plaintiffs 6/15/23.
- Maney v. Oregon DOC, Case No. 6:20-cv-00570. Expert for plaintiffs 9/15/23.
- Serna v. San Diego, CA., Case No. 20-CV-2096-LAB-DDL. Expert for plaintiffs 10/27/23 (Video deposition).
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 11/17/23 (Video testimony).
- Carty v. Governor Bryan 3:94-cv-00078 Court appointed monitor. Hearing 4/30/24.
- Enyart v. San Bernardino 5:23-cv-00540. Expert for plaintiffs 5/8/23 (Video deposition) 5/21/24 testify at trial.
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 7/17/24 (Video testimony).
- Reed v. Wexford 3:20-cv-01139-SPM. Expert for plaintiffs. Deposition 9/26/24. Garden City, NY.
- Porio v. City of Tustin Case No. 8:22-CV-812-RGK Expert for plaintiffs. (Video deposition) 11/21/24, trial testimony 12/11/25, 1/22/25.
- Boyer v. ACH 20-CV-1123. Expert for plaintiffs 1/11/25 (Video deposition).

- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 1/30/25 (Video testimony).
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 2/5/25, Camden, NJ.
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 7/3/25, Camden, NJ.
- McCoy v. County of San Diego. Case No. No. 22cv1724- BTM-SBC. Expert for plaintiffs 7/18/25 (Video deposition).
- Cardew v. New York Department of Corrections and Community Supervision. Case No 21-cv-6557. Expert for plaintiffs 7/29/25 (Video deposition).
- Scott v. City of Baton Rouge. Case No. 3:22-cv-488. Expert for plaintiffs 7/30/25 (Video deposition).
- Scott v. Clarke. case 3:12CV36. Court appointed monitor. Hearing 8/01/25 (Video testimony).
- Vargas v. USA/Geo. Case No. 5:23-cv-00380-JWH-SP (CA). Expert for plaintiffs 08/18/25 (Video deposition).
- Rogers v. Columbia County (AK). Case 1:24-cv-01036-SOH. Expert for plaintiffs 12/9/25 (Video deposition).
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 12/19/25, Camden, NJ (Video testimony).
- Jung v. City of Philadelphia. Expert for plaintiffs. Trial testimony 2/25/26. Philadelphia PA.
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 2/27/26, Camden, NJ (Video testimony).
- Carty v. Governor Bryan, St. Thomas USVI. 3:94-cv-00078. Court appointed monitor, remote status hearing, 4/15/26.
- Paul v. New York Department of Corrections and Community Supervision. Case No 9:21-cv-000476. Expert for plaintiffs 5/20/26 (Video deposition).
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 6/26/26, Camden, NJ (Video testimony).

**Rate Sheet for Dr. Homer Venters**

Hourly rate for all work, $600/hr.

Travel time, $300/hr. plus travel expenses.

Per Diem, GSA rates utilized, available at https://www.gsa.gov/travel/plan-book/per-diem-rates

Expenses, including lodging, travel, receipts provided with invoices.