# EXHIBIT 10

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD;

Plaintiff,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE CORPORATION; CHRISTINA GOODALL (SUED AS CHRISTINA ANOSIKE) , IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; DEFENDANT DEPUTIES DOES 1-10, DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10.

Defendants.

**CASE NO.** 3:23-cv-1357-CAB-BLM

## DEPOSITION OF
HOMER VENTERS, M.D.

Thursday, September 10, 2026

10:01 AM to 2:38 PM

Reported By: Stephanie Cherness, CSR No. 13775

## VIA REMOTE VIDEO TECHNOLOGY

Hines Reporters

INTERNATIONAL TOWER
888 S. FIGUEROA STREET, SUITE 940, LOS ANGELES, CALIFORNIA 90017
866.432.4300

LOS ANGELES * SAN FRANCISCO * SAN DIEGO

10:29:25 A I have been retained by -- I was retained by the Department of Corrections in Washington State to help them, but that did not involve trial testimony. It involved them retaining me to help with healthcare but not -- I believe all the cases where I've offered testimony in a trial or a deposition are on that list.
10:29:55 Q Okay. Fair enough.
10:30:06 Okay. In your own words, how would you describe what you were retained to do in this matter?
10:30:13 A I was retained to assess the adequacy of care provided to Mr. Rupard in his final detention and also to assess the nature of the -- any errors I found, whether they were individual or systemic.
10:30:39 Q Okay. And I apologize. I have to jump back. There was a couple of questions I wanted to ask and forgot. You are --
10:30:51 Are you board-certified in internal medicine, sir?
10:30:54 A Yes.
10:30:55 Q Okay. You are not a board-certified psychiatrist, correct?
10:31:01 A Correct.
10:31:01 Q Okay. And you did not complete a psychiatry residency, correct?
10:31:07 A Correct.

10:31:07 Q Okay. And your medical license is in the State
10:31:11 of New York, correct?
10:31:13 A Yes.
10:31:13 Q Okay. Are you licensed in California?
10:31:17 A No.
10:31:18 Q Okay. And the hands-on work that you did in
10:31:30 correctional practice was in the New York City jail
10:31:33 system, correct?
10:31:34 A Yes.
10:31:35 Q Okay. Have you ever been employed to provide
10:31:39 care inside a California jail?
10:31:41 A No.
10:31:43 Q Okay. Have you ever been inside a San Diego
10:31:48 County jail?
10:31:48 A Yes.
10:31:50 Q When was that?
10:31:52 A I think I was there for part of a day in maybe
10:32:01 2019 or 2020. I don't recall.
10:32:04 Q And what was the purpose of that?
10:32:08 A I was working with a nonprofit called Community
10:32:17 Oriented Correctional Health Services, and so the nature
10:32:22 of that engagement was to give kind of a best practices
10:32:29 or scoping of best practices in jail health review to
10:32:35 the County. And so I believe there was a brief
10:32:40 walk-through of one of the facilities, and then the

13:03:03 refusing. And these are very serious, potentially life-sustaining medications. So that part of the refusal process in Mr. Rupard's case reflects systemic errors that accrued to somebody besides the psychiatrist.

13:03:17 Now, I also have said in my reports that I find fault with Dr. Cruz's long trajectory, putting aside the inadequacy of his assessment of Mr. Rupard. I also found fault with the notion of simply leaving him in this locked cell without any treatment or any transfer to a higher level of care.

13:03:40 Q Okay. All right. Okay. Is there anything else that you have that you haven't mentioned with regard to your -- with regard to this opinion that you plan on offering as testimony in this case?

13:04:38 A Not that's not included either in -- there is both this -- part of this report which has the sum total of my opinions on this finding based on the initial information and then the rebuttal report has also reviews, this finding, and has some specific opinions, mostly in response to the other experts' reports, but that would be where all of the opinions I have on this matter of inadequate mental healthcare would reside based on the information I've reviewed up to now.

