# EXHIBIT 11

# Daphne Glindmeyer, M.D.

611 River Highlands Blvd. Suite B
Covington, LA 70433

Phone: (504) 392-8348
Facsimile: (504) 398-4334

Phone: (985) 888-1414
Facsimile: (985) 888-1415


July 13, 2026

Lowe Law, APC
Attn: Jeremiah Lowe, Esq.
402 West Broadway Street Suite 1720
San Diego, California 932101

Re: Estate of Lonnie Rupard v. County of San Diego, et al.
Case No: 23CV1357 CAB BLM

Dear Mr. Lowe,
My name is Daphne Glindmeyer. My office address is 611 River Highlands Boulevard, Suite B, Covington, Louisiana. I am a medical doctor, licensed to practice medicine in the state of Louisiana and in the state of Texas.

I am a graduate of the Louisiana State University Health Sciences Center. I completed a residency in Adult Psychiatry, a fellowship in Child and Adolescent Psychiatry, and a fellowship in Forensic Psychiatry. I am board certified in Adult Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry. I am a Distinguished Fellow of the American Psychiatric Association, past President of the Louisiana Psychiatric Medical Association, and past President of the Louisiana Council on Child and Adolescent Psychiatry.

I am currently in private practice, providing psychiatric evaluation and medication management services to child, adolescent, and adult clients as well as forensic consultation. My fee for forensic consultation, charged in this case, is $600.00 per hour, with approximately 32 hours spent on this review/report. Testimony, if required, is also charged at $600.00 per hour, in four-hour blocks. For further information, please refer to my attached Curriculum Vitae and Fee Agreement. In addition, I have attached my testimony log detailing depositions and courtroom testimony for the past four years.

<u>Statement of Opinion:</u>
Mr. Lowe requested my opinions in the above noted case. My opinions are based on my skill, education, training, experience, knowledge of medical and scientific literature,

other materials reasonably relied upon by members of my medical specialty, and my review of the case information available at this time. Should additional information become available that modifies my opinions and conclusions, an addendum will be authored.

To provide this opinion, information regarding this case including case pleadings, depositions, photographs, medical/mental health, and other records were reviewed. For a complete listing of all information reviewed, please refer to the list of documents and pertinent information from each included below.

Based on the available information, it is my opinion, to a reasonable degree of psychiatric certainty, that there were significant deviations from the standard of care regarding the psychiatric treatment, mental health treatment, and monitoring provided to Mr. Rupard during his incarceration at the San Diego County Jail. In my opinion, the failures on the part of the facility and mental health/psychiatry staff resulted in Mr. Rupard's death due to "Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia." Mr. Rupard's death was classified as "homicide" per the County of San Diego Department of the Medical Examiner.

<u>Document Review:</u>
As part of the evaluation, the following documents, provided by Jeremiah Lowe, Esq. were reviewed: *(Pertinent information regarding each document will be included here. Please note common medical abbreviations have been deciphered for the reader.)*

<u>Legal:</u>

1. United States District Court, Southern District of California, Estate of Lonnie Rupard, through its Court-Appointed Administrator Terri Lopez; and Justino Rupard v. County of San Diego, et al., Third Amended Complaint for Damages filed February 19, 2025:
    a. "Lonnie suffered from schizophrenia. On March 17, 2022, Lonnie died…at the age of 46 while in custody at the SDCJ [San Diego County Jail]…
    b. While in custody at the SDCJ, County employees neglected his schizophrenia and basic needs despite obvious signs that he was in acute psychosis. They discontinued his antipsychotic medication. During the approximately three months he was in custody at SDCJ, Lonnie lost 60 pounds, more than a third of his total body weight. Lonnie was six feet tall and weighed 105 pounds at his death.
    c. In his final days, Lonnie ate nothing. He was never let out of his cell…Deputies, who saw Lonnie in…trash and maggots in his food and his body caked in feces, left him to die.
    d. According to the medical examiner, Lonnie died from pneumonia, malnutrition, and dehydration. The Medical Examiner ruled his death to be a homicide."

Conclusions:
Mr. Rupard's death due to his untreated mental illness resulted from a confluence of system and treatment failures that were identifiable, but in multiple deviations from the standard of care, were ignored by jail personnel, medical, and mental health staff. These deviations will be addressed individually below:

*Housing:*
Housing was a precipitating factor in Mr. Rupard's mental health deterioration and death as he was housed in a single cell, isolated from others. Mr. Rupard apparently remained in administrative segregation type housing on 7D for most of his 89-day incarceration.[1] Per the investigative report of Detective Blumenshine, Mr. Rupard's "housing block, 7D, was classified as COVID quarantine, and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health." As Mr. Rupard had a history of serious mental illness, specifically a psychotic illness, placement in this type of housing is inappropriate and would only serve to further isolate him and exacerbate his mental health symptoms.

The negative impact of isolation on individuals is accepted in the scientific literature. Grassian (2006) described "severe psychiatric harm" resulting from solitary confinement wherein individuals experienced either reoccurrence of preexisting mental illness or acute mental health symptoms. He noted that individuals exposed to isolation experienced consistent symptoms including: hyperresponsivity to external stimuli; panic attacks; difficulty with thinking, concentration, and memory; intrusive obsessional thoughts; overt paranoia; problems with impulse control; and delirium.

The deleterious effects of confinement and seclusion have been documented in adult settings (Haney, 2003). Specific effects include psychological consequences associated with lack of social contact, sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilation. Metzner and Dvoskin (2006) also documented psychological harm associated with seclusion in Supermax correctional settings. Seclusion has been associated with exacerbation of pre-existing conditions, as well as psychoses, depression, and anxiety in individuals with a history of mental health problems.

