# EXHIBIT 12

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD; et al.,

Plaintiff,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE CORPORATION; CHRISTINA GOODALL (SUED AS CHRISTINA ANOSIKE) , IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; DEFENDANT DEPUTIES DOES 1-10, DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10.

Defendants.

**CASE NO.**
3:23-cv-1357-CAB-JAC

## DEPOSITION OF
DAPHNE A GLINDMEYER, M.D.

Wednesday, September 16, 2026

12:06 PM (ct) to 7:19 PM (ct

Reporter: Devon Willard, CSR No. 10535, RPR

## VIA REMOTE VIDEO TECHNOLOGY

Hines Reporters
INTERNATIONAL TOWER
888 S. FIGUEROA STREET, SUITE 940, LOS ANGELES, CALIFORNIA 90017
866.432.4300

LOS ANGELES * SAN FRANCISCO * SAN DIEGO

12:31 Q. Anything else?
12:31 A. I'm board-certified -- I'm a triple board-certified psychiatrist. So I'm board-certified in general psychiatry, child and adolescent psychiatry, and forensic psychiatry.
12:31 Q. Are you licensed in a state or particular states to practice psychiatry?
12:31 A. I'm licensed to practice medicine in Louisiana and Texas.
12:31 Q. Are you licensed in California?
12:31 A. I'm not.
12:32 Q. Do you have any other licenses or professional credentials in addition to being a doctor and a psychiatrist?
12:32 A. No. I'm not sure what you're asking. I'm sorry.
12:32 Q. Other than what you've identified, is there -- are you a practicing physician in any other specialty?
12:32 A. No, just in psychiatry, child and adolescent psychiatry and forensic psychiatry.
12:32 Q. And do you currently practice as a physician?
12:32 A. I do.
12:32 Q. Where?

2:07 A. It's significant. Mr. Rupard was ill. He was psychotic. You don't allow a patient to wallow in their mental illness for 14 days when you know they're psychotic.
2:07 Q. But what information do you have that Mr. Rupard ultimately seeing Dr. Cruz on February 22nd, 2022, didn't constitute referral to psychiatry to assess him again?
2:07 A. I'm sorry. I don't understand your question. I apologize.
2:07 Q. You're saying there's a 14-day gap between a referral to psychiatry, correct?
2:07 A. Well, here is the thing. There's an 89-day gap because Mr. Rupard was in this administrative segregation housing the whole time. Ms. Goodall Anosike saw him once. Once, that's it. He should have been seen every week. So the gap is long.
2:08 Q. I'm talking about the time that a psychiatrist did see him after Mrs. Goodall's appointment.
2:08 What information do you have that anything different would have happened had there been a referral between those two weeks?
2:08 A. I don't. I would have assumed -- hoped that had Dr. Cruz seen the deterioration of Mr. Rupard,

that he would have considered, A, either a 5150 and admission to the PSU or a petition for involuntary medication. Unfortunately, none of that happened.

Q. Did you review in detail the note from Dr. Cruz from February 2022?

A. I did.

Q. And --

A. I paraphrase it here.

Q. And did Dr. Cruz document rambling incoherently?

A. Hold on. Let me get to it. Okay.

He documented that, yes, rambling incoherently, disorganized thought process, may be responding to internal stimuli.

Q. Anything else?

A. He talked about him being irritable, uncooperative. Talked about him refusing medication. That he became verbally aggressive.

Q. He also states, "Due to patient's presentation, psych history, legal status (PC 1368), and potential for decompensation, will continue to monitor and offer treatment. Discussed current treatment plan with patient."

Do you see that?

A. Yes.

3:19 group -- I mean, I'm sorry -- individual and group therapy to address symptoms that an individual would be experiencing.

3:19 Q. What about an individual with schizophrenia?

3:19 A. Psychosis is a symptom of schizophrenia.

3:19 Q. So are you saying that in California, as of 2022, the licensed marriage and therapy clinician -- or licensed marriage therapy therapist clinician had the ability and authority to make decisions as to the psychiatric care and treatment of a patient with a diagnosis of schizophrenia?

3:19 A. That's not what I said. A LMFT can assess an individual, such as Mr. Rupard, and report the results of their assessment back to psychiatry. The psychotropic medication prescription, the decision for a 5150, the decision for a forced medication -- excuse me -- is the responsibility of the psychiatrist.

3:20 Q. Okay. And what information do you have that anything different would have happened had, at the time of Ms. Goodall's assessment on February 9th, 2022, she reported back to Dr. Cruz about her assessment?

3:20 A. I don't know.

3:20 Q. Well, Dr. Cruz did see Mr. Rupard on

4:18 regularly recurring basis, it's hard to make any recommendation to the psychiatrist at all. So what we have here is a complete failure to assess and address Mr. Rupard's mental health needs.

