Corey E. Krueger, Esq. (SBN 244989)
ckrueger@burgermeyer.com
**BURGER, MEYER & D'ANGELO, LLP**
999 Corporate Drive, Suite 225
Ladera Ranch, California 92694
Telephone: (949) 427-1888
Fax: (949) 427-1889

Attorneys for Defendants, Anthony Cruz, D.O. and Liberty Healthcare of California, Inc.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ESTATE OF LONNIE RUPARD, THROUGH ITS COURT-APPOINTED ADMINISTRATOR TERRI LOPEZ;

Plaintiffs.

v.

COUNTY OF SAN DIEGO; et al.

Defendants.

Case No. 3:23-cv-01357-CAB-JAC
Assigned for All Purposes:
Judge: Hon. Cathy Ann Bencivengo
Magistrate Judge: Janet A. Cabral

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Hearing Date: None set; to be set by the Court if needed (Doc. No. 305)

Action filed: July 26, 2023
Trial Date: March 8, 2027

## Table of Contents

I. INTRODUCTION AND SUMMARY OF ARGUMENT .......... 1
II. RELEVANT FACTUAL BACKGROUND .......... 3
A. Psychiatric Care and Separate County Observation and Referral Functions .......... 3
B. Dr. Cruz's Psychiatric Encounters With Mr. Rupard .......... 4
C. County Observation, Assessment, and Referral Procedures .......... 6
D. No Concern or Request for an Earlier Evaluation Was Communicated to Dr. Cruz After February 22 .......... 7
III. LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT .......... 8
IV. LEGAL ARGUMENT .......... 9
A. Plaintiff's First Cause of Action for Fourteenth Amendment Deliberate Indifference Against Dr. Cruz Fails. .......... 9
1. Governing Legal Standard .......... 9
2. Dr. Cruz's Psychiatric Treatment Decisions Did Not Constitute Objectively Unreasonable Conduct Amounting to Reckless Disregard of Mr. Rupard's Serious Medical Needs. .......... 11
3. Plaintiff Cannot Establish That Dr. Cruz's Conduct Actually and Proximately Caused Mr. Rupard's Alleged Injuries or Death. .......... 15
B. Dr. Cruz Is Entitled to Qualified Immunity on the Federal Claim. .......... 18
1. Governing Standard .......... 18
2. Dr. Cruz May Assert the Defense. .......... 19
3. There Was No Constitutional Violation. .......... 19
4. Any Right Was Not Clearly Established in February 2022. .......... 20
C. Plaintiff's Fourth Cause of Action for Monell Liability Against Liberty Fails. 20
1. Governing Legal Standard .......... 20
2. Plaintiff Cannot Establish an Unconstitutional Policy, Widespread Custom, or Deliberately Indifferent Policy of Inaction Attributable to Liberty. .......... 22
3. Plaintiff Cannot Establish Deliberate Indifference Through Liberty's Alleged Staffing, Training, Supervision, or Other Institutional Deficiencies. .......... 27
4. Plaintiff Cannot Establish Ratification or Moving-Force Causation. .......... 28
D. Plaintiff's Fifth Cause of Action for Violation of the Bane Act Against Dr. Cruz Fails. .......... 30
1. Governing Legal Standard .......... 30
2. Plaintiff Cannot Establish That Dr. Cruz Intentionally or Recklessly Interfered With Mr. Rupard's Protected Rights. .......... 30
3. Plaintiff Cannot Establish That Any Actionable Conduct by Dr. Cruz Caused the Alleged Bane Act Injury. .......... 33
E. Plaintiff's Sixth Cause of Action for Negligence Fails Against Dr. Cruz and Liberty. .......... 33
1. Governing Legal Standard .......... 33

2. Dr. Cruz's Psychiatric Treatment and the Contemporaneous Record Do Not Establish a Breach of His Professional Duty. 34
3. Liberty Did Not Breach a Duty Owed to Mr. Rupard Because the Challenged Daily Custodial and Nursing Functions Were the County's Responsibilities, Not Liberty's. 36
4. Plaintiff Cannot Establish That Any Alleged Negligence by Dr. Cruz or Liberty Was a Substantial Factor in Causing Mr. Rupard's Injuries or Death. 40
5. Government Code Section 845.6 and Negligence Per Se Do Not Establish Liability Against Dr. Cruz or Liberty. 41
F. Plaintiff's Seventh Cause of Action for Dependent-Adult Neglect Fails. 42
1. Governing Standard 42
2. Neither Dr. Cruz Nor Liberty Had the Required Caretaking or Custodial Relationship. 43
3. At Most, Plaintiff Alleges Only Professional Negligence. 43
4. No Enhanced Remedies or Employer Liability. 44
V. CONCLUSION 44

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) .......... 9
*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) .......... 19
*Board of County Commissioners v. Brown*, 520 U.S. 397, 403–07 (1997) .......... 21
*Bromme v. Pavitt*, 5 Cal. App. 4th 1487, 1498–1505 (1992) .......... 34
*Carter v. Prime Healthcare Paradise Valley LLC*, 198 Cal. App. 4th 396, 404 (2011) .......... 43
*Castaneda v. Department of Corrections & Rehabilitation*, 212 Cal. App. 4th 1051, 1070–72 (2013) .......... 42
*Castro v. County of Los Angeles*, 833 F.3d 1060, 1069–70 (9th Cir. 2016) .......... 10
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) .......... 9
*Chaudhry v. Aragon*, 68 F.4th 1161, 1169–70 (9th Cir. 2023) .......... 2
*Christie v. Iopa*, 176 F.3d 1231, 1238–39 (9th Cir. 1999) .......... 29
*City of Canton v. Harris*, 489 U.S. 378, 388–91 (1989) .......... 2
*Connick v. Thompson*, 563 U.S. 51, 61–64 (2011) .......... 21
*Cornell v. City & County of San Francisco*, 17 Cal. App. 5th 766, 801–04 (2017) .......... 30
*Covenant Care, Inc. v. Superior Court*, 32 Cal. 4th 771, 785 (2004) .......... 43
*Delaney v. Baker*, 20 Cal. 4th 23, 31–32 (1999) .......... 43
*District of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018) .......... 19
*Estate of Matthew Settles v. County of San Diego*, No. 3:24-cv-00352-CAB-MSB, ECF No. 91, at 7–8 (S.D. Cal. Oct. 30, 2025) .......... 18
*Fairley v. Luman*, 281 F.3d 913, 916–18 (9th Cir. 2002) .......... 21
*Filarsky v. Delia*, 566 U.S. 377, 389, 393–94 (2012) .......... 19
*Flowers v. Torrance Memorial Hospital Medical Center*, 8 Cal. 4th 992, 997–1002 (1994) .......... 34
*Gillette v. Delmore*, 979 F.2d 1342, 1346–48 (9th Cir. 1992) .......... 28
*Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) .......... 2
*Horton v. City of Santa Maria*, 915 F.3d 592 .......... 22
*Jennings v. Palomar Pomerado Health Systems, Inc.*, 114 Cal. App. 4th 1108, 1117–19 (2003) .......... 40
*Jensen v. Lane County*, 222 F.3d 570, 576–78 (9th Cir. 2000) .......... 19
*Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996) .......... 2
*Landeros v. Flood*, 17 Cal. 3d 399, 410 (1976) .......... 33
*Lattimore v. Dickey*, 239 Cal. App. 4th 959, 968 (2015) .......... 2
*Leer v. Murphy*, 844 F.2d 628, 633–34 (9th Cir. 1988) .......... 11
*Long v. County of Los Angeles*, 442 F.3d 1178, 1185–86 (9th Cir. 2006) .......... 21
*Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978) .......... 2
*Mullenix v. Luna*, 577 U.S. 7, 12 (2015) .......... 19
*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) .......... 18
*Quiroz v. Seventh Ave. Center*, 140 Cal. App. 4th 1256, 1285–86 (2006) .......... 42

*Reese v. County of Sacramento*, 888 F.3d 1030, 1043–45 (9th Cir. 2018) .... 2
*Richardson v. McKnight*, 521 U.S. 399, 412 (1997) .... 19
*Russell v. Lumitap*, 31 F.4th 729, 735 (9th Cir. 2022) .... 10
*Sandoval v. County of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021) .... 30
*Sandoval v. County of Sonoma*, 912 F.3d 509, 519–20 (9th Cir. 2018) .... 30
*Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) .... 19
*Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) .... 21
*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) .... 2
*Winn v. Pioneer Medical Group, Inc.*, 63 Cal. 4th 148, 152, 158–59 (2016) .... 2
*Worsham v. O'Connor Hosp.*, 226 Cal. App. 4th 331, 337–39 (2014) .... 43

**Statutes**

42 U.S.C. § 1983 .... 20
Cal. Civ. Code § 52.1 .... 33
Welf. & Inst. Code § 15600 et seq. .... 42
Welf. & Inst. Code § 15657 .... 43

**Rules**

Fed. R. Civ. P. 56(a) .... 9
Fed. R. Civ. P. 56(c)(1) .... 9

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff's Third Amended Complaint ("TAC"), brought by the Estate of Lonnie Rupard through its court-appointed administrator Terri Lopez ("Plaintiff"), seeks to hold Defendants Anthony Cruz, D.O. ("Dr. Cruz") and Liberty Healthcare of California, Inc. ("Liberty") liable for the March 17, 2022 death of Lonnie Rupard ("Mr. Rupard") at the San Diego Central Jail ("SDCJ"). (TAC ¶¶ 1–2 [Doc. No. 184 at 1–2].) The central issue is causation—whether an act or omission attributable to Dr. Cruz or Liberty caused the alleged injuries or death.

Dr. Cruz was a Liberty-employed outpatient psychiatrist assigned to SDCJ. He evaluated Mr. Rupard on December 29, 2021, prescribed medication, reviewed reported medication refusals on January 20, 2022, and conducted a follow-up encounter on February 22, 2022. He then scheduled further psychiatric follow-up in six to seven weeks, or sooner if needed. (Krueger Decl. Ex. A, Cruz Dep. 68:11–69:1, 78:9–21, 232:6–233:16, 251:8–254:18, 305:8–306:25.) Personnel employed by Defendant County of San Diego ("County") had separate custody, nursing, and mental health functions, including observation, assessment, and procedures for communicating concerns and requesting psychiatric assistance between encounters. (Krueger Decl. Ex. E, Boorman Dep. 10:22–11:2; Krueger Decl. Ex. C, Quiroz Dep. 146:10–147:5, 151:20–25, 163:3–25, 169:14–171:7; Krueger Decl. Ex. D, Rognlien-Hood Dep. 32:9–33:1, 176:14–177:11.)[1]

Between February 22 and Mr. Rupard's death on March 17, no one reported a concern about Mr. Rupard's condition to Dr. Cruz or asked him to return for an earlier evaluation. (Krueger Decl. Ex. A, Cruz Dep. 164:1–165:23, 306:24–307:10.)

---

[1] Exhibits D, F, L, M, and N are the subject of Defendants' pending Application to File Documents Under Seal (ECF No. 310). Pending the Court's ruling, those exhibits are lodged conditionally under seal; public redacted versions (Exs. D and F) and placeholders (Exs. L, M, and N) are filed herewith. (Krueger Decl. ¶¶ 18–19.)

The County expressly admitted that "no County employee discussed Lonnie Rupard with Dr. Cruz after Dr. Cruz's assessment on February 22, 2022." (Krueger Decl. Ex. K, County's Resps. to Cruz's Reqs. for Admis., Set One, Resp. No. 5, at 6–7.) Dr. Cruz testified that he would have acted immediately had the reported conditions been brought to his attention. (Krueger Decl. Ex. A, Cruz Dep. 164:23–165:1.)

