# EXHIBIT A

# Deposition Transcript

Case Number: 23CV1357 CAB BLM
Date: March 3, 2026

In the matter of:

# ESTATE OF LONNIE RUPARD v COUNTY OF SAN DIEGO, et al.

# ANTHONY CRUZ, M.D.

CERTIFIED COPY

Reported by:
DEBRA D. SMALLEY

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

Q Let me ask you when you recall that happening?
A Can you repeat that.
Q Yes.
When did NavCare take over the work with the County?
A You mean NavCare taking over Liberty or --
MR. KRUEGER: He's asking --
BY MR. IREDALE:
Q Let me reframe the question. Let me make it clearer.
You got a paycheck from Liberty, I take it?
A Yes.
Q And at some point, NavCare started issuing your paychecks?
A Yes.
Q And was that point at some point in the year 2022?
A Yes.
Q And was it approximately June of 2022 that NavCare then started issuing your paychecks?
A Yes.
Q And I don't think it's of moment whether -- your precise legal status, but as you understood it, were you an employee of Liberty during the time you worked for Liberty?

A Yes.

Q Now, you have described for me that one-day crash course orientation with Nurse Noelle that took place shortly after you were hired; do you recall that?

Did you, after that, receive any additional training or orientation by County officials?

MR. KRUEGER: May call for speculation as to the employment of those who gave training, but to the extent you know, answer.

THE WITNESS: Yeah, that I can't -- I just remember that day-long mandatory training with Noelle, and then also meeting, on the same day, with the Liberty administrative assistant on pay -- you know, how to obtain your pay, how to call out sick. Just basically the logistics. And after that, I was just -- I just started. And then I remember -- I'm trying to -- yeah. Again, it was so -- this is back in 2020, so I'm trying to remember any other additional training that I had to do. But that was mostly it.

BY MR. IREDALE:

Q Okay. I need to then ask you, in addition to the training that you've described to me thus far with Nurse Noelle and then the later 5150 orientation and testing that date --

A Yeah.

A Yes. Yes.
Q Have you seen those ever?
A I've seen -- you know, in emails, I've seen those type of forms.
Q Did anybody from the sheriff's office ever give you training in the policies and procedures regarding mental health care?
A That I -- I cannot recall.
Q Now, I need to ask, what was your title while you worked for Liberty in the Central Jail?
A My main role was outpatient psychiatrist.
Q And was there a chief psychiatrist? Was that Dr. Ysla?
MR. KRUEGER: Calls for speculation.
THE WITNESS: Yeah. I knew him as the medical mental health director for Liberty at that time.
BY MR. IREDALE:
Q So that was his title as far as you knew?
A Yes.
Q And your title was psychiatrist?
A Psychiatrist.
Q While you were working there, was there also a clinic director who was a Liberty employee?
MR. KRUEGER: Calls for speculation.
THE WITNESS: Yeah. I don't -- I don't recall.

BY MR. IREDALE:

Q In other words, you say we're going to discontinue the prescription because he's refusing the meds.

Do you see that?

A Yes.

Q And my question is, did you do anything to inquire about the welfare of this patient between the date of that entry, 1/20/22, and the date of the next one, which was a month and two days later?

A Can you repeat the question.

Q Sure.

Did you do anything to check on this patient between 1/20/2022 and 2/22/2022?

A 1/20 to 2022 to 2/20 to 2022.

Again, I'm only going by this because, again, I can't recall the details, but he had psych sick call follow-up already scheduled so I knew I was going to see him after continuous weeks of refusal of his medication.

Q Let me put the question again.

Between the dates when you --

A Yeah.

Q -- made that entry on January 20th and the time you went to see him again the 22nd of February, did you do anything in check on the welfare of this patient?

A I made sure as far as to, you know -- again, I relied on my clinicians, my deputies, to tell me if there -- if he had been decompensating or knowing that he already had a follow-up appointment, so I did not feel that I needed to see him sooner because I had not heard any type of report from my clinicians, my deputies, saying that this person needs to be seen sooner.
Q You never received a report from any deputy at any time that he appeared --
A No.
Q -- to be decompensating?
A No. That I don't -- I do not recall.
Q You never --
A Yeah.
Q You never received a report from --
A No.
Q -- any deputy at any time --
A No.
Q -- that he appeared to be emaciated?
A No.
Q Never received a report --
A No.
Q -- from any deputy at any time that his cell was filled with excrement and trash?
A No. No. If I had heard that, immediately I

would have acted on it immediately.

