# EXHIBIT B

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD; )
)
Plaintiff, )
vs. ) **CASE NO.** 3:23-cv-1357-CAB-BLM
)
COUNTY OF SAN DIEGO; ET AL., )
)
Defendants. )
___________________________________ )

## DEPOSITION OF
Francis Ysla, M.D.

**DATE:** Friday, April 10, 2026

**TIME:** 11:02 AM to 1:01 PM

**REPORTER:** Amy L. Horn, CSR No. 7919

## VIA REMOTE VIDEO TECHNOLOGY

Hines Reporters

INTERNATIONAL TOWER
888 S. FIGUEROA STREET, SUITE 940, LOS ANGELES, CALIFORNIA 90017
866.432.4300

LOS ANGELES * SAN FRANCISCO * SAN DIEGO

Lonnie Rupard's death in another way other than through counsel?

A. No. I think it's only been through this -- for the purpose of this deposition.

Q. When was the first time that you learned about Lonnie Rupard's death?

A. It must have been several months ago.

Q. So in late 2025, early 2026 would be the first time that you learned Lonnie Rupard, a former incarcerated person at the Central Jail, had passed?

A. Yeah. I would say sometime in 2025.

Q. And you are you familiar with Dr. Anthony Cruz?

A. Yes.

Q. And how are you familiar with Dr. Anthony Cruz?

A. He was a staff psychiatrist for our Liberty Healthcare Program when we were there, up until June -- June 2022.

Q. When you say "we," you are referring to Liberty Healthcare?

A. Yes. Sorry. Liberty Healthcare. We were -- when Liberty Healthcare was rendering services up until June 2022, he was a staff psychiatrist at that point.

Q. And when you say staff psychiatrist, did he

work at a specific -- at that point in time -- so we'll be talking about the December 2021 through March 2022 time frame.

So before the contract ended in June 2022, was Dr. Cruz assigned to a specific facility in San Diego County?

MR. KRUEGER: Calls for speculation.

THE WITNESS: He provided his services at Central Jail, at the San Diego Sheriff's Central Jail. We never had him see patients outside of that facility.

But the expectation for our psychiatrists is that occasionally we may send them to see patients at other facilities, whether that be in person or through a telehealth modality.

BY MS. FELDMAN:

Q. And were you the individual -- one of the individuals at Liberty who was responsible for the initial hiring of Dr. Cruz as a Liberty staff psychiatrist?

A. I believe I did an interview with him prior to him being hired with Liberty Healthcare.

Q. Okay. And so you interviewed Dr. Cruz for the staff psychiatrist position with Liberty Healthcare?

A. Yes.

Q. Do you recall when that was?

A. No.

Q. Is it safe to refresh your memory if I said that Dr. Cruz began his employment in March 2022? Does that -- sorry, 2020. I'm sorry. March 2020. Let me rephrase that.

Does it refresh your recollection to hear that Dr. Cruz began his employment in March 2020?

MR. KRUEGER: May lack foundation. It calls for speculation.

THE WITNESS: I would guess that would be correct.

BY MS. FELDMAN:

Q. And what were the duties and responsibilities of Dr. Cruz's role as a staff psychiatrist?

A. It was a clinical -- mainly clinical responsibilities. He would see patients face to face. He would review charts or do what we call chart checks. That's where he would review the medical record and can make changes to medication plans, things of that nature. And attend staff -- attend meetings, whether that be for Liberty Healthcare or for the county.

Q. Anything else?

A. No. Essentially, he was a clinical physician where he was seeing patients.

Q. Would it be fair to say that Dr. Cruz was an

BY MS. FELDMAN:
Q. Who else is in the PSU?
MR. KRUEGER: Calls for speculation.
THE WITNESS: Other disciplines, including nursing, custody, and recreational therapy, as well as clinicians.
BY MS. FELDMAN:
Q. In the PSU at San Diego Central Jail?
A. Yes.
Q. Were you part of this group?
A. I was part of the treatment team in that I was the medical director for Liberty Healthcare's contract, so I provided supervision and oversight for all their psychiatry services.
Q. And let's talk about your role and responsibility as medical director for Liberty Healthcare. You said that you provided oversight for all the psychiatry services?
A. Yes.
Q. Can you give me some description about what that entailed, what kind of oversight?
A. Discussing cases within Liberty's clinical staff, which included psychiatrists, psychiatric nurse practitioners, and some psychologists. And then coordinating care with custody -- county staff, including

mental health clinicians, nursing and custody.
Q. Did you supervise the Liberty psychiatrists and psychiatry nurse practitioners to make sure that they were providing appropriate psychiatric medical care?
MR. KRUEGER: Vague and ambiguous.
THE WITNESS: Yes.
BY MS. FELDMAN:
Q. And when did you become the medical director for Liberty?
A. It was sometime in 2019.
Q. And then you served in this role until June 2022; is that correct?
A. Yes.
Q. Okay. And can you briefly summarize your background, your education, where you went to school and what training you received?
A. Yes. I am a general adult psychiatrist, board certified. Residency completed at West Virginia University. Medical school completed at Ponce School of Medicine. Undergraduate degree in molecular toxicology at the University of California, Berkeley.
Q. Thank you. And in what settings have you practiced psychiatry?
A. All settings. Inpatient, outpatient. I don't think there's any other side. Hospitals, clinics,

had both telehealth and on-site psychiatrists, psychiatry services, so prescriptions could be made either on-site or remotely.

BY MS. FELDMAN:

Q. Okay. And again, it would be someone from the psychiatry staff?

MR. KRUEGER: I'm sorry, could you say that again?

MS. FELDMAN: It would be someone from psychiatry?

MR. KRUEGER: Asked and answered.

THE WITNESS: Yes. But again, as I mentioned, there were several -- a few occasions where primary care medical would sometimes order psychiatric medications, as well.

BY MS. FELDMAN:

Q. And what was the handling of inmate -- or patients who had been -- who are not adhering to their medication and refusing medication? Would that then be up to the prescribing psychiatrist to determine whether to modify or discontinue or do something else with respect to the psychotropic medication?

MR. KRUEGER: Incomplete hypothetical. May call for expert opinion. May call for speculation.

If you're able to answer, you can.

THE WITNESS: It's the evaluating psychiatrist that makes that determination. So since we have a cohort of psychiatrists, you don't necessarily always see the -- the patients are not necessarily always seen by the same patient [sic] in any given encounter. So it's the evaluating psychiatrist that makes the determination about medications based on their evaluation.

BY MS. FELDMAN:

Q. And so it would be the psychiatrist with the history who had been monitoring the patient during this time?

MR. KRUEGER: Misstates testimony.

THE WITNESS: The patient isn't monitored per se by the psychiatrist. The chart is reviewed, in addition to the evaluation, the assessment itself. Whether that's, again, face to face or based on collateral information from other disciplines. But then, yes, they would then make the determination of the plan of care.

BY MS. FELDMAN:

Q. Okay. I just want to quickly share a document, but I'm not -- am I not permitted?

In follow-up to that, if the psychiatrist that assessed and did the initial assessment continues to

STATE OF CALIFORNIA )
)ss
COUNTY OF LOS ANGELES )

I, AMY L. HORN, C.S.R. #7919, Certified Shorthand Reporter qualified in and for the State of California, do hereby certify:

That the foregoing deposition is a true and correct transcription of my original stenographic notes.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this proceeding was taken; and furthermore, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of April, 2026.

AMY L. HORN, CSR 7919