**EXHIBIT C**

# Deposition Transcript

**Case Number: 23-CV-1357-CAB-BLM**
**Date: January 8, 2026**

**In the matter of:**

# JUSTINO RUPARD, et al. v COUNTY OF SAN DIEGO, et al.

# Melissa Quiroz - PMK - 30(b)(6)

CERTIFIED COPY

Reported by:
Nicole O'Neil

**Steno Agency, Inc.**

**315 West 9th Street**
**Suite 807**
**Los Angeles, CA 90015**
**concierge@steno.com**
**(888) 707-8366**
**NV: Firm #108F**

04:07 a clinical director, who was also a psychiatrist, and that was the oversight for those physicians who they could collaborate with and who would have oversight of their care.
04:08 Q. All right. Now, let's go carefully so that we're speaking clearly about the things.
04:08 First of all, let's talk about Sheriff's Department employees.
04:08 A. Uh-huh.
04:08 Q. The mental health clinicians that you have referred to, were they sheriff's employees, independent contractors, or both?
04:08 A. A mental health clinician title is a sheriff employee.
04:08 Q. And did that include the QHMPs, whether we say professional or provider?
04:08 MS. FELDMAN: You mean QMHP?
04:08 MR. IREDALE: QMHP.
04:08 THE WITNESS: Psychiatrists are not sheriff's employees.
04:08 BY MR. IREDALE:
04:08 Q. I understand that. That's not my question. We've used the phrase "mental health clinicians." I use that, because that's your phrase, and I want to make sure that I'm being

clear.

A. Okay.

Q. You said to me, "Mental health clinicians are sheriff's employees."

A. Yes.

Q. And my question now goes to another issue, which is, we've used another word, or another word has appeared in some of the documents, the acronym QMHP, and my question is: Are QMHPs sheriff's employees?

MS. FELDMAN: Vague and ambiguous.

THE WITNESS: Not all sheriff's employees are QMHPs.

BY MR. IREDALE:

Q. If I have to draw a diagram, I will. The issue is: We went through the definition of QMHP's repeatedly.

Do you recall? We looked at that. QHMP's include psychiatric social workers, include marriage and family counselors, include psychologists. And my question is: As that acronym was used in the policies, QMHPs, were those sheriff's employees or private contractors or both?

A. We currently have -- there are those same licensures as a contractor as well.

04:10 Q. Okay. Let's go back to 2021 and 2022. In 2021, the psychiatrists were all independent -- they were all employees or affiliated with an independent contractor. Right? They weren't employees of the sheriff.

04:11 MS. FELDMAN: Or the County.

04:11 MR. IREDALE: Or the County.

04:11 THE WITNESS: That is correct.

04:11 BY MR. IREDALE:

04:11 Q. Now, my question is: In 2021 and 2022, the other people who were not psychiatrists, but who were involved in providing mental health treatment, were some or all of them sheriff's employees?

04:11 MS. FELDMAN: Vague and ambiguous.

04:11 MR. IREDALE: Your answer?

04:11 THE WITNESS: Not all are sheriff employees.

04:11 BY MR. IREDALE:

04:11 Q. In 2021 and 2022, among the people who provided mental health services at the Central Jail, how many people, to your knowledge, were employees of the County?

04:12 MS. FELDMAN: Vague and ambiguous and to the extent it's beyond the scope of her testimony. You mean mental health clinicians?

04:14 of patients."

04:14 So when I asked that question, I was asking you something that we need now to break down, so let's break it down.

04:14 BY MR. IREDALE:

04:14 Q. So all psychiatrists were employees or affiliated with contractors. Is that fair?

04:15 A. Yes.

04:15 Q. Now, as to the psychologists, there were psychologists who worked at the Central Jail facility?

04:15 A. Yes.

04:15 Q. Were any of them employees of the County?

04:15 A. No.

04:15 Q. Let's go to psychiatric social workers. Were any of the psychiatric social workers employees of the County?

04:15 A. I don't have any staff that are identified as psychiatric social workers.

04:15 Q. How about licensed mental health clinicians, such as MFT, LCSW, et cetera?

04:15 A. Yes.

04:15 Q. And were they, all the licensed mental health clinicians, employees of the County?

04:15 A. Yes.

04:32 action that I'm going to undertake.

04:32 Thank you so much. That's all I have.

04:32 MR. KRUEGER: I have just a couple of questions.

04:32 EXAMINATION

04:32 BY MR. KRUEGER:

04:32 Q. Ms. Quiroz, my name is Corey Krueger. I represent Dr. Cruz and Liberty Healthcare in this case.

04:32 A. Okay.

04:32 Q. For your reference, I have questions that I believe fall within category 2B of Exhibit 1, and that category says, "The specific policies and procedures and training regarding 'sick calls' by psychiatric and mental health staff at the San Diego Central Jail in the years 2020, 2021, and 2022."

04:33 My question to you is: In your role, are you familiar with the communication protocols via which sworn staff would communicate concerns to mental health staff?

04:33 A. Familiar.

