EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
PETER BIBRING: SBN 223981
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ESTATE OF LONNIE RUPARD,

Plaintiff,

v.

COUNTY OF SAN DIEGO, *et al.*,

Defendants.

CASE NO. 23-CV-1357-CAB-JAC

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS AGAINST DEFENDANT COUNTY OF SAN DIEGO FOR SPOLIATION OF EVIDENCE**

Judge: Hon. Cathy Ann Bencivengo

Date: December 18, 2026

**PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT**

# TABLE OF CONTENTS


I. INTRODUCTION .................... 1

II. STATEMENT OF FACTS .................... 3

- A. Mr. Rupard deteriorates for eighty-six days in a cell. .................... 3
- B. Two men die in Module 7D in two days, and the County's investigator attends Mr. Rupard's autopsy. .................... 4
- C. The County collects "as much video as they had" for Mr. Schuck but only 24 hours for Mr. Rupard. .................... 5
- D. The County lets three months of video be recorded over, contrary to its own retention schedules. .................... 7
- E. County personnel review the video before it is gone, and save screenshots, not video. .................... 8
- F. After the Medical Examiner's homicide finding, the County claims it looked for the video and found it gone. .................... 8
- G. The Homicide Unit's Manual calls for a thorough and immediate investigation; the County waits for the Medical Examiner. .................... 9
- H. Even the preserved video is incomplete. .................... 10

III. ARGUMENT .................... 11

- A. The County is guilty of spoliation of the Module 7D video. .................... 12
  1. The County had a duty to preserve relevant video. .................... 12
  2. The County took no reasonable steps to preserve the video. .................... 14
  3. The video cannot be restored or replaced. .................... 16
- B. The loss of the video prejudices Plaintiff. .................... 16
- C. The County acted with the intent to deprive Plaintiff of the video. .................... 18
- D. The Court should instruct the jury to presume the lost video was unfavorable to the County and order curative measures. .................... 22

1. The jury should be instructed to presume that the lost video was unfavorable to the County. ........ 22

2. Whether or not it finds intent, the Court should order curative measures under Rule 37(e)(1). ........ 23

3. The County's conduct supports default judgment on liability. ........ 25

IV. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Title Ins. Co. v. Lacelaw Corp.*,
861 F.2d 224 (9th Cir. 1988) ........ 10

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
881 F. Supp. 2d 1132 (N.D. Cal. 2012) ........ 17

*Bistrian v. Levi*,
448 F. Supp. 3d 454 (E.D. Pa. 2020) ........ 24

*Colonies Partners, L.P. v. Cnty. of San Bernardino*,
No. 5:18-CV-00420-JGB-SHK,
2020 WL 1496444 (C.D. Cal. Feb. 27, 2020) ........ 25

*Est. of Bosco v. Cnty. of Sonoma*,
640 F. Supp. 3d 915 (N.D. Cal. 2022) ........ passim

*Est. of Hill v. NaphCare, Inc.*,
No. 2:20-CV-00410-MKD,
2022 WL 1464830 (E.D. Wash. May 9, 2022) ........ 18, 25, 26, 30

*Est. of Schuck v. Cnty. of San Diego*,
No. 3:23-CV-00785-DMS-AHG,
2025 WL 2180987 (S.D. Cal. Aug. 1, 2025) ........ passim

*Estate of Arroyo v. County of San Diego*,
No. 21-CV-1956-RBM-SBC, 2025 WL 1914399 (S.D. Cal. Apr. 14, 2025) ........ 19

*Gregory v. Montana*,
118 F.4th 1069 (9th Cir. 2024) ........ 16, 23

*Hargis v. Overton Cnty.*,
No. 2:22-CV-00011,
2023 WL 8604139 (M.D. Tenn. Dec. 12, 2023) ........ 18, 20, 24, 29

*Jones v. Riot Hosp. Grp. LLC*,
95 F.4th 730 (9th Cir. 2024) ........ 23, 24, 30

*Laub v. Horbaczewski*,

No. CV 17-6210-JAK (KS),
2020 WL 9066078 (C.D. Cal. July 22, 2020) .......... 23

*Lopez v. Cardenas Mkts., LLC*,
No. 2:21-CV-01915-JCM-BNW,
2023 WL 3182658 (D. Nev. May 1, 2023) .......... 8

*Musse v. King Cnty.*,
No. C18-1736-JCC,
2021 WL 4709875 (W.D. Wash. Oct. 8, 2021).......... 23, 25, 26

*Porter v. City & Cnty. of San Francisco*,
No. 16-CV-03771-CW (DMR),
2018 WL 4215602 (N.D. Cal. Sept. 5, 2018).......... 29

*Posner v. Hillstone Rest. Grp., Inc.*,
No. 2:19-CV-00507-TLN-KJN,
2022 WL 705602 (E.D. Cal. Mar. 9, 2022).......... 19

*Scalia v. Cnty. of Kern*,
658 F. Supp. 3d 809 (E.D. Cal. 2023) .......... 21, 28, 30

*Snapp v. United Transp. Union*,
889 F.3d 1088 (9th Cir. 2018) .......... 10

*United States v. Kitsap Physicians Serv.*,
314 F.3d 995 (9th Cir. 2002) .......... 17

*Welter v. Hurt*,
No. 2:23-CV-02627-SPG (MARx),
2025 WL 1843263 (C.D. Cal. Apr. 1, 2025) .......... 27

**Statutes**

Cal. Gov't Code § 26202.6 .......... 12, 23

**Rules**

Fed. R. Civ. P. 37(e) .......... passim

Fed. R. Evid. 801(d)(2)(C)–(D) .......... 10

## I. INTRODUCTION

Lonnie Rupard wasted away. Over eighty-six days, from December 22, 2021, to March 17, 2022, in Cell 17 of Module 7D at the San Diego Central Jail, his recorded weight fell from 165 pounds to 105. Ex. 1 at COSD 001660, 001662, 001676; Ex. 2 at COSD 001635. On March 17, 2022, deputies found Mr. Rupard unresponsive, dead, in a filthy cell with "feces and old food throughout." Ex. 3 at COSD 001641; Ex. 1 at COSD 001656. The Medical Examiner concluded that he died of "[p]neumonia, malnutrition, and dehydration in the setting of neglected schizophrenia," and ruled his death a homicide. Ex. 1 at COSD 001667.

Every cell door in Module 7D, including Mr. Rupard's, was within view of two wall-mounted cameras. Ex. 3 at COSD 001640. Those cameras recorded every safety check, every meal delivered or not delivered, and every deputy who looked through Mr. Rupard's window and walked on without summoning medical care for almost three months. The County kept only 40 hours of the video.[1] It let the rest be recorded over and lost.

