EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

JEREMIAH A. LOWE (CA SBN 239166)
*jeremiah@lowelawapc.com*
LOWE LAW, APC
402 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 878-2725
Facsimile: (619) 878-2737

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ESTATE OF LONNIE RUPARD,

Plaintiff,

v.

COUNTY OF SAN DIEGO, *et al.*,

Defendants.

CASE NO. 23-CV1357-CAB-JAC

**DECLARATION OF GARY RANEY**

Judge: Hon. Cathy Ann Bencivengo

Date: December 18, 2026

**PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT**

I, GARY RANEY, being duly sworn, hereby declare:

1. I have been retained as an expert in jail policy and practice, specializing in the prevention of jail deaths, by the law firm Iredale & Yoo in *Estate of Lonnie Rupard v. County of San Diego, et al.* I make the following declaration based on my personal knowledge. If called to testify to the matters set forth herein, I could and would competently testify thereto based upon my personal knowledge.

2. I was hired by the Ada County (Idaho) Sheriff's Office in 1983. Throughout my career, I served various duties with the Ada County Sheriff's Office, including jail operations and administration in a 1,300-bed jail. My duties also included patrol, criminal investigations, internal affairs, administrative investigations, training, and more.

3. While with the Sheriff's Office, I was a training officer in the jail, patrol, and detective divisions. I helped create and/or update the training programs in each of those areas.

4. In 1993, I was promoted to sergeant (supervisor) and served in the jail as both a housing supervisor and as the administrative sergeant over the jail. My duties included reviewing and writing policies and procedures, auditing operations and processes, and conducting detainee hearings.

5. I was later assigned to the patrol division until I was selected by the Sheriff as administrative project manager, during which I oversaw all training for the agency and rewrote the entire Sheriff's Office Policy Manual. I also had assignments as an internal affairs and risk management investigator, conducting investigations into misconduct and agency liability.

6. In 1998, I was promoted to Lieutenant and placed in charge of all patrol operations.

7. In 2001, I was promoted to Captain and to undersheriff in 2002, where I oversaw the operation of the entire agency.

8. I was elected as Sheriff in 2004 and served until I retired in 2015. At the time of my retirement, the Sheriff's Office employed approximately 665 people

and as its elected official, I had final authority on personnel actions within the agency, including medical care.

9. During my time as Sheriff, the Governor appointed me to the Idaho Peace Officer Standards & Training (POST) Council and later appointed me the chair. POST is responsible for providing or approving almost all law enforcement and corrections training in Idaho, including legal training and jail procedures.

10. My qualifications to serve as an expert witness, including my educational and occupational background, are more thoroughly detailed in my curriculum vitae, which is attached to this declaration

11. Per my education, training, and professional experience, I am qualified to provide expert opinions regarding jail policies and practices, including procedures on cell checks.

12. I reviewed numerous materials in this case. Attached as **Exhibit A** to this declaration is a true and correct copy of my Rule 26 report in this case and my curriculum vitae.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of November 2026, in McCall, Idaho.

GARY RANEY

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**
**Case No.: 3:23-cv-01357**
**Estate of Lonnie Rupard, Plaintiff,**
**vs**
**County of San Diego et al, Defendants**

# REPORT OF EXPERT WITNESS GARY RANEY

**July 14, 2026**

## QUALIFICATIONS

I was hired by the Ada County (Idaho) Sheriff's Office in 1983 and served in a wide range of operational, supervisory, and executive roles over the course of my 32-year career with the Office. My assignments included jail operations and administration, patrol, criminal investigations, internal affairs, administrative investigations, training, and other specialized duties. During my tenure, I served as a training officer in the jail, patrol, and detective divisions and was responsible for developing, revising, and updating training programs for each division. I rose through the ranks and, in 2004, was elected Sheriff, serving in that capacity until I retired in 2015.

During my tenure as Sheriff, I was appointed by the Governor to the Idaho Peace Officer Standards & Training (POST) Council and later served as its chair. POST is responsible for providing or approving nearly all law enforcement and correctional training in Idaho, including legal instruction and jail operations training. For part of my service on the Council, I also chaired the POST Hearing and Decertification Board, which reviewed and made recommendations on officer decertification. As chair, I played a key role in updating the administrative rules governing POST operations and the Council's disciplinary review and decision-making processes.

I was also appointed by the Governor to the Idaho Criminal Justice Commission (ICJC), where I served as vice chair until my retirement. The ICJC was responsible for identifying opportunities for statewide criminal justice reform and submitting policy recommendations to the Idaho Legislature.

In 2010, I was appointed by the U.S. Attorney General to the board of the National Institute of Corrections (NIC) in Washington, D.C., where I served as vice chair. I am also a past president of the Idaho Sheriffs' Association.

Throughout my career, I have provided instruction and presentations to thousands of law enforcement professionals across the United States. These presentations included training for the

National Sheriffs' Association, American Jail Association, American Correctional Association, Police Executive Research Forum, Americans for Effective Law Enforcement, and the sheriffs' associations of Idaho, Utah, Oregon, and Texas, as well as judicial conferences in Idaho, Maryland, New Mexico, South Dakota, and St. Croix. Many of these presentations focused on policy development, training systems, organizational accountability, and best practices in jail operations.

I hold both Bachelor's and Master's degrees in Criminal Justice Administration from Boise State University. I am a graduate of Northwestern University's School of Police Staff and Command, the FBI National Academy, the FBI Law Enforcement Executive Development Seminar, and the FBI National Executive Institute. I have earned Advanced, Supervision, Management, and Executive Certificates from Idaho POST. I taught for many years at the Idaho Peace Officer Academy, Northwestern University's Center for Public Safety, and Boise State University. I began consulting independently with law enforcement agencies in 2007 and have done so continuously since then.

I am currently the President of G.A.R., Inc., and I work for the U.S. Department of Justice and independently as a consultant in jail and law enforcement policy and practice. I have provided analyses, recommendations, and expert opinions in more than 40 states.

In 2018, I was appointed by a federal court as a consent decree court monitor for the San Bernardino County Jail in California. The San Bernardino County jail system comprises approximately 6,000 beds across eight jails, four of which are large facilities. By working with staff to improve its policies and practices, the system reached substantial compliance, and the Consent Decree was terminated.

In 2019, I was appointed as a federal consent decree court monitor for the Santa Clara County Jail in California. The Santa Clara County jail system initially included almost 5,000 beds across two facilities, but population-reduction strategies have reduced the average daily population to well below 4,000. The jail system has achieved substantial compliance in most areas but remains noncompliant in others.

In March 2022, Miami-Dade County hired me as a consultant because it was losing substantial ground in its jail consent judgment compliance ratings, and the federal court was threatening receivership. After demonstrating progress to the court, in February 2023, the federal court appointed me as the Independent Compliance Director (receiver) for the Miami-Dade Corrections and Rehabilitation Department, with responsibility for bringing the jail system into substantial compliance with all remaining provisions. By working with the jail staff to improve policies and practices, substantial compliance was fully achieved in August 2023, and the consent judgment was terminated in April 2025.

In 2023, the Department of Justice hired me to conduct a constitutional compliance investigation into correctional practices at the Fulton County Jail in Atlanta, Georgia. The jail system housed around 3,000 inmates across three locations. Serious constitutional violations were uncovered, including violations related to protection from harm, use of force, classification, segregation, sanitation, and healthcare. Shortly after the Department of Justice report was issued, Fulton County agreed to enter a consent decree with little objection to the findings.

In 2025, the New York City Department of Correction, commonly known as Rikers Island, hired me as a consultant to recommend strategies to achieve substantial compliance with 18 provisions of its consent judgment that were in the third contempt order. I led reforms related to the use of force, classification, housing practices, and other violence reduction strategies. In 2026, the federal court appointed a Remediation Manager (receiver) to oversee the jail system, and the mayor replaced the sitting commissioner with someone with no prior correctional leadership experience, so my work is currently inactive.

In addition to consulting on law enforcement policy and practice, I provide expert witness services focused on use of force, in-custody deaths, and jail policies. Over the course of my career, I have been directly involved in or have reviewed thousands of cases involving jail practices as a line officer, supervisor, administrator, sheriff, and consultant. I have written or reviewed hundreds of policies and guided jails in implementing best practices across several areas. I have also provided executive, leadership, and strategic planning services to various organizations.

Additional publications, professional engagements, and recognitions are listed in my attached curriculum vitae.

## COMPENSATION

I am being compensated at a rate of $500.00 per hour for my work in this matter. My compensation is not contingent on the outcome of this litigation or the substance of my opinions.

## PRIOR TESTIMONY

A list of cases in which I have testified at trial or by deposition during the preceding four years is set forth in my attached curriculum vitae.

## METHOD

In analyzing the materials and forming my opinions, I drew upon my more than 40 years of experience in correctional administration, including my direct oversight of large jail systems as a sheriff, federal court-appointed monitor, and federal receiver. After understanding what is alleged to have occurred, I applied a methodology to compare the acts and omissions against

applicable laws, standards, and generally accepted correctional practices. Since there are no compulsory national correctional standards, *generally accepted correctional practices* are those widely agreed-upon practices that would be used to create standards if it were possible.

I then compared the individual acts and omissions and the agency's policies, practices, training and administrative acts or omissions against generally accepted correctional practices, constitutional requirements, and the practices I have observed and implemented in comparable large correctional systems throughout the country. My analysis, where applicable, evaluated whether the agency acted as a reasonable corrections administrator under the circumstances presented.

All the opinions below are based on my education, training, and experience, as well as my review of the evidence, documentation, and other information that may have been considered in forming them. My opinions are held to a reasonable degree of professional certainty.

A complete list of materials to date is attached as ***Exhibit A***.

Statements or testimony documented in this report may have been edited for grammar or punctuation for readability, but no substantive information was changed.

## OVERVIEW

On December 19, 2021, Lonnie Rupard was arrested and booked into the San Diego Sheriff's Office (SDSO) Central Jail. His behavior, apparently caused by mental illness, caused him to be housed on the 7th floor in module D, cell 17. Module D typically housed IPs designated for administrative segregation.

On March 17, 2022, Rupard died in the cell. The cause of death included malnutrition and dehydration. Although there was an initial investigation by a homicide detective, it was incomplete and restarted after the February 8, 2023, autopsy report listed the manner of death as homicide. By that time, the video recordings had been erased, and the witnesses' memories had faded.

The investigation revealed that there were about nine days of accumulated food containers and associated trash, as well as feces in his cell at the time of his death.

## SUMMARY OF OPINIONS

1. The SDSO staff violated California Title 15, American Correctional Association (ACA) accreditation standards, generally accepted jail practices, and its own policy by failing to monitor Rupard's well-being and take action to keep his cell reasonably clean. Had they done so, it is more likely than not that they would have recognized his deteriorating physical health.
2. The SDSO violated generally accepted jail practices by failing to provide sufficient training and supervision on California Title 15 requirements on cleanliness and housekeeping as well as recognizing and responding to unsanitary conditions, especially involving someone with a mental illness.
3. The SDSO, particularly Detective Blumenshine, failed to follow generally accepted law enforcement practices and conduct a thorough investigation that collected all the pertinent evidence.

## DEATH INVESTIGATION

SDSO Homicide Detective M. Blumenshine was the lead investigator.

"On December 19, 2021, Lonnie Rupard (10/1/ 75) was arrested for a probation revocation by the National City Police Department. Inmate Rupard was booked into the San Diego Central Jail.

"On March 18, 2022, Inmate Rupard was housed in 7th-floor Module D, Cell 17. Inmate Rupard had no cellmate.

"At 2248 hours, Deputy Romans was conducting a security check in Module D. Deputy Romans looked in Cell 17 but could not see the rise and fall of Inmate Rupard's chest. Deputy Mendoza

and Deputy Gutierrez responded to assist Deputy Romans. At 2250 hours, the deputies entered cell 17. Rupard was moved onto the floor and CPR was initiated.

At 2253 hours, medical staff arrived and took over lifesaving measures. No pulse or breathing was observed."[1]

---

"Rupard refused every offer for the COVID-19 vaccine. Rupard had numerous notes regarding refusal to take medication and being verbally combative with medical staff. Additionally, Rupard routinely refused to comply during psychiatric evaluations.

"On Saturday, March 19, 2022, at 0850 hours, FET Gervasoni, FET Racicot, and I attended the autopsy of Lonnie Rupard conducted by Forensic Pathologist Doctor Schaber, case #2022-01007. The decedent appeared severely emaciated and had a peptic ulcer. He may have had pneumonia.

"On February 9, 2022, Christina Anosike, a mental health clinician, attempted to evaluate Rupard. Rupard stated, "I am fine. I don't want to talk to you." Anosike noted Rupard was clean, and his cell appeared clean aside from some open food containers. His cell was free of urine, feces, or flooring. She scheduled a future contact in two weeks to re-evaluate Rupard."[2]

"On Wednesday, October 19, 2022, at 0815 hours, I asked Lieutenant Kopchak if any hygiene inspections were done. Lieutenant Kopchak notified me the last logged hygiene inspection was on March 5, 2022. However, after a review of the video, it appeared the inspection was not completed. Additionally, the housing unit log was not completed regarding as to why the hygiene inspection was not completed. That investigation into the lack of hygiene inspections falls under the Internal Affairs purview and as such I will not be investigating the policy violations.

"Rupard's housing block, 7D, was classified as COVID quarantine and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health."[3]

On Wednesday, October 19, 2022, at 1152 hours, I received a copy of the Forensic Psychiatry Clinic report on Mental Competency by Dr. Nicolas Badre. I also received the Forensic Psychiatry Clinic Report on Involuntary Medication to Restore Competency report by Dr. Nicolas Badre. I reviewed both reports and discovered the following.

- Dr. Badre went to see Lonnie Rupard while in custody at the San Diego Central Jail at the direction of the Honorable Judge Cindy David. Dr. Badre was present to examine Rupard for mental competency to stand trial.
- Dr. Badre reviewed Rupard's jail psychiatric records.

