EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
PETER BIBRING: SBN 223981
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ESTATE OF LONNIE RUPARD,

Plaintiff,

v.

COUNTY OF SAN DIEGO, *et al.*,

Defendants.

CASE NO. 23-CV-1357-CAB-JAC

**EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS AGAINST DEFENDANT COUNTY OF SAN DIEGO FOR SPOLIATION OF EVIDENCE, VOL. 1 OF 2**

Judge: Hon. Cathy Ann Bencivengo

Date: December 18, 2026

**PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT**

## INDEX OF EXHIBITS

| Exhibit | Description | Volume | Ex. Page |
|---|---|---|---|
| 1 | Follow-Up Investigative Report II, Det. Blumenshine, Mar. 16, 2023 (COSD 001656–1677) | 1 | 4 |
| 2 | Follow-Up Investigative Report re Autopsy, Det. Blumenshine (COSD 001633–1636) | 1 | 27 |
| 3 | Follow-Up Investigative Report, Det. Blumenshine, June 7, 2022 (COSD 001637–1649) | 1 | 32 |
| 4 | Inmate History Summary Report (COSD 000712) | 1 | 46 |
| 5 | Deposition of Det. Max Blumenshine, Jan. 7, 2026 (excerpts) | 1 | 48 |
| 6 | Follow-Up Investigative Report III, Det. Blumenshine, Feb. 7, 2024 (COSD 000266–274) | 1 | 80 |
| 7 | Photographs of Cell 17 | 1 | 90 |
| 8 | Deposition of Cpl. Thomas Mace, Feb. 27, 2026 (excerpts) | 1 | 96 |
| 9 | Deposition of Lt. Gino Matrone, Jan. 16, 2026 (excerpts) | 1 | 103 |
| 10 | Autopsy photographs | 1 | 109 |
| 11 | Rule 30(b)(6) Deposition of Capt. Derek Williamson, Oct. 11, 2024, in *Estate of Schuck v. County of San Diego*, No. 3:23-CV-00785-DMS-AHG (filed as ECF No. 111-5) (excerpts) | 1 | 116 |

| Exhibit | Description | Volume | Ex. Page |
|---|---|---|---|
| 12 | County Defendants' Objection to Report and Recommendation in *Estate of Schuck v. County of San Diego*, No. 3:23-CV-00785-DMS-AHG (ECF No. 145) | 1 | 131 |
| 13 | Deposition of Bethann Schaber, M.D., May 5, 2025 (excerpts) | 1 | 147 |
| 14 | Sheriff's Homicide Unit Manual of Policy and Procedures (Oct. 2021) | 2 | 4 |
| 15 | Deposition of Sgt. Michael Johnson, Feb. 27, 2026 (excerpts) | 2 | 70 |
| 16 | California State Auditor's Report, No. 2021-109, *San Diego County Sheriff's Department — It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody* (Feb. 3, 2022) | 2 | 78 |

# EXHIBIT 1

Follow-Up Investigative Report II, Det. Blumenshine, Mar. 16, 2023 (COSD 001656–1677)

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)

**Case Number:** 22111838



---

## Follow Up Report II

### Origin:

On Thursday, March 17, 2022, at 2246 hours, Inmate Lonnie Rupard (10/1/75) was found unresponsive in his cell. Deputies and medical staff attempted lifesaving measures until paramedics arrived. Inmate Rupard was transferred to UCSD Hospital before being pronounced deceased at 2351 hours by Dr. Allen.

On Thursday, March 18, 2022, at about 0200 hours, San Diego County Sheriff's Homicide responded and assumed control of the investigation. I was assigned as the lead investigator at that time.

As documented in my initial follow up report:

Inmate Rupard had a history of psychotic and assaultive behavior while in the San Diego County jail system.

Inmate Rupard's cell was full of feces and food trays (both empty and full). The toilet had been filled with feces, food, and food trays. The water was operable, but the cell intercom had been tampered with and was difficult to hear through.

Inmate Rupard was unable to be processed at the hospital as he had been released to the medical examiner's office prior to Homicide's arrival.

Video of March 17, 2022, was reviewed, showing multiple checks by deputies. Inmate Rupard never left his cell, and no movement was observed inside the cell. The logs were consistent with what was seen on video.

On Sunday, March 19, 2022, the autopsy of Lonnie Rupard was conducted. Rupard was 69 inches in height and weighed 105 pounds. Inmate Rupard appeared severely malnourished.

A cursory review of the medical records was conducted, and a copy was turned over to Dr. Schaber at the Medical Examiner's Office.

On Tuesday, June 7, 2022, I completed my preliminary investigation into the in-custody death.

---

| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 3/16/2023 |

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)

**Case Number:** 22111838



**Investigation:**

I conducted a review of Rupard's California and Federal criminal history. His criminal history dates back to the 90's between California and Texas. For details, refer to the attached criminal history printouts and crime reports.

**Criminal History:**

On Saturday, January 8, 2019, Rupard was arrested for PC 245(A)(1), PC 594(B)(2)(A) by the National City Police Department. Rupard threw a rock through the victim's vehicle while the car was stopped at a stop light. The assault was unprovoked.

During Rupard's sentencing, it was discovered he had a criminal history dating back to 1993. Within that time period, he had obtained convictions related to battery, accessory, resisting arrest, evading a police officer, violation of a court order, robbery, assault with a deadly weapon, making terrorist threats, and causing injury to an elderly person.

On Monday, February 14, 2020, Rupard pled guilty to PC 245(A)(4) with a prior prison commit. Rupard was sentenced to 4 years prison.

On Tuesday, May 18, 2021, Rupard was released to the San Diego County Probation Department.




| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 3/16/2023 |

On Monday, August 23, 2021, Rupard was contacted at the Imperial Beach Pier reference a call for service of an intoxicated male (CAD#E7321231). Rupard was cooperative and cordial with deputies. He willingly provided his identifying information and allowed them to take photographs, taking off his own shirt.



Rupard was then arrested on the following dates:

8/25/21 – Probation violation



9/11/21 – Probation violation



9/14/21 – Under the influence of narcotics



10/20/21 – Probation violation



12/19/21 – Probation violation



On Sunday, December 19, 2021, at about 0100 hours, Officer Shafer #0523 with the National City Police Department was conducting a traffic stop. A nearby transient approached the vehicle and threw a bag at it. Officer Shafer recognized the transient as Lonnie Rupard. After concluding his traffic stop, he conducted a records check and saw Rupard had a felony warrant. Officer Shafer and his partners attempted to contact and arrest Rupard who immediately fled. A foot pursuit ensued. Officer Shafer was ultimately able to catch Rupard who had turned to face him. Officer Shafer tackled Rupard to the ground and arrested him without incident.

**Investigation Continued:**

On Wednesday, October 19, 2022, at 0815 hours, I asked Lieutenant Kopchak if any hygiene inspections were done. Lieutenant Kopchak notified me the last logged hygiene inspection was on March 5, 2022. However, after a review of the video, it appeared the inspection was not completed. Additionally, the housing unit log was not completed regarding as to why the hygiene inspection was not completed. That investigation into the lack of hygiene inspections falls under the Internal Affairs purview and as such I will not be investigating the policy violations.

Rupard's housing block, 7D, was classified as COVID quarantine and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health.

On Wednesday, October 19, 2022, at 1003 hours, I requested a copy of the psychiatric evaluation of Lonnie Rupard by Doctor Nicolas Badre. In reviewing the court paperwork

and the visitation logs, I could see Rupard had been visited by Dr. Badre for a psychiatric evaluation.

On Wednesday, October 19, 2022, at 1152 hours, I received a copy of the Forensic Psychiatry Clinic report on Mental Competency by Dr. Nicolas Badre. I also received the Forensic Psychiatry Clinic Report on Involuntary Medication to Restore Competency report by Dr. Nicolas Badre. I reviewed both reports and discovered the following.

> Dr. Badre went to see Lonnie Rupard while in custody at the San Diego Central Jail at the direction of the Honorable Judge Cindy David. Dr. Badre was present to examine Rupard for mental competency to stand trial.
>
> Dr. Badre reviewed Rupard's jail psychiatric records.
>
> Dr. Badre spoke with Rupard at his cell at the recommendation of jail mental health staff and floor deputies.
>
> *The cell was dirty with trash throughout. The toilet was full of excrement and the room was very malodorous.*
>
> *The defendant was unkempt and dirty himself. He was lying in bed in an uncomfortable manner with a blanket over his head.*
>
> *There were feces on the floor. There was food smeared on the wall.*
>
> *It required the food flap and a very loud introduction on my part to get the defendant's attention.*
>
> Dr. Badre attempted to interview Rupard. Rupard was hostile, continually referring to Dr. Badre as "dog", asking for water, and insulting him. Rupard ultimately placed a blanket over his head and ignored Dr. Badre.
>
> Dr. Badre wrote his Findings and Opinions at follows:
>
> *Given the information I have, it is my opinion with reasonable medical certainty that the defendant is unable to have a rational and factual understanding of the charges and is unable to assist counsel in a rational manner.*

*While the defendant's lack of cooperation is likely in part volitional. I think that is motivated by underlying disorganization of thought, which would be consistent with prior evaluation that diagnosed him to be psychotic.*

*The defendant suffers from mental illness, displaying active signs of mental illness, including disorganized thinking. Those symptoms of mental illness disable the defendant from being able to have a rational understanding of the charges and assist legal counsel.*

*I would recommend that the defendant be referred to a station hospital or JBCT program for restoration to competency.*

Dr. Badre's report was dated March 24, 2022, which is 7 days after Rupard died.

On Wednesday, February 8, 2023, at about 1300 hours, Dr. Schaber called me to discuss the in-custody death of Inmate Rupard. Dr. Schaber requested assistance in reviewing and understand the San Diego Sheriff Medical Records and acronyms used.

**Medical Records Review:**

On Sunday, December 19, 2021, at 0118 hours, National City Police Department (NCPD) arrested Lonnie Rupard (10/1/75) at 100 W. 8th Street in National City. Rupard had a felony warrant for his arrest due to a probation violation. Rupard was reported to medical staff by officers regarding his assaultive behavior. It was noted in his evaluation he did not sustain any injuries, had no suicidal ideations, but did have psychotic disorders. His height was listed as 72 inches and weight was listed as 165 pounds. Rupard denied narcotics use and refused a COVID-19 test.

On Sunday, December 19, 2021, Rupard refused to take his medication during the booking process. Over the course of his incarceration, his refusal was documented many more times.

On Thursday, December 30, 2021. (3 times)
On Friday, December 31, 2021. (2 times)
On Saturday, January 1, 2022. (2 times)
On Sunday, January 2, 2022.
On Monday, January 3, 2022.
On Tuesday, January 4, 2022.
On Wednesday, January 5, 2022. (2 times)

On Thursday, January 6, 2022.
On Saturday, January 8, 2022. (2 times)
On Sunday, January 9, 2022. (2 times)
On Monday, January 10, 2022.
On Tuesday, January 11, 2022. (2 times)
On Wednesday, January 12, 2022.
On Thursday, January 13, 2022. (2 times)
On Friday, January 14, 2022. (2 times)
On Saturday, January 15, 2022. (2 times)
On Sunday, January 16, 2022.
On Monday, January 17, 2022. (2 times)
On Tuesday, January 18, 2022.
On Wednesday, January 19, 2022. (2 times)
On Thursday, January 20, 2022.

On Sunday, December 19, 2021, Rupard had his vital signs checked twice.

At 0251 hours, Rupard had blood pressure of 128/82 with a pulse of 90.
At 1136 hours, Rupard had blood pressure of 120/74 with a pulse of 110.

Rupard's vital signs were never checked again until his death on March 17, 2022.

On Monday, December 20, 2021, Rupard had a psychiatric sick call but refused. It was rescheduled for December 23, 2021. Rupard's chart reflected he had a history of extensive medication use and Patton State Hospital commits.

On Friday, December 24, 2021, Rupard's psychiatrist visit was canceled due to time constraints.

On Tuesday, December 28, 2021, Rupard's psychiatrist visit was canceled due to time constraints.

On Wednesday, December 29, 2021, Rupard was seen by Psychiatrist A. Cruz. Rupard was brought to medical screening by deputies. He was described as "alert, oriented, disheveled in appearance, and verbally abusive but directable." Rupard refused a COVID-19 test. Rupard stated, "You're a nurse, I'm a PA. What do we got? I want nothing!"

On Thursday, January 20, 2022, Psychiatrist A. Cruz documented a review of Rupard's chart. Due to his consistent refusal of medication, Haldol, Cogentin, and Valproic Acid (VPA) were discontinued. Cruz noted Rupard already had a psychiatric appointment scheduled for follow up.

On Saturday, January 29, 2022, Rupard was contacted after a use of force by deputies. RN C. Romero noted that Rupard stated, "I don't need a medic. Leave me alone, if you touch me I'll kill you." The medical assessment was terminated for safety. Deputy A. Wanzer [redacted] was present with RN Romero.

On Wednesday, February 9, 2022, Mental Health Clinician (MHC) C. Anosike contacted Rupard at his cell for a Wellness Check. Rupard was standing at the cell door. He stated, "I am fine. I don't want to talk to you" and "go away". Deputies reported to Anosike that Rupard will often speak to himself in unintelligible words. Anosike noted Rupard's cell was clean with the exception of some debris. Rupard had empty food trays inside his cell. There was no urine, feces, or flooding. No immediate safety concerns were noted.

On Sunday, February 20, 2022, RN C. Romero noted Rupard was on lockdown per Sergeant F. Burkey [redacted]. RN Romero noted, "no contraindication noted."

On Tuesday, February 22, 2022, RN L. Kreiss noted "Psych SC noted, no new orders" in Rupard's file.

On Tuesday, February 22, 2022, Psychiatrist A. Cruz evaluated Rupard while inside his cell. Cruz was outside the cell as Rupard was inside.

> "Today, multiple attempts were made to engage the Pt in conversation, however he refused to answer questions and rambled incoherently and became verbally aggressive. Pt was observed through his cell door window. Pt was awake, alert, shirtless (wearing pants), initially sitting on his bed then kneeled on his cell floor and appeared to be in no acute distress. Cell room was relatively clean, no flooding/gassing or smearing of feces. However, toilet seat was covered with cloth. No s/s of Pt being a danger to self or others. Regarding psychotropic medication, Pt continued to yell when offered psych meds. No s/s of Pt being a danger to self or others at this time."

Cruz ultimately noted that Rupard refused all medication and assistance. A follow up appointment was scheduled for 6 to 7 weeks.

For complete details of the medical interactions, refer to Rupard's medical record.

**Investigation Continued:**

A review of Rupard's court history was reviewed and shared with Doctor Schaber.

**Court History Review:**

On Monday, December 27, 2021, Rupard had court for his probation revocation. Rupard refused to appear on his 9th custody day. His probation was preliminarily revoked.

On Tuesday, December 28, 2021, Rupard had court for his probation revocation. Rupard was ordered to remain remanded into the custody of the Sheriff with a future court date of January 3, 2022.

On Monday, January 3, 2022, Rupard had court for his probation revocation. His parole remained preliminarily revoked, and he remained remanded into the custody of the Sheriff. Rupard refused to appear in court, his future court date was set for January 7, 2022.

On Friday, January 7, 2022, Rupard had court for his probation revocation. His parole remained preliminarily revoked and he remained remanded into the custody of the Sheriff. Rupard refused to appear in court, his future court date was set for January 13, 2022.

On Thursday, January 13, 2022, Rupard had court for his probation revocation. His parole remained preliminarily revoked and he remained remanded into the custody of the Sheriff. Rupard refused to appear in court, his future court date was set for January 24, 2022.

On Monday, January 24, 2022, Rupard had court for his probation revocation. His parole remained preliminarily revoked and he remained remanded into the custody of the Sheriff. Rupard refused to appear in court, his future court date was set for February 1, 2022.

On Tuesday, February 1, 2022, Rupard had court for his probation revocation. His parole was formally revoked, and he remained remanded into the custody of the Sheriff. He had a future "intervening hearing" scheduled for March 18, 2022.

