**Rada Feldman, Esq. (State Bar No. 285931)**
**Nicholas R. Colletti, Esq. (State Bar No. 283947)**
**Robert S. Kahn, Esq. (State Bar No. 231277)**
**Caroline M. Park, Esq. (State Bar No. 334008)**
**Cristina I. Butoiu, Esq. (State Bar No. 335902)**
**COLLINS + COLLINS LLP**
**2011 Palomar Airport Road, Suite 207**
**Carlsbad, CA 92011**
**(760) 274-2110 - FAX (760) 274-2111**
**Email: rfeldman@ccllp.law**
**Email: ncolletti@ccllp.law**
**Email: rkahn@ccllp.law**
**Email: cpark@ccllp.law**
**Email: cbutoiu@ccllp.law**

Attorneys for Defendants,
COUNTY OF SAN DIEGO, BILL GORE, KELLY MARTINEZ, JON MONTGOMERY, CHRISTINA GOODALL (sued as CHRISTINA ANOSIKE), MIGUEL AGUILERA, JASON VILADIU, GUSTAVO MARTINEZ, JEFF AMADO, ERNESTO AGUIRRE, TREYVONNE JAMES (sued in duplicate J. TREYVONNE), BERNARDO ROMERO, MICHAEL JOHNSON, ANDREW TORRES, ALLEN WERESKI, BLADE ROMANS, LINDA GUTIERREZ, AND THOMAS MACE

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ESTATE OF LONNIE RUPARD, THROUGH ITS COURT-APPOINTED ADMINISTRATOR TERRI LOPEZ;

Plaintiffs,

vs.

COUNTY OF SAN DIEGO; et al.

Defendants.

CASE NO. 3:23-cv-1357-CAB-JAC
***Assigned to Hon. Cathy Ann Bencivengo***
***Magistrate Hon. Janet A. Cabral in Dept. 15A***

**DECLARATION OF ROBERT S. KAHN IN SUPPORT OF DEFENDANT COUNTY OF SAN DIEGO'S MOTION TO EXCLUDE OR LIMIT THE OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERT GARY RANEY**

Date: December 18, 2026
Time: __________
Dept.: 15A

*25163*



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**Complaint Filed: 7/26/2023**
**Trial Date: 2/22/2027**

## DECLARATION OF ROBERT S. KAHN

I, Robert S. Kahn, declare as follows:

1. I am an attorney licensed to practice before this Court and a Senior Associate attorney at Collins + Collins LLP, counsel of record for Defendant County of San Diego (the "County") in this action. I make this declaration in support of the County's Motion to Exclude or Limit the Opinions and Testimony of Plaintiff's retained jail-practices expert, Gary L. Raney. I have personal knowledge of the matters stated herein and, if called as a witness, could and would testify competently to them. As to matters concerning the contents of the records and transcripts identified below, my knowledge is based on my personal review of those documents in the course of representing the County.

2. I submit this declaration to authenticate and place before the Court the documentary evidence on which the County's motion relies, pursuant to Civil Local Rule 7.1.

3. **Plaintiffs' expert disclosures and Mr. Raney's report.** Attached hereto as **Exhibit A** is a true and correct copy of the relevant portions of Plaintiffs' Expert Witness Disclosures and Reports Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), including the signed expert report of Gary L. Raney, which was executed on July 14, 2026. Exhibit A also includes the portions of Plaintiffs' expert designations identifying Plaintiffs' retained experts in this action, which separately designate physicians to address the medical, psychiatric, and nursing standards of care and a forensic pathologist to address the cause and manner of death. Those designations also separately retain Plaintiffs' correctional-health-systems expert, Dr. Homer Venters, to address jail health care, inmate monitoring, segregation housing, and systemic or organizational jail practices — the same custody subjects addressed by Mr. Raney. Based on my review of Mr. Raney's report: (a) the report does not state any opinion, to a

*25163*



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

reasonable degree of medical certainty, on the cause of Mr. Rupard's death, and instead reproduces and adopts the Medical Examiner's determination that the cause of death was "pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia" and the manner of death was "homicide"; (b) the report relies on California Title 15, American Correctional Association (ACA) accreditation standards, Mr. Raney's self-defined "generally accepted jail practices," and internal Sheriff's Department policies as the measure of the County's conduct, states that ACA standards are "not compulsory," and defines "generally accepted correctional practices" as practices that "would be used to create standards if it were possible" because there are "no compulsory national correctional standards"; (c) the report opines that the Sheriff's Department "violated California Title 15, [ACA] accreditation standards, generally accepted jail practices, and its own policy," that each deputy had a "legal and ethical obligation" and was "increasingly culpable," and that staff "intentionally ignored" the cell's condition; (d) the report criticizes Detective Blumenshine's death investigation as failing to "conduct a thorough investigation that collected all the pertinent evidence"; and (e) the report's "Method" section describes Mr. Raney's approach as comparing the facts, based on his experience, to "applicable laws, standards, and generally accepted correctional practices."

4. **Mr. Raney's deposition.** The videotaped deposition of Mr. Raney was taken in this action on September 3, 2026. Attached hereto as **Exhibit B** is a true and correct copy of the relevant excerpts of the certified transcript of that deposition. The excerpts in Exhibit B include, among others, the following testimony cited in the County's motion:

a. Transcript pages 39, 59, and 61, in which Mr. Raney testified that, asked how the condition of Mr. Rupard's cell contributed to or was related to his death, "I'm not qualified to answer that," that he "can't offer that medical opinion" as to Mr. Rupard's final hours, and that he relied on the Medical Examiner for the cause of death; and page 68, in which he testified he is "not qualified to offer a medical opinion" yet

*25163*



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

opined that Mr. Rupard "would have had a difficult time walking in the last day or two prior to his death."

b. Transcript pages 16, 37 through 38, and 54 through 55, in which Mr. Raney testified that ACA "[a]ccreditation is voluntary" and "does not establish a greater constitutional mandate," that membership in the ACA confers no certification, that there are "no compulsory jail standards in the United States" and no "mandatory jail practices in California other than Title 15," and that he could identify no statute requiring the cell-cleaning practice he faulted.

c. Transcript pages 35 and 60, in which Mr. Raney testified that whether staff conduct was reasonable is "up to [the jury], not up to me," and that whether deputies "saw it and ignored it or whether they never saw it … would be up to them."

d. Transcript pages 32, 48 through 49, and 60, in which Mr. Raney described his process as reviewing "the facts of the case, the reports, the policies, the videos," testified that identifying who committed the asserted Title 15 safety-check violation "would only be supposition" because of "poor logging … that didn't record … who conducted those safety checks," and testified that "[w]e don't know who checked on him when."

e. Transcript pages 17, 24, and 56, in which Mr. Raney testified that, apart from his degrees, he holds no current special licenses or certifications, that he has had no substantially similar starvation or malnourishment case in the preceding four years, and that his training-failure opinion rests on "inference … regardless of what the training materials may have said," having not reviewed the Sheriff's training curriculum.

f. Transcript pages 39 and 71 through 72, in which Mr. Raney testified that his basis for criticizing Detective Blumenshine's death investigation was that it is "self-evident" and "beyond belief."

*25163*



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

g. Transcript pages 12 through 14, 31, and 32, in which Mr. Raney confirmed that he has served only his July 14, 2026 report and his August 5, 2026 rebuttal report, that he plans no additional or supplemental reports, that his remaining work in the case is "[o]nly testimony," and that nothing further is needed "for the current opinions."

5. **Mr. Raney's rebuttal report.** Attached hereto as **Exhibit C** is a true and correct copy of Mr. Raney's rebuttal expert report, dated August 5, 2026, as served by Plaintiffs. In that report, Mr. Raney states that "the determination of indifference or negligence is the decision of the finder of fact."

6. **Medical Examiner's report.** Attached hereto as **Exhibit D** are true and correct copies of the relevant portions of the County of San Diego Medical Examiner's report concerning the death of Lonnie Rupard, which certifies the cause of death as "Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia" and the manner of death as homicide, and which Mr. Raney reproduces and adopts in his report.

7. The excerpts attached as Exhibit B are drawn from the certified transcript of Mr. Raney's deposition. The County reserves the right to lodge the complete certified transcript and the videotaped recording with the Court and will provide any additional portions the Court wishes to review.

8. The exhibits attached to this declaration are paginated in consecutive order, and a table of contents indicating the page number of each exhibit precedes the exhibits, in compliance with Civil Local Rule 5.1 and the Court's CM/ECF procedures.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 13, 2026, at Pasadena, California.

ROBERT S. KAHN

*25163*



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

# EXHIBIT "A"

EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

JEREMIAH A. LOWE (CA SBN 239166)
*jeremiah@lowelawapc.com*
LOWE LAW, APC
402 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 878-2725
Facsimile: (619) 878-2737

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ESTATE OF LONNIE RUPARD,

Plaintiff,

v.

COUNTY OF SAN DIEGO, *et al.*,

Defendants.

CASE NO. 23-CV-1357-CAB-JAC

**PLAINTIFF'S EXPERT WITNESS DISCLOSURES AND REPORTS PURSUANT TO FED. R. CIV. P. 26(a)(2)(B)**

Plaintiff the Estate of Lonnie Rupard, by and through its attorneys of record, Iredale & Yoo, APC and Lowe Law, APC, hereby submits the following expert witness reports pursuant to Fed. R. Civ. P. 26(a)(2)(B).

**RETAINED EXPERT REPORTS**

1. Homer Venters, M.D.: Dr. Venters' expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 1**.
2. Daphne A. Glindmeyer, M.D.: Dr. Glindmeyer's expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 2**.
3. Gary Raney: Mr. Raney's expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 3**.
4. Lori E. Roscoe, DNP: Dr. Roscoe's expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 4**.

Respectfully submitted,

DATED: July 15, 2026

**IREDALE & YOO, APC**
EUGENE G. IREDALE
JULIA YOO
SARAH MUSUMECI

*s/ Eugene Iredale*
Attorneys for Plaintiff

DATED: July 15, 2026

**LOWE LAW, APC**
JEREMIAH LOWE

*s/ Jeremiah Lowe*
Attorney for Plaintiff

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**
**Case No.: 3:23-cv-01357**
**Estate of Lonnie Rupard, Plaintiff,**
**vs**
**County of San Diego et al, Defendants**

# REPORT OF EXPERT WITNESS GARY RANEY

**July 14, 2026**

## QUALIFICATIONS

I was hired by the Ada County (Idaho) Sheriff's Office in 1983 and served in a wide range of operational, supervisory, and executive roles over the course of my 32-year career with the Office. My assignments included jail operations and administration, patrol, criminal investigations, internal affairs, administrative investigations, training, and other specialized duties. During my tenure, I served as a training officer in the jail, patrol, and detective divisions and was responsible for developing, revising, and updating training programs for each division. I rose through the ranks and, in 2004, was elected Sheriff, serving in that capacity until I retired in 2015.

During my tenure as Sheriff, I was appointed by the Governor to the Idaho Peace Officer Standards & Training (POST) Council and later served as its chair. POST is responsible for providing or approving nearly all law enforcement and correctional training in Idaho, including legal instruction and jail operations training. For part of my service on the Council, I also chaired the POST Hearing and Decertification Board, which reviewed and made recommendations on officer decertification. As chair, I played a key role in updating the administrative rules governing POST operations and the Council's disciplinary review and decision-making processes.

I was also appointed by the Governor to the Idaho Criminal Justice Commission (ICJC), where I served as vice chair until my retirement. The ICJC was responsible for identifying opportunities for statewide criminal justice reform and submitting policy recommendations to the Idaho Legislature.

In 2010, I was appointed by the U.S. Attorney General to the board of the National Institute of Corrections (NIC) in Washington, D.C., where I served as vice chair. I am also a past president of the Idaho Sheriffs' Association.

Throughout my career, I have provided instruction and presentations to thousands of law enforcement professionals across the United States. These presentations included training for the

National Sheriffs' Association, American Jail Association, American Correctional Association, Police Executive Research Forum, Americans for Effective Law Enforcement, and the sheriffs' associations of Idaho, Utah, Oregon, and Texas, as well as judicial conferences in Idaho, Maryland, New Mexico, South Dakota, and St. Croix. Many of these presentations focused on policy development, training systems, organizational accountability, and best practices in jail operations.

I hold both Bachelor's and Master's degrees in Criminal Justice Administration from Boise State University. I am a graduate of Northwestern University's School of Police Staff and Command, the FBI National Academy, the FBI Law Enforcement Executive Development Seminar, and the FBI National Executive Institute. I have earned Advanced, Supervision, Management, and Executive Certificates from Idaho POST. I taught for many years at the Idaho Peace Officer Academy, Northwestern University's Center for Public Safety, and Boise State University. I began consulting independently with law enforcement agencies in 2007 and have done so continuously since then.

I am currently the President of G.A.R., Inc., and I work for the U.S. Department of Justice and independently as a consultant in jail and law enforcement policy and practice. I have provided analyses, recommendations, and expert opinions in more than 40 states.

In 2018, I was appointed by a federal court as a consent decree court monitor for the San Bernardino County Jail in California. The San Bernardino County jail system comprises approximately 6,000 beds across eight jails, four of which are large facilities. By working with staff to improve its policies and practices, the system reached substantial compliance, and the Consent Decree was terminated.

In 2019, I was appointed as a federal consent decree court monitor for the Santa Clara County Jail in California. The Santa Clara County jail system initially included almost 5,000 beds across two facilities, but population-reduction strategies have reduced the average daily population to well below 4,000. The jail system has achieved substantial compliance in most areas but remains noncompliant in others.

In March 2022, Miami-Dade County hired me as a consultant because it was losing substantial ground in its jail consent judgment compliance ratings, and the federal court was threatening receivership. After demonstrating progress to the court, in February 2023, the federal court appointed me as the Independent Compliance Director (receiver) for the Miami-Dade Corrections and Rehabilitation Department, with responsibility for bringing the jail system into substantial compliance with all remaining provisions. By working with the jail staff to improve policies and practices, substantial compliance was fully achieved in August 2023, and the consent judgment was terminated in April 2025.

In 2023, the Department of Justice hired me to conduct a constitutional compliance investigation into correctional practices at the Fulton County Jail in Atlanta, Georgia. The jail system housed around 3,000 inmates across three locations. Serious constitutional violations were uncovered, including violations related to protection from harm, use of force, classification, segregation, sanitation, and healthcare. Shortly after the Department of Justice report was issued, Fulton County agreed to enter a consent decree with little objection to the findings.

In 2025, the New York City Department of Correction, commonly known as Rikers Island, hired me as a consultant to recommend strategies to achieve substantial compliance with 18 provisions of its consent judgment that were in the third contempt order. I led reforms related to the use of force, classification, housing practices, and other violence reduction strategies. In 2026, the federal court appointed a Remediation Manager (receiver) to oversee the jail system, and the mayor replaced the sitting commissioner with someone with no prior correctional leadership experience, so my work is currently inactive.

In addition to consulting on law enforcement policy and practice, I provide expert witness services focused on use of force, in-custody deaths, and jail policies. Over the course of my career, I have been directly involved in or have reviewed thousands of cases involving jail practices as a line officer, supervisor, administrator, sheriff, and consultant. I have written or reviewed hundreds of policies and guided jails in implementing best practices across several areas. I have also provided executive, leadership, and strategic planning services to various organizations.

Additional publications, professional engagements, and recognitions are listed in my attached curriculum vitae.

## COMPENSATION

I am being compensated at a rate of $500.00 per hour for my work in this matter. My compensation is not contingent on the outcome of this litigation or the substance of my opinions.

## PRIOR TESTIMONY

A list of cases in which I have testified at trial or by deposition during the preceding four years is set forth in my attached curriculum vitae.

## METHOD

In analyzing the materials and forming my opinions, I drew upon my more than 40 years of experience in correctional administration, including my direct oversight of large jail systems as a sheriff, federal court-appointed monitor, and federal receiver. After understanding what is alleged to have occurred, I applied a methodology to compare the acts and omissions against

applicable laws, standards, and generally accepted correctional practices. Since there are no compulsory national correctional standards, *generally accepted correctional practices* are those widely agreed-upon practices that would be used to create standards if it were possible.

I then compared the individual acts and omissions and the agency's policies, practices, training and administrative acts or omissions against generally accepted correctional practices, constitutional requirements, and the practices I have observed and implemented in comparable large correctional systems throughout the country. My analysis, where applicable, evaluated whether the agency acted as a reasonable corrections administrator under the circumstances presented.

All the opinions below are based on my education, training, and experience, as well as my review of the evidence, documentation, and other information that may have been considered in forming them. My opinions are held to a reasonable degree of professional certainty.

A complete list of materials to date is attached as ***Exhibit A***.

Statements or testimony documented in this report may have been edited for grammar or punctuation for readability, but no substantive information was changed.

## OVERVIEW

On December 19, 2021, Lonnie Rupard was arrested and booked into the San Diego Sheriff's Office (SDSO) Central Jail. His behavior, apparently caused by mental illness, caused him to be housed on the 7th floor in module D, cell 17. Module D typically housed IPs designated for administrative segregation.

On March 17, 2022, Rupard died in the cell. The cause of death included malnutrition and dehydration. Although there was an initial investigation by a homicide detective, it was incomplete and restarted after the February 8, 2023, autopsy report listed the manner of death as homicide. By that time, the video recordings had been erased, and the witnesses' memories had faded.

The investigation revealed that there were about nine days of accumulated food containers and associated trash, as well as feces in his cell at the time of his death.

## SUMMARY OF OPINIONS

1. The SDSO staff violated California Title 15, American Correctional Association (ACA) accreditation standards, generally accepted jail practices, and its own policy by failing to monitor Rupard's well-being and take action to keep his cell reasonably clean. Had they done so, it is more likely than not that they would have recognized his deteriorating physical health.
2. The SDSO violated generally accepted jail practices by failing to provide sufficient training and supervision on California Title 15 requirements on cleanliness and housekeeping as well as recognizing and responding to unsanitary conditions, especially involving someone with a mental illness.
3. The SDSO, particularly Detective Blumenshine, failed to follow generally accepted law enforcement practices and conduct a thorough investigation that collected all the pertinent evidence.

## DEATH INVESTIGATION

SDSO Homicide Detective M. Blumenshine was the lead investigator.

"On December 19, 2021, Lonnie Rupard (10/1/ 75) was arrested for a probation revocation by the National City Police Department. Inmate Rupard was booked into the San Diego Central Jail.

"On March 18, 2022, Inmate Rupard was housed in 7th-floor Module D, Cell 17. Inmate Rupard had no cellmate.

"At 2248 hours, Deputy Romans was conducting a security check in Module D. Deputy Romans looked in Cell 17 but could not see the rise and fall of Inmate Rupard's chest. Deputy Mendoza

and Deputy Gutierrez responded to assist Deputy Romans. At 2250 hours, the deputies entered cell 17. Rupard was moved onto the floor and CPR was initiated.

At 2253 hours, medical staff arrived and took over lifesaving measures. No pulse or breathing was observed."[1]

---

"Rupard refused every offer for the COVID-19 vaccine. Rupard had numerous notes regarding refusal to take medication and being verbally combative with medical staff. Additionally, Rupard routinely refused to comply during psychiatric evaluations.

"On Saturday, March 19, 2022, at 0850 hours, FET Gervasoni, FET Racicot, and I attended the autopsy of Lonnie Rupard conducted by Forensic Pathologist Doctor Schaber, case #2022-01007. The decedent appeared severely emaciated and had a peptic ulcer. He may have had pneumonia.

"On February 9, 2022, Christina Anosike, a mental health clinician, attempted to evaluate Rupard. Rupard stated, "I am fine. I don't want to talk to you." Anosike noted Rupard was clean, and his cell appeared clean aside from some open food containers. His cell was free of urine, feces, or flooring. She scheduled a future contact in two weeks to re-evaluate Rupard."[2]

"On Wednesday, October 19, 2022, at 0815 hours, I asked Lieutenant Kopchak if any hygiene inspections were done. Lieutenant Kopchak notified me the last logged hygiene inspection was on March 5, 2022. However, after a review of the video, it appeared the inspection was not completed. Additionally, the housing unit log was not completed regarding as to why the hygiene inspection was not completed. That investigation into the lack of hygiene inspections falls under the Internal Affairs purview and as such I will not be investigating the policy violations.

"Rupard's housing block, 7D, was classified as COVID quarantine and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health."[3]

On Wednesday, October 19, 2022, at 1152 hours, I received a copy of the Forensic Psychiatry Clinic report on Mental Competency by Dr. Nicolas Badre. I also received the Forensic Psychiatry Clinic Report on Involuntary Medication to Restore Competency report by Dr. Nicolas Badre. I reviewed both reports and discovered the following.

- Dr. Badre went to see Lonnie Rupard while in custody at the San Diego Central Jail at the direction of the Honorable Judge Cindy David. Dr. Badre was present to examine Rupard for mental competency to stand trial.
- Dr. Badre reviewed Rupard's jail psychiatric records.

---

[1] COSD 001638
[2] COSD 001643
[3] COSD 001660

- Dr. Badre spoke with Rupard at his cell at the recommendation of jail mental health staff and floor deputies.
- The cell was dirty with trash throughout. The toilet was full of excrement, and the room was very malodorous.
- The defendant was unkempt and dirty himself. He was lying in bed in an uncomfortable manner with a blanket over his head.
- There were feces on the floor. There was food smeared on the wall.
- It required the food flap and a very loud introduction on my part to get the defendant's attention.
- Dr. Badre attempted to interview Rupard. Rupard was hostile, continually referring to Dr. Badre as "dog", asking for water, and insulting him. Rupard ultimately placed a blanket over his head and ignored Dr. Badre.
- Dr. Badre wrote his Findings and Opinions as follows:
    - Given the information I have, it is my opinion with reasonable medical certainty that the defendant is unable to have a rational and factual understanding of the charges and is unable to assist counsel in a rational manner.
    - While the defendant's lack of cooperation is likely in part volitional. I think that is motivated by underlying disorganization of thought, which would be consistent with prior evaluation that diagnosed him to be psychotic.
    - The defendant suffers from mental illness, displaying active signs of mental illness, including disorganized thinking. Those symptoms of mental illness disable the defendant from being able to have a rational understanding of the charges and assist legal counsel.
    - I would recommend that the defendant be referred to a station hospital or JBCT program for restoration to competency."[4]

"Dr. Badre's report was dated March 24, 2022, which is 7 days after Rupard died.[5]

"On Sunday, December 19, 2021, Rupard refused to take his medication during the booking process. Over the course of his incarceration, his refusal was documented many more times.

- On Thursday, December 30, 2021. (3 times)
- On Friday, December 31, 2021. (2 times)
- On Saturday, January 1, 2022. (2 times)
- On Sunday, January 2, 2022.
- On Monday, January 3, 2022.
- On Tuesday, January 4, 2022.

---

[4] COSD 001661-2
[5] COSD 001661-2

- On Wednesday, January 5, 2022. (2 times)
- On Thursday, January 6, 2022.
- On Saturday, January 8, 2022. (2 times)
- On Sunday, January 9, 2022. (2 times)
- On Monday, January 10, 2022.
- On Tuesday, January 11, 2022. (2 times)
- On Wednesday, January 12, 2022.
- On Thursday, January 13, 2022. (2 times)
- On Friday, January 14, 2022. (2 times)
- On Saturday, January 15, 2022. (2 times)
- On Sunday, January 16, 2022.
- On Monday, January 17, 2022. (2 times)
- On Tuesday, January 18, 2022.
- On Wednesday, January 19, 2022. (2 times)
- On Thursday, January 20, 2022."[6]

On Sunday, December 19, 2021, Rupard had his vital signs checked twice.

- At 0251 hours, Rupard had blood pressure of 128/82 with a pulse of 90.
- At 1136 hours, Rupard had blood pressure of 120/74 with a pulse of 110.

Rupard's vital signs were never checked again until his death on March 17, 2022.[7]

"I began a search of the cell for any narcotics or paraphernalia. I did not locate any illegal substances. There were feces and old food throughout the cell. The toilet and sink were full of fecal matter. There were feces in two corners of the room on the ground, feces on the bedroll, feces on the bottom bunk under the bedroll, feces on the ground, feces on the table, and strewn about the rest of the room. The sink in the cell was operable."[8]

"I later checked the speaker box inside cell 17 and confirmed that, although the speaker had been vandalized, I was able to hear the deputy when he shouted, and I had my ear pressed up to the box."[9]

"On Thursday, March 17, 2022, at 2246 hours, Inmate Lonnie Rupard (10/1/75) was found unresponsive in his cell. Deputies and medical staff attempted lifesaving measures until

---

[6] COSD 001662-3
[7] COSD 001663
[8] COSD 001641
[9] COSD 001641

paramedics arrived. Inmate Rupard was transferred to UCSD Hospital before being pronounced deceased at 2351 hours by Dr. Allen."[10]

"Rupard's cell was in a dismal state; however, not uncommon for housing of inmates with psychiatric history. Rupard had roughly 28 meal containers in his cell at the time of his death ( ~ 9 days' worth of trash). In review of the containers, most had been opened, and many of the food items were missing. While there was food on the floor, table, and bed of the cell, it would not account for the food missing from the food trays. The food was either eaten or flushed down the toilet. There was feces in the cell, on the bed, floor, blanket, and in the toilet. However, it appeared the feces was smeared and moved, suggesting the feces on the floor and bed originated from about three separate defecations. It was unknown how much feces had been backed up in the toilet, as it was also full of food wrappers and trash, clogging the toilet. The condition of Rupard's cell, while visibly upsetting, was not a factor in his death."[11]

"Rupard's logs show he had been continually refusing his dayroom time, which offers a possible explanation for the trash buildup in his room. An inmate is allowed to clean their cell during their one hour of dayroom. Their cell is opened to the dayroom with trash bins where they can come and go freely during their time. Inmates are also allowed to pass their trash through their food flaps to trustees. If Rupard refused to come out of his cell, and refused to give his trash to trustees, he would have nowhere to throw out his trash.

During the autopsy, Rupard weighed 105 pounds. Rupard weighed 60 pounds less than when he was booked into custody 89 days prior."[12]

Lieutenant Kopchak provided Blumenshine with screenshots from an incident on February 19, 2022, when Rupard was standing in the dayroom, refusing to lock down, and an incident report was created.[13]

"On Monday, March 6, 2023, I began contacting staff at the San Diego Central Jail to acquire surveillance video from the 3-month period Rupard was in custody. Deputy Hann #3492 is the Corporal in charge of the San Diego Central Jail Administration. He reviewed the surveillance video and determined it was no longer available. The video was saved for approximately 6 months back. He also pulled the surveillance video hard drive which was used to save critical incidents. Deputy Hann confirmed the video for this case had not been saved."[14]

"On Thursday, March 9, 2023, a more extensive video review from the incident was done. The 24 hours of video surveillance for Module 7D was reviewed in full. It was confirmed all security

---

[10] COSD 000266
[11] COSD 001676
[12] COSD 001676
[13] COSD 001671-2
[14] COSD 001667

checks (11-53) were done on time and accurate. It was also noted all deputies conducted the hard count, soft count, food pass, and temperature checks accurately."[15]

"On Thursday, November 16, 2023, I began reviewing the area activities summary report and hygiene inspection report for potentially involved parties that needed to be interviewed. I noticed that Module D was not being cleaned during the ad-seg cell hygiene inspections. Only Module E was being cleaned.

"On Monday, November 20, 2023, I reviewed green sheet "GS L.2.C.1" regarding Sanitation and Hygiene Inspections as of September 12, 2019. On Page 2, I noted it read 'High risk security housing hygiene inspections (E modules) shall be conducted throughout the week and finalized by the Saturday nightshift team. Inmate workers shall be utilized to clean common area and cells in all high risk security level housing modules.

"In my review, I saw D module was missing from the policy. This would provide an explanation for the reason it was not being cleaned by deputies. On Tuesday, November 21, 2023, I notified the reviewing agencies the reasoning D Module (where Rupard was housed) was not being cleaned during hygiene inspections.

"An oversight in policy did not account for D Module.

On Thursday, January 4, 2024, GS L.2.C.1 was approved and entered as the updated green sheet for Sanitation and Hygiene Inspections."[16]

"On Monday, December 11, 2023, I sent out voluntary interview requests to the following personnel:

- Doctor Nicolas Badre (Court Ordered Psychiatric Doctor)
- Doctor Anthony Cruz (SDCJ Psychiatric Doctor)
- Deputy Morgan Ackerman #5994, Tower deputy during 3-12-23 hygiene inspection
- Deputy Andrew Rodriguez #4322, Floor deputy during 3-12-23 hygiene inspection Dayshift 3-15-23
- Deputy Christopher Anthony #405, Floor deputy during 3-12-23 hygiene inspection*
- Deputy Andrew Torres #3208, Deputy during 3-17-23 dayshift
- Deputy Michael Johnson #0568, Deputy during 3-16-23 and 3-17-23 dayshift
- Lieutenant Gino Matrone #0740, Sergeant during 3-16-23 and 3-17-23 dayshift*
- Deputy Treyvonne James #4039, Deputy during 3-16-23 night shift*
- Deputy Ernesto Aguirre #322, Deputy during 3-16-23 night shift
- Lieutenant Jesus Lizarraga #5400, Lieutenant during 3-15-23 and 3-16-23 nightshift

---

[15] COSD001673
[16] COSD 000268-9

- Sergeant Cesar Cardoza #3223, Sergeant during 3-16-23 nightshift
- Deputy Jeff Amado #4193, Deputy during 3-16-23 day shift
- Deputy Thomas Mace #4324, Deputy during 3-16-23 dayshift*
- Sergeant Brendan Bourgeois #7770, Sergeant during 3-16-23 dayshift*
- Deputy Jason Viladiu #0659, Deputy during 3-15-23 nightshift
- Sergeant Brian Bumbasi #3216, Sergeant during 3-15-23 nightshift*
- Deputy Brian Aguilera #4166, Deputy during 3-15-23 dayshift
- Deputy Jonathan Inacio #0715, Deputy during 3-15-23 dayshift
- Deputy Ramond Altmeyer #4196, Deputy during 3-15-23 dayshift
- Deputy Anthony Gallegos #3503, Deputy during 3-15-23 dayshift
- Deputy Luis Ortiz #3792, Deputy during 3-15-23 day shift"

*Agreed to an interview or statement.

"It is apparent that care was continually offered to Rupard throughout his time in custody, as was noted by the Medical Examiner's Office. In my review of our records: deputies reported to medical staff issues with Rupard, nurses continually checked on Rupard, and Rupard's psychiatrist continually evaluated him. Despite all that, he ultimately died while in custody of the Sheriff's Department. Rupard refused his medication, refused to communicate with medical staff, and refused to allow himself to be evaluated.

