**Rada Feldman, Esq. (State Bar No. 285931)**
**Nicholas R. Colletti, Esq. (State Bar No. 283947)**
**Robert S. Kahn, Esq. (State Bar No. 231277)**
**Caroline M. Park, Esq. (State Bar No. 334008)**
**Cristina I. Butoiu, Esq. (State Bar No. 335902)**
**COLLINS + COLLINS LLP**
**2011 Palomar Airport Road, Suite 207**
**Carlsbad, CA 92011**
**(760) 274-2110 - FAX (760) 274-2111**
**Email: rfeldman@ccllp.law**
**Email: ncolletti@ccllp.law**
**Email: rkahn@ccllp.law**
**Email: cpark@ccllp.law**
**Email: cbutoiu@ccllp.law**

Attorneys for Defendants,
COUNTY OF SAN DIEGO, BILL GORE, KELLY MARTINEZ, JON MONTGOMERY, CHRISTINA GOODALL (sued as CHRISTINA ANOSIKE), MIGUEL AGUILERA, JASON VILADIU, GUSTAVO MARTINEZ, JEFF AMADO, ERNESTO AGUIRRE, TREYVONNE JAMES (sued in duplicate J. TREYVONNE), BERNARDO ROMERO, MICHAEL JOHNSON, ANDREW TORRES, ALLEN WERESKI, BLADE ROMANS, LINDA GUTIERREZ, AND THOMAS MACE

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ESTATE OF LONNIE RUPARD, THROUGH ITS COURT-APPOINTED ADMINISTRATOR TERRI LOPEZ;<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; et al.<br><br>Defendants. | CASE NO. 3:23-cv-1357-CAB-JAC<br>***Assigned to Hon. Cathy Ann Bencivengo***<br>***Magistrate Hon. Janet A. Cabral in Dept. 15A***<br><br>**DECLARATION OF ROBERT S. KAHN IN SUPPORT OF DEFENDANT COUNTY OF SAN DIEGO'S MOTION TO EXCLUDE OR LIMIT THE OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERT HOMER VENTERS, M.D.**<br><br>Date: December 18, 2026<br>Time: ________<br>Dept.: 15A |

*25163*

**Complaint Filed: 7/26/2023**
**Trial Date: 2/22/2027**

**DECLARATION OF ROBERT S. KAHN**

I, Robert S. Kahn, declare as follows:

1. I am an attorney licensed to practice before this Court and a Senior Associate attorney at Collins + Collins LLP, counsel of record for Defendant County of San Diego (the "County") in this action. I make this declaration in support of the County's Motion to Exclude or Limit the Opinions and Testimony of Plaintiff's retained forensic-correctional health expert, Homer Venters, M.D. I have personal knowledge of the matters stated herein and, if called as a witness, could and would testify competently to them. As to matters concerning the contents of the records and transcripts identified below, my knowledge is based on my personal review of those documents in the course of representing the County.

2. I submit this declaration to authenticate and place before the Court the documentary evidence on which the County's motion relies, pursuant to Civil Local Rule 7.1.

3. **Plaintiffs' expert disclosures and Dr. Venters' report.** Attached hereto as **Exhibit A** is a true and correct copy of the relevant portions of Plaintiffs' Expert Witness Disclosures and Reports Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), including the signed expert report of Dr. Homer Venters, which was executed on July 14, 2026. Exhibit A also includes the portions of Plaintiffs' disclosures identifying Plaintiffs' retained experts in this action, including Plaintiffs' separately retained jail-practices expert, Gary Raney, who addresses inmate monitoring, segregation, and organizational jail practices; Plaintiffs' separately retained forensic-psychiatry expert, Dr. Daphne Glindmeyer, who addresses the treating psychiatrist's clinical judgment; and Plaintiffs' separately retained correctional-nursing expert, Lori Roscoe — the same custody, psychiatric, and nursing subjects addressed by Dr. Venters. Based on my review of Dr. Venters' report: (a) the report does not state any opinion, to a reasonable degree

*25163*



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

of medical certainty, on the cause of Mr. Rupard's death; (b) the report relies on the standards and guidelines of the National Commission on Correctional Health Care (NCCHC) and the American Correctional Association (ACA), which it repeatedly refers to as the "standard of care"; (c) the report criticizes the treating psychiatrist's clinical judgment, including the discontinuation of psychiatric medication, the decision not to transfer Mr. Rupard, and the follow-up intervals; and (d) the report's "Role and Methods" section consists of a list of the documents Dr. Venters reviewed.

4. **Dr. Venters' deposition.** The videotaped deposition of Dr. Venters was taken in this action on September 10, 2026. Attached hereto as **Exhibit B** is a true and correct copy of the relevant excerpts of the certified transcript of that deposition. The excerpts in Exhibit B include, among others, the following testimony cited in the County's motion:

a. Transcript pages 62 through 64, in which Dr. Venters testified that, as to the cause of Mr. Rupard's death, "I don't have any independent opinion" and that he "take[s] it at [the Medical Examiner's] word about the three causes of Mr. Rupard's death," and agreed that he is not offering any independent causation opinion and "defer[s] to the medical examiner" on the cause of death.

b. Transcript pages 64 through 65 and 96 through 97, in which Dr. Venters testified that he is "not offering any type of legal opinions," that he has no "expertise on what is a constitutional standard because [he is] not an attorney," and that he is "not offering any opinion that any defendant was deliberately indifferent in the constitutional sense."

c. Transcript pages 30 through 32 and 48 through 49, in which Dr. Venters testified that NCCHC accreditation "is a voluntary thing" and that the County was "not legally required to be accredited," that the ACA standards are likewise voluntary, and that his "expertise is purely on the kind of adequacy of care from the clinical standpoint, so I don't think I would ever be in a position to say that a level of

*25163*





COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

care, even if I thought it was inadequate, met or didn't meet some sort of legal standard."

d. Transcript page 84, in which Dr. Venters testified that his "criticisms are based on correctional standards of care, not any California laws" that he reviewed or attempted to interpret.

e. Transcript page 23 and page 72, in which Dr. Venters testified that he is "not a board-certified psychiatrist," did not complete a psychiatry residency, and has "never personally practiced clinical psychiatry or prescribed or managed psychiatric medications for patients as their treating psychiatrist at any point in [his] career."

f. Transcript page 64, in which Dr. Venters testified that he is "not a forensic pathologist" and did not perform an autopsy in this case. (Deposition of Homer Venters, M.D. at 66)

g. Transcript pages 24 through 25, 67, and 81 through 83, in which Dr. Venters testified that he is licensed only in New York and not in California, that his only time inside a San Diego County jail was part of a day for a best-practices walk-through, that he is "not an expert ... in the specific 5150 hold," that he is "not familiar" with California's Lanterman-Petris-Short Act, that he has never initiated a 5150 or 5250 hold, and that he does not know how a Riese petition and order take place. (Deposition of Homer Venters, M.D. at 25; Deposition of Homer Venters, M.D. at 25-26; Deposition of Homer Venters, M.D. at 68; Deposition of Homer Venters, M.D. at 82-83; Deposition of Homer Venters, M.D. at 84)

h. Transcript pages 26 through 29, in which Dr. Venters testified that he performed "primarily a records review" and, when asked whether he used "a specific methodology," described only reviewing records and assessing "the adequacy and the timeliness of the response." (Deposition of Homer Venters, M.D. at 27; Deposition of Homer Venters, M.D. at 29)

*25163*





COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

i. Transcript page 63 and page 78, in which Dr. Venters testified that "it's not evident to me whether these errors are always individual or systemic" and that "I just don't know ... the why, the underlying reason behind every one of those failures." (Deposition of Homer Venters, M.D. at 64; Deposition of Homer Venters, M.D. at 79)

j. Transcript pages 73, 80 through 81, and 91, in which Dr. Venters testified that medication choice "is very much a matter of clinical decisionmaking" by the treating psychiatrist, that the segregation-rounds policies and practices were "not within Dr. Cruz's control," that he had "no basis" to say Dr. Cruz caused the jail's lack of a peer-review process or clinical mortality review, and that the decision to direct Mr. Rupard to a higher level of care "would not have been exclusively Dr. Cruz's." (Deposition of Homer Venters, M.D. at 74; Deposition of Homer Venters, M.D. at 81; Deposition of Homer Venters, M.D. at 82; Deposition of Homer Venters, M.D. at 92)

k. Transcript page 98, in which Dr. Venters confirmed that he has "no other opinions that [he] plan[s] to offer at trial" beyond his reports and deposition.(Deposition of Homer Venters, M.D. at 98)

5. **Dr. Venters' rebuttal report.** Attached hereto as **Exhibit C** is a true and correct copy of the rebuttal expert report of Dr. Venters as served by Plaintiffs.

6. **Medical Examiner's report.** Attached hereto as **Exhibit D** are true and correct copies of the relevant portions of the County of San Diego Medical Examiner's report concerning the death of Lonnie Rupard, which certifies the cause of death as "Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia" and the manner of death as homicide, and which Dr. Venters identified as the source of the cause and manner of death to which he defers.

7. The excerpts attached as Exhibit B are drawn from the certified transcript of Dr. Venters' deposition. The County reserves the right to lodge the complete certified transcript and the videotaped recording with the Court and will provide any additional portions the Court wishes to review.

*25163*



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

8. The exhibits attached to this declaration are paginated in consecutive order, and a table of contents indicating the page number of each exhibit precedes the exhibits, in compliance with Civil Local Rule 5.1 and the Court's CM/ECF procedures.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 13, 2026, at Pasadena, California.

ROBERT S. KAHN

*25163*



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

# EXHIBIT "A"

EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

JEREMIAH A. LOWE (CA SBN 239166)
*jeremiah@lowelawapc.com*
LOWE LAW, APC
402 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 878-2725
Facsimile: (619) 878-2737

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ESTATE OF LONNIE RUPARD,

Plaintiff,

v.

COUNTY OF SAN DIEGO, *et al.*,

Defendants.

CASE NO. 23-CV-1357-CAB-JAC

**PLAINTIFF'S EXPERT WITNESS DISCLOSURES AND REPORTS PURSUANT TO FED. R. CIV. P. 26(a)(2)(B)**

Plaintiff the Estate of Lonnie Rupard, by and through its attorneys of record, Iredale & Yoo, APC and Lowe Law, APC, hereby submits the following expert witness reports pursuant to Fed. R. Civ. P. 26(a)(2)(B).

**RETAINED EXPERT REPORTS**

1. Homer Venters, M.D.: Dr. Venters' expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 1**.
2. Daphne A. Glindmeyer, M.D.: Dr. Glindmeyer's expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 2**.
3. Gary Raney: Mr. Raney's expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 3**.
4. Lori E. Roscoe, DNP: Dr. Roscoe's expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 4**.

Respectfully submitted,

DATED: July 15, 2026

**IREDALE & YOO, APC**
EUGENE G. IREDALE
JULIA YOO
SARAH MUSUMECI

*s/ Eugene Iredale*
Attorneys for Plaintiff

DATED: July 15, 2026

**LOWE LAW, APC**
JEREMIAH LOWE

*s/ Jeremiah Lowe*
Attorney for Plaintiff

# Exhibit 1

# Review of Care for Lonnie Rupard in the San Diego County Jail

## Introduction and Qualifications

I am a physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. This work included and resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous individual cases of medical release, the formulation of health-related policies, as well as testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

After my fellowship training, I became the Deputy Medical Director of the Correctional Health Services of New York City. This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care. I was subsequently promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer of the New York City jails. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, substance use treatment, quality improvement, re-entry and morbidity and mortality reviews, as well as all training and oversight of physicians, nursing, and pharmacy staff. In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices, including correctional officer responses to patients in distress, assessment after use of force injuries and medical observation and care for people in solitary confinement/segregation settings. My responsibilities during this time included review and approval of all medical and mental health policies, including those relating to intake health assessments, chronic care and sick call, emergency responses, mental health and substance abuse care, infirmary care, and transfer of patients for higher levels of care.

During this time, I worked closely with correctional leadership to provide training to correctional staff on traumatic brain injuries and other common injuries that occur during use of force. I have provided input on security policies and provided training for security staff relating to how correctional staff should recognize signs of illness and injury among incarcerated people. Part of my work in leading a jail health service has been to provide training to both health and security staff on how to safeguard patient confidentiality and ensure the delivery of care to patients in

both general population and solitary confinement/segregation housing areas. These trainings have included topics ranging from how security staff should recognize and urgently report health concerns to the medical staff, and how medical staff should work with security staff on provision of care and monitoring of high-risk patients.

In March 2017, I left Correctional Health Services of New York City to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges, and law enforcement staff on forensic evaluation and documentation, analysis of mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

Between December 2018 and April 2020, I served as the Senior Health Fellow and President of Community Oriented Correctional Health Services ("COCHS"), a nonprofit organization that promotes evidence-based improvements to correctional practices across the United States.

I have worked as a medical expert in cases involving correctional health since 2017. Several of the cases I have offered expert reports for relate to deaths that have occurred in the San Diego Jails.

During the COVID-19 pandemic, I worked on numerous COVID-19 responses in detention settings. During this time, I have conducted dozens of court-ordered inspections of detention facilities to assess the adequacy of their COVID-19 responses in ICE detention centers, county jails, and state and federal prisons. I was named as an independent monitor for COVID-19 response for both the Connecticut State Prisons and the Hawaii Department of Corrections, and I was named as COVID-19 inspector by a Federal Court for the Bureau of Prisons facility in Lompoc, California.

I have been named as Federal Court-appointed monitor for the health services in the Santa Barbara, California County Jail, the Fluvanna Prison for Women in the Virginia Department of Corrections and the Criminal Justice Complex in St. Thomas, United States Virgin Islands and the Cumberland County Jail. I have been retained by the U.S. Department of Justice and several State Attorney General's offices in their investigations into the adequacy of health services in jail and prison settings.

I have published two books on correctional health, both published by Johns Hopkins University Press; *Life and Death in Rikers Island (2019*) and *Outbreak Behind Bars* (2025).

**Role and Methods**

I have been retained by the Estate of Mr. Rupard to assess the adequacy of care he received in the San Diego Jail leading up to his death in 2022. I have also been retained to assess whether any failures to deliver the standard of care to Mr. Rupard reflect potentially systemic problems with

care in this facility. In order to formulate my opinions in this case I have reviewed the following information:

- San Diego County Jail medical records (COSD 000026-000150, 0026887-002801)for Mr. Rupard.
- Medical Examiner's report and autospyon the death of Mr. Rupard.
- Floor evacuation list for Module 7B on 3/18/22.
- Deposition testimony of Jon Mongomery, initial and follow up.
- Deposition testimony of Anthony Cruz
- Deposition testimony of Serina Rognlien-Hood
- Deposition testimony of Melissa Quiroz
- Deposition testimony of Michael Johnson
- Deposition testimony of Francis Ysla
- Deposition testimony of Dr. Sandeep Jouhal.
- Deposition testimony of Dr. Jean Kloker
- Complaint in Case No: 23CV1357 CAB BLM.
- Incident and Hearing Reports from 1/29/22 incident (COSD 000670-672, 000904-913) and 2/19/22 incident (COSD 000443-445)
- Job postings for San Diego Sheriff's Chief Medical Officer and Medical Services Administrator roles.
- San Diego Sheriff's Classification Navigator Report for Mr. Rupard.
- San Diego Sheriff's Department Policies;
  - "Segregated Inmates", G.2.1, 10/30/20.
  - "Refusal Procedures", MSD.R.5 1/6/22 and 7/14/16.
  - "Psychiatric Stabilization Unit (PSU)", MSD.P.8, dated 10/2/19 and1/24/22.
  - Psychiatric Stabilization Units" M25 dated 3/27/20.
  - "Psych Stabilization Unit-Admission Types" MSDP.15 dated 1/31/22.
  - Mental Health Evaluation and Screen MDS.E.5.1 dated 6/23/20.

- San Diego Sheriff's Follow-up Investigative Reports (I, II, III) regarding Mr. Rupard's death, from Det. Blumenshine.
- Dr. Montgomery's notes regarding Mr. Rupard's death.
- DOJ Death in Custody Reporting Form for Mr. Rupard.
- Contract between Liberty Healthcare and San Diego County (555357)
- California State Auditor's Report on San Diego County Sheriff's Department, February 2022.

**Medical Timeline**

Mr. Rupard was incarcerated in the San Diego Jail on 12/19/21 at the age of 46. Medical Clearance, General Informed Consent and Receiving Screening forms are present signed by RN Samonte between 2:20 and 2:55 am. These documents include notation that Mr. Rupard was willing but unable to sign these forms, without explanation as to why. These forms also have checked boxes for the following observations;

- Combative, assaultive or extremely hostile behavior
- Chronic conditions, psychotic disorders

These forms also document Mr. Rupard as not taking any medications, not having any history of suicide attempts or substance withdrawal. The area for past medical or psychiatric hospitalizations is left unchecked on the receiving screening form. The receiving screening form appears to lack any field to document whether or not prior jail medical records have been reviewed as part of the screening. The housing area disposition of the receiving screening is left without any housing area type checked.

A nursing note for COVID-19 test is present at 11:36 pm the same day. In this encounter, the nurse documents Mr. Rupard's refusal noting that he is verbally abusive and disheveled, and oriented only x 2. His pulse at this encounter is 110 but this is not addressed in either the assessment or plan of this encounter.

The request for other information (other medical records) appears to be checked as not indicated.

On12/20/21, a psychiatric sick call encounter is present with the information in the encounter reason "Refused tele 12/23 - denies that he will come. H/O extensive meds, Patton. Pt has hx of psych and was on medications during previous incarceration, please eval." This encounter is marked completed on 12/29/21.

On 12/24/21, Psychiatrist Cruz enters a note into Mr. Rupard's medical records with the information "Pt was scheduled for an initial evaluation, however due to limited time constraints, Pt was unable to be seen. Pt will be scheduled for Psych SC intake."

On 12/28/21, Psychiatrist Cruz enters a note into Mr. Rupard's medical records with the information "Pt was scheduled for an initial evaluation, however due to limited time constraints, Pt was unable to be seen. Pt will be scheduled for Psych SC intake."

On 12/29/21, a note is present from Dr. Cruz in Mr. Rupard's medical records. This note documents that Cruz attempted to see Mr. Rupard cell side, in a nonconfidential manner, and that Mr. Rupard refused to participate in this encounter. In this note, Dr. Cruz documents that Mr. Rupard was last seen by the jail mental health services during a previous incarceration on 7/11/20, with observations from that time including the following:

"Today multiple attempts were made to engage the Pt in conversation, however Pt yelled, rambled incoherently at times and was verbally aggressive throughout the interview. Pt was observed through his cell door window."

This note by Dr. Cruz on 12/29/21 includes the following diagnoses:

- Unspecified schizophrenia and other psychotic disorder by history
- Antisocial personality disorder by history
- Stimulant use disorder by history

The plan includes offering the medications Haldol, Cogentin andValproic Acid. The rationale for this plan is documented as "Due to Pt's presentation, psych hx, and potential for decompensation…"

This plan also includes that the next encounter will be "4-5 wks or sooner, if needed"

A nursing note on the same day records that "Psych encounter noted. Meds verified in eMAR."

On 1/15/22, a "psych chart review" note is present with the reason that "Inmate has been refusing medication." This encounter is marked completed on 1/20/22.

On 1/20/22, a note is present from Dr. Cruz stating that "Pt consistently refuses psych meds. At this time, will discontinue Haldol, Cogentin and VPA. Psych f/u is already scheduled." No assessment of decision making capacity for Mr. Rupard is present in this note.

On 1/29/22 at 11:24 am, a nursing note documents that Mr. Rupard was seen on the housing area floor after a use of force and that he had sustained head trauma.

> Pt seen on housing floor s/p use of force. Per deputies, pt was taken down, no taser deployment. Noted w/laceration between eyebrows not actively bleeding, unable to further assess d/t patient repeatedly stating "I don't need a medic. Leave me alone, if you touch me I'll kill you" irritable, breathing even and unlabored. noted w/small abrasion to L side of face and some possible blood on lips. Assessment terminated for safety.

No vital signs are present and no assessment or plan are present in this encounter and no follow up is present later in the day with either a physician, nurse practitioner, physician assistant or nurse. No assessment of decision making capacity for Mr. Rupard is present in this note. There is no assessment of any type in this note, including any assessment that Mr. Rupard is "cleared" to return to his cell. The list of vital signs and sick calls for Mr. Rupard's medical record lack any entry for the day 1/29/22. The final words of this 3 line note by Nurse Romero are "Assessment terminated for safety".

On 2/1/22, an entry is present attributed to the QMHP with the information "IP has D/I. Pls assess. This encounter is marked completed on 2/9/22.

On 2/2/22, an entry for Chronic Care, Psychotic Disorders is present with no completion date. On 2/2/22, an entry for "Psychiatry Sick Call" is present with the reasons of "Refused 12/18. Last seen 12/29, f/u in 4-5 wks or sooner, started (offer) Haldol, VPA, Cogentin" This encounter

is marked completed on 2/22/22. A nursing entry from RN Kreiss at 9:46 pm documents that "Psych SC noted, no new orders." No assessment of decision making capacity for Mr. Rupard is present in this note.

A nursing note is present on 2/20/21 which includes one sentence, "per dep 5144 pt is on lockdown, no contraindication noted." No assessment of Mr. Rupard or review of his medical and psychiatric history is documented in this note. No mention of his facial/head trauma from three weeks earlier is made in this note.

On 2/23/22, an entry for QMPH Wellness Check is present in the medical records of Mr. Rupard. There is no completion date for this encounter.

On 3/17/22, note is present in the medical records from RN Mendoza that records Mr. Rupard is scheduled to be released the following two days and also states "no psych/critical meds".

An emergency room referral note is present in Mr. Rupard's medical records later the same day, at 11:09 pm. This note indicates that Mr. Rupard was found unresponsive in his cell, not breathing and without a pulse, that CPR was initiated and 911 transfer to an outside hospital initiated. A mandown assessment from 1:09 the following morning documents that nursing staff were alerted to respond to Mr. Rupard's cell at 10:50 pm, arrived at 10:53 pm and continued CPR which had been initiated by custody staff.

Refusal forms are listed in Mr. Rupard's medical records separate from the daily medication administration records, which show daily records of administration followed by a list of refusals for each medication including Benztropine (Cogentin), Haloperidol (Haldol) and Valproic Acid (Depakene). The MAR records show that Mr. Rupard's medications have administrations entered in between 12/29/21 pm and 1/20/22 am. His MAR documents that he refused medications occurred on all 22 am administrations and all 22 pm administrations, a total of 44 medication administrations. No medications were documented as being administered during this period.

There are 33 medication refusal forms present in Mr. Rupard's medical records during this time period, leaving 11 administrations unaccounted for. None of the medication refusal forms have Mr. Rupard's signature on them and none of them include any assessment of his understanding the risks/benefits of his refused medications or his decisional capacity.

During his 3 months of incarceration, Mr. Rupard's medical records show that the only vital signs recorded in his care occurred on 12/19/21, with an initial set taken at approximately 3 am within normal limits and a second set 20 hours later showing an abnormally elevated heart rate. The only weight for Mr. Rupard is documented on 12/19/21, at 165 lbs.

Review of the medication administration records refusals and signatures for consent for Mr. Rupard shows the following refusals of care or refusals to sign medical consent forms. Each part of his medical records has been reviewed for the presence of a signed refusal form and also for

the presence of assessment of decisional capacity or documentation that Mr. Rupard understood the risks and benefits of his refusal.

A general informed consent form is present from Mr. Rupard's entry to the jail on 12/19/21.


☐ Refused
☐ Patient accepts treatment, but declines to sign waiver
☑ Patient is willing to sign, but unable to sign

There is no explanation from the nurse who completed the form as to whether Mr. Rupard appeared to have decision making capacity or understood the risks and benefits of consenting to care. There is no explanation of why this nurse perceived that Mr. Rupard was willing but unable to sign this form.

A nursing note for "medical services" is present on the same day, without any detail as to the type of medical services being offered or provided and without any explanation as to whether this form reflects a consent or actual offering of specific medical services. This form includes the checked box that Mr. Rupard is willing but unable to sign the form without any documentation as to why or whether he understands the risks and benefits of what is being offered.

I have also reviewed medical records for Mr. Rupard's 2019 incarceration in the San Diego Jails that mention his order for involuntary medication. One psychiatric progress note is present on 6/19/19 from Dr. Ysla which mentions Mr. Rupard's involuntary medication order. This note documents that Mr. Rupard was seen cell side "for safety concerns" and that he was seen by Dr. Ysla one month earlier, when Mr. Rupard was similarly not taking any medications. This encounter documents the following about Mr. Rupard, "On approach pt does not engage with the interview. He is clothed though he rambles nonsensically."

An order is present on the next page of Mr. Rupard's medical records for injection of the antipsychotic medication Haldol with the instruction "-court ordered, cannot refuse" as well as "rtc in 2wks". Mr. Rupard's medical records show that the Haldol was forcibly administered on 6/23/19 and at least one subsequent time on 7/6/19. Multiple notes by clinicians and at least one psychologist during this time document that Mr. Rupard was being held in an administrative segregation cell starting in February 2019.

The documents I have reviewed indicate that Mr. Rupard underwent a similar process in 2015, of involuntary medication order being imposed after he refused psychotropic medication.

**Review of Additional Information**

I have reviewed the Medical Examiner's report of Mr. Rupard's death. The Medical Examiner's report contains the following summary:

> Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

This report includes the following details about Mr. Rupard's access to care after his 2/22/22 cell side encounter with a psychiatrist.

> On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.
>
> No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

I reviewed San Diego Sheriff's Department Incident and Hearing Reports for two incidents involving Mr. Rupard, one on 1/29/22 and another occurring three weeks later on 2/19/22. The incident report and hearing report for the 1/29/22 incident indicate that Mr. Rupard was alleged to have been disrespectful towards staff, had made threats towards staff or incarcerated people, had refused to comply with instructions and had "took his food flap hostage";

> While conducting hygiene inspections in the 7th Floor "D" module, an inmate I later identified as Rupard, took his food flap hostage, spit and tried to grab at multiple deputies resulting in a use of force.

The incident report also lists inmate rights as part of this disciplinary process including the following:

Officer for disposition, you have the following rights:

1. The right to have a written copy of the charges(s) against you at least 24 hours prior to appearing before the Disciplinary Hearing Officer.

2. If you are illiterate or unable to represent yourself, you have the right to have a full-time member of the staff who is reasonably available to represent you before the Disciplinary Hearing Officer.

3. The right to call witnesses (or present written statements of unavailable witnesses) and to present documentary evidence in your behalf provided institutional safety would not be jeopardized.

4. The right to present a statement or to remain silent. Your silence may be used to draw an adverse inference against you. However, your silence alone may not be used to support a finding that you committed a prohibited act.

5. The right to be advised of the Disciplinary Hearing Officer's decision and the facts supporting the decision in writing.

6. The right to appeal the decision of the Disciplinary Hearing Officer by means of the Grievance procedure within 10 calendar days once notified of disposition.

7. I also have the right to an immediate hearing before the Disciplinary Hearing Officer if I sign a waiver.

The incident report also includes the following details:

> On 01/29/2022, Incarcerated person Rupard was provided a copy of the incident report and advised of their right to a disciplinary hearing. When offered the opportunity to appear at the Disciplinary Hearing, Incarcerated person Rupard refused to sign the disciplinary hearing rights waiver form and verbally abused the serving deputy.
>
> I find Rupard's behavior is disruptive, and he will not comply during the hearing.
>
> I find Incarcerated person Rupard guilty of the above-mentioned violation(s).
>
> I based my decision on the deputy's statement and interaction with Rupard
>
> Recommending five (5) days of Disciplinary Isolation.

There is no documentation on this form as to whether Mr. Rupard understood these charges or whether any representation was actually offered to him in responding to these charges. In addition, there is no documentation in the incident or hearing reports that Mr. Rupard's serious mental illness was ever considered as a potential cause of his behaviors. There is no documentation in the incident or hearing reports that any mental health staff were asked whether Mr. Rupard's serious mental illness was a potential cause of his behaviors.

One of the incident reports, written by Officer Wanzer, documents that Mr. Rupard sustained an abrasion on the top of his head during the use of force. This report includes the following description of Nurse Romero's interaction with Mr. Rupard:

> INJURIES:
>
> Rupard sustained a small abrasion on the top of his head. Nurse Romero (0710) medically evaluated Rupard and cleared him to remain in his cell.

I have also reviewed an incident report dated 2/19/22. An officer's description of the incident is included below:

> At Approximately 1440 hours, Rupard was ignoring Deputies to return to his cell and lock down. Rupard was pacing back and forth and screaming to other incarcerated people with his shirt off and clinched fist. Deputy Costelow (3804) instructed Rupard to lock down numerous times. Ruppard would not comply with instructions. Ruppard threw the Module (D) trash at the gate door and threw the trash can at the module gate where Deputy Costelow, Deputy Spearman (3674) and I were standing. Deputy Gaspar (4313) broadcasted for available deputies to the 7th Floor Staging area for further assistance.
>
> Once Sergeant Burkey #5144 and additional deputies arrived on scene, Deputy Costelow requested for Module (D) gate to be opened. Once the gate was opened Deputy Costelow secured handcuffs on Rupard and escorted him to cell 17. The handcuffs were removed through the cuffing port. No force was used.

This incident report states that Mr. Rupard is believed to be in violation of the following jail rules:

> 101 Inmates shall treat members of facility staff in a civil fashion.
> 102 Inmates shall obey staff instructions.
> 103 Inmates shall not threaten, assault or attempt to intimidate any other inmate or any
> member of the jail staff.
> 105 Inmates shall not take part in aggressive or boisterous activity.
> 109 Inmates shall not maliciously throw any object.
> 701 Inmates shall not engage in any activity that impairs or interferes with the operation of the facility.

The incident report lists the same inmate rights as referenced above. There is no documentation on this form as to whether Mr. Rupard understood these charges or whether any representation was actually offered to him in responding to these charges. In addition, there is no documentation in the incident or hearing reports that Mr. Rupard's serious mental illness was ever considered as a potential cause of his behaviors. There is no documentation in the incident or hearing reports that any mental health staff were asked whether Mr. Rupard's serious mental illness was a potential cause of his behaviors.

I have reviewed the Follow-up Investigative Reports of the Sheriff's Department (I-III) regarding Mr. Rupard's death. Report I documents that Mr. Rupard was treated as being in Administrative Segregation because of his mental health status: "Rupard's housing block, 7D, was classified as COVID quarantine and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health."

The third report documents that D module was not included in the cleaning/hygiene protocols of the jail for high risk inspection and cleaning, and that this omission on module D "…would provide an explanation for the reason it was not being cleaned by deputies." The interview with Lieutenant Matrone detailed in this reports documents that while some cleanings occurred in the module D cells around Mr. Rupard, Mr. Rupard's cell was not cleaned.

I have reviewed photographs taken of Mr. Rupard's cell at the time he was found in distress on 3/17/22. They show his cell to be covered with trash, food and fecal material in full view of the cell entrance where the photos were taken.



I have reviewed autopsy photos of Mr. Rupard. These photos show that Mr. Rupard was cachectic at the time of his death, clearly having suffered a level of malnutrition or wasting that much of his fat and muscle tissue had disappeared. This wasting is easily seen in a lateral view of Mr. Rupard's ribs and hip area.



I have reviewed the San Diego Sheriff's policy titled "Psychiatric Stabilization Unit (PSU)", MSD.P.8, dated 10/2/19 and1/24/22 as well two policies titled "Psychiatric Stabilization Units" M25 dated 3/27/20 and "Psych Stabilization Unit-Admission Types" MSDP.15 dated 1/31/22.

I have reviewed the San Diego Sheriff's policy titled "Segregated Inmates", G.2.1, dated 10/30/2020. This policy defines people in segregation status as "those isolated from the general population and who receive services and activities apart from other inmates" regardless of the reason for the segregation. This policy mandates that people in segregation status "shall be monitored three days a week by nursing staff and a minimum of once a week by a qualified mental health provider (QMHP)." This policy mandates that documentation by health staff must include "any significant health findings, signs of physical and/or psychological deterioration, other signs of failing health, the date of the encounter and time of contact." This policy establishes that "In addition to documenting in the health record, documentation may also be made on individual logs or cell cards."

I have reviewed the refusal policies of the San Diego Sheriff's Department, "Refusal Procedures", MSD.R.5 1/6/22 and 7/14/16. Both the 2016 and 2022 policies mandate the following in section VIII of the policy;

"In all instances of refusal, physicians and nurses shall document health education provided and patient's understanding of the counseling."

I have reviewed several policies relating to PSU placement and operations (see Information Reviewed above). One common element to the PSU policies is that the unit is clearly identified as being an appropriate setting for patients who may pose a threat to themselves, others, or who are gravely disabled. These policies make clear that patients may be transferred into the PSU via voluntary or involuntary transfers and that a variety of clinical and Court-ordered triggers exist for PSU transfer. These policies also clearly identify that a Psychiatrist will be the staff member to initiate and to approve transfer. For example, the PSU Admission Types policy that was in place when Dr. Cruz saw Mr. Rupard on 2/22/22 (MDS.P15) has the following admission process;

PROCEDURE

I. Admission Procedure
   A. Referring provider will provide patient information to the unit's attending psychiatrist or on-call attending psychiatrist.
   B. Unit's attending psychiatrist or on-call attending psychiatrist in collaboration with referring psychiatrist will determine admission into the unit.
   C. Referring psychiatrist will initiate routine PSU admission orders.

