**Rada Feldman, Esq. (State Bar No. 285931)**
**Nicholas R. Colletti, Esq. (State Bar No. 283947)**
**Robert S. Kahn, Esq. (State Bar No. 231277)**
**Caroline M. Park, Esq. (State Bar No. 334008)**
**Cristina I. Butoiu, Esq. (State Bar No. 335902)**
**COLLINS + COLLINS LLP**
**2011 Palomar Airport Road, Suite 207**
**Carlsbad, CA 92011**
**(760) 274-2110 - FAX (760) 274-2111**
**Email: rfeldman@ccllp.law**
**Email: ncolletti@ccllp.law**
**Email: rkahn@ccllp.law**
**Email: cpark@ccllp.law**
**Email: cbutoiu@ccllp.law**

Attorneys for Defendants,
COUNTY OF SAN DIEGO, BILL GORE, KELLY MARTINEZ, JON MONTGOMERY, CHRISTINA GOODALL (sued as CHRISTINA ANOSIKE), MIGUEL AGUILERA, JASON VILADIU, GUSTAVO MARTINEZ, JEFF AMADO, ERNESTO AGUIRRE, TREYVONNE JAMES (sued in duplicate J. TREYVONNE), BERNARDO ROMERO, MICHAEL JOHNSON, ANDREW TORRES, ALLEN WERESKI, BLADE ROMANS, LINDA GUTIERREZ, AND THOMAS MACE

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ESTATE OF LONNIE RUPARD, THROUGH ITS COURT-APPOINTED ADMINISTRATOR TERRI LOPEZ;<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; et al.<br><br>Defendants. | CASE NO. 3:23-cv-1357-CAB-JAC<br>***Assigned to Hon. Cathy Ann Bencivengo***<br>***Magistrate Hon. Janet A. Cabral, Dept. 15A***<br><br>**DECLARATION OF ROBERT S. KAHN IN SUPPORT OF DEFENDANT COUNTY OF SAN DIEGO'S MOTION TO EXCLUDE OR LIMIT THE OPINIONS AND TESTIMONY OF PLAINTIFF'S EXPERT LORI E. ROSCOE**<br><br>Date: December 18, 2026<br>Time: ________<br>Dept.: 15A |

*25163*



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**Complaint Filed: 7/26/2023**

**Trial Date: 2/22/2027**

## DECLARATION OF ROBERT S. KAHN

I, Robert S. Kahn, declare as follows:

1. I am an attorney licensed to practice before this Court and a Senior Associate attorney at Collins + Collins LLP, counsel of record for Defendant County of San Diego (the "County") in this action. I make this declaration in support of the County's Motion to Exclude Expert Opinion Testimony of Plaintiff's retained correctional-nursing expert, Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN. I have personal knowledge of the matters stated herein and, if called as a witness, could and would testify competently to them. As to matters concerning the contents of the records and transcripts identified below, my knowledge is based on my personal review of those documents in the course of representing the County.

2. I submit this declaration to authenticate and place before the Court the documentary evidence on which the County's motion relies, pursuant to Civil Local Rule 7.1.

3. **Plaintiffs' expert disclosures and Ms. Roscoe's report.** Attached hereto as **Exhibit A** is a true and correct copy of the relevant portions of Plaintiffs' Expert Witness Disclosures and Reports Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), including the signed expert report of Lori E. Roscoe, DNP, which was executed on July 15, 2026. Exhibit A also includes the portions of Plaintiffs' disclosures identifying Plaintiffs' retained experts in this action, including Plaintiffs' separately retained correctional-health expert, Dr. Homer Venters, and Plaintiffs' separately retained jail-practices expert, Gary Raney, who address inmate monitoring, segregation, and organizational or "systemic" jail practices — the same custody-monitoring and systemic subjects addressed by Ms. Roscoe. Based on my review of

*25163*



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Ms. Roscoe's report: (a) the report does not state any opinion, to a reasonable degree of medical certainty, on the cause of Mr. Rupard's death, and instead states that the identified nursing failures "significantly increased the risk of serious harm and death"; (b) the report relies on the standards of the National Commission on Correctional Health Care (NCCHC) and the American Nurses Association (ANA), together with internal facility policy — including the segregated-inmate policy (MSD.G.2.1) and the hunger-strike policy — as the measure of the County's conduct; (c) the report's monitoring opinions rest on the premises that Mr. Rupard was a "segregated" incarcerated person and that a hunger strike should have been declared; and (d) the report contains a lengthy, document-by-document recitation of the medical and custodial records and policies reviewed, including an "Exhibit C — Materials Reviewed."

4. **Ms. Roscoe's deposition.** The videotaped deposition of Ms. Roscoe was taken in this action on September 14, 2026. Attached hereto as **Exhibit B** is a true and correct copy of the relevant excerpts of the certified transcript of that deposition. The excerpts in Exhibit B include, among others, the following testimony cited in the County's motion:

a. Transcript pages 179, 258, and 259, in which Ms. Roscoe testified that she is not qualified to opine on what caused Mr. Rupard's death, that she "defer[s] to the medical examiner," and that "[m]edical causation I don't do," and in which she confirmed that she is not offering any opinion on the cause-of-death topic and not offering any opinion that the County had a policy, custom, or practice that caused Mr. Rupard's death or was a moving force behind any constitutional violation.

b. Transcript pages 44, 59, 70, 162, and 165, in which Ms. Roscoe identified the bases for her opinions as "foundational correctional nursing practice," "good nursing," and "common sense," described the "nursing care plan" she faults the County for not following only as "something that nurses do," and testified that the basis

*25163*





COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

for her "progressive and foreseeable deterioration" opinion was "[her] experience, education, and training in correctional health" and her "common sense."

c. Transcript pages 35 and 36, in which Ms. Roscoe testified that her "failure to escalate" opinion rests on the premise that Mr. Rupard signed no medication-refusal forms, that this premise is an "assumption," and that it "would change [her] opinion" if she were provided with 34 refusal forms.

d. Transcript pages 83 and 84, in which Ms. Roscoe conceded that Mr. Rupard was never given an administrative-segregation or "segregated" classification, and that her segregation-monitoring opinion rests on her view that his "conditions of confinement equaled a segregated patient."

e. Transcript pages 146 through 148, in which Ms. Roscoe testified that Mr. Rupard was "never placed on a hunger strike," that "[t]here's nothing in the record, period" indicating a hunger strike, and that "you don't know, one way or another, whether Mr. Rupard was on a hunger strike."

f. Transcript page 159, in which Ms. Roscoe described her opinions in terms of "the system" and systemic issues "not just attributable to one individual."

g. Transcript page 181, in which Ms. Roscoe conceded that the NCCHC and ANA standards are voluntary and "are not the law."

h. Transcript page 258, in which Ms. Roscoe recounted that "[t]he medical examiner has ruled it a homicide" and attributed the death to the causes identified by the Medical Examiner, while deferring to the Medical Examiner on the cause and manner of death.

5. **Ms. Roscoe's rebuttal report.** Attached hereto as **Exhibit C** is a true and correct copy of the rebuttal expert report of Ms. Roscoe as served by Plaintiffs.

6. **Medical Examiner's report.** Attached hereto as **Exhibit D** are true and correct copies of the relevant portions of the County of San Diego Medical Examiner's report concerning the death of Lonnie Rupard, which certifies the cause of death as



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

"Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia" and the manner of death as homicide, and which Ms. Roscoe identified as the source of the cause and manner of death to which she defers.

7. The excerpts attached as Exhibit B are drawn from the certified transcript of Ms. Roscoe's deposition. The County reserves the right to lodge the complete certified transcript and the videotaped recording with the Court and will provide any additional portions the Court wishes to review.

8. The exhibits attached to this declaration are paginated in consecutive order, and a table of contents indicating the page number of each exhibit precedes the exhibits, in compliance with Civil Local Rule 5.1 and the Court's CM/ECF procedures.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 13, 2026, at Pasadena, California.

ROBERT S. KAHN

*25163*



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

# EXHIBIT "A"

EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

JEREMIAH A. LOWE (CA SBN 239166)
*jeremiah@lowelawapc.com*
LOWE LAW, APC
402 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 878-2725
Facsimile: (619) 878-2737

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ESTATE OF LONNIE RUPARD,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, *et al.*,<br><br>Defendants. | CASE NO. 23-CV-1357-CAB-JAC<br><br>**PLAINTIFF'S EXPERT WITNESS DISCLOSURES AND REPORTS PURSUANT TO FED. R. CIV. P. 26(a)(2)(B)** |

Plaintiff the Estate of Lonnie Rupard, by and through its attorneys of record, Iredale & Yoo, APC and Lowe Law, APC, hereby submits the following expert witness reports pursuant to Fed. R. Civ. P. 26(a)(2)(B).

**RETAINED EXPERT REPORTS**

1. Homer Venters, M.D.: Dr. Venters' expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 1**.
2. Daphne A. Glindmeyer, M.D.: Dr. Glindmeyer's expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 2**.
3. Gary Raney: Mr. Raney's expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 3**.
4. Lori E. Roscoe, DNP: Dr. Roscoe's expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 4**.

Respectfully submitted,

DATED: July 15, 2026

**IREDALE & YOO, APC**
EUGENE G. IREDALE
JULIA YOO
SARAH MUSUMECI

*s/ Eugene Iredale*
Attorneys for Plaintiff

DATED: July 15, 2026

**LOWE LAW, APC**
JEREMIAH LOWE

*s/ Jeremiah Lowe*
Attorney for Plaintiff

# Exhibit 4

CHC
CORRECTIONAL HEALTHCARE CONSULTANTS LLC

**EXPERT WITNESS REPORT OF LORI E. ROSCOE, DNP, PhD, APRN, ANP-C, CCHP-RN REGARDING Lonnie Rupard.**

The Estate of Lonnie Rupard v. County of San Diego, et al.
U.S. District Court Southern District of California, No. 3:23-cv-1357-CAB-BLM

I have been retained to render opinions regarding the care and treatment of Mr. Lonnie Rupard while he was detained at the San Diego Central Jail December 2021 through his death on March 17, 2022. My opinions are based upon my knowledge, education, training and experience, and the materials, records, and testimony I reviewed regarding this matter.

**EXPERIENCE AND QUALIFICATIONS:**

I am an Advanced Practice Registered Nurse and certified Adult Nurse Practitioner with more than 35 years of experience in nursing and three decades of experience in correctional healthcare. I began working in correctional healthcare in 1995 and have served in a variety of clinical and administrative roles within correctional health systems.

My academic preparation includes a Bachelor's Degree in Education, a Bachelor of Science in Nursing, a Master of Public Administration with a healthcare concentration, a Master of Science in Nursing, a Doctorate in Healthcare Administration, and a Doctor of Nursing Practice degree.

I am certified by the National Commission on Correctional Health Care (NCCHC) as a Certified Correctional Health Professional (CCHP) and as a Certified Correctional Health Professional – Nurse (CCHP-N). I am currently the principal of Correctional HealthCare Consultants, LLC. Throughout my career I have worked for private correctional healthcare contractors, including Correct Care Solutions and CorrectHealth, LLC, as well as county

and state programs, and academic subcontractors such as the Medical College of Georgia. My work in correctional healthcare has included service as a correctional facility Health Services Administrator, Regional Administrator, Associate Program Director, Executive Director of Clinical Services, nurse practitioner, and registered nurse.

In my administrative and clinical leadership roles, I have been responsible for healthcare policy and procedure development; supervision of healthcare staff including providers, registered nurses, licensed practical nurses, and ancillary personnel; staff education and training for healthcare and custody staff; Continuous Quality Improvement programs; and healthcare program fiscal management. Through Correctional HealthCare Consultants, LLC, I continue to provide healthcare program evaluation, operational consultation, and transitional leadership services to correctional health systems.

I hold active registered nurse licensure in California, Kentucky, Washington, Virginia, and Georgia. I am licensed as an Advanced Practice Registered Nurse (nurse practitioner) in California, Kentucky, Virginia, and Georgia.

I served as a member of the American Nurses Association expert workgroup that reviewed and revised the *Correctional Nursing: Scope and Standards of Practice*, most recently published in 2021 (third edition). Under the auspices of the American Correctional Nurses Association, work is currently underway on the fourth edition, anticipated for publication in 2026.

I am a member of the National Commission on Correctional Health Care Multidisciplinary Education Committee and a member of both the Nursing Committee and Healthcare Committee of the American Correctional Association. I serve as a peer reviewer for the *Journal of Correctional Health Care*.

I was also invited to serve on the 2026 NCCHC Standards Advisory Task Force, which reviewed and edited the *Standards for Health Services in Jails* and the *Standards for Health Services in Prisons*, published in August 2025 and effective January 2026.

I am a founding member and President-Elect of the American Correctional Nurses Association.

A complete listing of my education, training, and professional experience is contained in my Curriculum Vitae, attached to this report as **Exhibit A.**

**COMPENSATION AND PRIOR TESTIMONY:**

I have attached to this report as **Exhibit B** a list of all cases in which I have testified in deposition or at trial in the last four years. I currently receive compensation of $400 per hour for case review and expert report production, with an initial retainer of $5000 for up to 10 hours of work. I receive $650 per hour compensation for deposition and court testimony, with a four-hour daily minimum and travel time reimbursed at $275 per hour as applicable. Travel expenses are charged per actual cost.

**DOCUMENTATION REVIEWED:**

Please see **Exhibit C**, attached.

**SUMMARY OF FACTS:**

On December 19, 2021, Lonnie Rupard was arrested by National City Police for a parole violation and booked into the San Diego Central Jail. Arresting personnel were aware of Mr. Rupard's psychiatric history, including psychotic disorder, and that information was relayed to jail staff at the time of intake. During the intake screening performed by registered nurse (RN) Samonte, Mr. Rupard was documented as disheveled in appearance, verbally abusive but redirectable, and oriented to person and place. His pulse was elevated at 110 beats per minute. He refused COVID testing. Nursing documentation identified a nursing diagnosis of

"alteration in health maintenance." Mr. Rupard weighed approximately 165 pounds at intake and was subsequently housed in general population.

On December 20, 2021, a request was generated for psychiatric evaluation due to Mr. Rupard's extensive psychiatric history, including prior treatment at Patton State Hospital and previous prescription of psychotropic medication. An initial psychiatric evaluation was scheduled for December 24, 2021; however, the encounter did not occur because of "time constraints." A second scheduled psychiatric intake evaluation on December 28, 2021, likewise, did not occur due to "time constraints."

On December 29, 2021, psychiatrist Anthony Cruz conducted an initial psychiatric evaluation of Mr. Rupard cell-side in a non-confidential environment. Mr. Rupard refused to participate meaningfully in the assessment. Documentation described him as verbally aggressive, rambling incoherently, disorganized, irritable, and uncooperative. He was noted to be shirtless, standing at the cell door, and was described as a poor historian. Dr. Cruz documented prior diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, antisocial personality disorder, and stimulant use disorder. Records reviewed by Dr. Cruz reflected more than ten prior psychiatric hospitalizations, including recent hospitalization at Patton State Hospital, as well as prior treatment with Haldol Decanoate, Zyprexa,  Klonopin, Depakene, and Cogentin. Documentation further reflected a prior history of suicide attempts, including overdose.

During the December 29 psychiatric evaluation, Mr. Rupard's thought processes were documented as disorganized, with pressured speech, incoherent rambling, and he was irritable and verbally aggressive. Although much of the mental status examination could not be completed due to lack of cooperation, Dr. Cruz documented concern for psychosis, psychiatric decompensation, and Mr. Rupard's extensive psychiatric history. Haldol, Cogentin, and Valproic acid were prescribed.  Laboratory testing was declined.

Between December 2021 and January 2022, Mr. Rupard repeatedly refused psychiatric medications and was at times noted to be unable or unwilling to sign medical refusal forms.

On January 20, 2022, Dr. Cruz conducted a psychiatric chart review documenting that Mr. Rupard had consistently refused psychiatric medications. At that time, Mr. Rupard's psychotropic medications, including Haldol, Cogentin, and Valproic acid, were discontinued. The medical record does not reflect referral to the Psychiatric Stabilization Unit (PSU) or another higher level of psychiatric care following the discontinuation of these medications.

On January 29, 2022, following a use-of-force incident involving deputies, RN Romero evaluated Mr. Rupard in the housing unit. Nursing documentation included that deputies reported Mr. Rupard had been "taken down." He was observed with a laceration between his eyebrows, abrasions to the face, and blood present on his lips. Mr. Rupard repeatedly refused assessment and threatened staff if touched. The nursing assessment was terminated for safety reasons.

On February 1, 2022, jail staff requested that Mr. Rupard be evaluated by a qualified mental health professional (QMHP) due to concerns regarding his mental status and functioning.

On February 9, 2022, a mental health wellness check was conducted by QMHP Anosike. Deputies reported that Mr. Rupard was frequently speaking to himself in unintelligible words. Documentation of the encounter reflected impoverished thought processes, inability or refusal to cooperate fully with assessment, and unintelligible speech.

On February 20, 2022, RN Romero documented that Mr. Rupard was placed on lockdown status, noting only that there were "no contraindications" to the placement. The record does not identify the reason for the lockdown or include any accompanying nursing assessment

of Mr. Rupard's psychiatric condition, functional ability, hygiene, nutritional status, vital signs, or ability to care for himself.

