# EXHIBIT "A"

EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

JEREMIAH A. LOWE (CA SBN 239166)
*jeremiah@lowelawapc.com*
LOWE LAW, APC
402 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 878-2725
Facsimile: (619) 878-2737

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ESTATE OF LONNIE RUPARD,

Plaintiff,

v.

COUNTY OF SAN DIEGO, *et al.*,

Defendants.

CASE NO. 23-CV-1357-CAB-JAC

**PLAINTIFF'S EXPERT WITNESS DISCLOSURES AND REPORTS PURSUANT TO FED. R. CIV. P. 26(a)(2)(B)**

Plaintiff the Estate of Lonnie Rupard, by and through its attorneys of record, Iredale & Yoo, APC and Lowe Law, APC, hereby submits the following expert witness reports pursuant to Fed. R. Civ. P. 26(a)(2)(B).

**RETAINED EXPERT REPORTS**

1. Homer Venters, M.D.: Dr. Venters' expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 1**.
2. Daphne A. Glindmeyer, M.D.: Dr. Glindmeyer's expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 2**.
3. Gary Raney: Mr. Raney's expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 3**.
4. Lori E. Roscoe, DNP: Dr. Roscoe's expert report, CV, list of testimony and fee schedule are collectively attached as **Exhibit 4**.

Respectfully submitted,

DATED: July 15, 2026

**IREDALE & YOO, APC**
EUGENE G. IREDALE
JULIA YOO
SARAH MUSUMECI

*s/ Eugene Iredale*
Attorneys for Plaintiff

DATED: July 15, 2026

**LOWE LAW, APC**
JEREMIAH LOWE

*s/ Jeremiah Lowe*
Attorney for Plaintiff

# Exhibit 2

# Daphne Glindmeyer, M.D.

611 River Highlands Blvd. Suite B
Covington, LA 70433

Phone: (504) 392-8348
Facsimile: (504) 398-4334

Phone: (985) 888-1414
Facsimile: (985) 888-1415


July 13, 2026

Lowe Law, APC
Attn: Jeremiah Lowe, Esq.
402 West Broadway Street Suite 1720
San Diego, California 932101

Re: Estate of Lonnie Rupard v. County of San Diego, et al.
Case No: 23CV1357 CAB BLM

Dear Mr. Lowe,
My name is Daphne Glindmeyer. My office address is 611 River Highlands Boulevard, Suite B, Covington, Louisiana. I am a medical doctor, licensed to practice medicine in the state of Louisiana and in the state of Texas.

I am a graduate of the Louisiana State University Health Sciences Center. I completed a residency in Adult Psychiatry, a fellowship in Child and Adolescent Psychiatry, and a fellowship in Forensic Psychiatry. I am board certified in Adult Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry. I am a Distinguished Fellow of the American Psychiatric Association, past President of the Louisiana Psychiatric Medical Association, and past President of the Louisiana Council on Child and Adolescent Psychiatry.

I am currently in private practice, providing psychiatric evaluation and medication management services to child, adolescent, and adult clients as well as forensic consultation. My fee for forensic consultation, charged in this case, is $600.00 per hour, with approximately 32 hours spent on this review/report. Testimony, if required, is also charged at $600.00 per hour, in four-hour blocks. For further information, please refer to my attached Curriculum Vitae and Fee Agreement. In addition, I have attached my testimony log detailing depositions and courtroom testimony for the past four years.

<u>Statement of Opinion:</u>
Mr. Lowe requested my opinions in the above noted case. My opinions are based on my skill, education, training, experience, knowledge of medical and scientific literature,

other materials reasonably relied upon by members of my medical specialty, and my review of the case information available at this time. Should additional information become available that modifies my opinions and conclusions, an addendum will be authored.

To provide this opinion, information regarding this case including case pleadings, depositions, photographs, medical/mental health, and other records were reviewed. For a complete listing of all information reviewed, please refer to the list of documents and pertinent information from each included below.

Based on the available information, it is my opinion, to a reasonable degree of psychiatric certainty, that there were significant deviations from the standard of care regarding the psychiatric treatment, mental health treatment, and monitoring provided to Mr. Rupard during his incarceration at the San Diego County Jail. In my opinion, the failures on the part of the facility and mental health/psychiatry staff resulted in Mr. Rupard's death due to "Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia." Mr. Rupard's death was classified as "homicide" per the County of San Diego Department of the Medical Examiner.

<u>Document Review:</u>
As part of the evaluation, the following documents, provided by Jeremiah Lowe, Esq. were reviewed: *(Pertinent information regarding each document will be included here. Please note common medical abbreviations have been deciphered for the reader.)*

<u>Legal:</u>

1. United States District Court, Southern District of California, Estate of Lonnie Rupard, through its Court-Appointed Administrator Terri Lopez; and Justino Rupard v. County of San Diego, et al., Third Amended Complaint for Damages filed February 19, 2025:
    a. "Lonnie suffered from schizophrenia. On March 17, 2022, Lonnie died…at the age of 46 while in custody at the SDCJ [San Diego County Jail]…
    b. While in custody at the SDCJ, County employees neglected his schizophrenia and basic needs despite obvious signs that he was in acute psychosis. They discontinued his antipsychotic medication. During the approximately three months he was in custody at SDCJ, Lonnie lost 60 pounds, more than a third of his total body weight. Lonnie was six feet tall and weighed 105 pounds at his death.
    c. In his final days, Lonnie ate nothing. He was never let out of his cell…Deputies, who saw Lonnie in…trash and maggots in his food and his body caked in feces, left him to die.
    d. According to the medical examiner, Lonnie died from pneumonia, malnutrition, and dehydration. The Medical Examiner ruled his death to be a homicide."

<u>Medical/Corrections Records:</u>

2. San Diego County Sheriff's Department Medical Intake Questions dated December 6, 2007:
    a. Medications: Prozac 20 mg by mouth daily in the morning, Benadryl 50 mg by mouth daily at bedtime, Cogentin 1 mg by mouth daily at bedtime, Haldol Decanoate 100 mg intramuscularly every month.
    b. Weight 183 pounds.
    c. Psychiatric questions: "current psychiatric/mental health problems…bipolar schizophrenia…psychiatrist…Dr. Kugel…visual hallucinations sometimes… auditory hallucinations…sometimes…prior suicide attempts last time last year, does not remember what he did…"

3. San Diego County Sheriff's Department Medical Intake Questions dated May 24, 2009.

4. San Diego County Sheriff's Department Medical Chart dated November 9, 2009 through December 9, 2009:
    a. 11.10.09 - "A STAT psychiatric evaluation was done…will be scheduled to see psychiatrist this morning."
    b. 11.10.09 – "Received a call…identified herself as the inmate patient's wife…stated that inmate patient has been diagnosed with bipolar disorder and schizophrenia, was taking Haldol injection once a month but stopped taking it four months ago because he felt better…lacks insight into his psychiatric problem…has been talking to himself lately and have verbalized hurting himself and others…they were in a doctor's office trying to get help when inmate patient's behavior led to his arrest."
    c. 11.11.09 – "History of…schizophrenia, not compliant with medications (five months off meds) …a very poor historian, most of information was taken from the chart…Haldol 5 mg by mouth at bedtime."
    d. 12.9.09 – "Stable on Haldol 5 mg…will be released on 12.14.09 with 15 days supply of medication."

5. San Diego County Sheriff's Department Medical Chart dated May 6, 2010 through November 4, 2010.
    a. Mr. Rupard reported a history of mental health problems, "bipolar" and treatment with medications, "does not remember the name…submitted for psychiatry referral."
    b. 5.8.10 – "seen by psychiatrist…history of several hospitalizations…extremely difficult to interview…continue Haldol 5 mg at bedtime."
    c. 5.27.10 – "discharge summary from Paradise Valley Hospital was reviewed…was on Haldol 10 mg by mouth and Haldol Decanoate every month, but it is not known when was the last dose given, also he is on Cogentin and Depakote daily."

   d. 5.27.10 – Psychiatry Sick Call "diagnosis schizoaffective type schizophrenia…Haldol 10 mg at bedtime, Cogentin 1 mg twice daily, Depakote 500 mg twice daily, and Haldol Decanoate 100 mg intramuscularly monthly."

6. San Diego County Sheriff's Department Medical Chart July 1, 2011 through July 19, 2011:
   a. Mr. Rupard did not report a history of psychiatric illness. "but per old records…he was on Haldol/Cogentin for paranoid schizophrenia."
   b. 7.12.11-Psychiatry Sick Call: Mr. Rupard "refused psychiatric evaluation on 7.8.11 and today, essentially refused…". Mr. Rupard was noted as exhibiting selective mutism, "

7. San Diego County Sheriff's Department Medical Chart dated August 18, 2011 through September 2, 2011.
   a. 8.19.11 -Mr. Rupard reported a history of "bipolar – recent hospitalization at Bayview…when there on a 5150…is on Prolixin intramuscularly and Depakote…psychiatry referral."
   b. Mr. Rupard refused psychiatry clinic.

8. San Diego County Sheriff's Department Medical Chart dated September 24, 2011 through June 10, 2012.
   a. Mr. Rupard reported a history of schizophrenia. He could not remember the names of his medications.
   b. 9.24.11 – "Received a call…claims to be inmate patient's mother…her son ahs mental issues and is receiving weekly intramuscular shots from his psychiatrist…Dr. Samuel Kugel."
   c. Mr. Rupard refused psychiatry sick call on multiple occasions. He required safety cell and was noted to refused medications.
   d. Medications: Risperdal 2 mg by mouth at bedtime, Depakene 500 mg by mouth in the morning, Cogentin 1 mg by mouth at bedtime.
   e. 5.11.12 – "received A call from the 5th floor sworn staff reporting that patient's mental state is deteriorating. His cell is filthy, he is not flushing the toilet, he makes himself throw up. On review of medical records, patient has been refusing to see the psychiatrist, has been refusing meds…"
   f. 6.10.12 – "called to respond to a tac team call…inmate patient reportedly not wanting to come out of cell despite being released from custody. He was therefore extracted out of cell…plan…to drop off at County Mental Health under 5150."

9. San Diego County Sheriff's Department Medical Chart dated June 20, 2012 through June 21, 2012.
   a. 6.21.12 – "will be transported to County Mental Health now."

b. 6.21.12 – "ongoing observation…remains in sobering cell. Erratic behavior…long history of mental illness per JIMS, non-compliant with treatment in jail before…has been observed talking to self…"
c. 6.21.12 – "the patient appears to have an acute psychosis…drug delirium…will put patient on a 5150…acutely disorganized though pattern and evidence of grave disability."

10. San Diego County Sheriff's Department Medical Chart dated April 18, 2015 through September 19, 2015:
    a. Mr. Rupard was noted as "uncooperative" and he "denied any medical or psychiatric issues…history of schizoaffective disorder…angry and loud…for psychiatry follow-up."
    b. 5.24.15 – Psychiatry/Nurse Practitioner Progress Note "in mild distress secondary to psychosis/agitation…loud…agitated…irritable, intrusive, and disorganized…Diagnostic: Psychosis, not otherwise specified…"
    c. 7.13.15 – Psychiatry/Nurse Practitioner Progress Note: "he has been very hostile and belligerent to the clinical staff…thoughts seem disorganized… this incarcerated person is gravely disabled. He has no insight into his illness, the need for psychotropic medications, or the fact that the clinical staff are trying to help him…recommend transfer to PSU."
    d. 7.24.15 – Psychiatry Sick Call "patient who is Patton committed and on involuntary medications…legal status 1370…continue to offer psych medications…at this time, does not meet criteria for PSU admission."
    e. 8.1.25 – Psychiatry Follow-up "history of psychosis, not otherwise specified…refusing [medication]…yells obscenities…does not cooperate with questions…rambling incoherent speech…irritable…arrange transfer to PSU."
    f. During this incarceration, Mr. Rupard's continued refusal to adhere to his medication regimen was documented. He transferred to Patton State Hospital 9.24.15.

11. San Diego County Sheriff's Department Medical Chart dated February 11, 2016 through April 6, 2016:
    a. Mr. Rupard reported a history of "schizoaffective disorder – on medications from Patton."
    b. Per the discharge summary from Patton State Hospital, Medications: Klonopin 1 mg at bedtime, Zyprexa 20 mg twice daily, Haldol decanoate 300 mg intramuscularly every 28 days.
    c. 2.18.16 – Psychiatrist Initial Evaluation noted diagnosis of schizophrenia, "'I am feeling good'…would like to continue his psychotropic medications…to prevent relapse…prior hospitalizations: approximately 10-15 psychiatric hospitalizations with the most recent being at Patton State Hospital… continue discharge medications from Patton State Hospital."

d. Mr. Rupard maintained adherence to his prescribed medication and was documented as participating appropriately in group therapeutic interactions.

12. San Diego County Sheriff's Department Medical Chart dated November 30, 2018:
   a. At intake, Mr. Rupard's history of schizophrenia and treatment with psychotropic medications was noted. Scheduled for psychiatry sick call.

13. San Diego County Sheriff's Department Medical Chart dated January 8, 2019 July 6, 2019:
   a. At intake, Mr. Rupard denied any history of mental illness or psychiatric hospitalization.
   b. 1.9.19 – Psychiatry Sick Call "history of psych…denies at intake…no medications ordered."
   c. 1.31.19 – Psychiatry Initial Evaluation "Psychosis, not otherwise specified…no medications per patient preference…follow up three weeks."
   d. 2.4.19 – Psychologist "seen at the request of sworn staff…not very cooperative…disorganized thinking…he is currently 1368…"
   e. 2.8.19 – "deputy request psychiatry sooner, been in lockdown…extremely agitated…combative, refusing medications…threatening…"
   f. 2.12.19 – Mental Health Clinician "currently in lockdown due to being uncooperative, unkempt and having difficulty managing in housing…being seen one time per week by mental health clinician while on lockdown and is also being seen routinely by psychiatrist."
   g. 2.18.19 – Welfare Check "speaking with rapid fire speech and appears to be responding to internal stimuli…"
   h. Mr. Rupard remained in administrative segregation, with welfare checks noting hostility, lack of cooperation, rapid and unintelligible speech.
   i. 3.10-19 – "attempt to obtain an order for medications…before transferring this inmate to …administrative segregation…is agitated and uncooperative."
   j. 3.25.19 – Psychiatric Progress Note "rambling incoherently…history of medications…psychosis, not otherwise specified…offer Zyprexa 10 mg twice daily…"
   k. 3.31.19 – Psychologist "called…sworn staff…in administrative segregation… unintelligible…word salad…cell was messy and filled with trash."
   l. 4.12.19 – Psychiatric Progress Note "angry…semi-intelligible rant…uncooperative, intense eye contact…continue to offer Zyprexa 10 mg twice daily…follow up in one week to reattempt interview/build rapport."
   m. Mr. Rupard was seen weekly after this. Despite being noted as "appears manic and/or psychotic" he was not identified as gravely disabled.
   n. 4.26.19 – Psychiatry Sick Call "consider admission to PSU…refusing…medication."

o. 5.4.19 – Psychologist "referred by sworn staff…refusing to come out of his cell…asked to attempt to convince patient to come out of his cell voluntarily prior to the Tac Team forcibly removing him…cell was messy and the toilet was filled with trash and feces…". Mr. Rupard was noted as verbally aggressive and threatening."
p. 5.10.19 – Psychiatry "rambling…meal tray containers scattered…toilet appears to have the content of multiple voids…a large mound of toilet paper…paranoid ideation…will increase Olanzapine to 20 mg at bedtime…compliance is poor, a larger dose when he does accept medication may have some slow benefit…does not appear gravely disabled at this time."
q. 6.19.19 – Psychiatry "rambles nonsensically…given level of disorganization…administer Haldol Dec 150 mg starting 6.22.19…court ordered, cannot refuse."
r. 6.23.19 – Haldol Dec…patient refused…medication was forced."
s. 7.6.19 – Haldol Dec 150 mg administered.

14. San Diego County Sheriff's Department Medication Administration Record regarding Mr. Lonnie Rupard.

15. San Diego County Sheriff's Department Medical Clearance dated January 30, 2020.

16. San Diego County Sheriff's Department Medical Chart dated April 22, 2020 through September 28, 2020.
    a. Returned from Patton State Hospital.
    b. Medications Haldol Decanoate 200 mg intramuscular on the 4th and 22nd of every month. Depakene 500 mg twice daily, Cogentin 2 mg at bedtime.
    c. Mr. Rupard began to refuse his oral medications,

17. Patton State Hospital Discharge Summary dated January 30, 2020. Diagnoses noted as "unspecified schizophrenia spectrum and other psychotic disorder…on the unit, he has been calm and cooperative…medication adherent…Haldol Decanoate 200 mg intramuscular monthly on the 4th."

18. Patton State Hospital Medical Record:
    a. 1.30.20 – Discharge Summary:
        i. Date of admission 7.19.19, date of discharge 1.30.20.
        ii. Mr. Lonnie Rupard…committed to the California Department of State Hospitals on 5.17.19…Incompetent to Stand Trial…Dr. Rao noted that Mr. Rupard was agitated…speech was incoherent and loud…disorganized…Mr. Rupard…stated that all symptoms have resolved since he started taking his medication… diagnosis:

unspecified schizophrenia spectrum and other psychotic disorder... antisocial personality disorder...stimulant use disorder."

b. 1.7.20 - Monthly Psychiatric Progress Note:
    i. Mr. Rupard's legal status was "PC1370 Incompetent to Stand Trial."
    ii. He was noted as "compliant with his medications...Depakote 500 mg twice daily, Haldol Decanoate 200 mg intramuscularly monthly on the 4th...Cogentin 1 mg twice daily."
    iii. Mr. Rupard was described as "agitated with increased psychomotor abnormality, his speech was incoherent and loud, the thought process was disorganized and has poor attention and concentration...he is presently demonstrating several signs of a severe mental disorder...diagnosis: unspecified schizophrenia spectrum and other psychotic disorder... antisocial personality disorder...stimulant use disorder."
c. 11.4.19 - Physician Quarterly Review Medical Progress Note
    i. Height 71" weight 211 pounds.
d. 8.8.19 – Medical Surgical: "three stitches removed from eyebrow area, one stitch removed from lower lip.
e. 7.23.19 – PC1370 Intramuscular Order Status:
    i. "The attached order authorizes the...patient to be involuntarily medicated with psychotropic medications...Order date 5.17.19 expiration date 5.17.20."
    ii. 7.22.19 – Admission Screening Rule out Tuberculosis – Chest X-Ray results "No radiographic evidence of active tuberculosis."

19. San Diego County Mental Health Client Roster Report regarding Mr. Lonnie Rupard dated October 5, 2007 through April 24, 2020.

20. San Diego County Sheriff's Department Medical Record for Mr. Lonnie Rupard dated August 25, 2021:
    a. Height 5'9" weight 186 pounds.
    b. The intake document noted "Behavioral Health Chronic Care: Psychotic disorders."

21. San Diego County Sheriff's Department Medical Record for Mr. Lonnie Rupard dated September 11, 2021:
    a. Height 5'9" weight 175 pounds,
    b. The intake document noted "Behavioral Health Chronic Care: Psychotic disorders."

22. San Diego County Sheriff's Department Medical Record for Mr. Lonnie Rupard dated September 14, 2021:
    a. Height 5'9" weight 175 pounds.

b. The intake document noted "Behavioral Health Chronic Care: Psychotic disorders."
c. PERT Mental Health Screen for Detention indicated no suicide risk, positive risk of violence, "client had verbal argument with ticket agent from Southwest airlines…multiple psychiatric hospitalizations…client is impulsive and has poor judgement. He denies intent to harm others. Stated that he got angry and then left the airport on foot."

23. San Diego County Sheriff's Department Medical Record for Mr. Lonnie Rupard dated October 20, 2021 through November 29, 2021:
   a. Height 6'0" weight 173 pounds.
   b. The intake document noted "Behavioral Health Chronic Care: Psychotic disorders."
   c. Sobering Cell 72 hours, "Incarcerated person has history of psychiatry…please assess."
   d. 11.12.21.- Behavioral Health Assessment "Wellness check…non-confidential, met with incarcerated person cell side…with deputy assistance…he reports he is 'fine. I am getting out in two weeks'…denies any ongoing disturbances…reports he is eating, sleeping and ha energy to get out of bed each day for activities of daily living…calm, cooperative with writer with no response to internal stimuli…appears to be maintaining his cell and with a cell mate…no acute safety concerns…provisional diagnosis: unspecified schizophrenia spectrum and other psychotic disorder… antisocial personality disorder…stimulant use disorder… no treatment indicated…wellness check in two weeks."

24. San Diego County Sheriff's Department Health Information Management, Medical records for Mr. Lonnie Rupard dated December 12, 2021 through March 17, 2022:
   a. 12.19.21 – "Medical Clearance…Date of Birth: 10.1.75…age=48…weight 165…height 6'…BMI 22.4…". No other screening items were checked, and it was noted that Mr. Rupard was "fit to continue booking process."
   b. 12.19.21 – "Receiving Screening...patient is verbally abusive and combative…" The document response indicated "no" to "any indication of a mental health concern." For Behavioral Health Chronic Care, "psychotic disorders" was checked. The mental health screening indicated all "no" responses as did the suicide risk questionnaire and substance use assessment. Mr. Rupard was noted as fit to continue the booking process and referred to "2nd stage nurse evaluation/NAP."
   c. 12.19.21 – "General Informed Consent" was checked "patient is willing to sign, but unable to sign."
   d. 12.19.21 – "Authorization for Release of Information" was checked "not indicated."

e. Sick Calls –
    i. 12.19.21 – "Second stage nurse eval scheduled from receiving screening: Patient refused COVID test at intake."
    ii. 12.20.21 –Psychiatry Sick Call "Reschedule on-site- Refused telehealth 12.23 – denies that he will come. History of extensive meds, Patton [State Hospital]. Patient has history of psych and was on medications during previous incarceration, please evaluate."
    iii. 1.15.22 – Psych Chart Review "Multiple refusal of psych medications. Please evaluate."
    iv. 1.15.22 – Psych Chart Review "Inmate has been refusing medication. Please Evaluate."
    v. 2.2.22 – Chronic Care "psychotic disorders."
    vi. 2.1.22 – QMPH "has D/I. Please assess."
    vii. 2.2.22 – Psychiatry Sick Call "Reschedule on site – refused 2.18. Last seen 12.29. Follow-up in 4-5 weeks or sooner as needed, started (offer) Haldol, Valproic Acid, Cogentin."
    viii. 4.12.22 – Psychiatry Sick Call "Last seen 2.22, follow up in 6-7 weeks or sooner as needed. Patient refuses medications (PC1368),"

f. 12.19.21 –Nursing Progress Note "disheveled in appearance, verbally abusive but directable…refused COVID test."

g. 12.24.21 – Psychiatrist "patient was scheduled for an initial evaluation, however due to time constraints, patient was unable to be seen…will be rescheduled."

h. 12.28.21 – Psychiatrist "patient was scheduled for an initial evaluation, however due to time constraints, patient was unable to be seen. Patient will be rescheduled."

i. 12.29.21 – Psychiatrist "Patient booked on 12.19.21… Patient is seen today for psychiatry sick call initial psychotropic medication evaluation to address history of psychosis and psychotropic medication treatment...SDCJ-7D And was evaluated today by this clinician cell side in a non-confidential environment. Patient was made aware of the nature/ purpose of the evaluation and refused to participate. Patient was last seen in psychiatry sick call during a previous incarceration on 7.11.20 for follow up. At that time, patient was diagnosed with unspecified schizophrenia spectrum and other psychotic disorder… antisocial personality disorder… stimulant use disorder… with plan to continue Haldol decanoate intramuscularly 200 milligrams every 4th and 22nd of every month, Depakene 500 milligrams by mouth twice daily, Vistaril 25 milligrams twice daily, and increased Cogentin 1 milligram in the morning and 2 milligram at bedtime…" Information from the prior sick call note in 2020 was included noting that the patient indicated "his mood is 'good'… Has some anxiety. He reports he is eating and sleeping well… states the Haldol helps with auditory hallucinations but claims tremor in his left hand continues from Haldol." The

progress note then discusses the results of the current sick call encounter, "Today, multiple attempts were made to engage the patient in conversation, however patient yelled, mumbled incoherently at times and was verbally aggressive throughout the interview. Patient was Observed through his cell door window. Patient was awake, alert, shirtless (wearing pants), standing by cell door, and appeared to be in no acute distress. Cell room was relatively clean, no flooding/gassing or smearing of feces. Empty food trays were visible in his cell. No signs are symptoms of patient being a danger to self or others at this visit. Patient was informed Haldol, Depakene, Vistaril, and Cogentin would be restarted/ offered, and medication compliance was encouraged. Medication indications, risk/ benefit and potential side effects including no medications were reviewed." The Mental Status Examination noted "Irritable, uncooperative…speech yelling/ verbally aggressive, pressured… Mood/ affect, unable to assess due to lack of patient cooperation/ irritable, reactive. Thought process: disorganized. Thought content: unable to assess due to lack of cooperation… no apparent response to internal stimuli... No signs or symptoms of patient being a danger to self or others… diagnosis: unspecified schizophrenia spectrum and other psychotic disorder... By history… antisocial personality disorder… by history… stimulant use disorder… by history… patient presents to the clinic irritable and uncooperative with today's visit. Patient has history of psychosis, substance use, suicidality, psychiatric hospitalizations and psychotropic medication treatment. No signs or symptoms of patient being a danger to self or others at this time. Patient was a poor historian and was irritable and verbally aggressive during the interview. Due to patients' presentation, psychiatric history, and potential for decompensation, will start/offer previous psychotropic medications. Discussed current treatment plan with patient… no signs of danger to self/ danger to others or grave disability requiring immediate psychiatric intervention at this visit. Plan: start/ offer Haldol 5 milligrams by mouth twice daily…start/offer Cogentin 1 mg by mouth twice daily…start/offer Valproic Acid 500mg/10ml by mouth twice daily…encourage medication compliance…did not consent to labs at this visit…return to clinic 4-5 weeks or sooner.:

j. 12.29.21 – Nursing Progress Note "psych sick call encounter noted. Medications verified.
k. 12.30.21 – 1.6.22 Medication Refusal forms completed daily regarding Mr. Rupard's psychotropic medications. These forms were not signed by Mr. Rupard.
l. 1.8.22 – 1.20.22 Medication Refusal forms completed daily regarding Mr. Rupard's psychotropic medications. These forms were not signed by Mr. Rupard.
m. 1.20.22 – Psychiatrist "per…chart review, patient consistently refuses psychotropic medications. At this time, will discontinue Haldol, Cogentin, and Valproic Acid. Psychiatry sick call follow up is already scheduled."

n. 1.21.22 – Nursing Progress Note "psych sick call encounter noted."

o. 1.29.22 – Nursing Progress Note "Seeing on housing floor status post use of force. Per deputies, patient was taken down... Noted with laceration between eyebrows not actively bleeding. Unable to further assess due to patient repeatedly stating 'I don't need a medic. Leave me alone, if you touch me, I'll kill you.' Irritable, breathing even and unlabored, noted with small abrasion to left side of face and some possible blood on lips. Assessment terminated for safety."

p. 2.9.22 – QMHP Progress Note "Wellness check…semi-confidential…segregation/confinement…housed in 7D…no reported aggression, violence or erratic behaviors…observed…standing at the cell door…was uncooperative as evidenced by…stating 'I am fine. I don't want to talk to you…observed…not engaging in self-injurious behavior. Unable to fully assess…due to his refusal and/or inability to cooperate…did not answer any further…question despite multiple attempts from writer trying to engage…Incarcerated person then began speaking in unintelligible words…sated 'go away'. Deputies on the 7th floor report incarcerated person will often speak to himself in intelligible words…cell was clean and had some debris…observed empty food trays inside of his cell…cell was free of any urine, feces, or flooding…moderately groomed…does not demonstrate any acute distress or immediate safety concerns…no distressing symptoms or major impairment requiring ISP or PSU referral…will continue to be monitored for safety concerns and grave disability…unable to fully assess incarcerated person due to his refusal and/or inability to cooperate." Mr. Rupard's mental status examination was pertinent for "Moderately groomed… quiet... Behavior: agitated… attitude: uncooperative, non-disclosing… mood: irritable… affect: irritable… thought content: impoverished… thought process: concrete…intervention provided: no intervention indicated…return to clinic…wellness check in 2 weeks…". No referral was indicated.

q. 2.20.22 – Nursing Progress Note "per deputy…patient is on lockdown, no contraindication noted."

r. 2.22.22 – Psychiatry "…seen today for psychiatry sick call follow up…last seen 12.29.21…and is currently not prescribed psychotropic medications…medications were discontinued due to consistent refusals…evaluated today…cell-side in a non-confidential environment… Today, multiple attempts were made to engage the patient in conversation, however he refused to answer questions and rambled incoherently and became verbally aggressive… observed through his cell door window. Patient was awake, alert, shirtless (wearing pants), initially sitting on his bed then kneeled on his cell floor and appeared to be in no acute distress. Cell room was relatively clean, no flooding/ gassing or smearing of. However, toilet seat was covered with cloth. No signs or symptoms of patient being a danger to self or others. Regarding

psychotropic medication, patient continued to yell when offered psychotropic medications… mental status examination… irritable, uncooperative… limited grooming...speech: yelling, verbally aggressive, rambling incoherently at times, non-pressured, spontaneous… thought process disorganized… patient may be responding to internal stimuli… patient presents to the clinic irritable and uncooperative with today's visit. Patient has a history of psychosis, substance use, suicidality, psychiatric hospitalizations and psychotropic medication treatment… patient was irritable and verbally aggressive during the interview. Due to patient's presentation, psych history, legal status (PC1368), and potential for decompensation, will continue to monitor and offer treatment. Discussed current treatment plan with patient… no signs of danger to self/ danger to others or grave disability requiring immediate psychiatric intervention… patient offered psychotropic medication, however patient refuses medication… return to clinic six to seven weeks or sooner, if needed."

s. 2.22.22 – Nursing Progress Note "psych sick call noted, no new orders."
t. 3.17.22 – Nursing Progress Note "patient is scheduled to release on 3.19.22 but is pending the outcome from his court hearing...has no psych/critical medications."
u. 3.17.22 – Emergency Room Referral "Chief Complaint…unresponsive, non-breathing, applied AED, no shock advised, continue CPR."
v. 12.29.21-1.20.21 – Medication Administration Record noting Mr. Rupard refused prescribed psychotropic medications.

25. County of San Diego Department of the Medical Examiner report regarding Mr. Lonnie Rupard dated February 8, 2023:
   a. Medical Examiner Investigator - "Per medical records…the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications…
      i. Scene Description…The decedent appeared to be incontinent of feces, and there were feces about the buttock area, and the posterior aspect of the lower extremities and the soles of both feet…"
   b. Autopsy Report dated March 19, 2022 – "Cause of Death: Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia. Contributing: SARS-COV-2 (COVID-19) Viral infection; pulmonary emphysema; duodenal ulcer. Manner of Death: Homicide."
      i. "Malnutrition and Dehydration – Height 69 inches, weight 105 pounds with a body mass index of 15.5."
      ii. "Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; Nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this

decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide."

c. Toxicology Report dated March 21, 2022 indicated alcohol and drugs of abuse screen result "none detected."

26. Autopsy photographs of Mr. Lonnie Rupard.

27. Photographs of Mr. Lonnie Rupard's cell. There were food containers littering the cell. The toilet and sink contained a brown substance, opined to be feces. There was substance smeared on the walls and floors.

<u>Depositions:</u>

Note – the deposition summaries are included as Attachment 1.

28. Video Deposition of Christina Goodall dated December 16, 2024.

29. Video deposition of Nicolas Badre, M.D. dated December 18, 2025.

30. Video deposition of Detective Max Blumenshine dated January 7, 2026.

31. Video deposition of Melissa Quiroz dated January 8, 2026.

32. Video deposition of Bethann Schaber, M.D. dated May 5, 2025.

33. Video deposition of Jon Montgomery, D.O. dated January 15, 2026.

34. Video deposition of Anthony Cruz, D.O. dated March 3, 2026, with errata sheet dated April 21, 2026.

35. Video Deposition of Rebecca Jean Kloker, M.D. dated April 17, 2026.

36. Video Deposition of Sandeep Jouhal, M.D. dated April 10, 2026, with exhibit.

37. Video Deposition of Francis Ysla, M.D. dated April 10, 2026, with exhibit. He was the supervisor employed by Liberty, and include some info

<u>San Diego County Sheriff's Department:</u>

38. Medical Services Division Operations Manual:
    a. Mentally Disordered Inmates – Emergency Transportation dated 2.24.11.
        i. "Any patient who is believed to be a danger to self, or a danger to others, or gravely mentally disabled shall be removed from mainline.
        ii. Gravely Mentally Disabled shall refer to any inmate:
            1. Who is believed to be a danger to self or a danger to others, or
            2. Who does not appear to be able to provide for his/ her own personal needs such as eating, showering, and toileting, or

3. Who does not appear to be sufficiently lucid to comprehend the fact of their arrest or incarceration."

iii. "The detention psychiatrist will determine if the patient meets 5150 criteria. Thee evaluating psychiatrist shall complete A5150 form and refer patient for admission to PSU."

b. Mentally Disordered Individuals -Emergency dated 2.1.22.

i. "Any patient who is believed to be a danger to self, or a danger to others, or gravely mentally disabled shall be assessed by a qualified mental health professional (QMHP) for housing recommendations/options."

ii. "Gravely mentally disabled shall refer to any individual:

1. Who is believed to be a danger to self or a danger to others, or
2. Who does not appear to be able to provide for their own personal needs such as eating, showering and toileting, or
3. Who does not appear to be sufficiently lucid to comprehend the fact of their detainment or incarceration."

c. Psychiatric Stabilization Unit (PSU) dated 10.2.19.

i. "Policy:

1. A patient shall be admitted to the Psychiatric Stabilization Unit… upon the direct order of a Detention Psychiatrist or the San Diego County Psychiatric Hospital- Emergency Psychiatric Unit… psychiatrist.
2. Patients admitted to the PSU shall meet the criteria as defined by the California Welfare and Institution code 5150 as an involuntary admission or a voluntary patient needing acute psychiatric care.
3. Patients under penal commitments (e.g., PC1370 incompetent to stand trial…) may be treated in this program, to ensure their stability and safety while in sheriff's custody…
4. Involuntary Admission Criteria
    a. Meets Short-Doyle criteria for inpatient care
        i. Is dangerous to self, dangerous to others, or gravely disabled
        ii. Advisement of legal status and good cause for incomplete advisements including required subsequent attempts to advise our made and documented…
5. PC1370 - These are individuals found incompetent to stand trial and are legally involuntary patients until found restored to competency by the court…"

d. Psychiatric Stabilization Unit (PSU) dated 1.24.22.

i. "Individuals under Penal Commitment (PC) 1370 will be admitted to PSU."

e. Staff Training for 5150 Certification dated 6.23.20.
    i. "San Diego County Board of Supervisors has determined that psychiatrists, licensed clinical psychologists, emergency room physicians, licensed clinical social workers, licensed professional clinical counselor, licensed marriage and family therapists, marriage family and child counselor and registered nurses who are members of the attending staff of a designated facility may be authorized by the facilities medical director to write involuntary holds...
    ii. Only those professionals who have received LPS designation and are considered members of attending staff may write 5150s...
    iii. Training for A5150 certification is completed by a trainer as designated by the medical director. The trainer maintains education and certification files...
    iv. San Diego Sheriff's Department, Medical Services Division will provide training by a designated county trainer for attending staff as defined above..."
f. Staff Training for 5150 Certification dated 1.18.22.
g. Psychiatric Stabilization Unit-Admission Types dated 2.13.15.
    i. "When a person, as a result of a mental disorder, is a danger to others or them, or is gravely disabled, they may be admitted involuntarily for a 72-hour Welfare and Institutions Code ...(5150) evaluation and/or treatment...
    ii. Admission Procedure...
        1. Referring provider will provide patient information to the unit's attending psychiatrist or on-call attending psychiatrist...
        2. Unit's attending psychiatrist or on-call attending psychiatrist in collaboration with referring psychiatrist will determine admission into the unit...
        3. Referring psychiatrist will initiate routine PSU admission orders.
        4. If additional assessment is indicated prior to PSU admission, the unit's attending psychiatrist or on-call attending PSU psychiatrist may request for the patient to be transferred (males) to San Diego Central Detention Facility (SCJ) and placed into the Inmate Safety Program for assessment and evaluation (ISP) for safety cell placement."
h. Psychiatric Stabilization Unit-Admission Types dated 1.31.22.
i. Medical and Psychiatric Services dated 1.18.22.
    i. "To ensure that a psychiatric evaluation shall be completed as soon as possible when the courts have ordered..."
        1. "Upon receipt of a court order...Every effort must be made to assign the patient to "a psychiatric clinic for completion..."
j. Medical and Psychiatric Services dated 3.22.13.

k. PSU Psychiatric Holds – Civil Commits dated 9.30.14.
    i. "To establish recommended procedures for handling holds and certifying psychiatric patients...
    ii. Applications for 72-hour (5150) Detention are initiated and completed in writing by a police officer, a member of the psychiatric staff of sheriff's medical services division, or other professional mental health professionals designated by the MSD Chief Medical Officer...
    iii. A 72-hour (5150) detention may be designated on a patient if he/she is considered as a result of a mental disorder, danger to self, danger to others, and/ or he/she is considered unable to provide for food, clothing, and/or shelter."
l. PSU Psychiatric Holds – Civil Commits dated 1.18.22.
m. Refusal Procedures dated 7.14.16
    i. "To develop a standardized procedure when a patient refuses treatment while in custody...
    ii. A patient who is refusing treatment will be counseled by medical staff of the risks and benefits of such action...
    iii. If a patient refuses psychiatric sick call, the same day assessment by a registered nurse is to be conducted to determine reason for refusal and indication for rescheduling. A signed refusal slip... is to be placed on record...
    iv. Refusals for medications:
        1. Patient shall sign a refusal form with the specific medication being refused.
        2. If the patient refuses to sign the refusal form, the nurse... and deputy shall sign the form...
        3. all refusal shall have the reason documented...
        4. if the medicine is indicated for a serious medical/ psych condition, refer the patient to MD or psychiatrist immediately or as soon as possible...
    v. In all instances of refusal, physicians and nurses shall document health education provided and patients understanding of the counseling."
n. Refusal Procedures dated 1.6.22.
    i. Edits to this procedure included that the refusal slip shall be scanned into the record and that in iv.4, the patient can also be referred to the psychiatric nurse practitioner.
o. Physicians Orders dated 2.3.20 and 1.18.22.
p. Mental Health Screen and Evaluation dated 6.23.20.
    i. "To outline procedure for mental health screening and evaluation while in custody...
    ii. Mental health screening is to be completed to ensure that urgent mental health needs are met to prevent deterioration in level of functioning and to receive necessary treatment in a timely fashion...

iii. Qualified mental health professionals (QMHP) -include psychiatrists, psychologists, psychiatric social workers, licensed mental health clinicians… psychiatric nurses, and others who by their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients…
iv. All inmate patients entering into custody will have a mental health screening completed during the intake process by a qualified healthcare professional who have received documented training period those who yield positive mental health screenings will be required to have follow up with the QMHP within 30 days when clinically indicated…
v. Upon booking into facility, all inmates will complete the intake process. This process will include a mental health screening and evaluation… inmate patients who screened positive to mental health concerns will be scheduled by intake nursing staff for a '30-day QMHP' clinic type for further assessment…
vi. QMHP will evaluate the patients with positive screens within 30 days or sooner…
vii. QMHP will complete appropriate documentation within patients' chart and schedule any needed ongoing follow up and/ or refer to psychiatric services if clinically indicated.
viii. Random audit will be conducted by the group program manager or designee to monitor compliance with the 30-day evaluations and follow up as indicated."

q. Mental Health Screen and Evaluation dated 2.1.22;
   i. Edits to this procedure include change in terms from "inmate" to "incarcerated individual." Also, "for patients who require acute mental health services; a gatekeeper is notified for assessment and treatment recommendations."

r. Segregated Inmates dated 10.30.20.
   i. "To ensure appropriate segregation practice… any practice of segregation should not adversely affect an inmate's health…
   ii. Sworn staff shall notify the charge nurse or designee when placing an inmate in segregation. Upon notification, health staff will complete the following:
      1. Review the patient's health record to determine whether existing medical, dental, or mental health needs require accommodation. Health staff shall document the review in the health record and notify the watch commander of any accommodation needed.
   iii. Inmates housed in segregation will be monitored by health staff based on established frequency.
      1. Inmates who are segregated and receive services and activities apart from other inmates shall be monitored three

days a week by nursing staff and a minimum of once a week by a qualified mental health provider (QMHP).
2. Documentation of segregation rounds (also known as 'wellness checks') will be made in… the inmates health record using the AdSeg template for mental health clinicians…
3. Documentation should include any significant health findings, signs of physical and/ or psychological deterioration…
4. health staff will promptly identify and inform custody staff of inmates who are physically or psychologically deteriorating…"

s. Segregated Inmates dated 1.5.22.
t. Emergency Psychotropic Medication dated 4.27.20.
    i. "To establish procedure for the use of forced sedation using psychotropic medication in the event of a behavioral health/ mental health emergency…
    ii. Emergency forced psychotropic medications-the administration of central nervous system… depressant medication to induce sedation… given without the patient's consent for the purpose of rapid sedation in the event of a mental health/ behavioral health emergency, where the health and welfare of the patient and others are considered to be threatened. This standard does not apply to the forced dosing of medications as a result of legal competency evaluation, or to the involuntary long-term administration of medications…
    iii. In the absence of informed consent, the presence of emergency criteria must be documented. 'Emergency' means a situation in which action to impose treatment over the persons objection is immediately necessary for the preservation of life or the prevention of serious bodily harm to the patient or others. It is not necessary for harm to take place before or become unavoidable prior to treatment.
u. Emergency Psychotropic Medication dated 1.25.22.
v. Psychotropic Medication dated 4.24.20
    i. "To establish procedure for the use of maintenance psychotropic medication…
    ii. All psychotropic medications shall be administered on a voluntary basis, with the exception of those patients under the jurisdiction of penal codes 1370, 1370.01…"
    iii. The policy addressed involuntary treatment, medication management, medication monitoring, medication refusal, cheeking/hoarding/selling, discharge medication.
w. Psychotropic Medication dated 11.15.21.
x. Hunger Strikes dated 6.15.15.
    i. "To provide guidelines for the care of patients who refuse to eat and initiates a 'hunger strike.'

ii. Patients who refuse to eat and state they are on a hunger strike will be monitored medically…
iii. medical staff can be notified by: patient, sworn staff, counselor, religious leaders, referrals from family, attorneys…
iv. The medical staff shall evaluate and assess the patient
1. RN staff will do an assessment to evaluate the medical and psychiatric history. The assessment is to include weight and vital signs.
2. The patient shall be scheduled for psychiatric sick call. At that time the psychiatrist will determine whether the refusal of food is based on mental illness.
3. The patient shall be scheduled for nursing sick called daily to monitor weight, medical condition and hydration status…
4. If necessary, specialized housing may be recommended… the patient may be housed in administrative segregation or medical observation bed… for closer monitoring…
5. Deputies shall continue to offer meals and record patients responses…
6. Deputies will monitor other sources of food, including the patients stores and food 'passes' from other inmates…
7. document in patient's health record all observations common nursing assessments and all contacts with the patient."

39. San Diego County Sheriff's Department Detention Services Bureau- Manual of Policies and Procedures:
a. Hunger Strikes dated 10.21.20.
i. "Purpose: to provide guidelines when an inmate refuses to eat and initiates a hunger strike… the refusal to eat, also known as a hunger strike can be proclaimed or unspecified by an inmate. While some inmates may inform staff they are on a hunger strike, others may not voice their intentions, but their refusal of meals may indicate a hunger strike. In either case, sworn staff should be observant, make necessary notifications and document the incident. Health staff will evaluate the seriousness of the situation and provide necessary medical care."
ii. "Notifications: Sworn staff shall notify the health staff."
iii. "Evaluation: Health staff shall evaluate the inmate's condition and take appropriate action (e.g., weight monitoring, hydration monitoring, appointment with psychiatrist, etc.) based on findings and identified needs… If necessary for closer monitoring, the inmate may be moved to administrative segregation housing."

Reports:

40. County of San Diego health and Human Services Agency Behavioral health Services Forensic Psychiatry Clinic Report on Mental Competency regarding Mr. Lonnie Rupard dated March 24, 2022 completed by Nicholas Badre, M.D.:
   a. The date of evaluation was March 14. 2022.
   b. "The defendant is facing revocation of community supervision. The court issued an order for an examination of mental competency to stand trial...
   c. I interviewed the defendant at his cell at the recommendation of jail mental health staff and the floor deputies. The cell was dirty with trash throughout. The toilet was full of excrement, and the room was very malodorous… the defendant was unkempt and dirty himself. He was laying in bed in an uncomfortable manner with a blanket over his head. There were feces on the floor. There was food smeared on the wall. It required the food flap and a very loud introduction on my part to get the defendant's attention. Once I had his attention, I asked the defendant why he was incarcerated, he answered 'water dog.' I told the defendant again that I was here to evaluate him for competency, he answered 'I am home, dog.'… His speech was pressured and mostly incoherent when he spoke... His mood was down, and his affect was flat. His thought content presented as impoverished. His thought process was disorganized…
   d. Diagnostic Impression: psychosis, not otherwise specified, stimulant use disorder per record…
   e. Findings and Opinions… it is my opinion within a reasonable medical certainty that the defendant is unable to have a rational and factual understanding of the charges and is unable to assist counsel in a rational manner. While the defendants lack of cooperation is likely in part volitional. I think that it is motivated by underlying disorganization of thought, which would be consistent with prior evaluation that diagnosed him to be psychotic. The defendant suffers from mental illness, displaying active signs of mental illness, including disorganized thinking. Those symptoms of mental illness disable the defendant from being able to have a rational understanding of the charges and assist legal counsel. I would recommend that the defendant be referred to a state hospital or jail-based competency treatment program for restoration to competency."

41. County of San Diego Health and Human Services Agency Behavioral health Services Forensic Psychiatry Clinic Report on Involuntary Medication to Restore Competency dated March 24, 2022 completed by Nicholas Badre, M.D.:
   a. The date of the evaluation was March 14, 2022.
   b. "I have evaluated the defendant for mental competency. I opined that the defendant was not competent to stand trial. The purpose of this evaluation is to address involuntary medication to restore competency…
   c. Findings: In my opinion, the defendant suffers from severe mental illness. The defendant lacks the capacity to make decisions regarding antipsychotic

medication. The mental disorder requires medical treatment with anti-psychotic medication at this time. If the defendant's mental disorder is not treated with antipsychotic medication, it is possible that serious harm to the physical or mental health of the defendant will result. Administration of antipsychotic medication is likely to restore the defendant's competency to stand trial... Antipsychotics are in the defendants best medical interest in light of the medical condition. I would recommend that the defendant be given medications involuntarily under Penal Code section 1370."

42. San Diego Sheriff's Department Follow-up Investigative Report regarding Mr. Lonnie Rupard dated February 7, 2024, written by Detective M. Blumenshine.

43. San Diego Sheriff's Department Follow-up Investigative Report regarding Mr. Lonnie Rupard dated June 8, 2022, written by Detective M. Blumenshine.

44. San Diego Sheriff's Department Follow-up Investigative Report regarding Mr. Lonnie Rupard dated June 7, 2022, written by Detective M. Blumenshine. Detective Blumenshine documented a search of Mr. Rupard's cell, "there were feces and old food throughout the cell. The toilet and sink were full of fecal matter. There were feces in two corners of the room on the ground, feces on the bedroll, feces on the bottom bunk under the bedroll, feces on the ground, feces on the table, and strewn about the rest of the room. The sink in the cell was operable."

45. San Diego Sheriff's Department Follow-up Investigative Report regarding Mr. Lonnie Rupard dated March 16, 2023, written by Detective M. Blumenshine.
    a. Detective Blumenshine reported a review of video footage "March 17, 2022 was reviewed, showing multiple checks by deputies. Inmate Rupard never left his cell, and no movement was observed inside the cell."
    b. Detective Blumenshine reported "On...October 19, 2022...I asked Lieutenant Kopchak if any hygiene inspections were done...the last logged hygiene inspection was on March 5, 2022...after a review of the video, it appeared the inspection was not completed...Rupard's housing block, 7D, was classified as COVID quarantine, and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health."
    c. "I reviewed Rupard's Jail Information management System (JIMS). The records showed numerous dayroom refusals, food refusals, and documented incidents."
    d. "Rupard was in COVID quarantine and administrative segregated housing. This was done because of his jail history as well as his current mental state. Due to Rupard's psychiatric issues, he was unable to peacefully interact around other inmates and was therefore unable to have the standard program of a regular mainline inmate. In his level of housing, there was expected he would be given more psychiatric care."

e. "A review of the video, logs, incident reports, criminal reports, and statements show deputies were very familiar with Rupard. It was often a use of force when contacting him due to his behavior. Rupard had two major incidents in his three months of recent custody time. One when he obtained the wrong outfit, took the food flap hostage, and spit at deputies resulting in a use of force. And one when he took the dayroom hostage, refusing to lock down and throwing objects… Most contacts noted volatile and aggressive behavior coupled with the documented prior uses of force."

f. "Rupard's cell was in a dismal state, however, not uncommon for housing of inmates with psychiatric history. Rupert had roughly 28 meal containers in his cell at the time of his death (about nine days' worth of trash). In review of the containers, most had been opened and many of the food items were missing. While there was food on the floor, table, and bed of the cell, it would not account for the food missing from the food trays. The food was either eaten or flushed down the toilet. There was feces in the cell, on the bed, floor, blanket…in the toilet."

46. California State Auditor Report of the San Diego County Sheriff's Department dated February 2022:

a. "From 2006 through 2020, a total of 185 people died in San Diego County's Jails – more than in nearly any other county across the State…the high rate of deaths…raises concerns and suggests that underlying systemic issues with the Sheriff's Department's policies and practices have undermined its ability to ensure the health and safety of the individuals in its custody. Significant deficiencies in the Sheriff's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails."

b. In addition to policy and practice, the deficiencies identified included:

   i. Intake – "The San Diego Sheriff's Department relies on registered nurses to perform the mental health portion of its intake screening, even though those nurses may not specialize in mental health care…Health staff did not always properly identify incarcerated individual's medical and mental health needs at intake. Consequently, some of these individuals did not receive proper care, likely contributing to their deaths."

   ii. Follow-up – "Sheriff's Department's staff did not always provide consistent follow-up care to individuals who requested or previously received medical or mental health services…timely treatment and follow-up are important components of any health care system. Although the reasons that the Sheriff's Department did not always follow up consistently- such as poor policies and communication- varied by case, they represent deficiencies in its medical and mental health care system…Detentions staff did not consistently follow-up after individuals received or requested medical or mental health

services, even though they often had serious needs that, when unmet, may have contributed to their deaths."

iii. Safety checks – "Conducting these checks – which state law requires hourly through direct visual observation – is the Sheriff's Department's most consistent means of monitoring for medical distress...in our review of 30 in- custody deaths, we found instances in which deputies performed these checks inadequately...sworn staff did not always adequately check on incarcerated individuals. Some individuals were found hours after their deaths."

iv. Delays – "Sworn staff's and medical personnel's slow response time to administer aid during medical emergencies may have contributed to unnecessary delays in lifesaving measures."

c. The audit noted that "Although external entities...have made recommendations in the past to address some of the deficiencies we describe, the Sheriff's Department has not implemented a number of them."

Case Summary:

Mr. Lonnie Rupard was born October 1, 1975, and was 48 years old when he was booked into the San Diego County Jail [SDCJ] on December 19, 2021. Mr. Rupard remained in the SDCJ until his death on March 17, 2022.

At the time of his admission to SDCJ, Mr. Rupard weighed 165 pounds. The receiving screening indicated "no" to any indication of a mental health concern despite other documentation that Mr. Rupard was "verbally abusive and combative" and information in the behavioral health chronic care portion of the document indicated "psychotic disorders." Mr. Rupard was scheduled for psychiatry clinic. As he refused to attend a telehealth appointment on 12.20.21, he was rescheduled for an in-person psychiatric evaluation. Appointments scheduled 12.24.21 and 12.28.21 were rescheduled due to time constraints.

The initial psychiatric evaluation occurred 12.29.21, cell side in 7D, reportedly an administrative segregation unit, ten days after booking. The progress note indicated the evaluation was to address Mr. Rupard's "history of psychosis and psychotropic medication treatment." The clinician, Dr. Cruz, was aware of Mr. Rupard's prior medication regimen as documented during an incarceration in 2020. Mr. Rupard was uncooperative with the evaluation and was noted to "mumble incoherently and was verbally aggressive." Dr. Cruz documented that Mr. Rupard was irritable with disorganized thought processes and noted diagnoses of unspecified schizophrenia and other psychotic disorder, by history; antisocial personality disorder, by history; and stimulant use disorder, by history. Dr. Cruz noted Mr. Rupard's potential for decompensation, and initiated treatment with Mr. Rupard's previously prescribed medications, Haldol Decanoate intramuscularly 200 milligrams on the 4th and 22nd of every month, Depakene 500 milligrams by mouth twice daily, Vistaril 25 milligrams twice

daily, and Cogentin 1 milligram in the morning and 2 milligrams at bedtime, with a plan for Mr. Rupard to return to psychiatry clinic in four to five weeks.

Typical of his previous presentations to the SDCJ, Mr. Rupard reportedly refused to adhere to his prescribed psychotropic medication regimen. Medication refusal forms were completed daily but were not signed by Mr. Rupard. On January 20, 2022, after a chart review that revealed Mr. Rupard was consistently refusing his prescribed psychotropic medications, Dr. Cruz discontinued the medications in the absence of a clinical encounter, with plans to follow up with Mr. Rupard at his next scheduled appointment.

Mr. Rupard's medical record revealed a use of force event 1.29.22. During this event, Mr. Rupard was injured, with a laceration between his eyebrows. He refused to allow nursing to assess him, and threatened to kill the nurse, "If you touch me, I'll kill you." Nursing documented that the assessment was "terminated for safety." This event was not recognized as a mental health crisis by nursing and Mr. Rupard was not referred for a mental health evaluation.

Mr. Rupard's next contact with a health care provider occurred on 2.9.22. At this time, Mr. Rupard was in 7D, which is administrative segregation type housing. A cell side "wellness check" was performed by a qualified mental health professional [QMHP], Ms. Anosike [Goodall]. Deputies reported Mr. Rupard, "will often speak to himself in unintelligible words." Mr. Rupard was noted as having "no reported aggression, violence or erratic behaviors" despite the recent use of force and homicidal threat verbalized to nursing staff. He was "uncooperative...began speaking in unintelligible words...unable to fully assess." The care plan was to monitor for "safety concerns and grave disability" with a "wellness check in 2 weeks."

By February 20, 2022, nursing notes indicated Mr. Rupard was "on lockdown." Nursing documented "no contraindication" and there was no documentation of a mental health assessment to determine if placement in lockdown was appropriate given his mental health condition. At Mr. Rupard's next cell side appointment with psychiatry, Dr. Cruz, on 2.22.22, he "rambled incoherently and became verbally aggressive...thought process disorganized...may be responding to internal stimuli...Due to patient's presentation, psych history, legal status (PC1368), and potential for decompensation, will continue to monitor and offer treatment." There were no subsequent progress notes documenting clinical encounters with psychiatry or mental health clinicians.

On March 14, 2022, Mr. Rupard was evaluated by Nicholas Badre, M.D. to assess for "mental competency to stand trial." Dr. Badre documented that Mr. Rupard's cell was "dirty with trash...toilet was full of excrement...room was very malodorous...defendant was unkept and dirty...there were feces on the floor...food smeared on the wall." Dr. Badre documented Mr. Rupard's disorganized thought processes, and indicated a

diagnosis of "psychosis, not otherwise specified…The defendant suffers from mental illness, displaying active signs of mental illness, including disorganized thinking."

On March 17, 2022, Mr. Rupard was found "unresponsive, non-breathing." Attempts to resuscitate Mr. Rupard were unsuccessful. Per the San Diego County Medical Examiner, Mr. Rupard's "Cause of Death: Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia. Contributing: SARS-COV-2 (COVID-19) Viral infection; pulmonary emphysema; duodenal ulcer. Manner of Death: Homicide." At the time of his death, Mr. Rupard weighed 105 pounds. His body was dirty, with feces on the soles of his feet, buttocks, and legs. His cell was littered with food containers. There were feces and toilet paper mounded in the toilet, with feces in the sink, and feces on the floor.

Timeline:

| | |
|---|---|
| 12.19.21 | Mr. Rupard's intake to the SDCJ. |
| 12.20.21 | Mr. Rupard declined to attend psychiatry clinic |
| 12.24.21 | Mr. Rupard was scheduled for psychiatry clinic. This appointment was rescheduled by Dr. Cruz. |
| 12.28.21 | Mr. Rupard was scheduled for psychiatry clinic. This appointment was rescheduled by Dr. Cruz. |
| 12.29.21 | Initial psychiatric evaluation performed by Dr. Cruz. |
| 12.30.21 – 1.20.22 | Daily medication refusals documented but not signed by Mr. Rupard. |
| 1.20.22 | Medications discontinued by Dr. Cruz in the absence of a psychiatric clinical encounter. |
| 1.29.22 | Use of force incident that was not recognized as a mental health crisis despite Mr. Rupard verbalizing homicidal ideation. |
| 2.9.22 | Mental health "wellness check." Despite documentation of Mr. Rupard's symptoms of psychosis, there was no escalation in his treatment. Requested a follow-up in two weeks. |
| 2.20.22 | Mr. Rupard was placed on lockdown with no documented mental health assessment or intervention. |
| 2.22.22 | Psychiatric follow-up appointment. Despite documentation of Mr. Rupard's symptoms of psychosis, there was no escalation in his treatment. |
| 2.23.22 | Mental health follow-up appointment was requested but did not occur. |
| 3.14.22 | Evaluation by Dr. Badre, where Mr. Rupard's cell was described as "dirty with trash…toilet was full of excrement…room was very malodorous …defendant was unkept and dirty…there were feces on the floor…food smeared on the wall." |
| 3.17.22 | Mr. Rupard died due to "Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia. Contributing: SARS-COV-2 (COVID-19) Viral infection; pulmonary emphysema; duodenal ulcer. Manner of Death: Homicide." |

Conclusions:
Mr. Rupard's death due to his untreated mental illness resulted from a confluence of system and treatment failures that were identifiable, but in multiple deviations from the standard of care, were ignored by jail personnel, medical, and mental health staff. These deviations will be addressed individually below:

*Housing:*
Housing was a precipitating factor in Mr. Rupard's mental health deterioration and death as he was housed in a single cell, isolated from others. Mr. Rupard apparently remained in administrative segregation type housing on 7D for most of his 89-day incarceration.[1] Per the investigative report of Detective Blumenshine, Mr. Rupard's "housing block, 7D, was classified as COVID quarantine, and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health." As Mr. Rupard had a history of serious mental illness, specifically a psychotic illness, placement in this type of housing is inappropriate and would only serve to further isolate him and exacerbate his mental health symptoms.

The negative impact of isolation on individuals is accepted in the scientific literature. Grassian (2006) described "severe psychiatric harm" resulting from solitary confinement wherein individuals experienced either reoccurrence of preexisting mental illness or acute mental health symptoms. He noted that individuals exposed to isolation experienced consistent symptoms including: hyperresponsivity to external stimuli; panic attacks; difficulty with thinking, concentration, and memory; intrusive obsessional thoughts; overt paranoia; problems with impulse control; and delirium.

The deleterious effects of confinement and seclusion have been documented in adult settings (Haney, 2003). Specific effects include psychological consequences associated with lack of social contact, sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilation. Metzner and Dvoskin (2006) also documented psychological harm associated with seclusion in Supermax correctional settings. Seclusion has been associated with exacerbation of pre-existing conditions, as well as psychoses, depression, and anxiety in individuals with a history of mental health problems.

Over the course of his incarceration, Mr. Rupard's mental status declined. He refused psychotropic medication and was noted to have increasing signs and symptoms of psychosis. As his mental status declined, so did his physical health; however, as Mr. Rupard was not appropriately monitored by medical and mental health staff, his

---

[1] Note, Mr. Rupard's housing is classified as administrative segregation, or 23 hours in cell daily/1 hour out of cell daily. Regardless of the terminology used, Mr. Rupard's housing qualifies as isolation or restrictive housing.

condition was allowed to deteriorate. Mr. Rupard reportedly lost approximately 60 pounds over the course of his 89-day incarceration. The San Diego County Medical Examiner revealed Mr. Rupard had a body mass index of 15.5 at the time of his death, which is classified as severely underweight. Further, the San Diego County Medical Examiner documented that Mr. Rupard had "feces about the buttock area, and the posterior aspect of the lower extremities and the soles of both feet."

*Use of Segregation:*
Mr. Rupard was housed in administrative segregation type housing. In a deviation from the standard of care, there was no documentation of mental health advocating for him or assessing him to determine whether his existing mental health needs contraindicated his placement in segregation or if accommodations were necessary. This is required per the National Commission on Correctional Health Care [NCCHC] standard regarding Segregated Inmates. Further, per this standard, it is noted "for inmates housed in segregation, qualified mental health professionals provide mental health services according to established treatment plans and respond in a timely manner to referrals." As noted in the sectioned entitled "Treatment Planning", in a deviation from the standard of care, Mr. Rupard did not have a Treatment Plan developed.

*Failure to Monitor- Mental Health:*
Over the course of Mr. Rupard's 89-day incarceration at San Diego County, he was housed in 7D, which is reportedly an administrative segregation unit. The Medical Services Division Operations Manual policy titled "Segregated Inmates" requires that an individual will be assessed by nursing a minimum of three times per week and by mental health staff a minimum of one time per week.

In a deviation from the standard of care, and failure to follow facility policy, there was no documentation of monitoring three days a week by medical staff. The only contact Mr. Rupard received were attempts to administer psychotropic medication, which he reportedly consistently refused. Refusals were documented from the time the medication was ordered, 12.30.21, through the time of discontinuation, 1.20.22; however, none of the refusal forms were signed by Mr. Rupard. Once the medication was discontinued, there was no other documentation of regularly reoccurring visits by nursing.

The next documented contact between nursing and Mr. Rupard was documented 1.29.22, when he was assessed following a use of force. Mr. Rupard refused the nurses assessment and intervention, threatening, "If you touch me, I'll kill you." The assessment was terminated. This event was not recognized by the facility staff as a mental health crisis and Mr. Rupard's homicidal threat was not reported to or acknowledged by mental health.

In a deviation from the standard of care, and a failure to follow facility policy, there was no documentation of monitoring once weekly by mental health staff. Over the course of his 89-day incarceration, Mr. Rupard had one contact with mental health, 2.9.22. This was a wellness check, that noted "no reported aggression, violence, or erratic behavior." Given the event of 1.29.22, this report is not accurate. Per the deposition of Ms. Goodall, she was not asked to see Mr. Rupard on a weekly basis during his stay in administrative segregation type housing and only saw those individuals who appeared on her "sick call" list. This is a deviation from the standard of care and a failure to follow facility policy entitled "Segregated Inmates" which states that "Inmates housed in segregation will be monitored by health staff based on established frequency. Inmates who are segregated and receive services and activities apart from other inmates shall be monitored three days a week by nursing staff and a minimum of once a week by a qualified mental health provider (QMHP)."

Despite Mr. Rupard exhibiting significant signs of mental health difficulties during the 2.9.22 assessment performed by Ms. Goodall including "speaking in unintelligible words...behavior... agitated... thought content...impoverished" in a deviation from the standard of care, he was not referred for further assessment or psychiatric evaluation. The plan was to follow up in two weeks, again, not at the one-week frequency designated by policy. Regardless, this scheduled follow up did not occur.

Given the failure to monitor Mr. Rupard during his incarceration on 7D, his mental health was allowed to deteriorate without intervention. In a deviation from the standard of care, Mr. Rupard received no regularly reoccurring behavioral health treatment services. Despite his serious mental illness, he did not have a treatment plan developed, and he was not receiving regularly reoccurring behavioral health interventions. He was housed in 7D, a unit affording limited out of cell time, which given Mr. Rupard's significant mental health needs, was entirely inappropriate for him.

*Duration of Untreated Psychosis and Medication Refusals:*
A review of Mr. Rupard's record at the SDCJ revealed a long history of serious mental illness. This information was available for review by the mental health staff including psychiatric clinicians. Mr. Rupard had a history of mental illness documented at the SDCJ beginning in 2007. Diagnoses documented included schizophrenia, schizoaffective disorder, schizophrenia spectrum and other psychotic disorder, antisocial personality disorder, and stimulant use disorder.

Mr. Rupard had a history of over 20 presentations to the facility. His initial presentations varied. Documents indicated that if Mr. Rupard was adherent to his medication regimen on admission, such as on return from court ordered treatment at Patton State Hospital, he was pleasant and cooperative. There was also documentation that Mr. Rupard often denied a history of mental illness and refused to consider treatment with psychotropic medications leading to increased behavioral health symptoms, specifically psychotic symptoms.

Mr. Rupard had a history of treatment with long-acting antipsychotic medications. These medications, such as Prolixin and Haldol, are administered via intramuscular injection every two to four weeks. Mr. Rupard had a history of court ordered or forced medication administration. Mr. Rupard also had a history of requiring civil commitment, or 5150 admissions to inpatient psychiatric treatment. For example, in 2012, Mr. Rupard was admitted to the SDCJ. At that time, he reported a history of a diagnosis of schizophrenia but could not recall the name of his medications. During this incarceration, Mr. Rupard refused psychiatry sick call and refused treatment with psychotropic medications. Documentation noted, "his cell is filthy, he is not flushing the toilet, he makes himself throw up." Ultimately, although Mr. Rupard was released from custody, he refused to leave his cell and required inpatient psychiatric hospitalization under 5150.

During Mr. Rupard's incarceration period from December 12, 2021 through March 17, 2022, Mr. Rupard consistently refused psychotropic medications. Given his history of improvement with medication and deterioration in the absence of medication, the declining trajectory of Mr. Rupard's clinical course in the setting of untreated psychosis in schizophrenia was predictable. In a deviation from the standard of care, Mr. Rupard was allowed to deteriorate and become increasingly psychotic. While it is understood that individuals have the right to refuse psychotropic medication, there was a need to consider involuntary medications to avoid further decompensation.

The standards regarding Informed Consent and Refusal of Mental Health Care per the National Commission on Correctional Health Care Standards for Mental Health Treatment in Correctional Facilities (2015) require "that any menial health intervention refusal is documented and must include...evidence that the inmate has been made aware of any consequences to health/mental health that may occur as a result of the refusal...a patients refusal of care is to be an informed decision, with the consequences explained to the individual...competency may be an issue when mentally ill inmates refuse treatment. Management of such refusals, particularly if they seriously jeopardize the patient's health, requires a collaborative approach of psychiatric, psychological, criminal justice and legal assistance."

SDCJ policy titled "Refusal Procedures" indicated that when a patient refuses treatment, they will "be counseled by medical staff of the risks and benefits of such action." For refusal of medications, policy requires "if the medicine is indicated for a serious medical/ psych condition, refer the patient to MD or psychiatrist immediately or as soon as possible." Mr. Rupard began refusing psychotropic medications immediately upon prescription,12.30.21. Although facility procedure requires immediate referral to psychiatry, that did not occur. Instead, Mr. Rupard was allowed experience an extended duration of untreated psychosis.

Delays in treatment of psychosis have been linked to neurodegeneration, persistence of symptoms, poorer social outcomes, increased difficulties in cognitive functions, and poorer response to future attempts at treatment with antipsychotic medications. Psychiatry was not advised of Mr. Rupard's medication refusals until 1.15.22. Facility policy requires documentation of "health education provided and patient's understanding of the counseling." In a deviation from the standard of care, rather than meet with Mr. Rupard and provide health education and an assessment of Mr. Rupard's capacity to make an informed decision to refuse medications, Dr. Cruz performed a chart review on 1.20.22, during which all medications were discontinued in the absence of any clinical encounter.

As discussed above, after his initial psychiatric evaluation and prescription of psychotropic medication, Mr. Rupard consistently refused medications and exhibited increasingly bizarre behavior. In a deviation from the standard of care and a deviation from facility policy and procedure, there was no plan to provide psychoeducation or to meet with Mr. Rupard further to develop rapport, assess, educate, or inform him of the potential benefits of medication. Additionally, given Mr. Rupard's history, his presentation and the fact that psychiatry at SDCJ could petition the Court for forced medications, in a deviation from the standard of care, this was not considered.

*Basic Mental Health Services:*
Per the NCCHC standards, basic mental health services are an essential standard. This means that "a range of mental health services are available for all inmates who require them." A review of the documentation from SDCJ revealed that in a deviation from the standard of care, basic mental health services other than outpatient psychiatry were not available or at least not provided to Mr. Rupard.

The NCCHC states that onsite outpatient services must include at a minimum, identification and referral of inmates with mental health needs. This obviously did not occur, as while Mr. Rupard was identified at intake as having a history of mental health symptoms/treatment he was not referred for ongoing treatment or development of an individualized treatment plan outside of a psychiatric evaluation for treatment with psychotropic medications.

In a deviation from the standard of care, there was no continuity or ongoing behavioral health treatment provided to Mr. Rupard. Another minimum requirement is for psychosocial/ psychoeducational programs. In a deviation from the standard of care, this did not occur for Mr. Rupard. There was no documentation of ongoing attempts to meet with Mr. Rupard, to establish rapport, to educate him on the need for psychotropic medication, and to monitor him for increased symptoms.

*Treatment Planning:*
Per the NCCHC standards, it is essential that mental health services are provided according to individual treatment plans. These plans direct the mental health services

needed for every patient on the mental health caseload and include the treatment goals and objectives. The responsible mental health clinician provides periodic reviews of the individuals treatment plan.

The NCCHC defines a treatment plan as a "series of written statements specifying a patient's particular course of therapy and the roles of qualified mental health professionals in carrying it out. Such a plan is individualized, may be multidisciplinary, and is based on an assessment of the patient's needs. It contains a statement of short- and long-term goals as well as the methods by which those goals will be pursued." The intent of the treatment plan standard is that mental health patients receive care tailored to their individual needs.

The NCCHC compliance indicators for this standard include that "treatment planning is initiated when the individual enters into treatment with a qualified mental health professional. Development of the treatment plan is undertaken in collaboration with the inmate when feasible. Mental health treatment plans must include, at a minimum: frequency of follow up for evaluation and adjustment of treatment modalities... adjustment of psychotropic medications, if indicated... referrals for psychological testing, medical testing, and evaluation, including blood levels for medication monitoring as required... when appropriate, instructions about diet, exercise, personal hygiene, and adaptation to the correctional environment... documentation of treatment goals and objectives, interventions necessary to achieve these goals, and notation of clinical progress."

In a deviation from the standard of care, Mr. Rupard was not afforded a treatment plan or regularly reoccurring behavioral health interventions other than one mental health "wellness check" and two visits with psychiatry. Despite his significant psychotic symptoms, refusal to take psychotropic medications, risk for ongoing decompensation, and housing in administrative segregation, Mr. Rupard was not offered individualized mental health interventions.

*Failure to Monitor – Psychiatry:*
Over the course of this incarceration at SDCJ, Mr. Rupard was seen twice by the facility outpatient psychiatrist, Dr Cruz. In a deviation from the standard of care, both encounters were cell side, in a non-confidential space. Cell side encounters are not recommended as they are a barrier to assessment, engagement, and rapport building. Per the deposition of Dr. Cruz, cell side encounters are typical at SDCJ.

Mr. Rupard's initial encounter with Dr Cruz was a psychiatric evaluation dated 12.29.21. During this encounter, Mr. Rupard was noted as mumbling incoherently, yelling, verbally aggressive, with disorganized thought processes. This description is indicative of a thought disorder. Dr Cruz utilized diagnoses from Mr. Rupard's prior incarceration, noting historical diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, antisocial personality disorder, and stimulant use disorder. Dr, Cruz continued

Mr. Rupard's previously prescribed psychotropic medication, Haldol Decanoate, Depakene, Vistaril, and Cogentin. Dr. Cruz indicated he did not access Mr. Rupard's prior treatment records from Patton State Hospital. The plan was for Mr. Rupard to return to clinic in four to five weeks or sooner. Unfortunately, that did not occur.

As Mr. Rupard refused to adhere to the prescribed psychotropic medication regimen, Dr. Cruz made the decision to discontinue the medication on 1.20.22. In a deviation from the standard of care, this discontinuation was done in the absence of a clinical encounter with Mr. Rupard. Dr. Cruz indicated a plan to follow up with Mr. Rupard at his previously scheduled follow-up clinic.

Mr. Rupard was next seen by psychiatry 2.22.22. This was the last encounter between Mr. Rupard and Dr. Cruz. Mr. Rupard was noted to "ramble incoherently… verbally aggressive…shirtless…irritable…uncooperative…limited grooming…thought process disorganized…may be responding to internal stimuli…". This mental status examination notes an exacerbation of symptoms, specifically incoherent rambling, disorganized thought processes and the potential for response to internal stimuli. These symptoms are indicative of psychosis, even so, Dr. Cruz did not consider Mr. Rupard as gravely disabled requiring immediate psychiatric intervention.

In his deposition, Dr. Cruz, who was trained and able to complete a 5150 certificate, stated that just because an individual refuses medication, that does not mean that they qualify for a 5150 commitment. While this statement on the surface is accurate, Mr. Rupard's exacerbated psychosis indicated he did not have the capacity to make a rational, informed decision regarding refusing his psychotropic medications. Facility policy included a definition for grave disability that would qualify an individual for a 5150 commitment. "Gravely Mentally Disabled shall refer to any inmate: 1. Who is believed to be a danger to self or a danger to others, or 2. Who does not appear to be able to provide for his/ her own personal needs such as eating, showering, and toileting, or 3. Who does not appear to be sufficiently lucid to comprehend the fact of their arrest or incarceration." Mr. Rupard had a history of dangerousness to others. He had verbally threatened to kill a nurse in January 2022. Further, his failure to care for himself was obvious prior to the time of his death. As medical and mental health staff did not assess and monitor his condition, he was allowed to deteriorate without intervention. It is obvious that Mr. Rupard was deteriorating both mentally and physically. This was not recognized as Mr. Rupard was not monitored. As he was not monitored, his significant weight loss was not appreciated.

In his deposition, Dr. Cruz reported that he relied on medical, mental health and sworn staff to provide him information regarding individuals, and if necessary, they would be added to the sick call list. Unfortunately, medical and mental health staff were not monitoring Mr. Rupard, and sworn staff do not have the clinical acumen to assess Mr. Rupard.

*Standard of Care:*
As discussed above, there were multiple systemic deviations from the standard of care evident in the mental health treatment of Mr. Rupard. The following are deviations attributed to psychiatry and mental health staff.
The treating psychiatrist, Dr. Cruz, employed by Liberty Healthcare:

- Performed an initial psychiatric evaluation of Mr. Rupard but did not review records of his prior hospitalizations;
- Discontinued Mr. Rupard's psychotropic medications on 1.20.22 in the absence of a clinical encounter and did not initiate involuntary medication proceedings.
- Documented a clinical encounter with Mr. Rupard on 2.22.22 where he noted signs and symptoms of psychosis and a deterioration in his mental status, but did not refer for a higher level of care (e.g., PSU);
- Did not adequately monitor Mr. Rupard, rather, he relied on sworn staff and other clinicians.

The SDCJ mental health clinician, Ms. Christina Anosike [Goodall]:

- Had only one clinical encounter with Mr. Rupard once during his 89-day incarceration despite the requirement for weekly encounters in his housing unit;
- Did not escalate his care despite documenting Mr. Rupard experiencing symptoms of psychosis including "unintelligible speech" and "impoverished thought."
- Did not perform a clinical follow-up as scheduled.

<u>Summary:</u>
In summary, Mr. Rupard was seriously mentally ill with diagnoses including unspecified schizophrenia and other psychotic disorders, but due to inadequate mental health treatment, he experienced an extended duration of untreated psychosis and an exacerbation of psychotic symptoms, with significant functional impairment. His death occurred due to a confluence of events and system failures that were identifiable and preventable, yet in deviations from the standard of care described in detail above, were not addressed.

Mr. Rupard was increasingly psychotic. He was not engaged in mental health treatment per an individualized treatment plan. He was not consistently monitored by mental health staff despite his housing in administrative segregation. Despite his deterioration and increased psychotic symptoms, he was not considered for a forced medication protocol or a 5150 designation and transfer to the Psychiatric Stabilization Unit.

Facility staff of all disciplines (e.g. sworn staff, medical staff, mental health staff, and psychiatry) failed to monitor Mr. Rupard, recognize his deteriorating condition, intervene on his behalf, and escalate his treatment to a higher level of care (e.g., the PSU). Given the documentation of his experiencing psychotic symptoms, mental health staff should have intervened. Mr. Rupard was documented as psychotic. He did not have the

capacity to make appropriate decisions regarding his care. Further, Mr. Rupard's severe deterioration was documented by Dr. Badre in his evaluation of 3.14.22. Based on Dr. Badre's description of Mr. Rupard's cell and his hygiene, it is obvious that any one of the jail staff would have recognized Mr. Rupard's grave disability.

Had Mr. Rupard been properly evaluated, monitored and treated, his death would have been prevented. Unfortunately, the failures ultimately resulted in Mr. Rupard's death due to "Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia. Contributing: SARS-COV-2 (COVID-19) Viral infection; pulmonary emphysema; duodenal ulcer." The Medical Examiner indicated Mr. Rupard's death was "homicide" due to "ineffective delivery of...care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide."

Please note the above opinions are provided to a reasonable degree of psychiatric certainty. If additional information or collateral documentation becomes available, I reserve the right to change my opinions based on such, and that will be submitted as an addendum to this report. Should you have any questions, or require any further information regarding these opinions, please contact me at 504.392.8348.

Submitted by:

Daphne Glindmeyer, M.D., D.F.A.P.A.
Board Certified Child, Adolescent, and Adult Psychiatrist
Board Certified Forensic Psychiatrist

Attachment 1:
Deposition Summaries –
Estate of Lonnie Rupard v. County of San Diego, et al.
Case No: 23CV1357 CAB BLM

1. Video Deposition of Christina Goodall dated December 16, 2024:
   - Ms. Goodall's maiden name is Anosike, she has a master's degree in counseling of marriage and family therapy. She worked at the San Diego County Jail from September 2021 to April 2022. She was a QMHP [Qualified Mental Health Professional].
   - Ms. Goodall discussed the training provided during her employment at the SDCJ, "culture of the jail, safety for staff and inmates, ethicals...everyone was about safety and ultimately the best care...a team environment...we would have scheduled meetings too, to check in and make sure things were done up to par..."
   - Team meetings occurred "every week." The subject of the team meetings was "trainings, policies, and discussing individuals that were maybe having a hard time...how to conduct a 5150 and...assessing for their mental health status needs overall...the criteria for somebody who would need to be placed on a 5150...how to write a 5150, the workflow as far as successfully transferring somebody to the hospital..."
   - The PSU was for "individuals that...needed a higher level of care...I wasn't able to write...admissions to the PSU...it would be the psychiatrist that would do that inside the jail, not me...if we felt that they might need a higher level of care, more constant supervision, higher than the inmate safety program, then I would reach out to the psychiatrist for an assessment."
   - Ms. Goodall was trained that if there is an individual in custody who needs a higher level of care, she would do "a recommendation...like a psych sick call...I was trained by my supervisor and if they met the criteria of maybe danger to self, others, or gravely disabled, then I would make a recommendation for a psychiatrist to come and assess an individual."
   - Ms. Goodall described grave disability as "they were unable to take care of themselves and poor hygiene habits."
   - Ms. Goodall was trained to do a "wellness check" that she described as "assessing for the individual's safety primarily, mental health status, suicide risk, homicidal risk, self-injurious behavior, gravely disabled...I was trained to review history...medical records—for mental health..."

- Ms. Goodall indicated she did not do a weekly round of people in administrative segregation, she saw "individuals on my sick call list…not everybody."
- Ms. Goodall saw Mr. Rupard on one occasion. She was not asked to see him every week.
- Ms. Goodall was "gatekeeper…responding to emergency or crisis mental health situations in the jail." As "gatekeeper" she could recommend an individual move to EOH, "enhanced supervision housing…a specific area monitored by deputies and there would be cameras in there."
- Ms. Goodall was trained that if "I saw somebody was at risk to themselves or others or gravely disabled, then I would make the appropriate recommendation to EOH or safety cell and/or call for a psychiatric evaluation…the safety cell was the highest level…if somebody was harming themselves or others."
- Ms. Goodall was trained that if an inmate patient was not eating over a period of a day or more that should be brought to the attention of a psychiatrist.
- Ms. Goodall saw Mr. Rupard on 2/9/22 "cell side." She did not enter his cell. She recalled "seeing a few empty containers of food" in Mr. Rupard's cell.
- She performed a "wellness check…he showed up on my sick call list." At the time of her visit, Mr. Rupard was housed in administrative segregation.
- As part of the visit, she spoke with a deputy regarding Mr. Rupard.
- She documented that Mr. Rupard was uncooperative and "I did not observe him engaging in self-injurious behavior…he…refused to speak to me but he did share that he was fine….still able to make an assessment based on his overall appearance, his cell, and his mood that he's displaying to me during the assessment…he was mumbling…I remember speaking to the deputy...he sometimes mumbles things to himself, but nothing distressing or any concerning type of behavior…he still said 'go away'…to me he was understanding my purpose there, but he didn't want to speak to me…"
- Ms. Goodall noted that ongoing monitoring for "safety concerns is conducted by the staff or sworn staff. If they saw anything concerning, they would call a gatekeeper for an immediate assessment. And the gravely disabled, they saw he was under the care of a psychiatrist and had follow-ups for that…I made like a follow-up appointment to come back and look…I remembered that the psychiatrist saw him shortly after, so that was complete, like being assessed by a psychiatrist…"

- Ms. Goodall stated, "he did say coherently 'I'm fine. I don't want to talk to you.' So, I am allowed to respect his autonomy."
- Ms. Goodall noted, "to complete a full assessment, if a person didn't want to speak to a therapist, you would look at their behaviors, their demeanors, the condition of their cell, if there is anything that looked risky..."
- Ms. Goodall reported that prior to assessing a patient, "typically I would do a full chart review." She did not recall reviewing information regarding Mr. Rupard's history. She recalled that when she assessed Mr. Rupard, "I remember being aware [that he had refused his medication] ad that he was under the care...seen by a psychiatrist."

2. Video deposition of Nicolas Badre, M.D. dated December 18, 2025:
    - Dr. Badre, a psychiatrist, works as a "temporary expert professional...at a clinic the 'Forensic Evaluation Unit'...we receive court orders to perform evaluations...competency evaluation."
    - Dr. Badre wrote a "report on involuntary medication" regarding Mr. Rupard.
    - Dr. Badre wrote a report concerning competency, based on an interview of Mr. Rupard at his cell. There was a deputy present at the time of the evaluation.
    - "I described his mood as down and his affect as flat." Dr. Badre also noted Mr. Rupard exhibited "an expression of disorganized thinking." He indicated that Mr. Rupard did not answer questions "in a relevant manner."
    - Dr. Badre noted that there were feces on the floor, food smeared on the wall, Mr. Rupard was unkempt, dirty, the cell was dirty, the room was malodorous, the toilet was filled with excrement. Dr. Badre noted, "it was my understanding he was receiving care from the providers at the jail...this person had been made attention to me by the mail...I was under the understanding that they were reaching out to me because they were concerned for him..."
    - Dr. Badre recalled "writing in my report that I interviewed the defendant at his cell at the recommendation of jail mental health staff and the floor deputies."
    - Dr. Badre noted that "when I am doing competency evaluations, I am not doing a clinical interview...I am looking to best answer the questions of the court...I am under the understanding that the jail is doing everything it can to maintain appropriate hygiene for the defendant...that is my expectation..."
    - Dr. Badre stated that CLERB [Citizens Law Enforcement Review Board] "requested I answer some questions."

- In his diagnostic impressions, Dr. Badre diagnosed "psychosis, not otherwise specified." Dr. Badre recommended a referral for Mr. Rupard to a state hospital or a Jail Based Competency Treatment. He also "wrote if the defendant's mental disorder is not treated with antipsychotic medication, it is possible that serious harm to the physical or mental health to the defendant will result…I came to the opinions there were signs of psychosis and I tried to inform the court that, in my opinion, he needed treatment."
- At the time Dr. Badre evaluated Mr. Rupard, he did not have the ability to write a 5150, "we don't conduct such evaluations…you have to be approved for each facility you work at to be an LPS [Lanterman-Petris-Short Act] certified individual." Dr. Badre did not have the ability to admit Mr. Rupard to the PSU.
- Dr. Badre's report was completed and submitted March 21, after Mr. Rupard's death.
- Dr. Badre did not evaluate Mr. Rupard regarding grave disability, "I did not assess him for that and did not have an opinion."

3. Video deposition of Detective Max Blumenshine dated January 7, 2026:
   - Detective Blumenshine works for the San Diego County Sheriff's Office and investigated the death of Mr. Rupard.

4. Video deposition of Melissa Quiroz dated January 8, 2026:
   - Ms. Quiroz was identified as the County's designee for the purposes of testimony.
   - In order to prepare for testimony, Ms. Quiroz reviewed policy and reviewed Mr. Rupard's chart.
   - Ms. Quiroz has previously worked as a mental health clinician and then as chief mental health clinician. She currently is "group program manager" at the SDCJ. The chief mental health clinician, Leandra Holland, reported to her. Ms. Quiroz role is administrative.
   - Ms. Quiroz has participated in meetings regarding mortality reviews at the facility but did not recall meeting regarding Mr. Rupard.
   - Ms. Quiroz indicated that mental health clinicians attend a 5150 training performed by the County of San Diego.
   - Ms. Quiroz estimated there were 30 beds in the PSY in the Central Jail. The PSU is on the third floor.
   - EOH, or enhanced observation housing, "is a module on the sixth floor." There were also safety cells, "I think there are some on the third floor at Central Jail."
   - Ms. Quiroz did not have the data regarding how many individuals were admitted to the PSU under a 5150 in 2121 or 2022.

- Ms. Quiroz indicated that QMHP staff had to take the required course first before writing a 5150. She did not know if Ms. Anosike had completed the course.
- Ms. Quiroz has personally never participated in a request for a 5150 hold.
- The PSU is a LPS [Lanterman-Petris-Short] unit, that allows provisions for involuntary commitments for evaluation and then additional periods can be allowed for treatment.
- Policies regarding mental health treatment and the PSU are "available in electronic form…on a computer drive that they can access."
- Training on policy occurs, "during new employee orientation…usually it is led by nursing staff…and supervisors-chief mental health clinician will review [policies]…" She could not say if there was a test to assess the clinician's basic knowledge of the policy.
- With regard to 5150, "I know no instances where a 5150 has been written by a mental health clinician as admission into a PSU…if A clinician see somebody who they think might need PSU placement, they would talk to the outpatient psychiatrist to say, this individual might need to be considered, and they will schedule an appointment… that's what a clinician would do. They would elevate it to the next level of care, but they wouldn't necessarily be the one writing the 5150."
- Ms. Quiroz was asked the process for changes to policy and procedure, "there is a process…I can't recall what the process would be in 2022…" She indicated that currently "policies are reviewed and tracked edits. If there's changes, they are archived, and the newer version is kept, and that's the one that's followed…it's a collaboration on policy provisions…"
- Ms. Quiroz did not know if QMHP had ever been disciplined for failing to a minimum of one time a week to monitor someone in administrative segregation.
- Ms. Quiroz did not know if there was a procedure in place to review files to ensure adequate treatment.
- For psychiatry, "the treating psychiatrists throughout our jail have a supervisor…who was also a psychiatrist, and that was the oversight for those physicians…and would have oversight of their care…for the mental health clinicians…there were onsite supervisors…the chief mental health clinicians…
- Dr. Francis Ysla oversaw the psychiatric care that was delivered…I do not oversee the contract…it would be out of my scope of practice to critique a doctor…"

- Ms. Quiroz indicated that if sworn staff had a concern about an individual, they could tell the QMHP, send an email, or call on the telephone. The incarcerated person could fill out a sick call requesting to be seen. The incarcerated person would then be listed for sick call.

5. Video deposition of Bethann Schaber, M.D. dated May 5, 2025:
   - Dr. Schaber is employed at the San Diego County Medical Examiner's Office and is a forensic pathologist.
   - Dr. Shaber performed a "full autopsy and completed an autopsy report and death certificate with a final cause and manner of death" regarding Mr. Rupard.
   - Dr. Shaber reviewed Mr. Rupard's autopsy results, "bilateral pneumonia…malnourished…body mass index was 15.5...he had lost approximately 60 pounds from the day of his arrest… dehydration… neglected schizophrenia. He was known to have that diagnosis of schizophrenia…and neglected both in the part of his own self-neglect, refusing to take medications, and also neglected care while he was in custody at the jail…".
   - Regarding the manner of death that Dr. Shaber classified as a homicide, "In this case, the investigation, along with the autopsy, demonstrated that not only in a matter of hours to days, but over weeks to months, there was failure to deliver reasonable or adequate care for Mr. Rupard that ultimately resulted in his death."
   - "His malnutrition and dehydration are a combination of his own self-neglect and the neglect of the jail to provide him with care…it was clear that over a matter of weeks to months he did not receive medications for his schizophrenia…the psychiatrist, who saw him on March 14th…thought he required to be involuntarily medicated as allowed by law."

6. Video deposition of Jon Montgomery, D.O. dated January 15, 2026.
   - Dr. Montgomery is Chief Medical Officer for the San Diego County Sheriff's Office. He reports to the Health Services Administrator.
   - Fron December 2021 through the end of March 2022, Dr. Montgomery active as a "medical advisor and acted as the health services administrator."
   - Dr. Montgomery did not provide supervision to the medical personnel, "they are individually licensed. They do not require immediate direct supervision."
   - He was "responsible for ensuring that medical care and services are provided throughout all facilities."

- He was involved in quality assurance, "evaluating for productivity...the number of patient encounters...the number of appointments made."
- Dr. Montgomery indicated there were no quality of care audits.
- Dr. Montgomery was not involved with mental health services at the jail. He was "not responsible for monitoring the actions of the mental health providers. That was done by the mental health director...that mental health director was reviewing and overseeing the quality of care provided by the contracted mental health staff."
- Dr. Montgomery was involved in mortality reviews, "a part of that process...was to evaluate whether or not there was anything that could potentially be done for a root cause analysis....it is my responsibility to participate in the program and to make recommendations and to work in a collaborative manner for process improvement."
- Reviewed the NCCHC technical assistance report, Dr. Montgomery indicated, "all of our development of evaluations and work on policies and procedures would be with the end goal in mind of eventually getting that level of [NCCHC] certifications...we're still in process and no they have not achieved that yet."

7. Video deposition of Anthony Cruz, D.O. dated March 3, 2026 with errata sheet dated April 21, 2026.
    - Dr. Cruz is a psychiatrist. He began working for Liberty Healthcare in March 2020.
    - Orientation was from "a nurse...who conducted the one-on-one orientation on exactly how everything worked from TechCare to...becoming certified in 5150 training...how to document...it was a crash course in one day to get all that done because they wanted me to start immediately...". TechCare is the medical recordkeeping system in use at the jail.
    - "She gave me...a password...all my user names and passwords for TechCare, JIMS...she told me there would be another individual who would be doing the training for [5150]...I had already been 5150 certified in San Bernadino county...it was like nothing new, and I passed the exam easily..."
    - Dr. Cruz's employment with Liberty Health care ended in June 2022.
    - With Liberty, he worked "four 10-hour shifts [per week]." He then transitioned to working for Naphcare and is "working as the head PSU psychiatrist with the psychiatric stabilization unit with Naphcare at the Central Jail."
    - Dr. Cruz did not recall any additional training other than the one day of orientation, "after that...I just started."

- Dr. Cruz did not recall anyone from Liberty Healthcare telling him about the requirements of Title 15.
- Dr. Cruz is familiar with NCCHC standards, he "was certified as a correctional health professional in 2017."
- While working with Liberty Healthcare, Dr. Cruz utilized their forms, "there was a form that was kind of the standard at the time…I was making my own standardized notes that I would use…I looked at other previous providers beforehand and used that as a template…"
- Dr. Cruz was introduced to deputies, "always I had a deputy staff escort that would assist me…"
- Dr. Cruz was provided policies and procedures from the sheriff's office but did not recall specific training regarding the mental health policy.
- Dr. Cruz's title was "outpatient psychiatrist."
- Dr. Cruz indicated he documented clinical encounters "at a later time. Once I get back to my office…that's why I'm feverishly taking notes as I'm seeing everyone…"
- For scheduling, "when I arrived…my office assistant…would already have a list of all the patients that I was scheduled to see that morning…he was an employee of the County…there was always an ongoing roster on TechCare to see…what patients are high priority or who have not been seen, so he would go by that list…he would also take into account from other…clinicians…and he would …add…them to the list for priority…the deputies would make their concerns…mental health clinicians…it could be through verbal, email…I knew some of the ones that we could not see the day before would most likely show up on the following day, but…new patients would always pop up and more acute patients would pop up…the minute I got that…list of patients, that was the start of my day…gather as much information, because I went to go see these patients cell side, so I didn't have access to a computer so I would get as much information to prepare to see these patients."
- "I was given the most acute patients…I only had a limited amount of time [to prepare]. I was basically at the mercy of my deputy because he had other obligations…once he was ready, I had to go…"
- Dr. Cruz estimated that he had 45 minutes to an hour to prepare. There would be 12 to 14 patients on the list, and he would "probably only see six."
- Dr. Cruz recalled that his clinic assistant, Rogelio Avila, prepared his clinic list, "every day was case by case, depending if he was getting informed by other clinicians. He would triage, but typically, he would just go by the psych sick call list that was in TechCare."

- As of 12.24.21, Dr. Cruz indicated he was the only outpatient psychiatrist at the facility.
- Dr. Cruz rescheduled Mr. Rupard's appointment that day, because the list was longer than his ability to see patients.
- Also on 12.28.21, Dr. Cruz was unable to see Mr. Rupard due to time constraints.
- Dr. Cruz understood that "those that were in administrative segregation were definitely more followed up by the...mental health clinicians." He did not recall reviewing policy regarding administrative segregation.
- Dr. Cruz could not answer if there was a notification to mental health staff as to who in administrative segregation needed to be seen. He did not recall being given a list of people in administrative segregation. He did recall "that a QMHP...was supposed to see them once a week." Although he was a QMHP, he was "never required, as an outpatient psychiatry provider to do those."
- There were mental health staff who worked for Liberty Healthcare and other mental health staff who worked for the County. There was a "multidisciplinary treatment team meeting where all sworn staff was present...we had everyone present...PSU psychiatrist, outpatient...sworn staff. All the QMHPs...once a month...it was mostly the mental health and support staff...on occasion there was some nursing staff..."
- Dr. Cruz reviewed the initial psychiatric evaluation document. He described disorganized thinking as "not linear...difficult to follow...they can't answer in a coherent manner." And word salad, "just saying random words that had no correlation or meaning...no sense."
- Dr. Cruz indicated that Mr. Rupard was not cooperative with the evaluation. He did not access Mr. Rupard's records from Patton State Hospital, "I don't recall it being available."
- Dr. Cruz did speak to the deputies, "any time a patient is not cooperative during their evaluation...I will get as much collateral information from...anyone who is willing to talk to me...I saw that there were empty food trays, but I still wanted to get confirmation that he was actually eating...they did confirm that he was eating at least some of his meals...". There was no documentation of this conversation in the record, but "I remember clearly."
- As Mr. Rupard was refusing medications, Dr. Cruz discontinued the medicine on 1.20.22 with a follow-up appointment scheduled 2.22.22, "I relied on my clinicians, my deputies, to tell me if...he had been decompensated...knowing that he already had a follow-up appointment...I did not feel that I needed to see him sooner

because I had not heard any type of report…saying this person needs to be seen sooner."

- Dr. Cruz assumed that nursing and the mental health clinician were checking on Mr. Rupard.
- Dr. Cruz indicated if an individual was identified as being on hunger strike, "they would notify me…medical is also notified…"
- Dr. Cruz is currently the psychiatrist in the PSU. He indicated the majority of individuals "placed involuntarily to the PSU…on a 5150 for various reasons…request of a psychiatrist or a psychiatric nurse practitioner. Anyone that is certified to write 5150s."
- Dr. Cruz did not seek an admission to the PSU for Mr. Rupard, "he did not meet the criteria at both times for a 5150."
- Dr. Cruz was not aware of Mr. Rupard's mental health history, history of refusal of medications, history of court ordered involuntary administration of antipsychotic medication. He stated "I assess what I see at that time. I use historical information…knowing that he was at Patton, but that does not mean that automatically…I'm going to immediately send him to PSU."
- Dr. Cruz discussed discontinuing Mr. Rupard's psychotropic medications, "he was refusing all medications…I was instructed, if a patient is refusing medications consistently…patients have a right to refuse medication, so I am not going to…continuously force….prescriptions to medication for a person who is refusing… and knowing I was going to follow up with him where I could…try to discuss why he was refusing meds, I felt it was appropriate to discontinue the medication , knowing I would be seeing him relatively soon….I relied on my mental health clinicians deputies, staff to tell me 'hey, maybe you need to restart this medication. He's not looking well' I didn't get any report of that…I never received any notification from staff…If I had received information from staff, I would have seen him."
- Dr. Cruz was aware that per policy and procedure, in the event a patient refuses medication, involuntary placement and medications in the PSU can be considered, "that is only one aspect as far as requiring a 5150. Just because someone refuses medication does not automatically mean that they need to be placed in PSU on a 5150."
- When Dr. Cruz performed the chart review on January 20, 2022, he did not evaluation Mr. Rupard for potential placement in PSU.
- At the follow-up appointment 2.22.22, Dr. Cruz did not restart medications. He did not consult with the PSU psychiatrist or Dr. Ysla regarding possible evaluation of Mr. Rupard for admission into the PSU. "I could always consult with the PSU…that's the policy…you don't want to just dump someone…because they may not even

have room in PSU." But he decided not to consult a that time, because he determined that there was no need for intervention or a higher level of care.
- Dr. Cruz indicated that when he saw Mr. Rupard on 2.22.22, his physical condition did not appear changed from the initial evaluation 12.29.21, "the same presentation."
- Dr. Cruz saw the autopsy photographs of Mr. Rupard, "I'm shocked right now...if someone had told me that he was in this state...I would have done whatever I could...oh, my God."

8. Video Deposition of Rebecca Jean Kloker, M.D. dated April 17, 2026.
   - Psychiatrist
   - Worked PSU as a Locum Tenens physician.
   - Did not admit or discharge, only interim treatment like a hospitalist
   - Did not treat Mr. Rupard.

9. Video Deposition of Sandeep Jouhal, M.D. dated April 10, 2026 with exhibit.
   - Psychiatrist
   - Worked for Liberty Health Care
   - Dr. Jouhal did not treat Mr. Rupard
   - July 2017-September 2018 at George Bailey Detention Facility
   - Then began working at the PSU as the PSU psychiatrist.
   - Worked at the PSU, Psychiatric Stabilization Unit, for four and half years.
   - Initially, "any admission was done through me...they would contact me and then we would collaborate and arrange for the admission...towards the end of my tenure...it was no longer up to me...anybody could actually admit a patient to PSU...by anybody, I mean the qualified mental health professionals who work in the jail...towards the end...sometimes, I was not consulted...I would find out from the in-charge nurse that there's an admission on PSU...anybody could raise concern about a patient that they have seen and they believe...needs PSU admission....any psychiatrist could admit to the PSU."
   - Individuals could be admitted to the PSU based on a 5150 for grave disability.
   - Dr. Jouhal indicated that grave disability, "In jail, it could be slightly different because they already have a place to say, so it was more based on not being... neglecting yourself and not eating, not drinking, and not having the insight to engage in any kind of treatment."
   - Refusing to take psychotropic medication, "I wouldn't say that... would meet the criteria for admission to PSU simply because a

patient is refusing to take their medications… you had to clinically assess the patient to see how decompensated he is. And he's not taking care of himself, of his basic needs, then he would be admitted to PSU. But not every patient who refused medication met the criteria…"

- "we had patients who were refusing their medications, and as a result of that, they decompensated over time and were brought to the PSU…that is correct."
- "If they are decompensated and they're not taking their medications, we could make a case that they do need involuntary medications... There were some individuals who would be refusing medications, but once they came to PSU, they were more amenable to taking medications, so we didn't have to file a Riese."
- "The majority of the patients come on a 5150. But once they become compliant with the treatment and they start improving, then they could change their legal status to voluntary. Straight voluntary admissions were quite rare, because if the patient is willing to come to PSU… and engage in treatment, then he can be treated wherever he's housed."
- "The mental health clinicians and psychologists… they used to see patients more frequently than the outpatient psychiatrist, so they were the ones who would pick up whether the patient is decompensating. And then they would go to the outpatient psychiatrist and raise the alarm, like alert them or express their concerns. And then the outpatient psychiatrist would actually review the patient, and if he felt that the patient met the criteria for a 5150, then he would start the admission process."
- Dr. Cruz was Dr. Jouhal's colleague, an outpatient psychiatrist. "Dr. Cruz…and all the other outpatient psychiatrists…they would complete the admission process…he was also one of the psychiatrists who admitted patients to the PSU."
- The threshold for being admitted to the PSU involuntarily was If they were a risk to themselves, or risk to others, or they were gravely disabled… it was not difficult to meet the criteria… for grave disability… if they're not taking care of their basic needs. They're not eating or they're just neglecting themselves, not doing their… activities of daily living, then they would meet the criteria for grave disability."
- Dr. Jouhal recalled two instances of patients with a Riese petition, "It did help in medicating then involuntarily when they were not agreeing to take voluntarily."
- There are observation cells, "just right outside the PSU unit…to house the patients who were really decompensated and they were not able to program with other…incarcerated persons…they don't

have access to the day room…they had to be segregated from the other inmates…I personally do not agree with people in isolation for such long hours."

- Dr. Jouhal performed a "chart check" regarding Mr. Rupard when he returned from Patton State Hospital on January 31, 2020. "As a PSU psychiatrist, one of my jobs was to do a chart check on the patients… whose mental competency had been restored and they were returning to the jail after having completed their mental competency time… on that day I did a chart check so that we can maintain the continuity of their care and continue them on the same medications that they were prescribed at the state hospital…"
- Dr. Jouhal was asked to review documented from a subsequent incarceration per Dr. Cruz, "I've never had any conversation with Dr. Cruz regarding this specific incarcerated person… the work of an outpatient psychiatrist is separate from the inpatient, and the only time we collaborate is when there's a potential for admission."
- Dr. Jouhal was "familiar with administrative segregation" but was not familiar with the conditions on 7D. Dr. Jouhal stated "I am familiar that isolation can have deleterious effects on the mind…in PSU, it was not only the medications, it was also because they had greater interaction with the staff…they were monitored more closely. They saw more people in their 24 hours…I think that human interaction also helped in getting them better…"
- Dr. Jouhal indicated she was not surprised by Mr. Rupard's death given the conditions of the jail, "A few months prior to this news, while I was working... an inmate had died in George Bailey detention facility. He had not been eating and drinking and three days later, the custody found him dead. So that was a reflection of the kind of care."

10. Video Deposition of Francis Ysla, M.D. dated April 10, 2026 with exhibit.
    - The chief psychiatrist for the Liberty Healthcare Early Access and Stabilization Services Program, a jail-based competency program.
    - Dr. Ysla did not recall Mr. Rupard.
    - Dr. Ysla was familiar with Dr. Anthony Cruz, "he was a staff psychiatrist for our Liberty Healthcare Program…he provided services at Central Jail…"
    - Dr. Cruz's role was "mainly clinical responsibilities."
    - Dr. Ysla provided oversight for all psychiatric services, "Discussing cases within Liberty's clinical staff…coordinating care with custody…"
    - Dr. Ysla discussed the PSU and agreed there were patients there that had been admitted into the PSU via a 5150 for grave disability.,

some who lacked capacity to make meaningful decisions about the refusal of medications because of a mental disorder.

- Dr. Ysla indicated "several disciplines can write the 5150 hold, but the actual admission into the PSU which involves admission orders can only be placed by the PSU psychiatrist."
- "Dr. Cruz had written 5150 holds in the past."
- Dr. Jouhal and then Dr. Kloker were in charge of psychiatry services at the PSU during the 2021 to 2022 timeframe. They would need to be consulted before a patient could be admitted to the PSU, "It was a functional requirement because patients that were admitted to the PSU were initially housed in an observation cell in the PSU, and... There were only a limited amount of observation cells available, so the PSU as a whole would have to make arrangements to have... one of those observation cells open."
- Dr. Ysla discussed "multiple cases regularly with my staff and team... Oftentimes it was a coordinated effort between myself and the PSU... it was more so along the lines of coordinating the availability of that observation cell, so ensuring that if an outpatient psychiatrist were to evaluate a patient that required a higher level of care... and the patient was unwilling to voluntarily be accepted into or voluntarily come to the PSU... a 5150 hold would be placed and we would coordinate... to make sure that the PSU had the capacity to bring that patient in."
- Regarding grave disability, "It's difficult to determine if a patient can provide for their food and clothing because they're given it while in jail, and their shelter of course is they're housed in jail... finding a grave disability is sometimes difficult just because those are already provided to the individual on behalf of the jail..."
- Dr. Ysla had admitted individuals to the PSU on a 5150 hold for grave disability, "A patient had to be fairly decompensated. A lot of the times we use the PSU as a way to obtain an involuntary medication order... that's not to say that a patient that doesn't take their medications automatically needs to come into the PSU... you're looking for the clinical picture for someone that is gravely disabled, so someone that is unable to communicate for their needs. Maybe they're unwilling to or unable to eat... perhaps because of a delusional thought or thought content or paranoid thought content, like the food may be poisoned for them. So in these cases, for grave disability, that would indicate a 5150 placement... to treat the psychosis."
- "Psychosis isn't necessarily synonymous with a grave disability finding. The psychosis just has to impair the patient's ability to maintain their food, clothing and shelter... A patient who is gravely disabled should be referred to the PSU on a 5150 grave disability

finding… a patient has to be decompensated sufficiently to the point of becoming gravely disabled…"

- Dr. Ysla did not recall consulting with Dr. Cruz regarding Mr. Rupard, but indicated if there was a discussion, it would be "reasonable to include in documentation as part…of the decision-making process and rationale."
- "The evaluating psychiatrist…makes the determination about medications based on their evaluation…"
- Dr. Ysla guessed that Dr. Cruz documenting continue to monitor in Mr. Rupard's progress note meant, "that the patient will continue to be offered psychiatric services…based on what was documented in this current note…it seems reasonable that the patient wasn't referred to the PSU at that time."
- Dr. Ysla was not sure if the NCCHC had a specific set of standards for psychiatry and did not recall if the psychiatrists "given the specific documentation standards that needed to be purchased from NCCHC."
- No knowledge of ACHC accreditation commission for healthcare
- No knowledge of IMQ institute of medical quality
- No knowledge of ACHSA
- Did review California Penal Code title 15
- The county provided policies and procedures.
- Dr. Ysla "In my role as medical director…provided guidance In the policies and procedures for new hires…we would have an orientation period for new hires and we would go over policies and procedures…"
- Dr. Ysla recalled meeting with Dr. Montgomery, the chief medical officer at least "once a month…a leadership meeting between Liberty and the county medical staff." In these meetings, Dr. Ysla indicated "quality was always a topic…ensuring that psychiatric care was provided for cases that were…flagged by leadership. Going over what the management approach was…about documentation. I did audits quarterly, and we discussed the results of those audits…the County would give me a certain amount of charts to review…I would review those charts based on the auditing form that they would provide to me…"
- Dr. Ysla recalled that the audit reviewed "obtaining labs… Ensuring that if polypharmacy was being prescribed, that the rationale for doing so was applicable… documentation of informed consent… I provided the outcome of the audit back to the county… these were quarterly…"
- Dr. Ysla was the head of psychiatry, Melissa Quiroz was the chief of mental health services.

- Dr. Ysla completed an annual performance evaluation for psychiatry staff.
- Dr. Ysla participated in a review of the circumstances of an inmate's death on "maybe eight occasions."

Curriculum Vitae

# Daphne A. Glindmeyer, M.D.

---

Business Address:

611 River Highlands Blvd., Suite B
Covington, Louisiana 70433

Phone: (504) 392-8348
Fax: (504) 398-4334
Email: psychdoctors@gmail.com

Mailing Address:

Post Office Box 4240
Covington, Louisiana 70434

---

## EDUCATION

**Post Graduate Medical Education:**

Louisiana State University Health Sciences Center
Division of Law and Psychiatry
Forensic Psychiatry Fellowship, 1998-1999
New Orleans, Louisiana

Louisiana State University Health Sciences Center
Division of Infant, Child, and Adolescent Psychiatry
Child Psychiatry Fellowship, 1995-1997
New Orleans, Louisiana

Louisiana State University Health Sciences Center
Psychiatry Residency Training Program
Adult Psychiatry Residency, 1993-1995; 1997-1998

**Medical Education:**

Louisiana State University Health Sciences Center
Doctor of Medicine, 1989-1993
New Orleans, Louisiana

**Undergraduate Education:**

University of New Orleans
Premedical Curriculum, 1987-1989
New Orleans, Louisiana

Mississippi Gulf Coast Community College
Premedical Curriculum, 1985-1987
Gulfport, Mississippi

Loyola University
Bachelor of Business Administration/Finance, 1981-1985
New Orleans, Louisiana

---

## PROFESSIONAL LICENSES AND CERTIFICATIONS

**Medical License:**

Louisiana, 1993
Texas, 2015

**Board Certification:**

| | | |
|---|---|---|
| Psychiatry | October 1999 | **Recertification:** Current |
| Forensic Psychiatry | April 2001 | **Recertification:** Current |
| Child and Adolescent Psychiatry | November 2002 | **Recertification:** Current |

---

## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

American Psychiatric Association
- Fellow 2009
- Distinguished Fellow 2016

American Academy of Psychiatry and the Law
- Program Committee, 2000-2002

Louisiana Council of Child and Adolescent Psychiatry
- President 2009-2012

Louisiana Psychiatric Medical Association
- Executive Council Resident Program Representative 1997-1999
- Law and Psychiatry Committee 1999-Present
- Chairman Law and Psychiatry Committee 2009-Present
- Co-Chairman Child and Adolescent Psychiatry Committee 2003-2005
- Parliamentarian 2005-2006
- Secretary 2006-2007
- President 2007-2008

Louisiana State Medical Society
Membership Committee 2004-2007
Mental Health and Substance Abuse Committee 2004-2007
Council on Membership Services 2008-2010

Selected by her peers for inclusion in Best Doctors in America® from 2007 to 2018

Orleans Parish Medical Society
Women's Taskforce 2004-2005

Jefferson Parish Medical Society 2010-2020

Louisiana State University Health Sciences Center
Student Government Association 1989-1993
Senior Class Vice President
Executive Council Vice President of Social Affairs
Sophomore Class Vice President
Freshman Class Vice President

Student Representative Five Year Planning Committee 1993

Psychiatric Resident Representative to the Committee for Professional Conduct 1997-1998

---

## CURRENT EXPERIENCE

**March 2004-Present** Daphne Glindmeyer, M.D., A.P.M.C.
Private Practice
Psychiatric evaluation and psychotropic medication management services for children, adolescents and adults are provided in outpatient setting. Also perform forensic consultations for adolescents and adults (civil and criminal).

**April 2020 – Present** Subject Matter Expert
Iowa Boys State Training School
Compliance monitoring regarding mental health services in a juvenile justice center in the State of Iowa pursuant to a consent decree.

**December 2022 – Present** United States District Court for the District of Rhode Island
Court Appointed Rule 706 Expert
Consultation regarding behavioral health and conditions of confinement in Rhode Island Department of Corrections.

---

## PAST EXPERIENCE

**March 2023 – May 2024** Subject Matter Expert
Bailey and Associates, L.L.C.
Glenwood Resource Center

Compliance monitoring regarding psychiatric services in a supported living center in the State of Iowa pursuant to a consent decree.

**June 2010-November 2024** Compliance Monitor
Harchik and Associates, L.L.C.
State of Texas

Compliance monitoring regarding psychiatric services in supported living centers in the State of Texas pursuant to a consent decree.

**August 2016- 2023** Consultant
Carter Goble Associates, LLC

Completed Consultations:

Alaska Juvenile Privatization Feasibility Study
Alabama Department of Corrections
Florida Department of Corrections
Montgomery County Jail
Nevada Juvenile Staffing Review & Organization Assessment Project
Sacramento County Jail Facilities
Wyoming Department of Corrections
Los Angeles County Jail

**2008-2015** Psychiatric Consultant
Department of Justice
Special Litigation Section

Completed Consultations:

Investigation-New York Juvenile Justice System.
Compliance Monitor-South Bend Juvenile Correctional Center.
Investigation-California Youth Authority, N.A. Chaderjian Facility.
Investigation – Pendleton Juvenile Correctional Center
Compliance Monitor-State of Ohio, Scioto Juvenile Correctional Facility.

**September 2011-2015** S.H. v. Reed

Compliance monitoring regarding psychiatric services in three Ohio juvenile correctional facilities pursuant to a consent decree.

**February 2012-July 2012** Psychiatric Consultant
Psychiatric consultant to the mental health compliance monitor in New York's secure juvenile facilities.

**May 2011- December 2014** Compliance Monitor
Scioto, Ohio
Compliance monitoring regarding psychiatric services in a juvenile correctional facility pursuant to a consent decree.

**January 2011-April 2015** Psychiatric Consultant
Southern Poverty Law Center
Completed Consultations:
Walnut Grove Youth Correctional Facility
Birmingham City School District
Polk County Jail
Orleans Parish Prison

**April 2009-January 2014** Compliance Monitor
Los Angeles County, California
Compliance monitoring regarding psychiatric services in juvenile correctional facilities pursuant to a consent decree.

**January 2008-2010** Compliance Monitor
Attorney General's Office
State of Mississippi
Compliance monitoring regarding mental health and rehabilitative services in Mississippi's secure juvenile correctional facilities pursuant to a Consent decree.

**March 2004-December 2010** Psychiatrist
Louisiana State University Health Science Center
Juvenile Justice Program
Provided psychiatric evaluation and medical management to youth in a secure juvenile correctional facility, Bridge City Center for Youth. In addition, supervised and directed the resident rotations for Child and Adolescent Psychiatry and Forensic Psychiatry residents within the Juvenile Justice Program.

**March 2004-October 2007** Medical Director
West Jefferson General Hospital
Behavioral Medicine Center
Medical Director for inpatient and outpatient psychiatric services at West Jefferson Hospital. Responsible for administrative decisions as well as

providing clinical services to both acutely mentally ill psychiatric inpatients and outpatients attending intensive outpatient and partial hospitalization programs. In addition, provided consult liaison psychiatric services to the general hospital.

**November 2003-August 2015** Medical Director
Assertive Community Treatment
Administrative responsibilities as well as providing intensive outpatient home based psychiatric services to adults with serious and persistent mental illness.

**January 2003-September 2012** Consulting Psychiatrist
Community Support Team
Resource Center for Psychiatric and Behavioral Supports
Stabilization Unit at Northlake Supports and Services
Provided consultative psychiatric services for individuals with developmental disabilities.

**July 2002-March 2004** Director of Psychiatry
Louisiana State University Health Sciences Center
Juvenile Corrections Program
Administrative supervision of lead psychiatrists at individual facilities, Provided direct psychiatric care to youth in Louisiana's secure correctional facilities, and supervised psychiatric residents and fellows rotating at Bridge City Center for Youth. Additional duties included serving as the Course Director for the Child and Adolescent Psychiatry Forensic Lecture Series.

**July 2000-March 2002** Director of Clinical Operations
Louisiana State University Health Sciences Center
Juvenile Corrections Program
Administrative supervision and implementation of medical, mental health, and dental care for youth in Louisiana's secure correctional facilities.

**July 1999-July 2000** Attending Psychiatrist
Medical Center of Louisiana, New Orleans
Provided psychiatric care to adult patients hospitalized in the acute psychiatric unit, supervision of medical students, psychology interns, psychiatric interns, and residents.

**July 1999-July 2000** Medical Director
Jefferson Parish Adult Drug Court Program

Responsible for the clinical quality of court-mandated substance abuse treatment for first time nonviolent offenders, evaluation and treatment of dual diagnosis clients, and the supervision of social services staff and forensic psychiatric fellows.

**July 1999-July 2000** Medical Director
Jefferson Parish Juvenile Drug Court Program

Responsible for the clinical quality of court mandated substance abuse treatment and the psychiatric evaluation and treatment of juvenile offenders.

**July 1999-July 2000** Medical Director
**July 1995-July 1999** Staff Psychiatrist
Jefferson Parish Human Services Authority
Mobile Crisis Team

Crisis assessment, evaluation, and disposition planning for adult, child, and adolescent clients, and the supervision of child psychiatrists and child psychiatry fellows.

**1994-1999** Clinic Psychiatrist
Orleans Parish Prison

Evaluation and treatment of incarcerated individuals.

**1996-1997** Duty Doctor
New Orleans Adolescent Hospital

Crisis assessment, evaluation, and emergency hospitalization of children and adolescents, after hour's management of acute inpatient unit.

**1994-1996** On-Call Provider
Child and Adolescent Mental Health Program

Crisis assessment, evaluation, and treatment disposition for children and adolescents in Orleans Parish.

---

**PRESENTATION AND TEACHING ACTIVITIES**

Forensic Psychiatry Lecture Series (2025-2026) presented to Child and Adolescent Psychiatry Fellows at Louisiana State University Baton Rouge Psychiatry Residency Program.

Psychopharmacology and Developmental Disabilities (March 2024) presented to staff and community providers associated with Glenwood Resource Center, Glenwood Iowa.

Crisis Intervention Training (2016-2020) to the Jefferson Parish Sheriff's Office Crisis Intervention Unit. Topics of instruction – Psychiatric Medications and Diagnoses, Suicide Prevention and risk factors, Communication with Children and Adolescents in Crisis.

Psychotropic Medications, Suicide Prevention, Child and Adolescent Crisis Management (2011-2019) a reoccurring presentation to the Crisis Intervention Team of the Jefferson Parish Sheriff's Office.

Adolescent Brain Development: Implications in Juvenile Justice (May 2018). Daphne Glindmeyer, M.D. Presented to staff at the Nevada Youth Training Center and Caliente Youth Center.

Psychotropic Medication and Developmental Disabilities (February 2015). Daphne Glindmeyer, M.D. Presented to the Louisiana and Mississippi Councils for Child and Adolescent Psychiatry Annual Spring Meeting.

Better Living through Chemistry? A review of psychopharmacology and developmental disabilities. (April 2011). Daphne Glindmeyer, M.D. Presented to the Louisiana Disability Summit Annual Conference.

Autism Spectrum Disorder. (March 2010). Daphne Glindmeyer, M.D. Presented to Louisiana Public Health Association Annual Educational Conference.

Speakers Bureau:
Pfizer, 2007-2011
Eli Lily, 2008-2010
Astra Zeneca, 2010-2013
Abbott, 2007-2008
Pam Lab, 2010-2015
Otsuka 2012-2015

Landmark Cases in Child and Adolescent Psychiatry. (May, 2004). Daphne Glindmeyer, M.D. Presented to LSUHSC psychology students.

Psychopharmacology and Metabolic Syndrome. (November, 2008). Daphne Glindmeyer, M.D. Presented to the Medical Staff of Northlake Supports and Services.

Bipolar Mood Disorder: Diagnosis and Treatment. (October, 2007). Daphne Glindmeyer, M.D. Presented to the Louisiana Society of Nurse Practitioners.

Mental Status Examinations. (May 2004). Daphne Glindmeyer, M.D. Presented to psychology students at University of New Orleans.

Psychopharmacology and Developmental Disabilities. Daphne Glindmeyer, M.D. (March, 2004). Presented to the American Academy of Family Physicians, and presented to the Region II Office of Citizens with Developmental Disabilities staff.

Child and Adolescent Forensic Lecture Series. (2003). Daphne Glindmeyer, M.D. Course Director. Overview of the Juvenile Justice System, Introduction to the Court Process

Forensic Issues in Inpatient Psychiatry. (1999).

Stalking: The Psychiatric Perspective. (1999).

Child Abuse and Confidentiality in the treatment of Children and Adolescents. (1998)

Psychiatry Clerkship Small Group Leader. (1997-1998).

Adolescent Depression and Juvenile Delinquency. (1997).

Psychiatry and Medicine Small Group Leader. (1996-1997).

---

## PUBLICATIONS

Glindmeyer, D.A. & Cruise, K.R. (2003). Callous and Unemotional Traits in a Juvenile Offender, A clinical case study. Published in the Journal of Forensic Psychology Practice, 3, 73-78.

---

## REFERENCES

Available upon request.

# Testimony and Depositions

Daphne Glindmeyer, M.D.

| | | |
|---|---|---|
| 09.27.05 | Judicial Commitment of J.D. | 24th Judicial District Court |
| 03.23.06 | Deposition – Succession of R.A.A.M. | |
| 11.03.06 | Judicial Commitment of M.T. | 24th Judicial District Court |
| 11.15.06 | Judicial Commitment of A.D. | 24th Judicial District Court |
| 01.05.07 | Judicial Commitment of G.C. | 24th Judicial District Court |
| 01.19.07 | Judicial Commitment of D.E. | 24th Judicial District Court |
| 04.27.07 | Judicial Commitment of L.H. | 24th Judicial District Court |
| 05.15.07 | Judicial Commitment of E.A. | 24th Judicial District Court |
| 08.24.07 | Deposition – C.D. v. H.L.B. Jr. | |
| 05.15.08 | Deposition – R.D. v. P.A., et al | |
| 07.31.08 | Judicial Commitment of G.D. | Orleans Parish Civil Court |
| 10.23.08 | Deposition – S.K. v. Dollar General Corp | |
| 09.02.09 | State of La. v. J.B. | 24th Judicial District Court |
| 10.08.09 | State of La. v. A.C. | 22nd Judicial District Court |
| 11.30.09 | Judicial Commitment of S.K. | 21st Judicial District Court |
| 01.12.10 | The Matter of the Mental Health of R.R. | 22nd Judicial District Court |
| 02.04.10 | State of La. v. T.V. | 22nd Judicial District Court |
| 04.06.10 | State of La. v. E.H.T. | 24th Judicial District Court |
| 04.27.10 | State of La. v. E.W. | 24th Judicial District Court |
| 04.29.10 | Judicial Commitment of S.J. | 22nd Judicial District Court |
| 02.14.11 | Deposition - JB v. Art Catering | |
| 10.19.11 | State of La. v. A.J. | Hammond City Court |
| 10.20.11 | D.G. v. R.F. | 24th Judicial District Court |
| 11.07.11 | State of La. v. S.S. | 41st Judicial Criminal Court |
| 12.21.11 | I.F. v. K.K. and Safeco Insurance Company of America | U.S. District Court - Eastern District of Louisiana |
| 01.26.12 | State of La. v. D.B. | 24th Judicial District Court |
| 01.27.12 | Deposition - I.F. v. Tulane University | |
| 02.07.12 | Deposition - J.W. ex rel. Williams v. A.C. Roper | |
| 04.26.12 | I.F. v. Tulane University | Orleans Parish Civil Court |
| 08.17.12 | Deposition - C. H. v. G. J. | |
| 09.12.12 | Hughes v. Judd | United States District Court-Florida, Tampa Division |
| 11.29.12 | L.R. v. D.P.W. | Personnel Board Jefferson Parish |
| 02.14.13 | Deposition – C.H. v. G.J. | |
| 02.19.13 | Judicial Commitment of D.P. | 24th Judicial District Court |
| 02.28.13 | Deposition – C.H. v. G.J. | |
| 04.02.13 | L.R. v. D.P.W. | Personnel Board Jefferson Parish |
| 04.03.13 | J. v. G. | United States District Court – Eastern District of Louisiana |
| 07.02.13 | Deposition – J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | |
| 07.23.13 | J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | Terrebonne Parish Clerk of Court |
| 07.25.13 | J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | Terrebonne Parish Clerk of Court |

| | | |
|---|---|---|
| 10.29.13 | Deposition - Hughes v. Judd, et al | United States District Court Florida, Tampa Division |
| 11.25.13 - 11.27.13 | Hughes v. Judd, et al | United States District Court Florida, Tampa Division |
| 01.21.14 | Deposition - D. H. v. Coroner, St. Tammany Parish, The State of Louisiana, et al | 22nd Judicial District Court |
| 02.05.14 | State of La. v. A.T. | 40th Judicial District Court |
| 05.08.14 | Deposition – C.C. V. LC. | |
| 08.27.14 | Jefferson Parish Human Services Authority v. D.T. | 24th Judicial District Court |
| 09.25.14 | In re D.T. | 24th Judicial District Court |
| 01.22.15 | Depositions- J.B. v. R.J. Reynolds Tobacco Co. | |
| 01.23.15 | J.W. ex rel. Williams, et al. v. Birmingham Board of Education, et al. | United States District Court Northern District of AL, Southern Div. |
| 05.15.15 | Deposition- B.P., et al v. River Oaks, Inc., et al | |
| 06.18.14 | E v. E | Orleans Parish Civil District Court |
| 09.22.15 | Deposition- B.D. v. S.D. | |
| 09.28.15 | B.D. v. S.D. | 22nd Judicial District Court |
| 09.29.15 | A.F. v. United States of America | United States District Court for the Eastern District of New York |
| 11.23.15 | Deposition- P.J. v. R.J. Reynolds Tobacco Co. | |
| 01.13.16 | State of La. V. D.R. | 18th Judicial Court |
| 02.17.16 | State of La. V. E.P. | 24th Judicial Court |
| 03.08.16 | Deposition- G.J. v. C.A., et al | |
| 07.29.16 | Deposition- S.S. v. R.J. Reynolds Tobacco Co. | |
| 12.02.16 | Deposition- D.H., et al v. City of New Orleans, et al | |
| 02.13.17 | State of La. V. J.D. | 29th Judicial Court |
| 08.24.18 | Deposition L.C., et al v. Evergreen, et al | |
| 08.31.18 | M.A. v. R.A. | 24th Judicial Court |
| 11.26.18 | Daubert Hearing- L.C., et al v. Evergreen, et al | 21st Judicial Court |
| 02.07.20 | Deposition- J.A. v. E.C., et al | |
| 02.11.20 | State of La v. A.H. | 24th Judicial Court |
| 11.16.20 | Deposition- D.M. et al v. Erie County, Ohio et al | |
| 03.09.21 | Interdiction of E.M. | 24th Judicial Court |
| 03.12.21 | Deposition- Vargas v. Sheriff of Cook County, et al | United States District Court for the Northern District of Illinois, Eastern Division |
| 05.04.22 | State of LA v. B.J. | 24th Judicial Court |
| 10.20.23 | Deposition- D.A, et al v. New Orleans Military & Maritime Academy, Inc., et al | |
| 10.27.2 | Deposition- D.A, et al v. New Orleans Military & Maritime Academy, Inc., et al | |
| 04.16.24 | Deposition- J.T. v. NaphCare, Inc., et al | |
| 04.24.24 - 04.25.24 | D.M. v. State of New Hampshire, Dept. of Health and Human Services, et al | Rockingham Superior Court Brentwood New Hampshire |
| 10.16.24 | State of LA v. D.A. | 24th Judicial Court |
| 01.23.25 | Deposition- J.Y. v. CoreCivic Inc., et al | |
| 03.25.25- 03.26.25 | J.T. v. Naphcare, Inc., et al | United States District Court for the Western District Court of Washington at Seattle |
| 04.30.25 | Deposition- A.S. et al v. Endeavor Southlake OpCo, LLC et al | |

| | | |
|---|---|---|
| 06.06.25 | Deposition- J.F. v J. Landry et al | |
| 11.14.25 | Deposition- E.M. v. New Mexico Corrections Dept. et al | |
| 05.29.26 | Garcia v. City of New York, et al | Supreme Court of the State of New York Bronx County |

*Information prior to August 2005 unavailable

# Daphne Glindmeyer, M.D.

Post Office Box 4240 Covington, Louisiana 70434

Phone: (504) 392-8348
Facsimile: (504) 398-4334

Phone: (985) 888-1414
Facsimile: (985) 888-1415


Fee Agreement in the matter of:

______________________________________________________

Case title

Dr. Glindmeyer's fee for expert consultation is $600.00 per hour. This hourly rate applies for record review or collection, interviews, research, report writing, consultation with attorneys, telephone calls, site visits, travel time, and any other activity necessary to complete the consultation.

Once Dr. Glindmeyer agrees to a forensic consultation, retainer fees will be discussed with the referring party and determined based on the consultation requested. The retainer amount must be paid promptly. Any and all case records (e.g., police reports, case filings, medical records, mental health records, depositions) must be provided to Dr. Glindmeyer for review. The consulting client must not withhold or make unilateral decisions on what records to provide to Dr. Glindmeyer. Based on the volume of records and interviews necessary, Dr. Glindmeyer will be better able to gauge costs for completion of the full evaluation report.

The client will be billed only for the hours worked, and any unused portion of the retainer will be returned. Once the retainer is expended, an additional retainer will be requested. Any remaining balance must be satisfied prior to the delivery of the final report. All fees must be satisfied prior to testimony or deposition. Further, testimony and deposition fees must be satisfied 15 business days prior to appearance.

My expert opinion testimony at depositions, trials or hearings will be provided at the rate of $600.00 per hour. For local cases, there is a minimum charge of four hours ($2400.00) for an appearance. The four-hour minimum, which must be paid 15 business days prior to appearance, includes travel time (portal to portal) and time waiting to be called to testify in court. If the testimony time inclusive of travel and waiting exceeds four hours, a second four-hour charge will be applied. This second four-hour charge must be paid prior to the continuation of the deposition or trial testimony. Any testimony or deposition appearance exceeding 8 hours in one day or continuing after 5PM(CST) is charged an hourly rate of $700 per hour. For cases where car travel is greater than 2 hours portal to portal or where air travel is necessary, a full eight-hour day will be charged. Again, fees must be satisfied prior to appearance.

In certain cases, when agreed upon by Dr. Glindmeyer and the referring party, the services of a forensic medical assistant may be necessary to review documents, depositions, and other data. The fee for this assistant is $150.00 per hour.

Any travel expenses (hotel, taxi, car rental, food, etc.) must be reimbursed fully with receipts provided. Airfare must be paid in advance of any travel. Dr. Glindmeyer will make all travel arrangements for herself at reasonable pricing available at the time, in consideration of the notice provided to her, and based on her professional schedule. Incidental expenses related to the case necessary for her to provide her expert opinion (copies, mailing charges, misc) are to be reimbursed fully with receipts provided.

A minimum of 90 business days is required to complete evaluations/reports. In some cases, this time period may be longer; however, that will be discussed with the referring client. If the services requested must be completed within 90 business days or a time less than that period, then a rush fee will apply. If the consultation is accepted and there is a need to change the previously agreed upon time schedules, Dr. Glindmeyer may decline to continue work on your consultation or, to continue work, an intermediate rush fee will be applied. This rush fee will be determined by Dr. Glindmeyer and if agreed upon by the client, in writing, payment of the rush fee to continue work must be submitted within 24 hours.

A ten-business day notice is required for cancellation of appointments, testimony, or court appearances or the scheduled time will be billed against the retainer, or any deposit received forfeited. Billed items must be paid within 30 days and all fees satisfied prior to any deposition or trial testimony. Checks should be made payable to Daphne Glindmeyer, M.D., A.P.M.C. Other methods of payment include credit card and a variety of electronic funds transfers.

Please sign and return one copy of this agreement with your retainer check indicating you agree to the terms as outlined above, acknowledge the responsibility for all fees and expenses, and that payment is not contingent on any verdict or settlement of the matter.

________________________________________

Responsible party/Law Firm Signature

________________________________________

Date

________________________________________

Email Address

________________________________________

________________________________________

Mailing Address

# EXHIBIT "B"

# Daphne Glindmeyer, M.D.

611 River Highlands Blvd. Suite B
Covington, LA 70433

Phone: (504) 392-8348
Facsimile: (504) 398-4334

Phone: (985) 888-1414
Facsimile: (985) 888-1415


July 13, 2026

Lowe Law, APC
Attn: Jeremiah Lowe, Esq.
402 West Broadway Street Suite 1720
San Diego, California 932101

Re: Estate of Lonnie Rupard v. County of San Diego, et al.
Case No: 23CV1357 CAB BLM

Dear Mr. Lowe,
My name is Daphne Glindmeyer. My office address is 611 River Highlands Boulevard, Suite B, Covington, Louisiana. I am a medical doctor, licensed to practice medicine in the state of Louisiana and in the state of Texas.

I am a graduate of the Louisiana State University Health Sciences Center. I completed a residency in Adult Psychiatry, a fellowship in Child and Adolescent Psychiatry, and a fellowship in Forensic Psychiatry. I am board certified in Adult Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry. I am a Distinguished Fellow of the American Psychiatric Association, past President of the Louisiana Psychiatric Medical Association, and past President of the Louisiana Council on Child and Adolescent Psychiatry.

I am currently in private practice, providing psychiatric evaluation and medication management services to child, adolescent, and adult clients as well as forensic consultation. My fee for forensic consultation, charged in this case, is $600.00 per hour, with approximately 32 hours spent on this review/report. Testimony, if required, is also charged at $600.00 per hour, in four-hour blocks. For further information, please refer to my attached Curriculum Vitae and Fee Agreement. In addition, I have attached my testimony log detailing depositions and courtroom testimony for the past four years.

<u>Statement of Opinion:</u>
Mr. Lowe requested my opinions in the above noted case. My opinions are based on my skill, education, training, experience, knowledge of medical and scientific literature,

other materials reasonably relied upon by members of my medical specialty, and my review of the case information available at this time. Should additional information become available that modifies my opinions and conclusions, an addendum will be authored.

To provide this opinion, information regarding this case including case pleadings, depositions, photographs, medical/mental health, and other records were reviewed. For a complete listing of all information reviewed, please refer to the list of documents and pertinent information from each included below.

Based on the available information, it is my opinion, to a reasonable degree of psychiatric certainty, that there were significant deviations from the standard of care regarding the psychiatric treatment, mental health treatment, and monitoring provided to Mr. Rupard during his incarceration at the San Diego County Jail. In my opinion, the failures on the part of the facility and mental health/psychiatry staff resulted in Mr. Rupard's death due to "Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia." Mr. Rupard's death was classified as "homicide" per the County of San Diego Department of the Medical Examiner.

<u>Document Review:</u>
As part of the evaluation, the following documents, provided by Jeremiah Lowe, Esq. were reviewed: *(Pertinent information regarding each document will be included here. Please note common medical abbreviations have been deciphered for the reader.)*

<u>Legal:</u>

1. United States District Court, Southern District of California, Estate of Lonnie Rupard, through its Court-Appointed Administrator Terri Lopez; and Justino Rupard v. County of San Diego, et al., Third Amended Complaint for Damages filed February 19, 2025:
    a. "Lonnie suffered from schizophrenia. On March 17, 2022, Lonnie died…at the age of 46 while in custody at the SDCJ [San Diego County Jail]…
    b. While in custody at the SDCJ, County employees neglected his schizophrenia and basic needs despite obvious signs that he was in acute psychosis. They discontinued his antipsychotic medication. During the approximately three months he was in custody at SDCJ, Lonnie lost 60 pounds, more than a third of his total body weight. Lonnie was six feet tall and weighed 105 pounds at his death.
    c. In his final days, Lonnie ate nothing. He was never let out of his cell…Deputies, who saw Lonnie in…trash and maggots in his food and his body caked in feces, left him to die.
    d. According to the medical examiner, Lonnie died from pneumonia, malnutrition, and dehydration. The Medical Examiner ruled his death to be a homicide."

<u>Medical/Corrections Records:</u>

2. San Diego County Sheriff's Department Medical Intake Questions dated December 6, 2007:
    a. Medications: Prozac 20 mg by mouth daily in the morning, Benadryl 50 mg by mouth daily at bedtime, Cogentin 1 mg by mouth daily at bedtime, Haldol Decanoate 100 mg intramuscularly every month.
    b. Weight 183 pounds.
    c. Psychiatric questions: "current psychiatric/mental health problems…bipolar schizophrenia…psychiatrist…Dr. Kugel…visual hallucinations sometimes… auditory hallucinations…sometimes…prior suicide attempts last time last year, does not remember what he did…"

3. San Diego County Sheriff's Department Medical Intake Questions dated May 24, 2009.

4. San Diego County Sheriff's Department Medical Chart dated November 9, 2009 through December 9, 2009:
    a. 11.10.09 - "A STAT psychiatric evaluation was done…will be scheduled to see psychiatrist this morning."
    b. 11.10.09 – "Received a call…identified herself as the inmate patient's wife…stated that inmate patient has been diagnosed with bipolar disorder and schizophrenia, was taking Haldol injection once a month but stopped taking it four months ago because he felt better…lacks insight into his psychiatric problem…has been talking to himself lately and have verbalized hurting himself and others…they were in a doctor's office trying to get help when inmate patient's behavior led to his arrest."
    c. 11.11.09 – "History of…schizophrenia, not compliant with medications (five months off meds) …a very poor historian, most of information was taken from the chart…Haldol 5 mg by mouth at bedtime."
    d. 12.9.09 – "Stable on Haldol 5 mg…will be released on 12.14.09 with 15 days supply of medication."

5. San Diego County Sheriff's Department Medical Chart dated May 6, 2010 through November 4, 2010.
    a. Mr. Rupard reported a history of mental health problems, "bipolar" and treatment with medications, "does not remember the name…submitted for psychiatry referral."
    b. 5.8.10 – "seen by psychiatrist…history of several hospitalizations…extremely difficult to interview…continue Haldol 5 mg at bedtime."
    c. 5.27.10 – "discharge summary from Paradise Valley Hospital was reviewed…was on Haldol 10 mg by mouth and Haldol Decanoate every month, but it is not known when was the last dose given, also he is on Cogentin and Depakote daily."

   d. 5.27.10 – Psychiatry Sick Call "diagnosis schizoaffective type schizophrenia…Haldol 10 mg at bedtime, Cogentin 1 mg twice daily, Depakote 500 mg twice daily, and Haldol Decanoate 100 mg intramuscularly monthly."

6. San Diego County Sheriff's Department Medical Chart July 1, 2011 through July 19, 2011:
   a. Mr. Rupard did not report a history of psychiatric illness. "but per old records…he was on Haldol/Cogentin for paranoid schizophrenia."
   b. 7.12.11-Psychiatry Sick Call: Mr. Rupard "refused psychiatric evaluation on 7.8.11 and today, essentially refused…". Mr. Rupard was noted as exhibiting selective mutism, "

7. San Diego County Sheriff's Department Medical Chart dated August 18, 2011 through September 2, 2011.
   a. 8.19.11 -Mr. Rupard reported a history of "bipolar – recent hospitalization at Bayview…when there on a 5150…is on Prolixin intramuscularly and Depakote…psychiatry referral."
   b. Mr. Rupard refused psychiatry clinic.

8. San Diego County Sheriff's Department Medical Chart dated September 24, 2011 through June 10, 2012.
   a. Mr. Rupard reported a history of schizophrenia. He could not remember the names of his medications.
   b. 9.24.11 – "Received a call…claims to be inmate patient's mother…her son ahs mental issues and is receiving weekly intramuscular shots from his psychiatrist…Dr. Samuel Kugel."
   c. Mr. Rupard refused psychiatry sick call on multiple occasions. He required safety cell and was noted to refused medications.
   d. Medications: Risperdal 2 mg by mouth at bedtime, Depakene 500 mg by mouth in the morning, Cogentin 1 mg by mouth at bedtime.
   e. 5.11.12 – "received A call from the 5th floor sworn staff reporting that patient's mental state is deteriorating. His cell is filthy, he is not flushing the toilet, he makes himself throw up. On review of medical records, patient has been refusing to see the psychiatrist, has been refusing meds…"
   f. 6.10.12 – "called to respond to a tac team call…inmate patient reportedly not wanting to come out of cell despite being released from custody. He was therefore extracted out of cell…plan…to drop off at County Mental Health under 5150."

9. San Diego County Sheriff's Department Medical Chart dated June 20, 2012 through June 21, 2012.
   a. 6.21.12 – "will be transported to County Mental Health now."

b. 6.21.12 – "ongoing observation…remains in sobering cell. Erratic behavior…long history of mental illness per JIMS, non-compliant with treatment in jail before…has been observed talking to self…"
c. 6.21.12 – "the patient appears to have an acute psychosis…drug delirium…will put patient on a 5150…acutely disorganized though pattern and evidence of grave disability."

10. San Diego County Sheriff's Department Medical Chart dated April 18, 2015 through September 19, 2015:
    a. Mr. Rupard was noted as "uncooperative" and he "denied any medical or psychiatric issues…history of schizoaffective disorder…angry and loud…for psychiatry follow-up."
    b. 5.24.15 – Psychiatry/Nurse Practitioner Progress Note "in mild distress secondary to psychosis/agitation…loud…agitated…irritable, intrusive, and disorganized…Diagnostic: Psychosis, not otherwise specified…"
    c. 7.13.15 – Psychiatry/Nurse Practitioner Progress Note: "he has been very hostile and belligerent to the clinical staff…thoughts seem disorganized… this incarcerated person is gravely disabled. He has no insight into his illness, the need for psychotropic medications, or the fact that the clinical staff are trying to help him…recommend transfer to PSU."
    d. 7.24.15 – Psychiatry Sick Call "patient who is Patton committed and on involuntary medications…legal status 1370…continue to offer psych medications…at this time, does not meet criteria for PSU admission."
    e. 8.1.25 – Psychiatry Follow-up "history of psychosis, not otherwise specified…refusing [medication]…yells obscenities…does not cooperate with questions…rambling incoherent speech…irritable…arrange transfer to PSU."
    f. During this incarceration, Mr. Rupard's continued refusal to adhere to his medication regimen was documented. He transferred to Patton State Hospital 9.24.15.

11. San Diego County Sheriff's Department Medical Chart dated February 11, 2016 through April 6, 2016:
    a. Mr. Rupard reported a history of "schizoaffective disorder – on medications from Patton."
    b. Per the discharge summary from Patton State Hospital, Medications: Klonopin 1 mg at bedtime, Zyprexa 20 mg twice daily, Haldol decanoate 300 mg intramuscularly every 28 days.
    c. 2.18.16 – Psychiatrist Initial Evaluation noted diagnosis of schizophrenia, "'I am feeling good'…would like to continue his psychotropic medications…to prevent relapse…prior hospitalizations: approximately 10-15 psychiatric hospitalizations with the most recent being at Patton State Hospital… continue discharge medications from Patton State Hospital."

d. Mr. Rupard maintained adherence to his prescribed medication and was documented as participating appropriately in group therapeutic interactions.

12. San Diego County Sheriff's Department Medical Chart dated November 30, 2018:
   a. At intake, Mr. Rupard's history of schizophrenia and treatment with psychotropic medications was noted. Scheduled for psychiatry sick call.

13. San Diego County Sheriff's Department Medical Chart dated January 8, 2019 July 6, 2019:
   a. At intake, Mr. Rupard denied any history of mental illness or psychiatric hospitalization.
   b. 1.9.19 – Psychiatry Sick Call "history of psych…denies at intake…no medications ordered."
   c. 1.31.19 – Psychiatry Initial Evaluation "Psychosis, not otherwise specified…no medications per patient preference…follow up three weeks."
   d. 2.4.19 – Psychologist "seen at the request of sworn staff…not very cooperative…disorganized thinking…he is currently 1368…"
   e. 2.8.19 – "deputy request psychiatry sooner, been in lockdown…extremely agitated…combative, refusing medications…threatening…"
   f. 2.12.19 – Mental Health Clinician "currently in lockdown due to being uncooperative, unkempt and having difficulty managing in housing…being seen one time per week by mental health clinician while on lockdown and is also being seen routinely by psychiatrist."
   g. 2.18.19 – Welfare Check "speaking with rapid fire speech and appears to be responding to internal stimuli…"
   h. Mr. Rupard remained in administrative segregation, with welfare checks noting hostility, lack of cooperation, rapid and unintelligible speech.
   i. 3.10-19 – "attempt to obtain an order for medications…before transferring this inmate to …administrative segregation…is agitated and uncooperative."
   j. 3.25.19 – Psychiatric Progress Note "rambling incoherently…history of medications…psychosis, not otherwise specified…offer Zyprexa 10 mg twice daily…"
   k. 3.31.19 – Psychologist "called…sworn staff…in administrative segregation… unintelligible…word salad…cell was messy and filled with trash."
   l. 4.12.19 – Psychiatric Progress Note "angry…semi-intelligible rant…uncooperative, intense eye contact…continue to offer Zyprexa 10 mg twice daily…follow up in one week to reattempt interview/build rapport."
   m. Mr. Rupard was seen weekly after this. Despite being noted as "appears manic and/or psychotic" he was not identified as gravely disabled.
   n. 4.26.19 – Psychiatry Sick Call "consider admission to PSU…refusing…medication."

o. 5.4.19 – Psychologist "referred by sworn staff…refusing to come out of his cell…asked to attempt to convince patient to come out of his cell voluntarily prior to the Tac Team forcibly removing him…cell was messy and the toilet was filled with trash and feces…". Mr. Rupard was noted as verbally aggressive and threatening."
p. 5.10.19 – Psychiatry "rambling…meal tray containers scattered…toilet appears to have the content of multiple voids…a large mound of toilet paper…paranoid ideation…will increase Olanzapine to 20 mg at bedtime…compliance is poor, a larger dose when he does accept medication may have some slow benefit…does not appear gravely disabled at this time."
q. 6.19.19 – Psychiatry "rambles nonsensically…given level of disorganization…administer Haldol Dec 150 mg starting 6.22.19…court ordered, cannot refuse."
r. 6.23.19 – Haldol Dec…patient refused…medication was forced."
s. 7.6.19 – Haldol Dec 150 mg administered.

14. San Diego County Sheriff's Department Medication Administration Record regarding Mr. Lonnie Rupard.

15. San Diego County Sheriff's Department Medical Clearance dated January 30, 2020.

16. San Diego County Sheriff's Department Medical Chart dated April 22, 2020 through September 28, 2020.
    a. Returned from Patton State Hospital.
    b. Medications Haldol Decanoate 200 mg intramuscular on the 4th and 22nd of every month. Depakene 500 mg twice daily, Cogentin 2 mg at bedtime.
    c. Mr. Rupard began to refuse his oral medications,

17. Patton State Hospital Discharge Summary dated January 30, 2020. Diagnoses noted as "unspecified schizophrenia spectrum and other psychotic disorder…on the unit, he has been calm and cooperative…medication adherent…Haldol Decanoate 200 mg intramuscular monthly on the 4th."

18. Patton State Hospital Medical Record:
    a. 1.30.20 – Discharge Summary:
        i. Date of admission 7.19.19, date of discharge 1.30.20.
        ii. Mr. Lonnie Rupard…committed to the California Department of State Hospitals on 5.17.19…Incompetent to Stand Trial…Dr. Rao noted that Mr. Rupard was agitated…speech was incoherent and loud…disorganized…Mr. Rupard…stated that all symptoms have resolved since he started taking his medication… diagnosis:

unspecified schizophrenia spectrum and other psychotic disorder... antisocial personality disorder...stimulant use disorder."

b. 1.7.20 - Monthly Psychiatric Progress Note:
    i. Mr. Rupard's legal status was "PC1370 Incompetent to Stand Trial."
    ii. He was noted as "compliant with his medications...Depakote 500 mg twice daily, Haldol Decanoate 200 mg intramuscularly monthly on the 4th...Cogentin 1 mg twice daily."
    iii. Mr. Rupard was described as "agitated with increased psychomotor abnormality, his speech was incoherent and loud, the thought process was disorganized and has poor attention and concentration...he is presently demonstrating several signs of a severe mental disorder...diagnosis: unspecified schizophrenia spectrum and other psychotic disorder... antisocial personality disorder...stimulant use disorder."
c. 11.4.19 - Physician Quarterly Review Medical Progress Note
    i. Height 71" weight 211 pounds.
d. 8.8.19 – Medical Surgical: "three stitches removed from eyebrow area, one stitch removed from lower lip.
e. 7.23.19 – PC1370 Intramuscular Order Status:
    i. "The attached order authorizes the...patient to be involuntarily medicated with psychotropic medications...Order date 5.17.19 expiration date 5.17.20."
    ii. 7.22.19 – Admission Screening Rule out Tuberculosis – Chest X-Ray results "No radiographic evidence of active tuberculosis."

19. San Diego County Mental Health Client Roster Report regarding Mr. Lonnie Rupard dated October 5, 2007 through April 24, 2020.

20. San Diego County Sheriff's Department Medical Record for Mr. Lonnie Rupard dated August 25, 2021:
    a. Height 5'9" weight 186 pounds.
    b. The intake document noted "Behavioral Health Chronic Care: Psychotic disorders."

21. San Diego County Sheriff's Department Medical Record for Mr. Lonnie Rupard dated September 11, 2021:
    a. Height 5'9" weight 175 pounds,
    b. The intake document noted "Behavioral Health Chronic Care: Psychotic disorders."

22. San Diego County Sheriff's Department Medical Record for Mr. Lonnie Rupard dated September 14, 2021:
    a. Height 5'9" weight 175 pounds.

b. The intake document noted "Behavioral Health Chronic Care: Psychotic disorders."
c. PERT Mental Health Screen for Detention indicated no suicide risk, positive risk of violence, "client had verbal argument with ticket agent from Southwest airlines…multiple psychiatric hospitalizations…client is impulsive and has poor judgement. He denies intent to harm others. Stated that he got angry and then left the airport on foot."

23. San Diego County Sheriff's Department Medical Record for Mr. Lonnie Rupard dated October 20, 2021 through November 29, 2021:
a. Height 6'0" weight 173 pounds.
b. The intake document noted "Behavioral Health Chronic Care: Psychotic disorders."
c. Sobering Cell 72 hours, "Incarcerated person has history of psychiatry…please assess."
d. 11.12.21.- Behavioral Health Assessment "Wellness check…non-confidential, met with incarcerated person cell side…with deputy assistance…he reports he is 'fine. I am getting out in two weeks'…denies any ongoing disturbances…reports he is eating, sleeping and ha energy to get out of bed each day for activities of daily living…calm, cooperative with writer with no response to internal stimuli…appears to be maintaining his cell and with a cell mate…no acute safety concerns…provisional diagnosis: unspecified schizophrenia spectrum and other psychotic disorder… antisocial personality disorder…stimulant use disorder… no treatment indicated…wellness check in two weeks."

24. San Diego County Sheriff's Department Health Information Management, Medical records for Mr. Lonnie Rupard dated December 12, 2021 through March 17, 2022:
a. 12.19.21 – "Medical Clearance…Date of Birth: 10.1.75…age=48…weight 165…height 6'…BMI 22.4…". No other screening items were checked, and it was noted that Mr. Rupard was "fit to continue booking process."
b. 12.19.21 – "Receiving Screening...patient is verbally abusive and combative…" The document response indicated "no" to "any indication of a mental health concern." For Behavioral Health Chronic Care, "psychotic disorders" was checked. The mental health screening indicated all "no" responses as did the suicide risk questionnaire and substance use assessment. Mr. Rupard was noted as fit to continue the booking process and referred to "2nd stage nurse evaluation/NAP."
c. 12.19.21 – "General Informed Consent" was checked "patient is willing to sign, but unable to sign."
d. 12.19.21 – "Authorization for Release of Information" was checked "not indicated."

e. Sick Calls –
   i. 12.19.21 – "Second stage nurse eval scheduled from receiving screening: Patient refused COVID test at intake."
   ii. 12.20.21 –Psychiatry Sick Call "Reschedule on-site- Refused telehealth 12.23 – denies that he will come. History of extensive meds, Patton [State Hospital]. Patient has history of psych and was on medications during previous incarceration, please evaluate."
   iii. 1.15.22 – Psych Chart Review "Multiple refusal of psych medications. Please evaluate."
   iv. 1.15.22 – Psych Chart Review "Inmate has been refusing medication. Please Evaluate."
   v. 2.2.22 – Chronic Care "psychotic disorders."
   vi. 2.1.22 – QMPH "has D/I. Please assess."
   vii. 2.2.22 – Psychiatry Sick Call "Reschedule on site – refused 2.18. Last seen 12.29. Follow-up in 4-5 weeks or sooner as needed, started (offer) Haldol, Valproic Acid, Cogentin."
   viii. 4.12.22 – Psychiatry Sick Call "Last seen 2.22, follow up in 6-7 weeks or sooner as needed. Patient refuses medications (PC1368),"

f. 12.19.21 –Nursing Progress Note "disheveled in appearance, verbally abusive but directable…refused COVID test."

g. 12.24.21 – Psychiatrist "patient was scheduled for an initial evaluation, however due to time constraints, patient was unable to be seen…will be rescheduled."

h. 12.28.21 – Psychiatrist "patient was scheduled for an initial evaluation, however due to time constraints, patient was unable to be seen. Patient will be rescheduled."

i. 12.29.21 – Psychiatrist "Patient booked on 12.19.21… Patient is seen today for psychiatry sick call initial psychotropic medication evaluation to address history of psychosis and psychotropic medication treatment...SDCJ-7D And was evaluated today by this clinician cell side in a non-confidential environment. Patient was made aware of the nature/ purpose of the evaluation and refused to participate. Patient was last seen in psychiatry sick call during a previous incarceration on 7.11.20 for follow up. At that time, patient was diagnosed with unspecified schizophrenia spectrum and other psychotic disorder… antisocial personality disorder… stimulant use disorder… with plan to continue Haldol decanoate intramuscularly 200 milligrams every 4th and 22nd of every month, Depakene 500 milligrams by mouth twice daily, Vistaril 25 milligrams twice daily, and increased Cogentin 1 milligram in the morning and 2 milligram at bedtime…" Information from the prior sick call note in 2020 was included noting that the patient indicated "his mood is 'good'… Has some anxiety. He reports he is eating and sleeping well… states the Haldol helps with auditory hallucinations but claims tremor in his left hand continues from Haldol." The

progress note then discusses the results of the current sick call encounter, "Today, multiple attempts were made to engage the patient in conversation, however patient yelled, mumbled incoherently at times and was verbally aggressive throughout the interview. Patient was Observed through his cell door window. Patient was awake, alert, shirtless (wearing pants), standing by cell door, and appeared to be in no acute distress. Cell room was relatively clean, no flooding/gassing or smearing of feces. Empty food trays were visible in his cell. No signs are symptoms of patient being a danger to self or others at this visit. Patient was informed Haldol, Depakene, Vistaril, and Cogentin would be restarted/ offered, and medication compliance was encouraged. Medication indications, risk/ benefit and potential side effects including no medications were reviewed." The Mental Status Examination noted "Irritable, uncooperative…speech yelling/ verbally aggressive, pressured… Mood/ affect, unable to assess due to lack of patient cooperation/ irritable, reactive. Thought process: disorganized. Thought content: unable to assess due to lack of cooperation… no apparent response to internal stimuli... No signs or symptoms of patient being a danger to self or others… diagnosis: unspecified schizophrenia spectrum and other psychotic disorder... By history… antisocial personality disorder… by history… stimulant use disorder… by history… patient presents to the clinic irritable and uncooperative with today's visit. Patient has history of psychosis, substance use, suicidality, psychiatric hospitalizations and psychotropic medication treatment. No signs or symptoms of patient being a danger to self or others at this time. Patient was a poor historian and was irritable and verbally aggressive during the interview. Due to patients' presentation, psychiatric history, and potential for decompensation, will start/offer previous psychotropic medications. Discussed current treatment plan with patient… no signs of danger to self/ danger to others or grave disability requiring immediate psychiatric intervention at this visit. Plan: start/ offer Haldol 5 milligrams by mouth twice daily…start/offer Cogentin 1 mg by mouth twice daily…start/offer Valproic Acid 500mg/10ml by mouth twice daily…encourage medication compliance…did not consent to labs at this visit…return to clinic 4-5 weeks or sooner.:

j. 12.29.21 – Nursing Progress Note "psych sick call encounter noted. Medications verified.
k. 12.30.21 – 1.6.22 Medication Refusal forms completed daily regarding Mr. Rupard's psychotropic medications. These forms were not signed by Mr. Rupard.
l. 1.8.22 – 1.20.22 Medication Refusal forms completed daily regarding Mr. Rupard's psychotropic medications. These forms were not signed by Mr. Rupard.
m. 1.20.22 – Psychiatrist "per…chart review, patient consistently refuses psychotropic medications. At this time, will discontinue Haldol, Cogentin, and Valproic Acid. Psychiatry sick call follow up is already scheduled."

n. 1.21.22 – Nursing Progress Note "psych sick call encounter noted."
o. 1.29.22 – Nursing Progress Note "Seeing on housing floor status post use of force. Per deputies, patient was taken down... Noted with laceration between eyebrows not actively bleeding. Unable to further assess due to patient repeatedly stating 'I don't need a medic. Leave me alone, if you touch me, I'll kill you.' Irritable, breathing even and unlabored, noted with small abrasion to left side of face and some possible blood on lips. Assessment terminated for safety."
p. 2.9.22 – QMHP Progress Note "Wellness check…semi-confidential…segregation/confinement…housed in 7D…no reported aggression, violence or erratic behaviors…observed…standing at the cell door…was uncooperative as evidenced by…stating 'I am fine. I don't want to talk to you…observed…not engaging in self-injurious behavior. Unable to fully assess…due to his refusal and/or inability to cooperate…did not answer any further…question despite multiple attempts from writer trying to engage…Incarcerated person then began speaking in unintelligible words…sated 'go away'. Deputies on the 7th floor report incarcerated person will often speak to himself in intelligible words…cell was clean and had some debris…observed empty food trays inside of his cell…cell was free of any urine, feces, or flooding…moderately groomed…does not demonstrate any acute distress or immediate safety concerns…no distressing symptoms or major impairment requiring ISP or PSU referral…will continue to be monitored for safety concerns and grave disability…unable to fully assess incarcerated person due to his refusal and/or inability to cooperate." Mr. Rupard's mental status examination was pertinent for "Moderately groomed… quiet... Behavior: agitated… attitude: uncooperative, non-disclosing… mood: irritable… affect: irritable… thought content: impoverished… thought process: concrete…intervention provided: no intervention indicated…return to clinic…wellness check in 2 weeks…". No referral was indicated.
q. 2.20.22 – Nursing Progress Note "per deputy…patient is on lockdown, no contraindication noted."
r. 2.22.22 – Psychiatry "…seen today for psychiatry sick call follow up…last seen 12.29.21…and is currently not prescribed psychotropic medications…medications were discontinued due to consistent refusals…evaluated today…cell-side in a non-confidential environment… Today, multiple attempts were made to engage the patient in conversation, however he refused to answer questions and rambled incoherently and became verbally aggressive… observed through his cell door window. Patient was awake, alert, shirtless (wearing pants), initially sitting on his bed then kneeled on his cell floor and appeared to be in no acute distress. Cell room was relatively clean, no flooding/ gassing or smearing of. However, toilet seat was covered with cloth. No signs or symptoms of patient being a danger to self or others. Regarding

psychotropic medication, patient continued to yell when offered psychotropic medications… mental status examination… irritable, uncooperative… limited grooming...speech: yelling, verbally aggressive, rambling incoherently at times, non-pressured, spontaneous… thought process disorganized… patient may be responding to internal stimuli… patient presents to the clinic irritable and uncooperative with today's visit. Patient has a history of psychosis, substance use, suicidality, psychiatric hospitalizations and psychotropic medication treatment… patient was irritable and verbally aggressive during the interview. Due to patient's presentation, psych history, legal status (PC1368), and potential for decompensation, will continue to monitor and offer treatment. Discussed current treatment plan with patient… no signs of danger to self/ danger to others or grave disability requiring immediate psychiatric intervention… patient offered psychotropic medication, however patient refuses medication… return to clinic six to seven weeks or sooner, if needed."

s. 2.22.22 – Nursing Progress Note "psych sick call noted, no new orders."
t. 3.17.22 – Nursing Progress Note "patient is scheduled to release on 3.19.22 but is pending the outcome from his court hearing...has no psych/critical medications."
u. 3.17.22 – Emergency Room Referral "Chief Complaint…unresponsive, non-breathing, applied AED, no shock advised, continue CPR."
v. 12.29.21-1.20.21 – Medication Administration Record noting Mr. Rupard refused prescribed psychotropic medications.

25. County of San Diego Department of the Medical Examiner report regarding Mr. Lonnie Rupard dated February 8, 2023:
   a. Medical Examiner Investigator - "Per medical records…the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications…
      i. Scene Description…The decedent appeared to be incontinent of feces, and there were feces about the buttock area, and the posterior aspect of the lower extremities and the soles of both feet…"
   b. Autopsy Report dated March 19, 2022 – "Cause of Death: Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia. Contributing: SARS-COV-2 (COVID-19) Viral infection; pulmonary emphysema; duodenal ulcer. Manner of Death: Homicide."
      i. "Malnutrition and Dehydration – Height 69 inches, weight 105 pounds with a body mass index of 15.5."
      ii. "Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; Nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this

decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide."

c. Toxicology Report dated March 21, 2022 indicated alcohol and drugs of abuse screen result "none detected."

26. Autopsy photographs of Mr. Lonnie Rupard.

27. Photographs of Mr. Lonnie Rupard's cell. There were food containers littering the cell. The toilet and sink contained a brown substance, opined to be feces. There was substance smeared on the walls and floors.

<u>Depositions:</u>
Note – the deposition summaries are included as Attachment 1.

28. Video Deposition of Christina Goodall dated December 16, 2024.

29. Video deposition of Nicolas Badre, M.D. dated December 18, 2025.

30. Video deposition of Detective Max Blumenshine dated January 7, 2026.

31. Video deposition of Melissa Quiroz dated January 8, 2026.

32. Video deposition of Bethann Schaber, M.D. dated May 5, 2025.

33. Video deposition of Jon Montgomery, D.O. dated January 15, 2026.

34. Video deposition of Anthony Cruz, D.O. dated March 3, 2026, with errata sheet dated April 21, 2026.

35. Video Deposition of Rebecca Jean Kloker, M.D. dated April 17, 2026.

36. Video Deposition of Sandeep Jouhal, M.D. dated April 10, 2026, with exhibit.

37. Video Deposition of Francis Ysla, M.D. dated April 10, 2026, with exhibit. He was the supervisor employed by Liberty, and include some info

<u>San Diego County Sheriff's Department:</u>

38. Medical Services Division Operations Manual:
    a. Mentally Disordered Inmates – Emergency Transportation dated 2.24.11.
        i. "Any patient who is believed to be a danger to self, or a danger to others, or gravely mentally disabled shall be removed from mainline.
        ii. Gravely Mentally Disabled shall refer to any inmate:
            1. Who is believed to be a danger to self or a danger to others, or
            2. Who does not appear to be able to provide for his/ her own personal needs such as eating, showering, and toileting, or

3. Who does not appear to be sufficiently lucid to comprehend the fact of their arrest or incarceration."

iii. "The detention psychiatrist will determine if the patient meets 5150 criteria. Thee evaluating psychiatrist shall complete A5150 form and refer patient for admission to PSU."

b. Mentally Disordered Individuals -Emergency dated 2.1.22.

i. "Any patient who is believed to be a danger to self, or a danger to others, or gravely mentally disabled shall be assessed by a qualified mental health professional (QMHP) for housing recommendations/options."

ii. "Gravely mentally disabled shall refer to any individual:

1. Who is believed to be a danger to self or a danger to others, or
2. Who does not appear to be able to provide for their own personal needs such as eating, showering and toileting, or
3. Who does not appear to be sufficiently lucid to comprehend the fact of their detainment or incarceration."

c. Psychiatric Stabilization Unit (PSU) dated 10.2.19.

i. "Policy:

1. A patient shall be admitted to the Psychiatric Stabilization Unit... upon the direct order of a Detention Psychiatrist or the San Diego County Psychiatric Hospital- Emergency Psychiatric Unit... psychiatrist.
2. Patients admitted to the PSU shall meet the criteria as defined by the California Welfare and Institution code 5150 as an involuntary admission or a voluntary patient needing acute psychiatric care.
3. Patients under penal commitments (e.g., PC1370 incompetent to stand trial...) may be treated in this program, to ensure their stability and safety while in sheriff's custody...
4. Involuntary Admission Criteria

a. Meets Short-Doyle criteria for inpatient care

i. Is dangerous to self, dangerous to others, or gravely disabled

ii. Advisement of legal status and good cause for incomplete advisements including required subsequent attempts to advise our made and documented...

5. PC1370 - These are individuals found incompetent to stand trial and are legally involuntary patients until found restored to competency by the court..."

d. Psychiatric Stabilization Unit (PSU) dated 1.24.22.

i. "Individuals under Penal Commitment (PC) 1370 will be admitted to PSU."

e. Staff Training for 5150 Certification dated 6.23.20.
    i. "San Diego County Board of Supervisors has determined that psychiatrists, licensed clinical psychologists, emergency room physicians, licensed clinical social workers, licensed professional clinical counselor, licensed marriage and family therapists, marriage family and child counselor and registered nurses who are members of the attending staff of a designated facility may be authorized by the facilities medical director to write involuntary holds...
    ii. Only those professionals who have received LPS designation and are considered members of attending staff may write 5150s...
    iii. Training for A5150 certification is completed by a trainer as designated by the medical director. The trainer maintains education and certification files...
    iv. San Diego Sheriff's Department, Medical Services Division will provide training by a designated county trainer for attending staff as defined above..."
f. Staff Training for 5150 Certification dated 1.18.22.
g. Psychiatric Stabilization Unit-Admission Types dated 2.13.15.
    i. "When a person, as a result of a mental disorder, is a danger to others or them, or is gravely disabled, they may be admitted involuntarily for a 72-hour Welfare and Institutions Code ...(5150) evaluation and/or treatment...
    ii. Admission Procedure...
        1. Referring provider will provide patient information to the unit's attending psychiatrist or on-call attending psychiatrist...
        2. Unit's attending psychiatrist or on-call attending psychiatrist in collaboration with referring psychiatrist will determine admission into the unit...
        3. Referring psychiatrist will initiate routine PSU admission orders.
        4. If additional assessment is indicated prior to PSU admission, the unit's attending psychiatrist or on-call attending PSU psychiatrist may request for the patient to be transferred (males) to San Diego Central Detention Facility (SCJ) and placed into the Inmate Safety Program for assessment and evaluation (ISP) for safety cell placement."
h. Psychiatric Stabilization Unit-Admission Types dated 1.31.22.
i. Medical and Psychiatric Services dated 1.18.22.
    i. "To ensure that a psychiatric evaluation shall be completed as soon as possible when the courts have ordered..."
        1. "Upon receipt of a court order...Every effort must be made to assign the patient to "a psychiatric clinic for completion..."
j. Medical and Psychiatric Services dated 3.22.13.

k. PSU Psychiatric Holds – Civil Commits dated 9.30.14.
   i. "To establish recommended procedures for handling holds and certifying psychiatric patients...
   ii. Applications for 72-hour (5150) Detention are initiated and completed in writing by a police officer, a member of the psychiatric staff of sheriff's medical services division, or other professional mental health professionals designated by the MSD Chief Medical Officer...
   iii. A 72-hour (5150) detention may be designated on a patient if he/she is considered as a result of a mental disorder, danger to self, danger to others, and/ or he/she is considered unable to provide for food, clothing, and/or shelter."

l. PSU Psychiatric Holds – Civil Commits dated 1.18.22.

m. Refusal Procedures dated 7.14.16
   i. "To develop a standardized procedure when a patient refuses treatment while in custody...
   ii. A patient who is refusing treatment will be counseled by medical staff of the risks and benefits of such action...
   iii. If a patient refuses psychiatric sick call, the same day assessment by a registered nurse is to be conducted to determine reason for refusal and indication for rescheduling. A signed refusal slip... is to be placed on record...
   iv. Refusals for medications:
      1. Patient shall sign a refusal form with the specific medication being refused.
      2. If the patient refuses to sign the refusal form, the nurse... and deputy shall sign the form...
      3. all refusal shall have the reason documented...
      4. if the medicine is indicated for a serious medical/ psych condition, refer the patient to MD or psychiatrist immediately or as soon as possible...
   v. In all instances of refusal, physicians and nurses shall document health education provided and patients understanding of the counseling."

n. Refusal Procedures dated 1.6.22.
   i. Edits to this procedure included that the refusal slip shall be scanned into the record and that in iv.4, the patient can also be referred to the psychiatric nurse practitioner.

o. Physicians Orders dated 2.3.20 and 1.18.22.

p. Mental Health Screen and Evaluation dated 6.23.20.
   i. "To outline procedure for mental health screening and evaluation while in custody...
   ii. Mental health screening is to be completed to ensure that urgent mental health needs are met to prevent deterioration in level of functioning and to receive necessary treatment in a timely fashion...

iii. Qualified mental health professionals (QMHP) -include psychiatrists, psychologists, psychiatric social workers, licensed mental health clinicians... psychiatric nurses, and others who by their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients...

iv. All inmate patients entering into custody will have a mental health screening completed during the intake process by a qualified healthcare professional who have received documented training period those who yield positive mental health screenings will be required to have follow up with the QMHP within 30 days when clinically indicated...

v. Upon booking into facility, all inmates will complete the intake process. This process will include a mental health screening and evaluation... inmate patients who screened positive to mental health concerns will be scheduled by intake nursing staff for a '30-day QMHP' clinic type for further assessment...

vi. QMHP will evaluate the patients with positive screens within 30 days or sooner...

vii. QMHP will complete appropriate documentation within patients' chart and schedule any needed ongoing follow up and/ or refer to psychiatric services if clinically indicated.

viii. Random audit will be conducted by the group program manager or designee to monitor compliance with the 30-day evaluations and follow up as indicated."

q. Mental Health Screen and Evaluation dated 2.1.22;

i. Edits to this procedure include change in terms from "inmate" to "incarcerated individual." Also, "for patients who require acute mental health services; a gatekeeper is notified for assessment and treatment recommendations."

r. Segregated Inmates dated 10.30.20.

i. "To ensure appropriate segregation practice... any practice of segregation should not adversely affect an inmate's health...

ii. Sworn staff shall notify the charge nurse or designee when placing an inmate in segregation. Upon notification, health staff will complete the following:

1. Review the patient's health record to determine whether existing medical, dental, or mental health needs require accommodation. Health staff shall document the review in the health record and notify the watch commander of any accommodation needed.

iii. Inmates housed in segregation will be monitored by health staff based on established frequency.

1. Inmates who are segregated and receive services and activities apart from other inmates shall be monitored three

days a week by nursing staff and a minimum of once a week by a qualified mental health provider (QMHP).

2. Documentation of segregation rounds (also known as 'wellness checks') will be made in… the inmates health record using the AdSeg template for mental health clinicians…
3. Documentation should include any significant health findings, signs of physical and/ or psychological deterioration…
4. health staff will promptly identify and inform custody staff of inmates who are physically or psychologically deteriorating…"

s. Segregated Inmates dated 1.5.22.
t. Emergency Psychotropic Medication dated 4.27.20.
   i. "To establish procedure for the use of forced sedation using psychotropic medication in the event of a behavioral health/ mental health emergency…
   ii. Emergency forced psychotropic medications-the administration of central nervous system… depressant medication to induce sedation… given without the patient's consent for the purpose of rapid sedation in the event of a mental health/ behavioral health emergency, where the health and welfare of the patient and others are considered to be threatened. This standard does not apply to the forced dosing of medications as a result of legal competency evaluation, or to the involuntary long-term administration of medications…
   iii. In the absence of informed consent, the presence of emergency criteria must be documented. 'Emergency' means a situation in which action to impose treatment over the persons objection is immediately necessary for the preservation of life or the prevention of serious bodily harm to the patient or others. It is not necessary for harm to take place before or become unavoidable prior to treatment.
u. Emergency Psychotropic Medication dated 1.25.22.
v. Psychotropic Medication dated 4.24.20
   i. "To establish procedure for the use of maintenance psychotropic medication…
   ii. All psychotropic medications shall be administered on a voluntary basis, with the exception of those patients under the jurisdiction of penal codes 1370, 1370.01…"
   iii. The policy addressed involuntary treatment, medication management, medication monitoring, medication refusal, cheeking/hoarding/selling, discharge medication.
w. Psychotropic Medication dated 11.15.21.
x. Hunger Strikes dated 6.15.15.
   i. "To provide guidelines for the care of patients who refuse to eat and initiates a 'hunger strike.'

ii. Patients who refuse to eat and state they are on a hunger strike will be monitored medically…
iii. medical staff can be notified by: patient, sworn staff, counselor, religious leaders, referrals from family, attorneys…
iv. The medical staff shall evaluate and assess the patient
    1. RN staff will do an assessment to evaluate the medical and psychiatric history. The assessment is to include weight and vital signs.
    2. The patient shall be scheduled for psychiatric sick call. At that time the psychiatrist will determine whether the refusal of food is based on mental illness.
    3. The patient shall be scheduled for nursing sick called daily to monitor weight, medical condition and hydration status…
    4. If necessary, specialized housing may be recommended… the patient may be housed in administrative segregation or medical observation bed… for closer monitoring…
    5. Deputies shall continue to offer meals and record patients responses…
    6. Deputies will monitor other sources of food, including the patients stores and food 'passes' from other inmates…
    7. document in patient's health record all observations common nursing assessments and all contacts with the patient."

39. San Diego County Sheriff's Department Detention Services Bureau- Manual of Policies and Procedures:
  a. Hunger Strikes dated 10.21.20.
    i. "Purpose: to provide guidelines when an inmate refuses to eat and initiates a hunger strike… the refusal to eat, also known as a hunger strike can be proclaimed or unspecified by an inmate. While some inmates may inform staff they are on a hunger strike, others may not voice their intentions, but their refusal of meals may indicate a hunger strike. In either case, sworn staff should be observant, make necessary notifications and document the incident. Health staff will evaluate the seriousness of the situation and provide necessary medical care."
    ii. "Notifications: Sworn staff shall notify the health staff."
    iii. "Evaluation: Health staff shall evaluate the inmate's condition and take appropriate action (e.g., weight monitoring, hydration monitoring, appointment with psychiatrist, etc.) based on findings and identified needs… If necessary for closer monitoring, the inmate may be moved to administrative segregation housing."

Reports:

40. County of San Diego health and Human Services Agency Behavioral health Services Forensic Psychiatry Clinic Report on Mental Competency regarding Mr. Lonnie Rupard dated March 24, 2022 completed by Nicholas Badre, M.D.:
    a. The date of evaluation was March 14. 2022.
    b. "The defendant is facing revocation of community supervision. The court issued an order for an examination of mental competency to stand trial...
    c. I interviewed the defendant at his cell at the recommendation of jail mental health staff and the floor deputies. The cell was dirty with trash throughout. The toilet was full of excrement, and the room was very malodorous... the defendant was unkempt and dirty himself. He was laying in bed in an uncomfortable manner with a blanket over his head. There were feces on the floor. There was food smeared on the wall. It required the food flap and a very loud introduction on my part to get the defendant's attention. Once I had his attention, I asked the defendant why he was incarcerated, he answered 'water dog.' I told the defendant again that I was here to evaluate him for competency, he answered 'I am home, dog.'... His speech was pressured and mostly incoherent when he spoke... His mood was down, and his affect was flat. His thought content presented as impoverished. His thought process was disorganized...
    d. Diagnostic Impression: psychosis, not otherwise specified, stimulant use disorder per record...
    e. Findings and Opinions... it is my opinion within a reasonable medical certainty that the defendant is unable to have a rational and factual understanding of the charges and is unable to assist counsel in a rational manner. While the defendants lack of cooperation is likely in part volitional. I think that it is motivated by underlying disorganization of thought, which would be consistent with prior evaluation that diagnosed him to be psychotic. The defendant suffers from mental illness, displaying active signs of mental illness, including disorganized thinking. Those symptoms of mental illness disable the defendant from being able to have a rational understanding of the charges and assist legal counsel. I would recommend that the defendant be referred to a state hospital or jail-based competency treatment program for restoration to competency."

41. County of San Diego Health and Human Services Agency Behavioral health Services Forensic Psychiatry Clinic Report on Involuntary Medication to Restore Competency dated March 24, 2022 completed by Nicholas Badre, M.D.:
    a. The date of the evaluation was March 14, 2022.
    b. "I have evaluated the defendant for mental competency. I opined that the defendant was not competent to stand trial. The purpose of this evaluation is to address involuntary medication to restore competency...
    c. Findings: In my opinion, the defendant suffers from severe mental illness. The defendant lacks the capacity to make decisions regarding antipsychotic

medication. The mental disorder requires medical treatment with anti-psychotic medication at this time. If the defendant's mental disorder is not treated with antipsychotic medication, it is possible that serious harm to the physical or mental health of the defendant will result. Administration of antipsychotic medication is likely to restore the defendant's competency to stand trial… Antipsychotics are in the defendants best medical interest in light of the medical condition. I would recommend that the defendant be given medications involuntarily under Penal Code section 1370."

42. San Diego Sheriff's Department Follow-up Investigative Report regarding Mr. Lonnie Rupard dated February 7, 2024, written by Detective M. Blumenshine.

43. San Diego Sheriff's Department Follow-up Investigative Report regarding Mr. Lonnie Rupard dated June 8, 2022, written by Detective M. Blumenshine.

44. San Diego Sheriff's Department Follow-up Investigative Report regarding Mr. Lonnie Rupard dated June 7, 2022, written by Detective M. Blumenshine. Detective Blumenshine documented a search of Mr. Rupard's cell, "there were feces and old food throughout the cell. The toilet and sink were full of fecal matter. There were feces in two corners of the room on the ground, feces on the bedroll, feces on the bottom bunk under the bedroll, feces on the ground, feces on the table, and strewn about the rest of the room. The sink in the cell was operable."

45. San Diego Sheriff's Department Follow-up Investigative Report regarding Mr. Lonnie Rupard dated March 16, 2023, written by Detective M. Blumenshine.
    a. Detective Blumenshine reported a review of video footage "March 17, 2022 was reviewed, showing multiple checks by deputies. Inmate Rupard never left his cell, and no movement was observed inside the cell."
    b. Detective Blumenshine reported "On…October 19, 2022…I asked Lieutenant Kopchak if any hygiene inspections were done…the last logged hygiene inspection was on March 5, 2022…after a review of the video, it appeared the inspection was not completed…Rupard's housing block, 7D, was classified as COVID quarantine, and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health."
    c. "I reviewed Rupard's Jail Information management System (JIMS). The records showed numerous dayroom refusals, food refusals, and documented incidents."
    d. "Rupard was in COVID quarantine and administrative segregated housing. This was done because of his jail history as well as his current mental state. Due to Rupard's psychiatric issues, he was unable to peacefully interact around other inmates and was therefore unable to have the standard program of a regular mainline inmate. In his level of housing, there was expected he would be given more psychiatric care."

e. "A review of the video, logs, incident reports, criminal reports, and statements show deputies were very familiar with Rupard. It was often a use of force when contacting him due to his behavior. Rupard had two major incidents in his three months of recent custody time. One when he obtained the wrong outfit, took the food flap hostage, and spit at deputies resulting in a use of force. And one when he took the dayroom hostage, refusing to lock down and throwing objects… Most contacts noted volatile and aggressive behavior coupled with the documented prior uses of force."

f. "Rupard's cell was in a dismal state, however, not uncommon for housing of inmates with psychiatric history. Rupert had roughly 28 meal containers in his cell at the time of his death (about nine days' worth of trash). In review of the containers, most had been opened and many of the food items were missing. While there was food on the floor, table, and bed of the cell, it would not account for the food missing from the food trays. The food was either eaten or flushed down the toilet. There was feces in the cell, on the bed, floor, blanket…in the toilet."

46. California State Auditor Report of the San Diego County Sheriff's Department dated February 2022:

a. "From 2006 through 2020, a total of 185 people died in San Diego County's Jails – more than in nearly any other county across the State…the high rate of deaths…raises concerns and suggests that underlying systemic issues with the Sheriff's Department's policies and practices have undermined its ability to ensure the health and safety of the individuals in its custody. Significant deficiencies in the Sheriff's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails."

b. In addition to policy and practice, the deficiencies identified included:

i. Intake – "The San Diego Sheriff's Department relies on registered nurses to perform the mental health portion of its intake screening, even though those nurses may not specialize in mental health care…Health staff did not always properly identify incarcerated individual's medical and mental health needs at intake. Consequently, some of these individuals did not receive proper care, likely contributing to their deaths."

ii. Follow-up – "Sheriff's Department's staff did not always provide consistent follow-up care to individuals who requested or previously received medical or mental health services…timely treatment and follow-up are important components of any health care system. Although the reasons that the Sheriff's Department did not always follow up consistently- such as poor policies and communication- varied by case, they represent deficiencies in its medical and mental health care system…Detentions staff did not consistently follow-up after individuals received or requested medical or mental health

services, even though they often had serious needs that, when unmet, may have contributed to their deaths."

iii. Safety checks – "Conducting these checks – which state law requires hourly through direct visual observation – is the Sheriff's Department's most consistent means of monitoring for medical distress…in our review of 30 in- custody deaths, we found instances in which deputies performed these checks inadequately…sworn staff did not always adequately check on incarcerated individuals. Some individuals were found hours after their deaths."

iv. Delays – "Sworn staff's and medical personnel's slow response time to administer aid during medical emergencies may have contributed to unnecessary delays in lifesaving measures."

c. The audit noted that "Although external entities…have made recommendations in the past to address some of the deficiencies we describe, the Sheriff's Department has not implemented a number of them."

<u>Case Summary:</u>

Mr. Lonnie Rupard was born October 1, 1975, and was 48 years old when he was booked into the San Diego County Jail [SDCJ] on December 19, 2021. Mr. Rupard remained in the SDCJ until his death on March 17, 2022.

At the time of his admission to SDCJ, Mr. Rupard weighed 165 pounds. The receiving screening indicated "no" to any indication of a mental health concern despite other documentation that Mr. Rupard was "verbally abusive and combative" and information in the behavioral health chronic care portion of the document indicated "psychotic disorders." Mr. Rupard was scheduled for psychiatry clinic. As he refused to attend a telehealth appointment on 12.20.21, he was rescheduled for an in-person psychiatric evaluation. Appointments scheduled 12.24.21 and 12.28.21 were rescheduled due to time constraints.

The initial psychiatric evaluation occurred 12.29.21, cell side in 7D, reportedly an administrative segregation unit, ten days after booking. The progress note indicated the evaluation was to address Mr. Rupard's "history of psychosis and psychotropic medication treatment." The clinician, Dr. Cruz, was aware of Mr. Rupard's prior medication regimen as documented during an incarceration in 2020. Mr. Rupard was uncooperative with the evaluation and was noted to "mumble incoherently and was verbally aggressive." Dr. Cruz documented that Mr. Rupard was irritable with disorganized thought processes and noted diagnoses of unspecified schizophrenia and other psychotic disorder, by history; antisocial personality disorder, by history; and stimulant use disorder, by history. Dr. Cruz noted Mr. Rupard's potential for decompensation, and initiated treatment with Mr. Rupard's previously prescribed medications, Haldol Decanoate intramuscularly 200 milligrams on the 4th and 22nd of every month, Depakene 500 milligrams by mouth twice daily, Vistaril 25 milligrams twice

daily, and Cogentin 1 milligram in the morning and 2 milligrams at bedtime, with a plan for Mr. Rupard to return to psychiatry clinic in four to five weeks.

Typical of his previous presentations to the SDCJ, Mr. Rupard reportedly refused to adhere to his prescribed psychotropic medication regimen. Medication refusal forms were completed daily but were not signed by Mr. Rupard. On January 20, 2022, after a chart review that revealed Mr. Rupard was consistently refusing his prescribed psychotropic medications, Dr. Cruz discontinued the medications in the absence of a clinical encounter, with plans to follow up with Mr. Rupard at his next scheduled appointment.

Mr. Rupard's medical record revealed a use of force event 1.29.22. During this event, Mr. Rupard was injured, with a laceration between his eyebrows. He refused to allow nursing to assess him, and threatened to kill the nurse, "If you touch me, I'll kill you." Nursing documented that the assessment was "terminated for safety." This event was not recognized as a mental health crisis by nursing and Mr. Rupard was not referred for a mental health evaluation.

Mr. Rupard's next contact with a health care provider occurred on 2.9.22. At this time, Mr. Rupard was in 7D, which is administrative segregation type housing. A cell side "wellness check" was performed by a qualified mental health professional [QMHP], Ms. Anosike [Goodall]. Deputies reported Mr. Rupard, "will often speak to himself in unintelligible words." Mr. Rupard was noted as having "no reported aggression, violence or erratic behaviors" despite the recent use of force and homicidal threat verbalized to nursing staff. He was "uncooperative...began speaking in unintelligible words...unable to fully assess." The care plan was to monitor for "safety concerns and grave disability" with a "wellness check in 2 weeks."

By February 20, 2022, nursing notes indicated Mr. Rupard was "on lockdown." Nursing documented "no contraindication" and there was no documentation of a mental health assessment to determine if placement in lockdown was appropriate given his mental health condition. At Mr. Rupard's next cell side appointment with psychiatry, Dr. Cruz, on 2.22.22, he "rambled incoherently and became verbally aggressive...thought process disorganized...may be responding to internal stimuli...Due to patient's presentation, psych history, legal status (PC1368), and potential for decompensation, will continue to monitor and offer treatment." There were no subsequent progress notes documenting clinical encounters with psychiatry or mental health clinicians.

On March 14, 2022, Mr. Rupard was evaluated by Nicholas Badre, M.D. to assess for "mental competency to stand trial." Dr. Badre documented that Mr. Rupard's cell was "dirty with trash...toilet was full of excrement...room was very malodorous...defendant was unkept and dirty...there were feces on the floor...food smeared on the wall." Dr. Badre documented Mr. Rupard's disorganized thought processes, and indicated a

diagnosis of "psychosis, not otherwise specified…The defendant suffers from mental illness, displaying active signs of mental illness, including disorganized thinking."

On March 17, 2022, Mr. Rupard was found "unresponsive, non-breathing." Attempts to resuscitate Mr. Rupard were unsuccessful. Per the San Diego County Medical Examiner, Mr. Rupard's "Cause of Death: Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia. Contributing: SARS-COV-2 (COVID-19) Viral infection; pulmonary emphysema; duodenal ulcer. Manner of Death: Homicide." At the time of his death, Mr. Rupard weighed 105 pounds. His body was dirty, with feces on the soles of his feet, buttocks, and legs. His cell was littered with food containers. There were feces and toilet paper mounded in the toilet, with feces in the sink, and feces on the floor.

Timeline:

| | |
|---|---|
| 12.19.21 | Mr. Rupard's intake to the SDCJ. |
| 12.20.21 | Mr. Rupard declined to attend psychiatry clinic |
| 12.24.21 | Mr. Rupard was scheduled for psychiatry clinic. This appointment was rescheduled by Dr. Cruz. |
| 12.28.21 | Mr. Rupard was scheduled for psychiatry clinic. This appointment was rescheduled by Dr. Cruz. |
| 12.29.21 | Initial psychiatric evaluation performed by Dr. Cruz. |
| 12.30.21 – 1.20.22 | Daily medication refusals documented but not signed by Mr. Rupard. |
| 1.20.22 | Medications discontinued by Dr. Cruz in the absence of a psychiatric clinical encounter. |
| 1.29.22 | Use of force incident that was not recognized as a mental health crisis despite Mr. Rupard verbalizing homicidal ideation. |
| 2.9.22 | Mental health "wellness check." Despite documentation of Mr. Rupard's symptoms of psychosis, there was no escalation in his treatment. Requested a follow-up in two weeks. |
| 2.20.22 | Mr. Rupard was placed on lockdown with no documented mental health assessment or intervention. |
| 2.22.22 | Psychiatric follow-up appointment. Despite documentation of Mr. Rupard's symptoms of psychosis, there was no escalation in his treatment. |
| 2.23.22 | Mental health follow-up appointment was requested but did not occur. |
| 3.14.22 | Evaluation by Dr. Badre, where Mr. Rupard's cell was described as "dirty with trash…toilet was full of excrement…room was very malodorous …defendant was unkept and dirty…there were feces on the floor…food smeared on the wall." |
| 3.17.22 | Mr. Rupard died due to "Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia. Contributing: SARS-COV-2 (COVID-19) Viral infection; pulmonary emphysema; duodenal ulcer. Manner of Death: Homicide." |

<u>Conclusions:</u>
Mr. Rupard's death due to his untreated mental illness resulted from a confluence of system and treatment failures that were identifiable, but in multiple deviations from the standard of care, were ignored by jail personnel, medical, and mental health staff. These deviations will be addressed individually below:

*Housing:*
Housing was a precipitating factor in Mr. Rupard's mental health deterioration and death as he was housed in a single cell, isolated from others. Mr. Rupard apparently remained in administrative segregation type housing on 7D for most of his 89-day incarceration.[1] Per the investigative report of Detective Blumenshine, Mr. Rupard's "housing block, 7D, was classified as COVID quarantine, and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health." As Mr. Rupard had a history of serious mental illness, specifically a psychotic illness, placement in this type of housing is inappropriate and would only serve to further isolate him and exacerbate his mental health symptoms.

The negative impact of isolation on individuals is accepted in the scientific literature. Grassian (2006) described "severe psychiatric harm" resulting from solitary confinement wherein individuals experienced either reoccurrence of preexisting mental illness or acute mental health symptoms. He noted that individuals exposed to isolation experienced consistent symptoms including: hyperresponsivity to external stimuli; panic attacks; difficulty with thinking, concentration, and memory; intrusive obsessional thoughts; overt paranoia; problems with impulse control; and delirium.

The deleterious effects of confinement and seclusion have been documented in adult settings (Haney, 2003). Specific effects include psychological consequences associated with lack of social contact, sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilation. Metzner and Dvoskin (2006) also documented psychological harm associated with seclusion in Supermax correctional settings. Seclusion has been associated with exacerbation of pre-existing conditions, as well as psychoses, depression, and anxiety in individuals with a history of mental health problems.

Over the course of his incarceration, Mr. Rupard's mental status declined. He refused psychotropic medication and was noted to have increasing signs and symptoms of psychosis. As his mental status declined, so did his physical health; however, as Mr. Rupard was not appropriately monitored by medical and mental health staff, his

---

[1] Note, Mr. Rupard's housing is classified as administrative segregation, or 23 hours in cell daily/1 hour out of cell daily. Regardless of the terminology used, Mr. Rupard's housing qualifies as isolation or restrictive housing.

condition was allowed to deteriorate. Mr. Rupard reportedly lost approximately 60 pounds over the course of his 89-day incarceration. The San Diego County Medical Examiner revealed Mr. Rupard had a body mass index of 15.5 at the time of his death, which is classified as severely underweight. Further, the San Diego County Medical Examiner documented that Mr. Rupard had "feces about the buttock area, and the posterior aspect of the lower extremities and the soles of both feet."

*Use of Segregation:*
Mr. Rupard was housed in administrative segregation type housing. In a deviation from the standard of care, there was no documentation of mental health advocating for him or assessing him to determine whether his existing mental health needs contraindicated his placement in segregation or if accommodations were necessary. This is required per the National Commission on Correctional Health Care [NCCHC] standard regarding Segregated Inmates. Further, per this standard, it is noted "for inmates housed in segregation, qualified mental health professionals provide mental health services according to established treatment plans and respond in a timely manner to referrals." As noted in the sectioned entitled "Treatment Planning", in a deviation from the standard of care, Mr. Rupard did not have a Treatment Plan developed.

*Failure to Monitor- Mental Health:*
Over the course of Mr. Rupard's 89-day incarceration at San Diego County, he was housed in 7D, which is reportedly an administrative segregation unit. The Medical Services Division Operations Manual policy titled "Segregated Inmates" requires that an individual will be assessed by nursing a minimum of three times per week and by mental health staff a minimum of one time per week.

In a deviation from the standard of care, and failure to follow facility policy, there was no documentation of monitoring three days a week by medical staff. The only contact Mr. Rupard received were attempts to administer psychotropic medication, which he reportedly consistently refused. Refusals were documented from the time the medication was ordered, 12.30.21, through the time of discontinuation, 1.20.22; however, none of the refusal forms were signed by Mr. Rupard. Once the medication was discontinued, there was no other documentation of regularly reoccurring visits by nursing.

The next documented contact between nursing and Mr. Rupard was documented 1.29.22, when he was assessed following a use of force. Mr. Rupard refused the nurses assessment and intervention, threatening, "If you touch me, I'll kill you." The assessment was terminated. This event was not recognized by the facility staff as a mental health crisis and Mr. Rupard's homicidal threat was not reported to or acknowledged by mental health.

In a deviation from the standard of care, and a failure to follow facility policy, there was no documentation of monitoring once weekly by mental health staff. Over the course of his 89-day incarceration, Mr. Rupard had one contact with mental health, 2.9.22. This was a wellness check, that noted "no reported aggression, violence, or erratic behavior." Given the event of 1.29.22, this report is not accurate. Per the deposition of Ms. Goodall, she was not asked to see Mr. Rupard on a weekly basis during his stay in administrative segregation type housing and only saw those individuals who appeared on her "sick call" list. This is a deviation from the standard of care and a failure to follow facility policy entitled "Segregated Inmates" which states that "Inmates housed in segregation will be monitored by health staff based on established frequency. Inmates who are segregated and receive services and activities apart from other inmates shall be monitored three days a week by nursing staff and a minimum of once a week by a qualified mental health provider (QMHP)."

Despite Mr. Rupard exhibiting significant signs of mental health difficulties during the 2.9.22 assessment performed by Ms. Goodall including "speaking in unintelligible words...behavior... agitated... thought content...impoverished" in a deviation from the standard of care, he was not referred for further assessment or psychiatric evaluation. The plan was to follow up in two weeks, again, not at the one-week frequency designated by policy. Regardless, this scheduled follow up did not occur.

Given the failure to monitor Mr. Rupard during his incarceration on 7D, his mental health was allowed to deteriorate without intervention. In a deviation from the standard of care, Mr. Rupard received no regularly reoccurring behavioral health treatment services. Despite his serious mental illness, he did not have a treatment plan developed, and he was not receiving regularly reoccurring behavioral health interventions. He was housed in 7D, a unit affording limited out of cell time, which given Mr. Rupard's significant mental health needs, was entirely inappropriate for him.

*Duration of Untreated Psychosis and Medication Refusals:*
A review of Mr. Rupard's record at the SDCJ revealed a long history of serious mental illness. This information was available for review by the mental health staff including psychiatric clinicians. Mr. Rupard had a history of mental illness documented at the SDCJ beginning in 2007. Diagnoses documented included schizophrenia, schizoaffective disorder, schizophrenia spectrum and other psychotic disorder, antisocial personality disorder, and stimulant use disorder.

Mr. Rupard had a history of over 20 presentations to the facility. His initial presentations varied. Documents indicated that if Mr. Rupard was adherent to his medication regimen on admission, such as on return from court ordered treatment at Patton State Hospital, he was pleasant and cooperative. There was also documentation that Mr. Rupard often denied a history of mental illness and refused to consider treatment with psychotropic medications leading to increased behavioral health symptoms, specifically psychotic symptoms.

Mr. Rupard had a history of treatment with long-acting antipsychotic medications. These medications, such as Prolixin and Haldol, are administered via intramuscular injection every two to four weeks. Mr. Rupard had a history of court ordered or forced medication administration. Mr. Rupard also had a history of requiring civil commitment, or 5150 admissions to inpatient psychiatric treatment. For example, in 2012, Mr. Rupard was admitted to the SDCJ. At that time, he reported a history of a diagnosis of schizophrenia but could not recall the name of his medications. During this incarceration, Mr. Rupard refused psychiatry sick call and refused treatment with psychotropic medications. Documentation noted, "his cell is filthy, he is not flushing the toilet, he makes himself throw up." Ultimately, although Mr. Rupard was released from custody, he refused to leave his cell and required inpatient psychiatric hospitalization under 5150.

During Mr. Rupard's incarceration period from December 12, 2021 through March 17, 2022, Mr. Rupard consistently refused psychotropic medications. Given his history of improvement with medication and deterioration in the absence of medication, the declining trajectory of Mr. Rupard's clinical course in the setting of untreated psychosis in schizophrenia was predictable. In a deviation from the standard of care, Mr. Rupard was allowed to deteriorate and become increasingly psychotic. While it is understood that individuals have the right to refuse psychotropic medication, there was a need to consider involuntary medications to avoid further decompensation.

The standards regarding Informed Consent and Refusal of Mental Health Care per the National Commission on Correctional Health Care Standards for Mental Health Treatment in Correctional Facilities (2015) require "that any menial health intervention refusal is documented and must include...evidence that the inmate has been made aware of any consequences to health/mental health that may occur as a result of the refusal...a patients refusal of care is to be an informed decision, with the consequences explained to the individual...competency may be an issue when mentally ill inmates refuse treatment. Management of such refusals, particularly if they seriously jeopardize the patient's health, requires a collaborative approach of psychiatric, psychological, criminal justice and legal assistance."

SDCJ policy titled "Refusal Procedures" indicated that when a patient refuses treatment, they will "be counseled by medical staff of the risks and benefits of such action." For refusal of medications, policy requires "if the medicine is indicated for a serious medical/ psych condition, refer the patient to MD or psychiatrist immediately or as soon as possible." Mr. Rupard began refusing psychotropic medications immediately upon prescription,12.30.21. Although facility procedure requires immediate referral to psychiatry, that did not occur. Instead, Mr. Rupard was allowed experience an extended duration of untreated psychosis.

Delays in treatment of psychosis have been linked to neurodegeneration, persistence of symptoms, poorer social outcomes, increased difficulties in cognitive functions, and poorer response to future attempts at treatment with antipsychotic medications. Psychiatry was not advised of Mr. Rupard's medication refusals until 1.15.22. Facility policy requires documentation of "health education provided and patient's understanding of the counseling." In a deviation from the standard of care, rather than meet with Mr. Rupard and provide health education and an assessment of Mr. Rupard's capacity to make an informed decision to refuse medications, Dr. Cruz performed a chart review on 1.20.22, during which all medications were discontinued in the absence of any clinical encounter.

As discussed above, after his initial psychiatric evaluation and prescription of psychotropic medication, Mr. Rupard consistently refused medications and exhibited increasingly bizarre behavior. In a deviation from the standard of care and a deviation from facility policy and procedure, there was no plan to provide psychoeducation or to meet with Mr. Rupard further to develop rapport, assess, educate, or inform him of the potential benefits of medication. Additionally, given Mr. Rupard's history, his presentation and the fact that psychiatry at SDCJ could petition the Court for forced medications, in a deviation from the standard of care, this was not considered.

*Basic Mental Health Services:*
Per the NCCHC standards, basic mental health services are an essential standard. This means that "a range of mental health services are available for all inmates who require them." A review of the documentation from SDCJ revealed that in a deviation from the standard of care, basic mental health services other than outpatient psychiatry were not available or at least not provided to Mr. Rupard.

The NCCHC states that onsite outpatient services must include at a minimum, identification and referral of inmates with mental health needs. This obviously did not occur, as while Mr. Rupard was identified at intake as having a history of mental health symptoms/treatment he was not referred for ongoing treatment or development of an individualized treatment plan outside of a psychiatric evaluation for treatment with psychotropic medications.

In a deviation from the standard of care, there was no continuity or ongoing behavioral health treatment provided to Mr. Rupard. Another minimum requirement is for psychosocial/ psychoeducational programs. In a deviation from the standard of care, this did not occur for Mr. Rupard. There was no documentation of ongoing attempts to meet with Mr. Rupard, to establish rapport, to educate him on the need for psychotropic medication, and to monitor him for increased symptoms.

*Treatment Planning:*
Per the NCCHC standards, it is essential that mental health services are provided according to individual treatment plans. These plans direct the mental health services

needed for every patient on the mental health caseload and include the treatment goals and objectives. The responsible mental health clinician provides periodic reviews of the individuals treatment plan.

The NCCHC defines a treatment plan as a "series of written statements specifying a patient's particular course of therapy and the roles of qualified mental health professionals in carrying it out. Such a plan is individualized, may be multidisciplinary, and is based on an assessment of the patient's needs. It contains a statement of short- and long-term goals as well as the methods by which those goals will be pursued." The intent of the treatment plan standard is that mental health patients receive care tailored to their individual needs.

The NCCHC compliance indicators for this standard include that "treatment planning is initiated when the individual enters into treatment with a qualified mental health professional. Development of the treatment plan is undertaken in collaboration with the inmate when feasible. Mental health treatment plans must include, at a minimum: frequency of follow up for evaluation and adjustment of treatment modalities... adjustment of psychotropic medications, if indicated… referrals for psychological testing, medical testing, and evaluation, including blood levels for medication monitoring as required… when appropriate, instructions about diet, exercise, personal hygiene, and adaptation to the correctional environment… documentation of treatment goals and objectives, interventions necessary to achieve these goals, and notation of clinical progress."

In a deviation from the standard of care, Mr. Rupard was not afforded a treatment plan or regularly reoccurring behavioral health interventions other than one mental health "wellness check" and two visits with psychiatry. Despite his significant psychotic symptoms, refusal to take psychotropic medications, risk for ongoing decompensation, and housing in administrative segregation, Mr. Rupard was not offered individualized mental health interventions.

*Failure to Monitor – Psychiatry:*
Over the course of this incarceration at SDCJ, Mr. Rupard was seen twice by the facility outpatient psychiatrist, Dr Cruz. In a deviation from the standard of care, both encounters were cell side, in a non-confidential space. Cell side encounters are not recommended as they are a barrier to assessment, engagement, and rapport building. Per the deposition of Dr. Cruz, cell side encounters are typical at SDCJ.

Mr. Rupard's initial encounter with Dr Cruz was a psychiatric evaluation dated 12.29.21. During this encounter, Mr. Rupard was noted as mumbling incoherently, yelling, verbally aggressive, with disorganized thought processes. This description is indicative of a thought disorder. Dr Cruz utilized diagnoses from Mr. Rupard's prior incarceration, noting historical diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, antisocial personality disorder, and stimulant use disorder. Dr, Cruz continued

Mr. Rupard's previously prescribed psychotropic medication, Haldol Decanoate, Depakene, Vistaril, and Cogentin. Dr. Cruz indicated he did not access Mr. Rupard's prior treatment records from Patton State Hospital. The plan was for Mr. Rupard to return to clinic in four to five weeks or sooner. Unfortunately, that did not occur.

As Mr. Rupard refused to adhere to the prescribed psychotropic medication regimen, Dr. Cruz made the decision to discontinue the medication on 1.20.22. In a deviation from the standard of care, this discontinuation was done in the absence of a clinical encounter with Mr. Rupard. Dr. Cruz indicated a plan to follow up with Mr. Rupard at his previously scheduled follow-up clinic.

Mr. Rupard was next seen by psychiatry 2.22.22. This was the last encounter between Mr. Rupard and Dr. Cruz. Mr. Rupard was noted to "ramble incoherently… verbally aggressive…shirtless…irritable…uncooperative…limited grooming…thought process disorganized…may be responding to internal stimuli…". This mental status examination notes an exacerbation of symptoms, specifically incoherent rambling, disorganized thought processes and the potential for response to internal stimuli. These symptoms are indicative of psychosis, even so, Dr. Cruz did not consider Mr. Rupard as gravely disabled requiring immediate psychiatric intervention.

In his deposition, Dr. Cruz, who was trained and able to complete a 5150 certificate, stated that just because an individual refuses medication, that does not mean that they qualify for a 5150 commitment. While this statement on the surface is accurate, Mr. Rupard's exacerbated psychosis indicated he did not have the capacity to make a rational, informed decision regarding refusing his psychotropic medications. Facility policy included a definition for grave disability that would qualify an individual for a 5150 commitment. "Gravely Mentally Disabled shall refer to any inmate: 1. Who is believed to be a danger to self or a danger to others, or 2. Who does not appear to be able to provide for his/ her own personal needs such as eating, showering, and toileting, or 3. Who does not appear to be sufficiently lucid to comprehend the fact of their arrest or incarceration." Mr. Rupard had a history of dangerousness to others. He had verbally threatened to kill a nurse in January 2022. Further, his failure to care for himself was obvious prior to the time of his death. As medical and mental health staff did not assess and monitor his condition, he was allowed to deteriorate without intervention. It is obvious that Mr. Rupard was deteriorating both mentally and physically. This was not recognized as Mr. Rupard was not monitored. As he was not monitored, his significant weight loss was not appreciated.

In his deposition, Dr. Cruz reported that he relied on medical, mental health and sworn staff to provide him information regarding individuals, and if necessary, they would be added to the sick call list. Unfortunately, medical and mental health staff were not monitoring Mr. Rupard, and sworn staff do not have the clinical acumen to assess Mr. Rupard.

*Standard of Care:*
As discussed above, there were multiple systemic deviations from the standard of care evident in the mental health treatment of Mr. Rupard. The following are deviations attributed to psychiatry and mental health staff.
The treating psychiatrist, Dr. Cruz, employed by Liberty Healthcare:

- Performed an initial psychiatric evaluation of Mr. Rupard but did not review records of his prior hospitalizations;
- Discontinued Mr. Rupard's psychotropic medications on 1.20.22 in the absence of a clinical encounter and did not initiate involuntary medication proceedings.
- Documented a clinical encounter with Mr. Rupard on 2.22.22 where he noted signs and symptoms of psychosis and a deterioration in his mental status, but did not refer for a higher level of care (e.g., PSU);
- Did not adequately monitor Mr. Rupard, rather, he relied on sworn staff and other clinicians.

The SDCJ mental health clinician, Ms. Christina Anosike [Goodall]:

- Had only one clinical encounter with Mr. Rupard once during his 89-day incarceration despite the requirement for weekly encounters in his housing unit;
- Did not escalate his care despite documenting Mr. Rupard experiencing symptoms of psychosis including "unintelligible speech" and "impoverished thought."
- Did not perform a clinical follow-up as scheduled.

<u>Summary:</u>
In summary, Mr. Rupard was seriously mentally ill with diagnoses including unspecified schizophrenia and other psychotic disorders, but due to inadequate mental health treatment, he experienced an extended duration of untreated psychosis and an exacerbation of psychotic symptoms, with significant functional impairment. His death occurred due to a confluence of events and system failures that were identifiable and preventable, yet in deviations from the standard of care described in detail above, were not addressed.

Mr. Rupard was increasingly psychotic. He was not engaged in mental health treatment per an individualized treatment plan. He was not consistently monitored by mental health staff despite his housing in administrative segregation. Despite his deterioration and increased psychotic symptoms, he was not considered for a forced medication protocol or a 5150 designation and transfer to the Psychiatric Stabilization Unit.

Facility staff of all disciplines (e.g. sworn staff, medical staff, mental health staff, and psychiatry) failed to monitor Mr. Rupard, recognize his deteriorating condition, intervene on his behalf, and escalate his treatment to a higher level of care (e.g., the PSU). Given the documentation of his experiencing psychotic symptoms, mental health staff should have intervened. Mr. Rupard was documented as psychotic. He did not have the

capacity to make appropriate decisions regarding his care. Further, Mr. Rupard's severe deterioration was documented by Dr. Badre in his evaluation of 3.14.22. Based on Dr. Badre's description of Mr. Rupard's cell and his hygiene, it is obvious that any one of the jail staff would have recognized Mr. Rupard's grave disability.

Had Mr. Rupard been properly evaluated, monitored and treated, his death would have been prevented. Unfortunately, the failures ultimately resulted in Mr. Rupard's death due to "Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia. Contributing: SARS-COV-2 (COVID-19) Viral infection; pulmonary emphysema; duodenal ulcer." The Medical Examiner indicated Mr. Rupard's death was "homicide" due to "ineffective delivery of...care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide."

Please note the above opinions are provided to a reasonable degree of psychiatric certainty. If additional information or collateral documentation becomes available, I reserve the right to change my opinions based on such, and that will be submitted as an addendum to this report. Should you have any questions, or require any further information regarding these opinions, please contact me at 504.392.8348.

Submitted by:

Daphne Glindmeyer, M.D., D.F.A.P.A.
Board Certified Child, Adolescent, and Adult Psychiatrist
Board Certified Forensic Psychiatrist

Attachment 1:
Deposition Summaries –
Estate of Lonnie Rupard v. County of San Diego, et al.
Case No: 23CV1357 CAB BLM

1. Video Deposition of Christina Goodall dated December 16, 2024:
   - Ms. Goodall's maiden name is Anosike, she has a master's degree in counseling of marriage and family therapy. She worked at the San Diego County Jail from September 2021 to April 2022. She was a QMHP [Qualified Mental Health Professional].
   - Ms. Goodall discussed the training provided during her employment at the SDCJ, "culture of the jail, safety for staff and inmates, ethicals...everyone was about safety and ultimately the best care…a team environment…we would have scheduled meetings too, to check in and make sure things were done up to par…"
   - Team meetings occurred "every week." The subject of the team meetings was "trainings, policies, and discussing individuals that were maybe having a hard time…how to conduct a 5150 and…assessing for their mental health status needs overall…the criteria for somebody who would need to be placed on a 5150…how to write a 5150, the workflow as far as successfully transferring somebody to the hospital…"
   - The PSU was for "individuals that…needed a higher level of care…I wasn't able to write…admissions to the PSU…it would be the psychiatrist that would do that inside the jail, not me…if we felt that they might need a higher level of care, more constant supervision, higher than the inmate safety program, then I would reach out to the psychiatrist for an assessment."
   - Ms. Goodall was trained that if there is an individual in custody who needs a higher level of care, she would do "a recommendation…like a psych sick call…I was trained by my supervisor and if they met the criteria of maybe danger to self, others, or gravely disabled, then I would make a recommendation for a psychiatrist to come and assess an individual."
   - Ms. Goodall described grave disability as "they were unable to take care of themselves and poor hygiene habits."
   - Ms. Goodall was trained to do a "wellness check" that she described as "assessing for the individual's safety primarily, mental health status, suicide risk, homicidal risk, self-injurious behavior, gravely disabled…I was trained to review history…medical records—for mental health…"

- Ms. Goodall indicated she did not do a weekly round of people in administrative segregation, she saw "individuals on my sick call list…not everybody."
- Ms. Goodall saw Mr. Rupard on one occasion. She was not asked to see him every week.
- Ms. Goodall was "gatekeeper…responding to emergency or crisis mental health situations in the jail." As "gatekeeper" she could recommend an individual move to EOH, "enhanced supervision housing…a specific area monitored by deputies and there would be cameras in there."
- Ms. Goodall was trained that if "I saw somebody was at risk to themselves or others or gravely disabled, then I would make the appropriate recommendation to EOH or safety cell and/or call for a psychiatric evaluation…the safety cell was the highest level…if somebody was harming themselves or others."
- Ms. Goodall was trained that if an inmate patient was not eating over a period of a day or more that should be brought to the attention of a psychiatrist.
- Ms. Goodall saw Mr. Rupard on 2/9/22 "cell side." She did not enter his cell. She recalled "seeing a few empty containers of food" in Mr. Rupard's cell.
- She performed a "wellness check…he showed up on my sick call list." At the time of her visit, Mr. Rupard was housed in administrative segregation.
- As part of the visit, she spoke with a deputy regarding Mr. Rupard.
- She documented that Mr. Rupard was uncooperative and "I did not observe him engaging in self-injurious behavior…he…refused to speak to me but he did share that he was fine….still able to make an assessment based on his overall appearance, his cell, and his mood that he's displaying to me during the assessment…he was mumbling…I remember speaking to the deputy...he sometimes mumbles things to himself, but nothing distressing or any concerning type of behavior…he still said 'go away'…to me he was understanding my purpose there, but he didn't want to speak to me…"
- Ms. Goodall noted that ongoing monitoring for "safety concerns is conducted by the staff or sworn staff. If they saw anything concerning, they would call a gatekeeper for an immediate assessment. And the gravely disabled, they saw he was under the care of a psychiatrist and had follow-ups for that…I made like a follow-up appointment to come back and look…I remembered that the psychiatrist saw him shortly after, so that was complete, like being assessed by a psychiatrist…"

- Ms. Goodall stated, "he did say coherently 'I'm fine. I don't want to talk to you.' So, I am allowed to respect his autonomy."
- Ms. Goodall noted, "to complete a full assessment, if a person didn't want to speak to a therapist, you would look at their behaviors, their demeanors, the condition of their cell, if there is anything that looked risky..."
- Ms. Goodall reported that prior to assessing a patient, "typically I would do a full chart review." She did not recall reviewing information regarding Mr. Rupard's history. She recalled that when she assessed Mr. Rupard, "I remember being aware [that he had refused his medication] ad that he was under the care...seen by a psychiatrist."

2. Video deposition of Nicolas Badre, M.D. dated December 18, 2025:
   - Dr. Badre, a psychiatrist, works as a "temporary expert professional...at a clinic the 'Forensic Evaluation Unit'...we receive court orders to perform evaluations...competency evaluation."
   - Dr. Badre wrote a "report on involuntary medication" regarding Mr. Rupard.
   - Dr. Badre wrote a report concerning competency, based on an interview of Mr. Rupard at his cell. There was a deputy present at the time of the evaluation.
   - "I described his mood as down and his affect as flat." Dr. Badre also noted Mr. Rupard exhibited "an expression of disorganized thinking." He indicated that Mr. Rupard did not answer questions "in a relevant manner."
   - Dr. Badre noted that there were feces on the floor, food smeared on the wall, Mr. Rupard was unkempt, dirty, the cell was dirty, the room was malodorous, the toilet was filled with excrement. Dr. Badre noted, "it was my understanding he was receiving care from the providers at the jail...this person had been made attention to me by the mail...I was under the understanding that they were reaching out to me because they were concerned for him..."
   - Dr. Badre recalled "writing in my report that I interviewed the defendant at his cell at the recommendation of jail mental health staff and the floor deputies."
   - Dr. Badre noted that "when I am doing competency evaluations, I am not doing a clinical interview...I am looking to best answer the questions of the court...I am under the understanding that the jail is doing everything it can to maintain appropriate hygiene for the defendant...that is my expectation..."
   - Dr. Badre stated that CLERB [Citizens Law Enforcement Review Board] "requested I answer some questions."

- In his diagnostic impressions, Dr. Badre diagnosed "psychosis, not otherwise specified." Dr. Badre recommended a referral for Mr. Rupard to a state hospital or a Jail Based Competency Treatment. He also "wrote if the defendant's mental disorder is not treated with antipsychotic medication, it is possible that serious harm to the physical or mental health to the defendant will result…I came to the opinions there were signs of psychosis and I tried to inform the court that, in my opinion, he needed treatment."
- At the time Dr. Badre evaluated Mr. Rupard, he did not have the ability to write a 5150, "we don't conduct such evaluations…you have to be approved for each facility you work at to be an LPS [Lanterman-Petris-Short Act] certified individual." Dr. Badre did not have the ability to admit Mr. Rupard to the PSU.
- Dr. Badre's report was completed and submitted March 21, after Mr. Rupard's death.
- Dr. Badre did not evaluate Mr. Rupard regarding grave disability, "I did not assess him for that and did not have an opinion."

3. Video deposition of Detective Max Blumenshine dated January 7, 2026:
   - Detective Blumenshine works for the San Diego County Sheriff's Office and investigated the death of Mr. Rupard.

4. Video deposition of Melissa Quiroz dated January 8, 2026:
   - Ms. Quiroz was identified as the County's designee for the purposes of testimony.
   - In order to prepare for testimony, Ms. Quiroz reviewed policy and reviewed Mr. Rupard's chart.
   - Ms. Quiroz has previously worked as a mental health clinician and then as chief mental health clinician. She currently is "group program manager" at the SDCJ. The chief mental health clinician, Leandra Holland, reported to her. Ms. Quiroz role is administrative.
   - Ms. Quiroz has participated in meetings regarding mortality reviews at the facility but did not recall meeting regarding Mr. Rupard.
   - Ms. Quiroz indicated that mental health clinicians attend a 5150 training performed by the County of San Diego.
   - Ms. Quiroz estimated there were 30 beds in the PSY in the Central Jail. The PSU is on the third floor.
   - EOH, or enhanced observation housing, "is a module on the sixth floor." There were also safety cells, "I think there are some on the third floor at Central Jail."
   - Ms. Quiroz did not have the data regarding how many individuals were admitted to the PSU under a 5150 in 2121 or 2022.

- Ms. Quiroz indicated that QMHP staff had to take the required course first before writing a 5150. She did not know if Ms. Anosike had completed the course.
- Ms. Quiroz has personally never participated in a request for a 5150 hold.
- The PSU is a LPS [Lanterman-Petris-Short] unit, that allows provisions for involuntary commitments for evaluation and then additional periods can be allowed for treatment.
- Policies regarding mental health treatment and the PSU are "available in electronic form...on a computer drive that they can access."
- Training on policy occurs, "during new employee orientation...usually it is led by nursing staff...and supervisors-chief mental health clinician will review [policies]..." She could not say if there was a test to assess the clinician's basic knowledge of the policy.
- With regard to 5150, "I know no instances where a 5150 has been written by a mental health clinician as admission into a PSU...if A clinician see somebody who they think might need PSU placement, they would talk to the outpatient psychiatrist to say, this individual might need to be considered, and they will schedule an appointment... that's what a clinician would do. They would elevate it to the next level of care, but they wouldn't necessarily be the one writing the 5150."
- Ms. Quiroz was asked the process for changes to policy and procedure, "there is a process...I can't recall what the process would be in 2022..." She indicated that currently "policies are reviewed and tracked edits. If there's changes, they are archived, and the newer version is kept, and that's the one that's followed...it's a collaboration on policy provisions..."
- Ms. Quiroz did not know if QMHP had ever been disciplined for failing to a minimum of one time a week to monitor someone in administrative segregation.
- Ms. Quiroz did not know if there was a procedure in place to review files to ensure adequate treatment.
- For psychiatry, "the treating psychiatrists throughout our jail have a supervisor...who was also a psychiatrist, and that was the oversight for those physicians...and would have oversight of their care...for the mental health clinicians...there were onsite supervisors...the chief mental health clinicians...
- Dr. Francis Ysla oversaw the psychiatric care that was delivered...I do not oversee the contract...it would be out of my scope of practice to critique a doctor..."

- Ms. Quiroz indicated that if sworn staff had a concern about an individual, they could tell the QMHP, send an email, or call on the telephone. The incarcerated person could fill out a sick call requesting to be seen. The incarcerated person would then be listed for sick call.

5. Video deposition of Bethann Schaber, M.D. dated May 5, 2025:
   - Dr. Schaber is employed at the San Diego County Medical Examiner's Office and is a forensic pathologist.
   - Dr. Shaber performed a "full autopsy and completed an autopsy report and death certificate with a final cause and manner of death" regarding Mr. Rupard.
   - Dr. Shaber reviewed Mr. Rupard's autopsy results, "bilateral pneumonia…malnourished…body mass index was 15.5...he had lost approximately 60 pounds from the day of his arrest… dehydration… neglected schizophrenia. He was known to have that diagnosis of schizophrenia…and neglected both in the part of his own self-neglect, refusing to take medications, and also neglected care while he was in custody at the jail…".
   - Regarding the manner of death that Dr. Shaber classified as a homicide, "In this case, the investigation, along with the autopsy, demonstrated that not only in a matter of hours to days, but over weeks to months, there was failure to deliver reasonable or adequate care for Mr. Rupard that ultimately resulted in his death."
   - "His malnutrition and dehydration are a combination of his own self-neglect and the neglect of the jail to provide him with care…it was clear that over a matter of weeks to months he did not receive medications for his schizophrenia…the psychiatrist, who saw him on March 14th…thought he required to be involuntarily medicated as allowed by law."

6. Video deposition of Jon Montgomery, D.O. dated January 15, 2026.
   - Dr. Montgomery is Chief Medical Officer for the San Diego County Sheriff's Office. He reports to the Health Services Administrator.
   - Fron December 2021 through the end of March 2022, Dr. Montgomery active as a "medical advisor and acted as the health services administrator."
   - Dr. Montgomery did not provide supervision to the medical personnel, "they are individually licensed. They do not require immediate direct supervision."
   - He was "responsible for ensuring that medical care and services are provided throughout all facilities."

- He was involved in quality assurance, "evaluating for productivity...the number of patient encounters...the number of appointments made."
- Dr. Montgomery indicated there were no quality of care audits.
- Dr. Montgomery was not involved with mental health services at the jail. He was "not responsible for monitoring the actions of the mental health providers. That was done by the mental health director...that mental health director was reviewing and overseeing the quality of care provided by the contracted mental health staff."
- Dr. Montgomery was involved in mortality reviews, "a part of that process...was to evaluate whether or not there was anything that could potentially be done for a root cause analysis....it is my responsibility to participate in the program and to make recommendations and to work in a collaborative manner for process improvement."
- Reviewed the NCCHC technical assistance report, Dr. Montgomery indicated, "all of our development of evaluations and work on policies and procedures would be with the end goal in mind of eventually getting that level of [NCCHC] certifications...we're still in process and no they have not achieved that yet."

7. Video deposition of Anthony Cruz, D.O. dated March 3, 2026 with errata sheet dated April 21, 2026.
   - Dr. Cruz is a psychiatrist. He began working for Liberty Healthcare in March 2020.
   - Orientation was from "a nurse...who conducted the one-on-one orientation on exactly how everything worked from TechCare to...becoming certified in 5150 training...how to document...it was a crash course in one day to get all that done because they wanted me to start immediately...". TechCare is the medical recordkeeping system in use at the jail.
   - "She gave me...a password...all my user names and passwords for TechCare, JIMS...she told me there would be another individual who would be doing the training for [5150]...I had already been 5150 certified in San Bernadino county...it was like nothing new, and I passed the exam easily..."
   - Dr. Cruz's employment with Liberty Health care ended in June 2022.
   - With Liberty, he worked "four 10-hour shifts [per week]." He then transitioned to working for Naphcare and is "working as the head PSU psychiatrist with the psychiatric stabilization unit with Naphcare at the Central Jail."
   - Dr. Cruz did not recall any additional training other than the one day of orientation, "after that...I just started."

- Dr. Cruz did not recall anyone from Liberty Healthcare telling him about the requirements of Title 15.
- Dr. Cruz is familiar with NCCHC standards, he "was certified as a correctional health professional in 2017."
- While working with Liberty Healthcare, Dr. Cruz utilized their forms, "there was a form that was kind of the standard at the time…I was making my own standardized notes that I would use…I looked at other previous providers beforehand and used that as a template…"
- Dr. Cruz was introduced to deputies, "always I had a deputy staff escort that would assist me…"
- Dr. Cruz was provided policies and procedures from the sheriff's office but did not recall specific training regarding the mental health policy.
- Dr. Cruz's title was "outpatient psychiatrist."
- Dr. Cruz indicated he documented clinical encounters "at a later time. Once I get back to my office…that's why I'm feverishly taking notes as I'm seeing everyone…"
- For scheduling, "when I arrived…my office assistant…would already have a list of all the patients that I was scheduled to see that morning…he was an employee of the County…there was always an ongoing roster on TechCare to see…what patients are high priority or who have not been seen, so he would go by that list…he would also take into account from other…clinicians…and he would …add…them to the list for priority…the deputies would make their concerns…mental health clinicians…it could be through verbal, email…I knew some of the ones that we could not see the day before would most likely show up on the following day, but…new patients would always pop up and more acute patients would pop up…the minute I got that…list of patients, that was the start of my day…gather as much information, because I went to go see these patients cell side, so I didn't have access to a computer so I would get as much information to prepare to see these patients."
- "I was given the most acute patients…I only had a limited amount of time [to prepare]. I was basically at the mercy of my deputy because he had other obligations…once he was ready, I had to go…"
- Dr. Cruz estimated that he had 45 minutes to an hour to prepare. There would be 12 to 14 patients on the list, and he would "probably only see six."
- Dr. Cruz recalled that his clinic assistant, Rogelio Avila, prepared his clinic list, "every day was case by case, depending if he was getting informed by other clinicians. He would triage, but typically, he would just go by the psych sick call list that was in TechCare."

- As of 12.24.21, Dr. Cruz indicated he was the only outpatient psychiatrist at the facility.
- Dr. Cruz rescheduled Mr. Rupard's appointment that day, because the list was longer than his ability to see patients.
- Also on 12.28.21, Dr. Cruz was unable to see Mr. Rupard due to time constraints.
- Dr. Cruz understood that "those that were in administrative segregation were definitely more followed up by the...mental health clinicians." He did not recall reviewing policy regarding administrative segregation.
- Dr. Cruz could not answer if there was a notification to mental health staff as to who in administrative segregation needed to be seen. He did not recall being given a list of people in administrative segregation. He did recall "that a QMHP...was supposed to see them once a week." Although he was a QMHP, he was "never required, as an outpatient psychiatry provider to do those."
- There were mental health staff who worked for Liberty Healthcare and other mental health staff who worked for the County. There was a "multidisciplinary treatment team meeting where all sworn staff was present...we had everyone present...PSU psychiatrist, outpatient...sworn staff. All the QMHPs...once a month...it was mostly the mental health and support staff...on occasion there was some nursing staff..."
- Dr. Cruz reviewed the initial psychiatric evaluation document. He described disorganized thinking as "not linear...difficult to follow...they can't answer in a coherent manner." And word salad, "just saying random words that had no correlation or meaning...no sense."
- Dr. Cruz indicated that Mr. Rupard was not cooperative with the evaluation. He did not access Mr. Rupard's records from Patton State Hospital, "I don't recall it being available."
- Dr. Cruz did speak to the deputies, "any time a patient is not cooperative during their evaluation...I will get as much collateral information from...anyone who is willing to talk to me...I saw that there were empty food trays, but I still wanted to get confirmation that he was actually eating...they did confirm that he was eating at least some of his meals...". There was no documentation of this conversation in the record, but "I remember clearly."
- As Mr. Rupard was refusing medications, Dr. Cruz discontinued the medicine on 1.20.22 with a follow-up appointment scheduled 2.22.22, "I relied on my clinicians, my deputies, to tell me if...he had been decompensated...knowing that he already had a follow-up appointment...I did not feel that I needed to see him sooner

because I had not heard any type of report…saying this person needs to be seen sooner."

- Dr. Cruz assumed that nursing and the mental health clinician were checking on Mr. Rupard.
- Dr. Cruz indicated if an individual was identified as being on hunger strike, "they would notify me…medical is also notified…"
- Dr. Cruz is currently the psychiatrist in the PSU. He indicated the majority of individuals "placed involuntarily to the PSU…on a 5150 for various reasons…request of a psychiatrist or a psychiatric nurse practitioner. Anyone that is certified to write 5150s."
- Dr. Cruz did not seek an admission to the PSU for Mr. Rupard, "he did not meet the criteria at both times for a 5150."
- Dr. Cruz was not aware of Mr. Rupard's mental health history, history of refusal of medications, history of court ordered involuntary administration of antipsychotic medication. He stated "I assess what I see at that time. I use historical information…knowing that he was at Patton, but that does not mean that automatically…I'm going to immediately send him to PSU."
- Dr. Cruz discussed discontinuing Mr. Rupard's psychotropic medications, "he was refusing all medications…I was instructed, if a patient is refusing medications consistently…patients have a right to refuse medication, so I am not going to…continuously force….prescriptions to medication for a person who is refusing… and knowing I was going to follow up with him where I could…try to discuss why he was refusing meds, I felt it was appropriate to discontinue the medication , knowing I would be seeing him relatively soon….I relied on my mental health clinicians deputies, staff to tell me 'hey, maybe you need to restart this medication. He's not looking well' I didn't get any report of that…I never received any notification from staff…If I had received information from staff, I would have seen him."
- Dr. Cruz was aware that per policy and procedure, in the event a patient refuses medication, involuntary placement and medications in the PSU can be considered, "that is only one aspect as far as requiring a 5150. Just because someone refuses medication does not automatically mean that they need to be placed in PSU on a 5150."
- When Dr. Cruz performed the chart review on January 20, 2022, he did not evaluation Mr. Rupard for potential placement in PSU.
- At the follow-up appointment 2.22.22, Dr. Cruz did not restart medications. He did not consult with the PSU psychiatrist or Dr. Ysla regarding possible evaluation of Mr. Rupard for admission into the PSU. "I could always consult with the PSU…that's the policy…you don't want to just dump someone…because they may not even

have room in PSU." But he decided not to consult a that time, because he determined that there was no need for intervention or a higher level of care.

- Dr. Cruz indicated that when he saw Mr. Rupard on 2.22.22, his physical condition did not appear changed from the initial evaluation 12.29.21, "the same presentation."
- Dr. Cruz saw the autopsy photographs of Mr. Rupard, "I'm shocked right now…if someone had told me that he was in this state…I would have done whatever I could…oh, my God."

8. Video Deposition of Rebecca Jean Kloker, M.D. dated April 17, 2026.
   - Psychiatrist
   - Worked PSU as a Locum Tenens physician.
   - Did not admit or discharge, only interim treatment like a hospitalist
   - Did not treat Mr. Rupard.

9. Video Deposition of Sandeep Jouhal, M.D. dated April 10, 2026 with exhibit.
   - Psychiatrist
   - Worked for Liberty Health Care
   - Dr. Jouhal did not treat Mr. Rupard
   - July 2017-September 2018 at George Bailey Detention Facility
   - Then began working at the PSU as the PSU psychiatrist.
   - Worked at the PSU, Psychiatric Stabilization Unit, for four and half years.
   - Initially, "any admission was done through me…they would contact me and then we would collaborate and arrange for the admission…towards the end of my tenure…it was no longer up to me…anybody could actually admit a patient to PSU…by anybody, I mean the qualified mental health professionals who work in the jail…towards the end…sometimes, I was not consulted…I would find out from the in-charge nurse that there's an admission on PSU…anybody could raise concern about a patient that they have seen and they believe…needs PSU admission….any psychiatrist could admit to the PSU."
   - Individuals could be admitted to the PSU based on a 5150 for grave disability.
   - Dr. Jouhal indicated that grave disability, "In jail, it could be slightly different because they already have a place to say, so it was more based on not being… neglecting yourself and not eating, not drinking, and not having the insight to engage in any kind of treatment."
   - Refusing to take psychotropic medication, "I wouldn't say that… would meet the criteria for admission to PSU simply because a

patient is refusing to take their medications... you had to clinically assess the patient to see how decompensated he is. And he's not taking care of himself, of his basic needs, then he would be admitted to PSU. But not every patient who refused medication met the criteria..."

- "we had patients who were refusing their medications, and as a result of that, they decompensated over time and were brought to the PSU...that is correct."
- "If they are decompensated and they're not taking their medications, we could make a case that they do need involuntary medications... There were some individuals who would be refusing medications, but once they came to PSU, they were more amenable to taking medications, so we didn't have to file a Riese."
- "The majority of the patients come on a 5150. But once they become compliant with the treatment and they start improving, then they could change their legal status to voluntary. Straight voluntary admissions were quite rare, because if the patient is willing to come to PSU... and engage in treatment, then he can be treated wherever he's housed."
- "The mental health clinicians and psychologists... they used to see patients more frequently than the outpatient psychiatrist, so they were the ones who would pick up whether the patient is decompensating. And then they would go to the outpatient psychiatrist and raise the alarm, like alert them or express their concerns. And then the outpatient psychiatrist would actually review the patient, and if he felt that the patient met the criteria for a 5150, then he would start the admission process."
- Dr. Cruz was Dr. Jouhal's colleague, an outpatient psychiatrist. "Dr. Cruz...and all the other outpatient psychiatrists...they would complete the admission process...he was also one of the psychiatrists who admitted patients to the PSU."
- The threshold for being admitted to the PSU involuntarily was If they were a risk to themselves, or risk to others, or they were gravely disabled... it was not difficult to meet the criteria... for grave disability... if they're not taking care of their basic needs. They're not eating or they're just neglecting themselves, not doing their... activities of daily living, then they would meet the criteria for grave disability."
- Dr. Jouhal recalled two instances of patients with a Riese petition, "It did help in medicating then involuntarily when they were not agreeing to take voluntarily."
- There are observation cells, "just right outside the PSU unit...to house the patients who were really decompensated and they were not able to program with other...incarcerated persons...they don't

have access to the day room…they had to be segregated from the other inmates…I personally do not agree with people in isolation for such long hours."

- Dr. Jouhal performed a "chart check" regarding Mr. Rupard when he returned from Patton State Hospital on January 31, 2020. "As a PSU psychiatrist, one of my jobs was to do a chart check on the patients… whose mental competency had been restored and they were returning to the jail after having completed their mental competency time… on that day I did a chart check so that we can maintain the continuity of their care and continue them on the same medications that they were prescribed at the state hospital…"
- Dr. Jouhal was asked to review documented from a subsequent incarceration per Dr. Cruz, "I've never had any conversation with Dr. Cruz regarding this specific incarcerated person… the work of an outpatient psychiatrist is separate from the inpatient, and the only time we collaborate is when there's a potential for admission."
- Dr. Jouhal was "familiar with administrative segregation" but was not familiar with the conditions on 7D. Dr. Jouhal stated "I am familiar that isolation can have deleterious effects on the mind…in PSU, it was not only the medications, it was also because they had greater interaction with the staff…they were monitored more closely. They saw more people in their 24 hours…I think that human interaction also helped in getting them better…"
- Dr. Jouhal indicated she was not surprised by Mr. Rupard's death given the conditions of the jail, "A few months prior to this news, while I was working… an inmate had died in George Bailey detention facility. He had not been eating and drinking and three days later, the custody found him dead. So that was a reflection of the kind of care."

10. Video Deposition of Francis Ysla, M.D. dated April 10, 2026 with exhibit.
    - The chief psychiatrist for the Liberty Healthcare Early Access and Stabilization Services Program, a jail-based competency program.
    - Dr. Ysla did not recall Mr. Rupard.
    - Dr. Ysla was familiar with Dr. Anthony Cruz, "he was a staff psychiatrist for our Liberty Healthcare Program…he provided services at Central Jail…"
    - Dr. Cruz's role was "mainly clinical responsibilities."
    - Dr. Ysla provided oversight for all psychiatric services, "Discussing cases within Liberty's clinical staff…coordinating care with custody…"
    - Dr. Ysla discussed the PSU and agreed there were patients there that had been admitted into the PSU via a 5150 for grave disability.,

some who lacked capacity to make meaningful decisions about the refusal of medications because of a mental disorder.

- Dr. Ysla indicated "several disciplines can write the 5150 hold, but the actual admission into the PSU which involves admission orders can only be placed by the PSU psychiatrist."
- "Dr. Cruz had written 5150 holds in the past."
- Dr. Jouhal and then Dr. Kloker were in charge of psychiatry services at the PSU during the 2021 to 2022 timeframe. They would need to be consulted before a patient could be admitted to the PSU, "It was a functional requirement because patients that were admitted to the PSU were initially housed in an observation cell in the PSU, and... There were only a limited amount of observation cells available, so the PSU as a whole would have to make arrangements to have... one of those observation cells open."
- Dr. Ysla discussed "multiple cases regularly with my staff and team... Oftentimes it was a coordinated effort between myself and the PSU... it was more so along the lines of coordinating the availability of that observation cell, so ensuring that if an outpatient psychiatrist were to evaluate a patient that required a higher level of care... and the patient was unwilling to voluntarily be accepted into or voluntarily come to the PSU... a 5150 hold would be placed and we would coordinate... to make sure that the PSU had the capacity to bring that patient in."
- Regarding grave disability, "It's difficult to determine if a patient can provide for their food and clothing because they're given it while in jail, and their shelter of course is they're housed in jail... finding a grave disability is sometimes difficult just because those are already provided to the individual on behalf of the jail..."
- Dr. Ysla had admitted individuals to the PSU on a 5150 hold for grave disability, "A patient had to be fairly decompensated. A lot of the times we use the PSU as a way to obtain an involuntary medication order... that's not to say that a patient that doesn't take their medications automatically needs to come into the PSU... you're looking for the clinical picture for someone that is gravely disabled, so someone that is unable to communicate for their needs. Maybe they're unwilling to or unable to eat... perhaps because of a delusional thought or thought content or paranoid thought content, like the food may be poisoned for them. So in these cases, for grave disability, that would indicate a 5150 placement... to treat the psychosis."
- "Psychosis isn't necessarily synonymous with a grave disability finding. The psychosis just has to impair the patient's ability to maintain their food, clothing and shelter... A patient who is gravely disabled should be referred to the PSU on a 5150 grave disability

finding... a patient has to be decompensated sufficiently to the point of becoming gravely disabled..."

- Dr. Ysla did not recall consulting with Dr. Cruz regarding Mr. Rupard, but indicated if there was a discussion, it would be "reasonable to include in documentation as part...of the decision-making process and rationale."
- "The evaluating psychiatrist...makes the determination about medications based on their evaluation..."
- Dr. Ysla guessed that Dr. Cruz documenting continue to monitor in Mr. Rupard's progress note meant, "that the patient will continue to be offered psychiatric services...based on what was documented in this current note...it seems reasonable that the patient wasn't referred to the PSU at that time."
- Dr. Ysla was not sure if the NCCHC had a specific set of standards for psychiatry and did not recall if the psychiatrists "given the specific documentation standards that needed to be purchased from NCCHC."
- No knowledge of ACHC accreditation commission for healthcare
- No knowledge of IMQ institute of medical quality
- No knowledge of ACHSA
- Did review California Penal Code title 15
- The county provided policies and procedures.
- Dr. Ysla "In my role as medical director...provided guidance In the policies and procedures for new hires...we would have an orientation period for new hires and we would go over policies and procedures..."
- Dr. Ysla recalled meeting with Dr. Montgomery, the chief medical officer at least "once a month...a leadership meeting between Liberty and the county medical staff." In these meetings, Dr. Ysla indicated "quality was always a topic...ensuring that psychiatric care was provided for cases that were...flagged by leadership. Going over what the management approach was...about documentation. I did audits quarterly, and we discussed the results of those audits...the County would give me a certain amount of charts to review...I would review those charts based on the auditing form that they would provide to me..."
- Dr. Ysla recalled that the audit reviewed "obtaining labs... Ensuring that if polypharmacy was being prescribed, that the rationale for doing so was applicable... documentation of informed consent... I provided the outcome of the audit back to the county... these were quarterly..."
- Dr. Ysla was the head of psychiatry, Melissa Quiroz was the chief of mental health services.

- Dr. Ysla completed an annual performance evaluation for psychiatry staff.
- Dr. Ysla participated in a review of the circumstances of an inmate's death on "maybe eight occasions."

Curriculum Vitae

# Daphne A. Glindmeyer, M.D.

---

Business Address:

611 River Highlands Blvd., Suite B
Covington, Louisiana 70433

Phone: (504) 392-8348
Fax: (504) 398-4334
Email: psychdoctors@gmail.com

Mailing Address:

Post Office Box 4240
Covington, Louisiana 70434

---

## EDUCATION

**Post Graduate Medical Education:**

Louisiana State University Health Sciences Center
Division of Law and Psychiatry
Forensic Psychiatry Fellowship, 1998-1999
New Orleans, Louisiana

Louisiana State University Health Sciences Center
Division of Infant, Child, and Adolescent Psychiatry
Child Psychiatry Fellowship, 1995-1997
New Orleans, Louisiana

Louisiana State University Health Sciences Center
Psychiatry Residency Training Program
Adult Psychiatry Residency, 1993-1995; 1997-1998

**Medical Education:**

Louisiana State University Health Sciences Center
Doctor of Medicine, 1989-1993
New Orleans, Louisiana

**Undergraduate Education:**

University of New Orleans
Premedical Curriculum, 1987-1989
New Orleans, Louisiana

Mississippi Gulf Coast Community College
Premedical Curriculum, 1985-1987
Gulfport, Mississippi

Loyola University
Bachelor of Business Administration/Finance, 1981-1985
New Orleans, Louisiana

---

## PROFESSIONAL LICENSES AND CERTIFICATIONS

**Medical License:**

Louisiana, 1993
Texas, 2015

**Board Certification:**

| | | |
|---|---|---|
| Psychiatry | October 1999 | **Recertification:** Current |
| Forensic Psychiatry | April 2001 | **Recertification:** Current |
| Child and Adolescent Psychiatry | November 2002 | **Recertification:** Current |

---

## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

American Psychiatric Association
- Fellow 2009
- Distinguished Fellow 2016

American Academy of Psychiatry and the Law
- Program Committee, 2000-2002

Louisiana Council of Child and Adolescent Psychiatry
- President 2009-2012

Louisiana Psychiatric Medical Association
- Executive Council Resident Program Representative 1997-1999
- Law and Psychiatry Committee 1999-Present
- Chairman Law and Psychiatry Committee 2009-Present
- Co-Chairman Child and Adolescent Psychiatry Committee 2003-2005
- Parliamentarian 2005-2006
- Secretary 2006-2007
- President 2007-2008

Louisiana State Medical Society
- Membership Committee 2004-2007
- Mental Health and Substance Abuse Committee 2004-2007
- Council on Membership Services 2008-2010

Selected by her peers for inclusion in Best Doctors in America® from 2007 to 2018

Orleans Parish Medical Society
- Women's Taskforce 2004-2005

Jefferson Parish Medical Society 2010-2020

Louisiana State University Health Sciences Center
Student Government Association 1989-1993
- Senior Class Vice President
- Executive Council Vice President of Social Affairs
- Sophomore Class Vice President
- Freshman Class Vice President

Student Representative Five Year Planning Committee 1993

Psychiatric Resident Representative to the Committee for Professional Conduct 1997-1998

---

## CURRENT EXPERIENCE

**March 2004-Present** Daphne Glindmeyer, M.D., A.P.M.C.
Private Practice
Psychiatric evaluation and psychotropic medication management services for children, adolescents and adults are provided in outpatient setting. Also perform forensic consultations for adolescents and adults (civil and criminal).

**April 2020 – Present** Subject Matter Expert
Iowa Boys State Training School
Compliance monitoring regarding mental health services in a juvenile justice center in the State of Iowa pursuant to a consent decree.

**December 2022 – Present** United States District Court for the District of Rhode Island
Court Appointed Rule 706 Expert
Consultation regarding behavioral health and conditions of confinement in Rhode Island Department of Corrections.

---

## PAST EXPERIENCE

**March 2023 – May 2024** Subject Matter Expert
Bailey and Associates, L.L.C.
Glenwood Resource Center

Compliance monitoring regarding psychiatric services in a supported living center in the State of Iowa pursuant to a consent decree.

**June 2010-November 2024** Compliance Monitor
Harchik and Associates, L.L.C.
State of Texas

Compliance monitoring regarding psychiatric services in supported living centers in the State of Texas pursuant to a consent decree.

**August 2016- 2023** Consultant
Carter Goble Associates, LLC

Completed Consultations:

Alaska Juvenile Privatization Feasibility Study
Alabama Department of Corrections
Florida Department of Corrections
Montgomery County Jail
Nevada Juvenile Staffing Review & Organization Assessment Project
Sacramento County Jail Facilities
Wyoming Department of Corrections
Los Angeles County Jail

**2008-2015** Psychiatric Consultant
Department of Justice
Special Litigation Section

Completed Consultations:

Investigation-New York Juvenile Justice System.
Compliance Monitor-South Bend Juvenile Correctional Center.
Investigation-California Youth Authority, N.A. Chaderjian Facility.
Investigation – Pendleton Juvenile Correctional Center
Compliance Monitor-State of Ohio, Scioto Juvenile Correctional Facility.

**September 2011-2015** S.H. v. Reed

Compliance monitoring regarding psychiatric services in three Ohio juvenile correctional facilities pursuant to a consent decree.

**February 2012-July 2012** Psychiatric Consultant
Psychiatric consultant to the mental health compliance monitor in New York's secure juvenile facilities.

**May 2011- December 2014** Compliance Monitor
Scioto, Ohio
Compliance monitoring regarding psychiatric services in a juvenile correctional facility pursuant to a consent decree.

**January 2011-April 2015** Psychiatric Consultant
Southern Poverty Law Center
Completed Consultations:
Walnut Grove Youth Correctional Facility
Birmingham City School District
Polk County Jail
Orleans Parish Prison

**April 2009-January 2014** Compliance Monitor
Los Angeles County, California
Compliance monitoring regarding psychiatric services in juvenile correctional facilities pursuant to a consent decree.

**January 2008-2010** Compliance Monitor
Attorney General's Office
State of Mississippi
Compliance monitoring regarding mental health and rehabilitative services in Mississippi's secure juvenile correctional facilities pursuant to a Consent decree.

**March 2004-December 2010** Psychiatrist
Louisiana State University Health Science Center
Juvenile Justice Program
Provided psychiatric evaluation and medical management to youth in a secure juvenile correctional facility, Bridge City Center for Youth. In addition, supervised and directed the resident rotations for Child and Adolescent Psychiatry and Forensic Psychiatry residents within the Juvenile Justice Program.

**March 2004-October 2007** Medical Director
West Jefferson General Hospital
Behavioral Medicine Center
Medical Director for inpatient and outpatient psychiatric services at West Jefferson Hospital. Responsible for administrative decisions as well as

providing clinical services to both acutely mentally ill psychiatric inpatients and outpatients attending intensive outpatient and partial hospitalization programs. In addition, provided consult liaison psychiatric services to the general hospital.

**November 2003-August 2015** Medical Director
Assertive Community Treatment
Administrative responsibilities as well as providing intensive outpatient home based psychiatric services to adults with serious and persistent mental illness.

**January 2003-September 2012** Consulting Psychiatrist
Community Support Team
Resource Center for Psychiatric and Behavioral Supports
Stabilization Unit at Northlake Supports and Services
Provided consultative psychiatric services for individuals with developmental disabilities.

**July 2002-March 2004** Director of Psychiatry
Louisiana State University Health Sciences Center
Juvenile Corrections Program
Administrative supervision of lead psychiatrists at individual facilities, Provided direct psychiatric care to youth in Louisiana's secure correctional facilities, and supervised psychiatric residents and fellows rotating at Bridge City Center for Youth. Additional duties included serving as the Course Director for the Child and Adolescent Psychiatry Forensic Lecture Series.

**July 2000-March 2002** Director of Clinical Operations
Louisiana State University Health Sciences Center
Juvenile Corrections Program
Administrative supervision and implementation of medical, mental health, and dental care for youth in Louisiana's secure correctional facilities.

**July 1999-July 2000** Attending Psychiatrist
Medical Center of Louisiana, New Orleans
Provided psychiatric care to adult patients hospitalized in the acute psychiatric unit, supervision of medical students, psychology interns, psychiatric interns, and residents.

**July 1999-July 2000** Medical Director
Jefferson Parish Adult Drug Court Program

Responsible for the clinical quality of court-mandated substance abuse treatment for first time nonviolent offenders, evaluation and treatment of dual diagnosis clients, and the supervision of social services staff and forensic psychiatric fellows.

**July 1999-July 2000** Medical Director
Jefferson Parish Juvenile Drug Court Program

Responsible for the clinical quality of court mandated substance abuse treatment and the psychiatric evaluation and treatment of juvenile offenders.

**July 1999-July 2000** Medical Director
**July 1995-July 1999** Staff Psychiatrist
Jefferson Parish Human Services Authority
Mobile Crisis Team

Crisis assessment, evaluation, and disposition planning for adult, child, and adolescent clients, and the supervision of child psychiatrists and child psychiatry fellows.

**1994-1999** Clinic Psychiatrist
Orleans Parish Prison

Evaluation and treatment of incarcerated individuals.

**1996-1997** Duty Doctor
New Orleans Adolescent Hospital

Crisis assessment, evaluation, and emergency hospitalization of children and adolescents, after hour's management of acute inpatient unit.

**1994-1996** On-Call Provider
Child and Adolescent Mental Health Program

Crisis assessment, evaluation, and treatment disposition for children and adolescents in Orleans Parish.

---

## PRESENTATION AND TEACHING ACTIVITIES

Forensic Psychiatry Lecture Series (2025-2026) presented to Child and Adolescent Psychiatry Fellows at Louisiana State University Baton Rouge Psychiatry Residency Program.

Psychopharmacology and Developmental Disabilities (March 2024) presented to staff and community providers associated with Glenwood Resource Center, Glenwood Iowa.

Crisis Intervention Training (2016-2020) to the Jefferson Parish Sheriff's Office Crisis Intervention Unit. Topics of instruction – Psychiatric Medications and Diagnoses, Suicide Prevention and risk factors, Communication with Children and Adolescents in Crisis.

Psychotropic Medications, Suicide Prevention, Child and Adolescent Crisis Management (2011-2019) a reoccurring presentation to the Crisis Intervention Team of the Jefferson Parish Sheriff's Office.

Adolescent Brain Development: Implications in Juvenile Justice (May 2018). Daphne Glindmeyer, M.D. Presented to staff at the Nevada Youth Training Center and Caliente Youth Center.

Psychotropic Medication and Developmental Disabilities (February 2015). Daphne Glindmeyer, M.D. Presented to the Louisiana and Mississippi Councils for Child and Adolescent Psychiatry Annual Spring Meeting.

Better Living through Chemistry? A review of psychopharmacology and developmental disabilities. (April 2011). Daphne Glindmeyer, M.D. Presented to the Louisiana Disability Summit Annual Conference.

Autism Spectrum Disorder. (March 2010). Daphne Glindmeyer, M.D. Presented to Louisiana Public Health Association Annual Educational Conference.

Speakers Bureau: Pfizer, 2007-2011
Eli Lily, 2008-2010
Astra Zeneca, 2010-2013
Abbott, 2007-2008
Pam Lab, 2010-2015
Otsuka 2012-2015

Landmark Cases in Child and Adolescent Psychiatry. (May, 2004).
Daphne Glindmeyer, M.D. Presented to LSUHSC psychology students.

Psychopharmacology and Metabolic Syndrome. (November, 2008).
Daphne Glindmeyer, M.D. Presented to the Medical Staff of Northlake Supports and Services.

Bipolar Mood Disorder: Diagnosis and Treatment. (October, 2007).
Daphne Glindmeyer, M.D. Presented to the Louisiana Society of Nurse Practitioners.

Mental Status Examinations. (May 2004). Daphne Glindmeyer, M.D. Presented to psychology students at University of New Orleans.

Psychopharmacology and Developmental Disabilities. Daphne Glindmeyer, M.D. (March, 2004). Presented to the American Academy of Family Physicians, and presented to the Region II Office of Citizens with Developmental Disabilities staff.

Child and Adolescent Forensic Lecture Series. (2003). Daphne Glindmeyer, M.D. Course Director. Overview of the Juvenile Justice System, Introduction to the Court Process

Forensic Issues in Inpatient Psychiatry. (1999).

Stalking: The Psychiatric Perspective. (1999).

Child Abuse and Confidentiality in the treatment of Children and Adolescents. (1998)

Psychiatry Clerkship Small Group Leader. (1997-1998).

Adolescent Depression and Juvenile Delinquency. (1997).

Psychiatry and Medicine Small Group Leader. (1996-1997).

---

**PUBLICATIONS**

Glindmeyer, D.A. & Cruise, K.R. (2003). Callous and Unemotional Traits in a Juvenile Offender, A clinical case study. Published in the Journal of Forensic Psychology Practice, 3, 73-78.

---

**REFERENCES**

Available upon request.

# Testimony and Depositions

Daphne Glindmeyer, M.D.

| | | |
|---|---|---|
| 09.27.05 | Judicial Commitment of J.D. | 24th Judicial District Court |
| 03.23.06 | Deposition – Succession of R.A.A.M. | |
| 11.03.06 | Judicial Commitment of M.T. | 24th Judicial District Court |
| 11.15.06 | Judicial Commitment of A.D. | 24th Judicial District Court |
| 01.05.07 | Judicial Commitment of G.C. | 24th Judicial District Court |
| 01.19.07 | Judicial Commitment of D.E. | 24th Judicial District Court |
| 04.27.07 | Judicial Commitment of L.H. | 24th Judicial District Court |
| 05.15.07 | Judicial Commitment of E.A. | 24th Judicial District Court |
| 08.24.07 | Deposition – C.D. v. H.L.B. Jr. | |
| 05.15.08 | Deposition – R.D. v. P.A., et al | |
| 07.31.08 | Judicial Commitment of G.D. | Orleans Parish Civil Court |
| 10.23.08 | Deposition – S.K. v. Dollar General Corp | |
| 09.02.09 | State of La. v. J.B. | 24th Judicial District Court |
| 10.08.09 | State of La. v. A.C. | 22nd Judicial District Court |
| 11.30.09 | Judicial Commitment of S.K. | 21st Judicial District Court |
| 01.12.10 | The Matter of the Mental Health of R.R. | 22nd Judicial District Court |
| 02.04.10 | State of La. v. T.V. | 22nd Judicial District Court |
| 04.06.10 | State of La. v. E.H.T. | 24th Judicial District Court |
| 04.27.10 | State of La. v. E.W. | 24th Judicial District Court |
| 04.29.10 | Judicial Commitment of S.J. | 22nd Judicial District Court |
| 02.14.11 | Deposition - JB v. Art Catering | |
| 10.19.11 | State of La. v. A.J. | Hammond City Court |
| 10.20.11 | D.G. v. R.F. | 24th Judicial District Court |
| 11.07.11 | State of La. v. S.S. | 41st Judicial Criminal Court |
| 12.21.11 | I.F. v. K.K. and Safeco Insurance Company of America | U.S. District Court - Eastern District of Louisiana |
| 01.26.12 | State of La. v. D.B. | 24th Judicial District Court |
| 01.27.12 | Deposition - I.F. v. Tulane University | |
| 02.07.12 | Deposition - J.W. ex rel. Williams v. A.C. Roper | |
| 04.26.12 | I.F. v. Tulane University | Orleans Parish Civil Court |
| 08.17.12 | Deposition - C. H. v. G. J. | |
| 09.12.12 | Hughes v. Judd | United States District Court- Florida, Tampa Division |
| 11.29.12 | L.R. v. D.P.W. | Personnel Board Jefferson Parish |
| 02.14.13 | Deposition – C.H. v. G.J. | |
| 02.19.13 | Judicial Commitment of D.P. | 24th Judicial District Court |
| 02.28.13 | Deposition – C.H. v. G.J. | |
| 04.02.13 | L.R. v. D.P.W. | Personnel Board Jefferson Parish |
| 04.03.13 | J. v. G. | United States District Court – Eastern District of Louisiana |
| 07.02.13 | Deposition – J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | |
| 07.23.13 | J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | Terrebonne Parish Clerk of Court |
| 07.25.13 | J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | Terrebonne Parish Clerk of Court |

| | | |
|---|---|---|
| 10.29.13 | Deposition - Hughes v. Judd, et al | United States District Court Florida, Tampa Division |
| 11.25.13 - 11.27.13 | Hughes v. Judd, et al | United States District Court Florida, Tampa Division |
| 01.21.14 | Deposition - D. H. v. Coroner, St. Tammany Parish, The State of Louisiana, et al | 22nd Judicial District Court |
| 02.05.14 | State of La. v. A.T. | 40th Judicial District Court |
| 05.08.14 | Deposition – C.C. V. LC. | |
| 08.27.14 | Jefferson Parish Human Services Authority v. D.T. | 24th Judicial District Court |
| 09.25.14 | In re D.T. | 24th Judicial District Court |
| 01.22.15 | Depositions- J.B. v. R.J. Reynolds Tobacco Co. | |
| 01.23.15 | J.W. ex rel. Williams, et al. v. Birmingham Board of Education, et al. | United States District Court Northern District of AL, Southern Div. |
| 05.15.15 | Deposition- B.P., et al v. River Oaks, Inc., et al | |
| 06.18.14 | E v. E | Orleans Parish Civil District Court |
| 09.22.15 | Deposition- B.D. v. S.D. | |
| 09.28.15 | B.D. v. S.D. | 22nd Judicial District Court |
| 09.29.15 | A.F. v. United States of America | United States District Court for the Eastern District of New York |
| 11.23.15 | Deposition- P.J. v. R.J. Reynolds Tobacco Co. | |
| 01.13.16 | State of La. V. D.R. | 18th Judicial Court |
| 02.17.16 | State of La. V. E.P. | 24th Judicial Court |
| 03.08.16 | Deposition- G.J. v. C.A., et al | |
| 07.29.16 | Deposition- S.S. v. R.J. Reynolds Tobacco Co. | |
| 12.02.16 | Deposition- D.H., et al v. City of New Orleans, et al | |
| 02.13.17 | State of La. V. J.D. | 29th Judicial Court |
| 08.24.18 | Deposition L.C., et al v. Evergreen, et al | |
| 08.31.18 | M.A. v. R.A. | 24th Judicial Court |
| 11.26.18 | Daubert Hearing- L.C., et al v. Evergreen, et al | 21st Judicial Court |
| 02.07.20 | Deposition- J.A. v. E.C., et al | |
| 02.11.20 | State of La v. A.H. | 24th Judicial Court |
| 11.16.20 | Deposition- D.M. et al v. Erie County, Ohio et al | |
| 03.09.21 | Interdiction of E.M. | 24th Judicial Court |
| 03.12.21 | Deposition- Vargas v. Sheriff of Cook County, et al | United States District Court for the Northern District of Illinois, Eastern Division |
| 05.04.22 | State of LA v. B.J. | 24th Judicial Court |
| 10.20.23 | Deposition- D.A, et al v. New Orleans Military & Maritime Academy, Inc., et al | |
| 10.27.2 | Deposition- D.A, et al v. New Orleans Military & Maritime Academy, Inc., et al | |
| 04.16.24 | Deposition- J.T. v. NaphCare, Inc., et al | |
| 04.24.24 - 04.25.24 | D.M. v. State of New Hampshire, Dept. of Health and Human Services, et al | Rockingham Superior Court Brentwood New Hampshire |
| 10.16.24 | State of LA v. D.A. | 24th Judicial Court |
| 01.23.25 | Deposition- J.Y. v. CoreCivic Inc., et al | |
| 03.25.25- 03.26.25 | J.T. v. Naphcare, Inc., et al | United States District Court for the Western District Court of Washington at Seattle |
| 04.30.25 | Deposition- A.S. et al v. Endeavor Southlake OpCo, LLC et al | |

| | | |
|---|---|---|
| 06.06.25 | Deposition- J.F. v J. Landry et al | |
| 11.14.25 | Deposition- E.M. v. New Mexico Corrections Dept. et al | |
| 05.29.26 | Garcia v. City of New York, et al | Supreme Court of the State of New York Bronx County |

*Information prior to August 2005 unavailable

# Daphne Glindmeyer, M.D.

Post Office Box 4240 Covington, Louisiana 70434

Phone: (504) 392-8348 Phone: (985) 888-1414
Facsimile: (504) 398-4334 Facsimile: (985) 888-1415

Fee Agreement in the matter of:

______________________________________________________

Case title

Dr. Glindmeyer's fee for expert consultation is $600.00 per hour. This hourly rate applies for record review or collection, interviews, research, report writing, consultation with attorneys, telephone calls, site visits, travel time, and any other activity necessary to complete the consultation.

Once Dr. Glindmeyer agrees to a forensic consultation, retainer fees will be discussed with the referring party and determined based on the consultation requested. The retainer amount must be paid promptly. Any and all case records (e.g., police reports, case filings, medical records, mental health records, depositions) must be provided to Dr. Glindmeyer for review. The consulting client must not withhold or make unilateral decisions on what records to provide to Dr. Glindmeyer. Based on the volume of records and interviews necessary, Dr. Glindmeyer will be better able to gauge costs for completion of the full evaluation report.

The client will be billed only for the hours worked, and any unused portion of the retainer will be returned. Once the retainer is expended, an additional retainer will be requested. Any remaining balance must be satisfied prior to the delivery of the final report. All fees must be satisfied prior to testimony or deposition. Further, testimony and deposition fees must be satisfied 15 business days prior to appearance.

My expert opinion testimony at depositions, trials or hearings will be provided at the rate of $600.00 per hour. For local cases, there is a minimum charge of four hours ($2400.00) for an appearance. The four-hour minimum, which must be paid 15 business days prior to appearance, includes travel time (portal to portal) and time waiting to be called to testify in court. If the testimony time inclusive of travel and waiting exceeds four hours, a second four-hour charge will be applied. This second four-hour charge must be paid prior to the continuation of the deposition or trial testimony. Any testimony or deposition appearance exceeding 8 hours in one day or continuing after 5PM(CST) is charged an hourly rate of $700 per hour. For cases where car travel is greater than 2 hours portal to portal or where air travel is necessary, a full eight-hour day will be charged. Again, fees must be satisfied prior to appearance.

In certain cases, when agreed upon by Dr. Glindmeyer and the referring party, the services of a forensic medical assistant may be necessary to review documents, depositions, and other data. The fee for this assistant is $150.00 per hour.

Any travel expenses (hotel, taxi, car rental, food, etc.) must be reimbursed fully with receipts provided. Airfare must be paid in advance of any travel. Dr. Glindmeyer will make all travel arrangements for herself at reasonable pricing available at the time, in consideration of the notice provided to her, and based on her professional schedule. Incidental expenses related to the case necessary for her to provide her expert opinion (copies, mailing charges, misc) are to be reimbursed fully with receipts provided.

A minimum of 90 business days is required to complete evaluations/reports. In some cases, this time period may be longer; however, that will be discussed with the referring client. If the services requested must be completed within 90 business days or a time less than that period, then a rush fee will apply. If the consultation is accepted and there is a need to change the previously agreed upon time schedules, Dr. Glindmeyer may decline to continue work on your consultation or, to continue work, an intermediate rush fee will be applied. This rush fee will be determined by Dr. Glindmeyer and if agreed upon by the client, in writing, payment of the rush fee to continue work must be submitted within 24 hours.

A ten-business day notice is required for cancellation of appointments, testimony, or court appearances or the scheduled time will be billed against the retainer, or any deposit received forfeited. Billed items must be paid within 30 days and all fees satisfied prior to any deposition or trial testimony. Checks should be made payable to Daphne Glindmeyer, M.D., A.P.M.C. Other methods of payment include credit card and a variety of electronic funds transfers.

Please sign and return one copy of this agreement with your retainer check indicating you agree to the terms as outlined above, acknowledge the responsibility for all fees and expenses, and that payment is not contingent on any verdict or settlement of the matter.

________________________________________
Responsible party/Law Firm Signature

________________________________________
Date

________________________________________
Email Address

________________________________________

________________________________________
Mailing Address

# EXHIBIT "C"

Curriculum Vitae

# Daphne A. Glindmeyer, M.D.

---

Business Address:

611 River Highlands Blvd., Suite B
Covington, Louisiana 70433

Phone: (504) 392-8348
Fax: (504) 398-4334
Email: psychdoctors@gmail.com

Mailing Address:

Post Office Box 4240
Covington, Louisiana 70434

---

## EDUCATION

**Post Graduate Medical Education:**

Louisiana State University Health Sciences Center
Division of Law and Psychiatry
Forensic Psychiatry Fellowship, 1998-1999
New Orleans, Louisiana

Louisiana State University Health Sciences Center
Division of Infant, Child, and Adolescent Psychiatry
Child Psychiatry Fellowship, 1995-1997
New Orleans, Louisiana

Louisiana State University Health Sciences Center
Psychiatry Residency Training Program
Adult Psychiatry Residency, 1993-1995; 1997-1998

**Medical Education:**

Louisiana State University Health Sciences Center
Doctor of Medicine, 1989-1993
New Orleans, Louisiana

**Undergraduate Education:**

University of New Orleans
Premedical Curriculum, 1987-1989
New Orleans, Louisiana

Mississippi Gulf Coast Community College
Premedical Curriculum, 1985-1987
Gulfport, Mississippi

Loyola University
Bachelor of Business Administration/Finance, 1981-1985
New Orleans, Louisiana

---

## PROFESSIONAL LICENSES AND CERTIFICATIONS

**Medical License:**

Louisiana, 1993
Texas, 2015

**Board Certification:**

| | | |
|---|---|---|
| Psychiatry | October 1999 | **Recertification:** Current |
| Forensic Psychiatry | April 2001 | **Recertification:** Current |
| Child and Adolescent Psychiatry | November 2002 | **Recertification:** Current |

---

## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

American Psychiatric Association
- Fellow 2009
- Distinguished Fellow 2016

American Academy of Psychiatry and the Law
- Program Committee, 2000-2002

Louisiana Council of Child and Adolescent Psychiatry
- President 2009-2012

Louisiana Psychiatric Medical Association
- Executive Council Resident Program Representative 1997-1999
- Law and Psychiatry Committee 1999-Present
- Chairman Law and Psychiatry Committee 2009-Present
- Co-Chairman Child and Adolescent Psychiatry Committee 2003-2005
- Parliamentarian 2005-2006
- Secretary 2006-2007
- President 2007-2008

Louisiana State Medical Society
Membership Committee 2004-2007
Mental Health and Substance Abuse Committee 2004-2007
Council on Membership Services 2008-2010

Selected by her peers for inclusion in Best Doctors in America® from 2007 to 2018

Orleans Parish Medical Society
Women's Taskforce 2004-2005

Jefferson Parish Medical Society 2010-2020

Louisiana State University Health Sciences Center
Student Government Association 1989-1993
Senior Class Vice President
Executive Council Vice President of Social Affairs
Sophomore Class Vice President
Freshman Class Vice President

Student Representative Five Year Planning Committee 1993

Psychiatric Resident Representative to the Committee for Professional Conduct 1997-1998

---

## CURRENT EXPERIENCE

**March 2004-Present** Daphne Glindmeyer, M.D., A.P.M.C.
Private Practice
Psychiatric evaluation and psychotropic medication management services for children, adolescents and adults are provided in outpatient setting. Also perform forensic consultations for adolescents and adults (civil and criminal).

**April 2020 – Present** Subject Matter Expert
Iowa Boys State Training School
Compliance monitoring regarding mental health services in a juvenile justice center in the State of Iowa pursuant to a consent decree.

**December 2022 – Present** United States District Court for the District of Rhode Island
Court Appointed Rule 706 Expert
Consultation regarding behavioral health and conditions of confinement in Rhode Island Department of Corrections.

---

## PAST EXPERIENCE

**March 2023 – May 2024** Subject Matter Expert
Bailey and Associates, L.L.C.
Glenwood Resource Center

Compliance monitoring regarding psychiatric services in a supported living center in the State of Iowa pursuant to a consent decree.

**June 2010-November 2024** Compliance Monitor
Harchik and Associates, L.L.C.
State of Texas

Compliance monitoring regarding psychiatric services in supported living centers in the State of Texas pursuant to a consent decree.

**August 2016- 2023** Consultant
Carter Goble Associates, LLC

Completed Consultations:

- Alaska Juvenile Privatization Feasibility Study
- Alabama Department of Corrections
- Florida Department of Corrections
- Montgomery County Jail
- Nevada Juvenile Staffing Review & Organization Assessment Project
- Sacramento County Jail Facilities
- Wyoming Department of Corrections
- Los Angeles County Jail

**2008-2015** Psychiatric Consultant
Department of Justice
Special Litigation Section

Completed Consultations:

- Investigation-New York Juvenile Justice System.
- Compliance Monitor-South Bend Juvenile Correctional Center.
- Investigation-California Youth Authority, N.A. Chaderjian Facility.
- Investigation – Pendleton Juvenile Correctional Center
- Compliance Monitor-State of Ohio, Scioto Juvenile Correctional Facility.

**September 2011-2015** S.H. v. Reed

Compliance monitoring regarding psychiatric services in three Ohio juvenile correctional facilities pursuant to a consent decree.

**February 2012-July 2012** Psychiatric Consultant
Psychiatric consultant to the mental health compliance monitor in New York's secure juvenile facilities.

**May 2011- December 2014** Compliance Monitor
Scioto, Ohio
Compliance monitoring regarding psychiatric services in a juvenile correctional facility pursuant to a consent decree.

**January 2011-April 2015** Psychiatric Consultant
Southern Poverty Law Center
Completed Consultations:
Walnut Grove Youth Correctional Facility
Birmingham City School District
Polk County Jail
Orleans Parish Prison

**April 2009-January 2014** Compliance Monitor
Los Angeles County, California
Compliance monitoring regarding psychiatric services in juvenile correctional facilities pursuant to a consent decree.

**January 2008-2010** Compliance Monitor
Attorney General's Office
State of Mississippi
Compliance monitoring regarding mental health and rehabilitative services in Mississippi's secure juvenile correctional facilities pursuant to a Consent decree.

**March 2004-December 2010** Psychiatrist
Louisiana State University Health Science Center
Juvenile Justice Program
Provided psychiatric evaluation and medical management to youth in a secure juvenile correctional facility, Bridge City Center for Youth. In addition, supervised and directed the resident rotations for Child and Adolescent Psychiatry and Forensic Psychiatry residents within the Juvenile Justice Program.

**March 2004-October 2007** Medical Director
West Jefferson General Hospital
Behavioral Medicine Center
Medical Director for inpatient and outpatient psychiatric services at West Jefferson Hospital. Responsible for administrative decisions as well as

providing clinical services to both acutely mentally ill psychiatric inpatients and outpatients attending intensive outpatient and partial hospitalization programs. In addition, provided consult liaison psychiatric services to the general hospital.

**November 2003-August 2015** Medical Director
Assertive Community Treatment
Administrative responsibilities as well as providing intensive outpatient home based psychiatric services to adults with serious and persistent mental illness.

**January 2003-September 2012** Consulting Psychiatrist
Community Support Team
Resource Center for Psychiatric and Behavioral Supports
Stabilization Unit at Northlake Supports and Services
Provided consultative psychiatric services for individuals with developmental disabilities.

**July 2002-March 2004** Director of Psychiatry
Louisiana State University Health Sciences Center
Juvenile Corrections Program
Administrative supervision of lead psychiatrists at individual facilities, Provided direct psychiatric care to youth in Louisiana's secure correctional facilities, and supervised psychiatric residents and fellows rotating at Bridge City Center for Youth. Additional duties included serving as the Course Director for the Child and Adolescent Psychiatry Forensic Lecture Series.

**July 2000-March 2002** Director of Clinical Operations
Louisiana State University Health Sciences Center
Juvenile Corrections Program
Administrative supervision and implementation of medical, mental health, and dental care for youth in Louisiana's secure correctional facilities.

**July 1999-July 2000** Attending Psychiatrist
Medical Center of Louisiana, New Orleans
Provided psychiatric care to adult patients hospitalized in the acute psychiatric unit, supervision of medical students, psychology interns, psychiatric interns, and residents.

**July 1999-July 2000** Medical Director
Jefferson Parish Adult Drug Court Program

Responsible for the clinical quality of court-mandated substance abuse treatment for first time nonviolent offenders, evaluation and treatment of dual diagnosis clients, and the supervision of social services staff and forensic psychiatric fellows.

**July 1999-July 2000** Medical Director
Jefferson Parish Juvenile Drug Court Program

Responsible for the clinical quality of court mandated substance abuse treatment and the psychiatric evaluation and treatment of juvenile offenders.

**July 1999-July 2000** Medical Director
**July 1995-July 1999** Staff Psychiatrist
Jefferson Parish Human Services Authority
Mobile Crisis Team

Crisis assessment, evaluation, and disposition planning for adult, child, and adolescent clients, and the supervision of child psychiatrists and child psychiatry fellows.

**1994-1999** Clinic Psychiatrist
Orleans Parish Prison

Evaluation and treatment of incarcerated individuals.

**1996-1997** Duty Doctor
New Orleans Adolescent Hospital

Crisis assessment, evaluation, and emergency hospitalization of children and adolescents, after hour's management of acute inpatient unit.

**1994-1996** On-Call Provider
Child and Adolescent Mental Health Program

Crisis assessment, evaluation, and treatment disposition for children and adolescents in Orleans Parish.

---

## PRESENTATION AND TEACHING ACTIVITIES

Forensic Psychiatry Lecture Series (2025-2026) presented to Child and Adolescent Psychiatry Fellows at Louisiana State University Baton Rouge Psychiatry Residency Program.

Psychopharmacology and Developmental Disabilities (March 2024) presented to staff and community providers associated with Glenwood Resource Center, Glenwood Iowa.

Crisis Intervention Training (2016-2020) to the Jefferson Parish Sheriff's Office Crisis Intervention Unit. Topics of instruction – Psychiatric Medications and Diagnoses, Suicide Prevention and risk factors, Communication with Children and Adolescents in Crisis.

Psychotropic Medications, Suicide Prevention, Child and Adolescent Crisis Management (2011-2019) a reoccurring presentation to the Crisis Intervention Team of the Jefferson Parish Sheriff's Office.

Adolescent Brain Development: Implications in Juvenile Justice (May 2018). Daphne Glindmeyer, M.D. Presented to staff at the Nevada Youth Training Center and Caliente Youth Center.

Psychotropic Medication and Developmental Disabilities (February 2015). Daphne Glindmeyer, M.D. Presented to the Louisiana and Mississippi Councils for Child and Adolescent Psychiatry Annual Spring Meeting.

Better Living through Chemistry? A review of psychopharmacology and developmental disabilities. (April 2011). Daphne Glindmeyer, M.D. Presented to the Louisiana Disability Summit Annual Conference.

Autism Spectrum Disorder. (March 2010). Daphne Glindmeyer, M.D. Presented to Louisiana Public Health Association Annual Educational Conference.

Speakers Bureau: Pfizer, 2007-2011
Eli Lily, 2008-2010
Astra Zeneca, 2010-2013
Abbott, 2007-2008
Pam Lab, 2010-2015
Otsuka 2012-2015

Landmark Cases in Child and Adolescent Psychiatry. (May, 2004).
Daphne Glindmeyer, M.D. Presented to LSUHSC psychology students.

Psychopharmacology and Metabolic Syndrome. (November, 2008).
Daphne Glindmeyer, M.D. Presented to the Medical Staff of Northlake Supports and Services.

Bipolar Mood Disorder: Diagnosis and Treatment. (October, 2007).
Daphne Glindmeyer, M.D. Presented to the Louisiana Society of Nurse Practitioners.

Mental Status Examinations. (May 2004). Daphne Glindmeyer, M.D. Presented to psychology students at University of New Orleans.

Psychopharmacology and Developmental Disabilities. Daphne Glindmeyer, M.D. (March, 2004). Presented to the American Academy of Family Physicians, and presented to the Region II Office of Citizens with Developmental Disabilities staff.

Child and Adolescent Forensic Lecture Series. (2003). Daphne Glindmeyer, M.D. Course Director. Overview of the Juvenile Justice System, Introduction to the Court Process

Forensic Issues in Inpatient Psychiatry. (1999).

Stalking: The Psychiatric Perspective. (1999).

Child Abuse and Confidentiality in the treatment of Children and Adolescents. (1998)

Psychiatry Clerkship Small Group Leader. (1997-1998).

Adolescent Depression and Juvenile Delinquency. (1997).

Psychiatry and Medicine Small Group Leader. (1996-1997).

---

## PUBLICATIONS

Glindmeyer, D.A. & Cruise, K.R. (2003). Callous and Unemotional Traits in a Juvenile Offender, A clinical case study. Published in the Journal of Forensic Psychology Practice, 3, 73-78.

---

## REFERENCES

Available upon request.

# Testimony and Depositions

Daphne Glindmeyer, M.D.

| | | |
|---|---|---|
| 09.27.05 | Judicial Commitment of J.D. | 24th Judicial District Court |
| 03.23.06 | Deposition – Succession of R.A.A.M. | |
| 11.03.06 | Judicial Commitment of M.T. | 24th Judicial District Court |
| 11.15.06 | Judicial Commitment of A.D. | 24th Judicial District Court |
| 01.05.07 | Judicial Commitment of G.C. | 24th Judicial District Court |
| 01.19.07 | Judicial Commitment of D.E. | 24th Judicial District Court |
| 04.27.07 | Judicial Commitment of L.H. | 24th Judicial District Court |
| 05.15.07 | Judicial Commitment of E.A. | 24th Judicial District Court |
| 08.24.07 | Deposition – C.D. v. H.L.B. Jr. | |
| 05.15.08 | Deposition – R.D. v. P.A., et al | |
| 07.31.08 | Judicial Commitment of G.D. | Orleans Parish Civil Court |
| 10.23.08 | Deposition – S.K. v. Dollar General Corp | |
| 09.02.09 | State of La. v. J.B. | 24th Judicial District Court |
| 10.08.09 | State of La. v. A.C. | 22nd Judicial District Court |
| 11.30.09 | Judicial Commitment of S.K. | 21st Judicial District Court |
| 01.12.10 | The Matter of the Mental Health of R.R. | 22nd Judicial District Court |
| 02.04.10 | State of La. v. T.V. | 22nd Judicial District Court |
| 04.06.10 | State of La. v. E.H.T. | 24th Judicial District Court |
| 04.27.10 | State of La. v. E.W. | 24th Judicial District Court |
| 04.29.10 | Judicial Commitment of S.J. | 22nd Judicial District Court |
| 02.14.11 | Deposition - JB v. Art Catering | |
| 10.19.11 | State of La. v. A.J. | Hammond City Court |
| 10.20.11 | D.G. v. R.F. | 24th Judicial District Court |
| 11.07.11 | State of La. v. S.S. | 41st Judicial Criminal Court |
| 12.21.11 | I.F. v. K.K. and Safeco Insurance Company of America | U.S. District Court - Eastern District of Louisiana |
| 01.26.12 | State of La. v. D.B. | 24th Judicial District Court |
| 01.27.12 | Deposition - I.F. v. Tulane University | |
| 02.07.12 | Deposition - J.W. ex rel. Williams v. A.C. Roper | |
| 04.26.12 | I.F. v. Tulane University | Orleans Parish Civil Court |
| 08.17.12 | Deposition - C. H. v. G. J. | |
| 09.12.12 | Hughes v. Judd | United States District Court- Florida, Tampa Division |
| 11.29.12 | L.R. v. D.P.W. | Personnel Board Jefferson Parish |
| 02.14.13 | Deposition – C.H. v. G.J. | |
| 02.19.13 | Judicial Commitment of D.P. | 24th Judicial District Court |
| 02.28.13 | Deposition – C.H. v. G.J. | |
| 04.02.13 | L.R. v. D.P.W. | Personnel Board Jefferson Parish |
| 04.03.13 | J. v. G. | United States District Court – Eastern District of Louisiana |
| 07.02.13 | Deposition – J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | |
| 07.23.13 | J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | Terrebonne Parish Clerk of Court |
| 07.25.13 | J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | Terrebonne Parish Clerk of Court |

| | | |
|---|---|---|
| 10.29.13 | Deposition - Hughes v. Judd, et al | United States District Court Florida, Tampa Division |
| 11.25.13 - 11.27.13 | Hughes v. Judd, et al | United States District Court Florida, Tampa Division |
| 01.21.14 | Deposition - D. H. v. Coroner, St. Tammany Parish, The State of Louisiana, et al | 22nd Judicial District Court |
| 02.05.14 | State of La. v. A.T. | 40th Judicial District Court |
| 05.08.14 | Deposition – C.C. V. LC. | |
| 08.27.14 | Jefferson Parish Human Services Authority v. D.T. | 24th Judicial District Court |
| 09.25.14 | In re D.T. | 24th Judicial District Court |
| 01.22.15 | Depositions- J.B. v. R.J. Reynolds Tobacco Co. | |
| 01.23.15 | J.W. ex rel. Williams, et al. v. Birmingham Board of Education, et al. | United States District Court Northern District of AL, Southern Div. |
| 05.15.15 | Deposition- B.P., et al v. River Oaks, Inc., et al | |
| 06.18.14 | E v. E | Orleans Parish Civil District Court |
| 09.22.15 | Deposition- B.D. v. S.D. | |
| 09.28.15 | B.D. v. S.D. | 22nd Judicial District Court |
| 09.29.15 | A.F. v. United States of America | United States District Court for the Eastern District of New York |
| 11.23.15 | Deposition- P.J. v. R.J. Reynolds Tobacco Co. | |
| 01.13.16 | State of La. V. D.R. | 18th Judicial Court |
| 02.17.16 | State of La. V. E.P. | 24th Judicial Court |
| 03.08.16 | Deposition- G.J. v. C.A., et al | |
| 07.29.16 | Deposition- S.S. v. R.J. Reynolds Tobacco Co. | |
| 12.02.16 | Deposition- D.H., et al v. City of New Orleans, et al | |
| 02.13.17 | State of La. V. J.D. | 29th Judicial Court |
| 08.24.18 | Deposition L.C., et al v. Evergreen, et al | |
| 08.31.18 | M.A. v. R.A. | 24th Judicial Court |
| 11.26.18 | Daubert Hearing- L.C., et al v. Evergreen, et al | 21st Judicial Court |
| 02.07.20 | Deposition- J.A. v. E.C., et al | |
| 02.11.20 | State of La v. A.H. | 24th Judicial Court |
| 11.16.20 | Deposition- D.M. et al v. Erie County, Ohio et al | |
| 03.09.21 | Interdiction of E.M. | 24th Judicial Court |
| 03.12.21 | Deposition- Vargas v. Sheriff of Cook County, et al | United States District Court for the Northern District of Illinois, Eastern Division |
| 05.04.22 | State of LA v. B.J. | 24th Judicial Court |
| 10.20.23 | Deposition- D.A, et al v. New Orleans Military & Maritime Academy, Inc., et al | |
| 10.27.2 | Deposition- D.A, et al v. New Orleans Military & Maritime Academy, Inc., et al | |
| 04.16.24 | Deposition- J.T. v. NaphCare, Inc., et al | |
| 04.24.24 - 04.25.24 | D.M. v. State of New Hampshire, Dept. of Health and Human Services, et al | Rockingham Superior Court Brentwood New Hampshire |
| 10.16.24 | State of LA v. D.A. | 24th Judicial Court |
| 01.23.25 | Deposition- J.Y. v. CoreCivic Inc., et al | |
| 03.25.25- 03.26.25 | J.T. v. Naphcare, Inc., et al | United States District Court for the Western District Court of Washington at Seattle |
| 04.30.25 | Deposition- A.S. et al v. Endeavor Southlake OpCo, LLC et al | |

| | | |
|---|---|---|
| 06.06.25 | Deposition- J.F. v J. Landry et al | |
| 11.14.25 | Deposition- E.M. v. New Mexico Corrections Dept. et al | |
| 05.29.26 | Garcia v. City of New York, et al | Supreme Court of the State of New York Bronx County |

*Information prior to August 2005 unavailable

# Daphne Glindmeyer, M.D.

Post Office Box 4240 Covington, Louisiana 70434

Phone: (504) 392-8348 Phone: (985) 888-1414
Facsimile: (504) 398-4334 Facsimile: (985) 888-1415

Fee Agreement in the matter of:

______________________________________________________
Case title

Dr. Glindmeyer's fee for expert consultation is $600.00 per hour. This hourly rate applies for record review or collection, interviews, research, report writing, consultation with attorneys, telephone calls, site visits, travel time, and any other activity necessary to complete the consultation.

Once Dr. Glindmeyer agrees to a forensic consultation, retainer fees will be discussed with the referring party and determined based on the consultation requested. The retainer amount must be paid promptly. Any and all case records (e.g., police reports, case filings, medical records, mental health records, depositions) must be provided to Dr. Glindmeyer for review. The consulting client must not withhold or make unilateral decisions on what records to provide to Dr. Glindmeyer. Based on the volume of records and interviews necessary, Dr. Glindmeyer will be better able to gauge costs for completion of the full evaluation report.

The client will be billed only for the hours worked, and any unused portion of the retainer will be returned. Once the retainer is expended, an additional retainer will be requested. Any remaining balance must be satisfied prior to the delivery of the final report. All fees must be satisfied prior to testimony or deposition. Further, testimony and deposition fees must be satisfied 15 business days prior to appearance.

My expert opinion testimony at depositions, trials or hearings will be provided at the rate of $600.00 per hour. For local cases, there is a minimum charge of four hours ($2400.00) for an appearance. The four-hour minimum, which must be paid 15 business days prior to appearance, includes travel time (portal to portal) and time waiting to be called to testify in court. If the testimony time inclusive of travel and waiting exceeds four hours, a second four-hour charge will be applied. This second four-hour charge must be paid prior to the continuation of the deposition or trial testimony. Any testimony or deposition appearance exceeding 8 hours in one day or continuing after 5PM(CST) is charged an hourly rate of $700 per hour. For cases where car travel is greater than 2 hours portal to portal or where air travel is necessary, a full eight-hour day will be charged. Again, fees must be satisfied prior to appearance.

In certain cases, when agreed upon by Dr. Glindmeyer and the referring party, the services of a forensic medical assistant may be necessary to review documents, depositions, and other data. The fee for this assistant is $150.00 per hour.

Any travel expenses (hotel, taxi, car rental, food, etc.) must be reimbursed fully with receipts provided. Airfare must be paid in advance of any travel. Dr. Glindmeyer will make all travel arrangements for herself at reasonable pricing available at the time, in consideration of the notice provided to her, and based on her professional schedule. Incidental expenses related to the case necessary for her to provide her expert opinion (copies, mailing charges, misc) are to be reimbursed fully with receipts provided.

A minimum of 90 business days is required to complete evaluations/reports. In some cases, this time period may be longer; however, that will be discussed with the referring client. If the services requested must be completed within 90 business days or a time less than that period, then a rush fee will apply. If the consultation is accepted and there is a need to change the previously agreed upon time schedules, Dr. Glindmeyer may decline to continue work on your consultation or, to continue work, an intermediate rush fee will be applied. This rush fee will be determined by Dr. Glindmeyer and if agreed upon by the client, in writing, payment of the rush fee to continue work must be submitted within 24 hours.

A ten-business day notice is required for cancellation of appointments, testimony, or court appearances or the scheduled time will be billed against the retainer, or any deposit received forfeited. Billed items must be paid within 30 days and all fees satisfied prior to any deposition or trial testimony. Checks should be made payable to Daphne Glindmeyer, M.D., A.P.M.C. Other methods of payment include credit card and a variety of electronic funds transfers.

Please sign and return one copy of this agreement with your retainer check indicating you agree to the terms as outlined above, acknowledge the responsibility for all fees and expenses, and that payment is not contingent on any verdict or settlement of the matter.

____________________________________

Responsible party/Law Firm Signature

____________________________________

Date

____________________________________

Email Address

____________________________________

____________________________________

Mailing Address

# EXHIBIT “D:

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD; et al.,

Plaintiff,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE CORPORATION; CHRISTINA GOODALL (SUED AS CHRISTINA ANOSIKE) , IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; DEFENDANT DEPUTIES DOES 1-10, DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10.

Defendants.

**CASE NO.** 3:23-cv-1357-CAB-JAC

## DEPOSITION OF

DAPHNE A GLINDMEYER, M.D.

Wednesday, September 16, 2026

12:06 PM (ct) to 7:19 PM (ct

Reporter: Devon Willard, CSR No. 10535, RPR

## VIA REMOTE VIDEO TECHNOLOGY

**Hines Reporters**

**INTERNATIONAL TOWER**
**888 S. FIGUEROA STREET, SUITE 940, LOS ANGELES, CALIFORNIA 90017**
**866.432.4300**

**LOS ANGELES * SAN FRANCISCO * SAN DIEGO**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD, By and Through his Successors-In-Interest Justino Rupard & Ronnie Rupard; JUSTINO RUPARD, Individually and In His Capacity as Successor in Interest; RONNIE RUPARD, Individually and In His Capacity as Successor in Interest,

Plaintiffs,

vs.

COUNTY OF SAN DIEGO, et al.,

Defendants.

CASE NO: 3:23-cv-1357-CAB-JAC

VIDEOCONFERENCE AND VIDEOTAPED DEPOSITION OF

EXPERT DAPHNE A. GLINDMEYER, MD

WEDNESDAY, SEPTEMBER 16, 2026

12:06 P.M. CENTRAL TIME

VIA REMOTE ZOOM VIDEOCONFERENCE
Folsom, Louisiana

DEVON WILLARD, RPR
Certified Shorthand Reporter No. 10535

Videoconference and Videotaped Deposition of EXPERT DAPHNE A. GLINDMEYER, MD, before Devon Willard, a Certified Shorthand Reporter for the State of California, with principal office in the State of California, County of Riverside, commencing at 12:06 P.M. Central Time, Wednesday, September 16, 2026, VIA REMOTE ZOOM VIDEOCONFERENCE, Folsom, Louisiana.

* * *

APPEARANCES OF COUNSEL:

For the Plaintiff Justino Rupard and the Estate of Lonnie Rupard:

LOWE LAW, LLP
BY: JEREMIAH A. LOWE, ESQ.
402 West Broadway
Suite 1720
San Diego, California 92101
(619) 878-2725
jeremiah@lowelawapc.com

For the Plaintiff Justino Rupard:

IREDALE & YOO, APC
EUGENE G. IREDALE, ESQ.
(Not present at deposition)
105 West F Street
Fourth Floor
San Diego, California 92101
(619) 233-1525
egiredale@iredalelaw.com

APPEARANCES (CONTINUED)

For the Defendants County of San Diego, Bill Gore, Kelly Martinez, Jon Montgomery, Christina Goodall (sued as Christina Anosike), Miguel Aguilera, Jason Viladiu, Gustavo Martinez, Jeff Amado, Ernesto Aguirre, Treyvonne James (sued in duplicate J. Treyvonne), Bernardo Romero, Michael Johnson, Andrew Torres, Allen Wereski, Blade Romans, and Linda Gutierrez:

COLLINS + COLLINS LLP
BY: RADA FELDMAN, ESQ.
2011 Palomar Airport Road
Suite 207
Carlsbad, California 92011
(760) 274-2110
rfeldman@ccllp.law

For the Defendants Anthony Cruz, MD., and Liberty Healthcare of California, Inc.:

TRESSLER LLP
BY: COREY E. KRUEGER, ESQ.
909 North Pacific Coast Highway
Suite 840
El Segundo, California 90245
(310) 203-4800
ckrueger@tresslerllp.com

Also Present:

KAMERON HINES, Videographer

I N D E X


| EXAMINATION | PAGE |
|---|---|
| BY MS. FELDMAN | 7, 93 |
| BY MR. KRUEGER | 191, 260 |
| BY MR. LOWE | 258 |


EXHIBITS


| MARKED | DEFENDANTS' DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | ENTIRE EXPERT FILE | 8 |
| EXHIBIT 2 | EXPERT REPORT; 66 PAGES | 10 |
| EXHIBIT 3 | REBUTTAL REPORT; 7 PAGES | 15 |
| EXHIBIT 4 | SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION, OPERATIONS MANUAL; COSD 006170 THROUGH 006173; 4 PAGES | 221 |
| EXHIBIT 5 | DEFENDANT COUNTY OF SAN DIEGO'S RESPONSES TO DEFENDANT ANTHONY CRUZ, DO'S REQUESTS FOR ADMISSION, SET ONE; 10 PAGES | 246 |


QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

(None)

INFORMATION REQUESTED

(None)

WEDNESDAY, SEPTEMBER 16, 2026; FOLSOM, LOUISIANA

12:06 P.M. CENTRAL TIME

- - -

12:06 THE VIDEOGRAPHER: All right. Good morning. Here begins Media No. 1 in Volume I in the deposition of Dr. Daphne A. Glindmeyer in the matter of Estate of Lonnie Rupard, et al., versus County of San Diego, et al., being heard in the United States District Court, Southern District of California. The case number is 3:23-CV-1357-CAB-JAC.

12:07 Today's date is Wednesday, September 16th, 2026, and the time on the video monitor is 12:07 p.m. Central Time. This deposition is being taken via Zoom remote video technology and being made at the request of the defendants. Your videographer today is Kameron Hines here on behalf of Hines Reporters located at 888 South Figueroa Street in Los Angeles, California.

12:07 Would counsel and all present today please identify yourselves and state whom you represent, beginning with the witness.

12:07 Your name, Doctor.

12:07 THE WITNESS: Hi, I'm Daphne Glindmeyer.

12:07 MS. FELDMAN: Rada Feldman on behalf of the County defendants.

12:57 2015 from the National Commission on Correctional Health Care was in effect. Those standards have since been updated, and we have the 2026 standards. But because this occurred during the time of the implementation of the 2015 standards, those were used in order to form my opinion. And when you go here --

12:58 Q. You said the 2015 standards were used for him?

12:58 A. Yes.

12:58 Q. Okay.

12:58 A. Because those were the ones that were in implementation during that time.

12:58 Q. Okay. Let's talk about those standards.

12:58 The NCCHC standards, those are not mandatory standards for jail facilities, including San Diego Central Jail at the time of this incident, correct?

12:58 A. The National Commission on Correctional Health Care standards provide an overarching basis for the provision of medical and mentalhealth care in correctional facilities in the United States. They are the foundation for the standard of care.

12:58 Q. But they're voluntary, correct?

12:58 A. I don't know how you describe "voluntary." I'm not sure what you're saying there.

Q. Is -- was a jail facility, such as San Diego Central Jail, at the time of this incident mandated to comply with the standard set forth by NCCHC?

A. No. If they want to deviate from the standard of care, they don't have to.

Q. What authority do you have to support your opinion that NCCHC was the standard of care at that time?

A. That is -- the standard of care is the standard of care, right. So it's what should happen in a correctional facility when you have someone who is mentally ill or needs services. So this is the basis or the foundation for the standard of care across the country.

Q. But you agree that NCCHC provided guidelines, not requirements for correctional facilities as of 2022, correct?

A. No. These are guidelines, clinical care guidelines. And to deviate from the clinical care guidelines is to deviate from the standard of care.

Q. And so you are offering a standard of care opinion in this case?

A. Yes.

Q. And is there anyone in particular as to whom you are offering a standard of care opinion in this

1:09 by "its contractors," I mean Liberty Healthcare -- that its employees -- by "employees" I mean Ms. Goodall Anosike -- are -- and its sworn staff are doing what they are supposed to do. That they are monitoring their employees to ensure that they are following the policy and that things are occurring in their facility the way they believe they should be. But from what I can tell, that didn't occur here.

1:10 BY MS. FELDMAN:

1:10 Q. Doctor, are you offering opinions in this case as to the conduct of any of the sworn staff --

1:10 A. I'm not.

1:10 Q. -- in this case?

1:10 A. I'm not. But -- but what I am saying is that Dr. Cruz testified in his deposition that he relied on Ms. Anosike and sworn staff to give him information about the individuals on his caseload. Well, that didn't occur. He didn't know that Mr. Rupard was deteriorating and that he was deteriorating significantly.

1:10 Mr. Blumenshine stated that when he did the investigation, there were approximately nine days worth of trash in Mr. Rupard's cell. He also indicated that -- also Dr. Badre, who saw Mr. Rupard

1:11 approximately four days, I think, prior to his
1:11 death, also documented the condition of Mr. Rupard's
1:11 cell, the smell, the feces. And if any sworn staff
1:11 had walked by and looked in that cell up to four
1:11 days -- at least, let's just say four days, when
1:11 Dr. Badre did the evaluation, they would have seen
1:11 that. Nobody reported it. So --
1:11 Q. And --
1:11 A. From a failure -- so let me just finish this
1:11 thought. From a failure of sworn staff, that would
1:11 be my opinion. But I have no --
1:11 Q. You would agree that you're not qualified
1:11 here in this case to opine on the conduct of the
1:12 deputies and sworn staff in this case, correct?
1:12 MR. KRUEGER: I'm sorry. I think -- I don't
1:12 think the doctor was quite finished with her answer.
1:12 THE WITNESS: With the -- I can't see you
1:12 again. I see what's happening, and I don't know how
1:12 to stop it. Okay.
1:12 MS. FELDMAN: Do you want to pin me?
1:12 THE WITNESS: I don't know how to do that.
1:12 MS. FELDMAN: You just go to -- you see the
1:12 little three dots where I am.
1:12 THE WITNESS: Hold on.
1:12 THE VIDEOGRAPHER: Probably because you have

2:07 A. It's significant. Mr. Rupard was ill. He was psychotic. You don't allow a patient to wallow in their mental illness for 14 days when you know they're psychotic.

2:07 Q. But what information do you have that Mr. Rupard ultimately seeing Dr. Cruz on February 22nd, 2022, didn't constitute referral to psychiatry to assess him again?

2:07 A. I'm sorry. I don't understand your question. I apologize.

2:07 Q. You're saying there's a 14-day gap between a referral to psychiatry, correct?

2:07 A. Well, here is the thing. There's an 89-day gap because Mr. Rupard was in this administrative segregation housing the whole time. Ms. Goodall Anosike saw him once. Once, that's it. He should have been seen every week. So the gap is long.

2:08 Q. I'm talking about the time that a psychiatrist did see him after Mrs. Goodall's appointment.

2:08 What information do you have that anything different would have happened had there been a referral between those two weeks?

2:08 A. I don't. I would have assumed -- hoped that had Dr. Cruz seen the deterioration of Mr. Rupard,

2:08 that he would have considered, A, either a 5150 and admission to the PSU or a petition for involuntary medication. Unfortunately, none of that happened.
2:08 Q. Did you review in detail the note from Dr. Cruz from February 2022?
2:08 A. I did.
2:08 Q. And --
2:09 A. I paraphrase it here.
2:09 Q. And did Dr. Cruz document rambling incoherently?
2:09 A. Hold on. Let me get to it. Okay.
2:09 He documented that, yes, rambling incoherently, disorganized thought process, may be responding to internal stimuli.
2:09 Q. Anything else?
2:09 A. He talked about him being irritable, uncooperative. Talked about him refusing medication. That he became verbally aggressive.
2:10 Q. He also states, "Due to patient's presentation, psych history, legal status (PC 1368), and potential for decompensation, will continue to monitor and offer treatment. Discussed current treatment plan with patient."
2:10 Do you see that?
2:10 A. Yes.

2:14 MS. FELDMAN: Okay. Let's move -- we can take -- if you want to take a break, Court Reporter, everyone, just tell me now.

2:14 THE REPORTER: I would like to.

2:14 MS. FELDMAN: Okay. Would you like to take a short -- we can go off the record.

2:14 THE VIDEOGRAPHER: All right. The time is 2:14 p.m. Going off record.

2:14 (Lunch recess taken at 2:14 p.m. CT)

2:14 * * *

WEDNESDAY, SEPTEMBER 16, 2026; FOLSOM, LOUISIANA

2:49 P.M. CT

\- - -

2:49 THE VIDEOGRAPHER: Time is 2:49 p.m. Back on record.

2:49

2:49 EXAMINATION (CONTINUED)

2:49 BY MS. FELDMAN:

2:49 Q. Okay. Good afternoon, Doctor. I'd like to move on to your next opinion in your report. I believe it's under -- it's on Page 28 under the header "Failure to Monitor - Mental Health."

2:49 Can you tell me all of your opinions with respect to this opinion.

2:49 A. I think we've talked about this quite a bit. Talking about that in-facility policy, it requires that mental health staff would be reviewing an individual or assessing an individual a minimum of one time a week. There's also a requirement for three times per week by nursing, but I think there's another expert who is going to address the nursing component of this.

2:50 Q. Okay. Just to be clear, you are not opining on any nursing standard of care, correct?

2:50 A. No, I'm not.

2:50 But by mental health staff, it would be a minimum of one time a week. But there was -- you know, I did note that there was no documentation of the monitoring three days a week by medical staff. I didn't see that. There were issues with the fact that, like we said, he was not monitored on a weekly basis, and that's pretty well the -- hold on a second. That's -- that's essentially -- I'm sorry. I didn't mean to cut you off. I apologize.

2:51 Q. That's okay.

2:51 Just looking at your report under this umbrella "Failure to Monitor - Mental Health," you do mention nursing.

2:51 So just to be clear, you are not offering any opinions in this case with respect to nursing or any other medical staff other than psychiatry and mental health; is that correct?

2:51 A. As it -- as it relates to this part, no. I think -- I did talk about medical somewhat during the refusal of medication section, but I think that really the failure to appropriately document and sign the refusals for psychotropic medication, again, is an overarching systems issue because it doesn't apply to just one person. It applies to the whole staff. That they were not appropriately

2:55 A. That's fine.
2:55 Q. -- I don't know if --
2:55 (Simultaneous speakers.)
2:55 (Reporter clarification.)
2:55 MS. FELDMAN: Yes.
2:55 Q. For the Failure to Monitor - Mental Health, are you -- with respect to the medication refusal documentation that you've just been discussing, is that a separate opinion, or is that part of this opinion?
2:55 A. Separate.
2:55 Q. Okay. So do you want -- can we just first work with making sure that we've covered your opinions for the Failure to Monitor - Mental Health, and then we can move on to the next item on your -- in your report, which would --
2:55 A. Sure.
2:55 Q. -- would be the medication refusal?
2:55 A. Yeah. So yes.
2:55 Q. So for Failure to Monitor - Mental Health, I believe you just said that you believe you covered your opinions with respect to this subject.
2:56 Is there anything else that you want to add?
2:56 A. One moment, please. I believe we've discussed it all previously.

2:56 Q. Okay. And then under this opinion when you refer -- you refer to the policy section titled "Segregated Inmates."

2:56 That's the same policy section that you've been referring to for your opinions on housing and use of segregation, correct?

2:56 A. Yes.

2:57 Q. And the same policy section you've been referring to with respect to the one-time-a-week monitoring by mental health?

2:57 A. Yes.

2:57 Q. Okay. And your opinion mentions nursing.

2:57 Can we just be clear that opinions asked to the conduct of any nursing staff is outside the scope of the opinions you're offering at trial?

2:57 A. Yes.

2:57 Q. Okay. And so the -- where your report refers to your opinions as to things being done or not being done by nursing, you will not be offering those opinions?

2:57 A. No.

2:57 MR. KRUEGER: Are we talking about this particular opinion?

2:57 MS. FELDMAN: Yes, under "Failure to Monitor - Mental Health."

3:17 indicates to you that Mr. Rupard was any different
3:17 from when he was booked in December through
3:17 January and the time frame of January through
3:17 February?
3:17     A. You mean through the time of his death?
3:18     Q. Let's just start with the January to
3:18 February time frame?
3:18     A. There was documentation that Mr. Rupard was
3:18 speaking in unintelligible words. That he, I think,
3:18 in January had homicidal ideations toward a nurse.
3:18 So there are increasing symptoms that can be
3:18 attributed to psychosis. Unfortunately, as he was
3:18 not seen on a regular basis by mental health, we
3:18 don't have a lot of documentation. That's
3:18 unfortunate.
3:18     Q. Well, psychosis, that's within the purview
3:18 of the psychiatrist, correct?
3:18     A. It's also within the purview of a mental
3:18 health treatment provider.
3:18     Q. An LMFT?
3:18     A. Yes.
3:18     Q. And LMFT in California can diagnose someone?
3:18     A. I didn't say "diagnose." They can treat and
3:18 develop a treatment plan to address psychoeducation,
3:18 to address reality testing and other interventions,

group -- I mean, I'm sorry -- individual and group therapy to address symptoms that an individual would be experiencing.

Q. What about an individual with schizophrenia?

A. Psychosis is a symptom of schizophrenia.

Q. So are you saying that in California, as of 2022, the licensed marriage and therapy clinician -- or licensed marriage therapy therapist clinician had the ability and authority to make decisions as to the psychiatric care and treatment of a patient with a diagnosis of schizophrenia?

A. That's not what I said. A LMFT can assess an individual, such as Mr. Rupard, and report the results of their assessment back to psychiatry. The psychotropic medication prescription, the decision for a 5150, the decision for a forced medication -- excuse me -- is the responsibility of the psychiatrist.

Q. Okay. And what information do you have that anything different would have happened had, at the time of Ms. Goodall's assessment on February 9th, 2022, she reported back to Dr. Cruz about her assessment?

A. I don't know.

Q. Well, Dr. Cruz did see Mr. Rupard on

3:20 February 22nd, correct?
3:20 A. 14 days later.
3:20 Q. And he did determine that no immediate intervention was needed based on his assessment, correct?
3:20 A. Despite his documentation of significant psychotic symptoms, he did determine that. I don't agree with his determination, but he did determine that.
3:20 Q. And so if Dr. Cruz made that determination, Christina, as a clinician, could not override that, correct?
3:21 A. No, but she could advocate. And there's no documentation that she advocated or continued to see Mr. Rupard after Ms. -- Dr. Cruz saw him. So after that time on February -- what was it? -- February 20 -- 22nd, there is no further documentation of the facility mental health -- and when I say "facility mental health," I mean either Ms. Anosike Goodall or Dr. Cruz -- seeing Mr. Rupard between that time and his death.
3:21 Q. And when you say "advocate" -- "advocate" after a psychiatrist makes a decision to continue the discontinuation of a patient's psychotropic medication and that the patient doesn't meet

3:34 Q. Did you review the jail medical records indicating that Mr. Rupard was referred to psychiatry for evaluation of his medication refusal of the psychotropic medication that Dr. Cruz had prescribed him?

3:34 A. Apparently when you look at the record -- hold on just a second. Let me pull it up. Okay?

3:35 Q. Uh-huh.

3:35 A. So wait. This is the wrong place. Hold on just a second. I'm sorry. I was reading the wrong section. I was like, why does this not look right?

3:35 So Mr. Rupard comes into the facility on -- and he's prescribed the medication, I think, as of December 29th, but there's multiple refusals. He's not referred to psychiatry until January 15th, which is approximately two weeks. According to policy, it appears that any refusal needs to be referred to psychiatry, but that didn't happen.

3:36 Q. What if you saw documentation showing that he was referred to psychiatry twice and as early as January 8th, 2022? Would that change your opinion?

3:36 MR. KRUEGER: Lacks foundation.

3:36 THE WITNESS: Perhaps, but I don't have that.

3:36 ///

3:36 BY MS. FELDMAN:
3:36 Q. So you don't have the full sick call log spreadsheet chart showing when a request to psychiatry is made and when that request is performed?
3:36 A. I have a list of sick calls. I don't have anything on January 8th. And again, what I have is my outline of the document. We can pull up the --
3:36 Q. Well, how about I'll -- you know, if I represent to you that a request -- there were two requests made to psychiatry to evaluate Mr. Rupard for the refusal of the medication that Dr. Cruz had prescribed, with the first one on January 8th, 2022.
3:37 MR. KRUEGER: Lacks foundation.
3:37 BY MS. FELDMAN:
3:37 Q. Would that -- would that change -- having that information, would that change your opinion in any way?
3:37 A. Not necessarily. So we've got -- I have medication refusal forms that were completed daily regarding Mr. Rupard's psychotropic medications beginning January 8th through January 20th. The forms -- and we talked about this earlier -- were not signed by Mr. Rupard. So it's not clear if the refusal started on January 8th that Dr. Cruz, A,

didn't address it 'til January 20th; and B, at the time he addressed it, just discontinued the medications without a clinical encounter.

Q. Okay. So it would change your opinion that there was no referral to psychiatry --

MR. KRUEGER: Misstates --

MS. FELDMAN: -- correct?

MR. KRUEGER: Misstates testimony.

THE WITNESS: I'm sorry. I'm not understanding what you're saying.

BY MS. FELDMAN:

Q. Well, I understood your opinion as having two parts. One, you opined that Mr. Rupard was not referred to psychiatry for the refusal of these psychotropic medications?

A. Uh-huh, yes.

Q. And I said if I had shown you records indicating that he had been referred to psychiatry as early as January 8th, 2022, and then again January 15th, 2022, or January 19th, 2022, would that change your opinion on that issue?

A. With regard to the referral --

Q. Yes.

A. -- and policy? I'm not sure. I would have to see the -- and associate the refusal forms with

the referral forms. But theoretically, according to policy, if he's refusing every time, they should be generating a referral. So Dr. Cruz knows this guy is continuously refusing to take his medication. I need to do something about this.

But unfortunately, Dr. Cruz didn't really do anything about it. He just made the decision to discontinue the medication in an absence of talking with Mr. Rupard, trying to educate him or anything, or considering a Riese petition, which, if you look at Mr. Rupard's history, he had required Riese petitions in the past.

Q. Are you familiar with the TechCare system?

A. Yeah, it's your electronic medical record.

Q. Are you familiar with how it operates?

A. I'm not.

Q. Okay. And are you familiar with sick call requests within the TechCare system?

A. I'm -- I'm familiar with sick call requests in general, yes.

Q. And what is your understanding of what sick call requests are in the context of the TechCare system at San Diego Central Jail for purposes of medical care at the time we're talking about?

A. I'm not opining on medical care. I'm

opining on psychiatric behavioral healthcare.
Q. Do you -- do you understand that a sick call request is the same thing as making a referral or an appointment by, say, psychiatry?
A. Yes.
Q. Okay. And did you review any of the sick call records in the jail medical records part of this case?
A. Yes.
Q. And did you see the referral to psychiatry for the medication referral refusal within those sick call requests?
A. On January 15th, yes.
Q. Okay. And so there was a referral to Dr. Cruz?
A. On January 15th, yes.
Q. So --
A. But according to policy, it reads as though if he refuses his psychotropic medication, there's supposed to be repetitive referrals. So I'm not sure what the practice was at the facility with regard to that.
Q. What is the basis for your opinion then?
A. Your policy.
Q. What policy? Does the policy say that --

3:41 A. I think it's refusal -- I have to get it for you. Just take me a second. I'm not very good at searching is the problem, searching in my document. You know, some people can do that and get things very quickly. I am not fast. Here we go.

3:42 So under the refusals policy that was dated July 14th, 2016, the purpose is to develop a standardized procedure when a patient refuses treatment while in custody, and that that patient will be counseled by medical staff of the risks and benefits of such an action. I didn't see where that was documented.

3:43 For refusals for medications it says, "Patient shall sign a refusal form with the specific medication being refused. If the patient refuses to sign the refusal form, the nurse and deputy shall sign the form. All refusals shall have the reason documented. If the medicine is indicated for a serious medical psychiatric condition, refer the patient to the doctor or psychiatrist immediately or as soon as possible."

3:43 So I do not see where his refusals resulted in an immediate referral to psychiatry.

3:44 Q. And "immediate," does that say every day the medication is being refused?

A. It says "immediately."

Q. Okay. At one point you agree that the refusal was referred to psychiatry?

A. It was, but I don't see that it was immediate upon every refusal, and I don't see that it was immediate that the psychiatrist responded.

May I ask for a break for about two minutes, please.

MS. FELDMAN: Yes, of course. We can take a break.

THE VIDEOGRAPHER: Time is 3:44 p.m. Going off record.

(A two-minute recess was taken.)

THE VIDEOGRAPHER: Time is 3:46 p.m. Back on record.

BY MS. FELDMAN:

Q. Okay. With respect to the referral to psychiatry for the medication refusal and its timing, what information do you have, if any, that the speed in which it was referred would have made any difference here?

A. I think the issue is that it was occurring repetitively. So Mr. Rupard didn't just refuse his medication one time; he refused it repetitively. And despite those repetitive refusals, there were

3:46 not repetitive referrals. So it would be difficult -- well, unless he looked at the record -- for Dr. Cruz to ascertain that Mr. Rupard was continually refusing his medication. That in the absence of ongoing referrals.

3:47 Q. Did you review the EMR record in this case?

3:47 A. Yeah, I think I had that. I think I did. I can't really remember.

3:47 Q. And the EMR record, it documents the 33 or 34 medication refusals; is that correct?

3:47 A. Correct. But again, Dr. Cruz would not just go look at that as a matter of course. That's not something he would just do on the daily. He would require information letting him know that his patient was nonadherent to his regimen. If you get one refusal and one referral, oh, this patient refused his medication. Okay.

3:47 But if you get repetitive refusals, you know, you know you have to do something. The policy requires immediate addressing in a situation such as this.

3:47 Q. Okay. But what information do you have that the outcome would have been any different, meaning Dr. Cruz's decision to discontinue the medication without a face-to-face assessment?

3:48 A. I would hope that an intervention on the part of Dr. Cruz, with regard to looking at this individual who is refusing medication, attempts to develop rapport, attempts to educate him regarding the need for medication, and the need for a Riese or forced medication would have changed the trajectory of Mr. Rupard's disease process.

3:48 When you look at -- history is the best predictor of what's going to happen in the future. Mr. Rupard's psychiatric history was clear that over time, he had refused his medication. He had required a Riese petition for forced medications. And when then that was -- and when that happened and he took his medication, he was better. He was pleasant. He was cooperative. So I would think -- it's my opinion that had he been taking medication, that would have been the outcome.

3:49 Q. Okay. So that's the opinion as to Dr. Cruz's decision to discontinue the medication, correct?

3:49 A. Yes.

3:49 Q. Do you have an opinion one way or another that the timing of the referral would have had any impact on the outcome, meaning Dr. Cruz's decision to discontinue the medication?

A. The longer you allow a psychotic person to remain in a psychotic state, the more difficult it is to treat them. So here we have what's called the duration of untreated psychosis where a person doesn't take their medication because they refuse, and their symptoms become more intense, more difficult to treat, more resistant to psychotropic medication.

Q. Okay. But the outcome here, which was Dr. Cruz did a chart check, correct?

A. I'm sorry?

Q. The outcome of the medication refusals that were occurring since the prescription of December 29th, 2021 --

A. Uh-huh.

Q. -- was Dr. Cruz reviewed Mr. Rupard's chart, correct?

A. That's what's documented, yes.

Q. And Dr. Cruz was the one that made the decision to discontinue Mr. Rupard's medication after reviewing his chart, correct?

A. Yes.

Q. So what information, if any, do you have that there would have been a change in that outcome based on the timing of the referral to Dr. Cruz --

3:51 A. That's what I just --

3:51 Q. -- for the medication?

3:51 A. That's what I just said. That had Mr. Rupard been seen by Dr. Cruz in a timely manner after beginning to refuse the medication, which apparently occurred in the beginning, so January 8th, January 9th, and done actually an appropriate assessment of an individual who is refusing medication, seeing Mr. Rupard, attempted to develop rapport, intervention, education, and considering of a Riese petition, which had in the past been effective to address Mr. Rupard's psychosis, we may not be sitting here.

3:51 Q. Okay. And those were all decisions that Dr. Cruz -- those were all Dr. Cruz's decision --

3:51 MR. KRUEGER: Lacks foundation.

3:51 BY MS. FELDMAN:

3:52 Q. -- the decision -- so that you mentioned the decision to seek involuntary medication through a Riese petition, court petition, 5150 hold, or PSU admission, those were all decisions that Dr. Cruz would make, correct?

3:52 MR. KRUEGER: Lacks foundation.

3:52 THE WITNESS: Yes.

3:52 ///

3:52 BY MS. FELDMAN:
3:52 Q. No one else --
3:52 MR. KRUEGER: Same objection.
3:52 MS. FELDMAN: -- at the jail?
3:52 MR. KRUEGER: Same objection.
3:52 BY MS. FELDMAN:
3:52 Q. You agree that no one else -- that was not the decision of anyone else other than Dr. Cruz, correct?
3:52 MR. KRUEGER: Same objection.
3:52 THE WITNESS: Like I talked about earlier, it's also incumbent upon the mental health staff to develop rapport, to attempt to educate, to advocate for Mr. Rupard with psychiatry, to report as part of that treatment team what's going on with him. So I don't think anybody gets treated in isolation.
3:53 BY MS. FELDMAN:
3:53 Q. You're talking about --
3:53 A. In isolation, I don't mean isolation in ad seg. That's not what I mean. I mean nobody -- no man is an island. There you go. I don't believe that it was just one person. It's the whole team as far as the treatment of Mr. Rupard.
3:53 Q. I'm just talking about your topic for opinions "Duration of Untreated Psychosis and

3:53 Medication Refusals" and your opinions with respect to this.

3:53 A. What we've talked about.

3:53 Q. Okay. So we talked about Dr. Cruz not making -- Dr. Cruz's decision to discontinue the medication, and, in your words, I believe you said not do anything about it, including consider a Riese petition; is that right?

3:54 A. In the absence of any intervention, yes.

3:54 Q. What does that mean?

3:54 A. Dr. Cruz made the decision to discontinue Mr. Rupard's medication in the absence of any intervention. He didn't meet with Dr. -- with Mr. Rupard. He didn't attempt to establish rapport. He didn't attempt education. He didn't do any of those things. He discontinued the medication.

3:54 Q. Understood.

3:54 Any other opinions with respect to this category, "Duration of Untreated Psychosis and Medication Refusals"?

3:54 A. I don't think so.

3:54 Q. Do you have an opinion as to the conduct of Dr. Cruz and the standard of care under this category?

3:55 THE REPORTER: I'm sorry. Mr. Krueger, did

3:55 you have an objection?

3:55 MR. KRUEGER: Yes. It was asked and answered.

3:55 THE WITNESS: I don't think anything that I've already said, I believe -- and it's written in my report that, in my opinion, it's a deviation of the standard of care to discontinue the medications without a clinical encounter.

3:55 BY MS. FELDMAN:

3:55 Q. And what's the basis?

3:55 A. That's the standard of care. You don't discontinue a person's medication without -- which we've talked about ad nauseam now -- interventions to assist an individual in understanding the need for their medication. And if they don't have the capacity to make that informed decision to refuse because of their psychosis, you need to consider the Riese petition and a 5150.

3:55 Q. In your opinion, Doctor, you agree that Dr. Cruz could have pursued the consideration of a Riese petition or a forced medication petition or a 5150 in this circumstance, correct?

3:56 MR. KRUEGER: Vague as to time.

3:56 THE WITNESS: Yes.

3:56 ///

3:56 BY MS. FELDMAN:
3:56 Q. And he did not, is your opinion?
3:56 A. He did not.
3:56 Q. In your opinion --
3:56 A. It's not my opinion. It's not my opinion. That's a fact.
3:56 Q. He didn't -- okay.
3:56 And your opinion is that those failures were a deviation from the standard of care, correct?
3:56 A. Yes.
3:56 Q. Okay. Any other opinions with respect to this category of opinions that you'd like to provide?
3:56 A. Nothing other than what's included in my report.
3:56 Q. Okay. And then the next item in your report I see is "Failure to Monitor" -- I'm sorry. I skipped one. It's on Page 31, "Basic Mental Health Services."
3:57 A. We've talked about that with regard to the need for treatment interventions for Mr. Rupard in addition to psychotropic medication. We talked about that.
3:57 Q. Okay. Can you tell me what those opinions are.

A. That basic mental health services in a correctional institution indicate that a range of mental health services should be available for those individuals who require them. There were no basic mental health services documented as provided to Mr. Rupard, nor were they included in a treatment plan.

So, you know, Mr. Rupard could have benefited perhaps from psycho education, rapport-building, reality testing. We've talked about this. And he did not have a treatment plan addressing any of that. So these are the basic psychological -- I'm sorry -- basic psychosocial, psychoeducational programs that would be provided to someone with Mr. Rupard's chronic severe mental illness.

Q. And what is the basis for this opinion?

A. I'm not sure -- you asked me that very often, and I'm not sure what you're referring to when you say the basis of my opinion, other than the NCCHC standards and mental healthcare across the country.

Q. Right. That's what I referred to, the basis for your opinion is what is the support for this opinion?

3:58 A. The NCCHC standards and other facilities' review of other cases over the course of my career.
3:58 Q. Other facilities in California?
3:58 A. Yes. Like I said, I've been on the monitoring team in California before. Done investigations in California. But again, as I stated earlier, California is not an island. You guys are not special. Sorry. The standard of care is the same no matter where you live.
3:59 Q. Okay. And the NCCHC, is there a specific standard section that you are relying on for purposes of this basic mental health services opinion? Is it the G-03 or something else?
3:59 A. Oh, no, it's different. Hold on. I'll get you this one. Basic mental health services is MH-G-01.
4:00 Q. And that is an NCCHC standard that was in effect in 2022?
4:00 A. Yes.
4:00 Q. Again, that was a guideline that San Diego Central Jail did not have to adhere to, right, as voluntary?
4:00 A. I've been over this. It's not voluntary; it's the standard of care. It's the basis for mental healthcare in correctional facilities.

4:00 Q. Was it the law?
4:00 A. Standard of care is not a law.
4:00 Q. So it's a guideline?
4:00 A. It's the standard of care.
4:00 Q. And what does G-01 state?
4:00 A. Basic mental health services. That a range of mental health services are available for all inmates who require them.
4:00 Q. And under this basic mental health services opinion, do you have an opinion that's specific to any individual defendant in this case?
4:01 A. I'm sorry?
4:01 Q. Does this opinion with respect to basic mental health services relate to a specific defendant?
4:01 A. It would be the jail and Ms. Goodall Anosike.
4:01 Q. Who is the "jail"?
4:01 A. San Diego County jail.
4:01 Q. Anyone specific?
4:01 A. No. And I think I talked about this earlier. There are systems issues here. So it's not just attributable to one individual; it's to the system of care as a whole.
4:01 Q. What -- what is -- what do you mean by

4:01 "systems issues"? It's pretty vague.
4:01 A. The mental healthcare at the facility as a whole.
4:01 Q. What does that mean?
4:01 MR. LOWE: Overbroad.
4:01 Go ahead.
4:02 MR. KRUEGER: Join.
4:02 THE WITNESS: I'm sorry. I apologize.
4:02 BY MS. FELDMAN:
4:02 Q. What's your opinion? I just want to understand what it means.
4:02 A. It means the mental health services provided at the San Diego County jail were not appropriate. And I think the jail had been placed on notice of the lack of appropriate care based on the state auditor's report.
4:02 Q. What is the basis for the opinion that the mental health services in the jail as a whole were not appropriate?
4:02 MR. LOWE: Asked and answered.
4:02 But go ahead.
4:02 MR. KRUEGER: Join.
4:02 THE WITNESS: Let's see. Mr. Rupard was not receiving weekly assessments in his housing unit, which would be required based on the conditions

4:02 of -- his confinement. Mr. Rupard did not have a treatment plan. Mr. Rupard was not receiving any mental health services, psychoeducation, rapport-building, anything. There was no documentation of ongoing attempts to meet with him.

4:03 BY MS. FELDMAN:

4:03 Q. And --

4:03 A. Nothing.

4:03 Q. And this is based on the NCCHC guideline that you had just referenced?

4:03 A. And the medical record -- the mental health records that I reviewed in this case.

4:03 Q. And the -- you referred to notice based on the state auditor's report.

4:03 Can you identify specific sections in the state auditor's report that you're referring to?

4:03 A. We talked about this earlier. Hold on just a second. I'll get there for you. The state auditor's report was dated February of 2022. It talked about the high rate of death that raised concerns and suggests underlying systemic issues with the sheriff's department policies and practices.

4:04 Q. Is that the only section you relied on for this opinion?

A. There are multiple issues talking about the lack of -- that health staff did not always properly identify mental health needs. That some of the individuals as a consequence did not receive proper care. That the sheriff's department did not always provide consistent follow-up care for mental health services. So there were multiple issues identified by the auditor's report.

Q. And just to be clear, this opinion relates to the jail, but not anyone in specific that you've identified other than Ms. Anosike Goodall?

A. I'm sorry?

Q. Your opinion under basic mental health services, it relates to, you said, the jail, without having identified anyone in specific, and then Christina Goodall Anosike, the clinician?

A. Yes.

Q. And what are your opinions with respect to Christina Anosike Goodall under basic mental health services?

A. I think we've been over those. She didn't provide any. There was no treatment plan. There were no basic mental health services. There were no required assessments in the housing unit. He got nothing.

4:09 that Dr. Cruz was not aware of Mr. Rupard's history; therefore, did not understand that Mr. Rupard could improve with forced medications. Did not access his prior record. Made the decision to discontinue Mr. Rupard's psychotropic medication in the absence of a clinical encounter or other intervention.

And as you know and we've discussed, did not, in my opinion, appropriately appreciate Mr. Rupard's exacerbation of symptoms, specifically his incoherent rambling, disorganized thought process, and potential response to internal stimuli.

Q. And what is the basis for your opinion?

A. The medical records.

Q. Anything else?

A. Mr. Rupard's extensive medical records. His history. Documentation included in the record. The potential for a Riese petition. Dr. Badre's report. I mean, the entire record.

Q. And your opinion for "Failure to Monitor - Psychiatry," part of your opinion is that Dr. Cruz had documented Mr. Rupard's psychosis and psychiatric state hospital history and deterioration, but that he did not refer him to the PSU, 51- -- via a 5150 or a Riese petition for involuntary medication, correct?

A. Yes.
Q. And this was all Dr. Cruz's call as his psychiatrist, correct?
A. Yes.
Q. And under this opinion heading for "Failure to Monitor - Psychiatry," each of the decisions and conduct that your opinion discusses, that all relates to decisions or conduct by Dr. Cruz, correct?
A. Yes, with one caveat. That was that Dr. Cruz indicated in his deposition -- and we talked about this already -- that he relied on mental health and sworn staff to -- and medical staff to provide him with information regarding people.
And unfortunately, as Mr. Rupard was not being appropriately monitored by mental health staff, and sworn staff don't have the clinical acumen, but they should be trained to recognize and been able to recognize when someone was speaking in unintelligible words that they -- that should have been reported up the chain to Dr. Cruz.
Q. Okay. And what facts is this based on other than deposition testimony from Dr. Cruz?
A. Oh, and the documentation that Mr. Rupard

4:26 THE WITNESS: How long do I get?
4:26 MS. FELDMAN: Let's go off the record first.
4:26 THE VIDEOGRAPHER: All right. The time is
4:26 4:26 p.m. Going off record.
4:26 (A 14-minute recess was taken.)
4:40 THE VIDEOGRAPHER: Time is 4:40 p.m. We're
4:40 back on record.
4:40 BY MS. FELDMAN:
4:40 Q. Okay. Doctor, I'd like to move on to your
4:40 rebuttal report, which I've marked as Exhibit 3.
4:40 Do you have that in front of you?
4:40 A. Yes.
4:41 Q. Can you tell me all of your opinions that
4:41 you are providing in rebuttal to -- concerning
4:41 defense experts in this case?
4:41 A. They're outlined in my report. I noted that
4:41 for each expert opinion, I provided some rebuttal
4:41 opinions. For example, do you want to start with
4:41 the report of Mace Beckson? Is that where you want
4:41 to begin?
4:41 Q. Well, yes, and let me ask you this first.
4:41 Your rebuttal report, does it provide any
4:41 new opinions other than those that we have discussed
4:41 and you've written out in your initial report?
4:42 A. There's only, I think, one that was based on

4:42 the defense expert's report, specifically related to reduced life expectancy. And I wrote a response here about assigning a qualitative reduction in life expectancy, specifically needing comprehensive medical examination beyond a psychiatric expertise, and that that would require, in my opinion, an individualized life expectancy assessment, and that is not something that I do. Typically that's done by actuaries, and I outlined that in my report.

4:42 Q. Okay. So you are not offering an opinion on life expectancy here?

4:43 A. I am not. And I -- it's my opinion that Dr. Beckson and Dr. Abrams should not be either.

4:43 Q. What is the basis for your opinion?

4:43 A. We are not -- we're psychiatrists. We are not -- I apologize. It's dementia hour and -- I don't know -- can you guys hear my dog?

4:43 MS. FELDMAN: I can't hear it.

4:43 MR. KRUEGER: No.

4:43 THE WITNESS: You can't hear it?

4:43 MR. KRUEGER: No.

4:43 THE WITNESS: Okay. Good. He sundowns about this time, and I can hear him. And there's nothing I can do to stop it, so I apologize.

4:43 So we're psychiatrists. We are not

4:43 actuaries, nor does this case give us all the information that would be needed to determine life expectancy. So I don't think that's an appropriate opinion.

4:43 BY MS. FELDMAN:

4:43 Q. What information do you not have that you would need to make that determination?

4:44 A. So -- and I wrote it in my report that, you know, an individualized life expectancy assessment would incorporate, you know, medical evaluations, actuarial life tables, an analysis of, you know, mortality determinants, family history, and we really don't have all that here. So, you know, the magnitude of risk, it's not -- it's heterogeneous, so it varies across the population. And so I don't think this is something that can be opined in this case.

4:44 Q. So you're not offering an opinion on life expectancy one way or another in this case?

4:44 A. Other than to say that it's my opinion that Dr. Beckson and Dr. Abrams shouldn't be offering it either.

4:44 Q. Okay. And the basis for that, is there any authority that you're basing that on --

4:44 A. Everything that I --

Q. -- that you searched?

A. Everything that I just said.

Q. Okay. And any other opinions in the rebuttal that are new or different from what we've discussed?

A. Hold on. Let me look. I don't believe so, but just let me look real quick.

Q. Well, let's just obtain all your rebuttal opinions. Does that work?

A. I mean, I can look for you. So we talked about -- we've talked about all this. I think we've been over most of this.

Q. Well, so the purpose --

A. I don't think there's anything new other than what I just said.

Q. Okay. So I just want to make sure that I have all of your opinions out on the table so that there's nothing that we haven't discussed.

So if you can just walk me through your rebuttal opinions.

A. Sure. So at the top -- we'll start at the top -- I have a "Statement of Opinion," and that's really taken from my prior report of July 13th talking about the opinions that we just went over in depth, and I summarized them. It's everything that

5:16 Q. Can you tell me those opinions.
5:16 A. Again, there are multiple disagreements in this -- with Dr. Abrams's report and the rationale for this disagreement is found in my original report, which we have reviewed in detail. I did put some discrete discussion in this rebuttal report, and that is Dr. Abrams did not consider the measure of Mr. Rupard's weight where it was noted on medical clearance that he weighed 165 pounds at intake. Dr. Abrams did not consider that.
5:16 Dr. Abrams did not consider Mr. Rupard's prior mental health history, which included similar deteriorations in his mental health, including psychotic symptoms. The failure by Mr. Rupard to maintain his hygiene and collecting feces was something he had done before. This was a sign of his deterioration. And in the past, that required transfer to and treatment in a state hospital.
5:17 Dr. Abrams did not consider Mr. Rupard's history of a positive response to treatment with medication, which included a resolution of psychosis. Dr. Abrams did not consider documentation of Mr. Rupard's symptoms -- we've talked about this over the course of this afternoon -- including irritability, incoherent

mumbling, verbal aggression, disorganized thought processes as evidence of mental health deterioration.

But again, it's in my opinion that Mr. Rupard's mental health was in a state of decline from the time of his admission and only deteriorated further in the setting of isolation and lack of treatment with medication.

Dr. Abrams talked about that he did not -- it was his opinion that Mr. Rupard would not meet criteria for involuntary treatment. I disagree with that because I believe Dr. Abrams improperly conflated medication refusal with informed refusal. Mr. Rupard was psychotic. He was unable to appreciate the impact of his refusal and make a knowing and informed refusal. And Mr. Rupard should have been referred for a Riese petition, as we've discussed.

Dr. Abrams disagrees with the County medical examiner. That opinion is outside of our scope of expertise as psychiatrists, and I agree with the medical examiner. What they say was the cause of death is the cause of death, in my opinion. Dr. Abrams mischaracterized the NCCHC standards. We've been over that multiple times. Those

standards are recognized as defining the standard of care in corrections.

Dr. Abrams stated several times that Dr. Cruz's psychiatric treatment of Mr. Rupard is within the standard of care in correctional psychiatry, somehow implying that the standard of care is different in corrections relative to the general population, and that's simply not accurate. The standard of care is the same professional standard that governs psychiatric practice in the community.

The NCCHC, the American Psychiatric Association all recognize that individuals who are incarcerated are entitled to mental healthcare that is clinically appropriate and consistent with accepted psychiatric practice. So our obligations to provide treatment are unchanged regarding of our practice location.

And then there was also the life expectancy situation, which I don't feel we need to reiterate because we've already discussed that.

So my disagreements or my differing opinions from Dr. Abrams' are outlined here. And then, again, these are discrete examples of places where I disagreed with Dr. Abrams. But for further

5:21 information, you can refer to the original report.

5:21 Q. And with respect to all of your opinions on your disagreements with Dr. Abrams, those relate to Dr. Cruz and what you opine was the responsibility or standard that Dr. Cruz, as a psychiatrist, had to follow, correct?

5:21 A. Well, some of them. But again, I think the weight issue doesn't really have anything to do with Dr. Cruz. That's more general. The lack of -- the issue -- I'm sorry. The issue with the opinion of the County medical examiner, that's not Dr. Cruz. The mischaracterization of the NCCHC standards and the life expectancy issue, those are outside of Dr. Cruz, I think.

5:22 Q. Okay. Any other opinions that you intend to offer in response to Dr. Abrams or any other defense expert?

5:22 A. I don't think so, other than what's included in my original report.

5:22 Q. Okay. And is it correct that you're not offering an opinion in this case that the County had a policy or custom that was a moving force behind any constitutional violation here; is that correct?

5:22 MR. KRUEGER: Object. Calls for a legal conclusion.

5:22 THE WITNESS: I'm sorry. I'm not understanding what you're asking me. I apologize.
5:22 BY MS. FELDMAN:
5:22 Q. Will you be offering an opinion in this case that the County had a policy or custom that was the moving force behind a constitutional violation?
5:22 MR. KRUEGER: Same objection.
5:22 THE WITNESS: I don't --
5:22 MR. LOWE: Join.
5:22 THE WITNESS: I don't make opinions about constitutional violations; the judge does that. So --
5:23 BY MS. FELDMAN:
5:23 Q. Okay. And are you offering an opinion that the County had any policy or custom that was deficient?
5:23 A. Other than what we've talked about, I think there are multiple deficient customs here where people are in isolation and are not reviewed by mental health. Where people aren't receiving -- Mr. Rupard isn't receiving mental health treatment. You've got -- so there are multiple things that are problematic here.
5:23 Q. Well, can you identify -- if you're going to be offering an opinion on it, I need to know the

5:23 specifics.
5:23 A. Everything that we've talked about today.
5:23 MR. LOWE: I was just going to do an objection. It's been asked and answered, but --
5:23 MR. KRUEGER: Join.
5:23 MR. LOWE: -- I believe the witness responded.
5:23 BY MS. FELDMAN:
5:23 Q. Are you offering an opinion as to any specific County policy?
5:24 A. Well, we have the segregated inmate policy that wasn't followed.
5:24 Q. Are you offering an opinion that the policy was deficient in any way?
5:24 A. I don't think I did. What I said was that it's my opinion that the facility as a whole -- the overarching governance of the facility should have been aware that people like Mr. Rupard were not receiving appropriate monitoring and treatment.
5:24 Q. Okay. And the basis for that is what you discussed at deposition today, correct?
5:24 A. Yes.
5:24 Q. And unless you have any other opinions you want to add to what we've discussed, I just want to confirm that we have all of your opinions now on the

EXAMINATION

BY MR. KRUEGER:

Q. All right. Doctor, thank you for sticking with us. My name is Corey Krueger. I represent Dr. Cruz and Liberty Healthcare in this case. And as I'm sure you know, whoever comes up second or third or what have you has to jump around a bit, so I will do my best to stay organized. If you don't follow anything that I'm doing, please let me know.

A. For sure.

Q. We've been talking a lot about the NCCHC standards, and I want to make sure that we're talking about the same thing. And, of course, this is going to show up in mirror image -- it's not even going to show. I've got this book. It says "2015 Standards for Mental Health Services in Correctional Facilities."

Is that what you're referring to?

A. Yes, sir, it is.

Q. You've got the same one. Okay. We're talking about the same thing.

Am I understanding you correctly that the NCCHC standards themselves establish the standard of care?

A. That in conjunction with the

5:33 American Psychiatric Association's standards. So there are multiple things that impact psychiatry and our provision of care, but it's, you know, the NCCHC standards, the American Psychiatric Association standards, medical literature, what we know. Basically the practice of psychiatry.

5:33 Q. I think I understand what you're saying, but I'm having a hard time reconciling it with something we talked about earlier.

5:34 So is it your testimony that the NCCHC standards themselves establish the standard of care or that they are consistent with the standard of care?

5:34 A. They establish. They're the baseline of the standard of care. And then you also have the American Psychiatric Association -- I think they call them the "clinical guidelines," which also in- -- inform treatment provision.

5:34 Q. Okay. So it's your testimony that anytime care inside of a correctional facility deviates in any respect from an NCCHC standard, that is by definition a deviation from the standard of care; am I correct?

5:34 A. Yes.

5:34 Q. Okay. Now, the NCCHC classifies each of its

5:34 standards as either essential or --
5:34 (Reporter clarification.)
5:35 BY MR. KRUEGER: Q. -- or important?
5:35 A. I think there's -- isn't there one more?
5:35 Q. It's possible. I won't argue with you if
5:35 there is.
5:35 A. I think it's essential, important. That
5:35 might be -- might just be two. It's been a long
5:35 day.
5:35 Q. I understand.
5:35 But according to --
5:35 A. Yes, I just found it. It's essential or
5:35 important, yes.
5:35 Q. Very good.
5:35 But as you just said, a deviation from an
5:35 NCCHC standard is a deviation from the standard of
5:35 care, correct?
5:35 A. Yes, in my opinion.
5:35 Q. So is it then essentially irrelevant whether
5:35 a standard is deemed essential or important within
5:35 the NCCHC book?
5:35 A. No, it is not. So the important standards,
5:35 are they -- are they necessary? No, they're
5:36 important. The essential ones, however, form the
5:36 floor of the standard of care. The standards that

5:36 we've been talking about today -- oh, my gosh. Can you excuse me for just a moment.

5:36 Never get a really small emotionally dependent dog. That's all I will tell you.

5:36 Q. No problem.

5:36 A. The essential standards that we've been talking about today -- I mean, I'm sorry, the standards that we've been talking about today, basic mental health services, segregated inmates, treatment planning, those are all, I believe, classified as essential standards.

5:36 Q. Okay. As we've been talking about this, your -- your testimony is that the NCCHC establishes the standard of care. So what I'm trying to understand is -- well, let me ask the next question. Maybe that will make it a little bit more clear.

5:37 So if you've got your book -- and I can put this on screen if you want, but the scan that I have is not particularly great. Since you have the book in front of you, it will be a little bit better.

5:37 If you look at Appendix A -- excuse me -- Appendix A is entitled "NCCHC Mental Health Services Accreditation."

5:37 A. Yes.

5:37 Q. And on the second page of that appendix,

that had improved his -- his outcomes.

If he didn't have that information, and he, therefore, cannot act upon it, how does that change your analysis of Dr. Cruz's evaluations on December 29, and then mid-January, and then on February 22?

A. I still maintain that Mr. Rupard was psychotic. That's clearly documented that this individual is psychotic. I still opine that an individual with psychosis, such as Mr. Rupard, should not be housed in the conditions that he was housed in. I still opine that Mr. Rupard was allowed to spend an inordinate amount of time in the absence of psychotropic medications and that a Riese petition or 5150 should have been considered.

So I don't think it changes the ultimate opinion, but I do feel that -- I do opine that there is a systems issue that impacted Dr. Cruz's ability to provide services, and that the overarching system should have been aware that this was a problem.

Q. Okay. So I understand your point, and we're going to get to all of that. I do want to talk about it. But what you didn't say I think is interesting.

Is it fair to say that if he did not know

about it, that would no longer be a component of why you believe he breached the standard of care?

MR. LOWE: Incomplete hypothetical. Overbroad.

THE WITNESS: I'm not really sure. And you're asking me to opine on something on the fly, and I really --

MR. KRUEGER: I am.

THE WITNESS: -- have to give that a lot of thought.

BY MR. KRUEGER:

Q. All right. Is there any additional material you would need in order to make an opinion on that point?

A. I think it would be interesting to get information about the whole JRMS [as said], TechCare -- JIMS, I'm sorry -- JIMS, TechCare transition. What was available, what was not, and what, if anything, did providers, such as at Liberty -- Liberty providers ask the system as a whole, "Hey, we need this. We can't get this. How can you help us get this?" to see was that something that the system failed.

Q. All right. All right. I'd like to move on to what you kind of just referred to. You gave me a

A. I mean, do I think it was great? No. But it appears that Mr. Rupard came into the facility December 12th of 2021, and then I think he ultimately saw Dr. Cruz on the 29th. Did I make that up? No, that's right. There were a couple of reschedules due to time constraints. Is that terrific? No. Do I think that that's a deviation from the standard of care? Not necessarily because Mr. Rupard was assessed via a receiving screening at the time of admission. I think that was on the 19th. And then -- so that's his receiving screening on the 19th, and then he's seen on the 29th, which is within ten days.

Q. When you look at the evaluation on December 29, do you reach the conclusion that as of December 29, Mr. Rupard qualified for a 5150 hold?

A. Hard to say. It's very possible. He was noted as irritable, uncooperative, yelling, verbally aggressive, and pressured. But at this point, Dr. Cruz is going to try psychotropic medications, which is appropriate. That he's going to prescribe the psychotropic medications in hopes that Mr. Rupard will take the medications and that his condition will improve.

Unfortunately, that's not how this worked

6:17 out, right, but I think that Dr. Cruz was putting -- restarting/resuming the medications that Mr. Rupard had previously taken.

6:17 Q. Okay. Is it fair to say that to a reasonable degree -- you -- long day. You're right. Let me try again.

6:17 Am I correct that you cannot say to a reasonable degree of psychiatric probability that Mr. Rupard did qualify for a 5150 as of December 29, 2021?

6:17 A. It doesn't appear so. But again, here we have Dr. Cruz doing what he can, and he's going to start him on psychotropic medication. Unfortunately, that doesn't work out so well.

6:17 Q. Understood.

6:18 We've talked about a lot of opinions today, and as we have talked through them, it seems to me that they fall into two broad categories. And I'm not trying to put words in your mouth, and if you disagree with me, please let me know. But it appears that the opinions can be categorized into places where you disagree with what was done versus another group where you -- you believe that something failed to be done that should have been done.

6:34 force. He had to be taken down. He had a laceration. He said, "I'll kill you." And so at this point, he's got homicidal ideation. So I think on January 29th, he met criteria for a 5150.

6:34 Q. And that would be on the basis of danger to others?

6:34 A. Correct.

6:34 Q. Under Welfare and Institutions Code Section 5150, am I correct that it is not simply danger to self, danger to others, or grave disability, but that it also requires that it be on the basis of a mental illness?

6:34 A. Yes. And so Mr. Rupard is mentally ill. He is -- got -- he has psychosis. He has a diagnosis of schizophrenia. He is unmedicated. There is no treatment. He is housed in isolation. And he says, "I'm going to kill you." Taking together, to me, he meets criteria for a 5150.

6:35 Q. So just -- just the coexistence of his mental illness and the threat links them together causally in your mind?

6:35 A. In my opinion, yes.

6:35 Q. Okay. We talked about if Dr. Cruz doesn't know about that, he can't act upon it, correct?

6:35 A. That's what we said, yes.

Q. Right. But we also said others in the facility had the ability to write a 5150, correct?
A. And they should have done so.
Q. Right. Okay.
So now going back to February 22. And I apologize, we've jumped back and forth.
So on February 22, it's your opinion, then, that Mr. Rupard qualified for a 5150 as of that date?
A. He had deteriorated based on the documentation. He had an episode of homicidal ideation. Dr. Cruz didn't know about it, but there was -- I'm sorry -- there was documentation of increased symptomatology, no medication. And from a clinical perspective, psychosis in the absence of psychotropic medication is only going to exacerbate further, so yes.
That was a long-winded way to get to the word "yes" now, wasn't it?
Q. That's okay. That's okay.
On which statutory basis did Mr. Rupard qualify for a 5150 on February 22?
A. My opinion, grave disability. In the context of his mental illness, his base mental illness. His history of homicidal ideation on the

6:38 incarceration.

6:38 So number one, we had that based on the use of force and the threat. Number two, Mr. Rupard is incarcerated, right. So somebody delivers his food to him three times a day. Toileting may have been an issue already at that point. I believe Dr. Cruz documented that the toilet was covered with a towel at that -- at that clinical encounter. We know that Mr. Rupard historically had issues with feces, retaining feces in the toilet, and that was a sign of his mental health decompensation in prior admissions.

6:39 And then the third one is who does not appear to be significantly lucid -- I'm sorry -- sufficiently lucid to comprehend the fact of their detainment or incarceration. It's not clear what he comprehended, right. So it's my opinion that based on this definition that he would meet the criteria.

6:39 Q. You're referring to County policy, correct?

6:39 A. It's the Medical Services Division Operations Manual.

6:39 Q. Right. 5150 is a -- a legal mechanism; am I correct?

6:39 A. It is. And I'm going to say I have the 5150 criteria too. Hold on. I might not. Nope, I don't

6:40 have those quoted in here.

6:40 Q. All right. Is it fair to say that a person writing a 5150 has an obligation to follow the legal standard for a 5150 as opposed to a County policy, which may or may not be consistent with that legal standard?

6:40 A. I believe both. So they have the obligation to follow the legal -- the legal requirements, but they are also operating within a County facility. And if the County facility is documenting what the 5150 should be, there's also -- you have to incorporate both requirements there.

6:41 Q. You mentioned earlier that you -- you don't currently hold a California license, correct?

6:41 A. I do not.

6:41 Q. Have you ever held a California license?

6:41 A. I have not.

6:41 Q. Am I correct, then, that you've never written a 5150 under California law?

6:41 A. I have not.

6:41 Q. And you have not filed a Riese petition under California law?

6:41 A. I have not.

6:41 Q. Okay. I will represent to you that under California law, specifically Welfare and

6:55 Q. Yeah, of course. It's 4:55, so let's shoot
6:55 for 5:05 our time. That would be, I think, 7:05.
6:55 A. 7:05, yeah. Okay. Thanks.
6:55 THE VIDEOGRAPHER: I'll take us off. The
6:55 time is 6:55 p.m. Going off record.
6:55 (A ten-minute recess was taken.)
7:05 THE VIDEOGRAPHER: Time is 7:05 p.m. Back
7:05 on record.
7:05 BY MR. KRUEGER:
7:05 Q. Dr. Glindmeyer, thank you for coming on
7:05 back. I just want to cover a couple more areas. I
7:05 hope not to take too much longer. I want to talk
7:05 briefly about the PSU itself.
7:05 Do you have any understanding of the PSU's
7:05 capabilities with respect to a patient with medical
7:05 complications as opposed to mental health
7:05 complications?
7:05 A. Not really.
7:05 THE REPORTER: I'm sorry. The objection?
7:05 MR. LOWE: Overbroad.
7:05 THE WITNESS: Not so much. I have looked at
7:05 PSU in other facilities, visited them, reviewed
7:05 cases there. But I'm not real sure about that level
7:05 of capability.
7:05 ///

7:05 BY MR. KRUEGER:
7:06 Q. There has been testimony in this case, including by nonparties, to the effect that medical complications cannot always be managed inside the PSU.
7:06 Is that something that you experience in facilities of this kind?
7:06 A. It does.
7:06 Q. Okay. In that circumstance, if the PSU could not handle a patient being put on a 5150 because there are also medical complications, what would your expectation be with respect to how to handle that patient?
7:06 A. It would depend. It would depend on what the medical complications are. Do they need to be transferred to a state hospital or another hospital where their condition or care can be managed?
7:06 Q. Uh-huh. If a nonpsychiatrist who is authorized to write a 5150 does so and writes the 5150, then the PSU cannot handle that patient because of the medical issues, is it my -- strike that.
7:07 Is it correct that your opinion would be that the appropriate facility needs to be found and the patient transferred?

7:07 A. Yes.
7:07 Q. Do you have any opinion on whose responsibility it is to find the correct facility?
7:07 A. Typically, it's done by whoever the health services authority is.
7:07 Q. Understood. Okay.
7:07 I want to talk about some opinions you provided on the cause of death and the autopsy, and we've got a couple of overlapping things here.
7:07 But first, as a general proposition, I believe you expressed the opinion that psychiatrists should not be expressing opinions regarding whether or not the cause of death is a particular thing; am I right?
7:07 A. Whatever the medical examiner says it is, it is.
7:08 Q. Okay. Do you have any opinion on who is able to make such an opinion?
7:08 A. In this case, it would be the medical examiner, whoever -- the pathologist. Whoever did the autopsy, signed the death certificate.
7:08 Q. Do you -- you saw that there was a homicide determination in this case, correct?
7:08 A. I did.
7:08 Q. Did you review the deposition testimony of

7:08 the medical examiner, Dr. Schaber?
7:08 A. I did.
7:08 Q. Did you see her testimony to the effect that a homicide determination in this context is not reflective of blame?
7:08 A. I don't remember her saying it exactly like that.
7:08 Q. And I will represent to you that she did not say it exactly that way. I'm just paraphrasing.
7:08 A. Yeah, I don't remember exactly.
7:08 Q. Let me try to get closer to it. I think I can.
7:08 I believe what she testified was that it is -- a homicide determination is simply a reflection of death at the hands of another, and it is not a commentary on anything other than just death at the hands of another.
7:09 Do you recall that?
7:09 A. Hold on. I'm looking for her deposition summary. Hold on. I -- I truly don't remember.
7:09 Q. Okay.
7:09 A. What I have here is she classified it as a homicide. To quote, "In this case, the investigation along with the autopsy demonstrated that not only in a matter of hours to days, but over

7:09 weeks to months there was failure to deliver
7:09 reasonable or adequate care for Mr. Rupard that
7:09 ultimately resulted in his death."
7:10 Q. Did you see in her testimony where she
7:10 explicitly confirmed that she does not have any
7:10 training in psychiatry and expresses no opinions on
7:10 the propriety of the care provided?
7:10 A. I did see where she said she did not have
7:10 any training in psychiatry. I did see that.
7:10 Q. Okay. Excuse me.
7:10 There were other contributing factors in the
7:10 cause of death; am I correct?
7:10 A. According to Dr. Schaber, yes.
7:10 Q. Right. And what were those?
7:10 A. Oh, I think it was dehydration -- hold on.
7:11 I don't want to be wrong. I know it's in here.
7:11 Here we go. Pneumonia, malnutrition, and
7:11 dehydration in the setting of neglected
7:11 schizophrenia, contributing SARS/COVID 19 viral
7:11 infection, pulmonary emphysema, duodenal ulcer.
7:11 Q. There's a lot of things going on there,
7:11 right?
7:11 A. Lots of things.
7:11 Q. A lot of items on that list, relatively
7:11 speaking?

A. Yes.
Q. Okay. The -- hold on a second. I'm looking for that record myself now.
Do you have any training or experience in the manifestations of COVID-19 and how it can appear in different types of patients?
A. No.
Q. Do you have any training or experience in the gastrointestinal implications of a COVID infection?
A. No.
Q. Okay. Do you have any opinions whatsoever on the relative involvement of each of those different items? For example, pneumonia? Malnutrition? Dehydration? Those are all items on the list independent of the schizophrenia.
Do you have any opinions on the relative involvement of each on the cause of death?
A. No.
Q. Okay. And you saw that Dr. Schaber -- I believe it was in her autopsy report, and we also talked about it in her deposition -- the neglected schizophrenia, she testified that the neglect was not solely by others, but also by Mr. Rupard himself, correct?

A. Yes.

Q. Okay. So Mr. Rupard, by choosing not to take his medications, was contributing to that to some degree, in her mind at least, correct?

A. I think what we've talked about, I don't know that it was a choice. It certainly was not an informed refusal. I don't know based on the documentation that Mr. Rupard had the capacity to make that decision.

MR. KRUEGER: Okay. I want to do one last pass through my notes. I think I'm done. I might check a few things here. If Ms. Feldman or Mr. Lowe have any follow-ups, I'm happy to let them go ahead.

MS. FELDMAN: I do not.

MR. LOWE: Yes, I have a brief follow-up.

MR. KRUEGER: Okay.

EXAMINATION

BY MR. LOWE:

Q. Dr. Glindmeyer, I just want to touch base and ask you a few clarifying questions. Counsel had asked you about some discovery responses from the County, perhaps from Liberty Healthcare, that you did not receive, and so I want to clarify any impact on your opinions that you set forth here today. All

7:18 all done here, I'll close it out, just stand by.
7:18 THE WITNESS: I'm good to go?
7:18 THE VIDEOGRAPHER: I'll close it out now.
7:18 Just one second, Doctor.
7:18 This marks the end of Media No. 1 and
7:18 concludes Volume I of the deposition of
7:19 Dr. Daphne A. Glindmeyer. The total number of
7:19 physical media used today is one. Off the record at
7:19 7:19 p.m. Central Time.
7:19 (Proceedings concluded at 7:19 p.m. Central Time.)
7:19 * * *

DECLARATION UNDER PENALTY OF PERJURY

I, the undersigned, declare under penalty of perjury that I have read the entire foregoing transcript of my deposition or the same has been read to me, and the same is true and accurate, save and except for changes, corrections, additions, or deletions indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _________________, 20____, at __________________, _________________.
(City) (State)

______________________________________

EXPERT DAPHNE A. GLINDMEYER, MD

I, DEVON WILLARD, CSR No. 10535, RPR, certify that the foregoing proceedings were taken before me via videoconference at the time and place therein set forth, at which time EXPERT DAPHNE A. GLINDMEYER, MD, was duly remotely sworn; and that the transcript is a true record of the testimony so given;

Witness review, correction, and signature was
( ) by code. ( ) requested.
( ) waived. (XX) not requested.
( ) not handled by the deposition officer due to party stipulation.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificate null and void.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

Dated this 25th day of September, 2026.

DWillard
_________________________
DEVON WILLARD