# EXHIBIT "E"

# Daphne Glindmeyer, M.D.

611 River Highlands Blvd. Suite B
Covington, LA 70433

Phone: (504) 392-8348
Facsimile: (504) 398-4334

Phone: (985) 888-1414
Facsimile: (985) 888-1415

August 7, 2026

Lowe Law, APC
Attn: Jeremiah Lowe, Esq.
402 West Broadway Street Suite 1720
San Diego, California 932101

Re: Estate of Lonnie Rupard v. County of San Diego, et al.
Case No: 23CV1357 CAB BLM

Dear Mr. Lowe,
I am writing to provide rebuttal opinions to the three defense expert reports proffered in the above noted case. As I submitted a report in this matter dated July 13, 2026 that included my professional qualifications, that information will not be reiterated here. My overall opinions and summary will be repeated.

<u>Statement of Opinion:</u>
Mr. Lowe requested my opinions in the above noted case. My opinions are based on my skill, education, training, experience, knowledge of medical and scientific literature, other materials reasonably relied upon by members of my medical specialty, and my review of the case information available at this time. Should additional information become available that modifies my opinions and conclusions, an addendum will be authored.

To provide this opinion, information regarding this case including case pleadings, depositions, photographs, medical/mental health, and other records were reviewed. Based on the available information, it is my opinion, to a reasonable degree of psychiatric certainty, that there were significant deviations from the standard of care regarding the psychiatric treatment, mental health treatment, and monitoring provided to Mr. Rupard during his incarceration at the San Diego County Jail.

Mr. Rupard was seriously mentally ill with diagnoses including unspecified schizophrenia and other psychotic disorders, but due to inadequate mental health treatment, he experienced an extended duration of untreated psychosis and an exacerbation of

psychotic symptoms, with significant functional impairment. His death occurred due to a confluence of events and system failures that were identifiable and preventable, yet in deviations from the standard of care, were not addressed.

Mr. Rupard was increasingly psychotic. He was not engaged in mental health treatment per an individualized treatment plan. He was not consistently monitored by mental health staff despite his housing in administrative segregation. Despite his deterioration and increased psychotic symptoms, he was not considered for a forced medication protocol or a 5150 designation and transfer to the Psychiatric Stabilization Unit.

Facility staff of all disciplines (e.g. sworn staff, medical staff, mental health staff, and psychiatry) failed to monitor Mr. Rupard, failed to recognize his deteriorating condition, failed to intervene on his behalf, and failed to escalate his treatment to a higher level of care (e.g., the PSU). Given the documentation of his experiencing psychotic symptoms, mental health staff should have intervened. Mr. Rupard was documented as psychotic. He did not have the capacity to make appropriate decisions regarding his care. Further, Mr. Rupard's severe deterioration was documented by Dr. Badre in his evaluation of 3.14.22. Based on Dr. Badre's description of Mr. Rupard's cell and his hygiene, it is obvious that any one of the jail staff would have recognized Mr. Rupard's grave disability.

Had Mr. Rupard been properly evaluated, monitored and treated, his death would have been prevented. Unfortunately, the failures ultimately resulted in Mr. Rupard's death due to "Pneumonia, Malnutrition and Dehydration in the setting of neglected Schizophrenia. Contributing: SARS-COV-2 (COVID-19) Viral infection; pulmonary emphysema; duodenal ulcer." The Medical Examiner indicated Mr. Rupard's death was "homicide" due to "ineffective delivery of…care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide."

Defense Expert Rebuttal:

1. Report of Mace Beckson, M.D. dated July 14, 2026 included the following opinions:
    a. "Mr. Rupard's past psychiatric history makes it likely that, had he not died in March 2022, his clinical prognosis would have been guarded."

       Response: Mr. Rupard's medical records indicated that when treated with psychotropic medication, Mr. Rupard responded to treatment, had resolution of his psychotic symptoms, and improved insight into his illness. As such, had he received adequate care inclusive of long-acting injectable medication, his prognosis would have improved substantially.

b. "Based on statistics in the published scientific literature, had Mr. Rupard not died in March 2022, he likely would have had a substantial reduced life expectancy."

Response: While there is scientific literature, cited by Dr. Beckson, demonstrating that these conditions are associated with increased mortality at the population level, as Dr. Beckson noted, the available evidence does not support a reliable determination of an individual person's life expectancy based solely on these diagnoses.

The study cited by Dr. Beckson in support of reduced life expectancy describes average outcomes observed across large populations. These studies identify statistical associations between serious mental illness, substance use disorders, and increased mortality, but do not establish the life expectancy of any particular individual. Population-based mortality estimates are influenced by numerous variables, including age, sex, race, socioeconomic status, access to healthcare, smoking history, obesity, cardiovascular disease, diabetes, infectious disease, treatment adherence, remission or recovery from substance use, and the severity and duration of psychiatric illness. These factors vary substantially among individuals and limit the ability to extrapolate group averages to a single person.

Although schizophrenia, bipolar disorder, and chronic substance use disorders have been associated with reduced lifespan, the magnitude of risk is heterogeneous. Many individuals with these diagnoses experience long-term stability, sustained recovery, and life expectancies approaching or in some cases exceeding those of the general population when medical and psychiatric illnesses are effectively treated.

Moreover, assigning a qualitative reduction in life expectancy requires consideration of comprehensive medical information beyond psychiatric expertise alone. An individualized life expectancy assessment ordinarily incorporates objective medical evaluation, actuarial life tables, and analysis of established mortality determinants. Without such an analysis, any opinion regarding an individual's life expectancy is speculative.

2. Report of Kristina Tyler, Ph.D. QME dated July 15, 2026:
   a. Response: The basis of Dr. Tyler's opinions regarding the adequacy of the behavioral health care Mr. Rupard received at SDCJ relies on the distinction between his housing classification, asserting that because Mr. Rupard was assigned to "quarantine" rather than "administrative segregation," he was not entitled to the behavioral health interventions required for inmates in administrative segregation. This opinion suggests that it is acceptable for an individual with a documented serious mental

illness to remain in an isolated housing environment without regular behavioral health assessment or intervention solely because of the label assigned to the housing status.

This position is inconsistent with the applicable standard of care. SDCJ was aware of Mr. Rupard's history of severe and persistent mental illness, yet he received only a single documented behavioral health clinical contact during his 89-day incarceration. During this period, he remained housed in an isolation-type environment with no behavioral health monitoring or treatment. In my opinion, this represents a significant deviation from the standard of care.

Moreover, SDCJ's own policy does not support limiting mental health monitoring based on the specific classification assigned to an isolated individual. The policy states that "inmates who are segregated and receive services and activities apart from other inmates shall be monitored three days a week by nursing staff and a minimum of once a week by a qualified mental health provider (QMHP)." The policy does not distinguish between administrative segregation, quarantine, or any other form of segregated housing. Rather, the triggering criterion is removal from the general population and receipt of services apart from other inmates. Accordingly, Mr. Rupard's placement in an isolated housing environment should have prompted the required nursing and mental health monitoring regardless of the administrative designation assigned to his housing status.

Response: Dr. Tyler opined that Ms. Goodall's assessment of Mr. Rupard met the applicable standard of care. However, Dr. Tyler did not account for Ms. Goodall's failure to escalate Mr. Rupard's treatment despite documenting significant signs and symptoms consistent with an exacerbation of psychosis. This omission undermines Dr. Tyler's conclusion that Ms. Goodall's assessment and clinical management satisfied the standard of care.

b. Response: For additional rebuttal information, please refer to my initial report in this action dated July 13, 2026.

3. Report of Alan A. Abrams M.D., J.D., FCLM dated July 14, 2026:
    a. Response: I disagree with Dr. Abram's opinions. The rationale for my disagreement is found in my original report dated July 13, 2026; however, I will include some discrete discussion below:
        i. Dr. Abrams did not consider the measure of Mr. Rupard's weight per the SDCJ medical clearance documented 12.19.21, where it was noted he weighed 165 pounds at intake.
        ii. Dr. Abrams did not consider Mr. Rupard's prior mental health history which included similar deteriorations in his mental health including

psychotic symptoms, failing to maintain his hygiene by collecting feces in the toilet [SDCJ medical chart 5.4.19], requiring transfer to and treatment in the state hospital, and the need for involuntary medications. Further, Dr. Abrams did not consider Mr. Rupard's history of a positive response to treatment with psychotropic medications including a resolution of psychosis.

iii. Dr. Abrams did not consider documentation of Mr. Rupard's psychotic symptoms including irritability, incoherent mumbling, verbal aggression, and disorganized thought process as evidence of mental health deterioration. In my opinion, Mr. Rupard's mental health was in a state of decline from the time of his admission to the SDCJ and only deteriorated further in the setting of isolation and lack of treatment with psychotropic medications.

iv. Dr. Abrams opined that being in a "psychotic state" is not a legal basis for involuntary treatment. Dr. Abrams did not consider the sequelae of an extended duration of psychosis and the negative results thereof. He opined that Mr. Rupard, who was obviously psychotic, "was fully responsible for rejecting treatment of his mental illness." This is an inaccurate statement. Dr. Abrams improperly equated medication refusal with informed refusal. Mr. Rupard was floridly psychotic and unable to appreciate the impact of his refusal. Further, Dr. Cruz did not attempt to meet with Mr. Rupard to educate him, to discuss the consequences of his refusal, or to assess his decision-making capacity and the need to consider intervention rather, in the absence of a clinical encounter, and in a deviation from the standard of care, discontinued Mr. Rupard's psychotropic medications.

v. Dr. Abrams indicated that Mr. Rupard did not die as a result of "neglected Schizophrenia" as opined by the County Medical Examiner. This opinion is outside of Dr. Abrams scope of expertise. The Medical Examiner is responsible for determining the cause and manner of an individual's death. In my opinion, in Mr. Rupard's case, psychiatric illness and the lack of psychiatric treatment and intervention were substantial contributing factors to Mr. Rupard's mental and physical health deterioration

vi. Dr. Abrams mischaracterized the National Commission on Correctional Health Care (NCCHC) Standards. These standards are the professional standards governing the delivery of medical and mental health care in U.S. correctional facilities. These standards are recognized as defining the standard of correctional health care.

vii. Dr. Abrams stated several times that Dr. Cruz's psychiatric treatment of Mr. Rupard is "well within the standard of care in correctional psychiatry." This implies that the standard of care is somehow different in corrections relative to the general population.

The standard of psychiatric care in correctional settings is the same as the standard of care in the community. Incarceration does not diminish a patient's right to clinically appropriate psychiatric evaluation and treatment. The standard of psychiatric care applicable in correctional facilities is the same professional standard that governs psychiatric practice in the community. The American Psychiatric Association and the National Commission on Correctional Health Care (NCCHC), recognize that incarcerated individuals are entitled to mental health care that is clinically appropriate and consistent with accepted psychiatric practice.

Accordingly, the core obligations of a psychiatrist remain unchanged regardless of practice setting. These include conducting appropriate diagnostic evaluations, developing differential diagnoses, recognizing clinical deterioration, monitoring response to treatment, prescribing evidence-based medications, assessing suicide risk, responding to psychiatric emergencies, documenting clinical reasoning, and modifying treatment when a patient's condition worsens. A psychiatrist practicing in a correctional facility is expected to exercise the same degree of knowledge, skill, and clinical judgment that would be expected of a reasonably prudent psychiatrist treating a similar patient in the community.

viii. Dr. Abrams opined on Mr. Rupard's life expectancy. For my response to this, please refer to the discussion in section 1. b. above.

Summary:

In summary, Mr. Rupard was seriously mentally ill with diagnoses including unspecified schizophrenia and other psychotic disorders, but due to inadequate mental health treatment, he experienced an extended duration of untreated psychosis and an exacerbation of psychotic symptoms, with significant functional impairment. His death occurred due to a confluence of events and system failures that were identifiable and preventable, yet in deviations from the standard of care were not addressed.

Mr. Rupard was increasingly psychotic. He was not engaged in mental health treatment per an individualized treatment plan. He was not consistently monitored by mental health staff despite his housing in administrative segregation type housing. Despite his deterioration and increased psychotic symptoms, he was not considered for a forced medication protocol or a 5150 designation and transfer to the Psychiatric Stabilization Unit.

Facility staff of all disciplines (e.g. sworn staff, medical staff, mental health staff, and psychiatry) failed to monitor Mr. Rupard, recognize his deteriorating condition, intervene on his behalf, and escalate his treatment to a higher level of care (e.g., the PSU). Given

the documentation of his experiencing psychotic symptoms, mental health staff should have intervened. Mr. Rupard was documented as psychotic. He did not have the capacity to make appropriate decisions regarding his care. Further, Mr. Rupard's severe deterioration was documented by Dr. Badre in his evaluation of 3.14.22. Based on Dr. Badre's description of Mr. Rupard's cell and his hygiene, it is obvious that any one of the jail staff would have recognized Mr. Rupard's grave disability.

Had Mr. Rupard been properly evaluated, monitored and treated, his death would have been prevented. Unfortunately, the failures ultimately resulted in Mr. Rupard's death due to "Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia. Contributing: SARS-COV-2 (COVID-19) Viral infection; pulmonary emphysema; duodenal ulcer." The Medical Examiner indicated Mr. Rupard's death was "homicide" due to "ineffective delivery of...care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide."

Please note the above opinions are provided to a reasonable degree of psychiatric certainty. If additional information or collateral documentation becomes available, I reserve the right to change my opinions based on such, and that will be submitted as an addendum to this report. Should you have any questions, or require any further information regarding these opinions, please contact me at 504.392.8348.

Submitted by:

Daphne Glindmeyer, M.D., D.F.A.P.A.
Board Certified Child, Adolescent, and Adult Psychiatrist
Board Certified Forensic Psychiatrist

# EXHIBIT "F"

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number “4950349.” The body is in a second inner white body pouch sealed with a second red tamper resistant seal number “4950993.” A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner’s identification bearing the decedent’s name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent’s name, date of birth, and medical record number “31943869” is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff’s Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent’s name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent’s name and booking number “21149433” is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled “A” through “C” for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. <u>BLUNT FORCE INJURY OF TORSO</u>:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

# TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________
06/27/2022
Audra L. Brown
Interim Forensic Toxicology Laboratory Manager


CONFIDENTIAL COSD 002075

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure:<br>Date Received: | 3/17/2022 23:51 PDT<br>3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

GLENN N. WAGNER, D.O.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

STEVEN C. CAMPMAN, M.D.
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | 2022-01007 |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | Son | 3/18/2022 | |

| San Diego Medical Examiner<br>5570 Overland Avenue, Suite#101<br>San Diego, CA 92123-1206<br>(858) 694-2895 | Case Number<br>Investigator<br>Date of Death<br>Date Today | : 2022-01007<br>: Fernanda Sanchez<br>: 03/17/2022<br>: 02/08/2023 |
|---|---|---|

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name



CONFIDENTIAL COSD 001679

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

<u>OPINION</u>: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.
4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:
1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:
Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

GLENN N. WAGNER, D.O.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

STEVEN C. CAMPMAN, M.D.
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | **2022-01007** |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| Ronnie Rupard | Son | 3/18/2022 | |

| San Diego Medical Examiner<br>5570 Overland Avenue, Suite#101<br>San Diego, CA 92123-1206<br>(858) 694-2895 | Case Number<br>Investigator<br>Date of Death<br>Date Today | : 2022-01007<br>: Fernanda Sanchez<br>: 03/17/2022<br>: 02/08/2023 |
|---|---|---|

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, Florentina Rupard, and his ex-wife, Justina Lopez. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, "Ana", with whom he had a son named Ronnie Rupard. The decedent also had a son with Justina, named Justino Rupard. He had a third child who was reported to have died in October 2018 of muscular dystrophy, who was named Lonnie Rupard. The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.



CONFIDENTIAL COSD 001702

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, antisocial personality disorder, and stimulant use disorder from a previous record dated July 11, 2020. It also stated that he had a past medical history of "seizures or tbi," (traumatic brain injury) per a record dated February 6, 2020. The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, for a twisted left ankle injury. Imaging was negative for fracture, soft tissue swelling or other abnormality.

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

<u>SCARS</u>:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

*Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*
*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

<u>OPINION</u>: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was “relatively clean, no flooding/gassing or smearing of feces.” The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist’s diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist’s final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

<u>IDENTIFICATION</u>: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

<u>WITNESSES</u>: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

<u>CLOTHING AND PROPERTY</u>: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

<u>EVIDENCE OF MEDICAL INTERVENTION</u>:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled “A” through “C” for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

# TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: 
06/27/2022

Audra L. Brown
Interim Forensic Toxicology Laboratory Manager


CONFIDENTIAL COSD 002075

*Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure:<br>Date Received: | 3/17/2022 23:51 PDT<br>3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
(858) 694-2895 • FAX (858) 495-5956
http://www.sandiegocounty.gov/me

**JONATHAN R. LUCAS, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER


## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | **2022-01007** |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | BANNED, REFER TO MANAGEMENT, SEE CASE NOTES | 3/18/2022 | |

CONFIDENTIAL

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
(858) 694-2895 • FAX (858) 495-5956
http://www.sandiegocounty.gov/me

JONATHAN R. LUCAS, M.D.
CHIEF DEPUTY MEDICAL EXAMINER

CONFIDENTIAL

| **San Diego Medical Examiner**<br>**5570 Overland Avenue, Suite#101**<br>**San Diego, CA 92123-1206**<br>**(858) 694-2895** | **Case Number**<br>**Investigator**<br>**Date of Death**<br>**Date Today** | : 2022-01007<br>: Fernanda Sanchez<br>: 03/17/2022<br>: 02/08/2023 |
|---|---|---|

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted], with whom he had a son named [redacted]. The decedent also had a son with [redacted], named [redacted]. He had a third child who was reported to have died in October 2018 [redacted]. The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name



CONFIDENTIAL

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.



CONFIDENTIAL COSD 006379

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ____________________________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ____________________________________________

CONFIDENTIAL

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted]. The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed: 02/28/2023

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. <u>BLUNT FORCE INJURY OF TORSO</u>:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*
*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

# *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

LOMA LINDA UNIVERSITY PATHOLOGY LABORATORY
11370 Anderson Street, Suite 2950
Loma Linda CA 92354
(909) 558-2392
PJ Wat MD, GW Saukel MD, JC Kerstetter MD, HL Rojas MD – Directors

| | | |
|---|---|---|
| Name: | RUPARD, LONNIE | |
| MR#: | 06555376 | |
| Encounter: | | |
| DOB/Age: | 10/1/1975 | 46 years |
| Location: | LLU-FMO | Pathology Referrals |
| Physician: | Physician,Default | |
| CC: | | |
| Page: | | |

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: 06/27/2022

Audra L. Brown
Interim Forensic Toxicology Laboratory Manager


CONFIDENTIAL COSD 006398

COUNTY OF SAN DIEGO HHSA HEALTH AND HUMAN SERVICES AGENCY | LIVE WELL SAN DIEGO

San Diego County
PUBLIC HEALTH LABORATORY
CLIA # 05D0060808
Brett Austin. MA. PHM. Director

3851 Rosecrans Street
San Diego, CA 92110
Phone (619) 692-8500
FAX (619) 692-8558

# FINAL REPORT

| Patient Information | Specimen Information | Submitter Information |
|---|---|---|
| Patient Name: **Rupard, Lonnie** | Specimen # **22-206526-01** | SAN DIEGO COUNTY MEDICAL EXAMINER<br>5570 Overland Ave # 101<br>San Diego, CA 92123 |
| Patient Id:<br>Birth Date: 10/01/1975<br>Gender: Male<br>Pregnancy Status: Unknown<br>Outside ID: 2022-01007<br>PUID #:<br>Address: NOT PROVIDED<br>NOT PROVIDED, N/A 00000<br>Phone #: 000-000-0000 | Source: Nasopharynx<br>Date Collected: 03/19/2022<br>Date Received: 03/19/2022 | **Site Contact**<br>Steven Campman, M.D.<br>Fax: 858-495-5956<br>mxclerical@sdcounty.ca.gov<br>Physician: Schaber, B<br>Diagnosis Code:<br>Comments: B-00011 |

| Analyte (Method) | Result | Analysis Date |
|---|---|---|
| SARS-CoV-2 (NAAT) | Detected | 03/20/2022 |

**Comments:**

03/19/2022 NAAT (Nucleic Acid Amplification Test): This assay is for in vitro diagnostic use under FDA Emergency Use Authorization (EUA) only.

03/20/2022 Samples tested using GeneXpert under CLIA ID # 05D2197127 at 5570 Overland Avenue San Diego, CA 92123

Approved by: Joe Ana Jones-Price

Date reported: 03/20/2022

This document contains confidential health information that is privileged, confidential and exempt from disclosure under law. If you have received this information in error, please call (619) 692-8500 and arrange for return or destruction.

22-1007

COUNTY OF SAN DIEGO HHSA HEALTH AND HUMAN SERVICES AGENCY | LIVE WELL SAN DIEGO

San Diego County
PUBLIC HEALTH LABORATORY
CLIA # 05D0060808
Jeremy Corrigan, DrPH, HCLD/TS(ABB)

5570 Overland Ave, Ste 103
San Diego, CA 92123
Phone 619-692-8500
FAX 619-692-8558

# FINAL REPORT

| Patient Information | Specimen Information | Submitter Information |
|---|---|---|
| Patient Name: **Rupard, Lonnie** | Specimen # **22-206691-01** | SAN DIEGO COUNTY MEDICAL EXAMINER |
| Patient Id: | Source: Nasopharynx | 5570 Overland Ave # 101 |
| Birth Date: 10/01/1975 | Date Collected: 03/19/2022 | Site Contact: |
| Gender: Male | Date Received: 03/19/2022 | Steven Campman, M.D. |
| Pregnancy Status: | | Fax: 858-495-5956 |
| Outside ID: 2022-01007 | | Physician: Schaber, B |
| Comments: | | Diagnosis Code: |

| Analyte (Method) | Result | Analysis Date |
|---|---|---|
| Influenza Typing | Refer to reference laboratory report. | |

**Comments:**

03/24/2022 Sample sent to CA State Viral and Rickettsial Diseases Laboratory, 850 Marina Bay Parkway, Richmond, CA 94804.

04/13/2022 VRDL report

Approved by: Ishita Gulati

Date reported: 04/27/2022

This document contains confidential health information that is privileged, confidential and exempt from disclosure under law. If you have received this information in error, please call (619) 692-8500 and arrange for return or destruction.

California Department of Public Health

State of California-Health and Human Services Agency

# Viral and Rickettsial Disease Laboratory

CDPH 850 Marina Bay Parkway, E365
Richmond, CA 94804

CLIA ID # 05D0643850

Phone: 510-307-8575
Fax: 510-307-8599

## Laboratory Results

Page 1 of 1

**Patient Information**

| Patient Name or Submitter ID: | Gender | Date of Birth | Age |
|---|---|---|---|
| Rupard, Lonnie | Male | 10/1/1975 | 47 Years |

Medical Records:

CalREDIE Incident #:

Pregnancy Status:

Patient Address: , , CA.

**Disease Suspected / Test Requested / Symptoms**

Disease Onset:

Rash Onset .

Disease Suspected: Influenza A or B

Test Requested:

ICD Code:

Specimen Collection Site.

**Submitter Information**

Submitter Type: CA City & County Health Depts
Facility: San Diego County Public Health Dept.
Address: 3851 Rosecrans Street

San Diego, CA 92110-3134
Phone: (619) 692-8499 Fax: (858) 715-6458

Health Jurisdiction: San Diego,CA

Laboratory Results

Reason Code v_140

**Specimen Information**

| Specimen Type: | Date Collected | Date Received | Condition Received | Submitter Tracking#: | VRDL Accession #: |
|---|---|---|---|---|---|
| Nasopharyngeal Swab | 3/19/2022 | 3/22/2022 | Dry Ice | 22-206691 | V22T07708-01 |

**Polymerase Chain Reaction (PCR) Results**

| Analyte | Test Type | VRDL Accession # | Test Method | Laboratory Results |
|---|---|---|---|---|
| Influenza A Nucleic Acid | FDA | V22T07708-01 | PCR (realtime) | not detected |
| Influenza B Nucleic Acid | FDA | V22T07708-01 | PCR (realtime) | not detected |

**Additional Information or Overall Interpretation of State Laboratory Test Results:**

FDA - Food and Drug Administration: This test has been FDA approved for clinical diagnostic use.

JP 4/4/22

Reviewed by: Ishita Gulati
04/04/2022

**The VRDL is certified under the Clinical Laboratory Improvement Amendments of 1988 (CLIA-88) as qualified to perform high complexity clinical laboratory testing.**

Report to:
San Diego County Public Health Dept.
3851 Rosecrans St. Mail Stop P572 Suite 716
San Diego, CA 92110
Attn: Email - Laboratory Director Fax#
18587156458

Testing performed under the direction of Dr. Carl Hanson Ph.D., Laboratory Director, Viral and Rickettsial Disease Laboratory

**Final Report Date: April 04, 2022**

Report Method: [ ] faxed to 18587156458 [ ] E-mailed [ ] NR
[ ] by: date: 4/4/2022

eurofins [redacted] Product Testing

# Final Report

| Order Details | | Ordering Professional |
|---|---|---|
| Referral ID # | 22-01007 | [redacted] |
| DOB | 1975-10-01 | |
| Gender | M | |

| Request / Accession | R-P40234140 |
|---|---|
| Received | 03/25/2022 11:14 |
| Final Report | 03/25/2022 16:24 |
| Report Generated | 03/25/2022 16:24 |
| Time Zone | Pacific Standard Time |

## Results

| Test | Completed | Results | Ref. Range |
|---|---|---|---|
| Hepatitis B Surface Ag | 03/25/2022 16:21 | **Non Reactive** | Non Reactive |
| Hepatitis C Virus Ab | 03/25/2022 16:22 | **Non Reactive** | Non Reactive |
| HIV-1/HIV-2 Plus O | 03/25/2022 16:24 | **Non Reactive** | Non Reactive |

## Sample Reference(s)

**Collection Time Zone:** Pacific Standard Time

| VRL Sample ID | Type | Collected | Test(s) |
|---|---|---|---|
| S-P40234140A | Serum | 03/19/2022 13:15 | 3214, 3221, 3521 |

[redacted]: *Post-Mortem*

## Test Reference(s)

| Code | Name | Methodology Description |
|---|---|---|
| 3214 | Hepatitis B Surface Ag | BioRad Genetic Systems HBsAg EIA 3.0 is FDA approved for [redacted] screening. |
| 3221 | Hepatitis C Virus Ab | ORTHO HCV Version 3.0 ELISA is FDA approved for [redacted] screening. |
| 3521 | HIV-1/HIV-2 Plus O | BioRad GS HIV-1/HIV-2 Plus O EIA is FDA approved for [redacted] screening. This is a screening assay; it is neither a diagnostic assay nor a confirmatory test for the presence of HIV. |

**AUTOPSY FINDINGS**

San Diego County Medical Examiner

2022-01007

B. Schaber, M.D.
3/19/2022

RUPARD, Lonnie

**Age:** 46 **Sex:** M ✓ Embalmed
**Height:** 69 **Weight:** 105#
**Race:** ~~C / B / H / A / F / NA / Other~~
______ nourished / thin / (cachectic) / obese
**Lividity:** ant / (post) L / R, (fixed) / un-fixed
**Rigidity:** none / (mild) / mod / full
✓ Decomposition: mild / mod / advanced early green abd

**CAVITIES:** Pericardium: lac 75 ml hemoperic
Pleural: R ✓FFA L ØFFA
Peritoneum: ✓FFA Abd fat: 0.1 cm
**HEART:** 280 grams:
Hypertrophy: Ø Dilation: Ø
Ventricles: R 0.3 cm; L 1.5 cm; IVS 1.4 cm
Valves: WNL
Coronaries: LAD LCx R + UP
**Aorta:** (minimal) / mild / mod / severe atherosclerosis
Aneurysms: Ø Pulmonary arteries: NO PE

**LUNGS:** R 480 g, L 1030 g
~~atelectatic / hyperinflated~~
Anthracosis: none / (small) / mod / large
Edema: Consolidation: LUL Red Firm
Congestion: mild-mod Bronchi: WNL no pq

**LIVER:** 1170 g Fat: Ø Fibrosis: Ø
~~Cirrhosis: macro / micro~~
GALLBLADDER: 10 Stones: y / (n)
**PANCREAS:** WNL

**SPLEEN:** 70 g
Lymph nodes no enlg Marrow / Blood liq + clot
**THYMUS:** ~~____~~ g

**GI:** Esophagus: W BRN wall fn Bowel open
Stomach contents: 60 ml of SB soft tan BRN red
Bowels: cath LB soft BRN stool
Appendix: (Y) / N Anus: soft BRN stool
**KIDNEYS:** R 140 g, L 150 g, cysts: Ø
smooth / granular:
Bladder: 130 ml urine DK yellow urine
Prostate: WNL
Testes: ↓↓

2.5x2 ulcer just duod vst dist pylorus

**ADRENALS:** WNL
**THYROID:** WNL **PITUITARY:** WNL
**NECK:** Hemorrhages: NOT
Trachea AT Hyoid / Thyroid cartilage
Tongue: no hem WNL no hem or fx
**MUSCULOSKELETAL:** Fractures: Yes peristernal Rt 5-8 ant Rt 8
CPR: (Y) / N ) Ribs ( Ø brittle): perist Lt 4-7 ant Lt 4-7
~~Kyphosis / scoliosis~~ Skull: no Fx

**SCALP:** Bony defect Bild occip 1+ fat Ø EDH Ø SDH Ø SAH

**BRAIN:** 1290 g
+dura Retained for NP consultation

**TOXICOLOGY:**
✓ Central Blood
✓ Peripheral Bld
✓ Vitreous
✓ Urine
___ Chest blood / fluid
___ Other:
___ None
___ Bile
___ CSF
✓ Liver
___ Spleen
✓ Gastric:

**Rapid Screens:** Glu Ket
+ / - meth; + / - coc; + / - morph; + / - alcohol

**HISTOLOGY:** (Ht) (Liv) (Lung) (R / L), Cor art:
(Kid), Panc, Spl, GI, Thyroid, Brain:
Other:
___ None 7 Cassettes

**PHOTOGRAPHS:** ✓ ID ✓ Over-alls
✓ Other:

**X-RAYS:** ___ None ✓ Yes: no Fx's other than CPR, ML
___ head ___ chest ___ abd ___ other:

**CULTURES:** ___ None ___ Blood ___ Lung
___ CSF ✓ Viral:
___ Other: COVID-19 + Lung Sept Fnt SH - FAS
AMB UP - SC

**EVIDENCE:** Bullets:

Det Max Blumenshine

**WITNESSES:** ___ None ✓ Yes: D. Racicot Fed
SDPD, SO, NCIS, OPD, BP M. Gervasoni Fed

**GROSS AUTOPSY SUMMARY:**
Inmate central jail found unresp in his cell
Hx/o schizoph?

peric sac lac 75 ml
Rt atr/vent lac hemopericard
2° CPR

Rev. 9/08

**County of San Diego**
OFFICE OF THE MEDICAL EXAMINER

San Diego County Medical Examiner
**2022-01007** B. Schaber, M.D.
3/19/2022

RUPARD, Lonnie
outer Red Seal 4950349 yellow tarp
inner red seal 4950993 on green sheet

**Date & Time of Examination**: 0935
**CLOTHING** (~~None/~~ ~~Not examined~~): Blue sheet on body – adult clothing in property bag

**IDENTIFICATION**: ✓ M.E. band checked



County of San Diego
OFFICE OF THE MEDICAL EXAMINER

San Diego County Medical Examiner
2022-01007
B. Schaber, M.D.
3/19/2022
RUPARD, Lonnie



~~Doc~~

- 12/14/21 arrested Back Probation present single cell
  Refused medications.
- Single occupant cell.

Last seen alive cell check 2146

Found unresp in cell 2248 not Breathing. under blanket under
3/17 in Bunk.

CPR transported to ER pronounced in ER.

Cell soiled c̄ feces Food c̄ maggots.

~~Ø~~ never c̄ other inmates.

San Diego County Medical Examiner
2022-01007 B. Schaber, M.D.
3/19/2022
RUPARD, Lonnie

# County of San Diego

DR. GLENN N. WAGNER
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE., STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me/

DR. STEVEN CAMPMAN
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## EVIDENCE TRANSFER FORM

NAME OF DECEDENT: Rupard, Lonnie ME# 22-1007

PATHOLOGIST: Schaber, B. MD

INVESTIGATING AGENCY: SDSO

| | | | |
|---|---|---|---|
| | BODY BAG | | OTHER (See REMARKS) |
| | BAGS REMOVED FROM HEAD | | ANAL SWABS |
| | BAGS REMOVED FROM HANDS | ✓ | ORAL SWABS |
| | BAGS REMOVED FROM FEET | | URETHRA SWABS |
| | HEAD HAIR SAMPLE | | VAGINAL SWABS |
| | FACIAL HAIR SAMPLES | | GUNSHOT RESIDUE SWABS |
| | CHEST HAIR SAMPLES | | FINGERPRINTS |
| | PUBIC HAIR SAMPLE | | PALM PRINTS |
| | PUBIC HAIR COMBING | | PROJECTILES/FRAGMENTS |
| ✓ | BLOOD SAMPLE | | FINGERNAIL CLIPPINGS |
| | | | FINGERNAIL SCRAPINGS |

CLOTHING: 1- blue SHIRT

JEWELRY: None

BONES/TISSUE SPECIMEN: None

REMARKS:

RELEASED BY: Stephen Hannum (Print Name) — Stephen Hannum (Signature) — 3-19-22 (Date)

RECEIVED BY: Melissa Gervasoni / SDSD (Print Name/Agency) — [signature] (Signature) — 3/19/22 (Date)

Original: File Yellow: Customer
MEE-34 (R 8/2019)

**Receipt:** 31356

## San Diego County Medical Examiner's Office
### Personal Effects Inventory

Name of Deceased: RUPARD, LONNIE    Date: 3/19/22    M.E. Case No.: 22-1007

Name of Investigator/F.A.A: F. SANCHEZ / HANNUM PB # 687195

**Personal Effects**

**Currency:**

| | | | |
|---|---|---|---|
| $1 × | ø | =$ | ø |
| $5 × | 1 | =$ | 5.00 |
| $10 × | 1 | =$ | 10.00 |
| $20 × | 6 | =$ | 120.00 |
| $100 × | 2 | =$ | 200 |
| × | ø | =$ | |
| Coins: | | $ | ø.32 |
| **Total U.S. Currency:** | | $ | 335.32 |

**Bank Card:**

| QTY | Description – VISA, MasterCard, American Express (include account number) |
|---|---|
| / | / |

**Foreign Currency:** None

**Items:**

| QTY | Description | QTY | Description |
|---|---|---|---|
| 1 | wd y/metal watch | / | / |
| / | / | | |

**Government Issued Documents and Identification Cards** – The listed government documents issued by federal, state, county, or local agencies or foreign governments are property of that agency and will be returned to them.

| QTY | Description (include the agency name and ID number) |
|---|---|
| / | / / / |

**Witness Declaration**

The above listed property, found on the body, clothing, adjacent area, or residence of the above decedent was checked by me in the presence of the witness signed below.

| Print Name | Signature | Agency | Date |
|---|---|---|---|
| Deanne Rupari Osuna | [signature] | SDMEO | 03/19/22 |

**Release of Property to Next-of-Kin**

Received by: Megan Ruaner (Print Name)    Date: 3/22/22    Time: 1543

Signature: ____    Relationship: Mortuary

Address: ____    City/State/Zip: ____

**Affidavit Under California Probate Code, Section 330**

I declare under Penalty of Perjury under the laws of the State of California that the foregoing is true and correct and that I do not know or have reason to believe that a dispute exists over the right to possess the property held by the Medical Examiner.

**Signature of Declarant:** ____

**Printed Name of Declarant:** ____

☐ **Miscellaneous medications, <u>and/or</u> illicit drugs, <u>and/or</u> drug paraphernalia impounded and inventoried at the Medical Examiner's Office.** These items will be retained and subsequently destroyed pursuant to departmental policy.

LOS #

MEDICAL EXAMINER'S OFFICE
INVESTIGATIVE MEMO

AGE: 46

CASE # 22-1007

NAME RUPARD, LONNIE
LAST FIRST MIDDLE

DATE 03/18/2022

CARRIER 92M

INVESTIGATOR FERNANDA SÁNCHEZ

HIO NAT MVA SUI HOM ACC DONOR (NAT vs ACC circled)

HOW IN CUSTODY

BLUE SEAL # ~~B2294384~~ RED SEAL# 4950993

X-RAYS REQUIRED? (YES) (NO) (NO circled)

IF YES, WHAT AREA(S) OF BODY X-rays by JK 03/18/22

REMARKS RQ EXAM SAT 03/19

SDSO DET BLUMENSHINE

AGENCY, TEAM #, and PHONE # 619-886-0434

# CAUSE OF DEATH WORKSHEET

## San Diego County Medical Examiner Department

☒ Autopsy
☐ External
☐ Not Dictated
☐ Body not coming to office
☐ Fetal death
☐ Possible SIDS
☐ Family Paid

San Diego County Medical Examiner
2022-01007 B. Schaber, M.D. 3/19/2022
RUPARD, Lonnie

**CAUSE OF DEATH:** ( ✓ PENDING) Time interval

______________________________ ________

Due To: ______________________________ ________

Due To: ______________________________ ________

Due To: ______________________________ ________

**CONTRIBUTING:** ______________________________

______________________________

**MANNER:** ( ✓ )Pending ( ) Natural ( ) Accident ( ) Suicide ( ) Homicide ( ) Undetermined

**Use reverse side for manner type in non-pending cases

**HOW OCCURRED:** ______________________________

**DATE and TIME of INJURY:** **LOCATION:**

**SURGERIES and DATES:**

**If FEMALE, pregnant within the last year?** ( ) Yes ( ) No ( ) Unknown

[signature]
Deputy Medical Examiner/Fellow/Resident Supervising Pathologist Date 3/19/22

Rev. 06/15

TM 3/21/22

3/20/2022

# Manner Types and SubTypes

(check one)

## NATURAL

- ☐ AIDS Related
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Autoimmune/Systemic
- ☐ Cancer
- ☐ Cardiovascular
- ☐ Central Nervous System
- ☐ Chronic Drug Abuse
- ☐ Diabetes Related
- ☐ Endocrine
- ☐ Family Paid
- ☐ Gastrointestinal
- ☐ Hematologic
- ☐ Infant/Perinatal (not SIDS)
- ☐ Infectious
  - ☐ Viral
  - ☐ Bacterial
  - ☐ Other
- ☐ Intrauterine/Stillborn
- ☐ Liver disease
- ☐ Obesity Related
- ☐ Other
- ☐ Pregnancy Related
- ☐ Psychiatric Related
- ☐ Pulmonary
- ☐ Renal
- ☐ Seizures
- ☐ SIDS
- ☐ Undetermined

## ACCIDENT

- ☐ Aircraft
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Animal Related
- ☐ Asphyxia
  - ☐ Airway Obstruction
  - ☐ Autoerotic
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Traumatic
- ☐ Bicycle
- ☐ Blunt Force (other)
- ☐ Boating
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug and Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol

### ACCIDENT (cont.)

- ☐ Electrocution
- ☐ Explosion
- ☐ Exposure
- ☐ Fall
  - ☐ Blunt head trauma
  - ☐ Fracture, other
  - ☐ Hip/Femur fracture
  - ☐ Multiple injuries
  - ☐ Other
  - ☐ Spinal fracture
  - ☐ Subdural hematoma
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Industrial
- ☐ Ingested Foreign Object(s)
- ☐ Inhalation
- ☐ Medical/Therapeutic
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs Auto
  - ☐ Auto vs Bicycle
  - ☐ Auto vs Fixed Object
  - ☐ Auto vs Motorcycle
  - ☐ Auto vs Pedestrian
  - ☐ Hit and Run
  - ☐ Motorcycle
  - ☐ Off Road
  - ☐ Other
  - ☐ Unknown
- ☐ Other
- ☐ Restraint Related
- ☐ Scalding
- ☐ Scuba - Diving
- ☐ Spear gun
- ☐ Train
- ☐ Undetermined

## SUICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Other
- ☐ Blunt Force (other)
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug & Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol
- ☐ Electrocution

### SUICIDE (cont.)

- ☐ Explosion
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Inhalation
- ☐ Jumping
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs. Fixed Object
  - ☐ Auto vs. Pedestrian
  - ☐ Motorcycle
- ☐ Train
- ☐ Undetermined

## HOMICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
- ☐ Assault
- ☐ Blunt Force
- ☐ Chemical/Poison
- ☐ Child Abuse
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Elder Abuse
- ☐ Exposure
- ☐ Fire
- ☐ Firearm
- ☐ Homicidal Violence, NOS
- ☐ Intrauterine/Stillborn
- ☐ Motor Vehicle
- ☐ Other
- ☐ Restraint Related
- ☐ Undetermined

## UNDETERMINED

- ☐ Alcohol Related
- ☐ Blunt Force
- ☐ Decomposed
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Fire related
- ☐ Firearm
- ☐ Infant/Perinatal (not SIDS)
- ☐ Intrauterine/Stillborn
- ☐ Other
- ☐ Skeletal Remains
- ☐ Undetermined

Rev. 06/15

# DEATH CERTIFICATE AMENDMENT WORKSHEET

Case: 2022-1007

Name: RUPARD, LONNIE

CAUSE OF DEATH: PNEUMONIA, MALNUTRITION, AND DEHYDRATION ( )
IN THE SETTING OF NEGLECTED SCHIZOPHRENIA (unknown)

Due to: ( )

Due to: ( )

Due to: ( )

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

Surgeries:

MANNER OF DEATH

☐ NATURAL ☐ ACCIDENT ☐ SUICIDE ☑ HOMICIDE ☐ UNDETERMINED

Place of Injury: SAN DIEGO CENTRAL JAIL

Date & Time: UNKNOWN

How Occurred: INADEQUATE CARE WHILE INCARCERATED

[signature] 2/27/23
DEPUTY MEDICAL EXAMINER Date
SCHABER

[signature] 3/1/23
CHIEF MEDICAL EXAMINER Date

AL 03/01/23 @ 2:46pm

LG 3/1/23

# Manner Types and SubTypes

(check one)

## NATURAL

- ☐ AIDS Related
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Autoimmune/Systemic
- ☐ Cancer
- ☐ Cardiovascular
- ☐ Central Nervous System
- ☐ Chronic Drug Abuse
- ☐ Diabetes Related
- ☐ Endocrine
- ☐ Family Paid
- ☐ Gastrointestinal
- ☐ Hematologic
- ☐ Infant/Perinatal (not SIDS)
- ☐ Infectious
  - ☐ Viral
  - ☐ Bacterial
  - ☐ Other
- ☐ Intrauterine/Stillborn
- ☐ Liver disease
- ☐ Obesity Related
- ☐ Other
- ☐ Pregnancy Related
- ☐ Psychiatric Related
- ☐ Pulmonary
- ☐ Renal
- ☐ Seizures
- ☐ SIDS
- ☐ Undetermined

## ACCIDENT

- ☐ Aircraft
- ☐ Alcohol Related
- ☐ Anaphylactic Reaction
- ☐ Animal Related
- ☐ Asphyxia
  - ☐ Airway Obstruction
  - ☐ Autoerotic
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Traumatic
- ☐ Bicycle
- ☐ Blunt Force (other)
- ☐ Boating
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug and Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol

### ACCIDENT (cont.)

- ☐ Electrocution
- ☐ Explosion
- ☐ Exposure
- ☐ Fall
  - ☐ Blunt head trauma
  - ☐ Fracture, other
  - ☐ Hip/Femur fracture
  - ☐ Multiple injuries
  - ☐ Other
  - ☐ Spinal fracture
  - ☐ Subdural hematoma
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Industrial
- ☐ Ingested Foreign Object(s)
- ☐ Inhalation
- ☐ Medical/Therapeutic
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs Auto
  - ☐ Auto vs Bicycle
  - ☐ Auto vs Fixed Object
  - ☐ Auto vs Motorcycle
  - ☐ Auto vs Pedestrian
  - ☐ Hit and Run
  - ☐ Motorcycle
  - ☐ Off Road
  - ☐ Other
  - ☐ Unknown
- ☐ Other
- ☐ Restraint Related
- ☐ Scalding
- ☐ Scuba - Diving
- ☐ Spear gun
- ☐ Train
- ☐ Undetermined

## SUICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Strangulation
  - ☐ Suffocation
  - ☐ Other
- ☐ Blunt Force (other)
- ☐ Carbon Monoxide
- ☐ Chemical/Poison
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug – Medication
  - ☐ Drug & Alcohol
  - ☐ Drug and Meds
  - ☐ Drug, meds & alcohol
  - ☐ Drugs of Abuse
  - ☐ Medication
  - ☐ Meds & Alcohol
- ☐ Electrocution

### SUICIDE (cont.)

- ☐ Explosion
- ☐ Fire
- ☐ Firearm
- ☐ Hanging
- ☐ Inhalation
- ☐ Jumping
- ☐ Motor Vehicle
  - ☐ Auto Rollover (solo)
  - ☐ Auto vs. Fixed Object
  - ☐ Auto vs. Pedestrian
  - ☐ Motorcycle
- ☐ Train
- ☐ Undetermined

## HOMICIDE

- ☐ Alcohol Related
- ☐ Asphyxia
  - ☐ Other
  - ☐ Positional
  - ☐ Strangulation
  - ☐ Suffocation
- ☐ Assault
- ☐ Blunt Force
- ☐ Chemical/Poison
- ☐ Child Abuse
- ☐ Cutting/Stabbing
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Elder Abuse
- ☐ Exposure
- ☐ Fire
- ☐ Firearm
- ☐ Homicidal Violence, NOS
- ☐ Intrauterine/Stillborn
- ☐ Motor Vehicle
- ☒ Other
- ☐ Restraint Related
- ☐ Undetermined

## UNDETERMINED

- ☐ Alcohol Related
- ☐ Blunt Force
- ☐ Decomposed
- ☐ Drowning
- ☐ Drug - Medication
- ☐ Fire related
- ☐ Firearm
- ☐ Infant/Perinatal (not SIDS)
- ☐ Intrauterine/Stillborn
- ☐ Other
- ☐ Skeletal Remains
- ☐ Undetermined

Rev. 06/15

# COUNTY OF SAN DIEGO MEDICAL EXAMINER

5570 OVERLAND AVENUE, SUITE 101, SAN DIEGO, CA 92123-1215
PHONE: 858-694-2895 FAX: 858-495-5956

## ORDER FOR RELEASE OF REMAINS

**TO:** MEDICAL EXAMINER, COUNTY OF SAN DIEGO

**RE:** REMAINS OF Lonnie Newton Rupard, ME CASE # 22-1007

RUPARD Lonnie 2022-01007

I certify that pursuant to the State of California Health & Safety Code, Section 7100, it is my legal right to control the disposition of the remains referenced above, the location and conditions of interment, and arrangements for funeral goods and services to be provided. I further certify that I am acting in the capacity of: **Legal Next of Kin** [redacted], **OR Executor/Executrix** ________, **OR Agent with Durable Power of Attorney for Health Care** (must be for Health Care) ________ **OR other legal capacity** ________ (please **INITIAL** the appropriate category). If acting in a capacity other than Legal Next of Kin, I have attached a copy of the relevant appointing document(s).

Therefore, upon completion of your examination of the deceased, please release the remains referenced above to the custody of the service designated below. If possible please **RELEASE** [redacted] **OR DO NOT RELEASE** ________ (please **INITIAL** desired choice) all of the deceased's personal property in your care with the remains. I understand that personal property can only be released during regular working hours (M-F 8-5, except holidays). **As per California Laws and Department Policies, if the property in custody of the Medical Examiner's Department is not collected within 90 days from the date of death, it will be processed for immediate disposal.**

Featheringill Mortuary
Print Name of Designated Mortuary, Cremation Society, or other Disposition Service

| Print Name of Person Signing | Relationship | Signature | Date Signed |
|---|---|---|---|
| [redacted] | Son | [redacted] | Mar 22 2022 |

| Mailing Address of Person Signing | Home / Cell Phone Number |
|---|---|
| [redacted] El Cajon CA 92021 | [redacted] |

| City, State, Zip Code of Person Signing | City, State Where Signed |
|---|---|
| El Cajon CA 92021 | El Cajon CA |

**DECEDENT INFORMATION**

| Name of Deceased – First (Given) | Middle | Last (Family) | Gender | Date of Death |
|---|---|---|---|---|
| Lonnie | Newton | Rupard | N | 03/17/2022 |

| Date of Birth | Age | Place of Birth | Social Security Number | Race |
|---|---|---|---|---|
| 10/1/1975 | 46 | PI | [redacted] | Filipino |

| Marital Status | Occupation | Residence Address: |
|---|---|---|
| Div | Disabled | [redacted] Bonita ca 91902 |

**MEDICAL EXAMINER DEPARTMENT USE ONLY**

ME FAS Hannum

Release Date/Time: 3-22-22 1511

Transport Staff: (signed)

Printed Name: Megan Ruona

MEA-15 (R 3/26/19)

CONFIDENTIAL COSD 006414

# COUNTY OF SAN DIEGO MEDICAL EXAMINER

5570 OVERLAND AVENUE, SUITE 101, SAN DIEGO, CA 92123-1215
PHONE: 858-694-2895 FAX: 858-495-5956

## ORDER FOR RELEASE OF REMAINS

**TO:** MEDICAL EXAMINER, COUNTY OF SAN DIEGO

**RE:** REMAINS OF Lonnie Newton Rupard, ME CASE # 22-01007

RUPARD, Lonnie 2022-01007

I certify that pursuant to the State of California Health & Safety Code, Section 7100, it is my legal right to control the disposition of the remains referenced above, the location and conditions of interment, and arrangements for funeral goods and services to be provided. I further certify that I am acting in the capacity of: **Legal Next of Kin** [redacted], **OR Executor/Executrix** ________, **OR Agent with Durable Power of Attorney for Health Care** (must be for Health Care) ________ **OR other legal capacity** ________ (please INITIAL the appropriate category). If acting in a capacity other than Legal Next of Kin, I have attached a copy of the relevant appointing document(s).

Therefore, upon completion of your examination of the deceased please release the remains referenced above to the custody of the service designated below. If possible please **RELEASE** [redacted] **OR DO NOT RELEASE** ________ (please INITIAL desired choice) all of the deceased's personal property in your care with the remains. I understand that personal property can only be released during regular working hours (M-F 8-5, except holidays). **As per California Laws and Department Policies, if the property in custody of the Medical Examiner's Department is not collected within 90 days from the date of death, it will be processed for immediate disposal.**

Featheringill Mortuary
Print Name of Designated Mortuary, Cremation Society, or other Disposition Service

[redacted] Son X [redacted] 3-22-22
Print Name of Person Signing | Relationship | Signature | Date Signed

[redacted] [redacted]
Mailing Address of Person Signing | Home / Cell Phone Number

Bonita CA 91902 | San Diego CA
City, State, Zip Code of Person Signing | City, State Where Signed

**DECEDENT INFORMATION**

| Name of Deceased – First (Given) | Middle | Last (Family) | Gender | Date of Death |
|---|---|---|---|---|
| Lonnie | Newton | Rupard | M | 3-17-22 |

| Date of Birth | Age | Place of Birth | Social Security Number | Race |
|---|---|---|---|---|
| 10-1-1975 | 46 | PI | [redacted] | Filipino |

| Marital Status | Occupation | Residence Address: |
|---|---|---|
| div | Disabled | [redacted] Bonita CA 91902 |

**MEDICAL EXAMINER DEPARTMENT USE ONLY**

ME FAS ________ Release Date/Time: ________

Transport Staff: (signed) [signature] Printed Name: Megan Ruona

MEA-15 (R 3/26/19)

**County of San Diego**
**Office of the Medical Examiner**

**RELEASE OF REMAINS**

**Name: RUPARD, Lonnie**

**M.E. #: 2022-01007**

Investigator: Fernanda Sanchez

Date Rec: 3/18/2022

Body Status: Ready to release

Mortuary: Featheringill Mortuary

**OK to Release Property?** yes

Date and Time Released: 3/22/2022 1509

Ok to release property YES-JM

Released By: Data Entry: Stephen Hannum

T.E. NO-JM

Body Retrieval: Stephen Hannum

| | | | |
|---|---|---|---|
| [ ] Cert | [ ] N.C. | [ ] Military | [ ] Release |
| [ ] Property | [ ] Child | [ ] Vitals | [ ] County |
| [ ] Decomp | [ ] Fee Paid | [ ] P.A. | [ ] Pouch |

**Weight: 105 lb** **Height: 69"** **Age: 46 Years** **Sex: Male**

**Body Condition: Within Normal Limits**

**Exam Type: Autopsy**

**Clothing Released with Body: True**

**Location: 15C dbl Son [redacted] also signed OFR**

**Clothing:** blue stripped sweatshirt, grey tank top, grey pants, black underwear, pair brown boots

**Items on or with Body:** none

***Remains have been examined with I.D. verified by comparison to ankle bracelet.***
***Clothing, valuables, if any, and posession of remains recieved in satisfactory condition:***

SHannum
Signature (Body retrieval M.E. staff)

**Stephen Hannum**
Printed Name

[signature]
Signature (Transport staff)

Megan Ruana
Printed Name

Date: 3/22/22 Time: 1519

# EXHIBIT "G"

EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

Jeremiah A. Lowe (CA SBN 239166)
jeremiah@lowelazarlaw.com
Victoria J. Lazar (CA SBN 298668)
victoria@lowelazarlaw.com
Lowe Lazar Law, LLP
402 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 878-2725
Facsimile: (619) 878-2737

**Attorneys for Plaintiffs**
**JUSTINO RUPARD and the ESTATE OF LONNIE RUPARD**

Daniel M. Gilleon (CA SBN 195200)
dan@gilleon.com
The Gilleon Law Firm
1320 Columbia St., Suite 200
San Diego, CA 92101
Telephone: (619) 702-8623
Facsimile: (619) 702-6337

**Attorneys for Plaintiff**
**RONNIE RUPARD**

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD, THROUGH ITS COURT-APPOINTED ADMINISTRATOR TERRI LOPEZ; JUSTINO RUPARD INDIVIDUALLY; AND RONNIE RUPARD INDIVIDUALLY,

Plaintiffs,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVDIUAL CAPACITY; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE OF CALIFORNIA, INC; CHRISTINA ANOSIKE, IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; AGUILERA, M., VILADIU, J. MARTINEZ, G., AMADO, J., MACE, T., AGUIRRE, E., JAMES, T.,

Case No: 23CV1357 CAB BLM

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR:**

1. **U.S.C. § 1983: Deliberate Indifference of Serious Medical Needs;**
2. **42 U.S.C. § 1983: Right of Association;**
3. **42 U.S.C. § 1983: Failure to Properly Train and Supervise;**
4. **42 U.S.C. § 1983: *Monell* Municipal Liability Civil Rights Action;**
5. **Violation of the Americans with Disabilities Act;**
6. **Violation of the Rehabilitation Act**
7. **Cal. Gov. Code § 52.1 (Bane Act);**

ROMERO, B., JOHNSON, M., TORRES, A., TREYVONNE, J., , WERESKI, A., ROMANS, B., GUTIERREZ, L. IN THEIR INDIVIDUAL CAPACITIES, DEFENDANT DEPUTIES DOES 15-20, DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10,

Defendants,

**8. Negligence Survival Claim (CCP § 377.30);**
**9. Dependent Adult Neglect; and**
**10. Wrongful Death**

**DEMAND FOR JURY TRIAL**

Plaintiffs ESTATE OF LONNIE RUPARD, through its administrator Terri Lopez, JUSTINO RUPARD, individually, and RONNIE RUPARD, individually, hereby allege as follows:

**INTRODUCTION**

1. Plaintiffs the Estate of Lonnie Rupard, through its administrator Terri Lopez, and Justino Rupard and Ronnie Rupard, as individuals (hereinafter "Plaintiffs") sue to seek justice and recover damages arising from the wrongful death of Lonnie Rupard (hereinafter "Lonnie") while he was in the care and custody of the County of San Diego at the San Diego Central Jail (hereinafter "SDCJ").

2. Lonnie suffered from schizophrenia. On March 17, 2022, Lonnie died a slow painful death at the age of 46 while in custody at the SDCJ after months of neglect.

3. While in custody at the SDCJ, County employees neglected his schizophrenia and basic needs despite obvious signs that he was in acute psychosis. They discontinued his antipsychotic medication. During the approximately three months he was in custody at SDCJ, Lonnie lost 60 pounds, which was one third of his total body weight. Lonnie was six feet tall and weighed 105 pounds at his death.

4. In his final days, Lonnie ate nothing. He was never let out of his cell. He never bathed. He never saw sunlight. Deputies, who saw Lonnie in a mountain of trash and maggots in his food and his body caked in feces, left him to die.

5. According to the medical examiner, Lonnie died from pneumonia, malnutrition, and dehydration. The Medical Examiner ruled his death to be a homicide, meaning Lonnie died at the hands of the Jail staff.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert causes of action for constitutional violations arising under 42 U.S.C. § 1983.

7. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

8. At all times relevant to this complaint, decedent Lonnie Rupard was an individual residing in San Diego County, California.

9. The County of San Diego's Medical Examiner ("ME") did not disclose its findings on the cause of death until March 2, 2023. In accordance with the requirements of the California Tort Claims Act (Cal. Gov. Code §§ 810-996.6), Plaintiffs filed a timely government claim.

10. Plaintiffs properly complied with the Government Claim Act. Plaintiff Justino Rupard submitted claims on behalf of the Estate of Lonnie Rupard and himself as an individual on March 9, 2023. The claims were submitted against the County of San Diego and its employees under Cal. Gov. Code § 900.4. (See **Exhibit A**, attached hereto).

11. On March 14, 2023, Plaintiff Justino Rupard resubmitted the claims, along with an application for leave to file a late claim pursuant to Cal. Gov. Code § 911.4. (See **Exhibit B**, attached hereto).

12. On March 10, 2023, Plaintiff Ronnie Rupard served a timely tort claim against the County of San Diego and its employees under Cal. Gov. Code § 900.4 along with an application for leave to file a late claim pursuant to Cal. Gov. Code § 911.4. (See **Exhibit C**, attached hereto).

13. Plaintiffs' claims were timely because the accrual date for presenting a government tort Claim against the County of San Diego ("County") for their father's death was March 2, 2023, when the County first released its Medical Examiner's ("ME") report ruling Lonnie's death a homicide. Under the Delayed Discovery Doctrine, accrual of the cause of action is postponed until the plaintiff discovers, or has reason to discover, the cause of action. Plaintiffs did not know, and had no way of knowing, the cause of action stemming from Lonnie's death on March 17, 2022, until the ME report was released on March 2, 2023.

14. Until March 2, 2023, the Medical Examiner's report was unavailable to the public, including Lonnie's family.

15. Prior to the release of the ME report on March 2, 2023, Plaintiffs were only provided with a death certificate which stated, “PENDING” for the cause of their father’s death. Plaintiffs received no additional information from the County until March 2, 2023, when the autopsy report, attached hereto as **Exhibit D**, was published revealing substantial evidence of neglect.

16. The County of San Diego had exclusive control of all information necessary for Plaintiffs to determine the facts relevant to the accrual of a cause of action.

17. The County withheld, and even misstated, information concerning the details of Rupard’s death until March 2, 2023. As such, the County is estopped from raising untimeliness as a defense. “It is well settled that a public entity may be estopped from asserting the limitations of the claims statute where . . . (1) the public entity was apprised of the facts, (2) it intended its conduct to be acted upon, (3) the plaintiff was ignorant of the true state of facts, and (4) relied upon the conduct to his detriment.” *K.J. v. Arcadia Unified School Dist.* (2009) 172 Cal.App.4th 1229, 1239-40.

18. Even following the eventual release of the autopsy report, the County Sheriff Department continued to publish misleading information. Specifically, on March 2, 2023, the Sheriff published a news release which deliberately omitted the words “neglected schizophrenia” from its report regarding the ME’s findings.

19. The ME’s report ends with even more detail regarding the “neglect,” which the Sheriff willfully omitted from its news release:

> “Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was

dependent upon others for his care; therefore, the manner of death is classified as homicide."

20. Even if the accrual date was the date of Lonnie's death of March 17, 2022, Plaintiffs timely sought leave to file a late claim for failure to present a claim within six months of Lonnie's death on account of inadvertence, surprise, and excusable neglect. Plaintiffs had no way of knowing there was any cause of action related to Lonnie Rupard's death until March 2, 2023, when the San Diego County ME disclosed the findings that Lonnie's death was due to pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, ruling the death a homicide.

21. Prior to the ME's announcement, the County prevented Plaintiffs from discovering the facts giving rise to a cause of action by publishing incomplete, misleading and false information including, but not limited to, completely omitting all relevant facts and findings consistent with the ultimate cause of death disclosed on March 2, 2023, including dehydration, malnutrition, and neglected schizophrenia.

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiffs' claims arise out of events and omissions occurring in the County of San Diego, which is situated in the Southern District of California.

## PARTIES

23. All Plaintiffs are, and have at all times relevant to this Complaint, residing in San Diego, California.

24. Plaintiffs Justino Rupard and Ronnie Rupard are the only two biological children of Lonnie Rupard. (See Declaration of Justino Rupard, attached hereto as **Exhibit E**, at ¶¶ 2-3).

25. Lonnie Rupard did not leave behind any will. He did not leave behind any testamentary instrument or other written document designating any heir or beneficiary or making any donative transfer of property. As such, Lonnie Rupard died intestate. (*Id.* at ¶ 5).

26. When this lawsuit was commenced on July 26, 2023, no proceeding was pending in the State of California for the administration of Lonnie Rupard's estate. At the time this lawsuit was commenced, no probate proceeding was pending in any other state or country for the administration of Lonnie Rupard's estate. (*Id*. at ¶ 8).

27. At the time of his death, Lonnie Rupard was not married. (*Id*. at ¶ 9).

28. Because Lonnie Rupard is Justino Rupard's and Ronnie Rupard's biological father, at the time of the filing of this lawsuit, they were the successors in interest (as defined in Section 377.11 of the California Code of Civil Procedure) to decedent Lonnie Rupard and succeeded to Lonnie's interests in the action or proceeding. (*Id*. at ¶ 9).

29. At the time of the filing of this lawsuit on July 26, 2023, no other person had a superior right to commence the action or proceeding or to be substituted for decedent in the action. (*Id*. at ¶ 11). Justino filed a declaration of standing at that time.

30. When the first amended complaint was filed on November 21, 2023, no other person had a superior right to commence the action or proceeding or to be substituted for the decedent in the action. (*Id*. at ¶ 12). Justino filed a declaration of standing at that time.

31. On December 4, 2023, Plaintiff Justino Rupard filed a petition to open an Estate for Lonnie Rupard, seeking to be appointed administrator of the Estate. (*Id*. at ¶ 13).

32. On February 21, 2024, Plaintiff Justino Rupard filed a nomination of Terri Lopez to serve as the administrator of Lonnie Rupard's estate. Terri Lopez is Justino Rupard's grandmother. (*Id*. at ¶¶ 14-15).

33. Ronnie Rupard did not object to the nomination. (*Id*. at ¶ 22).

34. On April 15, 2024, the probate court appointed Terri Lopez to serve as the administrator of Lonnie Rupard's estate. (*Id*. at ¶ 21. See also Declaration of Terri Lopez, attached hereto as **Exhibit F**, at ¶ 6). The probate court issued letters of administration on May 17, 2024. (*Id*).

35. While there was no personal representative for the Estate of Lonnie Rupard at the time of the filing of the original complaint and the first amended complaint, one has since been appointed by the probate court. Accordingly, Ms. Lopez has standing to continue to prosecute this lawsuit on the Estate's behalf and the Estate's claims have not been abandoned.

36. The personal representative claims are categorized as claims that accrued to Lonnie Rupard and survives his death, rather than claims for injuries Terri Lopez herself has suffered. *Quiroz v. Seventh Ave. Ctr.*, 140 Cal.App.4th 1256, 1264-65 (2006) ("Unlike a cause for wrongful death, a survivor cause of action is not a new cause of action that vests in the heirs on the death of the decedent. It is instead a separate and distinct cause of action which belonged to the ***decedent*** before death but, by statute, survives that event").

37. Although the Estate claims are pursued through Terri Lopez, the claims are maintained by the Estate as the party because the cause of action belongs to the decedent, Lonnie Rupard. Terri Lopez is merely the court appointed administrator pursuing them on behalf of the Estate. *See Knox v. City of Fresno*, No. 1:14-cv-00799-GSA, 2015 WL 5923531, at *7 (E.D. Cal. Oct. 9, 2015)

38. Terri Lopez's addition is "more aptly characterized as a substitution, rather than the addition of a new party." (*Id*., citing *San Diego Gas & Elec. Co. v. Superior Court*, 146 Cal.App.4th 1545, 1553 (2007).

39. The relation back doctrine applies because Terri Lopez's substitution does not give rise to a wholly distinct and different legal obligation against the defendants. (*Id*. at *8, citing *Branick v. Downey Savings & Loan Assn.*, 39 Cal.4th 235, 243 (2006)) The Estate's causes of action rest on the same general set of facts, involve the same injury (*e.g.*, the suffering and death of Lonnie Rupard), and refer to the same instrumentality (*e.g.*, Lonnie's treatment while in the custody of the County of San Diego Sheriff's Department) as the initial complaint. (*Id*. See also **Exhibit F** at ¶ 9).

Case 3:23-cv-01575-CAB-JAC Document 26-3 Filed 01/03/24 PageID.8905 Page 9 of 90

40. Because Plaintiff Justino Rupard properly and timely submitted a claim on behalf of the Estate and because the relation back doctrine can be applied to the claims, Terri Lopez can step into the case as the personal representative of the Estate's (*i.e.*, Lonnie Rupard's) claims.

41. Defendant County of San Diego (hereinafter "County") is a governmental entity organized and existing under the laws of the State of California. The San Diego County Sheriff's Department is an agency operating under the County of San Diego's authority. The Sheriff's Department owns, operates and manages the San Diego Central Jail ("SDCJ") and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures, practices/customs of SDCJ, and its respective employees, contractors and/or agents who staff the SDCJ.

42. Defendant Bill Gore (hereinafter "Gore") was the San Diego County Sheriff during a portion of the relevant timeframe of Lonnie Rupard's incarceration, and he retired on February 3, 2022. In his capacity as Sheriff, Gore was a final policymaker for the Sheriff's Department and for the County on matters relating to the Sheriff's Department, the SDCJ, and its deputies, employees, agents, medical staff, contractors and Doe Defendants, including the hiring, screening, training, retention, supervision, discipline, counseling of such personnel.

43. He was also responsible for the County's compliance with state and federal laws and constitutions. Defendant Gore was the Title 15 officer and also responsible for the noncompliance with California state law. Having had the opportunity to comply with state law, he failed to do so. He was responsible for the supervision and control of officers who are or were employed by the Sheriff's Department, who were under his command and/or who reported to him, including the Defendants to be named.

44. Defendant Kelly Martinez (hereinafter "Martinez") was the Undersheriff for the San Diego County Sheriff's Department prior to Lonnie's death and the Acting Sheriff at the time of Lonnie's death, from February 3, 2022 to April 5, 2022. In her capacity as Undersheriff and Acting Sheriff, Martinez was a final policymaker for the

P

Sheriff's Department and for the County on matters relating to the Sheriff's Department, the SDCJ, and its deputies, employees, agents, medical staff, contractors and Doe Defendants, including the hiring, screening, training, retention, supervision, discipline, counseling of such personnel. She was also responsible for the County's compliance with state and federal laws and constitutions. Martinez was responsible for the supervision and control of officers who are or were employed by the Sheriff's Department, who were under her command and/or who reported to her, including the Defendants to be named.

45. After Martinez was sworn in as Sheriff, it was her duty and her responsibility to ensure proper investigation and discipline of all staff employed by the County of San Diego.

46. Defendant Medical Providers Does 1-10 (hereinafter "Doe Medical Providers") are all County employees, agents, or contractors working within the Sheriff's Department Medical Services Division who were responsible for Lonnie's medical care, including screening, follow-up assessments, and referrals for further treatment, whether or not they actually provided Lonnie with any medical care. Doe Medical Providers include all Qualified Mental Health Providers. Doe Medical Providers were acting under color of law and within the scope of their employment at all times relevant to the events described in this Complaint.

47. All staff worked under the direction and supervision of Defendants Gore and Martinez who set policies and procedures with respect to all services and programs of the County Jails.

48. Defendant Dr. Jon Montgomery, DO (hereinafter "Montgomery") was, at all times relevant, the Chief Medical Officer for the Sheriff's Department and was responsible for overseeing the Medical Services Division at the SDCJ. He was responsible for and oversaw the development and implementation of quality assurance and utilization review policies and procedures. All medical and psychiatric doctors and staff at the SDCJ worked under Dr. Montgomery's direction. He is sued in his

individual capacity for his failure to properly oversee the implementation of policies and procedures involving the care that was ultimately provided to Lonnie, and his failure to supervise other medical staff who were charged with providing care for Lonnie.

49. On information and belief, Dr. Montgomery was responsible for supervising medical staff at the SDCJ, including Defendant Medical Provider Does 1-10. He was also responsible for overseeing the implementation of quality assurance and the development and implementation of policies and procedures.

50. Christina Anosike, LMFT (hereinafter "Anosike") was a medical provider employed by the County and/or a contractor of the County working within the Sheriff's Department Medical Services Division who was responsible for Lonnie's medical care, including follow-up assessments and referrals for further treatment.

51. Anthony Cruz, MD was a medical provider believed to be an employee of Liberty Healthcare Inc. He was responsible for Lonnie's medical care, including follow-up assessments and referrals for further treatment.

52. On information and belief, Liberty Healthcare of California Inc. was a third-party contractor to the San Diego County Sheriff's Department and employed, supervised, and trained Cruz, and Defendant Medical Provider Does 1-10.

53. DEFENDANT DEPUTY DOE 1 has been identified as Aguilera, M. #0163 At all times relevant to this complaint, Aguilera was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022 and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

54. DEFENDANT DEPUTY DOE 2 has been identified as Jason Viladiu #0659. At all times relevant to this complaint, Viladiu was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning

medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

55. DEFENDANT DEPUTY 3 has been identified as Martinez, G. #3629. At all times relevant to this complaint, G. Martinez was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

56. DEFENDANT DEPUTY DOE 4 has been identified as Amado, J. #4193 At all times relevant to this complaint, Amado was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

57. DEFENDANT DEPUTY DOE 5 has been identified as Mace, T #4324. At all times relevant to this complaint, Mace was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

58. DEFENDANT DEPUTY DOE 6 has been identified as Aguirre, E #3322. At all times relevant to this complaint, Aguirre was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

59. DEFENDANT DEPUTY DOE 7 has been identified as James, T. #4309. At all times relevant to this complaint, James was a San Diego County Sheriff's deputy

who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

60. DEFENDANT DEPUTY DOE 8 has been identified as Romero, T. #4309. At all times relevant to this complaint, Romero was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

61. DEFENDANT DEPUTY DOE 9 has been identified as Johnson, M #0568. At all times relevant to this complaint, Johnson was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

62. DEFENDANT DEPUTY DOE 10 has been identified as Torres, A #3208. At all times relevant to this complaint, Torres was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

63. DEFENDANT DEPUTY DOE 11 has been identified as James Treyvonne. At all times relevant to this complaint, Trayvonne was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

64. DEFENDANT DEPUTY DOE 12 has been identified as Allan Wereski #4047. At all times relevant to this complaint, Wereski was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

65. DEFENDANT DEPUTY DOE 13 has been identified as Romans, B. #4011. At all times relevant to this complaint, Romans was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

66. DEFENDANT DEPUTY DOE 14 has been identified as Gutierrez, L. #0928. At all times relevant to this complaint, Gutierrez was a San Diego County Sheriff's deputy who worked a shift in housing unit "7D" between March 15, 2022 and the time of Lonnie's death on March 17, 2022, and was responsible for summoning medical or mental healthcare, monitoring, conducting cell checks and/or conducting wellness and/or safety checks on Lonnie.

67. Defendant Deputy Does 15-20 are all Sheriff's Department deputies who were responsible for summoning medical or mental health care, observing any audio or video monitors, or conducting wellness or safety checks on Lonnie in any housing unit in which Lonnie was housed leading up to his death on March 17, 2022, including but not limited to deputies in the housing unit "7D" or Module D on the seventh floor.

68. Defendant Deputy Does 15-20 will hereinafter be referred to collectively as "Doe Deputies" unless otherwise noted. Doe Deputies were acting under color of law and within the scope of their employment at all times relevant to the events described in this Complaint.

69. Defendant Deputy Supervisor Does 1-10 (hereinafter "Doe Deputy Supervisors") are Sheriff's Department deputies who were responsible for training and supervising Doe Deputies. Doe Deputy Supervisors were acting under color of law and within the scope of their employment at all times relevant to the events described in this Complaint.

70. Doe Deputies and Doe Medical Providers are sued in their individual capacities for the purposes of claims arising under § 1983 and as County employees for the purposes of claims arising under state law.

71. Plaintiffs are ignorant of the true names of all Doe Deputies, Doe Deputy Supervisors, and Doe Medical Providers despite due diligence and will amend the Complaint to add their true names upon learning them.

72. The SDCJ is owned and operated by Defendant County and staffed by County employees, agents, and contractors.

## FACTUAL ALLEGATIONS

### A. Defendants Were Deliberately Indifferent to Lonnie Rupard's Constitutional Rights

73. Lonnie Rupard died while in custody the SDCJ on March 17, 2022, from pneumonia, malnutrition, and dehydration from untreated schizophrenia.

74. As of March 17, 2022, Lonnie had lost approximately 60-pounds, or 36% of his total body weight, since the time of his arrest on December 19, 2021, approximately 3 months earlier.

75. At the time of his death, Lonnie was six feet tall and weighed 105 pounds.

76. Lonnie's basic care needs were so severely neglected by deputies and other staff while in custody despite obvious signs that he needed medical care that his death was classified as a homicide by the medical examiner.

77. According to the medical examiner's report, on the morning of December 19, 2021, Lonnie Rupard was arrested by National City Police for a parole violation and booked in San Diego Central Jail.

78. At the time of his death, Lonnie was a pre-trial detainee because he had not yet been convicted of a parole violation, and was still awaiting trial.

79. The arresting officer knew that Lonnie had a history of psychotic disorders, information that was relayed to the Jail.

80. On December 19, 2021, Lonnie's medical clearance screening at the SDCJ was completed by Ben Samonte, RN and May Ng, RN.

81. At intake, Lonnie weighed 165 pounds.

82. At intake, Lonnie was scheduled for a second stage nursing evaluation, after which he was housed in SDCJ's general population.

83. On December 20, 2021, a request was entered for Lonnie to have an initial psychiatric evaluation. The request for the psychiatric evaluation noted that Lonnie had a "H/O (history of) extensive meds, Patton (history of treatment at Patton State Hospital)."

84. The initial psychiatric evaluation was scheduled for December 24, 2021. It did not occur.

85. Defendant Anthony Cruz documented that Lonnie was not to be seen due to "time constraints." This was five days after Lonnie was booked into the jail with clear and obvious symptoms of serious mental illness.

86. Lonnie was again re-scheduled to have his initial psychiatric evaluation performed on December 28, 2021. Again, there was no evaluation.

87. Cruz documented once again Lonnie was not to be seen due to "time constraints."

88. On December 29, 2021, ten days after he was booked into SDCJ, Lonnie finally underwent a psychiatric evaluation. The psychiatric evaluation was performed by Cruz.

89. Cruz documented that Lonnie was seen for a psychiatric sick call during a previous incarceration in 2020. Cruz noted that during the previous sick call, Lonnie was diagnosed with a myriad of serious psychiatric issues, including unspecified

schizophrenia spectrum and other psychiatric disorders and antisocial personality disorders.

90. Cruz documented that Lonnie had previously been treated with Haldol (an antipsychotic), Depakene (valproic acid used to treat seizure disorders and mental conditions), Zyprexa (an antipsychotic) and Klonipin (a benzodiazepine).

91. Cruz documented that Lonnie had been hospitalized at Patton State Hospital until just a month prior.

92. Cruz spoke to Lonnie through Lonnie's cell window. In response, Lonnie rambled incoherently and was verbally aggressive. Lonnie was a poor historian.

93. Cruz deemed him to be "uncooperative."

94. Rather than send him to the PSU, Cruz' prescribed Lonnie psychiatric medications, including Haldol, Cogenti, and Valproic acid, "due to [Lonnie's] presentation, psychiatric hx (history) and **potential for decompensation**."

95. The PSU is a Lanterman-Petris-Short (LPS) licensed acute psychiatric care facility that offers 24-hour mental health treatment on a voluntary and involuntary basis. The Sheriff's Department operates two PSUs – one at the Central Jail for men, and one at the Las Colinas Detention Reentry Facility for women.

96. The PSU at the Central Jail functions as an inpatient psychiatric hospital that is regulated by the Health and Human Services Administration.

97. The function of the PSU is to treat mentally ill patients who need hospitalization.

98. The PSU is supposed to have three registered nurses per shift to provide medical care to those housed in the PSU.

99. The only staff members of the jail who are permitted to admit patients into the PSU are psychiatrists.

100. Involuntary admission into the PSU is permitted for patients who are a danger to themselves or others.

101. In 2015, a schizophrenic patient Ruben Nunez died after psychiatrists failed to place him in the PSU where he could be monitored. There, a psychiatrist saw Ruben through a food flap in his cell and deemed Ruben to be "uncooperative" when Ruben spoke in gibberish to a wall.

102. *The Estate of Ruben Nunez, et al. v. County of San Diego, et al.*, No. 16-cv-1412-BEN-MDD, placed the County on ample notice that it was failing to train their psychiatrists on how and when mentally ill patients should be placed into the PSU.

103. Between December 20, 2021 and January 20, 2022, Lonnie refused to take his medications, including psychiatric medications, and was unable to sign the medical consent form on multiple occasions.

104. On January 20, 2022, Cruz performed a psychiatric chart review and noted that Lonnie was consistently refusing psychiatric medications. Despite Cruz's well-documented awareness of Lonnie's psychiatric history, his knowledge that Lonnie had refused his medications for the previous month and his knowledge of Lonnie's potential for decompensation, Cruz did nothing.

105. Rather than refer him to the PSU or take any other steps to ensure Lonnie's compliance with his medication regime, Cruz and Medical Provider Does 1-10 discontinued Lonnie's prescribed medications, including his antipsychotic medications.

106. Cruz and Medical Provider Does 1-10 did not refer Lonnie to the PSU as was required for his medical needs.

107. As a result, Lonnie remained in general population where he could not be monitored or medicated.

108. Cruz's and Medical Provider Does 1-10's decision to discontinue Lonnie's psychiatric medications without a referral to PSU presented a substantial risk to Lonnie of further mental and physical deterioration and constituted deliberate indifference to Lonnie's serious medical needs.

109. Without his medication, the enhanced monitoring of his psychiatric wellbeing or the frequent assessments provided in the PSU, and without intervention

from any qualified health professional, Lonnie predictably continued to precipitously deteriorate mentally and physically.

110. On January 29, 2022, Lonnie was observed laying on the housing floor following use of force by deputies. While no one documented why deputies would use force on a vulnerable and mentally ill patient, it is believed that it was the result of Lonnie's psychosis.

111. Lonnie sustained injuries to his head and face, yet he vehemently refused medical care.

112. Upon information and belief, the deputies who entered the cell to used force on Lonnie observed the grave state of his mental and physical deterioration. The state of his tall, starving body and his psychotic delusions would be evident to the responding deputies. These deputies went inside the cell where the deteriorating living condition would have been obvious. Despite this, the deputies did not take any action to provide food or sanitation. They failed to notify their supervisors.

113. On February 1, 2022, SDCJ staff reportedly asked to have Lonnie seen by a qualified mental health professional (QMHP).

114. Eight days later, on February 9, 2022, a QHMP wellness check was performed by Christina Anosike, a mental health clinician. Anosike is a marriage and family counselor.

115. As noted in the QMHP report on February 9, 2022, completed by Christina Anosike, Deputies on the 7th floor reported that Lonnie often spoke to himself in unintelligible words.

116. Anosike noted throughout the QMHP that Lonnie was not able to be fully assessed due to his refusal and/or inability to cooperate. Lonnie displayed impoverished thought and spoke to Anosike in unintelligible words.

117. These were classic symptoms of psychosis.

118. Upon information and belief, at the time Anosike conducted her wellness check, Lonnie showed clear and obvious signs of weight loss and decompensation.

119. Despite Lonnie's psychotic presentation, obvious weight loss and overall deteriorating physical health, he was not referred by Anosike or  Medical Provider Does 1-10 to be assessed by a medical doctor, as was required for his obvious medical needs.

120. No one made a request for vital signs be taken.  No one took his vital signs.

121. Despite his known and obviously visible weight loss, neither Anosike, Cruz or Medical Provider Does 1-10 ordered that Lonnie be weighed.

122. It was obvious to all Jail staff, including Does, that Lonnie was not eating his food because they could see uneaten food in Lonnie's cell each day.

123. No one ever made a request for a nutritionist to make an assessment.

124. Despite Lonnie's extensive psychiatric history and obviously psychotic presentation during the QMHP wellness check, Christina Anosike determined Lonnie did not require a referral to PSU. Such a decision was in direct contradiction to Lonnie's obvious and serious medical needs.

125. Anosike took no action to provide psychiatric care to Lonnie.  She made no referral for a higher level of care.  She made no effort to obtain psychiatric medication. She made no effort to refer Lonnie for medical care.  She made no effort to weigh Lonnie.  She made no effort to comply with the policy on hunger strikes.

126. On February 20, 2022, Lonnie was placed on lockdown due to his psychotic state.

127. On February 22, 2022, almost two months after his initial psychiatric sick call with Lonnie, Defendant Cruz saw Lonnie again.  Cruz documented that Lonnie was not presently prescribed psychotropic medications, noting that they were discontinued due to Lonnie's consistent refusals to take the medications.

128. Lonnie did not engage with Cruz, was unable to answer questions, rambled incoherently and became verbally aggressive.

129. At the February 22, 2022, visit with Cruz, Lonnie was noted to be uncooperative, and oriented to person only (not oriented to place, time or event).  He was verbally aggressive, rambling incoherently at times, with disorganized thought.

130. Cruz noted that Lonnie's cell was only "relatively clean" and that the toilet seat was covered with a cloth. Cruz made no observation as to why someone would cover a toilet with a cloth or whether that may be a symptom of a psychiatric condition.

131. Cruz noted that Lonnie had "potential for decompensation." This observation for a "potential" was made despite the fact that Cruz was visiting Lonnie two days ***after*** placement in lockdown for full blown psychosis.

132. On information and belief, at the time Cruz saw Lonnie, Lonnie showed clear and obvious signs of dramatic weight loss.

133. It was obvious on this date that Lonnie was gravely disabled and had no ability to make rational decisions for himself. He was so gravely disabled that he needed to be involuntarily medicated.

134. In the PSU, jail staff are permitted to administer medication to individuals involuntarily. Involuntary administration of medication is not permitted outside of the PSU.

135. As of February 22, 2022, despite Lonnie's psychotic presentation, obvious signs of physical deterioration including, but not limited to, dangerous weight loss, he was not transferred to the PSU nor did he have his vital signs or weight assessed.

136. As of February 22, 2022, based on Lonnie's presentation including, but not limited to, the substantial weight loss, lack of orientation, and disorganized thought, it would have been obvious to Cruz and all who interacted with Lonnie, that he was in need of urgent medical care.

137. Despite Lonnie's presentation of severe physical decompensation and being in an ongoing state of psychosis, along with his extensive psychiatric history, creating a significant risk for further decompensation, Cruz indicated Lonnie did not require immediate psychiatric intervention at that time. Rather, the reported plan was simply to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner if needed. By this time, Lonnie had not taken his psychiatric medications for over a month.

138. Cruz and Medical Provider Does 1-10 failed to refer Lonnie to PSU and for a full psychiatric evaluation as was required for his safety, despite knowledge that Lonnie’s presentation of substantial weight loss, lack of orientation and overall psychosis required such medical care. Instead of taking any meaningful steps to ensure Lonnie’s health, safety, well-being and compliance with his psychiatric medication regime, Defendants adopted a “try again later” mentality.

139. On February 23, 2022, staff again requested that Lonnie be seen by a qualified mental health professional for a wellness check. This was a highly unusual event. Deputies do not request mental health professionals on behalf of inmates. When an inmate appears to be in need of medical care, deputies refer them to the process for the inmates to fill out a form for medical care.

140. Sworn staff would make a request for a wellness check if there was a dire need for medical attention.

141. This urgent request would go unanswered.

142. Despite the repeated and escalating request for a wellness check, no further wellness checks would be performed prior to Lonnie’s death on March 17, 2022.

143. Had a wellness check been done following the request on February 23, 2022, it would have been obvious to anyone who examined Lonnie that he needed immediate medical care and a referral to the PSU for psychiatric intervention.

144. On March 14, 2022, three days prior to his death, Lonnie was seen by a court-ordered psychiatrist, Nicolas Badre, MD, for examination of his mental competency to stand trial.

145. Dr. Badre, noted that Lonnie’s cell was dirty with trash throughout. The toilet was full of excrement and the room was very malodorous. There were feces on the floor and food smeared on the walls.

146. Lonnie was unkempt and dirty. Dr. Badre observed Lonnie lying in bed in an uncomfortable manner with a blanket over his head. Dr. Badre used the food flap and a very loud introduction to get Lonnie’s attention.

147. When Dr. Badre asked Lonnie why he was incarcerated, Lonnie responded, "water dog." Dr. Badre explained to Lonnie that he was there to evaluate him for competency and Lonnie replied, "I am home, dog."

148. Dr. Badre asked Lonnie about the charges against him. Lonnie answered, "dog."

149. Lonnie was unable to answer questions regarding his orientation during the March 14, 2022, examination.

150. Lonnie's speech was pressured and mostly incoherent. His mood was down and his affect was flat. His thought content was impoverished and his thought process was disorganized. Dr. Badre noted that Lonnie's insight and judgement were poor.

151. Dr. Badre opined that Lonnie suffered from severe mental illness and was not competent to stand trial. Dr. Badre noted, "While the defendant's lack of cooperation is likely in part volitional. I think that it is motivated by underlying disorganization of thought, which would be consistent with prior evaluation that diagnosed him to be psychotic."

152. Dr. Badre further elaborated in his report, "The defendant suffers from mental illness, displaying active signs of mental illness, including diagnosed thinking. Those symptoms of mental illness disable the defendant from being able to have a rational legal understanding of the charges and assist legal counsel."

153. Dr. Badre recommended referral to a state hospital and that Lonnie be given antipsychotic medication involuntarily as allowed by law.

154. Upon information and belief, Defendants, including Cruz and Anosike, Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre, James, Romero, Johnson, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Defendant Doe Deputies 15-20, and Doe Defendants, including Medical Provider Does 1-10, had access to and were aware of Dr. Badre's observations, diagnoses, impressions and recommendations made after his assessment of Lonnie. These defendants saw what Dr. Badre saw, which was a

person living in filth, covered in fecal matter, dying a slow painful death from starvation. Yet, they did nothing.

155. Despite their collective knowledge, none of the Defendants, including Cruz and Anosike, or the Medical Provider Does 1-10 heeded Dr. Badre's recommendations and failed to refer Lonnie to a state hospital. Defendants and Medical Provider Doe Defendants did not take any action to administer Lonnie's antipsychotic medications involuntarily, as allowed by law.

156. Despite their collective knowledge of Dr. Badre's observations, diagnoses, impressions and recommendations, none of the Defendants, including Cruz and Anosike, Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre, James, Romero, Johnson, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Defendant Doe Deputies 15-20, or the Medical Provider Does 1-10, made any effort to refer Lonnie to the PSU for emergency psychiatric intervention or request medical attention. No one attempted to feed Lonnie. No one arranged for Lonnie to leave his cell even for a moment to have exercise or yard time or socialization with another person.

157. There is no indication that Lonnie Rupard ever left his cell.

158. The observations made by Dr. Badre were the same conditions that were present when each of the Defendants interacted with him. These were the same conditions in Lonnie's cell that each medical care professional and deputies encountered.

159. The Defendant Deputies identified below were each responsible for summoning medical or mental health care, monitoring, conducting cell checks, and/or conducting wellness and/or safety checks on Lonnie, which they each failed to do during the time Lonnie was dying in his cell from malnutrition and dehydration leading up to his death on March 17, 2022: Aguilera, M. #0163, Viladiu, J. #0659, Martinez, G. #3629, Amado, J. #4193, Mace, T. #4324, Aguirre, E. #3322, James, T. #4309, Romero, B. #4284, Johnson, M. #0568, Torres, A. #3208, Treyvonne, J., Wereski, A. #4047, Romans, B. #4011, Gutierrez, L. #0928.

160. Title 15 section 1027.5 requires safety checks to be conducted at a minimum of 60-minute intervals.

161. For the two days leading up to Lonnie's death, deputies repeatedly failed to conduct Constitutionally adequate cell checks. At least four cell checks were conducted past the 60-minute time-frame required by law, with one conducted 79 minutes after the previous check. They violated California state law, Title 15, a total of five times over a two-day period. Over two dozen of the checks into Lonnie's cell lasted between one and five seconds, with eleven checks lasting only one second. Another eleven cell checks lasted only three seconds. Each of these deputies saw with their own eyes the condition of Lonnie and his cell. They observed a man dying in abject filth. These checks were grossly deficient to check Lonnie's wellbeing.

162. The last two days of Lonnie's life were captured on surveillance camera which was accessible to the deputies in the control tower. The deputies in the control tower and those who entered the module knew that Lonnie had refused to eat. Unlike other inmates, who would approach their food slots, retrieve their meals and discard their trash afterward, Lonnie's food remained untouched in his food slot. The 7D module footage clearly shows Lonnie's food slot left open, a stark contrast to the routine of other inmates. All the deputies walking past his cell saw his uneaten food remaining in the food slot. They ignored it.

163. Lonnie's starvation and refusal to eat lasted for weeks. Rather than ensuring Lonnie ate and reporting it as required, deputies stood by as Lonnie rapidly lost over 60 pounds.

164. At no point does anyone enter his cell to check on him. At no point does he come out of his cell. And at no point is he even seen through the windows in his door. All other inmates are seen moving around their cells, responding to deputies and engaging them in conversation. They are seen coming to the door to pick up their food and put their trash through the food flap. Lonnie is never seen for days.

165. While all other inmates are allowed out of their cells for "day break" into the common area, Lonnie was never seen outside of his cell. Lonnie never showered. There was no indication in any of the records that Lonnie was taken to the shower to clean himself. There is no record that anyone ever cleaned his cell the entire time he was incarcerated.

166. During his final days, no deputy ever entered his cell to conduct a hard count or to check on him. A hard count is required to be done twice a day, once every 12-hour shift. It does not appear that deputies conducted hard count of Lonnie Rupard.

167. Had Defendant Deputies monitored Lonnie in the days leading up to his death, as they were required to do, it would have been abundantly clear that he needed immediate medical and/or mental healthcare.

168. During his incarceration, despite his clear and obvious signs of weight loss, decline in both mental and physical health and severe decompensation, Lonnie was never transferred to PSU for evaluation or treatment.

169. Pursuant to San Diego County Sheriff's Department Medical Services Division Policy and Procedure Manual for "sick calls," RN duties include, but are not limited to, obtaining a full set of vital signs, including weight at the time of the appointment.

170. Psychiatry "sick calls" were reportedly requested for Lonnie on 12/20/21, 12/29/21, 2/2/22, 2/9/22.

171. There is no indication that Lonnie's vital signs were taken at any point following December 19, 2021, despite his deteriorating condition and multiple sick calls.

172. There is no indication that Lonnie's weight was ever taken at any point following December 19, 2021, despite his deteriorating condition and multiple sick calls.

173. By March, it was visible to anyone who saw Lonnie that he had lost 60 pounds of body weight. He had been starving. He was dying.

174. Not a single person initiated a protocol for hunger strikes as required by their own policy.

175. On information and belief, San Diego County Sheriff's Department Medical Services Division Policy MSD.H.12 was in place throughout Lonnie's incarceration. The policy provided that, "patients who refuse to eat and state they are on a hunger strike will be monitored medically."

176. Policy MSD.H.12 listed the myriad of individuals who were responsible for notifying medical staff of an inmate's hunger strike: the inmate/patient himself; sworn staff; counselor; religious leaders; and referrals from family members or attorneys.

177. On information and belief, and per policy, all sworn staff who were responsible for monitoring Lonnie throughout his incarceration, including the sworn staff present during meal handouts, were required to inform medical staff that Lonnie was not eating. Lonnie's starvation was or should have been obvious to Defendants, including Defendant Deputies Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre James, Romero, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Does 15-20, by his visible 60-pound weight loss and his refusal of, or failure to eat, his meal trays.

178. The policy provides that the following individuals were to be notified of the hunger strike: the chief medical officer (in this case, Defendant Jon Montgomery); the director of nursing services; the facility supervisor; the facility charge nurses, the facility Captain, all four facility watch commanders; and the dietician (collectively, "the Supervisors").

179. Upon notification of the hunger strike, medical staff were required to evaluate Lonnie's medical and psychiatric history. This assessment was to include weight and vital signs. Per policy, Lonnie should have been scheduled for a psychiatric sick call.

180. Per policy, Lonnie should have been scheduled for a registered nurse sick call ***daily*** to monitor weight, medical condition and hydration status.

181. Per policy, Lonnie should have been scheduled for a medical doctor sick call to assess for any acute and chronic medical conditions weekly and as needed.

182. Per policy, Lonnie should have been assessed by the jail population management unit for specialized housing to closely monitor his condition.

183. Per policy, deputies should have continued to offer Lonnie food and were required to record his responses.

184. Upon information and belief, either Defendants, including Deputies Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre James, Romero, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Doe Deputy Defendants 15-20, failed to communicate to medical staff that Lonnie was not eating or the medical provider defendants, including Medical Provider Does 1-10 were informed of the strike and failed to act according to the policy. They did not weigh Lonnie nor did they take his vitals. They did not monitor his medical condition and hydration status. They did not schedule Lonnie for the required sick calls. Sworn staff, including Deputies Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre James, Romero, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Doe Deputy Defendants 15-20, did not assess Lonnie for alternative specialized housing and did not document Lonnie's responses to being offered food.

185. Upon information and belief, either Defendants, including Deputies Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre James, Romero, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Doe Deputy Defendants 15-20 and Medical Provider Does 1-10, failed to notify Defendant Jon Montgomery and other Supervisors, that Lonnie was not eating, or Montgomery and the other Supervisors, including Defendant Supervisor Does 1-20, were informed of the strike and failed to act, including by failing to ensure medical and sworn staff were adhering to the hunger strike policy.

186. Either Defendants failed to follow the policy of the San Diego County Jail or the policy itself was facially deficient for excluding psychiatric patients like Lonnie

Rupard who lacked mental capacity to verbalize that he was on a hunger strike. If the policy excludes people who are nonverbal as a result of a disability, this policy itself would also violate the ADA and RA.

187. As of March 14, when Dr. Badre noted that he saw Lonnie in a filthy cell covered in feces until March 17, 2022, no one took any action to medicate Lonnie. No one referred him to a higher level of care. No one took his vitals. No one weighed him. No one made an attempt to clean his cell. For these three days, County officials left him to languish and die in filth.

188. Lonnie was reportedly last seen alive during cell checks on March 17, 2022 at approximately 21:46.

189. On March 17, 2022, the last day of Lonnie's life, two deputies began to conduct a cell check of Module 7D at 22:12:12. This cell check started 79 minutes after the last safety check. This was 19 minutes past what is permitted under California Law, which requires at a minimum a safety visual check once every 60 minutes. When the deputy conducting the cell check reached Lonnie's cell, he looked inside for approximately 12 seconds before walking away. This is a stark contrast to the same deputy spending substantially less time looking into all other cells. On the video footage it appears that the deputy is looking at Lonnie, presumably unconscious or dying in his cell. The deputy watched Lonnie, then walked away. He did nothing to render aid. He did nothing to come back to check on Lonnie. He did not enter the cell. He did not notify any medical professionals.

190. These two deputies are believed to be Deputies Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre James, Romero, Torres, Treyvonne, Wereski, Romans, and/or Gutierrez.

191. Once they discovered Lonnie dead, deputies struggled to enter and walk through Lonnie's cell due to the state of squalor he was living in. Multiple deputies kicked trash out of the way to wade through the cell. The condition was so bad that a

deputy had to use a broom to drag a mountain of toilet paper, feces and rotten food out of Lonnie's cell just so that they could access Lonnie's unresponsive body.

192. Once medics finally arrived to Module 7D, they dragged Lonnie's lifeless body through the floor of his filthy cell using a blanket. Once the life-saving measures did commence, it was too late to save Lonnie's life.

193. The effect of Lonnie's starvation was evidenced even on CCTV footage that was taken from a distance. His ribs, chest and arm bones were visible and pronounced through his thin skin. His face was gaunt. Lonnie's body was yellow and graying in color.

194. He was already be cold to the touch, indicating that he was likely dead long before he was found unresponsive.

195. Lonnie's cell was soiled with feces. Old food with insect larvae was found in his cell. This food had been rotting for several days.

196. The San Diego Citizens' Law Enforcement Review Board ("CLERB") conducted an investigation into Lonnie's death. The CLERB findings noted that despite the SDCJ green sheet stating the hygiene inspections for Lonnie's module should be conducted on Saturdays, CLERB was unable to determine if the inspections were conducted weekly: "Through the course of investigation, CLERB discovered hygiene inspection for Rupard's module may not have occurred."

197. Per CLERB, "The green sheet also states, 'SDCJ health staff will be notified of any incarcerated persons exhibiting extremely poor hygiene, self-neglect or the inability to take care for oneself. A health exam should be conducted by health staff to check on the individual's wellbeing . . . .'" CLERB concluded, "It is incumbent by the entire SDSD to take responsibility to care for those in their custody and identify and facilitate a higher level of care when needed. While CLERB does not currently have jurisdiction of medical personnel, the evidence showed an egregious neglect of care and ultimate failure of the system."

198. CLERB further found that hygiene inspection results for the period of December 22, 2021 to March 17, 2022, the time of Lonnie's incarceration, were not maintained by the Sheriff's Department, in contravention of Department policy. In response, CLERB recommended that the Sheriff's Department update policy L.2, titled Sanitation and Hygiene Inspections, to retain hard copies of the weekly inspections for a period of two years as required by County of San Diego Retention Policy Schedule.

199. While Lonnie's autopsy was performed on March 19, 2022, the medical examiner's report was not released until March 2, 2023.

200. At the time of the autopsy, Lonnie weighed 105 pounds representing a 60-pound weight loss, or 36% of his total body weight, since the time of his arrest.

201. Between the time of his arrest on December 20, 2021, and the time of his death on March 17, 2022, despite his refusal of medications, obvious signs of psychosis, decompensation, and significant weight loss, Lonnie never had his vital signs taken.

202. Between the time of his arrest on December 20, 2021, and the time of his death on March 17, 2022, despite his refusal of medications, obvious signs of psychosis, decompensation, and significant weight loss, Lonnie was never weighed.

203. The autopsy findings revealed that Lonnie had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration.

204. The autopsy findings further revealed that he had pulmonary congestion and edema, with acute bilateral bronchopneumonia.

205. The autopsy findings further revealed that Lonnie's right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material.

206. Postmortem nasopharyngeal swab for Covid-19 was positive.

207. Lonnie had no significant cardiovascular disease, liver disease, or kidney disease.

208. Lonnie also had several superficial pressure sores on his torso and extremity.

209. Neuropathology consultation of the brain documented a remote small cortical contusion on the right orbital frontal region.

210. Toxicology testing was negative for alcohol, common drugs of abuse, and medications.

211. The autopsy report describes in detail the abysmal condition Lonnie died in. He was caked in fecal matter. The autopsy report details that an “abundant” dry brown fecal matter was found on his posterior extremities. Fecal matter was also found on Lonnie’s thumb and index fingers and the soles of his feet were covered in feces.

212. The Deputy Medical Examiner concluded based on the autopsy findings and circumstances of death that “the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with Covid-19 viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions.”

213. The Deputy Medical Examiner concluded:

> Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

## B. *MONELL* Entity and Supervisory Liability Allegations

### 1. The San Diego County Sheriff’s Department Has a Higher Rate of In-Custody Deaths than Any Other Large County in California

214. In 2019, the Union Tribune published a series of articles regarding its 6-month investigation of in-custody deaths at San Diego County jails entitled, Dying Behind Bars. Jeff McDonald, Kelly Davis, and Lauryn Schroeder, Rate of jail inmate deaths in San Diego County far exceeds other large California counties, THE SAN DIEGO UNION TRIBUNE, September 20, 2019, available at:

https://www.sandiegouniontribune.com/news/watchdog/story/2019-09-19/dying-behind-bars-san-diego-county-jail-deaths.

215. The article begins by observing, "At least 140 people have died in San Diego County jails since 2009, the year Bill Gore took over as sheriff. That's an average higher than one inmate per month, every month, over the past 10 years. . . . A six-month investigation by The San Diego Union-Tribune shows that the county's jail mortality rate is the highest among California's largest county jail systems. The grim history shows no sign of waning."

216. In response to the Union Tribune's series Dying Behind Bars, Sheriff Gore wrote an op-ed that blamed the number of in-custody deaths on the inmates. William Gore, Sheriff Bill Gore: What U-T's coverage of jail deaths left out, THE SAN DIEGO UNION TRIBUNE, September 27, 2019, available at: https://www.sandiegouniontribune.com/opinion/story/2019-09-27/sheriff-gore-jail-deaths-coverage.

217. Gore wrote in the op-ed that the jail population has a high percentage of inmates with serious mental illness, and people that engage in extremely self-destructive behavior. Gore then challenged the Union Tribune's methodology in comparing statistics among counties and explained that the Union Tribune's statistics were wrong because it did not account for counties that have city lockups.

218. In response to Gore's criticism, the Union Tribune then revisited the death rates of inmates in California using California Department of Justice statistics from 2009 to 2018 and taking into account deaths in city jails. The UT published the following statistics:

////

////

////

////

////



## Mortality rate with city deaths

Deaths per 100,000 inmates

| County | Average daily population | 10-year average deaths | 10-year mortality rate |
|---|---|---|---|
| **San Diego** | **5,211.9** | **12.8** | **245.6** |
| Los Angeles | 17,060.6 | 30 | 175.8 |
| San Bernardino | 5,643.5 | 8.9 | 157.7 |
| Santa Clara | 3,702.3 | 5.4 | 145.9 |
| Orange | 5,928.6 | 8.1 | 136.6 |
| Sacramento | 3,942.2 | 3.7 | 93.9 |

## Mortality rate without city deaths

Deaths per 100,000 inmates

| County | Average daily population | 10-year average deaths | 10-year mortality rate |
|---|---|---|---|
| **San Diego** | **5,211.9** | **12.7** | **243.7** |
| Los Angeles | 17,060.6 | 25.5 | 149.5 |
| San Bernardino | 5,643.5 | 8.8 | 155.9 |
| Santa Clara | 3,702.3 | 5.4 | 145.9 |
| Orange | 5,928.6 | 7 | 118.1 |
| Sacramento | 3,942.2 | 3.7 | 93.9 |

Source: California Department of Justice U-T

Lauryn Schroeder, San Diego has highest jail mortality rate among largest counties, even with new data, THE SAN DIEGO UNION TRIBUNE, November 24, 2019, available at: https://www.sandiegouniontribune.com/news/watchdog/story/2019-11-24/san-diego-has-highest-jail-mortality-rate-among-largest-counties-even-with-new-data.

219. Schroeder noted that both the method advocated by Gore or by the UT showed San Diego County had the highest death rate.

220. According to the state Department of Justice data, San Diego County's death rate over the past 10 years was 50 percent higher than Los Angeles County's and two-and-a-half times the Orange County rate.

221. Given Gore's numerous responses to public criticism, it is obvious that he was made aware of the persistent problems with the lack of medical care in the Jails.

222. On information and belief, Defendant Martinez was aware of the exceptionally high rates of in-custody deaths even prior to her appointment as Sheriff by virtue of her previous role as Undersheriff and decades with the Sheriff's Department.

223. County officials acknowledged at least as of 2019, ***three years before Lonnie Rupard's death***, that their Jails had a large population of vulnerable people with mental illnesses who engaged in self-destructive behavior.

**2. External Audits and Reports Warn Gore, Martinez, the County and the Sheriff's Department of Pervasive Failure to Adequately Supervise Subordinates**

224. On November 8, 2016, the San Diego Sheriff's Department contracted with the National Commission on Correctional Health Care ("NCCHC") for assistance regarding compliance with Standards for Health Services in Jails. This was to receive NCCHC accreditation.

225. The County paid NCCHC one hundred thousand ($100,000) for the review of its Jails.

226. In January 2017, five years before Lonnie's death, the NCCHC provided a report to the San Diego Sheriff's Department after reviewing the practices of its Jails.

227. Of the 38 "essential standards" all of which must be met in order to attain accreditation, the Central Jail ***failed to meet 26 essential standards***.

228. NCCHC found that there was no specifically designated on-site responsible physician to serve as the responsible health authority.

229. NCCHC found there was ***no formal peer review process in place for physicians, psychiatrists, or psychologists who are contracted employees, or for nurses***.

230. NCCHC found that missing in the screening form was the "disposition" of the inmate, which would communicate to the next health care provider where the patient would be housed.

231. NCCHC found that there was ***a system of episodic care, instead of continuity of care***, with most appointments being made after a request for care was submitted by the patient.

232. NCCHC found there is an ***insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill***, and the ***number of mental health clinics in the facility is insufficient*** to meet the needs.

233. In October of 2019, three years after the County paid NCCHC for the study, the Union Tribune reported that it would be difficult to win accreditation by 2020, the timeline the Jail officials had outlined.

234. Indeed, as of today's date, five years later, there has never been accreditation.[1]

235. The UT wrote that mentally ill inmates were kept in isolation, with little evidence of monitoring for "mental condition, hygiene, orientation or how they were adjusting."

236. According to the article, jails had significant backlogs of requests for medical care. According to the article, "at the central jail, where 73 inmates have died since 2009, the report said the staff needed to do a better job looking into and communicating what caused an inmate's death so they can prevent similar incidents in the future, the consultants said."

237. In another pending lawsuit, the County officials admitted that the Medical Director and the Medical Administrator, the chief of the medical department, never read the NCCHC report.

---

[1]In failing to achieve accreditation, NCCHC found the County had no program to ensure inmates receive an initial health assessment within 14 days of incarceration, and no 14 day screening by a qualified mental health care professional after the receiving screening is completed. In February of 2022, when the Department revised its policy, it placed a 30 day requirement for the health assessment, thereby continuing to ignore the NCCHC findings of failure.

238. Sheriff Gore declined to be interviewed for the article but his staff told the UT that there were many NCCHC standards that needed to be met.

239. Although the County of San Diego and Gore were aware of Constitutional deficiencies in the delivery of seriously needed medical and psychiatric care due to the NCCHC audit, and the high number of deaths and injuries suffered by inmates, they took no steps to provide additional supervision of their subordinates. The failure to provide additional supervision of their subordinates was a moving force causing the ultimate injury to decedent Lonnie Rupard.

**3. The California State Auditor Issues a Scathing Report on the Deficiencies of the San Diego County Jail**

240. In February 2022, one month before Lonnie Rupard died, the California State Auditor made available to the public a scathing report that San Diego County jails are so unsafe and deficient that state lawmakers should intervene by forcing the Sheriff's Department to change course.

241. This should have been a wakeup call to the County and Liberty Healthcare.

242. The deficiencies outlined in the report were ongoing during the time Liberty was providing services to the County.

243. After the state of California performed an audit of 815 deaths in the County Jails, Michael Tilden, acting state auditor, wrote: "Our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths."

244. "These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody."

245. Mirroring what the community members and experts have repeatedly told the Sheriff over the past decade, the Auditor wrote: "The high rate of deaths in San Diego County's jails (as) compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices."

246. The audit said the Sheriff's Department "did not consistently follow up with" inmates who needed medical and mental health services, and concluded that lack of attention may have contributed to their deaths.

247. The report noted that when deputies did check up on inmates, these "safety checks" often amounted to inadequate glances that sometimes missed inmates in distress.

248. "In our review of 30 in-custody deaths ... based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module," the audit said. "When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours."

249. The auditors said San Diego County jails can only be fixed by legislation requiring the Sheriff's Department to implement a series of recommendations spelled out in the 126-page report.

250. "In fact, our review identified deficiencies with how the sheriff's department provides care for and protects incarcerated individuals (that) likely contributed to in-custody deaths. . . ."

251. State auditors found that the department has yet to meaningfully implement recommendations made by independent experts over the last several years.

252. "Given the ongoing risk to the safety of incarcerated individuals, the Sheriff's Department's inadequate response to deaths and the lack of effective independent oversight, we believe the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes," the report said.

### 4. Defendants County and Gore Admitted to the Deficiencies in Their Policies

253. On January 14, 2022, two months before Lonnie Rupard died, Gore and the Department submitted a written response to the Auditor's findings. The response stated in part:

> *CSA Recommendation:*
>
> *Revise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity rating as it assigns to individuals to all detentions staff overseeing them.*

Sheriff's Response: The Sheriff's Department concurs with the auditor's assessment that Qualified Mental Health Providers (QMHP) are the more appropriate staff to conduct the mental health screening portion of the intake process. The Medical Services Division (MSD) received funding for additional staffing in July 2021 and is currently in the process of recruiting and hiring from a limited pool of candidates. Additional staffing will allow us to provide a comprehensive screening process utilizing the electronic health record, in accordance with National Commission for Correctional Health Care (NCCHC) standards.

> *CSA Recommendation:*
>
> *Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.*

Sheriff's Response: The Sheriff's Department concurs with the auditors' assessment that a revision is necessary to address the process for medical/mental health referral after two requests. The Sheriff's Medical Services Division intends to implement a health care requests and services process in accordance with NCCHC standards. Patients will be referred to a provider to be evaluated. When a patient presents for health care services more than two times with the same complaint and has not seen a provider, they will receive an appointment to do so. Some mental health patients need

assistance with advocating for their medical care. Regular follow-up and ongoing engagement with QMHPs is essential to identifying patients who face these challenges.

*<u>CSA Recommendation</u>:*

*Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request. Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care.*

<u>Sheriff's Response</u>: The Sheriff's Department concurs a timely medical response to patient concerns is extremely important, and that repetitive patient refusals or an abject delay in follow-on scheduling of medical care are concerning issues and could potentially precipitate an adverse condition or event.

**5. Defendants Were Made Aware of a Persistent and Recurring Pattern of Preventable Deaths and Serious Injuries Caused by the Sheriff's Department's Misconduct, Apathy and Neglect**

254. There have been countless complaints made by inmates, family members, community members and the Jail's own staff regarding injuries caused by medical neglect and staff misconduct.

255. At the time of Lonnie Rupard's death, there had been a long-standing custom and practice of improper and inadequate investigations; refusals to sanction and discipline subordinate misconduct; and failures to further supervise and train both deputies and medical staff.

256. County Defendants were aware of the following examples of failure by Jail staff at County Jails leading to inmate deaths or serious injuries, including failures to coordinate and share critical information among personnel, failures to conduct adequate cell checks and failures to provide critical treatment to inmate-patients who Jail knew suffered from serious mental health disorders and/or developmental disabilities. These examples include:

a. In 2014, Christopher Carroll, who was mentally ill, was placed in segregation. He was found dead with a noose around his neck. Mr. Carroll had speared blood on the wall of his cell. He had urinated on the floor and food and feces were stuck to the ceiling. Deputies had failed to conduct proper cell checks to monitor his wellbeing despite Mr. Carroll's known condition.

b. In 2015, Ruben Nunez, a schizophrenic mental health patient transferred from Patton State Hospital, died when jail doctors failed to treat a potentially lethal condition for water intoxication. The psychiatrists treating Mr. Nunez failed to read his medical records and failed to input critical medical information in JIMS. One of the psychiatrists testified that she did not know how to use JIMS to add "alerts," meaning the most critical information regarding a patient's care. She testified that she was never trained. Despite the medical records from Patton Hospital reflecting hyponatremia, a condition caused by overconsumption of water, a nurse noted in Mr. Nunez's chart: "Informed I/P that he will be seen [sic] by psych for f/u. Exercise as tolerated and *drink plenty of water*. I/P verbalized understanding and agrees to plan." (Emphasis added). This nurse failed to document Mr. Nunez's medical records, leaving nearly the entire seven pages of an intake form blank. According to one of the nursing staff, intake nurses do not have sufficient time to read medical records or to conduct a thorough intake because of the number of inmates being booked at once. The intake nurses only have sufficient time to look to whether the Jail will book the person into jail.

c. In February 2018, Paul Silva died in Central Jail after deputies pepper sprayed, tased, and beat Paul to death in his cell. The Central Jail staff knew Paul suffered from schizophrenia as it was well documented in

the Jail's database system. Law enforcement encountered Paul after his mother requested Paul be hospitalized because he refused to take his schizophrenia medication. Paul was obedient with police officers at all times. Jail staff classified Paul as a "book and release" meaning he was supposed to be released after 8 hours. Instead, Paul decompensated as he stayed in temporary holding cells with little food, no blankets, no bed, and with constant light and noise for almost 36 hours. The staff failed to communicate Paul's critical medical condition and failed to monitor him. After he went without food, sleep, and any medication, Paul began acting bizarrely. He could not comprehend deputies' commands and questions. A nurse practitioner did not check Paul's medical record or review his medical history to determine whether he needed psychiatric care. She did not consult a medical doctor or psychiatrist. Instead, deputies killed Paul Silva after they entered his jail cell.

d. In August 2019, Jose Sevilla was discovered in his cell, unresponsive after overdosing. By the time they discovered Mr. Sevilla, rigor mortis had already set in with ants on his body.

e. On March 16, 2022, one day before the death of Lonnie, Hayden Schuck exhibited similar symptoms of medical distress during his time in custody and died in large part due to dehydration and neglect. Hayden had similarly elevated levels of sodium, chloride, and urea nitrogen. Hayden, like Lonnie, had pneumonia, a duodenal ulcer, and pressure sores. Hayden and Lonnie were also reportedly being housed in the same housing unit. As of March 16, 2022, the Jail staff was made aware that their neglect had killed a person. Even after Hayden died, deputies failed to conduct proper cell checks.

### 6. The County's Policy on Medicating Gravely Mentally Ill Patients Is Grossly Deficient

257. California Code of Regulation Title 15, § 1050 requires:

> "[a]dministrators to develop and implement a written classification plan designed to properly assign inmates to housing units and activities according to the categories of … physical or mental health needs … The written classification plan shall be based on objective criteria and include receiving screening performed at the time of intake by trained personnel, and a record of each inmate's classification level, housing restrictions, and housing assignments."

258. The Sheriff's Medical Services Division's policy no. MSD.I.3 regarding "Intake Receiving/Screening Assessment" states that for psychiatric housing, admission to the Psychiatric Security Unit (PSU) "must be upon an order from a psychiatrist [.]"

259. By failing to provide Lonnie with a psychiatric assessment which would obviate his need for placement in the PSU, County Defendants failed to implement a classification plan which would have provided adequate medical intervention for Lonnie.

260. To adhere with the standards set by § 1050, the jail was required to meaningfully assess Lonnie's mental health needs to house him appropriately. As a result of the jail's failure, Lonnie further decompensated in the squalor of his filthy cell without medication and without adequate nutrition.

261. The PSU is the only facility in the jail where patients may be involuntarily medicated, and by failing to place severely mentally ill patients in the PSU, it places vulnerable incarcerated people at risk of injury and death.

262. The PSU exists specifically for patients like Lonnie Rupard who are unable to make medical decisions or to care for their basic needs. The process under 5150 exists to prevent the predictable harm from psychotic patients' refusal to take their medication.

263. The PSU was equipped for monitoring and more frequent cell checks than in the general population. General population is not a safe environment for people like

Lonnie because the deputies have no medical training and lack the ability to understand and deal with serious mental illnesses.

264. Psychotic patients lack legal capacity to make medical decisions. In order for these patients to be involuntarily medicated, they are required to first be placed in the PSU.

265. By failing to place Lonnie in the PSU, County Defendants failed to medicate a gravely mentally ill patient who would fully decompensate.

266. The gravity of Lonnie's illness was evident to defendants because Lonnie had just been released a month prior from Patton State Hospital, which involuntarily medicates its patients who lack capacity to make decisions for themselves.

267. At the time of Lonnie Rupard's death, there had been a long-standing policy and practice of failure to medicate gravely mentally ill patients.

268. County Defendants were aware of their failure to medicate gravely mentally ill patients in their custody. For example, in the case of *The Estate of Ruben Nunez, et al. v. County of San Diego, et al.*, No. 16-cv-1412-BEN-MDD, a mentally ill man in San Diego Central Jail died after failing to be transferred to the PSU. After a judge found that Ruben lacked the capacity to make decisions regarding antipsychotic medication, and that serious harm was the probable result of Ruben not being medicated, San Diego Central Jail providers failed to admit Ruben to the PSU. As a result, Ruben did not receive his medication or proper monitoring, and Ruben died a few days later.

**7. The County's Policy on Weighing Patients and Taking Vital Signs Is Grossly Deficient**

269. At the time of Lonnie Rupard's death, there had been a long-standing policy and practice of failing to take the vital signs and weigh patients in County jails.

270. By failing to track these important health indicators for detainees in their custody, and more importantly, the changes thereof, this placed patients at risk of injury or death.

271. Had Lonnie's weight been adequately recorded for the duration of his incarceration, it would be evident that he was severely unwell.

272. Despite Lonnie's refusal to eat food, hunger strike protocols were never initiated by anyone in the jail.

273. San Diego County Sheriff's Department Medical Services Division Policy MSD.H.12 requires that sworn staff who are responsible for monitoring a patient who refuses to eat were required to inform medical staff that Lonnie was on a hunger strike.

274. Per the policy, numerous forms of medical intervention were meant to occur, such as a psychiatric sick call, a daily registered nurse sick call to monitor his weight, medical condition, and hydration status, a medical doctor sick call to assess for acute and chronic medical conditions weekly, an assessment by the jail population management unit for specialized housing to closely monitor his condition, and recording of his responses to deputies who were to offer him food. None of these interventions occurred.

275. County Defendants were aware of their failure to weigh patients and take their vitals causing deaths, demonstrated by the following cases:

a. The failure to weigh Ruben Nunez and limit his water intake despite knowing of his potentially lethal overconsumption of water resulted in his death from psychogenic polydipsia.

b. In February 2019, Michael Wilson collapsed in his cell and passed away. Mr. Wilson suffered from hypertrophic cardiomyopathy and regularly took medication that allowed him to live. Without the medication, Mr. Wilson's lungs would fill with fluids. Jail staff did not give Mr. Wilson his medication. Despite their knowledge that Mr. Wilson was not receiving his medication and despite weight increase being an indicator of lungs filling with fluid, jail staff failed to weigh Mr. Wilson.

c. In November 2019, Elisa Serna died in Las Colinas. She has suffered from withdrawal and continued to vomit for days. She was placed on the standard nursing protocol for dehydration, which required Elisa to be weighed regularly. Jail staff did not weigh Elisa.

276. The need to implement a policy on maintaining and communicating a patient's weight was obvious given that hunger strikes were so common in the jails that there was a written policy to address it. The County was on notice of the risks posed to inmates undergoing hunger strikes and the need to closely monitor their weight and vitals due to the risk of adverse health events due to lack of nutrition.

### 8. The San Diego County Sheriff's Department's Policy on Cell Checks Is Facially Deficient

277. California state law, Title 15 section 1027.5, requires safety checks to be conducted at a minimum of 60-minute intervals. "Safety checks" is defined as "direct, visual observation performed at random intervals within timeframes prescribed in these regulations to provide for the health and welfare of inmates."

278. Title 15 requires that a safety check be conducted hourly and requires a written plan that includes the documentation of routine safety checks.

279. This statute was intended to protect against the kind of risk suffered by the plaintiff. Title 15 § 1027.5 was implemented for the "safety and well-being of individuals" in custody.

280. The County failed to implement "a written plan that includes the documentation of all safety checks. Documentation shall include: (1) the actual time at which each individual safety check occurred; (2) the location where each individual safety check occurred, such as a cell, module, or dormitory number…." The County's policy violates Title 15 because it fails to document "the location where each individual safety check occurred, such as a cell, module, or dormitory number."

281. The County's policy violates Title 15 because it fails to document "employee identification number of staff who completed the safety check(s)"

The County only tracks the start time of the safety check, not the completion time.

282. The County's policy violates Title 15 because it fails to document a process where safety checks are "review[ed] at regular defined intervals by a supervisor…."

283. The County of San Diego violates Title 15 because it tracks only the time a deputy starts the round of checks of the module, instead of the cell or the inmates.

284. By contrast, the County of Los Angeles Safety checks are performed to see if an inmate needs any medical treatment, to ensure that inmates do not pass away, and to check on their well-being, including their health/signs of life/breathing. By way of these safety checks, deputies are to visually inspect each inmate's body for signs of life – breathing, talking, movement – even when inmates are sleeping.

285. Section 1027.5 of the California Code of Regulations requires safety checks at least hourly. According to LASD policy, however, safety checks for inmates in Los Angeles are to be conducted every thirty (30) minutes.

286. In Los Angeles, there is also a specific sergeant assigned on each shift to ensure that deputies comply with Title 15 and LASD safety-check policy. This "Title 15 Sergeant" monitors the electronic system that logs every safety check performed by deputies.

287. In Los Angeles, each safety check is tracked and logged electronically by recording scanned-barcodes. When performing a safety check, a deputy scans a barcode located at each cell with a handheld device to log the exact time the deputy checked on the welfare of each inmate.

288. The County of San Diego has none of these safeguards. There is no such thing as a barcode in San Diego jail cells. In violation of Title 15, no log is kept of the safety checks of the individual cells.

289. At some point during Sheriff Gore's administration, the County of San Diego got rid of the policy and the mechanism in which deputies were required to

log in the time that the safety check was completed. The only entry into JIMS is when a safety check round started.

290. There is no policy, mechanism or requirement that supervisors review the tapes of the cell checks for compliance.

291. As a result, when deputies fail to complete the round of checks or abandon their posts, there is no mechanism for anyone to find out about the deficient checks unless someone dies and a homicide investigator reviews the footage of the checks.

### 9. The County Maintains a *De Facto* Policy of Failing to Conduct Proper Cell Checks

292. Defendants have failed to implement proper policies and procedures with respect to monitoring detainees despite specific knowledge that their deputies were repeatedly failing to conduct proper cell checks.

293. For the three days preceding Ronnie's death, no deputy entered his cell to conduct a hard count. A "hard count" requires a deputy to scan the inmate's bracelet and verify proof of life. If an inmate is unable to come to the door to show the bracelet, deputies enter the cells to check for proof of life.

294. Upon information and belief, the County's written policy requires deputies to conduct hard counts twice per day, once every twelve hour shift.

295. Upon information and belief, the County's written policy requires deputies get verbal or physical acknowledgment from each incarcerated person.

296. In the three days preceding Ronnie's death, no deputy entered Ronnie's cell, or any cell in the 7D module, to conduct a hard count. Six hard counts were completely missed. It is clear that there is a custom of failing to conduct proper cell checks and follow policies because, during these three days, no action was taken to ensure deputies were conducting hard counts.

297. Additionally, Defendants were made aware by a series of deaths and catastrophic injuries that deputies were not monitoring detainees on camera and walking by cells without actually checking on the inmates.

298. Defendants knew of a long history of subordinates failing to conduct proper cells checks or failing to follow jail policies regarding care and monitoring of seriously ill inmates, including these prior cases:

a. On June 25, 2011, Daniel Sisson died from an acute asthma attack made worse by drug withdrawal. The San Diego County Medical Examiner estimated in an autopsy report that Sisson had been dead for several hours when a fellow inmate found him. Deputies had failed to check on Mr. Sisson for hours. Mr. Sisson later died during a drug withdrawal.

b. In 2012, as Mr. Victorianne laid on the floor of his cell, naked and unconscious, none of the deputies conducted proper security checks, soft counts or hard counts, which requires the deputies to scan the wrist band of each inmate. One deputy was told by an inmate that Mr. Victorianne was not breathing. This deputy kicked Mr. Victorianne; stated that Mr. Victorianne "twitched"; and left him to die in his cell. These deputies failed to conduct proper checks then lied about it to investigators.

c. In 2014, Christopher Carroll, who was mentally ill, was placed in segregation. He was found dead with a noose around his neck. Mr. Carroll had smeared blood on the wall of his cell. He had urinated on the floor and food and feces were stuck to the ceiling. Deputies had failed to conduct proper cell checks to check for his wellbeing despite Mr. Carroll's known condition.

d. In Ruben Nunez's case in 2015, a deputy saw Mr. Nunez in his cell sitting in his own vomit, blood and urine. A nurse told this deputy to take Mr. Nunez to Medical. Despite seeing Mr.

Nunez twice in this condition, this deputy failed to summon help or take Mr. Nunez to Medical as directed. The deputy left Mr. Nunez in his cell to die.

e. In February of 2016, Richard Boulanger hung himself in his cell at the Central Jail. His cellmate pressed the emergency call button, but no deputy came to the cell for approximately 20 minutes. A subsequent investigation revealed that one of the deputies did not break stride or look into Mr. Boulanger's cell during a cell check. The investigation revealed that during cell checks, the deputy peered into each cell for approximately one second in violation of policy. The investigation which followed revealed a practice in which the deputies were turning off the sound of the emergency call buttons, lowering the volume, or muting the inmate intercom system so that no sound could be heard. Call buttons in many of the housing units did not function, which made no sound when pressed. The audio for the monitor in the jail tower did not function well so that it was difficult to hear tones and sounds from the monitor even when the volume was turned to the maximum level. Deputy Dixon at the Central Jail admitted that he had failed to timely respond to multiple inmates' calls for help through the emergency intercom system because the "audio alert function of the inmate intercom system had been 'muted' and was turned all the way down in volume[.]" When Deputy Dixon started his shift on February 12, 2016, he walked into the control tower room and turned everything off.

f. On Christmas eve, 2017, at 3:50 am, Joseph Carroll Horsey was found dead in his cell. CLERB issued a finding in June of

Case 3:23-cv-01357-CAB-MMA Document 26-3 Filed 11/16/24 PageID.8951 Page 51 of 90

2020 that Mr. Horsey had been dead for hours when he was discovered. CLERB found that deputies at the Central Jail violated policies for inmate count and security checks of housing units and housing cells. The jail surveillance video recordings did not reveal any deputy entering the module to conduct a Hard Count; counting inmates with the use of a Bar Code Reader, an Emergency Evacuation List, Face Cards or Floor Sheets to confirm the identity. Deployment logs confirmed that Deputies 1, 2, and 3 were assigned/responsible for performing and logging in all security and safety checks. Three deputies had made entries into the JIMS system that they had properly conducted safety checks.

g. In January 2018, Frankie Greer was booked into Jail and requested his anti-seizure medication. The medical staff failed to provide it to him. He was required to be placed on the bottom bunk due to his seizure disorder. The housing staff placed Mr. Greer on top of the triple bunk. Mr. Greer suffered a seizure and fell approximately seven feet onto his head and face onto the cement ground. Mr. Greer's cellmates and the other inmates in the unit were screaming for help and frantically pounding on the emergency call button as Mr. Greer continued to have more seizures and bleed out. The deputies in the control tower had turned off the sound of the panic buttons. The deputies did not respond for approximately 45 minutes after the fall. Mr. Greer was in a medically induced coma and the doctors were forced to drill a hole in his head to relieve the pressure in his brain. Mr. Greer has a permanent and irreversible damage to his brain.

h. In March of 2018, Paul Silva who was going through a mental health crisis was booked into jail. For 36 hours he was left in temporary cells. The cells had no bed and nowhere Paul could sit other than a metal bench. Paul was denied medication for his schizophrenia and continued to decompensate. No deputy checked on Paul for 36 hours. Paul Silva died when he suffered a psychotic break and the deputies used force in extracting Paul from his cell.

i. In April of 2018, sheriff's deputies saw Colleen Garot with a black eye and contusions to her face. Instead of taking her to the hospital, they booked her in jail on an outstanding warrant for a failure to appear in court. Ms. Garot was agitated, and disoriented, making nonsensical statements. She had multiple bruises on her face and periorbital swelling. Instead of providing medical care, deputies placed her in a safety cell. She had no clothes. There was a video camera in the safety cell. Deputies could see that Ms. Garot was attempting to climb the wall. Ms. Garot suffered a seizure, fell to the ground and laid there. By the time someone noticed, Ms. Garot was foaming at the mouth. Ms. Garot was suffering from a skull fracture, and a traumatic brain injury. Either the deputies were failing to watch and monitor the video in the safety cell or they ignored a woman in medical crisis for approximately ten hours.

j. In March of 2019, Ivan Ortiz told the staff that he was suicidal. They placed him in the psychiatric unit so he could be observed. They failed to observe him and left him with a plastic bag, with which he suffocated himself to death.

k. In November of 2019, Elisa Serna was going through withdrawal and continued to vomit for days. Elisa was placed in a cell where she was supposed to be monitored. A deputy and a nurse witnessed Elisa suffer a seizure, fall to the ground and lose consciousness. The nurse and the deputy turned around, walked outside, and closed the door behind them. There was no cell check. The deputies either did not look at the video showing Elisa Serna on the floor urinating on herself or they chose to ignore it. By the time a deputy went inside the cell, rigor mortis had started to set in. The nurse in this case has been charged with manslaughter.

l. In January of 2020, deputies failed to conduct a mandatory safety check on Blake Wilson who was struggling with drug addiction. CLERB found that the deputy who was supposed to conduct “proof of life” checks in Blake Wilson’s module spent “approximately one second” looking into Wilson’s three-person cell. More than eight hours passed between the time Wilson was last seen alive and when he was found dead.

m. In February of 2020, Anthony Chon had trouble breathing. CLERB found that the deputies violated Sheriff’s Department policies by not immediately ensuring that Anthony Chon received medical attention. One of the deputies who had been told that Mr. Chon could not breathe decided not to take him to Medical because some inmates suffer from anxiety.

n. On November 22, 2020, Lazaro Alvarez was found dead at the San Diego Central Jail. After an investigation, it was determined that Mr. Alvarez had suffered a heart attack caused by methamphetamine and fentanyl. Mr. Alvarez was last seen

alive at approximately 11:20 PM on November 21, 2020. Despite hourly "safety checks," nobody rendered aid to Mr. Alvarez until after 3AM. After this incident, CLERB recommended that the San Diego County Sheriff's Department revise its policies to mandate proof of life verification through visual checks every 60 minutes during the booking process. Safety checks did not require proof of life, which is why no one noticed he was dead for over three hours. Even after Mr. Avarez was discovered, deputies chose not to conduct CPR.

o. On January 6, 2021, Omar Moreno was found dead at the San Diego Central Jail. Deputies performed safety checks late on Omar's cell and missed a crucial safety check. Safety checks that were performed were woefully inadequate, consisting of deputies peeking in to briefly check the safety of inmates for 1-2 seconds.

299. Defendants were on notice that deputies were failing to conduct proper cell checks. A working group of sheriff's officials convened as a result of Mr. Alvarez' death, which recommended that the Jail conduct 30 minute safety checks in intake, processing, and release areas. The working group recommended that the County revise its policies and implement training regarding the 30-minute safety checks for these areas. The working group recommended that facility commanders submit a written report 30 days post-implementation to discuss operational impacts of these changes.

300. Not a single one of these recommendations was ever implemented.

301. It was no mystery to the County defendants that their employees were failing and needed to be trained and supervised. In the 12 months before Omar Moreno's death, deputies at the Central Jail self-reported over 600 times in which they failed to start the cell check of the floor late or failed to properly log in their start time.

These are only the self-reported violations of state law. These involved ***374 separate instances*** in which deputies self-reported that they violated California state law by not starting their cell check rounds of the floor on time.

302. It is not possible for anyone to know how many unreported cell check failures occurred during this period because there is no system or policy in place to verify that cell checks were actually conducted.

303. On July 20, 2021, Saxon Rodriguez died at the Central Jail after overdosing on fentanyl and methamphetamine. CLERB's investigation revealed that a safety check had not been conducted timely. CLERB again found that the County violates Title 15 policies on safety checks.

304. According to CLERB:

> The San Diego Sheriff's Department's practice is to start safety checks within the 60-minute time-period but not necessarily to directly visualize each incarcerated person within that time-period, thus resulting in innumerable instances where incarcerated persons are not directly visually observed within statutorily mandated time periods. SDSD considers the resulting safety checks to be completed within statute and policy. For example, if a safety check of a module is started within 55 minutes of the last safety check start time, SDSD considers the safety checks occurring during that check as within statute and policy, even if the actual time between direct visualization of an incarcerated person is just a few minutes over 60 minutes or many minutes over 60 minutes. When it comes to the safety of incarcerated persons and the prevention of deaths or negative physical or mental health outcomes, every minute counts.

305. CLERB recommended to San Diego Sheriff's Department:

> Take all necessary measures to change its current practice to conform with statute and its own existing policy by mandating that every incarcerated person be directly observed by sworn staff at random intervals not to exceed 60 minutes (30 minutes for Medical Observation Beds and in Psychiatric Stabilization Units and 15 minutes for safety cells), as opposed to simply ensuring the safety checks start within the mandated time-period.

306. The Sheriff's Department refused to implement the changes recommended by CLERB.

307. Gore, Martinez and the County of San Diego had been advised repeatedly that the deputies were failing to conduct proper cell checks and failing to monitor the cells. Despite this specific knowledge, defendants failed to take appropriate action.

308. The Citizens Law Enforcement Review Board ("CLERB") also conducted an analysis of data regarding in-custody deaths in San Diego County jails over the past 10 years, the results of which were released in April 2022.

309. CLERB made the following findings, in pertinent part:

a. Residents of San Diego County are no more likely to die than residents of other California counties;

b. San Diego jails have the highest number of unexplained deaths compared with all other California counties when controlling for jail population;

c. The risk of overdose/accidental deaths is the greatest in San Diego jails;

d. Elevated risk of death appears to be isolated to the unsentenced jail population.

310. Despite their awareness of the need to take concrete actions to address a crisis of soaring jail deaths in San Diego County facilities, Gore and the County have avoided responsibility; resisted transparency; refused to conduct transparent investigations to determine wrongdoing; refused to hold individual deputies and medical staff accountable; and refused to discipline these individual staff members who commit misconduct that kills inmates. This has created a culture of apathy and impunity at the Sheriff's Department. As the Union-Tribune's Editorial Board noted, Gore's cavalier attitude toward inmate deaths reflects the attitude of his subordinates. Because it is impossible for any individual Sheriff's Department subordinate to suffer discipline, there is a custom of encouraging neglect and abuse of seriously ill inmates, and Jail staff

are permitted to act with impunity. Thus, the failure to investigate and discipline subordinates was the moving force that caused the ultimate injury to decedent Lonnie Rupard.

### 10. Jail Defendants and Liberty Healthcare Systemically Fail to Maintain Sufficient Numbers of Deputies and Health Care Professionals

311. Defendants maintain insufficient numbers of health care professionals to provide minimally adequate care to the approximately 4,000 incarcerated people in the Jail. In July 2021, the Sheriff's Department had 233 medical staff vacancies and only 287 medical staff. There are not sufficient health care staff to timely respond to incarcerated people's requests for medical care, to adequately screen, monitor, and provide follow-up care to incarcerated people who have serious and chronic illnesses, or to treat incarcerated people when medical emergencies occur. Jail Defendants have long been aware that the Jail's medical staffing is deficient and jeopardizes patient safety. The NCCHC Report found that medical understaffing may be contributing to untimely medical care at the Jail. After the NCCHC Report, the Sheriff's Department publicly acknowledged that it needed to hire more medical staff to provide adequate care and comply with NCCHC standards. Jeff McDonald, Kelly Davis, *Sheriff has a ways to go to meet 'gold standard' of jail accreditation*, San Diego Union-Tribune, Oct. 13, 2019, https://www.sandiegouniontribune.com/news/watchdog/story/2019-10-13/sheriffs-quest-for-jail-accreditation-to-take-time-money-and-culture-shift.

312. Understaffing of health care professionals translates to dangerous conditions and inadequate medical care for incarcerated people. In December 2020, understaffing prompted nursing staff at Vista to write a desperate plea to Jail command staff for "any kind of help we can get." The nurses' letter explained that during certain shifts, Vista had only two registered nurses available—one permanently stationed at intake—for the 600 people incarcerated at the facility. As a result, the nurses wrote, "this environment for patient care is not even close to standard," and "[p]atients are being neglected and not being given the care that they need and deserve." The nurses

implored command staff to “understand that people’s lives are put at risk” by the dangerous understaffing at the Jail.

313. Due to understaffing, the Sheriff’s Department improperly allows untrained nurses to perform mental health evaluation gatekeeping functions. Many nurses are uncomfortable being asked to serve this role. An October 2021 letter from the Service Employees International Union (“SEIU”) Local 221, which represents Jail health care workers, to the Citizens Law Enforcement Review Board (“CLERB”) explained that understaffing created “dangerous and inhumane” conditions for incarcerated people and medical staff alike.

314. Because of its failure to hire and retain sufficient medical staff, the Sheriff’s Department relies on a system of mandatory overtime, which causes medical staff burnout, results in high turnover, and places incarcerated people at further risk of harm. The Sheriff’s Department’s medical employees have been on mandatory overtime because of chronic staffing deficits. Medical staff often call in sick due to burnout, which leaves incarcerated people with even fewer medical professionals available to provide care. Mandatory overtime and other workplace stressors are so severe that medical staff often quit. Even when the Sheriff’s Department hires new medical staff, it is unable to retain new employees due to these impossible working conditions. The failure to maintain sufficient medical staff causes disruptions and delays in the care of incarcerated people’s serious medical needs. Many of the systematic and dangerous practices in the Jail outlined in this complaint stem from Jail Defendants’ failure to maintain sufficient numbers of health care staff and contractors in the Jail.

315. There was a persistent pattern of understaffing the jails so that it was nearly impossible for staff to conduct random safety checks or to have cover officers when there was a delay or problem in conducting checks.

316. The Jail was notified by its own employees that the pattern of understaffing the Jails was dangerous for both deputies and inmates.

317. The Jail, Gore and Martinez were notified by their own staff that their morale was low because they were being forced to work overtime as a result of understaffing, causing exhaustion and mistakes.

318. On any given shift, there were multiple absent deputies and supervisors were not able to staff the shift with sufficient numbers of deputies to perform their duties.

319. Defendants were well aware that cell checks were not being conducted properly because there was insufficient staffing to perform each check in compliance with Title 15.

320. The Jail's response to this serious problem was to change its policy so that deputies would not have to self report failed or delayed cell checks.

**11. The County of San Diego and Liberty Healthcare Had a Policy of Overscheduling Their Providers, Making It Impossible to Deliver Medical Services**

321. Liberty Healthcare as a third-party provider, was responsible to providing sufficient staffing to meet the needs of psychiatric patients.

322. Liberty Healthcare, as a policy, failed to staff a sufficient number of providers at the Central Jail as a policy. Liberty Healthcare knew that its' staffing, while saving costs and increasing revenue, was dangerous to the patients in its care.

323. As a result of its failure to properly staff the Central Jail, Lonnie Rupard was denied treatment on multiple occasions.

**12. Liberty Healthcare Failed to Train Its Medical Staff on the Recurring Situation of Treating Psychotic Inmates and Procedures for Admission to PSU**

324. Liberty Healthcare failed to adequately train Defendant Cruz on treating psychotic inmates and assessing the need for patients to be transferred to a higher level of medical care, including admission to the PSU.

325. Liberty Healthcare failed to adequately train Cruz on how and when to place a patient in the PSU.

326. Liberty Healthcare's failure to adequately train Cruz amounts to deliberate indifference.

327. Cruz' failure to place Lonnie – who was rambling incoherently and verbally aggressive – into the PSU is a constitutional violation that is so patently obvious as to implicate Liberty Healthcare's failure to provide him adequate training.

328. In *Bd. of Cnty. Commissioners v. Brown*, 520 U.S. 397, 409 (1997), the Supreme Court stated a pattern of similar violations is not that a failure to train claim may be proven where "a violation of federal rights may be a highly predictable consequence of a failure to equip [the employees] with specific tools to handle recurring situations."

329. In *The Estate of Ruben Nunez, et al. v. County of San Diego, et al.*, the court specifically held the death of mentally ill patients who were not placed into the PSU was a highly predictable consequence of a recurring situation for Jail officials pursuant to *Brown*: "The 'highly predictable consequence' of failing to equip CPMG doctors with knowledge about how to place critically ill patients in the PSU or that it was their responsibility to order transferred patients' housing in the PSU, is that critically ill transferred patients would not be placed in the PSU and would not receive the level of psychiatric care and monitoring required by the U.S. Constitution." (ECF. No. 414 at 12).

330. The same rings true today. The proper housing and classification of mentally ill people within the jail is a recurring situation that happens every day at the San Diego Central Jail.

331. By failing to place Lonnie into the PSU, his death was a highly predictable consequence of the failure to train Jail staff how to properly admit mentally ill patients into the PSU.

332. This failure to train and supervise Cruz constitutes deliberate indifference to the substantial risk its policies and procedures were inadequate.

**13. The County and Liberty Healthcare Ratified the Misconduct of Their Employees**

333. Defendants have a widespread history of ratifying employee misconduct by failing to conduct appropriate investigations. Instead of supervising his deputies, Gore chose to defend and deny their misconduct thereby encouraging further bad

behavior. Martinez continued to ratify the actions of her employees when she became the Sheriff. Upon information and belief, Montgomery ratified the actions of the medical staff by failing to take action to discipline them or terminate their employment.

334. Defendant County condoned and acquiesced in the abusive behavior of its subordinates by refusing to retrain them, discipline them, or correct their abusive behaviors.

335. The County ratified the actions of the individual defendants by failing to take any action after Lonnie's death.

336. Defendant County was, or should have been, aware that the program regarding supervision and discipline of subordinates, who violated the civil rights of inmates or citizens, was so inadequate that it was obvious that a failure to correct it would result in further incidents or dangerous or lawless conduct perpetrated by their subordinates.

337. Liberty Healthcare condoned the conduct of its employees, including Cruz. Upon information and belief, Liberty failed to take action to discipline him or terminate his contract.

**I.**

**FIRST CAUSE OF ACTION**

**42 U.S.C. § 1983: Deliberate Indifference of Serious Medical Needs**

**(By the Estate of Lonnie Rupard Against Defendants Anosike, Cruz, Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre, James, Romero, Johnson, Torres, Treyvonne, Wereski, Romans, Gutierrez, Doe Deputies 15-20 and Doe Medical Providers)**

338. Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

339. By virtue of both the Eighth Amendment and Fourteenth Amendment to our Constitution, the government has an obligation to provide medical care for those whom it is punishing by incarceration.

340. Deliberate indifference is the recognized standard of protection afforded to both convicted prisoners and pretrial detainees under the Eighth and Fourteenth Amendments respectively.

341. Plaintiff was a pretrial detainee awaiting trial following his arrest for probation violation and is thus protected by the Fourteenth Amendment right to due process. The Due Process Clause of the Fourteenth Amendment applies to pretrial detainees' claims of inadequate medical care.

342. In the alternative, if Lonnie is not determined to be a pre-trial detainee for which the Fourteenth Amendment would apply, the Eighth Amendment would apply, which protects Lonnie from cruel and unusual punishment.

343. Whether analyzed under the Fourteenth Amendment or the Eighth Amendment deliberate indifference standard, each of Defendants' conduct as set forth above amounts to both objective and subjective deliberate indifference of Lonnie's serious medical needs pertaining to his need for treatment related to his schizophrenia, psychosis, malnourishment, and dehydration, which ultimately resulted in his death from malnutrition and dehydration in the setting of neglected schizophrenia. The conduct was so egregious that the medical examiner ruled the manner of death to be a homicide.

344. Deliberate indifference is demonstrated by the way in which Defendants failed to: (1) provide medical care in the form of medications, psychiatric treatment, medical treatment for malnourishment, as well as medical monitoring of vital signs and weight; (2) chose a medically unacceptable course of treatment under the circumstances to house Lonnie in a general population as opposed to the PSU and not adequately monitor him; and (3) chose this course in conscious disregard to the excessive risk to Lonnie's health when it was known that Lonnie was not taking his psych medications, demonstrating psychosis, and was objectively malnourished.

345. Deliberate indifference is highlighted by the fact that Lonnie did not even have his vital signs checked, nor was he weighed, a single time between December 20, 2021 and the time of his death on March 17, 2022, during which time Defendants knew that Lonnie was not taking his prescribed psychiatric medications, was demonstrating

psychosis, severe decompensation, and was obviously and severely malnourished, ultimately losing 60 pounds (over 1/3 of his body weight) in less than three months.

346. Each of the above-named defendants made intentional decisions and omissions regarding Lonnie's conditions of confinement and the denial of adequate medical care, which amount to a deliberate indifference, including, but not limited to:

a. Failing to house Lonnie in a Psychiatric Stabilization Unit (PSU) despite knowledge that Lonnie was refusing his prescribed psych medications, psychotic, unable to care for himself and ultimately starved to death;

b. Failing to provide assessment or to summon medical care in the face of obvious signs that Lonnie's health was deteriorating dangerously including, but not limited to, rambling incoherently with altered thought process, unkempt and dirty appearance with an unclean cell with feces and contaminated food with larvae;

d. Failing to timely and adequately document information regarding Lonnie's deteriorating condition in the jail information system;

e. Failing to take appropriate measures to ensure Lonnie was receiving adequate and prompt medical care, particularly when he exhibited gravely concerning signs of illness;

f. Failing to take vital signs and obtain weight measurements for an individual who was obviously starving to death and in need of medical attention; and

g. Failing to timely and adequately check on Lonnie's safety and wellbeing while he was in his cell despite knowledge that he was disoriented in a state of complete psychosis, and visibly emaciated with a rapid weight loss of a third of his body weight. It is especially egregious that Lonnie was still not adequately checked on after

Defendants were made aware that another inmate in the same housing unit had died the day prior.

347. Defendants made an intentional decision to deny him the basic services of the Jail such as a hygiene check, a shower, or time outside his cell.

348. Defendants' intentional decisions and omissions put Lonnie at substantial risk of suffering serious harm.

349. Defendants did not take reasonable available measures to abate or reduce the risk of serious harm, even though a reasonable officer or employee under the circumstances would have understood the high degree of risk involved – making the consequences of the Defendants' conduct obvious.

350. As alleged above, Defendants' conduct and omissions constituted various policy violations.

351. While Lonnie was in their custody and care, Defendants had adequate time to reflect and reason prior to acting or failing to act. Because Lonnie's health deteriorated over the span of several days, if not weeks or months, actual deliberation was practical.

352. Defendant Cruz was aware Lonnie had been seen for a psychiatric sick call during his previous incarceration in 2020. He knew he had been previously treated with antipsychotic medications, and that he had been hospitalized at Patton State Hospital until prior. Indeed, after finally seeing Lonnie for a psychiatric evaluation, Cruz noted Lonnie **had a potential for decomposition.** Even after noting this in his December 29, 2021 evaluation, Cruz still permitted Lonnie to deny medication. Cruz refused to perform more frequent evaluations to ensure the potential decomposition did not occur. Cruz refused to refer or involuntarily admit Lonnie to the PSU. Cruz stood by as Lonnie's predictable decomposition occurred and did nothing to stop it.

353. Defendant Christina Anosike, a mental health clinician, performed a wellness check on Lonnie on February 9, 2022. Deputies informed Anosike that Lonnie often spoke to himself unintelligibly. She was aware and noted that Lonnie displayed

impoverished thoughts and talked to himself in unintelligible words. Despite this knowledge of Lonnie's psychotic presentation, obvious weight loss, and overall deteriorating physical health, he was not referred by Anosike. She made no effort to take Lonnie's vitals, take his weight, or refer him to PSU or a medical doctor.

354. For at least three days prior to Lonnie's death, Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre James, Romero, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Doe Deputy Defendants 15-20 watched as Lonnie refused food, medication, a shower, and day break time. They watched as Lonnie's food rotted in his cell and began growing maggots and larvae. They watched as Lonnie's cell became piled with feces and toilet paper to the point where the floor was unmovable. While observing Lonnie become more and more emaciated and succumb to his maladies, Deputies refused to provide the most basic level of care and human decency. They observed a man's life deplete before them and turned a blind eye to Lonnie's suffering. Deputies relegated Lonnie to a subclass of human existence, denying him of his most basic human needs in the process.

355. With this knowledge, they violated Title 15 by failing to perform cell checks to ensure that Lonnie was alive. They failed to perform proper cell checks even after another person died in the same module from neglect. They failed to perform proper cell checks even after the state auditor faulted them for deficient cell checks and misconduct causing deaths of inmates.

356. DOE Medical Providers had access to and were aware of Dr. Badre's report on Lonnie. DOE Medical Providers failed to refer Lonnie to a state hospital, and they did not make any effort to refer Lonnie to the PSU for emergency psychiatric intervention. The Medical Provider DOES either failed to notify Defendant Montgomery and other supervisors that Lonnie was not eating or Montgomery or Montgomery, and the other Supervisors were informed of Lonnie's hunger strike and failed to act according to the hunger strike policy.

Case 3:23-cv-01357-CAB-BLM Document 26 Filed 09/06/24 PageID.1896 Page 66 of 90

357. The Medical Provider DOES failed to monitor his condition hydration status or take his vitals. These Does were personally aware of the condition Lonnie was living in, yet failed to provide a medical assessment. They failed to weigh him. They failed to document the calls from sworn staff for a medical evaluation. They failed to schedule a medical doctor sick call so that Lonnie could be treated for starvation and malnutrition.

358. Over these days and weeks, each Defendant watched Lonnie steadily deteriorate and ignored his clear symptoms of inanition. Watching a grown adult shrink down to 105 pounds, these Defendants chose not to weigh Lonnie.

359. The actions and omissions by Defendants constituted objective and subjective deliberate indifference to Lonnie's medical needs and unsafe conditions of confinement. Defendants' actions and omissions violated the due process clause of the Fourteenth Amendment, or in the alternative constituted cruel and unusual punishment under the Eighth Amendment.

360. Defendants' actions and omissions constituted both objective and subjective deliberate indifference to Lonnie's medical needs and unsafe conditions of confinement.

361. Defendants' deliberate indifference was an actual and proximate cause of Plaintiffs' damages including both Lonnie's pain and suffering prior to his death and his death. Plaintiffs seek compensatory damages.

362. Plaintiffs also seek punitive damages on the grounds that Defendants acted with deliberate and reckless disregard of Lonnie's constitutional rights.

363. Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to 42 U.S.C.§ 1988.

////

////

////

////

## II.
## SECOND CAUSE OF ACTION

**42 U.S.C. § 1983: Right of Association**

**(By Justino Rupard and Ronnie Rupard, Individually Against Defendants Anosike, Cruz, Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre, James, Romero, Johnson, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Defendant Doe Deputies 15-20, Doe Medical Providers)**

364. Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

365. Plaintiffs Justino Rupard and Ronnie Rupard, as individuals, allege this substantive due process claim against Defendants for depriving them of their rights to love, companionship, and society with their father, Lonnie Rupard.

366. The aforementioned acts and/or omissions of Anosike, Cruz, Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre, James, Romero, Johnson, Torres, Treyvonne, Wereski, Romans, Gutierrez, and Defendant Doe Deputies 15-20, caused the untimely, preventable, and wrongful death of Lonnie Rupard and deprived Plaintiffs Justino and Ronnie Rupard of their liberty interest in their relationship with their father, in violation of her substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

367. There was no legitimate penological interest in failing to medicate and treat Ronnie Rupard.

368. There was no legitimate penological interest in failing to communicate critical medical information and denying access to medical care to an inmate in severe and obvious medical danger and distress. There was no legitimate reason for failing to place Lonnie Rupard in PSU.

369. There was no legitimate penological interest in failing to provide food and basic hygiene or leaving a man to die in his own filth.

370. There was no legitimate penological interest in failing to call for help while watching a man starve to death.

Case 3:23-cv-01357-CAB-BLM Document 26-3 Filed 11/13/24 PageID.8963 Page 68 of 90

371. The deprivation of the rights alleged above has destroyed the constitutional rights of Justino and Ronnie Rupard to the society and companionship of their father which is protected by the substantive due process clause of the Fourteenth Amendment.

372. A substantive due process claim of impermissible interference with familial association arises when a state official harms a parent or child in a manner that shocks the conscience. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation. *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

373. "There are two tests used to decide whether officers' conduct 'shocks the conscience.'" *Id*. at 1056. A state official's conduct may shock the conscience if (1) the official acted with a "purpose to harm" the victim for reasons unrelated to legitimate law enforcement objectives; ***or*** (2) the official acted with "deliberate indifference" to the victim. *Id.* at 1137 (emphasis added). Which test applies turns on the specific circumstances of the underlying events in each case. If the encounter at issue escalated so quickly that the officer had to make a snap judgment, the plaintiff must show the officer acted with a "purpose to harm." See *id*. However, if the situation evolved within a time frame that allowed officers to reflect before acting, the plaintiff must show the officer acted with "deliberate indifference." See *id*.

374. Here, in a situation that spans days, weeks and months, defendants had ample opportunity to deliberate. Allegations that they acted with deliberate indifference satisfies the "shocks the conscience" standard under the Fourteenth Amendment because they mean the same thing.

375. Defendants' deliberate indifference was an actual and proximate cause of Plaintiffs' damages.

376. The conduct alleged herein violated Plaintiffs' rights as alleged above, thereby legally, proximately, foreseeably and actually causing Plaintiffs Justino and Ronnie Rupard to suffer damages all to be shown in an amount according to proof at the time of trial.

377. Plaintiffs also seek punitive damages on the grounds that Defendants acted with deliberate and reckless disregard of Lonnie's constitutional rights.

378. Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

**III.**
**THIRD CAUSE OF ACTION**
**Failure to Properly Train and Supervise (42 U.S.C. § 1983)**
**(By The Estate of Lonnie Rupard Against Defendants Montgomery, Gore, Kelly Martinez, Liberty Healthcare Corporation and Doe Deputy Supervisors)**

379. Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

380. Defendants had a duty to use reasonable care in the training and supervision of its employees, deputies, sworn staff, contractors, and agents.

381. Defendants had a duty to properly train and supervise its employees in determining the proper and adequate course of treatment for detainees in need of medical treatment.

382. Defendants had a duty to properly train and supervise its employees to summon medical care for detainees whom they knew, or had reason to know, required medical care.

383. Defendants failed to properly train their employees with regard to the need to communicate critical medical information to each other.

384. Defendants failed to properly train their employees with regard to the treatment of schizophrenia and psychosis.

385. Defendants failed to properly train their employees with regard to the treatment of dehydration and starvation.

386. Defendants failed to properly train their employees with regard to conducting cell checks.

387. Defendants failed to properly train their employees with regard to hunger strike protocol.

388. Defendants failed to properly train their employees with regard to responding to staff requests for wellness checks.

389. Defendants failed to properly train their employees with regard to placing gravely ill patients in the PSU.

390. Defendants failed to properly train their employees with regard to sanitation and hygiene.

391. Defendants failed to properly train their employees with regard to the ADA and RA.

392. Montgomery, as the person in charge of medical services, had the duty to train all medical staff including the medical care providers who failed to properly treat Lonnie Rupard. He failed to train them in the following respects: (1) weighing patients who are starving; (2) taking vitals of patients in deteriorating medical condition; (3) following the hunger strike protocol for people dying of starvation; (4) placement of gravely ill patients in the PSU; and (5) timely responding to requests for wellness checks.

393. Gore and Kelly Martinez, as the decisionmakers for the Department, had the duty to train their employees in conducting proper cell checks and proper staffing to meet the basic needs of the people in custody. They had the duty to train their employees: (1) to respond to starvation and hunger strikes; (2) of basic sanitation and hygiene; and (3) complying with the ADA.

394. Liberty Healthcare failed to train its employees on: (1) placing patients in the PSU; (2) properly assessing patients who are decompensating; (3) properly scheduling patients to be seen; and (4) compliance with the ADA.

395. Defendants breached their duty of care such that Lonnie's prolonged health crisis was deliberately ignored and Lonnie endured pain and suffering and ultimately died as a result.

396. Defendants knew that deputies were consistently failing to conduct proper cell checks, leading to numerous deaths and serious injuries. Gore and Martinez knew

that their housing deputies were failing to place patients and inmates in proper housing units where they could be monitored for their serious medical needs. Despite this knowledge, Gore and Martinez failed to train and supervise their staff on conducting proper cell checks on medically vulnerable patients, including but not limited to Lonnie Rupard.

397. Their failure to train and supervise their deputies on Title 15 cell checks led to hundreds of violations each year, causing deaths and serious injuries.

398. Defendants Gore and Martinez, who were responsible for implementing proper training, have systemically failed to maintain adequate and proper training necessary to educate deputies and medical staff as to the Constitutional rights of inmates, and to prevent the consistent and systematic failure to provide medical care.

399. Defendants Gore, Martinez, and Montgomery failed train and supervise staff on the necessary care and assessments of inmates suffering from serious medical conditions including unmanaged schizophrenia and starvation, and they failed to implement policies and procedures with respect to communicating such sensitive and critical information to ensure that inmates will be cared for.

400. Despite specific knowledge that critical medical information was not being communicated between the medical staff to sworn staff, Defendants took no action.

401. Despite their knowledge of previous instances of wrongful deaths in the jails as a result of the failure to communicate critical medical conditions, Defendants failed to properly train or retrain their deputies and medical staff to prevent deaths of inmates.

402. As a direct, proximate, and foreseeable result of Defendants' breaching their duty to train their subordinates, Lonnie Rupard's medical needs were not properly addressed and he was not properly monitored.

403. As a direct and proximate result, Lonnie Rupard suffered unconstitutional and inhumane treatment, and ultimate died while in jail.

404. Plaintiffs seek damages in an amount according to proof at the time of trial.

## IV.
## FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983: *Monell* Municipal Liability
### (By all Plaintiffs Against Defendant County and Liberty Healthcare of California Inc.)

405. Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

406. A municipality may be liable under § 1983 when execution of a policy or custom inflicts plaintiff's injury. *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). The policy may be one of "inaction" that amounts to the "functional equivalent of a decision by the city itself to violate the Constitution." *City of Canton, Ohio v. Harris* ("Canton"), 489 U.S. 378, 394-95 (1989).

407. The County and Liberty Healthcare are liable under § 1983 for its customs of inaction and its failure to promulgate adequate policies related to treatment of individuals, such as Lonnie, who have known psychiatric illness.

408. In February 2022, the California State audit highlighted customs of inaction related to among other things, inadequate and inconsistent provision of medical and mental health care as well as inadequate and inconsistent follow-up regarding medical and mental health.

409. Despite an extensive history of inaction regarding treatment of medical and mental health needs, the County, by and through Gore and Martinez, continued to adhere to an approach that they knew or should have known has failed to prevent tortious conduct by their employees.

410. The County failed to promulgate adequate policies including, but not limited to:

a. Identifying critical and obvious medical and mental health needs at intake and properly housing them;

b. Screening individuals with schizophrenia who refuse medications for housing in the PSU;

c. Referral of individuals who are refusing psych medications and demonstrating psychosis to the PSU;

d. Taking vital signs and weight measurements for individuals who are dangerously malnourished;

e. Summoning medical or mental health care for individuals when individuals are identified to be psychotic and/or malnourished;

f. Coordinating and sharing critical medical or mental health information regarding individuals with mental illness who are refusing psych medications;

g. Providing medical treatment to individuals suffering from malnutrition and/or dehydration;

h. Responding to request for medical assessment by medical staff in a timely fashion;

i. Providing medical or mental health treatment to individuals suffering from mental health conditions including schizophrenia;

j. Complying with Title 15 cell checks; and

k. Staffing of the medical services division.

411. Defendant County was acting under color of state law because its employees, agents were acting or purporting to act in the performance of their official duties as deputies and employees of the County.

412. As alleged above, Defendant County, by and through its employees and agents, deprived Lonnie of his constitutional rights prohibiting deprivation of life without due process of law, and also amounted to cruel and unusual punishment.

413. Despite Defendant County's and Liberty's employees and agents knowing that Lonnie had schizophrenia, was refusing was refusing his required medications, was not fully oriented with disorganized thought and in a psychotic state for an extended period of weeks and months, and losing excessive amounts of weight from a lack of eating, nobody referred Lonnie to their PSU, or even took Lonnie's vital signs or

weighed him. And nobody checked on him for an extended period of time as evidenced by the fact that he was already cold to the touch when he was found unresponsive. Deputies who saw Lonnie in distress left him there to die.

414. There were longstanding and systemic deficiencies in San Diego jails' treatment of inmates that was extensively documented through audits, litigation, and public reporting, which was well known to the County. The documented systemic deficiencies included, but were not limited to, the failure to render medical care, improper cell checks, improper housing assignments, inadequate medical staffing, lack of required training on screening, lack of communication of necessary and critical medical information among staff, and non-compliant medical policies and procedures.

415. Upon information and belief, the permanent, widespread, well-settled practice or custom of defendant County was to deny treatment to inmates in serious medical distress and to place inmates in administrative segregation or general population instead of the medical ward despite inmates being in obvious need of medical care.

416. Defendant County, by and through its employees and agents, acted pursuant to the following official policies, or widespread or longstanding practices or customs, of Defendant County:

a. Failing to recognize when a detainee has serious medical needs;

b. Failing to communicate detainees' medical needs between medical staff and deputies;

c. Providing insufficient medical care to detainees;

d. Failing to transfer detainees to the hospital when medically necessary;

e. Failing to respond properly or timely to serious medical needs of detainees;

f. Failing to conduct timely safety checks;

g. Failing to monitor live video feeds for signs of medical distress;

h. Failing to recognize when a detainee has serious medical needs during safety checks;

i. Failing to meet accepted community standards of care with respect to medical care of detainees;

j. Failing to properly investigate in-custody deaths and properly respond to the results of those investigations to prevent further deaths;

k. Failing to adequately screen inmates for medical care and treatment;

l. Failing to communicate the medical needs of inmates between the medical staff and deputies;

m. Failing to check on the welfare of inmates, even those inmates known to have serious medical needs; and

n. Failing to conduct proper cell checks as required by the County's own written policies.

417. The misconduct and inaction by the Defendant Deputies, DOE Deputies, and DOE Medical Providers amounts to collective inaction on behalf of the County based on the following:

a. There was a *de facto* custom of ignoring critical medical information and not properly checking on the welfare of patients, even those known to have serious medical needs.

b. There was a *de facto* custom of not ensuring that deputies follow the policies and procedures with respect to emergency situations within Housing units.

c. There was a *de facto* custom of failing to conduct proper cell checks or monitoring, as required by the County's own written policies.

d. Defendants' failure to train its deputies and medical staff gives inference of a municipal custom that authorized or condoned deputy misconduct.

e. There has been a longstanding pattern of failing to provide adequate medical care and adequate monitoring of seriously ill inmates, causing a series of preventable and tragic deaths that placed Defendants on notice.

418. Lonnie's constitutional deprivations were not only caused by the conduct of individual deputies and medical staff, but also by the system failure resulting in a collective inaction of many within the San Diego County Sheriff's Department. Lonnie's constitutional deprivations were caused by the subordinates' adherence to customs and practices as alleged herein. See *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002); see also *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019.

419. The cumulative and persistent failures and misdeeds of the entire Sheriff's Department at the SDCJ caused the ultimate injury and harm suffered by decedent Lonnie Rupard and Plaintiffs.

420. Defendant County through Gore, and Martinez knew of a substantial risk that its polices, customs, and longstanding practices were inadequate to prevent civil rights violations of law by its employees and agents. Defendant County was deliberately indifferent to this risk and the well-documented history of widespread unconstitutional acts by employees and agents at the SDCJ. Yet, Defendant County failed to set forth appropriate policies regarding the treatment of detainees.

421. Defendant County, by and through Gore and Martinez, had ample notice of the following: that San Diego County Jail had the highest mortality rate among California largest jail systems; that there had been countless complaints made by inmates, family members, community members and the SDCJ's own staff regarding injuries caused by medical neglect and staff misconduct; and that failures to communicate critical medical information to coordinate care for inmate-patients with serious medical and psychiatric needs led to the preventable deaths and serious injuries of Richard Diaz, Adrian Correa, Daniel Sisson, Bernard Victorianne, Ronnie Sandoval,

Case 3:23-cv-01357-CAB-JAO Document 26-3 Filed 09/06/24 PageID.1873 Page 77 of 90

Heron Moriarty, Kristopher NeSmith, Jerry Cochran, Ruben Nunez, Frankie Greer, George Gallegos, Michael Wilson, Tanya Suarez and many other inmates.

422. Lonnie Rupard's death was also the result of the County's failure to train employees to properly evaluate the health of and risks to detainees at intake and while in custody, to determine proper and adequate courses of treatment for detainees in need of medical treatment, and summon and provide adequate medical care when necessary.

423. The County knew their failure to adequately train their staff made it highly foreseeable that its employees and agents would engage in conduct that would deprive detainees, including Lonnie Rupard, of constitutionally protected rights and result in additional inmate deaths. The County was deliberately indifferent to the rights of individuals in their custody and care as evidenced by their knowledge of disparately high rates of in-custody deaths, systemic failures, and the fact that the individual deputies and medical providers who they failed to properly train would come into contact with detainees. The inadequacy of the County's training caused Lonnie's constitutional deprivations.

424. Defendant County also acted through and is liable by virtue of their final policymakers, such as Gore and Martinez, and/or their subordinates who had been delegated final policymaking authority. Defendant County's final policymakers, including Gore and Martinez, and/or their subordinates were acting under color of state law. Their final policymaking authority concerned all constitutional violations described in this Complaint.

425. Defendant County is also liable based on Gore's and Martinez's failure to enact new and different policies despite their knowledge of woefully inadequate care of past detainees, a high rate of substance use prior to booking, and a high rate of in-custody deaths at the SDCJ.

426. Defendant County is liable because their written policy on cell checks violates Title 15 as alleged in this Complain.

427. Defendant Liberty is liable because it maintained an unconstitutional policy on systemically understaffing the Jails, making it impossible for its providers to see their patients in a timely manner nor to provide sufficient level of care.

428. Liberty systemically failed to train its providers on how and when to admit a patient into the PSU despite the fact that only Liberty employees had the authority to admit patients into the PSU. Admitting patients into the PSU is a recurring situation on a daily basis and the failure to properly train its providers was a done in reckless disregard of the rights of those patients.

429. Defendant County and Liberty are liable based on their ratification and approval of the constitutional, statutory, and other law violations as alleged in this Complaint.

430. Defendant County's and Liberty's policies, customs, or practices, actions and failures to act by final policymakers, ratification of constitutional and law violations, and failure to train its employees, caused Lonnie's deprivation of rights by the individual defendants. That is, their policies, customs, or practices, actions and failures to act by final policymakers, ratification of constitutional and law violations, and failure to train its employees were so closely related to Lonnie's deprivation of rights that they were the moving force causing Lonnie's injury and death.

431. Defendant County's and Liberty's actions and omissions actually and proximately caused Plaintiffs' economic and non-economic damages including funeral expenses, loss of love, companionship, society, comfort, care, assistance, protection, and moral support. Plaintiffs seek compensatory damages.

432. Plaintiffs also seek punitive damages against Liberty Healthcare.

433. Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

////

////

////

# V.
# FIFTH CAUSE OF ACTION
## Violation of the Americans with Disability Act of 1990 (42 U.S.C. 12101, *et seq.*)
## (By the Estate of Lonnie Rupard Against Defendants County of San Diego and Liberty Healthcare)

434. Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

435. Lonnie Rupard was a gravely disabled person whose major life activity was substantially limited by his schizophrenia. Lonnie Rupard was a qualified individual under the ADA.

436. Pursuant to 42 U.S.C. § 12132, "[s]ubject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

437. Under Title II of the Americans with Disability Act, public and private entities are required to make reasonable modifications to avoid discrimination on the basis of disability. The ADA sets an affirmative requirement to act appropriately with respect to prisoners with disabilities.

438. The County of San Diego is subject to Title II of the ADA.

439. ADA creates an affirmative duty in some circumstances to provide special, preferred treatment, or "reasonable accommodation."

440. Facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced.

441. Discrimination includes a defendant's failure to make reasonable accommodations to the needs of a disabled person based on his mental or physical health. These accommodations include training on specialized jail staff, heightened level of medical care, and diligent surveillance.

442. In order to safely enjoy the benefit of safe housing, access to the outdoors and recreational activities, access to phone calls, food, hygiene and showers, the benefit

of reading material and writing instruments, and access to activities and programming provided to all inmates, Lonnie Rupard required an accommodation – placement in the PSU.

443. Lonnie was entitled to an accommodation which was the utilization of the hunger strike protocol, which would have involved daily check in's for his weight and safety. The hunger strike protocol, as written, requires that an inmate not consume food and that the inmate verbally declare that they are engaged in a hunger strike. This violates the ADA because it discriminates against those with disabilities including mental illnesses or inability to speak or communicate with the staff. For those people who are unable to communicate, they are not entitled to the same service or program as those who are able bodied.

444. Lonnie was also entitled to an accommodation to be able to live in a safe and sanitary cell. As a result of his psychosis, the Jail's protocol on hygiene was not utilized. As a result, Lonnie lived in a mountain of trash, rotten food, and maggots. He was caked in fecal matter. This was a violation of the ADA.

445. Defendants failed to make that reasonable accommodation for Lonnie Rupard. Instead, Defendant placed Mr. Rupard in general population and allowed him to starve to death.

446. Lonnie had a right under the ADA and RA to safe housing and nutrition. He was entitled to basic sanitation and hygiene. These are services provided to all inmates in the Jail.

447. Defendants denied Lonnie Rupard the benefits of the services, programs or activities which it provides to all other inmates. It violated Lonnie's clearly established rights under the ADA with deliberate indifference by failing to place Lonnie in the PSU or on the hunger strike or hygiene protocol.

448. As a direct and proximate result of the Defendant's conduct as herein described, Lonnie Rupard suffered in the amount to be determined at the time of trial.

## VI.
## SIXTH CAUSE OF ACTION
## Violation of the Rehabilitation Act (29 U.S.C. § 794(a))
## (By the Estate of Lonnie Rupard Against Defendant County of San Diego)

449. Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

450. The Rehabilitation Act of 1973 (“Section 504”) states in pertinent part, provides that “No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .” 29 U.S.C. § 794(a).

451. Defendant County of San Diego is a program that receive federal financial assistance as defined in 29 U.S.C. § 794(b).

452. Lonnie Rupard was a “qualified individual with a disability” under the Rehabilitation Act.

453. Defendant violated the Rehabilitation Act by failing to make reasonable accommodations to the needs of Lonnie Rupard, a disabled person. Lonnie needed an accommodation by being placed in PSU instead of general population.

454. Employees of Defendant County of San Diego were deliberately indifferent to Lonnie Rupard’s serious medical condition. Defendants knew of the substantial risk of harm to Lonnie Rupard from his serious, diagnosed condition and they responded with deliberate indifference by failing to provide him adequate care, monitoring, and intervention in the PSU.

455. As a direct and proximate result of the Defendants’ conduct as herein described, Lonnie Rupard suffered in the amount to be determined at the time of trial.

////

////

////

////

**VII.**
**SEVENTH CAUSE OF ACTION**
**Cal. Gov. Code § 52.1 (Bane Act)**

**(By the Estate of Lonnie Rupard Against Defendants County of San Diego, Anosike, Cruz, Aguilera, Viladiu, G. Martinez, Amado, Mace, Aguirre, James, Romero, Johnson, Torres, Treyvonne, Wereski, Romans, Gutierrez, Doe Deputies 15-20, and Doe Medical Providers)**

456. Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

457. Plaintiff Estate of Lonnie Rupard brings the claim in this cause of action as survival claims permissible under California Law, including Cal. Code of Civil Procedure § 377.20 et. seq.

458. By their acts, omissions, and policies, Defendants, as described above, interfered with Lonnie Rupard's rights to receive adequate medical care.

459. By their acts, omissions, customs and policies, Defendants, acting in concert/conspiracy, by threat, intimidation, and/or coercion, interfered with, attempted to interfere with, and violated Lonnie Rupard's rights under California Civil Code § 52.1 and under the United States and California Constitutions as follows:

a. The right to be free from objectively unreasonable treatment and deliberate indifference to Lonnie Rupard's medical needs while in custody, as secured by either the Fourth, Eighth, and/or Fourteenth Amendment to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13;
b. The right to enjoy and defend life and liberty, acquire, possess, and protect property, and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1;
c. The right to protection from bodily restraint, harm, or personal insult as secured by California Civil Code § 43;
d. The right to emergency medical care as required by California Government Code § 845.6; and
e. The right to safety pursuant to Title 15.

460. These acts herein were coercive because they occurred while Lonnie Rupard was in the custody of the San Diego Sheriff's Department, an inherently coercive setting.

461. The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of Decedent's rights, or to any legitimate and lawful jail or law enforcement activity.

462. All Defendants' violations of decedent Lonnie Rupard's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.

463. All Defendants' violations of duties and rights, and coercive conduct described herein were volitional acts; none was accidental or merely negligent.

464. Refusing medical care to a patient in custody and letting him starve to death in a filthy cell is coercive and intimidating. It was done with reckless disregard for Lonnie Rupard's rights.

465. Each Defendant violated decedent Lonnie Rupard's rights with the specific intent and purpose to deprive him of his enjoyment of those rights and of the interests protected by those rights. Each defendant acted with reckless disregard for Lonnie Rupard's rights.

466. When there is actual or constructive knowledge of a need for immediate medical care, a duty of 'reasonable action to summon' medical care is created." (*Hart v. County of Orange* (1967) 254 Cal.App.2d 302, 306, 62 Cal.Rptr. 73.) Section 845.6 creates "a newly-defined duty not applicable to private persons, created by the Legislature as a special burden to be borne by public entities under limited circumstances."

467. Defendants Cruz, Anosike, Doe Medical Providers, the named Deputy Defendants and Doe Deputies 15-20 had actual knowledge of Lonnie's need for immediate medical care through their personal interactions and observations of Lonnie's deteriorating physical and mental state. These Defendants breached their duty to

summon medical care by failing to assist Lonnie in receiving life-saving medical intervention.

468. Under California Government Code Section 845.6, the public entity is liable if its employee knows or has reason to know that the prisoner is in need of immediate medical care and fails to take reasonable action to summon such medical care.

469. Defendant County of San Diego is also vicariously liable for the violations of rights by their employees and agents. Defendant County of San Diego is vicariously liable pursuant to California Government Code § 815.2.

470. As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of decedent Lonnie Rupard's rights under the United States and California Constitutions, Plaintiff sustained injuries and damages. Against each and every Defendant, Plaintiff is entitled to relief as set forth above, including punitive damages against all individual defendants, and all damages allowed by California Civil Code §§52 and 52.1 and California law, not limited to costs, attorneys' fees, treble damages and civil penalties.

471. The named Deputy Defendants also violated Title 15, a California statute which required a safety check conducted at random intervals and at a minimum every 60 minutes. The named Deputy Defendant's violation of Title 15 caused the untimely and wrongful death of Lonnie Rupard.

## VIII.
## EIGHTH CAUSE OF ACTION
## Negligence Survival Claim (CCP § 377.30)
## (By the Estate of Lonnie Rupard Against All Defendants)

472. Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

473. Defendants had a duty to Lonnie Rupard to act with ordinary care and prudence so as not to cause harm or injury to another.

474. Per Gov. Code § 820, except as provided by statute, a public employee is liable for injury caused by his/her act or omission to the same extent as a private person, and said liability is subject to any defenses that would be available to a public employee if he/she were a private person.

475. Gov. Code § 845.6 requires that "a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care."

476. Lonnie was in need of immediate medical care. Deputy and Medical Defendants knew that Lonnie had lost a substantial amount of weight, he was living in filth, and he was unable to communicate his dire health needs. Medical and Deputy Defendants knew that Lonnie was in medical and psychiatric crisis and needed to be placed into the PSU.

477. Defendants improperly, negligently, wrongfully, and recklessly delayed and failed to summon medical care to Lonnie Rupard who was in obvious physical distress and in acute need of urgent medical care by failing to conduct proper cell checks. Deputy Defendants are liable for negligence per se for violating Title 15. They violated a California statute which required a safety check conducted at random intervals and at a minimum every 60 minutes and this conduct was a substantial factor in Lonnie's death.

478. Named Medical Defendants failed to provide adequate medical care for Lonnie Rupard's serious psychiatric needs.

479. Medical Defendants improperly, negligently, wrongfully, and recklessly failed to provide adequate nourishment to Lonnie, who was unable to provide such nourishment for himself.

480. Medical Defendants improperly, negligently, wrongfully, and recklessly failed to provide adequate medical care for Lonnie's serious psychiatric needs.

481. In evaluating, assessing and handling Lonnie Rupard's medical condition, Medical Defendants failed to comply with professional and legal standards.

482. Both Medical Defendants and Deputy Defendants improperly, negligently, wrongfully, and recklessly failed to communicate Lonnie's serious medical need to each other and all jail staff.

483. Both Medical Defendants and Deputy Defendants improperly, negligently, wrongfully, and recklessly failed to take appropriate action to render medical care to Lonnie Rupard who was in obvious psychical distress and in acute need of medical care and intervention.

484. The County, Gore, Martinez, and Doe Deputy Supervisors are liable for their own negligent conduct pursuant to § 845.6, which permits claims against officials for negligent training as to when to summon medical care.

485. The County of San Diego are responsible for the acts of individuals and Doe Defendants under the theory of *respondeat superior*.

486. Defendants Gore and Martinez, as the Sheriff and Undersheriff, owe the inmates/patients in their care a duty to protect them from foreseeable harm, whether stated specifically in terms of a "special relationship" or otherwise. See *Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 252 (2008). California law recognized that jailers owe a duty of care to the prisoner who is deprived of the normal opportunity to protect himself from harm inflicted by others.

487. Supervisory Defendants improperly, negligently, wrongfully, and recklessly failed to train regarding the monitoring of psychiatric patients, proper cell check procedure, communication of an inmate's deteriorating condition between medical personnel and the proper treatment and placement of severely mentally ill inmates into the PSU.

488. The individual Defendants' failure to respond promptly to Lonnie's immediate medical need was a result of the supervisory Defendant's failure to train.

489. Defendant Liberty Health Corporation improperly, negligently, wrongfully and recklessly failed to set forth policies regarding medical treatment of inmates suffering from serious mental health conditions.

490. Defendant Liberty Health Corporation improperly, negligently, wrongfully and recklessly failed to set forth policies regarding proper screening, evaluation, treatment, and transfer into the PSU of inmates suffering from a serious mental health condition.

491. Defendant Liberty Health Corporation is vicariously responsible for the acts of its individual agents and employees, including Doe Defendants.

492. By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Lonnie Rupard.

493. As a direct and proximate result of the Defendants' negligent conduct as herein described, Lonnie Rupard suffered damages in an amount to be shown according to proof at the time of trial.

494. As a direct and proximate result of the Defendants' negligent conduct as described herein, Lonnie Rupard died.

**IX.**
**NINTH CAUSE OF ACTION**
**Dependent Adult Neglect**
**(By the Estate of Lonnie Rupard Against Defendants Montgomery, Liberty Healthcare Corporation, Anosike, Cruz and Doe Medical Providers)**

495. Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

496. Lonnie Rupard had physical and mental limitations that restricted his ability to carry out normal activities or protect his own rights. Defendants had a substantial caretaking and custodial relationship with Lonnie, involving ongoing responsibility for his basic needs.

497. San Diego County had a custodial relationship with Lonnie during the time he was in custody at the SDCJ.

498. Defendants had an ongoing responsibility for Lonnie's basic needs, which an able-bodied and fully competent adult would ordinarily be capable of managing without assistance.

499. Lonnie was a dependent adult during the time he was in custody at the SDCJ.

500. Defendants failed to use the degree of care that a reasonable person/entity in the same situation would have used in providing for Lonnie's basic needs including, but not limited to:

a. Failing to assist Lonnie with his personal hygiene;
b. Failing to provide Lonnie with food;
c. Failing to protect Lonnie from the health and safety hazards present in his filthy cell;
d. Failing to provide Lonnie with medical care for his physical and/or mental needs;
e. Failing to prevent malnutrition; and
f. Failing to prevent dehydration.

501. These failures constitute neglect that resulted in physical harm, pain, and mental suffering.

502. Defendants' conduct was a substantial factor in causing Lonnie's death.

503. Defendants and their employees/agents acted with recklessness in neglecting Lonnie.

**X.**
**TENTH CAUSE OF ACTION**
**Wrongful Death**
**(By Justino Rupard and Ronnie Rupard Individually Against All Defendants)**

504. Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

505. As set forth in the preceding paragraphs, Defendants committed wrongful acts which proximately caused the death of Lonnie Rupard.

506. Defendant Liberty Healthcare Corporation is vicariously responsible for the acts of its individual agents and employees, including Doe Defendants.

507. The County of San Diego is responsible for the acts of individual and Doe Defendants under the theory of *respondeat superior*.

508. The wrongful acts alleged have destroyed the relationship between Plaintiffs Justino and Ronnie Rupard and the decedent Lonnie Rupard and has legally, proximately, foreseeably, and actually caused severe emotional damages, including the loss of society, companionship, care, and comfort, and further economic and non-economic damages according to proof at the time of trial.

**REQUEST FOR A JURY TRIAL**

Plaintiffs hereby request a jury trial.

**PRAYER FOR RELIEF**

Plaintiffs pray for judgment against Defendants as follows:

a. General and compensatory damages in an amount according to proof;

b. Punitive and exemplary damages against all individual defendants and Liberty Healthcare;

c. Civil penalties as provided by law;

d. Attorney fees pursuant to Cal. Civil Code § 52.1(b), Cal. Civil Code § 52, and Welf. & Inst. Code, §15657;

e. Costs and reasonable attorney fees and costs pursuant to 42 U.S.C. §1988 and the ADA;

f. All other damages, penalties, costs, and fees as allowed by Cal. Civ. Proc. §§ 377.20, 377.60, 1021.5; and

h. For all other and further relief as the Court may deem proper.

////

////

////

Dated: September 6, 2024

Respectfully submitted,

**IREDALE & YOO, APC**

By: /s/ Julia Yoo
Julia Yoo and Sarah Musumeci
Attorneys for Plaintiffs Justino Rupard and the Estate of Lonnie Rupard

Dated: September 6, 2024

**LOWE LAZAR LAW, LLP**

By: /s/ Jeremiah Lowe
Jeremiah Lowe and Victoria Lazar
Attorneys for Plaintiffs Justino Rupard and the Estate of Lonnie Rupard

Dated: September 6, 2024

**GILLEON LAW FIRM, APC**

By: /s/ Daniel Gilleon
Daniel M. Gilleon
Attorney for Plaintiff Ronnie Rupard

# Exhibit A

Case 3:23-cv-01357-CAB-JAC Document 326-3 Filed 09/06/24 PageID.8882 Page 22 of 51

RECEIVED COUNTY COUNSEL

2023 MAR -9 PM 2:08 CV

COUNTY OF SAN DIEGO

Time Stamp

# CLAIM AGAINST THE COUNTY OF SAN DIEGO

(FOR DAMAGES TO PERSONS OR PERSONAL PROPERTY)

Received by via
U.S. Mail ☐
Inter-Office Mail ☐
Over the Counter ☒ CV

File No: ____________

A claim must be filed with the Claims Division of the County of San Diego within 6 months after which the incident or event occurred. Be sure your claim is against the County of San Diego, not another public entity. Where space is insufficient, please use additional paper and identify information by paragraph and number. Completed claims must be mailed or delivered to:

*County of San Diego, Claims Division, 1600 Pacific Highway, Room 355, San Diego, CA 92101- Phone (619) 531-4899*

## TO THE HONORABLE BOARD OF SUPERVISORS – THE COUNTY OF SAN DIEGO, CALIFORNIA

The undersigned respectfully submits the following claim and information relative to damage to persons and/or personal property:

**Claimant Information**

| Last Name | First Name | Middle Name |
|---|---|---|
| Estate of Lonnie Rupard | | |
| **Street Address** | **City** | **Zip** |
| 1430 Coker Way | El Cajon | 92021 |
| **Home Phone (include area code)** | **Work Phone (include area code)** | **E-mail Address** |
| 619 608 2485 | | justrupard3@gmail.com |

| Birth Date | Driver's License Number |
|---|---|
| | |

**Name, telephone and post office address to which claimant desires notices to be sent, if other than above:**
Lowe Lazar Law, LLP 402 W. Broadway Ste 1720 San Diego CA 92101

**Claim Information**

| Date of Occurrence or Event from which the claim arises: | Time of Occurrence or Event from which the claim arises: |
|---|---|
| March 17, 2022 | Unknown |

**Location, including address (if none, nearest cross street) and city:**
San Diego County Jail; 1173 Front Street, San Diego CA 92101

**Specify the particular occurrence, event, act or omission you claim caused the injury or damage (use additional paper if necessary):**
Wrongful death of Lonnie Rupard while he was in jail. As set forth in the autopsy findings, which were publicly released on or about March 2, 2023, Lonnie Rupard died of pneumonia, malnutrition, and dehydration due to jail caretaker's neglect and ineffective delivery of care. Lonnie Rupard was a dependent adult who was neglected, and whose civil rights were violated. The manner of death was classified as a homicide.

**State how or wherein the County of San Diego or its employees were at fault. Give the name(s) of the County department and employee(s) causing the damage or injury:**
County employees including jail caretakers fell short in safeguarding the health and wellbeing of Lonnie Rupard while he was in their custody. He had diagnosed schizophrenia with documented history of extensive medications and treatment at a state psychiatric hospital. He was dependent upon others for his care. Those in the jail that were supposed to be safeguarding Lonnie, neglected him, ultimately resulting in his death on March 17, 2022.

**Give a description of the property damage or loss, as is known at the time of the claim:**

Claimant is not seeking property damage.

**Give a description of the injury, as is known at the time of the claim:**

The Estate suffers the loss of love, society, companionship, comfort, care, assistance, protection, and moral support. Estate also seeks damages for Lonnie Rupard's pre-death pain and suffering.

**Social Security Number (required for Federal reporting requirements):**

**Name and address of any other person injured:**

Lonnie Rupard leaves behind sons Justino Rupard, Ronnie Rupard, and his mother, Florentina Rupard

**Name and address of the owner of any damaged property:**

## Damages Claimed

**Amount claimed as of this date:** $30,000,000

**Estimated amount of future costs:** $unknown

**Total amount claimed:** $30,000,000

**Basis for computation of amounts claimed (include copies of all bills, invoices, estimates, etc):**

wrongful death damages, pre-death pain and suffering, attorney fees, treble damages

## Damaged Vehicle (if applicable)

| Make: | Model: | Year: |
|---|---|---|
| | | |

| License Plate Number: | Mileage: |
|---|---|
| | |

| Insurance Company: | Policy Number: |
|---|---|
| | |

## Additional Information

**Names and Address of witnesses, hospitals, doctors, etc:**

A. Bethann Schaber, MD Deputy Medical Examiner

B. Individuals identified in the attached autopsy report.

C. Staff at the jail (identities unknown at this time)

**Any additional information that might be helpful in considering this claim:**

See Attached autopsy report as exhibit 1.

➢ **WARNING: IT IS A CRIMINAL OFFENSE TO FILE A FALSE CLAIM (PENAL CODE § 72; INSURANCE CODE § 556.1)**

**I have read the matters and statements made in the above claim and I know the same to be true of my own knowledge, except as to those matters stated upon information or belief and as to such matters I believe the same to be true. I certify under penalty of perjury that the foregoing is TRUE and CORRECT.**

**Signed this** 08 **day of** March, **20**23 **at** San Diego, CA

[signature]

**Claimant's Signature**

# EXHIBIT 1

# County of San Diego

GLENN N. WAGNER, D.O.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

STEVEN C. CAMPMAN, M.D.
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | 2022-01007 |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | Son | 3/18/2022 | |

| | | | |
|---|---|---|---|
| **San Diego Medical Examiner** | | **Case Number** | : 2022-01007 |
| **5570 Overland Avenue, Suite#101** | | **Investigator** | : Fernanda Sanchez |
| **San Diego, CA 92123-1206** | | **Date of Death** | : 03/17/2022 |
| **(858) 694-2895** | | **Date Today** | : 02/08/2023 |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

Case 3:23-cv-01357-CAB-BJW Document 131 Filed 11/13/24 PageID.9028 Page 39 of 51



refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

<u>IDENTIFICATION</u>: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

<u>WITNESSES</u>: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

<u>CLOTHING AND PROPERTY</u>: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:
1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

<u>EVIDENCE OF MEDICAL INTERVENTION</u>:
1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

<u>SCARS</u>:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. <u>BLUNT FORCE INJURY OF TORSO</u>:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

<u>TOXICOLOGY</u>: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

<u>MICROBIOLOGY</u>: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

<u>HISTOLOGY</u>: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

<u>PHOTOGRAPHS</u>: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

<u>X-RAYS</u>: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| **Test Name (Method of Analysis)** | **Specimen Tested** | **Result** |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________
06/27/2022
Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

### Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

RECEIVED
COUNTY COUNSEL
2023 MAR -9 PM 2:01 CV
COUNTY OF SAN DIEGO
Time Stamp

# CLAIM AGAINST THE COUNTY OF SAN DIEGO

(FOR DAMAGES TO PERSONS OR PERSONAL PROPERTY)

Received by via
U.S. Mail ☐
Inter-Office Mail ☐
Over the Counter ☒ AO

File No: ______

A claim must be filed with the Claims Division of the County of San Diego within 6 months after which the incident or event occurred. Be sure your claim is against the County of San Diego, not another public entity. Where space is insufficient, please use additional paper and identify information by paragraph and number. Completed claims must be mailed or delivered to:

*County of San Diego, Claims Division, 1600 Pacific Highway, Room 355, San Diego, CA 92101- Phone (619) 531-4899*

## TO THE HONORABLE BOARD OF SUPERVISORS – THE COUNTY OF SAN DIEGO, CALIFORNIA

The undersigned respectfully submits the following claim and information relative to damage to persons and/or personal property:

**Claimant Information**

| Last Name | First Name | Middle Name |
|---|---|---|
| Rupard | Justino | Newton Lopez |
| **Street Address** | **City** | **Zip** |
| 1430 Coker Way | El Cajon | 92021 |
| **Home Phone (include area code)** | **Work Phone (include area code)** | **E-mail Address** |
| 619 608 2485 | | justrupard3@gmail.com |

| Birth Date | Driver's License Number |
|---|---|
| 09/23/1996 | F8132360 |

**Name, telephone and post office address to which claimant desires notices to be sent, if other than above:**
Lowe Lazar Law, LLP 402 W. Broadway Ste 1720 San Diego CA 92101

**Claim Information**

| Date of Occurrence or Event from which the claim arises: | Time of Occurrence or Event from which the claim arises: |
|---|---|
| March 17, 2022 | Unknown |

**Location, including address (if none, nearest cross street) and city:**
San Diego County Jail; 1173 Front Street, San Diego CA 92101

**Specify the particular occurrence, event, act or omission you claim caused the injury or damage (use additional paper if necessary):**
Wrongful death of claimant's father, Lonnie Rupard, while he was in jail. As set forth in the autopsy findings, which were publicly released on or about March 2, 2023, Lonnie Rupard died of pneumonia, malnutrition, and dehydration due to jail caretaker's neglect and ineffective delivery of care. Lonnie Rupard was a dependent adult who was neglected, and whose civil rights were violated. The manner of death was classified as a homicide.

**State how or wherein the County of San Diego or its employees were at fault. Give the name(s) of the County department and employee(s) causing the damage or injury:**
County employees including jail caretakers fell short in safeguarding the health and wellbeing of Lonnie Rupard while he was in their custody. He had diagnosed schizophrenia with documented history of extensive medications and treatment at a state psychiatric hospital. He was dependent upon others for his care. Those in the jail that were supposed to be safeguarding Lonnie, neglected him, ultimately resulting in his death on March 17, 2022.

| Give a description of the property damage or loss, as is known at the time of the claim: |
|---|
| Claimant is not seeking property damage. |
| **Give a description of the injury, as is known at the time of the claim:** |
| Claimant suffers the loss of his dad's love, society, companionship, comfort, care, assistance, protection, and moral support. Lonnie Rupard suffered neglect and pre-death pain and suffering. |
| **Social Security Number (required for Federal reporting requirements):** |
| 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 |
| **Name and address of any other person injured:** |
| Lonnie Rupard has another son, Ronnie Rupard, and mother, Florentina Rupard |
| **Name and address of the owner of any damaged property:** |
| |

## Damages Claimed

| | |
|---|---|
| **Amount claimed as of this date:** | $ 30,000,000 |
| **Estimated amount of future costs:** | $ unknown |
| **Total amount claimed:** | $ 30,000,000 |

**Basis for computation of amounts claimed (include copies of all bills, invoices, estimates, etc):**

wrongful death damages, pre-death pain and suffering, attorney fees, treble damages

## Damaged Vehicle (if applicable)

| Make: | Model: | Year: |
|---|---|---|
| | | |

| License Plate Number: | Mileage: |
|---|---|
| | |
| **Insurance Company:** | **Policy Number:** |
| | |

## Additional Information

**Names and Address of witnesses, hospitals, doctors, etc:**

A. Bethann Schaber, MD Deputy Medical Examiner

B. Individuals identified in the attached autopsy report.

C. Staff at the jail (identities unknown at this time)

**Any additional information that might be helpful in considering this claim:**

See Attached autopsy report as exhibit 1.

➢ **WARNING: IT IS A CRIMINAL OFFENSE TO FILE A FALSE CLAIM (PENAL CODE § 72; INSURANCE CODE § 556.1)**

**I have read the matters and statements made in the above claim and I know the same to be true of my own knowledge, except as to those matters stated upon information or belief and as to such matters I believe the same to be true. I certify under penalty of perjury that the foregoing is TRUE and CORRECT.**

**Signed this** 08 **day of** March, **20**23 **at** San Diego, CA

[signature]

**Claimant's Signature**

# EXHIBIT 1

# County of San Diego

GLENN N. WAGNER, D.O.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

STEVEN C. CAMPMAN, M.D.
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| RUPARD, Lonnie | | ☐ | 2022-01007 |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | Son | 3/18/2022 | |

| San Diego Medical Examiner<br>5570 Overland Avenue, Suite#101<br>San Diego, CA 92123-1206<br>(858) 694-2895 | Case Number<br>Investigator<br>Date of Death<br>Date Today | : 2022-01007<br>: Fernanda Sanchez<br>: 03/17/2022<br>: 02/08/2023 |
|---|---|---|

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

<u>OPINION</u>: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was “relatively clean, no flooding/gassing or smearing of feces.” The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist’s diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist’s final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

<u>IDENTIFICATION</u>: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

<u>WITNESSES</u>: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

<u>CLOTHING AND PROPERTY</u>: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

<u>EVIDENCE OF MEDICAL INTERVENTION</u>:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

<u>SCARS</u>:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

<u>GASTROINTESTINAL SYSTEM</u>: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

<u>GENITOURINARY SYSTEM</u>: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

<u>ENDOCRINE SYSTEM</u>: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

<u>MUSCULOSKELETAL SYSTEM</u>: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

<u>HEAD</u>: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

<u>CENTRAL NERVOUS SYSTEM</u>: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

<u>NECK</u>: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________________
06/27/2022
Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*
*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

*Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# Exhibit B

LOWE LAZAR LAW LLP

RECEIVED
COUNTY COUNSEL
2023 MAR 14 PM 1:47
COUNTY OF SAN DIEGO

March 14, 2023

**APPLICATION FOR LEAVE TO FILE LATE CLAIM; GOV. CODE § 911.4**

County of San Diego
Claims Division
1600 Pacific Highway, Room 355
San Diego, CA 92101
Re: ***Justino Rupard v. County of San Diego***

Dear County Board:

This firm represents Claimant, Justino Rupard. Claimant Justino Rupard is a son of Decedent, Lonnie Newton Rupard, who died on March 17, 2022, while under the care and custody of the San Diego Sheriff's Department. Claimant contends that the accrual date for presenting a government tort claim against the County of San Diego ("County") for his father's death was March 2, 2023, when the County released its Medical Examiner's report ruling Decedent's death a homicide. "The accrual date for presenting a government tort claim is identical to the accrual date that would apply in an ordinary action when no public entity is involved." (*K.J. v. Arcadia Unified Sch. Dist.*, 172 Cal.App.4th 1229, 1233.) "Under the delayed discovery doctrine, accrual of the cause of action is postponed until the plaintiff discovers, or has reason to discover, the cause of action." (*Id.*; see also *Rivas v. Safety-Kleen Corp.*, (2002) 98 Cal.App.4th 218, 225; *Sanchez v. South Hoover Hospital*, (1976) 18 Cal.3d 93, 97.) Claimant contends that the attached claim, which was initially submitted on March 9, 2023, is timely submitted within six months of the accrual date, pursuant to Gov. Code §911.2(a), prior to the six month deadline on September 4, 2023.

However, if the County contends that the accrual date was Decedent's date of death, March 17, 2022, this letter serves as Claimant's application for leave to file a late claim pursuant to Gov. Code §911.4, and the attached claim serves as the proposed claim required by Gov. Code §911.4(b). Section 911.6(b)(1) states, "The board shall grant the application if … [t]he failure to present the claim was through mistake, inadvertence, surprise, or excusable neglect and the public entity was not prejudiced in its defense of the claim by the failure to present the claim within the time specified in Section 911.2."

Claimant's assertion of mistake, inadvertence, surprise or excusable neglect is justified regardless of the lack of capacity justification mentioned below. Until recently, Claimant did not know, and had no way of knowing, the cause of his father's death on March 17, 2022. The County of San Diego's Medical Examiner ("ME") did not disclose its findings on the cause of death until March 2, 2023.

LOWE LAZAR LAW LLP

March 14, 2023

**APPLICATION FOR LEAVE TO FILE LATE CLAIM; GOV. CODE § 911.4**

County of San Diego
Claims Division
1600 Pacific Highway, Room 355
San Diego, CA 92101
Re: ***Justino Rupard v. County of San Diego***

Dear County Board:

This firm represents Claimant, Justino Rupard. Claimant Justino Rupard is a son of Decedent, Lonnie Newton Rupard, who died on March 17, 2022, while under the care and custody of the San Diego Sheriff's Department. Claimant contends that the accrual date for presenting a government tort claim against the County of San Diego ("County") for his father's death was March 2, 2023, when the County released its Medical Examiner's report ruling Decedent's death a homicide. "The accrual date for presenting a government tort claim is identical to the accrual date that would apply in an ordinary action when no public entity is involved." (*K.J. v. Arcadia Unified Sch. Dist.,* 172 Cal.App.4th 1229, 1233.) "Under the delayed discovery doctrine, accrual of the cause of action is postponed until the plaintiff discovers, or has reason to discover, the cause of action." (*Id.*; see also *Rivas v. Safety-Kleen Corp*., (2002) 98 Cal.App.4th 218, 225; *Sanchez v. South Hoover Hospital*, (1976) 18 Cal.3d 93, 97.) Claimant contends that the attached claim, which was initially submitted on March 9, 2023, is timely submitted within six months of the accrual date, pursuant to Gov. Code §911.2(a), prior to the six month deadline on September 4, 2023.

However, if the County contends that the accrual date was Decedent's date of death, March 17, 2022, this letter serves as Claimant's application for leave to file a late claim pursuant to Gov. Code §911.4, and the attached claim serves as the proposed claim required by Gov. Code §911.4(b). Section 911.6(b)(1) states, "The board shall grant the application if … [t]he failure to present the claim was through mistake, inadvertence, surprise, or excusable neglect and the public entity was not prejudiced in its defense of the claim by the failure to present the claim within the time specified in Section 911.2."

Claimant's assertion of mistake, inadvertence, surprise or excusable neglect is justified regardless of the lack of capacity justification mentioned below. Until recently, Claimant did not know, and had no way of knowing, the cause of his father's death on March 17, 2022. The County of San Diego's Medical Examiner ("ME") did not disclose its findings on the cause of death until March 2, 2023.

Prior to the ME's announcement, and even thereafter, the Sheriff's Department published incomplete and false information that made it even less possible for Claimant to discover facts giving rise to a cause of action. For example, on March 18, 2023, the Sheriff published the attached News Release about the Decedent's death, which contained those following passages regarding the circumstances surrounding the death:

On March 17, 2022, at about 10:48 p.m., deputies were in the module when they found Rupard unresponsive in his cell. Deputies and medical staff immediately performed lifesaving measures until relieved by fire department personnel. Paramedics transported Rupard to a hospital. Unfortunately, Rupard was pronounced deceased at the hospital.

The Homicide Unit responded to the jail and hospital to investigate the death. Rupard was alone in the cell and there were no obvious signs of trauma. No evidence of foul play was discovered.

The Claimant received no information from the County until March 2, 2023, when the autopsy report was published revealing substantial evidence of "trauma" and "foul play."

Even then, the County's Sheriff's Department continued to publish misleading information. On March 2, 2023, the Sheriff published the attached News Release, containing the following passages regarding the circumstances surrounding the death:

> 46-year-old Lonnie Newton Rupard was in custody at San Diego Central Jail when he was found unresponsive in his cell on March 17, 2022. Sheriff's Deputies and Medical Staff performed lifesaving measures until he was transported to a hospital where he later died….
>
> Today, the San Diego County Medical Examiner's Office (M.E.) released its autopsy report. Mr. Rupard's preliminary cause of death is pneumonia, malnutrition and dehydration with COVID-19 viral infection, pulmonary emphysema and duodenal ulcer as contributing factors. The M.E. ruled his manner of death as homicide. We thank the M.E.'s Office for its thorough report and respect its findings. As though nobody would notice, the Sheriff's Department deliberately omitted the words "neglected schizophrenia" from its report regarding the ME's findings.

The ME's autopsy report begins with the following:

CAUSE OF DEATH: PNEUMONIA, MALNUTRITION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

The ME's report ends with even more detail regarding the "neglect," which the Sheriff wilfully omitted from its New Release:

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available

to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

Further justification stems from the County of San Diego's exclusive control of all information that would be necessary for Claimant to determine the pertinent facts for the accrual of a cause of action. However, the County withheld, and even mis-stated that information until March 2, 2023. As such, the County is *estopped* from raising untimeliness as a defense. "It is well settled that a public entity may be *estopped* from asserting the limitations of the claims statute where … (1) the public entity was apprised of the facts, (2) it intended its conduct to be acted upon, (3) the plaintiff was ignorant of the true state of facts, and (4) relied upon the conduct to his detriment." *K.J. v. Arcadia Unified School Dist*. (2009) 172 Cal.App.4th1229, 1239-1240.

Finally, the Claimant's assertion of mistake, inadvertence, surprise, or excusable neglect as a justification is bolstered by his long term cognitive deficits, which can be established to the Board in a confidential setting. For the reasons set forth above, Claimant Justino Rupard's application for leave to present a late claim should be granted.

Very truly yours,
**LOWE LAZAR LAW, LLP**

Jeremiah Lowe

Jeremiah A. Lowe, Esq.

Enclosures

# EXHIBIT A

RECEIVED
COUNTY COUNSEL
2023 MAR -9 PM 2:01 [handwritten initials]
COUNTY OF SAN DIEGO
Time Stamp

# CLAIM AGAINST THE COUNTY OF SAN DIEGO

(FOR DAMAGES TO PERSONS OR PERSONAL PROPERTY)

Received by via
U.S. Mail ☐
Inter-Office Mail ☐
Over the Counter ☒ [handwritten initials]

File No: ____________

A claim must be filed with the Claims Division of the County of San Diego within 6 months after which the incident or event occurred. Be sure your claim is against the County of San Diego, not another public entity. Where space is insufficient, please use additional paper and identify information by paragraph and number. Completed claims must be mailed or delivered to:

*County of San Diego, Claims Division, 1600 Pacific Highway, Room 355, San Diego, CA 92101- Phone (619) 531-4899*

## TO THE HONORABLE BOARD OF SUPERVISORS – THE COUNTY OF SAN DIEGO, CALIFORNIA

The undersigned respectfully submits the following claim and information relative to damage to persons and/or personal property:

**Claimant Information**

| Last Name | First Name | Middle Name |
|---|---|---|
| Rupard | Justino | Newton Lopez |
| **Street Address** | **City** | **Zip** |
| 1430 Coker Way | El Cajon | 92021 |
| **Home Phone (include area code)** | **Work Phone (include area code)** | **E-mail Address** |
| 619 608 2485 | | justrupard3@gmail.com |

| Birth Date | Driver's License Number |
|---|---|
| 09/23/1996 | F8132360 |

**Name, telephone and post office address to which claimant desires notices to be sent, if other than above:**
Lowe Lazar Law, LLP 402 W. Broadway Ste 1720 San Diego CA 92101

**Claim Information**

| Date of Occurrence or Event from which the claim arises: | Time of Occurrence or Event from which the claim arises: |
|---|---|
| March 17, 2022 | Unknown |

**Location, including address (if none, nearest cross street) and city:**
San Diego County Jail; 1173 Front Street, San Diego CA 92101

**Specify the particular occurrence, event, act or omission you claim caused the injury or damage (use additional paper if necessary):**

Wrongful death of claimant's father, Lonnie Rupard, while he was in jail. As set forth in the autopsy findings, which were publicly released on or about March 2, 2023, Lonnie Rupard died of pneumonia, malnutrition, and dehydration due to jail caretaker's neglect and ineffective delivery of care. Lonnie Rupard was a dependent adult who was neglected, and whose civil rights were violated. The manner of death was classified as a homicide.

**State how or wherein the County of San Diego or its employees were at fault. Give the name(s) of the County department and employee(s) causing the damage or injury:**

County employees including jail caretakers fell short in safeguarding the health and wellbeing of Lonnie Rupard while he was in their custody. He had diagnosed schizophrenia with documented history of extensive medications and treatment at a state psychiatric hospital. He was dependent upon others for his care. Those in the jail that were supposed to be safeguarding Lonnie, neglected him, ultimately resulting in his death on March 17, 2022.

**Give a description of the property damage or loss, as is known at the time of the claim:**

Claimant is not seeking property damage.

**Give a description of the injury, as is known at the time of the claim:**

Claimant suffers the loss of his dad's love, society, companionship, comfort, care, assistance, protection, and moral support. Lonnie Rupard suffered neglect and pre-death pain and suffering.

**Social Security Number (required for Federal reporting requirements):**

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

**Name and address of any other person injured:**

Lonnie Rupard has another son, Ronnie Rupard, and mother, Florentina Rupard

**Name and address of the owner of any damaged property:**

## Damages Claimed

| | |
|---|---|
| **Amount claimed as of this date:** | $ 30,000,000 |
| **Estimated amount of future costs:** | $ unknown |
| **Total amount claimed:** | $ 30,000,000 |

**Basis for computation of amounts claimed (include copies of all bills, invoices, estimates, etc):**

wrongful death damages, pre-death pain and suffering, attorney fees, treble damages

## Damaged Vehicle (if applicable)

| Make: | Model: | Year: |
|---|---|---|
| | | |

| License Plate Number: | Mileage: |
|---|---|
| | |
| **Insurance Company:** | **Policy Number:** |
| | |

## Additional Information

**Names and Address of witnesses, hospitals, doctors, etc:**

A. Bethann Schaber, MD Deputy Medical Examiner

B. Individuals identified in the attached autopsy report.

C. Staff at the jail (identities unknown at this time)

**Any additional information that might be helpful in considering this claim:**

See Attached autopsy report as exhibit 1.

➢ **WARNING: IT IS A CRIMINAL OFFENSE TO FILE A FALSE CLAIM (PENAL CODE § 72; INSURANCE CODE § 556.1)**

**I have read the matters and statements made in the above claim and I know the same to be true of my own knowledge, except as to those matters stated upon information or belief and as to such matters I believe the same to be true. I certify under penalty of perjury that the foregoing is TRUE and CORRECT.**

**Signed this** 08 **day of** March, **20**23 **at** San Diego, CA

[signature]

**Claimant's Signature**

# EXHIBIT 1

# County of San Diego

**GLENN N. WAGNER, D.O.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

**STEVEN C. CAMPMAN, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | 2022-01007 |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | Son | 3/18/2022 | |

| San Diego Medical Examiner<br>5570 Overland Avenue, Suite#101<br>San Diego, CA 92123-1206<br>(858) 694-2895 | Case Number : 2022-01007<br>Investigator : Fernanda Sanchez<br>Date of Death : 03/17/2022<br>Date Today : 02/08/2023 |
|---|---|

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

<u>OPINION</u>: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was “relatively clean, no flooding/gassing or smearing of feces.” The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist’s diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist’s final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Case 3:23-cv-01357-CAB-BLM Document 13-3 Filed 09/06/23 PageID.2965 Page 79 of 84



Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

Case 3:23-cv-01351-TWR-BLM Document 23-3 Filed 09/06/24 PageID.2857 Page 280 of 84



IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number “4950349.” The body is in a second inner white body pouch sealed with a second red tamper resistant seal number “4950993.” A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner’s identification bearing the decedent’s name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent’s name, date of birth, and medical record number “31943869” is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff’s Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent’s name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent’s name and booking number “21149433” is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.
4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

<u>SCARS</u>:
1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled “A” through “C” for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

Case 3:23-cv-01357-CAB-BJW Document 128-32 Filed 01/06/24 PageID.8264 Page 305 of 468 Page 27 of 84



## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________
06/27/2022
Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

RECEIVED
COUNTY COUNSEL
2023 MAR -9 PM 2:08 BS cv
COUNTY OF SAN DIEGO
Time Stamp

## CLAIM AGAINST THE COUNTY OF SAN DIEGO

(FOR DAMAGES TO PERSONS OR PERSONAL PROPERTY)

Received by via
U.S. Mail ☐
Inter-Office Mail ☐
Over the Counter ☒ cv

File No: ____________________

A claim must be filed with the Claims Division of the County of San Diego within 6 months after which the incident or event occurred. Be sure your claim is against the County of San Diego, not another public entity. Where space is insufficient, please use additional paper and identify information by paragraph and number. Completed claims must be mailed or delivered to:

*County of San Diego, Claims Division, 1600 Pacific Highway, Room 355, San Diego, CA 92101- Phone (619) 531-4899*

### TO THE HONORABLE BOARD OF SUPERVISORS – THE COUNTY OF SAN DIEGO, CALIFORNIA

The undersigned respectfully submits the following claim and information relative to damage to persons and/or personal property:

**Claimant Information**

| Last Name | First Name | Middle Name |
|---|---|---|
| Estate of Lonnie Rupard | | |
| **Street Address** | **City** | **Zip** |
| 1430 Coker Way | El Cajon | 92021 |
| **Home Phone (include area code)** | **Work Phone (include area code)** | **E-mail Address** |
| 619 608 2485 | | justrupard3@gmail.com |

| Birth Date | Driver's License Number |
|---|---|
| | |

**Name, telephone and post office address to which claimant desires notices to be sent, if other than above:**
Lowe Lazar Law, LLP 402 W. Broadway Ste 1720 San Diego CA 92101

**Claim Information**

| Date of Occurrence or Event from which the claim arises: | Time of Occurrence or Event from which the claim arises: |
|---|---|
| March 17, 2022 | Unknown |

**Location, including address (if none, nearest cross street) and city:**
San Diego County Jail; 1173 Front Street, San Diego CA 92101

**Specify the particular occurrence, event, act or omission you claim caused the injury or damage (use additional paper if necessary):**
Wrongful death of Lonnie Rupard while he was in jail. As set forth in the autopsy findings, which were publicly released on or about March 2, 2023, Lonnie Rupard died of pneumonia, malnutrition, and dehydration due to jail caretaker's neglect and ineffective delivery of care. Lonnie Rupard was a dependent adult who was neglected, and whose civil rights were violated. The manner of death was classified as a homicide.

**State how or wherein the County of San Diego or its employees were at fault. Give the name(s) of the County department and employee(s) causing the damage or injury:**
County employees including jail caretakers fell short in safeguarding the health and wellbeing of Lonnie Rupard while he was in their custody. He had diagnosed schizophrenia with documented history of extensive medications and treatment at a state psychiatric hospital. He was dependent upon others for his care. Those in the jail that were supposed to be safeguarding Lonnie, neglected him, ultimately resulting in his death on March 17, 2022.

**Give a description of the property damage or loss, as is known at the time of the claim:**

Claimant is not seeking property damage.

**Give a description of the injury, as is known at the time of the claim:**

The Estate suffers the loss of love, society, companionship, comfort, care, assistance, protection, and moral support. Estate also seeks damages for Lonnie Rupard's pre-death pain and suffering.

**Social Security Number (required for Federal reporting requirements):**

**Name and address of any other person injured:**

Lonnie Rupard leaves behind sons Justino Rupard, Ronnie Rupard, and his mother, Florentina Rupard

**Name and address of the owner of any damaged property:**

## Damages Claimed

**Amount claimed as of this date:** $30,000,000

**Estimated amount of future costs:** $unknown

**Total amount claimed:** $30,000,000

**Basis for computation of amounts claimed (include copies of all bills, invoices, estimates, etc):**

wrongful death damages, pre-death pain and suffering, attorney fees, treble damages

## Damaged Vehicle (if applicable)

| Make: | Model: | Year: |
|---|---|---|
| | | |

| License Plate Number: | Mileage: |
|---|---|
| **Insurance Company:** | **Policy Number:** |

## Additional Information

**Names and Address of witnesses, hospitals, doctors, etc:**

A. Bethann Schaber, MD Deputy Medical Examiner

B. Individuals identified in the attached autopsy report.

C. Staff at the jail (identities unknown at this time)

**Any additional information that might be helpful in considering this claim:**

See Attached autopsy report as exhibit 1.

➢ **WARNING: IT IS A CRIMINAL OFFENSE TO FILE A FALSE CLAIM (PENAL CODE § 72; INSURANCE CODE § 556.1)**

**I have read the matters and statements made in the above claim and I know the same to be true of my own knowledge, except as to those matters stated upon information or belief and as to such matters I believe the same to be true. I certify under penalty of perjury that the foregoing is TRUE and CORRECT.**

**Signed this** 08 **day of** March, **20**23 **at** San Diego, CA

[signature]
**Claimant's Signature**

# EXHIBIT 1

# County of San Diego

**GLENN N. WAGNER, D.O.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

**STEVEN C. CAMPMAN, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | 2022-01007 |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | Son | 3/18/2022 | |

Case 3:23-cv-01350-BJC-BJW Document 328-3 Filed 10/16/24 PageID.9073 Page 46 of 84

| San Diego Medical Examiner<br>5570 Overland Avenue, Suite#101<br>San Diego, CA 92123-1206<br>(858) 694-2895 | Case Number<br>Investigator<br>Date of Death<br>Date Today | : 2022-01007<br>: Fernanda Sanchez<br>: 03/17/2022<br>: 02/08/2023 |
|---|---|---|

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
- A. Anterior rib fractures.
- B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

<u>OPINION</u>: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

Case 3:23-cv-01351-TWR-BJW Document 126-3 Filed 11/13/24 PageID.8869 Page 4 of 84



refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

CaseCase3:23-cv-01357-... Documen t12832 Filed 01/06/26 PageID 8873 Page 324 of 84
468



A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled “A” through “C” for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. BLUNT FORCE INJURY OF EXTREMITIES:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

Case 3:23-cv-01357-CAB-BLM Document 28-2 Filed 09/06/24 PageID.3098 Page 330 of
468



## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

## Most Recent News Releases

# Death Investigation - San Diego Central Jail

***46-year-old person in custody deceased.***

**Post Date:** 03/18/2022 4:15 PM

*The following information is fragmentary and has not been completely verified. It is based, in part, on hearsay and is intended for early information use rather than being a formal investigative report.*

On January 8, 2019, forty-six-year-old Lonnie Newton Rupard was arrested by National City Police Department for multiple charges and subsequently convicted for 245(a)(4) PC – Assault with Force Likely to Cause Great Bodily Injury. He was transferred to prison in July 2019. In May 2021, he was released from prison on the Post Release Community Supervision (PRCS) program. PRCS is a form of supervision provided to an offender who has been released from a California Department of Corrections and Rehabilitation institution to the jurisdiction of a county agency, pursuant to the Post Release Community Supervision Act of 2011.

On December 19, 2021, the National City Police Department arrested Rupard for 3455(a) PC – Post Release Community Supervision Revocation. Rupard was booked into the San Diego Central Jail.

On March 17, 2022, at about 10:48 p.m., deputies were in the module when they found Rupard unresponsive in his cell. Deputies and medical staff immediately performed lifesaving measures until relieved by fire department personnel. Paramedics transported Rupard to a hospital. Unfortunately, Rupard was pronounced deceased at the hospital.

The Homicide Unit responded to the jail and hospital to investigate the death. Rupard was alone in the cell and there were no obvious signs of trauma. No evidence of foul play was discovered.

The Citizen's Law Enforcement Review Board (CLERB) was notified of the death and an investigator responded to the facility.

Rupard was a resident of National City and his family has been notified of his death.

The Medical Examiner's Office has scheduled an autopsy for March 19, 2022.

Media Contact: Lieutenant Joel Stranger
Joel.Stranger@sdsheriff.org
Major Crimes Division (858) 285-6149

*Return to full list >>*

**SUBSCRIBE**

STATE OF CALIFORNIA

CERTIFICATION OF VITAL RECORD

# COUNTY OF SAN DIEGO

## CERTIFICATE OF DEATH

STATE OF CALIFORNIA
USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS
VS-11 (REV 3/06)

STATE FILE NUMBER:

LOCAL REGISTRATION NUMBER: 3202237006090

**DECEDENT'S PERSONAL DATA**

| | | |
|---|---|---|
| 1. NAME OF DECEDENT – FIRST (Given): LONNIE | 2. MIDDLE: - | 3. LAST (Family): RUPARD |
| AKA. ALSO KNOWN AS – Include full AKA (FIRST, MIDDLE, LAST): LONNIE NEWTON RUPARD | 4. DATE OF BIRTH mm/dd/ccyy: 10/01/1975 | 5. AGE Yrs.: 46 |
| IF UNDER ONE YEAR Months / Days: | IF UNDER 24 HOURS Hours / Minutes: | 6. SEX: M |
| 9. BIRTH STATE/FOREIGN COUNTRY: PHILIPPINES | 10. SOCIAL SECURITY NUMBER: 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 | 11. EVER IN U.S. ARMED FORCES? ☐ YES ☒ NO ☐ UNK |
| 12. MARITAL STATUS/SRDP (at Time of Death): DIVORCED | 7. DATE OF DEATH mm/dd/ccyy: 03/17/2022 | 8. HOUR (24 Hours): 2351 |
| 13. EDUCATION – Highest Level/Degree (see worksheet on back): HS GRADUATE | 14/15. WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? (If yes, see worksheet on back) ☐ YES ☒ NO | 16. DECEDENT'S RACE – Up to 3 races may be listed (see worksheet on back): FILIPINO, AMERICAN, CAUCASIAN |
| 17. USUAL OCCUPATION – Type of work for most of life. DO NOT USE RETIRED: NEVER WORKED | 18. KIND OF BUSINESS OR INDUSTRY (e.g., grocery store, road construction, employment agency, etc.): - | 19. YEARS IN OCCUPATION: 0 |

**USUAL RESIDENCE**

| | | |
|---|---|---|
| 20. DECEDENT'S RESIDENCE (Street and number, or location): 3814 POLO DRIVE | | |
| 21. CITY: BONITA | 22. COUNTY/PROVINCE: SAN DIEGO | 23. ZIP CODE: 91902 |
| 24. YEARS IN COUNTY: 46 | 25. STATE/FOREIGN COUNTRY: CA | |

**INFORMANT**

26. INFORMANT'S NAME, RELATIONSHIP: RONNIE NEWTON GEORGE RUPARD, POA

27. INFORMANT'S MAILING ADDRESS (Street and number, or rural route number, city or town, state and zip): 3814 POLO DRIVE, BONITA, CA 91902

**SPOUSE/SRDP AND PARENT INFORMATION**

| | | | |
|---|---|---|---|
| 28. NAME OF SURVIVING SPOUSE/SRDP – FIRST: - | 29. MIDDLE: - | 30. LAST (BIRTH NAME): - | |
| 31. NAME OF FATHER/PARENT – FIRST: GERRY | 32. MIDDLE: NEWTON | 33. LAST: RUPARD | 34. BIRTH STATE: NC |
| 35. NAME OF MOTHER/PARENT – FIRST: FLORINTINA | 36. MIDDLE: G. | 37. LAST (BIRTH NAME): GRUSPE | 38. BIRTH STATE: PHILIPPINES |

**FUNERAL DIRECTOR/LOCAL REGISTRAR**

| | | |
|---|---|---|
| 39. DISPOSITION DATE mm/dd/ccyy: 03/29/2022 | 40. PLACE OF FINAL DISPOSITION: RES-FLORINTINA RUPARD LA PAZ SAN NARCISO, ZAMBALES 2205, -, PHILIPPINES | |
| 41. TYPE OF DISPOSITION(S): CREMATE/TRANSIT/RESIDENCE | 42. SIGNATURE OF EMBALMER: NOT EMBALMED | 43. LICENSE NUMBER: - |
| 44. NAME OF FUNERAL ESTABLISHMENT: FEATHERINGILL MORTUARY INC | 45. LICENSE NUMBER: FD1083 | 46. SIGNATURE OF LOCAL REGISTRAR: WILMA WOOTEN MD |
| 47. DATE mm/dd/ccyy: 03/24/2022 | | |

**PLACE OF DEATH**

101. PLACE OF DEATH: UC SAN DIEGO HEALTH HILLCREST - HILLCREST MEDICAL CENTER

102. IF HOSPITAL, SPECIFY ONE: ☐ IP ☒ ER/OP ☐ DOA

103. IF OTHER THAN HOSPITAL, SPECIFY ONE: ☐ Hospice ☐ Nursing Home/LTC ☐ Decedent's Home ☐ Other

104. COUNTY: SAN DIEGO | 105. FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number, or location): 200 W ARBOR DR | 106. CITY: SAN DIEGO

**CAUSE OF DEATH**

107. CAUSE OF DEATH — Enter the chain of events -- diseases, injuries, or complications -- that directly caused death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE

| | Cause | Time Interval Between Onset and Death |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) (A) | PENDING | (AT) - |
| Sequentially, list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST (B) | | (BT) |
| (C) | | (CT) |
| (D) | | (DT) |

108. DEATH REPORTED TO CORONER? ☒ YES ☐ NO — REFERRAL NUMBER: 22-01007

109. BIOPSY PERFORMED? ☐ YES ☒ NO

110. AUTOPSY PERFORMED? ☒ YES ☐ NO

111. USED IN DETERMINING CAUSE? ☒ YES ☐ NO

112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107: -

113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (If yes, list type of operation and date.): UNK

113A. IF FEMALE, PREGNANT IN LAST YEAR? ☐ YES ☒ NO ☐ UNK

**PHYSICIAN'S CERTIFICATION**

114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. Decedent Attended Since (A) mm/dd/ccyy; Decedent Last Seen Alive (B) mm/dd/ccyy

115. SIGNATURE AND TITLE OF CERTIFIER:

116. LICENSE NUMBER: | 117. DATE mm/dd/ccyy:

118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE:

**CORONER'S USE ONLY**

119. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. MANNER OF DEATH ☐ Natural ☐ Accident ☐ Homicide ☐ Suicide ☒ Pending Investigation ☐ Could not be determined

120. INJURED AT WORK? ☐ YES ☐ NO ☐ UNK

121. INJURY DATE mm/dd/ccyy: | 122. HOUR (24 Hours):

123. PLACE OF INJURY (e.g., home, construction site, wooded area, etc.):

124. DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury):

125. LOCATION OF INJURY (Street and number, or location, and city, and zip):

126. SIGNATURE OF CORONER / DEPUTY CORONER: BETHANN SCHABER | 127. DATE mm/dd/ccyy: 03/21/2022 | 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER: BETHANN SCHABER, DME

STATE REGISTRAR: A | B | C | D | E | FAX AUTH.# | CENSUS TRACT

County of San Diego –Health & Human Services Agency – 3851 Rosecrans Street. This is to certify that, if bearing the OFFICIAL SEAL OF THE STATE OF CALIFORNIA, the OFFICIAL SEAL OF SAN DIEGO COUNTY AND THEIR DEPARTMENT OF HEALTH SERVICES EMBOSSED SEAL, this is a true copy of the ORIGINAL DOCUMENT FILED. This copy not valid unless prepared on engraved border displaying seal and signature of Registrar

Wilma J. Wooten, M.D.

DATE ISSUED: 4/26/2022 WILMA J. WOOTEN, M.D., M.P.H.
REGISTRAR OF VITAL RECORDS
County of San Diego

THE GREAT SEAL OF THE STATE OF CALIFORNIA — EUREKA

THE NOBLEST MOTIVE IS THE PUBLIC GOOD — COUNTY OF SAN DIEGO — MDCCCLI

A004055059

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

# County of San Diego

**GLENN N. WAGNER, D.O.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

**STEVEN C. CAMPMAN, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | 2022-01007 |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | Son | 3/18/2022 | |

| San Diego Medical Examiner<br>5570 Overland Avenue, Suite#101<br>San Diego, CA 92123-1206<br>(858) 694-2895 | Case Number<br>Investigator<br>Date of Death<br>Date Today | : 2022-01007<br>: Fernanda Sanchez<br>: 03/17/2022<br>: 02/08/2023 |
|---|---|---|

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________

**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.
4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

<u>SCARS</u>:
1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

Case 3:23-cv-01351-... Document ... Filed 01/06/26 PageID.9210 Page 79 of 84

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# Most Recent News Releases

## In-Custody Death Finding

***Medical Examiner releases report on Lonnie Rupard.***

**Post Date:** 03/02/2023 9:30 AM

46-year-old Lonnie Newton Rupard was in custody at San Diego Central Jail when he was found unresponsive in his cell on March 17, 2022. Sheriff's Deputies and Medical Staff performed lifesaving measures until he was transported to a hospital where he later died.

We extend our earnest sympathies to Mr. Rupard's family and friends during this very difficult time. We share in your grief for this immense loss. A Sheriff's family liaison is working with Mr. Rupard's family to update them on the investigation and support them as best as we possibly can.

Today, the San Diego County Medical Examiner's Office (M.E.) released its autopsy report. Mr. Rupard's preliminary cause of death is pneumonia, malnutrition and dehydration with COVID-19 viral infection, pulmonary emphysema and duodenal ulcer as contributing factors. The M.E. ruled his manner of death as homicide. We thank the M.E.'s Office for its thorough report and respect its findings.

As part of its process, the Sheriff's Internal Affairs Unit began an investigation in April of last year. Investigators are looking into the circumstances surrounding Mr. Rupard's death to determine any violation of department policy and procedure.

The Sheriff's Homicide Unit is also investigating the incident and will submit its findings to the District Attorney's Office for review. We will also provide our findings to the U.S. Attorney's Office for review by its Civil Rights Unit regarding any potential violations related to Mr. Rupard's death.

Since this incident, which occurred March 2022, several changes and advancements have been implemented within the Detention Services Bureau to help identify when a person in custody may need additional medical and mental health care. These changes have helped staff recognize when a vulnerable individual may not be able to advocate for themselves and staff need to intervene on their behalf.

- Wellness Checks – These checks are comprised of a Multi-Disciplinary Group (MDG) including sworn staff, mental health providers, nurses, correctional counselors and classification deputies. This group conducts one-on-one visits with incarcerated persons deemed most vulnerable. The wellness checks give deputies an additional opportunity to conduct hygiene inspections and allow maintenance staff to address any concerns about the cell or housing unit. The living conditions and hygiene of an individual can be an indicator that they may be in crisis. Mental health clinicians and nurses assess the individual for any mental health or medical concerns and route them to the appropriate service provider for follow-up and recovery. These checks are done twice a week at George Bailey Detention Facility and San Diego Central Jail. They are conducted once a week at Las Colinas Detention and Reentry Facility and Vista Detention Facility.

- Collaborative Care Meetings – Each week, a multi-disciplinary group from each of the facilities meets to discuss individuals in custody who may need additional care and/or may be at risk for harm. Staff members develop a course of action tailored to the individual's needs. These individuals could be those who receive Wellness Checks each week or an incarcerated person who may be behaving in a manner that is indicative of a possible mental health crisis or medical need.

- Sharing of Critical Information for Continuity of Care – It is common for forensic psychiatrists to provide mental health services or assessments to incarcerated persons within our facilities. For increased collaboration and continuity of care, the Sheriff's Department has required the psychiatrist to provide a briefing to Sheriff's Mental Health Staff prior to leaving the jail. This enables Sheriff's Staff to provide the appropriate care to an individual immediately, instead of waiting for a written report in two weeks' time. We are also working to streamline the timely sharing of mental health information and medical records from the California Department of State Hospitals when they transfer people into our custody.

- Conservatorship – We established a process to request conservatorship of a person in our custody who is unable to care for themselves. Conservatorship allows the court to order medical decisions on behalf of a person who refuses or is not able to take care of themselves.

At the San Diego County Sheriff's Department, we are committed to the safety of the people entrusted in our care. We are resolved in our core values of recognizing the dignity and value of every human life. We have instituted many changes in the last year, as well as initiated several investigations to ensure policies and procedures are being followed. These improvements and transparency in communicating with the public uphold our culture of accountability. We will never shy away from demanding more from ourselves for more targeted reforms that advance the well-being of people in our custody.

# Hallazgo de Muerte Bajo Custodia

*Oficina del Médico Forense publica un informe sobre Lonnie Rupard.*

Lonnie Newton Rupard, de 46 años, estaba bajo custodia en la Cárcel Central de San Diego cuando lo encontraron inconsciente en su celda el 17 de marzo de 2022. Los oficiales del Alguacil y el personal médico tomaron medidas para salvarle la vida hasta que lo transportaron a un hospital donde murió más tarde.

Extendemos nuestras más sinceras condolencias a la familia y los amigos del Sr. Rupard durante este momento tan difícil. Compartimos su dolor por esta inmensa pérdida. Un enlace familiar del Alguacil está trabajando con la familia del Sr. Rupard para actualizarlos sobre la investigación y apoyarlos lo mejor que podamos.

Hoy, la Oficina del Médico Forense del Condado de San Diego (M.E.) publicó su informe de autopsia. La causa preliminar de muerte del Sr. Rupard es neumonía, desnutrición y deshidratación con infección viral por COVID-19, enfisema pulmonar y úlcera duodenal como factores contribuyentes. El ME dictaminó su forma de muerte como homicidio. Agradecemos a la Oficina del M.E. por su completo informe y respetamos sus hallazgos.

Como parte de su proceso, la Unidad de Asuntos Internos del Aheriff inició una investigación en abril del año pasado. Los investigadores están investigando las circunstancias que rodearon la muerte del Sr. Rupard para determinar cualquier violación de la política y el procedimiento del departamento.

La Unidad de Homicidios del Alguacil también está investigando el incidente y presentará sus hallazgos a la Oficina del Fiscal de Distrito para su revisión. También proporcionaremos nuestros hallazgos a la Oficina del Fiscal Federal para que los revise la Unidad de Derechos Civiles con respecto a cualquier posible violación relacionada con la muerte del Sr. Rupard.

Desde este incidente, que ocurrió en marzo de 2022, se han implementado varios cambios y avances dentro de la Oficina de Servicios de Detención para ayudar a identificar cuándo una persona bajo custodia puede necesitar atención médica y de salud mental adicional. Estos cambios han ayudado al personal a reconocer cuándo una persona vulnerable no puede defenderse por sí misma y el personal debe intervenir en su nombre.

- Controles de Bienestar - estos controles están compuestos por un grupo multidisciplinario (MDG) que incluye personal juramentado, proveedores de salud mental, enfermeras, consejeros correccionales y ayudantes de clasificación. Este grupo realiza visitas individuales con las personas encarceladas consideradas más vulnerables. Los controles de bienestar brindan a los oficiales del Alguacil una oportunidad adicional para realizar inspecciones de higiene y permiten que el personal de mantenimiento aborde cualquier inquietud sobre la celda o la unidad de vivienda. Las condiciones de vida e higiene de un individuo pueden ser un indicador de que puede estar en crisis. Los médicos y enfermeros de salud mental evalúan a la persona en busca de problemas médicos o de salud mental y la derivan al proveedor de servicios adecuado para el seguimiento y la recuperación. Estos controles se realizan dos veces por semana en el Centro de Detención George Bailey y en la Cárcel Central de San Diego. Se llevan a cabo una vez por semana en el Centro de Detención y Reingreso de Las Colinas y en el Centro de Detención de Vista.

- Reuniones de Atención Colaborativa - cada semana, un grupo multidisciplinario de cada una de las instalaciones se reúne para hablar sobre las personas bajo custodia que pueden necesitar atención adicional y/o pueden estar en riesgo de sufrir daños. Los miembros del personal desarrollan un curso de acción adaptado a las necesidades del individuo. Estas personas pueden ser aquellas que reciben Controles de Bienestar cada semana o una persona encarcelada que puede estar comportándose de una manera que sea indicativa de una posible crisis de salud mental o necesidad médica.

- Compartir Información Crítica para la Continuidad de la Atención - es común que los psiquiatras forenses brinden servicios de salud mental o evaluaciones a personas encarceladas dentro de nuestras instalaciones. Para una mayor colaboración y continuidad de la atención, el Departamento del Alguacil ha requerido que el psiquiatra brinde una sesión informativa al Personal de Salud Mental del Alguacil antes de salir de la cárcel. Esto permite que el personal del Alguacil brinde la atención adecuada a una persona de inmediato, en lugar de esperar un informe escrito dentro de dos semanas. También estamos trabajando para agilizar el intercambio oportuno de información de salud mental y registros médicos del Departamento de Hospitales Estatales de California cuando transfieren personas bajo nuestra custodia.

- Tutela - establecimos un proceso para solicitar la tutela de una persona bajo nuestra custodia que no puede cuidar de sí misma. La tutela le permite a la corte ordenar decisiones médicas en nombre de una persona que se niega o no puede cuidar de sí misma.

En el Departamento del Alguacil del Condado de San Diego, estamos comprometidos con la seguridad de las personas confiadas a nuestro cuidado. Estamos resueltos en nuestros valores fundamentales a reconocer la dignidad y el valor de cada vida humana. Hemos instituido muchos cambios en el último año, así como también iniciado varias investigaciones para garantizar que se sigan las políticas y los procedimientos. Estas mejoras y la transparencia en la comunicación con el público mantienen nuestra cultura de responsabilidad. Nunca evitaremos exigirnos más a nosotros mismos por reformas más específicas que promuevan el bienestar de las personas bajo nuestra custodia.

*Return to full list >>*

## SUBSCRIBE

Subscribe to receive updates.

Email

Email Address

SUBMIT

Case 3:23-cv-01357-AGS-BLM Document 163-3 Filed 09/06/24 PageID.9216 Page 31 of 36

# Exhibit C

# GILLEON LAW FIRM

A PROFESSIONAL CORPORATION

1320 Columbia Street, Ste. 200
San Diego, CA 92101
Tel: 619.702.8623
Fax: 619.374.7040
www.gilleonlawfirm.com

March 10, 2023

**APPLICATION FOR LEAVE TO FILE LATE CLAIM; GOV. CODE § 911.4**

County of San Diego
Claims Division
1600 Pacific Highway, Room 355
San Diego, CA 92101

Re: ***Ronnie Rupard v. County of San Diego***

Dear County Board:

Claimant, Ronnie Newton George Rupard, is the son of Decedent, Lonnie Newton Rupard, who died on March 17, 2022, while under the care and custody of the San Diego Sheriff's Department. Claimant contends that the accrual date for presenting a government tort claim against the County of San Diego ("County") for his father's death was March 2, 2023, when the County released its Medical Examiner's report ruling Decedent's death a homicide. "The accrual date for presenting a government tort claim is identical to the accrual date that would apply in an ordinary action when no public entity is involved." (*K.J. v. Arcadia Unified Sch. Dist.,* 172 Cal.App.4th 1229, 1233.) "Under the delayed discovery doctrine, accrual of the cause of action is postponed until the plaintiff discovers, or has reason to discover, the cause of action." (*Id.*; see also *Rivas v. Safety-Kleen Corp*., (2002) 98 Cal.App.4th 218, 225; *Sanchez v. South Hoover Hospital*, (1976) 18 Cal.3d 93, 97.) Claimant contends that the attached claim is timely submitted within six months of the accrual date, pursuant to Gov. Code §911.2(a), prior to the six month deadline on September 4, 2023.

If the County contends that the accrual date was Decedent's date of death, March 17, 2022, this letter serves as Claimant's application for leave to file a late claim pursuant to Gov. Code §911.4, and the attached claim serves as the proposed claim required by Gov. Code §911.4(b). Section 911.6(b)(1) states, "The board shall grant the application if … [t]he failure to present the claim was through mistake, inadvertence, surprise, or excusable neglect and the public entity was not prejudiced in its defense of the claim by the failure to present the claim within the time specified in Section 911.2."

Claimant's assertion of mistake, inadvertence, surprise or excusable neglect is justified regardless of the lack of capacity justification mentioned below. Until recently, Claimant did not know, and had no way of knowing, the cause of his father's death on March 17, 2022. The County of San Diego's Medical Examiner ("ME") did not disclose its findings on the cause of death until March 2, 2023. Prior to the ME's announcement, and even thereafter, the Sheriff's Department published incomplete and false information that made it even less possible for Claimant to discover facts giving rise to a cause of action. For example, on March 18, 2023, the Sheriff published the attached News Release about the Decedent's death, which contained those following passages regarding the circumstances surrounding the death:

> On March 17, 2022, at about 10:48 p.m., deputies were in the module when they found Rupard unresponsive in his cell. Deputies and medical staff immediately performed lifesaving measures until relieved by fire department personnel. Paramedics transported Rupard to a hospital. Unfortunately, Rupard was pronounced deceased at the hospital.
>
> The Homicide Unit responded to the jail and hospital to investigate the death. Rupard was alone in the cell and there were no obvious signs of trauma. No evidence of foul play was discovered.

Thereafter, Claimant received the attached death certificate from the County, which stated, "PENDING" for the cause of his father's death. The Claimant, however, received no additional information from the County until March 2, 2023, when the attached autopsy report was published revealing substantial evidence of "trauma" and "foul play."

Even then, the County's Sheriff's Department continued to publish misleading information. On March 2, 2023, the Sheriff published the attached News Release, containing the following passages regarding the circumstances surrounding the death:

> 46-year-old Lonnie Newton Rupard was in custody at San Diego Central Jail when he was found unresponsive in his cell on March 17, 2022. Sheriff's Deputies and Medical Staff performed lifesaving measures until he was transported to a hospital where he later died….
>
> Today, the San Diego County Medical Examiner's Office (M.E.) released its autopsy report. Mr. Rupard's preliminary cause of death is pneumonia, malnutrition and dehydration with COVID-19 viral infection, pulmonary emphysema and duodenal ulcer as contributing factors. The M.E. ruled his manner of death as homicide. We thank the M.E.'s Office for its thorough report and respect its findings.

As though nobody would notice, the Sheriff's Department deliberately omitted the words "neglected schizophrenia" from its report regarding the ME's findings.

The ME's autopsy report begins with the following:

> <u>CAUSE OF DEATH</u>: PNEUMONIA, MALNUTRITION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

The ME's report ends with even more detail regarding the "neglect," which the Sheriff wilfully omitted from its New Release:

> Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery

> of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

Further justification stems from the County of San Diego's exclusive control of all information that would be necessary for Claimant to determine the pertinent facts for the accrual of a cause of action. However, the County withheld, and even mis-stated that information until March 2, 2023. As such, the County is *estopped* from raising untimeliness as a defense. "It is well settled that a public entity may be *estopped* from asserting the limitations of the claims statute where … (1) the public entity was apprised of the facts, (2) it intended its conduct to be acted upon, (3) the plaintiff was ignorant of the true state of facts, and (4) relied upon the conduct to his detriment." *K.J. v. Arcadia Unified School Dist*. (2009) 172 Cal.App.4th1229, 1239-1240.

Finally, the Claimant's assertion of mistake, inadvertence, surprise, or excusable neglect as a justification is bolstered by his long term cognitive deficits, which can be established to the Board in a confidential setting.

For the reasons set forth above, Claimant's application for leave to present a late claim should be granted.

Sincerely,

Gilleon Law Firm, APC

Daniel M. Gilleon

Enc.

Application for late claim
Claim Form
Attachment to Claim Form
Sheriff News Release 03/18/2022
Death Certificate of Lonnie Rupard
Medical Examiner's Report
Sheriff News Release 03/02/2023

# CLAIM AGAINST THE COUNTY OF SAN DIEGO

(FOR DAMAGES TO PERSONS OR PERSONAL PROPERTY)

**Received by** **via**
**U.S. Mail** ☐
**Inter-Office Mail** ☐
**Over the Counter** ☐

Time Stamp

File No: ____________________

A claim must be filed with the Claims Division of the County of San Diego within 6 months after which the incident or event occurred. Be sure your claim is against the County of San Diego, not another public entity. Where space is insufficient, please use additional paper and identify information by paragraph and number. Completed claims must be mailed or delivered to:

*County of San Diego, Claims Division, 1600 Pacific Highway, Room 355, San Diego, CA 92101- Phone (619) 531-4899*

## TO THE HONORABLE BOARD OF SUPERVISORS – THE COUNTY OF SAN DIEGO, CALIFORNIA

The undersigned respectfully submits the following claim and information relative to damage to persons and/or personal property:

### Claimant Information

| **Last Name** | **First Name** | **Middle Name** |
|---|---|---|
| Rupard | Ronnie | Newton George |
| **Street Address** | **City** | **Zip** |
| 1320 Columbia St., Ste. 200 | San Diego | 92101 |
| **Home Phone (include area code)** | **Work Phone (include area code)** | **E-mail Address** |
| *** | (619) 702-8623 | dan@gilleon.com |

| **Birth Date** | **Driver's License Number** |
|---|---|
| *** | *** |

**Name, telephone and post office address to which claimant desires notices to be sent, if other than above:**

### Claim Information

| **Date of Occurrence or Event from which the claim arises:** | **Time of Occurrence or Event from which the claim arises:** |
|---|---|
| DOI: 03/17/2022; Accrual Date: 03/02/2023 | Time of Decedent's death: 2351 |

**Location, including address (if none, nearest cross street) and city:**
San Diego County Jail, Front St., San Diego 92101

**Specify the particular occurrence, event, act or omission you claim caused the injury or damage (use additional paper if necessary):**

See Attachment

**State how or wherein the County of San Diego or its employees were at fault. Give the name(s) of the County department and employee(s) causing the damage or injury:**

See Attachment



*** **Not required by GC 910**

| Give a description of the property damage or loss, as is known at the time of the claim: |
|---|
| N/A |

| Give a description of the injury, as is known at the time of the claim: |
|---|
| See Attachment |

| Social Security Number (required for Federal reporting requirements): |
|---|
| *** |

| Name and address of any other person injured: |
|---|
| N/A |

| Name and address of the owner of any damaged property: |
|---|
| N/A |

## Damages Claimed

| | |
|---|---|
| **Amount claimed as of this date:** | $ *** |
| **Estimated amount of future costs:** | $ *** |
| **Total amount claimed:** | $ More than $10,000; Unlimited Jurisdiction of Superior Court |

**Basis for computation of amounts claimed (include copies of all bills, invoices, estimates, etc):**

***

## Damaged Vehicle (if applicable)

| Make: | Model: | Year: |
|---|---|---|
| | | |

| License Plate Number: | Mileage: |
|---|---|
| | |

| Insurance Company: | Policy Number: |
|---|---|
| | |

## Additional Information

**Names and Address of witnesses, hospitals, doctors, etc:**

**A.** See Attachment

**B.**

**C.**

**Any additional information that might be helpful in considering this claim:**

See Attachment

➢ **WARNING: IT IS A CRIMINAL OFFENSE TO FILE A FALSE CLAIM (PENAL CODE § 72; INSURANCE CODE § 556.1)**

**I have read the matters and statements made in the above claim and I know the same to be true of my own knowledge, except as to those matters stated upon information or belief and as to such matters I believe the same to be true. I certify under penalty of perjury that the foregoing is TRUE and CORRECT.**

**Signed this** 11th **day of** March, **20**23 **at** Del Mar, CA

**Claimant's Signature**

**Daniel M. Gilleon, Gilleon Law Firm APC**
**Attorney for Claimant, Ronnie Rupard**

*** **Not required by GC 910**

Case 3:23-cv-01357-AGS-BLM Document 26-3 Filed 10/05/23 PageID.928 Page 7 of 36

Attachment to Tort Claim Form
*Rupard v. County of San Diego*

Claimant, Ronnie Newton George Lupard ("Claimant" or "Lupard"), is the adult son of Lonnie Newton Rupard ("Decedent"), who died on March 17, 2022, at the age of 46. At the time of his death, Decedent had been under the care and custody of the County of San Diego Sheriff's Department as an inmate at the San Diego Central Jail since approximately December 28, 2021. Decedent had long-standing physical and mental limitations, e.g. schizophrenia and other psychotic disorders, that restricted his ability to carry out normal activities or to protect his rights pursuant to W&I 15610.23(a), which defines "Dependent adult" under the California Elder Abuse and Dependant Adult Protection Act.

Between December 28, 2021 to March 17, 2022, the County of San Diego, through its deputies, committed a variety of torts and wrongdoings, such as physical abuse, neglect, abandonment (i.e., the desertion or willful forsaking of a dependent adult by anyone having care or custody of that person under circumstances in which a reasonable person would continue to provide care and custody), isolation, the deprivation by a care custodian of goods or services that are necessary to avoid physical harm or mental suffering, and other treatment with resulting physical harm or pain or mental suffering. For example, the County of San Diego allowed Decedent to live in a malodorous cell that was dirty with trash throughout, with feces on the floor, the toilet full of excrement, and food smeared on the walls. The County of San Diego's delivery of antipsychotic medications and care to Decedent was not only ineffective, it was malicious and homicidal. Decedent sustained untreated injuries at the hands of the deputies, such as a facial laceration, bruising and abrasions to his cheek, and bloody lips documented on January 29, 2023. At the time of Decedent's autopsy, the medical examiner noted multiple pressure injuries/sores of the torso and extremities, and blunt force injuries to the head, neck, torso, and extremities. Even after being expressly instructed by a court-ordered psychiatrist to give Decedent antipsychotic medication involuntarily as allowed by law and sent to a state hospital, the County of San Diego continued to commit the abuse described above, which was a substantial factor in causing Decedent to suffer severe emotional distress and a variety of health conditions that led to his death.

Causes of action to be filed under the unlimited jurisdiction of the Superior Court of California will include, but not be limited to: Dependent Adult Abuse (*W&I 15657* et seq.); Breach of Mandatory Duties (*GC 815.6*); Violation of Mandated Reporter laws; Medical Negligence; Excessive Force by Peace Officer; Battery by Peace Officer; Violation of Civil Rights Under Color of Authority; *42 USC 1983*; *Monell* and Negligent Supervision, Hiring and Retention; Vicarious Liability for above (*GC 815.2*); Wrongful Death (*CCP 366.70*); Survival Action (*CCP 377.34*), seeking Claimant's and Decedent's general and special damages in excess of $10,000, attorney's fees and costs, penalties, and punitive damages against the public employees who committed the malicious acts described above.

## Most Recent News Releases

# Death Investigation - San Diego Central Jail

***46-year-old person in custody deceased.***

**Post Date:** 03/18/2022 4:15 PM

*The following information is fragmentary and has not been completely verified. It is based, in part, on hearsay and is intended for early information use rather than being a formal investigative report.*

On January 8, 2019, forty-six-year-old Lonnie Newton Rupard was arrested by National City Police Department for multiple charges and subsequently convicted for 245(a)(4) PC – Assault with Force Likely to Cause Great Bodily Injury. He was transferred to prison in July 2019. In May 2021, he was released from prison on the Post Release Community Supervision (PRCS) program. PRCS is a form of supervision provided to an offender who has been released from a California Department of Corrections and Rehabilitation institution to the jurisdiction of a county agency, pursuant to the Post Release Community Supervision Act of 2011.

On December 19, 2021, the National City Police Department arrested Rupard for 3455(a) PC – Post Release Community Supervision Revocation. Rupard was booked into the San Diego Central Jail.

On March 17, 2022, at about 10:48 p.m., deputies were in the module when they found Rupard unresponsive in his cell. Deputies and medical staff immediately performed lifesaving measures until relieved by fire department personnel. Paramedics transported Rupard to a hospital. Unfortunately, Rupard was pronounced deceased at the hospital.

The Homicide Unit responded to the jail and hospital to investigate the death. Rupard was alone in the cell and there were no obvious signs of trauma. No evidence of foul play was discovered.

The Citizen's Law Enforcement Review Board (CLERB) was notified of the death and an investigator responded to the facility.

Rupard was a resident of National City and his family has been notified of his death.

The Medical Examiner's Office has scheduled an autopsy for March 19, 2022.

Media Contact: Lieutenant Joel Stranger
Joel.Stranger@sdsheriff.org
Major Crimes Division (858) 285-6149

*Return to full list >>*

**SUBSCRIBE**

STATE OF CALIFORNIA

CERTIFICATION OF VITAL RECORD

# COUNTY OF SAN DIEGO

## CERTIFICATE OF DEATH

STATE OF CALIFORNIA — USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS — VS-11 (REV 3/06)

STATE FILE NUMBER:

LOCAL REGISTRATION NUMBER: 3202237006090

**DECEDENT'S PERSONAL DATA**

| Field | Entry |
|---|---|
| 1. NAME OF DECEDENT – FIRST (Given) | LONNIE |
| 2. MIDDLE | - |
| 3. LAST (Family) | RUPARD |
| AKA, ALSO KNOWN AS – Include full AKA (FIRST, MIDDLE, LAST) | LONNIE NEWTON RUPARD |
| 4. DATE OF BIRTH mm/dd/ccyy | 10/01/1975 |
| 5. AGE Yrs. | 46 |
| IF UNDER ONE YEAR (Months / Days) | |
| IF UNDER 24 HOURS (Hours / Minutes) | |
| 6. SEX | M |
| 9. BIRTH STATE/FOREIGN COUNTRY | PHILIPPINES |
| 10. SOCIAL SECURITY NUMBER | 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 |
| 11. EVER IN U.S. ARMED FORCES? | [ ] YES [X] NO [ ] UNK |
| 12. MARITAL STATUS/SRDP (at Time of Death) | DIVORCED |
| 7. DATE OF DEATH mm/dd/ccyy | 03/17/2022 |
| 8. HOUR (24 Hours) | 2351 |
| 13. EDUCATION – Highest Level/Degree | HS GRADUATE |
| 14/15. WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? | [ ] YES [X] NO |
| 16. DECEDENT'S RACE – Up to 3 races may be listed | FILIPINO, AMERICAN, CAUCASIAN |
| 17. USUAL OCCUPATION – Type of work for most of life. DO NOT USE RETIRED | NEVER WORKED |
| 18. KIND OF BUSINESS OR INDUSTRY | - |
| 19. YEARS IN OCCUPATION | 0 |

**USUAL RESIDENCE**

| Field | Entry |
|---|---|
| 20. DECEDENT'S RESIDENCE (Street and number, or location) | 3814 POLO DRIVE |
| 21. CITY | BONITA |
| 22. COUNTY/PROVINCE | SAN DIEGO |
| 23. ZIP CODE | 91902 |
| 24. YEARS IN COUNTY | 46 |
| 25. STATE/FOREIGN COUNTRY | CA |

**INFORMANT**

| Field | Entry |
|---|---|
| 26. INFORMANT'S NAME, RELATIONSHIP | RONNIE NEWTON GEORGE RUPARD, POA |
| 27. INFORMANT'S MAILING ADDRESS | 3814 POLO DRIVE, BONITA, CA 91902 |

**SPOUSE/SRDP AND PARENT INFORMATION**

| Field | Entry |
|---|---|
| 28. NAME OF SURVIVING SPOUSE/SRDP – FIRST | - |
| 29. MIDDLE | - |
| 30. LAST (BIRTH NAME) | - |
| 31. NAME OF FATHER/PARENT – FIRST | GERRY |
| 32. MIDDLE | NEWTON |
| 33. LAST | RUPARD |
| 34. BIRTH STATE | NC |
| 35. NAME OF MOTHER/PARENT – FIRST | FLORINTINA |
| 36. MIDDLE | G. |
| 37. LAST (BIRTH NAME) | GRUSPE |
| 38. BIRTH STATE | PHILIPPINES |

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

| Field | Entry |
|---|---|
| 39. DISPOSITION DATE mm/dd/ccyy | 03/29/2022 |
| 40. PLACE OF FINAL DISPOSITION | RES-FLORINTINA RUPARD LA PAZ SAN NARCISO, ZAMBALES 2205, -, PHILIPPINES |
| 41. TYPE OF DISPOSITION(S) | CREMATE/TRANSIT/RESIDENCE |
| 42. SIGNATURE OF EMBALMER | NOT EMBALMED |
| 43. LICENSE NUMBER | - |
| 44. NAME OF FUNERAL ESTABLISHMENT | FEATHERINGILL MORTUARY INC |
| 45. LICENSE NUMBER | FD1083 |
| 46. SIGNATURE OF LOCAL REGISTRAR | WILMA WOOTEN MD |
| 47. DATE mm/dd/ccyy | 03/24/2022 |

**PLACE OF DEATH**

| Field | Entry |
|---|---|
| 101. PLACE OF DEATH | UC SAN DIEGO HEALTH HILLCREST - HILLCREST MEDICAL CENTER |
| 102. IF HOSPITAL, SPECIFY ONE | [ ] IP [X] ER/OP [ ] DOA |
| 103. IF OTHER THAN HOSPITAL, SPECIFY ONE | [ ] Hospice [ ] Nursing Home/LTC [ ] Decedent's Home [ ] Other |
| 104. COUNTY | SAN DIEGO |
| 105. FACILITY ADDRESS OR LOCATION WHERE FOUND | 200 W ARBOR DR |
| 106. CITY | SAN DIEGO |

**CAUSE OF DEATH**

| Field | Entry |
|---|---|
| 107. CAUSE OF DEATH – IMMEDIATE CAUSE (A) | PENDING |
| Time Interval Between Onset and Death (AT) | - |
| (B) | |
| (C) | |
| (D) | |
| 108. DEATH REPORTED TO CORONER? | [X] YES [ ] NO — REFERRAL NUMBER 22-01007 |
| 109. BIOPSY PERFORMED? | [ ] YES [X] NO |
| 110. AUTOPSY PERFORMED? | [X] YES [ ] NO |
| 111. USED IN DETERMINING CAUSE? | [X] YES [ ] NO |
| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 | - |
| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? | UNK |
| 113A. IF FEMALE, PREGNANT IN LAST YEAR? | [ ] YES [X] NO [ ] UNK |

**PHYSICIAN'S CERTIFICATION**

| Field | Entry |
|---|---|
| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. Decedent Attended Since (A) mm/dd/ccyy; Decedent Last Seen Alive (B) mm/dd/ccyy | |
| 115. SIGNATURE AND TITLE OF CERTIFIER | |
| 116. LICENSE NUMBER | |
| 117. DATE mm/dd/ccyy | |
| 118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | |

**CORONER'S USE ONLY**

| Field | Entry |
|---|---|
| 119. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. MANNER OF DEATH | [ ] Natural [ ] Accident [ ] Homicide [ ] Suicide [X] Pending Investigation [ ] Could not be determined |
| 120. INJURED AT WORK? | [ ] YES [ ] NO [ ] UNK |
| 121. INJURY DATE mm/dd/ccyy | |
| 122. HOUR (24 Hours) | |
| 123. PLACE OF INJURY | |
| 124. DESCRIBE HOW INJURY OCCURRED | |
| 125. LOCATION OF INJURY | |
| 126. SIGNATURE OF CORONER / DEPUTY CORONER | BETHANN SCHABER |
| 127. DATE mm/dd/ccyy | 03/21/2022 |
| 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER | BETHANN SCHABER, DME |

| STATE REGISTRAR | A | B | C | D | E | | FAX AUTH # | CENSUS TRACT |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

County of San Diego –Health & Human Services Agency – 3851 Rosecrans Street. This is to certify that, if bearing the OFFICIAL SEAL OF THE STATE OF CALIFORNIA, the OFFICIAL SEAL OF SAN DIEGO COUNTY AND THEIR DEPARTMENT OF HEALTH SERVICES EMBOSSED SEAL, this is a true copy of the ORIGINAL DOCUMENT FILED. This copy not valid unless prepared on engraved border displaying seal and signature of Registrar

Wilma J. Wooten, M.D.

DATE ISSUED: 4/26/2022

WILMA J. WOOTEN, M.D., M.P.H.
REGISTRAR OF VITAL RECORDS
County of San Diego

A004055059

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

# County of San Diego


**GLENN N. WAGNER, D.O.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

**STEVEN C. CAMPMAN, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895


## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | 2022-01007 |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | Son | 3/18/2022 | |

Case 3:23-cv-01350-BJC-BLM Document 28-33 Filed 09/06/24 PageID.9262 Page 31 of 36

| San Diego Medical Examiner<br>5570 Overland Avenue, Suite#101<br>San Diego, CA 92123-1206<br>(858) 694-2895 | Case Number<br>Investigator<br>Date of Death<br>Date Today | : 2022-01007<br>: Fernanda Sanchez<br>: 03/17/2022<br>: 02/08/2023 |
|---|---|---|

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
  A. Malnutrition and dehydration.
    1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
    2. Subcutaneous fat thickness 0.1 cm.
    3. Decreased skin turgor.
    4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
  B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
  C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
   A. Anterior rib fractures.
   B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

<u>OPINION</u>: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

Case 3:23-cv-01357-JO-MSB Document 33 Filed 11/13/24 PageID.9462 Page 38 of 36



A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

<u>SCARS</u>:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

Case 3:23-cv-01351-TJC-PDB Document 126-3 Filed 11/06/24 Page 390 of 468 PageID 9254



## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| **Test Name (Method of Analysis)** | **Specimen Tested** | **Result** |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________
06/27/2022
Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*

*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# Most Recent News Releases

# In-Custody Death Finding

***Medical Examiner releases report on Lonnie Rupard.***

**Post Date:** 03/02/2023 9:30 AM

46-year-old Lonnie Newton Rupard was in custody at San Diego Central Jail when he was found unresponsive in his cell on March 17, 2022. Sheriff's Deputies and Medical Staff performed lifesaving measures until he was transported to a hospital where he later died.

We extend our earnest sympathies to Mr. Rupard's family and friends during this very difficult time. We share in your grief for this immense loss. A Sheriff's family liaison is working with Mr. Rupard's family to update them on the investigation and support them as best as we possibly can.

Today, the San Diego County Medical Examiner's Office (M.E.) released its autopsy report. Mr. Rupard's preliminary cause of death is pneumonia, malnutrition and dehydration with COVID-19 viral infection, pulmonary emphysema and duodenal ulcer as contributing factors. The M.E. ruled his manner of death as homicide. We thank the M.E.'s Office for its thorough report and respect its findings.

As part of its process, the Sheriff's Internal Affairs Unit began an investigation in April of last year. Investigators are looking into the circumstances surrounding Mr. Rupard's death to determine any violation of department policy and procedure.

The Sheriff's Homicide Unit is also investigating the incident and will submit its findings to the District Attorney's Office for review. We will also provide our findings to the U.S. Attorney's Office for review by its Civil Rights Unit regarding any potential violations related to Mr. Rupard's death.

Since this incident, which occurred March 2022, several changes and advancements have been implemented within the Detention Services Bureau to help identify when a person in custody may need additional medical and mental health care. These changes have helped staff recognize when a vulnerable individual may not be able to advocate for themselves and staff need to intervene on their behalf.

- Wellness Checks – These checks are comprised of a Multi-Disciplinary Group (MDG) including sworn staff, mental health providers, nurses, correctional counselors and classification deputies. This group conducts one-on-one visits with incarcerated persons deemed most vulnerable. The wellness checks give deputies an additional opportunity to conduct hygiene inspections and allow maintenance staff to address any concerns about the cell or housing unit. The living conditions and hygiene of an individual can be an indicator that they may be in crisis. Mental health clinicians and nurses assess the individual for any mental health or medical concerns and route them to the appropriate service provider for follow-up and recovery. These checks are done twice a week at George Bailey Detention Facility and San Diego Central Jail. They are conducted once a week at Las Colinas Detention and Reentry Facility and Vista Detention Facility.

- Collaborative Care Meetings – Each week, a multi-disciplinary group from each of the facilities meets to discuss individuals in custody who may need additional care and/or may be at risk for harm. Staff members develop a course of action tailored to the individual's needs. These individuals could be those who receive Wellness Checks each week or an incarcerated person who may be behaving in a manner that is indicative of a possible mental health crisis or medical need.

- Sharing of Critical Information for Continuity of Care – It is common for forensic psychiatrists to provide mental health services or assessments to incarcerated persons within our facilities. For increased collaboration and continuity of care, the Sheriff's Department has required the psychiatrist to provide a briefing to Sheriff's Mental Health Staff prior to leaving the jail. This enables Sheriff's Staff to provide the appropriate care to an individual immediately, instead of waiting for a written report in two weeks' time. We are also working to streamline the timely sharing of mental health information and medical records from the California Department of State Hospitals when they transfer people into our custody.

- Conservatorship – We established a process to request conservatorship of a person in our custody who is unable to care for themselves. Conservatorship allows the court to order medical decisions on behalf of a person who refuses or is not able to take care of themselves.

At the San Diego County Sheriff's Department, we are committed to the safety of the people entrusted in our care. We are resolved in our core values of recognizing the dignity and value of every human life. We have instituted many changes in the last year, as well as initiated several investigations to ensure policies and procedures are being followed. These improvements and transparency in communicating with the public uphold our culture of accountability. We will never shy away from demanding more from ourselves for more targeted reforms that advance the well-being of people in our custody.

# Hallazgo de Muerte Bajo Custodia

*Oficina del Médico Forense publica un informe sobre Lonnie Rupard.*

Lonnie Newton Rupard, de 46 años, estaba bajo custodia en la Cárcel Central de San Diego cuando lo encontraron inconsciente en su celda el 17 de marzo de 2022. Los oficiales del Alguacil y el personal médico tomaron medidas para salvarle la vida hasta que lo transportaron a un hospital donde murió más tarde.

Extendemos nuestras más sinceras condolencias a la familia y los amigos del Sr. Rupard durante este momento tan difícil. Compartimos su dolor por esta inmensa pérdida. Un enlace familiar del Alguacil está trabajando con la familia del Sr. Rupard para actualizarlos sobre la investigación y apoyarlos lo mejor que podamos.

Hoy, la Oficina del Médico Forense del Condado de San Diego (M.E.) publicó su informe de autopsia. La causa preliminar de muerte del Sr. Rupard es neumonía, desnutrición y deshidratación con infección viral por COVID-19, enfisema pulmonar y úlcera duodenal como factores contribuyentes. El ME dictaminó su forma de muerte como homicidio. Agradecemos a la Oficina del M.E. por su completo informe y respetamos sus hallazgos.

Como parte de su proceso, la Unidad de Asuntos Internos del Aheriff inició una investigación en abril del año pasado. Los investigadores están investigando las circunstancias que rodearon la muerte del Sr. Rupard para determinar cualquier violación de la política y el procedimiento del departamento.

La Unidad de Homicidios del Alguacil también está investigando el incidente y presentará sus hallazgos a la Oficina del Fiscal de Distrito para su revisión. También proporcionaremos nuestros hallazgos a la Oficina del Fiscal Federal para que los revise la Unidad de Derechos Civiles con respecto a cualquier posible violación relacionada con la muerte del Sr. Rupard.

Desde este incidente, que ocurrió en marzo de 2022, se han implementado varios cambios y avances dentro de la Oficina de Servicios de Detención para ayudar a identificar cuándo una persona bajo custodia puede necesitar atención médica y de salud mental adicional. Estos cambios han ayudado al personal a reconocer cuándo una persona vulnerable no puede defenderse por sí misma y el personal debe intervenir en su nombre.

- Controles de Bienestar - estos controles están compuestos por un grupo multidisciplinario (MDG) que incluye personal juramentado, proveedores de salud mental, enfermeras, consejeros correccionales y ayudantes de clasificación. Este grupo realiza visitas individuales con las personas encarceladas consideradas más vulnerables. Los controles de bienestar brindan a los oficiales del Alguacil una oportunidad adicional para realizar inspecciones de higiene y permiten que el personal de mantenimiento aborde cualquier inquietud sobre la celda o la unidad de vivienda. Las condiciones de vida e higiene de un individuo pueden ser un indicador de que puede estar en crisis. Los médicos y enfermeros de salud mental evalúan a la persona en busca de problemas médicos o de salud mental y la derivan al proveedor de servicios adecuado para el seguimiento y la recuperación. Estos controles se realizan dos veces por semana en el Centro de Detención George Bailey y en la Cárcel Central de San Diego. Se llevan a cabo una vez por semana en el Centro de Detención y Reingreso de Las Colinas y en el Centro de Detención de Vista.

- Reuniones de Atención Colaborativa - cada semana, un grupo multidisciplinario de cada una de las instalaciones se reúne para hablar sobre las personas bajo custodia que pueden necesitar atención adicional y/o pueden estar en riesgo de sufrir daños. Los miembros del personal desarrollan un curso de acción adaptado a las necesidades del individuo. Estas personas pueden ser aquellas que reciben Controles de Bienestar cada semana o una persona encarcelada que puede estar comportándose de una manera que sea indicativa de una posible crisis de salud mental o necesidad médica.

- Compartir Información Crítica para la Continuidad de la Atención - es común que los psiquiatras forenses brinden servicios de salud mental o evaluaciones a personas encarceladas dentro de nuestras instalaciones. Para una mayor colaboración y continuidad de la atención, el Departamento del Alguacil ha requerido que el psiquiatra brinde una sesión informativa al Personal de Salud Mental del Alguacil antes de salir de la cárcel. Esto permite que el personal del Alguacil brinde la atención adecuada a una persona de inmediato, en lugar de esperar un informe escrito dentro de dos semanas. También estamos trabajando para agilizar el intercambio oportuno de información de salud mental y registros médicos del Departamento de Hospitales Estatales de California cuando transfieren personas bajo nuestra custodia.

- Tutela - establecimos un proceso para solicitar la tutela de una persona bajo nuestra custodia que no puede cuidar de sí misma. La tutela le permite a la corte ordenar decisiones médicas en nombre de una persona que se niega o no puede cuidar de sí misma.

En el Departamento del Alguacil del Condado de San Diego, estamos comprometidos con la seguridad de las personas confiadas a nuestro cuidado. Estamos resueltos en nuestros valores fundamentales a reconocer la dignidad y el valor de cada vida humana. Hemos instituido muchos cambios en el último año, así como también iniciado varias investigaciones para garantizar que se sigan las políticas y los procedimientos. Estas mejoras y la transparencia en la comunicación con el público mantienen nuestra cultura de responsabilidad. Nunca evitaremos exigirnos más a nosotros mismos por reformas más específicas que promuevan el bienestar de las personas bajo nuestra custodia.

*Return to full list >>*

**SUBSCRIBE**

Subscribe to receive updates.

Email

Email Address

SUBMIT

# County of San Diego

**OFFICE OF COUNTY COUNSEL**
**CLAIMS AND INVESTIGATION DIVISION**
**1600 PACIFIC HIGHWAY, ROOM 355, SAN DIEGO, CALIFORNIA 92101-2469**

March 17, 2023

Ronnie Newton George Rupard
c/o Gilleon Law Firm
1320 Columbia Street, Suite 200
San Diego, CA 92101

Re: Client/Claimant: Ronnie Newton George Rupard
County File Number: 230150A
Date of Incident: March 17, 2022

SUBJECT: **NOTICE OF GRANTING OF LATE CLAIM APPLICATION**

The subject application for leave to present a late claim has been received by the Claims Division for review and action, if any.

The underlying claim was not timely presented within the six months after the alleged claim arose. However, we have concluded that failure must be excused under the terms of California Government Section 911.6. Therefore, the application for leave to present the claim late is hereby granted this date.

Office of County Counsel
Claims and Investigation Division
(619) 531-4899

# Exhibit D

# County of San Diego

**GLENN N. WAGNER, D.O.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

**STEVEN C. CAMPMAN, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | 2022-01007 |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| [redacted] | Son | 3/18/2022 | |

| San Diego Medical Examiner<br>5570 Overland Avenue, Suite#101<br>San Diego, CA 92123-1206<br>(858) 694-2895 | Case Number<br>Investigator<br>Date of Death<br>Date Today | : 2022-01007<br>: Fernanda Sanchez<br>: 03/17/2022<br>: 02/08/2023 |
|---|---|---|

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, [redacted], and his ex-wife, [redacted]. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, [redacted] with whom he had a son named [redacted]. The decedent also had a son with [redacted] named [redacted]. He had a third child who was reported to have died in October 2018 [redacted] The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

Case 3:23-cv-01357-AGS-BLM Document 26-3-4 Filed 11/06/24 PageID.9051 Page 4 of 23

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CH EF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
  A. Anterior rib fractures.
  B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

<u>OPINION</u>: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, [redacted] The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated "I don't need a medic. Leave me alone, if you touch me, I'll kill you." For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating "I am fine, I don't want to talk to you." He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was "relatively clean, no flooding/gassing or smearing of feces." The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, [redacted]

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number “4950349.” The body is in a second inner white body pouch sealed with a second red tamper resistant seal number “4950993.” A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner’s identification bearing the decedent’s name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent’s name, date of birth, and medical record number “31943869” is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff’s Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent’s name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent’s name and booking number “21149433” is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.

4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

<u>SCARS</u>:

1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. BLUNT FORCE INJURY OF TORSO:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

### Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*
*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# Exhibit E

Case 3:23-cv-01357-CAB-BLM Document 26-3 Filed 01/03/24 PageID.2185 Page 2 of 26

# NOTARIZED DECLARATION OF JUSTINO NEWTON LOPEZ-RUPARD

I, Justino Newton Lopez-Rupard, declare as follows:

1. I am a plaintiff in the case, Case No: 23CV1357 CAB BLM. I am over the age of 18 and reside in San Diego County, California. I make the following declaration based on my personal knowledge. If called to testify to the matters set forth herein, I could and would competently testify to these matters based on my personal knowledge.

2. I am Lonnie Newton Rupard II's ("Lonnie") biological son. A true and correct copy of my birth certificate is attached as **Exhibit 1** to my declaration.

3. Lonnie Rupard has one other biological son, Ronnie Rupard.

4. Lonnie died in the city and county of San Diego on March 17, 2022. He was 46 years old. A true and correct copy of Lonnie's death certificate is attached as **Exhibit 2** to my declaration.

5. Lonnie did not leave behind any will. He did not leave any testamentary instrument or other written document designating any heir or beneficiary or making any donative transfer of property. As such, Lonnie died intestate.

6. On March 9, 2023, I submitted government claims on behalf of the Estate of Lonnie Rupard and myself as an individual. The claims were submitted against the County of San Diego and its employees pursuant to Cal. Gov. Code § 900.4.

7. On March 14, 2023, I resubmitted the claims, along with an application for leave to file a late claim pursuant to Cal. Gov. Code § 911.4.

8. This action was initially filed on July 26, 2023. When the lawsuit was commenced, no proceeding was pending in the State of California for the administration of Lonnie Rupard's estate. At the time this lawsuit was commenced, no probate proceeding was pending in any other state or country for the administration of Lonnie Rupard's estate.

9. At the time of his death, Lonnie Rupard was not married.

10. Because Lonnie Rupard is Ronnie Rupard's and my biological father, at the time of the filing of the complaint, we were the successors in interest (as defined in Section

377.11 of the California Code of Civil Procedure) to decedent Lonnie Rupard and succeeded to Lonnie's interests in the action or proceeding.

11. At the time of the filing of this lawsuit on July 26, 2023, no other person had a superior right to commence the action or proceeding or to be substituted for the decedent in the action.

12. When the first amended complaint was filed on November 21, 2023, no other person had a superior right to commence the action of proceeding or to be substituted for the decedent in the action.

13. On December 4, 2023 I filed a petition to open an Estate for my father Lonnie Rupard, seeking to be appointed as the administrator of the Estate. A true and correct copy of the petition is attached as **Exhibit 3**.

14. On February 21, 2024 I filed a nomination of Terri Lopez to serve as the administrator of the Estate. A true and correct copy of the nomination is attached as **Exhibit 4**.

15.Terri Lopez is my grandmother.

16. I nominated my grandmother Terri to serve as the administrator of the Estate, with her consent, because I felt that she was in the best position to competently serve in that capacity as the representative of Lonnie Rupard's estate.

17.This is in the best interest of the Estate because there are two beneficiaries to the Estate: my brother Ronnie Rupard and myself.

18.Ronnie has not been able to participate in litigation and has not filed any declarations supporting his capacity to serve as an administrator for the Estate.

19. At no point have I sought to abandon the survival claims I brought on behalf of the Estate as the appropriate successor in interest. I merely sought to have my grandmother serve in the capacity as the personal representative in pursuit of those claims.

20. At the time of filing the Second Amended Complaint on March 7, 2024, the probate proceeding had been opened, but the probate court had not formally appointed Terri Lopez as the administrator at that point.

21. On April 15, 2024 the probate court appointed Terri Lopez, with my consent, to serve as the administrator of the Estate. Letters of administration were subsequently issued on May 17, 2024. Attached as **Exhibit 5** is the minute order appointing Terri as administrator, and attached as **Exhibit 6** are the letters of administration.

22. My brother, Ronnie Rupard, did not object to the petition to appoint Terri Lopez to serve as the administrator of the Estate.

23. There is no conflict and no opposition to Terri Lopez pursuing the Estate claim as administrator of the Estate.

24. Until the release of the medical examiner's report in March 2023, I had no awareness that my father was being neglected while in prison.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and that this Declaration was executed this 6th day of September, 2024 at San Diego, California.

Justino Newton Lopez-Rupard

**CALIFORNIA ACKNOWLEDGMENT** **CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San Diego

On September 6, 2024 before me, Letty R. Macedo, Notary Public,
*Date* *Here Insert Name and Title of the Officer*

personally appeared Justino Newton Lopez-Rupard
*Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

LETTY R. MACEDO
Notary Public - California
San Diego County
Commission # 2371364
My Comm. Expires Sep 14, 2025

Signature ______________________
*Signature of Notary Public*

*Place Notary Seal and/or Stamp Above*

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: Notarized Declaration

Document Date: — Number of Pages: 3

Signer(s) Other Than Named Above: No other signers

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: ______________________
☐ Corporate Officer – Title(s): ______________
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ______________
Signer is Representing: ______________

Signer's Name: ______________________
☐ Corporate Officer – Title(s): ______________
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ______________
Signer is Representing: ______________

©2019 National Notary Association

Case 3:23-cv-01367-AGS-BLM Document 32-3 Filed 09/15/23 PageID.2910 Page 2 of 26

# Exhibit 1

STATE OF CALIFORNIA
CERTIFICATION OF VITAL RECORD

# COUNTY OF SAN DIEGO

## ASSESSOR/RECORDER/COUNTY CLERK

CERTIFICATE OF LIVE BIRTH
STATE OF CALIFORNIA
USE BLACK INK ONLY

STATE FILE NUMBER

LOCAL REGISTRATION DISTRICT AND CERTIFICATE NUMBER: 1 8 0 0 7 0 3 2 9 9 1

| | | | | |
|---|---|---|---|---|
| 0696 THIS CHILD | 1A. NAME OF CHILD — FIRST (GIVEN): JUSTINO | 1B. MIDDLE: NEWTON | 1C. LAST (FAMILY): LOPEZ-RUPARD | |
| | 2. SEX: MALE | 3A. THIS BIRTH, SINGLE, TWIN, ETC.: SINGLE | 3B. IF MULTIPLE, THIS CHILD 1ST, 2ND, ETC.: - | 4A. DATE OF BIRTH — MM/DD/CCYY: 09/23/1996 · 4B. HOUR — (24 HOUR CLOCK TIME): 1952 |
| PLACE OF BIRTH | 5A. PLACE OF BIRTH — NAME OF HOSPITAL OR FACILITY: SHARP CORONADO HOSPITAL | | 5B. STREET ADDRESS — STREET, NUMBER, OR LOCATION: 250 PROSPECT PLACE | |
| | 5C. CITY: CORONADO | | 5D. COUNTY: SAN DIEGO | 5E. PLANNED PLACE OF BIRTH: HOSPITAL |
| FATHER OF CHILD | 6A. NAME OF FATHER — FIRST (GIVEN): LONNIE | 6B. MIDDLE: NEWTON | 6C. LAST (FAMILY): RUPARD II | 7. STATE OF BIRTH: PI · 8. DATE OF BIRTH: 10/01/75 |
| MOTHER OF CHILD | 9A. NAME OF MOTHER — FIRST (GIVEN): JUSTINA | 9B. MIDDLE: MARIE | 9C. LAST (MAIDEN): LOPEZ | 10. STATE OF BIRTH: CA · 11. DATE OF BIRTH: 07/14/76 |
| PARENT'S CERTIFICATION | I CERTIFY THAT I HAVE REVIEWED THE STATED INFORMATION AND THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE. | 12A. PARENT OR OTHER INFORMANT — SIGNATURE: Justina Lopez | 12B. RELATIONSHIP TO CHILD: MOTHER | 12C. DATE SIGNED: 10/01/96 |
| CERTIFICATION OF BIRTH | I CERTIFY THAT THE CHILD WAS BORN ALIVE AT THE DATE, HOUR AND PLACE STATED. | 13A. ATTENDANT OR CERTIFIER — SIGNATURE — DEGREE OR TITLE: M Magone MD | 13B. LICENSE NUMBER: G69985 | 13C. DATE SIGNED: 10/04/96 |
| | 13D. TYPED NAME, TITLE AND MAILING ADDRESS OF ATTENDANT: M MAGONE MD, 1001 B AVE, STE 309, CORONADO, 92118 | | 14. TYPED NAME AND TITLE OF CERTIFIER IF OTHER THAN ATTENDANT | |
| LOCAL REGISTRAR | 15A. DATE OF DEATH | 15B. STATE FILE NO. (STATE USE ONLY) | 16. LOCAL REGISTRAR — SIGNATURE: [signature] | 17. DATE ACCEPTED FOR REGISTRATION: [illegible] / 1996 |

This is a true and exact reproduction of the document officially registered and placed on file in the office of the San Diego County Recorder/Clerk.

May 22, 2009

David Butler
Assessor/Recorder/County Clerk

This copy is not valid unless prepared on an engraved border displaying date, seal and signature of the Recorder/County Clerk

*002580432*

THE GREAT SEAL OF THE STATE OF CALIFORNIA EUREKA

ASSESSOR / RECORDER / COUNTY CLERK SAN DIEGO COUNTY, CA

MIDWEST BANK NOTE COMPANY

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

# Exhibit 2

STATE OF CALIFORNIA
CERTIFICATION OF VITAL RECORD

# COUNTY OF SAN DIEGO

## CERTIFICATE OF DEATH

STATE OF CALIFORNIA
USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS
VS 11 (REV 3/06)

STATE FILE NUMBER | LOCAL REGISTRATION NUMBER: 3202237006090

**DECEDENT'S PERSONAL DATA**

| Field | Entry |
|---|---|
| 1. NAME OF DECEDENT - FIRST (Given) | LONNIE |
| 2. MIDDLE | - |
| 3. LAST (Family) | RUPARD |
| AKA, ALSO KNOWN AS - Include full AKA (FIRST, MIDDLE, LAST) | LONNIE NEWTON RUPARD |
| 4. DATE OF BIRTH mm/dd/ccyy | 10/01/1975 |
| 5. AGE Yrs. | 46 |
| IF UNDER ONE YEAR (Months / Days) | |
| IF UNDER 24 HOURS (Hours / Minutes) | |
| 6. SEX | M |
| 9. BIRTH STATE/FOREIGN COUNTRY | PHILIPPINES |
| 10. SOCIAL SECURITY NUMBER | 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 |
| 11. EVER IN U.S. ARMED FORCES? | [ ] YES [X] NO [ ] UNK |
| 12. MARITAL STATUS/SRDP (at time of death) | DIVORCED |
| 7. DATE OF DEATH mm/dd/ccyy | 03/17/2022 |
| 8. HOUR (24 Hours) | 2351 |
| 13. EDUCATION – Highest Level/Degree (see worksheet on back) | HS GRADUATE |
| 14/15. WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? (If yes, see worksheet on back) | [ ] YES [X] NO |
| 16. DECEDENT'S RACE – Up to 3 races may be listed (see worksheet on back) | FILIPINO, AMERICAN, CAUCASIAN |
| 17. USUAL OCCUPATION – Type of work for most of life. DO NOT USE RETIRED | NEVER WORKED |
| 18. KIND OF BUSINESS OR INDUSTRY (e.g., grocery store, road construction, employment agency, etc.) | |
| 19. YEARS IN OCCUPATION | 0 |

**USUAL RESIDENCE**

| Field | Entry |
|---|---|
| 20. DECEDENT'S RESIDENCE (Street and number, or location) | 3814 POLO DRIVE |
| 21. CITY | BONITA |
| 22. COUNTY/PROVINCE | SAN DIEGO |
| 23. ZIP CODE | 91902 |
| 24. YEARS IN COUNTY | 46 |
| 25. STATE/FOREIGN COUNTRY | CA |

**INFORMANT**

| Field | Entry |
|---|---|
| 26. INFORMANT'S NAME, RELATIONSHIP | RONNIE NEWTON GEORGE RUPARD, POA |
| 27. INFORMANT'S MAILING ADDRESS (Street and number, or rural route number, city or town, state and zip) | 3814 POLO DRIVE, BONITA, CA 91902 |

**SPOUSE/SRDP AND PARENT INFORMATION**

| Field | Entry |
|---|---|
| 28. NAME OF SURVIVING SPOUSE/SRDP – FIRST | - |
| 29. MIDDLE | |
| 30. LAST (BIRTH NAME) | - |
| 31. NAME OF FATHER/PARENT – FIRST | GERRY |
| 32. MIDDLE | NEWTON |
| 33. LAST | RUPARD |
| 34. BIRTH STATE | NC |
| 35. NAME OF MOTHER/PARENT – FIRST | FLORINTINA |
| 36. MIDDLE | G. |
| 37. LAST (BIRTH NAME) | GRUSPE |
| 38. BIRTH STATE | PHILIPPINES |

**FUNERAL DIRECTOR/LOCAL REGISTRAR**

| Field | Entry |
|---|---|
| 39. DISPOSITION DATE mm/dd/ccyy | 03/29/2022 |
| 40. PLACE OF FINAL DISPOSITION | RES-FLORINTINA RUPARD LA PAZ SAN NARCISO, ZAMBALES 2205, -, PHILIPPINES |
| 41. TYPE OF DISPOSITION(S) | CREMATE/TRANSIT/RESIDENCE |
| 42. SIGNATURE OF EMBALMER | NOT EMBALMED |
| 43. LICENSE NUMBER | - |
| 44. NAME OF FUNERAL ESTABLISHMENT | FEATHERINGILL MORTUARY INC |
| 45. LICENSE NUMBER | FD1083 |
| 46. SIGNATURE OF LOCAL REGISTRAR | WILMA WOOTEN MD |
| 47. DATE mm/dd/ccyy | 03/24/2022 |

**PLACE OF DEATH**

| Field | Entry |
|---|---|
| 101. PLACE OF DEATH | UC SAN DIEGO HEALTH HILLCREST - HILLCREST MEDICAL CENTER |
| 102. IF HOSPITAL, SPECIFY ONE | [ ] IP [X] ER/OP [ ] DOA |
| 103. IF OTHER THAN HOSPITAL, SPECIFY ONE | [ ] Hospice [ ] Nursing Home/LTC [ ] Decedent's Home [ ] Other |
| 104. COUNTY | SAN DIEGO |
| 105. FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number, or location) | 200 W ARBOR DR |
| 106. CITY | SAN DIEGO |

**CAUSE OF DEATH**

107. CAUSE OF DEATH — Enter the chain of events -- diseases, injuries, or complications -- that directly caused death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE.

| | Cause | Time Interval Between Onset and Death |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) (A) | PENDING | (AT) - |
| Sequentially, list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST (B) | | (BT) |
| (C) | | (CT) |
| (D) | | (DT) |

| Field | Entry |
|---|---|
| 108. DEATH REPORTED TO CORONER? | [X] YES [ ] NO — Referral Number: 22-01007 |
| 109. BIOPSY PERFORMED? | [ ] YES [X] NO |
| 110. AUTOPSY PERFORMED? | [X] YES [ ] NO |
| 111. USED IN DETERMINING CAUSE? | [X] YES [ ] NO |
| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 | - |
| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (If yes, list type of operation and date.) | UNK |
| 113A. IF FEMALE, PREGNANT IN LAST YEAR? | [ ] YES [X] NO [ ] UNK |

**PHYSICIAN'S CERTIFICATION**

| Field | Entry |
|---|---|
| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. Decedent Attended Since (A) mm/dd/ccyy; Decedent Last Seen Alive (B) mm/dd/ccyy | |
| 115. SIGNATURE AND TITLE OF CERTIFIER | |
| 116. LICENSE NUMBER | |
| 117. DATE mm/dd/ccyy | |
| 118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | |

**CORONER'S USE ONLY**

| Field | Entry |
|---|---|
| 119. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. MANNER OF DEATH | [ ] Natural [ ] Accident [ ] Homicide [ ] Suicide [X] Pending Investigation [ ] Could not be Determined |
| 120. INJURED AT WORK? | [ ] YES [ ] NO [ ] UNK |
| 121. INJURY DATE mm/dd/ccyy | |
| 122. HOUR (24 Hours) | |
| 123. PLACE OF INJURY (e.g., home, construction site, wooded area, etc.) | |
| 124. DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) | |
| 125. LOCATION OF INJURY (Street and number, or location, and city, and zip) | |
| 126. SIGNATURE OF CORONER / DEPUTY CORONER | BETHANN SCHABER |
| 127. DATE mm/dd/ccyy | 03/21/2022 |
| 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER | BETHANN SCHABER, DME |

**STATE REGISTRAR**

| A | B | C | D | E | | FAX AUTH. # | CENSUS TRACT |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

County of San Diego –Health & Human Services Agency – 3851 Rosecrans Street. This is to certify that, if bearing the OFFICIAL SEAL OF THE STATE OF CALIFORNIA, the OFFICIAL SEAL OF SAN DIEGO COUNTY AND THEIR DEPARTMENT OF HEALTH SERVICES EMBOSSED SEAL, this is a true copy of the ORIGINAL DOCUMENT FILED. This copy not valid unless prepared on engraved border displaying seal and signature of Registrar

Wilma J. Wooten, M.D.

DATE ISSUED: 4/26/2022 WILMA J. WOOTEN, M.D., M.P.H.
REGISTRAR OF VITAL RECORDS
County of San Diego

A004055059

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

# Exhibit 3

DocuSign Envelope ID: 948F44F7-0B1C-4DA3-B96E-7017486B3B17

DE-111

ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: 110088
NAME: Susan Stricklin Wilson, CLS-ETP
FIRM NAME: Law Offices of Susan Stricklin Wilson
STREET ADDRESS: 416 Second Street
CITY: Encinitas STATE: CA ZIP CODE: 92024
TELEPHONE NO.: (760) 942-1278 FAX NO.: (760) 942-2483
E-MAIL ADDRESS: susan.wilson.esq@gmail.com
ATTORNEY FOR (*name*): Justino Rupard

FOR COURT USE ONLY

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego
**12/04/2023** at 03:55:33 PM
Clerk of the Superior Court
By Angelina Pena,Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 1100 Union Street
MAILING ADDRESS: 1100 Union Street
CITY AND ZIP CODE: San Diego, California 921101
BRANCH NAME: Central Courthouse

ESTATE OF (*name*): Lonnie Rupard a.k.a. Lonnie Newton Rupard II
DECEDENT

**ROA#1**

PETITION FOR
☐ Probate of ☐ Lost Will and for Letters Testamentary
☐ Probate of ☐ Lost Will and for Letters of Administration with Will Annexed
☒ Letters of Administration
☐ Letters of Special Administration ☐ with general powers
☒ Authorization to Administer Under the Independent Administration of Estates Act ☐ with limited authority

CASE NUMBER: 37-2023-00052316-PR-LA-CTL

HEARING DATE AND TIME: 03/06/2024 1:30PM DEPT.: 502

1. Publication will be in (*specify name of newspaper*): The Daily Transcript
   a. ☐ Publication requested.
   b. ☒ Publication to be arranged.
2. Petitioner (*name each*):
   Justino Rupard

   requests that
   a. ☐ decedent's will and codicils, if any, be admitted to probate.
   b. (*name*): Justino Rupard be appointed
      (1) ☐ executor
      (2) ☐ administrator with will annexed
      (3) ☒ administrator
      (4) ☐ special administrator ☐ with general powers

      and Letters issue upon qualification.
   c. ☒ full ☐ limited authority be granted to administer under the Independent Administration of Estates Act.
   d. (1) ☒ bond not be required for the reasons stated in item 3e.
      (2) ☐ $ bond be fixed. The bond will be furnished by an admitted surety insurer or as otherwise provided by law. (*Specify reasons in Attachment 2 if the amount is different from the maximum required by Prob. Code, § 8482.*)
      (3) ☐ $ in deposits in a blocked account be allowed. Receipts will be filed. (*Specify institution and location*):
3. a. Decedent died on (*date*): 3/17/2022 at (*place*): UC San Diego Health Hillcrest - Hillcrest Medical Center
      (1) ☒ a resident of the county named above.
      (2) ☐ a nonresident of California and left an estate in the county named above located at (*specify location permitting publication in the newspaper named in item 1*):
   b. ☐ Decedent was a citizen of a country other than the United States (*specify country*):
   c. Street address, city, and county of decedent's residence at time of death (*specify*):
      3814 Polo Drive, Bonita, County of San Diego, California 92024

DocuSign Envelope ID: 948F44F7-0B1C-4DA3-B96E-7017486B3B17

DE-111

| ESTATE OF *(name)*: Lonnie Rupard a.k.a. Lonnie Newton Rupard II DECEDENT | CASE NUMBER: |
|---|---|

3. d. Character and estimated value of the property of the estate *(complete in all cases)*:
   (1) Personal property: $0.00
   (2) Annual gross income from
      (a) real property: $ 0.00
      (b) personal property: $ 0.00
   (3) Subtotal *(add (1) and (2))*: $ Unknown at this time.
   (4) Gross fair market value of real property: $ 0.00
   (5) (Less) Encumbrances: ($ 0.00 )
   (6) Net value of real property: $ 0.00
   (7) Total *(add (3) and (6))*: $ Unknown at this time.

e. (1) ☐ Will waives bond. ☐ Special administrator is the named executor, and the will waives bond.
   (2) ☐ All beneficiaries are adults and have waived bond, and the will does not require a bond. *(Affix waiver as Attachment 3e(2).)*
   (3) ☐ All heirs at law are adults and have waived bond. *(Affix waiver as Attachment 3e(3).)*
   (4) ☐ Sole personal representative is a corporate fiduciary or an exempt government agency.

f. (1) ☒ Decedent died intestate.
   (2) ☐ Copy of decedent's will dated: ☐ codicil dated *(specify for each)*:
   are affixed as Attachment 3f(2). *(Include typed copies of handwritten documents and English translations of foreign-language documents.)*
   ☐ The will and all codicils are self-proving (Prob. Code, § 8220).
   (3) ☐ The original of the will and/or codicil identified above has been lost. *(Affix a copy of the lost will or codicil or a written statement of the testamentary words or their substance in Attachment 3f(3), and state reasons in that attachment why the presumption in Prob. Code, § 6124 does not apply.)*

g. Appointment of personal representative *(check all applicable boxes)*:
   (1) Appointment of executor or administrator with will annexed:
      (a) ☐ Proposed executor is named as executor in the will and consents to act.
      (b) ☐ No executor is named in the will.
      (c) ☐ Proposed personal representative is a nominee of a person entitled to Letters. *(Affix nomination as Attachment 3g(1)(c).)*
      (d) ☐ Other named executors will not act because of ☐ death ☐ declination
      ☐ other reasons *(specify)*:

      ☐ Continued in Attachment 3g(1)(d).
   (2) Appointment of administrator:
      (a) ☒ Petitioner is a person entitled to Letters. *(If necessary, explain priority in Attachment 3g(2)(a).)*
      (b) ☐ Petitioner is a nominee of a person entitled to Letters. *(Affix nomination as Attachment 3g(2)(b).)*
      (c) ☐ Petitioner is related to the decedent as *(specify)*:
   (3) ☐ Appointment of special administrator requested. *(Specify grounds and requested powers in Attachment 3g(3).)*
   (4) ☐ Proposed personal representative would be a successor personal representative.

h. Proposed personal representative is a
   (1) ☒ resident of California.
   (2) ☐ nonresident of California *(specify permanent address)*:

   (3) ☐ resident of the United States.
   (4) ☐ nonresident of the United States.

DocuSign Envelope ID: 948F44F7-0B1C-4DA3-B96E-7017486B3B17



| ESTATE OF *(name):* Lonnie Rupard a.k.a. Lonnie Newton Rupard II DECEDENT | CASE NUMBER: |
|---|---|

4. [ ] Decedent's will does not preclude administration of this estate under the Independent Administration of Estates Act.
5. a. Decedent was survived by *(check items (1) or (2), and (3) or (4), and (5) or (6), and (7) or (8))*
   (1) [ ] spouse.
   (2) [X] no spouse as follows:
      (a) [X] divorced or never married.
      (b) [ ] spouse deceased.
   (3) [ ] registered domestic partner.
   (4) [X] no registered domestic partner. *(See Fam. Code, § 297.5(c); Prob. Code, §§ 37(b), 6401(c), and 6402.)*
   (5) [X] child as follows:
      (a) [X] natural or adopted.
      (b) [ ] natural adopted by a third party.
   (6) [ ] no child.
   (7) [ ] issue of a predeceased child.
   (8) [X] no issue of a predeceased child.

   b. Decedent [ ] was [X] was not survived by a stepchild or foster child or children who would have been adopted by decedent but for a legal barrier. *(See Prob. Code, § 6454.)*

6. *(Complete if decedent was survived by (1) a spouse or registered domestic partner but no issue (only a or b apply), or (2) no spouse, registered domestic partner, or issue. (Check the first box that applies):*
   a. [ ] Decedent was survived by a parent or parents who are listed in item 8.
   b. [ ] Decedent was survived by issue of deceased parents, all of whom are listed in item 8.
   c. [ ] Decedent was survived by a grandparent or grandparents who are listed in item 8.
   d. [ ] Decedent was survived by issue of grandparents, all of whom are listed in item 8.
   e. [ ] Decedent was survived by issue of a predeceased spouse, all of whom are listed in item 8.
   f. [ ] Decedent was survived by next of kin, all of whom are listed in item 8.
   g. [ ] Decedent was survived by parents of a predeceased spouse or issue of those parents, if both are predeceased, all of whom are listed in item 8.
   h. [ ] Decedent was survived by no known next of kin.

7. *(Complete only if no spouse or issue survived decedent.)*
   a. [ ] Decedent had no predeceased spouse.
   b. [ ] Decedent had a predeceased spouse who
   (1) [ ] died not more than 15 years before decedent and who owned an interest in real property that passed to decedent,
   (2) [ ] died not more than five years before decedent and who owned personal property valued at $10,000 or more that passed to decedent, *(If you checked (1) or (2), check only the first box that applies):*
      (a) [ ] Decedent was survived by issue of a predeceased spouse, all of whom are listed in item 8.
      (b) [ ] Decedent was survived by a parent or parents of the predeceased spouse who are listed in item 8.
      (c) [ ] Decedent was survived by issue of a parent of the predeceased spouse, all of whom are listed in item 8.
      (d) [ ] Decedent was survived by next of kin of the decedent, all of whom are listed in item 8.
      (e) [ ] Decedent was survived by next of kin of the predeceased spouse, all of whom are listed in item 8.
   (3) [ ] neither (1) nor (2) apply.

8. Listed on the next page are the names, relationships to decedent, ages, and addresses, so far as known to or reasonably ascertainable by petitioner, of (1) all persons mentioned in decedent's will or any codicil, whether living or deceased; (2) all persons named or checked in items 2, 5, 6, and 7; and (3) all beneficiaries of a trust named in decedent's will or any codicil in which the trustee and personal representative are the same person.

DocuSign Envelope ID: 948F44F7-0B1C-4DA3-B96E-7017486B3B17

DE-111

| ESTATE OF *(name):* Lonnie Rupard a.k.a. Lonnie Newton Rupard II DECEDENT | CASE NUMBER: |
|---|---|

8. | Name and relationship to decedent | Age | Address |
|---|---|---|
| Justino Rupard<br>Son | Adult | 1430 Coker Way<br>El Cajon, California 92021 |
| Ronnie Rupard<br>Son | Adult | Ronnie Rupard, Booking No.: 23732428<br>San Diego Central Jail (SDCJ)<br>451 Riverview Parkway, Building "C" |

☐ Continued on Attachment 8.

9. Number of pages attached: 3

Date: 11/30/2023

Susan Strickin Wilson
(TYPE OR PRINT NAME OF ATTORNEY)

(SIGNATURE OF ATTORNEY) *

* (Signatures of all petitioners are also required. All petitioners must sign, but the petition may be verified by any one of them (Prob. Code, §§ 1020, 1021, Cal. Rules of Court, rule 7.103).)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 11/30/2023

Justino Rupard
(TYPE OR PRINT NAME OF PETITIONER)

DocuSigned by:
38705E35CA6F4F1...
(SIGNATURE OF PETITIONER)

(TYPE OR PRINT NAME OF PETITIONER)

(SIGNATURE OF PETITIONER)

Signatures of additional petitioners follow last attachment.

DocuSign Envelope ID: 948F44F7-0B1C-4DA3-B96E-7017486B3B17

## ESTATE OF LONNIE RUPARD a.k.a LONNIE NEWTON RUPARD II

### Attachment 3d

Petitioner has no knowledge of any liabilities, creditors or amounts of bills that might be due and owing by the decedent or his estate at this time.

DocuSign Envelope ID: 948F44F7-0B1C-4DA3-B96E-7017486B3B17

**Estate of LONNIE RUPARD a.k.a. LONNIE NEWTON RUPARD II**
**Petition for Probate, Attachment 3e**

Assets/Bond

The decedent owned no assets at the time of his death.

The decedent died under suspicious circumstances while in the custody at the San Diego Central Jail, San Diego County. After an initial investigation, a civil action is being filed in the Southern District of California. Justino Rupard, so of the decedent, and proposed administrator of the Decedent's estate, will be the plaintiff in this action.

An Administrator is required to represent the decedent's claims in the above federal civil rights case.

Any proceeds of settlement or judgment awarded upon the resolution of the civil rights case will constitute the assets to be administered within this estate.

Petitioner requests that until the resolution of the civil rights case, that no bond be required of the Administrator, unless other assets are marshaled, at which time, the administrator would seek an ex parte order from this Court requiring bond.

Case 3:23-cv-01357-CAB-JAC Doc 326-3 Filed 11/13/26 PgID.9101 Pg 438 of 468

DocuSign Envelope ID: 948F44F7-0B1C-4DA3-B96E-7017486B3B17

**Estate of LONNIE RUPARD a.k.a. LONNIE NEWTON RUPARD II**
**Petition for Probate, Attachment 3g(2)(a)**

Petitioner is the decedent's son. Petitioner was not married at the time of his death. Therefore, petitioner has priority for appointment as administrator, under Probate Code Section 8461(b) as the decedent's child.

Case 3:23-cv-01357-CAB-BLM Doc 126-35 Filed 09/13/24 PageID.9128 Page 19 of 26

# Exhibit 4

DocuSign Envelope ID: 86543E7B-1490-4EF3-832F-B19FA11847FB

**SUSAN STRICKLIN WILSON**
*CLS - ETP* / State Bar No. 110088
416 Second Street
Encinitas, California 92024
Telephone: (760) 942-1278
Facsimile: (760) 942-2483
Email: susan.wilson.esq@gmail.com

Attorney for: Justino Rupard

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
02/22/2024

Clerk of the Superior Court
By E. SDCourt ,Deputy Clerk

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SAN DIEGO

In the Matter of the Estate of

LONNIE RUPARD a.k.a. LONNIE NEWTON RUPARD II,

Deceased.

Case No. 37-2023-00052316-PR-LA-CTL

**NOMINATION JUSTINO RUPARD OF TERRI B. LOPEZ TO SERVE AS ADMINISTRATOR OF THE ESTATE OF LONNIE RUPARD a.k.a. LONNIE NEWTON RUPARD II**

I, JUSTINO RUPARD, son of LONNIE RUPARD a.k.a. LONNIE NEWTON RUPARD II, deceased, hereby nominate TERRI B. LOPEZ to serve as Administrator of the Estate of LONNIE RUPARD a.k.a. LONNIE NEWTON RUPARD II.

Date:2/21/2024

DocuSigned by:
39705E35CA6F4F1...
JUSTINO RUPARD

Case 3:23-cv-01357-JO-BLM    Document 28-35    Filed 10/16/24    PageID.2200    Page 441 of 468

**Susan Stricklin Wilson**
State Bar No. 110088, CLS-ETP
416 Second Street
Encinitas, California 92024
Telephone: (760) 942-1278
Facsimile: (760) 942-2483
Email: susan@susanswilson.com

Attorney for: Rupard Justino

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
2/22/2024 2:38:08 PM

Clerk of the Superior Court
By C. Morales ,Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF SAN DIEGO**

In the Estate of

Lonnie Rupard

a.k.a. Lonnie Newton Rupard II,

Deceased.

Case No. 37-2023-00052316-PR-LA-CTL

**PROOF OF SERVICE BY MAIL**

Date: March 6, 2024
Time: 1:30 p.m.
Dept.: 502
Judge: John B. Scherling

I, Spasena Johnson, declare that I am, and was at the time of service of the papers herein referred to, over the age of eighteen years, and not a party to the action. I am employed in the County of San Diego, California, in which county the service occurred. My business address is 416 Second Street, Encinitas, California. My electronic mail address is sena @susanswilson.com. I served the following document(s):

**NOTICE OF CASE ASSIGNMENT [ROA NO. 3]**

**FIRST SUPPLEMENT TO PETITION FOR LETTERS OF ADMINISTRATION [ROA NO. 9]**

**NOMINATION BY JUSTINO RUPARD OF TERRI B. LOPEZ TO SERVE AS ADMINISTRATOR OF THE ESTATE OF LONNIE RUPARD A.K.A. LONNIE NEWTON RUPARD II**

**CONSENT TO ACT AS ADMINISTRATOR ESTATE**

by placing a true and correct copy of the foregoing document in a sealed envelope for collection and mailing at Encinitas, California, on February 22, 2024, following our ordinary business practices with postage fully prepaid to the following addresses:

| | |
|---|---|
| Justino Rupard<br>1430 Coker Way<br>El Cajon, California 92021 | Ronnie Rupard, Booking No.: 2373248<br>San Diego Central Jail (SDCJ)<br>451 Riverview Parkway, Building “C”<br>Santee, California 92071 |
| Jeremiah Lowe<br>Victoria Lazar<br>Lowe Lazar Law, LLP<br>402 West Broadway, Suite 1720<br>San Diego, California 92101 | Terri Lopez<br>1430 Coker Way<br>El Cajon, California 92021 |

I am readily family with this business’s practices for collecting and processing correspondence for mailing. On the same that correspondence is place for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this document is executed by the undersigned on February 22, 2024, at Encinitas, California.

Spasena Johnson

DocuSign Envelope ID: CC8DF327-8EFC-4E69-90FA-01E5ADA02458

***SUSAN STRICKLIN WILSON***
Attorney at Law
CLS - PET / State Bar No. 110088
416 Second Street
Encinitas, California 92024
Telephone: (760) 942-1278
Facsimile: (760) 942-2483
Email: susan.wilson.esq@gmail.com

Attorney for: Justino Rupard

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
2/22/2024 2:38:08 PM
Clerk of the Superior Court
By C. Morales ,Deputy Clerk

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SAN DIEGO**

In the Matter of the Estate of

LONNIE RUPARD a.k.a. LONNIE NEWTON RUPARD II,

Deceased.

Case No. 37-2023-00052316-PR-LA-CTL

**CONSENT TO ACT AS ADMINISTRATOR OF ESTATE**

I, TERRI B. LOPEZ, hereby consent to act as administrator of the estate of LONNIE RUPARD a.k.a. LONNIE NEWTON RUPARD II, the deceased.

Dated: 2/21/2024

DocuSigned by:
Terri Lopez
327A000B5CBF442...
TERRI B. LOPEZ

# Exhibit 5

DE-140

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address)*: | TELEPHONE AND FAX NOS.: | *FOR COURT USE ONLY* |
|---|---|---|
| Susan Stricklin Wilson CLS-ETP SBN: 110088<br>Law Offices of Susan Stricklin Wilson<br>416 Second Street<br>Encinitas, California 92024<br>ATTORNEY FOR *(Name)*: Justino Rupard | 760-942-1278<br>760-942-2483 | ELECTRONICALLY FILED<br>Superior Court of California,<br>County of San Diego<br>5/17/2024 11:32:15 AM<br>Clerk of the Superior Court<br>By D. Silva Gomez ,Deputy Clerk |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO<br>STREET ADDRESS: 1100 Union Street<br>MAILING ADDRESS: 1100 Union Street<br>CITY AND ZIP CODE: San Diego 92101<br>BRANCH NAME: Central Courthouse | | |
| ESTATE OF *(Name)*:<br>Lonnie Rupard a.k.a. Lonnie Newton Rupard II<br>DECEDENT | | |
| **ORDER FOR PROBATE**<br>**ORDER APPOINTING** ☐ **Executor** ☐ **Administrator with Will Annexed** ☑ **Administrator** ☐ **Special Administrator**<br>☐ **Order Authorizing Independent Administration of Estate** ☐ **with full authority** ☐ **with limited authority** | | CASE NUMBER:<br>37-2023-00052316-PR-LA-CTL |

**WARNING: THIS APPOINTMENT IS NOT EFFECTIVE UNTIL LETTERS HAVE ISSUED.**

1. Date of hearing: April 15, 2024 Time: 10:30 A.M. Dept./Room: 502 Judge: John B. Scherling

**THE COURT FINDS**

2. a. All notices required by law have been given.
   b. Decedent died on *(date)*: March 17, 2022
      (1) ☑ a resident of the California county named above.
      (2) ☐ a nonresident of California and left an estate in the county named above.
   c. Decedent died
      (1) ☑ intestate
      (2) ☐ testate
      and decedent's will dated: and each codicil dated:
      was admitted to probate by Minute Order on *(date)*:

**THE COURT ORDERS**

3. *(Name)*: Terri B. Lopez
   is appointed **personal representative:**
   a. ☐ executor of the decedent's will
   b. ☐ administrator with will annexed
   c. ☑ administrator
   d. ☐ special administrator
      (1) ☐ with general powers
      (2) ☐ with special powers as specified in Attachment 3d(2)
      (3) ☐ without notice of hearing
      (4) ☐ letters will expire on *(date)*:

   and letters shall issue on qualification.

4. a. ☑ **Full authority** is granted to administer the estate under the Independent Administration of Estates Act.
   b. ☐ **Limited authority** is granted to administer the estate under the Independent Administration of Estates Act (there is no authority, without court supervision, to (1) sell or exchange real property or (2) grant an option to purchase real property or (3) borrow money with the loan secured by an encumbrance upon real property).
5. a. ☐ Bond is not required.
   b. ☑ Bond is fixed at: $ 0.00 to be furnished by an authorized surety company or as otherwise provided by law.
   c. ☐ Deposits of: $ are ordered to be placed in a blocked account at *(specify institution and location)*:
      and receipts shall be filed. No withdrawals shall be made without a court order. ☐ Additional orders in Attachment 5c.
   d. ☐ The personal representative is not authorized to take possession of money or any other property without a specific court order.
6. ☒ *(Name)*: McNitt, Roger L.
   1085 Arcadia Road
   Encinitas, CA 92024
   Phone: (858) 454-3531
   is appointed probate referee.

Date: 5/17/2024

John B. Scherling
J. Scherling
JUDGE OF THE SUPERIOR COURT

7. Number of pages attached: _____ ☐ SIGNATURE FOLLOWS LAST ATTACHMENT

# Exhibit 6

DocuSign Envelope ID: CC8DF327-8EFC-4E69-90FA-01E5ADA02458

DE-150

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address)*: | TELEPHONE AND FAX NOS.: | *FOR COURT USE ONLY* |
|---|---|---|
| Susan Stricklin Wilson, CLS ETP SBN: 110088<br>Law Offices of Susan Stricklin Wilson<br>416 Second Street<br>Encinitas, California 92024<br>ATTORNEY FOR *(Name)*: Justino Rupard | 760-942-1278<br>760-942-2483 | ELECTRONICALLY FILED<br>Superior Court of California,<br>County of San Diego<br>5/17/2024 11:32:15 AM<br>Clerk of the Superior Court<br>By D. Silva Gomez ,Deputy Clerk |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO<br>STREET ADDRESS: 1100 Union Street<br>MAILING ADDRESS: 1100 Union Street<br>CITY AND ZIP CODE: San Diego 92101<br>BRANCH NAME: Central Courthouse | | |
| ESTATE OF *(Name)*:<br>Lonnie Rupard a.k.a. Lonnie Newton Rupard II<br>DECEDENT | | |
| LETTERS<br>☐ TESTAMENTARY ☑ OF ADMINISTRATION<br>☐ OF ADMINISTRATION WITH WILL ANNEXED ☐ SPECIAL ADMINISTRATION | | CASE NUMBER:<br>37-2023-00052316-PR-LA-CTL |

## LETTERS

1. ☐ The last will of the decedent named above having been proved, the court appoints *(name)*:
   a. ☐ executor.
   b. ☐ administrator with will annexed.
2. ☑ The court appoints *(name)*:
   Terri B. Lopez
   a. ☑ administrator of the decedent's estate.
   b. ☐ special administrator of decedent's estate
      (1) ☐ with the special powers specified in the *Order for Probate*.
      (2) ☐ with the powers of a general administrator.
      (3) ☐ letters will expire on *(date)*:
3. ☑ The personal representative is authorized to administer the estate under the Independent Administration of Estates Act ☑ **with full authority**
   ☐ **with limited authority** (no authority, without court supervision, to (1) sell or exchange real property or (2) grant an option to purchase real property or (3) borrow money with the loan secured by an encumbrance upon real property).
4. ☐ The personal representative is not authorized to take possession of money or any other property without a specific court order.

WITNESS, clerk of the court, with seal of the court affixed.

(SEAL)

Superior Court of California County of San Diego

Date: 5/17/2024

Clerk, by [signature]

D. Silva Gomez
(DEPUTY)

## AFFIRMATION

1. ☐ PUBLIC ADMINISTRATOR: No affirmation required (Prob. Code, § 7621(c)).
2. ☑ INDIVIDUAL: I **solemnly affirm** that I will perform the duties of personal representative according to law.
3. ☐ INSTITUTIONAL FIDUCIARY *(name)*:

   I **solemnly affirm** that the institution will perform the duties of personal representative according to law. I make this affirmation for myself as an individual and on behalf of the institution as an officer.
   *(Name and title)*:

Letters Expire:
10/15/2025

4. Executed on *(date)*: 2/21/2024
   at *(place)*: San Diego, California.

DocuSigned by:
Terri Lopez
227A099B5CBF442...
(SIGNATURE)

## CERTIFICATION

I certify that this document is a correct copy of the original on file in my office and the letters issued the personal representative appointed above have not been revoked, annulled, or set aside, and are still in full force and effect.

(SEAL)

Date:

Clerk, by

(DEPUTY)

# Exhibit F

# NOTARIZED DECLARATION OF TERRI LOPEZ

I, TERRI LOPEZ, declare as follows:

1. I am over the age of 18 and reside in San Diego County, California. I make the following declaration based on my personal knowledge. If called to testify to the matters set forth herein, I could and would competently testify to these matters based on my personal knowledge.

2. I am Justino Rupard's biological grandmother.

3. Justino Rupard resides with me.

4. Justino Rupard requested that I serve in the capacity as the personal representative of the Estate of Lonnie Rupard for the benefit of Justino and his brother, Ronnie.

5. Justino and Ronnie, as the biological children, and heirs of Lonnie Rupard, will be the beneficiaries of any recovery on behalf of the Estate in this legal matter. I agreed to be appointed as the administrator of the Estate for the purpose of competently pursuing the Estate claims for their benefit as beneficiaries of the Estate.

6. On April 15, 2024 the probate court appointed me, with Justino's consent, to serve as the administrator of the Estate. Letters of administration were subsequently issued on May 17, 2024. Attached as **Exhibit 1** is the minute order appointing me as administrator, and attached as **Exhibit 2** are the letters of administration.

7. Ronnie Rupard, who was properly served with the probate paperwork, did not object to the petition to my appointment to serve as the administrator of the Estate. He has also verbally confirmed to me that he has no objection to my serving in the capacity as administrator of the Estate.

8. There is no conflict and no opposition to my pursuing the Estate claims as the appointed personal representative of the Estate.

9. My only role in this lawsuit is as the court appointed administrator for the Estate. The claims brought by the Estate accrued to Lonnie Rupard and survive his death. I do not bring any separate or distinct claims for injuries suffered by myself as an individual

related to the death of Lonnie Rupard. I am merely the court appointed administrator competently pursuing the claims on behalf of the Estate. The Estate's claims remain the same as at the time of the filing of the initial complaint in this action, including being based upon the same facts, the same injury, and the same instrumentality as alleged in the initial complaint. My representing the Estate does not give rise to a wholly distinct and different legal obligation against the Defendants than had already been stated in the initial complaint.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and that this Declaration was executed this 6th day of September, 2024 at San Diego, California.

Terri B. Lopez

Terri Lopez

LOWE LAZAR LAW, LLP

**CALIFORNIA ACKNOWLEDGMENT** **CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California }
County of San Diego }

On 9/6/24 (*Date*) before me, Mary Fernandez, Notary Public, (*Here Insert Name and Title of the Officer*)

personally appeared Terri Lopez (*Name(s) of Signer(s)*)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

MARY FERNANDEZ
Notary Public - California
San Diego County
Commission # 2484723
My Comm. Expires Mar 19, 2028

*Place Notary Seal and/or Stamp Above*

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature] *Signature of Notary Public*

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: Notarized Declaration of Terri Lopez

Document Date: 9/6/24 Number of Pages: 2

Signer(s) Other Than Named Above: ______

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: ______
☐ Corporate Officer – Title(s): ______
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ______
Signer is Representing: ______

Signer's Name: ______
☐ Corporate Officer – Title(s): ______
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ______
Signer is Representing: ______

©2019 National Notary Association

# Exhibit 1

**DE-140**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address)*:
Susan Stricklin Wilson CLS-ETP SBN: 110088
Law Offices of Susan Stricklin Wilson
416 Second Street
Encinitas, California 92024
ATTORNEY FOR *(Name)*: Justino Rupard

TELEPHONE AND FAX NOS.: 760-942-1278 / 760-942-2483

*FOR COURT USE ONLY*

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
5/17/2024 11:32:15 AM
Clerk of the Superior Court
By D. Silva Gomez ,Deputy Clerk

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SAN DIEGO
STREET ADDRESS: 1100 Union Street
MAILING ADDRESS: 1100 Union Street
CITY AND ZIP CODE: San Diego 92101
BRANCH NAME: Central Courthouse

ESTATE OF *(Name)*:
Lonnie Rupard a.k.a. Lonnie Newton Rupard II
DECEDENT

**ORDER FOR PROBATE**

**ORDER APPOINTING**
☐ **Executor**
☐ **Administrator with Will Annexed**
☑ **Administrator** ☐ **Special Administrator**
☐ **Order Authorizing Independent Administration of Estate**
☐ **with full authority** ☐ **with limited authority**

CASE NUMBER: 37-2023-00052316-PR-LA-CTL

**WARNING: THIS APPOINTMENT IS NOT EFFECTIVE UNTIL LETTERS HAVE ISSUED.**

1. Date of hearing: April 15, 2024 Time: 10:30 A.M. Dept./Room: 502 Judge: John B. Scherling

**THE COURT FINDS**

2. a. All notices required by law have been given.
   b. Decedent died on *(date)*: March 17, 2022
      (1) ☑ a resident of the California county named above.
      (2) ☐ a nonresident of California and left an estate in the county named above.
   c. Decedent died
      (1) ☑ intestate
      (2) ☐ testate
      and decedent's will dated: and each codicil dated:
      was admitted to probate by Minute Order on *(date)*:

**THE COURT ORDERS**

3. *(Name)*: Terri B. Lopez
   is appointed **personal representative:**
   a. ☐ executor of the decedent's will
   b. ☐ administrator with will annexed
   c. ☑ administrator
   d. ☐ special administrator
      (1) ☐ with general powers
      (2) ☐ with special powers as specified in Attachment 3d(2)
      (3) ☐ without notice of hearing
      (4) ☐ letters will expire on *(date)*:

   and letters shall issue on qualification.

4. a. ☑ **Full authority** is granted to administer the estate under the Independent Administration of Estates Act.
   b. ☐ **Limited authority** is granted to administer the estate under the Independent Administration of Estates Act (there is no authority, without court supervision, to (1) sell or exchange real property or (2) grant an option to purchase real property or (3) borrow money with the loan secured by an encumbrance upon real property).
5. a. ☐ Bond is not required.
   b. ☑ Bond is fixed at: $ 0.00 to be furnished by an authorized surety company or as otherwise provided by law.
   c. ☐ Deposits of: $ are ordered to be placed in a blocked account at *(specify institution and location)*:
      and receipts shall be filed. No withdrawals shall be made without a court order. ☐ Additional orders in Attachment 5c.
   d. ☐ The personal representative is not authorized to take possession of money or any other property without a specific court order.
6. ☒ *(Name)*: McNitt, Roger L.
   1085 Arcadia Road
   Encinitas, CA 92024
   Phone: (858) 454-3531
   is appointed probate referee.

Date: 5/17/2024

J. Scherling
JUDGE OF THE SUPERIOR COURT

7. Number of pages attached: ____ ☐ SIGNATURE FOLLOWS LAST ATTACHMENT


American LegalNet, Inc.
www.USCourtForms.com

# Exhibit 2

DocuSign Envelope ID: CC8DF327-8EFC-4E69-90FA-01E5ADA02458

DE-150

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address)*:
Susan Stricklin Wilson, CLS ETP SBN: 110088
Law Offices of Susan Stricklin Wilson
416 Second Street
Encinitas, California 92024
TELEPHONE AND FAX NOS.: 760-942-1278 / 760-942-2483
ATTORNEY FOR *(Name)*: Justino Rupard

*FOR COURT USE ONLY*

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
5/17/2024 11:32:15 AM
Clerk of the Superior Court
By D. Silva Gomez ,Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
STREET ADDRESS: 1100 Union Street
MAILING ADDRESS: 1100 Union Street
CITY AND ZIP CODE: San Diego 92101
BRANCH NAME: Central Courthouse

ESTATE OF *(Name)*:
Lonnie Rupard a.k.a. Lonnie Newton Rupard II
DECEDENT

LETTERS
☐ TESTAMENTARY ☑ OF ADMINISTRATION
☐ OF ADMINISTRATION WITH WILL ANNEXED ☐ SPECIAL ADMINISTRATION

CASE NUMBER: 37-2023-00052316-PR-LA-CTL

## LETTERS

1. ☐ The last will of the decedent named above having been proved, the court appoints *(name)*:
   a. ☐ executor.
   b. ☐ administrator with will annexed.
2. ☑ The court appoints *(name)*:
   Terri B. Lopez
   a. ☑ administrator of the decedent's estate.
   b. ☐ special administrator of decedent's estate
      (1) ☐ with the special powers specified in the *Order for Probate*.
      (2) ☐ with the powers of a general administrator.
      (3) ☐ letters will expire on *(date)*:
3. ☑ The personal representative is authorized to administer the estate under the Independent Administration of Estates Act ☑ **with full authority**
   ☐ **with limited authority** (no authority, without court supervision, to (1) sell or exchange real property or (2) grant an option to purchase real property or (3) borrow money with the loan secured by an encumbrance upon real property).
4. ☐ The personal representative is not authorized to take possession of money or any other property without a specific court order.

WITNESS, clerk of the court, with seal of the court affixed.

(SEAL)




Date: 5/17/2024
Clerk, by D. Silva Gomez
(DEPUTY)

## AFFIRMATION

1. ☐ PUBLIC ADMINISTRATOR: No affirmation required (Prob. Code, § 7621(c)).
2. ☑ INDIVIDUAL: I **solemnly affirm** that I will perform the duties of personal representative according to law.
3. ☐ INSTITUTIONAL FIDUCIARY *(name)*:

   I **solemnly affirm** that the institution will perform the duties of personal representative according to law.
   I make this affirmation for myself as an individual and on behalf of the institution as an officer.
   *(Name and title)*:

Letters Expire:
10/15/2025

4. Executed on *(date)*: 2/21/2024
   at *(place)*: San Diego , California.

DocuSigned by:
Terri Lopez
227A099B5CBF442...
(SIGNATURE)

## CERTIFICATION

I certify that this document is a correct copy of the original on file in my office and the letters issued the personal representative appointed above have not been revoked, annulled, or set aside, and are still in full force and effect.

(SEAL)

Date:
Clerk, by
(DEPUTY)

# Exhibit G

EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

Jeremiah A. Lowe (CA SBN 239166)
jeremiah@lowelazarlaw.com
Victoria J. Lazar (CA SBN 298668)
victoria@lowelazarlaw.com
Lowe Lazar Law, LLP
402 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 878-2725
Facsimile: (619) 878-2737

**Attorneys for Plaintiffs**
**JUSTINO RUPARD and the ESTATE OF LONNIE RUPARD**

Daniel M. Gilleon (CA SBN 195200)
dan@gilleon.com
The Gilleon Law Firm
1320 Columbia St., Suite 200
San Diego, CA 92101
Telephone: (619) 702-8623
Facsimile: (619) 702-6337

**Attorneys for Plaintiff**
**RONNIE RUPARD**

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD, THROUGH ITS COURT-APPOINTED ADMINISTRATOR TERRI LOPEZ; JUSTINO RUPARD INDIVIDUALLY; AND RONNIE RUPARD INDIVIDUALLY,

Plaintiffs,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVDIUAL CAPACITY; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE OF CALIFORNIA, INC; CHRISTINA ANOSIKE, IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; AGUILERA, M., VILADIU, J. MARTINEZ, G., AMADO, J., MACE, T., AGUIRRE, E., JAMES, T., ROMERO, B., JOHNSON, M.,

Case No: 23CV1357 CAB BLM

**DECLARATION OF COUNSEL ISO PLAINTIFFS' THIRD AMENDED COMPLAINT**

TORRES, A., TREYVONNE, J., , WERESKI, A., ROMANS, B., GUTIERREZ, L. IN THEIR INDIVIDUAL CAPACITIES, DEFENDANT DEPUTIES DOES 15-20, DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10.

Defendants,

---

COMES NOW undersigned counsel, Jeremiah A. Lowe, and hereby declares under penalty of perjury as follows:

1. I am counsel for Plaintiffs Justino Rupard and The Estate of Lonnie Rupard in the above-captioned matter.
2. Attached as <u>Exhibit 1</u> is a true and correct copy of Justino Rupard's declaration of standing that was filed in this case on November 21, 2023.

I declare the foregoing to be true and correct under penalty of perjury.

Dated: September 6, 2024

**LOWE LAZAR LAW, LLP**

By: *Jeremiah Lowe*

Jeremiah A. Lowe, Esq.

# Exhibit 1

EXHIBIT A

## NOTARIZED DECLARATION OF JUSTINO NEWTON LOPEZ-RUPARD

I, Justino Newton Lopez-Rupard, declare as follows:

1. I am a plaintiff in the case, Case No: 23CV1357 CAB BLM. I am over the age of 18 and reside in San Diego County, California. I make the following declaration based on my personal knowledge. If called to testify to the matters set forth herein, I could and would competently testify to these matters based on my personal knowledge.

2. I am Lonnie Newton Rupard II's ("Lonnie") biological son. A true and correct copy of my birth certificate is attached as Exhibit 1 to my declaration.

3. Lonnie died in the city and county of San Diego on March 17, 2022. He was 46 years old. A true and correct copy of Lonnie's death certificate is attached as Exhibit 2 to my declaration.

4. Lonnie did not leave behind any will. He did not leave any testamentary instrument or other written document designating any heir or beneficiary or making any donative transfer of property. Lonnie died intestate.

5. There are no probate proceedings pending at this time. However, I intend to file a Petition for Appointment as Administrator of the Estate of Lonnie Rupard.

6. Because Lonnie is my biological father, I am a successor in interest (as defined in Section 377.11 of the California Code of Civil Procedure) to decedent Lonnie and succeed to Lonnie's interest in the action or proceeding.

7. No other person has a superior right to commence the action or proceeding or to be substituted for the decedent in the pending action or proceeding.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and that this Declaration was executed this 15th day of November, 2023 at San Diego, California.

[signature]

Justino Newton Lopez-Rupard

**CALIFORNIA JURAT** **GOVERNMENT CODE § 8202**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San Diego

Subscribed and sworn to (or affirmed) before me on this 15 (*Date*) day of November (*Month*), 20 23 (*Year*); by

(1) Justino Newton Lopez-Rupard

(and (2) ____________________),
*Name(s) of Signer(s)*

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

LETTY R. MACEDO
Notary Public - California
San Diego County
Commission # 2371364
My Comm. Expires Sep 14, 2025

*Place Notary Seal and/or Stamp Above*

Signature ____________________
*Signature of Notary Public*

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: Notarized Declaration

Document Date: November 15, 2023 Number of Pages: 1

Signer(s) Other Than Named Above: No other Signers

©2019 National Notary Association

# EXHIBIT 1

STATE OF CALIFORNIA
CERTIFICATION OF VITAL RECORD

# COUNTY OF SAN DIEGO

## ASSESSOR/RECORDER/COUNTY CLERK

CERTIFICATE OF LIVE BIRTH
STATE OF CALIFORNIA
USE BLACK INK ONLY

| STATE FILE NUMBER | | LOCAL REGISTRATION DISTRICT AND CERTIFICATE NUMBER |
|---|---|---|
| | | 1[illegible]7032661 |

| | | | | |
|---|---|---|---|---|
| 0696 THIS CHILD | 1A. NAME OF CHILD — FIRST (GIVEN): JUSTINO | 1B. MIDDLE: NEWTON | 1C. LAST (FAMILY): LOPEZ-RUPARD | |
| | 2. SEX: MALE | 3A. THIS BIRTH, SINGLE, TWIN, ETC.: SINGLE | 3B. IF MULTIPLE, THIS CHILD 1ST, 2ND, ETC.: - | 4A. DATE OF BIRTH — MM/DD/CCYY: 09/23/1996 / 4B. HOUR — (24 HOUR CLOCK TIME): 1952 |
| PLACE OF BIRTH | 5A. PLACE OF BIRTH — NAME OF HOSPITAL OR FACILITY: SHARP CORONADO HOSPITAL | | 5B. STREET ADDRESS — STREET, NUMBER, OR LOCATION: 2[illegible]0 PROSPECT PLACE | |
| | 5C. CITY: CORONADO | | 5D. COUNTY: SAN DIEGO | 5E. PLANNED PLACE OF BIRTH: HOSPITAL |
| FATHER OF CHILD | 6A. NAME OF FATHER — FIRST (GIVEN): LONNIE | 6B. MIDDLE: NEWTON | 6C. LAST (FAMILY): [illegible]PARD II | 7. STATE OF BIRTH: [illegible] / 8. DATE OF BIRTH: 10/01/75 |
| MOTHER OF CHILD | 9A. NAME OF MOTHER — FIRST (GIVEN): JUSTINA | 9B. MIDDLE: MARIE | 9C. LAST (MAIDEN): [illegible]PEZ | 10. STATE OF BIRTH: CA / 11. DATE OF BIRTH: 07/14/76 |
| PARENT'S CERTIFICATION | I CERTIFY THAT I HAVE REVIEWED THE STATED INFORMATION AND THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE. | 12A. PARENT OR OTHER INFORMANT — SIGNATURE: Justina Lopez | 12B. RELATIONSHIP TO CHILD: MOTHER | 12C. DATE SIGNED: 10/01/96 |
| CERTIFICATION OF BIRTH | I CERTIFY THAT THE CHILD WAS BORN ALIVE AT THE DATE, HOUR AND PLACE STATED | 13A. ATTENDANT OR CERTIFIER — SIGNATURE — DEGREE OR TITLE: M Magone MD | 13B. LICENSE NUMBER: G69985 | 13C. DATE SIGNED: 10/04/96 |
| | 13D. TYPED NAME, TITLE AND MAILING ADDRESS OF ATTENDANT: M MAGONE MD, 1001 B AVE, STE 309, CORONADO, 92118 | | 14. TYPED NAME AND TITLE OF CERTIFIER IF OTHER THAN ATTENDANT | |
| LOCAL REGISTRAR | 15A. DATE OF DEATH | 15B. STATE FILE NO. (STATE USE ONLY) | 16. LOCAL REGISTRAR — SIGNATURE: [signature] | 17. DATE ACCEPTED FOR REGISTRATION: [illegible] / 1996 |

This is a true and exact reproduction of the document officially registered and placed on file in the office of the San Diego County Recorder/Clerk.

May 22, 2009

[signature]
David Butler
Assessor/Recorder/County Clerk

This copy is not valid unless prepared on an engraved border displaying date, seal and signature of the Recorder/County Clerk

*002580432*

THE GREAT SEAL OF THE STATE OF CALIFORNIA — EUREKA

ASSESSOR / RECORDER / COUNTY CLERK — SAN DIEGO COUNTY, CA

MIDWEST BANK NOTE COMPANY

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

EXHIBIT 2

CERTIFICATION OF VITAL RECORD

# COUNTY OF SAN DIEGO

## CERTIFICATE OF DEATH

STATE OF CALIFORNIA

3202237006090

STATE FILE NUMBER — LOCAL REGISTRATION NUMBER

**DECEDENT'S PERSONAL DATA**

| | | |
|---|---|---|
| 1. NAME OF DECEDENT – FIRST (Given): LONNIE | 2. MIDDLE: - | 3. LAST (Family): RUPARD |
| AKA, ALSO KNOWN AS: LONNIE NEWTON RUPARD | 4. DATE OF BIRTH: 10/01/1975 | 5. AGE Yrs: 46 — 6. SEX: M |
| 9. BIRTH STATE/FOREIGN COUNTRY: PHILIPPINES | 10. SOCIAL SECURITY NUMBER: 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 | 11. EVER IN U.S. ARMED FORCES?: [X] NO |
| 12. MARITAL STATUS: DIVORCED | 7. DATE OF DEATH: 03/17/2022 | 8. HOUR: 2351 |
| 13. EDUCATION: HS GRADUATE | 14/15. WAS DECEDENT HISPANIC/LATINO(A)/SPANISH?: [X] NO | 16. DECEDENT'S RACE: FILIPINO, AMERICAN, CAUCASIAN |
| 17. USUAL OCCUPATION: NEVER WORKED | 18. KIND OF BUSINESS OR INDUSTRY: - | 19. YEARS IN OCCUPATION: 0 |

**USUAL RESIDENCE**

| | | |
|---|---|---|
| 20. DECEDENT'S RESIDENCE: 3814 POLO DRIVE | | |
| 21. CITY: BONITA | 22. COUNTY/PROVINCE: SAN DIEGO | 23. ZIP CODE: 91902 |
| 24. YEARS IN COUNTY: 46 | 25. STATE/FOREIGN COUNTRY: CA | |

**INFORMANT**

26. INFORMANT'S NAME, RELATIONSHIP: RONNIE NEWTON GEORGE RUPARD, POA

27. INFORMANT'S MAILING ADDRESS: 3814 POLO DRIVE, BONITA, CA 91902

**SPOUSE/SRDP AND PARENT INFORMATION**

| | | | |
|---|---|---|---|
| 28. NAME OF SURVIVING SPOUSE/SRDP – FIRST: - | 29. MIDDLE: - | 30. LAST (BIRTH NAME): - | |
| 31. NAME OF FATHER/PARENT – FIRST: GERRY | 32. MIDDLE: NEWTON | 33. LAST: RUPARD | 34. BIRTH STATE: NC |
| 35. NAME OF MOTHER/PARENT – FIRST: FLORINTINA | 36. MIDDLE: G. | 37. LAST (BIRTH NAME): GRUSPE | 38. BIRTH STATE: PHILIPPINES |

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

39. DISPOSITION DATE: 03/29/2022

40. PLACE OF FINAL DISPOSITION: RES-FLORINTINA RUPARD, LA PAZ SAN NARCISO, ZAMBALES 2205, -, PHILIPPINES

41. TYPE OF DISPOSITION(S): CREMATE/TRANSIT/RESIDENCE

42. SIGNATURE OF EMBALMER: ▸ NOT EMBALMED

43. LICENSE NUMBER: -

44. NAME OF FUNERAL ESTABLISHMENT: FEATHERINGILL MORTUARY INC

45. LICENSE NUMBER: FD1083

46. SIGNATURE OF LOCAL REGISTRAR: ▸ WILMA WOOTEN MD

47. DATE: 03/24/2022

**PLACE OF DEATH**

101. PLACE OF DEATH: UC SAN DIEGO HEALTH HILLCREST - HILLCREST MEDICAL CENTER

102. IF HOSPITAL, SPECIFY ONE: [X] ER/OP

104. COUNTY: SAN DIEGO

105. FACILITY ADDRESS OR LOCATION WHERE FOUND: 200 W ARBOR DR

106. CITY: SAN DIEGO

**CAUSE OF DEATH**

107. CAUSE OF DEATH — IMMEDIATE CAUSE (A): PENDING

(B) —

(C) —

(D) —

108. DEATH REPORTED TO CORONER?: [X] YES — REFERRAL NUMBER: 22-01007

109. BIOPSY PERFORMED?: [X] NO

110. AUTOPSY PERFORMED?: [X] YES

111. USED IN DETERMINING CAUSE?: [X] YES

112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107: -

113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112?: UNK

113A. IF FEMALE, PREGNANT IN LAST YEAR?: [X] NO

**PHYSICIAN'S CERTIFICATION**

114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED.

115. SIGNATURE AND TITLE OF CERTIFIER: ▸

116. LICENSE NUMBER

117. DATE

118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE

**CORONER'S USE ONLY**

119. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. MANNER OF DEATH: [X] Pending Investigation

120. INJURED AT WORK?

121. INJURY DATE

122. HOUR

123. PLACE OF INJURY

124. DESCRIBE HOW INJURY OCCURRED

125. LOCATION OF INJURY

126. SIGNATURE OF CORONER / DEPUTY CORONER: ▸BETHANN SCHABER

127. DATE: 03/21/2022

128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER: BETHANN SCHABER, DME

STATE REGISTRAR: A B C D E — FAX AUTH.# — CENSUS TRACT

County of San Diego –Health & Human Services Agency – 3851 Rosecrans Street. This is to certify that, if bearing the OFFICIAL SEAL OF THE STATE OF CALIFORNIA, the OFFICIAL SEAL OF SAN DIEGO COUNTY AND THEIR DEPARTMENT OF HEALTH SERVICES EMBOSSED SEAL, this is a true copy of the ORIGINAL DOCUMENT FILED. This copy not valid unless prepared on engraved border displaying seal and signature of Registrar.

Wilma J. Wooten M.D.

DATE ISSUED: 4/26/2022 WILMA J. WOOTEN, M.D., M.P.H.
REGISTRAR OF VITAL RECORDS
County of San Diego

A004055059

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

# EXHIBIT "H"

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD et al.,
Plaintiffs,

v.

COUNTY OF SAN DIEGO et al.,
Defendants.

Case No.: 23-CV-1357-CAB-BLM

**ORDER GRANTING JOINT MOTION**

[ECF Nos. 164–65]

The parties have assented to a joint motion to dismiss Defendants Ben Samonte and May Ng as a party to this case without prejudice. [ECF Nos. 164–65] That motion is granted. Those Defendants are dismissed from this case.

It is **so ORDERED.**

Dated: January 2, 2025



Hon. Cathy Ann Bencivengo
United States District Judge