**Rada Feldman, Esq. (State Bar No. 285931)**
**Nicholas R. Colletti, Esq. (State Bar No. 283947)**
**Robert S. Kahn, Esq. (State Bar No. 231277)**
**Caroline M. Park, Esq. (State Bar No. 334008)**
**Cristina I. Butoiu, Esq. (State Bar No. 335902)**
**2011 Palomar Airport Road, Suite 207**
**Carlsbad, CA 92011**
**(760) 274-2110 - FAX (760) 274-2111**
**Email: rfeldman@ccllp.law**
**Email: ncolletti@ccllp.law**
**Email: rkahn@ccllp.law**
**Email: cpark@ccllp.law**
**Email: cbutoiu@ccllp.law**

Attorneys for Defendants
COUNTY OF SAN DIEGO, BILL GORE, KELLY MARTINEZ, JON MONTGOMERY, CHRISTINA GOODALL (sued as CHRISTINA ANOSIKE), MIGUEL AGUILERA, JASON VILADIU, GUSTAVO MARTINEZ, JEFF AMADO, ERNESTO AGUIRRE, TREYVONNE JAMES (sued in duplicate J. TREYVONNE), BERNARDO ROMERO, MICHAEL JOHNSON, ANDREW TORRES, ALLEN WERESKI, BLADE ROMANS, LINDA GUTIERREZ, AND THOMAS MACE

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ESTATE OF LONNIE RUPARD, THROUGH ITS COURT-APPOINTED ADMINISTRATOR TERRI LOPEZ;

Plaintiffs,

vs.

COUNTY OF SAN DIEGO; et al.

Defendants.

CASE NO. 3:23-cv-1357-CAB-JAC
***Assigned to Hon. Cathy Ann Bencivengo***
***Magistrate Hon. Janet A. Cabral in Dept. 15A***

**PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

**Date:** **December 18, 2026**
**Room:** **15A**

**Complaint Filed:** **7/26/2023**
**Trial Date:** **3/8/2027**

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

# TABLE OF CONTENTS


I. INTRODUCTION .... 1
II. STATEMENT OF FACTS .... 2
A. December 19, 2021 Rupard's Booking / Intake .... 2
B. Rupard's Housing Assignment .... 3
C. December 29, 2021 Initial Psychiatric Evaluation .... 4
D. December 30, 2021 to January 20, 2022 Medication Refusals .... 4
E. January 29, 2022 Disciplinary Incident and Subsequent Assessment .... 4
F. February 1, 2022 PRCS Formally Revoked .... 5
G. February 9, 2022 Clinician Wellness Check .... 5
H. February 19, 2022 Disciplinary Incident and Psych Assessment .... 6
I. February 22, 2022 Psychiatric Follow-Up .... 6
J. February 23, 2022 Discretionary QMHP Follow-Up .... 7
K. March 14, 2022 Court-Ordered Competency Exam .... 8
L. March 15, 2022 through March 17, 2022 .... 9
M. March 17, 2022 Rupard Found Unresponsive .... 12
N. Medical Examiner's Report .... 13
O. Homicide Investigation .... 14
P. Supervisory Defendants .... 14
Q. Rupard's Government Tort Claim .... 15
III. LEGAL STANDARD .... 16
IV. PLAINTIFF'S SECTION 1983 CLAIMS FAIL AS A MATTER OF LAW .... 17
A. No Violation or Causation Under the 8th or 14th Amendment .... 17
1. No Constitutional Violation or Causation by Deputy Defendants .... 19
2. Deputies Are Entitled to Qualified Immunity .... 22
a. The Law Must Govern Each Deputy's Specific Conduct .... 22
b. No Deputy Committed a Constitutional Violation .... 23
c. The Law was Not Clearly Established .... 25
d. The "Rare" "Obvious" Case Exception Does Not Apply .... 26


COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

3. No Constitutional Violation or Causation by MHC Goodall........................ 26
4. MHC Goodall is Entitled to Qualified Immunity ........................................ 30
B. Plaintiff's *Monell* Claim Fails as a Matter of Law....................................... 32
1. The Monell Standard ..................................................................................... 32
2. Prior In-Custody Deaths Are Not Pattern of Similar Violations .................. 34
3. The NCCHC Report Does Not Establish an Unconstitutional Policy or Deliberate Indifference ........................................................................................ 35
4. The State Auditor Report and Death-Review Evidence Cannot Supply Notice or Causation .............................................................................................. 36
5. No Policy was the Moving Force Behind Rupard's Death........................... 37
C. Plaintiff's Section 1983 Claim Against Supervisory Defendants Fails........ 38
1. Section 1983 Imposes No Vicarious Liability ............................................. 38
2. No Supervisory Defendant Had Any Personal Involvement ........................ 39
3. No Causal Connection Between Any Supervisory Defendants' Own Conduct and Rupard's Death ........................................................................................ 39
4. The Supervisory Liability Claim Repackages the *Monell* Claim ................. 40
V. PLAINTIFF'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW ......... 41
A. The State-Law Claims Are Barred by the Government Claims Act............. 41
B. Plaintiff Lacks Standing for Failure to Comply with Tort Claim Act .......... 44
C. Plaintiff's Tort Claims against Deputy Defendants Fail............................... 45
D. Tort Claims against MHC Goodall Fail ...................................................... 46
E. Dependent Adult Neglect Against Montgomery and Goodall Fails............. 47
F. County is Immune from Negligence ........................................................... 48
G. County Defendants are Statutorily Immune................................................ 49
H. Even if Not Barred, Plaintiff Cannot Establish a Bane Act Claim ............... 50
I. No Punitive Damages ................................................................................... 50
V. CONCLUSION.................................................................................................. 50

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

# TABLE OF AUTHORITIES

Page(s)

Federal Cases

*Alexander v. Nguyen*,
78 F.4th 1140 (9th Cir. 2023) ........ 17

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) ........ 30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009). ........ 38, 39

*Bd. of Cnty. Comm'rs v. Brown*,
520 U.S. 397 (1997) ........ 32, 36

*Cabral v. Cnty. of Glenn*,
624 F.Supp.2d 1184 (E.D. Cal. 2009) ........ 48

*Cabrales v. Cnty, of Los Angeles*,
864 F.2d 1454 (9th Cir. 1988) ........ 31

*Cabrales v. County of Los Angeles*,
886 F.2d 235 (9th Cir. 1989) ........ 31

*Castro v. County of Los Angeles*,
833 F.3d 1060 (9th Cir. 2016) ........ 36

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 17

*Christie v. Iopa*,
176 F.3d 1231 (9th Cir. 1999) ........ 34

*City of Canton*,
489 U.S. 378 (1989) ........ 41

*City of Los Angeles v. Heller*,
475 U.S. 796 (1986) ........ 34

*Connick v. Thompson*
563 U.S. 51 (2011) ........ passim

*Cravotta v. Cnty. of Sacramento*,
717 F.Supp.3d 941 (E.D. Cal. 2024) ........ 26

*Ctr. For Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*,
533 F.3d 780 (9th Cir. 2008) ........ 41

*D.C. v. Wesby*,
583 U.S. 48 (2018) ........ 22, 23, 25

*D'Braunstein v. Cal. Highway Patrol*,
131 F.4th 764 (9th Cir. 2025) ........ 26

*Davidson v. Cannon*,
474 U.S. 344, 106 S. Ct. 668 (1986) ........ 28

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

*Devereaux v. Abbey*,
263 F.3d 1070 (9th Cir. 2001) .................... 17
*Estate of Ford v. Ramirez-Palmer*
301 F.3d 1043 (9th Cir. 2002) .................... 23, 24, 25
*Est. of Kong v. City of San Diego*,
No. 22-CV-1858-BAS-DDL, 2023 WL 4939370 (S.D. Cal. Aug. 2, 2023)..... 42, 43
*Estate of Wilson v. Cnty. of San Diego*,
2022 WL 789127 (S.D. Cal. 2022).................... 17
*Estelle v. Gamble*,
429 U.S. 97 (1976).................... 17
*Farmer v. Brennan*,
511 U.S. 825 (1994).................... 17
*Flores v. Cnty. of Los Angeles*,
758 F.3d 1154 (9th Cir. 2014) .................... 33, 34, 35, 37
*Flores v. Mesenbourg*,
1997 WL 303277 (9th Cir. 1997) .................... 17
*Fortyune v. American Multi-Cinema, Inc.*,
364 F.3d 1075 (9th Cir. 2004) .................... 16
*Gilbert v. Turner*,
2024 WL 1947137 (9th Cir. May 3, 2024).................... 31
*Gohranson v. Snohomish Cnty.*,
No. C16-1124RSL, 2018 WL 5921012 (W.D. Wash. Nov. 13, 2018) .................. 26
*Gordon v. Cnty. of Orange*,
888 F.3d 1118 (9th Cir. 2018) .................... 17, 27
*Gordon v. County of Orange*,
6 F.4th 961 (9th Cir. 2021) .................... 23, 25
*Hallett v. Morgan*
296 F.3d 732 (9th Cir. 2002) .................... 31
*Harlow v. Fitzgerald*,
457 U.S. 800 (1982).................... 30
*Hope v. Pelzer*,
536 U.S. 730 (2022).................... 26
*Horton v. Horton v. City of Santa Maria*,
915 F.3d 592 (9th Cir. 2019) .................... 23, 25, 26, 30
*Jones v. Williams*,
297 F.3d 930 (9th Cir. 2002) .................... 20
*Kentucky v. Graham*,
473 U.S. 159 (1985).................... 41
*Leer v. Murphy*,
844 F.2d 628 (9th Cir. 1988) .................... 18, 23, 39, 40
*Lemoon v. California Forensic Med. Grp., Inc.*,
575 F.Supp.3d 1212 (N.D. Cal. 2021).................... 28

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

*Lytle v. Carl*,
382 F.3d 978 (9th Cir. 2004) .......... 38
*Matysik v. Cnty. of Santa Clara*,
No. 16-CV-06223-LHK, 2018 WL 732724 (N.D. Cal. Feb. 6, 2018) .......... 29
*McGregor v. Kitsap Cnty.*,
No. C17-5436 RBL, 2017 WL 6612012 (W.D. Wash. Dec. 27, 2017) .......... 41
*Meredith v. Ada Cnty. Sheriff's Dept*,
No. 113CV00381EJLREB, 2016 WL 1117401 (D. Idaho Mar. 22, 2016.) .......... 25
*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978) .......... 36
*Oviatt v. Pearce*,
954 F.2d 1470 (9th Cir. 1992) .......... 32
*Peralta v. Dillard*,
744 F.3d 1076 (9th Cir. 2014) .......... 18
*Rosales v. Cnty. of San Diego*,
511 F.Supp.3d 1070 (S.D. Cal. 2021) .......... 22, 26
*Russell v. Lumitap*,
31 F.4th 729 (9th Cir. 2022) .......... 31
*Sandoval v. Cnty. of San Diego*,
985 F.3d 657 (9th Cir. 2021) .......... 18, 26
*Santos v. NaphCare, Inc.*,
No. 3:21-CV-00131-YY, 2022 WL 828140 (D. Or. Feb. 4, 2022) .......... 35
*Smith v. Las Vegas Metro. Police Dep't*,
No. 2:23-CV-00092-JAD-NJK, 2026 WL 837398 (D. Nev. Mar. 26, 2026) .......... 26
*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) .......... 38, 39, 40
*Tater v. City of Huntington Beach*,
No. 820CV01772MEMFJDEX, 2023 WL 4291656 (C.D. Cal. May 8, 2023) .......... 31
*Taylor v. List*,
880 F.2d 1040 (9th Cir. 1989) .......... 38
*Toguchi v. Chung*,
391 F.3d 1051 (9th Cir. 2004) .......... 17, 18, 30
*Tsao v. Desert Palace, Inc.*,
698 F.3d 1128 (9th Cir. 2012) .......... 37
*Van Ort v. Estate of Stanewich*,
92 F.3d 831 (9th Cir. 1996) .......... 18, 46, 47
*Villegas v. Gilroy Garlic Festival Ass'n*,
541 F.3d 950 (9th Cir. 2008) .......... 32
*Waid v. Cnty. of Lyon*,
87 F.4th 383 (9th Cir. 2023) .......... 26
*Wilhelm v. Rotman*,
680 F.3d 1113 (9th Cir. 2012) .......... 27

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

State Cases

*California v. Super. Ct.*,
32 Cal. 4th 1234 (2004) .......... 42
*Carter v. Prime Healthcare Paradise Valley LLC*,
198 Cal.App.4th 396 (2011) .......... 47, 48
*Castaneda v. Dep't of Corr. & Rehab.*,
212 Cal. App. 4th 1051 (2013) .......... 43, 48, 49
*Cornell v. City & Cnty. of San Francisco*,
17 Cal. App. 5th 766 (2017) .......... 50
*Covenant Care, Inc. v. Super. Ct.*,
32 Cal.4th 771 (2004) .......... 48
*Delaney v. Baker*,
20 Cal.4th 23 (1999) .......... 48
*J.M. v. Huntington Beach Union High Sch. Dist.*,
2 Cal. 5th 648 (2017) .......... 44
*Lawson v. Superior Ct.*,
180 Cal.App.4th 1372 (2010) .......... 49
*Lowman v. Cnty. of Los Angeles*,
127 Cal.App.3d 613 (1982) .......... 48
*Remijio v. The Cnty. of Santa Barbara*,
No. 22CV01496, 2023 WL 9510748 (Cal. Super. Dec. 07, 2023) .......... 45
*Shoyoye v. Cnty. of Los Angeles*,
203 Cal.App.4th 947 (2012) .......... 50
*Watson v. State of Cal.*,
21 Cal.App.4th 836 (1993) .......... 49
*Winn v. Pioneer Med. Grp., Inc.*,
63 Cal.4th 148 (2016) .......... 47

Federal Statutes

42 U.S.C. § 1983 .......... 1

State Statutes

Cal. Gov't. Code § 810 .......... 42
Cal. Gov't. Code § 815, subd. (a) .......... 49
Cal. Gov't. Code §§ 820.8, 844.6, 845.6, 855.6, 855.8 .......... 49
Cal. Gov't. Code § 844.6 .......... 49
Cal. Gov't. Code § 844.6(a)(2) .......... 48
Cal. Gov't. Code § 845.6 .......... passim
Cal. Gov't. Code § 855.8 .......... 50
Cal. Gov't. Code § 911.2 .......... 42

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Cal. Gov't. Code § 911.4 .......... 16, 43
Cal. Gov't. Code § 945.4 .......... 42, 44
Cal. Gov't. Code § 946.6 .......... 44
Cal. Welf. & Inst. Code § 15657 .......... 47
Civil Code § 52.1 .......... 50
Penal Code § 3455 .......... 2
Penal Code § 1368 .......... 5
Penal Code § 1370 .......... 9
Penal Code § 245(a)(4) .......... 2

Federal Rules

Fed. R. Civ. P. 56(c) .......... 17
Fed. R. Civ. P. 56(c)(2) .......... 16
Fed. R. Evid. 407 .......... 37

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

# I. INTRODUCTION

This action arises from the death of Lonnie Rupard ("Rupard") on March 17, 2022, at the San Diego Central Jail ("SDCJ") while in custody on a Post-Release Community Supervision ("PRCS") revocation. Plaintiff the Estate of Lonnie Rupard ("Plaintiff") brings survival claims under 42 U.S.C. § 1983 for deliberate indifference to Rupard's serious medical and mental-health needs, a *Monell* claim and a failure-to-train claim, and state-law claims for negligence, violation of the Bane Act, and dependent adult neglect against Defendants County of San Diego, Bill Gore, Kelly Martinez, Jon Montgomery, Christina Goodall (sued as Christina Anosike), Miguel Aguilera, Jason Viladiu, Gustavo Martinez, Jeff Amado, Ernesto Aguirre, Treyvonne James (sued in duplicate J. Treyvonne), Bernardo Romero, Michael Johnson, Andrew Torres, Allen Wereski, Blade Romans, Linda Gutierrez, and Thomas Mace (collectively, "County Defendants").