13:05:13 Q Okay. What would be your second opinion that

13:25:03 A That's correct.
13:25:04 Q Okay. And you're not a forensic pathologist, correct?
13:25:15 A Correct.
13:25:15 Q You did not perform an autopsy in this case, correct?
13:25:18 A Correct.
13:25:18 Q You're not offering any independent causation
13:25:22 on -- or any causation opinion on the manner of death,
13:25:28 correct?
13:25:28 A I don't have any independent opinion. I
13:25:31 reviewed the information from the medical examiner's
13:25:35 report, so that's part of the content of my initial
13:25:37 report, but I haven't offered a separate opinion from
13:25:39 what the medical examiner offered.
13:25:42 Q Okay. So for all intents and purposes, you
13:25:47 defer to the medical examiner on that, correct?
13:25:50 A On the cause of death, yes.
13:25:52 Q Okay. Now, with regard to your rebuttal
13:27:17 report, you agree with Dr. Beckson that Mr. Rupard did
13:27:29 not receive the standard of care from Dr. Cruz, correct?
13:27:32 A Yes.
13:27:33 Q Okay. So, for example, I believe you took
13:27:37 issue with failure for close follow-ups, discontinuing
13:27:43 medications, failure to place him on a 5150 hold, and

13:29:25 13:29:28 13:29:29 exactly the kind of information that I think there should be a system that the County has in place to make sure the right information is reviewed. That's one systemic problem.

13:29:30 13:29:33 13:29:36 13:29:40 13:29:43 13:29:46 13:29:48 13:29:49 13:29:52 13:29:56 Another is the provision of -- or the conducting of psychiatric assessments in a nonconfidential cellside manner, just completely inadequate. And it's unclear to me if that's -- my own experience in correctional health is when that's happening, it's happening because it's an accepted practice. I haven't -- but to the extent that that's true in the San Diego jails, then that would reflect a systemic problem.

13:29:56 13:30:00 13:30:07 13:30:10 13:30:12 13:30:13 13:30:16 And then obviously we just talked a little bit about the failure to have independent oversight and assessment of the care by the County, both in terms of the independent peer review and also the lack of adequate clinical mortality review. So those are core kind of systemic problems, even though I do have specific areas --

13:30:20 13:30:24 13:30:27 13:30:33 I note Dr. Beckson. So I think what you were just reading from earlier are Dr. Beckson's findings about Dr. Cruz. I agree with some of those. I'm not an expert, for instance, in the specific 5150 hold, but I

13:30:38 agree with Dr. Beckson that there were failures in the care provided by Dr. Cruz.

13:30:45 Q Okay. Would those items that you agree with Dr. Beckson on, do you believe those to be systemic failures or individual failures?

13:31:10 A Well, I have listed Dr. Beckson's findings there, so those bullets -- one, two, three, four -- five bullets on page 3 of my rebuttal report, I attribute clearly that Dr. Beckson's report identifies several failures in the care provided by Dr. Cruz. I have on my own, both in the initial report and in this rebuttal, identified failures, some of which are just Dr. Cruz and some of which are systemic. So I list -- so, for instance, the failure to conduct a psychiatric assessment, the failure to schedule it in a timely manner, those are things I attribute to Dr. Cruz.

13:31:53 Some of the systems that I just talked about are systemic problems. But the way I put this together in my rebuttal report is I say on page 4, I agree with the basic opinion of Dr. Beckson that Mr. Rupard did not receive the standard of care from Dr. Cruz. But the next sentence is, "However, as I make clear in my initial report and below, these failures reflect more than individual errors by Dr. Cruz."

13:32:27 Q Okay. What is the basis for your offering a

13:38:28 A I don't believe so.
13:38:29 Q Have you offered any novel opinions today that
13:38:35 are critical of Dr. Cruz? And by "novel," I mean not
13:38:38 already contained in your report and/or in your rebuttal
13:38:41 report.
13:38:41 A I don't believe so, no.
13:38:42 Q Okay. Dr. Venters, you're not a
13:38:48 board-certified psychiatrist, true?
13:38:49 A True.
13:38:50 Q Is it fair to say you've never personally
13:38:54 practiced clinical psychiatry or prescribed or managed
13:38:59 psychiatric medications for patients as their treating
13:39:02 psychiatrist at any point in your career?
13:39:04 A True.
13:39:05 Q Since leaving direct correctional health
13:39:10 practice in New York City, your work has been almost
13:39:16 entirely administrative, advocacy, monetary or expert
13:39:19 witness work rather than direct patient care. Do you
13:39:22 agree?
13:39:23 A Yes.
13:39:24 Q Would you also agree with me, Dr. Venters, that
13:39:29 decisions about which specific antipsychotic medication
13:39:33 to offer and when to schedule a psychiatric follow-up
13:39:36 are clinical judgment calls best left to a treating
13:39:40 psychiatrist based on his or her real-time assessment of

13:48:28 A My understanding in this case is that there was a mental health unit that Dr. Cruz could have initiated some sort of transfer to, and -- but I don't know, for instance, if that also was equally true for him to trigger a transfer to a hospital on the outside. So I didn't see any documentation that he contemplated that type of move, but my understanding is it was possible for the psychiatrist to take some action to get somebody to a higher level of assessments and care.