Over the course of his incarceration, Mr. Rupard's mental status declined. He refused psychotropic medication and was noted to have increasing signs and symptoms of psychosis. As his mental status declined, so did his physical health; however, as Mr. Rupard was not appropriately monitored by medical and mental health staff, his

[1] Note, Mr. Rupard's housing is classified as administrative segregation, or 23 hours in cell daily/1 hour out of cell daily. Regardless of the terminology used, Mr. Rupard's housing qualifies as isolation or restrictive housing.

condition was allowed to deteriorate. Mr. Rupard reportedly lost approximately 60 pounds over the course of his 89-day incarceration. The San Diego County Medical Examiner revealed Mr. Rupard had a body mass index of 15.5 at the time of his death, which is classified as severely underweight. Further, the San Diego County Medical Examiner documented that Mr. Rupard had "feces about the buttock area, and the posterior aspect of the lower extremities and the soles of both feet."

*Use of Segregation:*
Mr. Rupard was housed in administrative segregation type housing. In a deviation from the standard of care, there was no documentation of mental health advocating for him or assessing him to determine whether his existing mental health needs contraindicated his placement in segregation or if accommodations were necessary. This is required per the National Commission on Correctional Health Care [NCCHC] standard regarding Segregated Inmates. Further, per this standard, it is noted "for inmates housed in segregation, qualified mental health professionals provide mental health services according to established treatment plans and respond in a timely manner to referrals." As noted in the sectioned entitled "Treatment Planning", in a deviation from the standard of care, Mr. Rupard did not have a Treatment Plan developed.

*Failure to Monitor- Mental Health:*
Over the course of Mr. Rupard's 89-day incarceration at San Diego County, he was housed in 7D, which is reportedly an administrative segregation unit. The Medical Services Division Operations Manual policy titled "Segregated Inmates" requires that an individual will be assessed by nursing a minimum of three times per week and by mental health staff a minimum of one time per week.

In a deviation from the standard of care, and failure to follow facility policy, there was no documentation of monitoring three days a week by medical staff. The only contact Mr. Rupard received were attempts to administer psychotropic medication, which he reportedly consistently refused. Refusals were documented from the time the medication was ordered, 12.30.21, through the time of discontinuation, 1.20.22; however, none of the refusal forms were signed by Mr. Rupard. Once the medication was discontinued, there was no other documentation of regularly reoccurring visits by nursing.

The next documented contact between nursing and Mr. Rupard was documented 1.29.22, when he was assessed following a use of force. Mr. Rupard refused the nurses assessment and intervention, threatening, "If you touch me, I'll kill you." The assessment was terminated. This event was not recognized by the facility staff as a mental health crisis and Mr. Rupard's homicidal threat was not reported to or acknowledged by mental health.

In a deviation from the standard of care, and a failure to follow facility policy, there was no documentation of monitoring once weekly by mental health staff. Over the course of his 89-day incarceration, Mr. Rupard had one contact with mental health, 2.9.22. This was a wellness check, that noted "no reported aggression, violence, or erratic behavior." Given the event of 1.29.22, this report is not accurate. Per the deposition of Ms. Goodall, she was not asked to see Mr. Rupard on a weekly basis during his stay in administrative segregation type housing and only saw those individuals who appeared on her "sick call" list. This is a deviation from the standard of care and a failure to follow facility policy entitled "Segregated Inmates" which states that "Inmates housed in segregation will be monitored by health staff based on established frequency. Inmates who are segregated and receive services and activities apart from other inmates shall be monitored three days a week by nursing staff and a minimum of once a week by a qualified mental health provider (QMHP)."

Despite Mr. Rupard exhibiting significant signs of mental health difficulties during the 2.9.22 assessment performed by Ms. Goodall including "speaking in unintelligible words…behavior… agitated… thought content…impoverished" in a deviation from the standard of care, he was not referred for further assessment or psychiatric evaluation. The plan was to follow up in two weeks, again, not at the one-week frequency designated by policy. Regardless, this scheduled follow up did not occur.

Given the failure to monitor Mr. Rupard during his incarceration on 7D, his mental health was allowed to deteriorate without intervention. In a deviation from the standard of care, Mr. Rupard received no regularly reoccurring behavioral health treatment services. Despite his serious mental illness, he did not have a treatment plan developed, and he was not receiving regularly reoccurring behavioral health interventions. He was housed in 7D, a unit affording limited out of cell time, which given Mr. Rupard's significant mental health needs, was entirely inappropriate for him.

*Duration of Untreated Psychosis and Medication Refusals:*
A review of Mr. Rupard's record at the SDCJ revealed a long history of serious mental illness. This information was available for review by the mental health staff including psychiatric clinicians. Mr. Rupard had a history of mental illness documented at the SDCJ beginning in 2007. Diagnoses documented included schizophrenia, schizoaffective disorder, schizophrenia spectrum and other psychotic disorder, antisocial personality disorder, and stimulant use disorder.

Mr. Rupard had a history of over 20 presentations to the facility. His initial presentations varied. Documents indicated that if Mr. Rupard was adherent to his medication regimen on admission, such as on return from court ordered treatment at Patton State Hospital, he was pleasant and cooperative. There was also documentation that Mr. Rupard often denied a history of mental illness and refused to consider treatment with psychotropic medications leading to increased behavioral health symptoms, specifically psychotic symptoms.