4:18 Q. What information do you have that the outcome would have been different had there been a recommendation to Dr. Cruz a day after his February 2022 assessment?

4:19 A. Mr. Rupard had documented history of positive improvement and symptom improvement with treatment with psychotropic medications.

4:19 Q. And Dr. Cruz made the decision to continue the discontinuation of the psychotropic medications in February 2022, correct?

4:19 A. He did.

4:19 Q. So what information do you have that Dr. Cruz would have made a different decision if he had been seen by a clinician a day or two later?

4:19 A. If he had been seen by a clinician every week.

4:19 Q. What information do you have that the outcome would be different?

4:19 A. Well, ultimately Mr. Rupard was documented in living in filth with feces coating his body and he was emaciated. Hopefully had Ms. Anosike Goodall

4:20 been seeing him on a weekly basis, she would have noticed.
4:20 Q. What facts support your opinion?
4:20 A. Dr. Badre's report documenting the conditions. Detective Blumingshile's -- Blumenshire's -- Blumenshine -- Blumenshine's investigative report documenting the conditions.
4:20 Q. I'm just unclear as to what your opinion is about the conditions and the time line.
4:20 A. The issue is that we have very little for time line because nobody saw him. I don't know how much clearer I can be. He wasn't seen. He was allowed to deteriorate in a 23 and 1 isolation admin seg-type housing, and he died.
4:21 Q. Dr. Cruz saw him at the end of February 2022, correct?
4:21 A. He did.
4:21 Q. And do you have an opinion as to what his condition was at that time?
4:21 A. He was psychotic; Dr. Cruz documented that. We've been over the fact that I disagree with Dr. Cruz's determination and the outcome of that appointment.
4:21 Q. Is it your opinion that Dr. Cruz should have ordered intervention at that point in time?

5:17 mumbling, verbal aggression, disorganized thought
5:17 processes as evidence of mental health
5:17 deterioration.
5:18 But again, it's in my opinion that
5:18 Mr. Rupard's mental health was in a state of decline
5:18 from the time of his admission and only deteriorated
5:18 further in the setting of isolation and lack of
5:18 treatment with medication.
5:18 Dr. Abrams talked about that he did not --
5:18 it was his opinion that Mr. Rupard would not meet
5:18 criteria for involuntary treatment. I disagree with
5:18 that because I believe Dr. Abrams improperly
5:18 conflated medication refusal with informed refusal.
5:18 Mr. Rupard was psychotic. He was unable to
5:18 appreciate the impact of his refusal and make a
5:18 knowing and informed refusal. And Mr. Rupard should
5:18 have been referred for a Riese petition, as we've
5:19 discussed.
5:19 Dr. Abrams disagrees with the County medical
5:19 examiner. That opinion is outside of our scope of
5:19 expertise as psychiatrists, and I agree with the
5:19 medical examiner. What they say was the cause of
5:19 death is the cause of death, in my opinion.
5:19 Dr. Abrams mischaracterized the NCCHC standards.
5:19 We've been over that multiple times. Those

American Psychiatric Association's standards. So there are multiple things that impact psychiatry and our provision of care, but it's, you know, the NCCHC standards, the American Psychiatric Association standards, medical literature, what we know. Basically the practice of psychiatry.

Q. I think I understand what you're saying, but I'm having a hard time reconciling it with something we talked about earlier.

So is it your testimony that the NCCHC standards themselves establish the standard of care or that they are consistent with the standard of care?

A. They establish. They're the baseline of the standard of care. And then you also have the American Psychiatric Association -- I think they call them the "clinical guidelines," which also in- -- inform treatment provision.

Q. Okay. So it's your testimony that anytime care inside of a correctional facility deviates in any respect from an NCCHC standard, that is by definition a deviation from the standard of care; am I correct?

A. Yes.

Q. Okay. Now, the NCCHC classifies each of its

5:34 standards as either essential or --
5:34 (Reporter clarification.)
5:35 BY MR. KRUEGER: Q. -- or important?
5:35 A. I think there's -- isn't there one more?
5:35 Q. It's possible. I won't argue with you if there is.
5:35 A. I think it's essential, important. That might be -- might just be two. It's been a long day.
5:35 Q. I understand.
5:35 But according to --
5:35 A. Yes, I just found it. It's essential or important, yes.
5:35 Q. Very good.
5:35 But as you just said, a deviation from an NCCHC standard is a deviation from the standard of care, correct?
5:35 A. Yes, in my opinion.
5:35 Q. So is it then essentially irrelevant whether a standard is deemed essential or important within the NCCHC book?
5:35 A. No, it is not. So the important standards, are they -- are they necessary? No, they're important. The essential ones, however, form the
5:36 floor of the standard of care. The standards that