The federal claims under 42 U.S.C. § 1983 require Plaintiff to connect Dr. Cruz's own acts or omissions to the alleged constitutional deprivation. *Chaudhry v. Aragon*, 68 F.4th 1161, 1169–70 (9th Cir. 2023). The medical care claim requires objectively deliberate indifference. *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018). Against the chronology and allocation of responsibilities described below, the evidence does not establish the causal connection required to hold Dr. Cruz liable for Mr. Rupard's alleged injuries or death.

To hold Liberty liable requires separate proof that its own policy, custom, or actionable institutional conduct was the moving force behind a constitutional deprivation. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012). Liberty's employment of Dr. Cruz alone is insufficient, and any failure-to-train theory requires deliberate indifference and causation. *Monell*, 436 U.S. at 691; *City of Canton v. Harris*, 489 U.S. 378, 388–91 (1989). The record does not establish that a Liberty policy, custom, staffing or scheduling practice, training deficiency, or actionable policymaker decision caused the alleged deprivation.

The state law claims likewise fail for lack of a causally connected wrongful act attributable to either Defendant. *Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996); *Lattimore v. Dickey*, 239 Cal. App. 4th 959, 968 (2015). Nor does the evidence establish the specific intent required for Bane Act liability or the substantial caretaking or custodial relationship required for dependent adult neglect. *Reese v. County of Sacramento*, 888 F.3d 1030, 1043–45 (9th Cir. 2018); *Winn v. Pioneer Medical Group, Inc.*, 63 Cal. 4th 148, 152, 158–59 (2016).

Accordingly, Dr. Cruz and Liberty respectfully request summary judgment on all claims asserted against them or, alternatively, partial summary judgment on each claim and issue properly subject to adjudication.

## II. RELEVANT FACTUAL BACKGROUND

### *A. Psychiatric Care and Separate County Observation and Referral Functions*

Dr. Cruz provided psychiatric evaluations and treatment as a Liberty-employed outpatient psychiatrist assigned to SDCJ. His clinical duties included evaluating patients, reviewing medical records, and making psychiatric treatment and medication decisions. (Krueger Decl. Ex. A, Cruz Dep. 68:11–69:1, 78:9–21; Krueger Decl. Ex. B, Ysla Dep. 7:12–8:10, 9:13–24.) Other personnel had separate custodial-check, nursing-assessment, and mental-health follow-up functions, together with procedures for communicating concerns to psychiatric providers between encounters. (Krueger Decl. Ex. E, Boorman Dep. 10:22–11:2, 33:5–35:4; Krueger Decl. Ex. C, Quiroz Dep. 162:22–163:25, 169:5–171:7; Krueger Decl. Ex. D, Rognlien-Hood Dep. 176:2–177:11.)

The County's witnesses described those separate personnel and functions. Melissa Quiroz, the County's Rule 30(b)(6) mental-health designee, confirmed that psychiatrists were employed by or affiliated with private contractors, while licensed mental-health clinicians, including marriage and family therapists and licensed clinical social workers, were County employees. (Krueger Decl. Ex. C, Quiroz Dep. 146:10–147:5, 148:1–8, 151:6–25.) Serina Rognlien-Hood, the Sheriff's Department's Director of Nursing during the relevant period, likewise identified registered nurses, licensed vocational nurses, and mental-health clinicians among the County's personnel. (Krueger Decl. Ex. D, Rognlien-Hood Dep. 19:18–20:9, 32:9–33:1.)

The County admitted that its mental-health clinicians performed "QMHP Follow-Up Sick Calls for scheduled patients." It does not contend that Liberty-

employed providers were responsible for conducting "wellness checks" as that term is used in Medical Services Division Operations Manual Policy G.2.1. (Krueger Decl. Ex. I, County's Resps. to Liberty's Reqs. for Admis., Set One, Resps. Nos. 2–3, at 3–5; Krueger Decl. Ex. J, County's Resps. to Liberty's Interrogs., Set One, Resps. Nos. 1–2, at 3–5.)

Dr. Cruz's involvement with Mr. Rupard consisted of the December 29, 2021 and February 22, 2022 cell-side psychiatric encounters and the January 20, 2022 chart review described below. He bore no responsibility for Mr. Rupard's housing, meals, hydration, cell sanitation, routine custodial observation, or physical monitoring. (Krueger Decl. Ex. O, County Contract No. 555357, Statement of Work §§ 3.1–3.2, LIBERTY 000017–000020; Krueger Decl. Ex. E, Boorman Dep. 10:22–11:2; Krueger Decl. Ex. D, Rognlien-Hood Dep. 176:2–177:11.)

***B. Dr. Cruz's Psychiatric Encounters With Mr. Rupard***

Dr. Cruz first evaluated Mr. Rupard cell-side on December 29, 2021. During that encounter, he assessed Mr. Rupard, prescribed psychiatric medication, and developed a psychiatric treatment plan. (Krueger Decl. Ex. A, Cruz Dep. 232:6–233:16.) Based on Mr. Rupard's presentation at that encounter, Dr. Cruz found no indication of grave disability, danger to self, or danger to others requiring immediate psychiatric intervention. (Krueger Decl. Ex. A, Cruz Dep. 247:9–25.) He scheduled psychiatric follow-up in four to five weeks, or sooner if circumstances required, and testified that an earlier encounter could occur if necessary. (Krueger Decl. Ex. A, Cruz Dep. 239:19–240:14, 241:4–19.)

On January 20, 2022, Dr. Cruz reviewed Mr. Rupard's chart in response to a request concerning repeated medication refusals. He reviewed the electronic medication-administration record, discontinued the refused prescriptions, and noted that psychiatric follow-up was already scheduled. (Krueger Decl. Ex. A, Cruz Dep. 251:7–254:18.) Dr. Cruz testified that he received no report that Mr. Rupard was not looking well or that circumstances warranted restarting the refused medication

before that follow-up. (Krueger Decl. Ex. A, Cruz Dep. 255:23–256:11.)

The County's sick-call summary records a psychiatry sick call scheduled for February 2, 2022 that was rescheduled on-site, a refusal noted on February 18, and the encounter completed on February 22. (Krueger Decl. Ex. L, County Sick-Call Summary, COSD 000152.)

On February 9, County mental-health clinician Christina Anosike conducted a cell-side mental-health encounter. Her progress note recorded that Mr. Rupard declined to participate, appeared in no acute distress, and was moderately groomed. The note described the cell as clean with some debris and empty food trays, without urine, feces, or flooding, and provided for continued monitoring and a follow-up wellness check in two weeks. (Krueger Decl. Ex. M, QMHP Progress Note, COSD 000052–000057.)

Dr. Cruz next evaluated Mr. Rupard on February 22, 2022. He made multiple attempts to engage Mr. Rupard and observed him awake, alert, and in no acute distress. He also observed that the cell appeared relatively clean, without fecal smearing or flooding. (Krueger Decl. Ex. N, Psychiatric Progress Note dated Feb. 22, 2022, COSD 000477–000478; Krueger Decl. Ex. A, Cruz Dep. 179:18–180:8.) Dr. Cruz testified that he observed no protruding ribs, emaciation, or otherwise unhealthy appearance, and no apparent loss of weight since the December encounter. (Krueger Decl. Ex. A, Cruz Dep. 178:4–179:6.) He confirmed that Mr. Rupard's physical presentation appeared unchanged from December. (Krueger Decl. Ex. A, Cruz Dep. 317:22–318:18.)

Based on the circumstances presented during the February 22 encounter, Dr. Cruz found no indication of danger to self, danger to others, or grave disability requiring immediate psychiatric intervention. (Krueger Decl. Ex. A, Cruz Dep. 309:12–310:22, 315:14–317:6.) He scheduled another psychiatric encounter in six to seven weeks, or sooner if circumstances required. Dr. Cruz explained that this interval was shorter than the ordinary outpatient psychiatric follow-up interval of two to three

months. (Krueger Decl. Ex. A, Cruz Dep. 304:18–307:1.)

***C. County Observation, Assessment, and Referral Procedures***

Psychiatric care incorporated information from the medical record, the patient's presentation, and other disciplines. Dr. Francis Ysla, Liberty's medical director for jail psychiatric services during the relevant period, explained that a psychiatrist reviewed the chart, evaluated the patient, considered collateral information supplied by other disciplines, and determined the psychiatric plan of care. (Krueger Decl. Ex. B, Ysla Dep. 14:2–19, 15:8–13, 41:17–42:20.)

County personnel had several means of communicating concerns to a provider. Quiroz testified that custody personnel could approach a provider directly, describe what they observed, communicate through the nursing station, or send an email. (Krueger Decl. Ex. C, Quiroz Dep. 162:22–163:25.) They also could communicate by telephone or request an immediate cell-side response from mental-health personnel. (Krueger Decl. Ex. C, Quiroz Dep. 167:23–168:9, 169:5–21.) Quiroz specifically described direct conversations and emergency calls as means of communicating with Liberty's contracted providers. (Krueger Decl. Ex. C, Quiroz Dep. 169:25–170:19.)

Lieutenant Aaron Boorman, the County's Rule 30(b)(6) designee concerning custodial counts and safety checks, testified that he was unaware of contractors or subcontractors performing those functions during 2021 or 2022. (Krueger Decl. Ex. E, Boorman Dep. 10:22–11:2.) County training materials directed sworn personnel to verify an incarcerated person's well-being and look for signs of medical, physical, or psychological distress, trauma, or criminal activity. (Krueger Decl. Ex. E, Boorman Dep. 34:22–35:4.)

County nursing personnel had a separate assessment and scheduling process when informed of a hunger strike. Rognlien-Hood testified that nursing would assess the patient, obtain weight and vital signs if the patient was willing, and schedule psychiatry and medical sick-call appointments through the computerized system. (Krueger Decl. Ex. D, Rognlien-Hood Dep. 176:2–177:11.)

Asked whether health staff had been notified that Mr. Rupard was losing weight or whether medical staff had received the notifications discussed in the hunger-strike policy, Rognlien-Hood answered that she was unaware of such notifications. She also testified that she had not personally been notified that Mr. Rupard was on a hunger strike. (Krueger Decl. Ex. D, Rognlien-Hood Dep. 81:4–84:9.)

***D. No Concern or Request for an Earlier Evaluation Was Communicated to Dr. Cruz After February 22***

The County expressly admitted that "no County employee discussed Lonnie Rupard with Dr. Cruz after Dr. Cruz's assessment on February 22, 2022." The same response maintained the County's position concerning Dr. Cruz's psychiatric-care responsibilities. (Krueger Decl. Ex. K, County's Resps. to Cruz's Reqs. for Admis., Set One, Resp. No. 5.)

On March 14, Dr. Nicolas Badre, a psychiatrist conducting a court-ordered competency evaluation, evaluated Mr. Rupard from outside his cell. During that encounter, Dr. Badre observed a malodorous, unhygienic cell with feces outside the toilet. A deputy remained beside him throughout the interview. (Krueger Decl. Ex. F, Badre Dep. 99:24–101:16.) Dr. Badre did not recall speaking with Dr. Cruz afterward. He also did not recall communicating his observations to mental-health personnel, although he acknowledged that such a communication was possible. (Krueger Decl. Ex. F, Badre Dep. 91:10–25.) Dr. Badre testified that his written competency report was not complete when Mr. Rupard died and that he submitted it to staff in his office on March 21, four days after the death. (Krueger Decl. Ex. F, Badre Dep. 107:6–108:3.)

Deputy Ernesto Aguirre, a County custody deputy who participated in safety checks on March 16, testified that he identified himself on surveillance footage performing at least one check of Mr. Rupard's cell. He could not recall the precise number or times of those checks. (Krueger Decl. Ex. G, Aguirre Dep. 51:9–52:19, 55:25–56:7.) Aguirre confirmed that he never reported Mr. Rupard as appearing

emaciated to medical or mental-health personnel. (Krueger Decl. Ex. G, Aguirre Dep. 85:20–23.)