Q And you would have expected, I take it, one of your deputies to have informed you if such were the case?

A Any deputy. It didn't have to be my specific deputy that was helping me out. It could have been any deputy on the floor. I would get calls from deputies on the floor.

Q I take it that you also would have expected that, pursuant to the policy, three times a week a nurse would be going by to check on the welfare of this patient?

A According to -- you know, I don't know if that was happening or not, but according to the policy, yes, a nurse would have been --

Q And once a week, according to the policy, a clinician would be going to see?

A Yes.

Q And so you assumed all of those things were happening?

A Yes.

Q And you were not informed that the patient, in fact, was grossly psychotic?

A No.

Q All right. Now let's go, if we could, to the next entry. This says "Progress Note." And then you

A Yeah.
Q -- wearing a shirt; right?
A Yes.
Q Did you see that he had lost considerable weight in the time since you last saw him?
A He looked quite similar to the first time I saw him in December.
Q No question in --
A Yeah.
Q -- your mind he had --
A I remember --
Q -- lost weight?
(Cross-talk)
A I even remember -- if I can explain more of what I saw that --
Q Well, let me just --
A Okay. Go ahead. Sorry.
Q -- inquire if I could.
A Yeah.
Q I'm focused now on his ribs.
You didn't see his ribs sticking out?
A No. No.
Q You didn't see him --
A No, no.
Q -- looking emaciated?

A No. No.

Q You didn't see that he looked unhealthy?

A No. No.

Q He hadn't lost any weight as far as you could tell?

A He looked similar to the first time I saw him.

Q Did you order to have his weight taken at any time?

A No. No.

Q Do you know how many times his weight was taken in the time he was there in jail?

MR. KRUEGER: Calls for speculation.

THE WITNESS: Yeah.

BY MR. IREDALE:

Q According to the medical records?

A I can't recall. I can't recall that.

Q Well, let's go to see what you said.

You said "Today, multiple attempts were made to engage the patient in conversation, however he refused to answer questions and rambled incoherently, became verbally aggressive. Patient was observed through his cell door window. Patient was awake, alert, shirtless (wearing pants), initially sitting on the bed and then kneeled on his cell floor and appeared to be in no acute distress. Cell room was relatively clean, no

flooding/gassing or smearing of feces. However, toilet seat was covered with cloth. No signs or symptoms of patient being a danger to self or others. Regarding psychotropic medication, patient continued to yell when offered psych meds. No signs or symptoms of patient being a danger to self or others at this time."

Is that what you wrote?

A That is what I wrote.

Q And this encounter took another three, four minutes?

A Again, longer than three to four minutes.

Q Five, six minutes?

A Possibly. I can't -- I can't speculate, but I remember again looking at -- checking around their -- their environment. That's why I like to go in cell side to check their environment.

Q So the actual verbal interaction took a couple of minutes. Looking around the environment took --

A Yeah.

Q -- two, three, four minutes?

A Yeah.

Q And then that was it?

A Yeah.

I remember him like -- it was a little briefer. He yelled at me. "I do not want medication. F you."

reason as the prior sick call note that Lonnie Rupard was scheduled for initial evaluation with you, but due to time constraints he was unable to be seen, and he was rescheduled for his psych sick call intake; correct?

A Correct.

Q Okay. And then ultimately, on December 29th, 2021, you do an initial psychiatric sick call evaluation of Lonnie Rupard; correct?

A Correct.

Q And your initial psych sick call evaluation of Lonnie Rupard, that was face to face?

MR. KRUEGER: Asked and answered.

BY MS. FELDMAN:

Q You were cell side?

A Cell side.

Q Okay. And you assessed Lonnie Rupard for psychiatric medication and psychiatric treatment plan?

MR. KRUEGER: Asked and answered.

THE WITNESS: Yes.

BY MS. FELDMAN:

Q And you had prescribed psychiatric medication for Lonnie Rupard during this initial assessment; correct?

MR. KRUEGER: Asked and answered.

THE WITNESS: Correct.