04:33 Q. Okay. How does that process work? If a member of sworn staff sees something and determines that they have a concern that they think should go to mental health, could you please describe the

04:33 pathway of communications such that it gets from
04:33 that sworn personnel to mental health?
04:33 A. A deputy or whomever from sworn could
04:33 simply walk up to a provider directly, and say, X,
04:33 Y, Z, this is what I see, what I hear, what I smell,
04:34 whatever their information is to share, they could
04:34 verbally walk up to the person and share it with
04:34 them right on the spot. They could possibly write
04:34 an -- what they call an ISR, or status report of
04:34 some sort, or -- most of the time, probably, that
04:34 would be it. Doing both, they have the option to do
04:34 that. Walk to a nurse's station and share it there.
04:34 Q. In the event that a mental health provider
04:34 of some kind -- and a QMHP is not immediately
04:34 available for a person-to-person conversation, and a
04:34 member of sworn staff wanted to get word to mental
04:34 health that, hey, there's something that needs your
04:34 attention. What then? What would happen?
04:34 A. Another way to communicate it could be in
04:34 an email possibly.
04:34 Q. Okay.
04:34 A. You know, maybe providing the individual's
04:35 booking number and sharing, you know, what the
04:35 information they want to share, they could possibly
04:35 do it in the form of an email as well.

04:39 A. Yeah. Patient list.
04:39 Q. Patient list. Okay. So a concern could be routed as potentially a sick call visit, which would then show up on a patient list. Is that right?
04:39 A. Yes. To be clear, the sworn individual wouldn't necessarily be approaching that person generating the list.
04:39 Q. Understood.
04:39 A. The person pulls that list from scheduled appointments in the electronic health record.
04:39 Q. Okay. Would it be accurate to say that if a concern about the mental health of an inmate is being raised with QMHP, and if that concern is not specifically delivered to that person, that the other way it would happen is the person -- the inmate showing up on their patient list. Does that question make sense?
04:40 MS. FELDMAN: I will object. Vague and ambiguous.
04:40 MR. KRUEGER: It's not my best question.
04:40 BY MR. KRUEGER:
04:40 Q. Let me break it down. You said earlier one way that a concern about the mental health of inmate could be brought to the attention of a QMHP,

04:40 someone could just walk up and tell them. Right?
04:40 A. Yes.
04:40 Q. Or send them an email?
04:40 A. Right.
04:40 Q. They could call them on the telephone?
04:40 A. Yes.
04:40 Q. That's all person-to-person communication.
04:40 Right?
04:40 A. Yes.
04:40 Q. Okay. Let's assume that that's not how it
04:40 happened, and it goes through another process and
04:40 has to work its way through the chain. Right? That
04:40 method of communicating a concern to mental health
04:40 would result in the inmate showing up on a patient
04:40 list for a QMHP. Is that correct?
04:40 MS. FELDMAN: Vague and ambiguous.
04:41 MR. KRUEGER: Do you understand my
04:41 question?
04:41 MS. FELDMAN: Are you asking how the sick
04:41 call process works?
04:41 MR. KRUEGER: That's what I'm trying to
04:41 get at, yes.
04:41 THE WITNESS: A patient would -- if there
04:41 was an appointment scheduled -- generally if a
04:41 patient is scheduled for an appointment, they show

up on a list.

BY MR. KRUEGER:

Q. Right. I will try to break it down as simply as I can.

If someone thinks that mental health should see a particular inmate or patient --

A. Yes.

Q. -- mental health is either going to be told person to person, or that inmate will show up on a patient list. Those are the two primary ways it happens. Am I right?

MS. FELDMAN: Misstates testimony.

MR. KRUEGER: Go ahead.

THE WITNESS: There could be a call for somebody to go see somebody immediately. You know, so another way a deputy could do this -- I guess we'll go back to that. There's -- they could call for mental health to come see them, because they think something is immediately wrong and ask them to come see them cell side, so it's not -- I guess it's still the continuation of the verbal.

MR. KRUEGER: It's the end of the long day. I'm probably asking poor questions.

BY MR. KRUEGER:

Q. I'm trying to figure out the different

ways in which an inmate can come to the attention of a QMHP, and I will even narrow it further. Let's talk about contracted providers through Liberty Healthcare, non-County employees -- ways that an inmate can come to the attention of a Liberty Healthcare provider. We talked about direct person-to-person conversation.

A. Yes.

Q. We've talked about an emergency call. Right?

A. Yes.

Q. What other ways could an inmate come to the attention of mental health?

MS. FELDMAN: For the Liberty --

MR. KRUEGER: Yes. I'm sorry. For the Liberty Healthcare providers.

THE WITNESS: An IP could submit their own request as well, a written request, and drop it in the box, and somebody comes by and picks it up.

BY MR. KRUEGER:

Q. Staff members who create the patient list, what are they pulling from to create a patient list?

A. Those appointments are in the electronic health record underneath sick call. There's a list that -- and --

04:43 MS. FELDMAN: I will represent that that was produced this morning.
04:43 THE WITNESS: Yes. The list could be all IPs that need to be seen for that day, or you could see the specific sick calls for an individual as well, so you could look at it from two ways in the electronic health record.
04:44 BY MR. KRUEGER:
04:44 Q. How it is determined which patients to put on a patient list for a particular provider on a particular day?
04:44 MS. FELDMAN: The sick-call list?
04:44 MR. KRUEGER: Uh-huh.
04:44 THE WITNESS: At this time, this individual that we're speaking of that's putting together this list doesn't report --
04:44 MS. FELDMAN: To mental health?
04:44 THE WITNESS: They are in a different -- I don't know what their process is. That's what I'm trying to say. I don't know what their process is. They are not a part of my team.
04:44 BY MR. KRUEGER:
04:44 Q. What division or team are they a part of?
04:44 A. I believe it was HIM, Health Information Management, possibly.

CERTIFICATE OF REPORTER

---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [ X ] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e).)

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 18th of January, 2026.

Nicole O'Neil, CSR No. 10774