The same issue of destruction of critical video evidence in a jail death occurred before, in the same jail, in the same week. Hayden Schuck died in Cell 1 of Module 7D of the Central Jail on March 16, 2022, the day before Mr. Rupard died in Cell 17

[1] During discovery in this case, the County produced to Plaintiff 40 hours and 35 minutes of surveillance video from the cameras covering Mr. Rupard's cell (Bates Nos. COSD 001738 through COSD 001763). Nearly all of the footage comes from the last three days of Mr. Rupard's life. An exception is a single 19-and-a-half-minute clip from January 29, 2022 (10:59 a.m. to 11:18 a.m.). The March footage begins at 8:19 p.m. on March 15, 2022, and runs continuously until 10:34 a.m. on March 16, 2022, ending towards the end of the response to Mr. Schuck's medical emergency which resulted in his death in Cell 1 of the same module. This was footage preserved from the Schuck case. There is no video from the next 11 hours and 25 minutes. The recordings resume at 9:59 p.m. on March 16, 2022, and continue through 11:59 p.m. on March 17, 2022, a little over an hour after deputies found Mr. Rupard unresponsive in his cell. In all, Plaintiff has video for about 2% of Mr. Rupard's time in custody. (Declaration of Eugene Iredale ("Iredale Decl."), filed concurrently herewith at ¶ 2).

of that very same module. Before he was moved to Module 7D on March 15, 2022, Mr. Schuck had been housed on the jail's second floor. The County failed to preserve the second-floor video footage from March 13, 2022, at 1:00 a.m. through March 15, 2022, at 8:00 a.m. *Est. of Schuck v. Cnty. of San Diego*, No. 3:23-CV-00785-DMS-AHG, 2025 WL 2180987, at *1 (S.D. Cal. Aug. 1, 2025), *report and recommendation adopted in full*, 2025 WL 3033407, at *1 (S.D. Cal. Oct. 9, 2025). Mr. Schuck's Estate moved for sanctions based on that loss of evidence. *Schuck*, 2025 WL 2180987, at *1–*2. The court there found that the County's duty to preserve jail video "attached as early as Hayden's death, on March 16, 2022"; that "the County failed to take reasonable steps to preserve the videos"; and "by a preponderance of the evidence that the County had an intent to deprive in deleting the video footage from the missing time period." *Id.* at *6, *8, *11.

This case mirrors *Schuck*, and on every point that matters, it is stronger. First, on the amount of video lost: in *Schuck.* the County lost approximately 55 hours of video; here it lost nearly three months. Second, the obviousness of the camera: the County's justification in *Schuck* was that the lost video footage was from a camera that could not show Mr. Schuck's second-floor cell door, *id.* at *10; here the camera was trained on Mr. Rupard's cell. Third, the County's efforts: for Mr. Schuck, the Sheriff's Homicide Unit sought "as much video as they had"; for Mr. Rupard, it asked for only 24 hours. Fourth, what the County knew here: its lead detective personally attended the autopsy of a "severely emaciated" man "covered in feces," and then did nothing to preserve the video for nearly a year — until the Medical Examiner found the death a homicide, by which time the video was gone. Finally, even the footage the County did preserve for discovery is missing approximately 11 hours and 25 minutes following Mr. Schuck's death and preceding Mr. Rupard's death, including an entry in Mr. Rupard's cell according to deposition testimony.

Plaintiff respectfully requests that the Court instruct the jury to presume that the lost video was unfavorable to the County, order curative measures under Rule

37(e)(1), award fees,[2] and consider entering terminating sanctions against the County.

## II. STATEMENT OF FACTS

### A. Mr. Rupard deteriorates for eighty-six days in a cell.

Mr. Rupard was booked into the San Diego Central Jail on December 19, 2021. Ex. 3 at COSD 001638. His intake records noted psychotic disorders and listed his weight as 165 pounds. Ex. 1 at COSD 001662. On December 22, 2021, Mr. Rupard was transferred to Module 7D. Ex. 4 at COSD 000712. He was housed alone in Cell 17 of Module 7D, an administrative-segregation module, where he was "treated as [ad-seg] because of his mental health." Ex. 3 at COSD 001638; Ex. 1 at COSD 001660. His vital signs were taken twice on the day he was booked and, according to the County's own homicide investigator, "were never checked again until his death." Ex. 1 at COSD 001663.

Module 7D has two cameras, which together "covered the dayroom and individual cell door entrance." Ex. 3 at COSD 001640; Blumenshine Dep. (Ex. 5) 105:24–106:15. County policy required deputies to conduct a safety check of every inmate "at least once every 60-minute time period," by "direct visual observation," looking at the inmates for signs of medical distress or suffering from medical trauma. Blumenshine Dep. 63:13–64:17.

Mr. Rupard's decline should have been obvious. On February 22, 2022, a jail psychiatrist observed Mr. Rupard through his cell window "shirtless," and

---

[2] This motion is timely. It seeks jury instructions and the exclusion of evidence at trial, and it is filed by the deadline for pretrial motions. *Schuck* held that a spoliation motion of this kind "is not a discovery dispute contemplated by the Court's Chambers Rules," and found "persuasive" the plaintiffs' position that it is a pretrial motion to be filed by the pretrial-motion deadline: like a *Daubert* motion, "the instant spoliation motion seeks an adverse jury instruction or exclusion of testimony at trial." *Schuck*, 2025 WL 2180987, at *2–*3; *see also id.* at *3 (citing *Lopez v. Cardenas Mkts., LLC*, No. 2:21-CV-01915-JCM-BNW, 2023 WL 3182658, at *3 (D. Nev. May 1, 2023), finding that "[t]he outer limit for seeking discovery sanctions that are dispositive in nature is the deadline for filing dispositive motions").

"rambl[ing] incoherently." Ex. 1 at COSD 001664. On March 14, Dr. Badre, the court-appointed psychiatrist who found Mr. Rupard to be legally incompetent and recommended that the court order administration of anti-psychotic medication (albeit the report was written after Mr. Rupard died), found Mr. Rupard's cell "dirty with trash throughout," the toilet "full of excrement," "feces on the floor," and "food smeared on the wall." *Id.* at COSD 001661-62; Blumenshine Dep. 70:8–14.

On March 17, shortly before 11:00 p.m., deputies found Mr. Rupard unresponsive in his cell. Ex. 6 at COSD 000266. Homicide Detective Max Blumenshine, the County's lead investigator, inspected Mr. Rupard's cell just hours later. Ex. 3 at COSD 001639. He found "feces and old food throughout the cell," including on the floor, the bedroll, the bunk and the table. *Id.* at COSD 001641–42. The toilet was full of excrement. *Id.* at COSD 001641–42. Blumenshine found roughly twenty-eight meal containers, which he described as "~9 days' worth of trash." Ex. 1 at COSD 001676; *see also* Ex. 7 (photographs).