[1] COSD 001638
[2] COSD 001643
[3] COSD 001660

- Dr. Badre spoke with Rupard at his cell at the recommendation of jail mental health staff and floor deputies.
- The cell was dirty with trash throughout. The toilet was full of excrement, and the room was very malodorous.
- The defendant was unkempt and dirty himself. He was lying in bed in an uncomfortable manner with a blanket over his head.
- There were feces on the floor. There was food smeared on the wall.
- It required the food flap and a very loud introduction on my part to get the defendant's attention.
- Dr. Badre attempted to interview Rupard. Rupard was hostile, continually referring to Dr. Badre as "dog", asking for water, and insulting him. Rupard ultimately placed a blanket over his head and ignored Dr. Badre.
- Dr. Badre wrote his Findings and Opinions as follows:
    - Given the information I have, it is my opinion with reasonable medical certainty that the defendant is unable to have a rational and factual understanding of the charges and is unable to assist counsel in a rational manner.
    - While the defendant's lack of cooperation is likely in part volitional. I think that is motivated by underlying disorganization of thought, which would be consistent with prior evaluation that diagnosed him to be psychotic.
    - The defendant suffers from mental illness, displaying active signs of mental illness, including disorganized thinking. Those symptoms of mental illness disable the defendant from being able to have a rational understanding of the charges and assist legal counsel.
    - I would recommend that the defendant be referred to a station hospital or JBCT program for restoration to competency."[4]

"Dr. Badre's report was dated March 24, 2022, which is 7 days after Rupard died.[5]

"On Sunday, December 19, 2021, Rupard refused to take his medication during the booking process. Over the course of his incarceration, his refusal was documented many more times.

- On Thursday, December 30, 2021. (3 times)
- On Friday, December 31, 2021. (2 times)
- On Saturday, January 1, 2022. (2 times)
- On Sunday, January 2, 2022.
- On Monday, January 3, 2022.
- On Tuesday, January 4, 2022.

---

[4] COSD 001661-2
[5] COSD 001661-2

- On Wednesday, January 5, 2022. (2 times)
- On Thursday, January 6, 2022.
- On Saturday, January 8, 2022. (2 times)
- On Sunday, January 9, 2022. (2 times)
- On Monday, January 10, 2022.
- On Tuesday, January 11, 2022. (2 times)
- On Wednesday, January 12, 2022.
- On Thursday, January 13, 2022. (2 times)
- On Friday, January 14, 2022. (2 times)
- On Saturday, January 15, 2022. (2 times)
- On Sunday, January 16, 2022.
- On Monday, January 17, 2022. (2 times)
- On Tuesday, January 18, 2022.
- On Wednesday, January 19, 2022. (2 times)
- On Thursday, January 20, 2022."[6]

On Sunday, December 19, 2021, Rupard had his vital signs checked twice.

- At 0251 hours, Rupard had blood pressure of 128/82 with a pulse of 90.
- At 1136 hours, Rupard had blood pressure of 120/74 with a pulse of 110.

Rupard's vital signs were never checked again until his death on March 17, 2022.[7]

"I began a search of the cell for any narcotics or paraphernalia. I did not locate any illegal substances. There were feces and old food throughout the cell. The toilet and sink were full of fecal matter. There were feces in two corners of the room on the ground, feces on the bedroll, feces on the bottom bunk under the bedroll, feces on the ground, feces on the table, and strewn about the rest of the room. The sink in the cell was operable."[8]

"I later checked the speaker box inside cell 17 and confirmed that, although the speaker had been vandalized, I was able to hear the deputy when he shouted, and I had my ear pressed up to the box."[9]

"On Thursday, March 17, 2022, at 2246 hours, Inmate Lonnie Rupard (10/1/75) was found unresponsive in his cell. Deputies and medical staff attempted lifesaving measures until

---

[6] COSD 001662-3
[7] COSD 001663
[8] COSD 001641
[9] COSD 001641

paramedics arrived. Inmate Rupard was transferred to UCSD Hospital before being pronounced deceased at 2351 hours by Dr. Allen."[10]

"Rupard's cell was in a dismal state; however, not uncommon for housing of inmates with psychiatric history. Rupard had roughly 28 meal containers in his cell at the time of his death ( ~ 9 days' worth of trash). In review of the containers, most had been opened, and many of the food items were missing. While there was food on the floor, table, and bed of the cell, it would not account for the food missing from the food trays. The food was either eaten or flushed down the toilet. There was feces in the cell, on the bed, floor, blanket, and in the toilet. However, it appeared the feces was smeared and moved, suggesting the feces on the floor and bed originated from about three separate defecations. It was unknown how much feces had been backed up in the toilet, as it was also full of food wrappers and trash, clogging the toilet. The condition of Rupard's cell, while visibly upsetting, was not a factor in his death."[11]

"Rupard's logs show he had been continually refusing his dayroom time, which offers a possible explanation for the trash buildup in his room. An inmate is allowed to clean their cell during their one hour of dayroom. Their cell is opened to the dayroom with trash bins where they can come and go freely during their time. Inmates are also allowed to pass their trash through their food flaps to trustees. If Rupard refused to come out of his cell, and refused to give his trash to trustees, he would have nowhere to throw out his trash.

During the autopsy, Rupard weighed 105 pounds. Rupard weighed 60 pounds less than when he was booked into custody 89 days prior."[12]

Lieutenant Kopchak provided Blumenshine with screenshots from an incident on February 19, 2022, when Rupard was standing in the dayroom, refusing to lock down, and an incident report was created.[13]

"On Monday, March 6, 2023, I began contacting staff at the San Diego Central Jail to acquire surveillance video from the 3-month period Rupard was in custody. Deputy Hann #3492 is the Corporal in charge of the San Diego Central Jail Administration. He reviewed the surveillance video and determined it was no longer available. The video was saved for approximately 6 months back. He also pulled the surveillance video hard drive which was used to save critical incidents. Deputy Hann confirmed the video for this case had not been saved."[14]

"On Thursday, March 9, 2023, a more extensive video review from the incident was done. The 24 hours of video surveillance for Module 7D was reviewed in full. It was confirmed all security

---

[10] COSD 000266
[11] COSD 001676
[12] COSD 001676
[13] COSD 001671-2
[14] COSD 001667

checks (11-53) were done on time and accurate. It was also noted all deputies conducted the hard count, soft count, food pass, and temperature checks accurately."[15]

"On Thursday, November 16, 2023, I began reviewing the area activities summary report and hygiene inspection report for potentially involved parties that needed to be interviewed. I noticed that Module D was not being cleaned during the ad-seg cell hygiene inspections. Only Module E was being cleaned.

"On Monday, November 20, 2023, I reviewed green sheet "GS L.2.C.1" regarding Sanitation and Hygiene Inspections as of September 12, 2019. On Page 2, I noted it read 'High risk security housing hygiene inspections (E modules) shall be conducted throughout the week and finalized by the Saturday nightshift team. Inmate workers shall be utilized to clean common area and cells in all high risk security level housing modules.

"In my review, I saw D module was missing from the policy. This would provide an explanation for the reason it was not being cleaned by deputies. On Tuesday, November 21, 2023, I notified the reviewing agencies the reasoning D Module (where Rupard was housed) was not being cleaned during hygiene inspections.

"An oversight in policy did not account for D Module.

On Thursday, January 4, 2024, GS L.2.C.1 was approved and entered as the updated green sheet for Sanitation and Hygiene Inspections."[16]

"On Monday, December 11, 2023, I sent out voluntary interview requests to the following personnel:

- Doctor Nicolas Badre (Court Ordered Psychiatric Doctor)
- Doctor Anthony Cruz (SDCJ Psychiatric Doctor)
- Deputy Morgan Ackerman #5994, Tower deputy during 3-12-23 hygiene inspection
- Deputy Andrew Rodriguez #4322, Floor deputy during 3-12-23 hygiene inspection Dayshift 3-15-23
- Deputy Christopher Anthony #405, Floor deputy during 3-12-23 hygiene inspection*
- Deputy Andrew Torres #3208, Deputy during 3-17-23 dayshift
- Deputy Michael Johnson #0568, Deputy during 3-16-23 and 3-17-23 dayshift
- Lieutenant Gino Matrone #0740, Sergeant during 3-16-23 and 3-17-23 dayshift*
- Deputy Treyvonne James #4039, Deputy during 3-16-23 night shift*
- Deputy Ernesto Aguirre #322, Deputy during 3-16-23 night shift
- Lieutenant Jesus Lizarraga #5400, Lieutenant during 3-15-23 and 3-16-23 nightshift

---

[15] COSD001673
[16] COSD 000268-9

- Sergeant Cesar Cardoza #3223, Sergeant during 3-16-23 nightshift
- Deputy Jeff Amado #4193, Deputy during 3-16-23 day shift
- Deputy Thomas Mace #4324, Deputy during 3-16-23 dayshift*
- Sergeant Brendan Bourgeois #7770, Sergeant during 3-16-23 dayshift*
- Deputy Jason Viladiu #0659, Deputy during 3-15-23 nightshift
- Sergeant Brian Bumbasi #3216, Sergeant during 3-15-23 nightshift*
- Deputy Brian Aguilera #4166, Deputy during 3-15-23 dayshift
- Deputy Jonathan Inacio #0715, Deputy during 3-15-23 dayshift
- Deputy Ramond Altmeyer #4196, Deputy during 3-15-23 dayshift
- Deputy Anthony Gallegos #3503, Deputy during 3-15-23 dayshift
- Deputy Luis Ortiz #3792, Deputy during 3-15-23 day shift"

*Agreed to an interview or statement.

"It is apparent that care was continually offered to Rupard throughout his time in custody, as was noted by the Medical Examiner's Office. In my review of our records: deputies reported to medical staff issues with Rupard, nurses continually checked on Rupard, and Rupard's psychiatrist continually evaluated him. Despite all that, he ultimately died while in custody of the Sheriff's Department. Rupard refused his medication, refused to communicate with medical staff, and refused to allow himself to be evaluated.

"Based on the facts determined from my investigation, as well as my knowledge and understanding of jail operations and procedures, I do not believe probable cause exists to charge any involved individuals."[17]

The Medical Examiner determined the Cause of Death was pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia. Contributing to it was SARS-COVID 19, pulmonary emphysema, and a duodenal ulcer. The manner of death was homicide.[18]

**Internal Affairs Investigation**

The Internal Affairs investigation read:

"These investigations and reviews were unable to identify individual staff members or specific violations of law or policy that contributed to the death of IP Rupard. Rather, the investigations revealed a slow deterioration of IP Rupard's mental and physical health occurring over a period of several weeks, and possibly longer. Multiple attempts by staff to address IP Rupard's deteriorating health were noted in the Homicide case file and the Medical Examiner's report.

---

[17] COSD 001676-7
[18] COSD 006412

With a timeline of missed opportunities spanning a month or more, and without the identification of any individual staff members whose actions or inactions can be shown to have contributed to the death of IP Rupard, this complaint cannot be further investigated. This complaint will be closed with this letter to file for purposes of documentation."[19]

## DEPOSITIONS

All of the deponents who testified about the safety checks and area activities log agreed that if there were more than one deputy, they would typically separate, with one checking the upper tier and the other the lower tier. Unless otherwise specified, the log would not reflect which deputy checked which tier.

### Deputy Allen Wereski

Allen was deposed on May 18, 2026. He was hired by the SDSO in 2018. While on duty at the jail, cocaine was found in his car that was parked in the jail parking lot, and he was criminally charged. At the time of his deposition, he was a manager at an Arby's restaurant.

Wereski conducted safety checks or counts in the housing unit on the night shift of March 10/11, and March 14/15.

- Wereski testified that he did not recall Rupard.[20]
- Testifying about the photographs of Rupard's cell, Wereski testified he would notify a supervisor if he saw a cell in that condition.[21]

### Deputy Miguel Aguilera

Aguilera was deposed April 13, 2026. He was hired by the SDSO in 2020 and later resigned to join the Carlsbad Police Department in 2022. He worked the night shift in housing area 7 on March 15/16, 2022, and logged several checks, but had no independent recollection of Rupard.

- Aguilera testified that he did not recall conducting safety checks on Rupard or seeing his cell.[22]
- Aguilera testified, "My responsibilities consisted of making sure the IPs were alive, not having some – some type of medical emergency, like a seizure or overdosing, and making sure they felt safe within the module."[23]

---

[19] COSD 006433
[20] page 69,
[21] page 76-7
[22] page 16-7
[23] page 18

- Aguilera testified that during a safety check, he was not looking at the condition of the cell but would be aware of unsanitary conditions like an overflow of trash. If necessary, deputies could move the IP and have an IP worker clean the cell.[24]
- Aguilera testified regarding a photograph of Rupard's cell, saying he did not recall seeing it in that condition and if he saw a cell like that, he would ask questions of the IP.[25] He later said if deputies saw or smelled feces, they would notify medical staff.[26]
- Aguilera testified that cell fixtures like sinks, toilets, and intercoms were checked during hygiene inspections but not during safety checks.[27]
- Aguilera testified in agreement with the other deputies that there was no way to look at the area activity summary and determine which deputies conducted the checks of which tier. From the summary, he testified that he worked the night shift of March 15/16, but he did not recall anything about the checks or Rupard.[28]

**Deputy Jeff Amado**

Amado was deposed on January 29, 2026. He was hired by the SDSO in 2019 and was assigned to the Jail Population Management Unit (JPMU) at the time of his deposition. Amado was the training officer for Deputy Mace and worked in 7D on March 16, when IP Hayden Schuck died there.

- Amado testified that he had no recollection of Rupard.[29]
- Amado described his safety check as stopping at every cell to see if there was medical distress, trauma, or criminal activity, and getting a verbal or physical acknowledgment from the IP.[30]
- Amado testified that soft counts were the same as safety checks other than also obtaining a count of the number of IP's. They were done twice each shift.[31] Hard counts were done once per shift and included verifying a person's identity from their wristband or count sheet. None of these checks or counts included looking at the cleanliness of the cell.[32]
- Amado testified that hygiene inspections included taking out the trash, making sure that water and air flowed properly, and that nothing was broken. They were done weekly, and every cell was inspected.[33]

---

[24] page 21-3
[25] page 44-5
[26] page 47
[27] page 49
[28] page 56-60
[29] page 11
[30] page 19
[31] page 20
[32] page 22-3
[33] page 31-3

- Amado testified from the photograph of Rupard's cell and toilet, saying if he saw a cell in a condition like that, he would move the IP and have the cell cleaned.[34]
- Testifying from the area activities summary, Amado testified that he was responsible for checking all of the cells on the 7th floor on March 16, 2022, at 6:00 PM.

**Deputy Ernesto Aguirre**

Aguirre was hired by the SDSO in December 2021.