> *"Proceedings suspended pursuant to PC1370.02. Mental competency examination on 03/09/22 at 8:00 am by Forensics. PC 1370.02 hearing on 03/24/22 at 9:00 am Department 1203 of the Central Division. The Sheriff is Ordered to transport the parolee to and from the examination."*

**Investigation Continued:**

On Wednesday, February 8, 2023, Dr. Schaber and I concluded our conversation that the likely cause of death was malnourishment and dehydration while the manner of death was natural. Dr. Schaber informed me there was a possibility the final ruling of the case could be homicide. I notified Dr. Schaber I would like to interview her if it was ruled homicide since I would be tailoring my investigation upon her findings.

On Tuesday, February 14, 2022, at Dr. Schaber's request, I sent her a summary of Rupard's arrest history and court appearances. Dr. Schaber and I spoke again about the case regarding questions of hospital visits, court visits, and jail abbreviations.

On Friday, February 17, 2023, I received a copy of Falck – Prehospital Patient Record for Rupard after my request for records in April of 2022.

> Falck records showed Rupard was asystole (no pulse) upon arrival.

On Tuesday, February 21, 2023, I sent Dr. Schaber a copy of Rupard's Falck – Prehospital Patient Record.

On Monday, February 27, 2023, I was notified the medical examiner's office was likely going to rule Rupard's cause of death as homicide. I later spoke with Dr. Schaber and discussed her findings at length. From our discussion, I learned she did not believe any specific act caused Rupard's death. But rather the lack of medical care from the Sheriff's Department contributed to his death. We both agreed that from the review of the records, multiple individuals were attempting to help Rupard, including deputies, doctors, and nurses. However, there was not enough help fast enough.

On Monday, February 27, 2023, I notified my supervisor, Sergeant Wilson [redacted], in the change of investigation type.

On Tuesday, February 28, 2023, I received a copy of the City of San Diego Fire-Rescue Incident Detail Report after my request for records in April of 2022.

On Wednesday, March 1, 2023, at 1401 hours, I contacted the Sheriff's Nursing Director Rognlien-Hood [redacted] and requested a copy of the Patton State Hospital records for Rupard. During our correspondence, Nursing Director Rognlien-Hood stated she would attempt to get the records from Patton State Hospital.

On Thursday, March 2, 2023, at 0902 hours, I received a copy of Rupard's Medical Examiner Report #2022-01007. The report's opinions and conclusions were as Dr. Schaber had read them off to me, the only change was the manner of death now read Homicide.

| | |
|---|---|
| **Cause of Death:** | Pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia |
| Contributing: | SARS-COV-2 (COVID-19) viral infection; pulmonary emphysema; duodenal ulcer |
| **Manner of Death:** | Homicide |

On Thursday, March 2, 2023, at 1300 hours, Sergeant Wilson and I met with Sergeant Madden [redacted] from Internal Affairs (IA). Sergeant Madden notified us internal affairs had been notified of possible misconduct due to the state of the decedent's cell. The IA investigation had been tolled (placed on hold) pending the completion of Sheriff's Homicide investigation. I notified Sergeant Madden the in-custody death had been changed to a homicide. Sergeant Madden added the investigation would continue to be tolled pending a review of criminal charges and civil judgements.

On Monday, March 6, 2023, I began contacting staff at the San Diego Central Jail to acquire surveillance video from the 3-month period Rupard was in custody. Deputy Hann [redacted] is the Corporal in charge of the San Diego Central Jail Administration. He reviewed the surveillance video and determined it was no longer available. The video was saved for approximately 6 months back. He also pulled the surveillance video hard drive which was used to save critical incidents. Deputy Hann confirmed the video for this case had not been saved.

On Monday, March 6, 2023, at 1330 hours, I contacted Lieutenant Kopchak [redacted], the In Custody Death Advocate and Department Investigation Coordinator. I requested he attempt to locate any potential surveillance video he may have saved during his investigation.

On Monday, March 6, 2023, at 1410 hours, I submitted a request for the National City Police Department (NCPD) reports and body worn camera from the arrest of Lonnie Rupard on 12/19/2021.

On Monday, March 6, 2022, I reviewed Rupard's Jail Information Management System (JIMS). The records showed numerous dayroom refusals, food refusals, and documented incidents.

Inmate Rupard had multiple incidents while in custody in San Diego dating back to 2009. The following are from his most recent time in custody.

**Jail Information Management System (JIMS):**

On Thursday, December 23, 2021, Rupard used dayroom.

On Saturday, December 25, 2021, Rupard used dayroom.

On Monday, December 27, 2021, Rupard refused breakfast.

On Monday, December 27, 2021, Rupard refused dayroom.

On Saturday, January 1, 2022, Rupard used dayroom.

On Monday, January 3, 2022, Rupard refused dayroom.

On Saturday, January 8, 2022, Rupard refused dayroom.

On Saturday, January 15, 2022, Rupard used dayroom.

On Tuesday, January 18, 2022, Rupard refused dayroom.

On Saturday, January 22, 2022, Rupard used dayroom. *(Rupard was logged as refusing dayroom one hour later)*

On Monday, January 24, 2022, Rupard refused dayroom.

On Wednesday, January 26, 2022, Rupard refused dayroom.

On Friday, January 28, 2022, Rupard refused dinner.

On Saturday, January 29, 2022, Rupard took his food flap hostage during a hygiene inspection. Rupard spit at and tried to grab multiple deputies, resulting in a use of force. For details, see Incident#224004460 by Deputy J. Mendoza [redacted].

On Saturday, January 29, 2022, Deputy A. Wanzer [redacted] responded to assist Deputy Mendoza with Inmate Rupard. Rupard was wearing "day-glo greens" despite being a mainline inmate. Rupard was handcuffed through the door and instructed to sit down as deputies entered the cell. Deputy Wanzer was explaining to Rupard why he was not allowed to wear greens when "Rupard became upset and yelled "I will fucking kill you!"" Rupard stood up to face Deputy Wanzer. Deputy Wanzer took Rupard to the ground. Rupard's "day-glo green" clothing was removed and he was given a new pair of "blues." Rupard sustained a small abrasion to the top of his head. Nurse Romero [redacted] responded to evaluate Rupard. Rupard's handcuffs were removed, and he was left in his cell. Deputies attempted to photograph Rupard for his injuries, but he was uncooperative. For details, refer to Case #22104241. The below photographs were taken by deputies as Rupard hid from the camera.





On Sunday, January 30, 2022, Rupard was placed on lockdown as a result of his rule violation.

On Tuesday, February 1, 2022, Rupard refused breakfast.

On Tuesday, February 1, 2022, Rupard refused a shower. *(A shower is offered to inmates on lockdown. They are allowed time to come out of their cell and shower but are not allowed to spend time in the dayroom.)*

On Friday, February 4, 2022, Rupard utilized his shower time.

On Sunday, February 6, 2022, Rupard refused dayroom.

On Tuesday, February 8, 2022, Rupard refused dayroom.

On Thursday, February 10, 2022, Rupard refused dayroom.

On Saturday, February 12, 2022, Rupard used dayroom.

On Monday, February 14, 2022, Rupard refused dayroom.

On Tuesday, February 15, 2022, Rupard refused lunch.

On Thursday, February 17, 2022, Rupard refused dayroom.

On Friday, February 18, 2022, Rupard refused breakfast.

On Friday, February 18, 2022, Rupard refused dayroom.

On Friday, February 18, 2022, Rupard used dayroom.

On Saturday, February 19, 2022, Rupard used dayroom. During dayroom, Rupard refused to lock down. He took off his shirt and clenched his fist. Rupard threw the trash can at the gate door where deputies were standing. Numerous deputies from the facility responded to assist with controlling Rupard. After multiple deputies responded, the gate was opened and Rupard complied with commands. He was placed back in his cell and placed on lockdown for his rule violation. For details, refer to Incident #224007616 by Deputy J. Gonzalez [redacted].

On Sunday, February 20, 2022, Rupard was in lockdown.

On Tuesday, March 1, 2022, Rupard refused dayroom.

On Thursday, March 3, 2022, Rupard refused dayroom.

On Thursday, March 3, 2022, Rupard refused lunch.

On Sunday, March 6, 2022, Rupard refused dayroom.

On Tuesday, March 8, 2022, Rupard refused dayroom.

On Thursday, March 10, 2022, Rupard refused dayroom.

On Saturday, March 12, 2022, Rupard refused lunch.

On Sunday, March 13, 2022, Rupard refused dayroom.

On Monday, March 14, 2022, Rupard had a professional visit with Nicolas Badre.

On Thursday, March 17, 2022, Rupard refused dayroom.

For complete details, refer to the Inmate History Summary Report.

**<u>Investigation Continued:</u>**

On Tuesday, March 7, 2023, at 1324 hours, Lieutenant Kopchak notified he did not have any of the video saved. However, he did locate screenshots he had saved showing Rupard alive and in the dayroom at various times of his stay in custody.

The screenshots were of the surveillance video on February 19, 2022, when Rupard took the dayroom hostage, refusing to lock down and throwing objects. For details, refer to Incident Report #224007616.



**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death **Case Number:** 22111838
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday) 



On Wednesday, March 8, 2023, I noted a discrepancy in my initial follow up report. I had drawn a diagram to depict the location of the cell in the module, circling the wrong cell.

Below is the new diagram with the correct cell circled.

[redacted]

Reporting Officer: Det. M. Blumenshine [redacted] MCD - HOMICIDE

Approved By: Sgt. J. Wilson [redacted] 3/16/2023

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)

**Case Number:** 22111838



On Thursday, March 9, 2023, a more extensive video review from the incident was done. The 24 hours of video surveillance for Module 7D was reviewed in full. It was confirmed all security checks (11-53) were done on time and accurate. It was also noted all deputies conducted the hard count, soft count, food pass, and temperature checks accurately.

During the review, I never observed movement through the window into Cell 17.

Also, during the review, I observed another inmate contact Rupard through the door to his cell. During Inmate Chism's dayroom, he could be seen for a short time at the cell door to Cell 17 (2046 hours). Chism had told detectives he knows Rupard and went to talk to him. He saw Rupard moving in bed, but Rupard did not respond to him. Chism noted Rupard had been quiet for the past week. He believed Rupard had died due to "methane gas poisoning." For details, refer to detective Magana Jr. [redacted] follow up report.




| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 3/16/2023 |

On Friday, March 10, 2023, at 0719 hours, NCPD Records provided the arrest report and use of force report for NCPD Case#2106992.

> On Sunday, December 19, 2021, at about 0100 hours, NCPD Officer Shafer [redacted] was conducting a traffic stop at the ARCO gas station at 133 W 8th Street in National City. During the traffic stop, Rupard was observed throwing a bag at the stopped vehicle and shouting incoherently at it.
>
> Additionally, units were called to assist with controlling Rupard while the stop was conducted. At the conclusion of the stop, officers conducted a record check of Rupard who they knew through prior contacts. Upon finding a felony warrant for his arrest, officers devised a plan to take him into custody as he had since walked away from them.
>
> As officers approached Rupard from multiple directions, he took off running and a pursuit ensued. As officers caught up to Rupard, he turned to face them. Rupard was tackled to the ground and placed into handcuffs without incident.
>
> Rupard was later booked by NCPD Officer Shafer into the San Diego Central Jail.
>
> For details, refer to NCPD Report #2106992.

On Wednesday, March 15, 2023, at 0941 hours, NCPD Records provided the body worn camera from the arrest of Rupard. The video and the reports were attached to the case file.

On Thursday, March 16, 2023, Detective Van Lingen notified me she had surveillance video of Module 7 D from 3/15/21 to 3/16/21. I copied the surveillance from her case and attached it to my case. That video has not been reviewed.

**Case Review:**

Rupard was released from the California State Prison system in May of 2021. He was turned over to San Diego County Probation on AB-109 status.

In August of 2021, Rupard was contacted by patrol deputies. Rupard was cooperative, cordial, and even fist bumped one deputy who used to work detentions.

Rupard was arrested later in the month. He was subsequently arrested multiple additional times between August and December. Each arrest showing a likely mental health decline.

Rupard was arrested by National City Police Department on December 19, 2021. Rupard was observed throwing a bag at a vehicle an NCPD Officer had stopped for a traffic violation. An Officer later conducted a records check and found Rupard had a warrant. As they attempted to contact him, a foot pursuit and use of force ensued. Rupard was shouting incoherently during his arrest and appeared delusional.

Since Rupard's release from state custody in May of 2018, he appeared to be suffering a mental health decline as seen in the difference of contacts and photographs throughout his law enforcement contacts.

Rupard was booked into custody at 165 pounds on 12/19/21.

Rupard was in COVID quarantine and administrative segregated (ad-seg) housing. This was done because of his jail history as well as his current mental state. Due to Rupard's psychiatric issues, he was unable to peacefully interact around other inmates and was therefore unable to have the standard program of a regular mainline inmate. In his level of housing, it was expected he would be given more psychiatric care.

A review of the video, logs, incident reports, criminal reports, and statements show deputies were very familiar with Rupard. It was often a use of force when contacting him due to his behavior. Rupard had two major incidents in his 3 months of recent custody time. One when he obtained the wrong outfit, took the food flap hostage, and spit at deputies resulting in a use of force. And one when he took the dayroom hostage, refusing to lock down and throwing objects. It was because of his history that deputies required a team to go into his cell to evaluate him, presumably in case he was faking and setting up an ambush. (On February 13, 2021, two inmates lured a deputy into their cell under feigned cooperation. They proceeded to assault that deputy, resulting in assault charges for both inmates.)

Rupard's safety, as well as that of staff, was a concern for all involved. Most contacts noted volatile and aggressive behavior coupled with the documented prior uses of force.

Rupard was found deceased on March 17, 2022. Homicide responded and took over the investigation.

Rupard's cell was in a dismal state, however, not uncommon of for housing of inmates with psychiatric history. Rupard had roughly 28 meal containers in his cell at the time of his death (~ 9 days' worth of trash). In review of the containers, most had been opened and many of the food items were missing. While there was food on the floor, table, and bed of the cell, it would not account for the food missing from the food trays. The food was either eaten or flushed down the toilet. There was feces in the cell, on the bed, floor, blanket, and in the toilet. However, it appeared the feces was smeared and moved. Suggesting the feces on the floor and bed originated from about three separate defecations. It was unknown how much feces had been backed up in the toilet as it was also full of food wrappers and trash, clogging the toilet. The condition of Rupard's cell, while visibly upsetting, was not a factor in his death.

During my processing of the scene, I noted many similar behavior types in the module. Most inmates yelled incoherently. The inmate in Cell 20 made violent sexual statements at my forensic evidence technicians and continually referred to me as a "Viking." Most other inmates were yelling incoherently. Some of the cells had trash in them.

Rupard's logs show he had been continually refusing his dayroom time, which offers a possible explanation for the trash buildup in his room. An inmate is allowed to clean their cell during their one hour of dayroom. Their cell is opened to the dayroom with trash bins where they can come and go freely during their time. Inmates are also allowed to pass their trash through their food flaps to trustees. If Rupard refused to come out of his cell, and refused to give his trash to trustees, he would have nowhere to throw out his trash.

During the autopsy, Rupard weighed 105 pounds. Rupard weighed 60 pounds less than when he was booked into custody 89 days prior.

After a lengthy discussion with Dr. Schaber, I requested an explanation regarding the manner of Rupard's death in detail. I explained I am required to conduct an investigation to determine who is at fault. Dr. Schaber noted the Medical Examiner's Officer does not determine criminal or civil liability/fault. However, she did state the methods for care were the problem and based upon our discussion no fault with a specific individual was noted.

It is apparent that care was continually offered to Rupard throughout his time in custody, as was noted by the Medical Examiner's Office. In my review of our records: deputies reported to medical staff issues with Rupard, nurses continually checked on Rupard, and Rupard's psychiatrist continually evaluated him. Despite all that, he ultimately died while

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)

**Case Number:** 22111838



in custody of the Sheriff's Department. Rupard refused his medication, refused to communicate with medical staff, and refused to allow himself to be evaluated.

Based on the facts determined from my investigation, as well as my knowledge and understanding of jail operations and procedures, I do not believe probable cause exists to charge any involved individuals. The case in its entirety will be turned over to the District Attorney's Special Operations Division, as per all Homicides. Additionally, a copy of the case will be turned over to the U.S. Attorney's Office, and the Federal Bureau of Investigations.