"Based on the facts determined from my investigation, as well as my knowledge and understanding of jail operations and procedures, I do not believe probable cause exists to charge any involved individuals."[17]

The Medical Examiner determined the Cause of Death was pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia. Contributing to it was SARS-COVID 19, pulmonary emphysema, and a duodenal ulcer. The manner of death was homicide.[18]

**Internal Affairs Investigation**

The Internal Affairs investigation read:

"These investigations and reviews were unable to identify individual staff members or specific violations of law or policy that contributed to the death of IP Rupard. Rather, the investigations revealed a slow deterioration of IP Rupard's mental and physical health occurring over a period of several weeks, and possibly longer. Multiple attempts by staff to address IP Rupard's deteriorating health were noted in the Homicide case file and the Medical Examiner's report.

[17] COSD 001676-7
[18] COSD 006412

With a timeline of missed opportunities spanning a month or more, and without the identification of any individual staff members whose actions or inactions can be shown to have contributed to the death of IP Rupard, this complaint cannot be further investigated. This complaint will be closed with this letter to file for purposes of documentation."[19]

## DEPOSITIONS

All of the deponents who testified about the safety checks and area activities log agreed that if there were more than one deputy, they would typically separate, with one checking the upper tier and the other the lower tier. Unless otherwise specified, the log would not reflect which deputy checked which tier.

### Deputy Allen Wereski

Allen was deposed on May 18, 2026. He was hired by the SDSO in 2018. While on duty at the jail, cocaine was found in his car that was parked in the jail parking lot, and he was criminally charged. At the time of his deposition, he was a manager at an Arby's restaurant.

Wereski conducted safety checks or counts in the housing unit on the night shift of March 10/11, and March 14/15.

- Wereski testified that he did not recall Rupard.[20]
- Testifying about the photographs of Rupard's cell, Wereski testified he would notify a supervisor if he saw a cell in that condition.[21]

### Deputy Miguel Aguilera

Aguilera was deposed April 13, 2026. He was hired by the SDSO in 2020 and later resigned to join the Carlsbad Police Department in 2022. He worked the night shift in housing area 7 on March 15/16, 2022, and logged several checks, but had no independent recollection of Rupard.

- Aguilera testified that he did not recall conducting safety checks on Rupard or seeing his cell.[22]
- Aguilera testified, "My responsibilities consisted of making sure the IPs were alive, not having some – some type of medical emergency, like a seizure or overdosing, and making sure they felt safe within the module."[23]

---

[19] COSD 006433
[20] page 69,
[21] page 76-7
[22] page 16-7
[23] page 18

- Aguilera testified that during a safety check, he was not looking at the condition of the cell but would be aware of unsanitary conditions like an overflow of trash. If necessary, deputies could move the IP and have an IP worker clean the cell.[24]
- Aguilera testified regarding a photograph of Rupard's cell, saying he did not recall seeing it in that condition and if he saw a cell like that, he would ask questions of the IP.[25] He later said if deputies saw or smelled feces, they would notify medical staff.[26]
- Aguilera testified that cell fixtures like sinks, toilets, and intercoms were checked during hygiene inspections but not during safety checks.[27]
- Aguilera testified in agreement with the other deputies that there was no way to look at the area activity summary and determine which deputies conducted the checks of which tier. From the summary, he testified that he worked the night shift of March 15/16, but he did not recall anything about the checks or Rupard.[28]

**Deputy Jeff Amado**

Amado was deposed on January 29, 2026. He was hired by the SDSO in 2019 and was assigned to the Jail Population Management Unit (JPMU) at the time of his deposition. Amado was the training officer for Deputy Mace and worked in 7D on March 16, when IP Hayden Schuck died there.

- Amado testified that he had no recollection of Rupard.[29]
- Amado described his safety check as stopping at every cell to see if there was medical distress, trauma, or criminal activity, and getting a verbal or physical acknowledgment from the IP.[30]
- Amado testified that soft counts were the same as safety checks other than also obtaining a count of the number of IP's. They were done twice each shift.[31] Hard counts were done once per shift and included verifying a person's identity from their wristband or count sheet. None of these checks or counts included looking at the cleanliness of the cell.[32]
- Amado testified that hygiene inspections included taking out the trash, making sure that water and air flowed properly, and that nothing was broken. They were done weekly, and every cell was inspected.[33]

---

[24] page 21-3
[25] page 44-5
[26] page 47
[27] page 49
[28] page 56-60
[29] page 11
[30] page 19
[31] page 20
[32] page 22-3
[33] page 31-3

- Amado testified from the photograph of Rupard's cell and toilet, saying if he saw a cell in a condition like that, he would move the IP and have the cell cleaned.[34]
- Testifying from the area activities summary, Amado testified that he was responsible for checking all of the cells on the 7th floor on March 16, 2022, at 6:00 PM.

**Deputy Ernesto Aguirre**

Aguirre was hired by the SDSO in December 2021.

- Aguirre testified that safety checks included looking at cell and sanitary conditions and maintenance issues. [35]
- Aguirre testified that he did not recall if unit 7D had been excluded from the sanitation inspection schedule.[36]
- Aguirre testified that he had no recollection of conducting checks on Rupard, but identified himself as doing so in the video recording.[37] Based on the activity log, Aguirre testified that he or Deputy James conducted safety checks throughout the shift starting on March 16, but the only check he conducted on his own was at 10:44 PM.
- Aguirre testified that he did not recall what Rupard looked like.[38]

**Deputy Gustavo Martinez**

Martinez was hired as a corrections deputy by the SDSO in 2015. He was promoted to corporal in 2018 and demoted in 2025.

- Martinez testified that a soft count was done during the first and last hours of a shift and required all IPs to verbally and physically acknowledge the deputy, but there was no responsibility to determine if the IP was in medical distress or in need of emergency psychiatric care.[39]
- Martinez testified there was one hard count each shift, but still no responsibility to assess if an IP was in medical distress. He said 1153 safety checks, conducted every 60 minutes, included assessing whether an IP was in medical distress.[40]
- Martinez testified that he had received training on assessing when mental health staff should be summoned, but was not able to describe it, other than saying when they were playing with toilet water.[41] He testified that it may also include the condition of an IP's

---

[34] page 46-8
[35] page 27
[36] page 32
[37] page 51
[38] page 61
[39] page 10-1
[40] page 11-2
[41] page 14-7

cell, such as excessive trash, flooding of their toilet, and feces on the wall or floor. In that case, he would notify the mental health staff.[42]

- Martinez testified he would not look to see if an individual appeared malnourished to the extent that they looked like they were starving to death, because he would not be able to determine that. When asked if he saw someone who was emaciated to the point of skin and bones, and they had a concave stomach and chest, with no muscle, or otherwise appeared to look like a victim of a concentration camp, he was not supposed to report it to medical staff. He said he was never told or trained to do that.[43]
- Martinez testified that if he came across a cell that looked like the photograph of Rupard's cell, he would notify his supervisor and move the IP to clean up the cell and have him evaluated. He explained it was to "have feces displayed like that."[44]
- Martinez testified that sanitation or hygiene checks were done weekly to ensure that the cells were clean, safe, and secure. He did not know if housing unit 7D was omitted from the schedule.[45]
- Martinez testified from the log, saying that he was responsible for the 1153 safety checks on March 15, 2022, at 3:31 AM and 5:25 AM. He did not recall seeing Rupard's cell in the condition depicted in the photographs.[46]

**Deputy Jason Viladiu**

Viladiu was deposed on February 2, 2026.

- Viladiu testified that he had no recollection of Rupard.[47]
- Viladiu testified from the area activities summary, saying that he worked the night of March 15/16. He acknowledged the documentation that he conducted several safety checks that night.[48] He also testified that he had no recollection about seeing the condition of Rupard's cell.[49]

**Corporal Thomas Mace**

Mace was deposed on February 27, 2026. He was hired by the SDSO in 2020. Mace completed safety checks of the module on March 9 and 16, 2022.

---

[42] page 18
[43] page 20-3
[44] page 27
[45] page 29
[46] page 32-3
[47] page 23
[48] page 28-32
[49] page 59-60

- Mace testified that a safety check occurred every hour and, "We walk into the module and check for signs of life, make sure everyone's okay, the cells in good working order, there is no sign of disrepair or anything dangerous in the cell, and that there is no signs of criminal activity inside the cell."[50]
- Mace testified, "We have a process that if someone communicates some kind of issue with me or if I can visibly see someone struggling, we would call a qualified mental health professional and ask them to come to the floor or take that person to them if need be.[51]
- Mace testified that he did not recall the interview with Detective Blumenshine and saying Rupard was often barefoot and shirtless.[52]
- Mace testified that during a safety check, one deputy would check the top tier and the other the bottom tier.[53]
- Mace testified that he had no recollection of Rupard or the conditions or odors of his cell.

**Treyvonne James**

James was deposed on February 26, 2026. He was hired by the SDSO in 2018 and resigned in 2024. At the time of his deposition, he was employed with the Travis County Sheriff's Office in Austin, Texas. James completed safety checks in the housing area during the night shift on March 16/17, 2022.

- James testified that when an IP was sleeping, a deputy was responsible for making sure the person was alive by looking for the rise and fall of their chest or by listening for snoring. If neither was successful, they would knock to get the IP's attention.[54]
- James testified that cell inspections were done "to make sure that all the water functions were working properly, the intercom was working properly, and that there was no access [sic] of amounts of trash or clutter left in the cell."[55]
- James testified that he had no recollection of Rupard.[56]
- Looking at the photograph of Rupard's cell and fixtures, James testified it would warrant reporting to medical or mental health staff.[57]

---

[50] page 26
[51] page 29
[52] page 47-50
[53] page 57, 62
[54] page 29-31
[55] page 39
[56] page 48-51
[57] page 58-60

- Testifying about Blumenshine's interview of James, James said Rupard's cell did not stand out from other cells in the module.[58] He said his recollection was that it was not uncommon to see feces in a cell.[59]

**Lieutenant Gino Matrone**

Matrone was hired by the SDSO in 2000. He was promoted to sergeant in about 2020 and lieutenant in 2023.

- Matrone testified that if a deputy knew of someone not eating, it should be documented or followed up on.[60]
- Matrone testified that a "wellness check" consisted of staff walking with mental health or medical staff to check on IPs.[61]
- Matrone testified that on March 17, Rupard was under his blankets when Matrone saw him.[62]
- Matrone testified that he did not recall seeing excrement in Rupard's cell on March 17, only food trash, but it caused him to direct Deputy Johnson to have the cell cleaned.[63]
- Matrone testified that the policy required him to conduct an 1153 safety check each shift and on each cell he was responsible for supervising.[64]
- Matrone testified that on March 17, he asked Johnson to "get someone up to clean some of the cells in that row, and then he said he would try to get to it."[65]
- Matrone testified that if a deputy noticed excrement in a cell, they should provide cleaning, medical, or hygiene needs.[66]

**Sergeant Michael Johnson**

Johnson was hired by the SDSO in 2018 and, in March 2022, was a training deputy.

- Johnson testified that during safety checks, deputies should be looking for obvious medical problems, crimes in progress, and maintenance issues. Face-to-face observation of the IP, nor observation of the IP's physical or mental condition, was not required.[67]
- Johnson testified that on Wednesday, March 16, there was a death on the lower tier of 7D, and when Deputy Weber tried to contact Rupard to see if he was a witness, he did not

---

[58] page 67, 70
[59] page 72
[60] page 27
[61] page 32
[62] page 37
[63] page 40-1
[64] page 45-6
[65] page 48
[66] page 83
[67] page 9-11

get a response from Rupard and called Johnson to help them with a welfare check.[68] When they went into Rupard's cell, he still did not respond, so Johnson "gave his shoulder a push" and called his name. Johnson testified that Rupard gave "an angry response," so they left. Johnson said he thought there was no part of Rupard's body that was visible because it was under the blanket.[69] Johnson did not recall odors, feces on the bedding, trash in the cell, "a toilet full of excrement," or the sink being covered in a brown substance.[70] Johnson said this would not belong in the area activities report.[71]

- Johnson testified that on March 17, 2022, he was training Deputy Torres and could not tell by the log whether the safety checks on Rupard were done by him or Torres.[72]
- Johnson testified that Sergeant Matrone requested that a number of the cells be cleaned, but he did not remember if Rupard's was one of those.[73]
- Johnson testified regarding Sergeant Matrone's statement [COSD 000272] that he specifically told Johnson to have Rupard's cell cleaned on March 16, saying he did not dispute it but had no recollection of it, nor an explanation for why it was not cleaned.[74]
- Johnson testified that when a psychiatrist came to evaluate an IP, a deputy would escort them and provide security.[75]
- Johnson testified that his overall experience with Rupard was that he was aggressive, and when they would try to serve food, he would swipe at it, yell, scream at the door, and spit on the window. He did not remember these behaviors on March 16 or 17.[76]
- Johnson testified he is not normally assigned to the 77th floor, but when the IP died on March 16, the floor deputies were pulled for the investigation, so he took over security duties.[77]

**Deputy Andrew Torres**

Torres was deposed on April 13, 2026. He was hired by SDSO in December 2021. At the time of the incident, he was still in training but could conduct checks on his own. Torres testified properly about his duty of care.

---

[68] page 57-9
[69] page 61-2
[70] page 62-3
[71] page 80
[72] page 74-5
[73] page 78
[74] page 90
[75] page 101
[76] page 102-3
[77] page 106

- Torres testified that he had no recollection of Rupard.[78] He also did not recall any interaction with Sergeant Matrone and Deputy Johnson about cleaning Rupard's cell.[79] Torres also testified he did not recall what Rupard's cell looked like or whether it was consistent with the photographs.[80]
- Torres testified that if an IP was not eating their food, he would notify medical or mental health staff.[81]

**Corporal Blade Romans**

Romans graduated from the academy in 2018 and has always worked in the jail. He was promoted to corporal in 2024.

- Romans testified that he was trained in safety checks during his "phased training" after graduating from the academy.[82]
- Romans testified that during a hard count, a deputy would have sheets with "mini face cards" and would check for verbal and physical responses from the IP's during the check, as well as matching the IP to the cell. These were conducted once every 12 hours. He said, "A hard count is the same thing as a normal 1153, just with the addition of getting a verbal or physical response, and matching them to their cell." Romans testified that he would look for visible trauma during these checks.[83]
- Romans testified that if an IP verbally refused a meal, the deputies would tell the tower deputy, who would log it. When asked about an IP not eating their meal, Romans testified that he didn't know how he would know that.[84]
- Romans testified that he was unaware of any responsibility to conduct hygiene or sanitation checks. He said they were done by a random group of deputies assigned to do so. When he was assigned to them, he would check for excessive trash and the cell's overall hygiene. If there were feces throughout the cell, he said it would be cleaned.[85]
- Romans testified that he had not received training on preventing malnutrition. He did not remember any training on schizophrenia.[86]

---

[78] page 21-2
[79] page 48
[80] page 51
[81] page 41
[82] page 14
[83] page 19-20
[84] page 22
[85] page 26-8
[86] page 32

- Romans testified that he began his shifts at 6:00 PM with a team briefing and then a pass-down from the deputies he was relieving. On March 17, he did not recall any information about Rupard or the death that had occurred in housing unit 7 the day before [Schuck].[87]
- Romans testified that the deputies' deployments rotated, and he had no permanent assignment. He said he would not know where he would be working until he began his shift.[88]
- Romans testified that at the time of this incident, housing unit 7D was an administrative separation unit.[89]
- Romans testified from the area activities summary report (COSD 000160) that it showed that the hard count on March 17, 2022, began at 9:46 PM [and was completed at 10:23 PM.][90]
- Romans testified that during the hard count, Rupard "responded to me, turned and said something, mouthed something to me, and that was, to me, my verbal and physical portion of my check, which was his response to me, so it satisfied my check."[91]
- Romans testified that on the next "walk," Rupard did not respond to him, so other deputies came, and when they checked further, Rupard was not breathing.[92]
- Romans testified from the video recording at 8:53 PM, confirming it was the check that began at 8:48 PM on the log and that he checked the bottom tier.[93]
- Romans testified from the video recording, saying that he checked the top tier at 10:12 PM, stopping at Rupard's cell at 10:13 PM. He said he was trying to get Rupard to give a verbal or physical response while he stood in front of the door for about thirteen seconds.[94] The corresponding log entry was 9:45 PM.[95]
- Romans testified, "Our walks are to be started within 60 minutes per floor, and 7D is the fourth module on the floor. It's fourth in line in the way that we conduct our 1153s typically."[96]
- Romans testified from the video that he was standing at Rupard's door at 10:13 PM and 10:45 PM. The second check corresponded to the log entry at 10:37 PM.[97]

---

[87] page 43-4
[88] page 46
[89] page 47
[90] page 53
[91] page 56
[92] page 58
[93] page 72-3
[94] page 76-7
[95] page 74
[96] page 78
[97] page 78-80

- Romans testified that someone refusing their day room time would typically be logged in the jail information management system (JIMS).[98]
- Romans testified that he did not recall any interactions with Rupard prior to March 17.[99]

**Deputy Linda Gutierrez**

Gutierrez was hired by the SDSO in 2010.

- Gutierrez testified that she was trained on what to do if someone was not eating or starving themselves to death, and she was to document it and report it to the mental clinician and medical staff. When asked why it was important to document IPs not eating, Gutierrez said, "They need to have records why they are not eating – keep records of the days possibly of when or how many days they are not eating."[100]
- Gutierrez testified that if she believed somebody needed psychiatric care, she would email the psychiatric team, and if it had gone on too long, she would cc the captain. She later added that she may speak to them either in person or by telephone. She said that was not standard practice, but the way she did it. She said these observations would include the IP being verbally aggressive, kicking the doors, "of course not eating, making a mess in their cell, unkept, poor hygiene," and when they were ripping their clothes or material. Gutierrez later added that she also looked for people who had not come out of their cells, explaining that they should shower and that she needed to see them in person. She said, "If they are not coming out of their cell, it's got to be for a reason."[101]
- When asked if she had a role in sanitation inspections, Gutierrez testified, "All of the time." She explained that there were informal sanitation checks that were not documented, and that facility sanitation inspections were conducted on weekends and documented, including in the activity log.[102]
- Gutierrez testified that a soft and hard count both required a verbal or physical response from the IP to "make sure they are alive."[103]
- Gutierrez testified she was trained to check the condition of the cell as part of doing checks.[104]
- Gutierrez testified that she was trained to check for IPs being malnourished by looking for uneaten meals or if the person was too thin. If that occurred, she would put in a referral to the medical staff.[105]

---

[98] page 98
[99] page 143
[100] page 19-20
[101] page 23-7
[102] page 28-9
[103] page 44
[104] page 45
[105] page 47-8

- Gutierrez testified that a housing officer's duty during safety checks included five modules on the seventh floor, from A to E, and possibly holding cells.[106]
- Gutierrez testified that during the evening [of March 17], she and Romans discussed getting cells clean and giving IP's clean clothing because "there were numerous cells that were unkept."[107]
- Gutierrez testified that the only safety check she did on Rupard on March 17 was the check at 6:55 PM, saying, "Mr. Rupard was alive, and I know the cell was dirty."[108] She said when they found Rupard unresponsive, she had to retrieve a squeegee to pull the trash out of the cell to bring Rupard out of it.[109]
- Gutierrez testified that she did not know the module 7D was excluded from the sanitation check schedule.[110]
- Gutierrez testified she did not recall Rupard being emaciated.[111]

**Deputy Bernardo Romero**

Romero was deposed on January 29, 2026. He worked for the SDSO from March 2021 to August 2022, when he joined the Oceanside Police Department.

- Romero testified that he worked in the tower on March 17 but did not do any counts or safety checks.[112]

**Lieutenant Aaron Boorman – PMK**

Boorman was deposed January 16, 2026.

- Boorman testified about the IP count procedure policy, I.43, saying a verbal or physical acknowledgment was "looking for the individual to either physically move to acknowledge, or if you're dealing with the individual and trying to do your count, they could also verbally say something to you, which then that gives you the response needed to show that, that person is basically – their well-being is there, and they are alive, conscious.[113]
- Testifying about a soft count, Boorman said, "You're looking for that verbal or physical acknowledgment of the IP, and along with that, you are also doing a count."[114]

---

[106] page 58
[107] page 62-3
[108] page 66
[109] page 71
[110] page 79
[111] page 81
[112] page 86-7
[113] page 15-6
[114] page 17

- Boorman testified that during a hard count, an IP's wristband was used to verify who they were. If a wristband could not be used, the count sheet with photos could be substituted to verify their identity. When asked, "And so the deputy, in order to comply with the policy, needs to be within a range where the deputy is able to see and read the wristband," Boorman responded, "correct." He later added, "It would be up to the deputy performing that count to be able to see that individual's face sufficient enough to compare it to the photo on this list." [115]
- Boorman testified about the training outlined in COSD 004346-54, "Class #5.2: Counts-ACO Supplemental Core," saying it would have been utilized for any kind of briefing, training, academy training, and also supplemental core training for sworn staff. He affirmed the instructor notes that read, "Look for any signs of medical or physical/psychological distress, trauma, and/or criminal activity."[116]
- Boorman testified that "lineup training" occurred as part of a briefing at the beginning of a shift. Attendance for the training was recorded in the learning management system (LMS), and if a deputy was absent from a shift, the training would be assigned in their LMS profile.[117]
- While discussing the Safety Check policy I.64, Boorman testified that the policy required deputies to directly observe the individual for "medical distress or trauma." He also testified that "security and maintenance" meant "getting a totality of the circumstances," and gave examples of seeing water running, a leak, or an overflowing toilet. He testified that the reference to "environmental factors" included "looking at the condition of the dayroom, the cells, the module area, so you're assessing that to see if there's anything that needs to be cleaned up or addressed in regards to general cleanliness." Boorman also testified about the policy requiring documentation and said that the listed example items, including broken fixtures and clogged toilets, should be logged after a check if noted.[118]
- Boorman testified that the supervisor's log review required reviews by the Sergeant and one by the lieutenant to ensure that "anything that needs to be logged is logged and logged appropriately," and to verify safety checks were logged at appropriate times and with appropriate information.[119]

**Christina Goodall**

Goodall was a mental health clinician for the SDSO.

---

[115] page 18-21
[116] page 31-35
[117] page 40-1
[118] page 46-50
[119] page 50-1

- Goodall testified that a male deputy was nearby, but not with her, when she completed the cell-side assessment of Rupard. She asked him if there was anything concerning she should be aware of, and the deputy reported, "nothing recently concerning."[120]
- Goodall testified that she saw Rupard on February 9, 2022.[121]
- Goodall testified that Rupard repeatedly said, "I'm fine. I don't want to talk to you." She also testified, "I was able to assess fully to complete the safety assessment and if he needed to be recommended to a higher level of care, but as far as engaging in like therapeutic interventions that I can imply [sic], he didn't want to talk to me about it. Therefore, that's why I picked refused."[122] Goodall scheduled a follow-up appointment, but then remembered that Doctor Cruz, the psychiatrist, was to see him "shortly after," so she canceled it.[123] [Cruz saw Rupard on February 22 and then scheduled a follow-up appointment for 6 to 8 weeks later, but never saw him again.][124]
- Goodall testified that she looked at Rupard's physical condition and demeanor to see if he was having a psychotic episode and what the condition of his cell was as well as his behavior. She said, "So I was able to complete my assessment to say at the time he was safe…."[125]

**Doctor Nicholas Badre**

Nicholas was deposed December 19, 2025. He was a "temporary expert professional" psychiatrist employed by the County of San Diego, who performed competency evaluations and provided psychiatric care. Nicholas testified from his report with little independent recollection of Rupard.

- Nicholas testified that he conducted a competency evaluation outside the cell door of Rupard's cell. A deputy was with him, but Nicholas did not know his name.[126]
- Testifying about his responses to the Citizens Law Enforcement Review Board about Rupard's death, Nicholas affirmed his answers but provided no additional information.[127]
- Nicholas testified that he was not tasked with making an evaluation about Rupard being a danger to himself or others, so he did not form an opinion about it.[128]

---

[120] page 144-6
[121] page 149
[122] page 164
[123] page 159
[124] Cruz deposition: page 304-6
[125] page 168
[126] page 66
[127] page 99-102
[128] page 110

- Nicholas testified that he did not form an opinion as to whether Rupard was on a hunger strike.[129]
- Nicholas testified that he did not recall any conversations about Rupard with a sworn staff member.[130]

**Doctor Anthony Cruz**

Cruz was deposed on March 3, 2026. He was a psychiatrist employed by Liberty Healthcare and had been employed at the jail since 2020. By the time of his deposition, he had resigned.

- Cruz testified that deputies could request an IP be seen by him verbally, through email, or "any form of communication."[131]
- Cruz testified that he never received a report from any deputy about Rupard's condition.[132]

**Melissa Quiroz – PMK**

Quiroz was hired by the SDSO in 2016 as a mental health clinician. She was promoted to Chief Mental Health Clinician in 2018 and Group Program Manager over clinicians in 2020.

- Quiroz testified about the medical health record for Rupard, saying, "I saw a progress note that discussed the condition of his cell, how – and noted in there as well as about grave disability. The note was no signs of – you know, the cell was cleaned, if I'm recalling correctly," adding, "The symptomology for GD [grave disability] was not present. He wasn't self-harming. He wasn't a danger to others."[133]
- Quiroz testified that she could not confirm or deny any record of healthcare staff informing custody staff of Rupard's deteriorating condition but said, "I do not recall that being in the note."[134]
- Quiroz testified a deputy could notify mental health staff of a concern by talking to them directly, writing an ISR, sending an email, or telephoning [135]

**Serena Roglien-Hood – PMK**

Roglien-Hood was deposed on March 26, 2026. She was hired as a nurse in the jail in 2007. She was the Deputy Director of Inpatient Residential Care Facilities for the jail, responsible for all nursing care.

---

[129] page 112-3
[130] *page 122-3*
[131] page 86-7
[132] page 164-5
[133] page 128
[134] page 134-5
[135] page 163-4, 168

- Roglien-Hood testified that the medical records did not include any indication that custody staff had notified healthcare staff about Rupard being placed in administrative segregation from December through March.[136]
- Roglien-Hood repeatedly testified that she was not aware of, or could not recall, any healthcare notifications by custody staff regarding Rupard's condition or behaviors.[137]

**Detective Max Blumenshine**

Blumenshine was deposed on January 7, 2026. He was hired by the SDSO in 2012 as a law enforcement corrections deputy. In 2013, he was assigned to the courthouse and in 2014 became a patrol deputy, then a detective. He was promoted to corporal, assigned to a gang enforcement team, and, in 2021, assigned to the homicide unit. He conducted the investigation of Rupard's death.

- Blumenshine testified that he did not know whether the healthcare staff followed the Medical Division's Segregated Inmates policy prior to Rupert's death.[138]
- Blumenshine testified that his investigation did not include the consideration of the duties and obligations of medical and mental health staff beyond a layperson's understanding.[139]
- Blumenshine testified that he tried to interview the deputies who worked the week prior to Rupard's death and other detectives interviewed the deputies on duty that day. Blumenshine said none indicated that Rupard had been losing weight or not eating.[140]
- Blumenshine testified that he did not recall seeing any safety check notes from December 2021 to March 2022 regarding maintenance issues, medical distress, or starvation.[141]
- Blumenshine testified he did not know who the deputy was who accompanied Doctor Badre, the psychiatrist, on his evaluation three days prior to Rupard's death.[142]
- Blumenshine testified that when he was in Rupard's cell during his investigation, there were feces throughout the cell, the toilet was full of excrement, and the cell smelled like feces. He clarified that although his original report documented feces in the sink, it was incorrect, and he corrected it in his supplemental reports. While in the cell, he flushed the toilet and ran water in the sink, and both functioned correctly.[143]
- Blumenshine testified that he was unaware of the video retention policy but did not take any action to preserve the videos related to Rupard.[144]

---

[136] page 98-9
[137] page 80-89, 98-100
[138] page 43-4
[139] page 56
[140] page 60-1
[141] page 66
[142] page 71
[143] page 107-9
[144] page 120

- Blumenshine testified that part of his investigation was to determine if checks were being done on time and per policy. He then clarified "we collect all the facts, and then anyone else can review or make their determination from these reports."[145]
- Blumenshine testified that he reviewed roughly 48 hours of video prior to Rupard's death to determine if he was given food. He used the previous 24 hours of video from his own request, and then an additional link to the video available through the Schuck death investigation.[146]
- Blumenshine testified that the investigation revealed that Rupard's cell had not received a hygiene inspection, and the log saying it had was inaccurate.[147]
- Blumenshine testified he could not recall the source of his information that Rupard was in the administrative segregation module but was not classified as an administrative segregation IP.[148]
- Blumenshine testified that he found no evidence of any deputy reporting to a supervisor that a man was emaciated.[149]
- Blumenshine testified that his March 6, 2023, request for video recordings for three months prior to Rupard's death was initiated by the medical examiner's determination of a homicide. It was then that he learned that video was only saved for six months.[150]
- Blumenshine confirmed the information in his report about module D being omitted from the sanitation inspection policy.[151]
- Blumenshine testified from the Area Activities Summary Report for inspections in housing area 7 (COSD 000755-8), March 5, 2022, that read "D module Ad-Seg" did not mean the module was inspected, and he later determined it was not. He did not know whether Rupard's cell was inspected between December 29, 2021 and March 17, 2022.[152]

## VIDEO COMPILATION OF SAFETY CHECKS

A video compilation of safety checks was produced by the Plaintiffs' counsel and represented to be edited clips from the safety checks since March 15, 2022, starting at about 8:54 PM Each segment was preceded by an image from the Activity Log when available. The times were taken from the video segment, not the log.

---

[145] page 123-4
[146] page 144
[147] page 147-50
[148] page 151
[149] page 156
[150] page 166-7, 171-2
[151] page 188-9
[152] page 202-4

**March 15, 2022**

- 8:54 PM: Aguilera or Viladiu briefly looked in Rupard's door.
- 9:57 PM: Aguilera or Viladiu was at the door for several seconds, including bending down, seemingly to speak with Rupard through the port in the door. (hard count)
- 10:51 PM: Aguilera or Viladiu stopped at Rupard's door, then shined a flashlight inside before proceeding.
- 11:47 PM: Aguilera or Viladiu paused at Rupard's door, then shined a flashlight inside before proceeding.