One of the relevant requirements for patients admitted to the PSU (from PSU MDS.P.8) is that they all must receive a nursing assessment in their first 24 hours on the unit and a medical assessment within 24-72 hours.

I have reviewed the deposition transcripts of Dr. Jon Montgomery. Dr. Montgomery was the Chief Medical officer of the San Diego Sheriff's Department starting in 2019. He testified in his first deposition that between December 2021 and March 2022, his role included acting as "a medical advisor" and that he "acted as the health services administrator." Dr. Montgomery testified that during this time, the medical care in the jail was being provided by a vendor, Contracted Health Care Partners.

Dr. Montgomery testified in his first deposition that he reported to the jail's Health Services Administrator, or when that position was unfilled, he reported to a Captain in the Sheriff's Department and acted as the Health Services Administrator himself.

Dr. Montgonery was asked in his first deposition about how he supervised the providers working the jail and whether his role included oversight of the quality of care provided by the medical vendor, CHP. His responses included the following: "As these are independently licensed, board-certified doctors under -- under the California Medical Board, they are individually licensed.· They do not require immediate direct supervision."

When asked again in his first deposition about supervising or monitoring the quality of care provided in the jails by this outside vendor, Dr. Montgomery testified that he viewed his role as monitoring productivity and numbers of patient encounters. But when asked specifically whether he did anything to examine the quality of the care that was administered, Dr. Montgomery testified "That goes back to the supervisory role.· That's more -- far more specific than oversight.· · · · ·So, no, I did not do that."

When asked in his first deposition specifically about whether any audits of the quality of care provided by CHP staff were done by Dr. Montgomery or anyone in the Sheriff's Office, Dr. Montgomery testified "But, again, specifically about quality, that would be proxy for individualized assessments." When asked for specific examples of what the audits he referenced did encompass, he testified that examples included the number of encounters per month and the number of patients seen.

When asked in his first deposition whether there were any quality assurance or quality improvement meetings or discussions involving Dr. Montgomery and Dr. Freedland, the Medical Director of CHP during 2021 and 2022, Dr. Montgomery testified as follows;

"All right.· And did you have meetings with him in the year 2021 on the subject of QA/QI for CHP personnel?

ATo your point of time, 2021 to 2022, I spoke with him several times, yes.· The topics of those conversations would vary.· I can't say if it was related to QA/QI.

Q Did you ever have any regular meetings with him to discuss issues of QA and QI for the CHP doctors who · · · · ·MS. FELDMAN:· In 2021?

BY MR. IREDALE:

Q· That time period, 2021-2022?

A Sorry.· Again, the question again specifically to request -- asking about QA/QI?

Q Yes,· Did you have any meetings with him to discuss that subject during '21 and '22?

A As I just said, I don't know if I -- I talked with him on numerous occasions, but I don't recall if it was about QA/QI.

Q Was there any memorialization of concerns that you expressed to him, if any, about the quality of the care provided by CHP personnel?

MS. FELDMAN:· Assumes facts.

THE WITNESS:· You're asking if any conversation was memorialized and documented?

BY MR. IREDALE:

Q Yes.

A I don't believe so.· No."

When asked in his first deposition about his involvement in oversight of the mental health services in the jails, Dr. Montgomery testified as follows:

"Q What, if anything, did you have to do with mental health services at the jail?

A I was not involved."

When asked again in his first deposition about having any role in oversight of the quality of care being provided by outside vendors, Dr. Montgomery testified as follows:

"Q All right.· Let me let you know I'm referring now, in these following questions, to the time period of the years 2021 and 2022. As chief medical officer, were you responsible in any way for monitoring the quality of care provided by private medical contractors?

A During that stated time frame, individually, no. I was not monitoring the quality of the private contractors. Their hierarchy was providing oversight over their individual employees."

Dr. Montgomery testified that he was part of the mortality review for Mr. Rupard and that he wrote the summary for this meeting.

When asked who the Director of Nursing reported to in 2021 and 2022, Dr. Montgomery testified "I don't know exactly."

When asked whether he had a role in auditing of the provision of medical and mental health care by Sheriff's employees, Dr. Montgomery testified as follows;

"Q How about auditing?· Were you involved in any audits of the provision of mental health and medical care by sheriff's employees?

A No.· That was not my role...”

When asked in his first deposition whether any changes were instituted in medical or mental health practices as a result of Mr. Rupard’s death, Dr. Montgomery testified as follows:

“There's -- I don't recall if any changes were specifically attributed to this death.· But there are a number of changes that are -- that are always in process.”

Dr. Montgomery testified in his first deposition that he did review the entire report of the Medical Examiner regarding Mr. Rupard’s death.

When asked whether he had identified any recommendations for changes in policies or procedures specifically as a result of 30 day death reviews, Dr. Montgomery testified as follows:

“In the last two years.· Again, the same premise.· · · · ·Yes, as we said, that we've been making ongoing changes regardless of the -- the -- I cannot say whether or not it was associated with an in-custody death or not, but we've been making changes to policies and procedures.”

I reviewed the second or follow-up deposition of Dr. Montgomery. In his second deposition, Dr. Montgomery testified that part of his responsibilities was to monitor quality assurance.

Dr. Montgomery was asked in this deposition whether it was his job to oversee the jail physicians. He testified that “No. Those jail clinic physicians would be independently licensed and credentialed and would be falling under their collaborative agreement with their contracted medical director.”

He testified as follows regarding this issue if jail physician oversight;

“Q. All right. When you obtained your position as chief medical officer, were you told that one of the duties was to oversee the jail clinic physicians?

A. Not with words to that effect, no.

Q. Well, in the very bulletin that specified the job that offered the job with the advertised salary rates, you don't recall that overseeing the jail clinic physicians was one of the duties?

MS. FELDMAN: Object as to form.

Q. Your answer?

A. I don't recall the specific components of that description specifically talking about overseeing clinic physicians as part of the job description.

Q. So in 2022, did you oversee the jail clinic physicians? Yes or no?

A. No. I did not provide direct oversight over the jail clinical physicians, as you say.”

Dr. Montgomery testified that he did provide oversight “making sure that the clinics were staffed and that the clinics were being run.”

Dr. Montgomery testified that he did have conversations with the medical director of the physician group, Dr. Freedland, but when asked about discussion of any quality concerns ever being discussed, he testified as follows;

"Q. Not one? Do you recall any problem with quality provided by jail clinic physicians that you discussed with Dr. Freedland?

A. In 2021/2022? No, sir, I don't recall offhand.

Q. How about at any time?

A. Not at the present time."

Asked specifically about issues with care ever being discussed, Dr. Montgomery testified as follows;

"Q. No. My question is, do you recall any a single instance of a particular discussion of any issue concerning the care provided by jail clinic physicians with Dr. Freedland in any year up to the present time?

MS. FELDMAN: Objection as to form.

THE WITNESS: Right now, no."

Dr. Montgomery testified that he was aware of the job posting for his position that was shown as an exhibit during his second deposition and that he read the job responsibilities before he took the job.

Dr. Montgomery testified that he was working as the interim Medical Services Administrator in late 2021 into 2022 and that this was the position that his role of Chief Medical Officer reported to. He testified that part of the Medical Services Administrator role was to monitor and evaluate the performance of contractors. When asked specifically about monitoring or oversight of Liberty Healthcare, Dr, Montgomery testified "No, I was not involved with any direct coordination with Liberty Healthcare. I was actually assisting -- it was Captain Duke at the time who was the sworn component who was servicing that element of the medical services administrator role." When asked whether he ever learned the obligations of Liberty Healthcare in their contract for providing care, Dr. Montgomery testified "No, I did not work on the mental health components to address those given elements."

When he was asked about the mortality review that occurred within a 30 day time period, unrelated to the CIRB process, Dr. Montgomery testified as follows:

Q. After the conclusion of the CURB investigation,

were there any changes in the practices or policies of
the medical services division?
MS. FELDMAN: Objection as to form.
THE WITNESS: I don't know. I'm not a member
of CURB, and I'm not privy to any of the CURB results.
BY MR. IREDALE:
Q. So you, yourself, have no knowledge of the
ultimate determination of the CURB investigation; is
that correct?
A. That's correct.

When he was asked about the NCCHC policies relating to mortality reviews, Dr. Montgomery testified that he was the responsible health authority referred to in the NCCHC policy. He was asked “What, if anything, did you do to improve care as a result of your review of Mr. Rupard's death, if anything?” His answer was “Myself? I did not do anything.”

Dr. Montgomery was asked about a finding in the 2019 NCCHC audit that there was no peer review process in place for physicians, psychiatrists, or psychologists. When he was asked in this deposition whether he had implemented such a process in 2022, Dr. Montgomery testified “No” and that no such process was in place in 2022 for either medical or psychiatric contract providers.

Dr. Montgomery was asked twice whether he agreed with the findings in the Medical Examiner’s report regarding the cause of death for Mr. Rupard and testified as follows;

“Q. I'm sorry. Do you disagree that Mr. Rupard died of dehydration, malnutrition and pneumonia?

MS. FELDMAN: Objection as to form.

MR. KRUEGER: Join.

THE WITNESS: Just to clarify, those are findings that was not the cause component that those were contributing to. And yes, I agree those were listed as part of the report.”

He also testified as follows;

“Q. Based on your review, do you quarrel that was the cause of his death?

MS. FELDMAN: Objection as to form.

MR. KRUEGER: Join.

THE WITNESS: I just said they were contributing to. They weren't the cause. He didn't say that they were the cause. We could certainly go ahead and look at the medical examiner report."

I have reviewed the deposition testimony of Serina Rognlien-Hood. Ms. Rognlien-Hood testified that she was a Deputy Director in the San Diego Sheriff's Department and that her role was "oversee the nursing directors who oversee the supervisors who oversee the care of the detention facilities.· So I oversee the nursing care of the detention facilities." Ms. Rognlien-Hood testified that the refusal policy in place in 2021 and 2022 required that patients who refuse medication or health encounters have their refusal documented on a refusal form with the patient's signing the form or the nurse or provider signing and an additional witness if the patient refused to sign. In addition, she testified that the first time a patient refused a medication for a serious health problem (as specified in the refusal policy as "indicated for a serious medical/psych condition") then the process detailed in the refusal policy including filling out a refusal form, clinical documentation and a provider referral were required.

I have reviewed the deposition testimony of Anthony Cruz, D.O. Dr. Cruz testified that he trained as a psychiatrist and that his role in the San Diego Jails started in March 2020. Dr. Cruz testified that when he went to see Mr. Rupard 12/29/21 for a psychiatric sick call encounter, he was not able to make an independent assessment of Mr. Rupard's diagnosis because he "…was not able to speak with him and get a full interview…". Dr. Cruz testified that the treatment plan after his encounter with Mr. Rupard included administration of intramuscular injection of the antipsychotic medication Haldol

Dr. Cruz characterized his earlier encounter July 11, 2020 with Mr. Rupard as follows;

"Immediately I got confronted with yelling, cussing, lots of profane language.· Definitely could hear "I do not want f'ing medication."· And then when I say "rambling incoherently," I knew he was Filipino so I could almost sense that he was speaking in some Tagalog, so I was trying to speak to him Tagalog, also. I'm Filipino, also, so I was trying to build rapport, but he continued to scream, it did not help, and so he just -- I recall him just constantly yelling and being angry to just get away.· 'I do not want meds.'· And my deputy at that time -- yeah, wanted to conclude the interview because it was escalating, yeah."

Dr. Cruz testified that when he attempted to speak with Mr. Rupard, it was through the cracks or gaps in hinges of the locked cell door, "Where the handle -- the hinges are, that's the best place to speak to the inmate."

Dr. Cruz confirmed in his testimony that he documented Mr. Rupard as facing the potential for decompensation on 12/29/21 and that he ordered the withdrawal of medication orders for Mr. Rupard due to noncompliance 1/20/22. When asked whether he took any steps to check on Mr. Rupard for decompensation between 1/20/22 when medications were terminated and the next scheduled encounter, Dr. Cruz testified that "I relied on my clinicians, my deputies, to tell me if there -- if he had been decompensating or knowing that he already had a follow-up appointment,

so I did not feel that I needed to see him sooner because I had not heard any type of report from my clinicians, my deputies, saying that this person needs to be seen sooner."

He testified that a nurse and clinician would have been going to see Mr. Rupard during this time and he believed he would have been informed by them or custody staff if Mr. Rupard appeared to be decompensating, was psychotic or had food and trash around his cell.

When Dr. Cruz was asked what a hunger strike is, he responded "Someone that we were concerned about refusing to eat for whatever reason.· They could be on strike.·"

Dr. Cruz was asked "So I take it that you assumed that if somebody was not eating or was losing large amounts of weight the sworn staff would notify you?"

He responded that 'They would notify me, notify medical."

When asked whether all patients in the PSU were there for a 5150 hold, Dr. Cruz testified that this was the case most but not all of the time. When asked for an example of a person who might be in the PSU for a non-5150 reason, he cited psychogenic polydipsia, a condition of excessive water intake.[1] He testified that he had the authority to admit patients to the PSU in 2022.

Dr. Cruz testified that his next encounter with Mr. Rupard on 2/22/22 occurred through a locked cell door, lasted several minutes and that he documented being unable to assess Mr. Rupard for multiple parts of the psychiatric exam he was attempting to conduct including mood and affect, thought content and perception. He agreed that he documented Mr. Rupard as yelling and incoherent at times and that he was possibly responding to internal stimuli. He confirmed that he gave a diagnosis by history in this encounter and that he was not able to give a current diagnosis.

Dr. Cruz testified that he was unaware of Mr. Rupard's death until he was notified about the current lawsuit. When asked whether medical competency evaluations for patients were available in the jail medical records, Dr. Cruz testified that "It's hard to recall.· Typically they would, but sometimes they didn't, so it was difficult to find.· So I can't say if they were uploaded into the person's medical -- electronic medical record. If I had access to them."

When asked whether he had reviewed prior records that showed Mr. Rupard previously refusing to take medications in jail in 2015 and 2019, or records documenting that Mr. Rupard had previously been ordered for involuntary medication, Dr. Cruz responded to each of these questions with "No". Dr. Cruz was asked if he had reviewed a specific court order regarding Mr. Rupard stating, "The defendant lacks capacity to make a decision regarding antipsychotic medication.· The defendant's mental disorder requires medical treatment with antipsychotic medication, and if the defendant's mental disorder is not treated with antipsychotic medication, it is possible that serious harm to the physical or mental health of the patient will result." Dr. Cruz

[1] https://bestpractice.bmj.com/topics/en-us/865.

testified that he had not reviewed this information when he was treating Mr. Rupard in 2021 and 2022.

Dr. Cruz testified that at the time he was seeing Mr. Rupard, he had the ability to admit patients to the jail PSU and that there were mechanisms to obtain an order for involuntary medication administration in the PSU. He agreed with the definition of gravely mentally disabled as including the inability to take care of basic needs for survival.

Dr. Cruz testified that he has seen reports similar to the ones written by Dr. Badre regarding Mr. Rupard, but when asked if Dr. Badre's specific report was available for him to review, he testified "I can't say for a fact. I do not recall."

Dr. Cruz testified during deposition that his diagnosis of Mr. Rupard on 12/29/21 was based entirely on historical information. Dr. Cruz testified that his workflow as the sole outpatient psychiatrist at the time he was Mr. Rupard in 2021 and 2022 involved being given a hard copy of patients to see, and him handing that hard copy back to an assistant with notations about the time for return visits or other dispositions such as "not seen." He testified that he would use a list of electronic medical record to document the individual patient encounter notes.

Dr. Cruz testified that when he arrived in the jail, Mr. Rupard was scheduled for a telepsychiatry encounter on 12/20/21 with Dr. Jan, but that he refused to come to that appointment. He testified that he came to see Mr. Rupard as a result of the original encounter with Dr. Jan not occurring. Dr. Cruz also testified that there were multiple barriers to seeing patients including a lack of security staff or not being allowed onto a housing area.

Dr. Cruz testified that he was the only psychiatrist who saw Mr. Rupard during his incarceration in 2021-2022, but that he was also unsure whether other psychiatrists could have been tasked with seeing Mr. Rupard. When asked about other psychiatrists, Dr. Cruz testified "I can't vouch if he was scheduled for another time or someone else attempted -- you know, there were other potential psychiatrists that could have seen him, but these are the times that I assessed him." Dr. Cruz testified that he assumed mental health clinicians were seeing Mr. Rupard.

I have  reviewed the deposition testimony of Christina Goodall, a therapist in the San Diego jail. She testified that she had one encounter with Mr. Rupard during his 2021-2022 incarceration as part of a sick call encounter and that she was not aware of any plan to have him seen weekly or more often.

When she was asked whether seeing patients in administrative segregation was driven by individual sick call requests or whether there was some plan for regular clinician visits for patients in segregation, Ms. Goodall testified as follows;

"…was there ever any procedure you were taught that with respect to inmates in ad seg they were to be seen on an established, regularized basis?

A.I don't remember that, sir."

When asked to clarify this approach, whether there was ever a time she would see people on a weekly or regular basis or whether it was strictly driven by sick calls, Ms. Goodall testified as follows;

Q. “Your answer?· In other words, did you ever see anybody in ad seg on every week or every two weeks or every month without respect to whether they were on the sick call or not?

A.It wasn't -- it was more the sick call.

Q.Right.· It was completely the sick call; right?

A.Yes.· That was the policy.”

Ms. Goodall testified to the gatekeeping role she served in referring patient concerns to a psychiatrist;

“Q.So your job as the QMHP was to exercise that gatekeeping function of referral to a psychiatrist in the event you believe somebody fell under the definitions, as you were taught, of gravely mentally disabled?

A.· ·Yes.· Recommendation to a psychiatrist.”

Ms. Goodall testified that the sole encounter she had with Mr. Rupard was cell side and that she could not recall whether she reviewed any records from previous incarcerations in the jail before she saw him. She testified that she did not recall reviewing any past medical records after the encounter, which lasted approximately 5-10 minutes. She stated that she was unaware of when or for what reason a patient would be weighed in the jail, “I wouldn’t know because that’s out of my scope.” When asked about her encounter with Mr. Rupard on 2/9/22, Ms. Goodall testified that she was unsure why Mr. Rupard was added to her sick call list to conduct a wellness check. She testified that Mr. Rupard was in administrative segregation when she saw him and that this was reflected in her encounter designation of “segregation/confinement” in her note.

“Q.When you say "He will continue to be monitored for safety concerns and GD," tell me what GD means.

A.Gravely disabled.

Q.And may I ask, with respect to this continuing monitoring, was that to be done by yourself?

A.And the psychiatrist -- more under the psychiatrist.”

She testified that for multiple parts of her planned assessment, she was unable to assess Mr. Rupard. Ms. Goodall testified that for one of the areas of her note, she believed at the time of the deposition that she actually intended to click on “appropriate to situation” instead of “impoverished” for thought content.

Ms. Goodall testified that sometime after her initial encounter with Mr. Rupard, he did appear on her sick call list but that she did not see him because the sick call was completed when he saw the psychiatrist. She testified that she never discussed Mr. Rupard with Dr. Cruz.

I reviewed the deposition testimony of Melissa Quiroz, a mental health counselor who testified regarding policies and procedures regarding sick calls as well as ensuring adequate treatment for inmates suffering from schizophrenia and mental health and psychiatric care of inmates refusing food and/or fluids all during the years 2020-2022. She testified to the policies and procedures regarding transfer into the PSU and oversight of the quality of psychiatric care to inmates by Sheriff's employees and private contractors during the same time period. Ms. Quiroz testified that she started working as a mental health clinician in the San Diego Sheriff's Department in 2016 and subsequently became the Chief Mental Health Clinician and then became the Group Program Manager in the jail.

Ms. Quiroz testified that she was unaware whether patients with schizophrenia were housed in administrative segregation on Module 7D. She testified that she did not know whether patients with mental illness were housed in administrative segregation on Module 7D.

Ms. Quiroz testified that she was aware of the segregation policy that required mental health and nursing wellness checks for patients in segregation settings and that she had reviewed Mr. Rupard's medical records, but she was unable to recall if any of these checks were in the medical records of Mr. Rupard; "I can't confirm or – I can't confirm or deny if it was in the note.· I do not recall that being in the note."

I have reviewed the deposition testimony of Dr. Francis Ysla, the Chief Psychiatrist for Liberty Healthcare, the company that provided mental health services in the San Diego jails. Dr Ysla testified that he was not aware of Mr. Rupard's death until the lawsuit was filed after his death, sometime in 2025. Dr. Ysla testified that Liberty Healthcare provided care in the San Diego Jails until June 2022. When asked whether he could think of any psychiatrist besides Dr. Cruz that would provide on-site outpatient psychiatric services at the Central Jail when Mr. Rupard was held there, Dr. Ysla testified "In person, no, but we did have a tele-psychiatrist." Dr. Ysla testified that he provided oversight for all the psychiatry services provided by Liberty Healthcare. He testified that "A lot of the times we use the PSU as a way to obtain an involuntary medication order." Dr. Ysla testified that he had not seen the clinical notes of Dr. Cruz regarding Mr. Rupard's care and that "I don't recall being aware of his case at the time that he was incarcerated. But again, we may have discussed this case at some point. I just don't recall." Dr. Ysla testified that he was provided policies and procedures regarding medical and psychiatric care in the jails by San Diego County and that he had the role of providing guidance on the policies and procedures for new hires at Liberty during orientation. He also testified that he recalled a specific requirement for patients in administrative segregation to be monitored; "I believe the policy stated that a mental health clinician was required to see that individual with some frequency, which I don't know." He also testified that he believed this requirement was for

County personnel. Dr. Ysla testified that he discussed individual cases with Dr. Montgomery in which the County identified discrepancies in care documentation.

When he was asked whether there were any QI/QA audits or discussions of psychiatric care in the final year of the Liberty contract at the San Diego jails, Dr. Ysla testified as follows;

"Q. Now, can you tell me if you recall any discussions of QA-QI as it related to psychiatric provision of care by Liberty during that last year of those QA-QI meetings?

A. No.

Q. Are you saying no such occurred or you can't remember any?

A. I don't recall there being any specific topics of psychiatry for QI-QA during those meetings during the last year."

Dr. Ysla testified that he was never notified by any County official about Mr. Rupard's death. He did testify that he had participated in approximately eight reviews of care for patients who died in the San Diego County jail, but that this was an "internal" review with "Corporate headquarters". When asked whether he ever discussed any of these reviews of patient deaths in the County Jail with the Jail's Chief Medical Officer, Dr. Montgomery, he testified "No".

I have reviewed the deposition testimony of Dr. Sandeep Jouhal. Dr. Jouhal testified that she worked as a psychiatrist for Liberty Healthcare between 2017 and January 2022 working in the PSU. She also testified that he was unaware of Mr. Rupard's name and learned of his case in the news two months after he left the Sheriff's' Department. She testified that early in his time running the PSU, she was the sole person to admit patients but that over time, other psychiatrists and also clinicians could admit patients to the PSU. She testified as follows;

"Q. And when you say the qualified mental health professionals who work in the jail, are you referring to psychiatrists who can admit, without needing additional authorization, a patient into the PSU?

A. No. I'm referring to the mental health clinicians and the psychologists who worked, you know, on an outpatient basis and who were routinely seeing the patients in the outpatient setting, as well as the psychiatrists. So it could be any one of them."

Dr. Jouhal testified that one pathway of PDU admission could involve when a patient was "…neglecting yourself and not eating, not drinking, and not having the insight to engage in any kind of treatment." When asked about refusal to take medications as part of the PSU admission criteria, she testified that "That would happen more often than not, and in that case, you had to actually clinically assess the patient to see how decompensated he is. And if he's not taking care of himself, of his basic needs, then he would be admitted to PSU. But not every patient who refused medication met the criteria."

She testified that PSU admission could depend on non-psychiatrist detecting when a patient was decompensating; "Like, the mental health clinicians and psychologists, as well, they used to see patients more frequently than the outpatient psychiatrist, so they were the ones who would pick up whether the patient is decompensating. And then they would go to the outpatient psychiatrist and raise the alarm, like alert them or express their concerns."

Dr. Jouhal testified that meeting criteria for grave disability and PSU admission was "not difficult" and gave the following as an example; "If a patient was making threats to harm others but in the context of a mental illness, then they were a danger to others, so they were admitted. And for grave disability, if a grave disability, basically, if they're not able to – if they're not taking care of their basic needs. They're not eating or they're just neglecting themselves, not doing their ADLs, activities of daily living, then they would meet the criteria for grave disability."

Dr. Jouhal testified that January 2020 jail medical records for Mr. Rupard did show that he had been diagnosed with schizophrenia and psychosis while at Patton State Hospital. She also testified that she ordered continuation of three medications that were started at the State Hospital, an anti-psychotic medication, a mood stabilizer and a medication to combat extrapyramidal side effects. When asked about whether it was important to quickly review and order these medications for Mr. Rupard when he returned from Patton State Hospital, Dr. Jouhal testified "Yes. Because we were trying to continue their care and we did not want them to miss any dose."

Dr. Jouhal testified that she was not surprised when she learned of Mr. Rupard's death "given the conditions of the jail". When asked to explain this lack of surprise, she cited another death of a patient before Mr. Rupard died who had not been eating or drinking and was found dead in his cell by custody staff. She testified that "A few months prior to this news, while I was working, I don't recall any names or anything, but an inmate had died in George Bailey Detention Facility. He had not been eating and drinking, and three days later, the custody found him dead. So that was a reflection of the kind of care."

I have reviewed the deposition testimony of Dr. Jean Kloker. Dr. Kloker testified that she is a psychiatrist who worked via *locum tenens* assignment for Liberty Healthcare in the San Diego Jail between February and May of 2022. Dr. Kloker testified that she worked in the PSU and that she was unaware of Mr. Rupard's death until shortly before the deposition but was generally aware of multiple deaths occurring;

"Q. So it's true that you learned of his death about two months ago when you found out about this case?

A. Well, specifically, I knew there had been several losses, but I didn't -- I did not remember that one specifically, since I had no contact with..."

Dr. Kloker testified that during her time working in the San Diego Jail, she was the only PSU psychiatrist. She testified that she was not involved in deciding who would be transferred into the PSU. "I had nothing to do with anything that happened before they physically arrived in the PSU." When asked whether it would her role to admit a patient to the PSU, she testified "It would have been someone else." I have reviewed the deposition testimony of Michael Johnson. Mr. Johnsons testified that he worked as a Sargeant in the Sheriff's Department, including working in the jail. Seargent Johnson testified that aside from formal Administrative Segregation status, a person could be confined to their cell for 23 hours per day for other security reasons. He testified that "·One example would be when there was a rule violation report written on them and they were in a lockdown status." He testified that "If somebody was in their cell for 23 hours a day, that could be a number of different things."

Sargeant Johnson testified that he was asked to help conduct a safety check on Mr. Rupard the day before his death, March 16th 2022, one day before he died. He testified that another person had died in the Module 7D and that a detective had asked for a welfare or safety check on Mr. Rupard. Sargeant Johnson testified as follows about the check on Mr. Rupard;

"A.I remember that he came down to ask me if we could do one.· We went up to the cell, up to I believe it was No. 17.· I called Rupard's name from the door and he had not responded at that time, so we asked for the door to be opened. We both stepped into the cell.· I called his name one more time.· He did not respond, so I went up. He was laying on the bed and I gave his shoulder a push with one of my hands and just called his name.· He gave an angry response and so we backed back out.

Q. What was the angry response?

A.It really wasn't a word.· It was just like a grunt.· It was just a sound."

Sargeant Johnson was asked multiple questions about the condition of Mr. Rupard's cell, and he responded that he did not recall to all of the questions about odor, trash, feces, food, the sink and toilet. He testified that prior to March 16th and 17th, Mr. Rupard acted aggressively towards him;

"In general, he was relatively aggressive. We -- I remember serving meals to him just at the door. We opened the little portal to pass food in.· He would swipe at it.· He would yell and scream at the door.· He liked to spit at the window. So just general aggressive behavior.

Q.And did you observe any of that behavior on March 16th or March 17th?

A.Not that I recall.· I just remember the one welfare check where we went in to check with him.· He made the one sound and just because of his prior aggressive behavior, we're like, okay, let's step out. Just make sure everything stays safe."

I have reviewed the floor evacuation sheet for Module 7D on 3/18/22. This 5 page document appears to contain information about 16 people held on Module 7D on 3/18/22. Among the 16 people listed in this document, 14 are designated as "Ad Seg" while one is designated as

"Protective Custody" and one has no designation. Two of the people designated as "Ad Seg" also have a designation of prior suicide attempt.

I have reviewed the job position postings for San Diego Sheriff's Chief Medical Officer and Medical Services Administrator. The Chief Medical Officer position role starts with the description that this staff member will be hired "To direct all clinical functions of the Sheriff's Department Medical Services…" The role is also described as being "responsible for all clinical/medical decisions within the Sheriff's Detention Medical Services, and all policies and operations concerning patient care, welfare, and treatment."

The specific examples of duties for this role include the following listed as "Essential Functions";

1. Directs and coordinates, through subordinates all clinical and related activities, including direction of the provision of all medical services.
2. Supervises medical staff.
3. Monitors quality assurance and utilization review policies, procedures, and methodologies.
4. Oversees the jail clinic physicians.
5. Evaluates existing services, identifies needs, and develops long-range program/service plans, including goal setting, program design and evaluation, and policy development.
6. Oversees the provisions of staff training to develop professional skills of medical personnel.
7. Serves as liaison between professional staff and hospitals for exchange of information and services, state and national hospitals, medical associations, community and advocacy organizations, volunteer groups, law enforcement, and other professional organizations, to encourage higher professional standards.
8. Represents and protects interests of the Sheriff's Detentions Medical Services.
9. Performs other duties as assigned.

The Medical Services Administrator job description describes this role as follows; "Under the direction of an Assistant Sheriff, this position is responsible for recommending, formulating, and implementing policies that provide comprehensive, integrated, and cost effective health services to inmates in Sheriff's detention facilities." Specific responsibilities of this role include the following:

- Formulates and implements policy and procedures relating to all aspects of health care and services provided to inmates in Sheriff's detention facilities
- Provides direction to all County and contracted professional, technical, and support staff to ensure compliance with State law
- Reviews, investigates, analyzes, and recommends policies, procedures, services, and other changes to minimize complaints and claims of inadequate medical care against the County by persons in custody
- Facilitates integrated and comprehensive medical services in conjunction with medical records, dietary, laundry, and housekeeping operations
- Negotiates and finalizes program/service contracts; monitors, records, and evaluates the performance of contractors

I have reviewed the Classification Navigator Report for Mr. Rupard. This document has a section for alerts and has the following information:

Alerts: PREVIOUS SUICIDE ATTEMPT. This document also appears to classify Mr. Rupard as a general population inmate. The Administrative Segregation section of this document “Ad-Seg Review History” is blank with no entries and subsequent fields for entry of “Ad-Seg” dates to and from specific times are all blank. The section on classification update questions includes a series of updates on 12/20/21 and 2/3/22 with identical responses to each entry date, including yes responses to “Institutional behavior problems”.

I have reviewed the California State Auditor’s Report on the San Diego Sheriff’s Department from February 2022, published shortly before Mr., Rupard died and based on information collected prior to that time. This report identifies multiple systemic problems with how Dan Diego Sherifff’s Department delivers health services. The executive summary of this report includes the following “Significant deficiencies in the Sheriff’s Department’s provision of care to incarcerated individuals likely contributed to the deaths in its jails.”

I have reviewed a brief set of notes reviewing Mr. Rupard’s timeline that were created by Dr. Montgomery. This 3 page free text document includes some of the clinical timeline of Mr. Rupard and includes several broad issue areas such as effectiveness of clinical policies and earlier intervention with “Pending” or “Under review” for all of these areas. This document does not have any date and does not have any documentation of meetings or reviewers or how/whether the document will be utilized in a clinical mortality review or quality committee function. The only area of this document that appears to reference deficiencies or gaps in care for Mr. Rupard reads as follows: “Notes: No medical engagements really on file. Psych has not evaluated this person for some time. Many comments of 'continue to monitor'.”

**Findings**

The following represent my major opinions regarding the treatment that Mr. Rupard received in the San Diego Jail leading up to his death.

<u>Failure to provide basic mental health care</u>

Review of the available information in this case clearly establishes that Mr. Rupard exhibited signs and symptoms of serious mental illness when he arrived at the San Diego Jail. These failures were part of systemic deviations in the standard of care by San Diego County and Liberty Healthcare.

When Mr. Rupard arrived in the San Diego Jail, health staff documented obvious signs and symptoms of serious mental illness, including the following during his receiving screening on 12/19/21 at approximately 3 am;

- Combative, assaultive or extremely hostile behavior
- Chronic conditions, psychotic disorders

Although this receiving screening documented clear signs of mental illness, it was deficient in several ways including the following about Mr. Rupard;

- Not taking any medications.
- No history of suicide attempts.
- Area for past medical or psychiatric hospitalizations is left unchecked.
- Housing area disposition of the receiving screening is left without any housing area type checked.