On February 22, 2022, Dr. Cruz again evaluated Mr. Rupard cell-side in a non-confidential environment. Documentation reflected that Mr. Rupard was no longer prescribed psychotropic medication because the medications previously ordered had been discontinued following repeated refusals. During the encounter, Mr. Rupard again refused meaningful participation, rambled incoherently, yelled at staff, and became verbally aggressive. He was described as alert and oriented only to person, with disorganized thought processes and poor grooming. Dr. Cruz documented that Mr. Rupard may have been responding to internal stimuli. Although his toilet was noted to be covered with cloth, the cell was otherwise described as relatively clean at that time. Dr. Cruz again documented Mr. Rupard's history of psychosis, psychiatric hospitalization, suicidality, and potential for psychiatric decompensation. The treatment plan documented continued monitoring and offering medications, with follow-up planned in six to seven weeks or sooner if needed. No description of what "need" would require sooner follow-up was documented.

On February 23, 2022, another request was made for Mr. Rupard to be evaluated by a qualified mental health professional. Documentation reflects that this request was not completed and no further documented wellness checks or psychiatric evaluations occurred prior to his death, except for the competency evaluation by Dr. Badre.

On March 14, 2022, court-appointed psychiatrist Nicolas Badre, MD, evaluated Mr. Rupard for competency to stand trial. Dr. Badre documented significantly deteriorated living conditions within the cell, including trash scattered throughout, feces present on the floor, a toilet filled with excrement, smeared food on the walls, and a strong malodor. Mr. Rupard himself was described as dirty, unkempt, incoherent, and severely disorganized. Dr. Badre determined that Mr. Rupard was not competent to stand trial and recommended transfer to a state hospital as well as involuntary antipsychotic medication treatment.

Between March 14 and March 17, 2022, the health record does not reflect that Mr. Rupard received psychiatric medications, was transferred to a higher level of psychiatric care, underwent medical evaluation, had vital signs obtained, was weighed, or received any intervention regarding the deteriorated sanitary conditions of his cell.

On March 17, 2022, Mr. Rupard was reportedly last observed alive during routine safety checks at approximately 2146 hours. At approximately 2212 hours, deputies conducting a welfare check briefly looked into Mr. Rupard's cell for several seconds before continuing to the next cell without entering the cell, rendering aid, or summoning medical personnel. Mr. Rupard was subsequently found in his cell at approximately 2248 hours not breathing (without a rise and fall of his chest). Cardiopulmonary resuscitation was initiated and emergency medical services were activated. Mr. Rupard was transported to UCSD Medical Center, where he was pronounced deceased at 2351 hours.

The policies and procedures of the San Diego County Central Jail pertinent to Mr. Rupard's medical care and treatment include *MSD.G.2.1 – Segregated Inmates* (Revised 1/5/2022); *MSD.N.4 – Nursing Documentation* (Revised 1/13/2022); *MSD.R.5 – Refusal Procedures* (Revised 1/6/2022) and *M.29 – Hunger Strikes* (Revised 10/21/2020). The associated standards by the NCCHC (2018) *include J-G-01: Segregated Inmates; J-A-08: Health Records; and J-G-05: Informed Consent and Right to Refuse*.

According to testimony from Serina Rognlien-Hood, Director of Nursing at the time, the County policy regarding incarcerated persons housed in segregation required notification to healthcare staff upon placement in segregation. The policy further required healthcare staff to review the incarcerated person's medical and mental health needs via a health record review, determine whether accommodations were necessary, inform custody as appicable, and document the review in the health record. The policy also required nursing staff to monitor incarcerated persons housed in segregation three times a week and mental health staff to monitor such persons at least weekly. The NCCHC standard *J-G-01: Segregated*

*Inmates* includes that same monitoring schedule and includes the documentation of these rounds and interactions with patients in their health record. Ms. Rognlien-Hood testified that she could not recall any documentation indicating that healthcare staff had been notified of Mr. Rupard's segregation placement, nor could she identify documentation demonstrating that the required nursing segregation monitoring occurred during Mr. Rupard's incarceration.

In February 2022, the California State Auditor's Office disseminated a report regarding the audit conducted as directed by the Joint Legislative Audit Committee of the San Diego County Sheriff's Department (Sheriff 's Department) to determine the reasons for in-custody deaths of incarcerated individuals and identify the steps it took to address these deaths. Its results suggested that systemic deficiencies had undermined the Sheriff's Office's ability to ensure the health and safety of the incarcerated persons in its custody. Its findings addressed medical, mental health and custody issues, and included the following nursing-related suggestions:

- Revise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity level rating it assigns to individuals to all detention staff overseeing them.
- Create a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process.
- Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.
- Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request.

- Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines necessary health care.

**DISCUSSION AND OPINIONS:**

It is my opinion, to a reasonable degree of nursing certainty, that the nursing and healthcare provided to Mr. Lonnie Rupard during his incarceration at the San Diego Central Jail failed to meet the accepted standard of nursing care and accepted correctional healthcare practices. The care provided also failed to comply with the facility's own policies regarding refusal management, monitoring of incarcerated persons housed in administrative segregation, and recognition of deteriorating health conditions.

Although Mr. Rupard had significant psychiatric illness, the nursing and medical issues presented in this case were not limited to psychiatric treatment decisions. Rather, the record reflects progressive deterioration in Mr. Rupard's physical functioning, self-care, hygiene, communication, and ability to meet his basic health and nutritional needs. These changes created foreseeable medical risks requiring ongoing nursing assessment, monitoring, reassessment, escalation of care, and provider notification.

**Failure to Escalate Monitoring Following Medication Refusals**

On January 20, 2022, Mr. Rupard's psychiatric medications were discontinued because of repeated refusals. MSD.R.5, the facility's Refusal Procedures policy, required nursing assessment, documentation of refusal reasoning, review of the acuity of the patient's condition, counseling regarding risks and benefits, and referral to a physician or psychiatric provider when refusals involved serious medical or psychiatric conditions.

At the time medications were discontinued, Mr. Rupard already demonstrated substantial impairment, including incoherent speech, disorganized thought processes, inability to cooperate with assessment, verbal aggression, impaired communication, and a

documented history of schizophrenia-spectrum disorder, suicidality, and repeated psychiatric hospitalization. Despite these findings, the medical record reflects no increase in nursing monitoring, no structured reassessment plan, no nutritional or hydration monitoring, and no escalation to a higher level of medical or psychiatric care. Importantly, once medications were discontinued, Mr. Rupard no longer had routine medication administration encounters with nursing staff. In correctional settings, medication administration frequently serves as one of the few consistent opportunities for direct nursing observation of incarcerated persons with severe mental illness. Such encounters allow nurses to assess physical appearance, weight changes, hygiene, nutritional status, cognition, mobility, responsiveness, and ability to care for oneself. Following the discontinuation of medications, those regular informal nursing observations effectively ceased.

More likely than not, continued routine nursing contact would have revealed Mr. Rupard's progressive deterioration. A reasonable and prudent correctional nurse observing worsening hygiene, impaired functioning, inability to care for oneself, probable weight loss, or evidence of nutritional decline would promptly initiate further medical evaluation and reassessment and then notify a provider of the findings.

**Failure to Recognize That Inability to Participate in Assessment Was Clinically Significant**

Throughout the record, healthcare staff repeatedly documented that Mr. Rupard was unable to be assessed, "uncooperative," incoherent, verbally aggressive, or unwilling to participate meaningfully in encounters. However, Mr. Rupard's inability to meaningfully participate in assessment was itself evidence of significant impairment and should not have resulted in reduced monitoring or abandonment of further evaluation efforts, but instead should have prompted increased objective assessment, provider notification, and development of an appropriate treatment plan.

Correctional nursing care requires adaptation of assessment techniques for incarcerated persons who are severely mentally ill, psychotic, disorganized, cognitively impaired, or unable to participate fully in traditional interview-based evaluations. In such patients, objective nursing observations become especially important, including observation of appearance, hygiene, nutritional status, hydration, mobility, environmental conditions, responsiveness, and overall functioning. Rather than increasing monitoring and objective reassessment in response to Mr. Rupard's inability to participate in care, the record shows progressively decreasing healthcare contact and limited objective medical evaluation despite obvious evidence of deterioration.

**Failure to Adequately Monitor a Segregated and Isolated Incarcerated Person**

The San Diego County policy regarding segregated incarcerated persons, *MSD.G.2.1 – Segregated Inmates*, specifically recognized that segregation should not adversely affect an incarcerated person's health. The policy required nursing monitoring of segregated incarcerated persons three times a week and mental health staff monitoring at least weekly. The policy further required healthcare staff to identify incarcerated persons who were physically or psychologically deteriorating or exhibiting signs of failing health and escalate their care.

On February 20, 2022, nursing documentation reflected that Mr. Rupard was placed on lockdown status, with RN Romero documenting only that there were "no contraindications" to the placement. At that time, Mr. Rupard already exhibited evidence of severe deterioration, including disorganized thought processes, incoherent speech, refusal of medications, impaired communication, and inability to meaningfully cooperate with assessment.

Despite the segregation monitoring requirements, the medical record does not reflect consistent nursing wellness checks, serial medical monitoring, nutritional assessment, hydration assessment, serial vital signs, or weight monitoring after placement in lockdown

or segregation status. There is likewise no indication that healthcare staff identified and escalated Mr. Rupard's progressive deterioration, despite increasingly obvious evidence of failing self-care and impaired functioning.

The facility's segregation policy existed specifically because isolated incarcerated persons are at increased risk for worsening psychiatric symptoms, malnutrition and dehydration, deterioration in hygiene and functioning, delayed recognition of illness, and inability to independently seek medical care.

These risks are especially pronounced in incarcerated persons suffering from severe psychotic disorders, disorganized thought processes, or significant psychiatric decompensation. Such individuals may be unable to appropriately communicate medical needs, recognize worsening illness, maintain adequate nutrition or hydration, engage in basic hygiene, or independently seek healthcare attention. In correctional settings, isolation and segregation may further reduce opportunities for healthcare observation and intervention, making regular nursing monitoring and reassessment critically important safeguards against unrecognized deterioration.

More likely than not, had the segregation monitoring policy been meaningfully implemented for Mr. Rupard, healthcare staff would have directly observed his deteriorating physical appearance, worsening hygiene, inability to care for himself, and probable weight loss. A reasonable and prudent nurse observing these findings would conduct a nursing reassessment and nutritional evaluation, including vital sign and weight measurements, and would immediately escalate care to a provider. More likely than not, a prudent provider getting report about Mr. Rupard would immediately consider transferring Mr. Rupard to a higher level of care. At a minimum, a reasonable provider would have contacted the psychiatric staff to discuss Mr. Rupard's care and treatment plan.

The testimony of Serina Rognlien-Hood supports the conclusion that established segregation monitoring policies were not followed in Mr. Rupard's care. The applicable policy required nursing staff to monitor segregated incarcerated persons three times weekly and required healthcare review upon placement in segregation. While RN Romero did a health record review and did not identify any contraindications to Mr. Rupard being placed in lockdown, Mr. Rupard's psychological condition itself was a contraindication to lockdown.

In addition, there is no evidence that the required three times weekly nursing assessments and wellness checks occurred. Dr. Cruz testified he expected nurses to follow the policies and procedures and assumed that Mr. Rupard was being monitored by nursing staff per policy *MSD.G.2.1 – Segregated Inmates* (Revised 1/5/2022), although he acknowledged he did nothing to check and verify this was occurring.

Had nursing staff performed the required segregation rounds, it is more likely than not that Mr. Rupard's progressive deterioration would have been identified substantially earlier. Mr. Rupard experienced obvious and progressive physical decline, including poor intake, severe weight loss, weakness, and declining functional status. Reasonable and prudent correctional nursing staff performing regular segregation monitoring would have recognized these findings as clinically significant and requiring further medical evaluation, escalation of care, and provider notification. The failure to perform required segregation monitoring substantially reduced opportunities for clinical observation, reassessment, intervention, and escalation of care and constituted a significant deviation from the standard of nursing care.

**Failure to Recognize and Evaluate Nutritional Decline and Failing Health**

The facility's Hunger Strike policy, *M.29 – Hunger Strikes* specifically recognized that incarcerated persons may not verbally declare a hunger strike and that refusal of meals alone may indicate inadequate nutritional intake requiring healthcare intervention. The

policy required staff observation, healthcare staff notification, weight monitoring, hydration monitoring, and medical evaluation based upon identified findings and needs.

Although there is evidence suggesting that Mr. Rupard was not maintaining adequate nutritional intake, healthcare staff failed to identify and appropriately respond to evidence of nutritional decline by initiating the Hunger Strike policy and associated monitoring procedures. At autopsy, Mr. Rupard weighed 105 pounds, a remarkable weight loss of 60 pounds in approximately three months that would have been obvious to staff if he was being monitored per policy. This constituted a significant deviation from the standard of nursing care.

By March 2022, Mr. Rupard exhibited profound deterioration in functioning and self-care. Conditions documented about his cell included feces on the floor, smeared food on the walls, overflowing human waste in the toilet, severe disorganization, poor hygiene, and inability to adequately communicate or care for himself. These conditions were not merely environmental or disciplinary concerns; they were objective clinical indicators of severe psychiatric decompensation, inability to perform activities of daily living, possible nutritional compromise, and failing health requiring immediate healthcare reassessment and intervention.

Regardless of whether healthcare staff had access to Dr. Badre's subsequent written report prior to Mr. Rupard's death, the conditions documented during the March 14 evaluation reflected observable conditions existing within Mr. Rupard's housing environment and ongoing deterioration that would have been visible to staff interacting with or monitoring him.

Despite these findings, the medical record contains no evidence of serial weight monitoring, nutritional assessment, hydration assessment and monitoring, calorie tracking, intake monitoring, or systematic evaluation for malnutrition or physical decline. There is likewise

no indication that custody or healthcare staff documented meal refusal patterns or monitored alternative food intake as contemplated by policy.

Importantly, Mr. Rupard's severe psychosis, impaired communication, segregation, and inability to care for himself substantially increased the risk that nutritional decline and medical deterioration would go unrecognized absent active monitoring by healthcare staff. More likely than not, had the Hunger Strike and Segregation monitoring policies been appropriately implemented, healthcare staff would have identified evidence of physical decline, obtained objective clinical data including serial weights and vital signs, escalated concerns to a provider, and initiated additional medical intervention prior to Mr. Rupard's death. The failure to initiate the Hunger Strike and Segregation policies constituted significant deviation from the standard of nursing care.

**Progressive and Foreseeable Deterioration**

Mr. Rupard's deterioration was not confined to a single isolated event. Rather, the record reflects repeated opportunities over a period of weeks for custody and healthcare staff to recognize worsening functioning, impaired self-care, disorganization, possible nutritional decline and dehydration, and failing health. The cumulative significance of these observations warranted increasing medical attention and reassessment rather than decreasing healthcare contact and continued segregation.

Importantly, the facility's own policies regarding segregation monitoring, refusals, and hunger strikes collectively recognized that incarcerated persons who are segregated, mentally ill, refusing treatment, or unable to adequately care for themselves require increased observation and ongoing healthcare assessment. These policies existed specifically to identify deterioration in incarcerated persons who may be unable or unwilling to independently request medical assistance and obtain the required care.

Mr. Rupard demonstrated progressive and foreseeable deterioration requiring ongoing nursing monitoring, objective reassessment, escalation of care, and provider notification, but that did not occur. The last nursing entry in the health record occurred on February 20, 2022, and was not a physical evaluation of his status, but rather a record review for contraindications to placing Mr. Rupard in lockdown. The documented monitoring and reassessment contemplated by the facility's own policies did not occur and staff failed to identify and appropriately respond to Mr. Rupard's progressively worsening condition.

These cumulative failures substantially delayed recognition of Mr. Rupard's deteriorating condition by healthcare staff, reduced opportunities for timely medical intervention, and significantly increased the risk of serious harm and death.

My opinions, conclusions and findings are made to a reasonable degree of administrative, provider, and nursing certainty and are based upon my knowledge, education, training and experience, and the records, materials, and testimony I reviewed regarding this matter. I hereby reserve the right to amend, supplement, or withdraw my opinion based upon future discovery and depositions of the relative parties that may be provided to me.

Respectfully Submitted on July 15, 2026.

Lori E. Roscoe

Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-N

# Curriculum Vitae

Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN
404-805-9502

## PROFILE

An innovative Healthcare Manager, certified as an Advanced Practice Registered Nurse, a Correctional Health Professional, and a Correctional Registered Nurse, with 31 years of experience in Correctional Health Care and 37 years of Registered Nursing experience. An expert on National Commission on Correctional Health Care and American Correctional Association standards, and policy and procedure development and compliance. An educator of both nurses and correctional officers. A seasoned Continuous Quality Improvement professional. An experienced correctional health expert legal witness, including case review, expert report authoring, and deposition/trial testimony.

## EDUCATION

**Doctor of Nursing Practice**
University of Alabama, 2017

**Master of Science in Nursing, Adult Nurse Practitioner**
South University, 2014

**Doctor of Health Care Administration**
Madison University, 2006

**Master of Public Administration, Health Care concentration**
University of Hartford, 1994

**Bachelor of Science in Nursing**
University of Connecticut, 1989

**Bachelor of Science in Education, Secondary Education and Sociology majors**
Southern Connecticut State University, 1978

## AWARDS

DAISY Team and Correctional Nurse Leadership Award – November 2025

Margaret Collatt Service Award - 2023 – Academy of Correctional Health Professionals

High Honors - South University - 2014

Award for Academic Excellence – University of Hartford 1994

Woodruff Fellow 1992 – 1994 – University of Hartford

## EXPERIENCE

**Correctional HealthCare Consultants LLC**

January 2007 – present – Managing Member

**American Correctional Nurses Association** – (2020 – present), Co-Founder and Member of the Correctional Nursing workgroup currently reviewing and editing the *Correctional Nursing*: *Scope and Standards of Practice, 4th edition,* to be published 2026. President-Elect 2025-2026.