Summary judgment is warranted because the undisputed record establishes that every medical and psychiatric decision Plaintiff challenges—whether to prescribe or discontinue medication and whether to admit Rupard to the Psychiatric Stabilization Unit ("PSU") or other higher level of care—rested solely with Liberty Healthcare, Inc. psychiatrist, Dr. Anthony Cruz, and never with any County deputy or mental health clinician. The individual-capacity constitutional claims fail on the merits and are further barred by qualified immunity. Plaintiff cannot establish subjective deliberate indifference under the Eighth Amendment, nor objective indifference under the Fourteenth Amendment to support the Section 1983 claims. There was no act or omission by any County Defendant that amounted to deliberate indifference to establish a constitutional violation. No County Defendant made an intentional decision that disregarded a known risk to Rupard's medical condition, and none was the cause of his death.

The *Monell* claim against the County fails because there is no underlying constitutional violation, the County was not on notice of any pattern of deliberate

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

indifference, and no policy or custom that was the moving force behind any injury. Plaintiff's failure-to-train theory fares no better as isolated, unrelated prior incidents do not supply the requisite notice, and Plaintiff must show a "direct causal link" between a deliberate municipal choice and the deprivation—that a County policy or practice was the "moving force" behind Rupard's death. The record does not establish that link.

The state-law claims also fail. The Bane Act requires specific intent to violate Rupard's rights, beyond the underlying violation. Government Code section 845.6 immunizes the County from prisoner-injury claims except for failure to summon immediate medical care, not the adequacy of care provided. Section 820.2 bars derivative claims against individual employees for discretionary acts. Finally, dependent-adult neglect requires clear and convincing evidence of recklessness, oppression, fraud, or malice—not mere professional negligence.

## II. STATEMENT OF FACTS

### A. December 19, 2021 Rupard's Booking / Intake

On March 16, 2020, in case No. SCS305746, Rupard was convicted of three counts of assault by means likely to produce great bodily injury (Penal Code § 245(a)(4)) and sentenced to four years in state prison. (AOE, Ex. 2 at COSD 006429.) He was released to Post-Release Community Supervision ("PRCS") on May 18, 2021, with supervision scheduled to expire on June 6, 2024. (Ex. 3 at COSD 001169–001208.) Rupard failed to report to his probation officer, failed to report a change of address, and absconded from supervision. (*Id.*) The Probation Department petitioned to revoke his PRCS under Penal Code § 3455 (case No. CPR210150), and a warrant issued on the petition. (Ex. 2 at COSD 006429.)

On December 19, 2021, Rupard was arrested by the National City Police Department and booked into SDCJ on a PRCS revocation. (Ex. 1 at COSD 000479–000486; Ex. 4 at 000700–000704, COSD 006426, 006436.) At intake, Nurse Ben Samonte completed the intake medical clearance, recorded a weight of 165-pounds,

flagged "Psychotic Disorders" for chronic behavioral-health care, and referred Rupard for a psychiatric evaluation noting his prior state hospital history and past medications. (Ex. 5 at COSD 000027–000051.) Nurse May Ng performed a second-stage nurse evaluation documenting that Rupard refused a COVID-19 test and consent to medical care. (Ex. 6 at COSD 000063–000064.)

At intake, Rupard was referred to Liberty Healthcare ("Liberty") psychiatry providers for psychiatric evaluation, including assessment for a higher level of care, based on his prior state-hospital and psychiatric history from earlier incarcerations. (Ex. 5 at COSD 000027–000051; Ex. 13 at COSD 000152; Ex. 14 at COSD 006437; Ex. 15 at COSD 003587-003588.) Liberty psychiatrist Dr. Anthony Cruz performed an initial psychiatric evaluation of Rupard on December 29, 2021. Dr. Cruz was the only outpatient psychiatric provider on site at SDCJ during the timeframe of December 2021 through March 2022. (Ex. 10 at COSD 000059–000061; Ex. 82 at 169:20–21.)

### B. Rupard's Housing Assignment

On December 22, 2021, Rupard was housed in Module 7D, Cell 17, where he remained through March 17, 2022. (Ex. 4 at COSD 000700, 000704, 006426, 006436.) Module 7D served as overflow and quarantine housing, and also used as an administrative-segregation ("Ad Seg") housing unit. Rupard was never classified as an Ad Seg at any point during his incarceration. (Ex. 16 at COSD 017940–017945; 018168–018172.)[1]

---

[1] That classification point is dispositive of a discrete duty: Ad Seg placement is a classification decision outside the authority of deputies and the mental-health clinician ("MHC"), and County policy reserves mandatory weekly Qualified Mental Health Provider ("QMHP") rounds for inmates classified to Ad Seg. (Ex. 62 at COSD 006311–006314.) Because Rupard was never classified Ad Seg, he came before a MHC only if he appeared on a clinician's sick-call list. (Ex. 16 at COSD 017940–017945, 018168–018172; Ex. 83 at 97:22; Ex. 71 at 165:1-168:25; Ex. 69 at 110:7-12.) An inmate is placed on that list in one of six ways: (1) if an inmate patient asked to see a MHC; (2) if sworn staff requested sick call; (3) if intake nurses placed on sick call for a 30-day assessment; (4) if requests through supervisor or other staff, such as other QMHP were made; (5) if an inmate patient was in the Inmate Safety Housing Program ("ISP") program; or (6) if an inmate patient received a gatekeeping assessment. (Ex. 105 at ¶¶ 5–6; Ex. 69 at 127:1–128:25); Ex. 71 at 166:2-8, 167:2-6.) If an inmate was not already under a psychiatrist's care, the clinician was trained to call for a psychiatric assessment; but Rupard was already under the psychiatric care of Dr. Cruz, so no such referral was required of the clinician. (Ex. 105 at ¶¶ 5, 9; Ex. 69 at 6:1–77:25; 97:1–101:25.)

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

### C. December 29, 2021 Initial Psychiatric Evaluation

Dr. Cruz conducted Rupard's initial psychiatric evaluation on December 29, 2021. (Ex. 10 at COSD 000059-61; Ex. 82 at 226:21-25; 227:1-17.) As part of Dr. Cruz's standard practice and preparation, he reviewed Rupard's medical records that were in the computer system prior to seeing Rupard. (*Id.* at 89:7-10.) Dr. Cruz prescribed the psychotropic medications Haldol, Cogentin, and Valproic Acid, determined that immediate psychiatric intervention was not necessary and that Rupard did not meet PSU criteria, and set a 4-5 week follow up. (*Id.* at 161:22-25; 177:2-4; 309:12-25; 310:1-25; 311:1-5; 312:13-21.) Dr. Cruz noted that he would continue to monitor Rupard for decompensation. (Ex. 10 at COSD 000059-61; Ex. 82 at 243–245.) Under County policy, PSU admission and psychotropic-medication decisions were solely reserved to the psychiatry service. (Ex. 62 at COSD 006120–006125; Ex. 82 at 175-177, 262; Ex. 94 at 11; Ex. 96 at 60.)

### D. December 30, 2021 to January 20, 2022 Medication Refusals

Rupard refused to take psychiatric medications daily from December 30, 2021 to January 20, 2022. (Ex. 11 at COSD 000565-000571; Ex. 12 at COSD 000070-135.) Nursing staff referred Rupard back to psychiatry to address the medication refusals as under County policy, only the psychiatrist could determine treatment regarding medication refusals. (Ex. 13 at COSD 000049, 000152, 000473, 004078; Ex. 14 at COSD 006437; Ex. 62 at COSD 006315–006320, 006324–006325; Ex. 82 at 175-176; 248:1-6; 249; 266.) On January 20, 2022, Dr. Cruz reviewed Rupard's chart and decided to discontinue the medications prescribed for Rupard's schizophrenia and instead set a follow-up evaluation with Rupard for February 22, 2022. (Ex. 10 at COSD 000052–000062; Ex. 82 at 265–266; Ex. 95 at 41-42.) No clinician or deputy had the authority to prescribe Rupard's medication. (Ex. 62 at COSD 006324–006325; Ex. 82 at 262.)

### E. January 29, 2022 Disciplinary Incident and Subsequent Assessment

On January 29, 2022, Rupard was cited with a disciplinary incident ("DI") after

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

wearing the wrong jail-issued uniform and being intentionally noncompliant with correctional staff. (Ex. 18 at COSD 018163–018165, 018167). A SDCJ RN medically evaluated Rupard following the DI and cleared Rupard to remain in his cell. The RN was unable to further assess Rupard due to his behavior—stating "I don't need a medic. Leave me alone, if you touch me, I'll kill you." (Ex. 10 at COSD 000058-62, COSD 000474; Ex. 18 at COSD 018163–018165.) The assessment was terminated due to safety concerns. (*Id.*) Following the DI citation, MHC Alonso submitted a request for Rupard to be evaluated by a QMHP. (Ex. 13 at COSD 000152, 000049.) This wellness check request was not an Ad Seg wellness evaluation under policy MSD.G.2.1. It was separately requested in response to the DI citation by MHC Alonso. (*Id.*)

**F. February 1, 2022 PRCS Formally Revoked**

After a hearing held on February 1, 2022, a court formally revoke Rupard's PRCS. (Ex. 2 at COSD 006428–006429; Ex. 21 at COSD 006417–006432.) The Superior Court minutes reflect that his "Parole/Post Release Community Supervision Remains Formally . . . revoked." (*Id.* at COSD 006428–006429.) While in custody, Rupard refused to appear at Court hearings for his PRCS revocation. (Ex. 2 at COSD 006428–006429.) On February 1, 2022, the Court suspended the criminal proceedings and ordered an expert's evaluation of Rupard on March 9, 2022, setting a hearing for March 24, 2022. (*Id.*) Although the court later suspended the revocation proceedings under Penal Code § 1368 pending a competency evaluation, the revocation remained in effect and Rupard remained in custody on his revoked PRCS term. (*Id.*)

**G. February 9, 2022 Clinician Wellness Check**

MHC Christina Goodall conducted a QMHP assessment of Rupard on February 9, 2022, pursuant to a sick-call request that he be assessed after the DI citation. (Ex. 19 at COSD 000479-486; Ex. 13 at COSD 000152; Ex. 105 at ¶¶ 6–8.) This was Goodall's first interaction with Rupard. (*Id.* at ¶ 7.) Goodall reviewed Rupard's jail mental health records prior to the evaluation but did not review Rupard's prescribed psychotropic medications as it was not part of her scope as an MHC. (*Id.* at ¶¶ 7-9.)

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

On February 9, 2022, Goodall evaluated Rupard cell-side. (Ex. 19 at COSD 000479-480; Ex. 105 at ¶ 7.) Goodall documented that Rupard's cell was clean with a couple of empty containers of food inside the cell. Rupard was not cooperative during this assessment, clearly stating to Goodall that he did not want to talk to Goodall. (Ex. 19 at COSD 000479.) Despite Goodall making multiple attempts to engage Rupard in further conversation, Rupard refused to speak with Goodall after informing Goodall that he was fine. (Ex. 19 at COSD 000479.) Goodall was able to observe that Rupard was not engaging in any self-injurious behavior. (*Id.*)

Rupard was fully dressed at the time of the assessment. (*Id.* at COSD 000479–000480.) Goodall did not observe that Rupard was underweight. (*Id.* at COSD 000479; Ex. 19 at COSD 000479–000480; Ex. 69 at 179:9-11.) She recorded no distressing symptoms or major impairments at the time of her evaluation. (Ex. 19 at COSD 000479-480.) Rupard was able to speak clearly to Goodall and look directly in her eyes while speaking. (Ex. 69 at 188:11-12.) At the time of this evaluation, Goodall believed that no ISP or PSU referral to the psychiatry for evaluation was warranted because the records showed that Rupard was already under the care of Liberty's psychiatry service with scheduled follow-ups. (Ex. 19 at COSD 000479; Ex. 105 at ¶ 9.)

### H. February 19, 2022 Disciplinary Incident and Psych Assessment

On February 19, 2022, Rupard was cited for a subsequent DI after he refused lockdown and threw trash in the 7D dayroom. (Ex. 20 at COSD 018160-018162, 018166, 00443-000445.)

### I. February 22, 2022 Psychiatric Follow-Up

On February 22, 2022, Dr. Cruz evaluated Rupard cell-side for a Psychiatric Sick Call assessment. (Ex. 10 at COSD 000061–000062; Ex. 82 at 177:14-22; 179:18-25; 180:1-6.) Dr. Cruz noted that multiple attempts were made to engage Rupard, but that Rupard was uncooperative and refused to participate. (*Id.*) Dr. Cruz noticed that Rupard rambled incoherently and became verbally aggressive. (*Id.*) Rupard appeared to be in no acute distress and his cell was relatively clean, with no flooding, gassing,

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

or smearing of feces. (*Id.*)

Dr. Cruz's report listed no concerns for malnutrition or severe weight loss and believed Rupard's physical appearance remained unchanged from the initial assessment back in December 2021. (*Id.* at 178; 179:1-6) Rupard continued to refuse medications and continued to yell when offered medications. (*Id.* at 180:24-25.) Dr. Cruz did not find signs of Rupard being a danger to self or others. (*Id.* at 295:17-25; 296:1-17; 309:12-25; 310:1-22.) Based on his assessment of Rupard, Dr. Cruz determined he would continue to monitor Rupard and offer treatment. (*Id.* at 306:16-23; 308:5-15.)