13:49:05 Q Do you know whether or not that would have been a collaborative process?

13:49:10 A My understanding is it would have involved more than him. He physically wouldn't be taking Mr. Rupard out of his cell, so he would have been triggering some sort of transfer. For the in-jail mental health unit, there would have been a psychiatrist there who then saw Mr. Rupard once he got there. I think there were nurses there that would have seen him, so it would have been multiple staff involved in that.

13:49:34 Q Does that include jail staff?

13:49:36 A Do you mean custody staff?

13:49:38 Q Yeah, any personnel from the jail.

13:49:42 A Yes, it would have involved the jail site, the people, the psychiatrists, maybe mental health workers, nurses working in the jail, as well as custody staff who

13:51:25 Q And you have no basis to say that Dr. Cruz individually caused or created the jail's lack of a peer-review process, correct?
13:51:34 A Correct.
13:51:34 Q And you likewise have no basis to say that Dr. Cruz individually was responsible for the County's failure to conduct a clinical mortality review after Mr. Rupard's death, correct?
13:51:48 A Correct.
13:51:48 Q Dr. Venters, you're not licensed to practice medicine in California, true?
13:51:55 A True.
13:51:56 Q Have you ever worked as a treating psychiatrist or in any other clinical role inside of a California County jail?
13:52:06 A Not as a treating provider. I am appointed by federal courts, as I mentioned earlier, as the health monitor in California and have been appointed by a federal judge as a health investigator in a prison.
13:52:24 Q Okay. And on that point, are you familiar with the California statute called the Lanterman Petris Short Act, or LPS?
13:52:33 A Not as a -- I've heard of it, but I'm not familiar. I haven't individually used it or relied on it, and so I'm not sure I'm familiar with the criteria

13:52:43 of it.
13:52:44 Q Okay. Is it fair to say, then, that you've never personally initiated a 5150 hold on a patient under California law?
13:52:53 A That is true.
13:52:54 Q And you've likewise never personally initiated a 5250 hold on any patient under California law, true?
13:53:01 A True.
13:53:01 Q And given your experience as a monitor of correctional facilities, I think in Santa Barbara, is that where you have court-monitored appointment services, Doctor?
13:53:18 A Yes.
13:53:18 Q Okay. Do you have any familiarity with the 5150, 5250, and Riese hold procedures under California law?
13:53:30 A That's not part of the monitoring I've been asked to do, so it's not -- I would say I'm not familiar with the specifics of those guidelines.
13:53:41 Q Okay. Fair to say that you wouldn't know, then, or have any knowledge about what California law requires before a patient can be certified for a 5250 hold, true?
13:53:53 A That's correct.
13:53:56 Q Likewise, would it be true with respect to 5150

13:54:01 holds, true?
13:54:02 A Yes, that's true.
13:54:03 Q Okay. Do you know how a Riese petition and
13:54:22 order takes place?
13:54:25 A No.
13:54:25 Q Isn't it true, Dr. Venters, that the findings
13:54:35 section of your report and those opinions contained
13:54:38 within your rebuttal report do not rely in any way upon
13:54:42 the Lanterman Petris Short Act, the 5150 and 5250
13:54:47 statutory system, the Riese order, or any other
13:54:51 California-specific statute; is that true?
13:54:55 MR. IREDALE: Objection to the compound form of
13:54:57 the question.
13:54:57 You may respond, Doctor.
13:55:00 THE WITNESS: I don't believe I've cited to any
13:55:04 California legal standards, including the ones you just
13:55:08 mentioned in my reports.
BY MR. MURPHY:
13:55:12 Q Understood. Would you agree with me,
13:55:15 Dr. Venters, that any criticisms of Dr. Cruz in this
13:55:19 case are not grounded in the legal framework established
13:55:23 under California law for what he could and could not do
13:55:26 for Mr. Rupard?
13:55:28 MR. IREDALE: I would object. It calls for
13:55:31 opinion and conclusion as to other states of mind, other

13:55:36 expert reports, and other contentions that may be made
13:55:39 at trial, so object to the form of the question.
13:55:43 THE WITNESS: I agree that my criticisms are
13:55:46 based on correctional standards of care, not any
13:55:51 California laws that I've reviewed or attempted to
13:55:54 interpret.