Mr. Rupard had a history of treatment with long-acting antipsychotic medications. These medications, such as Prolixin and Haldol, are administered via intramuscular injection every two to four weeks. Mr. Rupard had a history of court ordered or forced medication administration. Mr. Rupard also had a history of requiring civil commitment, or 5150 admissions to inpatient psychiatric treatment. For example, in 2012, Mr. Rupard was admitted to the SDCJ. At that time, he reported a history of a diagnosis of schizophrenia but could not recall the name of his medications. During this incarceration, Mr. Rupard refused psychiatry sick call and refused treatment with psychotropic medications. Documentation noted, "his cell is filthy, he is not flushing the toilet, he makes himself throw up." Ultimately, although Mr. Rupard was released from custody, he refused to leave his cell and required inpatient psychiatric hospitalization under 5150.

During Mr. Rupard's incarceration period from December 12, 2021 through March 17, 2022, Mr. Rupard consistently refused psychotropic medications. Given his history of improvement with medication and deterioration in the absence of medication, the declining trajectory of Mr. Rupard's clinical course in the setting of untreated psychosis in schizophrenia was predictable. In a deviation from the standard of care, Mr. Rupard was allowed to deteriorate and become increasingly psychotic. While it is understood that individuals have the right to refuse psychotropic medication, there was a need to consider involuntary medications to avoid further decompensation.

The standards regarding Informed Consent and Refusal of Mental Health Care per the National Commission on Correctional Health Care Standards for Mental Health Treatment in Correctional Facilities (2015) require "that any menial health intervention refusal is documented and must include...evidence that the inmate has been made aware of any consequences to health/mental health that may occur as a result of the refusal...a patients refusal of care is to be an informed decision, with the consequences explained to the individual...competency may be an issue when mentally ill inmates refuse treatment. Management of such refusals, particularly if they seriously jeopardize the patient's health, requires a collaborative approach of psychiatric, psychological, criminal justice and legal assistance."

SDCJ policy titled "Refusal Procedures" indicated that when a patient refuses treatment, they will "be counseled by medical staff of the risks and benefits of such action." For refusal of medications, policy requires "if the medicine is indicated for a serious medical/ psych condition, refer the patient to MD or psychiatrist immediately or as soon as possible." Mr. Rupard began refusing psychotropic medications immediately upon prescription,12.30.21. Although facility procedure requires immediate referral to psychiatry, that did not occur. Instead, Mr. Rupard was allowed experience an extended duration of untreated psychosis.

Delays in treatment of psychosis have been linked to neurodegeneration, persistence of symptoms, poorer social outcomes, increased difficulties in cognitive functions, and poorer response to future attempts at treatment with antipsychotic medications. Psychiatry was not advised of Mr. Rupard's medication refusals until 1.15.22. Facility policy requires documentation of "health education provided and patient's understanding of the counseling." In a deviation from the standard of care, rather than meet with Mr. Rupard and provide health education and an assessment of Mr. Rupard's capacity to make an informed decision to refuse medications, Dr. Cruz performed a chart review on 1.20.22, during which all medications were discontinued in the absence of any clinical encounter.

As discussed above, after his initial psychiatric evaluation and prescription of psychotropic medication, Mr. Rupard consistently refused medications and exhibited increasingly bizarre behavior. In a deviation from the standard of care and a deviation from facility policy and procedure, there was no plan to provide psychoeducation or to meet with Mr. Rupard further to develop rapport, assess, educate, or inform him of the potential benefits of medication. Additionally, given Mr. Rupard's history, his presentation and the fact that psychiatry at SDCJ could petition the Court for forced medications, in a deviation from the standard of care, this was not considered.

*Basic Mental Health Services:*
Per the NCCHC standards, basic mental health services are an essential standard. This means that "a range of mental health services are available for all inmates who require them." A review of the documentation from SDCJ revealed that in a deviation from the standard of care, basic mental health services other than outpatient psychiatry were not available or at least not provided to Mr. Rupard.

The NCCHC states that onsite outpatient services must include at a minimum, identification and referral of inmates with mental health needs. This obviously did not occur, as while Mr. Rupard was identified at intake as having a history of mental health symptoms/treatment he was not referred for ongoing treatment or development of an individualized treatment plan outside of a psychiatric evaluation for treatment with psychotropic medications.

In a deviation from the standard of care, there was no continuity or ongoing behavioral health treatment provided to Mr. Rupard. Another minimum requirement is for psychosocial/ psychoeducational programs. In a deviation from the standard of care, this did not occur for Mr. Rupard. There was no documentation of ongoing attempts to meet with Mr. Rupard, to establish rapport, to educate him on the need for psychotropic medication, and to monitor him for increased symptoms.

*Treatment Planning:*
Per the NCCHC standards, it is essential that mental health services are provided according to individual treatment plans. These plans direct the mental health services

needed for every patient on the mental health caseload and include the treatment goals and objectives. The responsible mental health clinician provides periodic reviews of the individuals treatment plan.

The NCCHC defines a treatment plan as a "series of written statements specifying a patient's particular course of therapy and the roles of qualified mental health professionals in carrying it out. Such a plan is individualized, may be multidisciplinary, and is based on an assessment of the patient's needs. It contains a statement of short- and long-term goals as well as the methods by which those goals will be pursued." The intent of the treatment plan standard is that mental health patients receive care tailored to their individual needs.

The NCCHC compliance indicators for this standard include that "treatment planning is initiated when the individual enters into treatment with a qualified mental health professional. Development of the treatment plan is undertaken in collaboration with the inmate when feasible. Mental health treatment plans must include, at a minimum: frequency of follow up for evaluation and adjustment of treatment modalities... adjustment of psychotropic medications, if indicated... referrals for psychological testing, medical testing, and evaluation, including blood levels for medication monitoring as required... when appropriate, instructions about diet, exercise, personal hygiene, and adaptation to the correctional environment... documentation of treatment goals and objectives, interventions necessary to achieve these goals, and notation of clinical progress."