5:36 we've been talking about today -- oh, my gosh. Can you excuse me for just a moment.
5:36 Never get a really small emotionally dependent dog. That's all I will tell you.
5:36 Q. No problem.
5:36 A. The essential standards that we've been talking about today -- I mean, I'm sorry, the standards that we've been talking about today, basic mental health services, segregated inmates, treatment planning, those are all, I believe, classified as essential standards.
5:36 Q. Okay. As we've been talking about this, your -- your testimony is that the NCCHC establishes the standard of care. So what I'm trying to understand is -- well, let me ask the next question. Maybe that will make it a little bit more clear.
5:37 So if you've got your book -- and I can put this on screen if you want, but the scan that I have is not particularly great. Since you have the book in front of you, it will be a little bit better.
5:37 If you look at Appendix A -- excuse me -- Appendix A is entitled "NCCHC Mental Health Services Accreditation."
5:37 A. Yes.
5:37 Q. And on the second page of that appendix,

there's a subsection called "Compliance with Standards."

Do you see that?

A. Yes.

Q. And I'm going to read just the first couple of lines, "Each standard is classified as either essential or important. Accreditation facilities are expected to be in compliance with all of the essential standards and at least 85 percent of the applicable important standards."

Did I read that correctly?

A. Yes.

Q. So my question is if the NCCHC standards established the standard of care and any deviation from them is a breach of the standard of care, is it then the case that a facility can obtain accreditation from the NCCHC when they're out of compliance with the standard of care on approximately 15 percent of important standards?

A. So remember we talked about important standards versus essential standards, right. Everything that we've talked about today is covered in the essential standards. So that would mean that you would be a hundred percent compliant with the essential standards.

Q. Okay. So then is it the case that we're talking about the essential standards and not so much the important standards when you say that the NCCHC establishes the standard of care?

A. Essentially, yes. I guess you could look at it that way.

Q. Okay. Got it.

You've also talked about how the standard of care does not differ between correctional facilities and the community.

Do you recall that testimony?

A. I do.

Q. Okay. But the NCCHC, which is the National Commission on Correctional Health Care, is providing a number of policies or proposed policies, if you will, based specifically on correctional healthcare.

So which is it? Is it that the NCCHC standards for correctional healthcare establish a correctional standard of care, or is it that the community standard governs?

A. Both. So there are certain situations in correctional facilities that you're not going to have in the community, right. If you're in the community and you don't feel well, you can get in

5:57 A. I'm not a hundred percent sure. I just know that the -- a doctor can request the petition to the court for the Riese petition. It goes before the court, a judge. I think there has to be a secondary or another physician or psychiatrist to come in and evaluate an individual to make sure that they agree with the -- with the involuntary medications. They are -- I think there's testimony required, I think, and then the judge makes the determination -- or the court makes the determination.

5:58 Q. And you're aware that there is an advocate who argues on behalf of the patient against involuntary medication, correct?

5:58 A. Yes, a hundred percent.

5:58 Q. Okay. And so in any given case, there are multiple people involved.

5:58 And can you state with any certainty that any particular Riese petition will or will not be granted?

5:58 A. No. That's up to the decision of the court. However, it can't be granted if you don't apply for it, right. So --

5:58 Q. Right. How long does the process take from -- from starting -- from writing a 5150 to a granted IMO, how long does that take?

5:59 A. I don't know. It could be -- to use the words of a southerner, it could be a hot minute. I don't really know what the length of time is.
5:59 Q. Okay. Well, are you --
5:59 A. I would hope it would be shorter than 89 days. How is that?
5:59 Q. Fair enough.
5:59 Are you offering any opinion to the effect that -- well, strike that.
5:59 Are you offering an opinion regarding any particular medications that should have been administered to Mr. Rupard at any point during his incarceration?
5:59 A. Well, so I think if you look at his history, antipsychotic medications -- if you look at his diagnosis, his present- -- symptom presentation, antipsychotic medications are the -- is the answer, right. Now, what form those take, whether they're oral, injectable, long-acting injectable, you know, that would be up to the clinician -- the prescribing clinician.
6:00 But I do think given his history, given his presentation, that -- and if we're going to go down the road of the Riese petition, a long-acting injectable would be the appropriate class of

6:01 petition requires a minimum of 21 days' notice with the hearing to occur within 30 days.
6:01 Do you have any information one way or the other on that?
6:01 A. I do not.
6:01 Q. Okay. Let's assume that I'm correct, which I may not be. But if I'm correct, we're talking about approximately 30 days --
6:01 A. Uh-huh.
6:01 Q. -- for that to be established. And as you explained earlier, before that we have 72 hours of the 5150 hold. So we're talking about approximately 33 days.
6:02 After the IMO when -- after the IMO is issued is when the therapeutic-effect clock essentially starts because that's when the medication starts to be given; am I right?
6:02 A. Theoretically --
6:02 Q. Yes.
6:02 A. -- unless you're able to meet with Mr. Rupard on a regular basis, establish any type of rapport, and educate him and encourage him to consider the medication prior to that, which is possible. That wasn't really attempted.
6:02 Q. I want to come back to that. I do want to