Deputy Linda Gutierrez, a County custody deputy assigned to the seventh floor on March 17, testified that no one had given her a report concerning Mr. Rupard. (Krueger Decl. Ex. H, Gutierrez Dep. 93:17–94:15.) She testified that she never brought Mr. Rupard to Dr. Cruz's attention and had not heard that anyone else had done so. (Krueger Decl. Ex. H, Gutierrez Dep. 103:24–104:7.) When asked about her interactions with Dr. Cruz concerning other incarcerated persons, Gutierrez described him as approachable and responsive and testified that he provided assistance the same day or the next day when she requested it. (Krueger Decl. Ex. H, Gutierrez Dep. 102:13–103:23.)

Dr. Cruz had no further psychiatric encounter with Mr. Rupard after February 22. He testified that no one contacted him to request an earlier assessment and that he received no collateral information indicating that an earlier encounter was needed. (Krueger Decl. Ex. A, Cruz Dep. 305:25–307:10, 317:17–20.) He also testified that he received no reports of psychiatric decompensation, emaciation, gross psychosis, or the allegedly unsanitary conditions described during his deposition. (Krueger Decl. Ex. A, Cruz Dep. 163:21–165:23.) No clinician, deputy, or other County employee reported information suggesting the physical condition depicted in the autopsy photographs shown to him. (Krueger Decl. Ex. A, Cruz Dep. 324:22–326:7.)

Dr. Cruz testified that he would have acted immediately had the reported conditions been brought to his attention and would have done whatever he could had he been told of the condition depicted in those photographs. (Krueger Decl. Ex. A, Cruz Dep. 164:8–165:1, 326:8–20.) The following sections address whether the evidence establishes the conduct and causal connection required for the claims asserted against Dr. Cruz and Liberty.

## III. LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome under the governing law, and a dispute is genuine only if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of identifying the basis for its motion and the portions of the record demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof at trial, the movant may satisfy its burden by identifying an absence of evidence supporting an essential element of that party's claim. *Id.* at 325. After an adequate opportunity for discovery, summary judgment is required when the non-moving party fails to produce evidence sufficient to permit a reasonable factfinder to find in its favor on an essential element on which it bears the burden of proof. *Id.* at 322–24.

Once the moving party satisfies its initial burden, the opposing party must identify specific evidence establishing a genuine dispute for trial and may not rely solely on allegations or denials in the pleadings. *Id.* at 324; Fed. R. Civ. P. 56(c)(1). The Court views the evidence and draws reasonable inferences in favor of the non-moving party, without weighing evidence or resolving credibility disputes. *Anderson*, 477 U.S. at 255. Evidence that is merely colorable or insufficiently probative does not create a genuine dispute for trial. *Id.* at 249–50.

## IV. LEGAL ARGUMENT

### *A. Plaintiff's First Cause of Action for Fourteenth Amendment Deliberate Indifference Against Dr. Cruz Fails.*

#### 1. Governing Legal Standard

Plaintiff's First Cause of Action alleges that Dr. Cruz violated Mr. Rupard's constitutional right to adequate medical care. (TAC ¶¶ 338–363.) Because Plaintiff alleges that Mr. Rupard was a pre-trial detainee, the claim is governed by the

Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's prohibition against cruel and unusual punishment, which governs medical care claims by convicted prisoners. *Gordon*, 888 F.3d at 1124–25; *Castro v. County of Los Angeles*, 833 F.3d 1060, 1069–70 (9th Cir. 2016) (en banc). The Fourteenth Amendment requires proof of objective deliberate indifference, as discussed below.

To establish individual liability, Plaintiff must demonstrate that: (1) Dr. Cruz made an intentional decision with respect to the conditions under which Mr. Rupard was confined, including medical treatment; (2) those conditions placed Mr. Rupard at substantial risk of suffering serious harm; (3) Dr. Cruz failed to take reasonable available measures to abate that risk, even though a reasonable provider in his circumstances would have appreciated the high degree of risk involved, making the consequences of his conduct obvious; and (4) by failing to take such measures, Dr. Cruz caused Mr. Rupard's injuries. *Gordon*, 888 F.3d at 1125; *Sandoval*, 985 F.3d at 669–70.

Although the standard is objective, it does not impose constitutional liability for ordinary negligence. Plaintiff must establish "more than negligence but less than subjective intent—something akin to reckless disregard." *Gordon*, 888 F.3d at 1125. Thus, the inquiry is not simply whether additional psychiatric treatment could have been provided or whether Plaintiff's experts would have recommended a different course of care. Plaintiff must establish that Dr. Cruz failed to take reasonable available measures in response to a substantial risk that a reasonable psychiatric provider in his circumstances would have appreciated.

In *Sandoval*, the Ninth Circuit applied this objective framework to jail medical care claims, recognizing that an intentional medical treatment decision may satisfy the first element, but the third element independently requires objectively unreasonable conduct. *Sandoval*, 985 F.3d at 669–70. Similarly, *Russell v. Lumitap*, 31 F.4th 729, 735 (9th Cir. 2022), distinguishes potentially substandard medical care from treatment that violates the Constitution. Although providing some medical care

does not automatically defeat a constitutional claim, Plaintiff must still establish objectively unreasonable conduct satisfying the Fourteenth Amendment's deliberate-indifference threshold.

Finally, § 1983 requires an individualized showing that the defendant's own conduct caused the constitutional deprivation, based on the defendant's duties, responsibilities, and ability to prevent the alleged injury. *Leer v. Murphy*, 844 F.2d 628, 633–34 (9th Cir. 1988). Plaintiff must establish both causation in fact and proximate causation. *Chaudhry*, 68 F.4th at 1170–71.

**2. Dr. Cruz's Psychiatric Treatment Decisions Did Not Constitute Objectively Unreasonable Conduct Amounting to Reckless Disregard of Mr. Rupard's Serious Medical Needs.**

Plaintiff challenge Dr. Cruz's psychiatric treatment decisions, including his management of Mr. Rupard's medication refusals, determination that PSU admission or involuntary treatment was not indicated, assessment of the need for additional intervention, and scheduling of psychiatric follow-up. (TAC ¶¶ 89–109, 121–138, 352.) However, even assuming Plaintiff identify a departure from accepted psychiatric practice, that showing does not, without more, establish the objectively unreasonable failure to take reasonable available measures required for Fourteenth Amendment liability. *Gordon*, 888 F.3d at 1125; *Sandoval*, 985 F.3d at 669–70.

The record establishes that Dr. Cruz evaluated Mr. Rupard on December 29, 2021, considered his psychiatric presentation, prescribed medication, and scheduled psychiatric follow-up in four to five weeks, or sooner if necessary. (Krueger Decl. Ex. A, Cruz Dep. 232:6–233:16, 239:19–241:19.) On January 20, 2022, Dr. Cruz reviewed Mr. Rupard's repeated medication refusals, discontinued prescriptions that Mr. Rupard was not accepting, and noted that psychiatric follow-up was already scheduled. (*Id.* at 251:8–254:18.) Importantly, the January 20 chart review was undertaken in response to reported medication refusals, not a report that Mr. Rupard was experiencing an acute psychiatric or physical emergency. Dr. Cruz understood

that a further psychiatric encounter was already scheduled and testified that he received no contemporaneous information indicating that additional intervention was required before that follow-up. (*Id.* at 251:8–254:18, 256:4–11.)

On February 22, Dr. Cruz again evaluated Mr. Rupard, attempted to engage him, assessed his psychiatric presentation, and determined that immediate psychiatric hospitalization was not indicated based on the circumstances observed. (Krueger Decl. Ex. N, Psychiatric Progress Note dated Feb. 22, 2022, COSD 000477; Ex. A, Cruz Dep. 309:12–310:21, 315:15–317:6.) Dr. Cruz testified that Mr. Rupard was awake and alert, exhibited no apparent acute distress or emaciation, and appeared physically unchanged from December. (Krueger Decl. Ex. A, Cruz Dep. 178:5–180:8, 318:1–18.) He scheduled another psychiatric follow-up in six to seven weeks, or sooner if circumstances warranted, an interval shorter than the ordinary two- to three-month outpatient psychiatric follow-up period. (*Id.* at 304:20–306:25.)

Plaintiff contend that Mr. Rupard's psychiatric history, medication refusals, disorganized speech, and limited orientation required more aggressive intervention, including PSU admission, involuntary medication, or increased monitoring. (TAC ¶¶ 127–138.) However, identifying additional treatment measures that might have been pursued does not establish that Dr. Cruz acted with objective reckless disregard. The constitutional inquiry is whether a reasonable psychiatrist confronting the information available during these encounters would have appreciated a substantial risk requiring additional reasonable measures and whether Dr. Cruz's response was objectively unreasonable. *Gordon*, 888 F.3d at 1125.

Importantly, Mr. Rupard's history of serious mental illness, repeated medication refusals, and limited participation in psychiatric examinations did not, standing alone, establish that immediate hospitalization, involuntary treatment, or PSU admission was constitutionally required. Dr. Cruz considered Mr. Rupard's presentation during his February 22 examination, including whether his observed condition indicated grave disability, danger to himself, or danger to others warranting

immediate psychiatric intervention. (Krueger Decl. Ex. A, Cruz Dep. 309:12–310:21, 315:15–317:6.) He testified that Mr. Rupard was awake and alert, exhibited no apparent acute physical distress or emaciation, and appeared physically unchanged from the prior encounter. (*Id.* at 178:5–180:8, 318:1–18.) Plaintiff may dispute whether those observations warranted a different clinical response, but they must establish more than the availability of alternative treatment. They must demonstrate that the circumstances presented an objectively appreciable, substantial risk of serious harm and that Dr. Cruz failed to take reasonable available measures in a manner amounting to reckless disregard. *Gordon*, 888 F.3d at 1125.

Nor does *Russell* establish that Dr. Cruz's decision not to escalate psychiatric care constituted deliberate indifference. There, medical providers received reports of acute and escalating symptoms, including severe chest pain, vomiting, respiratory distress, and an unsuccessful medication intervention, yet failed to pursue appropriate emergency care. *Russell*, 31 F.4th at 739–44. The Ninth Circuit emphasized that the constitutional inquiry concerns whether medical care violated the Constitution, not merely whether allegedly substandard care contributed to the patient's death. *Id.* at 735.

Here, Dr. Cruz personally evaluated Mr. Rupard, assessed whether his presentation warranted immediate psychiatric hospitalization, and scheduled further follow-up. (Krueger Decl. Ex. A, Cruz Dep. 304:20–306:25, 309:12–310:21, 315:15–317:6.) Unlike the escalating emergency symptoms communicated to medical providers in *Russell*, Dr. Cruz testified that his February 22 examination revealed no apparent acute physical deterioration or grounds requiring immediate psychiatric hospitalization. (*Id.* at 178:5–180:8, 315:15–317:6.) Although providing treatment does not automatically defeat a constitutional claim, Plaintiff must establish that his failure to pursue additional intervention was objectively reckless under the circumstances, rather than merely a disputed exercise of psychiatric judgment.

Moreover, no County employee discussed Mr. Rupard with Dr. Cruz after

February 22, despite established procedures for requesting additional psychiatric assessment. (Krueger Decl. Ex. K, County's Resps. to Cruz's Reqs. for Admis., Set One, Resp. No. 5, at 6–7; Ex. C, Quiroz Dep. 163:3–25, 169:14–171:7.) Dr. Cruz received no subsequent report of worsening psychosis, severe weight loss, unsanitary conditions, or other deterioration requiring an earlier encounter. (Krueger Decl. Ex. A, Cruz Dep. 164:1–165:23, 306:1–307:10.) Dr. Badre did not recall communicating his March 14 findings to Dr. Cruz, and his written report was not completed until after Mr. Rupard's death. (Krueger Decl. Ex. F, Badre Dep. 91:10–25, 107:6–108:3.)