BY MS. FELDMAN:
Q In fact, you had prescribed, I believe, three different types of medication -- psychiatric types of medication -- for Lonnie Rupard during this initial assessment of Lonnie Rupard that you performed?
MR. KRUEGER: Asked and answered.
THE WITNESS: Yes. Correct.
BY MS. FELDMAN:
Q Okay. And you also developed a psychiatric medication or a psychiatric treatment plan for Lonnie Rupard at the time of this 12/29/2021 initial psychiatric assessment that you had performed for Lonnie Rupard; correct?
MR. KRUEGER: Asked and answered.
THE WITNESS: Yes. There is a plan that's listed there, yes.
BY MS. FELDMAN:
Q And that plan was created by you as the psychiatric provider responsible for Lonnie Rupard's psychiatric care and treatment during the time that he's in jail during this period that we're talking about; right?
MR. KRUEGER: Misstates testimony. Lacks foundation. Vague as to time.
Go ahead.

A Could you repeat that again as far as --
Q You were --
A Yeah.
Q You were the psychiatrist responsible for creating a psychiatric treatment and care plan for Rupard?
MR. KRUEGER: On that date?
Vague as to time.
MS. FELDMAN: Yes.
THE WITNESS: Yes.
BY MS. FELDMAN:
Q Okay. And you did?
A Yes.
Q You had prescribed medication for Rupard; correct?
A Correct.
Q Psychiatric medication for Rupard; correct?
A Correct.
Q And you also indicated return to clinic four to five weeks or sooner, if needed?
A Yes.
Q And is that in reference to a follow-up psychiatric sick call evaluation that you had set between you and Lonnie Rupard?
MR. KRUEGER: I'm sorry, could I have that one

more time, please.

THE WITNESS: Yeah.

BY MS. FELDMAN:

Q So in your progress note for --

A Yeah.

Q -- the 29th, return to clinic four to five weeks or sooner as needed --

A Yes.

Q -- is that in reference to a psychiatric follow-up assessment appointment?

A Yes. That was my plan, to see him four to five weeks or sooner, if -- if needed. I always included "or sooner," so if he needed to be seen the next day, I would have seen him the next day.

Q And you would have been the psychiatric who would have seen Lonnie Rupard?

MR. KRUEGER: Calls for speculation. Assumes a particular date.

BY MS. FELDMAN:

Q Is that right?

A Yes. If I was there. If I -- yeah. If I was present, if I was working. Again, I was only worked four days a week, and if something came up, I'm -- you know, some emergency or emergent situation came up, I'm sure someone would have, I don't know, you know, seen him

sooner.

So as far as with my schedule, that's what I scheduled.

Q You scheduled a psychiatric provider follow-up appointment to happen within four to five weeks --

A Or sooner.

Q -- of Lonnie Rupard by you; correct?

MR. KRUEGER: It's incomplete. An incomplete representation of what the document says. It misstates the document based on his testimony about his schedule, but go ahead.

THE WITNESS: Yeah. Four to five weeks or sooner, yes.

BY MS. FELDMAN:

Q For an assessment by you of Lonnie Rupard; correct?

MR. KRUEGER: Again, misstates testimony. Vague as to time.

THE WITNESS: Yes.

BY MS. FELDMAN:

Q Okay. And during this initial assessment of Lonnie Rupard, you had also made a determination as to whether or not Lonnie Rupard meant the criteria for admission into the psychiatric stabilization unit; correct?

"by history." Not that I'm diagnosing with these -- him with these diagnoses at that time, because I have no information that he's giving me, so I would just document that he has these diagnoses by history.

BY MS. FELDMAN:

Q And he had a mental health disorder diagnoses by history as documented by you in your note; correct?

A Correct.

Q Okay. And then at this initial assessment of Lonnie Rupard, you had determined that although Lonnie Rupard had a potential for decompensation, that there were no signs of Lonnie Rupard being gravely ill or disabled; correct?

A Correct.

Q You had also made a determination that although there was a potential for decompensation, that Lonnie Rupard showed no signs of being a danger to himself or others; is that correct?

A That's correct.

Q And you also had made a determination at this time that although there was a potential for decompensation, there was no immediate psychiatric intervention required for Lonnie Rupard at the time of your initial visit; is that right?

A That is right.

Q -- 15th, 2022, you had become aware that there was a psych chart review request?