### B. Two men die in Module 7D in two days, and the County's investigator attends Mr. Rupard's autopsy.

Mr. Rupard's was the second death in Module 7D in two days.[3] On the morning of March 16, 2022, Hayden Schuck suffered a medical emergency in Cell 1 of the same module and died. Mace Dep. (Ex. 8) 76:16–21; Matrone Dep. (Ex. 9) 41:23–42:19, 77:15–17. Detective Blumenshine was told at the briefing on Mr. Rupard's death that Mr. Schuck had died in the same module within 48 hours. Blumenshine Dep. 133:9–19. Blumenshine had done some work on the Schuck death investigation himself. *Id.* at 134:25–135:7. He had never before seen two deaths in one unit in 48 hours: "This would be the first time." *Id.* at 137:9–12.

The incident briefing on Mr. Rupard's death, held within hours of the death,

[3] The seventh floor of the Central Jail has five separate "modules." Ex. 3 at COSD 001639. Module D consisted of twenty cells on two tiers. It was used for administrative segregation. *Id.* at COSD 001639–40. Inmates were permitted a single hour of "dayroom" time outside their cell every twenty-four hours. Ex. 1 at COSD 001676.

was attended by members of Sheriff's Homicide, the Division of Inspectional Services, the Detentions Investigations Unit, the jail's captain, and the Sheriff's Chief Medical Officer. Ex. 3 at COSD 001637–38. On March 19, 2022, less than 48 hours after the death, Detective Blumenshine personally attended Mr. Rupard's autopsy. Ex. 2 at COSD 001633. He recorded that Mr. Rupard "appeared emaciated." *Id*. at COSD 001635. He weighed 105 pounds, had "bed sores on his body," and was "covered in feces." *Id.* at COSD 001635–36; *see* Ex. 10 (photographs). According to Detective Blumenshine, Mr. Rupard was "severely emaciated." Ex. 3 at COSD 001643; Blumenshine Dep. 119:14–19.

### C. The County collects "as much video as they had" for Mr. Schuck but only 24 hours for Mr. Rupard.

The County has explained, through its Rule 30(b)(6) designee, how it handles video after an in-custody death.[4] Sheriff's Homicide makes "an extended request, not just of the incident itself but relevant video leading up to the incident." Williamson Dep. (Ex. 11) 32:16–33:7. "[T]ypically their request would be for all times that the individual was on video, going back a certain timeframe." *Id.* at 33:22–24. Where a camera cannot see the inmate, staff "pull enough to show that the legal monitoring requirements and care were being taken." *Id.* at 36:9–14.

That is what the County did for Mr. Schuck. By its own account, the Homicide detective on that case, Detective Van Lingen, instructed a colleague "to obtain 'as much video as they had on Mr. Schuck and his movements and where he is housed.'"

---

[4] Captain Williamson testified as the County's Rule 30(b)(6) designee in the Schuck case about County retention and preservation practices as of March 2022. Williamson Dep. (Ex. 11) 11:5–23. His testimony, and the County's factual representations in its *Schuck* briefing, are admissible against the County here as statements of a party opponent. Fed. R. Evid. 801(d)(2)(C)–(D); *Snapp v. United Transp. Union*, 889 F.3d 1088, 1103–04 (9th Cir. 2018) (Rule 30(b)(6) testimony is evidence against the entity); *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) (statements of fact in a party's brief may be treated as admissions).

Ex. 12 (County's Objections, *Schuck* ECF No. 145) at 4:12–16.

Detective Blumenshine, the lead detective on Mr. Rupard's case, asked for only twenty-four hours' worth of surveillance video. Blumenshine Dep. 119:5–10. He started his review of this footage on May 11, 2022. Ex. 3 at COSD 001643. He did not ask that any longer period be preserved. Blumenshine Dep. 119:11–13. He claimed he did not know how long the jail kept video in March of 2022, and he did not ask. *Id.* at 120:15–21. When asked whether he did "anything to preserve the video so that we could see the interactions, if any, of Mr. Rupard with the people who were supposed to be taking care of him," he answered: "As stated, no I did not." *Id.* at 120:7–13. But Mr. Rupard's death occurred as a result of mental decompensation and physical deterioration over a period of weeks. The County's own Medical Examiner, Dr. Bethann Schaber, who performed Mr. Rupard's autopsy and classified the death as a homicide, testified that "not only in a matter of hours to days, but over weeks to months, there was failure to deliver reasonable or adequate care for Mr. Rupard that ultimately resulted in his death." Schaber Dep. (Ex. 13) 17:1–10. It is obvious to any reasonable person that the loss of 60 pounds of body weight did not occur in a twenty-four-hour period. When a trained homicide investigator who saw the severely emaciated body of Mr. Rupard limits the preservation of video to twenty-four hours only and seeks to interview critical witnesses after a delay of twenty-one months (Ex. 6 at COSD000269-71) after the death, one must ask whether the real purpose of Blumenshine's investigation was to discover the truth, or effectively to conceal it.

Although the video produced in this case reaches back to March 15 and March 16, 2022, before the window Detective Blumenshine asked to have preserved, that earlier footage is not the product of anything preserved for the Rupard investigation. It exists because it was preserved for the investigation into the death of Hayden Schuck. When asked how he came to review footage showing whether Mr. Rupard had been given food by deputies in Module 7D in the days or weeks preceding his death, Detective Blumenshine explained that he brought video from the Schuck case

into his own file: "Not 48, but, remember, the Schuck case, I realized as documented that I pulled that video into my case as well." Blumenshine Dep. 144:13–24, 156:7–13; *see also* Ex. 1 at COSD 001674. He agreed that part of his analysis relied on footage related to the Schuck case and that the Schuck video he acquired "was no more than a day." Blumenshine Dep. 144:25–145:5.

In short, the footage that predates Blumenshine's preservation window reflects no step he took to investigate and document Mr. Rupard's care, or lack thereof. It was preserved to investigate Mr. Schuck's death, and it reached the Rupard file only because it was in existence because Blumenshine copied it from the Schuck homicide investigation case file.

### D. The County lets three months of video be recorded over, contrary to its own retention schedules.

Two written County retention schedules were in effect in March 2022. The County-wide schedule required that "Security Videos: Any videos relating to county building, property or employee security" be retained for two years. Williamson Dep. 46:15–47:10. The County's designee testified that this schedule "does apply" and, in his view, covers all jail video. *Id.* at 47:11–48:11. The Sheriff's own schedule required that "Facility Incident Videos" be retained for two years. *Id.* at 49:21–50:15, 52:2–6. The County has also told the court that state law "allows destruction of jail surveillance video after one year." Ex. 12 at 8:15–16 (citing Cal. Gov't Code § 26202.6).

But the two-year retention policy was not followed. Without a preservation order, the jail's recorders simply "automatically write over themselves when they start reaching the data retention threshold." Williamson Dep. 42:4–7. In Mr. Rupard's case, that took about six months. Ex. 1 at COSD 001667; Blumenshine Dep. 171:23–25. More than 84 days of video were destroyed.