- Aguirre testified that safety checks included looking at cell and sanitary conditions and maintenance issues. [35]
- Aguirre testified that he did not recall if unit 7D had been excluded from the sanitation inspection schedule.[36]
- Aguirre testified that he had no recollection of conducting checks on Rupard, but identified himself as doing so in the video recording.[37] Based on the activity log, Aguirre testified that he or Deputy James conducted safety checks throughout the shift starting on March 16, but the only check he conducted on his own was at 10:44 PM.
- Aguirre testified that he did not recall what Rupard looked like.[38]

**Deputy Gustavo Martinez**

Martinez was hired as a corrections deputy by the SDSO in 2015. He was promoted to corporal in 2018 and demoted in 2025.

- Martinez testified that a soft count was done during the first and last hours of a shift and required all IPs to verbally and physically acknowledge the deputy, but there was no responsibility to determine if the IP was in medical distress or in need of emergency psychiatric care.[39]
- Martinez testified there was one hard count each shift, but still no responsibility to assess if an IP was in medical distress. He said 1153 safety checks, conducted every 60 minutes, included assessing whether an IP was in medical distress.[40]
- Martinez testified that he had received training on assessing when mental health staff should be summoned, but was not able to describe it, other than saying when they were playing with toilet water.[41] He testified that it may also include the condition of an IP's

---

[34] page 46-8
[35] page 27
[36] page 32
[37] page 51
[38] page 61
[39] page 10-1
[40] page 11-2
[41] page 14-7

cell, such as excessive trash, flooding of their toilet, and feces on the wall or floor. In that case, he would notify the mental health staff.[42]

- Martinez testified he would not look to see if an individual appeared malnourished to the extent that they looked like they were starving to death, because he would not be able to determine that. When asked if he saw someone who was emaciated to the point of skin and bones, and they had a concave stomach and chest, with no muscle, or otherwise appeared to look like a victim of a concentration camp, he was not supposed to report it to medical staff. He said he was never told or trained to do that.[43]
- Martinez testified that if he came across a cell that looked like the photograph of Rupard's cell, he would notify his supervisor and move the IP to clean up the cell and have him evaluated. He explained it was to "have feces displayed like that."[44]
- Martinez testified that sanitation or hygiene checks were done weekly to ensure that the cells were clean, safe, and secure. He did not know if housing unit 7D was omitted from the schedule.[45]
- Martinez testified from the log, saying that he was responsible for the 1153 safety checks on March 15, 2022, at 3:31 AM and 5:25 AM. He did not recall seeing Rupard's cell in the condition depicted in the photographs.[46]

**Deputy Jason Viladiu**

Viladiu was deposed on February 2, 2026.

- Viladiu testified that he had no recollection of Rupard.[47]
- Viladiu testified from the area activities summary, saying that he worked the night of March 15/16. He acknowledged the documentation that he conducted several safety checks that night.[48] He also testified that he had no recollection about seeing the condition of Rupard's cell.[49]

**Corporal Thomas Mace**

Mace was deposed on February 27, 2026. He was hired by the SDSO in 2020. Mace completed safety checks of the module on March 9 and 16, 2022.

---

[42] page 18
[43] page 20-3
[44] page 27
[45] page 29
[46] page 32-3
[47] page 23
[48] page 28-32
[49] page 59-60

- Mace testified that a safety check occurred every hour and, “We walk into the module and check for signs of life, make sure everyone’s okay, the cells in good working order, there is no sign of disrepair or anything dangerous in the cell, and that there is no signs of criminal activity inside the cell.”[50]
- Mace testified, “We have a process that if someone communicates some kind of issue with me or if I can visibly see someone struggling, we would call a qualified mental health professional and ask them to come to the floor or take that person to them if need be.[51]
- Mace testified that he did not recall the interview with Detective Blumenshine and saying Rupard was often barefoot and shirtless.[52]
- Mace testified that during a safety check, one deputy would check the top tier and the other the bottom tier.[53]
- Mace testified that he had no recollection of Rupard or the conditions or odors of his cell.

**Treyvonne James**

James was deposed on February 26, 2026. He was hired by the SDSO in 2018 and resigned in 2024. At the time of his deposition, he was employed with the Travis County Sheriff’s Office in Austin, Texas. James completed safety checks in the housing area during the night shift on March 16/17, 2022.

- James testified that when an IP was sleeping, a deputy was responsible for making sure the person was alive by looking for the rise and fall of their chest or by listening for snoring. If neither was successful, they would knock to get the IP's attention.[54]
- James testified that cell inspections were done “to make sure that all the water functions were working properly, the intercom was working properly, and that there was no access [sic] of amounts of trash or clutter left in the cell.”[55]
- James testified that he had no recollection of Rupard.[56]
- Looking at the photograph of Rupard’s cell and fixtures, James testified it would warrant reporting to medical or mental health staff.[57]

---

[50] page 26
[51] page 29
[52] page 47-50
[53] page 57, 62
[54] page 29-31
[55] page 39
[56] page 48-51
[57] page 58-60

- Testifying about Blumenshine's interview of James, James said Rupard's cell did not stand out from other cells in the module.[58] He said his recollection was that it was not uncommon to see feces in a cell.[59]

**Lieutenant Gino Matrone**

Matrone was hired by the SDSO in 2000. He was promoted to sergeant in about 2020 and lieutenant in 2023.

- Matrone testified that if a deputy knew of someone not eating, it should be documented or followed up on.[60]
- Matrone testified that a "wellness check" consisted of staff walking with mental health or medical staff to check on IPs.[61]
- Matrone testified that on March 17, Rupard was under his blankets when Matrone saw him.[62]
- Matrone testified that he did not recall seeing excrement in Rupard's cell on March 17, only food trash, but it caused him to direct Deputy Johnson to have the cell cleaned.[63]
- Matrone testified that the policy required him to conduct an 1153 safety check each shift and on each cell he was responsible for supervising.[64]
- Matrone testified that on March 17, he asked Johnson to "get someone up to clean some of the cells in that row, and then he said he would try to get to it."[65]
- Matrone testified that if a deputy noticed excrement in a cell, they should provide cleaning, medical, or hygiene needs.[66]

**Sergeant Michael Johnson**

Johnson was hired by the SDSO in 2018 and, in March 2022, was a training deputy.

- Johnson testified that during safety checks, deputies should be looking for obvious medical problems, crimes in progress, and maintenance issues. Face-to-face observation of the IP, nor observation of the IP's physical or mental condition, was not required.[67]
- Johnson testified that on Wednesday, March 16, there was a death on the lower tier of 7D, and when Deputy Weber tried to contact Rupard to see if he was a witness, he did not

[58] page 67, 70
[59] page 72
[60] page 27
[61] page 32
[62] page 37
[63] page 40-1
[64] page 45-6
[65] page 48
[66] page 83
[67] page 9-11

get a response from Rupard and called Johnson to help them with a welfare check.[68] When they went into Rupard's cell, he still did not respond, so Johnson "gave his shoulder a push" and called his name. Johnson testified that Rupard gave "an angry response," so they left. Johnson said he thought there was no part of Rupard's body that was visible because it was under the blanket.[69] Johnson did not recall odors, feces on the bedding, trash in the cell, "a toilet full of excrement," or the sink being covered in a brown substance.[70] Johnson said this would not belong in the area activities report.[71]

- Johnson testified that on March 17, 2022, he was training Deputy Torres and could not tell by the log whether the safety checks on Rupard were done by him or Torres.[72]
- Johnson testified that Sergeant Matrone requested that a number of the cells be cleaned, but he did not remember if Rupard's was one of those.[73]
- Johnson testified regarding Sergeant Matrone's statement [COSD 000272] that he specifically told Johnson to have Rupard's cell cleaned on March 16, saying he did not dispute it but had no recollection of it, nor an explanation for why it was not cleaned.[74]
- Johnson testified that when a psychiatrist came to evaluate an IP, a deputy would escort them and provide security.[75]
- Johnson testified that his overall experience with Rupard was that he was aggressive, and when they would try to serve food, he would swipe at it, yell, scream at the door, and spit on the window. He did not remember these behaviors on March 16 or 17.[76]
- Johnson testified he is not normally assigned to the 77th floor, but when the IP died on March 16, the floor deputies were pulled for the investigation, so he took over security duties.[77]

**Deputy Andrew Torres**

Torres was deposed on April 13, 2026. He was hired by SDSO in December 2021. At the time of the incident, he was still in training but could conduct checks on his own. Torres testified properly about his duty of care.

---

[68] page 57-9
[69] page 61-2
[70] page 62-3
[71] page 80
[72] page 74-5
[73] page 78
[74] page 90
[75] page 101
[76] page 102-3
[77] page 106

- Torres testified that he had no recollection of Rupard.[78] He also did not recall any interaction with Sergeant Matrone and Deputy Johnson about cleaning Rupard's cell.[79] Torres also testified he did not recall what Rupard's cell looked like or whether it was consistent with the photographs.[80]
- Torres testified that if an IP was not eating their food, he would notify medical or mental health staff.[81]

**Corporal Blade Romans**

Romans graduated from the academy in 2018 and has always worked in the jail. He was promoted to corporal in 2024.

- Romans testified that he was trained in safety checks during his "phased training" after graduating from the academy.[82]
- Romans testified that during a hard count, a deputy would have sheets with "mini face cards" and would check for verbal and physical responses from the IP's during the check, as well as matching the IP to the cell. These were conducted once every 12 hours. He said, "A hard count is the same thing as a normal 1153, just with the addition of getting a verbal or physical response, and matching them to their cell." Romans testified that he would look for visible trauma during these checks.[83]
- Romans testified that if an IP verbally refused a meal, the deputies would tell the tower deputy, who would log it. When asked about an IP not eating their meal, Romans testified that he didn't know how he would know that.[84]
- Romans testified that he was unaware of any responsibility to conduct hygiene or sanitation checks. He said they were done by a random group of deputies assigned to do so. When he was assigned to them, he would check for excessive trash and the cell's overall hygiene. If there were feces throughout the cell, he said it would be cleaned.[85]
- Romans testified that he had not received training on preventing malnutrition. He did not remember any training on schizophrenia.[86]

---

[78] page 21-2
[79] page 48
[80] page 51
[81] page 41
[82] page 14
[83] page 19-20
[84] page 22
[85] page 26-8
[86] page 32

- Romans testified that he began his shifts at 6:00 PM with a team briefing and then a pass-down from the deputies he was relieving. On March 17, he did not recall any information about Rupard or the death that had occurred in housing unit 7 the day before [Schuck].[87]
- Romans testified that the deputies' deployments rotated, and he had no permanent assignment. He said he would not know where he would be working until he began his shift.[88]
- Romans testified that at the time of this incident, housing unit 7D was an administrative separation unit.[89]
- Romans testified from the area activities summary report (COSD 000160) that it showed that the hard count on March 17, 2022, began at 9:46 PM [and was completed at 10:23 PM.][90]
- Romans testified that during the hard count, Rupard "responded to me, turned and said something, mouthed something to me, and that was, to me, my verbal and physical portion of my check, which was his response to me, so it satisfied my check."[91]
- Romans testified that on the next "walk," Rupard did not respond to him, so other deputies came, and when they checked further, Rupard was not breathing.[92]
- Romans testified from the video recording at 8:53 PM, confirming it was the check that began at 8:48 PM on the log and that he checked the bottom tier.[93]
- Romans testified from the video recording, saying that he checked the top tier at 10:12 PM, stopping at Rupard's cell at 10:13 PM. He said he was trying to get Rupard to give a verbal or physical response while he stood in front of the door for about thirteen seconds.[94] The corresponding log entry was 9:45 PM.[95]
- Romans testified, "Our walks are to be started within 60 minutes per floor, and 7D is the fourth module on the floor. It's fourth in line in the way that we conduct our 1153s typically."[96]
- Romans testified from the video that he was standing at Rupard's door at 10:13 PM and 10:45 PM. The second check corresponded to the log entry at 10:37 PM.[97]

---

[87] page 43-4
[88] page 46
[89] page 47
[90] page 53
[91] page 56
[92] page 58
[93] page 72-3
[94] page 76-7
[95] page 74
[96] page 78
[97] page 78-80

- Romans testified that someone refusing their day room time would typically be logged in the jail information management system (JIMS).[98]
- Romans testified that he did not recall any interactions with Rupard prior to March 17.[99]

**Deputy Linda Gutierrez**

Gutierrez was hired by the SDSO in 2010.

- Gutierrez testified that she was trained on what to do if someone was not eating or starving themselves to death, and she was to document it and report it to the mental clinician and medical staff. When asked why it was important to document IPs not eating, Gutierrez said, "They need to have records why they are not eating – keep records of the days possibly of when or how many days they are not eating."[100]
- Gutierrez testified that if she believed somebody needed psychiatric care, she would email the psychiatric team, and if it had gone on too long, she would cc the captain. She later added that she may speak to them either in person or by telephone. She said that was not standard practice, but the way she did it. She said these observations would include the IP being verbally aggressive, kicking the doors, "of course not eating, making a mess in their cell, unkept, poor hygiene," and when they were ripping their clothes or material. Gutierrez later added that she also looked for people who had not come out of their cells, explaining that they should shower and that she needed to see them in person. She said, "If they are not coming out of their cell, it's got to be for a reason."[101]
- When asked if she had a role in sanitation inspections, Gutierrez testified, "All of the time." She explained that there were informal sanitation checks that were not documented, and that facility sanitation inspections were conducted on weekends and documented, including in the activity log.[102]
- Gutierrez testified that a soft and hard count both required a verbal or physical response from the IP to "make sure they are alive."[103]
- Gutierrez testified she was trained to check the condition of the cell as part of doing checks.[104]
- Gutierrez testified that she was trained to check for IPs being malnourished by looking for uneaten meals or if the person was too thin. If that occurred, she would put in a referral to the medical staff.[105]

---

[98] page 98
[99] page 143
[100] page 19-20
[101] page 23-7
[102] page 28-9
[103] page 44
[104] page 45
[105] page 47-8

- Gutierrez testified that a housing officer's duty during safety checks included five modules on the seventh floor, from A to E, and possibly holding cells.[106]
- Gutierrez testified that during the evening [of March 17], she and Romans discussed getting cells clean and giving IP's clean clothing because "there were numerous cells that were unkept."[107]
- Gutierrez testified that the only safety check she did on Rupard on March 17 was the check at 6:55 PM, saying, "Mr. Rupard was alive, and I know the cell was dirty."[108] She said when they found Rupard unresponsive, she had to retrieve a squeegee to pull the trash out of the cell to bring Rupard out of it.[109]
- Gutierrez testified that she did not know the module 7D was excluded from the sanitation check schedule.[110]
- Gutierrez testified she did not recall Rupard being emaciated.[111]

**Deputy Bernardo Romero**

Romero was deposed on January 29, 2026. He worked for the SDSO from March 2021 to August 2022, when he joined the Oceanside Police Department.