This concluded my involvement in this investigation at this time.

| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 3/16/2023 |

# EXHIBIT 2

Follow-Up Investigative Report re Autopsy, Det. Blumenshine
(COSD 001633–1636)

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death **Case Number:** 22111838
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday) **Page 1 of 4**

---

## Autopsy of Lonnie Rupard

### Origin:

On Saturday, March 19, 2022, at 0850 hours, I arrived at the San Diego County Medical Examiner's Office to attend the autopsy of Lonnie Rupard (10/01/1978). I was joined by Forensic Evidence Technician (FET) Gervasoni ([redacted]) and FET Racicot ([redacted]) who were present to take photographs and collect evidence. Forensic Autopsy Assistant (FAS) Hannum assisted Forensic Pathologist Doctor Schaber with the autopsy. The Medical Examiner's case number is 2022-01007.

### Investigation:

I entered the examination room and met with Dr. Schaber and FAS Hannum. I noted a white, vinyl body bag on the examination table. The decedent was enclosed in a white double-zippered vinyl body bag. The red tamper-evident seal ran through the pull tab hole on both zippers, securing the bag. The number on the red tamper-evident seal was 4950349.

On Saturday, March 19, 2022, at 0931 hours, I turned over Rupard's property given to me by jail staff to FAS Hannum.



Included in Rupard's property were his clothing items taken from him at booking as well as the money he had on his books.

| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 6/8/2022 |

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death **Case Number:** 22111838
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday) 






Rupard had two $100 bills, six $20 bills, one $10 bill, one $5 bill, a quarter, a nickel, and two pennies.



On Saturday, March 19, 2022, at 0937 hours, Dr. Schaber cut the red tamper-evident seal and opened the bag. Inside we discovered another white vinyl body bag with another red tamper-evident seal #4950993 with an attached tag displaying 2022-01007 Rupard, Lonnie. The second tag was broken at 0938 hours by Dr. Schaber. I observed the body of

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)

**Case Number:** 22111838



the decedent, identified as Lonnie Rupard (10/01/1978), present in a supine position on the examination table. The decedent was nude with numerous signs of medical intervention.



The decedent was an unknown race adult male who appeared emaciated. His height was 69 inches, and his weight was 105 pounds. He had brown hair with a goatee.

Affixed to his left wrist was a UCSD Medical Center Wristband with: Rupard, Lonnie MRN#31943869 DOB: 10/1/1975. Affixed to his right ankle was a yellow ankle band with 2022-01007 Rupard, Lonnie written on it.

The decedent had numerous tattoos on his body. He had the names of his children, old tattoos, newer tattoos, prison tattoos, and some white supremacy tattoos.





| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 6/8/2022 |

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death **Case Number:** 22111838
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)



Oral reference swabs, a blood sample, and the jail issued blue shirt were collected as evidence.

The decedent had minor cuts, scrapes, and bed sores on his body.




The decedent was also covered in feces.



During the internal examination, Dr. Schaber noted the decedent had a peptic ulcer. Additionally, he may have had pneumonia. Dr. Schaber stated she was submitting a COVID-19 test.

At the end of the autopsy, Dr. Schaber ruled the cause and manner of death are **pending.**

On Saturday, March 19, 2022, at 1244 hours, the autopsy concluded. FET Gervasoni, FET Racicot, and I exited the Medical Examiner's office.

| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 6/8/2022 |

# EXHIBIT 3

Follow-Up Investigative Report, Det. Blumenshine, June 7, 2022
(COSD 001637–1649)

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)

**Case Number:** 22111838



## Follow Up Investigation

### Origin:

On Friday, March 18, 2022, at 0049 hours, I received a callout notification from Sergeant Santiesteban for an in-custody death at the San Diego Central Jail.

I was designated the lead investigator.

### Investigation:

On Friday, March 18, 2022, at 0144 hours, I arrived at the San Diego Central Jail.

On Friday, March 18, 2022, at 0252 hours, I attended an incident brief given by Sergeant Burkey [redacted].

The following personnel attended the briefing:

| Name | Title | ARJIS | Assignment |
|---|---|---|---|
| F. Santiesteban | Sergeant | [redacted] | Homicide |
| B. Spencer | Detective | [redacted] | Homicide |
| M. Blumenshine | Detective | [redacted] | Homicide |
| A. Jurisaga | Detective | [redacted] | Homicide |
| M. Tingley | Sergeant | [redacted] | Division of Inspectional Services |
| A. Brown | Sergeant | [redacted] | Detentions Investigations Unit |
| J. Weber | Detective | [redacted] | Detentions Investigations Unit |
| C. Meyer | Detective | [redacted] | Detentions Investigations Unit |
| V. David | Detective | [redacted] | Detentions Investigations Unit |
| S. Paris | Detective | [redacted] | Detentions Investigations Unit |
| J. Magana | Detective | [redacted] | Detentions Investigations Unit |
| D. Rodriguez | Deputy | [redacted] | Peer Support |
| C. Darnell | Captain | [redacted] | San Diego Central Jail |
| K. Bibel | Captain | [redacted] | Medical Services |
| S. Rognlien-Hood | Nursing Director | [redacted] | Medical Services |
| J. Montgomery | Chief Medical Officer | [redacted] | Medical Services |
| F. Gardiner | Detective | [redacted] | Detentions Investigations Unit |
| M. Crowley | Deputy | [redacted] | San Diego Central Jail |
| A. Rapp | Deputy | [redacted] | Jail Population Management |

| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 6/7/2022 |

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)

**Case Number:** 22111838



| Name | Title | ARJIS | Assignment |
|---|---|---|---|
| J. Lizarraga | Lieutenant | [redacted] | San Diego Central Jail |
| F. Leon | Sergeant | | San Diego Central Jail |
| K. Lawrence | Sergeant | | Division of Inspectional Services |
| D. Racicot | FET | | Crime Lab |
| M. Gervasoni | FET | | Crime Lab |
| F. Burkey | Sergeant | | San Diego Central Jail |

**Briefing Information:**

*On December 19, 2021, Lonnie Rupard (10/1/75) was arrested for a probation revocation by the National City Police Department. Inmate Rupard was booked into the San Diego Central Jail.*

*On March 18, 2022, Inmate Rupard was housed inside 7th floor Module D, Cell 17. Inmate Rupard had no cellmate.*

*At 2248 hours, Deputy Romans was conducting a security check in Module D. Deputy Romans looked in Cell 17 but could not see the rise/fall of Inmate Rupard's chest. Deputy Mendoza and Deputy Gutierrez responded to assist Deputy Romans.*

*At 2250 hours, the deputies entered cell 17. Rupard was moved onto the floor and CPR was initiated.*

*At 2253 hours, medical staff arrived and took over lifesaving measures. No pulse or breathing was observed.*

*At 2301 hours, Fire Department personnel arrived.*

*At 2323 hours, Fire Department personnel transported Inmate Rupard to the UCSD Emergency Room*

*At 2351 hours, Inmate Rupard was pronounced deceased by Doctor Allen at UCSD.*

*The briefing concluded at 0303 hours.*

**Investigation Continued:**

| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 6/7/2022 |

I tasked Detective Jurisaga and Detective Meyer with interviewing deputies Romans, Mendoza, and Gutierrez. I tasked Detective Spencer and Detective Pantoja with interviewing Nurse Barrera, Nurse Echon, Nurse Gomez-Mercado, and Nurse Samonte.

On Friday, March 18, 2022, at 0314 hours, Detective Weber gave me Rupard's jail property bag. FET Gervasoni, FET Racicot, and I left the briefing room.

On Friday, March 18, 2022, at 0316 hours, FET Gervasoni, FET Racicot, and I arrived at the 7th floor module D and assumed control of the scene from Deputy Rodarte.

**Scene:**

On Friday, March 18, 2022, at 0316 hours, FET Gervasoni, FET Racicot, and I began our processing of the scene. FET Gervasoni took photographs of the module and the scene.

Floor 7 is comprised of five different modules; A through E. Module D is comprised of 20 cells. Module D is designated for administrative segregation (Ad-Seg) housing. Before entering the housing unit, a brown roll door was open to the module. Inside the module was, "MODULE 7D" in black writing on the balcony. Module D is a two-tiered module with "cell style" housing.



**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**



[redacted]

Module D has a dayroom with 5 tables, three phones, a video conference setup, and a television set. It is a two-tier set up with 20 cells and two showers. There were two surveillance cameras affixed to the wall of the module. The cameras were located above the module door entrance and covered the dayroom and individual cell door entrance.

I checked the communication buttons inside the quad on the wall. The three buttons worked but had been vandalized so it was only possible to hear deputies in the tower if they shouted and I placed my ear upon the speaker box.

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death **Case Number:** 22111838
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday) 

I later checked the speaker box inside cell 17 and confirmed that, although the speaker had been vandalized, I was able to hear the deputy when he shouted, and I had my ear pressed up to the box.

Affixed to the wall parallel to the entrance, were two white boxes and one red box. One box was designated for medical requests, one box for inmate grievances, and one box for inmate mail. The boxes were unlocked, and I reviewed all the contents, none were of evidentiary value. The letters and forms were placed back into their corresponding box and the boxes were locked.

Cell 17 consisted of a set of bunk beds, a table, a stool, a toilet, and a sink. It appeared to have been used by one occupant who had his bedding set up on the bottom bunk. The decedent's listed cell was cell 17 and he was listed as living alone.



I began a search of the cell for any narcotics or paraphernalia. I did not locate any illegal substances. There were feces and old food throughout the cell. The toilet and sink were

full of fecal matter. There were feces in two corners of the room on the ground, feces on the bedroll, feces on the bottom bunk under the bedroll, feces on the ground, feces on the table, and strewn about the rest of the room. The sink in the cell was operable.

On the top bunk was a receipt for funds Florentina Rupard had placed on Lonnie's books.

I searched the crash cart but was unable to locate the AED. I confirmed with Detective Spencer the nurses had taken it from the scene to download it since the facility had only one operable AED.

On Friday, March 18, 2022, at 0349 hours, FET Gervasoni, FET Racicot, and I cleared from the scene. We notified deputies we had concluded our scene investigation.

**<u>Follow Up Investigation Continued:</u>**

On Friday, March 18, 2022, at 0359 hours, FET Gervasoni, FET Racicot, and I cleared from the San Diego Central Jail (SDCJ). I called Sergeant Santiesteban and requested he have the medical examiner meet me at the hospital for Lonnie's body. Sergeant Santiesteban called me back a short time later and notified me that Lonnie had already been collected by the medical examiner. The Medical Examiner's case number was #22-01007 and the red tag number was #4950993. I cleared FET Gervasoni and FET Racicot from the investigation and returned to SDCJ.

Detective Jurisaga informed me Deputy Ramos had conducted a security check and spoken with Inmate Rupard through the door. The following security check, Inmate Rupard was unresponsive. Deputy Ramos waited for additional deputies then made entry and found Inmate Rupard unresponsive. Detective Spencer and Detective Jurisaga interviewed additional deputies and nurses who responded and provided lifesaving measures until paramedics arrived, provided lifesaving measures, and transported Inmate Rupard to the hospital.

On Friday, March 18, 2022, at 0457 hours, I called and spoke with Florentina Rupard. The death notification was audio recorded. Florentina lived at an unknown address and had a difficult time conversing, possibly due to her age or a language barrier. She was notified of Lonnie's passing. She asked me to speak with her grandson, Ronnie Rupard. After hanging up, I was unable to get a hold of her again or contact her grandson Ronnie at the number provided. For details, refer to the audio recording. The phone call ended at 0503 hours.

On Friday, March 18, 2022, at 1059 hours, I called and spoke with Ronnie Rupard. The phone call was audio recorded. I attempted to speak with Ronnie about Lonnie's medical condition and drug use. Ronnie admitted Lonnie had a history of drug use and health problems. However, Ronnie also made numerous nonsensical statements. Ronnie indicated he was pursuing a military search warrant for myself and my home in order to seize the cash on Lonnie's books at the San Diego Central Jail. For details, refer to the audio recording. The phone call ended at 1120 hours.

On Friday, March 18, 2022, at 1146 hours, I obtained the jail medical records for Rupard.

> Rupard refused every offer for the COVID-19 vaccine. Rupard had numerous notes regarding refusal to take medication and being verbally combative with medical staff. Additionally, Rupard routinely refused to comply during psychiatric evaluations.
>
> On February 9, 2022, Christina Anosike, a mental health clinician, attempted to evaluate Rupard. Rupard stated, "I am fine. I don't want to talk to you." Anosike noted Rupard was clean, and his cell appeared clean aside from some open food containers. His cell was free of urine, feces, or flooring. She scheduled a future contact in two weeks to re-evaluate Rupard.

On Saturday, March 19, 2022, at 0850 hours, FET Gervasoni, FET Racicot, and I attended the autopsy of Lonnie Rupard conducted by Forensic Pathologist Doctor Schaber, case #2022-01007. The decedent appeared severely emaciated and had a peptic ulcer. He may have had pneumonia. The cause and manner of death were **pending**. For details, refer to the autopsy report. We cleared from the autopsy at 1244 hours.

On Monday, March 21, 2022, Dr. Schaber called and notified me Lonnie Rupard had tested positive for COVID-19.

On Tuesday, March 22, 2022, I emailed the jail medical records for Rupard to Dr. Schaber.

On Wednesday, May 11, 2022, I began a review of the surveillance video of Floor 7, Module D.

**<u>Video Review:</u>**

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death **Case Number:** 22111838
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday) **Page 8 of 13**

On Thursday, March 17, 2022, at 0443 hours, a deputy and a trustee pass out breakfast. It appears the deputy hands the food back to the trustee.




On Thursday, March 17, 2022, at 0445 hours, a deputy stops at cell 17 and shines his flashlight in the cell.



On Thursday, March 17, 2022, at 1645 hours, a deputy and trustee place a meal on the food flap of Cell 17.




On Thursday, March 17, 2022, at 1702 hours, a deputy approached the cell with the food sitting on the food flap. Upon walking away, the food flap door is now closed.



On Thursday, March 17, 2022, at 2213 hours, Deputy Romans conducted a security check on Inmate Rupard.




On Thursday, March 17, 2022, at 2246 hours, Deputy Romans looks inside cell 17 and asks for additional units.



**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death **Case Number:** 22111838
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday) 

On Thursday, March 17, 2022, at 2246 hours, Deputy Gutierrez responds to cell 17.




On Thursday, March 17, 2022, at 2247 hours, Deputy Mendoza responds to assist Deputy Romans and Deputy Gutierrez. Deputy Mendoza makes entry into the cell.




On Thursday, March 17, 2022, at 2252 hours, medical staff arrive to Module D.

| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 6/7/2022 |




On Thursday, March 17, 2022, at 2300 hours, fire department personnel arrive to Module D.




**Follow Up Investigation Continued:**

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)

**Case Number:** 22111838



This concluded my investigation at this time. Upon completion, the medical examiner's report will be attached to this case.

| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 6/7/2022 |

# EXHIBIT 4

Inmate History Summary Report (COSD 000712)

# SAN DIEGO SHERIFFS DEPARTMENT

## Inmate History Summary Report

**Book #:** 21149433 **Name:** RUPARD, LONNIE **Fac:** 1 **Area:** **Hu:**

**Start Dt/Tm:** 12-19-2021 **End Dt/Tm:** 03-18-2022 **Event Type:** MOVE

| Event Dt/Tm | Event Type | Destination | Entry Dt/Tm | Entered By |
|---|---|---|---|---|
| 12-22-2021 1750 | MOVE | NEW HOUSING | 12-22-2021 1750 | DWANNASH, WANNAMAKER |
| Moved Book #21149433 TO fac 1 area 7 hu D cell 17 bed B. | | | | |
| 12-20-2021 0116 | MOVE | NEW HOUSING | 12-20-2021 0116 | ASANC2SH, SANCHEZ |
| Moved Book #21149433 FROM fac 1 area 2 hu BKG cell A bed 004 TO fac 1 area X . | | | | |
| 12-19-2021 1631 | MOVE | NEW HOUSING | 12-19-2021 1631 | SAUSBYSH, AUSBY |
| Moved Book #21149433 TO fac 1 area 2 hu BKG cell A bed 004. | | | | |

# EXHIBIT 5

Deposition of Det. Max Blumenshine, Jan. 7, 2026 (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

---o0o---

| | |
|---|---|
| JUSTINO RUPARD, INDIVIDUALLY AND RONNIE RUPARD, INDIVIDUALLY,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE OF CALIFORNIA, INC; CHRISTINA ANOSIKE, IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; AGUILERA, M., VILADIU, J., MARTINEZ, G., SCHMITZ, D., AMADO, J., MACE, T., ACKERMAN, M., KEY, K., MOSER, M., AGUIRRE, E., JAMES, T., ROMERO, B., JOHNSON, M., TORRES, A., DELANEY, C., TREYVONNE, J., EVERSOLL, T., WERESKI, A., ROMANS, B., GUTIERREZ, L. IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTIES DOES 1-20; DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10,<br><br>Defendants. | Case No.: 23CV1357 CAB BLM |

make necessary notifications and document indications that the person is not eating or on a hunger strike"?