**March 16, 2022**

- 12:54 AM: Aguilera or Viladiu paused at Rupard's door, then shined a flashlight inside before proceeding.
- 1:31 AM: Sergeant Bumbasi or Viladiu (sergeants stripes were on the person on the lower tier) paused at Rupard's door, then shined a flashlight inside before proceeding.
- 2:29 AM: Aguilera or Viladiu paused at Rupard's door, then shined a flashlight inside before proceeding.
- 3:28 AM: Aguilera or Viladiu paused at Rupard's door, then shined a flashlight inside before proceeding.
- 3:46 AM: An unknown deputy opened the port on Rupard's door. The lights were on. Several moments later, someone who appeared to be an IP worker delivered what appeared to be breakfast to the port doors. The deputy followed, closing the port doors, but when he reached Rupard's cell, there was no sign of Rupard, so he left the port door open. When he finished with the top tier, he returned to Rupard's cell, standing outside for a few seconds, before moving on.
- 4:25 AM: Aguilera or Viladiu paused at Rupard's door, then shined a flashlight inside before proceeding. This was logged as a soft count.
- 5:24 AM: Viladiu paused at Rupard's door, then shined a flashlight inside before proceeding.
- 6:02 AM: Aguilera or Viladiu paused at Rupard's door, then shined a flashlight inside, then bent down to the port door for many seconds, as if speaking with Rupard, before proceeding.
- 7:04 AM: Mace [per other evidence] or Amado paused at Rupard's door before moving on. The lights were on in the cell. This was logged as a soft count. It appeared the breakfast was still on the port door.
- 7:26 AM: The breakfast was gone when the video segment began. Two unknown deputies walked by Rupard's cell, the second one pausing to look inside. They went to the end of the tier, spoke with an IP, and then brought that IP out of his cell. They passed back by Rupard's cell, and the second one appeared to glance inside. At 7:27 AM, a log

entry was made for Lieutenant Kamoss, Sergeant Bourgeois, and Sergeant Matro doing a safety check. At 7:34 AM, one person was on the upper tier, and two walked on the lower tier. The person on the upper tier paused to look inside Rupard's cell.

- 8:37 AM: Mace or Amado paused at Rupard's door, closing the port door, then moving on.
- 9:32 AM: Mace [per other evidence] or Amado paused at Rupard's door before moving on.

From the Activity Log and original video [gap in compilation]:

- 9:40 AM: [medical emergency involving Schuck]
- 10:04 AM: Cross, Gallegos, Mascareno, Kim
- 11:02 AM: Amado, Gallegos
- 11:42 AM: Johnson, who responded for the IP death investigation, Amado, Gallegos
- 12:35 PM: Johnson checked both tiers
- 1:31 PM: Johnson checked both tiers
- 2:28 PM: Johnson checked both tiers
- 3:26 PM: Amado, Mace
- 4:05 PM: Amado, Mace
- 5:03 PM: Amado, Mace
- 6:00 PM: Amado, Mace
- 6:58 PM: James, Aguirre
- 7:56 PM: James, Aguirre
- 8:55 PM: James, Aguirre
- 9:45 PM: James, Aguirre
- 10:23 PM: Guitierrez, “Linda” (“Temp Check,” did not pause at Rupard’s cell)

Video Compilation Continued:

- 10:46 PM: Aguirre paused for a longer-than-normal amount of time to look in Rupard's cell, then moved on.
- [Log shows 11:43 PM: James, Aguirre – possibly the next check on video]

**March 17, 2022**

- 12:05 AM: James or Aguirre stopped at Rupard’s door, then continued.
- 12:58 AM: An unknown deputy paused at Rupard’s door, then continued.
- 1:44 AM: James or Aguirre paused at Rupard’s door, then continued.
- 2:19 AM: Lieutenant Lizarraga or Sergeant Cardoza paused at Rupard’s door, shined a flashlight inside, then continued.

- 3:23 AM: James or Aguirre paused at Rupard's door and shined a flashlight inside before proceeding.
- 4:21 AM: James or Aguirre paused at Rupard’s door before proceeding.
- 5:15 AM: An unknown deputy paused at Rupard's door, shined a flashlight inside, and then continued on. This was logged as a soft count.
- 6:07 AM: James or Aguirre paused at Rupard’s door before proceeding.
- 7:04 AM: The cell lights were now on. Torres or Johnson paused at Rupard’s door before proceeding.
- 8:02 AM: Torres or Johnson paused at Rupard's door before proceeding.
- 8:55 AM: Torres or Johnson paused at Rupard's door before proceeding.
- 9:49 AM: Two staff members, presumably Sergeant Matrone and Johnson, or Torres, paused at Rupard's door before proceeding.
- 10:39 AM: Torres and Johnson both paused at Rupard's door before proceeding.
- 11:02 AM: A deputy and IP workers were serving lunch through the ports. The deputy opened the port, leaned down as if speaking with Rupard, and then closed the port door.
- 11:43 AM: While IP workers were cleaning the module, Johnson conducted a hard count, pausing at Rupard's door and appearing to knock on it before moving on.
- 12:30 PM: Torres or Johnson paused at Rupard's door before continuing.
- 1:18 PM: Torres or Cortez paused at Rupard's door before continuing.
- 2:15 PM: Torres or Johnson paused at Rupard's door before continuing.
- 3:14 PM: Torres or Johnson paused at Rupard's door before continuing.
- 4:09 PM: Torres or Johnson paused at Rupard's door before continuing.
- 4:44 PM: Only one deputy was visible, although the log listed Torres and Johnson. It appeared the deputy was feeding lunch and opened Rupard's port door. An IP worker followed, appearing to collect garbage through the door ports.
- 4:49 PM: The deputy walked back to Rupard's door, pausing and shining a flashlight in before moving on. The lights in the cell were on.
- 5:02 PM: Rupard's port door was still open. Torres or Johnson stopped at the cell door, leaned over as if speaking with him, then closed the port door.
- 6:02 PM: Torres or Johnson paused at Rupard's door before continuing.
- 6:59 PM: A deputy [Gutierrez, per testimony] paused at Rupard's door, appeared to knock on it a few times, then continued on. This was logged as a soft count.
- 7:58 PM: Deputy Mendoza, Gutierrez, or Roman was on the top tier, stopping at Rupard’s cell and glancing in before continuing on.
- 08:53 PM: Deputy Mendoza, Gutierrez, or Roman was on the top tier and stopped at Rupard's door for a longer-than-normal amount of time, then moved on.
- 10:12 PM: A deputy [Romans, per testimony] paused at Rupard's door for a longer-than-normal amount of time, then moved on. This was logged as a hard count.

- 10:46 PM: Gutierrez or Roman paused at Rupard's cell for some time before the door opened and the other deputy came. They stood in the doorway, seemingly trying to get Rupard's attention and call for assistance.

## OTHER EVIDENCE

### Segregated Housing Orders

A Segregated Housing Order signed by “Mendoza” and dated January 31, 2022, appeared to order Rupard into administrative segregation “pending a hearing or investigation for a rule violation or criminal act.”[153]

A Segregated Housing Order signed by “J. Gonzalez” and dated February 20, 2022, appeared to order Rupard into administrative segregation “pending a hearing or investigation for a rule violation or criminal act.”[154]

### QMHP Progress Note on February 9, 2022

Christina Anosike wrote, “IP remains successfully housed in 7D quarantine, has coexisted with his peers with no reported aggression, violence or erratic behaviors. MHC observed IP standing at the cell door. This MHC introduced self and explained the reason for the meeting. IP was uncooperative AEB IP stating, "I am fine. I don't want to talk to you.” MHC observes IP not engaging in SIB. Unable to fully assess IP, due to his refusal and/or inability to cooperative. IP did not answer any further of MHCs questions despite multiple attempts from writer trying to engage IP. IP then began speaking in unintelligible words. IP stated, "go away.” Deputies on the 7th floor report IP will often speak to himself in unintelligible words. IP's cell was clean and had some debris. MHC observed empty food trays inside of his cell. IP's cell was free of any urine, feces or flooding. IP was moderately groomed. MHC spoke with deputies on the 7th floor who reports IP has been engaging in life-preserving bx's and has not engaged in any SIB. IP does not demonstrate any acute distress or immediate safety concerns. He has not engaged in any bx that would suggest harm to himself or others while under observation. There are no distressing sxs or major impairment requiring ISP or PSU referral. He will continue to be monitored for safety concerns and GD.[155]

### Dr. Badre

*Competency Report from March 14, 2022 Evaluation*

Excerpts included:

---

[153] COSD 018167
[154] COSD 018166
[155] COSD 000052

- On 1/20/22, the defendant was seen for psychiatric evaluation. The defendant was noted to be irritable, disorganized, and uncooperative. The defendant was diagnosed with unspecified psychosis, antisocial personality disorder, and stimulant use disorder.
- I interviewed the defendant at his cell at the recommendation of jail mental health staff and the floor deputies.
- The cell was dirty with trash throughout. The toilet was full of excrement and the room was very malodorous.
- The defendant was unkempt and dirty himself. He was laying in bed in an uncomfortable manner with a blanket over his head.
- There were feces on the floor. There was food smeared on the wall.[156]

*Citizens Law Enforcement Review Board Responses*

Excerpts included:

- Were deputies present during your visit? Please identify.
    - I do not recall the names of the deputies present. The deputies provided a security escort since I was in a custodial setting. The deputy was by my side for the entirety of the interview.
- During or after your visit, did you inform any sworn personnel of any concerns involving the condition of Rupard or his cell? Please identify and explain in detail.
    - I do not recall specific conversations with personnel. However, as a matter of practice, I inform Sheriff's personnel regarding my observations when it warrants it and likely did so here.[157]

**Autopsy Report on February 8, 2023**

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

---

[156] COSD 000136-9
[157] COSD 000343-4

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown. On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the contents could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow-up in six to seven weeks or sooner, if needed. He had no signs of danger to self or others and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.[158]

The cause of Death was pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia. Contributing to it was SARS-COVID 19, pulmonary emphysema, and a duodenal ulcer. The manner of death was homicide.

---

[158] COSD 006383-4

## LAWS, REGULATIONS, AND RULES

**California Title 15**

*§ 1027.5 Safety Checks.*

Safety checks shall be conducted at least hourly through direct visual observation of all IPs. There shall be no more than a 60-minute lapse between safety checks. There shall be a written plan that includes the documentation of routine safety checks.

*§ 1280. Facility Sanitation, Safety, and Maintenance.*

The facility administrator shall develop written policies and procedures for the maintenance of an acceptable level of cleanliness, repair and safety throughout the facility. Such a plan shall provide for a regular schedule of housekeeping tasks and inspections to identify and correct unsanitary or unsafe conditions or work practices which may be found.

**American Correctional Association Accreditation Standards**

*Sanitation*

- (5-ALDF-1A-01) The facility complies with all applicable laws and regulations of the governing jurisdiction, and there is documentation by an independent, outside source that any past deficiencies noted in annual inspections have been corrected. The following inspections are implemented;
  - Weekly sanitation inspections of all facility areas by a qualified departmental staff member.
  - Comprehensive and thorough monthly inspections by a safety/sanitation specialist.
  - At least annual inspections by federal, state, and/or local sanitation and health officials or other qualified person(s).
- (5-ALDF-1A-02) Disposal of liquid, solid, and hazardous materials complies with applicable government regulations.

*Housekeeping*

- (5-ALDF-1A-04) The facility is clean and in good repair. A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance by assigning specific duties and responsibilities to staff and inmates.

## POLICIES AND PROCEDURES

**Safety Checks: Inmates, Housing and Holding Areas, Policy I.64, dated December 17, 2021**

Excerpts included:

- Sworn staff will conduct safety checks of inmates, housing areas, holding areas and vacant cells through direct visual observation (i.e., direct personal view of the inmate/area without the aid of audio/video equipment). Safety checks of inmates consist of looking at the inmates for any obvious signs of medical distress, trauma or criminal activity. Safety checks shall be conducted at least once within every 60-minute time period. Safety checks of Medical Observation Beds (MOB) and in Psychiatric stabilization Units (WPSU/PSU) shall be conducted at least once within every 30-minute time period. The intervals of the safety checks, within the 60 or 30 minute time period, shall vary and must be logged in the Jail Information Management System (JIMS). In addition to observing the safety and welfare of inmates, sworn staff shall also be attentive to security and maintenance issues as well as environmental factors (e.g., temperature, odors, cleanliness) while conducting safety checks.
- When sworn staff conduct safety checks in a high-risk security level housing unit (e.g., administrative segregation), they should utilize the practice of contact and cover. Sworn staff should enter each module together on the same level and conduct the safety check as a team. Sworn staff should not split up to have one check the top tier and the other the bottom tier. Although recommended in high risk security level housing, contact and cover can be used in any housing unit/module when inmates are present in the dayroom. The cover deputy's primary responsibility is to provide security for the contact deputy during the safety check. While providing cover, this deputy is not expected to conduct the safety check.
- During safety checks in housing locations, sworn staff will physically enter each module and observe each inmate present in the common areas of the module ( e.g., dayrooms, showers, exercise areas, holding areas). In cell style housing modules, sworn staff shall stop at or enter each cell and observe each inmate. In dormitory style housing modules, sworn staff shall walk by each bunk in a manner that permits them to observe each inmate.
- LOGGING OF SAFETY CHECKS
  - A. The start of a safety check will be logged in JIMS using the event type "11-53 Started." The description field of the entry shall include the name(s) and/or ARJIS numbers of the sworn staff conducting the safety check. If additional space is needed, the notes section may be used. Once all necessary fields are completed, the sworn staff making the entry will immediately close the "11-53 Started" entry
  - B. At the conclusion of the safety check, an entry may be logged in JIMS using the event type "11-53 Notes," if there was anything encountered during the safety check. Items that necessitate documentation include, but are not limited to:
    1. Inmate in medical distress ( e.g., asthma attack, chest pain, etc.),
    2. Inmate suffering medical trauma (e.g., bleeding, ligature marks, etc.),
    3. Criminal activity (e.g., drug usage, fighting, etc.),

4. Facility damage ( e.g., broken fixtures, graffiti, etc.),
5. Maintenance issues (e.g., clogged toilet, running water),
6. Different or additional sworn staff conducted the safety check,
7. Anything that delayed the start or completion of the safety check.[159]

**Inmate Count Procedure, Policy I.43, dated December 23, 2020**

Excerpts included:

- Sworn staff will physically conduct counts of inmates. All counts require sworn staff to verify each inmate's well-being through "verbal or physical acknowledgment" from the inmate. In addition, sworn staff will look for any obvious signs of medical or physical distress (e.g., asthma attack, chest pain, etc.), trauma (e.g., bleeding, ligature marks, etc.) and/or criminal activity (e.g., drug usage, fighting, etc.).
- Definition: "Verbal or physical acknowledgment" - a response from the inmate to sworn staff that proves the inmate is alive, awake, conscious, and responsive. Verbal acknowledgment includes the use of spoken words, while physical acknowledgment includes actions of the body (i.e., hand gestures, head nod, etc.), in confirmation that the inmate notices and is responding to sworn staff.
- Hard counts are to be conducted during the following time periods.
  - 1000-1200 (day hard count)
  - 2100-2300 (night hard count)

Both soft and hard counts required a verbal or physical acknowledgment from the inmate.[160]

**Incarcerated Person Count Procedure, Green Sheet Number I.43.C.1, dated August 17, 2022**

Excerpts included:

- All counts in cell housing at SDCJ will be conducted in conjunction with a safety check. Emergency head counts ordered by the watch commander do not require a safety check.
- Day hard count will be conducted between 0900 and 1200 hours. Night hard count will be conducted between 2100 and 2300 hours. Counts may be conducted early at the discretion of the watch commander.
- Hard counts will be conducted with emergency evacuation lists or floor sheets. Incarcerated persons in Administrative Segregation and Enhanced Observation housing will be verified via their face card. Incarcerated persons and booking deputies will conduct hard count using the JIMS Operations Report.

---

[159] COSD 006088-90
[160] COSD 001155-6

- The deputies conducting the count shall check the incarcerated person's wristband (looking for any signs of tampering or wear) and verify the incarcerated person's name, booking number, and wristband photo with the appropriate count sheets.
- COUNT TIMES
    - DAY SHIFT
        - Head Count to be conducted between 0630-0700
        - Hard Count to be conducted between 0900-1200
        - Soft Count to be conducted between 1700-1800
    - NIGHT SHIFT
        - Soft Count to be conducted between 1830-1930
        - Hard Count to be conducted between 2100-2300
        - Soft Count to be conducted between 0400-0500[161]

**Sanitation and Hygiene Inspections, Policy L.2.C.1, dated September 12, 2019**

Excerpts included:

- Hygiene inspections for floors 4 through 8 shall be conducted on Saturdays by the assigned dayshift teams, except for inmate worker modules, high risk security level housing and Jail Based Competency Treatment (JBCT) modules.
- Deputies shall provide cleaning supplies to inmates prior to the hygiene inspection. Deputies shall give the inmates verbal directions regarding cleaning and emphasize the areas that will be inspected. (e.g., sweep and mop the floors, clean the windows, surrender all unauthorized contraband, food, excess clothing, etc.) Inmates incapable of participating in the cleaning process shall have their cells cleaned by inmate workers.
- The following guidelines will be observed:
    - All common and personal areas shall be inspected for cleanliness, maintenance, and security issues.
    - All reported maintenance issues shall be documented with proper notifications for repairs.
    - The SDCJ Module Inspection Rating Sheet shall be completed for each area and submitted to supervisors for approval.
    - A copy of the approved SDCJ Module Inspection Rating Sheet shall be posted in each module and the original signed documents shall be sent to the operations deputy for archiving.
    - A JIMS entry will be made under the event type "INSPECTION" documenting the completion of the hygiene inspection.

---

[161] COSD 001159-60

- An inmate's mental health should be taken into consideration when deciding on disciplinary sanctions.
- High security level housing hygiene inspections (E modules) be conducted throughout the week and finalized by the Saturday night shift team. Inmate workers shall be utilized to clean common areas and cells in all high risk security level housing modules.
- Both dayshift and nightshift teams should attempt to inspect high risk security level housing cells throughout the week when inmates are not present (e.g. rec yard time, medical, court, empty cells, etc.). The Sunday dayshift housing control deputies shall begin a SDCJ Module Inspection Rating Sheet and record when high risk security level housing cells are inspected during the week.
- At the end of each shift, the housing control deputy shall make a HMS log entry in the Area Activity under the event type, "INSPECTION" and list the cell number(s) of each high risk security level housing cells inspected.
- Every Saturday night, the key control deputy shall review the JIMS Area Activity under "INSPECTION" and notify the watch commander of any higher risk security level housing cells that were not inspected. Once all high risk security level housing cells are inspected, the SDCJ Module Inspection Sheet shall be sent to the team supervisors for their review and signatures, and the form shall be sent to the administrative deputy for archiving.[162]

**Psychiatric Stabilization Units, Policy M.25, dated March 27, 2020**

Excerpts included:

- Any person who has pertinent information regarding the behavior of any inmate may make inmate referrals to the health staff.

**Hunger Strikes, Policy M.29, dated October 21, 2020**

Excerpts included:

- The refusal to eat, also known as a hunger strike, can be either proclaimed or unspecified by an inmate. While some inmates may inform staff they are on a hunger strike, others may not voice their intentions, but their refusal of meals may indicate a hunger strike. In either case, sworn staff shall be observant, make necessary notifications and document the incident. Health staff will evaluate the seriousness of the situation and provide necessary medical care.

---

[162] COSD 001163-8

- When an inmate initiates a hunger strike, sworn staff shall document the incident in the Jail Information Management System (JIMS) via an inmate status report (ISR). The ISR shall include notifications made and any subsequent actions taken.

The policy also required sworn staff to notify the watch commander, facility commander, and health staff. It did not clarify when or what should cause the notification.[163]

**Medical Services Division Operations Manual Segregated Inmates document G.2.1, dated January 5, 2022**

Excerpts included:

- Segregated inmates - are those isolated from the general population and who receive services and activities apart from other inmates. Facilities may refer to such conditions as administrative segregation, protected custody, or disciplinary segregation. For the purpose of this standard, the living and confinement conditions define the segregated status, not the reason an inmate was placed in segregation.
- Inmates housed in segregation will be monitored by health staff based on established frequency. Inmates who are segregated and receive services and activities apart from other inmates shall be monitored three days a week by nursing staff and a minimum of once a week by a qualified mental health provider (QMHP). Documentation should include any significant health findings, signs of physical and/or psychological deterioration, other signs of failing health, the date and time of contact, and the signature or initials of the health staff member making the rounds. In addition to documenting in the health record, documentation may also be made on individual logs or cell cards. Health staff will promptly identify and inform custody staff of inmates who are physically or psychologically deteriorating and those exhibiting other signs or symptoms of failing health.

## TRAINING

**CLASS #5.2: COUNTS - ACO Supplemental Core, dated December 2, 2020**

Excerpts included:

- Hard Count- A count which verifies each inmate's well-being through verbal or physical acknowledgement from the inmate and uses one of the approved methods to confirm the identity of every inmate in the facility:
    - Face Cards

[163] COSD 006126-7

  - Jail Information Management System (JIMS) Web Reports (e .g., Floor Count, Floor Evacuation List)
  - JIMS Operations Reports (e .g., Inmates Still in Booking, Inmate Roster by Last Name, etc.)
- Verify the inmate's well- being -
  - Look for any signs of medical or physical /psychological distress, trauma and /or criminal activity.[164]

**Inmate Count Procedures Lineup Training Document, Dated May 2, 2021**

Excerpts included:

- Sworn staff will physically conduct counts of inmates through various methods (soft count and hard count) as defined below. All counts require sworn staff to verify each inmate's well-being through "verbal or physical acknowledgment" from the inmate. In addition, sworn staff will look for any obvious signs of medical or physical distress, trauma, and/or criminal activity.
- Definition: "Verbal or Physical Acknowledgment" - Response from the inmate to sworn staff that proves the inmate is awake, conscious, and responsive.

Both the soft and hard count requirements included a verbal or physical acknowledgment from the inmate.[165]

**Safety Checks Lineup Training Document, Dated May 1, 2021**

Excerpts included:

- Sworn staff will conduct safety checks of inmates, housing areas, holding areas and vacant cells through direct visual observation (i.e., direct personal view of the inmate/area without the aid of audio/video equipment). Safety checks of inmates consist of looking at inmates for any obvious signs of medical distress, trauma or criminal activity. Safety checks shall be conducted at least once within every hour (60 minute) time period. The intervals of the safety checks, within the hour ( 60 minute) time period, shall vary and must be logged in the Jail Information Management System (JIMS). In addition to observing the safety and welfare of inmates, sworn staff shall also be attentive to security and maintenance issues as well as environmental factors ( e.g., temperature, odors, cleanliness) while conducting safety checks.
- Cell style housing safety checks:

---

[164] COSD 006346-54
[165] COSD 006247-8

a) Staff shall observe each inmate present in the common areas of the module for any obvious signs of medical distress, trauma, or criminal activity.
b) This shall require sworn staff to stop at, or enter a cell/holding area, to properly observe the inmate(s).[166]

[166] COSD 006245-6

## SIGNIFICANT OPINION

**The SDSO staff violated California Title 15, American Correctional Association (ACA) accreditation standards, generally accepted jail practices, and its own policy by failing to monitor Rupard's well-being and take action to keep his cell reasonably clean. Had they done so, it is more likely than not that they would have recognized his deteriorating physical health.**

It is a basic humanitarian responsibility to ensure that IPs live in a reasonably clean and healthy environment. There is no lesser responsibility, and arguably an even greater one, when jail staff supervises someone with a serious mental illness.

California Title 15 requires "an acceptable level of cleanliness, repair and safety throughout the facility," as well as "a regular schedule of housekeeping tasks and inspections to identify and correct unsanitary or unsafe conditions."

While ACA accreditation standards are not compulsory, they provide guidance on what constitutes generally accepted jail practices. The sanitation standard properly advised the facility to comply with California Title 15 by providing weekly sanitation inspections of all facility areas, monthly inspections by a safety/sanitation specialist, and annual inspections by a qualified government authority. It also advised keeping the facility clean with a daily housekeeping and maintenance plan that addressed all facility areas and disposed of liquid, solid, and hazardous materials.

SDSO policy required weekly sanitation checks and required "inmate workers shall be utilized to clean common areas and cells in all high-risk security level housing modules."

The evidence showed that Rupard's cell contained about nine days' worth of food containers, along with other likely biological filth. It is more common for IPs with serious mental illness to live in unsanitary conditions, and conversely, unsanitary conditions are a sign of serious mental illness in jails. Allowing an environment like Rupard's cell is not only repulsive to the senses; it is also known to attract insects, vermin, mold, and other health hazards. For these reasons, generally accepted jail practices often require the daily removal of food waste and trash. In administrative segregation areas or cells housing those with a serious mental illness, jail staff often have to directly facilitate the cleaning by directing the IPs what to do or having IP workers do the cleaning.

When a cell is cleaned by IP workers, generally accepted jail practices always require staff to remove the IP from the cell during cleaning, especially one who suffers mental illness and/or is in administrative segregation. If the condition is bad enough and the IP refuses to leave the cell, generally accepted jail practices may have healthcare staff deem it a medical risk; regardless, a supervisor should order that the cell be cleaned, by force if necessary. Rupard's cell met the

standard to forcibly remove him, if necessary, to protect him from the harm of the filth, days before March 17, 2022.

Whether voluntarily, or by force, the custody staff, supervisor, and likely healthcare staff would have seen Rupard get up, walk, and respond to them, even if it was a violent response. In Rupard's case, he may well have been required to shower, allowing the deputies an even greater opportunity to witness his condition. At that point, hopefully they would have recognized his medical distress and summoned immediate medical help, if they were not present. Had they done so, it may have saved his life.

Matrone recognized the abhorrent conditions and ordered the cells cleaned. While the evidence did not clearly establish how many cells he ordered cleaned, the fact that it was more than Rupard's indicates a pattern and practice of staff failures that allowed similar unhealthy conditions with other IPs. However, it is hard to imagine that any other cell was worse than Rupard's, so it should have been one of the first to be cleaned.

While the SDSO had an organizational failure of not scheduling hygiene checks that included Rupard's cell, each deputy and supervisor who conducted a safety check, soft count, hard count, or supervisor inspection that included looking into Rupard's cell in the hours and days before his death had a legal and ethical obligation to correct its condition before it got to the state that it was on March 17, 2022. The longer the accumulation was, the more obvious it should have been. Each deputy and ranking staff member who looked into Rupard's cell from at least around March 15th was increasingly culpable for their inaction in providing care and notifying medical staff.

**The SDSO violated generally accepted jail practices by failing to provide sufficient training and supervision on California Title 15 requirements on cleanliness and housekeeping as well as recognizing and responding to unsanitary conditions, especially involving someone with a mental illness.**

As described, there were individual failures by SDSO staff to ensure an acceptable level of cleanliness, housekeeping, and sanitary conditions. However, there were several deputies who repeatedly saw the condition of Rupard's cell in the days prior to his death, yet they did nothing. This pattern and practice demonstrate the SDSO's failures in organizational training and supervision.

It should not take a sergeant, on the morning of March 17, to recognize the filthy and unsanitary conditions in Rupard's cell. Generally accepted jail training teaches deputies to take initiative and correct sanitation and hygiene problems when they present unsafe or unhealthy conditions for an IP. Deponent deputies testified that they would have had the cell cleaned if they had seen it in the condition it was in the evidentiary photographs. However, the unsanitary accumulation of trash did not appear only in the moments prior to Rupard's death. As discussed, it was an

accumulation over days that had long since exceeded the threshold at which someone should have taken action to clean the cell, and likely Rupard. Yet, none did anything.

Equally true, the policy required sergeants and lieutenants to walk through the module every day and inspect cells. They either failed to follow the policy requiring inspections, or they intentionally ignored the horrible conditions in Rupard's cell.

There were at least 15-20 different deputies or ranking staff members who worked the 7D module in the roughly five days before March 17, 2022. The fact that none of them took any action to care for Rupard, clean his cell, or ensure he was not in medical distress shows a pattern and practice of ignoring filth and inhumane care that was accepted within the SDSO.

**The SDSO, particularly Detective Blumenshine, failed to follow generally accepted law enforcement practices and conduct a thorough investigation that collected all the pertinent evidence.**

The SDSO is responsible for ensuring that a proper criminal and administrative investigation is completed, regardless of who ultimately conducts the investigation. The evidence is clear that Blumenshine failed to conduct a thorough investigation, as his own testimony shows he failed to gather all the evidence and investigate medical practices that may hypothetically have led to criminal charges, including failing to secure video recording evidence, interview key witnesses, and take other steps that a competent death investigator would have taken.

The determination by the Medical Examiner that the manner of death was a homicide prompted Blumenshine to attempt to remedy his failures, but by that time evidence was lost forever. Video recordings were unrecoverable, memories had faded, and any delay of this length creates a less thorough outcome. A competent investigation would have been complete and unaffected by the Medical Examiner's determination.

Additionally, Blumenshine failed to identify and investigate the fundamental question: "How did someone who was in jail, and supposedly checked on a minimum of 24 times a day, essentially starve to death?" He was either an incompetent investigator or intentionally avoided answering the key question of how this could have happened.

Then the SDSO failed to rectify Blumenshine's failures and ensure a competent investigation, and, in doing so, violated generally accepted law enforcement and jail practices.

## CONCLUSIONS

It is hard to imagine in this day and age someone dying from malnutrition, dehydration, and easily treatable medical conditions while in an American Jail, especially one with the resources of the SDSO. In this case, the SDSO's organizational failures, combined with the individual failures of its deputies, enabled such a tragedy.

While there is no compulsory obligation to schedule hygiene checks, it is every staff member's obligation to do so. There was an affirmative obligation on each of those staff members to provide reasonable care and custody of Rupard while he was in the SDSO jail, but none complied with that obligation. Instead, all the evidence showed a pattern and practice by SDSO custody staff of failing to recognize and act upon the obvious, each contributing to Rupard's death.

Then, the SDSO's solution to an apparent problem of staff not doing inspections was to create a policy and schedule for inspections and cleaning. This is unusual, because in most jails, staff do that continuously. However, the SDSO failed to ensure its solution was reliable, leaving the IPs in 7D to live in unchecked filth.

The testimony did not include explanations as to how the staff let this happen. The dichotomy is that most deponent deputies testified they would take action if they saw a cell in the condition of Rupard's – yet, they did not.

Respectfully submitted:

Gary Raney, President

GAR, Inc.

## EVIDENCE BY FILENAME

Note: Each deposition included exhibits, but because the exhibits were not uniquely numbered, the filenames were not descriptive; therefore, they were excluded.