Despite these deficiencies in the receiving screening, a psychiatric sick call clearly establishes the severity of Mr. Rupard's psychiatric illness the next day, and also document his refusal to engage in the encounter; "Refused tele 12/23 - denies that he will come. H/O extensive meds, Patton. Pt has hx of psych and was on medications during previous incarceration, please eval."

As this point, Mr. Rupard required an urgent psychiatric assessment that included an in person evaluation and prescribing of medications, all of which would require a psychiatrist. Given Mr. Rupard's lack of orientation to person, place and time at approximately 11 pm 12/19/21 and the signs and symptoms recorded earlier in the day, this sick call should have led to an urgent assessment by a psychiatrist within 24 hours, even if it meant transfer to an outside facility.

Instead, the mental health staff in the San Diego Jail started a passive and completely ineffective set of tasks that never resulted in Mr. Rupard receiving the mental health care that he obviously required. The mental health staff in the San Diego Jail repeatedly documented Mr. Rupard's dire needs for care and their own inability or refusal to provide that care, never once transferring him to an outside facility for any psychiatric assessment or treatment.

The only mental health note that has basic content areas including an assessment and plan occurs on 12/29/21, 10 days after Mr. Rupard arrived in the San Diego Jail. This encounter note is written by a psychiatrist, Dr. Cruz, but it documents that Mr. Rupard was seen in a non-confidential manner at his cell door. This note describes Mr. Rupard as rambling incoherently and being verbally aggressive. Multiple fields of this note include the psychiatrist documenting being "unable to assess due to lack of Pt cooperation". The plan section of this note clearly articulates that Mr. Rupard faces a "…potential for decompensation" The clinical plan from this encounter incudes offering Mr. Rupard three medications, Cogentin, Haldol and Valproic Acid and a return visit in "4-5 wks or sooner prn". The fact that this psychiatrist was unable to complete their initial assessment of Mr. Rupard but still chose to defer the next visit to more than a month later represents a gross deviation from the standard of care.

Mr. Rupard's medical records show one other psychiatrist note on 2/22/22. Like the initial note, this encounter is non confidential, cell side, and documents multiple areas the provider is "unable to assess" and that Mr. Rupard is "rambling incoherently" and refusing to participate. This note occurs 65 days into Mr. Rupard's incarceration and does not result in Mr. Rupard being taken to a confidential setting where he receives an actual psychiatric assessment. Instead, this

psychiatrist decides that Mr. Rupard can simply be held in the same cell with a plan for no medications and "rtc: 6-7 wks or sooner, if needed". This represents a gross deviation from the standard of care because Mr. Rupard was exhibiting ongoing signs and symptoms of untreated mental illness and mental health staff had still been unable to complete an initial psychiatric assessment. Faced with their ongoing inability to complete these essential steps, mental health staff should have transferred Mr. Rupard to a higher level of care either in a true mental health unit within the jail or via outside assessment if needed.

Part of the failures in the care that mental health staff provided to Mr. Rupard is rooted on their contact with him through a locked cell door. This is a completely inadequate approach and their failure to have a face to face, confidential encounter with him should have resulted in him being transferred to a place where this could occur. Put another way, inability to provide the standard of care in a jail setting does eliminate the patient's need for care, it requires that they are transferred to a setting where they can receive the standard of care. The 2016 NCCHC policy statement on solitary confinement and the 2018 NCCHC jail standards make this exact point.

From the 2016 NCCHC policy statement; "Principles of respect and medical confidentiality must be observed for patients who are in solitary confinement. Medical examinations should occur in clinical areas where privacy can be ensured. Patients should be examined without restraints and without the presence of custody staff unless there is a high risk of violence. In situations where this cannot occur, the patient's privacy, dignity, and confidentiality should be maintained as much as possible. If custody staff must be present, they should maintain visual contact, but remain at a distance that provides auditory privacy."

In the 2018 NCCHC Standards for Health Services in Jails, the very first compliance indicator in the mental health standard is that "Patients' mental health needs are addressed on-site or by referral to appropriate alternative facilities."

Mr. Rupard's level of mental health needs is not uncommon in a jail setting. The shocking aspect of his case is that instead of transferring him to an outside setting for a higher level of assessment and care, mental health staff repeatedly documented their own inability to see him, assess him and initiate treatment. It is a routine matter for jail health services to encounter patients they simply cannot provide care to, but they are absolutely obligated to transfer those patients to a setting where assessment and care can be provided, not give up and document the patient's demise. This is a basic standard of care included in the ACA and NCCHC guidelines and is one of the most important principles for jail health services to act on. This is also an essential area of oversight, to ensure that quality assurance and quality improvement work regularly determines whether patients needing a higher level of care are transferred in a timely manner. The failure to ensure a higher level of assessment and care for Mr. Rupard is all the more shocking because his jail medical records clearly indicate that staff had secured an order for involuntary medication in June 2019 and that he had been transferred to Patton State Psychiatric Hospital from the jail.

I believe that Dr. Cruz erred in his approach to Mr. Rupard because he documented that Mr. Rupard may decompensate on 12/29/21, then at the next encounter, withdrew his medications

and scheduled a follow-up encounter 6-7 weeks in the future. Dr. Cruz recognized that Mr. Rupard may deteriorate during their first encounter, and this outcome that was even more predictable once Mr. Rupard's medication noncompliance was documented by Dr. Cruz and they were stopped altogether. The second time Mr. Rupard was seen by Dr. Cruz, his assessment was again incomplete as well as being nonconfidential. There is no evidence that Dr. Cruz even attempted to see Mr. Rupard in a confidential clinical setting instead of seeing him non-confidentially through a locked cell door. Dr. Cruz should have triggered a transfer to the PSU or at least ensured a follow up psychiatric encounters in the week after the 2/22/22 encounter to monitor whether the decompensation he warned about was occurring and whether Mr. Rupard was in a psychiatric emergency.

But individual failures by Dr. Cruz were compounded by multiple systemic deficiencies in the San Diego jails that allowed Mr. Rupard to fall through the cracks in the health system. One of the most harmful systemic failures to Mr. Rupard was the lack of effective system to ensure that prior mental health records were incorporated into care for newly incarcerated patients. Dr. Cruz testified that he was familiar with the standards for grave disability and that he was familiar with the process for involuntary medication. But he also testified that he had not reviewed Mr. Rupard's history of involuntary medication in 2015 and 2019 incarcerations and he testified that access to this information as not consistently available or reviewed in his role as a jail psychiatrist. Dr. Cruz testified about his lack of consistent access to prior psychiatric assessments including the assessment of Dr. Badre as well as prior orders for involuntary medication for Mr. Rupard. This gap in information proved extremely consequential for Mr. Rupard because Dr. Cruz testified during deposition that his diagnosis of Mr. Rupard on 12/29/21 was based entirely on historical information. But this reliance on historical information omitted the critical information from 2015 and 2919 that showed how gravely disabled Mr. Rupard was and how he required involuntary medication. To the extent Dr. Cruz did assess whether Mr. Rupard needed PSU transfer, he did so without review critical information about Mr. Rupard and without any clear policy or procedure in place to ensure review of this information. The San Diego Sheriff's Department should have instituted a system that allowed consistent access to essential medical information from prior jail stays for patients with grave mental illness and prior involuntary medication, required documentation of review for providers, and tracked compliance via quality assurance. Creating a clear workflow that required psychiatrists to review this type of critical information was also the responsibility of Liberty Healthcare and their lead psychiatrist, Dr. Ysla. Dr. Ysla testified that he was the supervisor for the jail based psychiatrists such as Dr. Cruz and providing clear training and oversight to ensure that potentially life-saving information was reviewed and integrated into care was an essential task. Being forcibly medicated and being transferred for inpatient psychiatric care are two sentinel events that should appear as flags or alerts when a patient returns to jail since this is information that indicates a serious, potentially fatal health problem.

The testimony of Dr. Cruz reveals another systemic problem that delayed care for Mr. Rupard. Arriving in the jail on 12/19/21, Mr. Rupard was scheduled for a telepsychiatry encounter the following day, which was appropriate for his serious mental illness. But when Mr. Rupard refused to engage with the telepsychiatry assessment, his care was delayed multiple times, exactly the opposite of what was needed. Medical records show that Dr. Cruz was unable to see Mr. Rupard on 12/24/21 and again on 12/28/21 due to "time constraints". As a result, a patient with prior history of grave mental illness and involuntary medication in this jail was left without psychiatric assessment and care for 9 days, a gross deviation from the standard of care. The barriers reported by Dr. Cruz are common in jail settings, and there must be a system in place to ensure that when an individual provider cannot see a patient, the missed appointment is tracked and another provider is assigned or the patient is transferred for outside assessment and care. The testimony of Dr. Cruz and the case medical records make clear that no such system was in effect for Mr. Rupard.

I have reviewed the contract between San Diego County and Liberty Healthcare. One provision of the contract obligates Liberty Healthcare and San Diego County to report delays is provision of services to each other if they are aware of them. The contract requires reporting if "…any actual or potential situation is delaying or threatens to delay the timely performance of this contract…". Another section of this contract establishes the staffing for psychiatrists as 7.73 full time equivalent (FTE) plus one FTE for the Chief Psychiatrist, resulting in 8.73 FTE for the four sites being covered. I have not seen any reporting about the delays in psychiatric assessments for Mr. Rupard from Liberty Healthcare to San Diego County in the information I have reviewed. Not only are delays are clearly documented in Mr. Rupard's medical records on 12/24/21 and 12/28/21, but these notes also identify the reason for the delays as "time constraints" of Dr. Cruz. These delays in care caused by inadequate psychiatric time and resources should have been reported to the County by Liberty, but because these delays are so clearly documented in Mr. Rupard's medical records, they should have also been identified as part of any competent clinical mortality review by the County.

Ms. Quiroz was not only identified as the expert to testify for the County's clinicians and mental health workers, she was specifically identified as the person who would testify about "Sheriff's Department regarding oversight of the quality of psychiatric care to inmates by Sheriff's Department Employees and private contractors…" But when she was asked about this function, oversight of the quality of health care provided by the private contractor Liberty, Ms. Quiroz testified as follows;

"Q.· And in this regard, what did you do to check the process by which he oversaw the quality of that care?

MS. FELDMAN:· Vague and ambiguous.

THE WITNESS:· I do not oversee the contract, the Liberty Healthcare contract.· Dr. Ysla does."

These delays in care for Mr. Rupard's serious mental illness reflect gross failures by the County and Liberty Healthcare because neither developed a system to detect missed appointments that resulted in an expedited encounter either in the jail our at an outside facility.

The need to assess and treat patients with acute mental health needs off site when on-site care cannot occur is a basic correctional standard of care. This basic standard of care is clearly articulated in the NCCHC Standard for Health Services in Jails; "Patients who require acute mental health services beyond those available on-site are transferred to an appropriate facility."[2] This same sentence also appears in San Diego Jail's policy on Mental Health Evaluation and Screen MDS.E.5.1 dated 6/23/20. The San Diego Sheriff's Department should have instituted a system that ensured that patients with a history of grave mental illness and involuntary medication who missed their initial psychiatric assessment were seen within 24 hours, either by another psychiatrist on site or at an outside facility. Compliance with this requirement should have been tracked via quality assurance. The failure to ensure Mr. Rupard received a timely psychiatric encounter reflects a gross deficiency by Dr. Ysla and Liberty Healthcare as well as Dr. Montgomery and the County. As the vendor who is responsible for staffing and providing psychiatric assessments, Liberty and Dr. Ysla should have implemented a system that ensured a refused or missed initial assessment did not simply lead to 9 or 10 days of delays, especially for a patient with serious illness.

The testimony of Dr. Cruz revealed a third systemic problem that was part of the harm to Mr. Rupard. When asked about how or whether other staff, either mental health or custody, would be checking on Mr. Rupard in between the psychiatric encounters, he testified that he assumed that those staff members would inform him if Mr. Rupard decompensated further. He testified "You know, I would rely on them saying like he – knowing he's going to refuse medication, but still, I would rely on their -- knowing that they would be seeing – seeing him on a regular basis, hey, if he's not doing well, maybe I should see him sooner and try to -- again, try to encourage him to take medication, but I never received any, you know, notification from any staff saying "Hey, you need to see him sooner.· Maybe you need to try him on, you know, medication again, or see him and assess him." Although I believe the Dr. Cruz erred in not scheduling a prompt follow up between himself and Mr. Rupard after the two unsuccessful, nonconfidential & incomplete encounters on 1/29/21 and 2/22/22, it is also apparent that the jail system was not coordinating care between the psychiatrists and the other staff who should have had more regular contact with Mr. Rupard. Dr. Cruz testified that he assumed other staff were seeing Mr. Rupard regularly and will communicate concerns to him, but no mental health encounters with social work or other mental health staff occurred during this time. For a patient with known serious mental illness, there is a need for mental health staff to see and assess the patient in between psychiatric encounters, which may be occur monthly or even less often for patients stable on their

---

[2] NCCHC Mental Health Screening and Evaluation. J.E.05. Health Services in Jails, 2018.

medications. The goal of these encounters is to monitor symptoms and overall health of patients but the testimony of Dr. Cruz reveals that he assumed other staff would be seeing Mr. Rupard and inform him of any deterioration. The disconnect between how the jail's mental health system operated and the assumptions of Dr. Cruz' were apparent in this exchange during his deposition. Dr. Cruz answered a question about supporting counseling that might help with medication compliance as follows; "As far as -- I knew that mental health clinicians were seeing him, so they would potentially, you know, speak to him about medication, you know.· He was already getting follow-up by other providers, other mental health clinicians.· I never had to tell them to go "Hey, please tell this guy to -- to start medication."· They're -- they would be assessing him.

Q That's not accurate; right?

A What's that?

Q What you just said is not true because you, as the psychiatrist --

A Yeah.

Q The only psychiatrist -- outpatient psychiatrist on site at San Diego Central Jail at the time – were the only one who had authority to order psychiatric medication for a patient or discontinue psychiatric medication for a patient; is that correct?"

This exchange underscores that just as no system existed in the jail to ensure a psychiatric encounter occurred in a timely manner for patients like Mr. Rupard with serious mental illness, there was no system in place to ensure that the same patients with serious mental illness would automatically be seen on a regular basis by non-psychiatric clinicians. Dr. Cruz explained how clinician encounters in between psychiatric encounters were important for medication compliance, "So I am not saying that mental health clinicians can tell patients 'You need to start medications.' They can assess them and say 'Hey, are you interested in restarting your medication.· Not saying that they can prescribe or discontinue medication. That is my role.· Their role is assess them, determine if they're interested in medication, but not to prescribe or discontinue medication." In fact, the coordination of psychiatric care with clinician encounters is a basic approach in jail settings but it requires policies and procedures that ensure both type of encounters occur, and that case conferencing occurs, especially for patients with serious mental illness.

The testimony of mental health counselor Ms. Goodall was that seeing clinicians' patients was strictly driven by sick calls. This is contrary to the requirement that patients in segregation be seen regularly by mental health clinicians and it also reflects a reality that was obviously unknown to Dr. Cruz. The disconnect between the Liberty Healthcare staff and the County's mental health clinicians reflects a gross failure by the Liberty Healthcare leadership including Dr. Ysla, who testified that he was the one responsible for training and orienting psychiatrists to their actual roles in the jail. He specifically testified that "In my role as medical director, I provided guidance on the policies and procedures for new hires."

The lack of coordination between the psychiatric provider and mental health clinicians in Mr. Rupard's care is consistent with the erroneous claim by a County mental health supervisor, Ms. Quinoz, who testified that Mr. Rupard had a treatment plan in his medical records. By definition, a treatment plan includes an assessment of the patient's health problems and a plan for how the care will be delivered, including the roles of the health staff involved in the care. This is very different than the note in Mr. Rupard's records from Dr. Cruz, which makes no mention of mental health clinicians, nursing checks or any other aspects of ongoing mental health plan of care. This distinction is at the core of Mr. Rupard's preventable death, because the lack of a true treatment plan meant that there was no ongoing record of the care he needed and what was being missed. A basic treatment plan for his should have included a plan for assessment in a confidential setting and completion of the actual psychiatric assessment that was never completed by Dr. Cruz. A treatment plan should have also included the role of clinicians in seeing Mr. Cruz, how often they would see him and what their role was in his care. The NCCHC defines a treatment plan as "A treatment plan is a series of written statements specifying a patient's course of therapy and the roles of qualified health care professionals in carrying it out."

The failure to provide mental health care to Mr. Rupard reflect a failure to follow basic standards of care and the County's own policies regarding refusals of medication. I have reviewed the refusal policies of the San Diego Sheriff's Department, "Refusal Procedures", MSD.R.5 1/6/22 and 7/14/16. Both the 2016 and 2022 policies mandate the following in section VIII of the policy;

"In all instances of refusal, physicians and nurses shall document health education provided and patient's understanding of the counseling."

Several elements of Mr. Rupard's care fail to meet this standard. One of the first red flags in this area of care is the form labelled "General Informed Consent" completed at the time of his arrival at approximately 3 am on 12/19/21. The topic of this form is "Informed Consent" and it includes consent and voluntary agreements about medications, confidentiality, photographs, mandatory reporting and many other elements of consenting to care. There is no signature from Mr. Rupard but the box that is checked reads "Patient is willing to sign, but is unable." There is no explanation as to why Mr. Rupard cannot sign this form despite being willing. This entry implies that Mr. Rupard has a physical barrier to signing such as disability, but there is no evidence that this was the case. In fact, his receiving screening at the same time clearly identifies the following about him;

- Combative, assaultive or extremely hostile behavior
- Chronic conditions, psychotic disorders

This indicates that he likely was not able to engage in care or could not give informed consent because he may not have understood the risks and benefits of what he was being asked to consent to. Documenting that Mr. Rupard was willing but unable to sign a medical consent form when he is simultaneously documented as being combative, assaultive, extremely hostile and potential psychotic is a breach of basic medical practice. This deviation from standard medical practice occurs in the first hours of Mr. Rupard's incarceration in the San Diego Jail and is followed by dozens more contacts between health staff and Mr. Rupard that continue to sidestep

or ignore his ability to understand the risks and benefits of various offers of assessment and treatment.

Mr. Rupard's initial encounter note from a psychiatrist occurred 10 days after he arrived in jail on 12/29/21. This encounter was through a locked cell door, not confidential, and documents that the mental health provider was unable to assess Mr. Rupard for multiple parts of the encounter, that he was rambling incoherently and refusing to participate. The last sentence of this encounter note is "Patient understands that all treatments offered today are voluntary and adherence/refusal is independent of housing, privileges or other inmate services." The notion that Mr. Rupard was able to understand the nature of the treatment being offered or the relationship between treatment and jail programs and service is not credible given the actual documentation of this provider that Mr. Rupard was rambling incoherently, refusing to participate and verbally aggressive.

Mr. Rupard's second encounter note from a psychiatrist occurred on 2/22/22. This encounter was through a locked cell door, not confidential, and documents that the mental health provider was unable to assess Mr. Rupard for multiple parts of the encounter, that he was rambling incoherently and refusing to participate. This note states "Potential benefit, risks, side effects, alternatives discussed, including no medication." Again, the notion that Mr. Rupard was able to understand the nature of the treatment being offered or the risk and benefits of medications through a locked cell door and while he was refusing to even engage in assessment with this psychiatrist is not credible.

During Mr. Rupard's 89 days in the San Diego Jail system, his medical records document that he refused medications on 44 instances and that he refused some or part of his clinical assessments & care virtually every time he was approached through a locked cell door. During this time, there is not a single documented effort by health staff to see him in a confidential settings where his true understanding of risks and benefits could be assessed as required by the County's own policies. Communicating with a patient about the risks and benefits of their refusals of care is a standard of care in both community and correctional health and is specifically included in the NCHCC standard on Informed Consent and Right to Refuse.[3]

Based on the information I have reviewed, it is clear that security staff responded to clear and obvious symptoms of untreated mental illness with a punishment response by San Diego Sheriff's Department custody staff, placing Mr. Rupard in segregation/solitary confinement.

There were two separate incidents, on 1/29/22 and again on 2/19/22, when Mr. Rupard was involved in a use of force and punished for clear symptoms of his untreated mental illness. The Incident Report from 1/29/22 documented that Mr. Rupard was "holding his food flap hostage" as well as spitting and grabbing at multiple deputies. This reports also documents that when deputies were unable to even give the actual report to Mr. Rupard due to him being verbally abusive.

[3] NCCHC Informed Consent and Right to Refuse, J-G-05. 2018.

The second incident occurred three weeks later and included documentation by custody staff that Mr. Rupard was "pacing back and forth screaming to other incarcerated people with his shirt off and clenched fist". The same day, a nursing note is present in Mr. Rupard's medical records which includes one sentence, "per dep 5144 pt is on lockdown, no contraindication noted." No assessment of Mr. Rupard or review of his medical and psychiatric history is documented in this note. No mention of his facial/head trauma from three weeks earlier is made in this note.

San Diego Jail custody staff were aware of Mr. Rupard's mental health history because his prior suicide attempt was documented on the custody team's Classification Navigator Report. But there is no evidence that custody staff ever considered the potential that mental illness was causing or was a mitigating factor in Mr. Rupard's behaviors. By the time of the first incident, Mr. Rupard has been held in the jail for 42 days without taking any medications. By the time of the second incident, 63 days had passed.

San Diego custody staff should have developed a system to inquire with mental health staff whether the behaviors they were responding to were symptoms of untreated mental illness. This basic step is present in other correctional settings and ensures that patients with mental illness to not deteriorate in a punishment setting because their untreated health problem is becoming predictably worse over time. In the U.S. Bureau of Prisons (BOP), the Inmate Discipline policy clearly articulates the need to consider mental illness as a potential cause of behavioral problems including rules violations. The BOP Inmate Discipline policy from 2020 has an entire section on mental illness and includes the following;

"You will not be disciplined for conduct committed when, as the result of a severe mental disease or defect, you were unable to appreciate the nature and quality, or wrongfulness of the act. The UDC or DHO will make this decision based on evidence, including evidence presented by mental health staff."[4]

It is allowable for mental health staff to share information with custody staff when asked for consideration of this specific question, whether mental illness should be considered as a cause of behavioral problems in the context of infraction or punishment hearings. The NCCHC jail standards clearly establish the role of mental health staff in "advocating for mitigating circumstances in cases of medical and mental health disorders".[5] An even earlier NCCH document from 2015 also makes this same case "A policy and procedure should be developed and implemented relevant to the provision of mental health input into the disciplinary process with a focus on assessing potential mitigating factors that contributed to the inmate's alleged

---

[4] BOP Inmate Discipline Policy, 11/18/2020, at chrome extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.prisonpolicy.org/scans/disciplinepolicies/federal 5270009cn1.pdf?_gl=1*vms1hf*_gcl_au*MTAzMDA4NDE2Ny4xNzc5OTg3Mjg3*_ga*MTU4NDcxNDk3My4xNzc5OTg3Mjg3*_ga_3ZZXPJN7M4*czE3Nzk5ODcyODckbzEkZzAkdDE3Nzk5ODcyODckajYwJGwwJGgw.

[5] Therapeutic Relationship, Forensic Information and Disciplinary Action, J-G-04. NCCHC Jail Standards 2018.

disciplinary infraction."[6] None of the segregation policies I have reviewed include any of these basic policies and procedures to integrate mitigating factors into the efforts of custody staff to punish patients with mental illness via solitary confinement/segregation. The failures of the Sheriff's Department to create a policy and procedure for seeking out this basic input represents a systemic failure that is evident in Mr. Rupard's case. One additional feature of these custody failures is that there is no evidence that Mr. Rupard was ever offered representation or that anyone bothered to determine whether he understood or even heard any of the various rights he was supposedly afforded in the County's infraction/punishment process. Much to the contrary, the incident and hearing reports make clear that there was no meaningful communication with Mr. Rupard.

<u>Failure to provide basic medical care, including injury assessment/care and segregation rounds.</u>

Based on the information I have reviewed, Mr. Rupard needed multiple types of medical care and monitoring of his physical health that he was denied while in the San Diego Jails before his death in 2022. The first clear failure to meet the standard of medical care for Mr. Rupard occurred on 12/19/21, the day Mr. Rupard arrived in the jail. During his receiving screening at approximately 3 am, Mr. Rupard's vital signs were essentially normal. Approximately 20 hours later, a partial set of vital signs is present with a markedly increased heart rate of 110 beats per minute. These vital signs appear in conjunction with a nursing note to offer a COVID-19 test to Mr. Rupard. There was no clinical acknowledgement of this abnormal vital sign and no efforts to assess what was the potential cause of the tachycardia. This encounter documents that Mr. Rupard is only "oriented x 2" which established that of the cardinal three parts of quick orientation (person, place and time) he is not able to state all three. As a result, this note documents that Mr. Rupard had altered mental status and had tachycardia, a combination of abnormal findings that require a provider to assess him for serious medical problem or even potential medical emergency. Documenting these findings without taking action to ensure that they are immediately assessed represents a deviation from the standard of care because abnormal vital signs and lack of orientation obtained by nursing staff must be addressed. This is a common issue when people arrive in jail who may be experiencing intoxication, withdrawal, medication interruption, infection, dehydration, and other treatable but potentially fatal problems.

Another failure in Mr. Rupard's medical care occurred on 1/29/22. At 11:24 that am, a single nursing note is present that documents that Mr. Rupard was injured during a use of force and that he sustained at least 2 injuries, a laceration between his eyebrows and "some possible blood on lips". This encounter note records that Mr. Rupard was seen in the housing area and that the nurse was "unable to further assess" because of Mr. Rupard acting hostile and refusing care. There is no mention in this note of any plan for further assessment of Mr. Rupard for the two injuries that were observed and for assessment of other potential injuries. No vital signs are present in this encounter. This represents a gross deviation from the standard of care because the nurse clearly documented multiple injuries to the head, and also documented being unable to complete the encounter. This is a circumstance where the nurse was obligated to refer Mr. Rupard to a provider to complete the

[6] Mental Health Considerations for Segregated Inmates. NCCHC 2015 at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ncchc.org/wp-content/uploads/Segregated-Inmates-2015.pdf.

encounter, assess the full extent of his head trauma and other injuries and determine whether a higher level of assessment or care was needed outside the jail. Instead, these records indicate that Mr. Rupard was simply returned to his cell without further evaluation. This encounter is also troubling because a custody report from the same time documents that the nurse "cleared him to remain in his cell" but no such clearance is even mentioned in the nurse's note.

Another gross deficiency in the medical care provided to Mr. Rupard is the lack of nursing and mental health rounds to check on his health status. These rounds are required by San Diego Sheriff's policies but they never occurred for Mr. Rupard. The Segregated Inmates policy (G.2.1, dated 10/30/2020) clearly mandates that people in segregation status "shall be monitored three days a week by nursing staff and a minimum of once a week by a qualified mental health provider (QMHP)." I have not seen any explanation in the deposition testimony I have reviewed as to why these requirements were ignored by both the nursing and mental health services.

There is no doubt that Mr. Rupard was being held in solitary/segregation or lockdown status. The encounter note by Ms. Goodall clearly documented his as being in administrative segregation on Module 7D. The nursing note on clearly identified him as being on "lockdown" status. The third follow up report of Detective Blumenshine goes even further and asserts that Mr. Rupard was not only held in administrative segregation status, but that he was held in that cell restriction because of his mental illness; "reviewed the Follow up Investigative Reports of the Sheriff's Department (I-III) regarding Mr. Rupard's death. Report I documents that Mr. Rupard was treated as being in Administrative Segregation because of his mental health status; "Rupard's housing block, 7D, was classified as COVID quarantine and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health."

The deposition testimony of Sargent Johnson was that there were multiple ways that a person could be confined to a cell for 22 or more hours per day in the San Diego jails at this time, and he specifically mentioned both of these mechanisms, administrative segregation and lockdown.

Segregation rounds are required by both the American Correctional Association (ACA) and the NCCHC, which are the two major organizations that promulgate standards in correctional healthcare. The ACA policies mandate that facilities have a written policy, procedure, and practice provide that inmates in restrictive housing receive daily visits from the senior correctional supervisor in charge, daily health care rounds from a qualified health care professional (unless medical attention is needed more frequently), and visits from members of the program staff at least weekly. (5-ACI-4B-12, New Aug. 2018).

The NCCHC standards similarly mandate as an essential standard that people in restrictive housing cells in jail receive daily rounds by a health care professional. The 2018 NCCHC jail standards mandate that segregation rounds occur either daily or three times per week if a person is locked in a cell but does come out for some interaction with others.[7] These rounds are also required by the San Diego Sheriff's own policies and procedures but it is clear that no effective mechanism exists to ensure that they occur because no segregation rounds are documented in Mr. Rupard's medical records.

[7] https://www.ncchc.org/standards-q-a-qualification-of-segregation-status/.

The necessity for these rounds is not linked to the reason a person is locked in a segregated cell but instead is tied to the status of being locked in the cell. The NCCHC explains this in the following manner, "Segregated inmates are those who are isolated from the general population and who receive services and activities apart from others. Whether you call it administrative segregation, protective custody, or disciplinary segregation, standard G02 Segregated Inmates is about the conditions of living and confinement, not the reason for the segregation or what the area is called."[8] In addition, the NCCHC standards make clear that when a person needs medical assessment or care, "arrangements must be made for triage, examination, and treatment in an appropriate clinical setting."[9]

Likewise, in the U.S. Bureau of Prisons, there is a clear expectation that anyone held in a segregation or isolation setting will be checked on daily by health staff. Since 2011, the inmate handbook in this system includes the following regarding segregated housing cells: "A health services staff member will visit you daily to provide necessary medical care."[10] In my experience, state prisons and county jails across the country have similar requirements for segregated inmates to be checked regularly by a member of the medical staff.

In 2016, the NCCHC published a specific policy statement on segregation and solitary confinement which clearly identified the risks of isolation and the need for daily monitoring of isolated patients by health staff.[11] This policy document documented that the need for monitoring is linked to detecting physical health deterioration including inadequate eating or drinking, something directly relevant to Mr. Rupard's case. The 2016 policy statement from the NCCHC identified the following needs;

- Health care staff should evaluate individuals in solitary confinement upon placement and thereafter, on at least a daily basis. They should provide them with prompt medical assistance and treatment as required.
- Health care staff must advocate so that individuals are removed from solitary confinement if their medical or mental health deteriorates or if necessary services cannot be provided.
- Health care staff should ensure that the hygiene and cleanliness of individuals in solitary confinement and their housing areas are maintained; that they are receiving sufficient food, water, clothing, and exercise; and that the heating, lighting, and ventilation are adequate.

The lack of basic segregation rounds for Mr. Rupard appears to reflect a systemic failure in the San Diego Jails, not a single instance. The testimony by the County's expert on the quality of mental health care did not know in her deposition whether people with schizophrenia or who have mental health problems are even held in administrative segregation. This is an egregious admission

---

[8] NCCHC Segregated Inmates Standard J-G-02, 2018 and https://www.ncchc.org/spotlight-on-the-standards/segregated-inmates/.

[9] NCCHC Segregated Inmates Standard J-G-02, 2018.

[10] https://www.bop.gov/policy/progstat/5270_010.pdf.

[11] NCCHC Policy Statement on Solitary Confinement (Isolation), 2016, at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ncchc.org/wp-content/uploads/Solitary-Confinement-Isolation.pdf.

because Mr. Rupard was consistently held in segregation status in his final and also his prior jail incarcerations. For the County's expert designee on the quality of jail mental health care, Ms. Quinoz, to not know whether patients with mental illness are placed into these settings represents a profound failure of the County. The follow-up report of Detective Blumenshine actually makes the assertion that Mr. Rupard was not held in this setting in spite of his mental illness, but because of it. The County's ability to detect deterioration of their seriously mentally ill patients in solitary/segregation settings is impossible if they do not know where or whether patients with mental illness are exposed to these conditions. The evacuation list from Module 7D that I reviewed clearly showed that at least two other patients with a history of suicide attempt were held on 7D in administrative segregation status.

One of the harmful consequences of failing to track the presence of patients with serious mental illness in segregation/solitary settings is that being locked in a cell most or all of the day creates barriers to all health assessments and care. The NCCHC Policy Statement on Solitary Confinement includes this overview of how being in segregation/solitary creates barriers to health care:

"While correctional health care providers often encounter obstacles in the performance of their duties, there are specific challenges to the provision of health care to individuals in solitary confinement. Solitary confinement often makes it more difficult for patients to access care. Many facilities require that individuals in solitary confinement be shackled and accompanied by two officers when they are out of their cells. Many times, they must be body searched upon leaving and returning to their cells. As a result, health care staff may decide to perform their evaluations at cell-front, through bars or slots in the doors, either for their own or the patient's ease. Alternatively, clinical encounters may occur with the patient in a metal cage or behind a glass partition. Even when patients are taken to the medical clinic for evaluation, they often remain in restraints with custody officers in close proximity. Such arrangements are not respectful of an individual's dignity, interfere with privacy and confidentiality, and hamper or prevent the clinician from performing an adequate evaluation."