**National Commission on Correctional Health Care Jail and Prison Expert Advisory Task Force for the 2026 Standards** – 2024 – present.

**Independent Content Expert Reviewer** for Doctoral Nursing Student thesis regarding medication administration and Continuity of Care in a Jail setting - Aspen College – 2023-present

**Phoebe Putney Health System – Dougherty County Jail - Georgia** – (2023 – 2024) Healthcare program consultant

**Marion County, KY – Jailer J. Barry Brady** – (2018-present) Healthcare program transitional and ongoing consultation services

**Boone County, KY – Jailer Jason Maydak** – (2018-present) Healthcare program development, transition services and consultation services

**Laurel County, KY – Jailer Jamie Mosley –** (2017-2024; 2025 - current) Healthcare Program Evaluation, ongoing program development, and consultation services

**Preceptor for MSN Nurse Practitioner students from Georgia State University** – (2016 – 2017) Semester of Nurse Practitioner experience in a correctional setting

**CorHealth Solutions, LLC – Dr. D. Brent Cherry** – (2016) - Correctional Health Program Development and contract initiation consultation- Somerset, KY

**National Commission on Correctional Health Care Multi-Disciplinary Education Committee** (2019 – present)

**Journal of Correctional Health Care,** peer reviewer (2019 – present)

**University of Connecticut School of Nursing** (2014 - 2016) – Expert Nurse panelist for a research study regarding the Correctional nurse and stress being conducted by Dr. Denise Panosky.

**American Nurses Association –** Member of the Correctional Nursing workgroup responsible for reviewing and editing the *Correctional Nursing*: *Scope and Standards of Practice* – latest version published November 2020.

**The Correctional Nurse Educator** (2010-present) – Developed and maintain an online educational site where nurses can earn continuing education credits in topics specifically related to correctional nursing. Accredited as a Provider by the California, Florida, Georgia, South Carolina and other Boards of Nursing.

**Medical Association of Georgia** (2007-2017) – Accreditation auditor for the Corrections Division.

**Legal casework** (2007-present) - Multiple cases for both Defendants and Plaintiffs.

**American Correctional Health Services Association –** Executive Director – 2011-2012

**Correct Health, LLC –** DeKalb County Jail (2008-2009) - Operational review, Management staff mentoring, CQI Program expansion and Annual Review, Procedures and Post Order development, nursing staff mentoring and education.

**Comprehensive Nursing Care, Inc.** (2007 - 2009) **–** Development of successful bid proposal for Medical Nursing Services at Hall County Jail – continued association to develop and execute a complete Nursing orientation program, written procedures for staff, Nursing Assessment Protocols, corresponding Nursing Treatment Notes and Blood Borne Pathogen Exposure Plan, CQI Program and ongoing Staff and Management mentoring.

**The Community Health Center, West Palm Beach, FL**

July 2018 – 2023 – Nurse Practitioner

Nurse Practitioner volunteer provider at this Free Clinic – evaluate, diagnose and treat patients presenting to the clinic with a wide range of illnesses and injuries, including chronic illnesses such as diabetes, hypertension, seizure disorder and hyperthyroidism; women's health issues; mental illness; and acute conditions like infections; sprains and minor injuries. Preceptor for Nurse Practitioner, Physician Assistant, Medical and RN students.

**Correct Care Solutions, Nashville, TN**

September 2014 – January 2018 – Nurse Practitioner, Georgia

In collaboration with the Medical Director, provision of the full range of medical services for the patients at the facility, including sick call, urgent/emergent and chronic care. Interpretation of lab results and diagnostic studies ordered through the facility.

**CorrectHealth LLC, Atlanta, Georgia**

January 2013 – June 2013 – Director of Clinical Support

Responsible for Clinical Services Education, Infection Control, Continuous Quality Improvement, and Accreditation. Daily clinical practice and staff contact. Exclusively responsible for the clinical education of staff at 33 sites, which included working side-by-side with staff, conducting needs assessments and evaluations, and the research of evidence based practices and guidelines to ensure staff were adhering to nationally approved standards of care.

January 2012- January 2013 – Executive Director of Clinical Services

Responsible for all aspects of Clinical Services, including Education, Infection Control, Continuous Quality Improvement, Health Information and Accreditation. Policy and Procedure review and development. Responsible for nursing and ancillary staff. Visited sites and interacted with clients on a regular basis.

July 2009 – December 2011 – Director of Special Projects

Participated in projects with the Georgia Department of Corrections; Project Coordinator and Lead Surveyor for an audit of all healthcare services for the Maricopa County Jail, Phoenix, Arizona; Developed projects and procured funding for the CorrectHealth Community Development Center (non-profit); Project Manager for a Special Study for the Wyoming Department of Corrections regarding healthcare access, medical cost and potential efficiencies; internal operations auditing and staff development. Within CorrectHealth, major responsibility for the clinical education of staff, including nurses, providers and ancillary staff. This included working side-by-side with staff, conducting needs assessments and evaluations, and evidence-based practices and guidelines research to ensure staff adherence to nationally approved standards of care.

**Georgia Correctional Health Care, Georgia Department of Corrections**

2006 - 2007 – Staff Nurse/PRN - Georgia Diagnostic and Classification Prison

**Correctional Medical Services, St. Louis, Missouri**

2004 - 2006 - Health Service Administrator - DeKalb County Jail (GA)

2004 - Utilization Management Nurse (interim) - New Jersey Department of Corrections contract

2000 - 2002 - Associate Program Director – New Jersey Department of Corrections contract

1996 - 1998 - Associate Program Director – Massachusetts Department of Corrections contract

1995 - 1996 - Health Services Administrator - Framingham Women's Prison (MA)

**New Britain Technical Institute, New Britain, CT** 1998 - 1999 – Instructor, LPN program

---

## PRESENTATIONS/LECTURES/PUBLICATIONS

---

**Building Effective Nursing Orientation and Competency Programs with NPD Principles.** Presented April 2026 at the Spring NCCHC Conference, New Orleans, LA.

**Understanding Nursing Scope of Practice in Correctional Settings: A Provider-Focused Perspective.** Presented March 19, 2026 via webinar for the American College of Correctional Physicians.

**The Art of Saying No: Real Strategies for Real Situations.** Presented at the Fall 2025 NCCHC Conference, Baltimore, MD. November 4, 2025

**American Correctional Nurses Association** webinar **Advanced Wound Care Therapy for the Correctional Environment, Moderator** presented July 29, 2025.

**"How to Achieve Success as a Correctional Nurse Manager"** a series of 5 webinars held February 5th, 12th, 19th, and March 5th and 12th, 2025 for the National Commission on Correctional Healthcare - Lead Nurse Planner and presenter week 3, ***Clinical Processes*** and week 5, ***Capstone*** *presentation*.

**American Correctional Nurses Association** webinar "**Are You Ready to Advance Your Career? Principles of Correctional Nursing Leadership"** a panel discussion held February 6, 2025.

**American College of Correctional Physicians, Case Histories in Correctional Medicine, Webinar Moderator** presented August 21, 2024 .

**A Comprehensive Look at Correctional Healthcare Documentation: The Critical Importance of Medical and Behavioral Healthcare Documentation.** Academy of Correctional Health Professionals, webinar presented August 6, 2024.

**Case Studies in Correctional Nursing: Practice, Standards and Leadership** presented at the National Commission on Correctional Health Care Spring 2024 Conference April 27-30, 2024 in St. Louis, MO.

**APRN Challenges: Staying Current on Treatment Guidelines** presented at the National Commission on Correctional Health Care Spring 2024 Conference April 27-30, 2024 in St. Louis, MO.

**American Correctional Nurses Association webinar presenter, "What Do the Correctional Nursing: Scope and Standards of Practice Mean to Me?"** Presented February 1, 2024.

**American College of Correctional Physicians, Webinar Moderator, "Compassion and Care--War Stories from the Trenches--Case Histories in Correctional Medicine"** presented November 16, 2023.

**"Bringing High Quality Healthcare to the Incarcerated – Lessons from a Nurse Educator"** presented at The Western American Correctional Health Services Association conference October 25-27, 2023 in Sacramento, CA.
**The American Correctional Nurses Association, OPEN FORUM: All Things Intake** conducted June 20th, 2023; **Scope of Practice for Correctional Nurses** conducted July 20th, 2023; **Withdrawal** conducted October 19, 2023; **Systemic Racism**, December 2023; **Recruitment and Retention** January 2024; February 2024; March 2024; April 2024; … March 2025; and ongoing. ** This is a monthly ACNA activity**
**"Components of a Correctional Healthcare Program"** presented to the Kentucky Jailer's Association during its Educational Conference June 8, 2023, in Covington, Kentucky.

**"The Lived Experiences of Advanced Practice Registered Nurses in Correctional Settings"** presented at the National Commission on Correctional Health Care Spring 2023 Conference in New Orleans, Louisiana.

**"Components of a Correctional Healthcare Program"** presented to the newly elected Jailers at the Kentucky Jailers Association Conference December 9, 2022, in Lexington, Kentucky.

**"APRN Transformational Leadership"** presented at the National Commission on Correctional Health Care Spring 2022 Conference in Atlanta, Georgia.

**"How to Achieve Success as a Correctional Nurse Manager"** a series of 4 webinars for the National Commission on Correctional Healthcare by the Nurse Advisory Council – Lead Nurse Planner and presenter week 3, Clinical Processes, held August 3rd, 10th, 17th and 24th 2021.
Also Presented April 10, 2022, as a Pre-Conference half day session to the Spring National Conference of the National Commission on Correctional Health Care in Atlanta, Georgia.

**"Professional Practice in Our Post-COVID World: A Correctional Nurse Conversation"** presented at the Virginia Department of Correction Nursing Conference Keynote speaker July 13, 2021.

**"Honoring Our Practice in a Post-COVID World: A Correctional Nursing Conversation"** presented at the Wisconsin Department of Correction Health Services Administrators' meeting June 17, 2021.

**"How APRNs Can Add Value to Your Correctional Healthcare Operation"** presented at the National Commission on Correctional Health Care Spring 2021 Virtual Conference.

**"Patient Advocacy for the Correctional Nurse"** and **"Skin Assessment for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in Ft. Lauderdale, FL. October 2019.

**"Clinical Decision Making in Correctional Nursing"; "Advanced Practice Registered Nurses in Corrections: Roundtable"** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN. April 2019.

**"Clinical Judgment for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in Las Vegas, NV, October 2018 and in Atlanta, GA, May 2017.

**"A Seizure Disorder Primer for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN, April 2016.

**"A Hypertension Primer for the Correctional Nurse"** and **"The Nurse's Role in Chronic Care Management"** presented at the National Conference of the National Commission on Correctional Health Care in Dallas, TX, October 2015.

**"A Diabetic Primer for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in New Orleans, LA, April 2015.

Guest Expert Panelist, American Association of Legal Nurse Consultants webinar **"Civil Rights Litigation"** held nation-wide on October 30, 2014.

**"The Nurse's Role in Chronic Care Management"** presented at the National Conference of the National Commission on Correctional Health Care in Atlanta, GA, April 2014.

Guest Expert panelist, Omnisure webinar **"The Unscheduled Encounter: Reducing Liability and Risk",** held nation-wide on December 4, 2013**.**

**"The New ANA Scope and Standards of Practice for Correctional Nurses: Implementation Standard", "The New ANA Scope and Standards of Practice for Correctional Nurses: Communication Standard"** and **"The Essentials of Nursing Leadership: Capstone Presentation"** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN, October 2013.

**"Unscheduled Encounters: Managing the Nursing Curbside Consult"** and **"The New ANA Scope and Standards of Practice for Correctional Nurses: Implementation Standard"** presented at the National Conference of the National Commission on Correctional Health Care in Denver, CO, April 2013.

**"Unscheduled Encounters: Managing the Nursing Curbside Consult"** presented at the National Conference of the National Commission on Correctional Health Care in Las Vegas, NV, October 2012.

**"Children and Prescription Drug Abuse" –** CHAMPS Instructor School, Georgia Sheriff's Association, June 2012.

**"Con Games: Inmate Manipulation"** presented at the Nursing Forum, American Correctional Health Services Association's National Conference in San Antonio, TX, April 2012.

**"HIV Awareness", "Universal Precautions"** and **"Inmate Medical Services"** at the DeKalb County Sheriff's Office 111th Jail Academy, February 2011 through the 124th Jail Academy, August 2014.

**"Crisis Intervention Training"** co-presenter at the American Correctional Health Services Association Georgia Conference, Savannah, Georgia, November 2009.

**"Nursing Forum: Legal Parameters and Best Practice"** at the American Correctional Health Services Association National Conference, Orlando, Florida, March 2009.

**"Dilemmas in Correctional Nursing"** at the American Correctional Health Services Association National Conference, Reno, NV, June 2007.

---

## PUBLICATIONS

---

Zucker, D., Reagan, L., Clifton, J., Abdulhamed, A., Roscoe, L., Wright, R., Penix, D., Shelton, D., and Loeb, S. (2022). **NPs caring for people who are incarcerated and negatively impacted by social determinants of health**. *The Nurse Practitioner (47)* 6, 38 - 46. Wolters Kluwer Health, INC, DOI-10.1097/01.NPR.0000829804.16627.7b

Roscoe, L., Smith, S., and Shelton, D. (2023). **Translating the Essentials for correctional nursing practice and professional development.** *The Journal of Continuing Education in Nursing, 54(9).* Doi: 10.3928/00220124-20230816-14.

Shelton, D., Roscoe, L., Kaptanovic, T., and Smith, S. (2025). **The correctional nursing workforce crisis: An innovative solution to meet the challenge**. *Journal of Correctional Health Care,* Doi: 10.1089/jchc.24.09.0079.

## LICENSES AND CERTIFICATIONS

Advanced Practice Registered Nurse/Nurse Practitioner –California (NP95006810), Georgia (RN179490), Kentucky (3012955), Virginia (0024178346) and Florida (Autonomous Practice APRN9485060 - retired),

Certified Adult Nurse Practitioner – American Academy of Nurse Practitioners National Certification Board (A0614010 – expiration June 2029)

Registered Nurse licensure - Washington, California, Kentucky, Virginia, Georgia and Florida (retired)

Certified Correctional Health Professional – Certified Correctional Nurse – NCCHC

Certified Provider of Continuing Education – California Board of Registered Nursing and others

Certified Guest Instructor - Georgia Peace Officer Standards and Training Council

BLS Healthcare Provider

## MEMBERSHIPS

American Correctional Nurses Association - Founding Member and President-Elect 2025-2026

American Association of Nurse Practitioners - member

American College of Correctional Physicians – member and Virtual Education Committee

American Correctional Association – member and Health Care Committee and Correctional Nursing Committee

American Jail Association - member

Western American Correctional Health Services Association (WACHSA) - member

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN

**2022 - 2026**

**Paul James, James & Carter PLC**
**Little Rock, AR**

Michelle "Missy" Babin Special Administratrix estate of Larry Charles Babin, deceased, Plaintiff, vs John Montgomery, et al, Defendant.
*Plaintiff* - **ongoing litigation**

**Katharine Tapp, Poppe Law Group**
**Sandra Spurgeon, Spurgeon Law Group**
**Lexington, KY**
David Hammonds, estate of Robinson et al Plaintiff vs. Southern Health Partners, Adair County, et al, Defendants
*Plaintiff* - **ongoing litigation**

**Anne Vankirk, Dubin Law Group**
**Seattle, WA**

Nicole McClure, an individual, Plaintiff, vs. Washington State Patrol, a department of the State of Washington; Thurston County, a political subdivision of the State of Washington, et al., Defendant.
*Plaintiff* - **ongoing litigation**

**Linda Le Jones, Clark Von Plonski Anders**
**Dallas, TX**
**Josh Maness, Law Offices of Josh Maness**
**Waskom, TX**

Brian Newman, as Independent Administrator of the Estate of Terry Lamont Newman, deceased, et al., v. Smith County, TX et al.
*Plaintiff* - **ongoing litigation**

**Edward J. McNelis and Whit Long, Emroch & Kilduff**
**Richmond, VA**

Deandre R. Alston v. CHS TX, INC, d/b/a YesCare Corp., et al
*Plaintiff* - **settled 2025**

**Jason Hicks, Chris Hammons, Laird, Hammons, Laird, PLLC**
**Oklahoma City, OK**

Kizzie Simms, individually and as Special Administrator of the Estate of Gregory Neil Davis, Plaintiff, vs. Board Of County Commissioners For Oklahoma County; Board Of Trustees For The Oklahoma County Criminal Justice Authority; Greg Williams, individually, Turn Key Health Clinics, LLc, et al.
*Plaintiff* **- trial April 2026**

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN

**2022 - 2026**

**Sarah Mansfield, Wesley Clark and Frank Brazil, Brazil Clark PLLC**
**Nashville, TN**

Jason Michael Clark, ex rel Conservator Richard Gary Clark, Plaintiff v Fentress County, Sheriff Michael Reagon, Candy Norman (aka Candy Price), Fast Access Healthcare, Anthony Baird, Nerissa Owens, Defendants
*Plaintiff* - **settled 2025**