Dr. Cruz concluded that there were no signs requiring immediate psych intervention at the time of his visit. (*Id.* at 310:25; 311:1-5; 312:13-21.) He recommended a follow-up to occur in 6-7 weeks or sooner, if needed, and set a follow-up evaluation date for April 12, 2022. (*Id.* at 306:16-23; Ex. 13 at COSD 000049, 000152, 000473, 004078; Ex. 14 at COSD 006437.) He made no new orders for Rupard. (Ex. 10 at COSD 000061–000062.)

**J. February 23, 2022 Discretionary QMHP Follow-Up**

Following the February 9, 2022 assessment, MHC Goodall set a two-week follow-up appointment for February 23, 2022. (Ex. 19 at COSD 000479–000486.) Goodall set the discretionary February 23 follow-up in the exercise of her own clinical judgment because Rupard had declined to fully engage during the February 9 evaluation. (*Id.*; Ex. 105 at ¶ 11.) This follow-up was not physician-ordered, mandatory, or required under any County policy, and was not a mandatory Ad Seg wellness check under policy MSD.G.2.1. (*Id.* at ¶¶ 11-12; Ex. 62 at COSD 006313–006314.) During his incarceration, Rupard never appeared on any Ad Seg rounds list. (Ex. 16 at COSD 017940–017945, 018168–018172; Ex. 83 at 97:22; Ex. 71 at 65:1–168:25; Ex. 69 at 110:24; 111:1-14.) Goodall, however, was unable to personally perform the follow-up wellness check set for February 23, 2022. (Ex. 105 at ¶¶ 13-14.)

Goodall was not required to see every inmate in the facility—only the inmate-

patients that appeared on her sick-call list. (*Id.* at ¶ 6.) Consistent with Goodall's ordinary practice, Goodall would triage her follow-up visits after addressing the Enhanced Observation Housing ("EOH") and gatekeeping matters. (*Id.* at ¶ 13.) During this period, Goodall was working to catch up on a backlog of inmate-patients that she assumed from a departing MHC. Across 16 working days, Goodall had 152 inmate-patient encounters. (*Id.* at ¶¶ 13–14.) Because Rupard was already under the care of the psychiatry service, Goodall was not aware of any circumstance that made the February 23 follow-up urgent. (*Id.* at ¶ 9.) Moreover, records showed that Dr. Cruz had already evaluated Rupard the day prior on February 22. (Ex. 10 at COSD 000061–000062; Ex. 13 at COSD 000049, 000152; Ex. 14 at COSD 006437.)

**K. March 14, 2022 Court-Ordered Competency Exam**

Rupard was seen for a mental competency examination on March 14, 2022. On March 14, 2022, Rupard was evaluated by court-ordered forensic psychiatrist Dr. Nicolas Badre to determine competency to stand trial. (Ex. 21 at COSD 006417–006432; Ex. 24 at COSD 000153–000158.) Following his evaluation, Dr. Badre submitted his findings to the Court on March 24, 2022, after Rupard's death. (Ex. 24 at COSD 000153–000158.) This report was confidential under applicable California Penal Code and not shared with jail staff. (*Id.*; Ex. 91 at 91.) Dr. Badre also did not communicate his findings to any SDCJ staff during the March 14, 2022 competency evaluation. (Ex. 24 at COSD 000153–000158; Ex. 21 at COSD 006417–006432; Ex. 91 at 91.)

Dr. Badre's report stated Rupard's cell was dirty and Rupard was dirty and unkempt. (Ex. 24 at COSD 000153–000158; Ex. 91 at 92–94.) Rupard was uncooperative during the exam and Dr. Badre found Rupard unable to have a rational and factual understanding of the charges and assist counsel in a rational matter. (*Id.*) Dr. Badre reported that Rupard should be referred to a state hospital or jail-based competency treatment program for restoration to competency. (*Id.*)

Dr. Badre's evaluation concluded that Rupard suffered from severe mental

illness and lacked the capacity to make decisions regarding his antipsychotic medication. (Ex. 24 at COSD 000153-000158.) In reaching these conclusions, Dr. Badre recommended involuntary administration of antipsychotic medication pursuant to Penal Code § 1370, opining that such treatment was medically appropriate and could improve Rupard's competency to stand trial. (Ex. 24 at COSD 000153–000158; Ex. 91 at 92–94.) Dr. Badre's recommendations arose in the context of the psychiatric evaluation and differed from Dr. Cruz's prior treatment decision to discontinue Rupard's medications. (Ex. 24 at COSD 000153–000158; Ex. 91 at 92–94.) Dr. Badre did not communicate his findings and recommendations to the deputies or MHC, however. (*Id.*) Custodial staff, therefore, received no information regarding Dr. Badre's assessment or his recommendations concerning Rupard's medication. (*Id.*)

### L. March 15, 2022 through March 17, 2022

All deputies who were on shift between March 15, 2022 through March 17, 2022 were trained and performed their duties in accordance with SDCJ policies and Title 15. (Ex. 22; Ex. 32; Ex. 33-60; Ex. 63; Ex. 23 at COSD 000959-001135; Ex. 73 at 25:13.) The County's Learning Management System ("LMS") training transcripts demonstrate a complete, individual training history for each named Deputy Defendant. (Ex. 34-47)[2]

Plaintiff asserts claims against 14 deputies, alleging that these deputies worked shift(s) in Module 7D between March 15 and March 17, 2022, and are therefore responsible for Rupard's death. The record shows deputies performed all safety checks within the required one-hour intervals for Rupard's housing module between March 15 and March 17: (Ex. 67 at COSD 004864–005106, 004591–004834; Ex. 66 at COSD 001818–002026; Ex. 22 at COSD 000160–000265; Ex. 23 at COSD 000959–001135; Ex. 93 at 46:7-9; 47:7-9; 53:19-54:2.)

Deputy Allen Wereski was on the March 14 shift and performed the required

[2] See COSD 009867–009935; COSD 009939–009973; COSD 009974–010008; COSD 010009–010043; COSD 010044–010052; COSD 010053–010065; COSD 010066–010114; COSD 010115–010155; COSD 010156–010215; COSD 010216–010245; COSD 010246–010283; COSD 010284–010337; COSD 010338–010388



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

safety checks that shift. (Ex. 67 at COSD 004746–004756; Ex. 23 at COSD 000959–001135; Ex. 22 at COSD 000192-000197; Ex. 66 at COSD 001818-002026; Ex. 115 at ¶ 3; Ex. 86 at 71:17-73:7.)

Deputy Gustavo Martinez performed his required safety checks on March 15. (Ex. 67 at COSD 004753–004756; Ex. 23 at COSD 000959–001135; Ex. 22 at COSD 000192-000194; Ex. 66 at COSD 001818-002026; Ex. 108 at ¶ 3; Ex. 74 at 31:2-32:15.)

Deputy Miguel Aguilera worked one night shift on March 15 and conducted the required safety checks through the morning of March 16. (Ex. 67 at COSD 004770–004780; Ex. 22 COSD 000182–000187; Ex. 23 at COSD 000959–001135; Ex. 106 at ¶ 3; Ex. 85 at 55:2-22; 56:21-57:14; 83:24-84:4.)

Deputy Jason Viladiu also worked the night shift on March 15 and performed the required safety checks through March 16. (Ex. 67 at COSD 004770–004780; Ex. 22 COSD 000182–000187; Ex. 23 at COSD 000959–001135; Ex. 107 at ¶ 3; Ex. 78 at 27:13-28:11; 30:22-31:8; 32:6-11; 33:1-7.)

Deputy Jeff Amado worked the day shift on March 16 and conducted the required safety checks. (Ex. 67 at COSD 004783–004792; Ex. 22 at COSD 000177–000182; Ex. 23 at COSD 000959–001135; Ex. 109 at ¶ 3; Ex. 75 at 13:5-10; 62:15-63:23; 67:21-24.)

Deputy Thomas Mace worked on March 16 and conducted the required safety checks. (Ex. 67 at COSD 004783–004792; Ex. 22 at COSD 000177–000182; Ex. 23 at COSD 000959–001135; Ex. 118 at ¶ 3.)

Deputy Ernesto Aguirre worked the night shift on March 16 and performed the required safety checks. (Ex. 67 at COSD 004793–004808; Ex. 22 COSD 000169–000177; Ex. 23 at COSD 000959–001135; Ex. 110 at ¶ 3; Ex. 77 at 39:20-25; 44:12-15; 48:4-6; 48:9-12; 54:18-22; 55:25-56:18.)

Deputy Treyvonne James also worked the night shift on March 16 and performed the required safety checks through March 17. (Ex. 67 at COSD 004793–

004808; Ex. 22 at COSD 000169–000177; Ex. 23 at COSD 000959–001135; Ex. 111 at ¶ 3; Ex. 79 at 28:16-29:13; 34:22-35:10; 36:8-15.)

On March 16, Deputy Johnson was not assigned to work a shift on the seventh floor. (Ex. 23 at COSD 001091.) On March 16, he provided security in 7D due to an in-custody death incident that morning. (Ex. 81 at 58:18-60:17; 105:1-106:11; Ex. 67 at COSD 004785–004786.) A detective asked him to conduct a welfare check on Rupard. (Ex. 113 at ¶ 4; Ex. 81 at 58:18–60:6, 61:1–8.) Deputy Johnson was only asked to assist in limited capacity during an ongoing investigation by assisting with a welfare check on Rupard because of the unrelated incident involving another inmate on the seventh floor. (*Id.*; Ex. 67 at COSD 004785–004789.) Deputy Johnson walked up to Rupard's cell and called Rupard's name. (Ex. 113 at ¶ 4; Ex. 81 at 61:1–8.) Rupard did not respond so Deputy Johnson and the detective opened Rupard's cell and entered. Deputy Johnson walked up to Rupard who was lying on the bed and gave Rupard's shoulder a push with one of his hands. (*Id.* at 58–64; 67; 105; 61:11–18; Ex. 113 at ¶ 4.) Rupard was lying under the blanket but responded with a grunt to Deputy Johnson's contact. (Ex. 81 at 61:14–62:6; Ex. 113 at ¶ 4.)

Rupard was not typically conversational with the deputies on a regular basis, so once he responded, the deputies did not believe Rupard's response presented as an obvious medical emergency, and they exited the cell after Rupard acknowledged the deputies' presence. (Ex. 113 at ¶ 4; Ex. 81 at 61:14–62:6, 64:8-11.)

Deputy Johnson also worked the day shift on March 17, was assigned to Area 7, and performed the required safety checks. (Ex. 23 at COSD 001093; Ex. 67 at COSD 004808–004826; Ex. 22 at COSD 000162–000170; Ex. 113 at ¶¶ 3, 5-8.)

Deputy Andrew Torres worked the day shift on March 17 and performed the required safety checks. (Ex. 67 at COSD 004808–004826; Ex. 22 at COSD 000162–000170; Ex. 23 at COSD 000959–001135; Ex. 114 at ¶ 3; Ex. 84 at 47:24-48:16; 49:6-8, 13-19; 25-50:16.)

Deputy Bernardo Romero was on the day shift on March 17. However, Deputy

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Romero did not perform any of the safety rounds for the seventh floor. (Ex. 67 at COSD 004591–004834; Ex. 23 at COSD 000959–001135; Ex. 112 at ¶¶ 3-5.) He only worked in the tower, wherein he opened the doors for the deputies that were working the floor and monitored the camera feed. (Ex. 76 at 85:10–21; 89:7; Ex. 112 at ¶¶ 3-5.) While he logged the entries into the computer system, he was not doing any of the work associated with the floor itself. (*Id.* at 85:10–21; 89:7; Ex. 112 at ¶¶ 4-5.)

**M. March 17, 2022 Rupard Found Unresponsive**

During the period of December 2021 through March 2022, Deputy Linda Gutierrez remained almost permanently assigned to the sixth floor. (Ex. 23 at COSD 000959–001135; Ex. 68 at 29:12.) On the night of March 17, Deputy Gutierrez was working an overtime shift and assigned to the seventh floor. (Ex. 67 at COSD 004591–004834; Ex. 23 at COSD 000959–001135; Ex. 68 at 37:10, 16, 19; 94:2–3; Ex. 117 at ¶ 3.) She had no interactions or knowledge of Rupard prior to this shift. (*Id.* at ¶ 9; Ex. 68 at 94:2–3.) Deputy Gutierrez conducted the first safety check on Rupard at 18:55, where she confirmed Rupard was alive. (Ex. 67 at COSD 004591–004834; Ex. 68 at 66:7–10; 66:16–19; 67:16–23; Ex. 117 at ¶ 6.) During this check, Deputy Gutierrez made a mental note to address several cells that she believed needed cleaning, including Rupard's cell, and planned to take care of the cleaning requests at the end of all normal operations at night. (*Id.*; Ex. 67 at COSD 004591–004834.) The only other interaction Deputy Gutierrez had with Rupard was when she was called to assist Deputy Romans after Rupard was found nonresponsive in his cell during the 22:37 safety check. (*Id.* at ¶¶ 8-9; Ex. 68 at 65:21.)

Deputy Romans was also on an overtime night shift on March 17. He conducted his required safety checks, the last at 22:37. (Ex. 67 at COSD 004591–004834; Ex. 116 at ¶¶ 6-8.) Deputy Romans estimates that the 21:46 safety check was the "hard" count when per policy, each deputy must get a verbal or physical response and confirm the identity of each inmate. (Ex. 67 at COSD 004591–004834; Ex. 70 at 19:14-21; 20:3-7.)

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

During the "hard count," Deputy Romans confirmed Rupard's identity as Rupard physically turned to face Deputy Romans. (Ex. 67 at COSD 004591–004834; Ex. 116 at ¶ 6.) From what Deputy Romans could observe, Rupard did not appear to be in medical distress nor did Rupard request any medical assistance. (Ex. 70 at 57:7–14; Ex. 116 at ¶ 6.) Given the time of night, Rupard's position in bed and verbal acknowledgement of the safety check from bed appeared to be a normal response and did not flag any reason for concern.