BY MR. MURPHY:

13:55:58 Q Do you have any experience or practice under
13:56:03 any statute analogous to the LPS in California in any
13:56:09 other state? And if so, at what point in your career
13:56:13 and in what context?
13:56:15 A Well, if the LPS system -- I don't -- as the
13:56:23 leader of a correctional health service, a large
13:56:25 correctional health service, including all the aspects
13:56:28 of mental health service, I am familiar with the process
13:56:34 of restoration of patients, forensic restoration of
13:56:41 patients, both either in a jail setting or in an outside
13:56:44 psychiatric hospital. So I'm familiar with those, but
13:56:47 I'm familiar with those processes not as a lawyer or
13:56:50 legal expert, but as somebody who led a jail health
13:56:54 service to try and determine how best to provide care
13:56:57 for those patients.
13:56:58 Q Understood, Doctor. Are you familiar with any
13:57:01 sort of legal framework in any state in which you have
13:57:04 experience that pertains to involuntary holds and

14:35:31 MR. KAHN: Objection. Misstates prior
14:35:34 testimony, lacks foundation.
14:35:35 MR. IREDALE: It doesn't misstate anything.
14:35:37 I'm reading the very testimony you misstated.
14:35:42 THE WITNESS: I believe that the clinical
14:35:46 mortality review should happen within 30 days and that
14:35:50 that includes notification and involvement of the
14:35:54 clinical leadership and review of the death.
14:36:00 BY MR. IREDALE:
14:36:00 Q And then finally you were asked some questions
14:36:02 about Dr. Cruz and his authority and abilities. When
14:36:17 dealing with a person with Mr. Rupard's history and
14:36:20 background, would you think that spending, in clinical
14:36:25 consultation, a total between 10 and 14 minutes all told
14:36:32 in a period of three months is a sufficient time in
14:36:34 order to render proper clinical care?
14:36:37 MR. KAHN: Foundation.
14:36:39 THE WITNESS: I don't believe that the clinical
14:36:42 assessments of Mr. Rupard by Dr. Cruz were adequate.
14:36:49 BY MR. IREDALE:
14:36:50 Q Do you recall from reading his deposition that
14:36:54 he saw Mr. Rupard on two occasions?
14:36:56 A Yes.
14:36:59 Q And his testimony under oath was that each
14:37:03 occasion he interacted with Mr. Rupard from between 5 to

14:37:08 7 minutes?
14:37:09 A Yes.
14:37:15 MR. IREDALE: All right. Thank you so much.
14:37:17 That's all I have.
14:37:24 MR. KAHN: I have no follow-up.
14:37:26 MR. MURPHY: I likewise have no follow-up.
MR. KAHN: Thank you. Have a good day to everybody.
14:37:34 THE REPORTER: First, who needs a copy of the
14:37:36 transcript?
14:37:37 MR. IREDALE: I'll take a copy of the
14:37:38 transcript.
14:37:41 THE VIDEOGRAPHER: And copies of the videos?
14:37:44 MR. IREDALE: No, not now. Thank you. I
14:37:47 believe videographers should make a lot of money, but
14:37:50 I'm going to hold back on this.
14:37:53 THE VIDEOGRAPHER: Sounds good. Thank you.
14:37:56 THE REPORTER: Mr. Murphy, did you need a copy?
14:37:56 MR. MURPHY: Yes, consistent with my office's
14:37:58 prior orders, and I have specific instructions here,
14:38:01 electronic certified copy with Word index, TXT version,
14:38:05 and rough transcript, please.
14:38:09 THE REPORTER: Okay.
14:38:11 THE VIDEOGRAPHER: And Counsel Murphy, did you
want a copy of the video?

C E R T I F I C A T E

I, STEPHANIE M. CHERNESS, CSR, do certify:

That I am a disinterested person herein;

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth;

That thereafter the deposition was taken down by me in shorthand at the time and place therein named and thereafter transcribed under my direction and supervision;

That the foregoing deposition is a true and correct transcription of my shorthand notes so taken.

I further certify that I am neither counsel for nor related to any party to said action, nor in anywise interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my hand on September 18, 2026.

StephCherness
______________________________
STEPHANIE CHERNESS, CSR No. 13775