In a deviation from the standard of care, Mr. Rupard was not afforded a treatment plan or regularly reoccurring behavioral health interventions other than one mental health "wellness check" and two visits with psychiatry. Despite his significant psychotic symptoms, refusal to take psychotropic medications, risk for ongoing decompensation, and housing in administrative segregation, Mr. Rupard was not offered individualized mental health interventions.

*Failure to Monitor – Psychiatry:*
Over the course of this incarceration at SDCJ, Mr. Rupard was seen twice by the facility outpatient psychiatrist, Dr Cruz. In a deviation from the standard of care, both encounters were cell side, in a non-confidential space. Cell side encounters are not recommended as they are a barrier to assessment, engagement, and rapport building. Per the deposition of Dr. Cruz, cell side encounters are typical at SDCJ.

Mr. Rupard's initial encounter with Dr Cruz was a psychiatric evaluation dated 12.29.21. During this encounter, Mr. Rupard was noted as mumbling incoherently, yelling, verbally aggressive, with disorganized thought processes. This description is indicative of a thought disorder. Dr Cruz utilized diagnoses from Mr. Rupard's prior incarceration, noting historical diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, antisocial personality disorder, and stimulant use disorder. Dr, Cruz continued

Mr. Rupard's previously prescribed psychotropic medication, Haldol Decanoate, Depakene, Vistaril, and Cogentin. Dr. Cruz indicated he did not access Mr. Rupard's prior treatment records from Patton State Hospital. The plan was for Mr. Rupard to return to clinic in four to five weeks or sooner. Unfortunately, that did not occur.

As Mr. Rupard refused to adhere to the prescribed psychotropic medication regimen, Dr. Cruz made the decision to discontinue the medication on 1.20.22. In a deviation from the standard of care, this discontinuation was done in the absence of a clinical encounter with Mr. Rupard. Dr. Cruz indicated a plan to follow up with Mr. Rupard at his previously scheduled follow-up clinic.

Mr. Rupard was next seen by psychiatry 2.22.22. This was the last encounter between Mr. Rupard and Dr. Cruz. Mr. Rupard was noted to "ramble incoherently… verbally aggressive…shirtless…irritable…uncooperative…limited grooming…thought process disorganized…may be responding to internal stimuli…". This mental status examination notes an exacerbation of symptoms, specifically incoherent rambling, disorganized thought processes and the potential for response to internal stimuli. These symptoms are indicative of psychosis, even so, Dr. Cruz did not consider Mr. Rupard as gravely disabled requiring immediate psychiatric intervention.

In his deposition, Dr. Cruz, who was trained and able to complete a 5150 certificate, stated that just because an individual refuses medication, that does not mean that they qualify for a 5150 commitment. While this statement on the surface is accurate, Mr. Rupard's exacerbated psychosis indicated he did not have the capacity to make a rational, informed decision regarding refusing his psychotropic medications. Facility policy included a definition for grave disability that would qualify an individual for a 5150 commitment. "Gravely Mentally Disabled shall refer to any inmate: 1. Who is believed to be a danger to self or a danger to others, or 2. Who does not appear to be able to provide for his/ her own personal needs such as eating, showering, and toileting, or 3. Who does not appear to be sufficiently lucid to comprehend the fact of their arrest or incarceration." Mr. Rupard had a history of dangerousness to others. He had verbally threatened to kill a nurse in January 2022. Further, his failure to care for himself was obvious prior to the time of his death. As medical and mental health staff did not assess and monitor his condition, he was allowed to deteriorate without intervention. It is obvious that Mr. Rupard was deteriorating both mentally and physically. This was not recognized as Mr. Rupard was not monitored. As he was not monitored, his significant weight loss was not appreciated.

In his deposition, Dr. Cruz reported that he relied on medical, mental health and sworn staff to provide him information regarding individuals, and if necessary, they would be added to the sick call list. Unfortunately, medical and mental health staff were not monitoring Mr. Rupard, and sworn staff do not have the clinical acumen to assess Mr. Rupard.

*Standard of Care:*
As discussed above, there were multiple systemic deviations from the standard of care evident in the mental health treatment of Mr. Rupard. The following are deviations attributed to psychiatry and mental health staff.
The treating psychiatrist, Dr. Cruz, employed by Liberty Healthcare:

- Performed an initial psychiatric evaluation of Mr. Rupard but did not review records of his prior hospitalizations;
- Discontinued Mr. Rupard's psychotropic medications on 1.20.22 in the absence of a clinical encounter and did not initiate involuntary medication proceedings.
- Documented a clinical encounter with Mr. Rupard on 2.22.22 where he noted signs and symptoms of psychosis and a deterioration in his mental status, but did not refer for a higher level of care (e.g., PSU);
- Did not adequately monitor Mr. Rupard, rather, he relied on sworn staff and other clinicians.

The SDCJ mental health clinician, Ms. Christina Anosike [Goodall]:

- Had only one clinical encounter with Mr. Rupard once during his 89-day incarceration despite the requirement for weekly encounters in his housing unit;
- Did not escalate his care despite documenting Mr. Rupard experiencing symptoms of psychosis including "unintelligible speech" and "impoverished thought."
- Did not perform a clinical follow-up as scheduled.

<u>Summary:</u>
In summary, Mr. Rupard was seriously mentally ill with diagnoses including unspecified schizophrenia and other psychotic disorders, but due to inadequate mental health treatment, he experienced an extended duration of untreated psychosis and an exacerbation of psychotic symptoms, with significant functional impairment. His death occurred due to a confluence of events and system failures that were identifiable and preventable, yet in deviations from the standard of care described in detail above, were not addressed.