6:02 talk about that.
6:02 But if we're talking about on the short end,
6:02 five days to therapeutic effect and 33 days to a
6:02 granted IMO, that's 38 days.
6:02 I believe the time between February 22 and
6:02 March 17 is more than 38 days; am I correct?
6:02 A. It is.
6:02 Q. Okay. So an IMO as of -- well, let me put
6:03 it a different way. A 5150 as of February 22 would
6:03 not necessarily have changed the outcome here
6:03 because we -- we just don't know what would have
6:03 happened, and then we have to wait for therapeutic
6:03 effect even if the IMO is granted; am I right?
6:03 A. Again, I think we don't know, right. My
6:03 hope would be that had he had appropriate care, had
6:03 he not been in a 23 and 1 isolation situation, that
6:03 things would have been better. But I don't know.
6:03 Q. Okay. And you brought up an attempt to --
6:03 to establish rapport.
6:03 You read Dr. Cruz's deposition, correct?
6:03 A. Yes.
6:03 Q. Okay. Did you see where Dr. Cruz explained
6:03 what he meant by the various things that he had
6:03 written in his notes?
6:03 A. Yes.

6:40 have those quoted in here.

6:40 Q. All right. Is it fair to say that a person writing a 5150 has an obligation to follow the legal standard for a 5150 as opposed to a County policy, which may or may not be consistent with that legal standard?

6:40 A. I believe both. So they have the obligation to follow the legal -- the legal requirements, but they are also operating within a County facility. And if the County facility is documenting what the 5150 should be, there's also -- you have to incorporate both requirements there.

6:41 Q. You mentioned earlier that you -- you don't currently hold a California license, correct?

6:41 A. I do not.

6:41 Q. Have you ever held a California license?

6:41 A. I have not.

6:41 Q. Am I correct, then, that you've never written a 5150 under California law?

6:41 A. I have not.

6:41 Q. And you have not filed a Riese petition under California law?

6:41 A. I have not.

6:41 Q. Okay. I will represent to you that under California law, specifically Welfare and

7:07 A. Yes.
7:07 Q. Do you have any opinion on whose responsibility it is to find the correct facility?
7:07 A. Typically, it's done by whoever the health services authority is.
7:07 Q. Understood. Okay.
7:07 I want to talk about some opinions you provided on the cause of death and the autopsy, and we've got a couple of overlapping things here.
7:07 But first, as a general proposition, I believe you expressed the opinion that psychiatrists should not be expressing opinions regarding whether or not the cause of death is a particular thing; am I right?
7:07 A. Whatever the medical examiner says it is, it is.
7:08 Q. Okay. Do you have any opinion on who is able to make such an opinion?
7:08 A. In this case, it would be the medical examiner, whoever -- the pathologist. Whoever did the autopsy, signed the death certificate.
7:08 Q. Do you -- you saw that there was a homicide determination in this case, correct?
7:08 A. I did.
7:08 Q. Did you review the deposition testimony of

7:11 A. Yes.

7:11 Q. Okay. The -- hold on a second. I'm looking for that record myself now.

7:11 Do you have any training or experience in the manifestations of COVID-19 and how it can appear in different types of patients?

7:12 A. No.

7:12 Q. Do you have any training or experience in the gastrointestinal implications of a COVID infection?

7:12 A. No.

7:12 Q. Okay. Do you have any opinions whatsoever on the relative involvement of each of those different items? For example, pneumonia? Malnutrition? Dehydration? Those are all items on the list independent of the schizophrenia.

7:12 Do you have any opinions on the relative involvement of each on the cause of death?

7:12 A. No.

7:12 Q. Okay. And you saw that Dr. Schaber -- I believe it was in her autopsy report, and we also talked about it in her deposition -- the neglected schizophrenia, she testified that the neglect was not solely by others, but also by Mr. Rupard himself, correct?

I, DEVON WILLARD, CSR No. 10535, RPR, certify that the foregoing proceedings were taken before me via videoconference at the time and place therein set forth, at which time EXPERT DAPHNE A. GLINDMEYER, MD, was duly remotely sworn; and that the transcript is a true record of the testimony so given;

Witness review, correction, and signature was
( ) by code. ( ) requested.
( ) waived. (XX) not requested.
( ) not handled by the deposition officer due to party stipulation.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificate null and void.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

Dated this 25th day of September, 2026.

DWillard
_______________________
DEVON WILLARD