Plaintiff cannot establish objectively reckless disregard merely by substituting subsequent observations or retrospective treatment recommendations for the circumstances reasonably confronting Dr. Cruz. The relevant question is whether his conduct demonstrated an objectively unreasonable failure to take reasonable available measures in the face of a substantial risk of serious harm. *Gordon*, 888 F.3d at 1125; *Sandoval*, 985 F.3d at 669–70. On this record, Plaintiff cannot satisfy that constitutional requirement.

The distinction between Dr. Cruz's treatment decisions and the subsequent deterioration alleged by Plaintiff is critical. Whether his December 29, January 20, and February 22 assessments required additional psychiatric intervention must be evaluated based on the information reasonably available during those encounters. By contrast, Plaintiff cannot establish that Dr. Cruz recklessly failed to respond to later changes in Mr. Rupard's condition without identifying information that would have made the need for additional intervention objectively apparent to a reasonable psychiatrist in Dr. Cruz's circumstances. During the approximately three weeks following his final examination, Dr. Cruz received no report of worsening psychiatric symptoms, weight loss, or deteriorating living conditions, notwithstanding established procedures for requesting an earlier evaluation. (Krueger Decl. Ex. A, Cruz Dep. 164:1–165:23, 306:1–307:10; Ex. K, County's Resps. to Cruz's Reqs. for Admis., Set One, Resp. No. 5, at 6–7.) His responsibility for the psychiatric decisions

he actually made cannot be converted into responsibility for continuously monitoring custodial conditions or discovering subsequent deterioration that was neither reported to him nor within his assigned monitoring duties.

**3. Plaintiff Cannot Establish That Dr. Cruz's Conduct Actually and Proximately Caused Mr. Rupard's Alleged Injuries or Death.**

Plaintiff must establish that Dr. Cruz's own acts or omissions actually and proximately caused the alleged constitutional deprivation. *Gordon*, 888 F.3d at 1125; *Chaudhry*, 68 F.4th at 1170–71. This inquiry must be individualized, focusing on each defendant's duties, responsibilities, and ability to prevent the alleged harm. *Leer*, 844 F.2d at 633–34. Dr. Cruz cannot be held personally liable for the independent acts or omissions of County custodial, nursing, and medical personnel merely because he provided psychiatric treatment to Mr. Rupard.

The undisputed chronology is particularly significant. Dr. Cruz last evaluated Mr. Rupard on February 22, 2022, approximately three weeks before his death on March 17. At that encounter, Dr. Cruz assessed Mr. Rupard's psychiatric presentation and scheduled further psychiatric follow-up in six to seven weeks, or sooner if circumstances warranted. (Krueger Decl. Ex. A, Cruz Dep. 304:20–306:25.) Thus, Dr. Cruz did not terminate psychiatric care or foreclose an earlier assessment. His treatment plan expressly contemplated an earlier encounter if Mr. Rupard's condition required one.

During the ensuing three weeks, however, no one contacted Dr. Cruz to report a change in Mr. Rupard's condition, express concern regarding his physical or psychiatric deterioration, or request an earlier evaluation. The County expressly admitted that "no County employee discussed Lonnie Rupard with Dr. Cruz after Dr. Cruz's assessment on February 22, 2022." (Krueger Decl. Ex. K, County's Resps. to Cruz's Reqs. for Admis., Set One, Resp. No. 5, at 6–7.) Dr. Cruz likewise testified that he received no request to reassess Mr. Rupard and no information concerning the severe weight loss, worsening psychiatric condition, or unsanitary circumstances

subsequently alleged. (Krueger Decl. Ex. A, Cruz Dep. 164:1–165:23, 306:1–307:10, 325:7–326:17.)

Critically, Dr. Cruz was not responsible for conducting custodial safety checks, monitoring food consumption, maintaining cell sanitation, obtaining routine weights or vital signs, or performing the County's ongoing nursing assessments. Those functions were assigned to separate personnel who continued to encounter Mr. Rupard after February 22. Lieutenant Boorman confirmed that custodial safety checks were performed by County personnel, not contractors. (Krueger Decl. Ex. E, Boorman Dep. 10:22–11:2, 34:23–35:4.) The County's nursing designee separately described procedures for assessing detainees with food-refusal concerns, including obtaining weights and vital signs and arranging additional medical or psychiatric care. (Krueger Decl. Ex. D, Rognlien-Hood Dep. 176:14–177:11.)

Nor was there any absence of a mechanism for communicating concerns to Dr. Cruz. The County's mental health designee confirmed that custodial personnel could contact providers directly, communicate through nursing staff, request an immediate mental-health response, or arrange an additional psychiatric evaluation. (Krueger Decl. Ex. C, Quiroz Dep. 163:3–25, 169:14–171:7.) These procedures permitted personnel who observed a concerning change in Mr. Rupard's condition to request psychiatric intervention before his scheduled follow-up. Yet no such concern was communicated to Dr. Cruz.

Even when Dr. Badre evaluated Mr. Rupard on March 14 and observed the deteriorated conditions described in the TAC, he did not recall communicating those observations to Dr. Cruz. His written competency report was not completed until after Mr. Rupard's death. (Krueger Decl. Ex. F, Badre Dep. 91:10–25, 99:24–101:16, 107:6–108:3.) Deputy Gutierrez likewise testified that she never brought Mr. Rupard to Dr. Cruz's attention and had not heard that anyone else had done so. (Krueger Decl. Ex. H, Gutierrez Dep. 104:1–7.) Dr. Cruz testified that he would have acted immediately had the subsequently reported conditions been brought to his attention.

(Krueger Decl. Ex. A, Cruz Dep. 164:23–165:1, 326:14–17.)

Plaintiff cannot attribute to Dr. Cruz a failure to respond to deterioration that occurred after his final examination, was subject to ongoing monitoring by other personnel, and was never reported to him. Dr. Cruz was not responsible for conducting continuous custodial observations, routine nursing assessments, or physical monitoring between psychiatric encounters. Rather, those responsibilities belonged to separate County personnel who had established procedures for requesting additional psychiatric intervention. Under *Leer*, individual liability requires an examination of each defendant's particular duties, discretion, and ability to prevent the alleged harm, rather than collective attribution of the acts or omissions of other personnel. 844 F.2d at 633–34. Here, Dr. Cruz had scheduled further psychiatric follow-up, including an earlier evaluation if warranted, yet received no report of Mr. Rupard's subsequent deterioration during the approximately three weeks preceding his death. (Krueger Decl. Ex. A, Cruz Dep. 304:20–306:25, 306:1–307:10; Ex. K, County's Resps. to Cruz's Reqs. for Admis., Set One, Resp. No. 5, at 6–7.)

To the extent Plaintiff instead contend that Dr. Cruz's December 29, January 20, or February 22 psychiatric decisions themselves caused Mr. Rupard's subsequent deterioration, they must establish that those particular decisions were constitutionally culpable and actually and proximately caused the injuries alleged. *Chaudhry*, 68 F.4th at 1170–71. The subsequent occurrence of malnutrition, dehydration, pneumonia, or death does not, without the requisite causal evidence, establish that Dr. Cruz's psychiatric decisions caused those conditions. Nor does it permit Plaintiff to aggregate the conduct of separate custodial and medical personnel and attribute their collective omissions to Dr. Cruz.

The causal attenuation between Dr. Cruz's final psychiatric examination and Mr. Rupard's death further undermines Plaintiff's theory. In *Settles*, this Court expressly recognized that Dr. Cruz's conduct approximately one month before an incarcerated person's death might ultimately prove too attenuated to support liability,

while declining to resolve that issue on a motion to dismiss. *Estate of Matthew Settles v. County of San Diego*, No. 3:24-cv-00352-CAB-MSB, ECF No. 91, at 7–8 (S.D. Cal. Oct. 30, 2025). Here, the developed evidentiary record permits examination of the intervening circumstances: Dr. Cruz's February 22 treatment plan contemplated further psychiatric assessment; separate County personnel remained responsible for ongoing observation, nursing assessments, and referral; and no subsequent deterioration or request for earlier psychiatric intervention was communicated to him. (Krueger Decl. Ex. A, Cruz Dep. 304:20–307:10; Ex. E, Boorman Dep. 10:22–11:2; Ex. D, Rognlien-Hood Dep. 176:14–177:11; Ex. K, County's Resps. to Cruz's Reqs. for Admis., Set One, Resp. No. 5, at 6–7.) Plaintiff must establish a non-speculative causal connection between Dr. Cruz's specific psychiatric decisions and the subsequent fatal deterioration, rather than relying solely on his earlier involvement in Mr. Rupard's care. *Chaudhry*, 68 F.4th at 1170–71.

For approximately three weeks before Mr. Rupard’s death, Dr. Cruz received no information suggesting that an earlier psychiatric intervention was necessary, despite established procedures through which the personnel responsible for ongoing observation and monitoring could request one. Plaintiff cannot establish personal constitutional liability based on Dr. Cruz's failure to take additional action in response to conditions never communicated to him and outside the monitoring functions assigned to him. Accordingly, Plaintiff cannot establish the individualized causation required under § 1983, and summary judgment should be entered in Dr. Cruz's favor on the First Cause of Action.

### *B. Dr. Cruz Is Entitled to Qualified Immunity on the Federal Claim.*

#### 1. Governing Standard

Qualified immunity shields an official unless the plaintiff shows (1) a violation of a constitutional right and (2) that the right was clearly established at the time. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may address either prong first and in any order. *Id.* at 236. A right is clearly established only when existing precedent

places the question "beyond debate"; "[a] case directly on point" is not required, "but existing precedent must have placed the … constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Courts must not "define clearly established law at a high level of generality"; the inquiry "must be undertaken in light of the specific context of the case…". *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam). The plaintiff must ordinarily "identify a case where an officer acting under similar circumstances" was held to have violated the Constitution. *District of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018); *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam).

**2. Dr. Cruz May Assert the Defense.**

"A private individual temporarily retained by the government to carry out its work is entitled to seek qualified immunity from suit under § 1983." *Filarsky v. Delia*, 566 U.S. 377, 389, 393–94 (2012). Dr. Cruz discharged the County's own constitutional obligation to furnish psychiatric care to detainees, under the County's contract and in the place of a publicly employed jail psychiatrist. (See § II, supra; Krueger Decl. Ex. A, Cruz Dep. 68:11–69:1, 78:9–21; Ex. B, Ysla Dep. 14:11–19; Ex. O, County Contract No. 555357.) The purposes that animate the defense — avoiding unwarranted timidity, inducing talented persons to undertake public work, and preventing distraction from duties — apply fully to a psychiatrist performing that governmental function. *Filarsky*, 566 U.S. at 390–91.

The defense concedes that there is contrary law on point, including *Jensen v. Lane County*, 222 F.3d 570, 576–78 (9th Cir. 2000) and *Richardson v. McKnight*, 521 U.S. 399, 412 (1997). However, the more recent *Filarsky* opens the door to this defense in this context; even if the Court disagrees, the defense argues that qualified immunity should apply to an individual provider who is acting under color of state law, making it a good faith argument for extension of the law.

**3. There Was No Constitutional Violation.**

The first prong fails for the reasons already shown: Dr. Cruz's psychiatric

decisions were not objectively unreasonable or akin to reckless disregard, and his conduct did not cause the alleged deprivation (§ IV.A.2–3, supra). Without an underlying violation, qualified immunity attaches. *Pearson*, 555 U.S. at 232.