MR. KRUEGER: Calls for speculation as to when he became aware.

THE WITNESS: Yes.

BY MS. FELDMAN:

Q And then the row below that, the fourth row, has another psych chart review request also scheduled for January 15th, 2022?

A Yes.

Q And it says "Inmate has been refusing medication. Please evaluate"?

A Yes.

Q And it has a completed date of January 20, 2022?

A Yes.

Q And were you the one who had completed that psych chart review request in response to being notified that Lonnie Rupard had been refusing the psychiatric medication that you had prescribed at your initial assessment?

A I didn't see --

MR. KRUEGER: Do you need to look at a particular document to --

THE WITNESS: Yeah.

(Cross-talk)

THE WITNESS: Yes. I need to see when the -- because I would have put a note saying that medications were discontinued to complete that psych chart review.

MR. KRUEGER: So just tell us what you're looking at.

BY MS. FELDMAN:

Q So if we go back to Exhibit 1 --

A Oh, okay.

Q -- there's an entry from you on January 20, 2022.

A Oh, okay.

Q Would you agree that that's the same date as the date indicated as completed for the chart check request for the medication refusal?

A Yes.

Q Okay.

A Yes.

Q And so you would agree that at least as of January 20th, 2022, you had become aware that Lonnie Rupard was not taking his psychiatric medications that you had prescribed him?

A Yes.

Q And you performed a psych chart review in response to the requests for there to be an evaluation by you of Lonnie Rupard's refusals to take his psychiatric

medications that you had prescribed him?
A Yes. And I even double-checked the eMAR. eMAR is where it lists all the medications, and I saw consistent medication refusals for over two weeks, and so I decided to discontinue the medications as per request from the psych chart review on January 20th, 2022.
Q Okay. And so you had actually looked at the eMAR and reviewed each of the --
A Each of the --
Q -- medication.
A Yes.
Q -- refusal requests?
A Always. I always check. Yes.
Q And do you recall the number?
MR. KRUEGER: Vague and ambiguous. The number of what?
MS. FELDMAN: Of documented medication refusals of the psychiatric medications that you had prescribed Lonnie Rupard.
MR. KRUEGER: It's still vague, but if you know.
MS. FELDMAN: In the eMAR.
THE WITNESS: In the eMAR, I don't know how many, you know, times he re -- I mean, it was consistent. All medications. That's why I discontinued all

medications, because he was refusing all medications, but I can't say exactly how many times he was refusing each medication.

BY MS. FELDMAN:

Q And so in response to you being notified that, per your notes, that Lonnie Rupard had -- was consistently refusing the psych meds that you had prescribed, you made the decision to discontinue --

A Yes.

Q -- the prescription and providing of those psychiatric medications to Lonnie Rupard on January 20, 2022; correct?

A Correct.

Q And then you indicated a psych sick call follow-up is already scheduled; correct?

A Correct.

Q And that follow-up was with you; correct?

A Correct.

Q And why did you decide to discontinue the psychiatric medications that you had prescribed Lonnie Rupard in response to being notified that he had been consistently refusing those psychiatric medications?

MR. KRUEGER: It's asked and answered. Vague as phrased.

THE WITNESS: Yeah. As far as I -- how I was

instructed, if a patient is refusing medications consistently, I forget the time frame, but definitely at least two weeks or more -- you know, patients have the right to refuse medication, so I am not going to for -- continuously force, you know, prescriptions to medication for a person who is refusing, so -- and knowing I was going to follow up with him where I could discuss -- try to discuss why he was refusing meds, I felt it was appropriate to discontinue the medication, knowing I would be seeing him relatively soon.

BY MS. FELDMAN:

Q And when was that, your follow-up with him to discuss why he was refusing his psychiatric medications that you had prescribed him?

A When I last -- when I next saw him on February 22nd, 2022.

Q So that would be a little bit over a month from --

A Yeah.

Q -- when you discontinued the psychiatric medications that you had prescribed Lonnie Rupard?

A That -- that's correct.

Q Is there a reason that you did not follow up with Lonnie Rupard earlier than February 22nd, 2022, to discuss his refusal of the psychiatric medications?

MR. KRUEGER: Lacks foundation. Misstates the evidence in the case.

Go ahead.