All of the video of Mr. Rupard's incarceration therefore still existed when Blumenshine attended the autopsy on March 19, 2022, when he first reviewed the 24

hours he had requested in May 2022, and when he closed his "preliminary investigation" in June 2022 to wait for the Medical Examiner's report and review. Ex. 3 at COSD 001643; Ex. 1 at COSD 001656; Blumenshine Dep. 141:4–21. He did nothing more that year to obtain it. Blumenshine Dep. 155:20–156:6, 166:16–167:11.

### E. County personnel review the video before it is gone, and save screenshots, not video.

Others in the Sheriff's Department were looking at the footage while it still existed. Lieutenant Kopchak, the Department's "In Custody Death Advocate and Department Investigation Coordinator," viewed video of Mr. Rupard from February 19, 2022, and saved screenshots of it "during his investigation." Ex. 1 at COSD 001667, 001671. But "[w]hen he was looking at the video, he saved screenshots, but didn't download and save the video." Blumenshine Dep. 175:1–3. The limited screenshots show Mr. Rupard from above, but are limited to stills which lack sufficient detail. Ex. 1 at COSD001671-72.

Someone watched the Module 7D video from March 5, 2022. That was the date of the "last logged hygiene inspection" of the module; "after a review of the video, it appeared the inspection was not completed." Ex. 1 at COSD 001660; Blumenshine Dep. 148:9–149:19. Detective Blumenshine learned of this in October 2022 and did not pursue it; the matter, he wrote, "falls under the Internal Affairs purview." Ex. 1 at COSD 001660; Blumenshine Dep. 149:20–150:17. Internal Affairs, for its part, "had been notified of possible misconduct due to the state of the decedent's cell," and had placed its investigation on hold "pending a review of criminal charges and civil judgements." Ex. 1 at COSD 001667. According to Blumenshine, he was informed of this on March 2, 2023. *Id.*

### F. After the Medical Examiner's homicide finding, the County claims it looked for the video and found it gone.

In February 2023, the Medical Examiner pathologist, Dr. Schaber, told Detective Blumenshine that Mr. Rupard's death might be ruled a homicide, and that

"the lack of medical care from the Sheriff[']s Department contributed to his death." Ex. 1 at COSD 001666. Blumenshine told Dr. Schaber he would want to interview her if it were ruled a homicide, since he would be "tailoring" his investigation upon "her findings." *Id.* The autopsy report issued on March 2, 2023, and ruled the death a homicide. *Id.* at COSD 001667. Until then, Mr. Rupard's family had been given only a death certificate listing the cause of death as "PENDING." ECF No. 184 ¶¶ 13–16. They presented their claims to the County within days of learning of the autopsy results. *Id.* ¶¶ 10–11.

On March 6, 2023 — nearly a year after the death — Detective Blumenshine for the first time sought "surveillance video from the 3-month period Rupard was in custody." Ex. 1 at COSD 001667; Blumenshine Dep. 166:19–167:11. By then the video "was no longer available." Ex. 1 at COSD 001667. Nothing had been saved to the hard drive the jail uses for critical incidents. *Id.* Lieutenant Kopchak had only his screenshots, having chosen not to preserve the video from which they were excerpted. *Id.* at COSD 001671. The only additional footage was a day or so of Module 7D video from March 15–16 that Detective Van Lingen had preserved for the Schuck investigation. *Id.* at COSD 001674; Blumenshine Dep. 144:13–145:8, 156:7–13.

Detective Blumenshine then reviewed the limited video he had, concluded that "all security checks (11-53) were done on time and accurate," and found no probable cause to charge anyone. Ex. 1 at COSD 001673, 001677.

### G. The Homicide Unit's Manual calls for a thorough and immediate investigation; the County waits for the Medical Examiner.

The Sheriff's Homicide Unit has a written manual, which Detective Blumenshine recognized as "our unit manual" and tries to follow. Ex. 14 (Homicide Unit Manual of Policy and Procedures (Oct. 2021)); Blumenshine Dep. 92:11–12, 100:2–5. Its section on in-custody deaths has no separate track for deaths that appear natural. Its purpose is "a thorough investigation of an in-custody death," which "should be completed within 90 days." Ex. 14 § 3.12.1. "[T]he circumstances of the

death should be investigated immediately," and Homicide detectives "will interview all percipient witnesses in all in-custody deaths." *Id.* § 3.12.2. Evidence is to be preserved "for future presentation and identification in court." *Id.* § 3.5.1. And a copy of the finished investigation goes to the Division of Inspectional Services "to be dispersed as necessary to County Counsel, CLERB, or the Grand Jury." *Id.* § 3.12.5.

That is not how the County conducted the investigation into Mr. Rupard's death. Detective Blumenshine said he treated it as a "natural investigation." Blumenshine Dep. 163:17–20. In 2022, the only jail staff his team interviewed were the deputies and nurses who found Mr. Rupard or responded that night. Ex. 3 at COSD 001639, 001642; Blumenshine Dep. 60:22–25.[5] He closed his "preliminary investigation" in June 2022 and waited for the Medical Examiner. Blumenshine Dep. 141:9–21. The deputies, supervisors, and doctors who dealt with Mr. Rupard in his last days were first asked for interviews in December 2023 — twenty-one months after he died — and only after the District Attorney, the United States Attorney, and the FBI, reviewing the County's file, asked that he "interview any individual who may have had contact with Lonnie Rupard in his final week." Ex. 6 at COSD 000267–70. By then most of the witnesses refused to speak. *Id.* at COSD 000270–71. Plaintiff's law-enforcement practices expert concluded that the Sheriff's Office, "particularly Detective Blumenshine, failed to follow generally accepted law enforcement practices," and that "[a] competent investigation would have been complete and unaffected by the Medical Examiner's determination." Ex. A to Declaration of Gary Raney (Raney Report) at 44.

**H. Even the preserved video is incomplete.**

The video the County produced from the *Schuck* and *Rupard* cases lacks approximately eleven and a half hours, from 10:34 a.m. to 9:59 p.m. on March 16,

[5] Blumenshine testified that he "tried" to interview deputies who worked the week prior to Mr. Rupard's death. Blumenshine Dep. 60:22–25.

2022. Iredale Decl. ¶ 2. The missing period may include the footage of a sheriff's detective and a sergeant who entered Mr. Rupard's cell to conduct a welfare check in the immediate aftermath of Mr. Schuck's death. Johnson Dep. (Ex. 15) 59:4–15. Sergeant Johnson testified that Deputy Weber was taking witness statements following Mr. Schuck's death and asked Johnson to assist with a welfare check on Mr. Rupard. *Id.* at 57:24–58:22. The two went to Mr. Rupard's cell. *Id.* at 61:1–8. Johnson called Mr. Rupard's name but received no answer. *Id.* at 61:6–8. They entered the cell and pushed Mr. Rupard's shoulder. *Id.* at 61:9–12. Mr. Rupard grunted in response but did not otherwise respond to Johnson and Weber. Id. at 61:12–22. Johnson and Weber left Mr. Rupard's cell without asking Mr. Rupard if he was okay and without summoning nursing or mental health. *Id.* at 61:12–13, 64:14–21. There is no video of this alleged welfare check, and Johnson did not document the welfare check anywhere. *Id.* at 59:1–3.