- Romero testified that he worked in the tower on March 17 but did not do any counts or safety checks.[112]

**Lieutenant Aaron Boorman – PMK**

Boorman was deposed January 16, 2026.

- Boorman testified about the IP count procedure policy, I.43, saying a verbal or physical acknowledgment was "looking for the individual to either physically move to acknowledge, or if you're dealing with the individual and trying to do your count, they could also verbally say something to you, which then that gives you the response needed to show that, that person is basically – their well-being is there, and they are alive, conscious.[113]
- Testifying about a soft count, Boorman said, "You're looking for that verbal or physical acknowledgment of the IP, and along with that, you are also doing a count."[114]

---

[106] page 58
[107] page 62-3
[108] page 66
[109] page 71
[110] page 79
[111] page 81
[112] page 86-7
[113] page 15-6
[114] page 17

- Boorman testified that during a hard count, an IP's wristband was used to verify who they were. If a wristband could not be used, the count sheet with photos could be substituted to verify their identity. When asked, "And so the deputy, in order to comply with the policy, needs to be within a range where the deputy is able to see and read the wristband," Boorman responded, "correct." He later added, "It would be up to the deputy performing that count to be able to see that individual's face sufficient enough to compare it to the photo on this list." [115]
- Boorman testified about the training outlined in COSD 004346-54, "Class #5.2: Counts-ACO Supplemental Core," saying it would have been utilized for any kind of briefing, training, academy training, and also supplemental core training for sworn staff. He affirmed the instructor notes that read, "Look for any signs of medical or physical/psychological distress, trauma, and/or criminal activity."[116]
- Boorman testified that "lineup training" occurred as part of a briefing at the beginning of a shift. Attendance for the training was recorded in the learning management system (LMS), and if a deputy was absent from a shift, the training would be assigned in their LMS profile.[117]
- While discussing the Safety Check policy I.64, Boorman testified that the policy required deputies to directly observe the individual for "medical distress or trauma." He also testified that "security and maintenance" meant "getting a totality of the circumstances," and gave examples of seeing water running, a leak, or an overflowing toilet. He testified that the reference to "environmental factors" included "looking at the condition of the dayroom, the cells, the module area, so you're assessing that to see if there's anything that needs to be cleaned up or addressed in regards to general cleanliness." Boorman also testified about the policy requiring documentation and said that the listed example items, including broken fixtures and clogged toilets, should be logged after a check if noted.[118]
- Boorman testified that the supervisor's log review required reviews by the Sergeant and one by the lieutenant to ensure that "anything that needs to be logged is logged and logged appropriately," and to verify safety checks were logged at appropriate times and with appropriate information.[119]

**Christina Goodall**

Goodall was a mental health clinician for the SDSO.

---

[115] page 18-21
[116] page 31-35
[117] page 40-1
[118] page 46-50
[119] page 50-1

- Goodall testified that a male deputy was nearby, but not with her, when she completed the cell-side assessment of Rupard. She asked him if there was anything concerning she should be aware of, and the deputy reported, "nothing recently concerning."[120]
- Goodall testified that she saw Rupard on February 9, 2022.[121]
- Goodall testified that Rupard repeatedly said, "I'm fine. I don't want to talk to you." She also testified, "I was able to assess fully to complete the safety assessment and if he needed to be recommended to a higher level of care, but as far as engaging in like therapeutic interventions that I can imply [sic], he didn't want to talk to me about it. Therefore, that's why I picked refused."[122] Goodall scheduled a follow-up appointment, but then remembered that Doctor Cruz, the psychiatrist, was to see him "shortly after," so she canceled it.[123] [Cruz saw Rupard on February 22 and then scheduled a follow-up appointment for 6 to 8 weeks later, but never saw him again.][124]
- Goodall testified that she looked at Rupard's physical condition and demeanor to see if he was having a psychotic episode and what the condition of his cell was as well as his behavior. She said, "So I was able to complete my assessment to say at the time he was safe…."[125]

**Doctor Nicholas Badre**

Nicholas was deposed December 19, 2025. He was a "temporary expert professional" psychiatrist employed by the County of San Diego, who performed competency evaluations and provided psychiatric care. Nicholas testified from his report with little independent recollection of Rupard.

- Nicholas testified that he conducted a competency evaluation outside the cell door of Rupard's cell. A deputy was with him, but Nicholas did not know his name.[126]
- Testifying about his responses to the Citizens Law Enforcement Review Board about Rupard's death, Nicholas affirmed his answers but provided no additional information.[127]
- Nicholas testified that he was not tasked with making an evaluation about Rupard being a danger to himself or others, so he did not form an opinion about it.[128]

---

[120] page 144-6
[121] page 149
[122] page 164
[123] page 159
[124] Cruz deposition: page 304-6
[125] page 168
[126] page 66
[127] page 99-102
[128] page 110

- Nicholas testified that he did not form an opinion as to whether Rupard was on a hunger strike.[129]
- Nicholas testified that he did not recall any conversations about Rupard with a sworn staff member.[130]

**Doctor Anthony Cruz**

Cruz was deposed on March 3, 2026. He was a psychiatrist employed by Liberty Healthcare and had been employed at the jail since 2020. By the time of his deposition, he had resigned.

- Cruz testified that deputies could request an IP be seen by him verbally, through email, or "any form of communication."[131]
- Cruz testified that he never received a report from any deputy about Rupard's condition.[132]

**Melissa Quiroz – PMK**

Quiroz was hired by the SDSO in 2016 as a mental health clinician. She was promoted to Chief Mental Health Clinician in 2018 and Group Program Manager over clinicians in 2020.

- Quiroz testified about the medical health record for Rupard, saying, "I saw a progress note that discussed the condition of his cell, how – and noted in there as well as about grave disability. The note was no signs of – you know, the cell was cleaned, if I'm recalling correctly," adding, "The symptomology for GD [grave disability] was not present. He wasn't self-harming. He wasn't a danger to others."[133]
- Quiroz testified that she could not confirm or deny any record of healthcare staff informing custody staff of Rupard's deteriorating condition but said, "I do not recall that being in the note."[134]
- Quiroz testified a deputy could notify mental health staff of a concern by talking to them directly, writing an ISR, sending an email, or telephoning [135]

**Serena Roglien-Hood – PMK**

Roglien-Hood was deposed on March 26, 2026. She was hired as a nurse in the jail in 2007. She was the Deputy Director of Inpatient Residential Care Facilities for the jail, responsible for all nursing care.

---

[129] page 112-3
[130] *page 122-3*
[131] page 86-7
[132] page 164-5
[133] page 128
[134] page 134-5
[135] page 163-4, 168

- Roglien-Hood testified that the medical records did not include any indication that custody staff had notified healthcare staff about Rupard being placed in administrative segregation from December through March.[136]
- Roglien-Hood repeatedly testified that she was not aware of, or could not recall, any healthcare notifications by custody staff regarding Rupard's condition or behaviors.[137]

**Detective Max Blumenshine**

Blumenshine was deposed on January 7, 2026. He was hired by the SDSO in 2012 as a law enforcement corrections deputy. In 2013, he was assigned to the courthouse and in 2014 became a patrol deputy, then a detective. He was promoted to corporal, assigned to a gang enforcement team, and, in 2021, assigned to the homicide unit. He conducted the investigation of Rupard's death.

- Blumenshine testified that he did not know whether the healthcare staff followed the Medical Division's Segregated Inmates policy prior to Rupert's death.[138]
- Blumenshine testified that his investigation did not include the consideration of the duties and obligations of medical and mental health staff beyond a layperson's understanding.[139]
- Blumenshine testified that he tried to interview the deputies who worked the week prior to Rupard's death and other detectives interviewed the deputies on duty that day. Blumenshine said none indicated that Rupard had been losing weight or not eating.[140]
- Blumenshine testified that he did not recall seeing any safety check notes from December 2021 to March 2022 regarding maintenance issues, medical distress, or starvation.[141]
- Blumenshine testified he did not know who the deputy was who accompanied Doctor Badre, the psychiatrist, on his evaluation three days prior to Rupard's death.[142]
- Blumenshine testified that when he was in Rupard's cell during his investigation, there were feces throughout the cell, the toilet was full of excrement, and the cell smelled like feces. He clarified that although his original report documented feces in the sink, it was incorrect, and he corrected it in his supplemental reports. While in the cell, he flushed the toilet and ran water in the sink, and both functioned correctly.[143]
- Blumenshine testified that he was unaware of the video retention policy but did not take any action to preserve the videos related to Rupard.[144]

---

[136] page 98-9
[137] page 80-89, 98-100
[138] page 43-4
[139] page 56
[140] page 60-1
[141] page 66
[142] page 71
[143] page 107-9
[144] page 120

- Blumenshine testified that part of his investigation was to determine if checks were being done on time and per policy. He then clarified "we collect all the facts, and then anyone else can review or make their determination from these reports."[145]
- Blumenshine testified that he reviewed roughly 48 hours of video prior to Rupard's death to determine if he was given food. He used the previous 24 hours of video from his own request, and then an additional link to the video available through the Schuck death investigation.[146]
- Blumenshine testified that the investigation revealed that Rupard's cell had not received a hygiene inspection, and the log saying it had was inaccurate.[147]
- Blumenshine testified he could not recall the source of his information that Rupard was in the administrative segregation module but was not classified as an administrative segregation IP.[148]
- Blumenshine testified that he found no evidence of any deputy reporting to a supervisor that a man was emaciated.[149]
- Blumenshine testified that his March 6, 2023, request for video recordings for three months prior to Rupard's death was initiated by the medical examiner's determination of a homicide. It was then that he learned that video was only saved for six months.[150]
- Blumenshine confirmed the information in his report about module D being omitted from the sanitation inspection policy.[151]
- Blumenshine testified from the Area Activities Summary Report for inspections in housing area 7 (COSD 000755-8), March 5, 2022, that read "D module Ad-Seg" did not mean the module was inspected, and he later determined it was not. He did not know whether Rupard's cell was inspected between December 29, 2021 and March 17, 2022.[152]

## VIDEO COMPILATION OF SAFETY CHECKS

A video compilation of safety checks was produced by the Plaintiffs' counsel and represented to be edited clips from the safety checks since March 15, 2022, starting at about 8:54 PM Each segment was preceded by an image from the Activity Log when available. The times were taken from the video segment, not the log.

---

[145] page 123-4
[146] page 144
[147] page 147-50
[148] page 151
[149] page 156
[150] page 166-7, 171-2
[151] page 188-9
[152] page 202-4

**March 15, 2022**

- 8:54 PM: Aguilera or Viladiu briefly looked in Rupard's door.
- 9:57 PM: Aguilera or Viladiu was at the door for several seconds, including bending down, seemingly to speak with Rupard through the port in the door. (hard count)
- 10:51 PM: Aguilera or Viladiu stopped at Rupard's door, then shined a flashlight inside before proceeding.
- 11:47 PM: Aguilera or Viladiu paused at Rupard's door, then shined a flashlight inside before proceeding.

**March 16, 2022**

- 12:54 AM: Aguilera or Viladiu paused at Rupard's door, then shined a flashlight inside before proceeding.
- 1:31 AM: Sergeant Bumbasi or Viladiu (sergeants stripes were on the person on the lower tier) paused at Rupard's door, then shined a flashlight inside before proceeding.
- 2:29 AM: Aguilera or Viladiu paused at Rupard's door, then shined a flashlight inside before proceeding.
- 3:28 AM: Aguilera or Viladiu paused at Rupard's door, then shined a flashlight inside before proceeding.
- 3:46 AM: An unknown deputy opened the port on Rupard's door. The lights were on. Several moments later, someone who appeared to be an IP worker delivered what appeared to be breakfast to the port doors. The deputy followed, closing the port doors, but when he reached Rupard's cell, there was no sign of Rupard, so he left the port door open. When he finished with the top tier, he returned to Rupard's cell, standing outside for a few seconds, before moving on.
- 4:25 AM: Aguilera or Viladiu paused at Rupard's door, then shined a flashlight inside before proceeding. This was logged as a soft count.
- 5:24 AM: Viladiu paused at Rupard's door, then shined a flashlight inside before proceeding.
- 6:02 AM: Aguilera or Viladiu paused at Rupard's door, then shined a flashlight inside, then bent down to the port door for many seconds, as if speaking with Rupard, before proceeding.
- 7:04 AM: Mace [per other evidence] or Amado paused at Rupard's door before moving on. The lights were on in the cell. This was logged as a soft count. It appeared the breakfast was still on the port door.
- 7:26 AM: The breakfast was gone when the video segment began. Two unknown deputies walked by Rupard's cell, the second one pausing to look inside. They went to the end of the tier, spoke with an IP, and then brought that IP out of his cell. They passed back by Rupard's cell, and the second one appeared to glance inside. At 7:27 AM, a log

entry was made for Lieutenant Kamoss, Sergeant Bourgeois, and Sergeant Matro doing a safety check. At 7:34 AM, one person was on the upper tier, and two walked on the lower tier. The person on the upper tier paused to look inside Rupard's cell.

- 8:37 AM: Mace or Amado paused at Rupard's door, closing the port door, then moving on.
- 9:32 AM: Mace [per other evidence] or Amado paused at Rupard's door before moving on.

From the Activity Log and original video [gap in compilation]:

- 9:40 AM: [medical emergency involving Schuck]
- 10:04 AM: Cross, Gallegos, Mascareno, Kim
- 11:02 AM: Amado, Gallegos
- 11:42 AM: Johnson, who responded for the IP death investigation, Amado, Gallegos
- 12:35 PM: Johnson checked both tiers
- 1:31 PM: Johnson checked both tiers
- 2:28 PM: Johnson checked both tiers
- 3:26 PM: Amado, Mace
- 4:05 PM: Amado, Mace
- 5:03 PM: Amado, Mace
- 6:00 PM: Amado, Mace
- 6:58 PM: James, Aguirre
- 7:56 PM: James, Aguirre
- 8:55 PM: James, Aguirre
- 9:45 PM: James, Aguirre
- 10:23 PM: Guitierrez, "Linda" ("Temp Check," did not pause at Rupard's cell)

Video Compilation Continued:

- 10:46 PM: Aguirre paused for a longer-than-normal amount of time to look in Rupard's cell, then moved on.
- [Log shows 11:43 PM: James, Aguirre – possibly the next check on video]

**March 17, 2022**

- 12:05 AM: James or Aguirre stopped at Rupard's door, then continued.
- 12:58 AM: An unknown deputy paused at Rupard's door, then continued.
- 1:44 AM: James or Aguirre paused at Rupard's door, then continued.
- 2:19 AM: Lieutenant Lizarraga or Sergeant Cardoza paused at Rupard's door, shined a flashlight inside, then continued.