A. Yes.

MS. FELDMAN: Sorry. Objection to the extent the document speaks for itself.

BY MR. IREDALE:

Q. And sworn staff refers to the deputy?

A. Yes.

Q. Health staff, likewise, refers to nursing staff, as well as medical personnel?

MS. FELDMAN: Calls for speculation.

MR. KRUEGER: Join.

THE WITNESS: That's my understanding.

BY MR. IREDALE:

Q. Did you conduct any interviews yourself of the deputies who were involved in the case?

A. Yes.

Q. Which deputies do you remember you interviewed? Apropos of that, I have your report. It's not a memory test.

A. Yeah. The deputies that worked that day were interviewed by my partners. I interviewed -- or tried to interview rather -- the deputies that worked essentially the week prior.

can confirm that they are who they say they are.

MR. IREDALE: Let me give you Exhibit 11.

(Exhibit 11 was marked for identification.)

BY MR. IREDALE:

Q. And it is -- this is also from the detention services bureau, and it's dated December 17th, 2021, "Manual of Policies and Procedures."

It says, "The policy is that sworn staff will conduct safety checks of inmates, holding areas -- holding areas and vacant cells through" -- I'm sorry. I misread that. May I start again?

"Sworn staff will conduct safety checks of inmate's housing areas, holding areas and vacant cells through direct visual observation, that is, direct personal view of the inmate/area without the aid of audio/video equipment. Safety checks of inmates consists of looking at the inmates for any obvious signs of medical distress, trauma, or criminal activity. Safety checks shall be conducted at least once every 60-minute time period. Safety checks of medical observation beds and in psychiatric stabilization units will be conducted at least once within every 30-minute time period."

Let me stop there. I'm not going to read

the balance of the policy. Let me ask: In your own experience at VDF, did you do, in addition to hard counts and soft counts, safety checks as well?

A. Yes.

Q. And could you tell me during the time you did the safety checks, was the same rule pertaining, that is one in every 60-minute period?

A. Correct.

Q. And the purpose of the safety check, among other things, was to see whether there was a person in medical distress or suffering from medical trauma?

MS. FELDMAN: Objection to the extent it calls for speculation, expert opinion, and the document speaks for itself.

THE WITNESS: That's one of the many reasons.

BY MR. IREDALE:

Q. Let's let the document speak for itself. Could we go to page three, please?

The policy in effect at the time says, "At the conclusion of the safety check, an entry may be logged in JIMS using the event type '11-53 notes.' If there was anything encountered during the safety check, items that necessitate documentation include,

unkempt living conditions, unhygenic living conditions, anything to that effect in any of the 1153 documentation?

MS. FELDMAN: Objection. Lacks foundation. Calls for speculation.

THE WITNESS: I don't recall.

BY MR. IREDALE:

Q. Now, you at some point became aware that there was a psychiatrist named Dr. Badre who had seen and spoken to Mr. Rupard.

A. Correct.

Q. And that he saw and spoke to Mr. Rupard on the 14th of March, some three days before the death.

A. Correct.

Q. And you were aware or became aware that there was one or more deputies who accompanied Dr. Badre to the cell area outside of the cell as he spoke to Mr. Rupard.

MS. FELDMAN: Objection. Lacks foundation. Calls for speculation. Assumes facts not in evidence.

THE WITNESS: So --

MR. IREDALE: Let me simplify it. I will withdraw the question.

///

BY MR. IREDALE:

Q. Could you tell me: Do you recognize the document?

A. I do.

MS. FELDMAN: I'm sorry. You can answer, and then I will make an objection.

THE WITNESS: I do.

MS. FELDMAN: And my objection would be lacks foundation.

BY MR. IREDALE:

Q. How do you recognize it?

A. It's our unit manual.

Q. You are familiar with it?

A. I haven't gone through all of it. If it's the full manual, then, yes.

Q. Was it provided to you at some point in your work?

A. It's available to me.

Q. Could you tell me the purpose, as you understand it, of the Homicide Unit Manual of Policies and Procedures?

MS. FELDMAN: Sorry. What's the question?

BY MR. IREDALE:

Q. What is the purpose of the manual, as you understand it?

A. Yes.

Q. You attempt in your daily practice to adhere to the policies and procedures as you viewed it?

A. Yes.

Q. Under "PURPOSE," it says, "To establish a procedure for a thorough investigation of an in-custody death. Whenever the death of a person occurs or likely will occur, who is in the custody of the sheriff. In addition to the normal investigative reports, the death must be reported to the California Department of Justice within 10 days. The investigation should be completed within 90 days. If the in-custody death occurred as a result of a use of force or an officer-involved shooting, the completed case shall be submitted to the district attorney's office for review within 90 days."

Here. My question is: Was this death, to your knowledge, reported to the California Department of Justice within 10 days?

MS. FELDMAN: Objection. Lacks personal knowledge. Calls for speculation.

THE WITNESS: I do not know.

///

there affixed to the wall of the module. In fairness to you, let me refer you to the paragraph, which is the next to last, which talks about two surveillance cameras affixed to the wall of the module. Do you remember their approximate location?

A. No. But we take photographs of them. If you could show me those, I could circle them for you.

Q. Okay. And I apologize, but the reason I ask is because I haven't seen that photograph.

A. Okay.

Q. I make no accusation. It may be that I saw it but didn't understand the significance.

A. I can give you -- like, it's on the western wall, based on my description in the report. I can see that.

Q. And do you know -- does each camera have an independent field of vision?

MR. KRUEGER: Vague.

MS. FELDMAN: Calls for speculation.

THE WITNESS: If you could rephrase so I understand.

BY MR. IREDALE:

Q. Sure. Does each video camera cover a different part of the module, or do they both cover

the same areas?
A. Different.
Q. Different.
A. One is pointed down. One is showing everything.
Q. And the one that is pointed down shows what general area?
A. Just inside of the door, the module door.
Q. So the one that's pointing down would show the entry and the exit of people through the module door?
A. Correct.
Q. And the other one would show a broad picture of the Module D?
A. Correct.
Q. Thank you.
Now, I need to discuss with you the view of the scene that was involved. Let me talk about another aspect, which is smell. Was the room one in which there was a very bad odor?
MS. FELDMAN: Vague and ambiguous as to time.
MR. IREDALE: Okay. Let me see if we --
BY MR. IREDALE:
Q. How many times were you in the area of

A. Yes.

Q. To whom did you make the request?

A. One of the individuals in the briefing, and then we get it right then and there.

Q. All right. So did you request during that briefing of that individual the video surveillance?

A. Yes.

Q. For what period of time, if any, did you specify?

A. Twenty-four hours.

Q. Did you ask for the preservation of any later or longer period of video?

A. No. I did not.

Q. When you saw the autopsy, it was apparent, was it not, that Mr. Rupard was, in your words, extremely or severely emaciated?

MS. FELDMAN: Objection. Calls for expert opinion.

THE WITNESS: That is what I perceived.

BY MR. IREDALE:

Q. And if somebody is going to starve to death, that's something that we know, as a matter of common sense, occurs over a period of days or weeks?

MS. FELDMAN: Objection. Calls for speculation, expert opinion.

MR. KRUEGER: Join.

THE WITNESS: It could be -- I don't know if it could be that specific. It could be significantly longer. It could happen over years. Could be any number of times.

BY MR. IREDALE:

Q. Yes. And so did you do anything to preserve the video so that we could see the interactions, if any, of Mr. Rupard with the people who were supposed to be taking care of him?

MS. FELDMAN: Vague and ambiguous. Compound.

THE WITNESS: As stated, no I did not.

BY MR. IREDALE:

Q. Did you know in March of 2022 the practice of preservation or destruction of video there at the Central Jail?

A. I did not.

Q. Did you ask anybody how long video records are preserved?

A. No.

Q. Did you ask at any point for a period of video that went for a longer period of time than the one day back?

A. Like at any point? Like later in the

provided?

A. Yes.

Q. Did you, yourself, make the stills?

A. Yes.

Q. And you tried to do that because you felt it was important to see what interactions had occurred between the person in that cell and members of the staff or other persons?

MS. FELDMAN: Vague and ambiguous.

THE WITNESS: Not necessarily.

BY MR. IREDALE:

Q. What was your reason for reviewing the video?

A. Part of -- I think it's important to explain -- is part of our investigation is administrative in nature, so we're checking to ensure like, all the checks were done on time and per policy. That is one of the things that we are asked to do, so in this case, I don't know if I would classify it as important. I was definitely checking to see if there was any interaction, but I'm also looking to make sure the checks were actually done and there was a deputy there that went to the cell.

Q. When you say, "administrative in nature,"

BY MR. IREDALE:

Q. Could you read the Bates number please?

A. 001326.

Q. Thank you. And now I need to ask: Is this also another of the photos that depicts the appearance of the decedent at the time of the autopsy?

A. Yes.

Q. Thank you. When you made your appearance for the briefing on the early morning hours of the 18th of March, can you tell me during that briefing, were you informed that there had been another death of another inmate who had been held in that same -- that very same module within the previous 48 hours?

A. Yes.

Q. And were you told that that person's name was William Schuck, S-c-h-u-c-k?

A. Yes.

Q. Who told you that Mr. Schuck had died after having been an inmate in that same module and that he had died within the last 48 hours?

MS. FELDMAN: Objection to the extent assumes facts not in evidence and lacks foundation.

THE WITNESS: My partner, actually, who

did that investigation.
BY MR. IREDALE:
Q. What is your partner's name?
A. Detective Van Lingen.
Q. And Detective Van Lingen, as you told us, albeit under a different name -- or named Jurisaga was also there?
A. Correct. And when I say, "Van Lingen," it just encompasses both.
Q. We both have King's X on AdSeg/AdSep, sheriff's office, sheriff's department, Van Lingen and Jurisaga. I'm fine with that.
But she told you. What did she say?
A. She did not give me any details, but that was -- I believe it was still under investigation by her.
Q. Did you discuss with your partner on your team any of the facts of her investigation involving the death of Mr. Schuck?
MS. FELDMAN: Vague and ambiguous as to time.
THE WITNESS: So no, other than my involvement in it.
BY MR. IREDALE:
Q. You were involved in the investigation of

the death of Mr. Schuck?
A. Correct.
Q. What did you do in the investigation of the death of Mr. Schuck?
A. I'll have to refer to my report, which I haven't read in a few years, but similar to how I gave out tasks, I was tasked with some interviews.
Q. Understanding that you need to be precise to review your report, can you tell me, generally, what those interviews involved?
MS. FELDMAN: I am just going to object to the extent it calls for any information that may be under a protective order in that Schuck matter.
MR. IREDALE: Here's what we're going to do. We will leave this open, and if that's the case and there's some protective order, you can let me know, and I will agree that this part will be subject to the same protective order.
MS. FELDMAN: Well, no, because it's under protective order in the Schuck matter, so --
MR. IREDALE: Are you instructing the witness not to answer?
MS. FELDMAN: I don't know what the content of his response would be. If he is revealing information, it would be in the homicide

that case for years now.

Q. Did it strike you as unusual that two people in the same module had died?

MS. FELDMAN: Objection. Calls for speculation.

THE WITNESS: I don't know if I would say unusual.

BY MR. IREDALE:

Q. Did you have any previous experience in which two people had died in the jail within 48 hours of one another in the very same living unit?

A. No. This would be the first time.

Q. The first time.

A. Yes.

Q. And doing your work in this case, did you attempt to find out whether the death of Mr. Schuck had similarities to the death of Mr. Rupard?

MS. FELDMAN: Objection. Calls for speculation. Lacks foundation.

THE WITNESS: I don't recall.

BY MR. IREDALE:

Q. Did you ever review any of the reports of other detectives in the Schuck investigation?

A. No.

Q. Did you ever speak with Detective Van

"Autopsy," and then there's "Follow-Up II," which is what we've marked as Exhibit 26.

A. Correct.

Q. And by reviewing Exhibit 26, you can tell me the approximate date on which you had done your last investigative task in Mr. Rupard's case in 2022 --

A. Correct.

Q. -- in that year? Tell me, if you could, what that date was.

A. I believe June 7th, 2022.

Q. And you note on page one of your Follow-Up II report that you completed your preliminary investigation on that date.

A. Correct.

Q. You called it "preliminary." When you completed that preliminary investigation, in your own mind what additional steps needed to be done to complete the investigation?

A. I needed the medical examiner's report and review.

Q. Now, I need to go through some of the things that you mentioned here and ask some follow-up questions. On one of the paragraphs in the middle of the page, it notes, "The water was

slot. Right?
A. Yeah. I saw that, but your question was specific to what the food was. I don't know the menu items.
Q. I don't mean to quibble. Did you consider that it might be something that should be investigated to determine how often he was given meals by the deputies on that quad?
A. Yeah. I think that was investigated.
Q. And through watching video to determine that it was, in fact, passed in?
A. Yes.
Q. And how many days of video did you review to determine that, in fact, he had or had not been given food by the deputies on that floor in the days or weeks preceding his death?
A. Just two days.
Q. Two days?
A. Yes.
Q. So you had obtained not only the 24 hours, but 48 hours of video?
A. Not 48, but, remember, the Schuck case, I realized as documented that I pulled that video into my case as well.
Q. So part of your analysis did involve

something that related to the Schuck case.

A. Yes.

Q. Other than that video, how long was the Schuck video that you acquired?

A. It was no more than a day, but I can't remember if I documented how long the total video was. I would have to like, look at the video files to give you an exact number.

MS. FELDMAN: Is it possible to close that blind? It's just shining on me. I appreciate it. Thank you.

BY MR. IREDALE:

Q. All right. May I refer you now to page five of your report?

A. Yes.

Q. There is a reference here to a Lieutenant Kopchak, K-o-p-c-h-a-k.

A. Yes.

Q. And you spoke with Lieutenant Kopchak at some point?

A. Yes.

Q. And you asked him if any hygiene inspections were done?

A. Correct.

Q. And may I ask why you did that?

Q. And so I just want to make sure that that's clear, and in that regard, you say that he told you that the last logged hygiene inspection was March 5th, 2022?

A. Correct.

Q. And as far you recall, that's accurate, that he did tell you that?

A. Yes, yes.

Q. But when you reviewed the video, it says, "However, after a review of the video, it appeared the inspection was not completed."

Let me stop right there. The review of the video referred to, it's in the passive voice, so I need to know who reviewed the video to determine whether the inspection, the hygiene inspection, was, in fact, completed.

A. I know it was not me, and so I'm -- based on how I read this, I believe Lieutenant Kopchak reviewed it.

Q. And in any event the report that you got is that the review of the video by some other person, possibly Kopchak, showed that even though there was a log re -- saying that an inspection had occurred, it, in fact, had not occurred.

A. Also, there might be some confusion. Keep

in mind, the logged hygiene inspection is for a module. That's why I say without looking at the actual logs, I can't be sure, because they are supposed to list -- they're AdSeg. They are supposed to list, I believe, individual cells. I don't know -- for example, if the log doesn't show his cell, I know he wasn't done.

Q. Fair enough. I just need to try to parse out what this means, if I could, with you.

A. Okay.

Q. In order to determine whether the log was accurate, Kopchak or another person reviewed the video.

A. Correct.

Q. And the video showed in that regard that the log was not accurate.

A. Again, I don't know specific about the log. All I know is that from my understanding, his cell was not inspected.

Q. Now, after you learned that in October of 2022 that the video showed something that would indicate that there was no hygiene inspection conducted, did you ask that that video that had been reviewed, the video of March the 5th, 2022, be preserved and turned over to you for your file?

A. No.

Q. This states, "Additionally, the housing unit log was not completed regarding as to why the hygiene inspection was not completed."

Do you see that?

A. Yes.

Q. Did I accurately read from your report?

A. Yes.

Q. And when you said that, were you stating your understanding of what Kopchak told you?

A. That's my belief at the time, so, yes, that housing unit log was not completed.

Q. You then say, "That investigation into the lack of hygiene inspection falls under the internal affairs purview, and, as such, I will not be investigating the policy violations."