1. 0 - 2022-03-15 20-20-00-420.mov
2. 0 - 2022-03-15 22-04-07-632.mov
3. 0 - 2022-03-15 23-46-40-304.mov
4. 0 - 2022-03-16 01-21-27-452.mov
5. 0 - 2022-03-16 02-56-14-600.mov
6. 0 - 2022-03-16 04-30-34-364.mov
7. 0 - 2022-03-16 06-05-28-189.mov
8. 0 - 2022-03-16 07-43-23-684.mov
9. 0 - 2022-03-16 09-27-23-850.mov
10. 0 - 2022-03-16 22-00-00-125.mov
11. 0 - 2022-03-16 23-46-28-565.mov
12. 0 - 2022-03-17 01-23-37-307.mov
13. 0 - 2022-03-17 02-58-31-133.mov
14. 0 - 2022-03-17 04-33-39-720.mov
15. 0 - 2022-03-17 06-08-40-225.mov
16. 0 - 2022-03-17 07-47-36-499.mov
17. 0 - 2022-03-17 09-32-25-154.mov
18. 0 - 2022-03-17 11-17-00-385.mov
19. 0 - 2022-03-17 12-51-48-536.mov
20. 0 - 2022-03-17 14-31-18-872.mov
21. 0 - 2022-03-17 16-15-25-717.mov
22. 0 - 2022-03-17 18-00-26-663.mov
23. 0 - 2022-03-17 19-46-28-386.mov
24. 0 - 2022-03-17 21-31-36-444.mov
25. 0 - 2022-03-17 23-11-20-071.mov
26. 184 Third Amended Complaint (TAC).pdf
27. 2024-12-11 - PDF - FULL SIZE - LINDA GUTIERREZ - LINKED EXHIBITS.pdf
28. 2024-12-16 - PDF - FULL SIZE - CHRISTINA GOODALL - LINKED EXHIBITS.pdf
29. 2025-01-13 - PDF - FULL SIZE - CORPORAL BLADE ROMANS - LINKED EXHIBITS.pdf
30. 2025-05-05 - PDF - FULL SIZE - BETHANN SCHABER, M.D. - LINKED EXHIBITS.pdf
31. 2025-12-19 - PDF - FULL SIZE - NICOLAS BADRE, M.D. - LINKED EXHIBITS.pdf
32. 2026-01-07 - PDF - FULL SIZE - DETECTIVE MAX BLUMENSHINE - LINKED EXHIBITS.pdf
33. 2026-01-08 - PDF - FULL SIZE - MELISSA QUIROZ - PMK - 30(B)(6) - LINKED EXHIBITS.pdf
34. 2026-01-15 - PDF - FULL SIZE - JON MONTGOMERY, DO - LINKED EXHIBITS.pdf
35. 2026-01-16 - PDF - FULL SIZE - LIEUTENANT AARON BOORMAN - PMK - 30(B)(6) - LINKED EXHIBITS.pdf
36. 2026-01-16 - PDF - FULL SIZE - LIEUTENANT GINO MATRONE - LINKED EXHIBITS.pdf
37. 2026-01-29 - PDF - FULL SIZE - DEPUTY BERNARDO JOSE ROMERO - LINKED EXHIBITS.pdf
38. 2026-01-29 - PDF - FULL SIZE - DEPUTY GUSTAVO MARTINEZ - LINKED EXHIBITS.pdf
39. 2026-01-29 - PDF - FULL SIZE - DEPUTY JEFF RYAN MICU AMADO - LINKED EXHIBITS.pdf
40. 2026-02-02 - PDF - FULL SIZE - DEPUTY ERNESTO AGUIRRE - LINKED EXHIBITS.pdf
41. 2026-02-02 - PDF - FULL SIZE - DEPUTY JASON VILADIU - LINKED EXHIBITS.pdf

42. 2026-02-26 - PDF - FULL SIZE - TREYVONNE JORDAN JAMES.pdf
43. 2026-02-27 - PDF - FULL SIZE - CORPORAL THOMAS RANDALL MACE.pdf
44. 2026-02-27 - PDF - FULL SIZE - SERGEANT MICHAEL JOSEPH JOHNSON - LINKED EXHIBITS.pdf
45. 2026-03-03 - PDF - FULL SIZE - ANTHONY CRUZ, M.D. - LINKED EXHIBITS.pdf
46. 2026-03-26 - PDF - FULL SIZE - SERINA ROGNLIEN-HOOD - LINKED EXHIBITS Confidential.pdf
47. 2026-04-13 - PDF - FULL SIZE - DEPUTY ANDREW SANTIAGO TORRES - LINKED EXHIBITS.pdf
48. 2026-04-13 - PDF - FULL SIZE - DEPUTY MIGUEL AGUILERA - LINKED EXHIBITS.pdf
49. 2026-05-18 - PDF - FULL SIZE - DEPUTY ALLEN WERESKI - LINKED EXHIBITS.pdf
50. Combined Short Final.mp4
51. CONFIDENTIAL COSD 000026-000150 Lonnie Rupard Jail Medical Records.pdf
52. CONFIDENTIAL COSD 006376-006416 Autopsy Report and Notes from ME's Office (Redacted).pdf
53. CONFIDENTIAL COSD 006433-006436 IA Documents.PDF
54. COSD 000266-274 Blumenshine Report.pdf
55. COSD 000275-280 Green Sheet L.2.C.1 Sanitation and Hygiene Inspections 01.04.2024.pdf
56. COSD 001149-1154 L.2.C.1 Sanitation and Hygiene Inspections 04.06.2022.pdf
57. COSD 001155-1157 I.43 Inmate Count Procedures 12.23.2020.pdf
58. COSD 001158 L.2 Sanitation and Hygiene Inspections 07.03.2018.pdf
59. COSD 001159-1160 I.43.C.1 Incarcerated Person Count Procedure 02.14.2022.pdf
60. COSD 001161-1162 I.43.C.1 Inmate Count Procedure 08.17.2020.pdf
61. COSD 001163-1168 L.2.C.1 Sanitation and Hygiene Inspection 09.12.2019.pdf
62. COSD 001216-1442 Autopsy Photos of Lonnie Rupard.pdf
63. COSD 001510-1547 Photos of Rupard's Cell.pdf
64. COSD 001633-1636 Follow Up Investigative Report re Autopsy - Det. Blumenshine.pdf
65. COSD 001637-1649 Follow Up Investigative Report by Det. Blumenshine 06.07.2022.pdf
66. COSD 001656-1677 Follow Up Investigative Report II by Det. Blumenshine 03.16.2023.pdf
67. COSD 002085-2106 Autopsy Report (Unredacted).pdf
68. COSD 004864-5214 Area Activities Logs 2.21.2022 to 3.17.2022 (Reverse Chronological).pdf
69. COSD 006088-6090 I.64 - Safety Checks-Inmates, Housing and Holding Areas 12.17.2021.pdf
70. COSD 006120-6125 M.25 Psychiatric Stabilization Units 03.27.2020.pdf
71. COSD 006126 Hunger Strikes.pdf
72. COSD 006126-6127 M.29 Hunger Strikes 10.21.2020.pdf
73. COSD 006242-6244 Line-Up Training re Safety Cell Procedures 05.01.2021.pdf
74. COSD 006245-6246 Line-Up Training re 11-53 Safety Checks 05.01.2021.pdf
75. COSD 006247-6257 Line-Up Training re Inmate Count Procedures 05.02.2021.pdf
76. COSD 006335-6336 MSD.H.12 Hunger Strikes 06.15.2015.pdf
77. COSD 006343-6376 I.43 Inmate Count Procedure.pdf
78. COSD 006438-006439 I.64.C.1 Safety Checks of Housing Units 02.17.2022.pdf
79. COSD 006451-006452 Green Sheet I.43.C.1 Inmate Count Procedure 08.17.2020.pdf
80. COSD 006453-006454 Green Sheet I.64.C.1 Safety Checks of Inmates 10.11.2021.pdf
81. COSD 018166 Segregated Housing Order 2.20.2022.pdf
82. COSD 018167 Segregated Housing Order 01.31.2022.pdf
83. COSD 6939-6942-M.5 Medical Emergencies 12.02.2020.pdf
84. Exhibit 7 - Badre CLERB Response.pdf
85. From Estate of Schuck v. COSD, et al. - Floor Evacuation List.pdf

# GARY L. RANEY, SHERIFF (retired)

GAR, Inc. · 7154 West State Street, Suite #260 · Boise, Idaho 83714 · (208) 870-8400
gary@garyraney.com · www.garyraney.com

## EXPERIENCE

**2011** TO PRESENT

### PRESIDENT

GAR, INC. BOISE, ID

Experienced and knowledgeable consultation on jail policy and practice, specializing in cases involving deaths and uses of force. Gary has worked on projects in about 40 states and provided a wide range of services to government officials, attorneys, and prosecutors.

**U.S. Department of Justice**

- Comprehensive jail assessment, United States of America v Fulton County GA (2024)
- Jail operational assessment, Fayette-Lexington County KY (2022)
- Jail system evaluation, Las Vegas NV Metropolitan Police Department (2016)
- Organizational culture assessment, Santa Clara County CA Sheriff's Office (2016)
- Executive leadership training, Oregon Department of Public Safety Standards & Training (2016)
- Organizational culture assessment, Middlesex MA Sheriff's Office (2015)

**New York City Department of Correction (Rikers Island)** – Consultant for planning and implementation of reforms to improve the jail system and bring the NYDOC into substantial compliance with the 2015 Consent Agreement. (2025-26)

**Sangamon County (IL)** – Assessment of higher liability policies and practices in the jail. (2025)

**Lake County (MT)** – Assessment of constitutional compliance in jail conditions, policy and practices (2023)

**Police Executive Research Forum** – Consultant on de-escalation training. (2022-23)

**City of Louisville (KY)** – Assess six death cases, overall jail operations and the physical facility of the Louisville Metro Department of Corrections (2022)

**State of Arizona Department of Corrections** – Hired by Alvarez and Marsal to consult on court action against the Department of Corrections medical services (2022)

**U.S. Conference of Chief Justices** – Member of the National Judicial Task Force to Examine State Courts' Response to Mental Illness (2020-22)

**Howard Buffett Foundation / Macon County IL Sheriff's Office**

- Assessment and integration of Illinois law enforcement reform legislation (2021)
- Board member of the Central Illinois Regional Dispatch Center, representing the Macon County Sheriff (2019-2020)
- Comprehensive review and assessment of liability, security and operations (2017 - current)

- Study and recommendations on civil process service (2019)
- Study and recommendations on emergency communication fees (2019)
- Created policing and jail policy manuals (2018)

**Law Enforcement Policy Center, LLC** – License and distribute model policing policies to police and sheriff's agencies in Idaho (2016 - current)

**Howard Buffett Foundation / Christian County IL Sheriff's Office**
- Jail operations and liability assessment and planning (2020-2023)
- Created policing and jail policy manuals (2020 -2023)

**San Luis Obispo CA Sheriff's Office** – Jail staffing analysis (2020)

**Police Executive Research Forum**
- Jail diversion and pretrial strategies (2019)
- Jail mental health solutions (2018)

**Santa Clara County CA Sheriff's Office**
- Leadership planning and development (2018)
- Inmate and jail employee opinion surveys (2018)
- Evaluation of jail reform efforts (2017 - 2018)

**Idaho Counties Risk Management Program**
- Produced training video series on high-risk policing topics (2016 - 2018)
- Created two Idaho statewide standardized policing policy manuals (2015 - 2017)

**San Bernardino County CA Sheriff's Office** – Use of force analysis (2015 - 2017)

**City of Cascade ID / Valley County ID** – Cost analysis of city police services and negotiation of a joint powers' agreement (2017)

**Coeur d'Alene ID Police Department** – Selection process for Chief (2009)

**Strategic Planning / Organizational and Leadership Development**
- Idaho Department of Health & Welfare (2024)
- Meridian ID Police Department Strategic Planning (2023)
- Meridian ID Police Department Strategic Leadership Development (2021)
- Supportive Housing and Innovative Partnerships (2021)
- Saint Alphonsus Regional Medical Center ID (2019)
- Pima County AZ Sheriff's Department (2019)
- Idaho Department of Health & Welfare (2017)
- Imperial County CA Sheriff's Office (2017)
- Twin Falls ID County Sheriff's Office (2017)
- Boise County ID Sheriff's Office (2017)
- Pierce County WA Sheriff's Office (2010)

**Federal Court Appointments**

Independent Compliance Director of Miami-Dade County Corrections and Rehabilitation Department. United States of — Case #13-21570-CIV

| | |
|---|---|
| America v Miami-Dade County. U.S. District Court for the Southern District of Florida. (2021 ongoing). Appointed by the federal court and given broad authority to bring Miami-Dade in compliance with a 2013 Consent Agreement. Substantial compliance was achieved, and the Consent Agreement was terminated in November 2024. | Settlement Agreement |
| Federal Court Monitor - Chavez v Santa Clara County. Consent Decree. U.S. District Court for the Northern District of California, Eureka Division (2019 ongoing) | Consent Decree<br>Case #15-cv-05277<br>Use of Force |
| Federal Court Monitor – Turner v San Bernardino County Sheriff's Department Consent Decree. U.S. District Court for the Central District of California, Eastern Division (2018-2025) | Consent Decree<br>Case #5:16-cv-00355<br>Use of Force |
| Consultant to the Court Experts – Armstrong v Newsom. California Department of Corrections and Rehabilitation Investigation and Disciplinary Process | Consent Decree<br>Case # cv94-2307 |

## Criminal and Civil Consulting

**Trial or deposition testimony noted in bold below**

| | |
|---|---|
| Park v Alameda Co (CA). US District Court for the Northern District of California. (2026) | Case #4:22-cv-01817<br>Jail suicide |
| Wagner v Harris Co (TX). US District Court for the Southern District of Texas. (2026) (Two separate plaintiffs) | 4:23-cv-02886<br>Use of Force |
| Hemmer v Riverside Co (CA). US District Court for the Central District of California. (2026) | Case #5:22-cv-1247<br>Jail Homicide |
| Moore v Missouri DOC (MO). US District Court for the Western District of Missouri. (2026) | Case #2:24-cv-04107<br>Prison death |
| Seward v City of Meridian (ID). US District Court for the District of Idaho (2026). | Case #1:25-cv-00221<br>Use of force |
| Cunningham v Bergen Co (NJ). US District Court for the District of New Jersey. (2026) | Case #2:19-cv-06154<br>Jail Homicide |
| Borroto v Hudson Co (NJ). US District Court for the District of New Jersey. (2026) | Case #2:10-cv-17148<br>Jail suicide |

| | |
|---|---|
| Chau v Bernalillo Co (NM). US District Court for the District of New Mexico. (2026) | Case #25-cv-00772<br>Jail death. |
| Adams et al v Cook Co (IL). U.S. District Court for the Northern District of Illinois (2026) | Case #1:23-cv-01390<br>Harassment / Hostile work environment |
| Hanchett v Snohomish Co (WA). Superior Court for King County (2026) | Case #25-2-00725-1<br>Jail death. |
| Joiner v Correcthealth Columbia et al (GA). U.S. District Court for the Southern District of Georgia (2025) | Case #1:25-cv-00016<br>Jail death. |
| Peters v Hernando Co (FL). U.S. District Court for the Middle District of Florida (2025) | Case # 8:24-cv-00893<br>Jail death. |
| Jacksonville County (FL) Fourth Judicial District State Attorney's Office (2025) | Criminal review of jail death. |
| Michael v Daniels Co (MT). U.S. District Court for the District of Montana, Great Falls Division. (2025) | Case # CV-24-56<br>Illegal conduct by sheriff |
| **Deposed:** McCoy v San Diego Co (CA). US District Court for the Southern District of California (2025) | Case #22-cv-01724<br>Jail homicide by cellmate |
| Marroquin v San Diego Co (CA). U.S. District Court for the Southern District of California (2025) | Case #3:23-cv-00978<br>Jail death |
| Altstatt v County of Oklahoma (OK). U.S. District Court for the Western District of Oklahoma (2024) | Case #CIV-2022-811<br>Protection from harm |
| Tackett v Murphy (ID). U.S. District Court for the District of Idaho (2024) | Case #1:22-cv-00110<br>Duty of Care/Personnel |
| **Deposed:** Dunsmore et al v San Diego County (CA). U.S. District Court Southern District of California (2024) | Case #3:20-cv-00406<br>Class action case on jail practices |
| Smith v Santa Cruz Co (CA). U.S. District Court for the Northern District of California, San Jose Division (2024) | Case #5:21-cv-00421<br>Jail death |
| Schomer v Elko Co (NV). U.S. District Court for the District of Nevada (2024) | Case #3:23-cv-00390<br>Jail death |
| **Deposed:** Moreno v San Diego Co (CA). U.S. District Court for the Sothern District of California (2024) | Case #21-cv-1956<br>Jail death |

| | |
|---|---|
| **Court Testimony:** State of New Hampshire v Matthew Millar (2024) | Criminal murder charge from in-custody death |
| Bohanan v Butler Co (OH). U.S. District Court for the Sothern District of Ohio, Western Division (2024) | Case #1:22-cv-00380<br>Jail death |
| Peters v City and County of Denver (CO). U.S. District Court for the District of Colorado (2024) | Case #23-cv-750<br>Jail use of force |
| Lundmark v Beltrami & Clearwater Co (MN). U.S. District Court for the District of Minnesota (2024) | Case #22:cv-01493<br>Jail death |
| Spriestersbach v Hawai'i. U.S. District Court for the District of Hawai'i (2024) | Case #1:21-cv-00456<br>Unlawful imprisonment |
| Doe v Santa Barbara Co (CA). U.S. District Court for the Central District of California (2024) | Case #2:20-cv-04334<br>Sexual misconduct |
| Stacey v. Madison County (ID). U.S. District Court for the District of Idaho. (2023) | Case #4:23:cv-119<br>Jail homicide |
| State of Colorado v Humphrey (2023) | Criminal review of a use of force |
| State of Colorado v Adams County jail deputies (2023) | Criminal review of an in-custody death |
| **Deposed:** Serna v San Diego County (CA). U.S. District Court for the Southern District of California (2023) | Case #20-CV-2096<br>Jail death |
| Abbie v Shasta County (CA). U.S. District Court for the Eastern District of California (2023) | Case #2:20-CV-01995<br>Jail use of force death |
| **Deposed**: Hernandez/Zumwalt v Riverside County (CA). U.S. District Court for the Central District of California, Eastern Division (2023) | Case #5:21-CV-01791<br>Use of force death |
| Hall v Gooding County (ID). U.S. District Court for the District of Idaho (2023) | Case #1:22-CV-00277<br>Use of force |
| **Deposed**: Buxton v Mower County (MN). Minnesota District Court, Third Judicial District. (2023) | Case #50-CV-22-1660<br>Jail medical death |
| Wilson v San Diego County (CA). U.S. District Court for the Southern District of California (2023) | Case #20-cv-0457<br>Jail medical death |

| | |
|---|---|
| **Deposed**: Hepner v Tulare County (CA). U.S. District Court for the Eastern District of California – Fresno (2023) | Case #1:19-cv-00774<br>Use of force |
| Arispe (Alexander) v Riverside County (CA). U.S. District Court for the Central District of California. (2023) | Case #5:21-cv-00417<br>Jail suicide |
| Smallwood (Robertson) v Anderson County (SC). U.S. District Court for the District of South Carolina, Anderson Division (2023) | Case #0:22-cv-00232.<br>Use of force death |
| Wright v Ohio Youth Services (OH). (2022) | Ohio Claims Case #2021-00495. In-custody death. |
| Maine v Cochran (ME). District Attorney (2022) | Criminal review of a use of force incident |
| Maine v Becerra (ME). District Attorney (2022) | Criminal review of a use of force incident |
| Estate of Scott Hultman v Ventura County (CA). U.S. District Court for the Central District of California - Western Division. (2022) | Case #2:21-cv-06280<br>Jail suicide |
| Williams v Dixon (Washington D.C.) (2022) | Declaration regarding jail searches |
| **Deposed**: Luttrell v Santa Cruz County (CA). U.S. District Court for the Northern District of California, San Jose Division (2022) | Case #5:19-cv-07300<br>Inmate physical and sexual attack by other inmates |
| **Deposed:** Payne v Clay County (TX). U.S. District Court for the Northern District of Texas, Wichita Falls Division (2022) | Case # 7:21-cv-0080<br>Jail suicide |
| Cumberland County (ME). District Attorney (2022) | Criminal review of several use of force events |
| Campbell v Butler County (OH). U.S. District Court for the Southern District of Ohio (2022) | Case # 1:20-cv-00678<br>Jail suicide |
| Yellowbear v Salmonsen (MT). U.S. District Court for the District of Montana, Butte Division (2022) | Case # cv-21-59<br>Failure to protect |
| Neville v Forsyth County (NC). U.S. District Court for the Middle District of North Carolina (2022) | Case # 1:21-cv-758<br>In-custody death, use of force |
| Little v Nassau County (NY). U.S. District Court Eastern District of New York (2022) | Case # CV-14-125<br>In-custody death (homicide) |

| | |
|---|---|
| **Deposed:** Greer v San Diego County (CA). U.S. District Court for the Southern District of California (2022) | Case #19-cv-0378<br>Medical indifference |
| **Deposed:** Munday and Devine v Beaufort County (SC). U.S. District Court for District of South Carolina (2022) | Case #9:20-dv-02144<br>Strip searches |
| State of Idaho v Elias Cerdas (2022) | Officer-involved shooting |

# EMPLOYMENT

**2015-current**

## FOUNDER & PRESIDENT

GAR, INC. AND LAW ENFORCEMENT POLICY CENTER, LLC

Law enforcement and jail consulting, specializing in in-custody deaths, protection from harm and the use of force. Details are noted above.

**2005 – 2015**

## SHERIFF

ADA COUNTY SHERIFF'S OFFICE, BOISE, ID

Elected sheriff in 2004, leading 665 people in a full-service law enforcement agency, including responsibility for:

- All county police services and three contract police departments.
- 1,300 bed jail, recognized by the U.S. Department of Justice and others as a model jail for operation, management and minimal use of force.
- Consolidated emergency dispatch center serving all local law enforcement, fire and EMS agencies in the county; and
- Pretrial services and sentencing alternatives for offenders.

**1983 – 2004**

## DEPUTY TO UNDERSHERIFF

ADA COUNTY SHERIFF'S OFFICE, BOISE, ID

**Undersheriff** (appointed 2002) – Oversaw all aspects of the agency including patrol, the jail, dispatch, policy, planning and all other aspects of administration.

**Captain** (promoted 2001) – Directed the Administrative Services Division that included Finance, Training, Human Resources, Policy, Evidence and other administrative functions of the agency.

**Lieutenant** (promoted 1998) – Patrol Commander responsible for all patrol functions, as well as the SWAT, bomb, canine and traffic teams and supervised the Civil Process Office. During this time, led the Sheriff's Office expansion from one contract city police department to three.

**Sergeant** (promoted 1993)

- Jail housing sergeant – Supervised jail deputy teams.
- Jail administrative sergeant – Oversaw policy, purchasing and other administrative duties.
- Patrol sergeant – Supervised patrol teams in the field.
- Administrative sergeant – Worked directly for the sheriff on special projects such as policy, budgeting, internal affairs, training, etc. Rewrote full agency policy manual.

**Deputy**

- Jail deputy and later a jail training officer – Led most of the creation of the first formal jail training program.
- Patrol deputy and later a field training officer – Helped revise / update the training program.
- Detective – Ultimately assigned many complicated and high-profile crimes.

**2006 – 2011**

### ADJUNCT PROFESSOR

BOISE STATE UNIVERSITY CRIMINAL JUSTICE & PUBLIC ADMINISTRATION DEPARTMENTS

**2003 – 2016**

### ADJUNCT PROFESSOR AND ADVISOR

NORTHWESTERN UNIVERSITY CENTER FOR PUBLIC SAFETY

## EDUCATION & TRAINING

**2001 - 2008**

### FBI ACADEMIES AND SEMINARS

- **National Executive Institute** – Prestigious international executive education and exchange course (2008)
- **Law Enforcement Executive Development Seminar** – Quantico, VA (2006)
- **Executive Command College** – (2003)
- **National Academy** – University of Virginia, Quantico, VA GPA: 4.0 (2001)

**2006**

### NATIONAL SHERIFF'S INSTITUTE

NATIONAL INSTITUTE OF CORRECTIONS (Longmont, CO)

**2005**

### MASTER'S DEGREE, CRIMIMAL JUSTICE ADMINISTRATION

BOISE STATE UNIVERSITY

- Distinguished Graduate Award for 2008
- Criminal Justice Program Graduate Academic Excellence Award for 2003-2004
- Selected Boise State University Distinguished Alumni
- GPA: 4.0

1997

### SCHOOL OF POLICE STAFF & COMMAND

NORTHWESTERN UNIVERSITY CENTER FOR PUBLIC SAFETY

- GPA: 4.0

1986

### BACHELOR'S DEGREE, CRIMIMAL JUSTICE ADMINISTRATION

BOISE STATE UNIVERSITY

1985

### PEACE OFFICER CERTIFICIATIONS

IDAHO PEACE OFFICERS' STANDARDS AND TRAINING

- Earned Basic, Intermediate, Advanced, Supervisory and Executive Certifications
- Graduated #1 in the police academy

## PROFESSIONAL APPOINTMENTS

- Advisory Board for the National Institute of Corrections, Vice-Chair, appointed by the U.S. Attorney General
- Idaho Peace Officers Standards and Training Council, Chair
- Idaho Criminal Justice Commission, Vice Chair
- Idaho Criminal Justice Grants Council, Chair
- Pretrial Justice Institute (Washington, D.C), Chair
- Idaho Sheriff's Association, President
- National Judicial Task Force to Examine State Courts' Response to Mental Illness, member
- Central Illinois Regional Communications Center Board, Member on behalf of the Macon County Sheriff
- Ada County Critical Incident Task Force, Chair
- Idaho Association of Counties, member and Leadership Award recipient
- Intermountain Regional Computer Forensic Laboratory, Board member
- Family Advocacy Center and Educational Services, Board member
- Ada County Mental Health Court, Board member
- Ada County Drug Court, Board member
- Boise State University think-tank on innovation, Member

## PUBLICATIONS

2017 **Bail Reform Restores Basic American Values of Freedom and Justice.** Fox & Hounds www.foxandhoundsdaily.com. August 2017.

2015 **Eyewitness ID – The Importance of Getting it Right** with Jennifer Thompson. *Sheriff Magazine.* May/June 2015.

2015 **Here to Help: Taking Better Care of Cops** with Samantha Westendorf. *Fraternal Order of Police Journal*. Volume 10; Number 1: 2015.

2014 **Why Sheriffs Should Champion Pretrial Services** with Stan Hilkey, Mesa County CO Sheriff, and Beth Arthur, Arlington County VA Sheriff. *Sheriff Magazine.* May/June 2014.

2013 **Wise Beyond Your Field** with Dr. Nancy Napier, Jamie Cooper, Mark Hofflund, Don Kemper, Bob Lokken, Chris Peterson and John Michael Schert. CCI Press.

2012 **Treating Mental Illness: Jails are Not the Answer.** *The Blue Review*. https://thebluereview.org/treating-mental-illness/

2012 **In Pursuit of Cooperation: Idaho Police Agencies Join Together** with Boise Police Chief Mike Masterson. *FBI Law Enforcement Bulletin*. December 2012.

2012 **Jail Culture and Violence Part I and II.** Two whitepapers written at the request of the Los Angeles County Citizen's Commission on Jail Violence.

2011 **Gang Rules: Creativity in Unexpected Places** with Dr. Nancy Napier, Ron Freeman, Chris Petersen, Jamie Cooper, Don Kemper, Jim Balkins, Charlie Fee, Mark Hofflund, Trey McIntyre, John Michael Schert and Bob Lokken. *People & Strategy.* Vol. 34, Issue 3, 2011.

2008 **Turnaround, in a Good Jail** with Dr. Jeffrey Schwartz. *American Jails*. February 2007.

## PRESENTATIONS

Presentations on organizational behavior and development, the effective use of data, contemporary preferred practices, system reform and other topics to:

- United States Congress
- NASA Launch Services Program Leadership Retreat
- Police Executive Research Forum
- National Center for the State Courts
- Prosecutors Alliance of California
- American Jail Association
- American Correctional Association
- MyLawCLE: Civil Rights Cases
- National Sheriff's Association
- Idaho Department of Transportation Leadership Retreat
- State sheriffs' associations across the U.S.
- Los Angeles Citizens' Commission on the Reduction of Jail Violence
- Community Resources for Justice
- Human Rights Watch
- American College of Correctional Physicians
- Allegheny County (PA) Jail Oversight Board

## VOLUNTEER WORK

- Idaho Leaders United, Founder & Board Member
- Saint Alphonsus Health System Advisory Board
- Saint Alphonsus Regional Medical Center Foundation, Chair
- National Executive Institute Associates (FBI)
- Ada County Sheriff's Youth Foundation

- United Way of Treasure Valley, Chair
- Big Brothers Big Sisters of Southwest Idaho, Chair
- Festival of Trees community-wide fundraising event, Co-chair
- Founder and Chair of Defend and Protect Idaho
- Idaho Leaders United board member
- Idaho State Historical Society
- Recipient of the 2012 National Philanthropy Day Honor Roll Award National Sheriff's Association
- International Association of Chiefs of Police
- Police Executive Research Forum
- Boise State University Alumni Association
- Ada County Sheriff Employee's Association, President
- Children's Home Society
- Junior League of Boise

# EXHIBIT "B"

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD;

Plaintiff,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE CORPORATION; CHRISTINA GOODALL (SUED AS CHRISTINA ANOSIKE) , IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; DEFENDANT DEPUTIES DOES 1-10, DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10.

Defendants.

**CASE NO.** 3:23-cv-1357-CAB-BLM

## DEPOSITION OF

GARY L. RANEY

Thursday, September 3, 2026

10:08 AM to 12:17 PM

Reported By: Lesli Keligian, CSR No. 6006, RPR

## VIA REMOTE VIDEO TECHNOLOGY

**Hines Reporters**

**INTERNATIONAL TOWER**
**888 S. FIGUEROA STREET, SUITE 940, LOS ANGELES, CALIFORNIA 90017**
**866.432.4300**

**LOS ANGELES * SAN FRANCISCO * SAN DIEGO**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ESTATE OF LONNIE RUPARD, By and Through His Successors-In-Interest Justino Rupard & Ronnie Rupard; etc., et al., | ) | |
| Plaintiffs, | ) | |
| versus | ) | No. 3:23-cv-1357 CAB-JAC |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; etc., et al., | ) | |
| Defendants. | ) | |

REMOTE DEPOSITION OF

GARY L. RANEY

THURSDAY, SEPTEMBER 3, 2026

LESLI KELIGIAN,
CERTIFIED SHORTHAND REPORTER NO. 6006, RPR

DEPOSITION OF GARY L. RANEY, taken on behalf of the Defendants, remotely via Zoom videoconferencing, on Thursday, September 3, 2026, at 10:08 A.M. (PDT), before Lesli Keligian, CSR No. 6006, RPR.