These systemic failures in monitoring the health of patients in segregation/solitary confinement settings are apparent in the testimony of the Chief Medical Officer of the entire jail health service, Dr. Montgomery. His job description clearly assigns him the role of being responsible for the adequacy of all health services in the jail system. The Chief Medical Officer position role starts with the description that this staff member will be hired "To direct all clinical functions of the Sheriff's Department Medical Services…" The role is also described as being "responsible for all clinical/medical decisions within the Sheriff's Detention Medical Services, and all policies and operations concerning patient care, welfare, and treatment."

But when he was asked about his involvement in oversight of the mental health services in the jails, Dr. Montgomery testified as follows:

"Q. What, if anything, did you have to do with mental health services at the jail?

A I was not involved."

When he was about having any role in oversight of the quality of care being provided by outside vendors, Dr. Montgomery testified as follows:

“Q All right.· Let me let you know I'm referring now, in these following questions, to the time period of the years 2021 and 2022. · · · · ·As chief medical officer, were you responsible in any way for monitoring the quality of care provided by private medical contractors?

A During that stated time frame, individually, no. I was not monitoring the quality of the private contractors. · · · · ·Their hierarchy was providing oversight over their individual employees.”

This lack of involvement in monitoring the adequacy of care by the person charged with that very role highlights the deep dysfunction in the health service that contributed to Mr. Rupard’s death.

The failure of health staff to monitor Mr. Rupard’s health status caused him to deteriorate and die without being weighed, without having his vital signs checked and without any of the basic nurse rounds occurring to detect his decline. The Medical Examiner’s report on Mr. Rupard’s death clearly dehydration and malnutrition as major elements in his death. Mr. Rupard weighed 165 lbs. when he arrived in the San Diego Jail and at the time of his death, 105 lbs. He had lost 36% of his body weight over 89 days locked inside a cell.

The competency report conducted at the door of Mr. Rupard’s cell on 3/14/22, three days before his death, documented that his cell was covered with feces on the floor and wall and that trash was spread throughout the cell and Mr. Rupard was psychotic and not competent to stand trial, unkempt, dirty and covered with a blanket. The day before his death, 3/16/22, a custody officer entered Mr. Rupard’s cell for a wellness check. It is noteworthy that this check was not prompted by any health staff or custody staff initiating an actual status check on Mr. Rupard’s health, but instead because another person had died on this segregation unit and a homicide detective was seeking to interview potential witnesses. On the day before his death, the custody officer who entered Mr. Rupard’s cell notices a dramatic difference that his usually aggressive and hostile demeanor was absent and the officer was only able to elicit a single “grunt” when he prodded Mr. Rupard. This information about a clear and obvious decline of Mr. Rupard’s health was never known to the mental health or medical staff because they failed to comply with their own policies and the standards of correctional health to check on Mr. Rupard.

Dr. Montgomery testified that the Medical Examiner’s report did not identify dehydration, malnutrition and pneumonia as the causes of Mr. Rupard’s death. This is simply untrue. On p37 of the report, the following is clearly recorded;

CAUSE OF DEATH: PNEUMONIA, MALNUTRITION, AND DEHYDRATION
IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Even the initial summary of findings by Dr. Schaber clearly identifies these three causes of death, on p11 of the report.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting

These three causes of death reflect medical problems that likely occurred over a range of days to weeks. The malnutrition and muscle wasting likely occurred over weeks while acute viral pneumonia was a likely a much more acute process.[12] Patients who are malnourished have a higher risk of death from COVID-19 complications including pneumonia.[13] The Medical Examiner clearly identified these processes as actual causes of Mr. Rupard's death and I do not understand why Dr. Montgomery was unable or unwilling to agree with those findings. The more acute phase of Mr. Rupard's decline and death is relevant because of the failure of health staff conduct the required weekly mental health checks and three times per week nursing checks.

The physical decline of Mr. Rupard was completely detectable and addressable but it required nursing and medical staff to check on his wellbeing, assess him and follow the most basic standard of care including ensuring that he was eating, drinking, not injured and not suffering from untreated injuries or new medical problems. If staff felt unable to care for Mr. Rupard, or felt unable to assess him, they were obliged to transfer him to the hospital for assessment and treatment. But his medical records indicate a complete lack of nursing or medical assessments after his brief injury note until the day he died.

Failure of Dr. Montgomery and San Diego to conduct basic peer review of jail health staff.

One essential standard of care in correctional settings is to conduct peer review or clinician to clinician review of work conducted by all health professionals. This essential function is described in the NCCHC J-C-02 and details two levels of review; one for routine review the work conducted for all health staff by another health professional with equal or greater level of training, and another process that is discipline-specific and is initiated and overseen by the

---

[12] https://www.npr.org/sections/goatsandsoda/2016/01/20/463710330/what-happens-to-the-body-and-mind-when-starvation-sets-in and chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://pmc.ncbi.nlm.nih.gov/articles/PMC11065092/pdf/rmmj-15-2-e0010.pdf and chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://pmc.ncbi.nlm.nih.gov/articles/PMC11065092/pdf/rmmj-15-2-e0010.pdf.

[13] https://pmc.ncbi.nlm.nih.gov/articles/PMC11537834/ and https://pmc.ncbi.nlm.nih.gov/articles/PMC12348880/.

Responsible Health Authority.[14] Dr Montgomery testified that he worked in the role of the Responsible Health Authority during the time Mr. Rupard was held in the jail. He testified that no peer to peer review process had been implemented in the jail. This is an example of a gross systemic deficiency that increases the likelihood that health staff who do not follow basic policies and procedures will repeat their errors without any intervention. In the case of Mr. Rupard, it is clear that no health staff were conducting the required nursing and mental health encounters representing failures by two different disciplines of the health care team.

Failure to conduct a clinical mortality review

None of the information I have reviewed in this case indicates that the County has conducted a clinical mortality review of Mr. Rupard's death. When a person dies in a jail setting, one of the essential steps that must be taken is for a physician who was not part of the patient's care to lead a clinical mortality review. This process is separate from the administrative review and when indicated, the psychological autopsy. The NCCHC standard for this task (Procedures in the Event of Inmate Death) mandates that the clinical mortality review should physician led and must review the appropriateness of care.[15] This standard clearly establishes that the clinical mortality review should occur within 30 days and be part of the health system's quality improvement process because it is essential to disseminate findings and corrective actions to staff and track implementation in the facility's quality committee. The standard also includes three questions that should be answered in the clinical mortality review;

- Could the medical response at the time of death be improved?
- Was an earlier intervention possible?
- Independent of the cause of death, is there a way to improve care?

The standard includes the following; "Corrective actions identified through the review process are implemented and monitored through the quality improvement program for systemic issues and through the patient safety program for staff-related issues."

I have reviewed a brief set of notes reviewing Mr. Rupard's timeline that were created by Dr. Montgomery but that do not represent a clinical mortality review. These notes lack documentation of a meeting that includes records of attendees, documentation of findings and corrective actions with the timelines for implementation and names of health leadership that will take on the responsibilities for tracking and implementation of corrective actions. I have reviewed the DOJ reporting form which communicates some demographic and other information about Mr. Rupard to the U.S. Department of Justice but likewise does not constitute a mortality review. Neither of these represents a clinical mortality review.

During his deposition, Dr. Montgomery was asked whether nursing staff and mental health clinicians had conducted their required assessments of Mr. Rupard as per the segregation policy

[14] NCCHC J-C-02 Clinical Performance Enhancement. Standards for Health Services in Jails. 2018.
[15] NCCHC J-A-10 2014.

requirements. He was unable to simply state yes or no to these questions and gave the following response:

"As we commented on, is that the nursing review has been conducted by nursing staff. And the mental health element of the review that would be in a position to evaluate the actions of the QMHPS, was conducted. I was not involved in that part."

This lack of required checks by health staff is a very simple deficiency to see in Mr. Rupard's medical records, whether during his weeks in segregation he received three nursing assessments and one mental health clinician assessment per week documented in his medical records. In addition, the notes that Dr. Montgomery compiled appear to list each of the very few health contacts that Mr. Rupard had, and there is no record of the required three times per week nursing and weekly mental health clinician assessments in his notes.

In some County and State level systems, an oversight body may conduct a review of deaths in a jail or prison. In other settings, a legal or administrative investigation may occur that is internal and reviews multiple areas of the death case. None of these various reviews replaces the need for a clinical mortality review within 30 days if they are not physician-led, if they are not part of the quality improvement committee of the facility, and if they do not produce findings and corrective actions that are disseminated among staff and tracked in the quality improvement committee. I have not seen any document that represents a basic clinical mortality review for Mr. Rupard's case. In addition, the testimony of Dr. Ysla, the head psychiatrist for Liberty Healthcare, further indicates that the County was not conducting clinical mortality reviews. Dr. Ysla testified that he discussed approximately eight jail deaths of jail patients with his "corporate headquarters" in the final year of the contract with San Diego Jail (ended in June 2022 per his testimony) but also testified that he never discussed deaths with Dr. Montgomery, the County's Chief Medical Officer for the jail. Mr. Rupard died in March 2022, and a clinical mortality review would have occurred win 30 days and would have also identified findings and corrective actions that were then linked to the facility QI/QA process. Dr. Ysla testified that not only did he not discuss any of the jail deaths with Dr. Mongomery; he was not even aware of Mr. Rupard's death until much later when he was notified about the lawsuit. This indicates that Dr. Ysla spent the months of March-June not even aware that a patient in his care died. This reflects parallel failures of the County for failing to conduct a clinical mortality review that included the staff who provided care and linked back to the QI/QA apparatus of the jail, but it is also a stunning failure of Liberty Healthcare's leadership, admitting they were unaware that one of their own patients with serious mental illness had died.

The goal of clinical mortality review is to identify gaps in care or areas of improvement and prevent future deaths via corrective action plans. The failure of San Diego County to conduct a clinical mortality review for Mr. Rupard's death is even more stunning in the context that another patient with serious mental illness had also recently died in the San Diego Jail in a very similar manner. Publicly available press reports indicate that Daniel Marroquin was a patient with serious mental illness who died from excessive water intake while locked in a San Diego Jail cell in May 2021, a time when Liberty Healthcare was providing psychiatric care.[16] I have not

---

[16] https://www.sandiegouniontribune.com/2025/08/05/san-diego-county-to-pay-4m-to-mother-of-man-who-died-by-suicide-in-jail/.

reviewed any records in that case, but if it is true that this man did have serious mental illness, that he died from lack of nutrition or excessive water intake and that he was held in segregation, the testimony of Dr. Ysla that he had not discussed any deaths with Dr. Montgomery in the final year of the Liberty contract is a damning admission of negligence by both the County and Liberty Healthcare. In addition, Dr. Ysla's testimony that no QI/QA audits of any psychiatric care occurred in the final year of the Liberty contract is further evidence of the lack of attention paid to the most vulnerable patients in the jail system by both Liberty Healthcare and the County.

Dr. Montgomery's second deposition clarified the systemic failures in the jail's clinical mortality review process. He testified that he created some initial notes but that he was essentially not involved in any further process to determine failures and corrective action plans in response to Mr. Rupard's death and implement them in the jail. He testified that the confidential CIRB process did not yield any feedback to him after that process was completed. This shows a total breakdown of the most essential part of a clinical mortality review that findings and corrective actions be connected into the jail quality committee.

My own findings of gross deficiency in the San Diego Jail's approach to reviewing patient deaths is consistent with the findings in the State Auditor's Report. This report included the following: "For 22 of the 30 cases we reviewed, the Sheriff's Department was unable to provide us with documentation from these reviews that detailed any findings or conclusions about the clinical care given, identified whether any concerns required further study, or stated whether changes to policies, procedures, or practices are warranted. We believe that if the Sheriff's Department properly documented the 30-day medical reviews, it could better identify and track instances when it did not provide sufficient medical and mental health follow up care before an individual's death, such as those we discuss in Chapter 1."

**Summary**

The death of Mr. Rupard was not only preventable, but the information I have reviewed in his case indicates that both individual and systemic errors caused his death in the San Diego Jail. While the findings and opinions I present here are my own, they are very consistent with the alarming findings of the State Auditor in review of multiple cases, "Throughout Chapter 1 we provide numerous examples of deficiencies in the department's policies and procedures that likely contributed to the deaths of some incarcerated individuals and how these policies and procedures do not align with certain best practices used by comparable counties and other entities. Specifically, in the examples on pages 21 through 24, we describe how the Sheriff's Department did not consistently follow up with individuals who needed medical and mental health services, and that lack of attention may have contributed to their deaths."

The failures I have identified by the San Diego Sheriff's Department and their vendor Liberty Healthcare resulted in Mr. Rupard being locked in a cell for almost 90 days and not receiving any medication or a single completed or confidential psychiatric assessment. During this time, he

became ill and experienced malnutrition, eventually dying from a combination of pneumonia, malnutrition and dehydration. One of the Liberty psychiatrists who worked in the PSU testified that she was not surprised when she learned of Mr. Rupard's death "given the conditions of the jail". When asked to explain this lack of surprise, she cited another death of a patient before Mr. Rupard died who had not been eating or drinking and was found dead in his cell by custody staff. She testified that "A few months prior to this news, while I was working, I don't recall any names or anything, but an inmate had died in George Bailey Detention Facility. He had not been eating and drinking, and three days later, the custody found him dead. So that was a reflection of the kind of care."

These gross deviations from correctional health standards of care include failures by the San Diego Sheriff's Department and their vendor, Liberty Healthcare. One set of failures involved the denial of basic mental health care to Mr. Rupard including delays in his psychiatric assessment, inadequate assessment via incomplete and nonconfidential cell-side encounters and failures to review prior medical records. Jail medical records clearly identified that Mr. Rupard had required involuntary medication and Patton State Hospital during a recent incarceration but the testimony of Dr. Cruz revealed that these records were not part of the historical information he used despite being unable to complete his assessments of Mr. Rupard in 2022. A second set of failures include a lack of basic medical care and monitoring including lack of segregation rounds by nursing and mental health staff as clearly required by standards of care and the County's own policies. A third gross failure involved a complete lack of peer review, resulting in the Responsible Health Authority, Dr. Montgomery, not monitoring the adequacy of care provided by jail health professionals.

A final set of failures relate to the lack of any clinical mortality review which should have occurred within 30 days of Mr. Rupard's death should have connected and corrective action plans to the facility quality improvement process and should have been led by a physician. Instead, the head psychiatrist for Liberty Healthcare testified that he never discussed any of the deaths in the final year of their contract for jail psychiatric services with the Sheriff Department's Chief Medical Officer and Responsible Health Authority, Dr. Montgomery.

Executed on this 14th of July, 2026 in Port Washington, New York.



Homer Venters, MD, MS

**Dr. Homer D. Venters**
hventers@gmail.com

*Professional Profile*

- Physician / epidemiologist focused on the intersection of health, criminal justice and human rights.
- Leader in provision and improvement of health services to patients with criminal justice involvement.
- Successful implementer of nations' first large jail electronic health record.
- Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

*Professional Experience*

**Correctional Health Expert**, 3/2016-present

- Independent correctional health monitor/expert
    - Cumberland County Jail, NJ (ongoing). Serve as independent, court-appointed monitor of health services in a County Jail.
    - Fluvanna Women's Correctional Center, VA (ongoing). Serve as independent, court-appointed health services monitor in a women's prison.
    - Santa Barbara County Jail, CA (ongoing). Serve as independent, court-appointed monitor of health services in a County Jail Complex.
    - VI Department of Corrections (ongoing). Serve as independent, court-appointed monitor of health services in St. Thomas detention facility.
    - U.S. District Court Eastern District of NY, Case No. 1:22-cr-00486, 2025.
    - U.S. District Court Central District of CA, Case No. 2:20-cv-04450 (COVID-19, 2020-2022).
    - HI Department of Corrections (COVID-19, 2021-2022).
    - CT Corrections Department (COVID-19, 2020).
- U.S. Department of Justice, Civil Rights Investigations medical expert, 2019-present. Work with the USDOJ to investigate correctional health conditions and provide recommendations for addressing.
- State Attorney's General, provide expert consultation and investigation regarding correctional Health (CA, NY, IL).
- Other litigation, see testimony below.

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-4/30/20.

- Lead COCHS efforts to provide technical assistance, policy guidance.
- Oversee operations and programmatic development of COCHS.
- Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018

- Lead COCHS efforts to expand Health Services in Jails.
- Develop strategy for non-profit models of jail diversion/health care.

**Director of Programs,** Physicians for Human Rights, 3/17-11/18.

- Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
- Expand forensic documentation of mass killings and war crimes.
- Develop and support sexual violence capacity development with physicians, nurses and judges.

○ Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.
○ Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.
○ Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.
○ Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).
○ Reduced overall mortality in the nation's second largest jail system.
○ Increased operating budget from $140 million to $160 million.
○ Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.
○ Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
○ Implemented nation's first large jail electronic medical record for 1,400 staff and 75,000 patients in a jail.
○ Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.
○ Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.
○ Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
○ Direct all aspects of response to infectious outbreaks of H1N1, Legionella, Clostridium Difficile.
○ Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.
○ Developed training program with Montefiore Social internal medicine residency program.
○ Directed and delivered health services in multiple jail settings.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

*Education and Training*

**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.

**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert Einstein University7/2004-5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

*Academic Appointments, Licensure*

Adjunct Faculty, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D. New York (2007-present).

*Print articles and public testimony (last 15 years)*

Testimony: United States House of Representatives Subcommittee on Crime, Terrorism, and Homeland Security, Judiciary Committee 1/21/22.

Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails, New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction. NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

*Peer Reviewed Publications (last 15 years)*

**Venters H.** Preventing Another Fifty Years of Mass Incarceration: How Bioethics Can Help. *Hastings Center Report*. 2023 April; 53(6).

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. *Lancet Planet Health*. 2019 Mar;3(3):e144-e153.

K. Parmar, Jennifer Leigh, Ernest Thomas, Douglass Curry, **Homer Venters**, Andra Gilbert, Tamaryn Nelson, Ed Lester. Qualitative evidence of crimes against humanity: the August 2017 attacks on the Rohingya in northern Rakhine State, Myanmar *Confl Health*. 2019; 13: 41. Published online 2019 Sep 16.

Messner N, Woods A, Petty A, Parmar PK, Leigh J, Thomas E, Curry D, **Venters H**, Gilbert A, Nelson T, Lester E. Qualitative evidence of crimes against humanity: the August 2017 attacks on the Rohingya in northern Rakhine State, Myanmar. Confl Health. 2019 Sep 16;13:41.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated. *J Health Care Poor Underserved*. 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**. Feasibility of Treating Hepatitis C in a Transient Jail Population. *Open Forum Infect Dis*. 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care*. 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health*. April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The “Clinical Alternative to Punitive Segregation” (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, **Venters H.** Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

Granski M, Keller A, **Venters H**. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health.* 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health*. 2015. 9/17/15.

Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization*. 2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters**. Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved.* 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care.* 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health: Patient safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

*Honors and Presentations (past 15 years)*

**Invited Presentation,** National Association of County & City Health Officials. Outbreaks Behind Bars, together with the Centers for Disease Control, 6/17/26, Webinar. Johns Hopkins School of Public Health,

**Invited Presentation,** Johns Hopkins School of Public Health, Health in Prisons lecture. Baltimore, MD, 4/27/26.
**Invited Presentation,** Tulane University Book Festival, Outbreak Behind Bars. New Orleans, LA, 3/27/26.

**Invited Presentation,** University of North Carolina, Institute for Global Health and Infectious Diseases, Outbreak Behind Bars, Raleigh NC, 1/16/26.

**Invited Presentation,** Duke University School of Law and School of Medicine, Correctional Health and Outbreak Prevention, Durham, NC 1/15/26.

**Invited presentation,** Yale Law School/Liman Colloquium, Punishment and Health. Yale Law School, New Haven, CT. 11/6/25.

**Invited Presentation,** Johns Hopkins Bloomberg School of Public Health, Outbreaks and Dual Loyalty Behind Bars, Baltimore MD. 5/5/25.

**Invited presentation,** University of Texas LBJ School of Public Affairs, Conference on Deaths in Custody, Austin Tx. 11/15/24.

**Invited presentation,** Yale Law School/Liman Colloquium, Death investigation and models of carceral care. Yale Law School, New Haven, CT. 4/9/24.

**Invited presentation,** United Nations Office of Drugs and Crime, Presentation on Custodial Death Investigation. Malina, Philippines (remote), 3/18/24.

**Invited presentation,** Jail and Prison Health and Human Rights, Oklahoma University School of Health Sciences, 2/13/22.

**Invited presentation,** COVID-19 and Carceral Health, Stanford University Schools of Engineering and Public Health, 2/23/22.

**Invited presentation,** Screening and treatment for sexually transmitted infections in justice. National Academy of Sciences Committee on Law and Justice, remote, September14th, 2020.

**Invited presentation,** Vaccination for COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, August 20th, 2020.

**Invited Presentation,** Documenting Deaths in Custody, National Association for Civilian Oversight of Law Enforcement (NACOLE), remote, August 3rd, 2020.

**Invited Presentation,** Decarceration and Health. Radcliffe Institute/Harvard University. Policy Series. Remote. 6/23/20.

**Invited presentation,** COVID-19 in correctional settings. Briefing for U.S. Senate Staff, sponsored by The Sentencing Project, remote, May 29, 2020

**Invited presentation,** COVID-19 in correctional settings. Briefing for Long Island Voluntary Organizations Active in Disaster , sponsored by The Health & Welfare Council of Long Island, remote, May 29, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, May 12, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Association of Counties, Justice and Public Safety Committee, remote, April 1, 2020.

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina, postponed.

**TedMed Presentation**, Correctional Health, Boston MA, March 15, 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American*

*Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

*Teaching & Other Health & Activities*

**Reviewer, Deaths in Custody Report,** National Academies of Sciences, Engineering and Medicine, Published 12/2025.

**Member, Biden-Harris COVID-19 Health Equity Task Force,** 2/26/21-10/31/21
Work with Task Force members to provide President Biden with interim recommendations to address COVID-19 Health inequities.

**United Nations Office of the High Commissioner of Human Rights,** Istanbul Protocol, contributor to 2022 updated protocol.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-2020.

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Draconculiasis Eradication, Togo West Africa, June 1990- December 1991.

*Books*

**Venters H.** *Outbreaks Behind Bars.* Johns Hopkins University Press. 4/2025.

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/2019.

*Chapters in Books*

Beichner-Thomas and **Venters H**. Worldwide Incarceration of Women. In ***Global Women's Health: Advancing Health Equity with Public Health Approaches.*** Springer Press, Expected 10/25.

**Venters H.** COVID-19 and the Struggle for Health Behind Bars. In *Excessive Punishment*. Columbia University Press, 2024.

**Venters H.** Asylum Evaluation in Detention Settings. In *Asylum Medicine: A Clinician's Guide*. Springer Publishing 2022.

**Venters H.** Mythbusting Solitary Confinement in Jail. In *Solitary Confinement Effects, Practices, and Pathways toward Reform*. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In *Decarceration*. Ernest Drucker, New Press, 2017.

*Prior Testimony and Deposition (Since 7/15/2022)*

- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 11/14/22 (Video testimony).
- Derrick Jones et al. v. City of St. Louis, Missouri et al., Case No. 4:21-cv-600. 3/17/23 Expert for Plaintiffs (Video deposition).
- Wilson v. San Diego, CA., Case No. 3:20-cv-0457-BAS-DEB. Expert for plaintiffs 5/8/23 (Video deposition).
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 5/30/23 (Video testimony).
- Harris v. Georgia DOC, Case No. 5:18-CV-365-TES. Expert for plaintiffs 6/15/23.
- Maney v. Oregon DOC, Case No. 6:20-cv-00570. Expert for plaintiffs 9/15/23.
- Serna v. San Diego, CA., Case No. 20-CV-2096-LAB-DDL. Expert for plaintiffs 10/27/23 (Video deposition).
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 11/17/23 (Video testimony).
- Carty v. Governor Bryan 3:94-cv-00078 Court appointed monitor. Hearing 4/30/24.
- Enyart v. San Bernardino 5:23-cv-00540. Expert for plaintiffs 5/8/23 (Video deposition) 5/21/24 testify at trial.
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 7/17/24 (Video testimony).
- Reed v. Wexford 3:20-cv-01139-SPM. Expert for plaintiffs. Deposition 9/26/24. Garden City, NY.
- Porio v. City of Tustin Case No. 8:22-CV-812-RGK Expert for plaintiffs. (Video deposition) 11/21/24, trial testimony 12/11/25, 1/22/25.
- Boyer v. ACH 20-CV-1123. Expert for plaintiffs 1/11/25 (Video deposition).

- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 1/30/25 (Video testimony).
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 2/5/25, Camden, NJ.
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 7/3/25, Camden, NJ.
- McCoy v. County of San Diego. Case No. No. 22cv1724- BTM-SBC. Expert for plaintiffs 7/18/25 (Video deposition).
- Cardew v. New York Department of Corrections and Community Supervision. Case No 21-cv-6557. Expert for plaintiffs 7/29/25 (Video deposition).
- Scott v. City of Baton Rouge. Case No. 3:22-cv-488. Expert for plaintiffs 7/30/25 (Video deposition).
- Scott v. Clarke. case 3:12CV36. Court appointed monitor. Hearing 8/01/25 (Video testimony).
- Vargas v. USA/Geo. Case No. 5:23-cv-00380-JWH-SP (CA). Expert for plaintiffs 08/18/25 (Video deposition).
- Rogers v. Columbia County (AK). Case 1:24-cv-01036-SOH. Expert for plaintiffs 12/9/25 (Video deposition).
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 12/19/25, Camden, NJ (Video testimony).
- Jung v. City of Philadelphia. Expert for plaintiffs. Trial testimony 2/25/26. Philadelphia PA.
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 2/27/26, Camden, NJ (Video testimony).
- Carty v. Governor Bryan, St. Thomas USVI. 3:94-cv-00078. Court appointed monitor, remote status hearing, 4/15/26.
- Paul v. New York Department of Corrections and Community Supervision. Case No 9:21-cv-000476. Expert for plaintiffs 5/20/26 (Video deposition).
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 6/26/26, Camden, NJ (Video testimony).

**Rate Sheet for Dr. Homer Venters**

Hourly rate for all work, $600/hr.

Travel time, $300/hr. plus travel expenses.

Per Diem, GSA rates utilized, available at https://www.gsa.gov/travel/plan-book/per-diem-rates

Expenses, including lodging, travel, receipts provided with invoices.

# EXHIBIT "B"

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF LONNIE RUPARD;<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE CORPORATION; CHRISTINA GOODALL (SUED AS CHRISTINA ANOSIKE) , IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; DEFENDANT DEPUTIES DOES 1-10, DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10.<br><br>Defendants. | **CASE NO.**<br>3:23-cv-1357-CAB-BLM |

## DEPOSITION OF
HOMER VENTERS, M.D.

Thursday, September 10, 2026

10:01 AM to 2:38 PM

Reported By: Stephanie Cherness, CSR No. 13775

## VIA REMOTE VIDEO TECHNOLOGY

Hines Reporters

INTERNATIONAL TOWER
888 S. FIGUEROA STREET, SUITE 940, LOS ANGELES, CALIFORNIA 90017
866.432.4300

LOS ANGELES * SAN FRANCISCO * SAN DIEGO

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF LONNIE RUPARD, by and through his Successors-in-Interest Justino Rupard & Ronnie Rupard; JUSTINO RUPARD, individually and in his capacity as Successor in Interest; RONNIE RUPARD, individually and in his capacity as Successor-in-Interest,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; BILL GORE, in his individual capacity; KELLY MARTINEZ, in her individual capacity; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, in his individual capacity; LIBERTY HEALTHCARE CORPORATION; CHRISTINA GOODALL (sued as CHRISTINA ANOSIKE), in her individual capacity; ANTHONY CRUZ, MD, in his individual capacity; BEN SAMONTE, in his individual capacity; MAY NG, in her individual capacity; DEFENDANT DEPUTIES DOES 1-10, DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10,<br><br>Defendants. | Case No. 3:23-cv-1357-CAB-JAC |

VIDEOTAPED DEPOSITION OF HOMER VENTERS, M.D.
Thursday, September 10, 2026, via Zoom

Reported by: Stephanie Cherness, CSR No. 13775

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF LONNIE RUPARD, by and through his Successors-in-Interest Justino Rupard & Ronnie Rupard; JUSTINO RUPARD, individually and in his capacity as Successor in Interest; RONNIE RUPARD, individually and in his capacity as Successor-in-Interest, | Case No. 3:23-cv-1357-CAB-JAC |
| Plaintiffs, | |
| vs. | |
| COUNTY OF SAN DIEGO; BILL GORE, in his individual capacity; KELLY MARTINEZ, in her individual capacity; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, in his individual capacity; LIBERTY HEALTHCARE CORPORATION; CHRISTINA GOODALL (sued as CHRISTINA ANOSIKE), in her individual capacity; ANTHONY CRUZ, MD, in his individual capacity; BEN SAMONTE, in his individual capacity; MAY NG, in her individual capacity; DEFENDANT DEPUTIES DOES 1-10, DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10, | |
| Defendants. | |

The videotaped videoconference deposition of HOMER VENTERS, M.D., taken on behalf of the County Defendants, via Zoom videoconference, commencing at 10:01 a.m., Thursday, September 10, 2026, before Stephanie Cherness, CSR No. 13775.

APPEARANCES OF COUNSEL (via Zoom):

FOR PLAINTIFF JUSTINO RUPARD AND THE ESTATE OF LONNIE RUPARD:

IREDALE & YOO, APC
By: EUGENE G. IREDALE
Attorney at Law
105 West F Street, Fourth Floor
San Diego, California 92101
619-233-1525
Egiredale@iredalelaw.com

FOR COUNTY DEFENDANTS:

COLLINS & COLLINS, LLP
BY: ROBERT S. KAHN and RADA FELDMAN
Attorneys at Law
2011 Palomar Airport Road, Suite 207
Carlsbad, California 92011
760-274-2110
Rkahn@ccllp.law

FOR DEFENDANTS ANTHONY CRUZ, M.D. AND LIBERTY HEALTHCARE OF CALIFORNIA, INC.:

TRESSLER, LLP
BY: JEROME MURPHY
Attorney at Law
909 North Pacific Coast Highway, Suite 840
El Segundo, California 90245
310-203-4800

VIDEOGRAPHER:

OLIVER CALDERON

I N D E X

WITNESS: HOMER VENTERS, M.D.


| EXAMINATION | PAGE |
|---|---|
| BY MR. KAHN | 6, 94 |
| BY MR. MURPHY | 70 |
| BY MR. IREDALE | 98 |


DEPOSITION EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Deposition Notice | 10 |
| Exhibit 2 | Report | 10 |
| Exhibit 3 | Rebuttal Report | 10 |
| Exhibit 4 | Expert Designation | 11 |
| Exhibit 5 | COSD 006311-006312 | 98 |
| Exhibit 6 | Dr. Ysla's deposition testimony | 104 |

Via Zoom
Thursday, September 10, 2026
10:01 a.m.
***

10:00:38
10:00:38 THE VIDEOGRAPHER: Here begins media number
10:00:59 one, volume one, in the deposition of Homer Venters, in
10:01:04 the matter of the Estate of Lonnie Rupard versus County
10:01:08 of San Diego, being heard in the United States District
10:01:13 Court, Southern District of California. The case number
10:01:16 is 323CV1357CABJAC. Today's date is Thursday,
10:01:29 September 10th, 2026, and the time on the video monitor
10:01:34 is 10:01 a.m.
10:01:40 This deposition is being taken via Zoom video
10:01:43 web conference and is being made at the request of the
10:01:46 defendants. Your videographer today is Oliver Calderon,
10:01:53 here on behalf of Hines Reporters, located at 888 South
10:01:56 Figueroa, in Los Angeles, California.
10:02:00 Would counsel and all present please identify
10:02:03 yourselves and state whom you represent, beginning with
10:02:06 the witness?
10:02:07 THE WITNESS: Homer Venters.
10:02:10 MR. IREDALE: Do you want the noticing attorney
10:02:20 to announce first?
10:02:22 THE VIDEOGRAPHER: Yes.

counted it up, but I think I've probably been deposed or testified, you know, maybe 30 times. Most of my testimony now is as a court-appointed monitor, but the list of the individual cases, I think, is at the end of my CV.

Q Okay. That's on pages 12 and 13 of the CV that was provided to us. Is that your understanding, if you know?

A Yes, sir.

Q Okay. I believe I counted 29 separate bullet points, some of which may be repetitive as far as the case. It looks like you may have offered testimony in the same case on multiple occasions?

A Yes, most of my work now is as a federal monitor. And so in those -- in that work, I might routinely report back to the court on a quarterly basis or multiple times a year on my findings about the adequacy of healthcare in the jail.

Q Okay. All right. Now, looking at the list that is attached with your CV that we're briefly discussing, it says here that the work that you've done has either been as an expert for plaintiffs or as a court-appointed monitor. Are there cases where you have worked as an expert that are not listed here where you have worked for the defense?