**Marko Duric, Sandberg Phoenix**
**St. Louis, MO**
**Shauna Reitz, Loizzi Law Offices, LLC**
**Chicago, IL**

Amy Hernandez, as Administrator of the Estate of Alex Alvarez, deceased, Plaintiff, v. Vippin Shah, MD, Deena Seed, Amy Frey, Amy Thurman, Pamela Ward and Wexford Health Sources, Inc Defendants.
*Plaintiff* - **ongoing litigation**

**Paul K. Croley II, Law Offices of Croley & Foley**
**Lexington, KY**

Tammy Webb, as Administratrix of the Estate of Terri Beth Mays, deceased v. Whitley County, KY, Brian Lawson, et al.
*Plaintiff* - **ongoing litigation**

**Anika Ades, MacDonald Hoague & Bayless**
**Seattle, WA**

Ryan Kelty, Plaintiff, v. Walla Walla County, Rebecca Groom, Nadean Pulfer, et al.
*Plaintiff* - **settled 2025**

**Derek Franseen, Walsh & Franseen**
**Edmond, OK**

Blake Williams, Plaintiff, v. Heather Hasenmyer, individual
*Plaintiff* - **ongoing litigation**

**F. Davis Poisson III and Noah Abrams,** Poisson and Bower
**Raleigh, NC**

Kahleel Truesdale, Plaintiff v. Quality Mobile X-Ray, Wellpath LLC, et al Defendant
*Plaintiff* - **ongoing litigation**

**Paul K. Croley II, Law Offices of Croley & Foley**
**Lexington, KY**

Keri Burnette, as Administratrix of the Estate of Aaron K Burnette, deceased v. Whitley County
*Plaintiff* - **ongoing litigation**

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN

**2022 - 2026**

**Aurora Randolph, ALR Civil Rights LLC**
**Denver, CO**

Kisha Birts, Plaintiff, vs. Colorado Department of Corrections, Rita Winn, NP, et al. Defendants.
*Plaintiff* - **settled 2026**

**Brian Tanner, Griffin, Turner, Tanner & Clarkson**
**Savannah, GA**

Patsy Ann Amaro, as mother of Johnny Warren Conley;
Jake Calvin Conley, as father of Johnny Warren Conley; et al v. Dr. Myra Pope, et al
*Plaintiff* **- settled 2026**

**Anna Holland Edwards, Holland, Holland Edwards & Grossman, LLC**
**Denver, CO**

Estate of Cristo Jesus Canett, by and through its personal representative Elizabeth Naranjo v. Wellpath LLC, Board of County Commissioners of the County of El Paso, CO; Sheriff Joseph Roybal, Anthony Lupo, individually; et al.
*Plaintiff* **- ongoing litigation**

**Anna Holland Edwards, Holland, Holland Edwards & Grossman, LLC**
**Denver, CO**

Estate of Amy Lynn Cross v. Turn Key Health Clinics LLC, Board of County Commissioners, Weld County, et al
*Plaintiff* **- settled 2025**

**Thomas Day, Eagan Flanagan and Cohen**
**Springfield, MA**

MAURA O'NEILL, as administrator of the Estate of Madelyn E. Linsenmeir, Plaintiff, v. CITY OF SPRINGFIELD, et al. Defendants
*Defendant Hampton County Sheriff's Office* - Defendant - **settled 2025**

**Jason Hicks, Chris Hammons, Laird, Hammons, Laird, PLLC**
**Oklahoma City, OK**

Ashley Meyers, et al v. Board of County Commissioners of Rogers County, et al
*Plaintiff* **- closed**

**William Murray, Jaden Rhea, Bailey & Wyant, PLLC**
**Charleston, WV**

Joyce Horner as Administratrix of Estate of Noah Morris v. PrimeCare Medical of WV, INC and the WV Division of Corrections and Rehabilitation (DCR).
*Defendant DCR* - **ongoing litigation**

# Legal Cases-Depositions/Trial

Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN

**2022 - 2026**

**Todd Schroeder, McKeen and Associates**
**Detroit, MI**
Timothy Griswold as the personal representative of the estate of John E. Griswold of v. Trinity Health; County of Livingston; et al
*Plaintiff* - **ongoing litigation**

**Anna Holland Edwards, Erica Grossman, Holland, Holland Edwards & Grossman, LLC**
**Denver, CO**
Estate of Kelroy Newman, Plantiffs v Board of County Commissioners of the County of Montezuma, CO; Sheriff Steven Nowlin; et al
*Plaintiff* - **settled 2026**

**Frederick J. Schlosser, Gates, Wise, Schlosser and Goebel**
**Springfield, IL**
Smith v. County of Macon, et al.
*Plaintiff* - **settled 2025**

**Rachel Fuerst, Henson Fuerst, PA**
**Raleigh, NC**
Estate of Caveness v. Gray, et al.
*Plaintiff* - **settled 2023**

**Mark Krudys, The Krudys Law Firm, PLC**
**Richmond, VA**
Boley v. Armor Correctional Health Services, Inc., et al.
*Plaintiff* - ***Trial December 2022***

**John Coletti, Paulson Coletti Trial Attorneys PC**
**Portland, OR**
Thomsen v. NaphCare, Inc, et al
*Plaintiff* - ***settled 2024***

**Carolyn Trier, Trier Law Office, LLC**
**Fort Wayne, IN**
Rittenhouse v. Wells County et al
*Plaintiff* - ***settled 2024***

**Michael Crow, Beasley, Allen, Crow**
**Montgomery, AL**
Robert Edward Taylor, v. Eric Starr et al
*Plaintiff* - ***settled 2024***

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN

**2022 - 2026**

**Erik Heipt, Budge & Heipt, PLLC**
**Seattle, WA**
Mary Margaret Mathis v. Southwestern Correctional LLC et al
*Plaintiff* - ***settled 2023***

**Amy Miller, Miller Olsen, PLLCC**
**Seattle, WA**
Michael Eugene Searles, v. Washington State Department of Corrections
*Plaintiff* - ***settled 2023***

**Kevin Young, Peterson & Associates, P.C.**
**Kansas City, MO**
Gary Burke, et al. Plaintiffs vs. Butler County, et al. Defendants
*Plaintiff* - ***settled 2023***

**Paul Dworak & Jeffery Storms, Newmark Storms Dworak Law Office; and**
**Jeffrey Montpetit, Sieben Carey**
**Minneapolis, MN**
Janessa Novak, Special Administrator vs. Michael McIlvain, Douglas County, MEnD et al
*Plaintiff* - ***settled 2023***

**Samuel Daheim, Connolly Law Offices, PLLC**
**Tacoma, WA**
Daniel Bailey, as Personal Representative of the Estate of Michael Joseph Bailey, deceased vs. the City of Kent, Defendant
*Plaintiff* - ***settled 2022***

**Edwin Budge and Hank Balson, Budge & Heipt, PLLC**
**Seattle, WA**
The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, Individually, Plaintiff v. NaphCare, Inc.; Hannah Gubitz, Individually; and Spokane County, a political subdivision of the State of Washington, Defendants
*Plaintiff* - ***trial July 2022***

Exhibit C – Materials Reviewed

Third Amended Complaint;
Depositions of Kloker, Montgomery, Blumenshine, Badre, Cruz (with errata), Schaber, Quiroz, Goodall (Anoseke), Rognlien-Hood; Jouhal, and Ysla;
COSD 000375-380 Badre Reports;
COSD 001216-1442 Autopsy Photos of Lonnie Rupard;
COSD 001510-1547 Photos of Rupard's Cell;
COSD 001633-1636 Follow Up Investigative Report re Autopsy – Det. Blumenshine;
COSD 001637-1649 Follow Up Investigative Report by Det. Blumenshine 06.07.2022;
COSD 001656-1677 Follow Up Investigative Report II by Det. Blumenshine 03.16.2023;
COSD 002085-2106 Autopsy Report (Unredacted);
COSD 006108-6109 MSD.M.10 Mentally Disordered Individuals – Emergency Transportation 02.24.2011;
COSD 006126-6127 M.29 Hunger Strikes 10.21.2020;
COSD 006128-6130 MSD.N.4 Nursing Documentation 01.13.2022;
COSD 006131-6133 MSD.N.4 Nursing Documentation 09.15.2016;
COSD 006134-6142 MSD.P.8 Psychiatric Stabilization Unit (PSU) 10.02.2019;
COSD 006143-6151 MSD.P.8 Psychiatric Stabilization Unit (PSU) 01.24.2022;
COSD 006152-6154 MSD.P.13 Staff Training for 5150 Certification 01.18.2022;
COSD 006155-6157 MSD.P.13 Staff Training for 5150 Certification 06.23.2020;
COSD 006158-6161 MSD.P.15 Psych Stabilization Unit – Admission Types 01.31.2022;
COSD 006162-6165 MSD.P.16 Psych Stabilization Unit – Admission Types 02.13.2015;
COSD 006166-6167 MSD.P.16 on PSU 4011.6 Procedures 01.18.2022;
COSD 006168-6169 MSD.P.16 on PSU 4011.6 Procedures 03.22.2013;
COSD 006170-6173 MSD.P.17 PSU Psychiatric Holds – Civil Commits 01.18.2022;
COSD 006174-6177 MSD.P.17 on PSU Psychiatric Holds – Civil Commits 09.30.2014;
COSD 006190-6194 MSD.P.19 PSU – Welfare and Inst. Code 5270 09.30.2014;
COSD 006211-6213 MSD.R.5 Refusal Procedures 01.06.2022;
COSD 006214-6216 MSD.R.5 Refusal Procedures 07.14.2016;
COSD 006224-6227 MSD.S.6 Mental Health Clinicians Function – PSU 1.18.2022;
COSD 006262-6264 MSD.A.1.3 Health Care Services 02.03.2020;
COSD 006265-6266 MSD.A.3.2 Physician's Orders 01.18.2022;
COSD 006267-6268 MSD.A.3.2 Physician's Orders 02.03.2020;
COSD 006269 MSD.A.3.2 Physician's Orders 01.12.2022;
COSD 006270 MSD.C.1 Classification of Patients 03.22.2005;
COSD 006271-6273 MSD.C.4 Consent for Treatment 11.15.2021;
COSD 006274-6276 MSD.C.4 Consent for Treatment 10.30.2015;
COSD 006280 MSD.C.10 Court Orders 01.12.2022;
COSD 006281 MSD.C.10 Court Orders 10.30.1015;

COSD 006292-6299 MSD.E.2.1 Receiving Screening 06.23.2020;
COSD 006300-6301 MSD.E.5.1 Mental Health Screen and Evaluation 02.01.2022.
COSD 006302-6303 MSD.E.5.1 Mental Health Screen and Evaluation 06.23.2020;
COSD 006304-6305 MSD.E.9.2 State Hospital Returnees 07.21.2020;
COSD 006311-6312 MSD.G.2.1 Segregated Inmates 01.05.2022;
COSD 006313-6314 MSD.G.2.1 Segregated Inmates 10.30.2020;
COSD 006315-6317 MSD.G.3.1 Emergency Psychotropic Medication 01.25.2022;
COSD 006318-6320 MSD.G.3.1 Emergency Psychotropic Medication 04.07.2020;
COSD 006321-6325 MSD.G.3.2 Psychotropic Medication 11.15.2021;
COSD 006326-6330 MSD.G.3.2 Psychotropic Medication 04.24.2020;
COSD 006331-6334 MSD.H.8 Use and Disclosure of Psychotherapy Notes 04.15.2003;
COSD 006335-6336 MSD.H.12 Hunger Strikes 06.15.2015;
COSD 006437 Confidential Excel of Sick Calls and Referrals;
COSD 6780-COSD 6880 Training on Medical Issues and Universal Precautions;
COSD 7084-7116 Addressing Training on Mental Health Issues in Jails;
COSD 7206-7222 Training on PSU Orientation;
COSD 7223-7241 Training on Medical Issues and Universal Precautions;
COSD 7253-COSD 7269 Training Materials – Roles and Responsibilities ACO;
National Commission on Correctional Health Care (NCCHC) Report January 2017;
California State Auditor's Report February 2022;
CLERB 01-30-24 Final Findings Report (Redacted);
Confidential COSD 000026-000150 Lonnie Rupard Jail Medical Records;
Confidential COSD 006376-006416 Autopsy and Notes from ME's Office (Redacted);
COSD 00106-107 MSD.M.10 Mentally Disordered Individuals – Emergency 02.01.2022 and ;
COSD 000266-274 Blumenshine Report.

.

# EXHIBIT "B"

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD; et al.,

Plaintiff,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE CORPORATION; CHRISTINA GOODALL (SUED AS CHRISTINA ANOSIKE) , IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; DEFENDANT DEPUTIES DOES 1-10, DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10.

Defendants.

**CASE NO.** 3:23-cv-1357-CAB-JAC

## DEPOSITION OF
LORI E. ROSCOE, DNP

Monday, September 14, 2026

10:02 AM to 2:47 PM

Reporter: Althea L. Miller, CSR No. 3353, RPR, CCRR

**VIA REMOTE VIDEO TECHNOLOGY**

**Hines Reporters**
**INTERNATIONAL TOWER**
**888 S. FIGUEROA STREET, SUITE 940, LOS ANGELES, CALIFORNIA 90017**
**866.432.4300**

**LOS ANGELES * SAN FRANCISCO * SAN DIEGO**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD, By and Through His Successor-In-Interest Justino Rupard & Ronnie Rupard; JUSTINO RUPARD, Individually, and In His Capacity as Successor in Interest, RONNIE RUPARD, Individually, and In His Capacity as Successor in Interest,

Plaintiffs,

vs

No. 3:23-cv-1357-CAB-JAC

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; et cetera, et al.,

Defendants.

DEPOSITION OF: LORI E. ROSCOE, DNP

TAKEN ON: September 14, 2026

APPEARING REMOTELY FROM SAN DIEGO, CALIFORNIA

STENOGRAPHICALLY REPORTED BY:
ALTHEA L. MILLER
CSR No. 3353, RPR, CCRR No. 149
File No. 133692
APPEARING REMOTELY FROM LOS ANGELES COUNTY, CALIFORNIA

REMOTE DEPOSITION OF LORI E. ROSCOE, DNP, taken on behalf of the Defendants, with all parties, by agreement, attending the deposition remotely in Los Angeles and San Diego counties, California, on Monday, September 14, 2026, at 10:02 A.M., before Althea L. Miller, CSR No. 3353, RPR, CCRR No. 149.

APPEARANCES:

For the Plaintiff, Justino Rupard and the Estate of Lonnie Rupard:

LOWE LAW, APC
BY: JEREMIAH A. LOWE, ESQ.
402 West Broadway
Suite 1720
San Diego, California 92101
(619) 878-2725
jeremiah@lowelawapc.com

For the Defendants County of San Diego and others:

COLLINS + COLLINS LLP
BY: RADA FELDMAN, ESQ.
2011 Palomar Airport Road
Suite 207
Carlsbad, California 92011
(760) 274-2100
rfeldman@ccllp.law

///

///

APPEARANCES OF COUNSEL (Continued):

For the defendants Anthony Cruz, M.D. and Liberty Healthcare of California, Inc.:

TRESSLER LLP
BY: ALEXANDRA SENNET, ESQ.
909 North Pacific Coast Highway
Suite 840
El Segundo, California 90245
(310) 203-4800
asennet@tresslerllp.com

Also Present: Joseph L. Holden, Law Clerk

Kameron Hines, Videographer

///

///

I N D E X

| WITNESS | | PAGE |
|---|---|---|
| LORI E. ROSCOE, DNP | | |
| | BY MS. FELDMAN | 7 |
| | BY MS. SENNET | 182 |

E X H I B I T S

| DEFENDANTS' | | PAGE |
|---|---|---|
| EXHIBIT 1 | File of Lori E. Roscoe, DNP 112 pages | 9 |
| EXHIBIT 2 | 30-page document titled "Expert Witness Report of Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN Regarding Lonnie Rupard" | 11 |
| EXHIBIT 3 | Two-page letter to Lowe from Roscoe, dated July 27, 2026, designated as the Rebuttal Report | 13 |
| EXHIBIT 4 | 125-page document titled on page 1 "San Diego Sheriff's Department Health Management Information" | 182 |

Q U E S T I O N S   M A R K E D

(None.)

I N F O R M A T I O N   R E Q U E S T E D

(None.)

REPORTED REMOTELY FROM LOS ANGELES COUNTY,
CALIFORNIA
September 14, 2026
10:02 A.M.

-oOo-

10:02:28 THE VIDEOGRAPHER: All right. Good morning.

10:02:29 Here begins Media Number 1 in Volume 1 in the deposition of Dr. Lori Elisabeth Roscoe in the matter of Estate of Lonnie Rupard versus County of San Diego, being United States District Court, Southern District of California.

10:02:45 The case number is 3:23-cv-1357-CAB-JAC.

10:02:56 Today's date is Monday, September 14th, 2026.

10:03:00 The time is 10:03 A.M. Pacific Time.

10:03:03 This deposition is being taken via Zoom remote video technology and is being made at the request of the defendants.

10:03:10 Your videographer today is Kameron Hines, here on behalf of Hines Reporters located at 888 South Figueroa Street in Los Angeles, California.

the policy, I hope, so that I can take a look at it and be specific for you.