Surveillance records show at 16:45, a deputy and trustee placed a meal on the food flap of Cell 17. (Ex. 67 at COSD 004591–004834.) At 17:02, a deputy approached Cell 17 with the food sitting on the food flap. (*Id*.) Upon the deputy walking away, the food flap was closed by Rupard. (*Id*.)

At 22:37, while performing a safety check, Deputy Romans could not obtain a response or acknowledgement from Rupard so he requested for backup from Deputy Gutierrez and Deputy Mendoza who came so that they could make safe entry to verify Rupard was not in medical distress. (Ex. 67 at COSD 004591–004834; Ex. 116 at ¶ 8.) Deputies then discovered Rupard was not breathing. (*Id.*; Ex. 25 at COSD 002033-002035; Ex. 116 at ¶ 8.)

Deputy Romans radioed the Central Command Center to activate 911. Deputies Gutierrez and Mendoza removed Rupard from the bunk onto the floor and started chest compressions. At 22:52, medical staff arrived and took over lifesaving measures. At 23:00, the fire department arrived. Rupard was transported to UCSD Medical Center where despite efforts to resuscitate Rupard, he was pronounced dead at 23:51.

**N. Medical Examiner's Report**

Rupard's autopsy was performed on March 19, 2022. The Medical Examiner's ("ME") report was issued on March 2, 2023. (Ex. 28 at COSD 006376–006416.) The ME found no significant cardiovascular, liver, or kidney disease and no evidence of acute brain injury or nutritional/metabolic brain injury. (*Id*.) Toxicology results were negative for alcohol, common drugs of abuse, and medications. (*Id*.) The ME

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

determined the cause of death to be pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with COVID-19, pulmonary emphysema, and duodenal ulcer identified as contributing conditions. The ME noted that although records reflected the availability of meals, continuous in-cell water supply, psychiatric medications, and medical evaluations, the delivery of such care was ineffective. (*Id*.) Despite this statement, the autopsy confirmed that food was found in Rupard's stomach. (*Id*. at COSD 006376–006416; Ex. 90 at 14-15, 17.) The ME further noted that although Rupard exhibited self-neglect, he was dependent on others for care. Accordingly, the ME classified the manner of death as homicide. (*Id*.)

**O. Homicide Investigation**

The homicide investigation found no individual responsible for Rupard's death. (Ex. 29 at COSD 001591–001677.) The lead homicide detective's reports noted that Cell 17's water was operable. (*Id*. at COSD 001641.) Review of the video from March 17, 2022 showed multiple checks were completed by deputies on Rupard. The logs were consistent with what was on video. (*Id*. at COSD 001637–001642.) The homicide report noted that the condition of Rupard's cell was not uncommon for inmates with psychiatric history. The detective concluded that the condition of Rupard's cell, while visually upsetting, was not a factor in his death. (*Id*. at COSD 001675.)

**P. Supervisory Defendants**

At the time of Rupard's death, Sheriff William Gore was retired as of February 3, 2022. (TAC, ¶ 42.) Sheriff Kelly Martinez was the Undersheriff and Acting Sheriff after Gore's retirement. (TAC, ¶ 44.) Dr. Jon Montgomery was the Chief Medical Officer for the County's Sheriff's Department. (TAC, ¶ 48; Ex. 72 at 224:19-25; 225:1-4; Ex. 101 (FROG No. 1 (Montgomery).) Gore, Martinez, and Dr. Montgomery had no personal involvement with Rupard. (Ex. 103 (RFA, No. 3; Rog, Nos. 18–19); Ex. 104 (RFA, Nos. 1, 3); Ex. 72 at 224:19-25; 225:1-4; Ex. 101 (ROG Nos. 13, 17–19 (Gore), 10, 18 (Martinez), 1-3, 13, 17–19 (Montgomery).)

At no point during Rupard's incarceration and through his death, did Gore or

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Martinez review any records relating to Rupard, nor was any request for review submitted to them. (Ex. 103 (ROG No. 9); Ex. 104 (Revised ROG Nos. 5, 6, 9, 10).) Dr. Montgomery had no personal involvement with Rupard and only participated in the mortality review after Rupard's death. (Ex. 25 at COSD 002033–002035; Ex. 72 at 57:21-25; 58:1-7; 224:19-25: 225:1-4.)

During the relevant time period between 2021 and 2022, County maintained and enforced policies and procedures regarding mental health, medical, and psychiatric care. (Ex. 62.) The deputies were all trained on County policies. (Ex. 32; Ex. 33; Exs. 34–47; Exs. 48–60.) MHC Goodall had extensive training, education, experience, and received training on mental health care. (Ex. 35; Ex. 62; Ex. 69 at 17:1-10, 118:1–119:25.) County also maintained and enforced policies and procedures regarding safety checks and counts under Title 15. (Ex. 63; Ex. 73 at 25:16-22.) The Deputy Defendants had extensive training, education, and experience and received training on safety checks and counts under Title 15. (*Id.*; Ex. 32; Ex. 33; Exs. 34–47; Exs. 48–60.)

The Liberty Provider Dr. Cruz was trained with regard to the County's psychiatric-care policies. He was trained with regard to the County's policies governing the provision of psychiatric care to inmate-patients, including MSD Operations Manual provisions on PSU placement and admission, psychotropic medication and medication-refusal procedures, and the mental-health care of segregated inmates. (Ex. 62; Ex. 82 at 172-173 & Exs. 2, 4-6.)

### Q. Rupard's Government Tort Claim

Rupard died on March 17, 2022. He left no will and died intestate. He was not married at the time of death and was survived by two biological sons, Justino Rupard and Ronnie Rupard. (Ex. 97 at ¶¶ 2-5, 9.) On March 9, 2023, Justino Rupard submitted government claims to the County of San Diego. (*Id.* at ¶ 6.) Justino's claim form—stamped received by the County on March 9, 2023—was signed March 8, 2023, listed the date of occurrence as March 17, 2022, and claimed $30,000,000. (*Id.*) On March 14, 2023, Justino Rupard resubmitted the claims together with an application for leave

to present a late claim under Government Code § 911.4. (*Id.* at ¶ 7.) The § 911.4 application, dated March 14, 2023, was stamped received by the County on March 14, 2023. (*Id.*) In the late-claim application, the claimants asserted that the accrual date was March 2, 2023—the date the County released its ME's report ruling the death a homicide—and, in the alternative, that if the County contended accrual ran from the date of death on March 17, 2022, the letters served as § 911.4 applications for leave to present a late claim. (*Id.*) The federal action was filed on July 26, 2023. The first amended complaint was filed November 21, 2023, and the second amended complaint on March 7, 2024. When the action commenced, no probate proceeding for the administration of Lonnie Rupard's estate was pending. (*Id.* at ¶ 8.) On December 4, 2023, Justino Rupard filed a petition to open an estate and be appointed administrator. (Ex. 99.) On February 21, 2024, Justino nominated Terri Lopez to serve as administrator, and Terri Lopez consented. On April 15, 2024, the probate court appointed Terri Lopez administrator of the Estate, and Letters of Administration issued on May 17, 2024. (Ex. 97 ¶¶ 13-14, 21; Ex. 99; Ex. 100.) Terri Lopez is Justino Rupard's maternal grandmother. Her stated role in the action is solely as the court-appointed administrator of the Estate, pursuing the Estate's survival claims; she brings no separate or individual claims. (Ex. 89 at 31:24-32:3; Ex. 100.)

## III. LEGAL STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1080 (9th Cir. 2004). If summary judgment is not granted on the entire action, a court may render partial summary judgment on individual issues as to which there remains no genuine issue of material fact. Fed. R. Civ. P. 56(c)(2). Summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

has no burden to negate or disprove matters on which the non-moving party has the burden of proof at trial but needs only point out to the Court through argument an absence of evidence to support the non-moving party's case. *Devereaux v. Abbey*, 263 F.3d 1070 1076 (9th Cir. 2001). Indeed, the opposing party may not rely upon the mere allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits and/or admissible discovery material, in support of its contention that the dispute exists. *Id*.; F. R. Civ. P. 56(c).

## IV. PLAINTIFF'S SECTION 1983 CLAIMS FAIL AS A MATTER OF LAW

### A. No Violation or Causation Under the 8th or 14th Amendment

Because Rupard was confined on a PRCS revocation, his § 1983 medical claim is governed by the Eighth Amendment's subjective deliberate-indifference standard, not the Fourteenth. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); and, for parole violators, *Flores v. Mesenbourg*, 1997 WL 303277 (9th Cir. 1997), and *Estate of Wilson v. Cnty. of San Diego*, 2022 WL 789127, at *15 (S.D. Cal. 2022). Even under the more plaintiff-favorable Fourteenth Amendment objective standard, Plaintiff must prove that each defendant (i) made an intentional decision as to the conditions of Rupard's confinement; (ii) those conditions put him at substantial risk of serious harm; (iii) the defendant did not take reasonable available measures to abate that risk though a reasonable official would have appreciated the high degree of risk; and (iv) by not taking such measures, caused Rupard's injuries. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018). The conduct must be worse than negligent—even gross negligence is insufficient. *Id.* at 1125; *Toguchi v. Chung*, 391 F.3d 1051, 1057-60 (9th Cir. 2004); *Alexander v. Nguyen*, 78 F.4th 1140, 1145 (9th Cir. 2023).

Although the TAC characterizes Rupard as a pretrial detainee "awaiting trial" on a parole violation (TAC ¶ 341), the custody and classification records establish that Rupard was confined following revocation of his PRCS term. (Ex. 2 at COSD 006428-006429; Ex. 4 at COSD 006426.) Eighth Amendment medical claims require proof of

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

"both the objective and subjective components of a two-part test." *Toguchi*, 391 F.3d at 1057. Objectively, the inmate must have a "serious" medical need—one whose failure to treat results in "significant injury or the unnecessary and wanton infliction of pain" *Peralta v. Dillard*, 744 F.3d 1076, 1081 (9th Cir. 2014). Subjectively, the official is "deliberately indifferent to that need" only if he "knows of and disregards an excessive risk to inmate health." *Id.* at 1082.

This subjective component is demanding and is the dispositive point here. The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 686 (9th Cir. 2021). Critically, a prison official who is not actually aware of a medically related risk to an inmate, even if he should have been aware, has not violated the Eighth Amendment, no matter how severe the risk. *Id*. at 668.

Liability under Section 1983 requires actual and proximate cause. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). Traditional tort law principles regarding intervening causes that break the chain of proximate causation apply. *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996).

That principle is dispositive here. The medical decisions Plaintiff contends should have come out differently—whether to continue or discontinue Rupard's medications, whether to compel treatment, and whether to admit him to the PSU—rested exclusively with Dr. Cruz, the treating psychiatrist, who exercised his own independent professional judgment. No County Defendant had authority to prescribe, continue, or discontinue medication, to override a psychiatric treatment decision, or to order PSU placement. Dr. Cruz's independent clinical judgment was therefore an intervening cause that, as a matter of law, broke any chain of proximate causation running from the conduct of the County Defendants. Even assuming a County Defendant had acted unreasonably, it was Dr. Cruz's superseding exercise of

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

independent medical judgment—not any act or omission of the County Defendants—that proximately determined the course of treatment Plaintiff now challenges.

Here, Plaintiff asserts a 14th Amendment medical care claim against County Defendants, alleging that they acted with deliberate indifference to Rupard's medical needs by failing to: (1) provide medical care in the form of medications, psychiatric treatment, medical treatment for malnourishment, and medical monitoring; (2) choose to a medically acceptance course of treatment by not placing Rupard in PSU; and (3) monitor risks to Rupard's health when it was known Rupard was not taking his medications, demonstrating psychosis and was malnourished. (TAC ¶ 344)

**1. No Constitutional Violation or Causation by Deputy Defendants**

Plaintiff cannot demonstrate that any Deputy Defendant was deliberately indifferent to Rupard's medical needs under either the Eighth or Fourteenth Amendment standard. The PSU and medication decisions Rupard challenges belonged, by County policy, to the onsite psychiatrist, not to any deputy. (Ex. 62 at COSD 006324–006325.) It is undisputed that deputies had no authority to prescribe any medications to inmates. (*Id.*) Deputies had absolutely no authority to override psychiatry decisions on what medical treatment Rupard should receive. (*Id.*) The deputies also had no authority to make decisions on Ad Seg classifications. (*Id.*)

Rupard was provided available care with the assigned on-site psychiatrist and was prescribed medications, but Rupard refused them. (Ex. 10 at COSD 000059–000060; Ex. 12 at COSD 000070–000135.) It is further undisputed that Dr. Cruz, Rupard's treating psychiatrist, decided to discontinue Rupard's medications. (Ex. 10 at COSD 000052–000062.)

Plaintiff cannot establish that any of the deputies were deliberately indifferent to Rupard's "serious medical need" and knowingly disregarded the risk. (TAC ¶ 108) Plaintiff lists deputies who worked a shift on the seventh floor sometime during the period of March 15, 2022 through March 17, 2022, the days leading up to Rupard's

death. Each deputy adhered to County policy, performed the required checks, and did not observe anything during their individual checks that prompted deputies to take further action at that time. (Ex. 67 at COSD 004591–004834.) These deputies were not medical professionals, and Rupard did not demonstrate signs that he was in medical distress during the safety checks, outside of the check on March 17 at 22:37. (*Id.*)

The deputies bear no individual liability, and each is answerable only for the shifts he or she actually worked in Module 7D. Their job was custodial (hourly Title 15 safety checks, security, and clinical escort) not diagnosis, treatment, PSU placement, or classification. (Ex. 62; Ex. 63.) A deputy is liable under § 1983 only for his or her own personal participation in a constitutional violation. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). The Area Activity Logs confirm each named deputy made his/her assigned checks across those days, and that on every round before the last, Rupard was responsive and did not appear in emergent medical distress on every round before 22:37 on March 17. (See Section II.L-M, Statement of Facts; Ex. 67 at COSD 004591–004834.)

Additionally, Plaintiff cannot satisfy the subjective component. There is no evidence that establishes the deputies who worked a shift between March 15 and March 17 deliberately disregarded any known medical risk of Rupard. Nor is there any evidence that deputies refused to follow physician orders or any treatment plan for Rupard. (Ex. 10 at COSD 000052–000062.)

Some of these 11-53 safety checks were divided between deputies, meaning that not every check on Rupard's cell was performed by the same deputy on the shift. Regardless, these safety checks met the policy standards and deputies did not observe Rupard experiencing emergent medical distress that would have required further intervention until the 22:37 safety check on March 17. When Deputy Romans observed Rupard appeared to be in medical distress, he immediately called for backup and deputies entered Rupard's cell and performed lifesaving measures.