Mr. Rupard was increasingly psychotic. He was not engaged in mental health treatment per an individualized treatment plan. He was not consistently monitored by mental health staff despite his housing in administrative segregation. Despite his deterioration and increased psychotic symptoms, he was not considered for a forced medication protocol or a 5150 designation and transfer to the Psychiatric Stabilization Unit.

Facility staff of all disciplines (e.g. sworn staff, medical staff, mental health staff, and psychiatry) failed to monitor Mr. Rupard, recognize his deteriorating condition, intervene on his behalf, and escalate his treatment to a higher level of care (e.g., the PSU). Given the documentation of his experiencing psychotic symptoms, mental health staff should have intervened. Mr. Rupard was documented as psychotic. He did not have the

capacity to make appropriate decisions regarding his care. Further, Mr. Rupard's severe deterioration was documented by Dr. Badre in his evaluation of 3.14.22. Based on Dr. Badre's description of Mr. Rupard's cell and his hygiene, it is obvious that any one of the jail staff would have recognized Mr. Rupard's grave disability.

Had Mr. Rupard been properly evaluated, monitored and treated, his death would have been prevented. Unfortunately, the failures ultimately resulted in Mr. Rupard's death due to "Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia. Contributing: SARS-COV-2 (COVID-19) Viral infection; pulmonary emphysema; duodenal ulcer." The Medical Examiner indicated Mr. Rupard's death was "homicide" due to "ineffective delivery of...care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide."

Please note the above opinions are provided to a reasonable degree of psychiatric certainty. If additional information or collateral documentation becomes available, I reserve the right to change my opinions based on such, and that will be submitted as an addendum to this report. Should you have any questions, or require any further information regarding these opinions, please contact me at 504.392.8348.

Submitted by:

Daphne Glindmeyer, M.D., D.F.A.P.A.
Board Certified Child, Adolescent, and Adult Psychiatrist
Board Certified Forensic Psychiatrist

Curriculum Vitae

# Daphne A. Glindmeyer, M.D.

---

Business Address:

611 River Highlands Blvd., Suite B
Covington, Louisiana 70433

Phone: (504) 392-8348
Fax: (504) 398-4334
Email: psychdoctors@gmail.com

Mailing Address:

Post Office Box 4240
Covington, Louisiana 70434

---

## EDUCATION

**Post Graduate Medical Education:**

Louisiana State University Health Sciences Center
Division of Law and Psychiatry
Forensic Psychiatry Fellowship, 1998-1999
New Orleans, Louisiana

Louisiana State University Health Sciences Center
Division of Infant, Child, and Adolescent Psychiatry
Child Psychiatry Fellowship, 1995-1997
New Orleans, Louisiana

Louisiana State University Health Sciences Center
Psychiatry Residency Training Program
Adult Psychiatry Residency, 1993-1995; 1997-1998

**Medical Education:**

Louisiana State University Health Sciences Center
Doctor of Medicine, 1989-1993
New Orleans, Louisiana

**Undergraduate Education:**

University of New Orleans
Premedical Curriculum, 1987-1989
New Orleans, Louisiana

Mississippi Gulf Coast Community College
Premedical Curriculum, 1985-1987
Gulfport, Mississippi

Loyola University
Bachelor of Business Administration/Finance, 1981-1985
New Orleans, Louisiana

---

## PROFESSIONAL LICENSES AND CERTIFICATIONS

**Medical License:**

Louisiana, 1993
Texas, 2015

**Board Certification:**

| | | |
|---|---|---|
| Psychiatry | October 1999 | **Recertification:** Current |
| Forensic Psychiatry | April 2001 | **Recertification:** Current |
| Child and Adolescent Psychiatry | November 2002 | **Recertification:** Current |

---

## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

American Psychiatric Association
- Fellow 2009
- Distinguished Fellow 2016

American Academy of Psychiatry and the Law
- Program Committee, 2000-2002

Louisiana Council of Child and Adolescent Psychiatry
- President 2009-2012

Louisiana Psychiatric Medical Association
- Executive Council Resident Program Representative 1997-1999
- Law and Psychiatry Committee 1999-Present
- Chairman Law and Psychiatry Committee 2009-Present
- Co-Chairman Child and Adolescent Psychiatry Committee 2003-2005
- Parliamentarian 2005-2006
- Secretary 2006-2007
- President 2007-2008

Louisiana State Medical Society
    Membership Committee 2004-2007
    Mental Health and Substance Abuse Committee 2004-2007
    Council on Membership Services 2008-2010

Selected by her peers for inclusion in Best Doctors in America® from 2007 to 2018

Orleans Parish Medical Society
    Women's Taskforce 2004-2005

Jefferson Parish Medical Society 2010-2020

Louisiana State University Health Sciences Center
Student Government Association 1989-1993
    Senior Class Vice President
    Executive Council Vice President of Social Affairs
    Sophomore Class Vice President
    Freshman Class Vice President

Student Representative Five Year Planning Committee 1993

Psychiatric Resident Representative to the Committee for Professional Conduct 1997-1998

---

## CURRENT EXPERIENCE

**March 2004-Present** Daphne Glindmeyer, M.D., A.P.M.C.
Private Practice
Psychiatric evaluation and psychotropic medication management services for children, adolescents and adults are provided in outpatient setting. Also perform forensic consultations for adolescents and adults (civil and criminal).

**April 2020 – Present** Subject Matter Expert
Iowa Boys State Training School
Compliance monitoring regarding mental health services in a juvenile justice center in the State of Iowa pursuant to a consent decree.

**December 2022 – Present** United States District Court for the District of Rhode Island
Court Appointed Rule 706 Expert
Consultation regarding behavioral health and conditions of confinement in Rhode Island Department of Corrections.