**4. Any Right Was Not Clearly Established in February 2022.**

Even assuming a triable issue on the merits, no decision as of February 2022 placed the question "beyond debate" for a jail psychiatrist in Dr. Cruz's position. *al-Kidd*, 563 U.S. at 741. Plaintiff can identify no case holding that, on facts like these — a detainee evaluated and medicated, whose medication refusals were reviewed, who was re-evaluated and found without indication of grave disability or danger, for whom a shorter-than-usual follow-up was set, and about whose later deterioration the psychiatrist received no report — a reasonable psychiatrist would have understood that respecting the refusal, declining involuntary treatment or PSU admission, and scheduling a follow-up was unconstitutional. (See § II & § IV.A, supra.) The right cannot be defined at the general level of "adequate medical care." *Mullenix*, 577 U.S. at 12; *Wesby*, 583 U.S. at 63–64. Dr. Cruz is therefore entitled to qualified immunity on the federal claim.

***C. Plaintiff's Fourth Cause of Action for Monell Liability Against Liberty Fails.***

**1. Governing Legal Standard**

Under 42 U.S.C. § 1983, a municipality may be held liable for a constitutional deprivation caused by its own official policy, custom, or practice, but not merely because it employed an individual who allegedly violated another person's constitutional rights. *Monell v. Department of Social Services*, 436 U.S. 658, 690–94 (1978). The Ninth Circuit has expressly extended these limitations to private entities acting under color of state law. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139–40 (9th Cir. 2012). Accordingly, Liberty cannot be held liable under § 1983 solely because it employed Dr. Cruz or provided contracted psychiatric services at SDCJ. *Id.* at 1139.

To establish liability, Plaintiff must identify an official policy, longstanding custom or practice, or decision attributable to an authorized policymaker that caused a constitutional deprivation. *Monell*, 436 U.S. at 694; *Tsao*, 698 F.3d at 1143–44. A policy may consist of an affirmative decision or, in certain circumstances, an actionable omission. *Long v. County of Los Angeles*, 442 F.3d 1178, 1185–86 (9th Cir. 2006). However, an alleged custom must be sufficiently persistent and widespread to constitute a settled practice rather than an isolated or sporadic occurrence. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Where liability is premised on a failure to adopt adequate policies, implement safeguards, or provide sufficient training, Plaintiff must demonstrate that the institutional omission amounted to deliberate indifference to constitutional rights and caused the alleged deprivation. *City of Canton v. Harris*, 489 U.S. 378, 388–92 (1989); *Tsao*, 698 F.3d at 1143–44. Deliberate indifference ordinarily requires notice that existing procedures are inadequate, commonly established through a pattern of similar constitutional violations. *Connick v. Thompson*, 563 U.S. 51, 61–64 (2011). Although a pattern is not invariably required, the circumstances supporting liability without one are limited to situations in which the need for additional safeguards is sufficiently obvious. *Id.* at 63–64.

Finally, Plaintiff must establish that Liberty's own actionable policy, custom, or omission was the moving force behind the constitutional injury. *Board of County Commissioners v. Brown*, 520 U.S. 397, 403–07 (1997). This requires a direct causal connection between the particular institutional deficiency and the alleged deprivation, rather than an inference of liability based solely on the occurrence of an injury. *Id.* at 404–07; *City of Canton*, 489 U.S. at 391.

Although municipal liability may exist even where no individual employee is ultimately held liable, Plaintiff must still establish an underlying constitutional deprivation attributable to the entity's own policies or collective institutional conduct. *Fairley v. Luman*, 281 F.3d 913, 916–18 (9th Cir. 2002); *Horton v. City of Santa*

*Maria*, 915 F.3d 592, 603–05 (9th Cir. 2019). Accordingly, Liberty's potential liability must be evaluated independently of Dr. Cruz's individual liability, with particular attention to whether the alleged unconstitutional policy or omission was attributable to Liberty and actually caused Mr. Rupard's injuries.

**2. Plaintiff Cannot Establish an Unconstitutional Policy, Widespread Custom, or Deliberately Indifferent Policy of Inaction Attributable to Liberty.**

Plaintiff's Fourth Cause of Action alleges that Liberty and the County maintained unconstitutional customs of inaction and failed to promulgate adequate policies concerning detainees with serious psychiatric needs. (TAC ¶ 409.) However, Liberty cannot be held liable under § 1983 merely because it contracted with the County to furnish psychiatric services or employed Dr. Cruz. Plaintiff must establish that an official policy, widespread custom, or actionable institutional omission attributable to Liberty itself caused a constitutional deprivation. *Monell*, 436 U.S. at 690–94; *Tsao*, 698 F.3d at 1139–40, 1143–44.

Although paragraph 409 generally attributes a custom of inaction to both Liberty and the County, the TAC's detailed allegations concerning deficient policies and institutional practices are predominantly directed at the County. Paragraph 412 expressly attributes eleven alleged policy deficiencies to the County, including psychiatric screening, PSU referrals, medical monitoring, communication of critical information, and staffing. (TAC ¶ 412(a)–(k).) Paragraphs 417 through 419 similarly identify allegedly widespread County practices involving inadequate medical care, custodial observations, and failures to communicate medical information. Plaintiff further identify County officials Gore and Martinez as having knowledge of systemic deficiencies and responsibility for corrective measures. (TAC ¶¶ 422–426.) The TAC does not comparably identify an affirmative Liberty policy directing constitutionally inadequate psychiatric care or a widespread Liberty-specific practice. Nor does it identify a Liberty policymaker who instituted or knowingly maintained such a

practice.

A custom must be sufficiently persistent and widespread to constitute a settled institutional practice. Isolated incidents cannot establish a permanent and well-settled policy absent evidence of sufficient duration, frequency, and consistency. *Trevino*, 99 F.3d at 918. Plaintiff therefore cannot establish a widespread Liberty custom solely through Dr. Cruz's treatment of Mr. Rupard or alleged failures by County personnel performing separate custodial and medical functions.

Nor does labeling the alleged deficiency a policy of "inaction" eliminate Plaintiff's burden. An actionable omission requires evidence of a deficient institutional safeguard, actual or constructive notice that the omission was likely to cause constitutional violations, deliberate indifference, and causation. *Tsao*, 698 F.3d at 1143–46. Plaintiff have not identified a particular Liberty policy requiring psychiatric providers to disregard medication refusals, ignore psychiatric deterioration, or withhold clinically indicated follow-up. Nor have they identified prior similar constitutional violations involving Liberty's psychiatric services, complaints to Liberty decisionmakers, or other evidence establishing that Liberty knew or should have known that its existing procedures were likely to result in constitutional injury. Although notice may also arise from an obvious constitutional risk, Plaintiff must identify the particular omitted safeguard and explain why the need for it was so apparent that Liberty's failure to adopt it constituted deliberate indifference. *Id.* at 1145–46; *Connick*, 563 U.S. at 61–64. The allegations concerning Mr. Rupard's treatment and County-wide deficiencies do not, without additional institutional evidence, establish that showing.

Moreover, Plaintiff's attempt to attribute the County's alleged failure to promulgate or implement jail-wide policies to Liberty disregards the parties' contractual division of responsibilities. Liberty was retained as an independent contractor to provide specified psychiatric services, not to formulate or administer the Sheriff's Department's custodial policies. Under County Contract No. 555357, the

County retained responsibility for correctional security, training contractor personnel concerning jail security procedures, administering the detention facilities, and providing and dispensing prescribed medications. (Krueger Decl. Ex. O, County Contract No. 555357, Statement of Work §§ 3.1.2–3.1.9, LIBERTY 000018.) Liberty's responsibilities, by contrast, included providing qualified psychiatric personnel, psychiatric evaluations, medication management, clinically indicated follow-up, and coordination of mental-health care. (*Id.*, Statement of Work § 3.2, LIBERTY 000018–000020.) Although Liberty remained responsible for its own psychiatric services, the County's obligation to establish and administer custodial policies cannot automatically be imputed to Liberty.

The County's witnesses corroborated this allocation. Lieutenant Aaron Boorman, a San Diego County Sheriff's Department lieutenant, testified that County custody personnel, rather than contractors, performed custodial safety checks and were trained to observe detainees for signs of medical or psychological distress. (Krueger Decl. Ex. E, Boorman Dep. 10:22–11:2, 34:23–35:4.) The County's nursing designee, Serina Rognlien-Hood, separately described nursing procedures for responding to food refusal, obtaining weights and vital signs, and arranging additional medical or psychiatric appointments. (Krueger Decl. Ex. D, Rognlien-Hood Dep. 176:14–177:11.) The County also admitted that County mental health clinicians performed scheduled QMHP follow-up sick calls. (Krueger Decl. Ex. I, County's Resps. to Liberty's Reqs. for Admis., Set One, Resps. Nos. 2–3, at 4–5.) Its interrogatory responses further identified the responsibilities associated with the wellness checks described in Medical Services Division Operations Manual Policy G.2.1. (Krueger Decl. Ex. J, County's Resps. to Liberty's Interrogs., Set One, Resps. Nos. 1–2, at 3–5.)

Significantly, Plaintiff expressly attribute the alleged failures concerning Title 15 cell checks, housing assignments, physical monitoring, sanitation, and other custodial procedures to the County. (TAC ¶¶ 412, 417–419.) The evidence confirms

that these functions were performed by County personnel, not Liberty's psychiatric providers. Although paragraph 415 refers collectively to County and Liberty personnel, it does not identify a Liberty policy or widespread custom responsible for the alleged custodial failures. Plaintiff therefore cannot establish Liberty's institutional liability merely by alleging that the County maintained deficient jail policies. They must identify an actionable policy or omission attributable to Liberty's own responsibilities and demonstrate that it caused a constitutional deprivation. *Tsao*, 698 F.3d at 1143–46.

Nor is there evidence that Liberty maintained a policy of preventing County personnel from communicating medical or psychiatric concerns to its providers. The County's mental-health designee, Melissa Quiroz, testified that custody personnel could contact psychiatric providers directly, communicate through nursing staff, request an immediate mental-health response, or arrange additional psychiatric evaluations. (Krueger Decl. Ex. C, Quiroz Dep. 163:3–25, 168:1–9, 169:14–171:7.) These procedures permitted County personnel to request psychiatric intervention between scheduled encounters. Indeed, the County admitted that no County employee discussed Mr. Rupard with Dr. Cruz after his February 22 examination. (Krueger Decl. Ex. K, County's Resps. to Cruz's Reqs. for Admis., Set One, Resp. No. 5, at 6–7.) Plaintiff therefore must establish how an additional Liberty-controlled communication policy, rather than the absence of a subsequent request through available channels, caused the alleged deprivation.

The psychiatric treatment itself likewise does not establish a settled Liberty custom of ignoring serious psychiatric needs. Dr. Cruz evaluated Mr. Rupard on December 29, reviewed his medication refusals on January 20, and examined him again on February 22. (Krueger Decl. Ex. A, Cruz Dep. 232:6–233:16, 251:8–254:18, 304:20–306:25.) He considered whether immediate psychiatric intervention was indicated and scheduled further follow-up, with an earlier encounter if clinically warranted. (*Id.* at 304:20–306:25, 309:12–310:21.) Plaintiff may challenge those

decisions, but disputed treatment of one detainee does not, without evidence of an established institutional practice, demonstrate that Liberty maintained a widespread custom of withholding constitutionally adequate psychiatric care. *Trevino*, 99 F.3d at 918.

Similarly, Plaintiff's reliance on the February 2022 California State audit and prior jail deaths does not, without a Liberty-specific connection, establish the requisite institutional notice. (TAC ¶¶ 410, 416, 423.) The TAC primarily identifies County-wide deficiencies and notice to County officials. Plaintiff have not identified particular findings concerning an unconstitutional Liberty policy, prior similar violations attributable to Liberty's psychiatric services, or evidence that Liberty decisionmakers received notice of a specific constitutional risk and deliberately declined to address it. *Tsao*, 698 F.3d at 1145–46. Generalized allegations of deficiencies within the County's detention system cannot substitute for proof of deliberate indifference by Liberty.