THE WITNESS: Yeah. I had no, you know -- again, I relied on my mental health clinicians, deputies, staff, to tell me "Hey, maybe you need to restart this medication. He's not looking well."

I didn't get any report of that, that he may need to retry medication again, but I said "Okay, if I haven't heard anything, then I'm going to see him in follow-up and I can discuss with him then."

BY MS. FELDMAN:

Q You said that you relied on the deputies and mental health --

A Yeah.

Q -- clinician staff --

A Yeah.

Q -- to tell you that Lonnie Rupard needed to be restarted on --

A Or --

Q -- psychiatric medications that you, as the psychiatrist, had prescribed him?

MR. KRUEGER: Misstates testimony.

THE WITNESS: Yeah.

Not -- not exactly. If he was looking worse.

Q And so you determined at this assessment of Lonnie Rupard on February 22nd, 2022, that due to his presentation, psych history, his legal status under Penal Code 1368, and potential for decompensation, that you would continue to monitor and offer him treatment? Psychiatric treatment; is that correct?

MR. KRUEGER: Asked and answered. The document speaks for itself.

THE WITNESS: Yeah. Again, I've answered this question before that I --

BY MS. FELDMAN:

Q Is the "continue to monitor and offer treatment" in reference to psychiatric services and treatment being offered by you as Lonnie Rupard's psychiatrist at this point in time?

A Could you repeat that and be a little more clear, please.

Q "Will continue to monitor and offer treatment," who is that in reference to?

A Oh, "will continue to monitor and offer treatment." I will continue to monitor him and offer treatment, and that's why I scheduled him for, again, less than two to three months. I wanted to again try to see him sooner than the standard two- to three-month follow-up.

Q Did you?
Didn't you schedule him for six to seven weeks out from February 22nd, 2022?
MR. KRUEGER: Vague and ambiguous as phrased. I don't -- I don't understand what's being asked.
THE WITNESS: Yeah.
BY MS. FELDMAN:
Q You scheduled Lonnie Rupard for a follow-up with you; correct? At this appointment -- or at this assessment?
A Yes.
Q And you set your next psychiatric provider follow-up assessment of Lonnie Rupard to be six to seven weeks from February 22nd, 2022; correct?
MR. KRUEGER: Incomplete representation of the document.
THE WITNESS: I mean, that's what it says here as far as "return to clinic." That's what the RTC stands for.
BY MS. FELDMAN:
Q And so you set your next assessment of Lonnie Rupard to mid April 2022; correct?
A Whatever that date fell on, the six to seven weeks.
Q And in between this assessment of Lonnie Rupard

on February 22nd, 2022, and six to seven weeks later, did you ever assess Lonnie Rupard again?
A I'm -- if there are no other notes, this is my last note that I had seen him, I believe, before he -- he passed. Is that --
MR. KRUEGER: She's just asking if you ever --
THE WITNESS: Yeah.
MR. KRUEGER: -- saw him again.
THE WITNESS: No. No.
MS. FELDMAN: Okay.
THE WITNESS: No. Sorry.
BY MS. FELDMAN:
Q And so February 22nd, 2022 was your last assessment of Lonnie Rupard; correct?
A Correct.
Q And your next scheduled assessment of Lonnie Rupard, based on your indication that you would continue to monitor and offer treatment to Lonnie Rupard --
A Yeah.
Q -- was not until another six to seven weeks; correct?
A I need to make a correction. Six to seven weeks or sooner. Yeah.
Q Did you see him sooner?
A No one had contacted me that he needed to be

seen sooner. So I did not.

Q Did you make any determination yourself, as the psychiatrist who is continuing to monitor and offer treatment to Lonnie Rupard, that he should be seen sooner by you?

A I've already answered that. I did not receive any collateral information from other staff saying that he needed to be --

Q That's not my question.

A -- seen sooner.

Q Did you make a determination yourself?

MR. KRUEGER: Asked and answered.

Have you answered the question?

THE WITNESS: I feel like I've answered it.

MR. KRUEGER: Yeah.

BY MS. FELDMAN:

Q Okay. So you made no determination yourself that you should see Lonnie Rupard sooner than six to seven weeks?

MR. KRUEGER: Was that your testimony?

THE WITNESS: Yes.

MS. FELDMAN: Okay.

MR. KRUEGER: Let's go.