## III. ARGUMENT

Rule 37(e) governs the loss of electronically stored information, including surveillance video. *Gregory v. Montana*, 118 F.4th 1069, 1078–80 (9th Cir. 2024). A party may be sanctioned if ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). If the loss prejudices another party, the court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). If the party "acted with the intent to deprive another party of the information's use in the litigation," the court may presume the information was unfavorable to the party, instruct the jury that it may or must presume the information was unfavorable to the party, or dismiss the action or enter a default judgment. Fed. R. Civ. P. 37(e)(2). The Court finds the facts by a preponderance of the evidence. *Schuck*, 2025 WL 2180987, at *5.

### A. The County is guilty of spoliation of the Module 7D video.

#### 1. The County had a duty to preserve relevant video.

The duty to preserve arises when a party has "some notice that the documents were potentially relevant" to litigation. *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (quotation omitted). No preservation letter is required: "a future litigant is not required to make such a request, and a failure to do so does not vitiate the independent obligation of an adverse party to preserve such information." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 881 F. Supp. 2d 1132, 1136–37 (N.D. Cal. 2012) (quotation omitted).

Considering a death at the same jail one day earlier, investigated by the same Homicide Unit, the court in *Schuck* held:

> Here, the Court agrees with Plaintiffs and finds that the duty to preserve attached as early as Hayden's death, on March 16, 2022. The County's own policies require it to preserve information such as videos for homicide investigations.

*Schuck*, 2025 WL 2180987, at *6. The same must be true here. The County opened a homicide investigation within hours of Mr. Rupard's death and convened its Homicide, Inspectional Services, and Detentions Investigations units. Ex. 3 at COSD 001637–38. Its designee confirms that in-custody deaths are among the incidents for which video is to be downloaded and kept. Williamson Dep. 32:20–33:15. And its Homicide Manual requires each in-custody-death investigation to be "dispersed as necessary to County Counsel, CLERB, or the Grand Jury." Ex. 14 § 3.12.5. The same duty that attached on March 16 for Mr. Schuck attached on March 17 for Mr. Rupard.

If more notice were needed, the County had it. This was the second death in Module 7D in two days — something its lead detective had never seen. Blumenshine Dep. 137:9–12. Two days after the death, that detective watched the autopsy of a "severely emaciated" man "covered in feces." Ex. 3 at COSD 001643; Ex. 2 at COSD 001636. Internal Affairs was "notified of possible misconduct due to the state of the

decedent's cell," and tolled its investigation pending "civil judgements." Ex. 1 at COSD 001667. And six weeks after the two deaths, counsel for Mr. Schuck's family sent the County a letter demanding that it preserve "all evidence relating to" Mr. Schuck's "time in custody" at the same jail that same week. *Schuck*, 2025 WL 2180987, at *6. At that point every hour of Mr. Rupard's video still existed.[6]

The County cannot avoid its duty by pointing out that Mr. Rupard's family sent no letter of their own, or that the Medical Examiner did not rule the death a homicide until 2023. The County's duty turns on what it knew, not on what it told the family: the County held all the information about how Mr. Rupard died, and the family had only a death certificate that said "PENDING." ECF No. 184 ¶¶ 13–16. As one court put it in rejecting a county's argument that a grieving family had given it no reason to expect a lawsuit, "[o]nly Overton County and its agents knew those facts at that time." *Hargis v. Overton Cnty.*, No. 2:22-CV-00011, 2023 WL 8604139, at *9 (M.D. Tenn. Dec. 12, 2023). The standard is objective, and for a jail it is met when a person dies in its custody. *See id.* at *7–*9 (county's duty to preserve jail video "arose on March 30, 2021, when an unresponsive Hargis was taken to the hospital and the TBI [Tennessee Bureau of Investigation] began its investigation," not when family later sent preservation letter); *Est. of Hill v. NaphCare, Inc.*, No. 2:20-CV-00410-MKD, 2022 WL 1464830, at *10 (E.D. Wash. May 9, 2022) (county "had a reasonable anticipation of civil litigation as of" the day of the in-custody death).

Nor can the County limit its duty to the final 24 hours. A man does not become "severely emaciated" in a single day. The state of Mr. Rupard's body raised obvious questions about what the deputies who checked on him every hour for weeks had seen and done — the very questions Detective Blumenshine says he reviewed video to answer. Blumenshine Dep. 123:12–24 ("we're checking to ensure like, all the

---

[6] Six weeks before Mr. Rupard died, the California State Auditor reported — after reviewing jail video — that County deputies' safety checks often amounted to glances of "no more than one second." State Auditor's Report (Ex. 16) at 2.

checks were done on time and per policy"). *Schuck* rejected the County's attempt to define relevance for itself, applying the rule that a party's "unilateral determination that the overwritten video footage was not relevant is insufficient to overcome its duty to preserve relevant evidence." *Schuck*, 2025 WL 2180987, at *7 (quoting *Posner v. Hillstone Rest. Grp., Inc.*, No. 2:19-CV-00507-TLN-KJN, 2022 WL 705602, at *4 (E.D. Cal. Mar. 9, 2022)).[7]

**2. The County took no reasonable steps to preserve the video.**

"Once the duty to preserve attaches, a party must suspend any existing policies related to deleting or destroying files and preserve all relevant documents related to the litigation." *Schuck*, 2025 WL 2180987, at *5 (quoting *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1052 (S.D. Cal. 2015)). The County did nothing of the kind. It issued no litigation hold. It saved nothing to its critical-incident drive. Ex. 1 at COSD 001667. Its lead investigator asked for one day of video and never asked how long the rest would last. Blumenshine Dep. 119:8–13, 120:15–21. That is not, as the County's Homicide Manual describes, "a thorough investigation of an in-custody death," with evidence collected and preserved "for future presentation and identification in court." Ex. 14 §§ 3.5.1, 3.12.1.

As the *Schuck* court concluded, in that case: "The County did not place a litigation

[7] The County will likely cite *Estate of Arroyo v. County of San Diego*, No. 21-CV-1956-RBM-SBC, 2025 WL 1914399 (S.D. Cal. Apr. 14, 2025), *report and recommendation adopted*, 2025 WL 1733194 (S.D. Cal. June 23, 2025). *Arroyo* held that a preservation letter seeking footage that "depicts or shows" the decedent did not reach a hallway camera whose view of the cell was blocked by a concrete wall, where the decedent died the day he was booked and the County represented that Homicide had "reviewed and preserved all video that showed" him. *Id.* at *1–*2, *7, *9. None of that is true here. The Module 7D camera covered Mr. Rupard's cell door; Homicide preserved less than two days' time of eighty-six in that module; and no letter narrowed the County's duty. If anything, the County's representation in *Arroyo* confirms that its practice in in-custody deaths is to preserve all video showing the decedent, a practice it failed to follow for Mr. Rupard.

hold in March 2022, when by its own policies it anticipated litigation …. The County did not follow its formal document retention policy. The County did not follow its informal policy to preserve all video that shows an inmate ….” *Schuck*, 2025 WL 2180987, at *8. The very same is true here.