- 3:23 AM: James or Aguirre paused at Rupard's door and shined a flashlight inside before proceeding.
- 4:21 AM: James or Aguirre paused at Rupard’s door before proceeding.
- 5:15 AM: An unknown deputy paused at Rupard's door, shined a flashlight inside, and then continued on. This was logged as a soft count.
- 6:07 AM: James or Aguirre paused at Rupard’s door before proceeding.
- 7:04 AM: The cell lights were now on. Torres or Johnson paused at Rupard’s door before proceeding.
- 8:02 AM: Torres or Johnson paused at Rupard's door before proceeding.
- 8:55 AM: Torres or Johnson paused at Rupard's door before proceeding.
- 9:49 AM: Two staff members, presumably Sergeant Matrone and Johnson, or Torres, paused at Rupard's door before proceeding.
- 10:39 AM: Torres and Johnson both paused at Rupard's door before proceeding.
- 11:02 AM: A deputy and IP workers were serving lunch through the ports. The deputy opened the port, leaned down as if speaking with Rupard, and then closed the port door.
- 11:43 AM: While IP workers were cleaning the module, Johnson conducted a hard count, pausing at Rupard's door and appearing to knock on it before moving on.
- 12:30 PM: Torres or Johnson paused at Rupard's door before continuing.
- 1:18 PM: Torres or Cortez paused at Rupard's door before continuing.
- 2:15 PM: Torres or Johnson paused at Rupard's door before continuing.
- 3:14 PM: Torres or Johnson paused at Rupard's door before continuing.
- 4:09 PM: Torres or Johnson paused at Rupard's door before continuing.
- 4:44 PM: Only one deputy was visible, although the log listed Torres and Johnson. It appeared the deputy was feeding lunch and opened Rupard's port door. An IP worker followed, appearing to collect garbage through the door ports.
- 4:49 PM: The deputy walked back to Rupard's door, pausing and shining a flashlight in before moving on. The lights in the cell were on.
- 5:02 PM: Rupard's port door was still open. Torres or Johnson stopped at the cell door, leaned over as if speaking with him, then closed the port door.
- 6:02 PM: Torres or Johnson paused at Rupard's door before continuing.
- 6:59 PM: A deputy [Gutierrez, per testimony] paused at Rupard's door, appeared to knock on it a few times, then continued on. This was logged as a soft count.
- 7:58 PM: Deputy Mendoza, Gutierrez, or Roman was on the top tier, stopping at Rupard’s cell and glancing in before continuing on.
- 08:53 PM: Deputy Mendoza, Gutierrez, or Roman was on the top tier and stopped at Rupard's door for a longer-than-normal amount of time, then moved on.
- 10:12 PM: A deputy [Romans, per testimony] paused at Rupard's door for a longer-than-normal amount of time, then moved on. This was logged as a hard count.

- 10:46 PM: Gutierrez or Roman paused at Rupard's cell for some time before the door opened and the other deputy came. They stood in the doorway, seemingly trying to get Rupard's attention and call for assistance.

## OTHER EVIDENCE

### Segregated Housing Orders

A Segregated Housing Order signed by "Mendoza" and dated January 31, 2022, appeared to order Rupard into administrative segregation "pending a hearing or investigation for a rule violation or criminal act."[153]

A Segregated Housing Order signed by "J. Gonzalez" and dated February 20, 2022, appeared to order Rupard into administrative segregation "pending a hearing or investigation for a rule violation or criminal act."[154]

### QMHP Progress Note on February 9, 2022

Christina Anosike wrote, "IP remains successfully housed in 7D quarantine, has coexisted with his peers with no reported aggression, violence or erratic behaviors. MHC observed IP standing at the cell door. This MHC introduced self and explained the reason for the meeting. IP was uncooperative AEB IP stating, "I am fine. I don't want to talk to you." MHC observes IP not engaging in SIB. Unable to fully assess IP, due to his refusal and/or inability to cooperative. IP did not answer any further of MHCs questions despite multiple attempts from writer trying to engage IP. IP then began speaking in unintelligible words. IP stated, "go away." Deputies on the 7th floor report IP will often speak to himself in unintelligible words. IP's cell was clean and had some debris. MHC observed empty food trays inside of his cell. IP's cell was free of any urine, feces or flooding. IP was moderately groomed. MHC spoke with deputies on the 7th floor who reports IP has been engaging in life-preserving bx's and has not engaged in any SIB. IP does not demonstrate any acute distress or immediate safety concerns. He has not engaged in any bx that would suggest harm to himself or others while under observation. There are no distressing sxs or major impairment requiring ISP or PSU referral. He will continue to be monitored for safety concerns and GD.[155]

### Dr. Badre

*Competency Report from March 14, 2022 Evaluation*

Excerpts included:

---

[153] COSD 018167
[154] COSD 018166
[155] COSD 000052

- On 1/20/22, the defendant was seen for psychiatric evaluation. The defendant was noted to be irritable, disorganized, and uncooperative. The defendant was diagnosed with unspecified psychosis, antisocial personality disorder, and stimulant use disorder.
- I interviewed the defendant at his cell at the recommendation of jail mental health staff and the floor deputies.
- The cell was dirty with trash throughout. The toilet was full of excrement and the room was very malodorous.
- The defendant was unkempt and dirty himself. He was laying in bed in an uncomfortable manner with a blanket over his head.
- There were feces on the floor. There was food smeared on the wall.[156]

*Citizens Law Enforcement Review Board Responses*

Excerpts included:

- Were deputies present during your visit? Please identify.
  - I do not recall the names of the deputies present. The deputies provided a security escort since I was in a custodial setting. The deputy was by my side for the entirety of the interview.
- During or after your visit, did you inform any sworn personnel of any concerns involving the condition of Rupard or his cell? Please identify and explain in detail.
  - I do not recall specific conversations with personnel. However, as a matter of practice, I inform Sheriff's personnel regarding my observations when it warrants it and likely did so here.[157]

**Autopsy Report on February 8, 2023**

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

---

[156] COSD 000136-9
[157] COSD 000343-4

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown. On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the contents could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow-up in six to seven weeks or sooner, if needed. He had no signs of danger to self or others and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.[158]

The cause of Death was pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia. Contributing to it was SARS-COVID 19, pulmonary emphysema, and a duodenal ulcer. The manner of death was homicide.

---

[158] COSD 006383-4

## LAWS, REGULATIONS, AND RULES

### California Title 15

*§ 1027.5 Safety Checks.*

Safety checks shall be conducted at least hourly through direct visual observation of all IPs. There shall be no more than a 60-minute lapse between safety checks. There shall be a written plan that includes the documentation of routine safety checks.

*§ 1280. Facility Sanitation, Safety, and Maintenance.*

The facility administrator shall develop written policies and procedures for the maintenance of an acceptable level of cleanliness, repair and safety throughout the facility. Such a plan shall provide for a regular schedule of housekeeping tasks and inspections to identify and correct unsanitary or unsafe conditions or work practices which may be found.

### American Correctional Association Accreditation Standards

*Sanitation*

- (5-ALDF-1A-01) The facility complies with all applicable laws and regulations of the governing jurisdiction, and there is documentation by an independent, outside source that any past deficiencies noted in annual inspections have been corrected. The following inspections are implemented;
  - Weekly sanitation inspections of all facility areas by a qualified departmental staff member.
  - Comprehensive and thorough monthly inspections by a safety/sanitation specialist.
  - At least annual inspections by federal, state, and/or local sanitation and health officials or other qualified person(s).
- (5-ALDF-1A-02) Disposal of liquid, solid, and hazardous materials complies with applicable government regulations.

*Housekeeping*

- (5-ALDF-1A-04) The facility is clean and in good repair. A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance by assigning specific duties and responsibilities to staff and inmates.

## POLICIES AND PROCEDURES

### Safety Checks: Inmates, Housing and Holding Areas, Policy I.64, dated December 17, 2021

Excerpts included:

- Sworn staff will conduct safety checks of inmates, housing areas, holding areas and vacant cells through direct visual observation (i.e., direct personal view of the inmate/area without the aid of audio/video equipment). Safety checks of inmates consist of looking at the inmates for any obvious signs of medical distress, trauma or criminal activity. Safety checks shall be conducted at least once within every 60-minute time period. Safety checks of Medical Observation Beds (MOB) and in Psychiatric stabilization Units (WPSU/PSU) shall be conducted at least once within every 30-minute time period. The intervals of the safety checks, within the 60 or 30 minute time period, shall vary and must be logged in the Jail Information Management System (JIMS). In addition to observing the safety and welfare of inmates, sworn staff shall also be attentive to security and maintenance issues as well as environmental factors (e.g., temperature, odors, cleanliness) while conducting safety checks.
- When sworn staff conduct safety checks in a high-risk security level housing unit (e.g., administrative segregation), they should utilize the practice of contact and cover. Sworn staff should enter each module together on the same level and conduct the safety check as a team. Sworn staff should not split up to have one check the top tier and the other the bottom tier. Although recommended in high risk security level housing, contact and cover can be used in any housing unit/module when inmates are present in the dayroom. The cover deputy's primary responsibility is to provide security for the contact deputy during the safety check. While providing cover, this deputy is not expected to conduct the safety check.
- During safety checks in housing locations, sworn staff will physically enter each module and observe each inmate present in the common areas of the module ( e.g., dayrooms, showers, exercise areas, holding areas). In cell style housing modules, sworn staff shall stop at or enter each cell and observe each inmate. In dormitory style housing modules, sworn staff shall walk by each bunk in a manner that permits them to observe each inmate.
- LOGGING OF SAFETY CHECKS
  A. The start of a safety check will be logged in JIMS using the event type "11-53 Started." The description field of the entry shall include the name(s) and/or ARJIS numbers of the sworn staff conducting the safety check. If additional space is needed, the notes section may be used. Once all necessary fields are completed, the sworn staff making the entry will immediately close the "11-53 Started" entry
  B. At the conclusion of the safety check, an entry may be logged in JIMS using the event type "11-53 Notes," if there was anything encountered during the safety check. Items that necessitate documentation include, but are not limited to:
     1. Inmate in medical distress ( e.g., asthma attack, chest pain, etc.),
     2. Inmate suffering medical trauma (e.g., bleeding, ligature marks, etc.),
     3. Criminal activity (e.g., drug usage, fighting, etc.),

4. Facility damage ( e.g., broken fixtures, graffiti, etc.),
5. Maintenance issues (e.g., clogged toilet, running water),
6. Different or additional sworn staff conducted the safety check,
7. Anything that delayed the start or completion of the safety check.[159]

**Inmate Count Procedure, Policy I.43, dated December 23, 2020**

Excerpts included:

- Sworn staff will physically conduct counts of inmates. All counts require sworn staff to verify each inmate's well-being through "verbal or physical acknowledgment" from the inmate. In addition, sworn staff will look for any obvious signs of medical or physical distress (e.g., asthma attack, chest pain, etc.), trauma (e.g., bleeding, ligature marks, etc.) and/or criminal activity (e.g., drug usage, fighting, etc.).
- Definition: "Verbal or physical acknowledgment" - a response from the inmate to sworn staff that proves the inmate is alive, awake, conscious, and responsive. Verbal acknowledgment includes the use of spoken words, while physical acknowledgment includes actions of the body (i.e., hand gestures, head nod, etc.), in confirmation that the inmate notices and is responding to sworn staff.
- Hard counts are to be conducted during the following time periods.
    - 1000-1200 (day hard count)
    - 2100-2300 (night hard count)

Both soft and hard counts required a verbal or physical acknowledgment from the inmate.[160]

**Incarcerated Person Count Procedure, Green Sheet Number I.43.C.1, dated August 17, 2022**

Excerpts included:

- All counts in cell housing at SDCJ will be conducted in conjunction with a safety check. Emergency head counts ordered by the watch commander do not require a safety check.
- Day hard count will be conducted between 0900 and 1200 hours. Night hard count will be conducted between 2100 and 2300 hours. Counts may be conducted early at the discretion of the watch commander.
- Hard counts will be conducted with emergency evacuation lists or floor sheets. Incarcerated persons in Administrative Segregation and Enhanced Observation housing will be verified via their face card. Incarcerated persons and booking deputies will conduct hard count using the JIMS Operations Report.

---

[159] COSD 006088-90
[160] COSD 001155-6

- The deputies conducting the count shall check the incarcerated person's wristband (looking for any signs of tampering or wear) and verify the incarcerated person's name, booking number, and wristband photo with the appropriate count sheets.
- COUNT TIMES
    - DAY SHIFT
        - Head Count to be conducted between 0630-0700
        - Hard Count to be conducted between 0900-1200
        - Soft Count to be conducted between 1700-1800
    - NIGHT SHIFT
        - Soft Count to be conducted between 1830-1930
        - Hard Count to be conducted between 2100-2300
        - Soft Count to be conducted between 0400-0500[161]

**Sanitation and Hygiene Inspections, Policy L.2.C.1, dated September 12, 2019**

Excerpts included:

- Hygiene inspections for floors 4 through 8 shall be conducted on Saturdays by the assigned dayshift teams, except for inmate worker modules, high risk security level housing and Jail Based Competency Treatment (JBCT) modules.
- Deputies shall provide cleaning supplies to inmates prior to the hygiene inspection. Deputies shall give the inmates verbal directions regarding cleaning and emphasize the areas that will be inspected. (e.g., sweep and mop the floors, clean the windows, surrender all unauthorized contraband, food, excess clothing, etc.) Inmates incapable of participating in the cleaning process shall have their cells cleaned by inmate workers.
- The following guidelines will be observed:
    - All common and personal areas shall be inspected for cleanliness, maintenance, and security issues.
    - All reported maintenance issues shall be documented with proper notifications for repairs.
    - The SDCJ Module Inspection Rating Sheet shall be completed for each area and submitted to supervisors for approval.
    - A copy of the approved SDCJ Module Inspection Rating Sheet shall be posted in each module and the original signed documents shall be sent to the operations deputy for archiving.
    - A JIMS entry will be made under the event type "INSPECTION" documenting the completion of the hygiene inspection.