A. I did say that, yes.

Q. And you felt that the failure to properly ensure hygiene or conduct a hygiene inspection was entirely unrelated to the circumstances of the death of Mr. Rupard?

A. Yes.

MS. FELDMAN: Objection to the extent it misstates the document.

THE WITNESS: Yes.

person appears to have starved to death to look and see what the interactions were between the guards and that person in the weeks before the death?

MS. FELDMAN: Objection. Calls for expert opinion. Calls for speculation. Argumentative.

THE WITNESS: One, I disagree with your premise that he was starved to death. There was actually evidence to the contrary. He had plenty of food. He had partially eaten food. He had empty food containers. He was served food. There's not evidence of starvation. Starvation would be refusing to give him food.

BY MR. IREDALE:

Q. Did you conduct this investigation in order to avoid criminal liability for any of the sheriff's personnel?

A. No.

Q. Were you looking to cover something up?

A. No.

Q. You didn't request the videotape, except for 24 hours. Right?

MS. FELDMAN: Hold on. Objection. Misstates testimony. Assumes facts.

MR. IREDALE: Counsel, stop.

MS. FELDMAN: No. I'm entitled to make

objections.

BY MR. IREDALE:

Q. The only request for the videotape you made was for the 24 hours preceding the death. Right?

A. Correct.

Q. And you happened to get some other videotape because another person had died on that same module just shortly before. Right?

MS. FELDMAN: Misstates prior testimony.

BY MR. IREDALE:

Q. Am I right?

A. That is how I got the video.

Q. Did you find any evidence from any source that any deputy had reported to a superior officer, to the watch commander or anybody else, that this was a man who was emaciated before his death?

MS. FELDMAN: Assumes facts not in evidence.

THE WITNESS: I did not.

BY MR. IREDALE:

Q. No. Let me refer you to page 11. It refers on this page to a conversation you had with Dr. Schaber. Do you see that?

A. Yes.

Q. And so your rendition of your conversation is based on your recollection?

A. Correct.

Q. Did you take any notes when you were having the conversations with Dr. Schaber?

A. No.

Q. She told you words to the effect of the lack of medical care from the sheriff's department contributed to the death?

A. I believe so, yes.

Q. Did you agree with that or disagree?

A. I disagreed.

Q. I see. And so what did you then do after you learned that she was going to determine this to be a homicide in order to tailor your findings to her determination?

A. So I reviewed the medical examiner's report. I then changed the investigation from a natural investigation to that of a homicide and then began additional follow up.

Q. And whose conduct were you investigating to see if it contributed or caused the death of Mr. Rupard?

A. As stated in the medical examiner's report, it was a -- no specific individual. So in

A. No.

Q. What, if anything, did you do to prepare for the testimony for the deposition?

A. Every time I've been scheduled for a deposition, which I think is like --

MS. FELDMAN: He's just talking about this one.

THE WITNESS: Oh, essentially read my reports, all three, and I guess the autopsy reports. I've gone over some of the statements that my partners wrote of their interviews, the medical records, Dr. Badre's report, photographs, some of the video. I think that's it. There might be more. I just don't recall right now.

BY MR. IREDALE:

Q. All right. Let's go, if we could, to this paragraph on page 12 of 22. I'm going to read it and then ask you some questions about it.

"On Monday, March 6th, 2023, I began contacting staff at the San Diego Central Jail to acquire surveillance video from the three-month period Rupard was in custody."

I will stop right there. This was the first request that you made for extended surveillance video?

A. Correct.

Q. And you made it now, March the 6th, 2023, almost a year after the death, which had occurred on 17 March of 2022.

A. Correct.

Q. And the reason you requested it at this time was what?

A. The medical examiner's office had ruled that based on their review of the medical records, they changed it to homicide, which is essentially death at the hands of another.

Q. And so at that point you felt that you needed to investigate the case.

A. I needed to investigate the homicide.

Q. Let's talk about homicide. As part of your training in the police academy and also in your work in homicide, you learn about what are called degrees of homicide?

A. Correct.

Q. First-degree homicide?

A. Correct.

Q. Which is homicide with premeditation and deliberation?

A. Correct.

Q. Second-degree homicide?

MR. KRUEGER: Misstates testimony.
THE WITNESS: It's 192PC.
BY MR. IREDALE:
Q. Do you know what gross negligence is?
A. I do.
Q. Do you know what recklessness is?
A. I do.
Q. So when, almost a year after the death, you decided in light of the determination of homicide that you needed to get surveillance video, you talked to a person name Hann, Deputy H-a-n-n, Hann?
A. Correct.
Q. And you asked for those three months during which Mr. Rupard had been held?
A. Correct.
Q. And you learned that, at least, I take it, he told you it was no longer available?
A. Correct.
Q. Did he say what happened to it?
A. Yes.
Q. What did he say happened to it?
A. The video gets overridden as time goes on. It saves six months. As new video is recorded, it overwrites.

Hann?

A. Correct.

Q. And you asked him if he could try to locate any video?

A. Correct.

Q. Was he able to?

A. No.

Q. What did he report back to you, if anything?

A. So he -- I believe had he located screenshots he had saved from video from February 19th.

Q. And we'll get into that, because you also talk about that later in your report.

A. Oh.

Q. But other than the video from February 19th, any other video or screenshots that he saved?

A. No.

Q. And as to the February the 19th video, he only had screenshots, or he only provided you screenshots?

A. He only had screenshots.

Q. And the video itself, did he explain what had happened to it, if anything?

A. I don't know if he knew, but that was

answered in my request. When he was looking at the video, he saved screenshots, but didn't download and save the video.

Q. In other words, was the video in existence at the time you spoke to him on the 6th of March from the 19th, if you know?

A. Of what year?

Q. The video you referred to be the screenshot was February 19th, 2022.

A. The video was in existence then.

Q. And my question is: When you talked to him and asked him if he could get you any additional video, after your conversation with Hann, at that point did he indicate to you that he had some additional video?

A. He did not.

Q. Did he indicate he had some additional screenshots?

A. Just the ones we've talked about.

Q. And as of that point, had the video already been destroyed, if you know?

MS. FELDMAN: Objection. Misstates testimony. Assumes facts not in evidence.

THE WITNESS: The video was overridden.

///

CERTIFICATE OF REPORTER

---oOo---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [ X ] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e).)

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 14th of January, 2026.

Nicole O'Neil

Nicole O'Neil, CSR No. 10774

# EXHIBIT 6

Follow-Up Investigative Report III, Det. Blumenshine, Feb. 7, 2024 (COSD 000266–274)

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)

**Case Number:** 22111838



## Follow Up Report III

**Origin:**

On Thursday, March 17, 2022, at 2246 hours, Inmate Lonnie Rupard (10/1/75) was found unresponsive in his cell. Deputies and medical staff attempted lifesaving measures until paramedics arrived. Inmate Rupard was transferred to UCSD Hospital before being pronounced deceased at 2351 hours by Dr. Allen.

On Thursday, March 18, 2022, at about 0200 hours, San Diego County Sheriff's Homicide responded and assumed control of the investigation. I was assigned as the lead investigator at that time.

For details, refer to Follow Up Report I.

On Thursday, March 2, 2023, at 0902 hours, I received a copy of Rupard's Medical Examiner Report #2022-01007. The report's opinions and conclusions were as Dr. Schaber had read them off to me, the only change was the manner of death now read Homicide.

| | |
|---|---|
| **Cause of Death:** | Pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia |
| Contributing: | SARS-COV-2 (COVID-19) viral infection; pulmonary emphysema; duodenal ulcer |
| **Manner of Death:** | Homicide |

An in-depth records review was conducted.

For details, refer to Follow up Report II.

**Investigation:**

On Thursday, March 23, 2023, at 1200 hours, the results of my investigation were presented to the San Diego County District Attorney's Office – Special Operations, the United States Attorney's Office – Civil Rights Enforcement Division, and the Federal Bureau of Investigation – Public Corruption Squad. I turned over a completed copy of my case file to the three agencies.

| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 2/7/2024 |

Jacob Wilson
Digitally signed by Jacob Wilson
Date: 2024.02.08 08:30:06 -08'00'

On Wednesday, April 5, 2023, I requested a copy of the old and new Detentions Policy and Procedures (PnP) as well as the "Green Sheets" (Facility specific policy).

On Monday, April 24, 2023, I received the PnP and Green Sheets related to County Procedures and Hygiene Inspections. They were added to the case file.

On Tuesday, June 6, 2023, I spoke with DDA Marquardt and offered to provide a facility tour/walkthrough of the San Diego Central Jail.

On Friday, September 1, 2023, DDA Marquardt informed me they would like a facility walkthrough.

On Wednesday, November 15, 2023, at 0900 hours, Lieutenant Kopchak and I met with the SDDA's Office, the U.S. Attorney's Office, and the FBI at the San Diego Central Jail (SDCJ).

> During the walkthrough, I showed the prosecutors and investigators the 7th floor staging area, D module, and Cell 17.
>
> While at Cell 17, I took photographs showing the cell after it had been cleaned up.








After, we went inside the 7th floor tower to observe the control deputy working.

We went down to the 6th floor to see where psychiatric inmates were taken to meet with a psychiatric doctor.

We went down to the 3rd floor to see the medical area of the facility.

At the conclusion of the tour, the representatives requested I interview any individual who may have had contact with Lonnie Rupard in his final week.

On Thursday, November 16, 2023, I began reviewing the area activities summary report and hygiene inspection report for potentially involved parties that needed to be interviewed. I noticed that Module D was not being cleaned during the ad-seg cell hygiene inspections. Only Module E was being cleaned.

On Monday, November 20, 2023, I reviewed green sheet "GS L.2.C.1" regarding Sanitation and Hygiene Inspections as of September 12, 2019. On Page 2, I noted it read "High risk security housing hygiene inspections (E modules) shall be conducted throughout the week and finalized by the Saturday nightshift team. Inmate workers shall be utilized to clean common area and cells in all high risk security level housing modules."

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)

**Case Number:** 22111838



In my review, I saw D module was missing from the policy. This would provide an explanation for the reason it was not being cleaned by deputies.

On Tuesday, November 21, 2023, I notified the reviewing agencies the reasoning D Module (where Rupard was housed) was not being cleaned during hygiene inspections. An oversight in policy did not account for D Module.

> On Thursday, January 4, 2024, GS L.2.C.1 was approved and entered as the updated green sheet for Sanitation and Hygiene Inspections.

On Monday, December 11, 2023, I sent out voluntary interview requests to the following personnel:

- Doctor Nicolas Badre (Court Ordered Psychiatric Doctor)
- Doctor Anthony Cruz (SDCJ Psychiatric Doctor)
- Deputy Morgan Ackerman [redacted]
    - Tower deputy during 3-12-23 hygiene inspection
- Deputy Andrew Rodriguez [redacted]
    - Floor deputy during 3-12-23 hygiene inspection
    - Dayshift 3-15-23
- Deputy Christopher Anthony [redacted]
    - Floor deputy during 3-12-23 hygiene inspection
- Deputy Andrew Torres [redacted]
    - Deputy during 3-17-23 dayshift
- Deputy Michael Johnson [redacted]
    - Deputy during 3-16-23 and 3-17-23 dayshift
- Lieutenant Gino Matrone [redacted]
    - Sergeant during 3-16-23 and 3-17-23 dayshift
- Deputy Treyvonne James [redacted]
    - Deputy during 3-16-23 nightshift
- Deputy Ernesto Aguirre [redacted]
    - Deputy during 3-16-23 nightshift
- Lieutenant Jesus Lizarraga [redacted]
    - Lieutenant during 3-15-23 and 3-16-23 nightshift
- Sergeant Cesar Cardoza [redacted]
    - Sergeant during 3-16-23 nightshift
- Deputy Jeff Amado [redacted]
    - Deputy during 3-16-23 dayshift
- Deputy Thomas Mace [redacted]

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death **Case Number:** 22111838
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday) 

- Deputy during 3-16-23 dayshift
- Sergeant Brendan Bourgeois [redacted]
    - Sergeant during 3-16-23 dayshift
- Deputy Jason Viladiu [redacted]
    - Deputy during 3-15-23 nightshift
- Sergeant Brian Bumbasi [redacted]
    - Sergeant during 3-15-23 nightshift
- Deputy Brian Aguilera [redacted]
    - Deputy during 3-15-23 dayshift
- Deputy Jonathan Inacio [redacted]
    - Deputy during 3-15-23 dayshift
- Deputy Ramond Altmeyer [redacted]
    - Deputy during 3-15-23 dayshift
- Deputy Anthony Gallegos [redacted]
    - Deputy during 3-15-23 dayshift
- Deputy Luis Ortiz [redacted]
    - Deputy during 3-15-23 dayshift

On Wednesday, December 13, 2023, I spoke with Doctor Badre who informed me he had already had to respond to Citizen Law Enforcement Review Board (CLERB) and didn't want to provide another statement. Dr. Badre provided a copy of his response to CLERB.

On Wednesday, December 13, 2023, Doctor Cruz agreed to an interview.

On Wednesday, December 20, 2023, I arrived at SDCJ to meet with Dr. Cruz for his interview. Upon arrival, Dr. Cruz was in a meeting with his peers and supervisor. Dr. Cruz informed me he wanted to provide an interview; however, he had been advised to seek counsel. He asked if he was entitled to an attorney and if he could talk with one. I reiterated to him the interview with me would be voluntary but since he had asked for an attorney, I advised him to contact one prior to speaking with me. I did not interview Dr. Cruz.

The following is a list of individuals who declined to interview:

- Deputy Ackerman
- Deputy Rodriguez
- Deputy Torres (Declined via attorney)
- Deputy Johnson
- Deputy Aguirre

- Lieutenant Lizarraga
- Sergeant Cardoza
- Deputy Amado
- Deputy Viladiu
- Deputy Aguilera
- Deputy Inacio
- Deputy Altmeyer
- Deputy Gallegos (Declined via attorney)
- Deputy Ortiz

The following is a list of individuals who provided voluntary interviews:

On Tuesday, December 19, 2023, at 1114 hours, Sergeant Bourgeois provided a voluntary interview. Present was his attorney, R. Pinckard with Bobbitt, Pinckard, and Fields. The interview was audio recorded. Sergeant Bourgeois did not have any independent recollection of Mr. Rupard or any interactions with him. For details, refer to the audio recording.

On Wednesday, December 20, 2023, at 1209 hours, Deputy Mace provided a voluntary interview. The interview was audio recorded. Deputy Mace was on training at the time Mr. Rupard had died. Deputy Mace did not recall any specific interactions with Mr. Rupard. For details, refer to the audio recording.

On Wednesday, January 3, 2024, at 1727 hours, Deputy James provided a voluntary interview. Present was his attorney, D. Lopez with Bobbitt, Pinckard, and Fields. The interview was audio recorded. Deputy James did recall Mr. Rupard's cell was cluttered but did not feel it was abnormal compared to some of the other inmates, so no action was taken. For details, refer to the audio recording.

On Tuesday, January 9, 2024, at 1323 hours, Deputy Anthony provided a voluntary interview. Present was his attorney, D. Lopez with Bobbitt, Pinckard, and Fields. The interview was audio recorded. Deputy Anthony was asked about the hygiene inspection on March 12, 2022. Deputy Anthony did not have any recollection, however, he stated that according to SDCJ policy, D module would not be included in his hygiene inspection. For details, refer to the audio recording.

On Thursday, January 25, 2024, at 1039 hours, Sergeant Bumbasi provided a voluntary interview. Present was his attorney, D. Lopez with Bobbitt, Pinckard, and Fields. The

interview was audio recorded. Sergeant Bumbasi did not have any recollection of Mr. Rupard or the incident. For details, refer to the audio recording.