APPEARANCES:

For Plaintiffs:

IREDALE & YOO, APC
BY: EUGENE G. IREDALE, ESQ.
105 West F Street
Fourth Floor
San Diego, California 92101-6036
(619) 233-1525
egiredale@iredalelaw.com

-and-

LOWE LAW, LLP
BY: JEREMIAH A. LOWE, ESQ.
402 West Broadway
Suite 1720
San Diego, California 92101
(619) 878-2725
jeremiah@lowelawapc.com

APPEARANCES:

For Defendants:

COLLINS + COLLINS
BY: ROBERT S. KAHN, ESQ.
2011 Palomar Airport Road
Suite 207
Carlsbad, California 92011
(760) 274-2110
rkahn@ccllp.law

For Defendants Dr. Anthony Cruz and Liberty Healthcare of California, Inc.:

TRESSLER, LLP
BY: ALEXANDRA SENNET, ESQ.
909 North Pacific Coast Highway
Suite 840
El Segundo, California 90245
(310) 203-4800
asennet@tresslerllp.com

Also Present:

Kameron Hines, Videographer

# I N D E X


| WITNESS | PAGE |
|---|---|
| GARY L. RANEY | |
| By Mr. Kahn | 8<br>72 |
| By Mr. Iredale | 66 |


# E X H I B I T S


| PLAINTIFFS' | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition of Plaintiffs' Retained Expert Witness Gary Raney Scheduled For August 4, 2026 | 21 |
| Exhibit 2 | Notice of Deposition of Plaintiffs' Retained Expert Gary Raney Scheduled for September 3, 2026 | 22 |
| Exhibit 3 | Curriculum Vitae | 20 |
| Exhibit 4 | Witness' Report | 40 |
| Exhibit 5 | Rebuttal Report of Defendants' Expert Paul Cappitelli | 62 |


# I N F O R M A T I O N   R E Q U E S T E D

(None.)

# I N D E X (Cont'd)

## Q U E S T I O N S   M A R K E D

| PAGE | LINE |
|---|---|
| 28 | 21 |
| 33 | 6 |

Thursday, September 3, 2026

10:08 A.M. (PDT)

-oOo-

10:08:11 THE VIDEOGRAPHER: All right. Good
10:08:12 morning. Here begins Media No. 1 in Volume I in the
10:08:15 deposition of Gary L. Raney in the matter of Estate
10:08:20 of Lonnie Rupard versus County of San Diego being
10:08:25 heard in the United States District Court, Southern
10:08:28 District of California. The case number is
10:08:29 3:23-cv-1357-CAB-JAC.
10:08:41 Today's date is Thursday, September 3rd,
10:08:44 2026. The time on the video is 11:08 A.M. mountain
10:08:50 time.
10:08:50 This deposition is being taken via Zoom
10:08:53 remote video technology and is being made at the
10:08:56 request of the defendants.
10:08:57 Your videographer today is Kameron Hines
10:09:00 here on behalf of Hines Reporters located at
10:09:03 888 South Figueroa Street in Los Angeles,
10:09:05 California.
10:09:06 Would counsel and all present today please
10:09:08 identify yourselves and state whom you represent
10:09:11 beginning with the witness.

10:14:16 happy to rephrase. I'm not here to trip you up or try and confuse you in any way.

10:14:22 A Great.

10:14:22 Q Also, I will acknowledge that our court reporter -- since we're all here on Zoom, I will certainly try to not talk on top of you. If you're giving an answer, I will try to not speak at the same time. All I would ask is that you do the same so that Lesli can get a clear record of everything that's going on here today; is that okay?

10:14:46 A Yes.

10:14:47 Q Okay. If you need to take a break for any reason, please let me know. It's not a problem. I've plugged in my computer. Hold on a second.

10:15:01 All right. That being said, did you obtain any information in this case that you used to form your opinions orally?

10:15:27 A No, not that I can think of.

10:15:30 Q Okay. Other than the items that you listed in your report, those 85 plus the two that you mentioned a few minutes ago, is there any other material that you used to gather and form your opinions in this case that have not been identified?

10:15:51 A Well, there's a multitude of readings and such throughout my career, but none that are

specific to this case.

Q Okay.

MR. IREDALE: Mr. Kahn, let me -- with your permission, let me just clear this up. I just spoke to my associate who had conveyed the materials to you this morning, and in your materials she verified there is a single one-page document headed "Invoice" further identified as Invoice No. Rupard 0726, and it's from GAR, Inc., Justice Consulting. So that should be in the materials you have.

MR. KAHN: I will take a look and see, and we can deal with this even after the deposition, Gene. I don't think that's a huge issue. Trial is not forthcoming imminently, so I think it's okay.

Q Okay. It's my understanding you have prepared one report and one supplemental report in this case; is that correct?

A Correct.

Q Okay. Have you prepared any other written reports other than the one dated July 14th and the rebuttal report dated August 5th?

A No.

Q Have you been asked or are you planning to prepare any additional reports or supplemental reports?

10:17:42 A No.
10:17:48 Q Of the materials contained in your file that you used to help either form or support your opinions, were any of those obtained by you for the first time after you issued your written report in this case?
10:18:06 A Yes.
10:18:08 Q What would that be?
10:18:11 A Defense expert reports.
10:18:46 Q Let's go through some personal information, and we'll get that out of the way.
10:18:52 Where do you currently reside, sir?
10:18:55 A Our primary residence is in Garden City, Idaho.
10:19:05 Q And do you have a separate business address?
10:19:08 A I have a mailing address, a personal mailbox address, in Boise, Idaho.
10:19:24 Q And who is your current employer, if you have one?
10:19:29 A I'm self-employed.
10:19:30 Q Okay. And what's the name of your business?
10:19:34 A GAR, Incorporated.
10:19:40 Q Okay. And what is the nature of that

10:19:45 business?
10:19:46 A For the most part, correctional consulting
10:19:51 and expert witness work.
10:20:06 Q And approximately how long have you been
10:20:08 employed as a correctional consulting expert?
10:20:22 A I think I did my first expert witness case
10:20:25 when I was still sheriff. I want to say that was
10:20:28 2012. I retired in 2015 and created GAR,
10:20:33 Incorporated, at that time and have been operating
10:20:35 it continuously since.
10:20:51 Q And what is your usual hourly rate billed
10:20:54 for your expert services?
10:20:57 A Currently $550 an hour.
10:21:04 Q Are you a member of any professional
10:21:06 organizations?
10:21:07 A Yes.
10:21:09 Q What would those be?
10:21:19 A I'd probably have to look back. American
10:21:22 Correctional Association, American Jail Association,
10:21:29 Lease Executive Research Forum, Law Enforcement
10:21:37 Leaders Association. There might be one or two
10:21:48 more, but they would be less important.
10:21:50 Q Okay. And just briefly, can you describe
10:21:56 your formal education graduating high school and
10:22:02 after.

10:22:03 A I have a Bachelor's degree and a Master's degree.
10:22:10 Q And where did you receive your Bachelor's degree?
10:22:13 A Both from Boise State University.
10:22:17 Q And what is your Bachelor's degree in?
10:22:20 A Criminal justice administration.
10:22:24 Q And when did you receive that degree?
10:22:29 A 1986, I think.
10:22:35 Q And what is your Master's degree in?
10:22:38 A Criminal justice administration. I received it in 2005.
10:22:47 Q Okay. After receiving your Master's degree, have you taken any classes or received any specified specifications or certifications in criminal justice on top of your Master's degree?
10:23:04 A Formal education outside of conferences and trainings because I was sheriff until 2015, so I went to many conferences that included trainings in those conferences. I probably went to some specialized training along that way.
10:23:22 More recently I have attended some correction-specific courses since I've retired.
10:23:42 Q Okay. All right. With regard to this particular case, do you believe that the facts of

10:23:59 the case are beyond the understanding of the average juror such that a person with specialized knowledge, skill, or education must explain them?

10:24:14 A I think the preeminent facts are pretty clear. I think understanding what corrections operations, policies, and practices should have been would require an expert -- or experts.

10:24:40 Q Okay. All right. Just going briefly back to some of the professional organizations you mentioned, American Correctional Association, how does one become a member of the American Correctional Association?

10:25:00 A I think you just join. I don't -- I don't remember any requirements for membership, but I don't recall.

10:25:11 Q Okay. Does membership in the American Correctional Association qualify you as holding any type of certification?

10:25:32 A No.

10:25:42 Q With regard to the American Jail Association, how does one become a member?

10:25:48 A The same thing. I think you just join.

10:25:50 Q Okay.

10:25:52 A Both of those might have different memberships depending on your professional capacity.

10:26:01 I remember some organizations, for example, if you're government employed is one type of membership. If you're a consultant or -- is another type, a vendor is another type. I just don't recall.

10:26:14 Q Okay. All right.

10:26:15 As you sit here today, is there any professional organization that you are a member of that would require some specialized training or position to become a member?

10:26:42 A I'm not sure about the term "membership." I'm an instructor for the jail -- I think they call it now the Jail and Prison Legal Liability Course by the Americans for Effective Law Enforcement or AELE. So it seems like when I started doing that, they had some questions about education and all of that, but that's all I can think of.

10:27:13 Q Okay. Aside from your Master's degree and Bachelor's degree, do you hold any special licenses or certifications?

10:27:32 A No. I had -- I received post certification that's since lapsed, so, no, nothing I can think of right now.

10:27:50 Q And is your post-certification lapse simply because you retired and are no longer a sheriff?

10:35:20 Washington Correction Center for Women, does that CV accurately reflect your employment history post college?
10:35:33 A Yes.
10:35:34 Q Okay. In addition to the employment history, I believe your CV lists a number of publications; is that your understanding?
10:35:51 A Yes.
10:35:51 Q Are those publications that are listed in your CV a complete list of publications that are attributed to you in one way or another that are related to your expertise in corrections practice management?
10:36:10 A Yes.
10:36:11 Q Okay. Are there any additional publications that would be added to the list to make it full and complete or is it full and complete as it is right now?
10:36:24 A With specifically publications, meaning --
10:36:27 Q Yeah, just publications.
10:36:33 A No, this is it.
10:36:47 Q All right. Are there any cases where you have worked as an expert witness in the last four years where you prepared a report but did not end up testifying either at deposition or at trial?

10:37:14 A Oh, many.
10:37:15 Q Okay. Can you give me an approximate number?
10:37:22 A I could count them on my CV here, but, no, I would -- it would be a guess.
10:37:27 Q Okay. If I gave you a range, could you give me a range, you know, 5 to 10, 10 to 20?
10:37:42 I don't want to have to go through each separate one. I don't think that would be very productive.
10:37:48 A I completely understand. I couldn't even guess how many cases I've had in the last four years, so I don't have a baseline.
10:37:57 Q Okay. Are there any cases in the last four years that you have worked on as an expert in corrections practice management that are substantially similar to the facts in this case?
10:38:22 A Regarding a starvation or malnourishment death, I cannot think of any. I've had other deaths like dehydration or overhydration. And as far as the correctional practices aspect that -- many cases similar to that, meaning safety checks and attentiveness to inmate needs or IP needs, many, many cases regarding those.
10:38:49 Q Okay. Have you ever failed to qualify or

10:47:34 different fee schedule, but that would be the only
10:47:37 different thing.
10:47:39 Q Okay. And earlier you testified your
10:47:42 current rate is $550 an hour; am I correct in that?
10:47:47 A That's correct. And this one is probably
10:47:51 $500 an hour.
10:47:53 Q Okay. And is that how you typically
10:47:57 charge, you just charge by the hour, not any
10:48:00 particular fixed fee for a particular task?
10:48:03 A Correct.
10:48:03 Q Okay.
10:48:09 A I should say there is a retainer fee that's
10:48:12 fixed.
10:48:13 Q Fair enough. Is the retainer fee used
10:48:19 typically to go against hours worked and then either
10:48:22 replenished for work billed on a going-forward
10:48:25 basis?
10:48:26 A Correct. But it's nonrefundable if they
10:48:30 don't use the hours or the case settles or --
10:48:33 Q Okay. What is your understanding of your
10:48:43 assignment in this case?
10:48:45 A To analyze the case and determine whether
10:48:47 or not the policy, practices, procedures by the
10:48:50 sheriff's office complied with either Title 15,
10:48:54 whatever other standards I might use, which I used

American Correctional Association standards, or generally accepted jail practices.

Q Okay. And did you do all that you were asked to do in this case?

A I believe so.

Q Okay.

A You would have to ask Mr. Iredale.

Q Did you do anything in this case that was beyond what you were asked to do?

A No.

Q Did you personally do all of the work that led to your opinions in this matter?

A Yes.

Q Okay. Do you believe there's any more investigation or analysis you need to do in this case?

A Not for the current opinions --

Q Okay.

A -- if that makes sense.

Q I think it makes sense.

If you were asked to do additional work and it required additional investigation, you would do that investigation; correct?

A Presumably, yes.

Q Okay. As you sit here today, are you

10:50:41 prepared to express your professional opinions in
10:50:45 this case?
10:50:46     A    Yes.
10:50:58     Q    Do you anticipate doing anything in
10:51:00 addition to the work you've already done in this
10:51:03 case in the future?
10:51:05     A    Only testimony.
10:51:21     Q    What was your process for preparing your
10:51:23 report?
10:51:26     A    It's outlined at the front of my report,
10:51:29 but I essentially look at the facts of the case, the
10:51:33 reports, the policies, the videos, all of those
10:51:36 things. If I have to brush up on something, for
10:51:39 example, the American Correctional Association's
10:51:39 standards or Title 15 standards, I'll review those
10:51:46 to make sure that I'm accurate in my recollection
10:51:48 and application of those.
10:51:52         So I look at the -- what the deputies did
10:51:56 and whether the policy was well constructed or
10:52:00 properly constructed and whether they complied with
10:52:03 that policy. And, then, in some cases this would --
10:52:08 some degree whether or not the training and
10:52:11 supervision were adequate in all of that.
10:52:15     Q    Okay. Did the process you use for
10:52:25 preparing your report in this case differ from the

10:54:41 over the days preceding Mr. Rupard's death and not
10:54:46 seen something. So I didn't focus on that in the
10:54:49 report, but the policy required that they verify,
10:54:51 particularly on the counts, the hard counts,
10:54:55 comparing the face card. And it's a little bit
10:55:00 vague in the policy, but I think from a practical
10:55:03 standpoint, the jury may have to -- also up to you,
10:55:06 not up to me -- the jury may have to determine
10:55:10 whether or not they think it was reasonable that
10:55:12 roughly a dozen or so deputies looked in on him at
10:55:17 least 24 hours a day and never noticed that he was
10:55:22 dying.
10:55:31 MR. KAHN: Okay. All right. I am going to
10:55:43 now share another document. I'm going to share a
10:55:48 copy of your report.
10:55:58 Q Can you see that on your screen, sir?
10:56:02 A It's easier to see that on mine, if that
10:56:04 works for you.
10:56:06 Q Okay. You have a hard copy of the report
10:56:08 with you?
10:56:09 A I have it on my monitor.
10:56:11 Q Okay. And I have a 47-page document on my
10:56:14 screen which I believe is the totality of your
10:56:17 report. Is that what you have?
10:56:19 A That looks correct.

10:56:23 Q Okay. Fair enough.
10:56:27 MR. IREDALE: Mr. Kahn, may I just inquire, is this an exhibit, and, if so, what is the marking?
10:56:33 MR. KAHN: This is going to be marked as Exhibit No. 4.
10:56:36 MR. IREDALE: Thank you.
10:56:37 (Whereupon, the document referred to was marked as Plaintiffs' Exhibit 4 for identification by the Reporter, a copy of which is attached hereto.)
10:56:55 BY MR. KAHN:
10:56:56 Q All right. To start out, sir, what are the opinions you have formed in this case?
10:57:02 A That,
10:57:02 "The San Diego Sheriff's office staff violated California Title 15 American Correctional Association accreditation standards, generally accepted jail practices, and its own policy by failing to monitor Rupard's well-being and take action to keep his cell reasonably clean. Had they done so, it is more likely than not that they would have recognized his deteriorating physical health."

Number two,

"The SDSO violated generally accepted jail practices by failing to provide sufficient training and supervision on California Title 15 requirements on cleanliness and housekeeping as well as recognizing and responding to unsanitary conditions especially involving someone with a mental illness."

And, number three,

"The SDSO, particularly Detective Blumenshine, failed to follow generally accepted law enforcement practices and conduct a thorough investigation that collected all of the pertinent evidence."

Q Okay. And I believe those opinions are expressed on Page 5 of your report; is that correct?
A That's correct.
Q Okay.
A It's really a reiteration from the Significant Opinions section at the end.
Q Okay. Now, if you would then, I guess, turn to Page 5, I have a few questions about that.
A Go ahead.

10:58:49 Q With regard to looking at the Summary of
10:58:54 Opinions No. 1, 2, and 3, which is what you just
10:58:58 read into the record, for No. 1, is the American
10:59:05 Correctional Association an oversight agency?
10:59:12 A No.
10:59:15 Q What is the American Correctional
10:59:16 Association?
10:59:20 A I explain this later in the report.
10:59:22 So it is an association that has
10:59:24 established accreditation standards. Accreditation
10:59:29 is voluntary for organizations, but it's heavily
10:59:33 relied upon in forming correctional policy across
10:59:34 the United States. So oftentimes you'll see a
10:59:38 policy with references to the ACA accreditation
10:59:41 numbers of the topic.
10:59:42 So it does not establish a greater
10:59:45 constitutional mandate, but it does help us
10:59:49 establish what generally accepted jail practices
10:59:53 should be.
10:59:54 So since there are no mandatory jail
10:59:57 practices in California other than Title 15, these
11:00:01 other areas, if there were standard jail practices
11:00:07 across the United States that were compulsory, they
11:00:10 would in part be derived from the lessons from the
11:00:17 American Correctional Association, the American Jail

11:00:19 Association, and similar areas.
11:00:30 Q Okay. And can you define what generally
11:00:33 accepted jail practices is?
11:00:35 A Yes, so, as I said, there are no compulsory
11:00:37 jail standards in the United States -- across the
11:00:41 United States, but if there were, those would be
11:00:43 derived from the generally accepted practices that
11:00:47 are wildly known to be the best ways or at least the
11:00:51 minimum ways that a jail should operate.
11:00:58 Q Okay. And in No. 1 when you're talking
11:01:17 about the accreditation standards, where does that
11:01:20 standard reside?
11:01:22 Like, where does it come from?
11:01:25 A The American Correctional Association.
11:01:28 Q Okay. And you said that's not a law. Is
11:01:31 it more of a recommendation?
11:01:37 A If an agency seeks accreditation, there are
11:01:42 mandatory standards that you have to meet all of
11:01:44 those, and then there are -- I don't remember the
11:01:46 terminology -- but it's a secondary standard where
11:01:48 you have to meet a certain percentage of them.
11:01:52 So in totality, you know, jails vary a lot,
11:01:55 particularly based on size, so these standards still
11:01:59 provide guidance and the best practices for
11:02:03 operating jails and prisons.

11:22:47 quarantine, has coexisted with his peers with no reported aggression, violence, or erratic behaviors. MHC observed IP standing at the cell door. This MHC introduced self and explained the reason for the meeting. IP was uncooperative AEB IP stating, 'I am fine. I don't want to talk to you.'"

11:23:28 That part that I just read from the paragraph on your report, is any part of that assessment the responsibility of custodial security staff?

11:23:49 A Yes.

11:23:51 Q What would be the -- what would be the responsibility -- or what parts would be the responsibility of the security staff?

11:23:59 A If I'm understanding your question correctly, observing whether or not he was aggressive with his peers, whether there was any violence, whether there were any erratic behaviors.

11:24:15 Of course, on their safety checks they should check and they may see him standing at his cell door.

11:24:22 She didn't explain -- she said the reason for the meeting. We kind of know what it is, but in

11:24:29 this sentence, she doesn't describe what that is, so
11:24:32 depending on the reason for the meeting, then
11:24:35 custody staff may well have been involved in that,
11:24:38 maybe, maybe not.
11:24:50 Q Okay. Anything else?
11:24:51 A I think that's all.
11:24:53 Q Okay. All right. Now, looking at Page 34
11:25:08 of your report, it starts with the heading "Laws,
11:25:12 Regulations, and Rules."
11:25:15 Do you see that?
11:25:16 A I do.
11:25:17 Q Okay. It then references California
11:25:22 Title 15 Section 1027.5 Safety Checks.
11:25:29 Do you see that?
11:25:29 A I do.
11:25:30 Q Okay. Without needing to read that into
11:25:36 the record, do you believe that this particular
11:25:42 section, 1027.5, was violated by any of the named
11:25:47 defendants?
11:25:48 A Yes.
11:25:50 Q Do you know who?
11:25:53 A It would only be supposition.
11:25:58 Q Okay.
11:25:59 A Because of the poor logging, which is
11:26:02 another issue we can talk about, that didn't record

11:26:06 exactly who made the check of Mr. Rupard on each safety check, then I don't know who conducted those safety checks at the times.

11:26:16 But, again, as we spoke of earlier, it's clear to me that those roughly dozen deputies who looked at him in the days before his death did not make direct visual observation with the intent of Section 1027.5.

11:26:33 And, as I said, it is a little vague in the Title 15. Title 15 was updated to include checking on well being. In my opinion, that was specifically because of San Diego County being the only county that I've ever heard of that doesn't think that a deputy should have what's most commonly referred to as skin and breath.

11:27:03 Q And when you say, "skin and breath," what does that mean?

11:27:07 A That's one of the most common ways to describe to new deputies or officers how to conduct a safety check and what they should look for. It is, unfortunately, not unheard of that a deputy will just walk by and not stop and look in and check on an inmate or IP in a cell. And, so, in training we say a safety check is signs of life and to check for skin and breath.

11:32:46 is a good example for accumulation of trash, poor personal hygiene, feces or urine outside of the toilet in the cell. Sometimes there's behaviors drawing or personal behaviors that are indicators of mental illness that can be harmful, but most typically the personal and environmental hygiene and then the trash being a part of that.

11:33:13 Even if that wasn't dangerous, the accumulation of trash can be mentally unhealthy for people. It's not a mental health opinion. That's a correctional practice belief.

11:33:35 Q Okay. Now, at the bottom of that same page there is a paragraph that starts, "When a cell is cleaned by IP workers."

11:33:56 Do you see that?

11:33:56 A Yes.

11:33:58 Q The sentence says,

11:33:59 "When a cell is cleaned by IP workers, generally accepted jail practices always require staff to remove the IP from the cell during cleaning, especially one who suffers mental illness and/or is an administrative -- or is in administrative segregation."

11:34:21 What generally accepted jail practices are

11:34:24 you referring to?
11:34:26 A It is widely accepted that you would never
11:34:31 send an inmate worker into a cell with a mentally
11:34:36 ill individual or somebody who is in administrative
11:34:38 segregation to clean their cell for risk of them
11:34:38 being attacked. There's other reasons, but that's
11:34:44 the main risk.
11:34:59 Q Is there any state or federal statute that
11:35:01 you would refer to for that generally accepted
11:35:03 practice?
11:35:04 A It's a constitutional protection-from-harm
11:35:07 issue if you were to put an inmate worker in harm's
11:35:11 way by knowingly subjecting them to that threat.
11:35:28 Q Okay. Turning to the next page, there is a
11:35:31 paragraph in the middle or just below the middle of
11:35:34 the page that's bolded. Do you see that, "The
11:35:38 SDSO"?
11:35:41 A Yes.
11:35:43 Q It says,
11:35:43 "The SDSO violated generally accepted
11:35:47 jail practices by failing to provide
11:35:50 sufficient training and supervision on
11:35:51 California Title 15 requirements on
11:35:54 cleanliness and housekeeping as well as
11:35:57 recognizing and responding to unsanitary

11:36:00 conditions, especially involving someone
11:36:03 with mental illness."
11:36:07 Did I read that correctly?
11:36:09 A You did.
11:36:18 Q Can you specify what training was lacking?
11:36:21 A As evidenced by their actions, the
11:36:23 accumulation of roughly nine days of garbage, the
11:36:28 feces that were in the cell, Mr. Rupard's personal
11:36:33 condition. All of those were significant failures.
11:36:44 Q In the process of forming your opinions in
11:36:47 this case, did you review all the relevant training
11:36:50 curriculum for the San Diego County sheriffs?
11:36:54 A I don't think so, but my inference in this
11:36:58 opinion is that regardless of what the training
11:37:02 materials may have said, it obviously didn't
11:37:07 operationalize into reality.
11:37:17 Q Okay. If we turn to the next page,
11:37:21 Page 44, there's a series of short paragraphs.
11:37:30 Towards -- just below of middle of the page, there's
11:37:33 a paragraph that starts, "The determination by the
11:37:38 medical examiner."
11:37:41 Do you see that?
11:37:41 A I do.
11:37:42 Q And without needing to read that paragraph
11:37:45 into the record, if you could review that short

11:37:48 paragraph, and then I just have one question on
11:37:50 that. Just let me know when you're done.
11:37:55 A Go ahead.
11:37:57 Q What evidence -- what evidence do you
11:37:59 believe is missing?
11:38:02 A So as we discussed most significantly, the
11:38:04 video evidence that was unrecoverable, and by
11:38:08 example it was only what I would call luck that he
11:38:11 had the additional 24 hours of video evidence from
11:38:14 the unrelated deaths otherwise he would have only
11:38:18 looked at 24 hours -- had 24 hours of video evidence
11:38:24 available.
11:38:25 Again, for somebody who is fundamentally
11:38:28 starved to death, that is a major blunder for an
11:38:33 investigation.
11:38:35 Again, memories fade, so the interviews
11:38:38 that could have been done -- I would have to look
11:38:43 back. I don't recall any or at least what I would
11:38:48 call sufficient interviews of other IP's in the
11:38:52 module or supervisors.
11:39:05 Q Okay. Now, the bottom of that page there's
11:39:19 a heading that is just below the bottom that says,
11:39:23 "Conclusions."
11:39:25 Do you see that?
11:39:25 A Yes, sir.

11:40:56 The sanitation issues of letting the trash and the filth build up in his cell the way that it did, while individuals had responsibility, the pattern and practice is clear. It went over days and days with many people. That's the organizational failure.

11:41:18 Q Okay. Now, turning to the next page, Page 45 of your report, the last three paragraphs before your signature -- is that what you see?

11:41:40 A Yes, sir.

11:41:41 Q Okay. If you could -- if you could review just those three short paragraphs, I just have a couple of questions. We don't need to read it into the record, I don't believe.

11:41:56 A Okay.

11:41:57 Q Just let me know when you're done.

11:42:40 A Go ahead.

11:42:41 Q All right. With reference to that first paragraph on the page, in your opinion, how did they -- how do you believe -- how do you believe that it contributed to Mr. Rupard's death?

11:43:05 Did that question make sense? It came out of my mouth, and I'm not even sure it made sense.

11:43:11 A I don't think so because I -- I don't think the purpose of this paragraph is -- each

11:43:19 contributing. I see. I see. That's what you're asking, the very last words.

11:43:24 Q Yeah. Let's put it -- I'll strike that question, and I'll ask a better question.

11:43:33 In your opinion, how did the condition of Mr. Rupard's cell contribute to his death?

11:43:44 A I'm not qualified to answer that.

11:43:47 Q Okay. In the forming of your opinions, did you rely on other -- someone else's or other people's opinions about the condition of the cell to form your opinion about -- regarding Mr. Rupard's death and the condition of his cell?

11:44:09 A His death from the medical examiner and, then, the condition of the cell from -- as we discussed, mostly the photographs, Dr. Badre's description, and the description from the medical distress response and investigation.

11:44:47 Q Now, with regards to some of the -- to what you state in that final paragraph on that page, taking aside the condition of Mr. Rupard's death -- the condition of his cell at the time of his death, understanding the opinions you've expressed about that today in your report, aside from the condition of his cell, where do you believe the security staff failed with -- you know -- let me strike that. I'll

ask a better question.

Where do you believe the custodial -- the custody security staff failed to perform their duties aside from the condition of the cell?

What evidence do you believe there is that they failed to do their duties with security checks?

A Again, I think the jury will find that likely unreasonable as the days passed by that nobody saw his physical condition and malnourishment enough to do something about it.

Whether they -- I can't say whether they're going to determine they saw it and ignored it or whether they never saw it. That would be up to them.

But my point is that the lack of proper safety checks that should have, as we discussed, well being, skin and breath, something over these days, and then the condition of cell both being likely harmful, but also an indication that somebody should have done something to verify his health.

Q Okay. Do you believe the security checks were regular and well documented?

A No.

Q Why?

A We don't know who checked on him when.

11:47:00 That in and of itself is a failure.
11:47:25 Q Now, when Mr. Rupard was found in his cell
11:47:33 deceased, was that during a regular check?
11:47:39 A I think so, but I don't recall. I'd have
11:47:41 to check.
11:47:42 Q All right. Do you believe that the
11:48:02 condition of Mr. Rupard's cell at the time of his
11:48:05 death was related to the cause of his death?
11:48:13 A I'm not qualified to answer that.
11:48:37 Q This is a 47-page document. Your report
11:48:40 really comprises just the first 45 pages; is that
11:49:01 correct?
11:49:02 (An off-the-record discussion was held.)
11:49:02 THE WITNESS: That's correct.
11:49:16 MR. KAHN: Now, let's see. I believe I am
11:49:22 just about finished. Rather than taking a break to
11:49:25 check my notes, Alexandra, do you have any questions
11:49:30 you want to ask?
11:49:31 MS. SENNET: You know what? I actually
11:49:33 don't have any questions.
11:49:34 Thank you very much. I appreciate you
11:49:36 being here, Mr. Raney.
11:49:39 THE WITNESS: Thank you.
11:49:40 MS. SENNET: You did everything I need you
11:49:42 to do. Thank you.

opinion that was touched upon in your previous testimony, the Summary of Opinions. You note,

"SDSO staff violated California Title 15 American Correctional Association accreditation standards, generally accepted jail practices, and its own policy by failing to monitor Rupard's well being and to take action to keep his cell reasonably clean. Had they done so, it is more likely than not that they would have recognized his deteriorating physical health."

Let me stop right there. May I ask if you would explain that opinion that you have and why it would have been had they taken care to clean his cell, they would have recognized his deteriorating physical health?

A The fact that he was in administrative segregation different from his pod or module there as well as the fact that he was mentally ill and had displayed violent tendencies at the time or at least very anti-social tendencies, they would have absolutely removed him from the cell to clean it. So in removing him from the cell, they almost certainly would have seen his physical condition, if

12:02:16 he could even get up and walk toward the end. I suspect, even though I'm not qualified to offer a medical opinion, that he would have had a difficult time walking in the last day or two prior to his death. But, nonetheless, they should have recognized his malnourishment.

Again, when cells are being cleaned and somebody with his condition with feces in the cell, that is a great opportunity to have somebody shower. And, so, on top of the normal observations, had they had him shower, it is highly likely that they would have seen his full physical condition and should have been concerned.

Q Now, the discussions that you've had regarding Module 7-D is, as I understand it, that was an administrative segregation unit or module.