10:29:25 A I have been retained by -- I was retained by the Department of Corrections in Washington State to help them, but that did not involve trial testimony. It involved them retaining me to help with healthcare but not -- I believe all the cases where I've offered testimony in a trial or a deposition are on that list.
10:29:55 Q Okay. Fair enough.
10:30:06 Okay. In your own words, how would you describe what you were retained to do in this matter?
10:30:13 A I was retained to assess the adequacy of care provided to Mr. Rupard in his final detention and also to assess the nature of the -- any errors I found, whether they were individual or systemic.
10:30:39 Q Okay. And I apologize. I have to jump back. There was a couple of questions I wanted to ask and forgot. You are --
10:30:51 Are you board-certified in internal medicine, sir?
10:30:54 A Yes.
10:30:55 Q Okay. You are not a board-certified psychiatrist, correct?
10:31:01 A Correct.
10:31:01 Q Okay. And you did not complete a psychiatry residency, correct?
10:31:07 A Correct.

10:31:07 Q Okay. And your medical license is in the State of New York, correct?
10:31:13 A Yes.
10:31:13 Q Okay. Are you licensed in California?
10:31:17 A No.
10:31:18 Q Okay. And the hands-on work that you did in correctional practice was in the New York City jail system, correct?
10:31:34 A Yes.
10:31:35 Q Okay. Have you ever been employed to provide care inside a California jail?
10:31:41 A No.
10:31:43 Q Okay. Have you ever been inside a San Diego County jail?
10:31:48 A Yes.
10:31:50 Q When was that?
10:31:52 A I think I was there for part of a day in maybe 2019 or 2020. I don't recall.
10:32:04 Q And what was the purpose of that?
10:32:08 A I was working with a nonprofit called Community Oriented Correctional Health Services, and so the nature of that engagement was to give kind of a best practices or scoping of best practices in jail health review to the County. And so I believe there was a brief walk-through of one of the facilities, and then the

10:32:45 organization I was working with provided an overview of
10:32:50 what are the best practices in correctional healthcare.
10:32:53 Q Okay. Do you recall which facility it was?
10:32:57 A I don't.
10:32:59 Q Okay. As part of that visit, did you offer any
10:33:09 type of training or did you offer any type of training
10:33:17 to any staff at the jail?
10:33:19 A No, I don't believe so.
10:33:20 Q Okay. Have you ever written or administered
10:33:24 training to staff in San Diego County?
10:33:27 A Not that I'm aware of.
10:33:30 Q Okay. And you've never trained staff on the --
10:33:37 let me rephrase.
10:33:39 You've never trained staff on San Diego County
10:33:43 Sheriff Department's detention or medical policies,
correct?
10:33:48 A No, not that I'm aware of.
10:33:50 Q Okay. So going back to your retainer and your
10:34:01 work on this case, can you walk me through your case
10:34:07 activities in order, you know, like what you reviewed
10:34:11 first and when?
10:34:12 A I'm not sure I recall the order of all those
10:34:19 documents. I still have the page up on my second
10:34:22 monitor that lists all those documents, so I don't have
10:34:25 a recollection of the order of review. But generally,

10:34:29 my practice is to look at the -- review the jail medical records of the patient involved, and then once I've reviewed those records, expand to look at other information. That's my basic recollection of the work I did in this case.

10:34:49 Q Okay. So you did primarily a records review. You didn't actually treat Mr. Rupard, correct?

10:34:58 A That is true.

10:34:59 Q Okay.

10:35:01 MR. IREDALE: He was dead.

10:35:05 BY MR. KAHN:

10:35:07 Q Did anyone assist you in preparing your reports?

10:35:10 A No, with the exception of some formatting of the report, which I would have received feedback on typos or errors, typographical errors, but the report itself was written by me.

10:35:33 Q Okay. Do you intend to conduct any further investigation in this matter before trial?

10:35:39 A I don't have any plans to as I sit here today.

10:35:46 Q Okay. All right. Why don't we start, then. If you want, I can bring up Exhibit 2 on my screen. Do you have a copy of your report on one of your screens?

10:36:16 A I do. I just have two screens, one which is our Zoom call to here, and the second screen I have is

10:36:23 just a larger screen that the only thing up on it now is the report, which I've just turned to page 1 of the report, which is page 2 of the document because there was an exhibit page at the beginning.

10:36:36 Q Okay. Why don't we start with -- why don't we start with the opinions you expressed in your report. What are the opinions that you have formed in this matter that you plan on presenting at trial?

10:36:53 A Well, there are three broad findings. Each of them has, as I put into the report, multiple elements to it, but the first broad finding is that the facility failed to provide Mr. Rupard with basic mental healthcare.

10:37:16 The second broad finding involves a failure to provide adequate medical care.

10:37:23 And the third broad area of finding deals with the failure to conduct a clinical mortality review for Mr. Rupard.

10:37:32 Q Okay. Now, with regards to the first opinion, the failure to provide basic mental healthcare, I believe that's listed on page 28 of your report?

10:38:00 A Yes, I see that.

10:38:01 Q Okay. Sorry. What is the basis -- what information do you rely on as the basis for forming that opinion?

10:38:32 A Well, each of these findings cites a specific supporting evidence, so there are multiple types of information that I cite. But broadly, in this area -- I'm just starting on page 28 -- I see that I have cited two specific medical records that show the acuity of his illness when he arrived, documentation by the staff that they themselves were noting. And aside from the medical records of Mr. Rupard, I also cite two standards of care from the NCCHC and the ACA. And then in the part of this finding that deals just with the mental healthcare, I also cite two specific parts of or testimony from the deposition testimony of several people.

10:39:42 Q Okay. Would the screening -- would your review of the screening forms from December of 2021 regarding Mr. Rupard, would that be one of the items that you looked at to help form this opinion?

10:40:03 A Yes, those forms, I believe I cite them in both the first finding and the second finding dealing with the medical care.

10:40:16 Q Okay. As to forming your -- forming this opinion, do you use or follow a specific methodology?

10:40:32 A Well, I review the medical records, as I said, of the patient. That's the primary source of my understanding of what was happening with his clinical care. And then, for instance in this case and any case

10:40:56 where there's a concern about the adequacy of his immediate care, I would look to see if there was documentation of an acute health problem by the staff who first saw him, which there was in this case. And then I would look to see the adequacy and the timeliness of the response in terms of whether or not he received the care he needed.

10:41:22 Q Okay. I believe your report -- I'm sorry. I need to take a break for just two minutes. Let's go off the record.

10:42:25 A Thank you.

10:42:26 THE VIDEOGRAPHER: We are going off the record. The time is 10:42 a.m.

10:45:18 (Recess.)

10:45:18 THE VIDEOGRAPHER: We are back on the record. The time is 10:45 a.m.

10:45:45 MR. KAHN: Sorry about that. I'm a little eager, I guess.

THE WITNESS: Can I ask, is Mr. Iredale present?

10:45:53 MR. KAHN: Oh, I don't see him on the screen, so let's go off the record until Gene gets back.

10:45:57 THE VIDEOGRAPHER: We are off the record. The time is 10:45 a.m.

10:47:05 (Recess.)

10:47:05 THE VIDEOGRAPHER: We are back on the record.
10:48:05 The time is 10:48 a.m.
10:48:07 BY MR. KAHN:
10:48:08 Q Okay. Dr. Venters, with regards to your first
10:48:12 opinion regarding failure to provide basic mental
10:48:16 healthcare, you make several references to the NCCHC
10:48:26 standards. What is the NCCHC?
10:48:33 A The NCCHC is the National Commission on
10:48:40 Correctional Healthcare. It's a nonprofit organization
10:48:42 that puts forth guidelines and standards for healthcare
10:48:49 in correctional settings, jails, and prisons, and also
10:48:52 does some accrediting and other work with individual
10:48:59 facilities.
10:48:59 Q And that accreditation work that it does,
10:49:09 that's a voluntary thing, correct?
10:49:13 A Yes.
10:49:13 Q Okay. Like a jail or -- a county or a jail,
10:49:20 they're not legally required to be accredited by NCCHC,
correct?
10:49:34 A Unless they put that requirement on themselves,
10:49:37 which sometimes happens. I'm not aware of it being
10:49:40 imposed.
10:49:41 Q Okay. And the San Diego Jail was not NCCHC
10:49:45 accredited during the relevant period that we're talking
10:49:48 about regarding Mr. Rupard, correct?

10:49:50 A That's my understanding.
10:49:51 Q Okay. The criteria that NCCHC promulgates, 10:50:05 those are like professional standards or professional 10:50:10 goals, correct?
10:50:12 A I think of them as guidelines for how 10:50:16 healthcare should be delivered, and so they're -- yeah, 10:50:22 I think a good word for them is standards. I think they 10:50:25 call them standards themselves.
10:50:27 Q Okay. They're not the -- they're not what 10:50:35 would be considered the legal or the constitutional 10:50:38 minimums, correct?
10:50:40 A Well, I certainly --
10:50:43 MR. IREDALE: Mr. Kahn, forgive me. I'm not 10:50:46 going to limit you in the inquiry, but technically this 10:50:53 calls for opinion and conclusion on a legal matter, but 10:50:58 I have no objection to the witness answering your 10:51:01 question.
10:51:01 THE WITNESS: I don't have any expertise on 10:51:07 what is a constitutional standard because I'm not an 10:51:15 attorney. I understand both that generally these are 10:51:19 guidelines from this organization, and then I also note 10:51:22 that many jail health services, as San Diego has done, 10:51:27 will actually identify their own policies and even the 10:51:33 names of the policies and the end table of contents of 10:51:38 the policies almost copied and pasted so that you can

10:51:41 see a jail may have a policy on segregated inmates, but when you look at the top, it mentions that the title and the -- even the name of the NCCHC policy, that this county or state policy is consistent with, and that's a pretty common practice that I see.

10:52:03 BY MR. KAHN:

10:52:03 Q Okay. But in your understanding as an expert in correctional healthcare, it's generally -- it's your understanding that noncompliance with the NCCHC doesn't necessarily establish some type of constitutional violation for the jail, correct?

10:52:31 A I wouldn't have any input. My expertise is purely on the kind of adequacy of care from the clinical standpoint, so I don't think I would ever be in a position to say that a level of care, even if I thought it was inadequate, met or didn't meet some sort of legal standard.

10:52:54 Q Okay. And then as far as the references you make in your report regarding the NCCHC with regard to your first opinion, for instance, as an example, I believe you identify NCCHC, it's identified as J-E-05. Do you understand or do you know what I'm talking about?

10:53:46 A Yeah, I don't know off the top of my head which policy that is, so I'm happy to look at a specific part of the report if there's a citation that you're

12:50:14 components to the failure. One is the -- involves the failure to conduct a psychiatric assessment for Mr. Rupard over the first ten days, and I, in the initial report, talk about that in terms of his medical records, the evident need for this assessment.

12:50:35 Then I also mention specific failures with regards to the failure to have a system that allows or ensures review of prior psychiatric records for patients like Mr. Rupard. I mentioned another element in that finding that has to do with the nonconfidential nature of the encounters with Mr. Rupard and the failure to transfer him to a higher level of care where he can be adequately assessed.

12:51:09 I also mention the lack of coordination between the mental health staff or behavioral health staff and the psychiatric staff. And there are, I think, at least a couple more sub-elements of that finding.

12:51:27 And besides the individual elements, then I also detail, using the medical records and also the deposition testimony and policies, how I believe these failures -- some of them reflect individual and some of them reflect systemic problems with how mental healthcare is delivered.

12:51:50 Q Okay. And when you use those -- the various bases that you've just described, do you tie those bases

to any particular standard or regulation that you believe that they fell below?

A I have cited throughout my findings, both standards of the National Commission on Correctional Healthcare, as well as in several instances the actual policies of San Diego County Correctional Health Services or Jail Health Services. And I believe I also have cited specifically to at least one or two standards of the American Correctional Association, which is another accredit -- pseudo-accrediting body.

Q Okay. And that's the ACA, correct?

A Yes.

Q Okay. And like the NCCHC, the ACA is a voluntary type of accreditation, correct?

A That's right. So unless you see a county or a state facility that says, "We comply with this specific NCCHC or ACA guideline," then you wouldn't -- you would generally know them to be kind of general standards of care, but they might not be -- it might not be clear how they're applied in that specific facility.

Q Okay. And all right. I think I'll have a couple questions about that further down the road.

And for forming that opinion regarding mental health, what specifics records did you review in helping you to form that opinion?

12:53:49 A I'm not sure I've committed to memory all of the records. It's a pretty lengthy review, but I can certainly go back and quickly scan that finding with your allowance.

12:54:11 Q Sure, please.

12:54:13 A So the finding for this in the initial report, failure to provide basic mental healthcare, starts with his medical records. As soon as Mr. Rupard arrived, there was documentation by the nursing staff of him being combative, assaultive, or extremely hostile. So they're establishing right away in the medical records his serious psychiatric illness. And then very quickly, he refused his initial telehealth or psychiatric encounter, and so -- and he was basically, it looks like, refusing telepsychiatry assessment.

12:54:57 And at the same time that's being documented, the staff are documenting history of extensive meds, history of psych, on medications during prior incarcerations. So very quickly it's established he has serious psychiatric problems, and the medical records show his serious psychiatric illness in the past. So those medical records establish the need for an urgent assessment. I also cite in this finding the medical records clearly display that for unknown reasons to me at least, psychiatrists attempted to see him at least

13:14:39 process was when it was completed. And so that's why I
13:14:42 say this was a complete breakdown of what should happen.
13:14:45 What should happen is this independent review
13:14:49 of a death should -- must be -- and the NCCHC is very
13:14:55 clear about this -- must be connected back to the jail's
13:14:59 quality improvement process so that they can fix things
13:15:02 that have been found.
13:15:03 Q Okay. And when you are referring to the NCCHC
13:15:07 policy, which policy are you referring to?
13:15:10 A The quality improvement -- there's a policy on
13:15:17 quality improvement, which cites clinical mortality
13:15:19 reviews. Also, in the -- the procedures in the event of
13:15:23 an inmate death, I believe there is reference to the
13:15:28 quality improvement process or the corrective action
13:15:32 plans being implemented by the jail -- the relevant jail
13:15:37 staff.
13:15:37 Q Okay. And do you know the edition or the
13:15:43 publication year for that policy?
13:15:45 A I -- my recollection is that these have been
13:15:51 part of -- integrating clinical mortality reviews into
13:15:55 the quality improvement process has been part of NCCHC
13:15:59 standards since I started, so certainly the 2014, 2018
13:16:05 jail standards would reflect this.
13:16:07 Q Okay. And in your review of records and in
13:16:16 your review of Dr. Montgomery's deposition, did that

13:16:22 include the notes or the form -- there was a form. I believe it was provided -- I believe it's dated March 18, 2022. Did you see that form?

13:16:37 A Yes.

13:16:38 Q Okay. And you'd agree that that form indicates that the questions, I guess, raised by the NCCHC policy, that those were identified as being under review, correct?

13:17:00 A I don't recall the wording of the form. I'm happy to look at it, but I mentioned in my report -- because that form happens the day -- usually the day after somebody dies. So it references some process that will come after that, which should be a clinical mortality review.

13:17:20 And so as I said in my report, that form itself is not the clinical mortality review. Whatever happened after that, Dr. Montgomery was very clear in his second deposition that whatever happened off "in the ether," it didn't come back to him in the way of corrective actions and findings, which is exactly the failure here. It doesn't really matter who figures out what the problems are if the jail leadership doesn't get those findings and then integrate them into doing something different.

13:17:56 Q Okay. And what would be the next opinion that you have that you plan on offering in this matter?

13:18:35 A I believe that's all the opinions that are -- those are the major opinions that are in my initial report. And then the rebuttal report has essentially the same broad opinions but then has rebuttals and also areas of agreement with the various expert reports from the defense, but I don't believe the overall broad areas of opinion changed in my rebuttal report.

13:19:05 Q Okay. Do you plan on offering an opinion that Mr. Rupard's death was -- would be considered a preventable death?

13:19:18 A Yes, that is the first sentence of the summary that I've written in my initial report.

13:19:24 Q Okay. And do you rely on the medical examiner's determination as -- for forming that opinion?

13:19:36 A I'm not -- I don't have -- I certainty have reviewed it. I don't have any reason to dispute it, but I'm not offering any -- it's part of the information I've reviewed, but I'm not, you know, saying that I have any like special opinion or expert opinion on cause of death. I've seen his report and take it at its word about the three causes of Mr. Rupard's death.

13:20:07 Q Okay. All right. Leaving things open here. Do you have any opinions that are specific to any of my individual clients?

13:21:22 A I have offered opinions about inadequacies in

13:21:29 several different clinical settings, but as I've said in the report, it's not evident to me whether these errors are always individual or systemic. So, for instance, there's a mental health provider that has a note that documented both that Mr. Rupard was in 7D quarantine but also there's a checked box saying segregation.

13:22:02 So it's unclear to me in that mental health worker's testimony, she made clear that she did not routinely have scheduled assessments to patients in AdSeg, that they were sick calls. So that to me indicates a likely systemic problem, that these patients get into AdSeg and nobody is affirmatively setting up scheduled encounters for them, and so that is unclear to me.

13:22:35 I did also document deficiencies in the nursing response to Mr. Rupard's initial presentation and also when he had a -- when he had injuries on the 29th of January. It's unclear to me, based on the information I've reviewed, if these reflect deficiencies in the training that the staff or oversight that they received or whether they even had knowledge that their care wasn't meeting the standard of care.

13:23:07 Q Okay. Do you have any opinions about any of the specific deputies or security staff?

13:23:16 A I don't think I've offered opinions about the

13:23:22 security staff.
13:23:23 Q Okay. So would it be fair to say you're not
13:23:30 offering any opinions about the individually named
13:23:35 deputies in this matter?
13:23:37 A I haven't -- I don't have any opinions -- based
13:23:43 on the information I reviewed, no, I don't have any
13:23:46 opinions that are specific to a custody staff.
13:23:49 Q Okay. Do you have any opinions as to Bill
13:23:57 Gore?
13:23:57 A I don't -- I don't know who is responsible for
13:24:04 the systemic failures that I document, so -- I'm not
13:24:09 sure I will ever, you know, understand, or it's
13:24:13 certainly not my area of expertise to know who makes
13:24:17 decision about jail, the adequacy of healthcare in the
13:24:22 jail. So I don't have a specific -- I haven't mentioned
13:24:24 Bill Gore by name. I have identified multiple systemic
13:24:28 failures in this case.
13:24:30 Q Okay. You're not offering -- strike that. Let
13:24:44 me rephrase.
13:24:45 Earlier I believe you testified you're not
13:24:48 offering any type of legal opinions, correct?
13:24:51 A That is correct.
13:24:52 Q So you're not offering any opinion that any
13:24:57 defendant was deliberately indifferent in the
13:25:01 constitutional sense, correct?

13:25:03 A That's correct.
13:25:04 Q Okay. And you're not a forensic pathologist, correct?
13:25:15 A Correct.
13:25:15 Q You did not perform an autopsy in this case, correct?
13:25:18 A Correct.
13:25:18 Q You're not offering any independent causation
13:25:22 on -- or any causation opinion on the manner of death,
13:25:28 correct?
13:25:28 A I don't have any independent opinion. I
13:25:31 reviewed the information from the medical examiner's
13:25:35 report, so that's part of the content of my initial
13:25:37 report, but I haven't offered a separate opinion from
13:25:39 what the medical examiner offered.
13:25:42 Q Okay. So for all intents and purposes, you
13:25:47 defer to the medical examiner on that, correct?
13:25:50 A On the cause of death, yes.
13:25:52 Q Okay. Now, with regard to your rebuttal
13:27:17 report, you agree with Dr. Beckson that Mr. Rupard did
13:27:29 not receive the standard of care from Dr. Cruz, correct?
13:27:32 A Yes.
13:27:33 Q Okay. So, for example, I believe you took
13:27:37 issue with failure for close follow-ups, discontinuing
13:27:43 medications, failure to place him on a 5150 hold, and

13:27:48 failure to admit or transfer him to the PSU; is that correct?

13:27:53 A I'm not sure those are my exact findings. I'm
13:27:56 looking at my rebuttal report here, and so I did -- in
13:28:01 the beginning, which I think is on page 2 of my rebuttal
13:28:03 report, I do list kind of these bulleted maybe six or
13:28:09 seven failures, and then I do have the specific findings
13:28:21 that you just mentioned also, but there are some other
13:28:24 features of how Dr. Cruz provided care that seemed to be
13:28:29 part of systemic problems.

13:28:30 Q And what would those be?

13:28:32 A Well, I think that -- the first one I
13:28:36 identified or one of the first ones is the failure for
13:28:38 the County to have a system that not just enables but
13:28:42 mandates review of critical information from prior
13:28:46 incarcerations. I think Dr. Cruz testified that some of
13:28:50 the information that would have been helpful he could
13:28:52 see, some he couldn't.

13:28:54 He testified, as I recall, that he provided a
13:28:58 diagnosis, an initial diagnosis based on historical
13:29:03 documents, on historical -- but he couldn't see -- you
13:29:06 know, somewhere in there there's a document that says
13:29:10 that failure to give Mr. Rupard Haldol will result in
13:29:17 physical or mental health harm, something to that
13:29:21 effect. I have it quoted in my report. So that's

13:29:25 exactly the kind of information that I think there should be a system that the County has in place to make
13:29:28 sure the right information is reviewed. That's one
13:29:29 systemic problem.

13:29:30 Another is the provision of -- or the
13:29:33 conducting of psychiatric assessments in a
13:29:36 nonconfidential cellside manner, just completely
13:29:40 inadequate. And it's unclear to me if that's -- my own
13:29:43 experience in correctional health is when that's
13:29:46 happening, it's happening because it's an accepted
13:29:48 practice. I
13:29:49 haven't -- but to the extent that that's true in the
13:29:52 San Diego jails, then that would reflect a systemic
13:29:56 problem.

13:29:56 And then obviously we just talked a little bit
13:30:00 about the failure to have independent oversight and
13:30:07 assessment of the care by the County, both in terms of
13:30:10 the independent peer review and also the lack of
13:30:12 adequate clinical mortality review. So those are core
13:30:13 kind of systemic problems, even though I do have
13:30:16 specific areas --

13:30:20 I note Dr. Beckson. So I think what you were
13:30:24 just reading from earlier are Dr. Beckson's findings
13:30:27 about Dr. Cruz. I agree with some of those. I'm not an
13:30:33 expert, for instance, in the specific 5150 hold, but I

13:30:38 agree with Dr. Beckson that there were failures in the care provided by Dr. Cruz.

13:30:45 Q Okay. Would those items that you agree with Dr. Beckson on, do you believe those to be systemic failures or individual failures?

13:31:10 A Well, I have listed Dr. Beckson's findings there, so those bullets -- one, two, three, four -- five bullets on page 3 of my rebuttal report, I attribute clearly that Dr. Beckson's report identifies several failures in the care provided by Dr. Cruz. I have on my own, both in the initial report and in this rebuttal, identified failures, some of which are just Dr. Cruz and some of which are systemic. So I list -- so, for instance, the failure to conduct a psychiatric assessment, the failure to schedule it in a timely manner, those are things I attribute to Dr. Cruz.

13:31:53 Some of the systems that I just talked about are systemic problems. But the way I put this together in my rebuttal report is I say on page 4, I agree with the basic opinion of Dr. Beckson that Mr. Rupard did not receive the standard of care from Dr. Cruz. But the next sentence is, "However, as I make clear in my initial report and below, these failures reflect more than individual errors by Dr. Cruz."

13:32:27 Q Okay. What is the basis for your offering a

13:36:57 of the plaintiff in those cases?

13:36:59 A Yes.

13:37:02 Q Can you generally describe the opinions you offered in those cases?

13:37:10 A I'm not sure I could. They would -- I don't recall the individual reports of the clinical findings. I believe that in some of the reports, there might have been a similar finding about clinical mortality review. There might -- I think in some of those cases, there might have been findings about the adequacy of receiving screening, what happens when a person gets to the jail and what kind of care and assessment they get. And there may have been findings about adequacy of different types of care or access to different types of care after the receiving screening occurred.

13:37:53 Q In any of those cases, were you critical of any psychiatric treatment team or psychiatric doctor?

13:38:00 A I don't recall. I think that that's possible. I just don't recall the reports as I sit here.

13:38:10 Q Did you testify either at deposition or trial in any of those cases?

13:38:15 A Certainly. I believe all of them I've been deposed in, so they would be listed in the -- at the end of my CV.

13:38:23 Q How about trials, if you recall?

13:38:28 A I don't believe so.
13:38:29 Q Have you offered any novel opinions today that are critical of Dr. Cruz? And by "novel," I mean not already contained in your report and/or in your rebuttal report.
13:38:41 A I don't believe so, no.
13:38:42 Q Okay. Dr. Venters, you're not a board-certified psychiatrist, true?
13:38:49 A True.
13:38:50 Q Is it fair to say you've never personally practiced clinical psychiatry or prescribed or managed psychiatric medications for patients as their treating psychiatrist at any point in your career?
13:39:04 A True.
13:39:05 Q Since leaving direct correctional health practice in New York City, your work has been almost entirely administrative, advocacy, monetary or expert witness work rather than direct patient care. Do you agree?
13:39:23 A Yes.
13:39:24 Q Would you also agree with me, Dr. Venters, that decisions about which specific antipsychotic medication to offer and when to schedule a psychiatric follow-up are clinical judgment calls best left to a treating psychiatrist based on his or her real-time assessment of

13:39:43 a particular patient?
13:39:44 A I would agree with the first part of that, which is that the -- so, for instance, choosing which antipsychotic medication or whether or not to add a second or third agent I think is very much a matter of clinical decisionmaking. I disagree strongly, though, with the second part of that statement.

13:40:06 In jails when we initiate a patient or we try to initiate a patient with a form of treatment, we have to have a very close follow-up. It cannot be left to the decision of an individual provider. It's very standard when a patient comes in the front door, that if it's an urgent situation where they're uncontrolled, we see them in 24 hours. If they are refusing medications, we see them again or we elevate them to a higher standard of care.

13:40:38 So I do not agree that the individual -- and this is very much a matter of jail policies in mental health and in physical health -- that it's not individual providers that are deciding when a poorly controlled patient can be seen again. That should be part of the correctional health service.

13:40:57 Q Okay. So when it comes to a psychiatric assessment upon admission to a jail, would the particular treating psychiatrist be deferring to other

treaters within the facility in your experience?

A Well, I don't know -- if the psychiatrist is seeing the patient for the initial assessment, then they have to, you know, obviously conduct an adequate assessment. But if they're unable to complete the assessment or do it adequately, then the patients would be transferred to a higher level of assessment and care.

Q Okay. In your experience, Dr. Venters, who, typically, in a jail setting would be involved in the psychiatric decisionmaking of a particular patient or inmate?

A Well, when a patient comes in the front door, generally the first person they're going to see after a custody staff is a nurse, who does a receiving screening, just as what happened with Mr. Rupard.

So let's say they document psychosis or very out-of-control behavior and history of psychosis, then the next person who sees that patient could either be a mental health worker, social worker, or -- Master's level, or a psychiatrist. But they need to urgently be seen by a psychiatrist if there is a concern about them needing medication, because the social workers, the mental health staff generally can't prescribe. So the first person to see them and do the psychiatric assessment and prescribe medications would be a

13:45:26 psychiatrist at San Diego Central Jail responsible for a large inmate population?

13:45:31 A I recall his testimony was that he didn't know if somebody else could see the patient. So it was a little -- I saw -- there were questions about who else could have seen him. And as I recall and I think I put into my initial report, his testimony was he didn't know -- because he wasn't able to see the patient the first couple times he sought to, he didn't know if there was somebody else who could have seen the patient. So that -- I don't -- I similarly don't know if there was somebody else who could have seen him.

13:46:01 Q Understood. Do you have any knowledge of the specific staffing levels or resources that San Diego County actually provided to Dr. Cruz to do his job?

13:46:11 A As regards -- the only mention of staffing with Dr. Cruz that I believe I've commented on or that I'm aware of has to do with his impression that the mental health workers would be seeing Mr. Rupard in between visits, but that that was not occurring or wasn't the case. So besides that, I don't recall, as I sit here today, other specific information I'm aware of about the staffing that was available to him.

13:46:45 Q Do you have any opinion in this case, Dr. Venters, that Dr. Cruz was provided adequate or

13:46:53 inadequate staffing from the jail?
13:46:55 A I just don't know. I haven't reviewed enough information to make an opinion about -- I'm clear about the opinions I have about the inadequacy of Mr. Rupard's care. I don't necessarily know the why, the underlying reason behind every one of those failures.
13:47:15 Q You'd agree that Dr. Cruz does not personally control whether jail staff brings an inmate to a confidential setting for a psychiatric encounter, true?
13:47:27 A Yes, all you can do is ask.
13:47:29 Q Okay. You have no evidence that Dr. Cruz had unilateral and exclusive authority to transfer Mr. Rupard to an outside psychiatric facility without signoff from jail administration, correct?
13:47:50 A I -- my understanding of the testimony of the Liberty psychiatrist is that there was a process for transferring a patient to a higher level of care, but I don't -- I'm not sure I know exactly what Dr. Cruz's practice was or how he triggered that.
13:48:10 Q Do you have an opinion one way or the other, Doctor, based on your knowledge, training, and experience in this particular field, whether or not that decision is something that is exclusively with the psychiatrist or with the jail or a combination of other people or entities?

A My understanding in this case is that there was a mental health unit that Dr. Cruz could have initiated some sort of transfer to, and -- but I don't know, for instance, if that also was equally true for him to trigger a transfer to a hospital on the outside. So I didn't see any documentation that he contemplated that type of move, but my understanding is it was possible for the psychiatrist to take some action to get somebody to a higher level of assessments and care.

Q Do you know whether or not that would have been a collaborative process?

A My understanding is it would have involved more than him. He physically wouldn't be taking Mr. Rupard out of his cell, so he would have been triggering some sort of transfer. For the in-jail mental health unit, there would have been a psychiatrist there who then saw Mr. Rupard once he got there. I think there were nurses there that would have seen him, so it would have been multiple staff involved in that.

Q Does that include jail staff?

A Do you mean custody staff?

Q Yeah, any personnel from the jail.

A Yes, it would have involved the jail site, the people, the psychiatrists, maybe mental health workers, nurses working in the jail, as well as custody staff who

13:49:53 would have been responsible for the physical transfer.

13:49:56 Q Do you agree, Dr. Venters, that the decision about whether nursing staff or counselors performing rounds on Mr. Rupard in between his psychiatric visits was not within Dr. Cruz's control?

13:50:11 A In the -- yes, in the administrative segregation unit, yes. As I just mentioned earlier, the caveat is had he transferred or triggered a transfer to the mental health unit, my understanding is there would have been an automatic nursing assessment that happened as a result of that. But in the administrative segregation status, I agree that he didn't -- based on what I've seen, he didn't have any role in the policies or practices of the segregation rounds.

13:50:46 Q And during both of Dr. Cruz's encounters with Mr. Rupard, Dr. Cruz documented his own concern that Mr. Rupard could decompensate, meaning he flagged the risk himself. Is that your understanding of the evidence?

13:51:05 A My understanding, as I recall writing it in my report, that he documented a concern for decompensation. My only qualification is that as I'm sitting here, I don't recall if that was in both notes or one note, but I certainly have put in both reports that part of his concern.

Q And you have no basis to say that Dr. Cruz individually caused or created the jail's lack of a peer-review process, correct?
A Correct.
Q And you likewise have no basis to say that Dr. Cruz individually was responsible for the County's failure to conduct a clinical mortality review after Mr. Rupard's death, correct?
A Correct.
Q Dr. Venters, you're not licensed to practice medicine in California, true?
A True.
Q Have you ever worked as a treating psychiatrist or in any other clinical role inside of a California County jail?
A Not as a treating provider. I am appointed by federal courts, as I mentioned earlier, as the health monitor in California and have been appointed by a federal judge as a health investigator in a prison.
Q Okay. And on that point, are you familiar with the California statute called the Lanterman Petris Short Act, or LPS?
A Not as a -- I've heard of it, but I'm not familiar. I haven't individually used it or relied on it, and so I'm not sure I'm familiar with the criteria

13:52:43 of it.
13:52:44 Q Okay. Is it fair to say, then, that you've
13:52:48 never personally initiated a 5150 hold on a patient
13:52:52 under California law?
13:52:53 A That is true.
13:52:54 Q And you've likewise never personally initiated
13:52:58 a 5250 hold on any patient under California law, true?
13:53:01 A True.
13:53:01 Q And given your experience as a monitor of
13:53:09 correctional facilities, I think in Santa Barbara, is
13:53:13 that where you have court-monitored appointment
13:53:17 services, Doctor?
13:53:18 A Yes.
13:53:18 Q Okay. Do you have any familiarity with the
13:53:23 5150, 5250, and Riese hold procedures under California
13:53:30 law?
13:53:30 A That's not part of the monitoring I've been
13:53:34 asked to do, so it's not -- I would say I'm not familiar
13:53:39 with the specifics of those guidelines.
13:53:41 Q Okay. Fair to say that you wouldn't know,
13:53:44 then, or have any knowledge about what California law
13:53:46 requires before a patient can be certified for a 5250
13:53:52 hold, true?
13:53:53 A That's correct.
13:53:56 Q Likewise, would it be true with respect to 5150

13:54:01 holds, true?
13:54:02 A Yes, that's true.
13:54:03 Q Okay. Do you know how a Riese petition and
13:54:22 order takes place?
13:54:25 A No.
13:54:25 Q Isn't it true, Dr. Venters, that the findings
13:54:35 section of your report and those opinions contained
13:54:38 within your rebuttal report do not rely in any way upon
13:54:42 the Lanterman Petris Short Act, the 5150 and 5250
13:54:47 statutory system, the Riese order, or any other
13:54:51 California-specific statute; is that true?
13:54:55 MR. IREDALE: Objection to the compound form of
13:54:57 the question.
13:54:57 You may respond, Doctor.
13:55:00 THE WITNESS: I don't believe I've cited to any
13:55:04 California legal standards, including the ones you just
13:55:08 mentioned in my reports.
BY MR. MURPHY:
13:55:12 Q Understood. Would you agree with me,
13:55:15 Dr. Venters, that any criticisms of Dr. Cruz in this
13:55:19 case are not grounded in the legal framework established
13:55:23 under California law for what he could and could not do
13:55:26 for Mr. Rupard?
13:55:28 MR. IREDALE: I would object. It calls for
13:55:31 opinion and conclusion as to other states of mind, other

13:55:36 expert reports, and other contentions that may be made at trial, so object to the form of the question.