Q Yes.

A But there were certain requirements that had to happen when someone refused and that included escalating the care or the -- the evaluation to someone.

Here we go.

Q Okay. And I have this policy in front of me and I pulled up the January 6, 2022, dated version.

Is that the one that you have been referring to?

A I don't know the answer to that. If there's one beforehand --

Q There is one with an effective date that runs from 2016 through this effective date. I can pull it up.

A No.

Because this is -- this is in operation at that time of January 6, 2022, and that's when he was there.

Q Okay. Do you want to point me to the section that you were referring to?

A Yes.

Let's look at "Refusals for Medications," Number 7 -- 6. Excuse me.

Q Okay. So that's the "VI, Refusals for Medications" on page 2; correct?

A Yes.

Mr. Rupard did not sign a refusal form. He did refuse, I would assume, to sign the refusal form. There should have been the nurse and a deputy signing the form.

I was provided no refusal forms at all for Mr. Rupard's refusals.

Q Okay. So can we -- with respect to that opinion that Mr. Rupard was not provided with a refusal form, are you saying that you are not aware of any documents in Mr. Rupard's jail medical record showing that he had signed a medication refusal form about, I believe, was 34 times?

A Correct.

Q So you were not provided with those documents in this case?

A Correct.

I would assume not, because I don't recall seeing any scanned refusals in the health record.

Q And so if I was to provide you with 34 documented refusal forms of medication for the

period of December 30th, 2021, through, I believe it's January 23, 2022, showing that Mr. Rupard had signed refusal forms for the specific medication that Dr. Cruz had prescribed, would that information change your opinion?

A That would change my opinion with -- with regard to them getting the refusal form, certainly.

If you go down a little bit more on E, it says:

"If the medication is indicated for serious medical or psych condition, refer patient to M.D., RNP, or psychiatric PRNP immediately or as soon as possible."

That didn't happen until the end of January, where my understanding is that his refusal started as soon as he arrived at the facility.

Q Were you provided with information indicating when requests were made for a psychiatric sick call to evaluate Mr. Rupard's refusal of the medication that Dr. Cruz had evaluat- -- had prescribed?

A I don't recall that, one way or the other.

But I do know that, again, he wasn't seen by Dr. Cruz until the end of January, where it's

refusal of these critical medications.

Q And what support do you have for your opinion that immediately or as soon as possible should be interpreted as that very day --

A Well --

Q -- with respect to this section?

A Sure.

In my experience of -- of passing medications and also supervising nurses who pass medications, that's part of the whole medication administration process.

You go out and you do your med pass.

You get people that don't want the medications.

You get the refusals.

You come back to the health unit. You chart your medications.

And then that follow-up has to occur and whatever that follow-up is, whether it's someone who is almost ready for renewal for medications, the nurse has to effect orders for that.

And in this case, again, to follow this policy, they should have gone back to their -- wherever their work area is, done the work to finish up the medication administration pass, and then as

10:48:58 part of that, they would make their referrals.
10:49:01 Q And what is the basis for this opinion?
10:49:04 A Foundational correctional nursing practice.
10:49:09 Q And what's that?
10:49:13 A That is the basic nursing practice that
10:49:16 every correctional nurse should know --
10:49:18 Q And is --
10:49:18 A -- and should abide by.
10:49:19 Q And is there any specific individual here
10:49:22 that you have an opinion to did not abide by that?
10:49:28 A No.
10:49:33 Q And do you agree that, at least at one
10:49:35 point, referral was made to the psychiatrist to
10:49:43 conduct -- to assess the patient, Mr. Rupard, for
10:49:46 the medication refusal?
10:49:48 A Yes.
10:49:48 You dropped off at the end there, but I
10:49:51 think what you said there was there was at least one
10:49:54 referral for psychiatry to review the chart of
10:49:59 Mr. Rupard based on a nursing referral.
10:50:02 And if that was your question, the answer
10:50:04 is yes.
10:50:05 Q Okay. And you indicated that you are
10:50:10 familiar with the TechCare system; correct?
10:50:14 A Yes.

11:06:51 It wasn't a physical in-person assessment. It was a chart-review assessment that was done.

11:06:57 Q And so after Dr. Cruz decides that Mr. Rupard's medication should be discontinued, your opinion is that that resulted in Mr. Rupard no longer having routine medication administration encounters with nursing staff; is that correct?

11:07:24 A Correct.

11:07:30 Q And then you indicate that your opinion is that nursing staff should have been aware after Dr. Cruz, the psychiatrist, makes the decision to discontinue Mr. Rupard's medication and Mr. Rupard no longer has routine medication administration encounters with nursing staff, that what? That Mr. Rupard should be back on his med- -- psychotropic medication?

11:08:02 A Oh, no. Not at all. That's not a nursing function to order medications, but it is a nursing function to review the care of your patient and determine what would be best for him.

11:08:13 And what I'm suggesting here is that the nursing staff itself could have put him on some kind of check-in as part of the usual unit activities.

11:08:27 For example, I know I'm going to mess up her name and I'll apologize in advance, but director

11:08:37 of nursing, Rognlien-Hood -- Hood -- was I close? --
11:08:41 Q Yes. I understand who you're referring to.
11:08:44 A -- testified that there was one nurse
11:08:45 assigned to the module, one nurse assigned to the
11:08:48 floor in the module, and that nurse for that
11:08:51 particular day, whoever it was, did the medication
11:08:54 administration, also did treatments like blood
11:08:58 pressure checks, wound care, and could have easily
11:09:03 added that to the module workload, if you will, to
11:09:07 make sure that there was a check-in with Mr. Rupard,
11:09:10 given his -- his deteriorating condition.
11:09:15 Q And what is the basis for this opinion?
11:09:20 A Foundational nursing care.
11:09:23 Q Is that a required standard for all jail
11:09:25 facilities, including San Diego Central Jail in
11:09:29 2022?
11:09:31 A Well, it is not a standard. It's a
11:09:34 practice and it's good nursing.
11:09:35 And it's basic fundamental nursing that we
11:09:38 monitor our patients and make sure that they are not
11:09:42 getting worse, deteriorating.
11:09:46 Q But the doctor, the psychiatrist, Dr. Cruz,
11:09:51 had reviewed Mr. Rupard's refusal and records and
11:09:55 made the decision that Mr. Rupard should be
11:10:01 discontinued from the medications that he had

11:21:24 there any other opinions that you intend to offer in this case regarding this "Failure to Escalate Monitoring Following Medication Refusals" opinion?

11:21:36 A No.

11:21:37 Q Okay. So is it okay if we move on to your next opinion?

11:21:41 A That would be fine.

11:21:42 Q Okay. And then your next opinion, would that be the next header in your report titled "Failure to Recognize That Inability to Participate in Assessment was Clinically Significant"?

11:21:56 A Yes.

11:21:57 Q And can you tell me what your opinion is?

11:22:00 A Yes.

11:22:06 Basically, just that --

11:22:16 Mr. Rupard displayed signs of not being able to cooperate or -- either because he couldn't or because he was unwilling -- to participate in his evaluation in the assessments that were done.

11:22:30 And so I just wanted to bring out the point that that, in and of itself, the fact that he couldn't participate in the assessment is a problem, and it's also an indication -- it was clinically significant, as it were, and it doesn't seem like that was taken into consideration when the care plan

11:22:56 was developed for him.
11:23:01 Q So you mentioned a care plan developed for him.
11:23:04 Can you identify what you're referring to?
11:23:08 A No, I cannot. It's just something that nurses do when they are taking care of patients.
11:23:16 They develop a plan of care for that particular person.
11:23:19 Again, not medical. Nursing care.
11:23:25 Q Is this opinion addressed with respect to any specific County or Liberty defendant?
11:23:36 A No.
11:23:37 Q Okay. And so is this opinion addressing the conduct of any individuals named as defendants in this case?
11:23:45 A No.
11:23:48 Q And what is the basis for this opinion?
11:23:50 A Again, good nursing practice.
11:23:56 Q And what is that? What documentation is that based on?
11:24:00 A Fundamental nursing care. There are manuals out there. Lippincott is one that has nursing education standards and processes and procedures, but it's just, again, foundational nursing care that nurses coming out of nursing

11:46:04 But you agree that Dr. Cruz, after assessing Mr. Rupard at the end of February 2022, made the decision to continue the discontinuation of the psychotropic medication; is that correct?
11:46:20 A Yes.
11:46:21 Q And do you agree that Dr. Cruz also made the determination that Mr. Rupard didn't -- did not meet the criteria for PSU admission?
11:46:32 A I didn't pay any attention to that. If it was in that note that I received from his care, I don't recall that specifically at all, but, again, I'm not opining in that area.
11:46:46 Q But you indicate there's obvious evidence of deterioration; right?
11:46:50 A Yes.
11:46:51 In -- in his description of Mr. Rupard's presentation.
11:46:55 Q Do you have an opinion, one way or another, other than that the record reflects obvious evidence of deterioration as to this issue?
11:47:06 A No.
11:47:08 Q Okay. So you're not opining on the existence of obvious evidence of deterioration in this case, are you?
11:47:16 A I'm sorry. Rephrase that.

MR. LOWE: Form.
BY MS. FELDMAN:
Q Are you -- do you have an opinion on Mr. Rupard's deterioration and evidence of that?
A Other than there was some, no.
Q Okay. And have you told me everything -- all of your opinions that you intend to offer with respect to that topic?
A Yes.
Q Okay. So let's move on to Opinion Number 3 in your report.
And I believe that's under the title "Failure to Adequately Monitor a Segregated and Isolated Incarcerated Person."
Do you see that?
A Yes.
Q And can you tell me what your opinion is?
A That Mr. Rupard should have been evaluated or monitored three times a week by nursing staff and once a week by mental health staff, and that was based on the MSD.G.2.1, segregated inmate policy and procedure.
Q Okay. So let's start with that first paragraph. Is that the one that you were referring to? Sorry. Under the "Failure to Adequately

11:48:34 Monitor"?
11:48:35 A Yes.
11:48:35 Q Okay. And your opinion, does it rely on
11:48:40 the policy "MSD.G.2.1, Segregated Inmates"?
11:48:46 A Yes.
11:48:49 Q And your opinion is based on the assumption
11:48:52 that this policy applied to Mr. Rupard?
11:48:55 A Yes.
11:48:56 Q And is your opinion that this policy
11:48:59 applied to Mr. Rupard, one way or another?
11:49:02 A Yes.
11:49:03 It did apply to him.
11:49:05 Q Can you tell me the basis for this opinion?
11:49:07 A He was in confinement, and segregated
11:49:14 patients are defined by their environment, not so
11:49:19 much a specific tag or title associated with them.
11:49:30 Q But you agree that Mr. Rupard, as indicated
11:49:33 in your rebuttal report, was not classified as an Ad
11:49:35 Seg inmate; is that correct?
11:49:41 THE REPORTER: I'm sorry. I didn't get
11:49:43 the -- was not what?
11:49:45 BY MS. FELDMAN:
11:49:45 Q Classified as an Ad Seg inmate.
11:49:51 MR. LOWE: Form.
11:49:52 THE WITNESS: I understand that he was not

in the system as segregation, but, again, based on where he was located, Floor 7, Module D, which is the Ad Seg unit, it was very clear that his conditions of confinement equaled a segregated patient.

BY MS. FELDMAN:

Q And you are not offering opinions in this case as to classification issues; is that correct?

A That's correct.

Q That would be outside your scope?

A Yes.

Q And you're not offering an opinion in this case as to custodial issues; is that correct?

A Correct.

Q That'd be outside your scope?

A I'm not opining on this in this instance; correct.

Q All right. And with respect to the policy G.2.1, in your opinion that, even though Mr. Rupard was not classified as an Ad Seg inmate, this policy should have still applied to him?

A Yes.

Again, typically, it's the conditions of confinement that define whether someone needs to be treated as a segregated patient or not.

13:46:19 it because he wasn't monitored.
13:46:21 BY MS. FELDMAN:
13:46:25 Q Anything else?
13:46:25 A Not at this time.
13:46:28 Q And you had referenced the Hunger Strike
13:46:33 Policy and Procedure section; is that correct?
13:46:36 A Yes.
13:46:37 Q And that was with respect to M.29?
13:46:44 A Hang on. Let me get there.
13:46:45 Yes.
13:46:49 Q Okay. And what is your opinion with
13:46:50 respect to this policy section?
13:46:52 A Had the -- the nurses been monitoring him
13:46:54 appropriately for the policy, then it would have
13:46:57 been evident that he needed to be monitored through
13:47:01 a Hunger Strike Policy and Procedure as well.
13:47:09 Q And what does the Hunger Strike Policy
13:47:12 provide?
13:47:13 A Excuse me.
13:47:17 Q We can take a break if you'd like.
13:47:19 A It won't help, but thank you. I appreciate
13:47:21 it.
13:47:27 The policy required staff observation,
13:47:31 health care staff notification, weight monitoring,
13:47:34 hydration monitoring, and medical evaluation based

upon identified findings and needs.

Q And is it your opinion that this policy, M.29, applied to Mr. Rupard at any point during his incarceration?

A Yes.

Q Can you tell me the basis for this opinion?

A His profound deterioration, body wasting.

He wasn't -- he wasn't eating or if he was, it was all over his cell.

There were reports of, again, hygiene issues in the cell.

And he was never placed on a hunger strike.

Q Okay. But M.29, the policy that we're specifically discussing, is the prospective patients who refuse to eat and initiate hunger strikes; is that correct?

A Yes.

But prior to that, the definition of a hunger strike can be someone who not necessarily is refusing to eat but just doesn't eat.

So it doesn't have to be a declared hunger strike. It can simply be their actions and the fact that they're not eating would -- would place them on a hunger strike protocol.

Q And what information do you have from the

13:48:55 record that this policy applied to Mr. Rupard, that he was on a hunger strike, whether proclaimed or unspecified?
13:49:06 A There's nothing in the record, period.
13:49:13 Q So you don't know, one way or another, whether or not this policy section applied to Mr. Rupard?
13:49:18 A Oh, I know that it applied to Mr. Rupard. It just wasn't applied to Mr. Rupard.
13:49:22 Q Well, what information do you have that it applied to Mr. Rupard?
13:49:26 A Well, we know the vast amount of weight that he lost, and, clearly, based on that, he wasn't eating and, therefore, the hunger strike policy should have been in effect so that his weight could be monitored, his vital signs could be monitored.
13:49:47 Mr. Rupard never had vital signs taken once he was admitted to the jail.
13:49:53 Q Have you seen any information indicating that Mr. Rupard was refusing meals?
13:50:01 A Yes.
13:50:01 I saw an officer log and it was attached to another deposition, I believe, so I didn't receive all of the officer logs, but on that log, there was meal refused, meal refused; so there was some

13:50:15 documentation that the officers were doing with
13:50:18 regard to meals.
13:50:24 Q But was there any documentation indicating
13:50:26 that there were -- the refusal of those particular
13:50:31 meals were a hunger strike by Mr. Rupard?
13:50:38 A Well, again, after a certain number of
13:50:40 refusals, you become a candidate for the hunger
13:50:43 strike protocol.
13:50:44 Q What number?
13:50:46 A I don't know what the number is here.
13:50:48 Typically, it's three in a row, in my
13:50:53 experience.
13:50:55 Q And did you see any documentation
13:50:58 indicating three in a row meal refusals by
13:51:02 Mr. Rupard?
13:51:04 A No.
13:51:05 Q Okay. And so you don't know, one way or
13:51:07 another, whether Mr. Rupard was on a hunger strike;
13:51:11 is that correct?
13:51:11 MR. LOWE: Form.
13:51:12 THE WITNESS: Yes.
13:51:12 And, again, we have to consider his mental
13:51:15 illness.
13:51:15 I don't often expect mentally ill patients
13:51:19 who are deteriorating to actually declare a hunger

14:01:56 A Yes.
14:01:57 Q You agree that that is an area that is -- is within the discipline and authority of the psychiatrist; correct?
14:02:06 A Yes.
14:02:09 Q And so you are not offering any opinions with respect to Mr. Rupard's psychosis?
14:02:18 A That's correct.
14:02:19 Q Okay. And then are you ready to move on to your next opinion, Number 5?
14:02:25 A Sure.
14:02:26 Q Okay. Unless you have anything else you would like to state on the other opinion.
14:02:42 A No.
14:02:42 Q Okay. So num- -- your next opinion is titled "Progressive and Foreseeable Deterioration."
14:02:47 And that appears to be your final opinion in your initial report; is that correct?
14:02:52 A Yes.
14:02:52 Q And what is your opinion there?
14:02:56 A That what happened to Mr. Rupard in his deterioration was progressive. It didn't start one day and just come. It was over time.
14:03:10 And his functioning was worsening.
14:03:12 He had impaired self-care.