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

While Plaintiff contends that Rupard's cell condition is evidence of deputies acting with deliberate indifference, this also fails. The March 17 cell-cleaning by the trustees that inadvertently skipped Rupard's cell was a hygiene task, not medical care, and figures in no cause-of-death finding. From December 25, 2021 to March 5, 2022, the logs reflect that hygiene checks were performed on Rupard's cell every two weeks. (Ex. 22 at COSD 000160–000265.) Hygiene checks are separate from the 11-53 safety checks performed by deputies. The last logged hygiene check on Rupard was on March 5, 2022 but video footage depicts that the inspection was not completed on Rupard's cell. (*Id.*) Deputy Johnson called trustees to clean cells, including Rupard's cell. There is no reason for the deputies to think or know that Rupard's cell cleaning would have been skipped.

The conditions Dr. Badre recorded on the morning of March 14, 2022 were included only in his court-ordered forensic report, delivered to the court after Rupard died. Custody staff never received it. Nor did Dr. Badre ever communicate his findings or concerns about Rupard's condition during the March 14 exam to anyone at the jail.

Safety checks are custodial observations, not the clinical evaluation Plaintiff faults the deputies for not performing. Failure to provide sufficient clinical evaluation, if any, is attributable only to Dr. Cruz who was responsible for Rupard's psychiatric treatment, care, and medication during his incarceration. Dr. Badre described the conditions of Rupard's cells for purposes of his diagnostic finding of Rupard's disorganized thought for mental competency purposes.

Under County policy, only Dr. Cruz and the Liberty psychiatry service could order PSU placement and manage Rupard's medications. The ME tied the death in part to Rupard's own refusals for medication. Psychiatry was responsible for Rupard's medication management and treatment plan. Deputies did not make any medical or psychiatry/mental health decisions nor were they even entitled to know this information under HIPAA; deputies' responsibility were to provide security. No act or omission of a County deputy was a substantial factor in his death. The "homicide"

manner of death does not change that. To the contrary, it affirms that no deputies have individual liability. As the ME explained, it assigns no blame to any individual for Rupard's death. A ME "homicide" classification reflects only that death resulted at the hands of another, not a finding of fault against any particular person. The investigations that did assess individual culpability—the Sheriff's homicide investigation, Internal Affairs, the District Attorney, and the United States Attorney's Office—each declined to find wrongdoing by, or to prosecute, any individual. No deputy's act or omission caused Rupard's death. For the same reasons set out above—responsive care, a mere difference of medical judgment, and the absence of defendant-specific causation—Plaintiff cannot meet that standard, and the individual deputies are entitled to summary judgment and to qualified immunity under either framework.

### 2. Deputies Are Entitled to Qualified Immunity

Even if Plaintiff could raise a triable question on the underlying constitutional claim, each named deputy is independently entitled to qualified immunity. The doctrine asks two questions, and Plaintiff must prevail on both: (1) whether the deputy violated a federal constitutional right, and (2) whether the unlawfulness of that deputy's conduct was clearly established at the time. *D.C. v. Wesby*, 583 U.S. 48, 62-63 (2018). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* The Court may grant summary judgment on either prong. *Rosales v. Cnty. of San Diego*, 511 F.Supp.3d 1070, 1092-1093 (S.D. Cal. 2021). Here, both prongs point the same way: no deputy who performed routine Title 15 monitoring committed a constitutional violation, and no clearly established law placed the asserted duty to intervene in Rupard's medical and psychiatric care "beyond debate."

#### a. The Law Must Govern Each Deputy's Specific Conduct

A right is "clearly established" only where existing precedent places "the constitutionality of the officer's conduct beyond debate." *D.C.*, 583 U.S. at 62-63. The rule must be "settled law" – "dictated by controlling authority or a robust consensus of

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

cases of persuasive authority"; "[i]t is not enough that the rule is suggested by then-existing precedent." *Id.* at 63. And the inquiry demands a high "degree of specificity." *Id.* at 63-64. Courts "must not define clearly established law at a high level of generality," because doing so "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* Plaintiff must therefore "identify a case where an officer acting under similar circumstances" was held to have violated the Constitution; absent the "rare 'obvious case,'" a general principle will not do. *Id.* at 64. The Ninth Circuit applies the same test to deliberate-indifference claims: the right "must be defined with specificity," and precedent must "squarely govern[] the specific facts at issue." *Gordon*, 6 F.4th at 968-970.

Critically, this inquiry is objective even though the deliberate-indifference claim has subjective features. *Id.* at 968. As the Ninth Circuit explained in *Est. of Ford v. Ramirez-Palmer*, the qualified immunity analysis is "separate from the constitutional inquiry," so a deputy is immune unless it would have been clear to a reasonable officer "knowing what [the deputy] knew" that the conduct was unlawful. 301 F.3d 1043, 1053 (9th Cir. 2002). Because "a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm [] could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high," the official "would be entitled to qualified immunity." *Horton v. Horton v. City of Santa Maria*, 915 F.3d 592, 600 (9th Cir. 2019).

**b. No Deputy Committed a Constitutional Violation**

Plaintiff must prove, as to each deputy, that his or her own acts or omissions were both deliberately indifferent and "the actual and proximate cause of the deprivation." The causation inquiry "must be individualized and focus on the duties and responsibilities of each individual" and "[s]weeping conclusory allegations will not suffice." *Leer*, 844 F.2d at 633-634.

The deputies cannot satisfy that standard, They are not supervisors, psychiatrists, or the officials who made the treatment and housing decisions at the

center of this case. Plaintiff's theory rests on the discontinuation of antipsychotic medication, the failure to conduct a psychiatric evaluation, the failure to place Rupard in the PSU, and the failure to monitor his weight and vital signs—none of which was committed to the custodial deputies who worked shifts in Module 7D. Deputies who conducted safety checks in accordance with Title 15 during a single shift in the final days of an alleged months-long decline cannot be the cause-in-fact of a death the ME attributed to "pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia." (Ex. 28 at COSD 006376-006416.)

Negligence, even gross negligence, is not deliberate indifference. Even if a deputy's cell check was brief or late, that sounds in negligence, not reckless disregard. "Deliberate indifference is a high legal standard"; [a] showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation," and "even gross negligence is insufficient." *Toguchi*, at 1060-1061. An official is liable only if he "knows of and disregards an excessive risk"; [i]f a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the [Constitution], no matter how severe the risk. *Id.* at 1057. *Toguchi* is analogous: it involved the discontinuation of psychiatric medication, a failure to conduct a differential diagnosis, and alleged inadequate monitoring of a mentally ill inmate who died, yet the Ninth Circuit held that a "difference of medical opinion" and failure to evaluate "conceivably could have risen to the level of negligence" but was not deliberate indifference. *Id.* at 1058-1060. The same principle defeated the claim in *Est. of Ford*, where the officers' failure to follow prison procedures "was certainly negligent; but negligence[] … 'cannot be condemned as the infliction of punishment.'" 301 F.3d at 1052.

An institutional "ineffective delivery of care" is therefore not the same as deliberate indifference by an individual custodial deputy performing monitoring duties while psychiatry staff retained responsibility for Rupard's treatment. Officials "who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

averted." *Meredith v. Ada Cnty. Sheriff's Dept*, No. 113CV00381EJLREB, 2016 WL 1117401 (D. Idaho Mar. 22, 2016.)

**c. The Law was Not Clearly Established**

Even assuming a violation, which County Defendants deny, Plaintiff cannot identify clearly established law that placed the unlawfulness of each deputy's specific conduct "beyond debate." *D.C.*, 583 U.S. at 64. It is not enough to invoke the general proposition that officials may not be deliberately indifferent to an inmate's serious medical needs; that formulation is cast at exactly the level of generality the Supreme Court has condemned. *Id.* at 63-64. As the Ninth Circuit held in *Horton*, "whether or not [the officer] was in fact deliberately indifferent," there was "no case law at the time of the incident clearly establishing that a reasonable officer should have perceived the substantial risk." 915 F.3d at 601-602. *Est. of Ford* makes the point decisive here: it is "not sufficient" that the general rule against deliberate indifference is clearly stated; because no authority has "fleshed out" when a risk becomes sufficiently "substantial," a reasonable official is entitled to immunity. 301 F.3d at 1050-1051.

On facts materially closer to this case, courts have granted qualified immunity non-medical officers performing exactly the kind of custodial monitoring at issue:

In *Gordon*, the Ninth Circuit granted qualified immunity to a custodial deputy performing Title 15 safety checks, holding that "the due process right to an adequate safety check for pretrial detainees was not clearly established at the time of the incident" and recognizing that right only prospectively. 6 F.4th at 965-967, 973. That narrow, forward-looking right — to "direct-view safety checks sufficient to determine whether [a detainee's] presentation indicates the need for medical treatment" — does not place beyond debate the far more demanding duty Plaintiff posits: that a deputy on monitoring rounds, while psychiatry staff bore responsibility for Rupard's treatment, had to intervene in his psychiatric care, second-guess his housing, or perceive the risk of impending death from a cell-front vantage. Other courts also agree that officers performing custodial monitoring are entitled to qualified immunity absent clearly

established law requiring more. *See Horton*, 915 F.3d at 601-602; *Cravotta v. Cnty. of Sacramento*, 717 F.Supp.3d 941, 954-955 (E.D. Cal. 2024); *Gohranson v. Snohomish Cnty.*, No. C16-1124RSL, 2018 WL 5921012 (W.D. Wash. Nov. 13, 2018); *Smith v. Las Vegas Metro. Police Dep't*, No. 2:23-CV-00092-JAD-NJK, 2026 WL 837398 (D. Nev. Mar. 26, 2026).

A court in this District has applied the same principle to grant qualified immunity, holding that—absent the "rare" "obvious" case—a plaintiff must "identify a controlling case existing at the time of the incident where an officer acting under similar circumstances as deputy defendants was held to have violated the constitutional right at issue." *Rosales*, 511 F.Supp.3d at 1092-1093. Plaintiff cannot identify such a case. Denials of qualified immunity involve officials who perceive or confront an obvious, acute emergency and consciously fail to act. *See Sandoval*, 985 F.3d 657 (9th Cir. 2021); *D'Braunstein v. Cal. Highway Patrol*, 131 F.4th 764 (9th Cir. 2025).

**d. The "Rare" "Obvious" Case Exception Does Not Apply**

Plaintiff's only remaining path—that the general deliberate-indifference standard defeats immunity without a case on point—fails. The "obvious case" is "rare," and the Ninth Circuit has found one "only…in exceedingly rare circumstances with extreme facts." *Waid v. Cnty. of Lyon*, 87 F.4th 383, 388 (9th Cir. 2023). The paradigm is *Hope v. Pelzer*, 536 U.S. 730 (2022), where guards chained an inmate to a hitching post for seven hours in the sun, denying water and bathroom breaks "despite the clear lack of an emergency" – "gratuitous infliction of 'wanton and unnecessary' pain." *Id.* at 738. A deputy performing routine Title 15 checks, confirming an inmate is not in observable distress while psychiatry staff direct his treatment, bears no resemblance to that "obvious cruelty." *Waid*, 87 F.4th at 388. Because no individual deputy was the actual and proximate cause of a constitutional violation and because no clearly established law placed the lawfulness of each deputy's specific routine monitoring conduct "beyond debate," each named deputy is entitled to qualified immunity.

**3. No Constitutional Violation or Causation by MHC Goodall**

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Plaintiff cannot establish that MHC Goodall was deliberately indifferent to Rupard's medical needs by failing to take action to provide psychiatric care to Rupard, failing to refer Rupard for a higher level of care, failing to obtain psychiatric medication, failing to weigh Rupard, and/or failing to comply with the policy on hunger strikes. (TAC ¶ 125.) Goodall had limited involvement with Rupard because Rupard was not an Ad Seg inmate who would regularly appear on Goodall's patient list. (Ex. 16 at COSD 017940–017945; Ex. 105 at ¶ 12.) Rupard was already under the psychiatric care of Dr. Cruz, who was responsible for Rupard's treatment plan and medications and determined whether he met criteria for PSU admission. (Ex. 10 at COSD 000052–000062.) At the time of the February 9, 2022 evaluation, Goodall understood that Rupard was receiving psychiatric care from Dr. Cruz, who was responsible for managing his treatment plan. The information available to Goodall provided no indication that Rupard faced an imminent medical emergency or a risk of death in the ensuing weeks. (*Id*; Ex. 105 at ¶ 8.) Dr. Cruz himself, a licensed psychiatrist, believed that as of February 22, Rupard was not at serious risk for harm and appeared in similar physical health as he did back in December 2021. (Ex. 10 at COSD 000052–000062.)

First, Goodall was not deliberately indifferent to Rupard's "serious" medical needs because she did not make an intentional decision with respect to Rupard's conditions of confinement. *Gordon*, 888 F.3d at 1125; *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) ("[a]n *inadvertent* failure to provide adequate medical care does not, by itself, state a deliberate indifference claim for § 1983 purposes." (emphasis in original) (quotation marks omitted)).

Goodall did not make an intentional decision to disregard Rupard's medical needs. Rupard was not an Ad Seg inmate under policy section MSD.G.2.1, so Goodall had no requirement to evaluate Rupard on a weekly basis. (Ex. 62 at COSD 006311–006312; Ex. 105 at ¶ 12.) Goodall was expected to complete MHC duties including performing gatekeeping assessments, Ad Seg wellness checks, QMHP sick calls, and

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

other clinic appointments as needed. (*Id*. at ¶¶ 5–6.) Goodall followed County standard practice and completed assessments as directed by SDCJ deputies to respond to the needs of the jail. (*Id.* at ¶¶ 5–6.) Goodall evaluated Rupard on February 9, 2022 pursuant to a QMHP sick-call request after Rupard's DI incident, not because he was Ad Seg classified. (Ex. 19 at COSD 000479; Ex. 13 at COSD 000152; Ex. 105 at ¶ 7.) Goodall's conduct here does not violate due process. *Davidson v. Cannon*, 474 U.S. 344, 106 S. Ct. 668, 668-69 (1986) ("lack of due care, while leading to serious injuries, simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent.") Although Plaintiff claims that Goodall failed to provide Rupard with adequate medical care, no evidence to support this assertion. (TAC ¶ 119).