---

**PAST EXPERIENCE**

**March 2023 – May 2024** Subject Matter Expert
Bailey and Associates, L.L.C.
Glenwood Resource Center

Compliance monitoring regarding psychiatric services in a supported living center in the State of Iowa pursuant to a consent decree.

**June 2010-November 2024** Compliance Monitor
Harchik and Associates, L.L.C.
State of Texas

Compliance monitoring regarding psychiatric services in supported living centers in the State of Texas pursuant to a consent decree.

**August 2016- 2023** Consultant
Carter Goble Associates, LLC

Completed Consultations:

- Alaska Juvenile Privatization Feasibility Study
- Alabama Department of Corrections
- Florida Department of Corrections
- Montgomery County Jail
- Nevada Juvenile Staffing Review & Organization Assessment Project
- Sacramento County Jail Facilities
- Wyoming Department of Corrections
- Los Angeles County Jail

**2008-2015** Psychiatric Consultant
Department of Justice
Special Litigation Section

Completed Consultations:

- Investigation-New York Juvenile Justice System.
- Compliance Monitor-South Bend Juvenile Correctional Center.
- Investigation-California Youth Authority, N.A. Chaderjian Facility.
- Investigation – Pendleton Juvenile Correctional Center
- Compliance Monitor-State of Ohio, Scioto Juvenile Correctional Facility.

**September 2011-2015** S.H. v. Reed

Compliance monitoring regarding psychiatric services in three Ohio juvenile correctional facilities pursuant to a consent decree.

**February 2012-July 2012** Psychiatric Consultant
Psychiatric consultant to the mental health compliance monitor in New York's secure juvenile facilities.

**May 2011- December 2014** Compliance Monitor
Scioto, Ohio
Compliance monitoring regarding psychiatric services in a juvenile correctional facility pursuant to a consent decree.

**January 2011-April 2015** Psychiatric Consultant
Southern Poverty Law Center
Completed Consultations:
Walnut Grove Youth Correctional Facility
Birmingham City School District
Polk County Jail
Orleans Parish Prison

**April 2009-January 2014** Compliance Monitor
Los Angeles County, California
Compliance monitoring regarding psychiatric services in juvenile correctional facilities pursuant to a consent decree.

**January 2008-2010** Compliance Monitor
Attorney General's Office
State of Mississippi
Compliance monitoring regarding mental health and rehabilitative services in Mississippi's secure juvenile correctional facilities pursuant to a Consent decree.

**March 2004-December 2010** Psychiatrist
Louisiana State University Health Science Center
Juvenile Justice Program
Provided psychiatric evaluation and medical management to youth in a secure juvenile correctional facility, Bridge City Center for Youth. In addition, supervised and directed the resident rotations for Child and Adolescent Psychiatry and Forensic Psychiatry residents within the Juvenile Justice Program.

**March 2004-October 2007** Medical Director
West Jefferson General Hospital
Behavioral Medicine Center
Medical Director for inpatient and outpatient psychiatric services at West Jefferson Hospital. Responsible for administrative decisions as well as

providing clinical services to both acutely mentally ill psychiatric inpatients and outpatients attending intensive outpatient and partial hospitalization programs. In addition, provided consult liaison psychiatric services to the general hospital.

**November 2003-August 2015** Medical Director
Assertive Community Treatment
Administrative responsibilities as well as providing intensive outpatient home based psychiatric services to adults with serious and persistent mental illness.

**January 2003-September 2012** Consulting Psychiatrist
Community Support Team
Resource Center for Psychiatric and Behavioral Supports
Stabilization Unit at Northlake Supports and Services
Provided consultative psychiatric services for individuals with developmental disabilities.

**July 2002-March 2004** Director of Psychiatry
Louisiana State University Health Sciences Center
Juvenile Corrections Program
Administrative supervision of lead psychiatrists at individual facilities, Provided direct psychiatric care to youth in Louisiana's secure correctional facilities, and supervised psychiatric residents and fellows rotating at Bridge City Center for Youth. Additional duties included serving as the Course Director for the Child and Adolescent Psychiatry Forensic Lecture Series.

**July 2000-March 2002** Director of Clinical Operations
Louisiana State University Health Sciences Center
Juvenile Corrections Program
Administrative supervision and implementation of medical, mental health, and dental care for youth in Louisiana's secure correctional facilities.

**July 1999-July 2000** Attending Psychiatrist
Medical Center of Louisiana, New Orleans
Provided psychiatric care to adult patients hospitalized in the acute psychiatric unit, supervision of medical students, psychology interns, psychiatric interns, and residents.

**July 1999-July 2000** Medical Director
Jefferson Parish Adult Drug Court Program

Responsible for the clinical quality of court-mandated substance abuse treatment for first time nonviolent offenders, evaluation and treatment of dual diagnosis clients, and the supervision of social services staff and forensic psychiatric fellows.

**July 1999-July 2000** Medical Director
Jefferson Parish Juvenile Drug Court Program
Responsible for the clinical quality of court mandated substance abuse treatment and the psychiatric evaluation and treatment of juvenile offenders.

**July 1999-July 2000** Medical Director
**July 1995-July 1999** Staff Psychiatrist
Jefferson Parish Human Services Authority
Mobile Crisis Team
Crisis assessment, evaluation, and disposition planning for adult, child, and adolescent clients, and the supervision of child psychiatrists and child psychiatry fellows.

**1994-1999** Clinic Psychiatrist
Orleans Parish Prison
Evaluation and treatment of incarcerated individuals.

**1996-1997** Duty Doctor
New Orleans Adolescent Hospital
Crisis assessment, evaluation, and emergency hospitalization of children and adolescents, after hour's management of acute inpatient unit.