Finally, Plaintiff must establish that the particular Liberty omission was the moving force behind a constitutional deprivation. *Monell*, 436 U.S. at 694; *Brown*, 520 U.S. at 404–07. In *Long*, 442 F.3d at 1189–90, the Ninth Circuit recognized that an entity's failure to implement necessary medical care policies may support liability where the plaintiff identifies specific institutional deficiencies and presents evidence connecting them to the constitutional injury. There, the plaintiff submitted expert evidence that inadequate medical unit policies concerning monitoring, medical assessment, and transfer contributed to the detainee's death. Here, Plaintiff must establish a comparable causal connection to an omitted safeguard within Liberty's own responsibilities rather than attributing alleged County-wide policy deficiencies to Liberty. The possibility that additional procedures might have produced a better outcome does not, without evidence of institutional culpability and causation, establish *Monell* liability.

Accordingly, Plaintiff cannot establish an unconstitutional Liberty policy or

widespread custom merely through allegations of deficient County jail operations or disagreement with Dr. Cruz's treatment decisions. Nor can they establish an actionable policy of inaction without identifying a Liberty-controlled safeguard that was omitted despite actual or constructive notice of a likely constitutional violation and demonstrating that the omission caused the alleged deprivation. Because the evidence identified does not establish those essential elements, Liberty is entitled to summary judgment on this theory of Plaintiff's Fourth Cause of Action.

**3. Plaintiff Cannot Establish Deliberate Indifference Through Liberty's Alleged Staffing, Training, Supervision, or Other Institutional Deficiencies.**

Although Plaintiff generally allege that Liberty failed to promulgate adequate policies concerning mentally ill detainees (TAC ¶ 409), their specific allegations of deficient staffing, training, and institutional practices are directed predominantly at the County. (TAC ¶¶ 412, 416–426.) To the extent Plaintiff nevertheless seek to impose liability on Liberty based on alleged understaffing, overscheduling, inadequate training or supervision, or deficient psychiatric procedures, they must identify an actionable Liberty policy or omission, establish deliberate indifference, and demonstrate that the deficiency caused a constitutional deprivation. *City of Canton*, 489 U.S. at 388–91; *Connick*, 563 U.S. at 61–64; *Tsao*, 698 F.3d at 1143–46.

As established above, Liberty's contract required it to furnish qualified psychiatric personnel and provide clinically indicated psychiatric services. (Krueger Decl. Ex. O, County Contract No. 555357, Statement of Work §§ 3.2, 4.1, LIBERTY 000018–000020.) Plaintiff must therefore identify how Liberty's actual staffing, scheduling, or training practices were constitutionally inadequate, rather than simply attributing the County's alleged custodial and medical monitoring failures to Liberty. Nor have Plaintiff identified evidence that Liberty deliberately understaffed or overscheduled psychiatric providers to reduce expenses or increase revenue at the expense of constitutionally adequate care. Disagreement with Dr. Cruz's clinical

decisions does not itself demonstrate a corporate training or supervisory deficiency. *City of Canton*, 489 U.S. at 391.

Nor does Mr. Rupard's diagnosis of schizophrenia or refusal of psychiatric medication establish that Liberty was constitutionally required to adopt a policy mandating PSU admission irrespective of an individualized clinical assessment. As discussed in Section IV.A, Dr. Cruz evaluated Mr. Rupard's psychiatric condition, considered whether immediate intervention was warranted, and established a follow-up plan. (Krueger Decl. Ex. A, Cruz Dep. 304:20–306:25, 309:12–310:21.) Plaintiff must identify an actionable deficiency in Liberty's institutional psychiatric procedures rather than simply disagreeing with an individual clinical determination.

Plaintiff also must establish that Liberty's policymakers were on actual or constructive notice of the particular constitutional risk posed by the alleged deficiency. *Tsao*, 698 F.3d at 1145–46. Although Plaintiff reference prior jail deaths and systemic deficiencies, the TAC principally attributes those matters to the County. (TAC ¶¶ 416, 422–426.) Without evidence of comparable Liberty-related constitutional violations, notice of a particular institutional deficiency, or circumstances demonstrating an obvious need for additional safeguards, Plaintiff cannot establish deliberate institutional indifference. *Connick*, 563 U.S. at 62–64.

Accordingly, Plaintiff's allegations concerning Liberty's staffing, scheduling, training, supervision, or psychiatric policies cannot support *Monell* liability absent evidence of an actionable institutional deficiency, deliberate indifference, and a causal connection to Mr. Rupard's constitutional injury.

**4. Plaintiff Cannot Establish Ratification or Moving-Force Causation.**

Plaintiff also cannot establish Liberty's liability through ratification absent evidence that an official possessing final policymaking authority knowingly approved an unconstitutional decision and its underlying basis. *Gillette v. Delmore*, 979 F.2d 1342, 1346–48 (9th Cir. 1992); *Christie v. Iopa*, 176 F.3d 1231, 1238–39 (9th Cir.

1999). The TAC identifies County officials Gore and Martinez as the relevant institutional policymakers but does not identify a Liberty final policymaker who directed or ratified unconstitutional psychiatric treatment. (TAC ¶¶ 422–426.) Nor would an alleged failure to discipline Dr. Cruz following Mr. Rupard's death, without more, establish ratification or demonstrate that a subsequent employment decision caused the preceding constitutional deprivation. *Christie*, 176 F.3d at 1239; *Brown*, 520 U.S. at 404–07.

Regardless of the theory asserted, Plaintiff must establish that Liberty's own policy, custom, or deliberately indifferent omission was the moving force behind a constitutional deprivation. *Monell*, 436 U.S. at 694; *Brown*, 520 U.S. at 404–07. As established above, the contract assigned distinct responsibilities to Liberty and the County, County personnel retained responsibility for custodial and physical monitoring, and established procedures permitted requests for additional psychiatric intervention. (Krueger Decl. Ex. O, County Contract No. 555357, Statement of Work §§ 3.1–3.2, LIBERTY 000018–000020; Ex. C, Quiroz Dep. 163:3–25, 169:14–171:7.) Moreover, the County admitted that no County employee discussed Mr. Rupard with Dr. Cruz after February 22. (Krueger Decl. Ex. K, County's Resps. to Cruz's Reqs. for Admis., Set One, Resp. No. 5, at 6–7.)

Although the absence of individual liability against Dr. Cruz does not automatically foreclose Liberty's institutional liability, Plaintiff must still establish an underlying constitutional deprivation caused by Liberty's own policies or collective institutional conduct. *Fairley*, 281 F.3d at 916–18; *Horton*, 915 F.3d at 603–05. They must demonstrate how an identified Liberty policy or omitted safeguard caused the deprivation and establish the requisite causal connection between that deficiency and Mr. Rupard's injury. *Tsao*, 698 F.3d at 1143–46; *Long*, 442 F.3d at 1190. Plaintiff cannot satisfy that burden merely by alleging that different psychiatric policies, additional supervision, or greater resources might have produced a better outcome. Because Plaintiff cannot establish an unconstitutional Liberty policy or custom, a

deliberately indifferent institutional omission, actionable ratification, or moving-force causation, Liberty is entitled to summary judgment on Plaintiff's Fourth Cause of Action.

***D. Plaintiff's Fifth Cause of Action for Violation of the Bane Act Against Dr. Cruz Fails.***

**1. Governing Legal Standard**

California Civil Code section 52.1, commonly known as the Bane Act, provides a cause of action for interference or attempted interference with the exercise or enjoyment of rights secured by federal or state law through threats, intimidation, or coercion. To establish liability, Plaintiff must demonstrate specific intent to interfere with a protected right, which may be established through reckless disregard of that right. *Cornell v. City & County of San Francisco*, 17 Cal. App. 5th 766, 801–04 (2017); *Reese v. County of Sacramento*, 888 F.3d 1030, 1043–45 (9th Cir. 2018). Although threats, intimidation, or coercion need not be independent of the underlying constitutional violation, proof of a constitutional violation alone does not automatically establish Bane Act liability. *Sandoval v. County of Sonoma*, 912 F.3d 509, 519–20 (9th Cir. 2018). In the context of a pre-trial detainee's medical care, objective deliberate indifference requires more than negligence and conduct approaching reckless disregard. *Sandoval v. County of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021).

**2. Plaintiff Cannot Establish That Dr. Cruz Intentionally or Recklessly Interfered With Mr. Rupard's Protected Rights.**

Plaintiff alleges that Dr. Cruz, together with other Defendants, interfered with Mr. Rupard's right to adequate medical care through deliberate indifference, threats, intimidation, or coercion. (TAC ¶¶ 438–445.) Specifically, they allege that Dr. Cruz personally observed Mr. Rupard's deteriorating physical and mental condition, knew that he required immediate medical intervention, and failed to summon necessary care. (TAC ¶ 447.) However, the evidence does not establish that Dr. Cruz

intentionally or recklessly disregarded Mr. Rupard's constitutional right to adequate psychiatric treatment.

Rather than refusing psychiatric care, Dr. Cruz evaluated Mr. Rupard on December 29, 2021, reviewed his medication refusals on January 20, 2022, and performed another psychiatric evaluation on February 22, 2022. (Krueger Decl. Ex. A, Cruz Dep. 232:6–233:16, 251:8–254:18, 304:20–306:25.) During those encounters, Dr. Cruz assessed Mr. Rupard's psychiatric presentation, considered his medication history and whether additional intervention was warranted, and established follow-up care, including an earlier examination if clinically indicated. (*Id.* at 304:20–306:25, 309:12–310:21.) These affirmative clinical measures are inconsistent with Plaintiff's characterization of his conduct as an intentional refusal to provide psychiatric care or reckless disregard of Mr. Rupard's rights.

The critical inquiry is not whether additional treatment might have been appropriate in hindsight, but whether Dr. Cruz failed to take reasonable available measures in response to a substantial risk that a reasonable psychiatric provider would have appreciated under the circumstances. *Gordon*, 888 F.3d at 1125; *Sandoval v. County of San Diego*, 985 F.3d at 669. Although an adequately pleaded claim of deliberate indifference may satisfy the Bane Act's specific intent requirement, *Estate of Settles v. County of San Diego*, No. 3:24-cv-00352-CAB-MSB, ECF No. 91, at 15–16 (S.D. Cal. Oct. 30, 2025), Plaintiff must establish that the evidence supports such deliberate indifference at summary judgment. Unlike the pleading stage allegations considered in *Settles*, the evidentiary record here reflects affirmative psychiatric evaluations, medication review, and follow-up planning by Dr. Cruz. Plaintiff therefore must identify evidence demonstrating that those measures were objectively unreasonable in light of the information available to him, rather than relying solely on the tragic outcome or disagreement with his clinical judgments.

The distinction is particularly significant because Plaintiff's theory depends in substantial part on Mr. Rupard's subsequent physical deterioration. Although Plaintiff

alleges that Dr. Cruz ignored deteriorating conditions requiring immediate intervention, the County admitted that no County employee discussed Mr. Rupard with Dr. Cruz after his February 22 examination. (Krueger Decl. Ex. K, County's Resps. to Cruz's Reqs. for Admis., Set One, Resp. No. 5, at 6–7.) As discussed above, the County's custody and nursing personnel remained responsible for custodial observations, routine physical monitoring, nutritional assessments, and communicating medical concerns requiring additional intervention. Plaintiff identifies no evidence that Dr. Cruz personally observed or was informed of the subsequent deterioration described in the TAC.

Nor does Plaintiff identify any threatening statement, intimidating conduct, or coercive directive by Dr. Cruz intended to interfere with Mr. Rupard's protected rights. Although a Bane Act plaintiff need not establish coercion independent of the underlying constitutional violation, the statute still requires the requisite specific intent or reckless disregard. *Reese*, 888 F.3d at 1043–45; *Sandoval v. County of Sonoma*, 912 F.3d at 519–20. The inherently coercive nature of incarceration does not, by itself, establish that Dr. Cruz acted with the particular purpose of depriving Mr. Rupard of constitutionally adequate care.