BY MS. FELDMAN:

Q And then it says "Discussed current treatment

A Yeah.
Q -- did you develop that?
A Yes. Yes.
Q Okay. And that current treatment plan included no medication to be prescribed for Lonnie Rupard?
MR. KRUEGER: Misstates the document. Misstates testimony.
THE WITNESS: That's what I wrote.
MS. FELDMAN: Okay.
THE WITNESS: That's what's in the document.
BY MS. FELDMAN:
Q And then you also made a determination that Lonnie Rupard did not meet the criteria for PSU admission at this February 22nd, 2022 assessment; correct?
A At that visit.
Q There was no visit after this visit; correct?
A Oh, correct.
Q Okay. And you see that last line that says "No signs of danger to self, danger to others or gravely disabled requiring immediate psychiatric intervention at this visit"?
A That is correct.
Q And is that in reference to your determination that you assessed Lonnie Rupard for admission into the PSU and determined that he did not meet the criteria for

admission into the PSU?

MR. KRUEGER: Asked and answered.

BY MS. FELDMAN:

Q Is that right?

A Correct.

Q And even though at this assessment on February 22nd, 2022, you had indicated that you determined that there was a potential for decompensation, it was your finding that there were no signs that Lonnie Rupard was gravely ill or disabled; is that right?

MR. KRUEGER: Asked and answered.

THE WITNESS: Yes. I answered --

BY MS. FELDMAN:

Q And there were no signs of Lonnie Rupard being a danger to himself or others?

MR. KRUEGER: Asked and answered. We're coming up on like ten times.

THE WITNESS: Yes.

MR. KRUEGER: You can answer it again.

THE WITNESS: Yes, at that time, when I saw him on that date.

BY MS. FELDMAN:

Q Yes.

And at that time, when you saw him on that

A Yeah. I know one was Dr. Kloker. Rebecca Kloker. And the other one was Dr. Jouhal, but I believe Dr. Kloker was the more recent -- she's the one who took over for Dr. Jouhal.

MR. KRUEGER: Counsel, I'll represent you asked me to get in touch with --

MS. FELDMAN: I know --

MR. KRUEGER: -- the PSU doctor. She has been assigned counsel, and I'm waiting to hear from them.

MS. FELDMAN: Okay.

MR. KRUEGER: She's not a Liberty provider.

MS. FELDMAN: Understood.

BY MS. FELDMAN:

Q And at the time of your last assessment of Lonnie Rupard on February 22nd, 2022, or after it, did you discuss with the PSU psychiatrist or Dr. Ysla or any other psychiatrist regarding possible evaluation of Lonnie Rupard for admission into the PSU?

A At that time when I assessed him, there was no -- there was no reason to. Again, as you see in my note, there was no signs or symptoms for danger to self, danger to others or grave disability, so I did not consult.

There was other inmate -- incarcerated persons that met criteria that I was consulting, but Mr. Rupard,

in this case when I saw him on this date, no.
Q And if you did make a determination as of this date that Lonnie Rupard did meet the criteria to be admitted into PSU, could you have admitted Lonnie Rupard at that point in time into the PSU?
MR. KRUEGER: Calls for speculation. Misstates prior testimony.
But if you want to explain the process again, you can.
THE WITNESS: Yeah.
I mean, if you met criteria, absolutely, I would have consulted the PSU psychiatrist.
BY MS. FELDMAN:
Q Could you have admitted him without consultation with the PSU psychiatrist?
A I would always --
MR. KRUEGER: Same objections.
Go ahead.
THE WITNESS: I would always consult with the PSU. You know, that's the policy, protocol. You know, you want to do an easy handoff. You don't want to just dump someone on to their -- because they may not even have room in the PSU.
We have a limited amount of available observation beds in the PSU, so I would always have

to consult.
BY MS. FELDMAN:
Q And as you testified, you decided not to do that because you determined that there was no need for intervention or a higher level at that time?
A At that time. Correct.
Q And is it correct to say that after your assessment of Lonnie Rupard on February 22nd, 2022, no other psychiatric provider at San Diego Central Jail assessed Lonnie Rupard before his death on March 17th, 2022?
MR. KRUEGER: Calls for speculation.
If you know.
THE WITNESS: Yeah. I do not know. I do not know if any other provider --
BY MS. FELDMAN:
Q Did you assess Lonnie Rupard at any point in time after February 22nd, 2022?
MR. KRUEGER: Asked and answered.
THE WITNESS: No, I did not.
BY MS. FELDMAN:
Q Okay. And you had indicated that your -- at the time your February 22nd, 2022 assessment of Lonnie Rupard, which was face to face in person, you observed that his physical appearance remained unchanged from

the prior time that you had your initial face-to-face assessment with Lonnie Rupard on December --

A December 29th.