Each of those failures recurred here, mere days later. The same two-year schedules applied. Williamson Dep. 46:15–48:11, 49:21–50:15. As *Schuck* observed, "[i]f the County had followed its own retention policies, the video would have been preserved for two years, until March 2024." *Schuck*, 2025 WL 2180987, at *7. Here, too, had the County followed its own schedules, every hour of the Module 7D video would still have existed when Plaintiff presented the claims in March 2023 and when it filed this action in July 2023. ECF No. 184 ¶¶ 10–11, 26. The County also violated state law: A county may destroy "recordings of routine video monitoring" — which include "jail observation and monitoring systems" — only "after one year," and "[i]n the event that the recordings are evidence in any claim filed or any pending litigation, they shall be preserved until pending litigation is resolved." Cal. Gov't Code § 26202.6(a), (c); *see* Ex. 12 at 8:15–16. Mr. Rupard's video was gone in six months. And the County's "informal policy" — Homicide's practice of requesting "all times that the individual was on video" — was followed for Mr. Schuck and abandoned for Mr. Rupard. Williamson Dep. 33:22–24.

It is no answer that the County kept only what its detective initially requested. In *Hargis*, the county kept the jail video that the Tennessee Bureau of Investigation ("TBI") requested and let the rest be overwritten; the court found that unreasonable because "the scope and purpose of the TBI's investigation was not coextensive with the civil litigation that Overton County should have reasonably anticipated," and "preserving the relevant footage would have required very little effort." 2023 WL 8604139, at *11–*12. A county jail is a "sophisticated party" with long experience of in-custody-death litigation. *Est. of Bosco v. Cnty. of Sonoma*, 640 F. Supp. 3d 915, 926 (N.D. Cal. 2022). Saving the Module 7D video would have taken one request to

the deputy who had already pulled the 24 hours.

**3. The video cannot be restored or replaced.**

The video is gone. Ex. 1 at COSD 001667, 001671. Nothing else in the record can replace it. The jail's logs record only when a round of safety checks began — not when it ended, which deputy looked into which cell, or for how long. Mace Dep. 58:15–18, 61:15–23; Williamson Dep. 24:9–25. The deputies claim not to remember what Mr. Rupard looked like during the safety checks. Mace Dep. 79:16–21. Most declined to be interviewed. Ex. 6 at COSD 000270–71. And Mr. Rupard cannot testify.

*Schuck* rejected the County's reliance on the same kind of logs and the same kind of testimony: "The Court finds that logs are not an adequate substitute of the video footage," and testimony is not "a complete and fair substitute, given that Decedent is unavailable to provide h[is] own testimony regarding the events leading up to h[is] death." *Schuck*, 2025 WL 2180987, at *8 (quoting *Scalia v. Cnty. of Kern*, 658 F. Supp. 3d 809, 816 (E.D. Cal. 2023)). The court agreed with the plaintiffs there that "Plaintiffs cannot know what they do not know." *Id.* The same is true here, as the County's own investigation shows: the one time the record shows someone checking a Module 7D log against the video, the "logged" hygiene inspection turned out not to have been completed. Ex. 1 at COSD 001660.

**B. The loss of the video prejudices Plaintiff.**

The prejudice is plain. Rule 37(e) "does not place a burden of proving or disproving prejudice on one party or the other," because "placing the burden of proving prejudice on the party that did not lose the information may be unfair." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. But Plaintiff can show it. It must prove what each individual deputy knew about Mr. Rupard's condition and what the County's customs were in conducting safety checks. The lost video was the only objective record of who looked into Cell 17 and for how long; whether meals reached him or went back untouched; whether he came to the door;

and whether anyone entered his cell in the weeks in which his recorded weight fell by sixty pounds.

The video that survives shows how much the rest would have shown. On March 17, the video shows a breakfast tray apparently handed back to the inmate worker, Ex. 3 at COSD 001644; a sergeant and deputy standing at the door of Cell 17, and a cleaning crew passing it by, Ex. 6 at COSD 000272–73; and a full day in which the County's own investigator "never observed movement through the window into Cell 17," Ex. 1 at COSD 001673. Plaintiff can show the jury that footage. It cannot show the days and weeks that came before.

The *Schuck* court found that "the prejudice to Plaintiff is clear" on less:

> The footage would be relevant even if it never showed Hayden or anyone else. In that case, it would demonstrate a lack of medical attention. If, instead, the footage showed people coming to the cell, they would be witnesses to Hayden's condition.

*Schuck*, 2025 WL 2180987, at *11. The County will answer, as it did in *Schuck*, that it kept the footage closest to the death and that nothing earlier could matter as much. *Schuck* rejected that argument in terms directly applicable here:

> But this argument actually underscores why the missing time period is particularly critical. At the end of the missing time period, there is evidence that Hayden was found in a state of decompensation …. The video from the hallway outside his cell for the 55 hours leading up to that moment … would have been highly probative as to the cause of that decompensation, including whether it was the result of neglect. That issue is at the core of this litigation.

*Id.* at *9. This is even more true here. The final day shows Mr. Rupard's terrible end, but the lost video showed how he got there — and here, unlike in *Schuck*, the camera was pointed at the cell door. As the County itself told the *Schuck* court, "the regular housing modules," unlike the holding cell at issue there, have "video surveillance pointing at all of the cell doors." *Id.* at *10. *See also Bosco*, 640 F. Supp. 3d at 927 (lost jail video was "the best evidence of whether jail staff initially denied or delayed

medical aid”).

**C. The County acted with the intent to deprive Plaintiff of the video.**

Intent under Rule 37(e)(2) means “the willful destruction of evidence with the purpose of avoiding its discovery by an adverse party.” *Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024). That is “a demanding specific-intent standard, and purposely so,” and recklessness is “not enough.” *Gregory*, 118 F.4th at 1080. But “[b]ecause intent can rarely be shown directly, a district court may consider circumstantial evidence,” including “the timing of destruction, affirmative steps taken to delete evidence, and selective preservation.” *Jones*, 95 F.4th at 735. Courts also consider “the reason some evidence was preserved, and, where relevant, the existence of institutional policies on preservation.” *Schuck*, 2025 WL 2180987, at *9 (quoting *Laub v. Horbaczewski*, No. CV 17-6210-JAK (KS), 2020 WL 9066078, at *6 (C.D. Cal. July 22, 2020)). Applying those considerations, *Schuck* found intent. They compel the same finding here, for four reasons.