---

[161] COSD 001159-60

- An inmate's mental health should be taken into consideration when deciding on disciplinary sanctions.
- High security level housing hygiene inspections (E modules) be conducted throughout the week and finalized by the Saturday night shift team. Inmate workers shall be utilized to clean common areas and cells in all high risk security level housing modules.
- Both dayshift and nightshift teams should attempt to inspect high risk security level housing cells throughout the week when inmates are not present (e.g. rec yard time, medical, court, empty cells, etc.). The Sunday dayshift housing control deputies shall begin a SDCJ Module Inspection Rating Sheet and record when high risk security level housing cells are inspected during the week.
- At the end of each shift, the housing control deputy shall make a HMS log entry in the Area Activity under the event type, "INSPECTION" and list the cell number(s) of each high risk security level housing cells inspected.
- Every Saturday night, the key control deputy shall review the JIMS Area Activity under "INSPECTION" and notify the watch commander of any higher risk security level housing cells that were not inspected. Once all high risk security level housing cells are inspected, the SDCJ Module Inspection Sheet shall be sent to the team supervisors for their review and signatures, and the form shall be sent to the administrative deputy for archiving.[162]

**Psychiatric Stabilization Units, Policy M.25, dated March 27, 2020**

Excerpts included:

- Any person who has pertinent information regarding the behavior of any inmate may make inmate referrals to the health staff.

**Hunger Strikes, Policy M.29, dated October 21, 2020**

Excerpts included:

- The refusal to eat, also known as a hunger strike, can be either proclaimed or unspecified by an inmate. While some inmates may inform staff they are on a hunger strike, others may not voice their intentions, but their refusal of meals may indicate a hunger strike. In either case, sworn staff shall be observant, make necessary notifications and document the incident. Health staff will evaluate the seriousness of the situation and provide necessary medical care.

---

[162] COSD 001163-8

- When an inmate initiates a hunger strike, sworn staff shall document the incident in the Jail Information Management System (JIMS) via an inmate status report (ISR). The ISR shall include notifications made and any subsequent actions taken.

The policy also required sworn staff to notify the watch commander, facility commander, and health staff. It did not clarify when or what should cause the notification.[163]

**Medical Services Division Operations Manual Segregated Inmates document G.2.1, dated January 5, 2022**

Excerpts included:

- Segregated inmates - are those isolated from the general population and who receive services and activities apart from other inmates. Facilities may refer to such conditions as administrative segregation, protected custody, or disciplinary segregation. For the purpose of this standard, the living and confinement conditions define the segregated status, not the reason an inmate was placed in segregation.
- Inmates housed in segregation will be monitored by health staff based on established frequency. Inmates who are segregated and receive services and activities apart from other inmates shall be monitored three days a week by nursing staff and a minimum of once a week by a qualified mental health provider (QMHP). Documentation should include any significant health findings, signs of physical and/or psychological deterioration, other signs of failing health, the date and time of contact, and the signature or initials of the health staff member making the rounds. In addition to documenting in the health record, documentation may also be made on individual logs or cell cards. Health staff will promptly identify and inform custody staff of inmates who are physically or psychologically deteriorating and those exhibiting other signs or symptoms of failing health.

## TRAINING

**CLASS #5.2: COUNTS - ACO Supplemental Core, dated December 2, 2020**

Excerpts included:

- Hard Count- A count which verifies each inmate's well-being through verbal or physical acknowledgement from the inmate and uses one of the approved methods to confirm the identity of every inmate in the facility:
    - Face Cards

[163] COSD 006126-7

  - Jail Information Management System (JIMS) Web Reports (e .g., Floor Count, Floor Evacuation List)
  - JIMS Operations Reports (e .g., Inmates Still in Booking, Inmate Roster by Last Name, etc.)
- Verify the inmate's well- being -
  - Look for any signs of medical or physical /psychological distress, trauma and /or criminal activity.[164]

**Inmate Count Procedures Lineup Training Document, Dated May 2, 2021**

Excerpts included:

- Sworn staff will physically conduct counts of inmates through various methods (soft count and hard count) as defined below. All counts require sworn staff to verify each inmate's well-being through "verbal or physical acknowledgment" from the inmate. In addition, sworn staff will look for any obvious signs of medical or physical distress, trauma, and/or criminal activity.
- Definition: "Verbal or Physical Acknowledgment" - Response from the inmate to sworn staff that proves the inmate is awake, conscious, and responsive.

Both the soft and hard count requirements included a verbal or physical acknowledgment from the inmate.[165]

**Safety Checks Lineup Training Document, Dated May 1, 2021**

Excerpts included:

- Sworn staff will conduct safety checks of inmates, housing areas, holding areas and vacant cells through direct visual observation (i.e., direct personal view of the inmate/area without the aid of audio/video equipment). Safety checks of inmates consist of looking at inmates for any obvious signs of medical distress, trauma or criminal activity. Safety checks shall be conducted at least once within every hour (60 minute) time period. The intervals of the safety checks, within the hour ( 60 minute) time period, shall vary and must be logged in the Jail Information Management System (JIMS). In addition to observing the safety and welfare of inmates, sworn staff shall also be attentive to security and maintenance issues as well as environmental factors ( e.g., temperature, odors, cleanliness) while conducting safety checks.
- Cell style housing safety checks:

---

[164] COSD 006346-54
[165] COSD 006247-8

a) Staff shall observe each inmate present in the common areas of the module for any obvious signs of medical distress, trauma, or criminal activity.
b) This shall require sworn staff to stop at, or enter a cell/holding area, to properly observe the inmate(s).[166]

[166] COSD 006245-6

## SIGNIFICANT OPINION

**The SDSO staff violated California Title 15, American Correctional Association (ACA) accreditation standards, generally accepted jail practices, and its own policy by failing to monitor Rupard's well-being and take action to keep his cell reasonably clean. Had they done so, it is more likely than not that they would have recognized his deteriorating physical health.**

It is a basic humanitarian responsibility to ensure that IPs live in a reasonably clean and healthy environment. There is no lesser responsibility, and arguably an even greater one, when jail staff supervises someone with a serious mental illness.

California Title 15 requires "an acceptable level of cleanliness, repair and safety throughout the facility," as well as "a regular schedule of housekeeping tasks and inspections to identify and correct unsanitary or unsafe conditions."

While ACA accreditation standards are not compulsory, they provide guidance on what constitutes generally accepted jail practices. The sanitation standard properly advised the facility to comply with California Title 15 by providing weekly sanitation inspections of all facility areas, monthly inspections by a safety/sanitation specialist, and annual inspections by a qualified government authority. It also advised keeping the facility clean with a daily housekeeping and maintenance plan that addressed all facility areas and disposed of liquid, solid, and hazardous materials.

SDSO policy required weekly sanitation checks and required "inmate workers shall be utilized to clean common areas and cells in all high-risk security level housing modules."

The evidence showed that Rupard's cell contained about nine days' worth of food containers, along with other likely biological filth. It is more common for IPs with serious mental illness to live in unsanitary conditions, and conversely, unsanitary conditions are a sign of serious mental illness in jails. Allowing an environment like Rupard's cell is not only repulsive to the senses; it is also known to attract insects, vermin, mold, and other health hazards. For these reasons, generally accepted jail practices often require the daily removal of food waste and trash. In administrative segregation areas or cells housing those with a serious mental illness, jail staff often have to directly facilitate the cleaning by directing the IPs what to do or having IP workers do the cleaning.

When a cell is cleaned by IP workers, generally accepted jail practices always require staff to remove the IP from the cell during cleaning, especially one who suffers mental illness and/or is in administrative segregation. If the condition is bad enough and the IP refuses to leave the cell, generally accepted jail practices may have healthcare staff deem it a medical risk; regardless, a supervisor should order that the cell be cleaned, by force if necessary. Rupard's cell met the

standard to forcibly remove him, if necessary, to protect him from the harm of the filth, days before March 17, 2022.

Whether voluntarily, or by force, the custody staff, supervisor, and likely healthcare staff would have seen Rupard get up, walk, and respond to them, even if it was a violent response. In Rupard's case, he may well have been required to shower, allowing the deputies an even greater opportunity to witness his condition. At that point, hopefully they would have recognized his medical distress and summoned immediate medical help, if they were not present. Had they done so, it may have saved his life.

Matrone recognized the abhorrent conditions and ordered the cells cleaned. While the evidence did not clearly establish how many cells he ordered cleaned, the fact that it was more than Rupard's indicates a pattern and practice of staff failures that allowed similar unhealthy conditions with other IPs. However, it is hard to imagine that any other cell was worse than Rupard's, so it should have been one of the first to be cleaned.

While the SDSO had an organizational failure of not scheduling hygiene checks that included Rupard's cell, each deputy and supervisor who conducted a safety check, soft count, hard count, or supervisor inspection that included looking into Rupard's cell in the hours and days before his death had a legal and ethical obligation to correct its condition before it got to the state that it was on March 17, 2022. The longer the accumulation was, the more obvious it should have been. Each deputy and ranking staff member who looked into Rupard's cell from at least around March 15th was increasingly culpable for their inaction in providing care and notifying medical staff.

**The SDSO violated generally accepted jail practices by failing to provide sufficient training and supervision on California Title 15 requirements on cleanliness and housekeeping as well as recognizing and responding to unsanitary conditions, especially involving someone with a mental illness.**

As described, there were individual failures by SDSO staff to ensure an acceptable level of cleanliness, housekeeping, and sanitary conditions. However, there were several deputies who repeatedly saw the condition of Rupard's cell in the days prior to his death, yet they did nothing. This pattern and practice demonstrate the SDSO's failures in organizational training and supervision.

It should not take a sergeant, on the morning of March 17, to recognize the filthy and unsanitary conditions in Rupard's cell. Generally accepted jail training teaches deputies to take initiative and correct sanitation and hygiene problems when they present unsafe or unhealthy conditions for an IP. Deponent deputies testified that they would have had the cell cleaned if they had seen it in the condition it was in the evidentiary photographs. However, the unsanitary accumulation of trash did not appear only in the moments prior to Rupard's death. As discussed, it was an

accumulation over days that had long since exceeded the threshold at which someone should have taken action to clean the cell, and likely Rupard. Yet, none did anything.

Equally true, the policy required sergeants and lieutenants to walk through the module every day and inspect cells. They either failed to follow the policy requiring inspections, or they intentionally ignored the horrible conditions in Rupard's cell.

There were at least 15-20 different deputies or ranking staff members who worked the 7D module in the roughly five days before March 17, 2022. The fact that none of them took any action to care for Rupard, clean his cell, or ensure he was not in medical distress shows a pattern and practice of ignoring filth and inhumane care that was accepted within the SDSO.

**The SDSO, particularly Detective Blumenshine, failed to follow generally accepted law enforcement practices and conduct a thorough investigation that collected all the pertinent evidence.**

The SDSO is responsible for ensuring that a proper criminal and administrative investigation is completed, regardless of who ultimately conducts the investigation. The evidence is clear that Blumenshine failed to conduct a thorough investigation, as his own testimony shows he failed to gather all the evidence and investigate medical practices that may hypothetically have led to criminal charges, including failing to secure video recording evidence, interview key witnesses, and take other steps that a competent death investigator would have taken.

The determination by the Medical Examiner that the manner of death was a homicide prompted Blumenshine to attempt to remedy his failures, but by that time evidence was lost forever. Video recordings were unrecoverable, memories had faded, and any delay of this length creates a less thorough outcome. A competent investigation would have been complete and unaffected by the Medical Examiner's determination.

Additionally, Blumenshine failed to identify and investigate the fundamental question: "How did someone who was in jail, and supposedly checked on a minimum of 24 times a day, essentially starve to death?" He was either an incompetent investigator or intentionally avoided answering the key question of how this could have happened.

Then the SDSO failed to rectify Blumenshine's failures and ensure a competent investigation, and, in doing so, violated generally accepted law enforcement and jail practices.

## CONCLUSIONS

It is hard to imagine in this day and age someone dying from malnutrition, dehydration, and easily treatable medical conditions while in an American Jail, especially one with the resources of the SDSO. In this case, the SDSO's organizational failures, combined with the individual failures of its deputies, enabled such a tragedy.

While there is no compulsory obligation to schedule hygiene checks, it is every staff member's obligation to do so. There was an affirmative obligation on each of those staff members to provide reasonable care and custody of Rupard while he was in the SDSO jail, but none complied with that obligation. Instead, all the evidence showed a pattern and practice by SDSO custody staff of failing to recognize and act upon the obvious, each contributing to Rupard's death.

Then, the SDSO's solution to an apparent problem of staff not doing inspections was to create a policy and schedule for inspections and cleaning. This is unusual, because in most jails, staff do that continuously. However, the SDSO failed to ensure its solution was reliable, leaving the IPs in 7D to live in unchecked filth.

The testimony did not include explanations as to how the staff let this happen. The dichotomy is that most deponent deputies testified they would take action if they saw a cell in the condition of Rupard's – yet, they did not.

Respectfully submitted:

Gary Raney, President

GAR, Inc.

## EVIDENCE BY FILENAME

Note: Each deposition included exhibits, but because the exhibits were not uniquely numbered, the filenames were not descriptive; therefore, they were excluded.