On Friday, January 26, 2024, at 1705 hours, Lieutenant Matrone provided a voluntary interview. Present was his attorney, D. Lopez with Bobbitt, Pinckard, and Fields. The interview was audio recorded. Lieutenant Matrone was working as a Sergeant at the time of the incident. He was shown the area activities logs and surveillance video of his shifts on 3-16-22 and 3-17-22. Lieutenant Matrone stated he did have independent recollection of his security checks and did remember the state of Mr. Rupard's cell. Lieutenant Matrone recalled instructing Deputy Johnson (while looking inside Mr. Rupard's cell) that it needed to be cleaned. He told Deputy Johnson to get the module and dirty cells cleaned. Later, Lieutenant Matrone (then a Sergeant), came back to the floor and observed Deputy Sandoval in the module with inmate workers who were cleaning. Lieutenant Matrone thanked Deputy Sandoval for cleaning. Lieutenant Matrone and I reviewed the video together and confirmed Mr. Rupard's cell was not cleaned. Lieutenant Matrone stated he would have reviewed the logs on 3-18-22 and seen that Mr. Rupard's cell had not been cleaned. However, when he arrived on work that day, he saw that Mr. Rupard had been found deceased. For details, refer to the audio recording.

Surveillance video was reviewed to confirm Lieutenant Matrone's statement.

On 3-17-22, at 0949 hours, Sergeant Matrone and Deputy Johnson can be seen standing at Cell 17's door.



**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)

**Case Number:** 22111838



On March 17, 2022, at 1112 hours, inmate workers and an administrative deputy arrive to the housing unit. The administrative deputy walked up to cell 18 and cell 19 as the doors roll open. That deputy and the inmate workers proceed to conduct a deep cleaning of the module and the two empty cells until 1209 hours. The administrative deputy does not appear to stop at Cell 17 or to interact with Rupard.

A review of the area activity log and the hygiene inspection log does not show any entries for the 7D cleaning on March 17, 2022, at about 1100 hours.




On March 17, 2022, at 1143 hours, Deputy Johnson is conducting hard count when he stops at Cell 17 and knocks on the window. This is while the inmate workers are cleaning the module and other cells. Deputy Johnson continues, stopping at the other cells.

| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 2/7/2024 |

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)

**Case Number:** 22111838






On Tuesday, January 30, 2024, I emailed Deputy Christian Sandoval [redacted] for a voluntary interview. Deputy Michael Johnson had already declined to speak to me.

On Friday, February 2, 2024, Deputy Sandoval informed me he did not want to provide an interview.

This concluded my involvement in this investigation at this time. Any additional follow up will be documented in an additional report.

| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 2/7/2024 |

# EXHIBIT 7

Photographs of Cell 17



CONFIDENTIAL COSD 001514



CONFIDENTIAL COSD 001515



CONFIDENTIAL COSD 001536



CONFIDENTIAL COSD 001532



CONFIDENTIAL COSD 001540

# EXHIBIT 8

Deposition of Cpl. Thomas Mace, Feb. 27, 2026 (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF LONNIE RUPARD, Plaintiff, | ) |
| v. | ) Case No. 2023CV1357 CAB BLM |
| COUNTY OF SAN DIEGO, et al., Defendants. | ) |

VIDEOTAPED DEPOSITION OF CORPORAL THOMAS RANDALL MACE

Taken on behalf of the Plaintiff

DATE TAKEN: Friday, February 27, 2026

TIME: 1:39 p.m. to 4:05 p.m.

PLACE: Via Zoom / StenoConnect

Examination of the witness taken in machine shorthand before:

Marsha J. Husted, CSR, CCR, RPR
Steno
concierge@steno.com
(888)707-8366

you know which of the modules you walked, which of the modules you did safety checks for?

A. As a housing deputy, you are responsible to walk the entire floor.

Q. And so did you walk the entire floor, including Module D?

A. Yes, sir.

Q. And did you do both the upper level of Module D and the lower level?

A. I don't recall the specifics of that day, sir.

Q. Typically, would you do one or the other or would you typically do both?

A. It just depends on who gets in the door first most times.

Q. So from the entry alone, we cannot tell for sure who it was who did the safety check for a particular cell, Cell D17, on that date?

A. No, sir.

Q. And do you remember whether you on the 9th of March at 7:41 or shortly thereafter did a safety check for D17?

A. I don't recall, sir.

Q. Or how long it was, if at all, that you looked in to determine whether there should be any intervention during the course of the safety check?

been able to identify yourself in the video?

A. Sometimes.

Q. All right. Now let's go, if we could, to the very next page, which is 4984. And this is for an 11-53, a safety check that began at 0837. And it says the entry was made by you; is that correct?

A. Yes, sir. That's what the report reflects.

Q. And in this, you told me that the left-hand time is when the activity starts and the right-hand time is when it ends? Did I understand that right?

A. To clarify that, when I click to open the log on the computer is the first time. And when I click submit after typing all of my stuff in is the time that the log actually takes place.

Q. So is there any record actually kept of when the 11-53 ended on that day?

A. Not to my knowledge is there a log that we're required to do to document the end of our 11-53s.

Q. So from the records themselves as opposed to videos, one could be able to determine when it began -- when the safety check began, but not when it ended, right?

A. Yes, sir.

Q. All right. May I ask you to go to the next page, please.

MR. IREDALE: Yes.

THE VIDEOGRAPHER: That's much better. I appreciate that.

MR. IREDALE: Very good. Is this all right now?

THE VIDEOGRAPHER: I am all good on my end. I apologize for the interruption.

MR. IREDALE: Thank you so much.

And thank you for the help, Corporal Mace.

BY MR. IREDALE:

Q. May I now refer you on that page to the very bottom entry?

A. Yes.

Q. Do you see there -- I'm sorry. Go ahead.

A. I do see it.

Q. It says: Inmate incident.

And it's at 3/16/22 at 1006, meaning 10:06 a.m.?

A. Yes, sir.

Q. Medical emergency, Cell 1?

A. I see that.

Q. Was it at this point or around the time of this point that you entered into the cell where you found Mr. Shuck not breathing?

MR. COLLETTI: You can answer.

Q. And then there is, according to the record, another safety check involving yourself and Deputy Amado that commenced at 1605 hours, which would be 4:05 p.m.? Would that be fair --

A. That's correct.

Q. -- to say?

A. Yes, sir. I do see that.

Q. Then let me bring you, if I could, to the last page. And there is an entry for an 11-53 at 1703 hours involving yourself and Deputy Amado; is that correct?

A. Yes, sir.

Q. And then for this last page, then, a final entry at 1800 hours, which would be 6:00 p.m., showing another final safety check; is that fair?

A. Yes, sir. I see that.

Q. Now, do you remember the appearance of Mr. Rupard during any of the safety checks you conducted that day on 7D?

A. Not that I can recall, sir.

Q. Did you speak to him at any time that day?

A. Not that I can recall, sir.

Q. Were you asked by anyone -- Deputy Amado or the sergeant or the lieutenant -- to make any specific inquiry of Mr. Rupard or the other inmates about their health after you learned that Mr. Shuck was dead?

REPORTER'S CERTIFICATE

The undersigned, being empowered to administer oaths and affirmations remotely pursuant to Section 30(F)(1) of the Federal Rules of Civil Procedure, do hereby certify that the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings prior to testifying was placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; and that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of the attorney(s) or any of the parties.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case before completion of the proceedings, review of the transcript was not requested.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: March 9, 2026.

Marsha J. Husted

MARSHA J. HUSTED RPR No. 834396

# EXHIBIT 9

Deposition of Lt. Gino Matrone, Jan. 16, 2026 (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

---o0o---

| | |
|---|---|
| JUSTINO RUPARD, INDIVIDUALLY AND RONNIE RUPARD, INDIVIDUALLY,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE OF CALIFORNIA, INC; CHRISTINA ANOSIKE, IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; AGUILERA, M., VILADIU, J., MARTINEZ, G., SCHMITZ, D., AMADO, J., MACE, T., ACKERMAN, M., KEY, K., MOSER, M., AGUIRRE, E., JAMES, T., ROMERO, B., JOHNSON, M., TORRES, A., DELANEY, C., TREYVONNE, J., EVERSOLL, T., WERESKI, A., ROMANS, B., GUTIERREZ, L. IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTIES DOES 1-20; DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10,<br><br>Defendants. | )Case No.: 23CV1357 CAB<br>)BLM |

MS. FELDMAN: Vague and ambiguous.
THE WITNESS: Yes.
BY MR. IREDALE:
Q. And the name of that deputy that you asked was Deputy Johnson?
A. Correct.
Q. Now, you had been working the -- I believe it was the 6:00 A.M. to 6:30 P.M. shift on the 17th. Am I right in that?
A. I believe so.
Q. And the day before the 16th, you had worked that same shift?
A. Yes.
Q. And you had worked on that same floor or set of floors -- six, seven, and eight?
A. Yes, sir.
Q. And the day before, there was an unusual incident, was there not?
MS. FELDMAN: Vague and ambiguous. Lacks foundation.
THE WITNESS: I don't recall.
BY MR. IREDALE:
Q. Do you remember a man named Schuck, Hayden Schuck?
A. Vaguely, yes.

Q. Vaguely. Do you remember him being removed from the floor?

MS. FELDMAN: Vague and ambiguous.

THE WITNESS: I remember there being a medical incident with him involving that. I don't remember him being removed from the floor.

BY MR. IREDALE:

Q. Can you tell me what you do remember?

MS. FELDMAN: Vague and ambiguous.

THE WITNESS: We had a conversation walking with him. I remember there was a medical emergency that they pulled him out. I don't know the context of why. I just remember them performing CPR. I don't know any of the reasons -- I don't recall any of the reasons why.

BY MR. IREDALE:

Q. He was in the Module D of the seventh floor?

A. Yes.

Q. And can you tell me about what time this incident occurred where CPR was administered to Hayden Schuck?

MS. FELDMAN: Assumes facts not in evidence.

THE WITNESS: I don't recall.

medical?

MS. FELDMAN: At what point in time?

MR. IREDALE: When Schuck was getting CPR?

THE WITNESS: Yes.

BY MR. IREDALE:

Q. How many people, best estimate, that you recall?

A. I do not recall.

Q. More than five, less than five?

A. I don't recall.

Q. 911 was called, if you know?

A. Yes.

Q. Was he taken out on a gurney?

A. I don't recall.

Q. And you told me later that day on the 16th at some point you found out he was dead?

A. Yes.

Q. And my question to you is: After you found out he was dead, did you take any steps to check on the welfare of the other people in that module, Module D?

MS. FELDMAN: Vague and ambiguous.

THE WITNESS: I don't recall doing that.

BY MR. IREDALE:

Q. Did -- as the sergeant, do you have the

CERTIFICATE OF REPORTER
---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [ X ] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e).

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 23rd of January, 2026.

Nicole O'Neil

Nicole O'Neil, CSR No. 10774

# EXHIBIT 10

Autopsy photographs



CONFIDENTIAL COSD 001395



CONFIDENTIAL COSD 001367



CONFIDENTIAL COSD 001254



CONFIDENTIAL COSD 001326



CONFIDENTIAL COSD 001428



CONFIDENTIAL COSD 001261

# EXHIBIT 11

Rule 30(b)(6) Deposition of Capt. Derek Williamson, Oct. 11, 2024, in *Estate of Schuck v. County of San Diego*, No. 3:23-CV-00785-DMS-AHG (filed as ECF No. 111-5) (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CASE NO. 3:23-CV-00785-DMS-AHG

| | |
|---|---|
| ESTATE OF SCHUCK, et al., | ) |
| Plaintiff, | ) |
| vs. | ) |
| COUNTY OF SAN DIEGO, | ) |
| Defendant. | ) |

VIDEOTAPED DEPOSITION OF

CAPTAIN DEREK DON WILLIAMSON

PERSON MOST KNOWLEDGEABLE FOR

CORRECTIONAL HEALTHCARE PARTNERS, INC.

San Diego, California
Friday, October 11, 2024

Pages 1 through 64, inclusive

Reported by Adriana S. Angulo, CSR
Certificate No. 13824

A. Yes.

Q. Okay. And if there's ever any question about that, feel free to let us know, and we can either go off the record or resolve it somehow.

Today your understanding is that you're testifying on behalf of the County, right?

A. Yes.

Q. Okay. And so you're not testifying, you know, on your own behalf. Rather you're here as a representative of the County?

A. Yes.

Q. Okay. And do you have any questions about how you're testifying in that capacity today?

A. I do not.

Q. So for the purposes of this deposition, the relevant time period is March of 2022. So unless I notify you that we're talking about a different time period, that's going to be the assumption.

I'll try to just include that in my questions, but if I -- if I'm not doing that, then that's going to be implied.

Does that make sense?

A. Yes.

Q. Okay. Sorry. I interrupted you.

Okay. And so we're going to go through the

of my conversations with Lieutenant Boorman, was going through the camera angles and seeing if anything had been changed since then, and if there was a camera at the other end of the hallway, which would have viewed into that cell, but there still is not.

Q. Okay. I really appreciate you clarifying that. Thank you.

And -- oh, so in the activity logs, sworn staff are required to log when they begin, like, Title 15 -- I think they're logged as 1153, the safety checks?

A. That is correct.

Q. And those logs would only show when someone began those checks, not when they end them?

A. Correct.

Q. And they obviously wouldn't have details -- any additional details about those checks unless somebody were to manually log something about a particular detainee, right?

A. Correct.

Q. So it wouldn't say, for example, oh, I stopped at Hayden Schuck's cell for two seconds, unless somebody manually logged that, right?

A. That is correct.

Case 3:23-cv-00785-DMS-AHG Doc 121-5 Filed 01/10/25 PgID.2120 Pg 14 of 77

BY MS. MELLANO:

Q. So do you know if there is any sort of policy, whether written or unwritten, regarding when and how to preserve video evidence, or other evidence -- well, you're here to talk about video -- so video evidence regarding a potential incident that might be the subject to a lawsuit?

A. No.

Q. So you don't know what occurs when a preservation letter is received at either the central jail or by the sheriff's department requesting preservation of video at the Central Jail?

A. No. It has not been part of my job up to this point.

Q. Okay. Are you aware of how evidence regarding an incident is preserved video evidence -- is preserved for CLERB?

MR. INMAN: Objection. Scope.

THE WITNESS: I would not say specifically for CLERB. Jail incidents, uses of force, in-custody deaths -- the relevant video or extended requests for that video are typically downloaded by -- in, you know, more minor cases. The deputy who is the primary writer of the case, whether that

be the crime report or the use of force.

THE COURT REPORTER: Whether it be the?

THE WITNESS: Crime report or use of force.

And in cases similar to this one where sheriff's homicide were making an extended request, not just of the incident itself but relevant video leading up to the incident, it would typically go to, as I spoke earlier, the administrative deputy, which at the time of this incident would have been Deputy Hahn.

And then at that point, that deputy starts reviewing and downloading all video where -- like specifically in this case, where it would say that videos or photographs of Mr. Schuck or related events.

So typically when sheriffs homicide -- just speaking as to my background, I was at our investigation detentions units as a detective, and then back there for close to three years as a sergeant. So I had a lot of interaction with sheriff's homicide on in-custody death cases.

So typically their request would be for all times that the individual was on video, going back a certain timeframe. If the person was in custody for several months, they wouldn't request it all the way

just to show the level of activity -- the safety checks continuing to occur in the area, nursing staff going back into the area to provide medication, deputies passing out meals stuff of that nature.

So I did ask why there was that 36 hours, but not any video after that. He said -- and that was the response.

He said, "If we ran into a situation like that, where the person was off video for an extended period of time, then we would pull enough to show that the legal monitoring requirements and care were being taken, and then move on to the next time that that person did show up on video."

Q. But Deputy Hahn didn't have personal knowledge of whether that was -- what happened here?

A. No. He was just speaking to the typical matter of practice.

Q. And -- but in the safety checks, though, would have had to have continued to be conducted during the time period that's not depicted on camera, right?

A. Yes.

Q. So it wouldn't be sufficient, you know, for example, to say, Well, this detainee, he was checked

written over?

A. There's --

MR. INMAN: Objection. Vague.

THE WITNESS: There isn't. The facility DVRs at every single one of the facilities automatically write over themselves when they start reaching the data retention threshold.

So as years have gone on and additional cameras have been added, that time period in which the data is retained, gets to be shorter and shorter. And as all electronics, you have a different life of the electronic device at the beginning of it than you do towards the end of it.

You know, I'm not a super technical person, but as something gets older, its data retention does get to be, you know, shorter.

BY MS. MELLANO:

Q. Okay. So unless somebody, like, pulls some video and sort of saves it elsewhere, it's going to be automatically written over at some point?