And I need to ask you in that regard Counsel brought up a question about the testimony of one of the deputies that there were provisions for doing hygiene inspections and cleaning to ensure proper hygiene, adequate sanitary conditions within the cells.

Can you tell me based on your review of the evidence and specifically of the report of the homicide investigation and the deposition testimony

12:05:56 correct?
12:05:56 A Correct.
12:05:58 Q May I refer you to Deputy -- or Detective Blumenshine's report on what is listed as COSD 000270, if you have that?
12:06:32 A 270 you said?
12:06:33 Q Yes, sir.
12:06:37 A I have it up.
12:06:38 Q All right. At the bottom of the page, he says, "There is a list of individuals who declined to be interviewed." And then he lists out there on the Page 270 some five separate deputies who declined or declined by attorney and then on the following page, nine deputies who also declined to be interviewed.
12:07:14 And apparently he did not request those interviews until the latter part of the year 2023, more than a year and a half after the death took place.
12:07:30 A That's correct.
12:07:31 Q Is it typical in a homicide investigation when there are known witnesses for a competent detective to fail to request an interview for at least a year and a half after the homicide has occurred and the witness' identity is known?

12:07:53 A No, absolutely not. Part of the failure is he was conducting, as I understand it, a homicide investigation, criminal homicide investigation. And when he later saw policy violations, he said, "That's not my place. That's internal affairs' place."

12:08:11 But if he was conducting a proper homicide investigation, every one of these deputies on his list, plus additional people, should have had to invoke their Fifth Amendment privilege to remain silent in order for him to disregard them for a criminal investigation.

12:08:30 He sent letters and then didn't get responses on some of these. That's what might occur in an administrative investigation, but not in a criminal investigation, so just another part of the failure of him as an investigator.

12:08:46 Q Now, there is another question I had. I believe you became aware that there had actually on this very same module on the date before the death of Mr. Rupard, there had been the death of another IP, incarcerated person, whose name was Shuck. Are you aware of that?

12:09:15 A Yes.

12:09:20 Q And it was after Shuck's death that

Sergeant Matrone ordered that cleaning take place at least on certain cells?

A Correct.

Q And he apparently learned after Mr. Rupard's death that Mr. Rupard's cell had not, in fact, been cleaned?

A Correct.

MR. IREDALE: I think that's all I need. I have no further questions.

MR. KAHN: I just have one or two follow-ups real quick.

FURTHER EXAMINATION

BY MR. KAHN:

Q And this question may just display my inexperience in the case so far.

In your questioning from Mr. Iredale there is reference to the difference between an administrative investigation and a criminal investigation with regards to Detective Blumenshine.

A Yes, sir.

Q When did the investigation become a criminal investigation with regards to Mr. Rupard's death?

A It should have upon his death. Any

Mr. Lowe?

MR. LOWE: It doesn't matter. Either way. You can send it to Mr. Iredale is fine.

MR. IREDALE: We just get the transcripts and copy them and just give them all around.

THE REPORTER: Thanks, I appreciate that.

MR. LOWE: And you can send it to Mr. Iredale's office, etrans.

And no video at this point.

(An off-the-record discussion was held.)

THE VIDEOGRAPHER: This marks the end of Media No. 1 and concludes Volume I of the deposition of Gary L. Raney.

Total number of physical media used today is one. Off the record at 1:17 P.M. mountain time.

(The deposition concluded at 12:17 P.M.(PDT))

///

///

///

I, GARY L. RANEY, say I have read the foregoing deposition and declare under penalty of perjury that my answers as indicated are true and correct to the best of my ability.

Signed this ___ day of ____________, 20____, at ______________________________, California.

______________________________________
GARY L. RANEY

I, LESLI KELIGIAN, CSR No. 6006, RPR, certify: that the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was duly sworn; and that the transcript is a true record of the testimony so given.

Witness review, correction and signature was

(X) by code. ( ) requested.
( ) waived. ( ) not requested.
( ) not handled by the deposition officer due to party stipulation.

The dismantling, unsealing or unbinding of the original transcript will render the reporter's certificate null and void.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

Dated this 14th day of September, 2026.

LESLI KELIGIAN, CSR No. 6006

# EXHIBIT "C"

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**
**Case No.: 3:23-cv-01357**
**Estate of Lonnie Rupard, Plaintiff,**
**vs**
**County of San Diego et al, Defendants**

# REBUTTAL OF DEFENDANT'S EXPERT PAUL CAPPITELLI

**by**

**EXPERT WITNESS GARY RANEY**

**August 5, 2026**

I have reviewed the report by Paul Cappitelli, the Defendant's Corrections Expert, dated July 15th, 2026. My rebuttal of Cappitelli's opinions is based on the following statements from the opinions in his report:

- "SDCSO Custody Security Staff were attentive and conscientious in their interactions with Rupard during his incarceration up to, and including, the hours/minutes preceding his death."
- "A review of documents and interactions with Rupard does not indicate any form of indifference or negligence on the part of custodial security staff."
- "The actions taken by SDCSO custodial security staff were consistent with the standards for a reasonable custodial staff member."
- "There is no evidence to support Plaintiff's claims that named defendant custody security staff had collective knowledge of Rupard's clinical medical and/or mental health status and the need for further evaluation."

Additional assertions by Cappitelli include:

- "Upon review of all the documentation associated with this case, I do not find any indication that named SDCSO custody security staff defendants were indifferent or remiss in notifying medical/mental health staff."
- "The continued monitoring of medical and mental health is the responsibility of the psychiatric and medical staff, not the custody security staff."
- "One of the issues raised during the investigation was the condition of Rupard's cell at the time of his death. There is no indication that the condition of Rupard's cell was a factor in his death pursuant to the Coroner's Report and the SDCSO Investigation. There is documentation that Rupard's cell, as well as other cells, were cleaned on a regular basis. There is no indication that SDCSO Custody Staff were remiss in their duties in monitoring the cleanliness. Routine hygiene inspections and cleaning were conducted in various cells and housing units according to records

and testimony. Rupard's cell had been cleaned at some point prior to his being found unresponsive; however, it is not clear exactly when that occurred."

**Rebuttal**

Mr. Cappitelli has either overlooked or disregarded key facts that contradict his opinions. Allowing someone to accumulate nine days' worth of garbage in their cell is not "attentive and conscientious." Any reasonable person would recognize that ignoring such filth is inhumane, especially when it is widely known that these behaviors are often associated with serious mental illness. This directly contradicts Mr. Cappitelli's first and third opinions, listed above. When he asserted that the custody staff was consistent with standards for a reasonable custodial staff member, he disregarded not only the inhumane disregard for filth, but the policy violations of failing to conduct sanitation checks.

While the determination of indifference or negligence is the decision of the finder of fact, it is not true that the SDSO's staff's decisions to leave Rupard in unsanitary conditions were consistent with "standards for a reasonable custodial staff member[s]." It is unquestionable that generally accepted jail practices require staff to be attentive to the accumulation of filth in a cell and to attend to it once it begins to accumulate. Cappitelli's opinion on this is baseless.

Mr. Cappitelli's statement that he did not find that "custody security staff defendants were indifferent or remiss in notifying medical/mental health staff" is not based on facts. SDSO Medical Services Division Policy G.2.1 on Segregated Inmates reads[1], in part, "Sworn staff shall notify the charge nurse or designee when placing an inmate in segregation." The evidence shows that custody staff never notified health care staff that Rupard was being housed in the administrative segregation unit, directly violating the policy. Regardless of the SDSO's classification of Rupard, the conditions he lived in were unquestionably considered administrative segregation/separation. Mr. Cappitelli did not explain his rationale for asserting such an opinion when the facts prove otherwise, but the evidence is clear that he is wrong.

Lastly, Mr. Cappitelli seems to have chosen his words carefully when he talked about the condition of Rupard's cell. He highlighted the fact that other cells were cleaned and that, "at some point prior to him being found unresponsive," Rupard's cell had not been cleaned within a reasonable time preceding his death. From the evidence, it had likely not been cleaned for weeks, or maybe not at all, in violation of California Title 15, SDCSO policy, and generally accepted jail practices.

Respectfully submitted:



Gary Raney

---

[1] COSD 006313, Blumenshine Exhibit 1

# EXHIBIT “D:

**San Diego Medical Examiner**
**5570 Overland Avenue, Suite#101**
**San Diego, CA 92123-1206**
**(858) 694-2895**

| | |
|---|---|
| **Case Number** | : 2022-01007 |
| **Investigator** | : Fernanda Sanchez |
| **Date of Death** | : 03/17/2022 |
| **Date Today** | : 02/08/2023 |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
 A. Anterior rib fractures.
 B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

# TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________
06/27/2022
Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

# Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

GLENN N. WAGNER, D.O.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

STEVEN C. CAMPMAN, M.D.
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| RUPARD, Lonnie | | ☐ | 2022-01007 |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | Son | 3/18/2022 | |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CH EF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

| | |
|---|---|
| CAUSE OF DEATH: | PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA |
| Contributing: | SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER |
| MANNER OF DEATH: | HOMICIDE |

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

<u>OPINION</u>: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was “relatively clean, no flooding/gassing or smearing of feces.” The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist’s diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist’s final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.
4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:
1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. <u>BLUNT FORCE INJURY OF TORSO</u>:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:
Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

# TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: __________________________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager


CONFIDENTIAL COSD 001697

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

Outside Case Number: 2022-01007

Date of Examination: June 20, 2022

Forensic Pathologist: Bethann Schaber, MD

Originating Laboratory: County of San Diego Medical Examiner's Department

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

**LOMA LINDA UNIVERSITY PATHOLOGY LABORATORY**
11370 Anderson Street, Suite 2950
Loma Linda, CA 92354
(909) 558-2392
PJ Wat MD, GW Saukel MD, JC Kerstetter MD, HL Rojas MD – Directors

| | |
|---|---|
| **Name:** | **RUPARD, LONNIE** |
| MR#: | 06555376 |
| Encounter: | |
| DOB/Age: | 10/1/1975 46 years |
| Location: | LLU-FMO Pathology Referrals |
| Physician: | Physician,Default |
| CC: | |
| Order ID: | |
| Page: | Page 1 of 2 |

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

GLENN N. WAGNER, D.O.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

STEVEN C. CAMPMAN, M.D.
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | **2022-01007** |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| Ronnie Rupard | Son | 3/18/2022 | |

**San Diego Medical Examiner**
**5570 Overland Avenue, Suite#101**
**San Diego, CA 92123-1206**
**(858) 694-2895**

| | |
|---|---|
| **Case Number** | : 2022-01007 |
| **Investigator** | : Fernanda Sanchez |
| **Date of Death** | : 03/17/2022 |
| **Date Today** | : 02/08/2023 |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, Florentina Rupard, and his ex-wife, Justina Lopez. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, "Ana", with whom he had a son named Ronnie Rupard. The decedent also had a son with Justina, named Justino Rupard. He had a third child who was reported to have died in October 2018 of muscular dystrophy, who was named Lonnie Rupard. The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, antisocial personality disorder, and stimulant use disorder from a previous record dated July 11, 2020. It also stated that he had a past medical history of "seizures or tbi," (traumatic brain injury) per a record dated February 6, 2020. The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, for a twisted left ankle injury. Imaging was negative for fracture, soft tissue swelling or other abnormality.

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:
1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:
1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.
4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:
1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled “A” through “C” for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. <u>BLUNT FORCE INJURY OF TORSO</u>:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

# TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________
06/27/2022
Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

### Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.


CONFIDENTIAL COSD 001721

| | | |
|---|---|---|
| **San Diego Medical Examiner**<br>**5570 Overland Avenue, Suite#101**<br>**San Diego, CA 92123-1206**<br>**(858) 694-2895** | **Case Number**<br>**Investigator**<br>**Date of Death**<br>**Date Today** | : 2022-01007<br>: Fernanda Sanchez<br>: 03/17/2022<br>: 02/08/2023 |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name



CONFIDENTIAL COSD 002057

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ________________________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ________________________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

<u>OPINION</u>: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was “relatively clean, no flooding/gassing or smearing of feces.” The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist’s diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist’s final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number “4950349.” The body is in a second inner white body pouch sealed with a second red tamper resistant seal number “4950993.” A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner’s identification bearing the decedent’s name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent’s name, date of birth, and medical record number “31943869” is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff’s Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent’s name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent’s name and booking number “21149433” is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.
4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:
1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
(858) 694-2895 • FAX (858) 495-5956
http://www.sandiegocounty.gov/me

JONATHAN R. LUCAS, M.D.
CHIEF DEPUTY MEDICAL EXAMINER

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | **2022-01007** |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | BANNED, REFER TO MANAGEMENT, SEE CASE NOTES | 3/18/2022 | |

CONFIDENTIAL

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
(858) 694-2895 • FAX (858) 495-5956
http://www.sandiegocounty.gov/me

JONATHAN R. LUCAS, M.D.
CHIEF DEPUTY MEDICAL EXAMINER

CONFIDENTIAL

| San Diego Medical Examiner<br>5570 Overland Avenue, Suite#101<br>San Diego, CA 92123-1206<br>(858) 694-2895 | Case Number<br>Investigator<br>Date of Death<br>Date Today | : 2022-01007<br>: Fernanda Sanchez<br>: 03/17/2022<br>: 02/08/2023 |
|---|---|---|

CONFIDENTIAL

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted], with whom he had a son named [redacted]. The decedent also had a son with [redacted], named [redacted]. He had a third child who was reported to have died in October 2018 [redacted]. The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name



CONFIDENTIAL COSD 006378

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.



CONFIDENTIAL

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

CONFIDENTIAL

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

<u>OPINION</u>: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted]. The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed: 02/28/2023

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

**INJURIES, EXTERNAL AND INTERNAL**

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |



CONFIDENTIAL COSD 006396

# *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: 06/27/2022

Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

COUNTY OF SAN DIEGO HHSA HEALTH AND HUMAN SERVICES AGENCY | LIVE WELL SAN DIEGO

San Diego County
PUBLIC HEALTH LABORATORY
CLIA # 05D0060808
Brett Austin, MA, PHM, Director

3851 Rosecrans Street
San Diego, CA 92110
Phone (619) 692-8500
FAX (619) 692-8558

# FINAL REPORT

**Patient Information**

Patient Name: **Rupard, Lonnie**

Patient Id:
Birth Date: 10/01/1975
Gender: Male
Pregnancy Status: Unknown
Outside ID: 2022-01007
PUID #:
Address: NOT PROVIDED
NOT PROVIDED, N/A 00000

Phone #: 000-000-0000

**Specimen Information**

Specimen # **22-206526-01**

Source: Nasopharynx
Date Collected: 03/19/2022
Date Received: 03/19/2022

**Submitter Information**

SAN DIEGO COUNTY MEDICAL EXAMINER
5570 Overland Ave # 101
San Diego, CA 92123

**Site Contact**
Steven Campman, M.D.
Fax: 858-495-5956
mxclerical@sdcounty.ca.gov

Physician: Schaber, B
Diagnosis Code:

Comments: B-00011

| Analyte (Method) | Result | Analysis Date |
|---|---|---|
| SARS-CoV-2 (NAAT) | Detected | 03/20/2022 |

**Comments:**

03/19/2022 NAAT (Nucleic Acid Amplification Test): This assay is for in vitro diagnostic use under FDA Emergency Use Authorization (EUA) only.

03/20/2022 Samples tested using GeneXpert under CLIA ID # 05D2197127 at 5570 Overland Avenue San Diego, CA 92123

Approved by: Joe Ana Jones-Price

Date reported: 03/20/2022

This document contains confidential health information that is privileged, confidential and exempt from disclosure under law. If you have received this information in error, please call (619) 692-8500 and arrange for return or destruction.

22-1007

COUNTY OF SAN DIEGO HHSA HEALTH AND HUMAN SERVICES AGENCY

LIVE WELL SAN DIEGO

San Diego County
PUBLIC HEALTH LABORATORY
CLIA # 05D0060808
Jeremy Corrigan, DrPH, HCLD/TS(ABB)

5570 Overland Ave, Ste 103
San Diego, CA 92123
Phone 619-692-8500
FAX 619-692-8558

# FINAL REPORT

| Patient Information | Specimen Information | Submitter Information |
|---|---|---|
| Patient Name: **Rupard, Lonnie** | Specimen # **22-206691-01** | SAN DIEGO COUNTY MEDICAL EXAMINER |
| Patient Id: | Source: Nasopharynx | 5570 Overland Ave # 101 |
| Birth Date: 10/01/1975 | Date Collected: 03/19/2022 | Site Contact: Steven Campman, M.D. |
| Gender: Male | Date Received: 03/19/2022 | Fax: 858-495-5956 |
| Pregnancy Status: | | Physician: Schaber, B |
| Outside ID: 2022-01007 | | Diagnosis Code: |
| Comments: | | |

| Analyte (Method) | Result | Analysis Date |
|---|---|---|
| Influenza Typing | Refer to reference laboratory report. | |

**Comments:**

03/24/2022 Sample sent to CA State Viral and Rickettsial Diseases Laboratory, 850 Marina Bay Parkway, Richmond, CA 94804.

04/13/2022 VRDL report

Approved by: Ishita Gulati

Date reported: 04/27/2022

This document contains confidential health information that is privileged, confidential and exempt from disclosure under law. If you have received this information in error, please call (619) 692-8500 and arrange for return or destruction.

California Department of Public Health
State of California-Health and Human Services Agency

# Viral and Rickettsial Disease Laboratory

CDPH 850 Marina Bay Parkway, E365
Richmond, CA 94804

CLIA ID # 05D0643850

Phone: 510-307-8575
Fax: 510-307-8599

## Laboratory Results

Page 1 of 1

**Patient Information**

| Patient Name or Submitter ID: | Gender | Date of Birth | Age |
|---|---|---|---|
| Rupard, Lonnie | Male | 10/1/1975 | 47 Years |

Medical Records:

CalREDIE Incident #:

Pregnancy Status:

Patient Address: , , CA.

**Disease Suspected / Test Requested / Symptoms**

Disease Onset:

Rash Onset :

Disease Suspected: Influenza A or B

Test Requested:

ICD Code:

Specimen Collection Site:

**Submitter Information**

Submitter Type: CA City & County Health Depts
Facility: San Diego County Public Health Dept.
Address: 3851 Rosecrans Street

San Diego, CA 92110-3134
Phone: (619) 692-8499 Fax: (858) 715-6458

Health Jurisdiction: San Diego,CA

Laboratory Results

Reason Code v_140

**Specimen Information**

| Specimen Type: | Date Collected | Date Received | Condition Received | Submitter Tracking#: | VRDL Accession #: |
|---|---|---|---|---|---|
| Nasopharyngeal Swab | 3/19/2022 | 3/22/2022 | Dry Ice | 22-206891 | V22T07708-01 |

**Polymerase Chain Reaction (PCR) Results**

| Analyte | Test Type | VRDL Accession # | Test Method | Laboratory Results |
|---|---|---|---|---|
| Influenza A Nucleic Acid | FDA | V22T07708-01 | PCR (realtime) | not detected |
| Influenza B Nucleic Acid | FDA | V22T07708-01 | PCR (realtime) | not detected |

**Additional Information or Overall Interpretation of State Laboratory Test Results:**

FDA - Food and Drug Administration: This test has been FDA approved for clinical diagnostic use.

JP 4/4/22

Reviewed by: Ishita Gulati
04/04/2022

**The VRDL is certified under the Clinical Laboratory Improvement Amendments of 1988 (CLIA-88) as qualified to perform high complexity clinical laboratory testing.**

Report to:
San Diego County Public Health Dept.
3851 Rosecrans St. Mail Stop P572 Suite 716
San Diego, CA 92110
Attn: Email - Laboratory Director Fax#
18587156458

Testing performed under the direction of Dr. Carl Hanson Ph.D., Laboratory Director, Viral and Rickettsial Disease Laboratory

**Final Report Date: April 04, 2022**

Report Method: [ ] faxed to 18587156458 [ ] E-mailed [ ] NR [ ]
by: [signature] date: 4/4/2022

eurofins [redacted]
Product Testing

# Final Report

| Order Details | | Ordering Professional |
|---|---|---|
| Referral ID # | 22-01007 | [redacted] |
| DOB | 1975-10-01 | |
| Gender | M | |

| Request / Accession | R-P40234140 |
|---|---|
| Received | 03/25/2022 11:14 |
| Final Report | 03/25/2022 16:24 |
| Report Generated | 03/25/2022 16:24 |
| Time Zone | Pacific Standard Time |

## Results

| Test | Completed | Results | Ref. Range |
|---|---|---|---|
| Hepatitis B Surface Ag | 03/25/2022 16:21 | **Non Reactive** | Non Reactive |
| Hepatitis C Virus Ab | 03/25/2022 16:22 | **Non Reactive** | Non Reactive |
| HIV-1/HIV-2 Plus O | 03/25/2022 16:24 | **Non Reactive** | Non Reactive |

## Sample Reference(s)

**Collection Time Zone:** Pacific Standard Time

| VRL Sample ID | Type | Collected | Test(s) |
|---|---|---|---|
| S-P40234140A | Serum | 03/19/2022 13:15 | 3214, 3221, 3521 |

[redacted]: *Post-Mortem*

## Test Reference(s)

| Code | Name | Methodology Description |
|---|---|---|
| 3214 | Hepatitis B Surface Ag | BioRad Genetic Systems HBsAg EIA 3.0 is FDA approved for [redacted] screening. |
| 3221 | Hepatitis C Virus Ab | ORTHO HCV Version 3.0 ELISA is FDA approved for [redacted] screening. |
| 3521 | HIV-1/HIV-2 Plus O | BioRad GS HIV-1/HIV-2 Plus O EIA is FDA approved for [redacted] screening. This is a screening assay; it is neither a diagnostic assay nor a confirmatory test for the presence of HIV. |

San Diego County Medical Examiner

**AUTOPSY FINDINGS**

2022-01007 B. Schaber, M.D. 3/19/2022

RUPARD, Lonnie

Age: 46 Sex: M ✓ Embalmed
Height: 69 Weight: 105
Race: ~~C / B / H / A / F / NA / Other:~~
_____ nourished / thin / (cachectic) / obese
**Lividity**: ant / (post) L / R, (fixed) / un-fixed
**Rigidity**: none / (mild) / mod / full
X Decomposition: mild / mod / advanced early green abd

**CAVITIES**: Pericardium: lac 75 ml hemopericardium
Pleural: R ø FFA L ø FFA
Peritoneum: ø FFA Abd fat: 0.1 cm
**HEART**: 280 grams:
Hypertrophy: ø Dilation: ø
Ventricles: R 0.3 cm; L 1.5 cm; IVS 1.4 cm
Valves: WNL
Coronaries: LAD LCx R + WP
**Aorta**: (minimal) / mild / mod / severe atherosclerosis
Aneurysms: ø Pulmonary arteries: no PE

**LUNGS**: R 480 g, L 1030 g
~~atelectatic / hyperinflated~~
Anthracosis: none / (small) / mod / large
Edema: Consolidation: LUL Red Firm no pg
Congestion: mild-mod Bronchi: wnl

**LIVER**: 1170 g Fat: ø Fibrosis: ø
~~Cirrhosis: macro / micro~~
GALLBLADDER: 10 Stones: y / (n)
**PANCREAS**: WNL

**SPLEEN**: 70 g
Lymph nodes no enlg Marrow / Blood liq + clot
**THYMUS**: _____ g

**GI**: Esophagus: w BRN watery fluid Bowel opened
Stomach contents: 60 ml of SB soft tan BRN red
Bowels: cath LB soft BRN stool
Appendix: (Y) / N Anus: soft BRN stool
**KIDNEYS**: R 140 g, L 150 g, cysts: ø
smooth / granular:
Bladder: 130 ml urine dk yellow urine
Prostate: wnl
Testes: ↓↓

2.5 x 2 ulcer duod dist pylor

**ADRENALS**: WNL
**THYROID**: WNL **PITUITARY**: WNL
**NECK**: Hemorrhages: NOT
Trachea WT Hyoid / Thyroid cartilage
Tongue: no hem wnl no hem or fx
**MUSCULOSKELETAL**: Fractures: yes peristernal Rt 5-8 ant Rt 8
CPR: (Y) / N ) Ribs ( ø brittle): perist Lt 4-7 ant Lt 4-7
~~Kyphosis / scoliosis~~ Skull: no Fx

**SCALP**: Bny defect bild occip lt fnt ø EDH ø SDH ø SAH
**BRAIN**: 1290 g
+ dura Retained for NP consultation

**TOXICOLOGY**:
✓ Central Blood
✓ Peripheral Bld
✓ Vitreous
✓ Urine
___ Chest blood / fluid
___ Other:
___ None
___ Bile
___ CSF
✓ Liver
___ Spleen
✓ Gastric:

**Rapid Screens**: Glu Ket
+ / - meth; + / - coc; + / - morph; + / - alcohol

**HISTOLOGY**: (Ht) (Liv) (Lung) (R / L), Cor art: (Kid), Panc, Spl, GI, Thyroid, Brain:
Other:
___ None 7 Cassettes

**PHOTOGRAPHS**: ✓ ID ✓ Over-alls
✓ Other:

**X-RAYS**: __ None ✓ Yes: no Fx's other than CPR ml
___ head ___ chest ___ abd ___ other:

**CULTURES**: ___ None ___ Blood ___ Lung
___ CSF ✓ Viral:
___ Other: COVID-19 + Sept Fnt SH - FAS AFB WP - SC

**EVIDENCE**: Bullets:

Det Max Blumenshine

**WITNESSES**: ___ None ✓ Yes: D. Racicot Fed
SDPD, SO, NCIS, OPD, BP M. Gervasoni Fed

**GROSS AUTOPSY SUMMARY**:
Inmate central jail found unresp in his cell
Hx/o schizoph ?

pericsac lac 75 ml
Rt Atr/vent lac hemopericard
y/w CPR

Rev. 9/08

# County of San Diego
OFFICE OF THE MEDICAL EXAMINER

San Diego County Medical Examiner
2022-01007 B. Schaber, M.D.
3/19/2022

RUPARD, Lonnie
outer Red Seal 4950349 yellow tarp
inner red seal 4950993 on green sheet

**Date & Time of Examination**: 0935
**CLOTHING** (~~None/~~ ~~Not examined~~): Dict
Blue sheet on body - adult clothing in property bag

**IDENTIFICATION**: ✓ M.E. band checked



County of San Diego
OFFICE OF THE MEDICAL EXAMINER

San Diego County Medical Examiner
2022-01007
B. Schaber, M.D.
3/19/2022
RUPARD, Lonnie



~~Doc~~

- 12/14/21 arrested Back Probation [illegible] single cell
  Refused medications.

- Single occupan cell.

Last seen alive cell check 2146

Found unresp in cell 2248 not Breathy. under blanket under
3/17 in Bunk.

CPR transport to ER pronounced in ER.

Cell soil c̄ feces Food c̄ maggots.

~~[illegible]~~ ——— new c̄ other inmates.

San Diego County Medical Examiner
2022-01007 B. Schaber, M.D. 3/19/2022
RUPARD, Lonnie

# County of San Diego

DR. GLENN N. WAGNER
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE., STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me/

DR. STEVEN CAMPMAN
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## EVIDENCE TRANSFER FORM

NAME OF DECEDENT: Rupard, Lonnie ME# 22-1007

PATHOLOGIST: Schaber, B. MD

INVESTIGATINGAGENCY: SDSO

| | | | |
|---|---|---|---|
| | BODY BAG | | OTHER (See REMARKS) |
| | BAGS REMOVED FROM HEAD | | ANAL SWABS |
| | BAGS REMOVED FROM HANDS | ✓ | ORAL SWABS |
| | BAGS REMOVED FROM FEET | | URETHRA SWABS |
| | HEAD HAIR SAMPLE | | VAGINAL SWABS |
| | FACIAL HAIR SAMPLES | | GUNSHOT RESIDUE SWABS |
| | CHEST HAIR SAMPLES | | FINGERPRINTS |
| | PUBIC HAIR SAMPLE | | PALM PRINTS |
| | PUBIC HAIR COMBING | | PROJECTILES/FRAGMENTS |
| ✓ | BLOOD SAMPLE | | FINGERNAIL CLIPPINGS |
| | | | FINGERNAIL SCRAPINGS |

CLOTHING: 1- blue SHIRT

JEWELRY: None

BONES/TISSUE SPECIMEN: None

REMARKS:

RELEASED BY Stephen Hannum (Print Name) Stephen Hannum (Signature) 3-19-22 (Date)

RECEIVED BY Melissa Gervasoni /SDSO (Print Name/Agency) [signature] (Signature) 3/19/22 (Date)

Original: File Yellow: Customer
MEE-34 (R 8/2019)

Receipt: 31356

# San Diego County Medical Examiner's Office
## Personal Effects Inventory

Name of Deceased: RUPARD, LONNIE Date: 3/19/22 M.E. Case No.: 22-1007

Name of Investigator/F.A.A.: F. SANCHEZ / HANNUM PB # 687195

**Personal Effects**

**Currency:**

| | | | |
|---|---|---|---|
| $1 × | ø | =$ | ø |
| $5 × | 1 | =$ | 5.00 |
| $10 × | 1 | =$ | 10.00 |
| $20 × | 6 | =$ | 120.00 |
| $100 × | 2 | =$ | 200 |
| × | ø | =$ | |
| Coins: | | $ | ø.32 |
| Total U.S. Currency: | | $ | 335.32 |

**Bank Card:**

| QTY | Description – VISA, MasterCard, American Express (include account number) |
|---|---|
| / | / |

**Foreign Currency:** None

**Items:**

| QTY | Description | QTY | Description |
|---|---|---|---|
| 1 | wd y/metal watch | / | / |
| / | / | | |

**Government Issued Documents and Identification Cards** – The listed government documents issued by federal, state, county, or local agencies or foreign governments are property of that agency and will be returned to them.

| QTY | Description (include the agency name and ID number) |
|---|---|
| / | / / / |

**Witness Declaration**

The above listed property, found on the body, clothing, adjacent area, or residence of the above decedent was checked by me in the presence of the witness signed below.

| Print Name | Signature | Agency | Date |
|---|---|---|---|
| Deanne Rupari Osuna | [signature] Sn | SDMEO | 03,19,22 |

**Release of Property to Next-of-Kin**

Received by: Megan Ruane (Print Name) Date: 3/22/22 Time: 1543

Signature: Relationship: Mortuary

Address: City/State/Zip:

**Affidavit Under California Probate Code, Section 330**

I declare under Penalty of Perjury under the laws of the State of California that the foregoing is true and correct and that I do not know or have reason to believe that a dispute exists over the right to possess the property held by the Medical Examiner.

**Signature of Declarant:**

**Printed Name of Declarant:**

☐ **Miscellaneous medications, <u>and/or</u> illicit drugs, <u>and/or</u> drug paraphernalia impounded and inventoried at the Medical Examiner's Office.** These items will be retained and subsequently destroyed pursuant to departmental policy.