13:55:43 THE WITNESS: I agree that my criticisms are based on correctional standards of care, not any California laws that I've reviewed or attempted to interpret.

BY MR. MURPHY:

13:55:58 Q Do you have any experience or practice under any statute analogous to the LPS in California in any other state? And if so, at what point in your career and in what context?

13:56:15 A Well, if the LPS system -- I don't -- as the leader of a correctional health service, a large correctional health service, including all the aspects of mental health service, I am familiar with the process of restoration of patients, forensic restoration of patients, both either in a jail setting or in an outside psychiatric hospital. So I'm familiar with those, but I'm familiar with those processes not as a lawyer or legal expert, but as somebody who led a jail health service to try and determine how best to provide care for those patients.

13:56:58 Q Understood, Doctor. Are you familiar with any sort of legal framework in any state in which you have experience that pertains to involuntary holds and

14:04:16 medications or there was a use of force with a patient.
14:04:20 Those were situations where the problem had to be
14:04:22 escalated. The staff had to be trained and know when
14:04:26 they encounter this problem, they need to get
14:04:26 supervisors involved.

14:04:28 Q And likewise in this case, Dr. Venters, do you
14:04:30 agree that Dr. Cruz had decisionmaking that was
14:04:36 exclusively within his control as a qualified
14:04:39 psychiatrist obligated to treat Mr. Rupard?

14:04:43 A I don't know. I agree that he was there as a
14:04:49 psychiatrist. I think that when you're part of a big
14:04:52 team in a correctional health service, you also have a
14:04:55 responsibility to let people know and trigger this
14:04:59 higher level review of cases when there's a problem.

14:05:03 So when care is kind of moving along at an
14:05:06 expected pace and the patients are doing well, then you
14:05:09 can -- you know, the individual providers can do what
14:05:12 they've planned. But if they're not able to do the
14:05:14 things they need to do, then aside from their clinical
14:05:18 domain or their clinical training, they should be -- and
14:05:22 they should be trained to be and oversight should also
14:05:26 ensure that they notify their superiors or their team
14:05:31 members.

14:05:32 Q In the context of a correctional facility, who
14:05:37 was responsible for issuing directives to psychiatry to

14:05:41 place psychotic patients into a higher level of care?

14:05:45 A I don't know if there's -- my experience is there's not necessarily one person. So if a patient is in a cell, they're locked in a cell, and they're psychotic and they're not taking medications, they need a higher level of care, then my experience is that involves the people who are aware of that problem, the psychiatrist and maybe the mental health staff talking in a case conference with their mental health team and figuring out how to get the person to a higher level of care.

14:06:16 I think that's, you know, what had happened a couple of times for Mr. Rupard previously, but it has to start with the team members who see the patient recognizing that they can't get their work done or it's not going the way they planned and then calling in help.

14:06:33 Q So would you agree with me as a corollary, then, Dr. Venters, that that decision would not have been exclusively Dr. Cruz's in the case of Mr. Rupard?

14:06:44 A I agree with that.

14:06:46 Q Okay. Who else, in your view, could have and should have been involved in that sort of decision if it is your opinion in this case that Mr. Rupard should have been directed to a higher level of care?

14:07:00 A Well, I think that the supervisors for

14:07:07 Dr. Cruz, the team -- the other team members that would have seen Mr. Rupard, usually that involves somebody who is a supervisor of the psychiatrists. It can also involve somebody who has the title mental health director, who may not be a psychiatrist but maybe someone who runs the mental health service that includes the Master's levels social workers.

14:07:34 The pathway to get a patient to a higher level of care would also be different if he was going to a hospital versus to an in-jail unit, which may be simpler. It may involve calling a psychiatrist, who is, you know, admitting patients or seeing them over in the jail mental health unit.

14:07:55 Q Okay. And does that -- strike that.

14:08:02 Whether or not a patient or inmate is placed in a higher level of care, does that require the flow of information from the jail to the psychiatric treatment team?

14:08:18 MR. IREDALE: Objection to the vague nature of the question.

14:08:20 If you understand, you may answer.

BY MR. MURPHY:

14:08:24 Q I can ask a better one, Doctor. Would you agree with me that the condition of the inmate is material to the decision to direct an inmate to a higher

14:17:19 they're in compliance with NCCHC, I don't know, JG02 or 3 or something, so the County has cited those. So my -- the versions that I have referred to in this report I believe are from jail standards for 2018, because then the next most recent updates, as I said, were the end of 2025.

14:17:41 Q Okay. You also -- your report also makes some citations to the ACA, correct?

14:17:52 A Yes.

14:17:52 Q Okay. And what edition of the ACA are you using to help form your opinions with regards to this matter?

14:18:04 A I think I only mention it a couple places, but it's -- the 2020 is the only version I believe I've cited or have -- I think the only one I have access to, actually.

14:18:16 Q Okay. And in the course of your work and forming your opinions on this matter, did you refer to what's known in California as Title 15?

14:18:30 A I don't recall. I would need to do a search to see if either it's quoted or included anywhere in the report. I just don't recall as I sit here today.

14:18:46 Q If you could take a look, that would be great.

14:18:48 A It looks like between the two reports, the only mention I can find is when I'm talking about -- I'm

14:19:25 rebutting a point of Dr. Abrams, but I'm saying that the County's own policies, as we were kind of just discussing, mention specific standards that they're in compliance with. And in that respect, I say that the County policies mention both NCCHC and also some Title 15 standards, but I think that's the only thing I see regarding Title 15.

14:19:50 Q Okay. And I believe you already testified to this earlier; I just want to make sure. You're not -- in the course of your work and offering your opinions in this matter, you are not offering any type of legal opinion about any County act or individual being deliberately indifferent, correct?

14:20:16 A That's correct, certainty no legal opinion of any kind is being -- I'm not offering any legal opinion of any kind.

14:20:23 Q Okay. And in the -- you're not offering any opinion that any specific written County policy or training curriculum is facially inadequate unless you personally reviewed that document, correct?

14:20:58 A I think in my reports I've identified multiple processes that I find to be -- you know, reflect systemic problems. I'm not sure there's a specific policy that I've reviewed where I have a critique of that policy and named that policy, so I agree with that.

14:21:18 Q Okay. Did you review any of the training curriculum?
14:21:22 A I don't -- not that I recollect, not that I can recall as I sit here.
14:21:29 Q Okay. And are there any other opinions that you hold in this matter that we have not discussed today or that you plan on offering at trial?
14:21:47 A Absent what's in my two reports or what we've talked about today, there's no opinions that I plan to offer at trial -- or I should say, no other opinions that I plan to offer as I sit here today.
14:22:03 Q Okay. And are you planning on doing any additional work, other than possibly testifying at trial in this matter?
14:22:13 A No, I don't have any planned.
14:22:21 MR. KAHN: Okay. I have no further questions.
14:22:25 MR. IREDALE: All right. May I just inquire, Mr. Kahn, I think you have marked two documents as exhibits, so the next one would be 3?
14:22:36 MR. KAHN: I've identified, I believe, 4.
14:22:39 MR. IREDALE: 4. So the next exhibit number would be 5?
14:22:42 MR. KAHN: That's my understanding.
14:22:43 MR. IREDALE: Okay. Then let me ask that we display one of the policies and procedures that were

14:22:54 referred to in some earlier questioning that of G.2.1,
14:23:02 which will be Exhibit 5. Would you display that,
14:23:09 please?

(Deposition Exhibit 5 was marked for
identification by the court reporter.)

EXAMINATION

14:23:10 BY MR. IREDALE:
14:23:10 Q This is a policy and procedure of the Medical
14:23:17 Services Division. At the top it says "Segregate
14:23:22 Inmates." The date is given as 1/05/2022. The number
14:23:28 is G.2.1. And I believe Mr. Kahn discussed this with
14:23:35 you earlier; am I correct in that?
14:23:38 A Yes.
14:23:40 Q And I needed also to ask some specific
14:23:47 questions about this policy and procedure. So it was in
14:23:52 effect at the time of Mr. Rupard's death?
14:23:55 A It looks -- this policy says date, January 5th,
14:24:08 2022, and I think in my report, I cite a version that
14:24:13 was in effect from October 2020. But, yes, this one
14:24:21 is -- has -- I see the date there from January 5th,
14:24:25 2022.
14:24:25 Q Yes. And I think it might be the same
14:24:27 language, but in any event, I am displaying this. The
14:24:33 date of death, you understand, of Mr. Rupard, was
14:24:37 St. Patrick's Day, March 17th of 2022?

14:38:14 MR. MURPHY: I'll pass for now.

14:38:16 THE VIDEOGRAPHER: We are going off the record.
14:38:17 The time is 2:38 p.m. This concludes today's testimony.

(Deposition concluded at 2:38 p.m.)

DEPONENT'S DECLARATION UNDER PENALTY OF PERJURY

I, HOMER VENTERS, M.D., hereby declare under penalty of perjury under the laws of the State of California that I have read the foregoing deposition transcript. Corrections, additions, and/or changes, if any, were noted in ink, and the same is now a full, true, and correct transcript of my testimony.

Executed this _______ day of _________________, 20____, at ______________________________, California.

______________________

HOMER VENTERS, M.D.

CORRECTION CERTIFICATE

I, HOMER VENTERS, M.D., do hereby certify that I have read the foregoing statement and that, to the best of my knowledge, said statement is true and accurate (with the exception of the following changes listed below):

| PAGE | LINE | CHANGE TESTIMONY TO READ AS FOLLOWS: |
|---|---|---|
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |

______________________________________

HOMER VENTERS, M.D.

C E R T I F I C A T E

I, STEPHANIE M. CHERNESS, CSR, do certify:

That I am a disinterested person herein;

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth;

That thereafter the deposition was taken down by me in shorthand at the time and place therein named and thereafter transcribed under my direction and supervision;

That the foregoing deposition is a true and correct transcription of my shorthand notes so taken.

I further certify that I am neither counsel for nor related to any party to said action, nor in anywise interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my hand on September 18, 2026.

StephCherness
______________________________

STEPHANIE CHERNESS, CSR No. 13775

# EXHIBIT "C"

# Rebuttal Report Regarding Care for Lonnie Rupard in the San Diego County Jail

## Introduction

I am a correctional health expert and Court-appointed monitor/investigator of health services in jail and prison settings. I have been retained by the Estate of Mr. Rupard to assess the adequacy of care he received in the San Diego Jail leading up to his death in 2022. I submitted an initial report regarding the care he received, which included the following three findings;

1. The San Diego Jail and their health staff failed to provide basic mental health care to Mr. Rupard.
2. The San Diego Jail and their health staff failed to provide basic medical care, including injury assessment/care and segregation rounds.
3. The San Diego Jail failed to conduct a clinical mortality review after Mr. Rupard's death.

I have reviewed the following reports submitted by the Defendant's and provide rebuttal below in areas of these reports that relate to my original findings:

- Kathryn Wild, RN
- Mace Beckson, MD
- Kristina Tyler, PhD
- John Hiserodt, MD, PhD
- Alan Abrams, MD
- Rudolph Bedford, MD

I have also provided specific citations below to any additional information that I relied on in writing this rebuttal report.

Dr. Abrams appears to have provided care as a prison psychiatrist between 1997 and 2003 and has subsequently worked in community psychiatry and law since that time. I do not see any evidence in his CV that he has ever worked as a physician in a jail or has even been appointed as a Director of Mental Health, Psychiatry or other health leader in a jail. It appears he has never been appointed by any Court or State as a monitor to assess or monitor any standard of care in a jail or prison setting.

None of the other physicians who submitted expert reports from the defendants appear to have any experience providing care or conducting oversight of the adequacy of care in correctional settings. There does not appear to be any physician among the defense experts who has ever worked as a physician in a jail or has been appointed by any Court or State as a monitor to assess any standard of care in a jail or prison setting.

The psychologist, Dr. Tyler, similarly appears to lack any experience in providing mental health care in a jail or prison setting. Nurse Wild has experience as a correctional health nurse and Director of Nursing. I do not see any experience listed by Ms. Wild being appointed by any Court or State as a monitor to assess any standard of care in a jail or prison setting.

Below, I have provided review of the defense reports as they relate to the three opinions detailed in my original report. Finding #1: The San Diego Jail and their health staff failed to provide basic mental health care to Mr. Rupard. This finding from my original report included the following specific failures of the jail's mental health care provided to Mr. Rupard;

- Failure to conduct a psychiatric assessment for Mr. Rupard for 10 days despite documented history of serious mental illness and current documentation of "combative, assaultive or extremely hostile" behavior and "psychotic disorders" when he arrived in jail.
- Failure to review (and for San Diego County and Liberty Health care have a system that ensures review) of prior psychiatric care/involuntary medication from prior incarcerations of Mr. Rupard.
- Reliance on nonconfidential cell-side encounters for psychiatric and mental health encounters.
- Failure to transfer Mr. Rupard for a higher level of assessment and care despite ongoing lack of cooperation in care or taking medications, incoherent rambling, verbal aggression and "potential for decompensation" while locked in a cell.
- Lack of coordination between behavioral health and psychiatric staff.
- Failure of mental health staff to respond to disciplinary actions by security staff with information about Mr. Rupard's serious mental illness.
- Failure to follow basic standard of care regarding medication and care refusals.
- Several of these failures clearly represented systemic problems with how health services were provided at the time Mr. Rupard was incarcerated in the jail, including the following;
    - Failure of San Diego County and Liberty Healthcare to develop a system that detects missed initial psychiatric encounters and ensures a timely patient assessment.
    - Failure of San Diego County and Liberty Healthcare to develop a system that triggers review of prior psychiatric care and involuntary medication orders from prior incarcerations.
    - Failure of San Diego County to independently oversee the adequacy of care provided by Liberty Healthcare psychiatrists.

My opinions in this finding that San Diego Jail failures to provide mental health care to Mr. Rupard represented gross breaches of the correctional standard of care were supported by policies and guidelines of the National Commission of Correctional Health Care and cited

throughout my initial report. These opinions are also supported by my own experience as a physician who has worked in jail settings, conducted hundreds of encounters with patients in segregation status, who has led peer reviewed analysis and quality assurance reviews of the physical health risks of solitary confinement/isolation/segregation and who has been appointed by multiple courts to monitor and work to improve health services in jail and prison settings based on correctional standards of care. Multiple defense reports offered opinions about the adequacy of the mental health care received by Mr. Rupard, and I have categorized my review of these reports into care provided by Dr. Cruz, care provided by mental health/QMHP staff and review of the evidence for systemic versus individual failures.

Nurse Wild does not appear to offer opinions regarding the care provided by Dr. Cruz.

Dr. Beckson's report identifies several failures in the care provided by Dr. Cruz to Mr. Rupard including the following;

- Dr. Cruz failed to provide appropriately close follow-up and treatment for this severely ill medication-refusing patient.
- Dr. Cruz discontinued Mr. Rupard's medication orders in response to the latter's medication refusals, despite Mr. Rupard's serious mental illness and need for psychiatric treatment, and without maintaining close follow-up.
- Mr. Rupard was incarcerated in jail without medication or psychiatric treatment for three months.
- Dr. Cruz failed to place Mr. Rupard on a W.I.C. 5150 72- hour hold as gravely disabled due to his mental disorder.
- Dr. Cruz failed to admit Mr. Rupard to the San Diego County Jail's Psychiatric Stabilization Unit (PSU), an LPS-designated psychiatric inpatient unit in which Mr. Rupard could have been involuntarily hospitalized, where he could have received inpatient psychiatric care and involuntary medication administration if necessary.

Dr. Beckson offers the opinion that "While not the sole cause, Dr. Cruz's failure to meet the standard of care substantially contributed to Mr. Rupard's demise."

In discussing Mr. Rupard's physical decline without complaint or even without being noticed as he was kept in a locked cell, Dr. Beckson describes the following;

> "It is my opinion that Mr. Rupard's severe psychosis was the basis for this phenomenon. Specifically, Mr. Rupard, due to his delusional state (i.e., being divorced from reality) and his severely disorganized thinking, did not experience, interpret, and/or respond appropriately to his medical/physical problems, as would a rational, non-psychotic jail inmate. He lacked the mental capacity to appreciate his medical problems and access the medical resources that were available. Without hearing a complaint, a communication of physical distress or request for help, and without Mr. Rupard manifesting objective

> evidence of physical distress, the various observers of Mr. Rupard would assume that there was no medical problem."

I agree with the basic opinion of Dr. Beckson that Mr. Rupard did not receive the standard of care from Dr. Cruz. However, as I make clear in my initial report and below, these failures reflect more than individual errors by Dr. Cruz and are the product of the systemic problems with the care and oversight of the San Diego Jail.

Dr. Tyler's report primarily addresses the adequacy of care provided by Ms. Goodall.

John Hiserodt, MD, PhD. Dr. Hiserodt is a pathologist who does not appear to offer any opinions that bear on this area of my original report.

Dr. Abrams' report largely focuses on asserting that Dr. Cruz provided adequate care to Mr. Rupard. Before rebutting his specific claims, it is important to note that Dr. Abrams appears to lack any experience or expertise in assessing or implementing correctional standards of care in a jail setting. Aside from his brief time working in a prison, which ended 23 years ago, I see no other role as a provider, leader or Court monitor of any correctional facility. This gap in his expertise is significant because the last of the "Additional Opinions" listed in Dr. Abrams' report is the following;

"Standards for NCCHC accreditation are not the standards of care in correctional psychiatry. Meeting the NCCHC standards shows performance well above the standards of care in correctional psychiatry."

This statement by Dr. Abrams is completely undercut with review of the actual policies of the San Diego Sheriff's Department. Many of the County's own policies state that they are "In Compliance With" a specific NCCHC policy, with or without additional standards of California Title 15 or other standards. (see below).

| **SAN DIEGO COUNTY SHERIFF'S DEPARTMENT<br>MEDICAL SERVICES DIVISION** | | **Operations Manual** | |
|---|---|---|---|
| SUBJECT: | SEGREGATED INMATES | DATE: | 10/30/2020 |
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | G.2.1 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 1 |
| RELATED SECTIONS: | DSB J.3 | | |
| IN COMPLIANCE WITH: | NCCHC J-G-02 | | |

| **SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION** | | Operations Manual | |
|---|---|---|---|
| SUBJECT: | EMERGENCY PSYCHOTROPIC MEDICATION | DATE: | 1/25/2022 |
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | G.3.1 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 1 |
| RELATED SECTIONS: | MSD G.3.2 | | |
| IN COMPLIANCE WITH: | NCCHC J-G-03 | | |

| **SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION** | | Operations Manual | |
|---|---|---|---|
| SUBJECT: | PHYSICIAN'S ORDERS | DATE: | 2/3/2020 |
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | A.3.2 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 1 |
| RELATED SECTIONS: | MSDA.3.1 | | |
| IN COMPLIANCE WITH: | CCR, Title 15, Section 1216; NCCHC J-A-03 | | |

In his report, Dr. Abrams simply ignores the County's own reliance on the NCHCC as an important source of their own correctional standards of care. Dr. Abrams' report does include a 6-page list of references, but there is no actual citation, footnote or endnote in his report to indicate which of his specific opinions, if any, is supported by a specific publication. Furthermore, I have reviewed the publications he lists as "References" and cannot find a single manuscript that deals with correctional standards of care. Similarly, the publications that Dr. Abrams lists as his own stop at 2010 and lack any publication that demonstrated familiarity or expertise in correctional standards of care.

One specific opinion that Dr. Abrams offers about the care provided to Mr. Rupard by Dr. Cruz is that the encounters on 12/29/21 and 2/22/22 were "well within the standard of care for correctional psychiatry." As I have detailed above, it does not appear that Dr. Abrams has ever worked in a jail or been asked to take a role by a jail or Court in determining what the correctional standard of care is. In my original report, I offered specific citations that support my opinions that these encounters were deficient. The NCCHC's Suicide Prevention Guidelines clearly detail the dangers of reliance on nonconfidential encounters when assessing patient's for their risk factors; "Ensure reasonable privacy and confidentiality during the screening and assessment processes. Experience has demonstrated that it is not unusual for an otherwise suicidal inmate to deny suicidal ideation when questioned in a physical environment that lacks privacy and confidentiality."[1] This same guideline states that "Effective suicide risk assessment requires that the assessment be conducted in a private and confidential setting, not cell-front."

[1] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ncchc.org/wp-content/uploads/Suicide_Prevention_Resource_Guide.pdf.

Mr. Rupard was not suicidal but he was rambling incoherently and neither Dr. Cruz nor other health staff were ever able to complete their assessments with him. There is no documentation that Dr. Cruz even made an effort to see Mr. Rupard in a confidential setting. The NCCHC jail standards clearly direct health services to keep their exchanges of health information with patients private.[2] I have similarly cited NCCHC Standards in my opinion about the need for Mr. Rupard to be assessed in a higher level of care when Dr. Cruz was unable to complete key parts of his assessment of Mr. Rupard and the need for review of Mr. Rupard's prior hospitalization and outpatient records.[3]

Dr. Abrams includes an opinion in his report that Mr. Rupard's death was unrelated to his untreated mental illness, "I do not see any evidence that Mr. Rupard's mental illnesses in December 2021, January 2022 or February 2022, had any relationship to his death from medical causes in March 2022." This opinion demonstrates an extreme lack of understanding of how preventable deaths occur in a jail setting. As in the community, patients with serious mental illness arrive in jail with high burdens of physical health problems. Unlike community settings, however, jails may lock these patients into an isolation cell where their physical health can deteriorate to the point of death. This practice of placing a patient with untreated serious mental illness in an isolation cell creates a risk of death that directly ties untreated psychiatric illness to the outcome of death from medical problems, including infection, untreated chronic illness and even malnutrition and starvation. For Mr. Rupard, it is clear that he was locked in a cell for 89 days, that he was never treated with any psychiatric medication or transferred to a higher level of care (unlike prior incarcerations in the same jail) and that when the door of his cell was finally opened on the day of his medical emergency, he had lost alarming amount of weight and was close to death from starvation, dehydration and pneumonia. In 2025, the New Yorker published a review of this problem, starvation deaths in county jails, that detailed the intimate connection between death from a physical health decline and untreated mental illness.[4] In my career leading a jail health service, and, acting as a Court appointed monitor and investigating jail standards of care on behalf of the U.S. Department of Justice, I have encountered multiple deaths that fall into this category, of patients who die from an undetected physical health problem while locked in a cell with untreated psychiatric illness. The dangers of isolation/confinement leading to morbidity and mortality among patients with serious mental illness led us to eliminate this practice in the NYC jail system in 2014 and create therapeutic alternatives that included regular nursing and medical assessment of patients.[5]

Several of Dr. Abrams' opinions about the conduct or care provided by Dr. Cruz appear to be red herrings for Dr. Cruz' fundamental failure to conduct an adequate psychiatric assessment and transfer Mr. Rupard to a higher level of care. For example, Dr. Abrams' opinions #19, #20, #28

---

[2] NCCHC Privacy of Care J.A.07 Health Services in Jails, 2018.
[3] NCCHC Mental Health Screening and Evaluation. J.E.05. Health Services in Jails, 2018.
[4] https://www.newyorker.com/magazine/2025/04/21/starved-in-jail.
[5] https://pubmed.ncbi.nlm.nih.gov/26848667/.

deal with the lack of any law to require weighing or taking vital signs of a patient and the lack of hunger strike request for Mr. Rupard. I do not offer any legal opinions, but the central failure in Mr. Rupard's care from Dr. Cruz was that Dr. Cruz never completed his full psychiatric assessment in a confidential manner and never transferred Mr. Rupard to a setting where this could occur. These were part of numerous individual and systemic failures that contributed to Mr. Rupard's preventable death, which I detailed in my initial report.

Dr. Abrams' report includes the following statement, "There is no evidence that Mr. Rupard had any mental health deterioration until the examination by Dr. Badre on March 14, 2022. At this point, Mr. Rupard was already medically ill." This statement is contradicted by Mr. Rupard's medical records which clearly show the following documented observations from nursing staff on his first day of detention;

- Combative, assaultive or extremely hostile behavior
- Chronic conditions, psychotic disorders

The only way to construe that Mr. Rupard's mental health did not deteriorate during his months locked in a cell of the San Diego jail is to acknowledge that he arrived in a state of psychosis and simply remained in that untreated, uncontrolled state. This appears to be what occurred, and represents multiple serious failures in Mr. Rupard's care.

Rudolph Bedford, MD. Dr. Bedford is a gastroenterologist and does not appear to offer any opinions on this area of my original report.

As I detailed in my original report, I believe that the care provided by Dr. Cruz and the mental health service was substandard because he documented on 12/29/21 that Mr. Rupard may decompensate but never completed his full assessments of Mr. Rupard and never conduced any assessment of him in a confidential setting. This inability to actually complete his assigned work should have prompted him to transfer Mr. Rupard to a setting where this could occur, either inside the jail's mental health units or at an outside facility. This error was continued or repeated after Dr. Cruz' encounter on 2/22/22 with Mr. Rupard. Simply looking at a patient through a locked door, especially when that patient is not able or willing to complete a basic interview, is a grossly deficient approach to assessment by a physician. This weakness is also highlighted in my original report and as detailed by the NCCHC.

In his report, Dr, Abrams acknowledges that a nurse recorded Mr. Rupard's weight as 165 lbs. when he arrived on 12/1921, but then attempts to cast doubt on the weight measurement with the following statements;

> "…there is no note about how this measure was made"
>
> "…what did Mr. Rupard actually weigh when he was booked into SDCJ in December 2021- *it appears that his weight was by report not by measurement and at present I do not believe it is possible to know exactly what Mr. Rupard weighed up until his autopsy. However the booking photo suggests he weighed less than 165 lbs.*;"

A similar statement is presented in the report of Dr. Hiserodt about the appearance of Mr. Rupard in his booking photo, offering a theory that Mr. Rupard's weight was less than what was recorded. In his deposition testimony (p 153), Detective Blumenshine offers a theory that nursing staff may simply record the same weight from a prior intake when a person arrives in jail without actually taking their weight, but if this were the case with Mr. Rupard, his weight would have been listed as 190 lbs., which was the weight recorded in his prior 1/8/19 intake. The other defense experts, including Nurse Wild and Dr. Bedford, along with the County's Deputy Medical Examiner, Dr. Schaber, do not offer any opinions that the weight of 165 lbs. for Mr. Rupard on 12/19/21 was not accurate. I have not seen any information that would cause me to believe the Nurse who took Mr. Rupard's vital signs did so incorrectly or inaccurately.

Finding #2. Failure to provide basic medical care, including injury assessment/care and segregation rounds. This finding from my original report included the following specific failures:

- Failure to address Mr. Rupard's tachycardia and altered mental status on 12/19/21.
- Failure to adequately assess Mr. Rupard for injuries on 1/29/22.
- Lack of nursing and mental health rounds in administrative segregation as required by the standard of care in correctional health care and San Diego's own jail policies.

The only report that appears to address the areas of care involved in the first two of these failures is the report from Nurse Wild. Nurse Wild's report lists the encounter between RN Ng and Mr. Rupard at 11:36 pm on 12/19/21 where his pulse was 110 and his level of orientation was diminished, but in her review of the initial nursing encounters, Nurse Wild simply states that Mr. Rupard received the standard of care. This is untrue because when a nurse documents abnormal vital signs, including tachycardia and diminished level of orientation, they must take action to ensure an immediate medical assessment. Even Nurse Wild's review of the intake process makes the statement that nurses cannot make their own independent diagnosis and treatment plan. I agree with this position, but it is precisely because of this scope of service that nurses must take action to trigger immediate medical assessment/care when a patient has diminished orientation and tachycardia. A mental health referral is not a response to this combination of abnormal signs because jail admission often involves potentially fatal medical emergencies that must be assessed. Nurse Wild does not even mention these abnormal signs in her review of the receiving screening process and this undercuts her claim that the nursing care Mr. Rupard received in the initial day of his incarceration met the standard of care. I have led large medical and nursing services in a jail setting and been a Court appointed monitor of medical and nursing care in jail and prison settings, and when nursing staff fail to trigger medical assessment of patients with multiple abnormal vital signs, they have failed to provide the standard of care. Based on the information I have reviewed, it is unclear to me whether this failure represented an individual error or a systemic problem since the adequacy of nursing care, including correct use of standardized nursing protocols, is a responsibility of the Chief Medical Officer, the Director of Nursing and individual nursing staff. The need for nursing protocols to trigger referral to higher level assessment and care is also clearly identified in the NCCHC's Standard on Nursing

Assessment Protocols and Procedures; "Nursing assessment protocols are not intended to replace the referral of patients to licensed prescribers for clinical evaluation."[6]

Regarding my original opinion that Mr. Rupard did not receive adequate assessment and care when he was injured during a use of force on 1/29/22, Nurse Wild asserts that Mr. Rupard received adequate care. In my original report, I reviewed this encounter as follows;

> "No vital signs are present and no assessment or plan are present in this encounter and no follow up is present later in the day with either a physician, nurse practitioner, physician assistant or nurse. No assessment of decision making capacity for Mr. Rupard is present in this note. There is no assessment of any type in this note, including any assessment that Mr. Rupard is "cleared" to return to his cell. The list of vital signs and sick calls for Mr. Rupard's medical record lack any entry for the day 1/29/22. The final words of this 3 line note by Nurse Romero are "Assessment terminated for safety".

The failure to obtain vital signs and to have medical staff conduct an assessment for the severity of blows to the head sustained by Mr. Rupard represents a breach in the standard of care because vital signs should be part of any injury assessment and having sustained some blow to the face or head, it was important to determine whether Mr. Rupard had sustained any traumatic brain injury.

I agree with Nurse Wild's statement that "Correctional nurses are not required to place themselves at unreasonable risk of physical harm in order to complete an assessment when an inmate refuses care and threatens violence." But this statement, like her prior statement about nurses not being able to make their own independent diagnosis, sidesteps the specific failure of the nurse. Faced with an injury encounter that cannot be completed, the Nurse was obligated to do something to ensure Mr. Rupard was fully assessed, not simply stop her encounter and leave Mr. Rupard to be locked in a cell without further assessment and care for the injuries she just attempted to assess.

I believe that this substandard care for Mr. Rupard does reflect a mix of individual and systemic failures because basic nursing training should have led RN Romero to trigger a medical assessment when she documented "Unable to further assess…" and "Assessment terminated for safety", but the County should have a basic injury template for assessing patients (including those injured during use of force) that gives clear guidance on cases that require medical assessment including encounters that cannot be completed and those involving potentially serious injury including blows to the head.

In her defense of the nursing care in Mr. Rupard's case, Nurse Wild states in her report that the care for Mr. Rupard should be judged "by asking what information was reasonably available" at the time of each individual encounter. With respect to my opinions about inadequate nursing care when Mr. Rupard had abnormal signs documented by nursing staff on the day of his arrival on 12/19/21 and the aborted/incomplete injury assessment after his use of force on 1/29/22, these criticism are specifically about the lack of action by nurses after they themselves documented

---

[6] NCCHC J-E-08 Standard on Nursing Assessment Protocols and Procedures. Standards for Health Services in Jails. 2018.

abnormal signs and an inability to complete their assigned work. Nurse Wild has completely ignored this evidence in her report and her caution about judging care in hindsight does not apply to my criticisms of actions taken by these nurses based on their own documentation.