14:03:14 He was disorganized.
14:03:16 Possible nutritional decline and
14:03:19 dehydration and failing health.
14:03:21 And so, again, by not monitoring
14:03:25 Mr. Rupard, it was foreseeable that he was going to
14:03:28 deteriorate to the point of death, which is what
14:03:34 happened.
14:03:37 Q And is this opinion addressing the conduct
14:03:44 of any specific individual or defendant here?
14:03:48 A No.
14:03:51 Q Who is it addressing or -- if anyone?
14:03:54 A I'm sorry?
14:03:55 Q Is it addressing anyone?
14:03:57 A No.
14:03:58 Again, it's the system. It's everybody who
14:04:00 was -- every nurse that was in that unit any time
14:04:04 that Mr. Rupard was there.
14:04:08 Q You said any nurse that was in that unit?
14:04:12 A Any nurse working in the unit, based on
14:04:15 what the DON described as a nursing assignment,
14:04:20 where the nurse would go into the unit as an
14:04:22 assignment for the day, would do all of those things
14:04:25 associated with the individuals there, and be
14:04:28 responsible for that, yes.
14:04:32 Q But Miss Rognlien-Hood never testified that

14:06:09 required; correct?
14:06:10 A Yes.
14:06:12 Q And same thing with the hunger strike policy.
14:06:15 It assumes that that policy had applied to Mr. Rupard for there to have been any nursing monitoring or responsibility --
14:06:25 A Yes.
14:06:25 Q -- under that section?
14:06:27 And you don't have information, one way or another, whether this policy actually applied to Mr. Rupard; correct?
14:06:39 MR. LOWE: Misstates testimony.
14:06:42 THE WITNESS: Yes.
14:06:43 I believe that it does respond to him.
14:06:44 And actually, during the break, I pulled up Mr. Blumenshine's deposition.
14:06:51 BY MS. FELDMAN:
14:06:52 Q Okay.
14:06:53 A And he said that Mr. Rupard was in segregation status based on mental health, and that was on page 150, lines 2 through 9.
14:07:08 So, I mean, here it is a County person saying that he was in segregation status because of his mental illness.

So that's your answer right there.

Q Is that a classification?

A Well, it is a classification, but more so, it impacts on the care that was provided to Mr. Rupard, because throughout our testimony today, you've asked me, you know, what -- how could this work for him? How could this -- how could he be -- how could the policy be for him?

Well, now we have our answer. It is that he was identified as a segregation patient or incarcerated person and so he was treated as a segregated person.

Again, with regard to classification, if there was an error, as I said, I'm not testifying about that.

Q Okay. So other than this report and that portion that you've identified and indicated you're reading from, is there any other support that you have for your opinion?

A No.

Q And with respect to your Opinion No. 5 about "Progressive and Foreseeable Deterioration," what is the basis for your opinion?

A Again, my experience, education, and training in correctional health.

14:29:15 actually honored to be asked and sat on the committee, the workforce group, that actually reviewed and revised the 2026 standards.

14:29:27 They were published in 2025 in the -- August -- yeah. Right around now -- and they were in effect in January of 2026; so I was part of that committee representing nursing.

14:29:41 On the committee that, again, reviewed and revi- -- revised the national standards for jails and for prisons. We did both.

14:29:49 I was also, at one point in time, the director of their nurse advisory board. After six years, I retired from that and someone else is taking over in my place.

14:30:00 I present often at NCCHC conferences.

14:30:05 I have two presentations coming up in a month. The conference is in Las Vegas and I have two presentations that I'm giving at that point in time.

14:30:15 I've also done Webinars for them. They have monthly Webinars that they offer to individuals and so I've done Webinars for them as well.

14:30:27 One, a series of Webinars about correctional nursing management and how to be successful as a correctional nurse manager and also

14:30:35 one about irritable bowel.
14:30:38 Totally opposite sides of the spectrum.
14:30:42 Q Okay. And when we discussed those
14:30:45 standards with respect to NCCHC and ANA, those
14:30:54 standards you had agreed were professional guidance
14:30:56 to a facility as something they -- the facility may
14:31:00 voluntarily adopt; correct? They're not the law?
14:31:03 A Correct.
14:31:06 Q And plaintiffs' counsel -- have you
14:31:11 provided services to plaintiffs' counsel's office as
14:31:13 an expert witness in the past --
14:31:16 A No.
14:31:16 Q -- before this case?
14:31:17 A No.
14:31:20 Q And if you can estimate, what percentage of
14:31:22 your expert witness work is on behalf of plaintiffs
14:31:25 versus defendants?
14:31:26 A Sure.
14:31:27 It's about 80/20 with 80 being plaintiff
14:31:30 and 20 being defense.
14:31:32 That changes, again, based on the caseload
14:31:35 that I have at any particular time.
14:31:39 Q Okay. Well, Miss Roscoe, unless you have
14:31:41 any other opinions, then I just want to confirm it's
14:31:46 fair to say we have all your opinions on the table

MR. LOWE: No, thank you. No, thank you from the plaintiffs' perspective.

THE VIDEOGRAPHER: Thank you, Mr. Lowe.

MS. FELDMAN: Then synced, yes.

THE REPORTER: You do want one, Alexandra?

MS. SENNET: No, I don't. I don't need to see myself. Thank you.

THE WITNESS: Then I'm going to say good-bye. It was nice meeting everybody.

MS. FELDMAN: Thank you, Miss Roscoe.

THE VIDEOGRAPHER: Just a minute, Doctor. We'll wrap it up. Stand by.

This marks the end of Media Number 1 and concludes Volume 1 of the deposition of Dr. Lori Elisabeth Roscoe.

The total number of physical media used today is one.

Off record at 2:47 P.M. Pacific Time.

(The deposition concluded at 2:47 P.M.)

///

///

I, LORI E. ROSCOE, DNP, declare under penalty of perjury that the foregoing is true and correct, to the best of my ability.

Dated this ___ day of ____________________________, 2026, at ________________________________, California.

______________________________
LORI E. ROSCOE, DNP

I, ALTHEA L. MILLER, CSR NO. 3353, RPR, CCRR NO. 149 certify: That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness, LORI E. ROSCOE, DNP, was duly sworn; and that the transcript is a true record of the testimony so given.

Witness review, correction, and signature was

(X) by Code. (X) requested.

( ) waived. ( ) not requested.

The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certificate null and void.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

Dated this 22nd day of September, 2026.

Althea L. Miller

ALTHEA L. MILLER, CSR No. 3353, RPR, CCRR No. 149

# EXHIBIT "C"

CHC
CORRECTIONAL HEALTHCARE CONSULTANTS LLC

Jeremiah Lowe, Esquire
Lowe Law APC
San Diego, CA
*via email*

July 27, 2026
RE: Rupard matter

Dear Attorney Lowe,

I have received and reviewed the report of defense expert Kathryn Wild regarding the care and treatment of Mr. Lonnie Rupard while he was incarcerated at the San Diego Sheriff's Office. My opinions in this matter remain unchanged and are consistent with those expressed in my original expert report.

I agree with Ms. Wild that nursing staff did not possess the independent authority to determine whether an incarcerated person met the legal criteria for involuntary psychiatric treatment, admit an incarcerated person to the Psychiatric Stabilization Unit (PSU), or independently establish the incarcerated person's psychiatric treatment plan. Those responsibilities required physician-level psychiatric judgment and remained the responsibility of the treating psychiatrist.

However, I disagree with Ms. Wild's opinion regarding the failure of nursing staff to conduct the required segregation wellness evaluations. Ms. Wild opines that because Mr. Rupard was incorrectly classified, he was not entered into the electronic workflow that generated the roster for the required nursing wellness evaluations. Consequently, the required nursing wellness evaluations were not performed while Mr. Rupard was housed in segregation. Even accepting this explanation as accurate, it does not relieve nursing staff of their responsibility to recognize and correct the omission and ensure that the required nursing wellness evaluations were performed.

NCCHC Standard J-G-01, Segregated Inmates, and San Diego Sheriff's Office Policy MSD.G.2.1, Segregated Inmates (Revised January 5, 2022), required nursing wellness

evaluations three times each week and mental health wellness evaluations once each week for incarcerated persons housed under conditions of segregation. These requirements were based upon the incarcerated person's conditions of confinement rather than the accuracy of an electronic classification or housing designation. Accordingly, regardless of why Mr. Rupard's name did not appear on the electronic workflow, he remained entitled to the required wellness evaluations while housed on Floor 7, Module D.

Nursing staff entered Floor 7, Module D multiple times each day and knew that it housed incarcerated persons in segregation. Mr. Rupard was physically housed in that unit and was readily observable to the nurses providing care there. If the remaining incarcerated persons requiring segregation wellness evaluations appeared on the roster while Mr. Rupard did not, a reasonably prudent correctional nurse would have recognized the discrepancy, questioned why Mr. Rupard was absent from the roster, and taken appropriate action to ensure that the required evaluations were performed. Reliance on an electronic workflow does not replace the nurse's professional responsibility to recognize obvious omissions in patient care or to advocate for appropriate nursing evaluation when such omissions are identified.

Therefore, the failure to conduct Mr. Rupard's required segregation wellness evaluations cannot reasonably be attributed solely to an erroneous housing classification or an electronic workflow error. Rather, it reflects a failure of the nursing system to recognize and correct an obvious omission despite nurses' repeated presence in the housing unit and direct knowledge that Mr. Rupard was housed under conditions requiring segregation wellness evaluations. This represented a significant deviation from the standard of nursing care.

Best Regards,

Lori E. Roscoe

Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-N

# EXHIBIT “D:

| San Diego Medical Examiner<br>5570 Overland Avenue, Suite#101<br>San Diego, CA 92123-1206<br>(858) 694-2895 | Case Number<br>Investigator<br>Date of Death<br>Date Today | : 2022-01007<br>: Fernanda Sanchez<br>: 03/17/2022<br>: 02/08/2023 |
|---|---|---|

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was “relatively clean, no flooding/gassing or smearing of feces.” The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist’s diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist’s final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number “4950349.” The body is in a second inner white body pouch sealed with a second red tamper resistant seal number “4950993.” A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner’s identification bearing the decedent’s name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent’s name, date of birth, and medical record number “31943869” is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff’s Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent’s name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent’s name and booking number “21149433” is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.
4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:
1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled “A” through “C” for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. <u>BLUNT FORCE INJURY OF TORSO</u>:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:
Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager


CONFIDENTIAL COSD 002075

# Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

GLENN N. WAGNER, D.O.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

STEVEN C. CAMPMAN, M.D.
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | **2022-01007** |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | Son | 3/18/2022 | |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name



CONFIDENTIAL COSD 001679

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

<u>OPINION</u>: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:
Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| **Test Name (Method of Analysis)** | **Specimen Tested** | **Result** |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________________
06/27/2022
Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

**GLENN N. WAGNER, D.O.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

**STEVEN C. CAMPMAN, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | **2022-01007** |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| Ronnie Rupard | Son | 3/18/2022 | |

**San Diego Medical Examiner**
**5570 Overland Avenue, Suite#101**
**San Diego, CA 92123-1206**
**(858) 694-2895**

| | |
|---|---|
| **Case Number** | : 2022-01007 |
| **Investigator** | : Fernanda Sanchez |
| **Date of Death** | : 03/17/2022 |
| **Date Today** | : 02/08/2023 |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, Florentina Rupard, and his ex-wife, Justina Lopez. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, "Ana", with whom he had a son named Ronnie Rupard. The decedent also had a son with Justina, named Justino Rupard. He had a third child who was reported to have died in October 2018 of muscular dystrophy, who was named Lonnie Rupard. The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, antisocial personality disorder, and stimulant use disorder from a previous record dated July 11, 2020. It also stated that he had a past medical history of "seizures or tbi," (traumatic brain injury) per a record dated February 6, 2020. The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, for a twisted left ankle injury. Imaging was negative for fracture, soft tissue swelling or other abnormality.

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

<u>IDENTIFICATION</u>: The body is received in a white body pouch sealed with tamper resistant read seal number “4950349.” The body is in a second inner white body pouch sealed with a second red tamper resistant seal number “4950993.” A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner’s identification bearing the decedent’s name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent’s name, date of birth, and medical record number “31943869” is secured to the left wrist.

<u>WITNESSES</u>: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff’s Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

<u>CLOTHING AND PROPERTY</u>: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent’s name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent’s name and booking number “21149433” is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

<u>EVIDENCE OF MEDICAL INTERVENTION</u>:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.
4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:
1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:
Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure:<br>Date Received: | 3/17/2022 23:51 PDT<br>3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

**San Diego Medical Examiner**
**5570 Overland Avenue, Suite#101**
**San Diego, CA 92123-1206**
**(858) 694-2895**

| | |
|---|---|
| **Case Number** | : 2022-01007 |
| **Investigator** | : Fernanda Sanchez |
| **Date of Death** | : 03/17/2022 |
| **Date Today** | : 02/08/2023 |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________



CONFIDENTIAL COSD 002059

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number “4950349.” The body is in a second inner white body pouch sealed with a second red tamper resistant seal number “4950993.” A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner’s identification bearing the decedent’s name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent’s name, date of birth, and medical record number “31943869” is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff’s Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent’s name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent’s name and booking number “21149433” is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

<u>SCARS</u>:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager


CONFIDENTIAL COSD 002075

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*
*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
(858) 694-2895 • FAX (858) 495-5956
http://www.sandiegocounty.gov/me

**JONATHAN R. LUCAS, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER

CONFIDENTIAL

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | **2022-01007** |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATOR False | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | BANNED, REFER TO MANAGEMENT, SEE CASE NOTES | 3/18/2022 | |

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
(858) 694-2895 • FAX (858) 495-5956
http://www.sandiegocounty.gov/me

JONATHAN R. LUCAS, M.D.
CHIEF DEPUTY MEDICAL EXAMINER

CONFIDENTIAL

**San Diego Medical Examiner**
**5570 Overland Avenue, Suite#101**
**San Diego, CA 92123-1206**
**(858) 694-2895**

**Case Number** : 2022-01007
**Investigator** : Fernanda Sanchez
**Date of Death** : 03/17/2022
**Date Today** : 02/08/2023

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted], with whom he had a son named [redacted]. The decedent also had a son with [redacted], named [redacted]. He had a third child who was reported to have died in October 2018 [redacted]. The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name



CONFIDENTIAL COSD 006378

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.



CONFIDENTIAL COSD 006379

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

CONFIDENTIAL

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

<u>OPINION</u>: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted]. The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed: 02/28/2023

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.
4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:
1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. <u>BLUNT FORCE INJURY OF TORSO</u>:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: 06/27/2022
Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

COUNTY OF SAN DIEGO HHSA HEALTH AND HUMAN SERVICES AGENCY | LIVE WELL SAN DIEGO

San Diego County
PUBLIC HEALTH LABORATORY
CLIA # 05D0060808
Brett Austin. MA. PHM. Director

3851 Rosecrans Street
San Diego, CA 92110
Phone (619) 692-8500
FAX (619) 692-8558

# FINAL REPORT

| Patient Information | Specimen Information | Submitter Information |
|---|---|---|
| Patient Name: **Rupard, Lonnie**<br>Patient Id:<br>Birth Date: 10/01/1975<br>Gender: Male<br>Pregnancy Status: Unknown<br>Outside ID: 2022-01007<br>PUID #:<br>Address: NOT PROVIDED<br>NOT PROVIDED, N/A 00000<br>Phone #: 000-000-0000 | Specimen # **22-206526-01**<br>Source: Nasopharynx<br>Date Collected: 03/19/2022<br>Date Received: 03/19/2022 | SAN DIEGO COUNTY MEDICAL EXAMINER<br>5570 Overland Ave # 101<br>San Diego, CA 92123<br>**Site Contact**<br>Steven Campman, M.D.<br>Fax: 858-495-5956<br>mxclerical@sdcounty.ca.gov<br>Physician: Schaber, B<br>Diagnosis Code:<br>Comments: B-00011 |

| Analyte (Method) | Result | Analysis Date |
|---|---|---|
| SARS-CoV-2 (NAAT) | Detected | 03/20/2022 |

**Comments:**

03/19/2022 NAAT (Nucleic Acid Amplification Test): This assay is for in vitro diagnostic use under FDA Emergency Use Authorization (EUA) only.

03/20/2022 Samples tested using GeneXpert under CLIA ID # 05D2197127 at 5570 Overland Avenue San Diego, CA 92123

Approved by: Joe Ana Jones-Price

Date reported: 03/20/2022

This document contains confidential health information that is privileged, confidential and exempt from disclosure under law. If you have received this information in error, please call (619) 692-8500 and arrange for return or destruction.

22-1007

COUNTY OF SAN DIEGO HHSA HEALTH AND HUMAN SERVICES AGENCY — LIVE WELL SAN DIEGO

San Diego County
PUBLIC HEALTH LABORATORY
CLIA # 05D0060808
Jeremy Corrigan, DrPH, HCLD/TS(ABB)

5570 Overland Ave, Ste 103
San Diego, CA 92123
Phone 619-692-8500
FAX 619-692-8558

# FINAL REPORT

| *Patient Information* | *Specimen Information* | *Submitter Information* |
|---|---|---|
| Patient Name: **Rupard, Lonnie** | Specimen # **22-206691-01** | SAN DIEGO COUNTY MEDICAL EXAMINER |
| | Source: Nasopharynx | 5570 Overland Ave # 101 |
| Patient Id: | | |
| Birth Date: 10/01/1975 | Date Collected: 03/19/2022 | Site Contact: Steven Campman, M.D. |
| Gender: Male | Date Received: 03/19/2022 | Fax: 858-495-5956 |
| Pregnancy Status: | | Physician: Schaber, B |
| Outside ID: 2022-01007 | | Diagnosis Code: |
| Comments: | | |

| Analyte (Method) | Result | Analysis Date |
|---|---|---|
| Influenza Typing | Refer to reference laboratory report. | |

**Comments:**

03/24/2022 Sample sent to CA State Viral and Rickettsial Diseases Laboratory, 850 Marina Bay Parkway, Richmond, CA 94804.