Secondly, no reasonable official would have appreciated Rupard's "serious" medical needs under the circumstances. Goodall did not interact with, communicate with, or observe Rupard before his passing. (Ex. 105 at ¶¶ 10–11.) Accordingly, "Plaintiff cannot prove that [Goodall] knew of and disregarded [Rupard's] health [or safety] risks." *Lemoon v. California Forensic Med. Grp., Inc.*, 575 F.Supp.3d 1212, 1223 (N.D. Cal. 2021); *see also Cavanaugh v. Cnty. of San Diego* (S.D. Cal. Nov. 12, 2020), judgment entered, No. 18-CV-02557-BEN-LL, 2020 WL6702029 (S.D. Cal. Nov. 13, 2020), and aff'd, No. 20-56311, 2021 WL6103115 (9th Cir. Dec. 22, 2021).

Courts have held that deliberate indifference cannot be established under similar facts. *See Est. of Barrick v. Cnty. of San Joaquin*, No. 2:18-CV-02216-MCE-DB, 2021 WL5331456, at *5 (E.D. Cal. Nov. 16, 2021) (no deliberate indifference by on-site supervising clinician with respect to detainee-s in-custody suicide where clinician did not provide mental health treatment to detainee and did not interfere with treatment). Although Dr. Badre reported that Rupard needed to be on his psychiatric medications, Dr. Cruz was the one who made the sole decision to discontinue Rupard's medications. (Ex. 10 at COSD 000052–000062.) Goodall had no say in that decision at any point in time as an MHC. (Ex. 105 at ¶ 15.)

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

There is no evidence suggesting that Goodall "personally played a role in the alleged constitutional violations, either directly or by acquiescence or culpable indifference" so there is "no basis for liability against [Goodall] in [her] individual capacit[y]" *Matysik v. Cnty. of Santa Clara*, No. 16-CV-06223-LHK, 2018 WL 732724 (N.D. Cal. Feb. 6, 2018). Goodall had no authority to obtain psychiatric medication for Rupard nor was Rupard classified as a hunger strike inmate because Rupard did take meals. (Ex. 105 at ¶ 15; Ex. 19 at COSD 000479.) Occasionally skipping meals or eating portions of a meal does not constitute a hunger strike in accordance with County policies. (Ex. 63 at COSD 006088–006127.)

Third, Plaintiff cannot show causation. Goodall conducted a QMHP assessment on February 9 pursuant to a sick-call request after Rupard's DI incident. (Ex. 19 at COSD 000479; Ex. 13 at COSD 000152; Ex. 105 at ¶ 7.) During this evaluation, while Rupard was not cooperative, Goodall was able to observe that Rupard was not displaying any distressing symptoms or major impairments at this time. (Ex. 19 at COSD 000479.) Additionally, the records showed that Rupard was already under the care of Liberty's psychiatry service with scheduled follow-ups. (*Id.*; Ex. 10 at COSD 000061–000062.) On her own accord, in the exercise of her own clinical judgment, Goodall set a discretionary follow-up appointment for February 23. This was not physician-ordered or mandatory. (Ex.105 at ¶ 9.) Because Rupard was already under the care of the psychiatry service, with scheduled follow-ups in place, Goodall exercised her clinical judgment to prioritize her caseload—152 encounters over 16 working days—toward inmate-patients whose needs were not otherwise being addressed by another provider. (*Id*. at ¶¶ 13-14)

The record shows responsive care, not conscious disregard. It is undisputed that medical and psychiatric care was provided: as the Medical Examiner found, "[r]ecords document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations."

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Rupard was assessed and evaluated by psychiatrist Dr. Cruz, who set a plan of continued monitoring and follow-up. (TAC ¶ 137; Ex. 10 at COSD 000061–000062.) It is undisputed that Rupard was under the care of Dr. Cruz, who was responsible for Rupard's psychiatric care and treatment plan. That Plaintiff contends a different course should have been chosen—involuntary medication, a PSU transfer, or state-hospital referral (TAC ¶¶ 153-156)—establishes, at most, a difference of medical judgment. A "mere 'difference of medical opinion …[is] insufficient, as a matter of law, to establish deliberate indifference'…[the] prisoner must show the chosen course 'was medically unacceptable under the circumstances' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058. Ninth Circuit authority holds that where, as here, a clinician defers to the treating psychiatrist, there is no evidence that such conduct "den[ied], delay[ed], or intentionally interfere[d] with [Rupard's] medical treatment." *Toguchi*, 391 F.3d at 1061.

None of these decisions fell under Goodall's authority as she could not enforce involuntary medication, PSU admissions, or state-hospital referrals that Plaintiff contends should have occurred with Rupard. (Ex. 62 at COSD 006324–006325; Ex. 105 at ¶ 15.) Therefore, no constitutional violation claim exists against Goodall.

**4. MHC Goodall is Entitled to Qualified Immunity**

Notwithstanding, Goodall is entitled to qualified immunity from liability because Plaintiff cannot demonstrate that Goodall (1) violated a statutory or constitutional right by failing to take action to provide psychiatric care to Rupard, failing to refer Rupard for a higher level of care, failing to obtain psychiatric medication, failing to weigh Rupard, and failing to comply with the policy on hunger strikes (TAC ¶ 125.) or (2) that the right was clearly established at the time. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *see also Horton*, 915 F.3d at 599; and *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine gives clinicians "breathing room to make reasonable but mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft*, 563 U.S. at 743.

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

For the reasons set forth above in addressing the constitutional claim, Goodall performed all her duties as an MHC in accordance with County policy, was neither Rupard's assigned provider nor the decisionmaker for the treatment and housing choices at issue, and did not act with deliberate indifference. The qualified-immunity analysis therefore turns on the clearly-established prong, which Plaintiff independently cannot satisfy.

Plaintiff cannot point to any law clearly establishing a right to receive routine mental health follow-up assessments by an MHC who was not Rupard's scheduled provider. It is clearly established that officials are prohibited from displaying deliberate indifference to known serious medical needs or health risks. *Gilbert v. Turner*, 2024 WL 1947137, at *2 (9th Cir. May 3, 2024). District courts have rejected the argument, however, that inmates have a clearly established right to have a certain number of weekly visits within mental health staff. *Tater v. City of Huntington Beach*, No. 820CV01772MEMFJDEX, 2023 WL 4291656, at *26 (C.D. Cal. May 8, 2023) (citing *Cabrales v. Cnty, of Los Angeles*, 864 F.2d 1454, 1461 (9th Cir. 1988), *cert. granted and opinion vacated*, 490 U.S. 1087 (1989), *reinstated*, 886 F.2d 235 (9th Cir. 1989)).

The Ninth Circuit has squarely held that inmates have no constitutional entitlement to a set level or schedule of mental-health services. In *Hallett v. Morgan*, low mental-health staffing did not violate the Constitution where requests were triaged by the next business day and addressed within days, and the court held that "delay in providing a prisoner with [treatment], standing alone, does not constitute an eighth amendment violation" and that the absence of routine, schedule care—provided instead "in [the clinician's] discretion"—is not deliberate indifference absent proof of severe, foreseeable harm. 296 F.3d 732, 745-746 (9th Cir. 2002). In *Russell v. Lumitap*, the court found qualified immunity for a nurse who acted within her role and relied on the responsible physician's judgment. 31 F.4th 729 (9th Cir. 2022).

Rupard had no constitutional right to weekly visits with MHC Goodall. (Ex. 62 at COSD 006311–006312; Ex. 105 at ¶ 12.) Goodall performed the evaluation

requested on February 9 pursuant to a QMHP sick-call request, and the record contains no evidence that Goodall knew of and disregarded a risk to Rupard's health or safety during that evaluation. (Ex. 19 at COSD 000479.) Goodall perceived no risk, and the one follow-up she could not reach was covered by the staff psychiatrist, Dr. Cruz, within a day. Therefore, no basis exists to deny Goodall qualified immunity.

### B. Plaintiff's *Monell* Claim Fails as a Matter of Law

#### 1. The Monell Standard

Plaintiff's *Monell* claim against County alleging inadequate medical care policies and training program fails because no evidence supports a finding that any Deputy or MHC Goodall violated Rupard's constitutional rights. Plaintiff alleges that County had a custom of inaction or failed to implement or adopt a policy providing adequate medical care or mental health services to inmates such that it amounts to deliberate indifference. (TAC ¶¶ 409, 412) Plaintiff further alleges that County failed to adequately train its staff how to identify, treat, and house inmates displaying critical mental health needs on a continued basis such that County is deliberately indifferent to their needs. But Plaintiff lacks evidence to support these theories.

To succeed in the *Monell* claim, Plaintiff must show "(1) that [Rupard] possessed a constitutional right of which he was deprived; (2) that the [County] had a policy; (3) that this policy amounts to deliberate indifference to [Rupard]'s constitutional right; and (4) that the policy is the moving force behind the constitutional violation." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992); *see Connick*, 563 U.S. 51 at 60. "[R]igorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).

First, to the extent Plaintiff's *Monell* claim against County is premised upon the conduct of the deputies and MHC Goodall, that claim fails because, as set forth above, the evidence cannot support a finding that either deputies or MHC Goodall violated Plaintiff's rights under either the Eighth or Fourteenth Amendment. *Villegas v. Gilroy*

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

*Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir. 2008) ("Because there is no constitutional violation, there can be no municipal liability"). Neither Deputy Defendants nor MHC Goodall acted with deliberate indifference to Rupard's risk for serious medical harm. The deputies performed their custodial duties by conducting hourly Title 15 safety checks, providing security and clinical escorts. (Ex. 67 at COSD 004591–004834.) The deputies had no responsibilities involving the diagnosis, treatment, PSU placement or classification of Rupard. (Ex. 62.)

Goodall also performed all her duties as an MHC given that Rupard was not an Ad Seg inmate on any of Goodall's Ad Seg queue list, and appropriately assessed Rupard during the February 9 wellness check following Rupard's DI incident. (Ex. 19 at COSD 000479; Ex. 105 at ¶¶ 6–8.) Similarly, even if Plaintiff can establish that County's policies and customs violate the constitutional rights of its inmates, it cannot show causation between the allegedly unconstitutional policies or customs and Rupard's resulting death. There are no facts that suggest a causal link between the deputies' Title 15 safety checks or Goodall's clinical assessment and Rupard's death. (Ex. 67 at COSD 004591–004834; Ex. 28 at COSD 006376–006416.)

Further, County had sufficient policies in place during December 2021 through March 2022 and all SDCJ staff, including the deputies and MHC Goodall, received proper training. The County LMS training transcripts document a complete, individual training history for each named Deputy Defendant and for MHC Goodall. (Ex. 33-47.) A failure-to-train theory requires a pattern of similar constitutional violations by untrained employees; this documented, individualized training record is the opposite of the untrained workforce such a theory demands. *Connick*, 563 U.S. at 62; *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1158-59 (9th Cir. 2014). A municipality is "responsible only for [its] own illegal acts" and is "not vicariously liable under § 1983 for [its] employees' actions." *Id.* at 60. *Monell* liability cannot attach absent an underlying constitutional violation by a County actor. Because Plaintiff cannot establish an Eighth or Fourteenth Amendment violation by any individual County

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Defendant, the *Monell* claim fails at the threshold.

Even if a predicate violation existed, Plaintiff must prove that "action pursuant to official municipal policy"—a formal policy, a "longstanding practice or custom," a final policymaker's act, or ratification—"caused their injury" and was its "moving force." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). "A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom"; the practice must be "of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* Plaintiff's reliance on isolated prior incidents and media accounts (TAC ¶¶ 214-216) does not establish a custom with the force of law or that any such custom was the moving force behind this death. The summary-judgment record contains no evidence of an official policy, custom, or practice to support the *Monell* claim. Absent an underlying constitutional violation, the *Monell* claim fails with the individual claims. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

**2. Prior In-Custody Deaths Are Not Pattern of Similar Violations**

Here, Plaintiff relies on news articles, audits, and other incidents to infer a de facto policy of inadequate monitoring and medical care. (TAC ¶¶ 214-320.) Plaintiff has adduced no evidence of a specific County policy that is itself unconstitutional, nor evidence of a well-settled and permanent practice so widespread as to have the force of law. Plaintiff's list of prior in-custody deaths cannot establish notice because the incidents are not similar to Rupard's death. A pattern sufficient to show deliberate indifference requires prior violations that are similar to the one at issue; dissimilar incidents "could not have put [the municipality] on notice that specific training was necessary to avoid this constitutional violation." *Connick*, 563 U.S. at 62-63. The Ninth Circuit enforces that similarity requirement at summary judgment: "isolated incidents" dissimilar to the plaintiff's injury do not suffice to put the County on notice, and a defendant not "faced with a pattern of similar constitutional violations by untrained employees" is entitled to judgment. *Flores*, 758 F.3d at 1159-1160.

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Rupard died of pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia. The deaths Plaintiff catalogs arose from materially different causes—drug overdoses, suicides, seizure-related trauma, and withdrawal. (TAC ¶ 298.) An inmate's death from untreated psychiatric illness is not of a kind with a fentanyl overdose or an in-cell suicide, and those dissimilar prior events could not have placed the County on notice of the specific risk that materialized here. *Connick*, 563 U.S. at 62-63; *Flores*, 758 F.3d at 1159-1160. Plaintiff likewise cannot invoke the single-incident exception: there is nothing "patently obvious" and untrained about the risk analogous to the armed-officer hypothetical. *Connick*, 563 U.S. at 63-68.

**3. The NCCHC Report Does Not Establish an Unconstitutional Policy or Deliberate Indifference**

Plaintiff's reliance on the January 2017 National Commission on Correctional Health Care ("NCCHC") report fails for two reasons. First, timing and subject matter: the report issued more than five years before Rupard's death and addressed accreditation and the structure of medical services—the absence of a designated responsible physician, the lack of a formal peer-review process, episodic rather than continuity of care, and mental-health staffing—not the custodial cell-check conduct or the specific risk of a starvation death that Plaintiff says caused this injury. (TAC ¶¶ 226-232; Ex. 72 at 150:1-7; 230:2-19; 232:9-12.)