**1994-1996** On-Call Provider
Child and Adolescent Mental Health Program
Crisis assessment, evaluation, and treatment disposition for children and adolescents in Orleans Parish.

---

## PRESENTATION AND TEACHING ACTIVITIES

Forensic Psychiatry Lecture Series (2025-2026) presented to Child and Adolescent Psychiatry Fellows at Louisiana State University Baton Rouge Psychiatry Residency Program.

Psychopharmacology and Developmental Disabilities (March 2024) presented to staff and community providers associated with Glenwood Resource Center, Glenwood Iowa.

Crisis Intervention Training (2016-2020) to the Jefferson Parish Sheriff's Office Crisis Intervention Unit. Topics of instruction – Psychiatric Medications and Diagnoses, Suicide Prevention and risk factors, Communication with Children and Adolescents in Crisis.

Psychotropic Medications, Suicide Prevention, Child and Adolescent Crisis Management (2011-2019) a reoccurring presentation to the Crisis Intervention Team of the Jefferson Parish Sheriff's Office.

Adolescent Brain Development: Implications in Juvenile Justice (May 2018). Daphne Glindmeyer, M.D. Presented to staff at the Nevada Youth Training Center and Caliente Youth Center.

Psychotropic Medication and Developmental Disabilities (February 2015). Daphne Glindmeyer, M.D. Presented to the Louisiana and Mississippi Councils for Child and Adolescent Psychiatry Annual Spring Meeting.

Better Living through Chemistry? A review of psychopharmacology and developmental disabilities. (April 2011). Daphne Glindmeyer, M.D. Presented to the Louisiana Disability Summit Annual Conference.

Autism Spectrum Disorder. (March 2010). Daphne Glindmeyer, M.D. Presented to Louisiana Public Health Association Annual Educational Conference.

Speakers Bureau:
Pfizer, 2007-2011
Eli Lily, 2008-2010
Astra Zeneca, 2010-2013
Abbott, 2007-2008
Pam Lab, 2010-2015
Otsuka 2012-2015

Landmark Cases in Child and Adolescent Psychiatry. (May, 2004).
Daphne Glindmeyer, M.D. Presented to LSUHSC psychology students.

Psychopharmacology and Metabolic Syndrome. (November, 2008).
Daphne Glindmeyer, M.D. Presented to the Medical Staff of Northlake Supports and Services.

Bipolar Mood Disorder: Diagnosis and Treatment. (October, 2007).
Daphne Glindmeyer, M.D. Presented to the Louisiana Society of Nurse Practitioners.

Mental Status Examinations. (May 2004). Daphne Glindmeyer, M.D. Presented to psychology students at University of New Orleans.

Psychopharmacology and Developmental Disabilities. Daphne Glindmeyer, M.D. (March, 2004). Presented to the American Academy of Family Physicians, and presented to the Region II Office of Citizens with Developmental Disabilities staff.

Child and Adolescent Forensic Lecture Series. (2003). Daphne Glindmeyer, M.D. Course Director. Overview of the Juvenile Justice System, Introduction to the Court Process

Forensic Issues in Inpatient Psychiatry. (1999).

Stalking: The Psychiatric Perspective. (1999).

Child Abuse and Confidentiality in the treatment of Children and Adolescents. (1998)

Psychiatry Clerkship Small Group Leader. (1997-1998).

Adolescent Depression and Juvenile Delinquency. (1997).

Psychiatry and Medicine Small Group Leader. (1996-1997).

---

## PUBLICATIONS

Glindmeyer, D.A. & Cruise, K.R. (2003). Callous and Unemotional Traits in a Juvenile Offender, A clinical case study. Published in the Journal of Forensic Psychology Practice, 3, 73-78.

---

## REFERENCES

Available upon request.

# Testimony and Depositions

Daphne Glindmeyer, M.D.

| | | |
|---|---|---|
| 09.27.05 | Judicial Commitment of J.D. | 24th Judicial District Court |
| 03.23.06 | Deposition – Succession of R.A.A.M. | |
| 11.03.06 | Judicial Commitment of M.T. | 24th Judicial District Court |
| 11.15.06 | Judicial Commitment of A.D. | 24th Judicial District Court |
| 01.05.07 | Judicial Commitment of G.C. | 24th Judicial District Court |
| 01.19.07 | Judicial Commitment of D.E. | 24th Judicial District Court |
| 04.27.07 | Judicial Commitment of L.H. | 24th Judicial District Court |
| 05.15.07 | Judicial Commitment of E.A. | 24th Judicial District Court |
| 08.24.07 | Deposition – C.D. v. H.L.B. Jr. | |
| 05.15.08 | Deposition – R.D. v. P.A., et al | |
| 07.31.08 | Judicial Commitment of G.D. | Orleans Parish Civil Court |
| 10.23.08 | Deposition – S.K. v. Dollar General Corp | |
| 09.02.09 | State of La. v. J.B. | 24th Judicial District Court |
| 10.08.09 | State of La. v. A.C. | 22nd Judicial District Court |
| 11.30.09 | Judicial Commitment of S.K. | 21st Judicial District Court |
| 01.12.10 | The Matter of the Mental Health of R.R. | 22nd Judicial District Court |
| 02.04.10 | State of La. v. T.V. | 22nd Judicial District Court |
| 04.06.10 | State of La. v. E.H.T. | 24th Judicial District Court |
| 04.27.10 | State of La. v. E.W. | 24th Judicial District Court |
| 04.29.10 | Judicial Commitment of S.J. | 22nd Judicial District Court |
| 02.14.11 | Deposition - JB v. Art Catering | |
| 10.19.11 | State of La. v. A.J. | Hammond City Court |
| 10.20.11 | D.G. v. R.F. | 24th Judicial District Court |
| 11.07.11 | State of La. v. S.S. | 41st Judicial Criminal Court |
| 12.21.11 | I.F. v. K.K. and Safeco Insurance Company of America | U.S. District Court - Eastern District of Louisiana |
| 01.26.12 | State of La. v. D.B. | 24th Judicial District Court |
| 01.27.12 | Deposition - I.F. v. Tulane University | |
| 02.07.12 | Deposition - J.W. ex rel. Williams v. A.C. Roper | |
| 04.26.12 | I.F. v. Tulane University | Orleans Parish Civil Court |
| 08.17.12 | Deposition - C. H. v. G. J. | |
| 09.12.12 | Hughes v. Judd | United States District Court- Florida, Tampa Division |
| 11.29.12 | L.R. v. D.P.W. | Personnel Board Jefferson Parish |
| 02.14.13 | Deposition – C.H. v. G.J. | |
| 02.19.13 | Judicial Commitment of D.P. | 24th Judicial District Court |
| 02.28.13 | Deposition – C.H. v. G.J. | |
| 04.02.13 | L.R. v. D.P.W. | Personnel Board Jefferson Parish |
| 04.03.13 | J. v. G. | United States District Court – Eastern District of Louisiana |
| 07.02.13 | Deposition – J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | |
| 07.23.13 | J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | Terrebonne Parish Clerk of Court |
| 07.25.13 | J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | Terrebonne Parish Clerk of Court |