Even applying the reckless disregard standard recognized in the pre-trial detainee medical care context, Plaintiff cannot establish the required culpability merely by disputing Dr. Cruz's psychiatric assessments, medication decisions, or follow-up planning. See *Sandoval v. County of San Diego*, 985 F.3d at 669. His documented evaluations and treatment decisions, considered in light of the information available during his encounters, do not establish that he intentionally or recklessly disregarded an obvious substantial risk of serious harm. At most, Plaintiff dispute the adequacy of his clinical judgment, which is insufficient without evidence of the culpability required by section 52.1. Accordingly, Plaintiff cannot establish the requisite interference, coercive conduct, specific intent, or reckless disregard necessary to sustain their Bane Act claim against Dr. Cruz.

**3. Plaintiff Cannot Establish That Any Actionable Conduct by Dr. Cruz Caused the Alleged Bane Act Injury.**

Plaintiff must also establish that Dr. Cruz's own conduct was a substantial factor in causing the alleged interference with Mr. Rupard's protected rights and resulting injuries. Cal. Civ. Code § 52.1; CACI No. 3066. As addressed in Section IV.A, Dr. Cruz provided psychiatric evaluations and treatment, while subsequent custodial monitoring, nursing assessments, and opportunities to request additional psychiatric intervention remained within the County's responsibilities. The County's admission that no employee discussed Mr. Rupard with Dr. Cruz following the February 22 examination further undermines any claim that Dr. Cruz knowingly disregarded a later request for immediate intervention. (Krueger Decl. Ex. K, County's Resps. to Cruz's Reqs. for Admis., Set One, Resp. No. 5, at 6–7.)

Plaintiff cannot establish causation merely because Dr. Cruz previously treated Mr. Rupard or because additional psychiatric intervention might, in hindsight, have been preferable. Rather, they must establish that actionable conduct by Dr. Cruz interfered with a protected right and substantially contributed to the claimed injury. Because Plaintiff cannot establish the requisite specific intent or reckless disregard, or causation attributable to actionable conduct by Dr. Cruz, summary judgment should be granted in his favor on Plaintiff's Fifth Cause of Action.

***E. Plaintiff's Sixth Cause of Action for Negligence Fails Against Dr. Cruz and Liberty.***

**1. Governing Legal Standard**

Under California law, negligence requires a legal duty of care, breach of that duty, causation, and resulting injury. *Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996). Where the challenged conduct involves professional medical judgment, the applicable standard is the level of skill, knowledge, and care ordinarily exercised by reasonably careful practitioners under similar circumstances. *Landeros v. Flood*, 17 Cal. 3d 399, 410 (1976). The distinction between ordinary and professional

negligence does not create separate causes of action arising from the same alleged breach; rather, professional training and experience inform the care reasonably required under the circumstances. *Flowers v. Torrance Memorial Hospital Medical Center*, 8 Cal. 4th 992, 997–1002 (1994). Whether a medical professional breached that standard ordinarily requires competent expert testimony. *Landeros*, 17 Cal. 3d at 410.

Plaintiff must also establish that an actionable breach was a substantial factor in causing the claimed injury. CACI Nos. 430, 501. Where causation involves complex medical questions, a possible connection between the alleged negligence and resulting injury is insufficient; causation must be established to a reasonable medical probability. *Bromme v. Pavitt*, 5 Cal. App. 4th 1487, 1498–1505 (1992).

**2. Dr. Cruz's Psychiatric Treatment and the Contemporaneous Record Do Not Establish a Breach of His Professional Duty.**

Plaintiff alleges that the Medical Defendants failed to communicate Mr. Rupard's serious medical needs and provide appropriate intervention despite his deteriorating condition. (TAC ¶¶ 457–458, 463–464.) Dr. Cruz owed Mr. Rupard a duty to exercise reasonable care in providing psychiatric treatment. That duty, however, must be evaluated in light of the services he undertook, the information available to him, and the conditions reasonably apparent during his encounters. It did not make him responsible for every aspect of Mr. Rupard's incarceration or subsequent custodial and nursing monitoring.

The evidence establishes that Dr. Cruz evaluated Mr. Rupard on December 29, 2021, assessed his psychiatric presentation, prescribed medication, and developed a treatment plan. (Krueger Decl. Ex. A, Cruz Dep. 232:6–233:16.) Dr. Cruz testified that he observed no indication of grave disability, danger to self, or danger to others requiring immediate psychiatric intervention and scheduled follow-up in four to five weeks, or sooner if necessary. (*Id.* at 239:19–241:19, 247:9–25.) On January 20, 2022, Dr. Cruz reviewed Mr. Rupard's chart after receiving information concerning repeated

medication refusals, examined the medication-administration record, discontinued prescriptions Mr. Rupard was refusing, and noted that psychiatric follow-up was already scheduled. (*Id.* at 251:8–254:18.) The County's sick call summary separately documents a February 2 psychiatric appointment that Mr. Rupard refused and subsequent rescheduling. (Krueger Decl. Ex. L, COSD000152.)

Dr. Cruz re-evaluated Mr. Rupard on February 22, 2022. He made multiple attempts to engage him and documented that Mr. Rupard was awake, alert, and in no acute distress. (Krueger Decl. Ex. N, COSD000477; Krueger Decl. Ex. A, Cruz Dep. 179:18–180:8.) Dr. Cruz testified that he observed no protruding ribs, emaciation, or apparent weight loss since December, and that Mr. Rupard's physical appearance seemed unchanged from his earlier encounter. (Krueger Decl. Ex. A, Cruz Dep. 178:5–179:6, 318:1–18.) Based on that presentation, Dr. Cruz found no indication requiring immediate involuntary psychiatric intervention and scheduled further psychiatric follow-up in six to seven weeks, or sooner if indicated. (*Id.* at 304:20–306:25, 309:12–310:21, 315:15–317:6.)

The evidence also establishes that County personnel performed functions distinct from Dr. Cruz's psychiatric treatment. The County's mental health clinicians conducted follow-up sick calls, while custody personnel performed safety checks and nursing personnel maintained separate assessment and referral procedures. (Krueger Decl. Exs. C–E, I–J.) County personnel could communicate concerns directly to psychiatric providers, request urgent mental-health evaluations, and arrange further treatment. (Krueger Decl. Ex. C, Quiroz Dep. 163:3–25, 168:1–9, 169:14–171:7.) Dr. Cruz was therefore not the person conducting daily custodial observations, administering meals, inspecting sanitation, or performing routine nursing assessments. Although those distinctions do not eliminate his own professional duty to respond reasonably to information available to him, they are material to whether Plaintiff can attribute later failures in monitoring or communicating Mr. Rupard's condition to Dr. Cruz.

Finally, the County admitted that no County employee discussed Mr. Rupard with Dr. Cruz after his February 22 examination. (Krueger Decl. Ex. K, County's Resps. to Cruz's Reqs. for Admis., Set One, Resp. No. 5, at 6–7.) Dr. Cruz likewise testified that he received no subsequent request for an earlier psychiatric evaluation and would have acted had the reported deterioration been brought to his attention. (Krueger Decl. Ex. A, Cruz Dep. 164:1–165:23, 306:24–307:10.) The subsequent observations of other personnel, including those made in March, cannot establish what Dr. Cruz personally observed on February 22 or whether a need for additional intervention was reasonably apparent during his own encounters.

Accordingly, the contemporaneous record establishes affirmative psychiatric assessment, medication review, follow-up planning, and a division of responsibilities under which County personnel performed continuing custodial and nursing monitoring. Plaintiff must establish an actual departure from the applicable psychiatric standard of care based on the circumstances reasonably presented to Dr. Cruz, rather than attributing every subsequent custodial or medical deficiency to his earlier treatment decisions.

**3. Liberty Did Not Breach a Duty Owed to Mr. Rupard Because the Challenged Daily Custodial and Nursing Functions Were the County's Responsibilities, Not Liberty's.**

Plaintiff allege that Liberty negligently failed to establish policies concerning the treatment of inmates with serious mental illness, including procedures for psychiatric screening, evaluation, treatment, and transfer into the Psychiatric Stabilization Unit ("PSU"). (TAC ¶¶ 470–471.) Plaintiff further allege that Liberty is vicariously liable for the negligence of its employees and agents, principally Dr. Cruz. (TAC ¶ 472.) These allegations must be considered in light of Liberty's actual contractual undertaking and the distinct responsibilities of County personnel. Liberty was a private contractor retained to provide psychiatric services at the San Diego Central Jail ("SDCJ"); it did not thereby assume responsibility for the County's daily

custodial operations or the continuing nursing and monitoring functions upon which much of Plaintiff's negligence theory rests.

Liberty's contractual relationship with the County concerned the provision of psychiatric services. (Krueger Decl. Ex. O, County Contract No. 555357, LIBERTY000001–29.) Dr. Cruz's clinical responsibilities included psychiatric evaluation, chart review, medication management, treatment decisions, and psychiatric follow-up. (Krueger Decl. Ex. A, Cruz Dep. 68:11–69:1, 78:9–21.) In contrast, County personnel performed the daily custodial observation, safety checks, nursing assessments, and monitoring through which changes in Mr. Rupard's physical condition could be identified and referred for additional medical or psychiatric evaluation.

The County's own discovery responses confirm this division of responsibilities. The County acknowledged that its mental health clinicians performed scheduled qualified mental-health provider follow-up sick calls and did not attribute the wellness checks contemplated by Medical Services Division Operations Manual Policy G.2.1 to Liberty-employed providers. (Krueger Decl. Ex. I, County's Resps. to Liberty's Reqs. for Admis., Set One, Resps. Nos. 2–3, at 4–5; Krueger Decl. Ex. J, County's Resps. to Liberty's Interrogs., Set One, Resps. Nos. 1–2, at 3–5.) Lieutenant Aaron Boorman, the County's Rule 30(b)(6) designee concerning custodial counts and safety checks, testified that he was unaware of contractors performing those functions during the relevant period. (Krueger Decl. Ex. E, Boorman Dep. 10:22–11:2.) County nursing personnel likewise maintained separate procedures for assessing detainees who were refusing food, obtaining weight and vital-sign measurements when possible, and arranging medical or psychiatric referrals. (Krueger Decl. Ex. D, Rognlien-Hood Dep. 176:14–177:11.)

This allocation of responsibility is particularly significant because Plaintiff's allegations concerning Mr. Rupard's weight loss, inadequate food intake, unsanitary cell conditions, and progressive physical deterioration implicate the very daily

observation and monitoring functions performed by County personnel. Liberty did not conduct hourly custodial checks, deliver meals, inspect housing conditions, or perform the County's routine nursing assessments. The mere fact that Liberty provided psychiatric services within the jail did not make it responsible for ensuring that County employees performed those separate functions. Plaintiff therefore cannot establish Liberty's negligence by attributing every alleged failure in Mr. Rupard's daily custodial or nursing care to Liberty simply because it was a psychiatric contractor at the facility.

Moreover, the County maintained procedures for communicating clinical concerns to psychiatric providers when additional intervention was required. The County's mental health designee testified that personnel could communicate directly with providers, contact nursing staff, request an immediate mental health response, or arrange an additional psychiatric appointment. (Krueger Decl. Ex. C, Quiroz Dep. 163:3–25, 168:1–9, 169:14–171:7.) Thus, the County's continuing custodial and nursing responsibilities were accompanied by established means of obtaining additional psychiatric assistance. Yet the County expressly admitted that no County employee discussed Mr. Rupard with Dr. Cruz after his February 22, 2022 psychiatric examination. (Krueger Decl. Ex. K, County's Resps. to Cruz's Reqs. for Admis., Set One, Resp. No. 5, at 6–7.) Nothing in that admission establishes that Liberty was responsible for independently performing the County's daily observations or that Dr. Cruz received subsequent notice from County personnel requiring additional intervention.