MR. KRUEGER: Asked and answer -- well, let her finish.

THE WITNESS: Sorry.

BY MS. FELDMAN:

Q On December 29th, 2021; correct?

MR. KRUEGER: Asked and answered.

THE WITNESS: Correct.

BY MS. FELDMAN:

Q And I just wanted to confirm that Lonnie Rupard's physical condition appeared to be the same that it did about two months prior?

MR. KRUEGER: He literally just now answered that question. Asked and answered.

One more time.

THE WITNESS: Yes. The same presentation.

MS. FELDMAN: Just confirming.

THE WITNESS: Same -- yeah.

MR. KRUEGER: It's on the record. You don't need to confirm it.

MS. FELDMAN: Thank you.

Okay. That's all I have. Thank you, Dr. Cruz.

MR. IREDALE: Just -- just about four minutes.

MR. IREDALE: It's the spirit that helps. Thank you.
MS. FELDMAN: It's probably in my pile.
As long as I get my pen back.
(Exhibit 18 marked)
BY MR. IREDALE:
Q Now, Doctor, I show you this not for the purpose of asking whether --
A Oh, got it.
Q -- you were present at the autopsy where these photos were taken, but I can represent to you that these photos were taken on the date of 19 March, and they show the state of Lonnie Rupard at the time of that autopsy.
MR. KRUEGER: Hold on.
Doctor, I know these are not -- these are unsettling, but we do need you to look through them. Okay?
We're almost done. Bear with us.
MR. IREDALE: This is the last area.
THE WITNESS: Oh, my God. Oh, Lord.
BY MR. IREDALE:
Q Did any clinician at any point tell you that Lonnie Rupard was in the state such as you see here?
MS. FELDMAN: Objection to the photo itself as lacks foundation.

THE WITNESS: I don't even know what to --

MR. KRUEGER: Hold on. Slow down.

Do you understand the question?

THE WITNESS: No.

MR. KRUEGER: Okay. He wants to know, did any clinician-- tell me if I'm wrong.

Did any clinician ever tell you information that would suggest that his condition was like you're seeing here.

Am I right? Okay.

THE WITNESS: No. No. This is --

BY MR. IREDALE:

Q You said you relied on the deputies to report and --

A Yeah.

Q -- to notify you if a person were in a state that showed they were gravely mentally disabled; would that be fair to say?

MS. FELDMAN: Objection.

THE WITNESS: Yes.

BY MR. IREDALE:

Q Did any deputy or anyone else at the County notify you that Mr. Rupard was in the physical state that you see here?

A No.

Q Or anything that would suggest that to you?
A No.
If I had -- if this is the Mr. Rupard I had seen on the last time I saw him alive -- this is not the person I saw at that -- that date.
Again, I'm -- this is -- this is like -- I -- yeah. I'm shocked right now. This is really --
Q Do you think maybe you should have come to see him the next week or couple of weeks after that last appointment?
MR. KRUEGER: It calls for speculation. Calls for expert opinion.
If you know.
THE WITNESS: Yeah, I can't -- if someone had told me that he was in this state, yes. I -- you know. Absolutely. I would have done something. I would have done whatever I could, but I did not -- yeah, this is not -- wow. This is -- wow.
MR. KRUEGER: Okay.
THE WITNESS: Oh, my God.
MR. IREDALE: I think that's all I need. Thank you.
THE WITNESS: I'm so sorry. This is --
MR. KRUEGER: Okay. Let's -- let's wrap it up.
Are we all done?

REPORTER'S CERTIFICATION

I, Debra D. Smalley, Registered Merit Reporter, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenograhically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript (X) was ( ) not required.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: March 22, 2026.

Debra D. Smalley

DEBRA D. SMALLEY, RMR
CSR NO. 8513