*First*, the County departed from its own policies and practice. *Schuck* relied on the principle that a county acts culpably when it overwrites video “not ‘according to’ its record-retention policy, but in spite of it.” *Schuck*, 2025 WL 2180987, at *9 (quoting *Musse v. King Cnty.*, No. C18-1736-JCC, 2021 WL 4709875, at *4 (W.D. Wash. Oct. 8, 2021)). Here the County acted in spite of two written retention schedules, its own reading of § 26202.6, and its Homicide Unit’s practice in in-custody deaths. And the departure was starker than in *Schuck*. For Mr. Schuck, the Homicide Unit gathered “as much video as they had.” Ex. 12 at 4:12–16. For Mr. Rupard, the same unit asked for only 24 hours. Blumenshine Dep. 119:8–13.

*Second*, the County kept the video it considers favorable and let the rest go. *Schuck* held:

> The County’s decision to selectively preserve 36 hours of the footage after Hayden was placed in the cell, but not the 55 hours before he was found in a state of decompensation or when he was removed from the cell as a result, is evidence of an intent to deprive.

*Schuck*, 2025 WL 2180987, at *10. Such "selective preservation is troubling here, and moves the County's conduct beyond negligence." *Id.* The selection in Mr. Rupard's case was more overt. The County kept limited video that its investigator later described as showing that "all security checks … were done on time and accurate," Ex. 1 at COSD 001673, and lost the weeks that would show how a man in its care came to weigh 105 pounds and die of dehydration, malnutrition and pneumonia. And "production of some evidence does not excuse destruction of other relevant evidence." *Jones*, 95 F.4th at 736.[8]

*Third*, County personnel watched the footage while it could still be saved and chose not to save it. This is not a case of a "passive failure to halt an automatic deletion process, without more." *Bosco*, 640 F. Supp. 3d at 929. In *Bosco*, the court found intent where the lead detective investigating a jail death reviewed an incomplete set of video, "knew or suspected that the video did exist somewhere and nonetheless kept silent" — conduct that was "more than gross negligence." *Id.* at 929–30. The same is true here. Detective Blumenshine reviewed his 24 hours in May 2022, having seen the autopsy, when every other hour still existed. Ex. 3 at COSD 001643. Lieutenant Kopchak watched video of Mr. Rupard from February 19 and saved his selected screenshots, but not the video. Blumenshine Dep. 174:16–175:3. And someone watched the March 5 hygiene inspection, saw that it "was not completed," and let that video be overwritten too. Ex. 1 at COSD 001660. A person who saves a screenshot has decided what to keep, and what to allow to be destroyed.

---

[8] In *Hargis*, the court found a county's deletion of jail video "grossly negligent, but not done for the purpose of excluding that video from use in this litigation," where the county had preserved the footage that an outside state agency requested and that footage was itself adverse to the county. 2023 WL 8604139, at *14. Neither fact is present here. The investigators who chose what to keep were the County's own, and the County kept the video it now says vindicates its deputies. As *Hargis* itself recognized, "[c]ommon sense suggests that when a party preserves helpful or neutral information while deleting harmful information, that tends to indicate intentionality." *Id.* (quoting *Bistrian v. Levi*, 448 F. Supp. 3d 454, 476 (E.D. Pa. 2020)).

*Fourth*, the County's investigation departed from its Homicide Unit's written procedure, and every departure ran in the County's favor.[9] The manual calls for a "thorough investigation," begun "immediately," with interviews of "all percipient witnesses." Ex. 14 §§ 3.12.1–3.12.2. Detective Blumenshine collected one day of video, stopped in June 2022, and waited — although Internal Affairs had been told of "possible misconduct due to the state of the decedent's cell," and the Department's "In Custody Death Advocate" was reviewing footage. *Supra* Parts II.E, II.G. Blumenshine turned to the three months of video only when the Medical Examiner's ruling left him no choice — "tailoring" his investigation to her findings — and to the people who saw Mr. Rupard in his last week only when outside prosecutors asked. Ex. 1 at COSD 001666–67; Ex. 6 at COSD 000267–68. The County looked for the video only after it was certain not to find it. Courts treat such departures as evidence of intent. "Courts have found the requisite 'intent to deprive' when a litigant fails to provide a credible explanation for departing from standard operating procedure and intentionally failing to preserve ESI." *Hill*, 2022 WL 1464830, at *12. In *Musse*, the county's investigator "did not photograph Musse's injuries, interview any inmates who witnessed the attack, or ask jail staff whether there was photo or video evidence," and the court counted that "seemingly cursory follow-up investigation" against the county in finding it culpable under Rule 37(e)(2). 2021 WL 4709875, at *1, *4.

The County's likely explanation — that its detective took the death for a natural one and believed one day of video was enough — fares no better than the explanation it offered in *Schuck*, that its employee had been "over-inclusive" in

---

[9] Detective Blumenshine collected the evidence of this death as the County's agent, and his state of mind is attributable to it. *See Bosco*, 640 F. Supp. 3d at 928–30; *Colonies Partners, L.P. v. Cnty. of San Bernardino*, No. 5:18-CV-00420-JGB-SHK, 2020 WL 1496444, at *10 (C.D. Cal. Feb. 27, 2020) ("an employee's misconduct with regard to spoliation can be imputed to an employer"), *report and recommendation adopted*, 2020 WL 1491339 (C.D. Cal. Mar. 27, 2020).

keeping what he kept. "This explanation makes no sense," the court answered. "If a person were being 'over-inclusive,' they would preserve *more* footage, not less; and they would preserve the footage that the County acknowledges was more relevant …." *Schuck*, 2025 WL 2180987, at *10. The Homicide Manual has no natural-death exception; it calls for a thorough investigation of every in-custody death. Ex. 14 § 3.12.1. And a detective who has seen an emaciated man on an autopsy table, and whose own unit's practice is to collect "all times that the individual was on video," does not ask for only a single day of video because he believes that is all that is necessary to tell him what happened. *Bosco* rejected the same defense — that a detective "was only checking for possible criminal activity, and as such did not think the lack of footage was necessary." 640 F. Supp. 3d at 928. His failure to "question how or why the video was missing, even though it would have been central to his investigation, beggars belief." *Id.* at 929. Detective Blumenshine denies covering anything up, Blumenshine Dep. 155:14–19, but that denial does not explain the conduct.

The *Schuck* court was also "concerned that the County has not been able to identify the employee who reviewed the video and made decisions regarding what portions should be preserved," and observed that "[a]llowing self-collection by clients without attorney guidance is highly problematic." *Schuck*, 2025 WL 2180987, at *10. The same unsupervised process operated here. And *Schuck* summed up the County's culpability in terms that apply with equal force here: "It apparently knew what its retention policy required, did not follow the policy, and does not try to explain why. … Whether one calls this 'willful,' 'intentional,' or 'conscious disregard,' it is enough to put [Rule 37(e)(2)] sanctions in play." *Id.* at *11 (quoting *Musse*, 2021 WL 4709875, at *4). *See also Hill*, 2022 WL 1464830, at *13 (inferring intent where county preserved less relevant jail video and let the most relevant period be overwritten).