1. 0 - 2022-03-15 20-20-00-420.mov
2. 0 - 2022-03-15 22-04-07-632.mov
3. 0 - 2022-03-15 23-46-40-304.mov
4. 0 - 2022-03-16 01-21-27-452.mov
5. 0 - 2022-03-16 02-56-14-600.mov
6. 0 - 2022-03-16 04-30-34-364.mov
7. 0 - 2022-03-16 06-05-28-189.mov
8. 0 - 2022-03-16 07-43-23-684.mov
9. 0 - 2022-03-16 09-27-23-850.mov
10. 0 - 2022-03-16 22-00-00-125.mov
11. 0 - 2022-03-16 23-46-28-565.mov
12. 0 - 2022-03-17 01-23-37-307.mov
13. 0 - 2022-03-17 02-58-31-133.mov
14. 0 - 2022-03-17 04-33-39-720.mov
15. 0 - 2022-03-17 06-08-40-225.mov
16. 0 - 2022-03-17 07-47-36-499.mov
17. 0 - 2022-03-17 09-32-25-154.mov
18. 0 - 2022-03-17 11-17-00-385.mov
19. 0 - 2022-03-17 12-51-48-536.mov
20. 0 - 2022-03-17 14-31-18-872.mov
21. 0 - 2022-03-17 16-15-25-717.mov
22. 0 - 2022-03-17 18-00-26-663.mov
23. 0 - 2022-03-17 19-46-28-386.mov
24. 0 - 2022-03-17 21-31-36-444.mov
25. 0 - 2022-03-17 23-11-20-071.mov
26. 184 Third Amended Complaint (TAC).pdf
27. 2024-12-11 - PDF - FULL SIZE - LINDA GUTIERREZ - LINKED EXHIBITS.pdf
28. 2024-12-16 - PDF - FULL SIZE - CHRISTINA GOODALL - LINKED EXHIBITS.pdf
29. 2025-01-13 - PDF - FULL SIZE - CORPORAL BLADE ROMANS - LINKED EXHIBITS.pdf
30. 2025-05-05 - PDF - FULL SIZE - BETHANN SCHABER, M.D. - LINKED EXHIBITS.pdf
31. 2025-12-19 - PDF - FULL SIZE - NICOLAS BADRE, M.D. - LINKED EXHIBITS.pdf
32. 2026-01-07 - PDF - FULL SIZE - DETECTIVE MAX BLUMENSHINE - LINKED EXHIBITS.pdf
33. 2026-01-08 - PDF - FULL SIZE - MELISSA QUIROZ - PMK - 30(B)(6) - LINKED EXHIBITS.pdf
34. 2026-01-15 - PDF - FULL SIZE - JON MONTGOMERY, DO - LINKED EXHIBITS.pdf
35. 2026-01-16 - PDF - FULL SIZE - LIEUTENANT AARON BOORMAN - PMK - 30(B)(6) - LINKED EXHIBITS.pdf
36. 2026-01-16 - PDF - FULL SIZE - LIEUTENANT GINO MATRONE - LINKED EXHIBITS.pdf
37. 2026-01-29 - PDF - FULL SIZE - DEPUTY BERNARDO JOSE ROMERO - LINKED EXHIBITS.pdf
38. 2026-01-29 - PDF - FULL SIZE - DEPUTY GUSTAVO MARTINEZ - LINKED EXHIBITS.pdf
39. 2026-01-29 - PDF - FULL SIZE - DEPUTY JEFF RYAN MICU AMADO - LINKED EXHIBITS.pdf
40. 2026-02-02 - PDF - FULL SIZE - DEPUTY ERNESTO AGUIRRE - LINKED EXHIBITS.pdf
41. 2026-02-02 - PDF - FULL SIZE - DEPUTY JASON VILADIU - LINKED EXHIBITS.pdf

42. 2026-02-26 - PDF - FULL SIZE - TREYVONNE JORDAN JAMES.pdf
43. 2026-02-27 - PDF - FULL SIZE - CORPORAL THOMAS RANDALL MACE.pdf
44. 2026-02-27 - PDF - FULL SIZE - SERGEANT MICHAEL JOSEPH JOHNSON - LINKED EXHIBITS.pdf
45. 2026-03-03 - PDF - FULL SIZE - ANTHONY CRUZ, M.D. - LINKED EXHIBITS.pdf
46. 2026-03-26 - PDF - FULL SIZE - SERINA ROGNLIEN-HOOD - LINKED EXHIBITS Confidential.pdf
47. 2026-04-13 - PDF - FULL SIZE - DEPUTY ANDREW SANTIAGO TORRES - LINKED EXHIBITS.pdf
48. 2026-04-13 - PDF - FULL SIZE - DEPUTY MIGUEL AGUILERA - LINKED EXHIBITS.pdf
49. 2026-05-18 - PDF - FULL SIZE - DEPUTY ALLEN WERESKI - LINKED EXHIBITS.pdf
50. Combined Short Final.mp4
51. CONFIDENTIAL COSD 000026-000150 Lonnie Rupard Jail Medical Records.pdf
52. CONFIDENTIAL COSD 006376-006416 Autopsy Report and Notes from ME's Office (Redacted).pdf
53. CONFIDENTIAL COSD 006433-006436 IA Documents.PDF
54. COSD 000266-274 Blumenshine Report.pdf
55. COSD 000275-280 Green Sheet L.2.C.1 Sanitation and Hygiene Inspections 01.04.2024.pdf
56. COSD 001149-1154 L.2.C.1 Sanitation and Hygiene Inspections 04.06.2022.pdf
57. COSD 001155-1157 I.43 Inmate Count Procedures 12.23.2020.pdf
58. COSD 001158 L.2 Sanitation and Hygiene Inspections 07.03.2018.pdf
59. COSD 001159-1160 I.43.C.1 Incarcerated Person Count Procedure 02.14.2022.pdf
60. COSD 001161-1162 I.43.C.1 Inmate Count Procedure 08.17.2020.pdf
61. COSD 001163-1168 L.2.C.1 Sanitation and Hygiene Inspection 09.12.2019.pdf
62. COSD 001216-1442 Autopsy Photos of Lonnie Rupard.pdf
63. COSD 001510-1547 Photos of Rupard's Cell.pdf
64. COSD 001633-1636 Follow Up Investigative Report re Autopsy - Det. Blumenshine.pdf
65. COSD 001637-1649 Follow Up Investigative Report by Det. Blumenshine 06.07.2022.pdf
66. COSD 001656-1677 Follow Up Investigative Report II by Det. Blumenshine 03.16.2023.pdf
67. COSD 002085-2106 Autopsy Report (Unredacted).pdf
68. COSD 004864-5214 Area Activities Logs 2.21.2022 to 3.17.2022 (Reverse Chronological).pdf
69. COSD 006088-6090 I.64 - Safety Checks-Inmates, Housing and Holding Areas 12.17.2021.pdf
70. COSD 006120-6125 M.25 Psychiatric Stabilization Units 03.27.2020.pdf
71. COSD 006126 Hunger Strikes.pdf
72. COSD 006126-6127 M.29 Hunger Strikes 10.21.2020.pdf
73. COSD 006242-6244 Line-Up Training re Safety Cell Procedures 05.01.2021.pdf
74. COSD 006245-6246 Line-Up Training re 11-53 Safety Checks 05.01.2021.pdf
75. COSD 006247-6257 Line-Up Training re Inmate Count Procedures 05.02.2021.pdf
76. COSD 006335-6336 MSD.H.12 Hunger Strikes 06.15.2015.pdf
77. COSD 006343-6376 I.43 Inmate Count Procedure.pdf
78. COSD 006438-006439 I.64.C.1 Safety Checks of Housing Units 02.17.2022.pdf
79. COSD 006451-006452 Green Sheet I.43.C.1 Inmate Count Procedure 08.17.2020.pdf
80. COSD 006453-006454 Green Sheet I.64.C.1 Safety Checks of Inmates 10.11.2021.pdf
81. COSD 018166 Segregated Housing Order 2.20.2022.pdf
82. COSD 018167 Segregated Housing Order 01.31.2022.pdf
83. COSD 6939-6942-M.5 Medical Emergencies 12.02.2020.pdf
84. Exhibit 7 - Badre CLERB Response.pdf
85. From Estate of Schuck v. COSD, et al. - Floor Evacuation List.pdf

# GARY L. RANEY, SHERIFF (retired)

GAR, Inc. · 7154 West State Street, Suite #260 · Boise, Idaho 83714 · (208) 870-8400
gary@garyraney.com · www.garyraney.com

## EXPERIENCE

**2011** TO PRESENT

### PRESIDENT

GAR, INC. BOISE, ID

Experienced and knowledgeable consultation on jail policy and practice, specializing in cases involving deaths and uses of force. Gary has worked on projects in about 40 states and provided a wide range of services to government officials, attorneys, and prosecutors.

**U.S. Department of Justice**

- Comprehensive jail assessment, United States of America v Fulton County GA (2024)
- Jail operational assessment, Fayette-Lexington County KY (2022)
- Jail system evaluation, Las Vegas NV Metropolitan Police Department (2016)
- Organizational culture assessment, Santa Clara County CA Sheriff's Office (2016)
- Executive leadership training, Oregon Department of Public Safety Standards & Training (2016)
- Organizational culture assessment, Middlesex MA Sheriff's Office (2015)

**New York City Department of Correction (Rikers Island)** – Consultant for planning and implementation of reforms to improve the jail system and bring the NYDOC into substantial compliance with the 2015 Consent Agreement. (2025-26)

**Sangamon County (IL)** – Assessment of higher liability policies and practices in the jail. (2025)

**Lake County (MT)** – Assessment of constitutional compliance in jail conditions, policy and practices (2023)

**Police Executive Research Forum** – Consultant on de-escalation training. (2022-23)

**City of Louisville (KY)** – Assess six death cases, overall jail operations and the physical facility of the Louisville Metro Department of Corrections (2022)

**State of Arizona Department of Corrections** – Hired by Alvarez and Marsal to consult on court action against the Department of Corrections medical services (2022)

**U.S. Conference of Chief Justices** – Member of the National Judicial Task Force to Examine State Courts' Response to Mental Illness (2020-22)

**Howard Buffett Foundation / Macon County IL Sheriff's Office**

- Assessment and integration of Illinois law enforcement reform legislation (2021)
- Board member of the Central Illinois Regional Dispatch Center, representing the Macon County Sheriff (2019-2020)
- Comprehensive review and assessment of liability, security and operations (2017 - current)

- Study and recommendations on civil process service (2019)
- Study and recommendations on emergency communication fees (2019)
- Created policing and jail policy manuals (2018)

**Law Enforcement Policy Center, LLC** – License and distribute model policing policies to police and sheriff's agencies in Idaho (2016 - current)

**Howard Buffett Foundation / Christian County IL Sheriff's Office**
- Jail operations and liability assessment and planning (2020-2023)
- Created policing and jail policy manuals (2020 -2023)

**San Luis Obispo CA Sheriff's Office** – Jail staffing analysis (2020)

**Police Executive Research Forum**
- Jail diversion and pretrial strategies (2019)
- Jail mental health solutions (2018)

**Santa Clara County CA Sheriff's Office**
- Leadership planning and development (2018)
- Inmate and jail employee opinion surveys (2018)
- Evaluation of jail reform efforts (2017 - 2018)

**Idaho Counties Risk Management Program**
- Produced training video series on high-risk policing topics (2016 - 2018)
- Created two Idaho statewide standardized policing policy manuals (2015 - 2017)

**San Bernardino County CA Sheriff's Office** – Use of force analysis (2015 - 2017)

**City of Cascade ID / Valley County ID** – Cost analysis of city police services and negotiation of a joint powers' agreement (2017)

**Coeur d'Alene ID Police Department** – Selection process for Chief (2009)

**Strategic Planning / Organizational and Leadership Development**
- Idaho Department of Health & Welfare (2024)
- Meridian ID Police Department Strategic Planning (2023)
- Meridian ID Police Department Strategic Leadership Development (2021)
- Supportive Housing and Innovative Partnerships (2021)
- Saint Alphonsus Regional Medical Center ID (2019)
- Pima County AZ Sheriff's Department (2019)
- Idaho Department of Health & Welfare (2017)
- Imperial County CA Sheriff's Office (2017)
- Twin Falls ID County Sheriff's Office (2017)
- Boise County ID Sheriff's Office (2017)
- Pierce County WA Sheriff's Office (2010)

**Federal Court Appointments**

| | |
|---|---|
| Independent Compliance Director of Miami-Dade County Corrections and Rehabilitation Department. United States of | Case #13-21570-CIV |

| | |
|---|---|
| America v Miami-Dade County. U.S. District Court for the Southern District of Florida. (2021 ongoing).<br>Appointed by the federal court and given broad authority to bring Miami-Dade in compliance with a 2013 Consent Agreement. Substantial compliance was achieved, and the Consent Agreement was terminated in November 2024. | Settlement Agreement |
| Federal Court Monitor - Chavez v Santa Clara County. Consent Decree. U.S. District Court for the Northern District of California, Eureka Division (2019 ongoing) | Consent Decree<br>Case #15-cv-05277<br>Use of Force |
| Federal Court Monitor – Turner v San Bernardino County Sheriff's Department Consent Decree. U.S. District Court for the Central District of California, Eastern Division (2018-2025) | Consent Decree<br>Case #5:16-cv-00355<br>Use of Force |
| Consultant to the Court Experts – Armstrong v Newsom. California Department of Corrections and Rehabilitation Investigation and Disciplinary Process | Consent Decree<br>Case # cv94-2307 |