A. Correct.

Q. Do you know how quickly that occurs at the Central Jail?

A. At Central Jail, currently, I believe it's about nine months.

was actually just going to mark this whole batch here as 97. These are retention schedules.
     A. Yes.
     Q. I mean, I guess before we delve into them, what are these?
     A. These are retention schedules put forward and signed by the County of San Diego to all county entities. The global retention schedule is the one that covers all county departments, buildings, et cetera.
     Q. And is that -- I'm sorry.
     A. And then there's a specific sheriff's department retention schedule that the County assigns to the sheriff's department.
     Q. And so looking at this one, beginning at Bates 2036, so this is the global retention policy schedule report?
     A. Yes.
     Q. And -- so what is this -- under description and, like, retention timeframe, for example, what are those two columns sort of mean together?
     A. So this was -- this is the version -- in the upper-right corner it says 7/23/2019. So this is the version that would have been in effect at the time of this. So I believe on page 10 or so,

there's security videos or surveillance videos, something of the sort.

Q. Okay. I see --

A. Maybe on the newer version it's ten. I believe it's all in alphabetical order regarding the -- there we go.

Third from the top says "Security Videos: Any videos relating to county building, property or employee security." Two years for retention timeframe.

Q. Okay. And so earlier when you testified that there was no, like, written policy about retaining videos, why would this not apply here?

A. Oh, no, it does apply. There's nothing that the sheriff's department themselves have said specifically. There's nothing in our policy and procedures section. And prior to, you know, doing my homework for this deposition, I didn't even know that this existed.

Q. Okay. And so I guess I probably missed this. Who promulgates this?

A. The County of San Diego. So I believe the board of supervisors comes together and reviews and revises the retention schedule on a semi-regular basis.

Q. I see. Okay.
Okay. And so do you have any information about how this is interpreted, this quote, "Any videos related to county building, property or employee security"?
A. I mean, I would say it's -- it's right there in black and white, "Any videos relating to county building, property or employee security."
Q. Would you think that would include all of it then, all of the video?
A. In my opinion, yes.
Q. And this code, is this -- would GC stand for government code section here, or do you know?
A. I believe that's what it would stand for. I actually didn't even look at that government code section.
Q. Okay. That's okay.
Okay. And then so moving on to the next set.
A. So that's the newer version.
Q. Okay.
A. And there's actually, I believe, no change between the 2019 and 2023 versions of this. It's just a longer document.
Previous page.

Q. There we go.
Okay. And then I think there's four of them. What is the difference between this and the global?
A. This is the County's specific directive to the sheriff's department on document or video retention.
Q. Okay. And I'm just -- for the record, I should have said that this is the -- this is the PDF that begins on Bates 2058.
A. This is a long document. Since this has already been provided, I do have in -- what I brought, so I can tell you what specific page it's on.
Q. Sure. Thank you so much.
A. So we're not scrolling through 60 pages.
Q. I do know the alphabet though, so I can probably go a little quicker.
A. There's different verbiage here.
Q. Okay?
A. So page 26 -- and these are the only two places. If you took the document, and you searched the word video, there's only two places where it's going to show up in there.
So page 26 it says "Facility Incident

Videos: Store digitally on a detention facility digital video recorder hard drive and/or compact disc. Also stored on video cassette tape if recorded via handheld video recorder."

So that -- facility incident videos. So I would say these were automatically in compliance with, because if there is a specific incident, deputies would typically download that video to attach to a use of force report or a crime report.

So -- and those are uploaded into our net records management system, and then also copied onto a disc and stored into sheriffs evidence.

Q. Okay. And the retention timeframe for that is two years?

A. Correct.

And then on page 55 --

Q. So can I ask you a follow-up question real quick before we move on?

A. Absolutely.

Q. So I understand what you're saying, in terms of it's terms of it's sort of automatic, in a sense that when one incident occurs, they would grab that video and save it, but what would compel them to save it for specifically for two years or more without knowing of this, for example?

well, actually. Let me go back. Sorry.
So the time in the top right corner is December 3rd, 2018.
Do you know if this was the retention policy schedule in effect in March 2022?
A. Correct.
Q. And then turning to the next batch, starting at Bates number 2118, this is also another longer document.
Is this the same as what we looked at before but the most current version?
A. Yes.
Q. Okay.
A. So what I asked for when I was looking for these was current retention schedules, and then whatever the previous version that was archived. So there were no changes in between that 2018 version and the 2024 version.
Q. And who did you seek these from?
A. Sheriff's legal.
Q. Okay. I don't know that I have any additional questions for you.
MS. MELLANO: Give me just one -- ten seconds. Let me just make sure before I move on.

REPORTER'S CERTIFICATE

I, Adriana S. Angulo, Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the witness in the foregoing deposition was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the foregoing cause; that the deposition was then taken before me at the time and place therein named; that said deposition was reported by me in shorthand and later transcribed under my direction, and the preceding pages contain a true record of the testimony of the witness; and I do further certify that I am a disinterested person and am in no way interested in the outcome of said action, or connected with or related to any of the parties in said action, or to their respective counsel.

The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certification null and void.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of October 2024.

Adriana S. Angulo
Certificate No. 13824

# EXHIBIT 12

County Defendants' Objection to Report and Recommendation in *Estate of Schuck v. County of San Diego*, No. 3:23-CV-00785-DMS-AHG (ECF No. 145)

DAVID J. SMITH, Acting County Counsel (SBN 185643)
By STEVEN P. INMAN, II, Senior Deputy (State Bar No. 227748)
SOFIA L. REZVANI, Senior Deputy (State Bar No. 333447)
LINDSEY M. BURNETTE, Senior Deputy (SBN 294888)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 884-2931
Facsimile: (619) 531-6005
Email: Steven.Inman@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, William Gore, Kelly Martinez, Jon Montgomery, DO, Jessica Ramirez, Justin Page, Allan Valbuena, Jameelyn Barrera, Romeo DeGuzman, Emily Lymburn, Carina Echon, Jennifer Vivona, Thomas Mace, and Jeff Amado

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Estate of William Hayden Schuck; Sabrina Schuck; Timothy Schuck,<br><br>Plaintiffs,<br><br>v.<br><br>County of San Diego; Bill Gore, in his individual capacity; Kelly Martinez, in her individual capacity; Coast Hospitalist Medical Associates, Inc., (CCMG); Mark O'Brien, in his individual capacity; Correctional Healthcare Partners, (CHP); NaphCare; Barbara Lee, in her individual capacity; Jon Montgomery, DO, in his individual capacity; Jameelyn Barrera, in her individual capacity; Romeo Deguzman, in his individual capacity; Emily Lymburn, in her individual capacity; Carina Echon, in her individual capacity; Deputies Does 1-10, in their individual capacity; Medical Providers Does 1-6, in their individual capacities; Deputy Supervisor Does 1-6,<br><br>Defendants. | No. 23-cv-00785-DMS-AHG<br><br>**COUNTY DEFENDANTS' OBJECTION TO MAGISTRATE'S REPORT AND RECOMMENDATION CONCERNING PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE**<br><br>Judge: Hon. Dana M. Sabraw<br><br>Magistrate Judge Hon. Allison H. Goddard |

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1
II. PERTINENT FACTS .......... 2
III. STANDARD OF REVIEW .......... 5
IV. NO COUNTY EMPLOYEE INTENTIONALLY DELETED THE VIDEO OR ACTED WITH A CULPABLE STATE OF MIND .......... 5
V. THE MISSING VIDEO DOES NOT PREJUDICE PLAINTIFFS .......... 8
VI. PLAINTIFFS' MOTION WAS UNTIMELY .......... 11
VII. CONCLUSION .......... 12

# Table of Authorities

**Cases** **Page(s)**

*Cottle-Banks v. Cox Commnications, Inc.*, 2013 WL 2244333 (S.D. Cal. May 21, 2013) ........ 11, 12

*Dawson v. Marshall*, 561 F.3d 930 (9th Cir. 2009) ........ 5

*Est. of Arroyo v. Cnty. of San Diego*, 2025 WL 1914399 (S.D. Cal. Apr. 14, 2025) ........ 3, 4, 5, 7

*In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060 (N.D. Cal. 2006) ........ 6

*Karnazes v. County of San Mateo*, 2010 WL 2672003 at *2 (N.D. Cal. July 2, 2010) ........ 6

*Mahboob v. Educ. Credit Mgmt. Corp.*, 2021 WL 791853 (S.D. Cal. Mar. 1, 2021) ........ 11

*McDonnell Douglas Corp. v. Commodore Business Mach., Inc.*, 656 F.2d 1309 (9th Cir. 1981) ........ 5

*Otsuka v. Polo Ralph Lauren Corp.*, 2010 WL 366653 (N.D. Cal. Jan. 25, 2010) ........ 11

*Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604 (C.D. Cal. 2013) ........ 6

*U.S. v. Kitsap Physicians Serv.*, 314 F.3d 995 (9th Cir. 2002) ........ 7

*U.S. v. Reyna–Tapia*, 328 F.3d 1114 (9th Cir. 2003) (en banc) ........ 5

*Wilson v. Cnty. of San Diego*, 2025 WL 1733194 (S.D. Cal. June 23, 2025) ........ 7

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) ........ 10, 5

**Rules and Statutes**

28 U.S.C. § 636 ........ 5

Cal Gov't Code § 26202.6 ........ 8

Fed. R. Civ. P. 37 ........ 1, 3, 6, 8, 10

Fed. R. Civ. P. 26 ........ 8

## I. INTRODUCTION

County Defendants object to Magistrate Judge Goddard's report and recommendation ("R&R") concerning Plaintiff's motion for sanctions for spoliation of evidence. The duty to preserve documents under Federal Rule of Civil Procedure 37(e) requires reasonableness, not perfection. *See* Committee Notes to 2015 Amendment ("This rule recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection."). The parties do not dispute that the subject camera neither showed Schuck in his holding cell, nor even the door to his cell (to enable jurors to assess the adequacy of safety checks). The camera pointed down the hallway from a position directly above Schuck's cell door, and could neither tilt nor pivot. Because the camera could neither record Schuck in his cell nor record safety checks of Schuck, the County did not believe the video from that camera was relevant or that it had a duty to preserve it.

Neither Plaintiffs' preservation request nor their government claim sought preservation of such video or suggested that Plaintiffs' theory would be that Schuck was "forgotten" in the holding cell. The County could not have anticipated that Plaintiffs would come up with such a theory—particularly when no evidence exists to support it. In fact, this theory is inconsistent with evidence in the case that the second floor of the jail was overcrowded during the COVID-19 intake quarantines—not filled with empty spaces where inmates could be forgotten—and that inmates arriving after Schuck were being placed in holding cells in the same area.

The County and its counsel had a good faith belief that all video of Schuck had been preserved. The County does acknowledge that the missing video would have shown several seconds of Schuck walking in a hallway. But multiple videos taken only seconds later exist that show Schuck walking down hallways to the clinic (including, for example, Exhibit 20 to Plaintiff's Opposition to the County's Motion for Summary Judgment at timestamp 08:01:45). Videos from a short time later also show Schuck leaving the clinic in fresh, clean clothes and taking the elevator to the outcourts area (Exhibit 22 to Plaintiff's Opposition to the County's Motion for Summary Judgment at timestamp

08:01:45). Thus, no prejudice exists from that missing video that would have been before Schuck went to the medical clinic; before Schuck went to court and interacted with others on the way there, at court, and on the way back from court; and before the video that shows Schuck returning from court, returning to a holding cell, and being taken to his assigned housing in the module where he later died. Substantial video exists that was recorded after the alleged missing video.

No County employee intentionally destroyed the video, and the County did not have a culpable state of mind when the video was overwritten in the normal course. In addition, Plaintiffs have not been prejudiced, and even if they had, less severe measures would exist to overcome it. Finally, Plaintiffs' motion should have been denied as untimely. Accordingly, County Defendants respectfully request that the Court sustain this objection to the R&R [ECF No. 142] and not require that an adverse inference instruction be given to the jury.

## II. PERTINENT FACTS

Schuck died from cocaine and MDMA (Ecstasy) toxicity at the San Diego County Jail on March 16, 2022. No party disputes that these drugs were taken prior to Schuck's entry into the Jail. San Diego Police Department officers had arrested Schuck on March 10, 2021, after a traffic collision for driving under the influence and other offenses including possession of a controlled substance and possession of a loaded concealed weapon. Jail staff permitted Schuck's booking into the Central Jail after initially requiring him to go to UCSD Medical Center, where he refused evaluation and was discharged against medical advice. Once booked into the jail, Schuck was placed in a temporary holding cell for intake quarantine and to await his housing assignment.

The COVID-19 pandemic was ongoing at the time of Schuck's booking and severely limited housing availability. At the time of his booking, the jail was housing more than 300 inmates who were supposed to have been transferred to state prison. Inmates booked on different days also had to be housed separately during their quarantine periods. Under these exigent circumstances, deputies placed Schuck in a cell not typically

used to house inmates. ECF No. 118-1, Exh. A (Williamson Depo.) at p. 44:11-22. Deputies previously used cells in this area to hold inmates going to court. *Id*. That area of the second floor of the jail used to connect to the court with a bridge. *Id*. Deputies placed Schuck in one of these holding cells until he completed his intake quarantine and regular housing became available.

The temporary court holding cells do not have video surveillance pointing at all of the cell doors the way that the regular housing modules do; and the CCTV camera in Schuck's area was mounted directly above his door. *Id*. at pp. 34:17-35:23. Video from the camera could not have shown Schuck inside of his cell or even activity at the doorway to his cell (including safety checks) during the approximately 91 hours that Schuck remained in the holding cell awaiting housing and the completion of his intake quarantine.

Because footage from that camera would not have shown Schuck inside the cell or the safety checks at Schuck's cell door, no one at the Sheriff's Office believed footage from that camera was relevant or that the County had any duty to preserve it. This issue is similar to that in another jail case, *Estate of Arroyo v. County of San Diego*. There, the report and recommendation found no duty to preserve hallway video. *Est. of Arroyo v. Cnty. of San Diego*, 2025 WL 1914399, at *8 (S.D. Cal. Apr. 14, 2025). Nevertheless, it was a practice when there were such blindspots to include some hours of video to show generally the compliance with safety checks and the types of activities going on in the area. ECF No. 111-5, Exh. D at p. 36:9-14. Consequently, 36 hours of footage from the camera outside Schuck's cell was pulled following Schuck's entry into the cell as a sampling of activities in the area. Unfortunately, because the written Area Activity Log did not show Schuck leaving the cell at 8:00 a.m. on March 15, 2022 to go to the medical clinic, the deputy who was instructed to pull all video of Schuck would not have known that a few seconds of video of Schuck walking in the hallway would have existed at that time.

///

Deputies took Schuck to court on March 15, 2022. Multiple videos show Schuck walking down various hallways, getting checked by the nurse before going to court, and sitting and walking in the hallways after returning from court. Footage from CCTV videos then shows deputies taking Schuck to his assigned housing when it became available later that day: video from hallways, the elevator, and the housing module in which the deputies placed him.

After Schuck died on the following day, March 16, 2022, the Sheriff's Office assigned Detective Andrijana Van Lingen as the lead detective to investigate the in-custody death. Van Lingen coordinated with another detective, Detective Meyer, to help her get all video surveillance of Schuck during his time at the jail. ECF No. 118-2, Exh. A (Van Lingen Depo) at p. 36:17-23.

While typically detectives investigating an in-custody death do not pull video from every day of an inmate's incarceration—which, though often requested, is not typically feasible due to lengthy stays in custody—Van Lingen instructed Meyer to obtain "as much video as they had on Mr. Schuck and his movements and where he is housed." *Id.* at pp. 71:22-72:1. During her investigation—which began prior to the County's receipt of Plaintiff's document preservation request—Van Lingen believed that she had received all of the video that was available from the six days of Schuck's incarceration. With respect to the time period in which Schuck was in the holding cell below the camera, she testified, "I believe from my understanding that wherever he was housed, that there was no video of that." *Id*. at. 70:4-71:9. In fact, Deputy Williamson confirmed in his deposition that her assessment was accurate. ECF No. 118-1, Exh. A (Williamson Depo.) at p. 55:25-56:4.

///

///

///

The Sheriff's Office and its lawyers, as well as the County's lawyers, believed that all video of Schuck in the Central Jail and of safety checks on Schuck in the Central Jail were preserved—and no one at the Sheriff's Office or the County ever intentionally deleted any video. *Id*. Further, in compliance with the County's retention policy, no video that the County or Sheriff's Office believed was related to Schuck's death was ever overwritten or deleted—all such video was downloaded from the CCTV cameras and produced in this litigation. *Id*. at p. 51:6-14.