105 #

**MEDICAL EXAMINER'S OFFICE**
**INVESTIGATIVE MEMO**

AGE: 46

CASE # 22-1007

NAME RUPARD, LONNIE
LAST FIRST MIDDLE

DATE 03/18/2022

CARRIER 92M

INVESTIGATOR FERNANDA SÁNCHEZ

HIO (NAT) MVA SUI HOM (ACC) DONOR — NAT vs ACC

HOW IN CUSTODY

BLUE SEAL # ~~B2294384~~

RED SEAL# 4950993

X-RAYS REQUIRED? (YES) (NO) — NO circled

IF YES, WHAT AREA(S) OF BODY X-rays by [illegible] 03/18/22

REMARKS RQ EXAM SAT 03/19

SDSO DET BLUMENSHINE

AGENCY, TEAM #, and PHONE # 619-886-0434

# CAUSE OF DEATH WORKSHEET

## San Diego County Medical Examiner Department

☒ Autopsy
☐ External
☐ Not Dictated
☐ Body not coming to office

☐ Fetal death
☐ Possible SIDS
☐ Family Paid

San Diego County Medical Examiner
2022-01007 B. Schaber, M.D.
3/19/2022
RUPARD, Lonnie

**CAUSE OF DEATH:** ( ✓ PENDING) Time interval

Due To:

Due To:

Due To:

**CONTRIBUTING:**

**MANNER:** (✓) Pending ( ) Natural ( ) Accident ( ) Suicide ( ) Homicide ( ) Undetermined

**Use reverse side for manner type in non-pending cases

**HOW OCCURRED:**

**DATE and TIME of INJURY:** **LOCATION:**

**SURGERIES and DATES:**

**If FEMALE, pregnant within the last year?** ( ) Yes ( ) No ( ) Unknown

Deputy Medical Examiner/Fellow/Resident Supervising Pathologist Date 3/19/22

Rev. 06/15

TM 3/21/22

3/20/22

# Manner Types and SubTypes

(check one)

## NATURAL

- ☐ AIDS Related
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Autoimmune/Systemic
- ☐ Cancer
- ☐ Cardiovascular
- ☐ Central Nervous System
- ☐ Chronic Drug Abuse
- ☐ Diabetes Related
- ☐ Endocrine
- ☐ Family Paid
- ☐ Gastrointestinal
- ☐ Hematologic
- ☐ Infant/Perinatal (not SIDS)
- ☐ Infectious
  - ☐ Viral
  - ☐ Bacterial
  - ☐ Other
- ☐ Intrauterine/Stillborn
- ☐ Liver disease
- ☐ Obesity Related
- ☐ Other
- ☐ Pregnancy Related
- ☐ Psychiatric Related
- ☐ Pulmonary
- ☐ Renal
- ☐ Seizures
- ☐ SIDS
- ☐ Undetermined

## ACCIDENT

- ☐ Aircraft
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Animal Related
- ☐ Asphyxia
  - ☐ Airway Obstruction
  - ☐ Autoerotic
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Traumatic
- ☐ Bicycle
- ☐ Blunt Force (other)
- ☐ Boating
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug and Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol

### ACCIDENT (cont.)

- ☐ Electrocution
- ☐ Explosion
- ☐ Exposure
- ☐ Fall
  - ☐ Blunt head trauma
  - ☐ Fracture, other
  - ☐ Hip/Femur fracture
  - ☐ Multiple injuries
  - ☐ Other
  - ☐ Spinal fracture
  - ☐ Subdural hematoma
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Industrial
- ☐ Ingested Foreign Object(s)
- ☐ Inhalation
- ☐ Medical/Therapeutic
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs Auto
  - ☐ Auto vs Bicycle
  - ☐ Auto vs Fixed Object
  - ☐ Auto vs Motorcycle
  - ☐ Auto vs Pedestrian
  - ☐ Hit and Run
  - ☐ Motorcycle
  - ☐ Off Road
  - ☐ Other
  - ☐ Unknown
- ☐ Other
- ☐ Restraint Related
- ☐ Scalding
- ☐ Scuba - Diving
- ☐ Spear gun
- ☐ Train
- ☐ Undetermined

## SUICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Other
- ☐ Blunt Force (other)
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug & Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol
- ☐ Electrocution

### SUICIDE (cont.)

- ☐ Explosion
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Inhalation
- ☐ Jumping
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs. Fixed Object
  - ☐ Auto vs. Pedestrian
  - ☐ Motorcycle
- ☐ Train
- ☐ Undetermined

## HOMICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
- ☐ Assault
- ☐ Blunt Force
- ☐ Chemical/Poison
- ☐ Child Abuse
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Elder Abuse
- ☐ Exposure
- ☐ Fire
- ☐ Firearm
- ☐ Homicidal Violence, NOS
- ☐ Intrauterine/Stillborn
- ☐ Motor Vehicle
- ☐ Other
- ☐ Restraint Related
- ☐ Undetermined

## UNDETERMINED

- ☐ Alcohol Related
- ☐ Blunt Force
- ☐ Decomposed
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Fire related
- ☐ Firearm
- ☐ Infant/Perinatal (not SIDS)
- ☐ Intrauterine/Stillborn
- ☐ Other
- ☐ Skeletal Remains
- ☐ Undetermined

Rev. 06/15

# DEATH CERTIFICATE AMENDMENT WORKSHEET

Case: 2022-1007

Name: RUPARD, LONNIE

CAUSE OF DEATH: PNEUMONIA, MALNUTRITION, AND DEHYDRATION ( )
IN THE SETTING OF NEGLECTED SCHIZOPHRENIA (unknown)

Due to: ( )

Due to: ( )

Due to: ( )

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

Surgeries:

AL 03/01/23 @ 2:46pm

MANNER OF DEATH

☐ NATURAL ☐ ACCIDENT ☐ SUICIDE ☑ HOMICIDE ☐ UNDETERMINED

Place of Injury: SAN DIEGO CENTRAL JAIL

Date & Time: UNKNOWN

How Occurred: INADEQUATE CARE WHILE INCARCERATED

[signature] 2/27/23
DEPUTY MEDICAL EXAMINER Date
SCHABER

[signature] 3/1/23
CHIEF MEDICAL EXAMINER Date

LG 3/1/23

# Manner Types and SubTypes

(check one)

## NATURAL

- ☐ AIDS Related
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Autoimmune/Systemic
- ☐ Cancer
- ☐ Cardiovascular
- ☐ Central Nervous System
- ☐ Chronic Drug Abuse
- ☐ Diabetes Related
- ☐ Endocrine
- ☐ Family Paid
- ☐ Gastrointestinal
- ☐ Hematologic
- ☐ Infant/Perinatal (not SIDS)
- ☐ Infectious
    - ☐ Viral
    - ☐ Bacterial
    - ☐ Other
- ☐ Intrauterine/Stillborn
- ☐ Liver disease
- ☐ Obesity Related
- ☐ Other
- ☐ Pregnancy Related
- ☐ Psychiatric Related
- ☐ Pulmonary
- ☐ Renal
- ☐ Seizures
- ☐ SIDS
- ☐ Undetermined

## ACCIDENT

- ☐ Aircraft
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Animal Related
- ☐ Asphyxia
    - ☐ Airway Obstruction
    - ☐ Autoerotic
    - ☐ Other
    - ☐ Positional
    - ☐ Strangulation
    - ☐ Suffocation
    - ☐ Traumatic
- ☐ Bicycle
- ☐ Blunt Force (other)
- ☐ Boating
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
    - ☐ Drug and Alcohol
    - ☐ Drug and Meds
    - ☐ Drug, meds & alcohol
    - ☐ Drugs of Abuse
    - ☐ Medication
    - ☐ Meds & Alcohol

### ACCIDENT (cont.)

- ☐ Electrocution
- ☐ Explosion
- ☐ Exposure
- ☐ Fall
    - ☐ Blunt head trauma
    - ☐ Fracture, other
    - ☐ Hip/Femur fracture
    - ☐ Multiple injuries
    - ☐ Other
    - ☐ Spinal fracture
    - ☐ Subdural hematoma
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Industrial
- ☐ Ingested Foreign Object(s)
- ☐ Inhalation
- ☐ Medical/Therapeutic
- ☐ Motor Vehicle
    - ☐ Auto Rollover (solo)
    - ☐ Auto vs Auto
    - ☐ Auto vs Bicycle
    - ☐ Auto vs Fixed Object
    - ☐ Auto vs Motorcycle
    - ☐ Auto vs Pedestrian
    - ☐ Hit and Run
    - ☐ Motorcycle
    - ☐ Off Road
    - ☐ Other
    - ☐ Unknown
- ☐ Other
- ☐ Restraint Related
- ☐ Scalding
- ☐ Scuba - Diving
- ☐ Spear gun
- ☐ Train
- ☐ Undetermined

## SUICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
    - ☐ Strangulation
    - ☐ Suffocation
    - ☐ Other
- ☐ Blunt Force (other)
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
    - ☐ Drug & Alcohol
    - ☐ Drug and Meds
    - ☐ Drug, meds & alcohol
    - ☐ Drugs of Abuse
    - ☐ Medication
    - ☐ Meds & Alcohol
- ☐ Electrocution

### SUICIDE (cont.)

- ☐ Explosion
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Inhalation
- ☐ Jumping
- ☐ Motor Vehicle
    - ☐ Auto Rollover (solo)
    - ☐ Auto vs. Fixed Object
    - ☐ Auto vs. Pedestrian
    - ☐ Motorcycle
- ☐ Train
- ☐ Undetermined

## HOMICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
    - ☐ Other
    - ☐ Positional
    - ☐ Strangulation
    - ☐ Suffocation
- ☐ Assault
- ☐ Blunt Force
- ☐ Chemical/Poison
- ☐ Child Abuse
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Elder Abuse
- ☐ Exposure
- ☐ Fire
- ☐ Firearm
- ☐ Homicidal Violence, NOS
- ☐ Intrauterine/Stillborn
- ☐ Motor Vehicle
- ☒ Other
- ☐ Restraint Related
- ☐ Undetermined

## UNDETERMINED

- ☐ Alcohol Related
- ☐ Blunt Force
- ☐ Decomposed
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Fire related
- ☐ Firearm
- ☐ Infant/Perinatal (not SIDS)
- ☐ Intrauterine/Stillborn
- ☐ Other
- ☐ Skeletal Remains
- ☐ Undetermined

Rev. 06/15

# COUNTY OF SAN DIEGO MEDICAL EXAMINER

5570 OVERLAND AVENUE, SUITE 101, SAN DIEGO, CA 92123-1215
PHONE: 858-694-2895 FAX: 858-495-5956

## ORDER FOR RELEASE OF REMAINS

**TO:** MEDICAL EXAMINER, COUNTY OF SAN DIEGO

**RE:** REMAINS OF Lonnie Newton Rupard, ME CASE # 22-1007

RUPARD Lonnie 2022-01007

I certify that pursuant to the State of California Health & Safety Code, Section 7100, it is my legal right to control the disposition of the remains referenced above, the location and conditions of interment, and arrangements for funeral goods and services to be provided. I further certify that I am acting in the capacity of: **Legal Next of Kin** [redacted], **OR Executor/Executrix** __________, **OR Agent with Durable Power of Attorney for Health Care** (must be for Health Care) __________ **OR other legal capacity** __________ (please **INITIAL** the appropriate category). If acting in a capacity other than Legal Next of Kin, I have attached a copy of the relevant appointing document(s).

Therefore, upon completion of your examination of the deceased, please release the remains referenced above to the custody of the service designated below. If possible please **RELEASE** [redacted] **OR DO NOT RELEASE** __________ (please **INITIAL** desired choice) all of the deceased's personal property in your care with the remains. I understand that personal property can only be released during regular working hours (M-F 8-5, except holidays). **As per California Laws and Department Policies, if the property in custody of the Medical Examiner's Department is not collected within 90 days from the date of death, it will be processed for immediate disposal.**

Featheringill Mortuary
Print Name of Designated Mortuary, Cremation Society, or other Disposition Service

| Print Name of Person Signing | Relationship | Signature | Date Signed |
|---|---|---|---|
| [redacted] | Son | [redacted] | Mar 22 2022 |

| Mailing Address of Person Signing | Home / Cell Phone Number |
|---|---|
| [redacted] El Cajon CA 92021 | [redacted] |

| City, State, Zip Code of Person Signing | City, State Where Signed |
|---|---|
| El Cajon CA 92021 | El Cajon CA |

**DECEDENT INFORMATION**

| Name of Deceased – First (Given) | Middle | Last (Family) | Gender | Date of Death |
|---|---|---|---|---|
| Lonnie | Newton | Rupard | N | 03/17/2022 |

| Date of Birth | Age | Place of Birth | Social Security Number | Race |
|---|---|---|---|---|
| 10/1/1975 | 46 | PI | [redacted] | Filipino |

| Marital Status | Occupation | Residence Address: |
|---|---|---|
| Div | Disabled | [redacted] Bonita ca 91902 |

**MEDICAL EXAMINER DEPARTMENT USE ONLY**

ME FAS Hannum Release Date/Time: 3-22-22 1511

Transport Staff: (signed) [signature] Printed Name: Megan Ruona

MEA-15 (R 3/26/19)

# COUNTY OF SAN DIEGO MEDICAL EXAMINER

5570 OVERLAND AVENUE, SUITE 101, SAN DIEGO, CA 92123-1215
PHONE: 858-694-2895 FAX: 858-495-5956

## ORDER FOR RELEASE OF REMAINS

**TO:** MEDICAL EXAMINER, COUNTY OF SAN DIEGO

**RE:** REMAINS OF Lonnie Newton Rupard, ME CASE # 22-01007

RUPARD, Lonnie 2022-01007

I certify that pursuant to the State of California Health & Safety Code, Section 7100, it is my legal right to control the disposition of the remains referenced above, the location and conditions of interment, and arrangements for funeral goods and services to be provided. I further certify that I am acting in the capacity of: **Legal Next of Kin** [redacted], **OR Executor/Executrix** ________, **OR Agent with Durable Power of Attorney for Health Care** (must be for Health Care) ________ **OR other legal capacity** ________ (please INITIAL the appropriate category). If acting in a capacity other than Legal Next of Kin, I have attached a copy of the relevant appointing document(s).

Therefore, upon completion of your examination of the deceased please release the remains referenced above to the custody of the service designated below. If possible please **RELEASE** [redacted] **OR DO NOT RELEASE** ________ (please INITIAL desired choice) all of the deceased's personal property in your care with the remains. I understand that personal property can only be released during regular working hours (M-F 8-5, except holidays). **As per California Laws and Department Policies, if the property in custody of the Medical Examiner's Department is not collected within 90 days from the date of death, it will be processed for immediate disposal.**

Featheringill Mortuary
Print Name of Designated Mortuary, Cremation Society, or other Disposition Service

-> [redacted] Son X [redacted] 3-22-22
Print Name of Person Signing | Relationship | Signature | Date Signed

[redacted] [redacted]
Mailing Address of Person Signing | Home / Cell Phone Number

Bonita CA 91902 | San Diego CA
City, State, Zip Code of Person Signing | City, State Where Signed

**DECEDENT INFORMATION**

| Name of Deceased – First (Given) | Middle | Last (Family) | Gender | Date of Death |
|---|---|---|---|---|
| Lonnie | Newton | Rupard | M | 3-17-22 |

| Date of Birth | Age | Place of Birth | Social Security Number | Race |
|---|---|---|---|---|
| 10-1-1975 | 46 | PI | [redacted] | Filipino |

| Marital Status | Occupation | Residence Address: |
|---|---|---|
| div | Disabled | [redacted] Bonita CA 91902 |

**MEDICAL EXAMINER DEPARTMENT USE ONLY**

ME FAS ________ Release Date/Time: ________

Transport Staff: (signed) [signature] Printed Name: Megan Ruona

MEA-15 (R 3/26/19)

***County of San Diego***
***Office of the Medical Examiner***

**RELEASE OF REMAINS**

**Name: RUPARD, Lonnie**

**M.E. #: 2022-01007**

Investigator: Fernanda Sanchez

Date Rec: 3/18/2022

Body Status: Ready to release

Mortuary: Featheringill Mortuary

**OK to Release Property?** yes

Date and Time Released: 3/22/2022 1509

Ok to release property Yes-JM

Released By: Data Entry: Stephen Hannum

T.E. No-JM

Body Retrieval: Stephen Hannum

---

[ ] Cert [ ] N.C. [ ] Military [ ] Release

[ ] Property [ ] Child [ ] Vitals [ ] County

[ ] Decomp [ ] Fee Paid [ ] P.A. [ ] Pouch

**Weight: 105 lb** **Height: 69"** **Age: 46 Years** **Sex: Male**

**Body Condition: Within Normal Limits**

**Exam Type: Autopsy**

**Clothing Released with Body: True**

**Location: 15C dbl Son [redacted] also signed OFR**

**Clothing:** blue stripped sweatshirt, grey tank top, grey pants, black underwear, pair brown boots

**Items on or with Body:** none

---

***Remains have been examined with I.D. verified by comparison to ankle bracelet.***
***Clothing, valuables, if any, and posession of remains recieved in satisfactory condition:***

SHannum
Signature (Body retrieval M.E. staff)

**Stephen Hannum**
Printed Name

[signature]
Signature (Transport staff)

Megan Ruana
Printed Name

Date: 3/22/22 Time: 1519

2022-01007 Printed 3/22/2022

# EXHIBIT “D:

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
  A. Anterior rib fractures.
  B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.
4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:
1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled “A” through “C” for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

# TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager


CONFIDENTIAL COSD 002075

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

GLENN N. WAGNER, D.O.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

STEVEN C. CAMPMAN, M.D.
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| RUPARD, Lonnie | | ☐ | 2022-01007 |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | Son | 3/18/2022 | |

| **San Diego Medical Examiner**<br>**5570 Overland Avenue, Suite#101**<br>**San Diego, CA 92123-1206**<br>**(858) 694-2895** | **Case Number**<br>**Investigator**<br>**Date of Death**<br>**Date Today** | : 2022-01007<br>: Fernanda Sanchez<br>: 03/17/2022<br>: 02/08/2023 |
|---|---|---|

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name



CONFIDENTIAL COSD 001679

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.



CONFIDENTIAL COSD 001680

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
  A. Anterior rib fractures.
  B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

<u>SCARS</u>:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. <u>BLUNT FORCE INJURY OF TORSO</u>:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:
Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager


CONFIDENTIAL COSD 001697

# Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*
*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## Outside Brain Autopsy Final Reports

Accession #: FA-22-0000070 Date of Procedure: 3/17/2022 23:51 PDT
Date Received: 3/19/2022 09:35 PDT

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

**GLENN N. WAGNER, D.O.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

**STEVEN C. CAMPMAN, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | **2022-01007** |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| Ronnie Rupard | Son | 3/18/2022 | |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, Florentina Rupard, and his ex-wife, Justina Lopez. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, "Ana", with whom he had a son named Ronnie Rupard. The decedent also had a son with Justina, named Justino Rupard. He had a third child who was reported to have died in October 2018 of muscular dystrophy, who was named Lonnie Rupard. The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name



CONFIDENTIAL COSD 001701

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, antisocial personality disorder, and stimulant use disorder from a previous record dated July 11, 2020. It also stated that he had a past medical history of "seizures or tbi," (traumatic brain injury) per a record dated February 6, 2020. The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, for a twisted left ankle injury. Imaging was negative for fracture, soft tissue swelling or other abnormality.

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. <u>BLUNT FORCE INJURY OF TORSO</u>:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

# TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________________
06/27/2022
Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

**San Diego Medical Examiner**
**5570 Overland Avenue, Suite#101**
**San Diego, CA 92123-1206**
**(858) 694-2895**

| | |
|---|---|
| **Case Number** | : 2022-01007 |
| **Investigator** | : Fernanda Sanchez |
| **Date of Death** | : 03/17/2022 |
| **Date Today** | : 02/08/2023 |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name



CONFIDENTIAL COSD 002057

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
  A. Anterior rib fractures.
  B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## **INJURIES, EXTERNAL AND INTERNAL**

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. <u>BLUNT FORCE INJURY OF TORSO</u>:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
(858) 694-2895 • FAX (858) 495-5956
http://www.sandiegocounty.gov/me

**JONATHAN R. LUCAS, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | **2022-01007** |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | BANNED, REFER TO MANAGEMENT, SEE CASE NOTES | 3/18/2022 | |

CONFIDENTIAL

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
(858) 694-2895 • FAX (858) 495-5956
http://www.sandiegocounty.gov/me

**JONATHAN R. LUCAS, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER


CONFIDENTIAL

**San Diego Medical Examiner**
**5570 Overland Avenue, Suite#101**
**San Diego, CA 92123-1206**
**(858) 694-2895**

| | |
|---|---|
| **Case Number** | : 2022-01007 |
| **Investigator** | : Fernanda Sanchez |
| **Date of Death** | : 03/17/2022 |
| **Date Today** | : 02/08/2023 |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted], with whom he had a son named [redacted]. The decedent also had a son with [redacted], named [redacted]. He had a third child who was reported to have died in October 2018 [redacted]. The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name



CONFIDENTIAL COSD 006378

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.



CONFIDENTIAL

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ________________________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ________________________________________

CONFIDENTIAL

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
 A. Anterior rib fractures.
 B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted]. The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed: 02/28/2023

<u>IDENTIFICATION</u>: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

<u>WITNESSES</u>: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

<u>CLOTHING AND PROPERTY</u>: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

<u>EVIDENCE OF MEDICAL INTERVENTION</u>:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.
4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:
1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. <u>BLUNT FORCE INJURY OF TORSO</u>:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

<u>Block Key</u>:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

# TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: 06/27/2022

Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

COUNTY OF SAN DIEGO HHSA HEALTH AND HUMAN SERVICES AGENCY | LIVE WELL SAN DIEGO

San Diego County
PUBLIC HEALTH LABORATORY
CLIA # 05D0060808
Brett Austin. MA. PHM. Director

3851 Rosecrans Street
San Diego, CA 92110
Phone (619) 692-8500
FAX (619) 692-8558

# FINAL REPORT

| Patient Information | Specimen Information | Submitter Information |
|---|---|---|
| Patient Name: **Rupard, Lonnie** | Specimen # **22-206526-01** | SAN DIEGO COUNTY MEDICAL EXAMINER<br>5570 Overland Ave # 101<br>San Diego, CA 92123 |
| Patient Id:<br>Birth Date: 10/01/1975<br>Gender: Male<br>Pregnancy Status: Unknown<br>Outside ID: 2022-01007<br>PUID #:<br>Address: NOT PROVIDED<br>NOT PROVIDED, N/A 00000 | Source: Nasopharynx<br>Date Collected: 03/19/2022<br>Date Received: 03/19/2022 | **Site Contact**<br>Steven Campman, M.D.<br>Fax: 858-495-5956<br>mxclerical@sdcounty.ca.gov<br>Physician: Schaber, B<br>Diagnosis Code: |
| Phone #: 000-000-0000 | | Comments: B-00011 |

| Analyte (Method) | Result | Analysis Date |
|---|---|---|
| SARS-CoV-2 (NAAT) | Detected | 03/20/2022 |

**Comments:**

03/19/2022 NAAT (Nucleic Acid Amplification Test): This assay is for in vitro diagnostic use under FDA Emergency Use Authorization (EUA) only.

03/20/2022 Samples tested using GeneXpert under CLIA ID # 05D2197127 at 5570 Overland Avenue San Diego, CA 92123

Approved by: Joe Ana Jones-Price

Date reported: 03/20/2022

This document contains confidential health information that is privileged, confidential and exempt from disclosure under law. If you have received this information in error, please call (619) 692-8500 and arrange for return or destruction.

22-1007

COUNTY OF SAN DIEGO HHSA HEALTH AND HUMAN SERVICES AGENCY | LIVE WELL SAN DIEGO

San Diego County
PUBLIC HEALTH LABORATORY
CLIA # 05D0060808
Jeremy Corrigan, DrPH, HCLD/TS(ABB)

5570 Overland Ave, Ste 103
San Diego, CA 92123
Phone 619-692-8500
FAX 619-692-8558

# FINAL REPORT

| ***Patient Information*** | ***Specimen Information*** | ***Submitter Information*** |
|---|---|---|
| Patient Name: **Rupard, Lonnie**<br><br>Patient Id:<br>Birth Date: 10/01/1975<br>Gender: Male<br>Pregnancy Status:<br>Outside ID: 2022-01007<br>Comments: | Specimen # **22-206691-01**<br>Source: Nasopharynx<br><br>Date Collected: 03/19/2022<br>Date Received: 03/19/2022 | SAN DIEGO COUNTY MEDICAL EXAMINER<br>5570 Overland Ave # 101<br><br>Site Contact:<br>Steven Campman, M.D.<br>Fax: 858-495-5956<br>Physician: Schaber, B<br>Diagnosis Code: |

| **Analyte (Method)** | **Result** | **Analysis Date** |
|---|---|---|
| Influenza Typing | Refer to reference laboratory report. | |

**Comments:**

03/24/2022 Sample sent to CA State Viral and Rickettsial Diseases Laboratory, 850 Marina Bay Parkway, Richmond, CA 94804.

04/13/2022 VRDL report

Approved by: Ishita Gulati

Date reported: 04/27/2022

This document contains confidential health information that is privileged, confidential and exempt from disclosure under law. If you have received this information in error, please call (619) 692-8500 and arrange for return or destruction.

California Department of Public Health

State of California-Health and Human Services Agency

# Viral and Rickettsial Disease Laboratory

CDPH 850 Marina Bay Parkway, E365
Richmond, CA 94804

CLIA ID # 05D0643850

Phone: 510-307-8575
Fax: 510-307-8599

## Laboratory Results

Page 1 of 1

**Patient Information**

| Patient Name or Submitter ID: | Gender | Date of Birth | Age |
|---|---|---|---|
| Rupard, Lonnie | Male | 10/1/1975 | 47 Years |

Medical Records:

CalREDIE Incident #:

Pregnancy Status:

Patient Address: , , CA.

**Disease Suspected / Test Requested / Symptoms**

Disease Onset:

Rash Onset .

Disease Suspected: Influenza A or B

Test Requested:

ICD Code:

Specimen Collection Site.

**Submitter Information**

Submitter Type: CA City & County Health Depts
Facility: San Diego County Public Health Dept.
Address: 3851 Rosecrans Street

San Diego, CA 92110-3134
Phone: (619) 692-8499 Fax: (858) 715-6458

Health Jurisdiction: San Diego,CA

Laboratory Results

Reason Code v_140

**Specimen Information**

| Specimen Type. | Date Collected | Date Received | Condition Received | Submitter Tracking#: | VRDL Accession #: |
|---|---|---|---|---|---|
| Nasopharyngeal Swab | 3/19/2022 | 3/22/2022 | Dry Ice | 22-206891 | V22T07708-01 |

**Polymerase Chain Reaction (PCR) Results**

| Analyte | Test Type | VRDL Accession # | Test Method | Laboratory Results |
|---|---|---|---|---|
| Influenza A Nucleic Acid | FDA | V22T07708-01 | PCR (realtime) | not detected |
| Influenza B Nucleic Acid | FDA | V22T07708-01 | PCR (realtime) | not detected |

**Additional Information or Overall Interpretation of State Laboratory Test Results:**

FDA - Food and Drug Administration: This test has been FDA approved for clinical diagnostic use.