The next area of deficiency included the finding from my original report dealt with the failure to conduct regular nursing and mental health rounds as required by the standard of care in correctional health as well as the policies of the San Diego Sheriffs' Department. In order to come to the conclusion that Mr. Rupard was held in administrative segregation and that he required regular rounds from mental health and nursing staff to monitor his health status, I relied on the following sources of information;

1. Medical Records of QMHP Goodall 2/9/21.
2. Nursing note 2/20/21 documents "per dep 5144 pt is on lockdown, no contraindications noted".
3. Deposition of QMHP Goodall who testified that Mr. Rupard was in Ad. Seg.
4. Detective Blumenshire; "Rupard was not classified as ad-seg but was treated as such because of his mental health."
5. Floor evacuation sheet for 7D on 3/18/22 showing people with mental health issues are also in "Ad Seg".
6. Policy definition (Segregated Inmates G.2.1)-those isolated from the general population and who receive services and activities apart from other inmates- regardless of the reason for the segregation.
7. Ms. Quiroz' testimony that she was unsure if mentally ill persons were kept in Ad. Seg on 7D and was unsure if Mr. Rupard's records indicate he was in Ad. Seg. and also unsure if patients with serious mental illness are held on the 7D quarantine unit.

Review of these sources information makes very clear that while Mr. Rupard may not have been labelled as being in administrative segregation in the jail's computer classification system, he was clearly being locked in his cell and confined under the actual conditions of administrative segregation. In fact, this is the conclusion reached by Detective Blumenshire in the third follow-up report regarding Mr. Rupard's death when he concluded "Rupard was not classified as ad-seg but was treated as such because of his mental health". This is a crucial part of understanding Mr. Rupard's death. Losing track of patients with serious mental illness who are moved into punishment settings is a sadly common feature of preventable deaths in jail settings. One feature of these preventable deaths can involve a disconnect between a computer entry about status or location and what really happened to the patient. The health risks of isolation come from the experience of the patient, not the official designation in a computer system. In fact, this point is clearly articulated in San Diego's own policy on segregated inmates which I reviewed in my original report as follows;

> "I have reviewed the San Diego Sheriff's policy titled 'Segregated Inmates', G.2.1, dated 10/30/2020. This policy defines people in segregation status as "those isolated from the general population and who receive services and activities apart from other inmates" regardless of the reason for the segregation. This policy mandates that people in segregation status "shall be monitored three days a week by nursing staff and a minimum of once a week by a qualified mental health provider (QMHP)."

Very much like the report of Detective Blumenshine, the jail's own policy makes clear that the experience of isolation by a patient "regardless of the reason for the segregation" is what determines the need for the rounds that never occurred in Mr. Rupard's case. This distinction between what Mr. Rupard actually experienced and what was entered into the jail's computer system is a crucial weakness or omission in the defense reports I review below.

Nurse Wild bases her opinion that nursing and mental health staff did not fail in their obligations to Mr. Rupard on the following observation: "The evidence reviewed demonstrates that the automated segregation wellness-check process depended upon an inmate first being classified as an administrative segregation inmate. Mr. Rupard was not so classified and therefore was not entered into the workflow that generated scheduled nursing and QMHP wellness checks." This leads her to make the opinion that follows:

"Neither nursing staff nor County QMHPs possessed independent authority to classify inmates for administrative segregation or independently initiate the automated segregation monitoring process. Accordingly, nursing personnel and County QMHPs had no notice that Mr. Rupard should have been included in the administrative segregation wellness-check process."

There are several factual omissions in this opinion of Nurse Wild's. First, the QMHP Goodall testified in her deposition that she knew Mr. Rupard was in administrative segregation. Second, there is evidence in the medical records of Mr. Rupard that he was being held in lockdown and administrative segregation or confinement status.

- On 2/9/22, QMHP Goodall attempts but does not complete a wellness check with Mr. Rupard and documents that he is on the 7D quarantine unit but also documents that he is being held in "Segregation/Confinement".
- On 2/20/22, Nurse Romero documents Mr. Rupard being on "lockdown"

Nurse Wild ignores this evidence in providing her opinion. I agree with Nurse Wild that the nursing and mental health staff did not control the computer classification process, but she has ignored readily available evidence that Mr. Rupard was actually being held in isolation or segregation status. Like Nurse Wild's earlier opinions regarding nursing staff who encounter a problem with their ability to provide care, when these staff came to know (and document) that Mr. Rupard was being held in the conditions of administrative segregation, they were obligated to take action to notify their supervisors to make sure he was seen as needed.

Dr. Tyler's report asserts that Mr. Rupard was not in administrative segregation and consequently, that there was no obligation to conduct nursing and mental health rounds. As with Nurse Wild's report, the sources of information that Dr. Tyler relies on to draw this conclusion are far more limited than what I reviewed and cited in my report. Her conclusion about this part of Mr. Rupard's treatment ignores key information. For example, Dr Tyler mentions the opinion of Detective Blumenshire that Mr. Rupard was not technically in administrative segregation, but omits the extremely relevant opinion contained in the Detective's report that "Rupard's housing block, 7D, was classified as COVID quarantine and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health."

Dr. Tyler also includes several other inaccuracies or significant omissions in her discussion of Mr. Rupard's segregation status. For example, she writes that "Ms. Goodall's own note dated February 9, 2022, Mr. Rupard was not classified as administrative segregation. Ms. Goodall's note actually stated that he was in "quarantine."

Even a cursory review of this medical record shows that Ms. Goodall wrote that she saw Mr. Rupard on "7D Quarantine" and also that the box for housing type clearly was checked as "confinement/segregation"

**Housing Assignment**

☐ Mainline ☐ Mainline Protective Custody ☑ Segregation/Confinement

☐ Psychiatric ☐ Medical

Emotional Response to Incarceration:

IP remains successfully housed in 7D quarantine, has coexisted with his peers with no reported aggression, violence or erratic behaviors. MHC observed IP

This is entirely consistent with the opinion of Detective Blumenshire (that was ignored by Dr Tyler) that Mr. Rupard was being kept in administrative segregation without the actual computer designation. This is also consistent with the testimony of Sergeant Johnson that people were kept in administrative segregation on this unit and that there were multiple ways that a person could be held in isolation, confined to their cell for 23 hours per day. This is another source of information that was ignored by Dr. Tyler.

In addition, it is not evident whether Dr. Tyler even reviewed the Sherriff's policy on Segregation (G.2.1, 10/30/2020). This is the policy that not only mandates the regular nursing/mental health rounds but also clearly states that the condition of isolation/segregation establishes the need to follow the policy not the formal designation of status:

> *Segregated inmates* – are those isolated from the general population and who receive services and activities apart from other inmates. Facilities may refer to such conditions as administrative segregation, protected custody, or disciplinary segregation. For the purpose of this standard, the living and confinement conditions define the segregated status, not the reason an inmate was placed in segregation.

Dr. Tyler's opinion that Mr. Rupard was not being held in segregation ignores this very clear definition in the San Diego Sherrif's own policies.

Dr. Tyler acknowledges that Ms. Goodall testified that she knew Mr. Rupard was in administrative segregation but offers no rational for how her testimony on this question is reconcilable with Dr. Tyler's contrary opinion,

As a practical matter, there is no evidence anywhere in Mr. Rupard's medical records that he was being held in medical quarantine, which is routinely used for a patient in the first week or two of their admission or after exposure to a known or suspected case of a communicable disease.

Both Dr. Tyler and Nurse Wild also appear to ignore the multiple references to "lockdown" in Detective Blumenshine's report on Mr. Rupard.

The failure to conduct regular nursing and mental health for Mr. Rupard appears to involve two systemic failures, both of which go unacknowledged by the defense experts. First, it appears that regular adherence to the basic requirement to conduct these rounds was not in place. Second, it appears that despite clear knowledge by security and health staff that patients were held in administrative segregation status in Housing Module 7D, also used for other purposes, the leadership of the jail ignored this reality and failed to ensure that rounds occurred for patients held in administrative segregation on this specific housing area.

The failure to even conduct scheduled rounds for patients in administrative segregation is detailed the testimony of QMHP Goodall, who was asked whether there was a standard requirement to do so. In my original report, I detailed to following from her deposition testimony;

> When she was asked whether seeing patients in administrative segregation was driven by individual sick call requests or whether there was some plan for regular clinician visits for patients in segregation, Ms. Goodall testified as follows;
>
> "…was there ever any procedure you were taught that with respect to inmates in ad seg they were to be seen on an established, regularized basis?
>
> A.I don't remember that, sir."
>
> When asked to clarify this approach, whether there was ever a time she would see people on a weekly or regular basis or whether it was strictly driven by sick calls, Ms. Goodall testified as follows;
>
> Q. "Your answer?· In other words, did you ever see anybody in ad seg on every week or every two weeks or every month without respect to whether they were on the sick call or not?
>
> A.It wasn't -- it was more the sick call.
>
> Q.Right.· It was completely the sick call; right?
>
> A.Yes.· That was the policy."

As regards the second systemic failure, the lack of recognition or action by leadership that 7D was utilized for administrative segregation for some patients, there is ample evidence of this fact that is simply ignored in reports of the defense experts. In his deposition testimony, Sergeant Johnson, the custody training officer who worked in the Sheriff's Department since 2018, described very clearly how housing 7D was used for administrative segregation and other types of 23 hour cell isolation.

"Q.· ·Okay.· Now, let's talk about the Housing Unit 7D.· During that timeframe, do you recall if there were ad seg cells in Housing Unit 7D?

A.· ·D Module was mixed.· There were some ad seg cells in there, yes.

Q.· ·All right.· And what is ad seg?

A.· ·That was administrative segregation."

In this same testimony, Sergeant Johnson detailed multiple scenarios whereby a patient could be confined to their cell for 23 hours per day without having the administrative segregation label applied to their computer status; "If somebody was in their cell for 23 hours a day, that could be a number of different things."

The depth of this systemic problem was apparent in the testimony of Ms. Quiroz, who was offered by the County as an expert in the jail's mental health practices and held the title of Chief Mental Health Clinician and then became the Group Program Manager in the jail. She testified that she did not know whether patients with mental illness were held in administrative segregation on the 7D housing area. This information was ignored by all of the defense experts and indicates that as a mental health provider with patients in administrative segregation, QMHP Goodall lacked the knowledge, training and supervision to ensure this policy was followed. This failure of the jail's health service to even know where its own mental health patients are being held in isolation or segregation status is a profound abdication of their duty to provide basic health care, since being in isolation status increases the risk of death. This is such a basic part of correctional health standards of care that the NCCHC issued guidance on conducting these types of rounds in 2016. Both their jail and prison standards include clear language about this need. The American Correctional Association also includes this need in their correctional standards.[7]

Dr. Beckson is the only other defense expert who referenced Mr. Rupard's segregation status. Dr. Beckson's report asserts that Dr. Cruz testified that Mr. Rupard was being held in segregation conditions. While I do agree that Mr. Rupard was being held in administrative segregation conditions, and met the policy and standard of care requirement for regular nursing and mental health encounters, I based my opinion on the information cited above.

Dr. Abrams' report is silent on a critical feature of Mr. Rupard's death, the lack of regular nursing and mental health rounds while he was held in administrative segregation. This silence is surprising, because several of the references he lists (but does not link to any specific opinion) clearly establish the increased risk of medical and physical health problems among people with serious mental illness.[8] This higher burden of physical health problems among patients with

[7] 5-ACI-4B-28 (new 2018) Restrictive Housing, Health Care Screening. American Correctional Association Standards March 2021.

[8] Chesney E, Goodwin GM, Fazel S. Risks of all-cause and suicide mortality in mental disorders: a meta-review. World Psychiatry. 2014;13:153–60. doi: 10.1002/wps.20128.. and Lawrence D., Kisely S., Pais J. The epidemiology of excess mortality in people with mental illness. Can J Psychiatry 2010; 55: 752-760.

serious mental illness is well known in correctional settings and is part of the reason that dedicated nursing rounds are a requirement for people in segregation settings. In fact, my own experience in the design and implementation of alternatives to solitary confinement for patients with serious mental illness in jails is that the higher burden of medical problems for these patients requires increased nursing resources even when patients are moved from solitary settings to therapeutic units.[9] The publications that Dr. Abrams lists support the idea that Mr. Rupard was part of a cohort of people who share a higher burden of physical health problems and hence, he was in even more obvious need of the scheduled nursing rounds that were mandated by jail policy and correctional standards of care.

Dr. Abrams' silence on Mr. Rupard being held in a locked cell ignores a second serious issue, the health risks that solitary confinement/isolation impose on a patient. These risks are well-established and patients with serious mental illness should not be held in these settings. The 2016 NCCHC policy statement clearly articulates the risks as follows: "Juveniles, mentally ill individuals, and pregnant women should be excluded from solitary confinement of any duration."[10] In my own work as Chief Medical Officer of the NYC Correctional Health System, we identified this practice as especially dangerous for our patients with mental illness and we designed alternative and therapeutic housing areas. This approach was not limited to people who needed medication over objection or who were a grave threat to themselves or others, and was utilized to eliminate the practice of having patients with serious mental illness deteriorate in a solitary or isolation cell. Exposure to solitary confinement/isolation is a new health risk that San Diego County Jail introduced to Mr. Rupard, a risk that Dr. Abrams' report ignored. The reports of the other defense experts also ignored this systemic health risk, including the reports of Dr. Tyler and Dr. Beckson.

Finding #3. The San Diego Jail failed to conduct a clinical mortality review after Mr. Rupard's death. In my initial report, I detailed the evidence of serious flaws and deficiencies in the County's approach to mortality review for Mr. Rupard's death. This opinion was supported by review and citation of the following sources of information;

- The NCCHC Standard for Clinical Mortality Review.
- Dr. Montgomery's testimony regarding the mortality review process.
- Dr. Ysla's testimony regarding the mortality review process.
- California State Auditor's Report from 2022.

---

Crisanti AS, Love EJ. Mortality among involuntarily admitted psychiatric patients: a survival analysis. Soc Psychiatry Psychiatr Epidemiol. 1999 Dec;34(12):627-33. doi: 10.1007/s001270050185. PMID: 10703272. And

[9] https://pubmed.ncbi.nlm.nih.gov/26848667/.

[10] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ncchc.org/wp-content/uploads/Solitary-Confinement-Isolation.pdf.

The relevance of the NCCHC standards regarding clinical mortality review was detailed in my original report, but this standard clearly identifies that within 30 days, a clinical mortality review should be led by a physician who was not part of the care team, should create findings and corrective actions that are connected to the facility quality committee and should ask at least the three following questions;

- Could the medical response at the time of death be improved?
- Was an earlier intervention possible?
- Notes created by Dr. Montgomery regarding Mr. Rupard's death.
- Independent of the cause of death, is there a way to improve care?

Review of the testimony of Dr.s Ysla and Montgomery, as well as the notes taken by Dr. Montgomery regarding Mr. Rupard's death make clear that San Diego County did not meet these basic criteria for conducting a clinical mortality review. Not only did Dr. Montgomery's brief set of notes fail to meet these basic criteria for a clinical mortality review, but Dr. Ysla testified that he never discussed jail deaths with Dr. Montgomery and he wasn't even aware of Mr. Rupard's death during the period of March-June 2022, a period of three months between Mr. Rupard's death and responsibility of Liberty Inc. for provision of psychiatric care in the Jail.

The failures of the San Diego Jail to adequately review and correct problems after patient deaths was also identified by the California State Auditor's Report of February 3, 2022. specifically addressed the systematic failures in the Sheriff's flawed process of investigating in custody deaths. This report included the following opinions;

- The Sheriff's Department Has Not Consistently Implemented the Meaningful Changes Necessary to Respond to the Deaths of Individuals in its Custody

  The Sheriff's Department has not responded to incarcerated individuals' deaths in a matter that demonstrates commitment to improving and safety at its detention facilities. Every death of an individual in its custody should require a thorough review to determine whether changes to its processes are warranted. Nonetheless, the department's reviews of deaths are insufficient and have not always led to meaningful corrective action. (p. 33)
- However, the Sheriff's Department did not sufficiently document the results or recommendations from its 30-day medical reviews. For 22 of the 30 cases we reviewed, the Sheriff's Department was unable to provide us with documentation from these reviews that detailed any findings or conclusions about clinical care given; identified whether any concerns required further study; or stated whether changes to policies, procedures, or practices warranted. The documents we obtained for the most of these 22 cases were either presentation slides or meeting agendas. Neither type of document included findings about cases or recommended changes to policies, procedures, or practices. For some of the more recent cases in 2019 and 2020, the Sheriff's Department provided us with the chief medical officer's and medical staff members' typed notes, which included conclusions about the medical care its staff had provided to the incarcerated individuals as well as some recommendations. However, most of these

> reviews did not document whether the recommendations led to the department taking action, or whether the recommendations had been implemented. (p. 34)

The systemic failure in San Diego County's review of deaths among jail patients is an alarming deviation from the standard of care because it hampers or precludes learning form past errors to prevent future deaths.

Dr. Abrams makes several references to the dangers of outcome or hindsight bias. The essence of this kind of bias is that it is easier to look backwards with full information than it is to predict something in the moment without that information. This is not relevant to Mr. Rupard's case because the failures leading up to Mr. Rupard's death involve failures to look at information that the jail had at their disposal. Mr. Rupard had already been treated multiple times in the San Diego Jails and his decompensation was not an outcome that was a distant possibility, it had already occurred. Twice. On prior admissions to the jail, he had been mentally unstable and psychotic, and was transferred to an outside facility for medication. This was clearly documented when he was booked into December 19, 2021 but individual and systemic failure led to this information not being reviewed and/or acted on. After those relative successes, Mr. Rupard arrived in the jail in December 2021, and despite staff not being able to complete their work, he was instead was kept in a locked cell, never transferred to a higher level of care and he experienced nearly three months of physical and psychiatric decompensation. Similarly, staff knew that Mr. Rupard was in segregation but failed to do the required nursing and mental health rounds to monitor his health. The Liberty psychiatrist assumed (incorrectly) that Mr. Rupard was being monitored by mental health staff. Criticism of these failure does not amount to hindsight bias. These findings are well-founded critiques that the individual and systemic failures of the San Diego Sherrif's Department and Liberty Health jail failed to act in a manner that they had already twice seen the need for.

None of the defense reports mentioned the County's failure to conduct an adequate clinical mortality review for Mr. Rupard.

**Summary**

The expert reports submitted by the defense counsel regarding Mr. Rupard's death in the San Diego Jail contain some opinions with which I agree, and others with which I disagree  and have provided rebuttal to. None of the information I have reviewed in the reports has changed my confidence in my core three findings;

<u>Finding #1: The San Diego Jail and their health staff failed to provide basic mental health care to Mr. Rupard.</u>

<u>Finding #2. Failure to provide basic medical care, including injury assessment/care and segregation rounds.</u>

<u>Finding #3. The San Diego Jail failed to conduct a clinical mortality review after Mr. Rupard's death.</u>

The failure of these reports to identify any systemic problems in the care provided to Mr. Rupard is alarming, and mirrors the failures of San Diego County and their vendor, Liberty Inc. to ensure that a vulnerable patient like Mr. Rupard receives timely and adequate health care. The notion that Mr. Rupard's death was an unfortunate but unavoidable outcome is incorrect. The Autopsy report of the Deputy Medical Examiner makes this abundantly clear. The death of Mr. Rupard resulted from a combination of individual and systemic failures including the failure to review his prior treatment with forced medication, the failure to coordinate between the various parts of the health services, the failure to track and expedite his psychiatric assessment including transfer to a higher level of care and the failure to conduct the mandated nursing and mental health rounds because he was being held in segregation/isolation conditions. These failures reflect gross departures from the correctional standard of care by the County of San Diego and their psychiatric provider, Liberty Inc..

Executed on this 4th of August, 2026 in Port Washington, New York.

____________________________

Homer Venters, MD, MS

# EXHIBIT “D:

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number “4950349.” The body is in a second inner white body pouch sealed with a second red tamper resistant seal number “4950993.” A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner’s identification bearing the decedent’s name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent’s name, date of birth, and medical record number “31943869” is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff’s Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent’s name, date of birth, race and sex are the following items:
1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent’s name and booking number “21149433” is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:
1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled “A” through “C” for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. <u>BLUNT FORCE INJURY OF TORSO</u>:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

# TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

GLENN N. WAGNER, D.O.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

STEVEN C. CAMPMAN, M.D.
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| | | | |
|---|---|---|---|
| NAME OF DECEASED: **RUPARD, Lonnie** | AKA: | HIO: ☐ | CASE NUMBER: 2022-01007 |
| INVESTIGATOR: Fernanda Sanchez | REPORTED BY: Dr. Allen | REPORTING AGENCY: UCSD Medical Center | PREVIOUS WAIVE #: |
| CALL DATE AND TIME: 3/18/2022 0132 | ARRIVAL DATE AND TIME: 3/18/2022 0209 | RETURN DATE AND TIME: 3/18/2022 0252 | |

## DECEDENT

| | | | | |
|---|---|---|---|---|
| DATE AND TIME OF DEATH: 3/17/2022 2351 | DATE OF BIRTH: 10/1/1975 | AGE: 46 Years | GENDER: Male | RACE: Filipino, White |
| RESIDENCE (STREET, CITY, STATE, ZIP): | | COUNTY: | LAST SEEN ALIVE: 03/17/2022 | |
| COUNTRY OF RESIDENCE: | OCCUPATION: | | PAID AUTOPSY: ☐ | |

## DEATH

| | |
|---|---|
| LOCATION OF DEATH: UCSD Medical Center | TYPE OF PLACE: Hospital |
| ADDRESS (STREET, CITY, STATE, ZIP): 200 W Arbor Dr, San Diego, California, 92103 | |

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| | | | | |
|---|---|---|---|---|
| LOCATION OF INCIDENT: | INCIDENT PLACE TYPE: Jail, Prison, Detention Facility | AT WORK: ☐ | AT RESIDENCE: ☐ | |
| ADDRESS (STREET, CITY, STATE, ZIP): 1173 Front Street, San Diego, California, 92101 | COUNTY: San Diego | | | |
| DATE AND TIME OF INCIDENT: 03/17/2022 Unk | INVESTIGATING AGENCY: San Diego Sheriff | OFFICER: Blumenshine | BADGE #: 2137 | REPORT #: 21-011838 |
| DECEDENT WAS: | BELTED: No | HELMETED: ☐ YES ☑ NO | POSITION: | ON PRIVATE PROPERTY: ☐ YES ☐ NO |
| VEHICLE: | LICENSE NUMBER: | STATE: | | |

## NOTIFICATION

| | | | |
|---|---|---|---|
| IDENTIFIED BY: Dep. Costelow | METHOD: Visually | DATE AND TIME: 03/17/2022 | |
| FUNERAL HOME: | PROPERTY: ☑ YES ☐ NO | PUBLIC ADMINISTRATORFalse: ☐ YES ☑ NO | TYPE OF EXAM: Autopsy |
| NAME OF NOK OR OTHER: [redacted] | RELATIONSHIP: Son | DATE NOTIFIED: 3/18/2022 | NOTIFIED BY: |

| **San Diego Medical Examiner**<br>**5570 Overland Avenue, Suite#101**<br>**San Diego, CA 92123-1206**<br>**(858) 694-2895** | **Case Number**<br>**Investigator**<br>**Date of Death**<br>**Date Today** | : 2022-01007<br>: Fernanda Sanchez<br>: 03/17/2022<br>: 02/08/2023 |
|---|---|---|

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled “A” through “C” for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. <u>BLUNT FORCE INJURY OF TORSO</u>:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| **Test Name (Method of Analysis)** | **Specimen Tested** | **Result** |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

### Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## Outside Brain Autopsy Final Reports

Accession #: FA-22-0000070

Date of Procedure: 3/17/2022 23:51 PDT
Date Received: 3/19/2022 09:35 PDT

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

**GLENN N. WAGNER, D.O.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

**STEVEN C. CAMPMAN, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | **2022-01007** |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| Ronnie Rupard | Son | 3/18/2022 | |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, Florentina Rupard, and his ex-wife, Justina Lopez. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, "Ana", with whom he had a son named Ronnie Rupard. The decedent also had a son with Justina, named Justino Rupard. He had a third child who was reported to have died in October 2018 of muscular dystrophy, who was named Lonnie Rupard. The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ____________________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ____________________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
  A. Anterior rib fractures.
  B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, antisocial personality disorder, and stimulant use disorder from a previous record dated July 11, 2020. It also stated that he had a past medical history of "seizures or tbi," (traumatic brain injury) per a record dated February 6, 2020. The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, for a twisted left ankle injury. Imaging was negative for fracture, soft tissue swelling or other abnormality.

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.
4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:
1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________
06/27/2022
Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

### Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*
*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

<u>IDENTIFICATION</u>: The body is received in a white body pouch sealed with tamper resistant read seal number “4950349.” The body is in a second inner white body pouch sealed with a second red tamper resistant seal number “4950993.” A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner’s identification bearing the decedent’s name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent’s name, date of birth, and medical record number “31943869” is secured to the left wrist.

<u>WITNESSES</u>: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff’s Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

<u>CLOTHING AND PROPERTY</u>: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent’s name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent’s name and booking number “21149433” is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

<u>EVIDENCE OF MEDICAL INTERVENTION</u>:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:
Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

# TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
(858) 694-2895 • FAX (858) 495-5956
http://www.sandiegocounty.gov/me

JONATHAN R. LUCAS, M.D.
CHIEF DEPUTY MEDICAL EXAMINER

## CALL INFO

| | | | |
|---|---|---|---|
| NAME OF DECEASED: **RUPARD, Lonnie** | AKA: | HIO: ☐ | CASE NUMBER: **2022-01007** |
| INVESTIGATOR: Fernanda Sanchez | REPORTED BY: Dr. Allen | REPORTING AGENCY: UCSD Medical Center | PREVIOUS WAIVE #: |
| CALL DATE AND TIME: 3/18/2022 0132 | ARRIVAL DATE AND TIME: 3/18/2022 0209 | RETURN DATE AND TIME: 3/18/2022 0252 | |

## DECEDENT

| | | | | |
|---|---|---|---|---|
| DATE AND TIME OF DEATH: 3/17/2022 2351 | DATE OF BIRTH: 10/1/1975 | AGE: 46 Years | GENDER: Male | RACE: Filipino, White |
| RESIDENCE (STREET, CITY, STATE, ZIP): | | COUNTY: | | LAST SEEN ALIVE: 03/17/2022 |
| COUNTRY OF RESIDENCE: | OCCUPATION: | | | PAID AUTOPSY: ☐ |

## DEATH

LOCATION OF DEATH: UCSD Medical Center
TYPE OF PLACE: Hospital

ADDRESS (STREET, CITY, STATE, ZIP): 200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| | | | | |
|---|---|---|---|---|
| LOCATION OF INCIDENT: | INCIDENT PLACE TYPE: Jail, Prison, Detention Facility | | AT WORK ☐ | AT RESIDENCE ☐ |
| ADDRESS (STREET, CITY, STATE, ZIP): 1173 Front Street, San Diego, California, 92101 | | COUNTY: San Diego | | |
| DATE AND TIME OF INCIDENT: 03/17/2022 Unk | INVESTIGATING AGENCY: San Diego Sheriff | OFFICER: Blumenshine | BADGE #: 2137 | REPORT #: 21-011838 |
| DECEDENT WAS: | BELTED: No | HELMETED: ☐ YES ☑ NO | POSITION: | ON PRIVATE PROPERTY: ☐ YES ☐ NO |
| VEHICLE: | LICENSE NUMBER: | | STATE: | |

## NOTIFICATION

| | | | |
|---|---|---|---|
| IDENTIFIED BY: Dep. Costelow | METHOD: Visually | DATE AND TIME: 03/17/2022 | |
| FUNERAL HOME: | PROPERTY: ☑ YES ☐ NO | PUBLIC ADMINISTRATOR False: ☐ YES ☑ NO | TYPE OF EXAM: Autopsy |
| NAME OF NOK OR OTHER: [redacted] | RELATIONSHIP: BANNED, REFER TO MANAGEMENT, SEE CASE NOTES | DATE NOTIFIED: 3/18/2022 | NOTIFIED BY: |

CONFIDENTIAL

County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
(858) 694-2895 • FAX (858) 495-5956
http://www.sandiegocounty.gov/me

JONATHAN R. LUCAS, M.D.
CHIEF DEPUTY MEDICAL EXAMINER

CONFIDENTIAL

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted], with whom he had a son named [redacted]. The decedent also had a son with [redacted], named [redacted]. He had a third child who was reported to have died in October 2018 [redacted]. The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name



CONFIDENTIAL COSD 006378

CONFIDENTIAL

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.



CONFIDENTIAL COSD 006379

CONFIDENTIAL

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

CONFIDENTIAL

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted]. The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed: 02/28/2023

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.
4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:
1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |



CONFIDENTIAL COSD 006396

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: 06/27/2022

Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

COUNTY OF SAN DIEGO HHSA HEALTH AND HUMAN SERVICES AGENCY | LIVE WELL SAN DIEGO

San Diego County
PUBLIC HEALTH LABORATORY
CLIA # 05D0060808
Brett Austin. MA. PHM. Director

3851 Rosecrans Street
San Diego, CA 92110
Phone (619) 692-8500
FAX (619) 692-8558

# FINAL REPORT

| Patient Information | Specimen Information | Submitter Information |
|---|---|---|
| Patient Name: **Rupard, Lonnie** | Specimen # **22-206526-01** | SAN DIEGO COUNTY MEDICAL EXAMINER<br>5570 Overland Ave # 101<br>San Diego, CA 92123 |
| Patient Id:<br>Birth Date: 10/01/1975<br>Gender: Male<br>Pregnancy Status: Unknown<br>Outside ID: 2022-01007<br>PUID #:<br>Address: NOT PROVIDED<br>NOT PROVIDED, N/A 00000 | Source: Nasopharynx<br>Date Collected: 03/19/2022<br>Date Received: 03/19/2022 | **Site Contact**<br>Steven Campman, M.D.<br>Fax: 858-495-5956<br>mxclerical@sdcounty.ca.gov<br>Physician: Schaber, B<br>Diagnosis Code: |
| Phone #: 000-000-0000 | | Comments: B-00011 |

| Analyte (Method) | Result | Analysis Date |
|---|---|---|
| SARS-CoV-2 (NAAT) | Detected | 03/20/2022 |

**Comments:**

03/19/2022 NAAT (Nucleic Acid Amplification Test): This assay is for in vitro diagnostic use under FDA Emergency Use Authorization (EUA) only.

03/20/2022 Samples tested using GeneXpert under CLIA ID # 05D2197127 at 5570 Overland Avenue San Diego, CA 92123

Approved by: Joe Ana Jones-Price

Date reported: 03/20/2022

This document contains confidential health information that is privileged, confidential and exempt from disclosure under law. If you have received this information in error, please call (619) 692-8500 and arrange for return or destruction.

22-1007

San Diego County
PUBLIC HEALTH LABORATORY
CLIA # 05D0060808
Jeremy Corrigan, DrPH, HCLD/TS(ABB)

5570 Overland Ave, Ste 103
San Diego, CA 92123
Phone 619-692-8500
FAX 619-692-8558

# FINAL REPORT

| Patient Information | Specimen Information | Submitter Information |
|---|---|---|
| Patient Name: **Rupard, Lonnie** | Specimen # **22-206691-01** | SAN DIEGO COUNTY MEDICAL EXAMINER |
| Patient Id: | Source: Nasopharynx | 5570 Overland Ave # 101 |
| Birth Date: 10/01/1975 | Date Collected: 03/19/2022 | Site Contact: |
| Gender: Male | Date Received: 03/19/2022 | Steven Campman, M.D. |
| Pregnancy Status: | | Fax: 858-495-5956 |
| Outside ID: 2022-01007 | | Physician: Schaber, B |
| Comments: | | Diagnosis Code: |

| Analyte (Method) | Result | Analysis Date |
|---|---|---|
| Influenza Typing | Refer to reference laboratory report. | |

**Comments:**

03/24/2022 Sample sent to CA State Viral and Rickettsial Diseases Laboratory, 850 Marina Bay Parkway, Richmond, CA 94804.

04/13/2022 VRDL report

Approved by: Ishita Gulati

Date reported: 04/27/2022

This document contains confidential health information that is privileged, confidential and exempt from disclosure under law. If you have received this information in error, please call (619) 692-8500 and arrange for return or destruction.



Print Date: 04/27/2022

California Department of Public Health
State of California-Health and Human Services Agency
CDPH
850 Marina Bay Parkway, E365
Richmond, CA 94804
CLIA ID # 05D0643850
Phone: 510-307-8575
Fax: 510-307-8599

# Viral and Rickettsial Disease Laboratory

## Laboratory Results

Page 1 of 1

**Patient Information**

| Patient Name or Submitter ID: | Gender | Date of Birth | Age |
|---|---|---|---|
| Rupard, Lonnie | Male | 10/1/1975 | 47 Years |

Medical Records:

CalREDIE Incident #:

Pregnancy Status:

Patient Address: , , CA.

**Disease Suspected / Test Requested / Symptoms**

Disease Onset:

Rash Onset .

Disease Suspected: Influenza A or B

Test Requested:

ICD Code:

Specimen Collection Site.