04/13/2022 VRDL report

Approved by: Ishita Gulati

Date reported: 04/27/2022

This document contains confidential health information that is privileged, confidential and exempt from disclosure under law. If you have received this information in error, please call (619) 692-8500 and arrange for return or destruction.



Print Date: 04/27/2022

California Department of Public Health
State of California-Health and Human Services Agency
# Viral and Rickettsial Disease Laboratory
CDPH 850 Marina Bay Parkway, E365
Richmond, CA 94804
CLIA ID # 05D0643850
Phone: 510-307-8575
Fax: 510-307-8599

## Laboratory Results

Page 1 of 1

**Patient Information**

| Patient Name or Submitter ID: | Gender | Date of Birth | Age |
|---|---|---|---|
| Rupard, Lonnie | Male | 10/1/1975 | 47 Years |

Medical Records:

CalREDIE Incident #:

Pregnancy Status:

Patient Address: , , CA.

**Disease Suspected / Test Requested / Symptoms**

Disease Onset:

Rash Onset .

Disease Suspected: Influenza A or B

Test Requested:

ICD Code:

Specimen Collection Site.

**Submitter Information**

Submitter Type: CA City & County Health Depts
Facility: San Diego County Public Health Dept.
Address: 3851 Rosecrans Street

San Diego, CA 92110-3134
Phone: (619) 692-8499 Fax: (858) 715-6458

Health Jurisdiction: San Diego,CA

Laboratory Results

Reason Code v_140

**Specimen Information**

| Specimen Type | Date Collected | Date Received | Condition Received | Submitter Tracking#: | VRDL Accession #: |
|---|---|---|---|---|---|
| Nasopharyngeal Swab | 3/19/2022 | 3/22/2022 | Dry Ice | 22-206891 | V22T07708-01 |

**Polymerase Chain Reaction (PCR) Results**

| Analyte | Test Type | VRDL Accession # | Test Method | Laboratory Results |
|---|---|---|---|---|
| Influenza A Nucleic Acid | FDA | V22T07708-01 | PCR (realtime) | not detected |
| Influenza B Nucleic Acid | FDA | V22T07708-01 | PCR (realtime) | not detected |

**Additional Information or Overall Interpretation of State Laboratory Test Results:**

FDA - Food and Drug Administration: This test has been FDA approved for clinical diagnostic use.

JP 4/4/22

Reviewed by: *Ishita Gulati*
04/04/2022

**The VRDL is certified under the Clinical Laboratory Improvement Amendments of 1988 (CLIA-88) as qualified to perform high complexity clinical laboratory testing.**

| | |
|---|---|
| Report to:<br>San Diego County Public Health Dept.<br>3851 Rosecrans St. Mail Stop P572 Suite 716<br>San Diego, CA 92110<br>Attn: Email - Laboratory Director Fax#<br>18587156458 | Testing performed under the direction of Dr. Carl Hanson Ph.D., Laboratory Director, Viral and Rickettsial Disease Laboratory<br>**Final Report Date: April 04, 2022**<br>Report Method: [ ] faxed to 18587156458 [ ] E-mailed [ ] NR [ ]<br>by: [signature] date: 4/4/2022 |

eurofins [redacted]

Product Testing

# Final Report

| Order Details | | Ordering Professional |
|---|---|---|
| Referral ID # | 22-01007 | [redacted] |
| DOB | 1975-10-01 | |
| Gender | M | |

| Request / Accession | R-P40234140 |
|---|---|
| Received | 03/25/2022 11:14 |
| Final Report | 03/25/2022 16:24 |
| Report Generated | 03/25/2022 16:24 |
| Time Zone | Pacific Standard Time |

## Results

| Test | Completed | Results | Ref. Range |
|---|---|---|---|
| Hepatitis B Surface Ag | 03/25/2022 16:21 | **Non Reactive** | Non Reactive |
| Hepatitis C Virus Ab | 03/25/2022 16:22 | **Non Reactive** | Non Reactive |
| HIV-1/HIV-2 Plus O | 03/25/2022 16:24 | **Non Reactive** | Non Reactive |

## Sample Reference(s)

**Collection Time Zone:** Pacific Standard Time

| VRL Sample ID | Type | Collected | Test(s) |
|---|---|---|---|
| S-P40234140A | Serum | 03/19/2022 13:15 | 3214, 3221, 3521 |

[redacted]: *Post-Mortem*

## Test Reference(s)

| Code | Name | Methodology Description |
|---|---|---|
| 3214 | Hepatitis B Surface Ag | BioRad Genetic Systems HBsAg EIA 3.0 is FDA approved for [redacted] screening. |
| 3221 | Hepatitis C Virus Ab | ORTHO HCV Version 3.0 ELISA is FDA approved for [redacted] screening. |
| 3521 | HIV-1/HIV-2 Plus O | BioRad GS HIV-1/HIV-2 Plus O EIA is FDA approved for [redacted] screening. This is a screening assay; it is neither a diagnostic assay nor a confirmatory test for the presence of HIV. |

**AUTOPSY FINDINGS**

San Diego County Medical Examiner

2022-01007 B. Schaber, M.D. 3/19/2022

RUPARD, Lonnie

Age: 46 Sex: M ✓ Embalmed
Height: 69 Weight: 105
Race: ~~C / B / H / A / F / NA / Other:~~
_____ nourished / thin / (cachectic) / obese
Lividity: ant / (post) L / R, (fixed) / un-fixed
Rigidity: none / (mild) / mod / full
✗ Decomposition: mild / mod / advanced early green abd

CAVITIES: Pericardium: lac 75 ml hemopericardium
Pleural: R ✗ FFA L ✗ FFA
Peritoneum: ✗ FFA Abd fat: 0.1 cm
HEART: 280 grams:
Hypertrophy: ∅ Dilation: ∅
Ventricles: R 0.3 cm; L 1.5 cm; IVS 1.4 cm
Valves: WNL
Coronaries: LAD LCx R + WP
Aorta: (minimal) / mild / mod / severe atherosclerosis
Aneurysms: ∅ Pulmonary arteries: NO PE

LUNGS: R 480 g, L 1030 g
~~atelectatic / hyperinflated~~
Anthracosis: none / (small) / mod / large
Edema: Consolidation: LUL Red Firm no pq
Congestion: mild-mod Bronchi: WNL

LIVER: 1170 g Fat: ∅ Fibrosis: ∅
~~Cirrhosis: macro / micro~~
GALLBLADDER: 10 Stones: y / (n)
PANCREAS: WNL

SPLEEN: 70 g
Lymph nodes no enlg Marrow / Blood liq + clot
~~THYMUS:~~ _____ g

GI: Esophagus: W Bowel opened
Stomach contents: 60 ml of BRN watery fur
SB soft tan BRN red
Bowels: cath LB soft BRN stool
Appendix: (Y) / N Anus: soft BRN stool
KIDNEYS: R 140 g, L 150 g, cysts: ∅
smooth / granular:
Bladder: 130 ml urine Dk yellow urine
Prostate: WNL
Testes: ↓↓

2.5x2 ulcer dist duod proximal pylor [margin note, partly uncertain]

ADRENALS: WNL
THYROID: WNL PITUITARY: WNL
NECK: Hemorrhages: NOT
Trachea ET Hyoid / Thyroid cartilage
Tongue: no hem WNL NO hem or fx
MUSCULOSKELETAL: Fractures: Yes peristernal Rt 5-8 ant Rt 8
CPR: (Y) / N ) Ribs ( ∅ brittle): perist Lt 4-7 ant Lt 4-7
~~Kyphosis / scoliosis~~ Skull: no Fx

SCALP: Bry default bil occip lt fat ∅ EDH ∅ SDH ∅ SAH
BRAIN: 1290 g
+ dura retained for NP consultation

TOXICOLOGY: ___None
✓ Central Blood ___Bile
✓ Peripheral Bld ___CSF
✓ Vitreous ✓ Liver
✓ Urine ___Spleen
___Chest blood / fluid ✓ Gastric:
___Other:
**Rapid Screens**: Glu Ket
+ / - meth; + / - coc; + / - morph; + / - alcohol

HISTOLOGY: (Ht) (Liv) (Lung) (R / L), Cor art:
(Kid), Panc, Spl, GI, Thyroid, Brain:
Other:
___None 7 Cassettes

PHOTOGRAPHS: ✓ ID ✓ Over-alls
✓ Other:

X-RAYS: ___None ✓ Yes: No Fx's other than CPR ml
___head ___chest ___abd ___other:

CULTURES: ___None ___Blood ___Lung
___CSF ✓ Viral:
___Other: COVID-19 + Sept [illegible] SH - FAS
EVIDENCE: Bullets: AnBW - SC

Det Max Blumenshine

WITNESSES: ___None ✓ Yes: D. Raciot Fed M. Gervasoni Fed
SDPD, SO, NCIS, OPD, BP

GROSS AUTOPSY SUMMARY:

Inmate central jail found unresponsive in his cell
Hx/o schizoph ?

pericardial sac lac 75 ml
Rt atr/vent lac hemopericardium
4/w CPR

Rev. 9/08

# County of San Diego
OFFICE OF THE MEDICAL EXAMINER

San Diego County Medical Examiner
**2022-01007** B. Schaber, M.D.
3/19/2022

RUPARD, Lonnie

outer Red Seal 4950349 yellow tarp
inner red seal 4950993 on green sheet

**Date & Time of Examination:** 0935

**CLOTHING (__ ~~None/~~ __ ~~Not examined~~):** Diaper
Blue sheet on body - adult clothing in pouch bag

**IDENTIFICATION:** ✓ M.E. band checked



County of San Diego
OFFICE OF THE MEDICAL EXAMINER

San Diego County Medical Examiner
2022-01007
B. Schaber, M.D.
3/19/2022
RUPARD, Lonnie



~~Doc~~

- 12/18/21 arrested Back Probation privat single cell

Refused medication.

- Single occupan cell.

Last seen alive cell check 2146

Found unresp in cell 2248 not Breathing. underblanketed under in Bunk.

3/17

CPR transport to ER pronounced in ER.

Cell soiled c̄ feces Food c̄ maggots.

~~—~~ seen c̄ other inmates.

San Diego County Medical Examiner

**2022-01007**

B. Schaber, M.D.

3/19/2022

RUPARD, Lonnie

# County of San Diego

DR. GLENN N. WAGNER
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE., STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me/

DR. STEVEN CAMPMAN
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## EVIDENCE TRANSFER FORM

NAME OF DECEDENT: Rupard, Lonnie ME# 22-1007

PATHOLOGIST: Schaber, B. MD

INVESTIGATING AGENCY: SDSO

| | | | |
|---|---|---|---|
| | BODY BAG | | OTHER (See REMARKS) |
| | BAGS REMOVED FROM HEAD | | ANAL SWABS |
| | BAGS REMOVED FROM HANDS | ✓ | ORAL SWABS |
| | BAGS REMOVED FROM FEET | | URETHRA SWABS |
| | HEAD HAIR SAMPLE | | VAGINAL SWABS |
| | FACIAL HAIR SAMPLES | | GUNSHOT RESIDUE SWABS |
| | CHEST HAIR SAMPLES | | FINGERPRINTS |
| | PUBIC HAIR SAMPLE | | PALM PRINTS |
| | PUBIC HAIR COMBING | | PROJECTILES/FRAGMENTS |
| ✓ | BLOOD SAMPLE | | FINGERNAIL CLIPPINGS |
| | | | FINGERNAIL SCRAPINGS |

CLOTHING: 1- blue SHIRT

JEWELRY: None

BONES/TISSUE SPECIMEN: None

REMARKS:

RELEASED BY Stephen Hannum (Print Name) Stephen Hannum (Signature) 3-19-22 (Date)

RECEIVED BY Melissa Gervasoni /SDSO (Print Name/Agency) [signature] (Signature) 3/19/22 (Date)

Original: File Yellow: Customer
MEE-34 (R 8/2019)

Receipt: 31356

# San Diego County Medical Examiner's Office
## Personal Effects Inventory

Name of Deceased: RUPARD, LONNIE  Date: 3/19/22  M.E. Case No.: 22-1007

Name of Investigator/F.A.A: F. SANCHEZ / HANNUM  PB # 687195

**Personal Effects**

**Currency:**

| | | | |
|---|---|---|---|
| $1 × | ø | =$ | ø |
| $5 × | 1 | =$ | 5.00 |
| $10 × | 1 | =$ | 10.00 |
| $20 × | 6 | =$ | 120.00 |
| $100 × | 2 | =$ | 200 |
| × | ø | =$ | |
| Coins: | | $ | ø.32 |
| Total U.S. Currency: | | $ | 335.32 |

**Bank Card:**

| QTY | Description – VISA, MasterCard, American Express (include account number) |
|---|---|
| / | / |

**Foreign Currency:** None

**Items:**

| QTY | Description | QTY | Description |
|---|---|---|---|
| 1 | wdy/metal watch | / | / |
| / | / | | |

**Government Issued Documents and Identification Cards** – The listed government documents issued by federal, state, county, or local agencies or foreign governments are property of that agency and will be returned to them.

| QTY | Description (include the agency name and ID number) |
|---|---|
| / | / / / |

**Witness Declaration**

The above listed property, found on the body, clothing, adjacent area, or residence of the above decedent was checked by me in the presence of the witness signed below.

| Print Name | Signature | Agency | Date |
|---|---|---|---|
| DeanneRupari Osuna | [signature] | SDMEO | 03/19/22 |

**Release of Property to Next-of-Kin**

Received by: Megan Ruane (Print Name)  Date: 3/22/22  Time: 1543

Signature:  Relationship: Mortuary

Address:  City/State/Zip:

**Affidavit Under California Probate Code, Section 330**

I declare under Penalty of Perjury under the laws of the State of California that the foregoing is true and correct and that I do not know or have reason to believe that a dispute exists over the right to possess the property held by the Medical Examiner.

Signature of Declarant: ______

Printed Name of Declarant: ______

☐ **Miscellaneous medications, and/or illicit drugs, and/or drug paraphernalia impounded and inventoried at the Medical Examiner's Office.** These items will be retained and subsequently destroyed pursuant to departmental policy.

105 #

MEDICAL EXAMINER'S OFFICE
INVESTIGATIVE MEMO

AGE: 46

CASE # 22-1007

NAME RUPARD, LONNIE
LAST FIRST MIDDLE

DATE 03/18/2022

CARRIER 921M

INVESTIGATOR FERNANDA SÁNCHEZ

HIO (NAT) MVA SUI HOM (ACC) DONOR
VS

HOW IN CUSTODY

~~B2294384~~
BLUE SEAL # RED SEAL# 4950993

X-RAYS REQUIRED? (YES) (NO)

IF YES, WHAT AREA(S) OF BODY

X-rays by JRC 03/18/22

REMARKS RQ EXAM SAT 03/19

SDSO DET BLUMENSHINE
AGENCY, TEAM #, and PHONE # 619-886-0434

# CAUSE OF DEATH WORKSHEET

## San Diego County Medical Examiner Department

☒ Autopsy
☐ External
☐ Not Dictated
☐ Body not coming to office

☐ Fetal death
☐ Possible SIDS
☐ Family Paid

San Diego County Medical Examiner
2022-01007 B. Schaber, M.D.
3/19/2022
RUPARD, Lonnie

**CAUSE OF DEATH:** ( ✓ PENDING) Time interval

Due To:

Due To:

Due To:

**CONTRIBUTING:**

**MANNER:** ( ✓ ) Pending ( ) Natural ( ) Accident ( ) Suicide ( ) Homicide ( ) Undetermined
**Use reverse side for manner type in non-pending cases

**HOW OCCURRED:**

**DATE and TIME of INJURY:** **LOCATION:**

**SURGERIES and DATES:**

**If FEMALE, pregnant within the last year?** ( ) Yes ( ) No ( ) Unknown

[signature]
Deputy Medical Examiner/Fellow/Resident Supervising Pathologist Date 3/19/22

Rev. 06/15

TM 3/21/22

3/20/22

# Manner Types and SubTypes

(check one)

## NATURAL

- ☐ AIDS Related
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Autoimmune/Systemic
- ☐ Cancer
- ☐ Cardiovascular
- ☐ Central Nervous System
- ☐ Chronic Drug Abuse
- ☐ Diabetes Related
- ☐ Endocrine
- ☐ Family Paid
- ☐ Gastrointestinal
- ☐ Hematologic
- ☐ Infant/Perinatal (not SIDS)
- ☐ Infectious
  - ☐ Viral
  - ☐ Bacterial
  - ☐ Other
- ☐ Intrauterine/Stillborn
- ☐ Liver disease
- ☐ Obesity Related
- ☐ Other
- ☐ Pregnancy Related
- ☐ Psychiatric Related
- ☐ Pulmonary
- ☐ Renal
- ☐ Seizures
- ☐ SIDS
- ☐ Undetermined

## ACCIDENT

- ☐ Aircraft
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Animal Related
- ☐ Asphyxia
  - ☐ Airway Obstruction
  - ☐ Autoerotic
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Traumatic
- ☐ Bicycle
- ☐ Blunt Force (other)
- ☐ Boating
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug and Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol

### ACCIDENT (cont.)

- ☐ Electrocution
- ☐ Explosion
- ☐ Exposure
- ☐ Fall
  - ☐ Blunt head trauma
  - ☐ Fracture, other
  - ☐ Hip/Femur fracture
  - ☐ Multiple injuries
  - ☐ Other
  - ☐ Spinal fracture
  - ☐ Subdural hematoma
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Industrial
- ☐ Ingested Foreign Object(s)
- ☐ Inhalation
- ☐ Medical/Therapeutic
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs Auto
  - ☐ Auto vs Bicycle
  - ☐ Auto vs Fixed Object
  - ☐ Auto vs Motorcycle
  - ☐ Auto vs Pedestrian
  - ☐ Hit and Run
  - ☐ Motorcycle
  - ☐ Off Road
  - ☐ Other
  - ☐ Unknown
- ☐ Other
- ☐ Restraint Related
- ☐ Scalding
- ☐ Scuba - Diving
- ☐ Spear gun
- ☐ Train
- ☐ Undetermined

## SUICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Other
- ☐ Blunt Force (other)
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug & Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol
- ☐ Electrocution

### SUICIDE (cont.)

- ☐ Explosion
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Inhalation
- ☐ Jumping
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs. Fixed Object
  - ☐ Auto vs. Pedestrian
  - ☐ Motorcycle
- ☐ Train
- ☐ Undetermined

## HOMICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
- ☐ Assault
- ☐ Blunt Force
- ☐ Chemical/Poison
- ☐ Child Abuse
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Elder Abuse
- ☐ Exposure
- ☐ Fire
- ☐ Firearm
- ☐ Homicidal Violence, NOS
- ☐ Intrauterine/Stillborn
- ☐ Motor Vehicle
- ☐ Other
- ☐ Restraint Related
- ☐ Undetermined

## UNDETERMINED

- ☐ Alcohol Related
- ☐ Blunt Force
- ☐ Decomposed
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Fire related
- ☐ Firearm
- ☐ Infant/Perinatal (not SIDS)
- ☐ Intrauterine/Stillborn
- ☐ Other
- ☐ Skeletal Remains
- ☐ Undetermined

Rev. 06/15

# DEATH CERTIFICATE AMENDMENT WORKSHEET

Case: 2022-1007

Name: RUPARD, LONNIE

CAUSE OF DEATH: PNEUMONIA, MALNUTRITION, AND DEHYDRATION ( )
IN THE SETTING OF NEGLECTED SCHIZOPHRENIA (unknown)

Due to: ( )

Due to: ( )

Due to: ( )

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

Surgeries:

MANNER OF DEATH

☐ NATURAL ☐ ACCIDENT ☐ SUICIDE ☑ HOMICIDE ☐ UNDETERMINED

Place of Injury: SAN DIEGO CENTRAL JAIL

Date & Time: UNKNOWN

How Occurred: INADEQUATE CARE WHILE INCARCERATED

2/27/23

DEPUTY MEDICAL EXAMINER Date

SCHABER

3/1/23

CHIEF MEDICAL EXAMINER Date

AL 03/01/23 @ 2:46pm

LG 3/1/23

# Manner Types and SubTypes

(check one)

## NATURAL

- ☐ AIDS Related
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Autoimmune/Systemic
- ☐ Cancer
- ☐ Cardiovascular
- ☐ Central Nervous System
- ☐ Chronic Drug Abuse
- ☐ Diabetes Related
- ☐ Endocrine
- ☐ Family Paid
- ☐ Gastrointestinal
- ☐ Hematologic
- ☐ Infant/Perinatal (not SIDS)
- ☐ Infectious
  - ☐ Viral
  - ☐ Bacterial
  - ☐ Other
- ☐ Intrauterine/Stillborn
- ☐ Liver disease
- ☐ Obesity Related
- ☐ Other
- ☐ Pregnancy Related
- ☐ Psychiatric Related
- ☐ Pulmonary
- ☐ Renal
- ☐ Seizures
- ☐ SIDS
- ☐ Undetermined

## ACCIDENT

- ☐ Aircraft
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Animal Related
- ☐ Asphyxia
  - ☐ Airway Obstruction
  - ☐ Autoerotic
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Traumatic
- ☐ Bicycle
- ☐ Blunt Force (other)
- ☐ Boating
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug and Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol

## ACCIDENT (cont.)

- ☐ Electrocution
- ☐ Explosion
- ☐ Exposure
- ☐ Fall
  - ☐ Blunt head trauma
  - ☐ Fracture, other
  - ☐ Hip/Femur fracture
  - ☐ Multiple injuries
  - ☐ Other
  - ☐ Spinal fracture
  - ☐ Subdural hematoma
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Industrial
- ☐ Ingested Foreign Object(s)
- ☐ Inhalation
- ☐ Medical/Therapeutic
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs Auto
  - ☐ Auto vs Bicycle
  - ☐ Auto vs Fixed Object
  - ☐ Auto vs Motorcycle
  - ☐ Auto vs Pedestrian
  - ☐ Hit and Run
  - ☐ Motorcycle
  - ☐ Off Road
  - ☐ Other
  - ☐ Unknown
- ☐ Other
- ☐ Restraint Related
- ☐ Scalding
- ☐ Scuba - Diving
- ☐ Spear gun
- ☐ Train
- ☐ Undetermined

## SUICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Other
- ☐ Blunt Force (other)
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug & Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol
- ☐ Electrocution

## SUICIDE (cont.)

- ☐ Explosion
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Inhalation
- ☐ Jumping
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs. Fixed Object
  - ☐ Auto vs. Pedestrian
  - ☐ Motorcycle
- ☐ Train
- ☐ Undetermined

## HOMICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
- ☐ Assault
- ☐ Blunt Force
- ☐ Chemical/Poison
- ☐ Child Abuse
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Elder Abuse
- ☐ Exposure
- ☐ Fire
- ☐ Firearm
- ☐ Homicidal Violence, NOS
- ☐ Intrauterine/Stillborn
- ☐ Motor Vehicle
- ■ Other
- ☐ Restraint Related
- ☐ Undetermined

## UNDETERMINED

- ☐ Alcohol Related
- ☐ Blunt Force
- ☐ Decomposed
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Fire related
- ☐ Firearm
- ☐ Infant/Perinatal (not SIDS)
- ☐ Intrauterine/Stillborn
- ☐ Other
- ☐ Skeletal Remains
- ☐ Undetermined

Rev. 06/15

# COUNTY OF SAN DIEGO MEDICAL EXAMINER

5570 OVERLAND AVENUE, SUITE 101, SAN DIEGO, CA 92123-1215
PHONE: 858-694-2895 FAX: 858-495-5956

## ORDER FOR RELEASE OF REMAINS

**TO:** MEDICAL EXAMINER, COUNTY OF SAN DIEGO

**RE:** REMAINS OF Lonnie Newton Rupard, ME CASE # 22-1007

RUPARD Lonnie 2022-01007

I certify that pursuant to the State of California Health & Safety Code, Section 7100, it is my legal right to control the disposition of the remains referenced above, the location and conditions of interment, and arrangements for funeral goods and services to be provided. I further certify that I am acting in the capacity of: **Legal Next of Kin** [redacted], **OR Executor/Executrix** ________, **OR Agent with Durable Power of Attorney for Health Care** (must be for Health Care) ________ **OR other legal capacity** ________ (please **INITIAL** the appropriate category). If acting in a capacity other than Legal Next of Kin, I have attached a copy of the relevant appointing document(s).

Therefore, upon completion of your examination of the deceased, please release the remains referenced above to the custody of the service designated below. If possible please **RELEASE** [redacted] **OR DO NOT RELEASE** ________ (please **INITIAL** desired choice) all of the deceased's personal property in your care with the remains. I understand that personal property can only be released during regular working hours (M-F 8-5, except holidays). **As per California Laws and Department Policies, if the property in custody of the Medical Examiner's Department is not collected within 90 days from the date of death, it will be processed for immediate disposal.**

Featheringill Mortuary
Print Name of Designated Mortuary, Cremation Society, or other Disposition Service

| Print Name of Person Signing | Relationship | Signature | Date Signed |
|---|---|---|---|
| [redacted] | Son | [redacted] | Mar 22 2022 |

| Mailing Address of Person Signing | Home / Cell Phone Number |
|---|---|
| [redacted] El Cajon CA 92021 | [redacted] |

| City, State, Zip Code of Person Signing | City, State Where Signed |
|---|---|
| El Cajon CA 92021 | El Cajon CA |

**DECEDENT INFORMATION**

| Name of Deceased – First (Given) | Middle | Last (Family) | Gender | Date of Death |
|---|---|---|---|---|
| Lonnie | Newton | Rupard | N | 03/17/2022 |

| Date of Birth | Age | Place of Birth | Social Security Number | Race |
|---|---|---|---|---|
| 10/1/1975 | 46 | PI | [redacted] | Filipino |

| Marital Status | Occupation | Residence Address: |
|---|---|---|
| Div | Disabled | [redacted] Bonita ca 91902 |

**MEDICAL EXAMINER DEPARTMENT USE ONLY**

ME FAS Hanum

Release Date/Time: 3-22-22 1511

Transport Staff: (signed) [signature]

Printed Name: Megan Ruona

MEA-15 (R 3/26/19)

# COUNTY OF SAN DIEGO MEDICAL EXAMINER

5570 OVERLAND AVENUE, SUITE 101, SAN DIEGO, CA 92123-1215
PHONE: 858-694-2895 FAX: 858-495-5956

## ORDER FOR RELEASE OF REMAINS

**TO:** MEDICAL EXAMINER, COUNTY OF SAN DIEGO

**RE:** REMAINS OF Lonnie Newton Rupard, ME CASE # 22-01007

RUPARD, Lonnie 2022-01007

I certify that pursuant to the State of California Health & Safety Code, Section 7100, it is my legal right to control the disposition of the remains referenced above, the location and conditions of interment, and arrangements for funeral goods and services to be provided. I further certify that I am acting in the capacity of: **Legal Next of Kin** [redacted]____, **OR Executor/Executrix** ________, **OR Agent with Durable Power of Attorney for Health Care** (must be for Health Care) ________ **OR other legal capacity** ________ (please INITIAL the appropriate category). If acting in a capacity other than Legal Next of Kin, I have attached a copy of the relevant appointing document(s).

Therefore, upon completion of your examination of the deceased please release the remains referenced above to the custody of the service designated below. If possible please **RELEASE** [redacted]____ **OR DO NOT RELEASE**________ (please INITIAL desired choice) all of the deceased's personal property in your care with the remains. I understand that personal property can only be released during regular working hours (M-F 8-5, except holidays). **As per California Laws and Department Policies, if the property in custody of the Medical Examiner's Department is not collected within 90 days from the date of death, it will be processed for immediate disposal.**

Featheringill Mortuary

Print Name of Designated Mortuary, Cremation Society, or other Disposition Service

| Print Name of Person Signing | Relationship | Signature | Date Signed |
|---|---|---|---|
| [redacted] | Son | X [redacted] | 3-22-22 |

| Mailing Address of Person Signing | Home / Cell Phone Number |
|---|---|
| [redacted] | [redacted] |

| City, State, Zip Code of Person Signing | City, State Where Signed |
|---|---|
| Bonita CA 91902 | San Diego CA |

**DECEDENT INFORMATION**

| Name of Deceased – First (Given) | Middle | Last (Family) | Gender | Date of Death |
|---|---|---|---|---|
| Lonnie | Newton | Rupard | M | 3-17-22 |

| Date of Birth | Age | Place of Birth | Social Security Number | Race |
|---|---|---|---|---|
| 10-1-1975 | 46 | PI | [redacted] | Filipino |

| Marital Status | Occupation | Residence Address: |
|---|---|---|
| div | Disabled | [redacted] Bonita CA 91902 |

**MEDICAL EXAMINER DEPARTMENT USE ONLY**

ME FAS ________ Release Date/Time: ________

Transport Staff: (signed) [signature] Printed Name: Megan Ruona

MEA-15 (R 3/26/19)

***County of San Diego***
***Office of the Medical Examiner***

**RELEASE OF REMAINS**

**Name: RUPARD, Lonnie**

**M.E. #: 2022-01007**

Investigator: Fernanda Sanchez

Date Rec: 3/18/2022

Body Status: Ready to release

Mortuary: Featheringill Mortuary

**OK to Release Property?** yes

Date and Time Released: 3/22/2022 1509

Ok to release property Yes-JM

Released By: Data Entry: Stephen Hannum

T.E. No-JM

Body Retrieval: Stephen Hannum

---

| | | | |
|---|---|---|---|
| [ ] Cert | [ ] N.C. | [ ] Military | [ ] Release |
| [ ] Property | [ ] Child | [ ] Vitals | [ ] County |
| [ ] Decomp | [ ] Fee Paid | [ ] P.A. | [ ] Pouch |

**Weight: 105 lb** **Height: 69"** **Age: 46 Years** **Sex: Male**

**Body Condition: Within Normal Limits**

**Exam Type: Autopsy**

**Clothing Released with Body: True**

**Location: 15C dbl Son [redacted] also signed OFR**

**Clothing:** blue stripped sweatshirt, grey tank top, grey pants, black underwear, pair brown boots

**Items on or with Body:** none

***Remains have been examined with I.D. verified by comparison to ankle bracelet.***
***Clothing, valuables, if any, and posession of remains recieved in satisfactory condition:***

SHannum
Signature (Body retrieval M.E. staff)

**Stephen Hannum**
Printed Name

[signature]
Signature (Transport staff)

Megan Ruana
Printed Name

Date: 3/22/22 Time: 1519

2022-01007 Printed 3/22/2022

**PROOF OF SERVICE**
**(CCP §§ 1013(a) and 2015.5; FRCP 5)**

State of California, )
) ss.
County of Los Angeles. )

I am employed in the County of Los Angeles. I am over the age of 18 and not a party to the within action. My business address is 790 E. Colorado Boulevard, Suite 600, Pasadena, CA 91101.

On this date, I served the foregoing document described as **DECLARATION OF ROBERT S. KAHN IN SUPPORT OF DEFENDANT COUNTY OF SAN DIEGO'S MOTION TO EXCLUDE OR LIMIT THE OPINIONS AND TESTIMONY OF PLAINTIFF'S EXPERT LORI E. ROSCOE** on the interested parties in this action by placing same in a sealed envelope, addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ **(BY MAIL)** - I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail in Pasadena, California to be served on the parties as indicated on the attached service list. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Pasadena, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **(BY CERTIFIED MAIL)** – I caused such envelope(s) with postage thereon fully prepaid via Certified Mail Return Receipt Requested to be placed in the United States Mail in Pasadena, California.

☐ **FEDERAL EXPRESS** - I caused the envelope to be delivered to an authorized courier or driver authorized to receive documents with delivery fees provided for.

☒ **(BY ELECTRONIC FILING AND/OR SERVICE)** – I served a true copy, with all exhibits, electronically on designated recipients listed on the attached service list.

☐ **(ELECTRONIC SERVICE PER CODE CIV. PROC., § 1010.6)** – By prior consent or request or as required by rules of court (Code Civ. Proc., § 1010.6 (amended Jan. 1, 2021); Code Civ. Proc., § 1013(g); Cal. Rules of Court, rule 2.251(a)).

☐ **(BY PERSONAL SERVICE)** - I caused such envelope(s) to be delivered by hand to the office(s) of the addressee(s).

---

Executed on November 13, 2026 at Pasadena, California.

☐ **(STATE)** - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ **(FEDERAL)** - I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

---------------------------------------------
NATALIE URBINO
nurbino@ccllp.law

*25163*



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**ESTATE OF LONNIE RUPARD ET AL. V. COUNTY OF SAN DIEGO ET AL.**
**Case Number: 3:23-cv-1357-CAB-JAC**
**CCLLP File Number: 25163**

**SERVICE LIST**

Jeremiah A. Lowe
LOWE LAW, LLP
402 W. Broadway, Suite 1720
San Diego, CA 92101
T: (619) 878-2725 - F: (619) 878-2737
jeremiah@lowelawapc.com
laura@lowelawapc.com
**ATTORNEYS FOR PLAINTIFF JUSTINO RUPARD and the Estate of Lonnie Rupard**

Eugene G. Iredale
Julia Yoo
Sarah Musumeci
Peter Bibring
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
T: (619) 233-1525 - F: (619) 233-3221
egiredale@iredalelaw.com
jyoo@iredalelaw.com
smusumeci@iredalelaw.com
admin@iredalelaw.com
creherman@iredalelaw.com
gjun@iredalelaw.com
sbrockett@iredalelaw.com
pbibring@iredalelaw.com
**ATTORNEYS FOR PLAINTIFF JUSTINO RUPARD**

Alexandra Sennet
Kimberly B. Pinkerton
TRESSLER LLP
909 North Pacific Coast Highway, Suite 840
El Segundo, CA 90245
T: (310) 203-4800 - F: (323) 486-2704
asennet@tresslerllp.com
kpinkerton@tresslerllp.com
**ATTORNEYS FOR DEFENDANTS ANTHONY CRUZ, M.D. and LIBERTY HEALTHCARE OF CALIFORNIA, INC.**

Corey E. Krueger
BURGER, MEYER & D'ANGELO, LLP
999 Corporate Dr., Suite 225
Ladera Ranch, CA 92694
T: (949) 427-1888 - F: (949) 427-1889
ckrueger@burgermeyer.com
vcuevas-carey@burgermeyer.com
**ATTORNEYS FOR DEFENDANTS ANTHONY CRUZ, M.D. and LIBERTY HEALTHCARE OF CALIFORNIA, INC.**



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111