Second, a generalized audit cataloguing systemic "deficiencies" does not by itself establish deliberate indifference to Plaintiff or causation. Applying the Ninth Circuit's reasoning in *Wilgus v. Bannister*, a district court held that, irrespective of the deficiencies reported in the audit, there was no evidence of deliberate indifference to the plaintiff's medical needs, and therefore the audit report was irrelevant. *Santos v. NaphCare, Inc.*, No. 3:21-CV-00131-YY, 2022 WL 828140 (D. Or. Feb. 4, 2022). An institution's awareness of an audit, and even its failure to adopt the audit's recommendations, is not the same as the deliberate, conscious choice *Monell* demands. *Connick*, 563 U.S. at 61-62. That a different or better program "would have been

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

helpful…does not establish municipal liability.” *Id.* at 63-68. Even though this authority is persuasive rather than controlling, it applies the same stringent fault and causation standards the Supreme Court and Ninth Circuit require. *Castro*, 833 F.3d at 1074-1076; *Connick*, 563 U.S. at 61-62.

Deficiencies in accreditation efforts, documentation practices, or staffing do not constitute evidence of a County policy of violating the Constitution. No County policy was the moving force behind any constitutional injury. The NCCHC finding that the jail met 26 of 38 “essential” standards reflects a *voluntary* accreditation program. Those standards are professional best-practice benchmarks, not binding legal requirements, and a shortfall against a voluntary metric is not a constitutional violation, much less a policy that was the moving force behind this death.

**4. The State Auditor Report and Death-Review Evidence Cannot Supply Notice or Causation**

Neither the 2022 State Auditor report nor the Citizens’ Law Enforcement Review Board (“CLERB”) findings can supply the notice or causation Plaintiff’s *Monell* theory requires. A municipality is liable only where an official policy or longstanding custom was the "moving force" behind the constitutional violation, shown through a direct causal link and ordinarily a pattern of similar prior incidents. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *Connick*, 563 U.S. at 61-62; *Castro*, 833 F.3d at 1076. The Auditor report is a system-wide review of several county jails based on a limited sample. It identifies no deficiency that any evidence connects to Rupard, says nothing about his individual care, and issued in February 2022 — after most of his time in custody had already passed — far too late to show that the County made any deliberate, conscious choice to adhere to a deficient policy over time.

The CLERB materials fail on timing: both the review of Rupard's own death and CLERB's ten-year data analysis, released in April 2022, came after he died, and after-the-fact findings cannot establish the advance notice a pattern claim demands or serve

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

as the cause of a death that happened first. The other in-custody deaths these materials describe arose from entirely different causes, so they could not have placed the County on notice of the specific risk that took Rupard's life. *Connick*, 563 U.S. at 62-63; *Flores*, 758 F.3d at 1159-60; *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1145 (9th Cir. 2012). And to the extent Plaintiff relies on the County's failure, after the fact, to adopt the CLERB or Auditor recommendations, conduct postdating the death cannot establish pre-incident notice or be the "moving force" behind it, and evidence of subsequent remedial measures is in any event inadmissible to prove culpable conduct. Fed. R. Evid. 407. At most, these reports suggest that different or additional measures might have helped — which is not enough to hold the County liable.

These materials fare no better against the Supervisory Defendants, because the admissions in this case confirm there is no link between the reports and any decision that caused Rupard's death. The plaintiff's own discovery responses concede that Gore, Martinez, and Montgomery are sued only for their supervisory and policymaking roles — not for anything any of them personally did regarding Rupard — and both Gore and Martinez have admitted they had no personal involvement in, presence during, or knowledge of his care. Martinez was not even sworn in as Sheriff until December 2022, months after Rupard died. And although Gore acknowledged reading the 2017 NCCHC report, he confirmed that its recommendations were addressed and that the standards themselves were revised in 2018 — so his awareness of that report reflects attention and response, not the conscious disregard a deliberate-indifference theory demands. Generalized awareness of an audit, divorced from any case-specific knowledge or inaction, cannot supply either the notice or the causal connection needed to hold a supervisor — or, through them, the County — responsible for this death.

### 5. No Policy was the Moving Force Behind Rupard's Death

The *Monell* claim also fails for want of causation and on any ratification theory. Finally, the ratification theory fails because it requires that a final policymaker "approve a subordinate's decision and the basis for it" with "knowledge of the

constitutional violation," and "[a] mere failure to overrule a subordinate's actions, without more, is insufficient." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). Plaintiff has no such evidence.

### C. Plaintiff's Section 1983 Claim Against Supervisory Defendants Fails

Plaintiff's failure to train and supervise claim against former Sheriff Bill Gore, Undersheriff and Acting Sheriff Kelly Martinez, and chief medical officer Dr. Jon Montgomery ("Supervisory Defendants") fail because none of the Supervisory Defendants had any personal involvement with Rupard, and Plaintiff cannot establish a causal connection between any Supervisory Defendant's own conduct and Rupard's death. What remains is a generalized failure-to-train-and-supervise theory that merely restates the *Monell* municipal-liability claim without facts to show responsibility for any training that would have prevented Rupard's death.

#### 1. Section 1983 Imposes No Vicarious Liability

There is no respondeat superior liability under § 1983. Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must establish that each Government-official defendant, through the official's own individual actions, violated the Constitution. *Ashcroft*, 556 U.S. at 675-676. In a § 1983 action, "the term 'supervisory liability' is a misnomer," because "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 677. The Ninth Circuit applies the same rule: liability under section 1983 arises only upon a showing of personal participation by the defendant, and there is no respondeat superior liability under section 1983. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). A supervisor is liable only if he "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Id.*

A supervisor may therefore be held liable in his individual capacity only where there exists "(1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). That



COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

inquiry is individualized: liability attaches only for the supervisor's "own culpable action or inaction in the training, supervision, or control of his subordinates," for "acquiescence in the constitutional deprivation," or for "conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1207-1208. And the causation inquiry "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer*, 844 F.2d at 633.

**2. No Supervisory Defendant Had Any Personal Involvement**

The first path to supervisory liability—personal involvement in the deprivation—is absent. *Starr*, 652 F.3d at 1207. There is no evidence that Gore, Martinez, or Dr. Montgomery ever saw Rupard, examined him, spoke with him, reviewed his file, or had any case-specific knowledge of his deteriorating condition. The record shows only generic, role-based responsibility: that Gore and Martinez "as the decisionmakers for the Department," had a duty to train employees on cell checks, staffing, and responding to starvation and hunger strikes; that Dr. Montgomery, "as the person in charge of medical services," had a duty to train medical staff on weighing patients, taking vitals, and PSU placement; and that each "failed to properly train" and "supervise" subordinates. (TAC ¶¶ 392, 393) The knowledge Plaintiff attributes to the Supervisory Defendants is likewise systemic rather than case-specific—awareness of high in-custody death rates, press coverage, and external audits of the jails generally. None of this connects any Supervisory Defendant to Rupard. Because § 1983 requires "personal participation," generalized supervisory responsibility over a jail where Rupard was confined does not establish individual liability. *Ashcroft*, 556 U.S. at 677.

**3. No Causal Connection Between Any Supervisory Defendants' Own Conduct and Rupard's Death**

The second path—a "sufficient causal connection"—also fails. *Starr*, 652 F.3d at 1207. To recover damages against an individual official, Plaintiff must prove both "that the specific prison official, in acting or failing to act, was deliberately indifferent"

and “that this indifference was the actual and proximate cause of the deprivation” of Rupard’s rights. *Leer*, 844 F.2d at 634. Where plaintiffs fail to raise a triable issue “concerning the requisite causal connection between each individual prison official’s actions and the [constitutional] violation,” summary judgment is appropriate. *Id*. The causal chain Plaintiff posits—from department-wide training and staffing decisions, through the conduct of unidentified subordinates, to Rupard’s death months into his incarceration—is exactly the kind of attenuated, generalized theory that cannot satisfy the very individualized approach which accounts for the duties, discretion, and means of each defendant. *Id.* at 633-634. Plaintiff cannot identify any specific training or supervisory act or omission by Supervisory Defendants that was the proximate cause of Rupard’s death, as distinct from the conduct of the medical and custodial staff who actually treated and monitored Rupard. (Ex. 103 (RFA No. 3; Rog. Nos. 18–19); Ex. 104 (RFA No. 3); Ex. 72 at 59:10–16; 61:22–25.)

The contrast with *Starr* is instructive. There, the supervisory claim survived only because the complaint made “detailed factual allegations that go well beyond reciting the elements,” identifying “numerous incidents” of which the sheriff was specifically given “notice” through “several reports,” coupled with his failure to act. 652 F3d. at 1216-1217. Those allegations were “neither ‘bald’ nor ‘conclusory.’” *Id.* Plaintiff’s allegations here are the opposite: labels of inadequate training and supervision, untethered to any individualized showing that a Supervisory Defendant’s own deliberate indifference caused Rupard’s death.

**4. The Supervisory Liability Claim Repackages the *Monell* Claim**

Stripped of any personal involvement or individualized causation, Plaintiff’s Third Cause of Action is simply the *Monell* claim against the County. A “failure to train” theory is, by its nature, a theory of municipal liability: inadequate training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact, and only where that failure reflects a “deliberate” or “conscious” choice amounting to

a municipal "policy" that is the "moving force" behind the violation. *City of Canton*, 489 U.S. at 388-389. Such a claim "ordinarily" requires "[a] pattern of similar constitutional violations by untrained employees," because deliberate indifference is "a stringent standard of fault." *Connick*, 563 U.S. at 62. That is precisely the theory—systemic deficiencies, a pattern of in-custody deaths, and failure to reform policy—that Plaintiff asserts in the Fourth Cause of Action for *Monell* municipal liability.

To the extent the Third Cause of Action targets Supervisory Defendants in their official capacities, it adds nothing and is redundant. An official-capacity suit "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent" and "is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985).

Entity liability turns on the same showing as the *Monell* count—the entity must be a "moving force" behind the deprivation through its "policy or custom." *Id.* at 166-167. For that reason, there is no longer a need to bring official-capacity actions against local government officials, for under *Monell* local government units can be sued directly. *Id.* The Ninth Circuit accordingly holds that "[w]hen both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant." *Ctr. For Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008). Courts in this Circuit apply that principle directly to supervisory failure-to-train claims: a § 1983 claim for inadequate training or supervision pleaded against sheriffs or the county is duplicative of the *Monell* claim against the County and must be dismissed. *McGregor v. Kitsap Cnty.*, No. C17-5436 RBL, 2017 WL 6612012 (W.D. Wash. Dec. 27, 2017). Because Plaintiff has sued the County directly under *Monell*, the overlapping failure-to-train-and-supervise claim against the Supervisory Defendants is surplusage, and subject to summary judgment.

## V. PLAINTIFF'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW

### A. The State-Law Claims Are Barred by the Government Claims Act

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Plaintiff’s Fifth (Bane Act), Sixth (negligence/survival), and Seventh (dependent adult neglect) state law causes of action are barred as a matter of law by the Government Claims Act, Cal. Gov. Code § 810 et seq. No suit for money or damages may be maintained against a public entity on a claim within the Act "until a written claim therefor has been presented to the public entity and has been acted upon ... or has been deemed to have been rejected." (Cal. Gov't Code § 945.4) Timely claim presentation "is not merely a procedural requirement, but is ... a condition precedent to plaintiff's maintaining an action" and "an element of the plaintiff's cause of action"; a plaintiff who cannot demonstrate compliance (or a recognized excuse) cannot maintain the action. *California v. Super. Ct.*, 32 Cal. 4th 1234, 1243 (2004). Here the undisputed record establishes that Plaintiff, the Estate, neither presented a timely claim nor perfected the only statutory avenue for relief from that requirement.

Plaintiff’s survival claims accrued on the date of Rupard’s death, and no timely claim was presented. A claim "relating to a cause of action for death or for injury to [the] person" must be presented "not later than six months after the accrual of the cause of action." Cal. Gov't Code § 911.2. Accrual for purposes of the Act is measured by the same standard that would govern a dispute between private litigants. For a survival action, a claim that belonged to the decedent and passes to his estate: “the relevant question is when the decedent — not the plaintiff stepping in the shoes of the decedent's estate — knew or had reason to know of his injury.” *Est. of Kong v. City of San Diego*, No. 22-CV-1858-BAS-DDL, 2023 WL 4939370 at *11 (S.D. Cal. Aug. 2, 2023).

Rupard knew of his injuries, and of the conduct he now challenges, no later than the date of his death on March 17, 2022. (Ex. 28 at COSD 006376–006416.) The Estate’s survival claims therefore accrued on March 17, 2022, and any government claim was due no later than September 17, 2022. The only claim ever submitted on the Estate's behalf was presented on March 9, 2023. (Ex. 97.) Nor can the Estate borrow another claimant's presentation. "Generally, each claimant must file his or her own tort claim," and "[o]ne claimant cannot rely on a claim presented by another"—a rule that

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

applies with full force "where different claimants are alleging survivor theories and wrongful death theories of liability arising from the same transaction." *Castaneda v. Dep't of Corr. & Rehab.*, 212 Cal. App. 4th 1051, 1062–1063 (2013). The Estate's survival claims are distinct from the sons' individual claims and required their own timely presentation, which never occurred.

The delayed-discovery rule does not rescue the claims. The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Kong*, 2023 WL 4939370 at *11. It does not apply here, for two reasons. First, the rule is measured against the decedent's knowledge in a survival action, not the successors' later discovery. *Id*. The March 2, 2023 Medical Examiner's report—the event the Estate has invoked to delay accrual—post-dates Rupard's death and speaks to what his successors learned, not to what Rupard knew. It is legally irrelevant to accrual of the Estate's survival claims.

Second, this is now a summary-judgment record, not a pleading. When the Court previously declined to resolve timeliness, it did so because, "making all inferences in the Estate's favor" on the face of the complaint, it could not say as a matter of law when a reasonable person would have known the County's alleged wrongdoing caused the death. The developed record removes that obstacle: the undisputed evidence establishes that Rupard experienced, and was aware of, his own deteriorating condition throughout his months in custody, fixing the decedent's knowledge—and thus accrual—no later than his death. (Ex. 28 at COSD 006376–006416.)

The Estate never petitioned the superior court for relief under Section 946.6—an independent and dispositive bar. Even setting accrual aside, the Estate's claims fail on a ground this Court has not previously addressed and that no discovery-rule ruling can cure. When a claim is not presented within the six-month period, the claimant "may" apply to the public entity for leave to present a late claim and must do so "within a reasonable time not to exceed one year after the accrual of the cause of action." Gov't Code § 911.4. If the entity denies that application—or is "deemed" to have denied it

by inaction—the claimant's sole remaining remedy is to "petition ...the court for an order relieving the petitioner from Section 945.4," and that petition “shall be filed within six months after the application ...is denied or deemed to be denied.” Gov't Code § 946.6. The California Supreme Court has held that this six-month period “operates as a statute of limitations” and “[i]t is mandatory, not discretionary.” *J.M. v. Huntington Beach Union High Sch. Dist.*, 2 Cal. 5th 648, 653 (2017).