| | | |
|---|---|---|
| 10.29.13 | Deposition - Hughes v. Judd, et al | United States District Court Florida, Tampa Division |
| 11.25.13 - 11.27.13 | Hughes v. Judd, et al | United States District Court Florida, Tampa Division |
| 01.21.14 | Deposition - D. H. v. Coroner, St. Tammany Parish, The State of Louisiana, et al | 22nd Judicial District Court |
| 02.05.14 | State of La. v. A.T. | 40th Judicial District Court |
| 05.08.14 | Deposition – C.C. V. LC. | |
| 08.27.14 | Jefferson Parish Human Services Authority v. D.T. | 24th Judicial District Court |
| 09.25.14 | In re D.T. | 24th Judicial District Court |
| 01.22.15 | Depositions- J.B. v. R.J. Reynolds Tobacco Co. | |
| 01.23.15 | J.W. ex rel. Williams, et al. v. Birmingham Board of Education, et al. | United States District Court Northern District of AL, Southern Div. |
| 05.15.15 | Deposition- B.P., et al v. River Oaks, Inc., et al | |
| 06.18.14 | E v. E | Orleans Parish Civil District Court |
| 09.22.15 | Deposition- B.D. v. S.D. | |
| 09.28.15 | B.D. v. S.D. | 22nd Judicial District Court |
| 09.29.15 | A.F. v. United States of America | United States District Court for the Eastern District of New York |
| 11.23.15 | Deposition- P.J. v. R.J. Reynolds Tobacco Co. | |
| 01.13.16 | State of La. V. D.R. | 18th Judicial Court |
| 02.17.16 | State of La. V. E.P. | 24th Judicial Court |
| 03.08.16 | Deposition- G.J. v. C.A., et al | |
| 07.29.16 | Deposition- S.S. v. R.J. Reynolds Tobacco Co. | |
| 12.02.16 | Deposition- D.H., et al v. City of New Orleans, et al | |
| 02.13.17 | State of La. V. J.D. | 29th Judicial Court |
| 08.24.18 | Deposition L.C., et al v. Evergreen, et al | |
| 08.31.18 | M.A. v. R.A. | 24th Judicial Court |
| 11.26.18 | Daubert Hearing- L.C., et al v. Evergreen, et al | 21st Judicial Court |
| 02.07.20 | Deposition- J.A. v. E.C., et al | |
| 02.11.20 | State of La v. A.H. | 24th Judicial Court |
| 11.16.20 | Deposition- D.M. et al v. Erie County, Ohio et al | |
| 03.09.21 | Interdiction of E.M. | 24th Judicial Court |
| 03.12.21 | Deposition- Vargas v. Sheriff of Cook County, et al | United States District Court for the Northern District of Illinois, Eastern Division |
| 05.04.22 | State of LA v. B.J. | 24th Judicial Court |
| 10.20.23 | Deposition- D.A, et al v. New Orleans Military & Maritime Academy, Inc., et al | |
| 10.27.2 | Deposition- D.A, et al v. New Orleans Military & Maritime Academy, Inc., et al | |
| 04.16.24 | Deposition- J.T. v. NaphCare, Inc., et al | |
| 04.24.24 - 04.25.24 | D.M. v. State of New Hampshire, Dept. of Health and Human Services, et al | Rockingham Superior Court Brentwood New Hampshire |
| 10.16.24 | State of LA v. D.A. | 24th Judicial Court |
| 01.23.25 | Deposition- J.Y. v. CoreCivic Inc., et al | |
| 03.25.25- 03.26.25 | J.T. v. Naphcare, Inc., et al | United States District Court for the Western District Court of Washington at Seattle |
| 04.30.25 | Deposition- A.S. et al v. Endeavor Southlake OpCo, LLC et al | |

| | | |
|---|---|---|
| 06.06.25 | Deposition- J.F. v J. Landry et al | |
| 11.14.25 | Deposition- E.M. v. New Mexico Corrections Dept. et al | |
| 05.29.26 | Garcia v. City of New York, et al | Supreme Court of the State of New York Bronx County |

*Information prior to August 2005 unavailable