The contemporaneous record also demonstrates that psychiatric services were provided to Mr. Rupard. Dr. Cruz evaluated him on December 29, 2021, prescribed psychiatric medication, reviewed repeated medication refusals on January 20, 2022, and conducted a subsequent psychiatric evaluation on February 22, 2022. (Krueger Decl. Ex. A, Cruz Dep. 232:6–233:16, 251:8–254:18, 304:20–306:25.) These records establish that psychiatric evaluation, medication review, and follow-up procedures

were utilized in Mr. Rupard's care. Although the existence of those services does not independently resolve the adequacy of every Liberty policy, Plaintiff must identify a particular deficiency in Liberty's own psychiatric procedures and establish that it caused a compensable injury. Alleged failures by County personnel to monitor Mr. Rupard's physical condition or communicate subsequent concerns do not, standing alone, establish that Liberty negligently developed or implemented its psychiatric policies.

Plaintiff's vicarious liability theory likewise rests principally on the alleged negligence of Dr. Cruz, whom Liberty employed to provide psychiatric services at SDCJ. (TAC ¶ 472.) As discussed above, Dr. Cruz's involvement consisted of psychiatric evaluations, medication management, and follow-up planning, while separate County personnel performed the continuing custodial observation, nursing assessments, and referral functions. Plaintiff cannot establish Liberty's vicarious liability merely by attributing alleged failures in those County functions to Dr. Cruz. Nor have Plaintiff identified a specific negligent act by another Liberty employee that was a substantial factor in causing Mr. Rupard's claimed injuries. Liability based on Liberty's employment of Dr. Cruz requires proof that he committed actionable negligence within the scope of his employment; his employment alone does not establish a breach of duty.

Ultimately, Liberty's contractual undertaking did not make it the guarantor of every aspect of Mr. Rupard's custodial and medical care. Plaintiff must establish either that Liberty negligently performed responsibilities it actually undertook or that Dr. Cruz or another Liberty employee committed actionable negligence, and must further establish that the identified breach was a substantial factor in causing Mr. Rupard's injuries. The record distinguishes Liberty's psychiatric services from the County's separate daily custodial and nursing responsibilities and does not permit those responsibilities to be imposed upon Liberty solely because it furnished psychiatric treatment at SDCJ. Accordingly, summary judgment should be granted in Liberty's

favor on Plaintiff's Sixth Cause of Action.

**4. Plaintiff Cannot Establish That Any Alleged Negligence by Dr. Cruz or Liberty Was a Substantial Factor in Causing Mr. Rupard's Injuries or Death.**

Independently of breach, Plaintiff must establish that an act or omission attributable to Dr. Cruz or Liberty was a substantial factor in causing Mr. Rupard's injuries. *Ladd*, 12 Cal. 4th at 917; CACI No. 430. Where causation involves complex medical questions, a theoretical possibility that different treatment might have prevented injury is insufficient; causation must be established to a reasonable medical probability. *Bromme*, 5 Cal. App. 4th at 1498–1505. Nor may causation rest on speculative inferences unsupported by a reasoned connection between the alleged negligence and the particular injury. *Jennings v. Palomar Pomerado Health Systems, Inc.*, 114 Cal. App. 4th 1108, 1117–19 (2003).

Here, Plaintiff's theory requires connecting Dr. Cruz's psychiatric treatment decisions to Mr. Rupard's subsequent physical deterioration and death. Dr. Cruz last evaluated Mr. Rupard on February 22, 2022, documented that he was awake, alert, and in no acute distress, and scheduled further psychiatric follow-up, or earlier reassessment if indicated. (Krueger Decl. Ex. N, COSD000477; Ex. A, Cruz Dep. 304:20–306:25.) Thereafter, County personnel retained separate responsibilities for continuing custodial observation, nursing assessments, and communicating concerns requiring additional psychiatric intervention. (Krueger Decl. Exs. C–E, I–J.) Yet the County expressly admitted that no County employee discussed Mr. Rupard with Dr. Cruz after February 22. (Krueger Decl. Ex. K, County's Resps. to Cruz's Reqs. for Admis., Set One, Resp. No. 5, at 6–7.)

Moreover, when Dr. Badre observed unsanitary cell conditions during his March 14 competency evaluation, he did not recall communicating those observations to Dr. Cruz, and his written report was not completed until after Mr. Rupard's death. (Krueger Decl. Ex. F, Badre Dep. 91:10–25, 99:24–101:16, 107:6–108:3.) Those

subsequent observations do not establish that Dr. Cruz encountered the same conditions during his February 22 examination or received subsequent notice requiring additional intervention.

Although subsequent conduct by other personnel does not automatically sever causation, Plaintiff must still establish that an earlier act or omission by Dr. Cruz or Liberty was itself a substantial factor in producing the claimed injury. Plaintiff cannot presume that different psychiatric medication, a shorter follow-up interval, or PSU admission would have prevented Mr. Rupard's physical deterioration. Nor can Liberty's contractual provision of psychiatric services supply the missing causal connection between an identified corporate policy and the claimed harm. Without evidence establishing how a particular breach by either Defendant probably caused Mr. Rupard's physical deterioration, compensable predeath injuries, or death, Plaintiff's proposed causal chain remains too attenuated and speculative to support negligence liability. *Jennings*, 114 Cal. App. 4th at 1118–19.

**5. Government Code Section 845.6 and Negligence Per Se Do Not Establish Liability Against Dr. Cruz or Liberty.**

Plaintiff also invoke Government Code section 845.6, which provides a limited exception to governmental immunity where a public employee knows or has reason to know that a prisoner requires immediate medical care and fails to take reasonable action to summon it. (TAC ¶¶ 455–458.) However, the statute concerns public entities and public employees, and Government Code section 810.2 expressly excludes independent contractors from the definition of public employees. Liberty was a private psychiatric contractor, and Dr. Cruz provided psychiatric services through Liberty rather than as a County employee. (Krueger Decl. Ex. O.) Plaintiff's reliance on *Bousman*, 2024 WL 1496220, at *10, therefore does not establish statutory liability against these Defendants. Indeed, TAC ¶ 465 specifically directs its section 845.6 negligent training allegation against the County, Gore, Martinez, and Doe Deputy Supervisors.

Even assuming section 845.6 applied, it imposes a limited duty to summon immediate medical care, not liability for allegedly inadequate medical treatment already provided. *Castaneda v. Department of Corrections & Rehabilitation*, 212 Cal. App. 4th 1051, 1070–72 (2013). Dr. Cruz provided psychiatric evaluations and treatment, and the County admitted that no County employee discussed Mr. Rupard with him after February 22. (Krueger Decl. Exs. A, K, N.) Plaintiff have not established that Dr. Cruz failed to summon care for an immediate medical need known or reasonably apparent to him during his psychiatric encounters.

Finally, Plaintiff's negligence-per-se allegations expressly concern Title 15 custodial safety checks assigned to the Deputy Defendants. (TAC ¶¶ 459–460.) Evidence Code section 669 creates an evidentiary presumption under specified circumstances, not an independent cause of action. *Quiroz v. Seventh Ave. Center*, 140 Cal. App. 4th 1256, 1285–86 (2006). Plaintiff identifies no corresponding custodial safety check requirement imposed upon Dr. Cruz or Liberty, or any violation by either Defendant that caused Mr. Rupard's injuries. Neither statutory theory therefore establishes liability against these Defendants.

### *F. Plaintiff's Seventh Cause of Action for Dependent-Adult Neglect Fails.*

#### 1. Governing Standard

The Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code § 15600 et seq.) does not reach every provider who renders care. As the California Supreme Court held in *Winn v. Pioneer Medical Group, Inc.*, "the Act does not apply unless the defendant … had a substantial caretaking or custodial relationship, involving ongoing responsibility for one or more basic needs, with the elder patient." 63 Cal. 4th 148, 150 (2016). "It is the nature of the elder or dependent adult's relationship with the defendant — not the defendant's professional standing — that makes the defendant potentially liable for neglect." *Id.* The Act contemplates "more than casual or limited interactions" and does not extend to a party with "only circumscribed, intermittent, or episodic engagement" with the dependent adult. *Id.* at

158.

"Neglect" under the Act "speaks not of the *undertaking* of medical services, but of the failure to *provide* medical care." *Carter v. Prime Healthcare Paradise Valley LLC*, 198 Cal. App. 4th 396, 404 (2011) (emphasis in original). The Act therefore distinguishes neglect from professional negligence, and a provider's allegedly negligent rendition of medical services is not "neglect." *Winn*, 63 Cal. 4th at 165; *Worsham v. O'Connor Hosp.*, 226 Cal. App. 4th 331, 337–39 (2014). Enhanced remedies under section 15657 are available only on clear and convincing evidence of recklessness, oppression, fraud, or malice. Welf. & Inst. Code § 15657; *Covenant Care, Inc. v. Superior Court*, 32 Cal. 4th 771, 785 (2004); *Delaney v. Baker*, 20 Cal. 4th 23, 31–32 (1999).

**2. Neither Dr. Cruz Nor Liberty Had the Required Caretaking or Custodial Relationship.**

Dr. Cruz's involvement was two cell-side psychiatric encounters and an interim chart review (§ II.B, supra; Krueger Decl. Ex. A, Cruz Dep. 232:6–233:16, 251:8–254:18, 304:20–306:25) — precisely the "circumscribed, intermittent, or episodic engagement" that *Winn* holds is insufficient. 63 Cal. 4th at 158. He bore no ongoing responsibility for Mr. Rupard's food, hydration, hygiene, shelter, cell sanitation, custodial observation, or physical monitoring; those were County custody and nursing functions. (§ II.C, supra; Krueger Decl. Ex. E, Boorman Dep. 10:22–11:2, 34:23–35:4; Ex. D, Rognlien-Hood Dep. 176:14–177:11; Ex. O.) Liberty likewise contracted to furnish psychiatric services and did not assume custodial responsibility for Mr. Rupard's daily basic needs. (§ II.C & § IV.E.3, supra.) Allegations about Liberty's staffing, scheduling, or corporate practices do not create the custodial relationship the Act requires. *Worsham*, 226 Cal. App. 4th at 337–39.

**3. At Most, Plaintiff Alleges Only Professional Negligence.**

Plaintiff's theory — that Defendants should have evaluated, medicated, monitored, or hospitalized Mr. Rupard differently — challenges the manner in which

professional psychiatric services were rendered, which *Winn* holds is governed by professional-negligence law, not the Act. 63 Cal. 4th at 165. Because Defendants provided rather than withheld psychiatric care and had no custodial relationship for Mr. Rupard's basic needs, the Seventh Cause of Action fails as a matter of law.

**4. No Enhanced Remedies or Employer Liability.**

Independently, Plaintiff cannot meet the clear-and-convincing recklessness standard for section 15657 remedies (§ IV.A.2 & § IV.E.2, supra), and the employer-liability predicate for Liberty under Welfare and Institutions Code section 15657(c) and Civil Code section 3294(b) — advance knowledge, ratification, or authorization by an officer, director, or managing agent — is unsupported. Partial summary judgment on enhanced remedies is warranted even if any portion of the claim survives.

## V. CONCLUSION

For the foregoing reasons, Defendants Anthony Cruz, D.O. and Liberty Healthcare of California, Inc. respectfully request that the Court grant summary judgment on all claims asserted against them or, in the alternative, partial summary judgment on each cause of action and issue addressed above.

DATED: November 13, 2026 **BURGER, MEYER & D'ANGELO, LLP**

Corey E. Krueger
Attorneys for Defendant,
Anthony Cruz, D.O. and Liberty Healthcare of California, Inc.