### D. The Court should instruct the jury to presume the lost video was unfavorable to the County and order curative measures.

#### 1. The jury should be instructed to presume that the lost video was unfavorable to the County.

On a finding of intent, the Court may "instruct the jury that it may or must presume the information was unfavorable to the party." Fed. R. Civ. P. 37(e)(2)(B). The Court should give the mandatory form. Courts in this Circuit do so where a party intentionally destroyed evidence within its control. *See Welter v. Hurt*, No. 2:23-CV-02627-SPG (MARx), 2025 WL 1843263, at *12 (C.D. Cal. Apr. 1, 2025) (recommending instruction that the jury "must presume—irrebuttably—" that the destroyed information was unfavorable, because a permissive instruction "does not sufficiently sanction Defendant's intentional destruction"), *report and recommendation adopted*, 2025 WL 1843205 (C.D. Cal. May 28, 2025).

A mandatory presumption is warranted here for three reasons. First, the scale of the loss. A permissive inference was thought sufficient in *Schuck* to answer for 55 missing hours from a camera that did not show the cell door. It cannot answer here for eighty-four missing days from a camera that did. Second, the pattern. *Schuck* treated the loss there as the unexplained decision of one unidentified employee. This record shows it was no aberration: in the same week, at the same jail, the same Homicide Unit let the video of a second dying man be recorded over, in spite of the same policies. Third, the County's position. Having kept only the video its investigator says shows that every check was "done on time and accurate," the County will ask the jury to assume that the other eighty-four days looked the same. A permissive instruction lets it make that argument. Only a mandatory presumption takes from the County the benefit of the hole it made in the record.[10]

---

[10] *Schuck* chose the permissive form in part because "there is no evidence before the Court that the other fifteen named defendants participated in the spoliation." *Schuck*, 2025 WL 2180987, at *13. That concern can be met here by directing the presumption to Plaintiff's claims against the County alone.

At a minimum, the Court should give the permissive instruction ordered in *Schuck*. As that court explained, "any sanction less than a permissive adverse inference instruction would be 'unfair to Plaintiff[s] and may incentivize the County to spoliate future evidence if no adverse inference instruction is imposed in this case.'" *Schuck*, 2025 WL 2180987, at *13 (quoting *Scalia*, 658 F. Supp. 3d at 817). That concern is greater here. This is at least the second case in which the County let video of a man's last days at the Central Jail be recorded over — both from the same week.[11]

**2. Whether or not it finds intent, the Court should order curative measures under Rule 37(e)(1).**

Rule 37(e)(1) requires no finding of intent — only prejudice, which is clear. *See supra* Part III.B. The Advisory Committee identifies the appropriate measures: "forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Each is warranted here:[12]

1. Plaintiff should be permitted to present evidence and argument about the County's failure to preserve the video — including its retention schedules, its Homicide Unit's Manual and practice, what it did for Mr. Schuck, the course of its own investigation, and what its own personnel watched and did not save. Jurors will

---

[11] If the Court concludes that the question of intent should go to the jury, Plaintiff requests in the alternative that the jury be instructed as the Advisory Committee describes: that it "may infer from the loss of the information that it was unfavorable to the party that lost it" if it "first finds that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

[12] *Schuck* did not reach the plaintiffs' alternative request for such measures only because it ordered the adverse-inference instruction. *Schuck*, 2025 WL 2180987, at *13.

be asked to decide what deputies saw through the window of Cell 17. They are entitled to know why they cannot see for themselves.

2. The jury should be instructed that the County had a duty to preserve the video of Mr. Rupard's incarceration and failed to do so, and that it may consider that failure in weighing the evidence. *See Porter v. City & Cnty. of San Francisco*, No. 16-CV-03771-CW (DMR), 2018 WL 4215602, at *4 (N.D. Cal. Sept. 5, 2018) (jury to be told that defendant had a duty to preserve recording and failed to do so); *Hargis*, 2023 WL 8604139, at *15 (jury to be told that county "had a duty to preserve all the Booking Camera footage that showed the events leading to Hargis's death and negligently failed to do so," and that it "may give the fact of the lost video footage any weight you deem appropriate").

3. The County should be precluded from offering its logs — or testimony or argument based on them — to show that safety checks, counts, meal service, or hygiene inspections of Mr. Rupard's cell were properly performed during the periods for which it failed to preserve video. The Advisory Committee approved such limitations, noting: "it may be appropriate to exclude a specific item of evidence to offset prejudice caused by failure to preserve other evidence that might contradict the excluded item of evidence." Fed. R. Civ. P. 37(e) Advisory Committee's Note to 2015 amendment. The video is the evidence that "might contradict" the logs and the record shows that it would. The module's "last logged hygiene inspection" was not completed. Ex. 1 at COSD 001660. The remedial measure is narrow. It does not "preclud[e] a party from offering any evidence in support of" a defense, *id.*; it bars no witness with actual memory of Mr. Rupard. It prevents simply prevents the County from telling a story with unverifiable paper that cannot be compared against the more complete evidence that the County allowed to be destroyed.

4. The Court should award Plaintiff its reasonable attorney's fees and costs incurred in investigating the spoliation and bringing this motion, as *Schuck* did. *Schuck*, 2025 WL 2180987, at *13–*14 ("Rule 37(e)(1) permits courts to award costs

and fees associated with spoliation."); *Scalia*, 658 F. Supp. 3d at 817–18 (fees appropriate under Rule 37(e)(1) even without finding of intent).

### 3. The County's conduct supports default judgment on liability.

Where a party has acted with intent to deprive, the Court may enter default judgment if "lesser sanctions are insufficient to address the loss of the ESI." *Jones*, 95 F.4th at 735; Fed. R. Civ. P. 37(e)(2)(C). In *Hill*, the court entered default judgment on liability against a county that preserved some jail video of a dying inmate and let the most relevant hours be overwritten. 2022 WL 1464830, at *16. Plaintiff recognizes that *Schuck* declined to enter default, reasoning that the loss of 55 hours of hallway video "does not mean that the case cannot be determined on the merits." *Schuck*, 2025 WL 2180987, at *12. But the loss here is of a different order: nearly the entire video record of a three-month death by neglect, from a camera pointed at the decedent's door. Since no instruction can restore what the County destroyed, default judgment against the County on liability is warranted and should be entered.

## IV. CONCLUSION

The County had every reason to keep those recordings and the clear duty to do so — under the common law, its own retention schedules, and its own practice the day before. It kept 40 hours only. Plaintiff respectfully requests that the Court grant the motion and impose the sanctions set out in the Notice of Motion.

Respectfully submitted,

DATED: November 13, 2026

IREDALE & YOO, APC
EUGENE G. IREDALE
JULIA YOO
SARAH MUSUMECI

/s/ Eugene Iredale

Eugene G. Iredale
Attorneys for Plaintiff