## Criminal and Civil Consulting

**Trial or deposition testimony noted in bold below**

| | |
|---|---|
| Park v Alameda Co (CA). US District Court for the Northern District of California. (2026) | Case #4:22-cv-01817<br>Jail suicide |
| Wagner v Harris Co (TX). US District Court for the Southern District of Texas. (2026) (Two separate plaintiffs) | 4:23-cv-02886<br>Use of Force |
| Hemmer v Riverside Co (CA). US District Court for the Central District of California. (2026) | Case #5:22-cv-1247<br>Jail Homicide |
| Moore v Missouri DOC (MO). US District Court for the Western District of Missouri. (2026) | Case #2:24-cv-04107<br>Prison death |
| Seward v City of Meridian (ID). US District Court for the District of Idaho (2026). | Case #1:25-cv-00221<br>Use of force |
| Cunningham v Bergen Co (NJ). US District Court for the District of New Jersey. (2026) | Case #2:19-cv-06154<br>Jail Homicide |
| Borroto v Hudson Co (NJ). US District Court for the District of New Jersey. (2026) | Case #2:10-cv-17148<br>Jail suicide |

| | |
|---|---|
| Chau v Bernalillo Co (NM). US District Court for the District of New Mexico. (2026) | Case #25-cv-00772<br>Jail death. |
| Adams et al v Cook Co (IL). U.S. District Court for the Northern District of Illinois (2026) | Case #1:23-cv-01390<br>Harassment / Hostile work environment |
| Hanchett v Snohomish Co (WA). Superior Court for King County (2026) | Case #25-2-00725-1<br>Jail death. |
| Joiner v Correcthealth Columbia et al (GA). U.S. District Court for the Southern District of Georgia (2025) | Case #1:25-cv-00016<br>Jail death. |
| Peters v Hernando Co (FL). U.S. District Court for the Middle District of Florida (2025) | Case # 8:24-cv-00893<br>Jail death. |
| Jacksonville County (FL) Fourth Judicial District State Attorney's Office (2025) | Criminal review of jail death. |
| Michael v Daniels Co (MT). U.S. District Court for the District of Montana, Great Falls Division. (2025) | Case # CV-24-56<br>Illegal conduct by sheriff |
| **Deposed:** McCoy v San Diego Co (CA). US District Court for the Southern District of California (2025) | Case #22-cv-01724<br>Jail homicide by cellmate |
| Marroquin v San Diego Co (CA). U.S. District Court for the Southern District of California (2025) | Case #3:23-cv-00978<br>Jail death |
| Altstatt v County of Oklahoma (OK). U.S. District Court for the Western District of Oklahoma (2024) | Case #CIV-2022-811<br>Protection from harm |
| Tackett v Murphy (ID). U.S. District Court for the District of Idaho (2024) | Case #1:22-cv-00110<br>Duty of Care/Personnel |
| **Deposed:** Dunsmore et al v San Diego County (CA). U.S. District Court Southern District of California (2024) | Case #3:20-cv-00406<br>Class action case on jail practices |
| Smith v Santa Cruz Co (CA). U.S. District Court for the Northern District of California, San Jose Division (2024) | Case #5:21-cv-00421<br>Jail death |
| Schomer v Elko Co (NV). U.S. District Court for the District of Nevada (2024) | Case #3:23-cv-00390<br>Jail death |
| **Deposed:** Moreno v San Diego Co (CA). U.S. District Court for the Sothern District of California (2024) | Case #21-cv-1956<br>Jail death |

| | |
|---|---|
| **Court Testimony:** State of New Hampshire v Matthew Millar (2024) | Criminal murder charge from in-custody death |
| Bohanan v Butler Co (OH). U.S. District Court for the Sothern District of Ohio, Western Division (2024) | Case #1:22-cv-00380<br>Jail death |
| Peters v City and County of Denver (CO). U.S. District Court for the District of Colorado (2024) | Case #23-cv-750<br>Jail use of force |
| Lundmark v Beltrami & Clearwater Co (MN). U.S. District Court for the District of Minnesota (2024) | Case #22:cv-01493<br>Jail death |
| Spriestersbach v Hawai'i. U.S. District Court for the District of Hawai'i (2024) | Case #1:21-cv-00456<br>Unlawful imprisonment |
| Doe v Santa Barbara Co (CA). U.S. District Court for the Central District of California (2024) | Case #2:20-cv-04334<br>Sexual misconduct |
| Stacey v. Madison County (ID). U.S. District Court for the District of Idaho. (2023) | Case #4:23:cv-119<br>Jail homicide |
| State of Colorado v Humphrey (2023) | Criminal review of a use of force |
| State of Colorado v Adams County jail deputies (2023) | Criminal review of an in-custody death |
| **Deposed:** Serna v San Diego County (CA). U.S. District Court for the Southern District of California (2023) | Case #20-CV-2096<br>Jail death |
| Abbie v Shasta County (CA). U.S. District Court for the Eastern District of California (2023) | Case #2:20-CV-01995<br>Jail use of force death |
| **Deposed**: Hernandez/Zumwalt v Riverside County (CA). U.S. District Court for the Central District of California, Eastern Division (2023) | Case #5:21-CV-01791<br>Use of force death |
| Hall v Gooding County (ID). U.S. District Court for the District of Idaho (2023) | Case #1:22-CV-00277<br>Use of force |
| **Deposed**: Buxton v Mower County (MN). Minnesota District Court, Third Judicial District. (2023) | Case #50-CV-22-1660<br>Jail medical death |
| Wilson v San Diego County (CA). U.S. District Court for the Southern District of California (2023) | Case #20-cv-0457<br>Jail medical death |

| | |
|---|---|
| **Deposed**: Hepner v Tulare County (CA). U.S. District Court for the Eastern District of California – Fresno (2023) | Case #1:19-cv-00774<br>Use of force |
| Arispe (Alexander) v Riverside County (CA). U.S. District Court for the Central District of California. (2023) | Case #5:21-cv-00417<br>Jail suicide |
| Smallwood (Robertson) v Anderson County (SC). U.S. District Court for the District of South Carolina, Anderson Division (2023) | Case #0:22-cv-00232.<br>Use of force death |
| Wright v Ohio Youth Services (OH). (2022) | Ohio Claims Case #2021-00495. In-custody death. |
| Maine v Cochran (ME). District Attorney (2022) | Criminal review of a use of force incident |
| Maine v Becerra (ME). District Attorney (2022) | Criminal review of a use of force incident |
| Estate of Scott Hultman v Ventura County (CA). U.S. District Court for the Central District of California - Western Division. (2022) | Case #2:21-cv-06280<br>Jail suicide |
| Williams v Dixon (Washington D.C.) (2022) | Declaration regarding jail searches |
| **Deposed**: Luttrell v Santa Cruz County (CA). U.S. District Court for the Northern District of California, San Jose Division (2022) | Case #5:19-cv-07300<br>Inmate physical and sexual attack by other inmates |
| **Deposed:** Payne v Clay County (TX). U.S. District Court for the Northern District of Texas, Wichita Falls Division (2022) | Case # 7:21-cv-0080<br>Jail suicide |
| Cumberland County (ME). District Attorney (2022) | Criminal review of several use of force events |
| Campbell v Butler County (OH). U.S. District Court for the Southern District of Ohio (2022) | Case # 1:20-cv-00678<br>Jail suicide |
| Yellowbear v Salmonsen (MT). U.S. District Court for the District of Montana, Butte Division (2022) | Case # cv-21-59<br>Failure to protect |
| Neville v Forsyth County (NC). U.S. District Court for the Middle District of North Carolina (2022) | Case # 1:21-cv-758<br>In-custody death, use of force |
| Little v Nassau County (NY). U.S. District Court Eastern District of New York (2022) | Case # CV-14-125<br>In-custody death (homicide) |

| | |
|---|---|
| **Deposed:** Greer v San Diego County (CA). U.S. District Court for the Southern District of California (2022) | Case #19-cv-0378<br>Medical indifference |
| **Deposed:** Munday and Devine v Beaufort County (SC). U.S. District Court for District of South Carolina (2022) | Case #9:20-dv-02144<br>Strip searches |
| State of Idaho v Elias Cerdas (2022) | Officer-involved shooting |

## EMPLOYMENT

**2015-current**

### FOUNDER & PRESIDENT

GAR, INC. AND LAW ENFORCEMENT POLICY CENTER, LLC

Law enforcement and jail consulting, specializing in in-custody deaths, protection from harm and the use of force. Details are noted above.

**2005 – 2015**

### SHERIFF

ADA COUNTY SHERIFF'S OFFICE, BOISE, ID

Elected sheriff in 2004, leading 665 people in a full-service law enforcement agency, including responsibility for:

- All county police services and three contract police departments.
- 1,300 bed jail, recognized by the U.S. Department of Justice and others as a model jail for operation, management and minimal use of force.
- Consolidated emergency dispatch center serving all local law enforcement, fire and EMS agencies in the county; and
- Pretrial services and sentencing alternatives for offenders.

**1983 – 2004**

### DEPUTY TO UNDERSHERIFF

ADA COUNTY SHERIFF'S OFFICE, BOISE, ID

**Undersheriff** (appointed 2002) – Oversaw all aspects of the agency including patrol, the jail, dispatch, policy, planning and all other aspects of administration.

**Captain** (promoted 2001) – Directed the Administrative Services Division that included Finance, Training, Human Resources, Policy, Evidence and other administrative functions of the agency.

**Lieutenant** (promoted 1998) – Patrol Commander responsible for all patrol functions, as well as the SWAT, bomb, canine and traffic teams and supervised the Civil Process Office. During this time, led the Sheriff's Office expansion from one contract city police department to three.

**Sergeant** (promoted 1993)

- Jail housing sergeant – Supervised jail deputy teams.
- Jail administrative sergeant – Oversaw policy, purchasing and other administrative duties.
- Patrol sergeant – Supervised patrol teams in the field.
- Administrative sergeant – Worked directly for the sheriff on special projects such as policy, budgeting, internal affairs, training, etc. Rewrote full agency policy manual.

**Deputy**

- Jail deputy and later a jail training officer – Led most of the creation of the first formal jail training program.
- Patrol deputy and later a field training officer – Helped revise / update the training program.
- Detective – Ultimately assigned many complicated and high-profile crimes.

**2006 – 2011**

### ADJUNCT PROFESSOR

BOISE STATE UNIVERSITY CRIMINAL JUSTICE & PUBLIC ADMINISTRATION DEPARTMENTS

**2003 – 2016**

### ADJUNCT PROFESSOR AND ADVISOR

NORTHWESTERN UNIVERSITY CENTER FOR PUBLIC SAFETY

## EDUCATION & TRAINING

**2001 - 2008**

### FBI ACADEMIES AND SEMINARS

- **National Executive Institute** – Prestigious international executive education and exchange course (2008)
- **Law Enforcement Executive Development Seminar** – Quantico, VA (2006)
- **Executive Command College** – (2003)
- **National Academy** – University of Virginia, Quantico, VA GPA: 4.0 (2001)

**2006**

### NATIONAL SHERIFF'S INSTITUTE

NATIONAL INSTITUTE OF CORRECTIONS (Longmont, CO)

**2005**

### MASTER'S DEGREE, CRIMIMAL JUSTICE ADMINISTRATION

BOISE STATE UNIVERSITY

- Distinguished Graduate Award for 2008
- Criminal Justice Program Graduate Academic Excellence Award for 2003-2004
- Selected Boise State University Distinguished Alumni
- GPA: 4.0

1997

### SCHOOL OF POLICE STAFF & COMMAND

NORTHWESTERN UNIVERSITY CENTER FOR PUBLIC SAFETY

- GPA: 4.0

1986

### BACHELOR'S DEGREE, CRIMIMAL JUSTICE ADMINISTRATION

BOISE STATE UNIVERSITY

1985

### PEACE OFFICER CERTIFICIATIONS

IDAHO PEACE OFFICERS' STANDARDS AND TRAINING

- Earned Basic, Intermediate, Advanced, Supervisory and Executive Certifications
- Graduated #1 in the police academy

## PROFESSIONAL APPOINTMENTS

- Advisory Board for the National Institute of Corrections, Vice-Chair, appointed by the U.S. Attorney General
- Idaho Peace Officers Standards and Training Council, Chair
- Idaho Criminal Justice Commission, Vice Chair
- Idaho Criminal Justice Grants Council, Chair
- Pretrial Justice Institute (Washington, D.C), Chair
- Idaho Sheriff's Association, President
- National Judicial Task Force to Examine State Courts' Response to Mental Illness, member
- Central Illinois Regional Communications Center Board, Member on behalf of the Macon County Sheriff
- Ada County Critical Incident Task Force, Chair
- Idaho Association of Counties, member and Leadership Award recipient
- Intermountain Regional Computer Forensic Laboratory, Board member
- Family Advocacy Center and Educational Services, Board member
- Ada County Mental Health Court, Board member
- Ada County Drug Court, Board member
- Boise State University think-tank on innovation, Member

## PUBLICATIONS

2017 **Bail Reform Restores Basic American Values of Freedom and Justice.** Fox & Hounds www.foxandhoundsdaily.com. August 2017.

2015 **Eyewitness ID – The Importance of Getting it Right** with Jennifer Thompson. *Sheriff Magazine.* May/June 2015.

2015 **Here to Help: Taking Better Care of Cops** with Samantha Westendorf. *Fraternal Order of Police Journal*. Volume 10; Number 1: 2015.

2014 **Why Sheriffs Should Champion Pretrial Services** with Stan Hilkey, Mesa County CO Sheriff, and Beth Arthur, Arlington County VA Sheriff. *Sheriff Magazine.* May/June 2014.

2013 **Wise Beyond Your Field** with Dr. Nancy Napier, Jamie Cooper, Mark Hofflund, Don Kemper, Bob Lokken, Chris Peterson and John Michael Schert. CCI Press.

2012 **Treating Mental Illness: Jails are Not the Answer.** *The Blue Review*. https://thebluereview.org/treating-mental-illness/

2012 **In Pursuit of Cooperation: Idaho Police Agencies Join Together** with Boise Police Chief Mike Masterson. *FBI Law Enforcement Bulletin*. December 2012.

2012 **Jail Culture and Violence Part I and II.** Two whitepapers written at the request of the Los Angeles County Citizen's Commission on Jail Violence.

2011 **Gang Rules: Creativity in Unexpected Places** with Dr. Nancy Napier, Ron Freeman, Chris Petersen, Jamie Cooper, Don Kemper, Jim Balkins, Charlie Fee, Mark Hofflund, Trey McIntyre, John Michael Schert and Bob Lokken. *People & Strategy.* Vol. 34, Issue 3, 2011.

2008 **Turnaround, in a Good Jail** with Dr. Jeffrey Schwartz. *American Jails*. February 2007.

## PRESENTATIONS

Presentations on organizational behavior and development, the effective use of data, contemporary preferred practices, system reform and other topics to:

- United States Congress
- NASA Launch Services Program Leadership Retreat
- Police Executive Research Forum
- National Center for the State Courts
- Prosecutors Alliance of California
- American Jail Association
- American Correctional Association
- MyLawCLE: Civil Rights Cases
- National Sheriff's Association
- Idaho Department of Transportation Leadership Retreat
- State sheriffs' associations across the U.S.
- Los Angeles Citizens' Commission on the Reduction of Jail Violence
- Community Resources for Justice
- Human Rights Watch
- American College of Correctional Physicians
- Allegheny County (PA) Jail Oversight Board

## VOLUNTEER WORK

- Idaho Leaders United, Founder & Board Member
- Saint Alphonsus Health System Advisory Board
- Saint Alphonsus Regional Medical Center Foundation, Chair
- National Executive Institute Associates (FBI)
- Ada County Sheriff's Youth Foundation

- United Way of Treasure Valley, Chair
- Big Brothers Big Sisters of Southwest Idaho, Chair
- Festival of Trees community-wide fundraising event, Co-chair
- Founder and Chair of Defend and Protect Idaho
- Idaho Leaders United board member
- Idaho State Historical Society
- Recipient of the 2012 National Philanthropy Day Honor Roll Award National Sheriff's Association
- International Association of Chiefs of Police
- Police Executive Research Forum
- Boise State University Alumni Association
- Ada County Sheriff Employee's Association, President
- Children's Home Society
- Junior League of Boise