## III. STANDARD OF REVIEW

When a party objects to a magistrate's report and recommendation, the district court must make a de *novo* determination with respect to the subject matter of the objection. *See* 28 U.S.C. § 636(b)(1)(B); *Dawson v. Marshall*, 561 F.3d 930, 932 (9th Cir. 2009); *U.S. v. Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc); *accord McDonnell Douglas Corp. v. Commodore Business Mach., Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981). This de novo determination is especially consequential when an adverse inference is recommended. An adverse inference, "is an extreme sanction and should not be given lightly." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003). It often ends litigation because "when a jury is instructed that it may infer that the party who destroyed potentially relevant evidence did so 'out of a realization that the evidence was unfavorable,' the party suffering this instruction will be hard-pressed to prevail on the merits." *Id*. at 219-20 (cleaned-up). Consequently, a court should exercise great care in determining whether an adverse inference is warranted.

## IV. NO COUNTY EMPLOYEE INTENTIONALLY DELETED THE VIDEO OR ACTED WITH A CULPABLE STATE OF MIND

The County objects to the recommendation of an adverse inference because no County employee intentionally deleted the video, nor did any employee act with a culpable state of mind (e.g., willfulness or gross negligence) in allowing it to be overwritten. "A party seeking an adverse inference instruction based on the destruction of evidence must establish . . . that the records were destroyed with a culpable state of

mind." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1078 (N.D. Cal. 2006). That requires willfulness or at the very least gross negligence. *Karnazes v. County of San Mateo*, 2010 WL 2672003 at *2 (N.D. Cal. July 2, 2010) ("An adverse inference instruction may be appropriate where a party's bad faith or gross negligence has resulted in either the spoliation of evidence or failure to turn over relevant evidence."). *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 627 (C.D. Cal. 2013).

Plaintiffs did not allege bad faith, and the R&R does not include any finding of bad faith or even reach that issue. ECF No. 142 at 27. The facts and circumstances surrounding the video do not demonstrate gross negligence either. Plaintiffs requested the preservation of "videos and photographs of Mr. Schuck or related events." Detectives from the Sheriff's homicide unit had already gone through the process of collecting and preserving all video of Schuck. The County was aware of this and had no reason to believe the detectives had not complied with the lead Homicide investigator's instructions.

Plaintiffs sent a preservation letter for video relating to Schuck's "arrest on March 10, his time in custody, and death" or "related events." Such video was preserved. But when Plaintiffs filed their motion for sanctions, they changed their focus from Schuck to the activities of jail staff in the hallways. The preservation letter did not ask for preservation of video of the hallways near Plaintiff's cell or of Sheriff staff walking near Plaintiff's cell. At best the preservation letter was ambiguous with respect to hallways outside of Schuck's cell. See ECF No. 142 at 11. Nor did Plaintiff's government claim form put the County on notice that Plaintiffs were seeking preservation of video that showed the hallways near Schuck's cell or Sheriff staff walking near Plaintiff's cell. Rule 37(e) "does not apply when information is lost before a duty to preserve arises." (Committee Notes to 2015 Amendment of Rule 37.)

///

///

///

In these circumstances, a recent Southern District of California case involving similar allegations about deletion of jail hallway footage is instructive. In that case, Magistrate Judge Steve B. Chu determined the County's conduct in not preserving hallway footage was reasonable. Judge Chu's well-reasoned analysis below reaches a different conclusion than the R&R at issue here:

> Plaintiffs argue that the north/south hallway footage could have "support[ed] their allegations of inadequate safety checks." (ECF No. 179-1 at 11.) Their current focus has shifted away from footage showing Mr. Moreno, and towards the deputies' conduct in the hallway. **In so arguing, Plaintiffs effectively contend that their current focus on the deputies' conduct in the hallway should retroactively dictate whether the County had a legal duty to preserve the north/south hallway footage at a much earlier point in the litigation**. As the Rule 37(e) advisory notes makes clear, the applicable standard is reasonableness, not perfection. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. The County's conduct may not rise to the level of perfection, but the Court finds that it meets the standard of reasonableness. Accordingly, the Court finds that Plaintiffs' preservation letter did not give rise to a duty to preserve the north/south hallway footage outside of Mr. Moreno's cell.

*Est. of Arroyo v. Cnty. of San Diego*, 2025 WL 1914399, at *8 (S.D. Cal. Apr. 14, 2025), *report and recommendation adopted sub nom*., *Est. of Arroyo by & through Wilson v. Cnty. of San Diego*, No. 3:21-CV-01956-RBM-SBC, 2025 WL 1733194 (S.D. Cal. June 23, 2025) (emphasis added). Similarly, in this case, Plaintiffs did not request footage of the hallway to be preserved, and the County had no reason to believe that the footage would be relevant in litigation – especially when the footage would not show Schuck, or into his cell, or the area just outside his cell. *See U.S. v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (holding that spoliation requires notice that the records destroyed were potentially relevant to litigation).

Additionally, the R&R includes several unwarranted inferences. First, County Counsel did not know at the time of the Case Management Conference that any video depicting Schuck was missing and would not have imagined that video that neither showed Schuck nor even his cell door to check the adequacy of safety checks would be at

issue. Even as late as Captain Williamson's PMK deposition testimony on October 11, 2024, the County believed that "all of the video where Mr. Schuck was on video was pulled." Counsel's statements during the Rule 26(f) conference that they did not anticipate any preservation issues were accurate at that time.

The R&R also infers intent to deprive from the Sheriff's Office's alleged failure to follow document retention policies. The statement in the R&R that Captain Williamson testified that the County's failure to preserve violated its own retention policies, however, is inaccurate. Captain Williamson testified that "facility incidents" are preserved for two years: deputies download the video, attach it to a use of force or crime report, and then they are uploaded to a net records management system, and also copied onto a disc and stored in the Sheriff's evidence locker for at least the two-year retention timeframe. ECF No. 111-5, Exh D (Williamson Depo) at p. 50:5-15. In this case, however, the subject video did not show "facility incident." Additionally, although the R&R stated County policy requires jail video to be preserved for two years, that County policy refers to documents in general, not jail video. State law allows destruction of jail surveillance video after one year. California Government Code § 26202.6. Accordingly, because the County had no reason to believe that it needed to preserve the hallway video, had no knowledge that video footage of Schuck was missing, and did not fail to comply with the facility incident video retention policy, the overwriting of the video did not occur with a "culpable mind" and an adverse inference is not warranted.

## V. THE MISSING VIDEO DOES NOT PREJUDICE PLAINTIFFS

The recommended adverse inference is also inappropriate because it is greater than necessary to cure any prejudice. Fed R. Civ. Proc. 37(e) (the court "may order measures no greater than necessary to cure the prejudice."). Other evidence in the case demonstrates that Plaintiffs suffered no prejudice or very little, if any. The parties agree that the camera at issue was directly above the holding cell and had no direct visibility of the cell. Video from that camera neither shows the interior of the cell nor the cell doorway. Therefore, the statement in the R&R that Plaintiffs would have been able to see

safety checks on Schuck or details of Schuck's interaction with Deputy Holman and Corporal Gonzalez, including their reactions to seeing Schuck and the state of his cell, is not accurate. The video may have shown deputies headed in the direction of Schuck cell, but a juror could not tell from the video whether the deputy was checking on or delivering a meal to Schuck or another detainee in the same area.[1]

The assertion that the video could have demonstrated that Schuck was "forgotten" in that area is also contrary to evidence. The 36 hours of video produced from the camera shows that while Schuck may have been the first detainee placed in that area, as Captain Williamson testified, "as the time goes on, you can see the other cell doors being closed and people being placed in those cells; in some of those cases, multiple people being placed in those cells and not just a single person." ECF No. 111-5, Exh D (Williamson Depo) at p.61:14-20. Further, a low BMI and dehydration do not prove that Schuck was "forgotten about" in a remote area as Plaintiffs and the R&R suggest. Plaintiffs have argued that Schuck entered the jail with a low BMI and have never asserted the Schuck did not have a water fountain in this cell. No evidence exists to support that theory, rendering Plaintiffs' prejudice argument extremely speculative at best.

Other evidence is also available to cure any perceived prejudice with respect to Plaintiffs' theory. For example, the County has produced deployment logs showing the names of deputies assigned to the safety floor. A dozen or more of those listed (all except Deputy Holman and Cpl. Gonzalez) have never been deposed in this lawsuit and could have information about the holding cells in use during the period Schuck was in the jail and whether detainees were ever "forgotten" in those cells.

Plaintiffs can also claim no prejudice with respect to the assessment of Schuck's physical condition. As discussed above, the only missing video of Schuck from the camera above his cell would be a few seconds of video of his walking away from his cell in the hallway. But the County produced videos of Schuck walking down hallways

[1] The R&R also asserts that the video could have shown individuals bringing drugs to Schuck, but while initially believed to be an overdose, no party alleges that Schuck obtained drugs while in jail.

immediately after that from which a jury could assess Schuck's condition (see e.g., Plaintiff's Exhibit 20 in support of Plaintiff's Opposition to the Motion for Summary Judgment at time stamp 08:01:45). Video footage produced from the same date as the allegedly missing moment includes videos that show Schuck walking down hallways to get to the medical clinic; walking down hallways to the transportation area to leave for court after going to the medical clinic; walking down hallways and being placed in a different holding cell after returning from court; and walking down hallways and riding the elevator to the housing module after receiving his housing assignment. Thus, a plethora of footage exists that jurors will use to assess Schuck's physical condition after leaving the holding cell and to assess whether jail staff should have believed that he was in need of immediate care. Consequently, Plaintiffs have not suffered prejudice and will still be able to argue at trial—without a jury instruction—that the jury should take into account the lack of video from that time period.

Because of the lack of prejudice or minimal prejudice due to the "missing" video, and the lack of intent to deprive, the Court should not issue any sanction. However, if the Court does issue a sanction, it should not be an adverse inference instruction. Such a sanction is "extreme" because it results in the sanctioned party being "hard-pressed to prevail on the merits." *Zubulake*, 220 F.R.D. at 220. Under Rule 37, the Court can order an adverse inference instruction only if it finds the party acted with the intent to deprive. Rule 37(e)(2). The evidence does not show County Defendants acted with such an intent.

Thus, if the Court finds the County violated its duty to preserve the video and that the missing video caused Plaintiffs prejudice, the Court may order measures "no greater than necessary to cure the prejudice." Rule 37(e)(1). Given that many hours of video of the area near Shuck's cell were preserved and produced, an adverse inference instruction would be far greater than necessary to cure any prejudice. Thus, if the Court issues a sanction, it should choose a lesser sanction, such as by reopening discovery to allow Plaintiffs to depose second floor deputies for more information about the use of holding cells and the attention given to detainees during the time Schuck was there. They could

also inquire whether anyone had ever been "forgotten" on the floor. Plaintiffs would be free to argue to the jury without an adverse inference about the allegedly missing video. Alternatively, the Court could instruct the jury that the County inadvertently failed to preserve video.

## VI. PLAINTIFFS' MOTION WAS UNTIMELY

The R&R also errs by not recommending the denial of Plaintiffs' motion as untimely. The report acknowledges that Plaintiffs brought their motion "7.5 months after Plaintiffs gathered the facts for a motion." ECF No. 142 at p. 5. Bringing the motion now, after discovery has closed, prejudices the County because the County can no longer seek discovery to counter the adverse inference (*e.g.*, some staff present during Schuck's incarceration have left and would have to be subpoenaed for deposition). *See Otsuka v. Polo Ralph Lauren Corp.*, 2010 WL 366653, at *4 (N.D. Cal. Jan. 25, 2010) ("the Court also observes that plaintiff did not seek the Court's intervention in this matter at any time during the discovery process. Given this procedural history, the Court is not persuaded that it would be appropriate to impose evidentiary sanctions.").

As Judge Schopler previously wrote in a report and recommendation, "[S]poliation motions should be filed as soon as reasonably possible after discovery of the facts that underlie the motion," and "[f]ederal courts have denied such motions when the moving party knew about the evidence destruction and failed to move for sanctions within a reasonable time." *Mahboob v. Educ. Credit Mgmt. Corp.*, 2021 WL 791853, at *2 (S.D. Cal. Mar. 1, 2021), report and recommendation adopted in part, rejected in part, 2021 WL 7448531 (S.D. Cal. Mar. 31, 2021). The case Judge Schopler cited in support of this assertion was *Cottle-Banks v. Cox Commnications, Inc.*, 2013 WL 2244333, at *16 (S.D. Cal. May 21, 2013), in which Judge Gonzalo Curiel ruled that a spoliation motion was untimely when—like this one—it was filed almost nine months after the plaintiff learned that evidence had been overwritten.

Both Judge Schopler and Judge Curiel also ruled in these decisions that spoliation motions are subject to chambers discovery rules. *Mahboob*, 2021 WL 791853 at *2;

*Cottle-Banks*, 2013 WL 2244333 at *16. Judge Goddard's Pretrial Procedures require parties to bring discovery disputes to the Court's attention within 45 days. But Plaintiffs' motion includes an email regarding the dispute dated April 15, 2024—well over a year ago! And the jail videos were produced with written discovery responses that the County served on September 12, 2023—even longer ago. If spoliation motions are subject to chambers discovery rules as Judge Schopler and Judge Curiel have both ruled, then Plaintiffs' motion is clearly untimely.

## VII. CONCLUSION

The County and its employees did not act with a culpable state of mind in allowing video to be overwritten, and the County did not believe the video was relevant or that it had a duty to preserve it. Even if the County was wrong on those issues, Plaintiffs have not been prejudiced. Simply stated, the punishment here far exceeds the proverbial alleged crime and would harm the integrity of the proceedings. Plaintiffs' motion was also untimely and prejudicial because Plaintiffs brought it outside of the discovery period. Accordingly, the County Defendants respectfully request that the Court sustain their objection to the R&R and not sanction the County with an adverse inference instruction.

DATED: August 15, 2025

DAVID J. SMITH, Acting County Counsel

By: s/STEVEN P. INMAN, II, Senior Deputy
Attorneys for County of San Diego, William Gore, Kelly Martinez, Jon Montgomery, DO, Jessica Ramirez, Justin Page, Allan Valbuena, Jameelyn Barrera, Romeo DeGuzman, Emily Lymburn, Carina Echon, Jennifer Vivona, Thomas Mace, and Jeff Amado

# EXHIBIT 13

Deposition of Bethann Schaber, M.D., May 5, 2025 (excerpts)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

JUSTINO RUPARD, INDIVIDUALLY, AND
RONNIE RUPARD, INDIVIDUALLY,

Plaintiffs,

No. 23CV1357 CAB BLM

vs.

COUNTY OF SAN DIEGO, et al,

Defendants.
_________________________________/

VIDEOTAPED
DEPOSITION OF: BETHANN SCHABER, M.D.
(Conducted via videoconference)

DATE: May 5, 2025

TIME: 10:44 a.m. to 12:29 p.m.

BEFORE: KATHLEEN K. OHMAN, RMR
Notary Public, State of Ohio

Pages 1 - 68

Q. And manner of death, you have noted homicide. And could you briefly explain the meaning of homicide in the context of your findings in this autopsy?

A. In this case, the investigation, along with the autopsy, demonstrated that not only in a matter of hours to days, but over weeks to months, there was failure to deliver reasonable or adequate care for Mr. Rupard that ultimately resulted in his death.

Q. Now, I'd like to go into the specific findings that you have set forth in your autopsy summary here. You noted a history of schizophrenia and other psychotic disorders, with refusal to take the prescribed medications while incarcerated.

Let me stop right there. In connection with your ultimate findings that you have discussed with us, you indicated there was an investigation, and in that regard I understand that you had the opportunity to review information concerning the medical records of Mr. Rupard, as well as other documents that were provided to you. Am I correct in that?

A. There were records from the jail that were provided to me from the San Diego Sheriff's

REPORTER'S CERTIFICATE

STATE OF OHIO
COUNTY OF FRANKLIN

I, KATHLEEN K. OHMAN, Registered Merit Reporter, certify that I was authorized to and did stenographically report the deposition of BETHANN SCHABER, M.D.; that a review of the transcript WAS NOT requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 13th day of May, 2025.

KATHLEEN K. OHMAN, RMR