JP 4/4/22

Reviewed by: Ishita Gulati
04/04/2022

**The VRDL is certified under the Clinical Laboratory Improvement Amendments of 1988 (CLIA-88) as qualified to perform high complexity clinical laboratory testing.**

| Report to | |
|---|---|
| San Diego County Public Health Dept.<br>3851 Rosecrans St. Mail Stop P572 Suite 716<br>San Diego, CA 92110<br>Attn: Email - Laboratory Director Fax#<br>18587156458 | Testing performed under the direction of Dr. Carl Hanson Ph.D., Laboratory Director, Viral and Rickettsial Disease Laboratory<br>**Final Report Date: April 04, 2022**<br>Report Method: [ ] faxed to 18587156458 [ ] E-mailed [ ] NR [ ]<br>by: date: 4/4/2022 |

eurofins [redacted]
Product Testing

# Final Report

| Order Details | | Ordering Professional |
|---|---|---|
| Referral ID # | 22-01007 | [redacted] |
| DOB | 1975-10-01 | |
| Gender | M | |

| Request / Accession | R-P40234140 |
|---|---|
| Received | 03/25/2022 11:14 |
| Final Report | 03/25/2022 16:24 |
| Report Generated | 03/25/2022 16:24 |
| Time Zone | Pacific Standard Time |

## Results

| Test | Completed | Results | Ref. Range |
|---|---|---|---|
| Hepatitis B Surface Ag | 03/25/2022 16:21 | **Non Reactive** | Non Reactive |
| Hepatitis C Virus Ab | 03/25/2022 16:22 | **Non Reactive** | Non Reactive |
| HIV-1/HIV-2 Plus O | 03/25/2022 16:24 | **Non Reactive** | Non Reactive |

## Sample Reference(s)

**Collection Time Zone:** Pacific Standard Time

| VRL Sample ID | Type | Collected | Test(s) |
|---|---|---|---|
| S-P40234140A | Serum | 03/19/2022 13:15 | 3214, 3221, 3521 |

[redacted]: *Post-Mortem*

## Test Reference(s)

| Code | Name | Methodology Description |
|---|---|---|
| 3214 | Hepatitis B Surface Ag | BioRad Genetic Systems HBsAg EIA 3.0 is FDA approved for [redacted] screening. |
| 3221 | Hepatitis C Virus Ab | ORTHO HCV Version 3.0 ELISA is FDA approved for [redacted] screening. |
| 3521 | HIV-1/HIV-2 Plus O | BioRad GS HIV-1/HIV-2 Plus O EIA is FDA approved for [redacted] screening. This is a screening assay; it is neither a diagnostic assay nor a confirmatory test for the presence of HIV. |

## AUTOPSY FINDINGS

San Diego County Medical Examiner

2022-01007 B. Schaber, M.D. 3/19/2022

RUPARD, Lonnie

Age: 46 Sex: M ✓ Embalmed
Height: 69 Weight: 105#
Race: ~~C / B / H / A / F / NA / Other:~~
____ nourished / thin / (cachectic) / obese
Lividity: ant / (post) L / R, (fixed) / un-fixed
Rigidity: none / (mild) / mod / full
✗ Decomposition: mild / mod / advanced early green abd

**CAVITIES:** Pericardium: lac 75 ml hemopericardium
Pleural: R ✗FPA L ✗FPA
Peritoneum: ✗FPA Abd fat: 0.1 cm
**HEART:** 280 grams:
Hypertrophy: ∅ Dilation: ∅
Ventricles: R 0.3 cm; L 1.5 cm; IVS 1.4 cm
Valves: WNL
Coronaries: LAD LCx R + WP
**Aorta:** (minimal) / mild / mod / severe atherosclerosis
Aneurysms: ∅ Pulmonary arteries: no PE

**LUNGS:** R 480 g, L 1030 g
~~atelectatic / hyperinflated~~
Anthracosis: none / (small) / mod / large
Edema: Consolidation: LUL Red Firm no pa
Congestion: mild-mod Bronchi: WNL

**LIVER:** 1170 g Fat: ∅ Fibrosis: ∅
~~Cirrhosis: macro / micro~~
GALLBLADDER: 10 Stones: y / (n)
**PANCREAS:** WNL

**SPLEEN:** 70 g
Lymph nodes no enlg Marrow / Blood liq + clot
~~THYMUS:~~ ____ g

**GI:** Esophagus: W Bowel opened
Stomach contents: 60 ml of BRN watery fr SB soft tan Brown cast LB soft Brn stool
Bowels: 2.5 x 2 ulcer 3 wk ?duod... pylorus
Appendix: (Y) / N Anus: soft Brn stool
**KIDNEYS:** R 140 g, L 150 g, cysts: ∅
(smooth) / granular:
Bladder: 130 ml urine dk yellow urine
Prostate: WNL
Testes: ↓↓

**ADRENALS:** WNL
**THYROID:** WNL **PITUITARY:** WNL
**NECK:** Hemorrhages: NOT
Trachea ✗T Hyoid / Thyroid cartilage
Tongue: no hem WNL no hem or fx
**MUSCULOSKELETAL:** Fractures: Yes peristernal Rt 5-8 ant Rt 8
CPR: (Y) / N ) Ribs ( ∅ brittle): perist Lt 4-7 ant Lt 4-7
~~Kyphosis / scoliosis~~ Skull: no fx

pericardial sac lac 75 ml
Rt Atr/vent lac hemopericardium
y/u CPR

**SCALP:** Bry defect ∅ EDH ∅ SDH ∅ SAH
Bild occip Lt fat
**BRAIN:** 1290 g
+ dura Retained for NP consultation

**TOXICOLOGY:**
✓ Central Blood
✓ Peripheral Bld
✓ Vitreous
✓ Urine
___ Chest blood / fluid
___ Other:
___ None
___ Bile
___ CSF
✓ Liver
___ Spleen
✓ Gastric:

**Rapid Screens:** Glu Ket
+ / - meth; + / - coc; + / - morph; + / - alcohol

**HISTOLOGY:** (Ht) (Liv) (Lung) (R / L), Cor art:
(Kid), Panc, Spl, GI, Thyroid, Brain:
Other:
___ None 7 Cassettes

**PHOTOGRAPHS:** ✓ ID ✓ Over-alls
✓ Other:

**X-RAYS:** ___ None ✓ Yes: no fx's other than CPR, ml
___ head ___ chest ___ abd ___ other:

**CULTURES:** ___ None ___ Blood ___ Lung
___ CSF ✓ Viral:
___ Other: COVID-19 + Flu Seq SH - FA5 AntiB WP - SC

**EVIDENCE:** Bullets:

Det Max Blumenshine

**WITNESSES:** ___ None ✓ Yes: D. Racicot Fed, M. Gervasoni Fed
SDPD, SO, NCIS, OPD, BP

**GROSS AUTOPSY SUMMARY:**
Inmate central jail found unresp in his cell
Hx/o schizoph ?

Rev. 9/08

San Diego County Medical Examiner

**County of San Diego**
OFFICE OF THE MEDICAL EXAMINER

**2022-01007** B. Schaber, M.D.
3/19/2022

RUPARD, Lonnie

**Date & Time of Examination**: 0935
**CLOTHING** (___~~None/~~ ___~~Not examined~~):

**IDENTIFICATION**: ✓ M.E. band checked



County of San Diego
OFFICE OF THE MEDICAL EXAMINER

San Diego County Medical Examiner
2022-01007 B. Schaber, M.D.
3/19/2022
RUPARD, Lonnie



~~Doc~~

- 12/14/21 arrested Both Probate present single cell
  Refused medications.
- Single occupant cell.

Last seen alive cell check 2146

Found unresp in cell 2248 not Breathing. under blanket under in Bunk.
3/17

CPR transported to ER pronounced in ER.

Cell soiled c̄ feces food c̄ maggots.

- never c̄ other inmates.

San Diego County Medical Examiner
2022-01007 B. Schaber, M.D.
3/19/2022
RUPARD, Lonnie

# County of San Diego

DR. GLENN N. WAGNER
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE., STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me/

DR. STEVEN CAMPMAN
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## EVIDENCE TRANSFER FORM

NAME OF DECEDENT: Rupard, Lonnie ME# 22-1007

PATHOLOGIST: Schaber, B. MD

INVESTIGATING AGENCY: SDSO

| | | | |
|---|---|---|---|
| | BODY BAG | | OTHER (See REMARKS) |
| | BAGS REMOVED FROM HEAD | | ANAL SWABS |
| | BAGS REMOVED FROM HANDS | ✓ | ORAL SWABS |
| | BAGS REMOVED FROM FEET | | URETHRA SWABS |
| | HEAD HAIR SAMPLE | | VAGINAL SWABS |
| | FACIAL HAIR SAMPLES | | GUNSHOT RESIDUE SWABS |
| | CHEST HAIR SAMPLES | | FINGERPRINTS |
| | PUBIC HAIR SAMPLE | | PALM PRINTS |
| | PUBIC HAIR COMBING | | PROJECTILES/FRAGMENTS |
| ✓ | BLOOD SAMPLE | | FINGERNAIL CLIPPINGS |
| | | | FINGERNAIL SCRAPINGS |

CLOTHING: 1- blue SHIRT

JEWELRY: None

BONES/TISSUE SPECIMEN: None

REMARKS:

RELEASED BY Stephen Hannum (Print Name) Stephen Hannum (Signature) 3-19-22 (Date)

RECEIVED BY Melissa Gervasoni / SDSD (Print Name/Agency) [signature] (Signature) 3/19/22 (Date)

Original: File Yellow: Customer
MEE-34 (R 8/2019)

Receipt: 31356

# San Diego County Medical Examiner's Office
## Personal Effects Inventory

Name of Deceased: RUPARD, LONNIE Date: 3/19/22 M.E. Case No.: 22-1007

Name of Investigator/F.A.A: F. SANCHEZ / HANNUM PB # 687195

**Personal Effects**

**Currency:**

| | | | |
|---|---|---|---|
| $1 × | ø | =$ | ø |
| $5 × | 1 | =$ | 5.00 |
| $10 × | 1 | =$ | 10.00 |
| $20 × | 6 | =$ | 120.00 |
| $100 × | 2 | =$ | 200 |
| × | ø | =$ | |
| Coins: | | $ | ø.32 |
| Total U.S. Currency: | | $ | 335.32 |

**Bank Card:**

| QTY | Description – VISA, MasterCard, American Express (include account number) |
|---|---|
| / | / |

Foreign Currency: None

**Items:**

| QTY | Description | QTY | Description |
|---|---|---|---|
| 1 | wdy/metal watch | / | / |
| / | / | | |

**Government Issued Documents and Identification Cards** – The listed government documents issued by federal, state, county, or local agencies or foreign governments are property of that agency and will be returned to them.

| QTY | Description (include the agency name and ID number) |
|---|---|
| / | / / / |

**Witness Declaration**

The above listed property, found on the body, clothing, adjacent area, or residence of the above decedent was checked by me in the presence of the witness signed below.

| Print Name | Signature | Agency | Date |
|---|---|---|---|
| Deanne Rupard Osuna | [signature] | SDMEO | 03/19/22 |

**Release of Property to Next-of-Kin**

Received by: Megan Ruanca (Print Name) Date: 3/22/22 Time: 1543

Signature: ______ Relationship: Mortuary

Address: ______ City/State/Zip: ______

**Affidavit Under California Probate Code, Section 330**

I declare under Penalty of Perjury under the laws of the State of California that the foregoing is true and correct and that I do not know or have reason to believe that a dispute exists over the right to possess the property held by the Medical Examiner.

**Signature of Declarant:** ______

**Printed Name of Declarant:** ______

☐ **Miscellaneous medications, and/or illicit drugs, and/or drug paraphernalia impounded and inventoried at the Medical Examiner's Office.** These items will be retained and subsequently destroyed pursuant to departmental policy.

105 #

**MEDICAL EXAMINER'S OFFICE**
**INVESTIGATIVE MEMO**

AGE: 46 CASE # 22-1007

NAME RUPARD, LONNIE
LAST FIRST MIDDLE

DATE 03/18/2022

CARRIER 92M

INVESTIGATOR FERNANDA SÁNCHEZ

HIO (NAT) — VS — MVA SUI HOM (ACC) DONOR

HOW IN CUSTODY

BLUE SEAL # ~~K2294384~~ RED SEAL# 4950993

X-RAYS REQUIRED? (YES) (NO) [NO circled]

IF YES, WHAT AREA(S) OF BODY X-rays 3b4 JRC 03/18/22

REMARKS RQ EXAM SAT 03/19

AGENCY, TEAM #, and PHONE # SDSO DET BLUMENSHINE 619-886-0434

# CAUSE OF DEATH WORKSHEET

## San Diego County Medical Examiner Department

☒ Autopsy
☐ External
☐ Not Dictated
☐ Body not coming to office

☐ Fetal death
☐ Possible SIDS
☐ Family Paid

San Diego County Medical Examiner
2022-01007 B. Schaber, M.D.
3/19/2022
RUPARD, Lonnie

CAUSE OF DEATH: ( ✓ PENDING) Time interval

______________________________ ______

Due To: ______________________________ ______

Due To: ______________________________ ______

Due To: ______________________________ ______

CONTRIBUTING: ______________________________

______________________________

MANNER: ( ✓) Pending ( ) Natural ( ) Accident ( ) Suicide ( ) Homicide ( ) Undetermined

**Use reverse side for manner type in non-pending cases

HOW OCCURRED: ______________________________

DATE and TIME of INJURY: LOCATION:

SURGERIES and DATES:

If FEMALE, pregnant within the last year? ( ) Yes ( ) No ( ) Unknown

Deputy Medical Examiner/Fellow/Resident Supervising Pathologist Date 3/19/22

Rev. 06/15

TM 3/21/22

3/20/22

# Manner Types and SubTypes

(check one)

## NATURAL

- ☐ AIDS Related
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Autoimmune/Systemic
- ☐ Cancer
- ☐ Cardiovascular
- ☐ Central Nervous System
- ☐ Chronic Drug Abuse
- ☐ Diabetes Related
- ☐ Endocrine
- ☐ Family Paid
- ☐ Gastrointestinal
- ☐ Hematologic
- ☐ Infant/Perinatal (not SIDS)
- ☐ Infectious
  - ☐ Viral
  - ☐ Bacterial
  - ☐ Other
- ☐ Intrauterine/Stillborn
- ☐ Liver disease
- ☐ Obesity Related
- ☐ Other
- ☐ Pregnancy Related
- ☐ Psychiatric Related
- ☐ Pulmonary
- ☐ Renal
- ☐ Seizures
- ☐ SIDS
- ☐ Undetermined

## ACCIDENT

- ☐ Aircraft
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Animal Related
- ☐ Asphyxia
  - ☐ Airway Obstruction
  - ☐ Autoerotic
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Traumatic
- ☐ Bicycle
- ☐ Blunt Force (other)
- ☐ Boating
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug and Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol

### ACCIDENT (cont.)

- ☐ Electrocution
- ☐ Explosion
- ☐ Exposure
- ☐ Fall
  - ☐ Blunt head trauma
  - ☐ Fracture, other
  - ☐ Hip/Femur fracture
  - ☐ Multiple injuries
  - ☐ Other
  - ☐ Spinal fracture
  - ☐ Subdural hematoma
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Industrial
- ☐ Ingested Foreign Object(s)
- ☐ Inhalation
- ☐ Medical/Therapeutic
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs Auto
  - ☐ Auto vs Bicycle
  - ☐ Auto vs Fixed Object
  - ☐ Auto vs Motorcycle
  - ☐ Auto vs Pedestrian
  - ☐ Hit and Run
  - ☐ Motorcycle
  - ☐ Off Road
  - ☐ Other
  - ☐ Unknown
- ☐ Other
- ☐ Restraint Related
- ☐ Scalding
- ☐ Scuba - Diving
- ☐ Spear gun
- ☐ Train
- ☐ Undetermined

## SUICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Other
- ☐ Blunt Force (other)
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug & Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol
- ☐ Electrocution

### SUICIDE (cont.)

- ☐ Explosion
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Inhalation
- ☐ Jumping
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs. Fixed Object
  - ☐ Auto vs. Pedestrian
  - ☐ Motorcycle
- ☐ Train
- ☐ Undetermined

## HOMICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
- ☐ Assault
- ☐ Blunt Force
- ☐ Chemical/Poison
- ☐ Child Abuse
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Elder Abuse
- ☐ Exposure
- ☐ Fire
- ☐ Firearm
- ☐ Homicidal Violence, NOS
- ☐ Intrauterine/Stillborn
- ☐ Motor Vehicle
- ☐ Other
- ☐ Restraint Related
- ☐ Undetermined

## UNDETERMINED

- ☐ Alcohol Related
- ☐ Blunt Force
- ☐ Decomposed
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Fire related
- ☐ Firearm
- ☐ Infant/Perinatal (not SIDS)
- ☐ Intrauterine/Stillborn
- ☐ Other
- ☐ Skeletal Remains
- ☐ Undetermined

Rev. 06/15

# DEATH CERTIFICATE AMENDMENT WORKSHEET

Case: 2022-1007

Name: RUPARD, LONNIE

CAUSE OF DEATH: PNEUMONIA, MALNUTRITION, AND DEHYDRATION ( )
IN THE SETTING OF NEGLECTED SCHIZOPHRENIA (unknown)

Due to: ( )

Due to: ( )

Due to: ( )

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

Surgeries:

MANNER OF DEATH

☐ NATURAL ☐ ACCIDENT ☐ SUICIDE ☑ HOMICIDE ☐ UNDETERMINED

Place of Injury: SAN DIEGO CENTRAL JAIL

Date & Time: UNKNOWN

How Occurred: INADEQUATE CARE WHILE INCARCERATED

[signature] 2/27/23
DEPUTY MEDICAL EXAMINER Date
SCHABER

[signature] 3/1/23
CHIEF MEDICAL EXAMINER Date

AL 03/01/23 @ 2:46pm

LG 3/1/23

# Manner Types and SubTypes

(check one)

## NATURAL

- [ ] AIDS Related
- [ ] Alcohol Related
- [ ] Anaphylactic Reaction
- [ ] Autoimmune/Systemic
- [ ] Cancer
- [ ] Cardiovascular
- [ ] Central Nervous System
- [ ] Chronic Drug Abuse
- [ ] Diabetes Related
- [ ] Endocrine
- [ ] Family Paid
- [ ] Gastrointestinal
- [ ] Hematologic
- [ ] Infant/Perinatal (not SIDS)
- [ ] Infectious
  - [ ] Viral
  - [ ] Bacterial
  - [ ] Other
- [ ] Intrauterine/Stillborn
- [ ] Liver disease
- [ ] Obesity Related
- [ ] Other
- [ ] Pregnancy Related
- [ ] Psychiatric Related
- [ ] Pulmonary
- [ ] Renal
- [ ] Seizures
- [ ] SIDS
- [ ] Undetermined

## ACCIDENT

- [ ] Aircraft
- [ ] Alcohol Related
- [ ] Anaphylactic Reaction
- [ ] Animal Related
- [ ] Asphyxia
  - [ ] Airway Obstruction
  - [ ] Autoerotic
  - [ ] Other
  - [ ] Positional
  - [ ] Strangulation
  - [ ] Suffocation
  - [ ] Traumatic
- [ ] Bicycle
- [ ] Blunt Force (other)
- [ ] Boating
- [ ] Carbon Monoxide
- [ ] Chemical/Poison
- [ ] Cutting/Stabbing
- [ ] Drowning
- [ ] Drug – Medication
  - [ ] Drug and Alcohol
  - [ ] Drug and Meds
  - [ ] Drug, meds & alcohol
  - [ ] Drugs of Abuse
  - [ ] Medication
  - [ ] Meds & Alcohol

### ACCIDENT (cont.)

- [ ] Electrocution
- [ ] Explosion
- [ ] Exposure
- [ ] Fall
  - [ ] Blunt head trauma
  - [ ] Fracture, other
  - [ ] Hip/Femur fracture
  - [ ] Multiple injuries
  - [ ] Other
  - [ ] Spinal fracture
  - [ ] Subdural hematoma
- [ ] Fire
- [ ] Firearm
- [ ] Hanging
- [ ] Industrial
- [ ] Ingested Foreign Object(s)
- [ ] Inhalation
- [ ] Medical/Therapeutic
- [ ] Motor Vehicle
  - [ ] Auto Rollover (solo)
  - [ ] Auto vs Auto
  - [ ] Auto vs Bicycle
  - [ ] Auto vs Fixed Object
  - [ ] Auto vs Motorcycle
  - [ ] Auto vs Pedestrian
  - [ ] Hit and Run
  - [ ] Motorcycle
  - [ ] Off Road
  - [ ] Other
  - [ ] Unknown
- [ ] Other
- [ ] Restraint Related
- [ ] Scalding
- [ ] Scuba - Diving
- [ ] Spear gun
- [ ] Train
- [ ] Undetermined

## SUICIDE

- [ ] Alcohol Related
- [ ] Asphyxia
  - [ ] Strangulation
  - [ ] Suffocation
  - [ ] Other
- [ ] Blunt Force (other)
- [ ] Carbon Monoxide
- [ ] Chemical/Poison
- [ ] Cutting/Stabbing
- [ ] Drowning
- [ ] Drug – Medication
  - [ ] Drug & Alcohol
  - [ ] Drug and Meds
  - [ ] Drug, meds & alcohol
  - [ ] Drugs of Abuse
  - [ ] Medication
  - [ ] Meds & Alcohol
- [ ] Electrocution

### SUICIDE (cont.)

- [ ] Explosion
- [ ] Fire
- [ ] Firearm
- [ ] Hanging
- [ ] Inhalation
- [ ] Jumping
- [ ] Motor Vehicle
  - [ ] Auto Rollover (solo)
  - [ ] Auto vs. Fixed Object
  - [ ] Auto vs. Pedestrian
  - [ ] Motorcycle
- [ ] Train
- [ ] Undetermined

## HOMICIDE

- [ ] Alcohol Related
- [ ] Asphyxia
  - [ ] Other
  - [ ] Positional
  - [ ] Strangulation
  - [ ] Suffocation
- [ ] Assault
- [ ] Blunt Force
- [ ] Chemical/Poison
- [ ] Child Abuse
- [ ] Cutting/Stabbing
- [ ] Drowning
- [ ] Drug - Medication
- [ ] Elder Abuse
- [ ] Exposure
- [ ] Fire
- [ ] Firearm
- [ ] Homicidal Violence, NOS
- [ ] Intrauterine/Stillborn
- [ ] Motor Vehicle
- [x] Other
- [ ] Restraint Related
- [ ] Undetermined

## UNDETERMINED

- [ ] Alcohol Related
- [ ] Blunt Force
- [ ] Decomposed
- [ ] Drowning
- [ ] Drug - Medication
- [ ] Fire related
- [ ] Firearm
- [ ] Infant/Perinatal (not SIDS)
- [ ] Intrauterine/Stillborn
- [ ] Other
- [ ] Skeletal Remains
- [ ] Undetermined

Rev. 06/15

# COUNTY OF SAN DIEGO MEDICAL EXAMINER

5570 OVERLAND AVENUE, SUITE 101, SAN DIEGO, CA 92123-1215
PHONE: 858-694-2895 FAX: 858-495-5956

## ORDER FOR RELEASE OF REMAINS

**TO:** MEDICAL EXAMINER, COUNTY OF SAN DIEGO

**RE:** REMAINS OF Lonnie Newton Rupard, ME CASE # 22-1007

RUPARD Lonnie 2022-01007

I certify that pursuant to the State of California Health & Safety Code, Section 7100, it is my legal right to control the disposition of the remains referenced above, the location and conditions of interment, and arrangements for funeral goods and services to be provided. I further certify that I am acting in the capacity of: **Legal Next of Kin** [redacted], **OR Executor/Executrix** __________, **OR Agent with Durable Power of Attorney for Health Care** (must be for Health Care) __________ **OR other legal capacity** __________ (please **INITIAL** the appropriate category). If acting in a capacity other than Legal Next of Kin, I have attached a copy of the relevant appointing document(s).

Therefore, upon completion of your examination of the deceased, please release the remains referenced above to the custody of the service designated below. If possible please **RELEASE** [redacted] **OR DO NOT RELEASE**__________ (please **INITIAL** desired choice) all of the deceased's personal property in your care with the remains. I understand that personal property can only be released during regular working hours (M-F 8-5, except holidays). **As per California Laws and Department Policies, if the property in custody of the Medical Examiner's Department is not collected within 90 days from the date of death, it will be processed for immediate disposal.**

Featheringill Mortuary
Print Name of Designated Mortuary, Cremation Society, or other Disposition Service

[redacted] | Son | [redacted] | Mar 22 2022
Print Name of Person Signing | Relationship | Signature | Date Signed

[redacted] El Cajon CA 92021
Mailing Address of Person Signing

[redacted]
Home / Cell Phone Number

El Cajon CA 92021
City, State, Zip Code of Person Signing

El Cajon CA
City, State Where Signed

**DECEDENT INFORMATION**

| Name of Deceased – First (Given) | Middle | Last (Family) | Gender | Date of Death |
|---|---|---|---|---|
| Lonnie | Newton | Rupard | N | 03/17/2022 |

| Date of Birth | Age | Place of Birth | Social Security Number | Race |
|---|---|---|---|---|
| 10/1/1975 | 46 | PI | [redacted] | Filipino |

| Marital Status | Occupation | Residence Address: |
|---|---|---|
| Div | Disabled | [redacted] Bonita ca 91902 |

**MEDICAL EXAMINER DEPARTMENT USE ONLY**

ME FAS Hannum

Release Date/Time: 3-22-22 1511

Transport Staff: (signed) [signature]

Printed Name: Megan Rooney

MEA-15 (R 3/26/19)

# COUNTY OF SAN DIEGO MEDICAL EXAMINER

5570 OVERLAND AVENUE, SUITE 101, SAN DIEGO, CA 92123-1215
PHONE: 858-694-2895 FAX: 858-495-5956

## ORDER FOR RELEASE OF REMAINS

**TO:** MEDICAL EXAMINER, COUNTY OF SAN DIEGO

**RE:** REMAINS OF Lonnie Newton Rupard, ME CASE # 22-01007

RUPARD, Lonnie 2022-01007

I certify that pursuant to the State of California Health & Safety Code, Section 7100, it is my legal right to control the disposition of the remains referenced above, the location and conditions of interment, and arrangements for funeral goods and services to be provided. I further certify that I am acting in the capacity of: **Legal Next of Kin** [redacted]____, **OR Executor/Executrix** ________, **OR Agent with Durable Power of Attorney for Health Care** (must be for Health Care) ________ **OR other legal capacity** ________ (please INITIAL the appropriate category). If acting in a capacity other than Legal Next of Kin, I have attached a copy of the relevant appointing document(s).

Therefore, upon completion of your examination of the deceased please release the remains referenced above to the custody of the service designated below. If possible please **RELEASE** [redacted]____ **OR DO NOT RELEASE**________ (please INITIAL desired choice) all of the deceased's personal property in your care with the remains. I understand that personal property can only be released during regular working hours (M-F 8-5, except holidays). **As per California Laws and Department Policies, if the property in custody of the Medical Examiner's Department is not collected within 90 days from the date of death, it will be processed for immediate disposal.**

Featheringill Mortuary
Print Name of Designated Mortuary, Cremation Society, or other Disposition Service

| Print Name of Person Signing | Relationship | Signature | Date Signed |
|---|---|---|---|
| [redacted] | Son | X [redacted] | 3-22-22 |

| Mailing Address of Person Signing | Home / Cell Phone Number |
|---|---|
| [redacted] | [redacted] |

| City, State, Zip Code of Person Signing | City, State Where Signed |
|---|---|
| Bonita CA 91902 | San Diego CA |

**DECEDENT INFORMATION**

| Name of Deceased – First (Given) | Middle | Last (Family) | Gender | Date of Death |
|---|---|---|---|---|
| Lonnie | Newton | Rupard | M | 3-17-22 |

| Date of Birth | Age | Place of Birth | Social Security Number | Race |
|---|---|---|---|---|
| 10-1-1975 | 46 | PI | [redacted] | Filipino |

| Marital Status | Occupation | Residence Address: |
|---|---|---|
| div | Disabled | [redacted] Bonita CA 91902 |

**MEDICAL EXAMINER DEPARTMENT USE ONLY**

ME FAS __________ Release Date/Time: __________

Transport Staff: (signed) [signature] Printed Name: Megan Ruona

MEA-15 (R 3/26/19)

***County of San Diego***
***Office of the Medical Examiner***

**RELEASE OF REMAINS**

**Name: RUPARD, Lonnie**

**M.E. #: 2022-01007**

Investigator: Fernanda Sanchez

Date Rec: 3/18/2022

Body Status: Ready to release

Mortuary: Featheringill Mortuary

**OK to Release Property?** yes

Date and Time Released: 3/22/2022 1509

Ok to release property Yes-JM

Released By: Data Entry: Stephen Hannum

T.E. No-JM

Body Retrieval: Stephen Hannum

| | | | |
|---|---|---|---|
| [] Cert | [] N.C. | [] Military | [] Release |
| [] Property | [] Child | [] Vitals | [] County |
| [] Decomp | [] Fee Paid | [] P.A. | [] Pouch |

**Weight: 105 lb** **Height: 69"** **Age: 46 Years** **Sex: Male**

**Body Condition: Within Normal Limits**

**Exam Type: Autopsy**

**Clothing Released with Body: True**

**Location: 15C dbl Son [redacted] also signed OFR**

**Clothing:** blue stripped sweatshirt, grey tank top, grey pants, black underwear, pair brown boots

**Items on or with Body:** none

***Remains have been examined with I.D. verified by comparison to ankle bracelet.***
***Clothing, valuables, if any, and posession of remains recieved in satisfactory condition:***

SHannum
Signature (Body retrieval M.E. staff)

**Stephen Hannum**
Printed Name

[signature]
Signature (Transport staff)

Megan Ruana
Printed Name

Date: 3/22/22 Time: 1519

**PROOF OF SERVICE**
**(CCP §§ 1013(a) and 2015.5; FRCP 5)**

State of California, )
) ss.
County of Los Angeles. )

I am employed in the County of Los Angeles. I am over the age of 18 and not a party to the within action. My business address is 790 E. Colorado Boulevard, Suite 600, Pasadena, CA 91101.

On this date, I served the foregoing document described as **DECLARATION OF ROBERT S. KAHN IN SUPPORT OF DEFENDANT COUNTY OF SAN DIEGO'S MOTION TO EXCLUDE OR LIMIT THE OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERT GARY RANEY** on the interested parties in this action by placing same in a sealed envelope, addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ **(BY MAIL)** - I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail in Pasadena, California to be served on the parties as indicated on the attached service list. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Pasadena, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **(BY CERTIFIED MAIL)** – I caused such envelope(s) with postage thereon fully prepaid via Certified Mail Return Receipt Requested to be placed in the United States Mail in Pasadena, California.

☐ **FEDERAL EXPRESS** - I caused the envelope to be delivered to an authorized courier or driver authorized to receive documents with delivery fees provided for.

☐ **(BY ELECTRONIC FILING AND/OR SERVICE)** – I served a true copy, with all exhibits, electronically on designated recipients listed on the attached service list.

☒ **(ELECTRONIC SERVICE PER CODE CIV. PROC., § 1010.6)** – By prior consent or request or as required by rules of court (Code Civ. Proc., § 1010.6 (amended Jan. 1, 2021); Code Civ. Proc., § 1013(g); Cal. Rules of Court, rule 2.251(a)).

☐ **(BY PERSONAL SERVICE)** - I caused such envelope(s) to be delivered by hand to the office(s) of the addressee(s).

---

Executed on November 13, 2026 at Pasadena, California.

☐ **(STATE)** - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ **(FEDERAL)** - I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

NATALIE URBINO
nurbino@ccllp.law

*25163*



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**ESTATE OF LONNIE RUPARD ET AL. V. COUNTY OF SAN DIEGO ET AL.**
**Case Number: 3:23-cv-1357-CAB-JAC**
**CCLLP File Number: 25163**

**SERVICE LIST**

Jeremiah A. Lowe
LOWE LAW, LLP
402 W. Broadway, Suite 1720
San Diego, CA 92101
T: (619) 878-2725 - F: (619) 878-2737
jeremiah@lowelawapc.com
laura@lowelawapc.com
**ATTORNEYS FOR PLAINTIFF JUSTINO RUPARD and the Estate of Lonnie Rupard**

Eugene G. Iredale
Julia Yoo
Sarah Musumeci
Peter Bibring
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
T: (619) 233-1525 - F: (619) 233-3221
egiredale@iredalelaw.com
jyoo@iredalelaw.com
smusumeci@iredalelaw.com
admin@iredalelaw.com
creherman@iredalelaw.com
gjun@iredalelaw.com
sbrockett@iredalelaw.com
pbibring@iredalelaw.com
**ATTORNEYS FOR PLAINTIFF JUSTINO RUPARD**

Alexandra Sennet
Kimberly B. Pinkerton
TRESSLER LLP
909 North Pacific Coast Highway, Suite 840
El Segundo, CA 90245
T: (310) 203-4800 - F: (323) 486-2704
asennet@tresslerllp.com
kpinkerton@tresslerllp.com
**ATTORNEYS FOR DEFENDANTS ANTHONY CRUZ, M.D. and LIBERTY HEALTHCARE OF CALIFORNIA, INC.**

Jerome Murphy
TRESSLER LLP
233 S. Wacker Drive, 61st Floor
Chicago, IL 60606
jmurphy@tresslerllp.com
**ATTORNEY FOR DEFENDANTS ANTHONY CRUZ, M.D. and LIBERTY HEALTHCARE OF CALIFORNIA, INC.**

Corey E. Krueger
BURGER, MEYER & D'ANGELO, LLP
999 Corporate Dr., Suite 225
Ladera Ranch, CA 92694
T: (949) 427-1888 - F: (949) 427-1889
ckrueger@burgermeyer.com
vcuevas-carey@burgermeyer.com
**ATTORNEYS FOR DEFENDANTS ANTHONY CRUZ, M.D. and LIBERTY HEALTHCARE OF CALIFORNIA, INC.**