**Submitter Information**

Submitter Type: CA City & County Health Depts
Facility: San Diego County Public Health Dept.
Address: 3851 Rosecrans Street

San Diego, CA 92110-3134
Phone: (619) 692-8499 Fax: (858) 715-6458

Health Jurisdiction: San Diego,CA

Laboratory Results

Reason Code v_140

**Specimen Information**

| Specimen Type. | Date Collected | Date Received | Condition Received | Submitter Tracking#: | VRDL Accession #: |
|---|---|---|---|---|---|
| Nasopharyngeal Swab | 3/19/2022 | 3/22/2022 | Dry Ice | 22-206891 | V22T07708-01 |

**Polymerase Chain Reaction (PCR) Results**

| Analyte | Test Type | VRDL Accession # | Test Method | Laboratory Results |
|---|---|---|---|---|
| Influenza A Nucleic Acid | FDA | V22T07708-01 | PCR (realtime) | not detected |
| Influenza B Nucleic Acid | FDA | V22T07708-01 | PCR (realtime) | not detected |

**Additional Information or Overall Interpretation of State Laboratory Test Results:**

FDA - Food and Drug Administration: This test has been FDA approved for clinical diagnostic use.

JP 4/4/22

Reviewed by: *Ishita Gulati*
04/04/2022

**The VRDL is certified under the Clinical Laboratory Improvement Amendments of 1988 (CLIA-88) as qualified to perform high complexity clinical laboratory testing.**

| Report to | |
|---|---|
| San Diego County Public Health Dept.<br>3851 Rosecrans St. Mail Stop P572 Suite 716<br>San Diego, CA 92110<br>Attn: Email - Laboratory Director Fax#<br>18587156458 | Testing performed under the direction of Dr. Carl Hanson Ph.D., Laboratory Director, Viral and Rickettsial Disease Laboratory<br>**Final Report Date: April 04, 2022**<br>Report Method: [ ] faxed to 18587156458 [ ] E-mailed [ ] NR [ ]<br>by: [signature] date: 4/4/2022 |

eurofins [redacted]
Product Testing

# Final Report

| Order Details | | Ordering Professional | Request / Accession | R-P40234140 |
|---|---|---|---|---|
| Referral ID # | 22-01007 | [redacted] | Received | 03/25/2022 11:14 |
| DOB | 1975-10-01 | | Final Report | 03/25/2022 16:24 |
| Gender | M | | Report Generated | 03/25/2022 16:24 |
| | | | Time Zone | Pacific Standard Time |

## Results

| Test | Completed | Results | Ref. Range |
|---|---|---|---|
| Hepatitis B Surface Ag | 03/25/2022 16:21 | **Non Reactive** | Non Reactive |
| Hepatitis C Virus Ab | 03/25/2022 16:22 | **Non Reactive** | Non Reactive |
| HIV-1/HIV-2 Plus O | 03/25/2022 16:24 | **Non Reactive** | Non Reactive |

## Sample Reference(s)

**Collection Time Zone:** Pacific Standard Time

| VRL Sample ID | Type | Collected | Test(s) |
|---|---|---|---|
| S-P40234140A | Serum | 03/19/2022 13:15 | 3214, 3221, 3521 |

[redacted]: *Post-Mortem*

## Test Reference(s)

| Code | Name | Methodology Description |
|---|---|---|
| 3214 | Hepatitis B Surface Ag | BioRad Genetic Systems HBsAg EIA 3.0 is FDA approved for [redacted] screening. |
| 3221 | Hepatitis C Virus Ab | ORTHO HCV Version 3.0 ELISA is FDA approved for [redacted] screening. |
| 3521 | HIV-1/HIV-2 Plus O | BioRad GS HIV-1/HIV-2 Plus O EIA is FDA approved for [redacted] screening. This is a screening assay; it is neither a diagnostic assay nor a confirmatory test for the presence of HIV. |

San Diego County Medical Examiner

**AUTOPSY FINDINGS**

2022-01007 B. Schaber, M.D. 3/19/2022

RUPARD, Lonnie

Age: 46 Sex: M ✓ Embalmed
Height: 69 Weight: 105
Race: ~~C / B / H / A / F / NA / Other:~~
_____ nourished / thin / (cachectic) / obese
Lividity: ant / (post) L / R, (fixed) / un-fixed
Rigidity: none / (mild) / mod / full
✓ Decomposition: mild / mod / advanced early green abd

CAVITIES: Pericardium: lac 75 ml hemopericardium
Pleural: R ∅FPA L ∅FPA
Peritoneum: ∅FPA Abd fat: 0.1 cm
HEART: 280 grams:
Hypertrophy: ∅ Dilation: ∅
Ventricles: R 0.3 cm; L 1.5 cm; IVS 1.4 cm
Valves: WNL
Coronaries: LAD LCx R + UP
Aorta: (minimal) / mild / mod / severe atherosclerosis
Aneurysms: ∅ Pulmonary arteries: no PE

LUNGS: R 480 g, L 1030 g
~~atelectatic / hyperinflated~~
Anthracosis: none / (small) / mod / large
Edema: Consolidation: LUL Red Firm
Congestion: mild-mod Bronchi: ~ no pa

LIVER: 1170 g Fat: ∅ Fibrosis: ∅
~~Cirrhosis: macro / micro~~
GALLBLADDER: 10 Stones: y / (n)
PANCREAS: WNL

SPLEEN: 70 g
Lymph nodes no enlg Marrow / Blood lig + clot
~~THYMUS:~~ _____ g

GI: Esophagus: ~ Brown fx Bowel opened
Stomach contents: 60 ml of SB soft tan Brown red cast LB soft Brn stool
Bowels:
Appendix: (Y) / N Anus: soft Brn stool
KIDNEYS: R 140 g, L 150 g, cysts: ∅
(smooth) / granular:
Bladder: 130 ml urine dk yellow urine
Prostate: WNL
Testes: ↓↓

2.5 x 2 ulcer post Duod ... dsl pylorus

ADRENALS: WNL
THYROID: WNL PITUITARY: WNL
NECK: Hemorrhages: NOT
Trachea ∅T Hyoid / Thyroid cartilage
Tongue: no hem WNL No hem or fx
MUSCULOSKELETAL: Fractures: Yes peristernal Rt 5-8 ant Rt 8
CPR: (Y) / N ) Ribs ( ∅ brittle): perist Lt 4-7 ant Lt 4-7
~~Kyphosis / scoliosis~~ Skull: no Fx

SCALP: Bony defect Bild occip Ht fx ∅ EDH ∅ SDH ∅ SAH
BRAIN: 1290 g
+ dura Retained for NP consultation

TOXICOLOGY: ___None
✓ Central Blood ___Bile
✓ Peripheral Bld ___CSF
✓ Vitreous ✓ Liver
✓ Urine ___Spleen
___Chest blood / fluid ✓ Gastric:
___Other:

**Rapid Screens**: Glu Ket
+ / - meth; + / - coc; + / - morph; + / - alcohol

HISTOLOGY: (Ht) (Liv) (Lung) (R / L), Cor art: (Kid), Panc, Spl, GI, Thyroid, Brain:
Other:
___None 7 Cassettes

PHOTOGRAPHS: ✓ ID ✓ Over-alls
✓ Other:

X-RAYS: ___None ✓ Yes: no Fx's other than CPR
___head ___chest ___abd ___other:

CULTURES: ___None ___Blood ___Lung
___CSF ✓ Viral:
___Other: Covid-19 + Sept

EVIDENCE: Bullets: Fnt SH - FAS AMB UP - SC

Det Max Blumenshine

WITNESSES: ___None ✓ Yes: D. Racicot Fel
SDPD, SO, NCIS, OPD, BP M. Gervasoni Fel

GROSS AUTOPSY SUMMARY:

Inmate central jail found unresp in his cell
Hx/o schizoph ?

pericardial lac 75 ml
Rt atr/vent lac hemopericardium
2/2 CPR

Rev. 9/08

CONFIDENTIAL COSD 006403

# County of San Diego
OFFICE OF THE MEDICAL EXAMINER

San Diego County Medical Examiner

**2022-01007** B. Schaber, M.D.

3/19/2022

RUPARD, Lonnie

outer Red Seal 4950349 yellow tarp
inner red seal 4950993 on green sheet

**Date & Time of Examination**: 0935

**CLOTHING** (~~___None/___Not examined~~):

Blue sheet on body - adult clothing in property

**IDENTIFICATION**: ✓ M.E. band checked



County of San Diego
OFFICE OF THE MEDICAL EXAMINER

San Diego County Medical Examiner
2022-01007 B. Schaber, M.D.
3/19/2022
RUPARD, Lonnie



~~Doc~~

- 12/14/21 arrested Back Probation prison single cell.
  Refused medication.
- Single occupan cell.

Last seen alive cell check 2146

Found unresp in cell 2248 not Breathg. under blanket under in Bunk.
3/17

CPR transported to ER pronounced in ER.

Cell soiled c̄ feces Food c̄ maggots.

— never c̄ other inmates.

San Diego County Medical Examiner
2022-01007 B. Schaber, M.D.
3/19/2022
RUPARD, Lonnie

# County of San Diego

DR. GLENN N. WAGNER
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE., STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me/

DR. STEVEN CAMPMAN
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## EVIDENCE TRANSFER FORM

NAME OF DECEDENT: Rupard, Lonnie ME# 22-1007

PATHOLOGIST: Schaber, B. MD

INVESTIGATING AGENCY: SDSO

| | | | |
|---|---|---|---|
| | BODY BAG | | OTHER (See REMARKS) |
| | BAGS REMOVED FROM HEAD | | ANAL SWABS |
| | BAGS REMOVED FROM HANDS | ✓ | ORAL SWABS |
| | BAGS REMOVED FROM FEET | | URETHRA SWABS |
| | HEAD HAIR SAMPLE | | VAGINAL SWABS |
| | FACIAL HAIR SAMPLES | | GUNSHOT RESIDUE SWABS |
| | CHEST HAIR SAMPLES | | FINGERPRINTS |
| | PUBIC HAIR SAMPLE | | PALM PRINTS |
| | PUBIC HAIR COMBING | | PROJECTILES/FRAGMENTS |
| ✓ | BLOOD SAMPLE | | FINGERNAIL CLIPPINGS |
| | | | FINGERNAIL SCRAPINGS |

CLOTHING: 1- blue SHIRT

JEWELRY: None

BONES/TISSUE SPECIMEN: None

REMARKS:

RELEASED BY Stephen Hannum (Print Name) Stephen Hannum (Signature) 3-19-22 (Date)

RECEIVED BY Melissa Gervasoni /SDSO (Print Name/Agency) [signature] (Signature) 3/19/22 (Date)

Original: File Yellow: Customer
MEE-34 (R 8/2019)

Receipt: 31356

# San Diego County Medical Examiner's Office
## Personal Effects Inventory

Name of Deceased: Ruppard, Lonnie Date: 3/19/22 M.E. Case No.: 22-1007

Name of Investigator/F.A.A: F. Sanchez / Hannum PB # 687195

**Personal Effects**

**Currency:**

| | | | |
|---|---|---|---|
| $1 × | ø | =$ | ø |
| $5 × | 1 | =$ | 5.00 |
| $10 × | 1 | =$ | 10.00 |
| $20 × | 6 | =$ | 120.00 |
| $100 × | 2 | =$ | 200 |
| × | ø | =$ | |
| | Coins: | $ | 0.32 |
| | Total U.S. Currency: | $ | 335.32 |

**Bank Card:**

| QTY | Description – VISA, MasterCard, American Express (include account number) |
|---|---|
| / | / |

**Foreign Currency:** None

**Items:**

| QTY | Description | QTY | Description |
|---|---|---|---|
| 1 | wdy/metal watch | / | / |
| / | / | | |

**Government Issued Documents and Identification Cards** – The listed government documents issued by federal, state, county, or local agencies or foreign governments are property of that agency and will be returned to them.

| QTY | Description (include the agency name and ID number) |
|---|---|
| / | / / / |

**Witness Declaration**

The above listed property, found on the body, clothing, adjacent area, or residence of the above decedent was checked by me in the presence of the witness signed below.

| Print Name | Signature | Agency | Date |
|---|---|---|---|
| DeanneRuppari Osuna | [signature] Sn | SDMEO | 03,19,22 |

**Release of Property to Next-of-Kin**

Received by: Megan Rvaner (Print Name) Date: 3/22/22 Time: 1543

Signature: Relationship: Mortuary

Address: City/State/Zip:

**Affidavit Under California Probate Code, Section 330**

I declare under Penalty of Perjury under the laws of the State of California that the foregoing is true and correct and that I do not know or have reason to believe that a dispute exists over the right to possess the property held by the Medical Examiner.

**Signature of Declarant:**

**Printed Name of Declarant:**

☐ **Miscellaneous medications, and/or illicit drugs, and/or drug paraphernalia impounded and inventoried at the Medical Examiner's Office.** These items will be retained and subsequently destroyed pursuant to departmental policy.

105 #

MEDICAL EXAMINER'S OFFICE
INVESTIGATIVE MEMO

AGE: 46

CASE # 22-1007

NAME RUPARD, LONNIE
LAST FIRST MIDDLE

DATE 03/18/2022

CARRIER 92M

INVESTIGATOR FERNANDA SÁNCHEZ

HIO (NAT) vs MVA SUI HOM (ACC) DONOR

HOW IN CUSTODY

~~B2294384~~

BLUE SEAL # RED SEAL# 4950993

X-RAYS REQUIRED? (YES) (NO)

IF YES, WHAT AREA(S) OF BODY X-rays by [illegible] 03/18/22

REMARKS RQ EXAM SAT 03/19

SDSO DET BLUMENSHINE

AGENCY, TEAM #, and PHONE # 619-886-0434

# CAUSE OF DEATH WORKSHEET

## San Diego County Medical Examiner Department

| | | |
|---|---|---|
| ☒ Autopsy | ☐ Fetal death | San Diego County Medical Examiner |
| ☐ External | ☐ Possible SIDS | 2022-01007 B. Schaber, M.D. 3/19/2022 |
| ☐ Not Dictated | ☐ Family Paid | RUPARD, Lonnie |
| ☐ Body not coming to office | | |

**CAUSE OF DEATH:** ( ✓ PENDING) Time interval

Due To:

Due To:

Due To:

**CONTRIBUTING:**

**MANNER:** ( ✓ )Pending ( ) Natural ( ) Accident ( ) Suicide ( ) Homicide ( ) Undetermined

**Use reverse side for manner type in non-pending cases

**HOW OCCURRED:**

**DATE and TIME of INJURY:** **LOCATION:**

**SURGERIES and DATES:**

**If FEMALE, pregnant within the last year?** ( ) Yes ( ) No ( ) Unknown

Deputy Medical Examiner/Fellow/Resident Supervising Pathologist Date 3/19/22

Rev. 06/15

TM 3/21/22

3/20/2022

# Manner Types and SubTypes

(check one)

## NATURAL

- ☐ AIDS Related
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Autoimmune/Systemic
- ☐ Cancer
- ☐ Cardiovascular
- ☐ Central Nervous System
- ☐ Chronic Drug Abuse
- ☐ Diabetes Related
- ☐ Endocrine
- ☐ Family Paid
- ☐ Gastrointestinal
- ☐ Hematologic
- ☐ Infant/Perinatal (not SIDS)
- ☐ Infectious
  - ☐ Viral
  - ☐ Bacterial
  - ☐ Other
- ☐ Intrauterine/Stillborn
- ☐ Liver disease
- ☐ Obesity Related
- ☐ Other
- ☐ Pregnancy Related
- ☐ Psychiatric Related
- ☐ Pulmonary
- ☐ Renal
- ☐ Seizures
- ☐ SIDS
- ☐ Undetermined

## ACCIDENT

- ☐ Aircraft
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Animal Related
- ☐ Asphyxia
  - ☐ Airway Obstruction
  - ☐ Autoerotic
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Traumatic
- ☐ Bicycle
- ☐ Blunt Force (other)
- ☐ Boating
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug and Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol

### ACCIDENT (cont.)

- ☐ Electrocution
- ☐ Explosion
- ☐ Exposure
- ☐ Fall
  - ☐ Blunt head trauma
  - ☐ Fracture, other
  - ☐ Hip/Femur fracture
  - ☐ Multiple injuries
  - ☐ Other
  - ☐ Spinal fracture
  - ☐ Subdural hematoma
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Industrial
- ☐ Ingested Foreign Object(s)
- ☐ Inhalation
- ☐ Medical/Therapeutic
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs Auto
  - ☐ Auto vs Bicycle
  - ☐ Auto vs Fixed Object
  - ☐ Auto vs Motorcycle
  - ☐ Auto vs Pedestrian
  - ☐ Hit and Run
  - ☐ Motorcycle
  - ☐ Off Road
  - ☐ Other
  - ☐ Unknown
- ☐ Other
- ☐ Restraint Related
- ☐ Scalding
- ☐ Scuba - Diving
- ☐ Spear gun
- ☐ Train
- ☐ Undetermined

## SUICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Other
- ☐ Blunt Force (other)
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug & Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol
- ☐ Electrocution

### SUICIDE (cont.)

- ☐ Explosion
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Inhalation
- ☐ Jumping
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs. Fixed Object
  - ☐ Auto vs. Pedestrian
  - ☐ Motorcycle
- ☐ Train
- ☐ Undetermined

## HOMICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
- ☐ Assault
- ☐ Blunt Force
- ☐ Chemical/Poison
- ☐ Child Abuse
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Elder Abuse
- ☐ Exposure
- ☐ Fire
- ☐ Firearm
- ☐ Homicidal Violence, NOS
- ☐ Intrauterine/Stillborn
- ☐ Motor Vehicle
- ☐ Other
- ☐ Restraint Related
- ☐ Undetermined

## UNDETERMINED

- ☐ Alcohol Related
- ☐ Blunt Force
- ☐ Decomposed
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Fire related
- ☐ Firearm
- ☐ Infant/Perinatal (not SIDS)
- ☐ Intrauterine/Stillborn
- ☐ Other
- ☐ Skeletal Remains
- ☐ Undetermined

Rev. 06/15

# DEATH CERTIFICATE AMENDMENT WORKSHEET

Case: 2022-1007

Name: RUPARD, LONNIE

CAUSE OF DEATH: PNEUMONIA, MALNUTRITION, AND DEHYDRATION ( )

IN THE SETTING OF NEGLECTED SCHIZOPHRENIA (unknown)

Due to: ( )

Due to: ( )

Due to: ( )

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

Surgeries:

MANNER OF DEATH

☐ NATURAL ☐ ACCIDENT ☐ SUICIDE ☑ HOMICIDE ☐ UNDETERMINED

Place of Injury: SAN DIEGO CENTRAL JAIL

Date & Time: UNKNOWN

How Occurred: INADEQUATE CARE WHILE INCARCERATED

[signature] 2/27/23

DEPUTY MEDICAL EXAMINER Date

SCHABER

[signature] 3/1/23

CHIEF MEDICAL EXAMINER Date

AL 03/01/23 @ 2:46pm

LG 3/1/23

CONFIDENTIAL COSD 006412

# Manner Types and SubTypes

(check one)

## NATURAL

- ☐ AIDS Related
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Autoimmune/Systemic
- ☐ Cancer
- ☐ Cardiovascular
- ☐ Central Nervous System
- ☐ Chronic Drug Abuse
- ☐ Diabetes Related
- ☐ Endocrine
- ☐ Family Paid
- ☐ Gastrointestinal
- ☐ Hematologic
- ☐ Infant/Perinatal (not SIDS)
- ☐ Infectious
  - ☐ Viral
  - ☐ Bacterial
  - ☐ Other
- ☐ Intrauterine/Stillborn
- ☐ Liver disease
- ☐ Obesity Related
- ☐ Other
- ☐ Pregnancy Related
- ☐ Psychiatric Related
- ☐ Pulmonary
- ☐ Renal
- ☐ Seizures
- ☐ SIDS
- ☐ Undetermined

## ACCIDENT

- ☐ Aircraft
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Animal Related
- ☐ Asphyxia
  - ☐ Airway Obstruction
  - ☐ Autoerotic
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Traumatic
- ☐ Bicycle
- ☐ Blunt Force (other)
- ☐ Boating
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug and Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol

**ACCIDENT (cont.)**

- ☐ Electrocution
- ☐ Explosion
- ☐ Exposure
- ☐ Fall
  - ☐ Blunt head trauma
  - ☐ Fracture, other
  - ☐ Hip/Femur fracture
  - ☐ Multiple injuries
  - ☐ Other
  - ☐ Spinal fracture
  - ☐ Subdural hematoma
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Industrial
- ☐ Ingested Foreign Object(s)
- ☐ Inhalation
- ☐ Medical/Therapeutic
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs Auto
  - ☐ Auto vs Bicycle
  - ☐ Auto vs Fixed Object
  - ☐ Auto vs Motorcycle
  - ☐ Auto vs Pedestrian
  - ☐ Hit and Run
  - ☐ Motorcycle
  - ☐ Off Road
  - ☐ Other
  - ☐ Unknown
- ☐ Other
- ☐ Restraint Related
- ☐ Scalding
- ☐ Scuba - Diving
- ☐ Spear gun
- ☐ Train
- ☐ Undetermined

## SUICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Other
- ☐ Blunt Force (other)
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug & Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol
- ☐ Electrocution

**SUICIDE (cont.)**

- ☐ Explosion
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Inhalation
- ☐ Jumping
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs. Fixed Object
  - ☐ Auto vs. Pedestrian
  - ☐ Motorcycle
- ☐ Train
- ☐ Undetermined

## HOMICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
- ☐ Assault
- ☐ Blunt Force
- ☐ Chemical/Poison
- ☐ Child Abuse
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Elder Abuse
- ☐ Exposure
- ☐ Fire
- ☐ Firearm
- ☐ Homicidal Violence, NOS
- ☐ Intrauterine/Stillborn
- ☐ Motor Vehicle
- ■ Other
- ☐ Restraint Related
- ☐ Undetermined

## UNDETERMINED

- ☐ Alcohol Related
- ☐ Blunt Force
- ☐ Decomposed
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Fire related
- ☐ Firearm
- ☐ Infant/Perinatal (not SIDS)
- ☐ Intrauterine/Stillborn
- ☐ Other
- ☐ Skeletal Remains
- ☐ Undetermined

Rev. 06/15

# COUNTY OF SAN DIEGO MEDICAL EXAMINER

5570 OVERLAND AVENUE, SUITE 101, SAN DIEGO, CA 92123-1215
PHONE: 858-694-2895 FAX: 858-495-5956

## ORDER FOR RELEASE OF REMAINS

**TO:** MEDICAL EXAMINER, COUNTY OF SAN DIEGO

**RE:** REMAINS OF Lonnie Newton Rupard, ME CASE # 22-1007

RUPARD Lonnie 2022-01007

I certify that pursuant to the State of California Health & Safety Code, Section 7100, it is my legal right to control the disposition of the remains referenced above, the location and conditions of interment, and arrangements for funeral goods and services to be provided. I further certify that I am acting in the capacity of: **Legal Next of Kin** [redacted], **OR Executor/Executrix** ________, **OR Agent with Durable Power of Attorney for Health Care** (must be for Health Care) ________ **OR other legal capacity** ________ (please **INITIAL** the appropriate category). If acting in a capacity other than Legal Next of Kin, I have attached a copy of the relevant appointing document(s).

Therefore, upon completion of your examination of the deceased, please release the remains referenced above to the custody of the service designated below. If possible please **RELEASE** [redacted] **OR DO NOT RELEASE** ________ (please **INITIAL** desired choice) all of the deceased's personal property in your care with the remains. I understand that personal property can only be released during regular working hours (M-F 8-5, except holidays). **As per California Laws and Department Policies, if the property in custody of the Medical Examiner's Department is not collected within 90 days from the date of death, it will be processed for immediate disposal.**

Featheringill Mortuary
Print Name of Designated Mortuary, Cremation Society, or other Disposition Service

| Print Name of Person Signing | Relationship | Signature | Date Signed |
|---|---|---|---|
| [redacted] | Son | [redacted] | Mar 22 2022 |

| Mailing Address of Person Signing | Home / Cell Phone Number |
|---|---|
| [redacted] El Cajon CA 92021 | [redacted] |

| City, State, Zip Code of Person Signing | City, State Where Signed |
|---|---|
| El Cajon CA 92021 | El Cajon CA |

### DECEDENT INFORMATION

| Name of Deceased – First (Given) | Middle | Last (Family) | Gender | Date of Death |
|---|---|---|---|---|
| Lonnie | Newton | Rupard | N | 03/17/2022 |

| Date of Birth | Age | Place of Birth | Social Security Number | Race |
|---|---|---|---|---|
| 10/1/1975 | 46 | PI | [redacted] | Filipino |

| Marital Status | Occupation | Residence Address: |
|---|---|---|
| Div | Disabled | [redacted] Bonita ca 91902 |

### MEDICAL EXAMINER DEPARTMENT USE ONLY

ME FAS Hannum

Release Date/Time: 3-22-22 1511

Transport Staff: (signed) [signature]

Printed Name: Megan Rueana

MEA-15 (R 3/26/19)

# COUNTY OF SAN DIEGO MEDICAL EXAMINER

5570 OVERLAND AVENUE, SUITE 101, SAN DIEGO, CA 92123-1215
PHONE: 858-694-2895 FAX: 858-495-5956

## ORDER FOR RELEASE OF REMAINS

**TO:** MEDICAL EXAMINER, COUNTY OF SAN DIEGO

**RE:** REMAINS OF Lonnie Newton Rupard, ME CASE # 22-01007

RUPARD, Lonnie 2022-01007

I certify that pursuant to the State of California Health & Safety Code, Section 7100, it is my legal right to control the disposition of the remains referenced above, the location and conditions of interment, and arrangements for funeral goods and services to be provided. I further certify that I am acting in the capacity of: **Legal Next of Kin** [redacted]___, **OR Executor/Executrix** ___, **OR Agent with Durable Power of Attorney for Health Care** (must be for Health Care) ___ **OR other legal capacity** ___ (please **INITIAL** the appropriate category). If acting in a capacity other than Legal Next of Kin, I have attached a copy of the relevant appointing document(s).

Therefore, upon completion of your examination of the deceased please release the remains referenced above to the custody of the service designated below. If possible please **RELEASE** [redacted]___ **OR DO NOT RELEASE** ___ (please **INITIAL** desired choice) all of the deceased's personal property in your care with the remains. I understand that personal property can only be released during regular working hours (M-F 8-5, except holidays). **As per California Laws and Department Policies, if the property in custody of the Medical Examiner's Department is not collected within 90 days from the date of death, it will be processed for immediate disposal.**

Featheringill Mortuary

Print Name of Designated Mortuary, Cremation Society, or other Disposition Service

[redacted] Son X [redacted] 3-22-22

Print Name of Person Signing | Relationship | Signature | Date Signed

[redacted] [redacted]

Mailing Address of Person Signing | Home / Cell Phone Number

Bonita CA 91902 San Diego CA

City, State, Zip Code of Person Signing | City, State Where Signed

**DECEDENT INFORMATION**

| Name of Deceased – First (Given) | Middle | Last (Family) | Gender | Date of Death |
|---|---|---|---|---|
| Lonnie | Newton | Rupard | M | 3-17-22 |

| Date of Birth | Age | Place of Birth | Social Security Number | Race |
|---|---|---|---|---|
| 10-1-1975 | 46 | PI | [redacted] | Filipino |

| Marital Status | Occupation | Residence Address: |
|---|---|---|
| div | Disabled | [redacted] Bonita CA 91902 |

**MEDICAL EXAMINER DEPARTMENT USE ONLY**

ME FAS ___ Release Date/Time: ___

Transport Staff: (signed) [signature] Printed Name: Megan Rvona

MEA-15 (R 3/26/19)

***County of San Diego***
***Office of the Medical Examiner***

**RELEASE OF REMAINS**

**Name: RUPARD, Lonnie**

**M.E. #: 2022-01007**

Date Rec: 3/18/2022

Mortuary: Featheringill Mortuary

Date and Time Released: 3/22/2022 1509

Released By: Data Entry: Stephen Hannum

Body Retrieval: Stephen Hannum

Investigator: Fernanda Sanchez

Body Status: Ready to release

**OK to Release Property?** yes

Ok to release property Yes-JM

T.E. No-JM

| | | | |
|---|---|---|---|
| [] Cert | [] N.C. | [] Military | [] Release |
| [] Property | [] Child | [] Vitals | [] County |
| [] Decomp | [] Fee Paid | [] P.A. | [] Pouch |

**Weight: 105 lb** **Height: 69"** **Age: 46 Years** **Sex: Male**

**Body Condition: Within Normal Limits** **Exam Type: Autopsy**

**Clothing Released with Body: True** **Location: 15C dbl Son [redacted] also signed OFR**

**Clothing:** blue stripped sweatshirt, grey tank top, grey pants, black underwear, pair brown boots

**Items on or with Body:** none

***Remains have been examined with I.D. verified by comparison to ankle bracelet.***
***Clothing, valuables, if any, and posession of remains recieved in satisfactory condition:***

SHannum
Signature (Body retrieval M.E. staff)

**Stephen Hannum**
Printed Name

[signature]
Signature (Transport staff)

Megan Ruana
Printed Name

Date: 3/22/22 Time: 1519

2022-01007 Printed 3/22/2022

**CONFIDENTIAL COSD 006416**

**PROOF OF SERVICE**
**(CCP §§ 1013(a) and 2015.5; FRCP 5)**

State of California, ) ss.
County of Los Angeles. )

I am employed in the County of Los Angeles. I am over the age of 18 and not a party to the within action. My business address is 790 E. Colorado Boulevard, Suite 600, Pasadena, CA 91101.

On this date, I served the foregoing document described as **DECLARATION OF ROBERT S. KAHN IN SUPPORT OF DEFENDANT COUNTY OF SAN DIEGO'S MOTION TO EXCLUDE OR LIMIT THE OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERT HOMER VENTERS, M.D.** on the interested parties in this action by placing same in a sealed envelope, addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ **(BY MAIL)** - I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail in Pasadena, California to be served on the parties as indicated on the attached service list. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Pasadena, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **(BY CERTIFIED MAIL)** – I caused such envelope(s) with postage thereon fully prepaid via Certified Mail Return Receipt Requested to be placed in the United States Mail in Pasadena, California.

☐ **FEDERAL EXPRESS** - I caused the envelope to be delivered to an authorized courier or driver authorized to receive documents with delivery fees provided for.

☒ **(BY ELECTRONIC FILING AND/OR SERVICE)** – I served a true copy, with all exhibits, electronically on designated recipients listed on the attached service list.

☐ **(ELECTRONIC SERVICE PER CODE CIV. PROC., § 1010.6)** – By prior consent or request or as required by rules of court (Code Civ. Proc., § 1010.6 (amended Jan. 1, 2021); Code Civ. Proc., § 1013(g); Cal. Rules of Court, rule 2.251(a)).

☐ **(BY PERSONAL SERVICE)** - I caused such envelope(s) to be delivered by hand to the office(s) of the addressee(s).

---

Executed on November 13, 2026 at Pasadena, California.

☐ **(STATE)** - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ **(FEDERAL)** - I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

---------------------------------------------------------------------------------
NATALIE URBINO
nurbino@ccllp.law

*25163*





COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**ESTATE OF LONNIE RUPARD ET AL. V. COUNTY OF SAN DIEGO ET AL.**
**Case Number: 3:23-cv-1357-CAB-JAC**
**CCLLP File Number: 25163**

**SERVICE LIST**

Jeremiah A. Lowe
LOWE LAW, LLP
402 W. Broadway, Suite 1720
San Diego, CA 92101
T: (619) 878-2725 - F: (619) 878-2737
jeremiah@lowelawapc.com
laura@lowelawapc.com
**ATTORNEYS FOR PLAINTIFF JUSTINO RUPARD and the Estate of Lonnie Rupard**

Eugene G. Iredale
Julia Yoo
Sarah Musumeci
Peter Bibring
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
T: (619) 233-1525 - F: (619) 233-3221
egiredale@iredalelaw.com
jyoo@iredalelaw.com
smusumeci@iredalelaw.com
admin@iredalelaw.com
creherman@iredalelaw.com
gjun@iredalelaw.com
sbrockett@iredalelaw.com
pbibring@iredalelaw.com
**ATTORNEYS FOR PLAINTIFF JUSTINO RUPARD**

Alexandra Sennet
Kimberly B. Pinkerton
TRESSLER LLP
909 North Pacific Coast Highway, Suite 840
El Segundo, CA 90245
T: (310) 203-4800 - F: (323) 486-2704
asennet@tresslerllp.com
kpinkerton@tresslerllp.com
**ATTORNEYS FOR DEFENDANTS ANTHONY CRUZ, M.D. and LIBERTY HEALTHCARE OF CALIFORNIA, INC.**

Jerome Murphy
TRESSLER LLP
233 S. Wacker Drive, 61st Floor
Chicago, IL 60606
jmurphy@tresslerllp.com
**ATTORNEY FOR DEFENDANTS ANTHONY CRUZ, M.D. and LIBERTY HEALTHCARE OF CALIFORNIA, INC.**

Corey E. Krueger
BURGER, MEYER & D'ANGELO, LLP
999 Corporate Dr., Suite 225
Ladera Ranch, CA 92694
T: (949) 427-1888 - F: (949) 427-1889
ckrueger@burgermeyer.com
vcuevas-carey@burgermeyer.com
**ATTORNEYS FOR DEFENDANTS ANTHONY CRUZ, M.D. and LIBERTY HEALTHCARE OF CALIFORNIA, INC.**



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111