A plaintiff may not sue a public entity without presenting either a timely claim or a timely petition for relief under section 946.6; the Act “do[es] not permit such a procedural shortcut.” *Id*. at 654. That is precisely what the Estate did here. The late-claim application accompanying the March 9, 2023 claim was deemed denied by operation of law 45 days later. (Ex. 97.) Neither the Estate, nor Justino Rupard, nor the Estate's eventual administrator ever petitioned the superior court for relief from the claim-presentation requirement. (Ex. 99.) Having never obtained—or even sought—the only relief the statute provides, the Estate cannot satisfy the condition precedent to suit. This bar is independent of the accrual question: whatever date the claims accrued, the failure to file the mandatory Section 946.6 petition is dispositive. The Fifth, Sixth, and Seventh causes of action must be dismissed. *Id*.

**B. Plaintiff Lacks Standing for Failure to Comply with Tort Claim Act**

Plaintiff’s tort claims are independently subject to summary judgment for failure to comply with the California Tort Claims Act. Here, the only government claim presented on the Estate’s behalf was submitted by Justino Rupard on March 9, 2023—before any administrator of the Estate had been appointed. (Ex. 97.) That claim is a nullity because a successor-in-interest has no authority to present a claim on the Estate’s behalf; only the Estate’s personal representative may do so, and Terri Lopez was not appointed administrator until April 15, 2024. The claim was also untimely, and neither Justino Rupard nor the Estate’s administrator ever petitioned the superior court for relief under Government Code section 946.6. Plaintiff Estate therefore failed to comply with the Government Claims Act and is barred from maintaining its state-

law claims against County Defendants.

### C. Plaintiff's Tort Claims against Deputy Defendants Fail

Plaintiff alleges that the deputies' failure to take reasonable action to summon medical care to Rupard amounts to professional negligence and a failure to provide adequate medical care in violation of Cal. Gov. Code § 845.6. (TAC ¶¶ 447, 448).

First, no facts exist to support Plaintiff's claim that deputies were negligent in the performance of their duties. Plaintiff must show "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence. *Paul v. Patton*, Cal. Rptr. 3d 830, 835 (2015). As established, deputies followed policy and performed all Title 15 safety checks in accordance with their job duties. (Ex. 67 at COSD 004591–004834.) During the safety checks throughout the days leading to Rupard's death, deputies did not observe any clear signs of emergent medical distress, trauma, or criminal activity until the final safety check on March 17 when Rupard was found nonresponsive. (*Id.*)

Next, Plaintiff cannot show that deputies failed to summon medical care in violation of Cal. Gov. Code § 845.6. Plaintiff must show that (1) Rupard had a serious and obvious medical condition requiring immediate care, (2) deputies knew or had reason to know of Rupard's need, and (3) failed to furnish or obtain care for Rupard. Cal. Gov't. Code § 845.6; *Remijio v. The Cnty. of Santa Barbara*, No. 22CV01496, 2023 WL 9510748, at *9 (Cal. Super. Dec. 07, 2023) ("Liability under § 845.6 is limited to serious and obvious medical conditions requiring immediate care.") There is no evidence that Rupard had a serious and observable medical condition requiring immediate care between March 15 and March 17, 2022. (*Id.*) Rupard was not in medical distress, and never requested medical assistance while deputies conducted safety checks throughout this time period.

Third, Plaintiff cannot show causation between the deputies' performance of

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

their assigned custodial functions and Rupard's death. Dr. Cruz was in charge of Rupard's psychiatric care and discontinued his medications. (Ex. 10 at COSD 000052–000062.) Dr. Cruz performed a psychiatric assessment on February 22 and found that Rupard did not qualify for PSU admission. (*Id*) The ME report discussed the fatal impact that the lack of psychotropic medications had on Rupard's wellbeing. Only Dr. Cruz had the authority to decide Rupard's medications. Because Rupard's psychiatric medications and PSU placement rested solely with Dr. Cruz and the Liberty psychiatry service, no act or omission by the deputies was the actual or proximate cause of Rupard's death. And in any event, Dr. Cruz's independent clinical decisions regarding Rupard's medications and level of care were an intervening and superseding cause that breaks the chain of proximate causation. *Van Ort*, 92 F.3d at 837.

### D. Tort Claims against MHC Goodall Fail

Plaintiff alleges MHC Goodall acted with professional negligence and violated Cal. Gov. Code § 845.6 with respect to her inability to provide sufficient mental health services. First, Plaintiff cannot support a claim for medical negligence against Goodall because she acted reasonably. Goodall completed her work as directed to meet the shifting demands of the jail and prioritized assessments reasonably and in accordance with County policy. (Ex. 105 at ¶¶ 11, 13–14.). Next, Plaintiff cannot show that Goodall failed to summon medical care for Rupard in violation of Gov. Code § 845.6. Rupard was not in need of immediate medical care during Goodall's evaluation on February 9. (Ex. 19 at COSD 000479.) Dr. Cruz himself, who performed an independent psychiatric evaluation on February 22, found that there were no signs requiring immediate psych intervention. Third, Plaintiff cannot show causation between Goodall's assessment and Rupard's death. Dr. Cruz's evaluation postdates Goodall, and Dr. Cruz assessed Rupard did not qualify for PSU admission. (Ex. 10 at COSD 000061–000062.) Dr. Cruz was also the sole decisionmaker in discontinuing Rupard's medications, not Goodall. Goodall had no responsibility to continue weekly evaluations on Rupard because Rupard was not an Ad Seg inmate, and Goodall had no

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

authority in classification decisions. (Ex. 62 at COSD 006311–006312; Ex. 105 at ¶ 12.) Because the decisions over Rupard's medications and PSU placement rested solely with Dr. Cruz and the psychiatry service, no act or omission by Goodall was the actual or proximate cause of Rupard's death. And in any event, Dr. Cruz's independent psychiatric decisions were an intervening and superseding cause that breaks the chain of proximate causation. *Van Ort*, 92 F.3d at 837.

### E. Dependent Adult Neglect Against Montgomery and Goodall Fails

The claim against Dr. Montgomery and Goodall under the Elder Abuse and Dependent Adult Civil Protection Act fails as a matter of law. Welfare & Inst. Code § 15600 et seq. No qualifying caretaking or custodial relationship existed. The Act "does not apply unless the defendant…had a substantial caretaking or custodial relationship, involving ongoing responsibility for one or more basic needs." *Winn v. Pioneer Med. Grp., Inc.*, 63 Cal.4th 148, 152 (2016). The nature of the relationship with the defendant—not the defendant's professional standing—is what makes the defendant potentially liable. *Id.* Meeting the statutory "care custodian" definition is not enough; the statute "requires a separate analysis to determine whether such a relationship exists," and its enumerated list of facilities does not include jails or correctional institutions. *Id.* at 164. For instance, as Chief Medical Officer with administrative and supervisory responsibilities, Dr. Montgomery did not assume the "robust," hands-on responsibility for Rupard's fundamental daily needs the Act requires. *Id.* at 158. (Ex. 72 at 59:10–16, 61:22–25.)

The claim sounds in professional negligence, not neglect. Even where a custodial relationship exists, the Act's heightened remedies require proof "by clear and convincing evidence" of "recklessness, oppression, fraud, or malice"—conduct "essentially equivalent to conduct that would support recovery of punitive damages." *Carter v. Prime Healthcare Paradise Valley LLC*, 198 Cal.App.4th 396, 405 (2011); Cal. Welf. & Inst. Code § 15657. "[S]imple or even gross negligence" will not suffice, and the "substandard performance of medical services" is professional negligence

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

expressly excluded from the Act. *Covenant Care, Inc. v. Super. Ct.*, 32 Cal.4th 771, 783 (2004); *Carter*, 198 Cal.App.4th at 405. The Act targets "the failure to *provide* medical care," not "the *undertaking* of medical services." *Covenant*, at 783 (emphasis added). Because the undisputed record shows medical services were undertaken—evaluations performed, medication prescribed, and a treatment plan set—Plaintiff's allegations describe, at most, malpractice, and the Act's heightened remedies are reserved for "acts of egregious abuse." *Delaney v. Baker*, 20 Cal.4th 23, 35 (1999).

MHC Goodall is not a psychiatrist and could not determine treatment or medication for Rupard's refusal to take medication or consume every meal. Dr. Montgomery is not liable as he never personally treated Rupard and did not supervise the contracted psychiatric providers or mental health staff as it was not in his scope to do so. (Ex. 72 at 59:10–16; 61:22–25; Ex. 65 at COSD 018185–018213.) Therefore, this claim fails as to both Goodall and Dr. Montgomery.

### F. County is Immune from Negligence

Sovereign immunity is the rule in California. Governmental liability is limited to exceptions specifically set forth by statute. *Castaneda*, 212 Cal.App.4th at 1069-70; *Cabral v. Cnty. of Glenn*, 624 F.Supp.2d 1184 (E.D. Cal. 2009); *Lowman v. Cnty. of Los Angeles*, 127 Cal.App.3d 613 (1982). Government Code § 844.6(a)(2) provides that, "[n]otwithstanding any other provision," "a public entity is not liable for … [a]n injury to any prisoner," subject only to the enumerated exceptions. Therefore, as it relates to the negligence survival claim, County is immune unless Plaintiff fits within the narrow § 845.6 exception. The narrow exception does not apply. Section 845.6 preserves immunity for "the failure of the employee to furnish or obtain medical care," creating liability only where an employee "knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." Cal. Gov. Code § 845.6. The exception is very narrowly written to authorize a cause of action for failure to summon immediate medical care only, not for malpractice in providing that care. *Castaneda*, 212 Cal.App.4th at 1070.

"Once a practitioner has been summoned," any "[f]ailure…to prescribe or provide necessary medication or treatment…is also medical malpractice and…cannot be characterized as a failure to summon medical care." *Id.* at 1071. The duty to summon includes no "duty to provide reasonable medical care," not duty "to assure that prison medical staff properly diagnose and treat," and no "duty to monitor the quality of care provided." *Watson v. State of Cal.*, 21 Cal.App.4th 836, 843 (1993). Here, medical care was repeatedly summoned and provided. (Ex. 5 at COSD 000027–000051; Ex. 10 at COSD 000052–000062; Ex. 19 at COSD 000479.) As in *Castaneda*, where the public entity "did more than summon, it treated" the prisoner, any subsequent failure "to provide further treatment, or to ensure further diagnosis or treatment, or to monitor…or follow up" goes "to the reasonableness of the medical care provided" and is not a failure to summon. 212 Cal.App.4th at 1072. Liability is further "limited to serious and obvious medical conditions requiring immediate care," measured by the objective "reason to know" standard. *Lawson v. Superior Ct.*, 180 Cal.App.4th 1372, 1383-84 (2010). Because care was summoned, § 844.6 immunity applies to Plaintiff's negligence survival claim. *Castaneda*, 212 Cal.App.4th at 1070.

**G. County Defendants are Statutorily Immune**

Plaintiff's tort claims for failure to summon medical care, professional negligence, and dependent adult neglect against the individual County Defendants must be dismissed because they are statutorily immune from liability. Public entities and their employees are immune from liability except as provided by statute. Cal. Gov't. Code § 815, subd. (a). There is no statutory basis for liability against these County Defendants, who are immune from liability for injuries to a prisoner and failure to provide medical care, mental health exams, or diagnose mental illness. See Cal. Gov. Code §§ 820.8, 844.6, 845.6, 855.6, 855.8. The exception to statutory immunity set forth in Gov. Code § 845.6 does not support the finding of liability against County Defendants here, where the undisputed facts do not support a failure to summon medical care claim. Further, § 845.6 makes exceptions for failure to diagnose and/or

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

medicate a mental illness (§ 855.8) and confine a person for mental illness (§ 856).

### H. Even if Not Barred, Plaintiff Cannot Establish a Bane Act Claim

Even if the Estate's Bane Act claim is not barred by the Government Claims Act, it fails on the merits. The Bane Act (Civil Code § 52.1) does not reach mere negligence; its egregiousness element is tested by whether the defendant acted with a specific intent to violate the plaintiff's constitutional or statutory right, not by any coercion beyond that inherent in the underlying violation. *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 801-804 (2017); *Shoyoye v. Cnty. of Los Angeles*, 203 Cal.App.4th 947 (2012). That standard is satisfied only where (1) the right at issue was clearly delineated and plainly applicable under the circumstances, and (2) the defendant acted with the particular purpose of depriving the plaintiff of that right—that is, in reckless disregard of a constitutional or statutory guarantee. The record permits no such finding. The deputies performed custodial safety checks and MHC Goodall performed a sick-call assessment, while psychiatric treatment and PSU decisions rested with Dr. Cruz. No County Defendant acted with the particular purpose of depriving Rupard of any right; at most Plaintiff alleges negligence, which the Bane Act does not reach. The Bane Act claim therefore fails as a matter of law.

### I. No Punitive Damages

Plaintiff is not entitled to punitive damages against any of the individual Defendants. Punitive damages under § 1983 requires proof that an individual defendant acted with evil motive or intent, or reckless or callous indifference to federally protected rights. Plaintiff cannot meet that standard because the record does not establish a constitutional violation by any individual County Defendant. At most, Plaintiff alleges negligence or disagreement with clinical judgment, neither of which supports punitive damages.

## V. <u>CONCLUSION</u>

For the foregoing reasons, County Defendants respectfully request that the Court grant the motion for summary judgment, or in the alternative, summary adjudication.

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

DATED: November 13, 2026

COLLINS + COLLINS LLP

By: ______________________________

RADA FELDMAN
NICHOLAS R. COLLETTI
ROBERT S. KAHN
CAROLINE M. PARK
CRISTINA I. BUTOIU
Attorneys for Defendants
COUNTY OF SAN DIEGO, BILL GORE, KELLY MARTINEZ, JON MONTGOMERY, CHRISTINA GOODALL (sued as CHRISTINA ANOSIKE), MIGUEL AGUILERA, JASON VILADIU, GUSTAVO MARTINEZ, JEFF AMADO, ERNESTO AGUIRRE, TREYVONNE JAMES (sued in duplicate J. TREYVONNE), BERNARDO ROMERO, MICHAEL JOHNSON, ANDREW TORRES, ALLEN WERESKI, BLADE ROMANS, LINDA GUTIERREZ, AND THOMAS MACE