EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
PETER BIBRING: SBN 223981
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

JEREMIAH A. LOWE (CA SBN 239166)
*jeremiah@lowelawapc.com*
LOWE LAW, APC
402 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 878-2725
Facsimile: (619) 878-2737

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ESTATE OF LONNIE RUPARD,

Plaintiff,

v.

COUNTY OF SAN DIEGO, *et al.*,

Defendants.

CASE NO. 23-CV-1357-CAB-JAC

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT COUNTY OF SAN DIEGO, OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY ADJUDICATION**

Judge: Hon. Cathy Ann Bencivengo

Date: December 18, 2026

**PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... 3

I. INTRODUCTION ..... 7

II. LEGAL STANDARDS ..... 8

A. Summary Judgment ..... 8

B. Municipal liability under *Monell* ..... 8

C. The Fourteenth Amendment requires that the County provide safe conditions, medical care, and meaningful safety checks ..... 10

III. STATEMENT OF FACTS ..... 11

A. The County jailed Lonnie Rupard, a gravely mentally ill man, alone in a segregation cell. ..... 11

B. The County's deputies logged hourly checks of Mr. Rupard while his cell filled with trash and feces. ..... 11

1. County policy requires deputies to stop at every cell at least once an hour and observe both the person and the cell. ..... 11

2. Deputies logged every check of Mr. Rupard's cell but took no action as he wasted in a cell filled with trash and feces. ..... 14

C. The County never gave Mr. Rupard the nursing and clinician visits its policy requires for segregated people. ..... 19

D. The State Auditor warned the County about perfunctory safety checks six weeks before Mr. Rupard died. ..... 20

E. The County did nothing in response before Mr. Rupard died. ..... 23

F. The County changed its practices only after Mr. Rupard died. ..... 25

IV. ARGUMENT ..... 26

A. The County deprived Mr. Rupard of his Fourteenth Amendment right to adequate monitoring and care. ..... 27

1. The checks the County's deputies gave Mr. Rupard were not constitutionally adequate checks. ..... 27

2. Mr. Rupard's need for help was obvious to anyone who looked, but no one acted. .......... 29

B. The deprivation resulted from two County customs. .......... 32

1. The County's deputies treat a safety check as a glance for "proof of life." .......... 32

2. The County does not provide the nursing and mental-health rounds that its policy requires for people held in segregation. .......... 35

C. The County was deliberately indifferent. .......... 38

1. The County's own policies establish that it knew the risk. .......... 38

2. The State Auditor told the County that its deputies were not following the policy and that people were dying. .......... 39

3. The County did nothing. .......... 40

4. No prior identical death was required, and this was not a single incident. .......... 41

D. Each custom was the moving force behind Mr. Rupard's death. .......... 42

E. The record leaves nothing for a jury to decide. .......... 44

1. The County's own evidence supplies every fact on which the motion rests. .......... 44

2. The County's changes after Mr. Rupard's death confirm that it could have acted. .......... 45

F. In the alternative, the Court should grant partial summary judgment on each element that is not genuinely disputed. .......... 45

V. CONCLUSION .......... 46

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,
520 U.S. 397 (1997) ........................................ 8, 39

*Brown v. Plata*,
563 U.S. 493 (2011) ........................................ 35

*Castro v. Cnty. of Los Angeles*,
833 F.3d 1060 (9th Cir. 2016) ........................................ passim

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................ 7

*City of Canton v. Harris*,
489 U.S. 378 (1989) ........................................ 36

*Coleman v. Wilson*,
912 F. Supp. 1282 (E.D. Cal. 1995) ........................................ 35

*Connick v. Thompson*,
563 U.S. 51 (2011) ........................................ 8, 39

*Cortez v. Cnty. of Los Angeles*,
294 F.3d 1186 (9th Cir. 2002) ........................................ 39

*Disability Rts. Mont., Inc. v. Batista*,
930 F.3d 1090 (9th Cir. 2019) ........................................ 35

*Doty v. Cnty. of Lassen*,
37 F.3d 540 (9th Cir. 1994) ........................................ 35

*Dunsmore v. San Diego Cnty. Sheriff's Dep't*,
No. 20-cv-00406-AJB-DDL, 2025 WL 2315038 (S.D. Cal. Aug. 11, 2025) ........ 38

*Est. of Arroyo ex rel. Wilson v. Cnty. of San Diego*,
No. 3:21-cv-01956-RBM-SBC, 2026 WL 810042 (S.D. Cal. Mar. 24, 2026) 38, 42

*Est. of Hill ex rel. Grube v. NaphCare, Inc.*,
No. 23-2741, 2025 WL 1588738 (9th Cir. June 5, 2025) ........................................ 27, 33

*Fairley v. Luman*,
281 F.3d 913 (9th Cir. 2002) ........................................ 39

*Farmer v. Brennan*,
511 U.S. 825 (1994) ........................................ 9, 25

*Frary v. Cnty. of Marin*,
81 F. Supp. 3d 811 (N.D. Cal. 2015) ........................................ 26, 27, 33

*Fricano v. Lane Cnty.*,
No. 6:16-cv-01339-MC, 2018 WL 2770643 (D. Or. June 8, 2018) ........................................ 35

*Gauthier v. AMF, Inc.*,
788 F.2d 634 (9th Cir.) ........................................ 43

*Gordon v. Cnty. of Orange*,
6 F.4th 961 (9th Cir. 2021) ........................................ passim

*Gordon v. Cnty. of Orange*,
888 F.3d 1118 (9th Cir. 2018) ........................................ 9

*Greer v. Cnty. of San Diego*,
726 F. Supp. 3d 1058 (S.D. Cal. 2023) ........................................ 38

*Hunter v. Cnty. of Sacramento*,
652 F.3d 1225 (9th Cir. 2011) ........................................ 8

*Jackson v. Barnes*,
749 F.3d 755 (9th Cir. 2014) ........................................ 8

*Lemire v. Cal. Dep't of Corr. & Rehab.*,
726 F.3d 1062 (9th Cir. 2013) ........................................ 8

*Madrid v. Gomez*,
889 F. Supp. 1146 (N.D. Cal. 1995) ........................................ 35

*Medina v. Cnty. of Los Angeles*,
No. CV 19-3808-GW-Ex, 2020 WL 3964793 (C.D. Cal. Mar. 9, 2020) ... 27, 29, 30

*Menotti v. City of Seattle*,
409 F.3d 1113 (9th Cir. 2005) ........................................ 7

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978) ........................................ 6

*Morton v. Cnty. of San Diego*,
No. 21-cv-1428-MMA-DDL, 2024 WL 5126281 (S.D. Cal. Dec. 16, 2024)........35

*Redman v. Cnty. of San Diego*,
942 F.2d 1435 (9th Cir. 1991)........25

*Rodriguez v. Cnty. of Los Angeles*,
891 F.3d 776 (9th Cir. 2018)........31

*Rookaird v. BNSF Ry. Co.*,
908 F.3d 451 (9th Cir. 2018)........7, 44

*Russell v. Lumitap*,
31 F.4th 729 (9th Cir. 2022)........9, 27

*Sandoval v. Cnty. of San Diego*,
985 F.3d 657 (9th Cir. 2021)........29, 35, 40, 43

*Schomer v. Narvaiza*,
No. 3:23-cv-00390-ART-CSD, 2026 WL 892542 (D. Nev. Mar. 31, 2026)...29, 30

*Singleton v. Clark Cnty.*,
No. 3:24-cv-05392-TMC, 2025 WL 359015 (W.D. Wash. Jan. 31, 2025) .....29, 30

*Soremekun v. Thrifty Payless, Inc.*,
509 F.3d 978 (9th Cir. 2007)........7

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011)........38

*Trevino v. Gates*,
99 F.3d 911 (9th Cir. 1996)........8

*Tsao v. Desert Palace, Inc.*,
698 F.3d 1128 (9th Cir. 2012)........8

**Statutes**

42 U.S.C. § 1983........7

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................7, 42, 43, 44

Federal Rule of Evidence 407.......................................................................43

**Regulations**

Cal. Code Regs. tit. 15, § 1027 .......................................................................31

Cal. Code Regs. tit. 15, § 1280 .......................................................................31

# I. INTRODUCTION

When Lonnie Rupard was booked into the San Diego Central Jail, he weighed 165 pounds. Eighty-nine days later, County deputies carried his 105-pound body out of Cell 17 of Module 7D, through a mountain of trash and feces. He had lost 60 pounds — more than a third of his body weight. The autopsy photos are truly shocking — Mr. Rupard's emaciated form suggests a victim of famine or wartime prison camp, not a person in the custody and care of San Diego County. The County's Medical Examiner ruled the death a homicide, caused by "pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia." Mr. Rupard died of malnutrition and neglect in a cell that the County was required to check every hour and to keep sanitary.

How that happened is not seriously disputed. Two County customs killed Lonnie Rupard. First, the County conducts jail safety checks that are checks in name only: deputies log a check every hour but do not meaningfully observe the person or the cell, so a person can waste away, and a cell can fill with nine days of filth, without anyone acting. Second, the County does not in practice provide the nursing and mental-health visits that its own policy requires for people held in segregation — three nursing visits and one clinician visit every week. Each custom violated the County's written policies and California law. And each was the moving force behind this needless and preventable death.

The County cannot claim surprise. Six weeks before Mr. Rupard died, the California State Auditor told the County that deputies of the San Diego County Sheriff's Office ("SDCSO" or the "Department") commonly "spent no more than one second glancing into" cells before moving on, and that Department policy did not even require staff to confirm that a person was alive. Sheriff Kelly Martinez read that report. The County changed nothing before Mr. Rupard died, and then changed its practices immediately afterward. On this record, the County is liable to the Estate under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Plaintiff respectfully asks the Court to so

hold as a matter of law or, at a minimum, to establish the elements that are not genuinely disputed.

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may seek judgment on an entire claim or on "part of each claim." *Id.* Because Plaintiff bears the burden of proof at trial, Plaintiff "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). The Court draws all reasonable inferences in favor of the County as the non-moving party and does not weigh the evidence. *Soremekun*, 509 F.3d at 984. Summary judgment is proper where the record permits only one reasonable conclusion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought," Fed. R. Civ. P. 56(a); *see, e.g.*, *Rookaird*, 908 F.3d at 455 (reviewing grant of partial summary judgment as to elements of plaintiff's claim).

### B. Municipal liability under *Monell*

To impose liability under 42 U.S.C. § 1983 on a municipality or governmental entity, plaintiffs "must prove: [that] (1) [plaintiff] had a constitutional right of which he was deprived; (2) the municipality had a policy [or custom]; (3) the policy [or custom] amounts to deliberate indifference to his constitutional right; and (4) the policy [or custom] is the moving force behind the constitutional violation." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) ("*Gordon II*") (citation and internal quotation marks omitted); *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005). Municipal deliberate indifference in the context of a *Monell* claim is based

on an objective standard. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) (en banc). "[P]olicies of inaction as well as policies of action" can give rise to *Monell* liability. *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014). "[A] policy of inaction is based on a government body's 'failure to implement procedural safeguards to prevent constitutional violations.' " *Id.* (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012)); *see also Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("continued adherence to an approach that [policymakers] know or should know has failed to prevent tortious conduct" may establish deliberate indifference (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997))). Deliberate indifference exists when a municipality "fail[s] to investigate and discipline employees in the face of widespread constitutional violations." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011).

Among other ways, a plaintiff may establish a policy by showing that the alleged constitutional violation was done in accordance with the municipality's "longstanding practice or custom." *Gordon II*, 6 F.4th at 973 (citation omitted). A custom "need not be formal or written" so long as it is a "persistent and widespread" practice "of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* at 974; *Trevino v. Gates*, 99 F.3d 911, 918–19 (9th Cir. 1996). And a plaintiff may prove "a custom or practice of violating a written policy"; otherwise, "an entity, no matter how flagrant its actual routine practices, always could avoid liability by pointing to a pristine set of policies." *Castro*, 833 F.3d at 1075 n.10.

"[I]n order to satisfy the objective prong, it is enough for the inmate to demonstrate that he was exposed to a substantial risk of some range of serious harms; the harm he actually suffered need not have been the most likely result among this range of outcomes." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1076 (9th Cir. 2013). "[I]t does not matter whether the risk comes from a single source or multiple

sources, any more than it matters whether a prisoner faces an excessive risk . . . for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer v. Brennan,* 511 U.S. 825, 843 (1994).

### C. The Fourteenth Amendment requires that the County provide safe conditions, medical care, and meaningful safety checks

Under the Fourteenth Amendment's objective standard, a jail violates a detainee's right to safety and medical care when it makes an intentional decision about the conditions of his confinement; those conditions put him at substantial risk of serious harm; it fails to take reasonable available measures to abate the risk, although a reasonable official would have appreciated the high degree of risk; and its failure causes his injuries. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) ("*Gordon*"); *Castro*, 833 F.3d at 1071. No proof of subjective awareness is required. "A defendant can be liable even if he did not actually draw the inference that the plaintiff was at a substantial risk of suffering serious harm, so long as a reasonable official in his circumstances would have drawn that inference." *Russell v. Lumitap*, 31 F.4th 729, 739 (9th Cir. 2022).

The Ninth Circuit has applied that standard to safety checks in jails. In *Gordon II*, a deputy conducted his safety check of a detainee "from a corridor that was approximately six feet elevated from the tank floor and 12 to 15 feet away from the foot of Gordon's bunk," and admitted that from there "he was unable to ascertain whether Gordon was breathing, alive, sweating profusely, drooling, or had any potential indicators of a physical problem." 6 F.4th at 967. The court recognized a constitutional right to more: "We now hold that pre-trial detainees do have a right to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment." *Id.* at 973. The Ninth Circuit announced that rule in 2021, before the County booked Mr. Rupard into the Central Jail.

## III. STATEMENT OF FACTS

### A. The County jailed Lonnie Rupard, a gravely mentally ill man, alone in a segregation cell.

National City police arrested Mr. Rupard on a supervision-revocation hold, and the County booked him into the San Diego Central Jail on December 19, 2021. Exh. 1 (autopsy report) at COSD 002090. He suffered from schizophrenia, had at least twice been committed to Patton State Hospital, and had twice been adjudged incompetent and ordered medicated. *Id.*; Exh. 2 (incompetency judgments) at COSD 003055, 003256. The County housed him alone in Cell 17 of Module 7D beginning on December 22, 2021. ECF No. 321-4, p. 47. He weighed 165 pounds when he was booked. Exh. 3 (March 2023 investigative report) at COSD 001675. The Department's homicide detective later confirmed that 7D "was classified as COVID quarantine and ad-seg housing," and that although Mr. Rupard "was not classified as ad-seg," he "was treated as such because of his mental health." *Id.* at COSD 001660.

### B. The County's deputies logged hourly checks of Mr. Rupard while his cell filled with trash and feces.

#### 1. County policy requires deputies to stop at every cell at least once an hour and observe both the person and the cell.

The Department's safety-check policy, [redacted] Exh. 4 (Policy I.64) at COSD 006088. The policy defines what a check must include. "[redacted] *Id.* And the policy does not allow a deputy to check a cell by walking past it: [redacted]

[redacted] *Id.* at COSD 006089.

The policy also specifies what deputies must record. [redacted]

The County's Rule 30(b)(6) designee on safety checks and counts, Lieutenant Aaron Boorman, confirmed each of these requirements. Exh. 5 (Boorman Rule 30(b)(6) deposition) at 13:13–15. Observing "the safety and welfare of inmates" means "directly observing the individuals for medical distress or trauma." *Id.* at 46:23–47:3. Attending to "cleanliness" means "looking at the condition of the dayroom, the cells, the module area, so you're assessing that to see if there's anything that needs to be cleaned up or addressed." *Id.* at 48:8–20. A maintenance issue includes "maybe an overflowing toilet." *Id.* at 48:2–7. When a deputy observes one of the conditions the policy lists, "it should be logged after the check." *Id.* at 50:2–15. A sergeant must review the logs twice each shift, and the watch commander reviews them as well, "looking at the safety checks to ensure that they are done in the appropriate time and manner." *Id.* at 50:16–52:5.

County policy [redacted] Exh. 6 (Policy I.43) at COSD 006343–44; Exh. 5 (Boorman Rule 30(b)(6) deposition) at 21:16–23:6, 25:10–26:9. [redacted]

[redacted]” Exh. 6 (Policy I.43) at COSD 006343–44. [redacted] Exh. 5 (Boorman Rule 30(b)(6) deposition) at 15:6–8 (quoting Policy I.43). Lieutenant Boorman explained that the acknowledgment shows that the person’s “well-being is there, and they are alive, conscious,” and “should help you or determine that that individual is not suffering from any kind of medical trauma or distress.” *Id*. at 15:22–16:5, 18:3–6. [redacted] Exh. 6 (Policy I.43) at COSD 006344. [redacted] *Id*. The County’s Rule 30(b)(6) designee confirmed what that means: the deputy must “physically look at that individual and look at the photo that you have and be able to determine that person is the same person.” Exh. 5 (Boorman Rule 30(b)(6) deposition) at 21:11–15. Under the County’s own policy, then, a deputy was required to look at Mr. Rupard’s face twice every day.

Deputies assigned to Mr. Rupard’s module understood these requirements. Deputy Jason Viladiu, who conducted logged safety checks of the seventh floor, including Module 7D, on the night of March 15–16, 2022, agreed that at each safety check he was required to look at “the physical condition of the inmate,” at “their sort of mental state and whether they’re coherent,” and at “their cell conditions.” Exh. 7 (Viladiu deposition) at 22:2–8, 30:4–33:7. He understood that one reason for a safety check is to identify a person “who may be in medical distress such that you can then summon medical attention for them,” or who is showing signs of “a mental health crisis

such that you can summon mental health care for them." *Id.* at 12:8–22. He understood that he was required to look at the condition of the cell because "[i]t indicated how they were caring for themselves." *Id.* at 19:1–12. "[I]f the individual is not able to care for himself, then that would make me concerned for that individual and call a mental health professional to talk to him." *Id.* at 21:5–8. And he testified that a deputy conducting a safety check should not simply walk by: "During a safety check, I would stop and look in the cell." *Id.* at 69:5–13.

**2. Deputies logged every check of Mr. Rupard's cell but took no action as he wasted in a cell filled with trash and feces.**

The County logged those checks for Mr. Rupard. The homicide detective reviewed twenty-four hours of video from Module 7D and confirmed that "all security checks (11-53) were done on time and accurate." Exh. 3 (March 2023 investigative report) at COSD 001673. But the checks accomplished nothing. When deputies finally entered Cell 17, they found roughly twenty-eight meal containers — more than nine days of accumulated trash — and feces on the bed, floor, and blanket and in the toilet, originating from "about three separate defecations." *Id.* at COSD 001676. At autopsy Mr. Rupard weighed 105 pounds — "60 pounds less than when he was booked into custody 89 days prior." *Id.*

The cell did not reach that condition overnight. Three days earlier, at about 8:12 on the morning of March 14, 2022, Dr. Nicolas Badre came to Cell 17 to evaluate Mr. Rupard's competency on the order of the superior court. Exh. 8 (Badre reports) at COSD 000153; Exh. 9 (Badre deposition) at 99:24–100:8. Dr. Badre is a forensic psychiatrist employed by the County who has conducted more than a thousand competency evaluations. Exh. 9 (Badre deposition) at 9:16–20, 10:9–19. He ordinarily asks to see a person in a private evaluation room, but jail staff "told me he couldn't come because . . . he had the problems that he was having." *Id.* at 78:15–23. So he conducted the interview at the cell door, "at the recommendation of jail mental health

staff and the floor deputies." Exh. 8 (Badre reports) at COSD 000154.

Dr. Badre's report to the court describes the condition of both Mr. Rupard and his cell three days before his death:

> The cell was dirty with trash throughout. The toilet was full of excrement and the room was very malodorous.
>
> The defendant was unkempt and dirty himself. He was laying in bed in an uncomfortable manner with a blanket over his head.
>
> There were feces on the floor. There was food smeared on the wall.
>
> It required the food flap and a very loud introduction on my part to get the defendant's attention.

*Id*. The report repeats that description of the cell, word for word, in its section on Mr. Rupard's mental status. *Id*. at COSD 000155. When Dr. Badre asked why he was in jail, Mr. Rupard answered, "Water dog." Told that Dr. Badre was there to evaluate his competency, he answered, "I am home, dog." *Id*. at COSD 000154. He "was mute when asked other questions." *Id*. at COSD 000155.

In the reports he wrote for the court, Dr. Badre concluded that Mr. Rupard was "displaying active signs of mental illness, including disorganized thinking," and was not competent. *Id*. He advised that Mr. Rupard "suffers from severe mental illness"; that he "lacks the capacity to make decisions regarding antipsychotic medication"; and that "[i]f the defendant's mental disorder is not treated with antipsychotic medication, it is possible that serious harm to the physical or mental health of the defendant will result." *Id*. at COSD 000157. He recommended that Mr. Rupard be medicated involuntarily. *Id*. at COSD 000158.

At his deposition, Dr. Badre confirmed each of these observations: the trash throughout the cell, the toilet full of excrement, the feces on the floor, the food smeared on the wall, and a room that, he agreed, "smelled very bad." Exh. 9 (Badre deposition)

at 68:20–23, 69:7–8, 69:25–70:2, 71:13–17, 76:3–12. Asked by the Citizens' Law Enforcement Review Board to describe the cell, he wrote: "The cell was malodorous and was unhygienic, there was feces outside the toilet." *Id*. at 100:13–18. He testified that he had concerns about Mr. Rupard's welfare. *Id*. at 77:7–9.

The County's surveillance video shows what the logged checks looked like. Plaintiff's corrections expert, Gary Raney, a former elected sheriff, reviewed the available video of Module 7D from the evening of March 15, 2022 until Mr. Rupard was found on the night of March 17. Report of Gary Raney, ECF No. 321-3, p. 31-35, 58. Deputies and supervisors came to Mr. Rupard's door dozens of times in those two days. *Id*. at 32-34. Almost every time, the deputy "paused at Rupard's door," in many instances "shined a flashlight inside," and walked on. *Id*. At 3:46 a.m. on March 16, a worker delivered what appeared to be breakfast to the port in his door; at 7:04 a.m., "[i]t appeared the breakfast was still on the port door." *Id*. at 32. Raney counted "at least 15-20 different deputies or ranking staff members who worked the 7D module in the roughly five days before March 17, 2022," and "none of them took any action to care for Rupard, clean his cell, or ensure he was not in medical distress." *Id*. at 48.

On the one occasion when a deputy went inside the cell, he left without doing anything. On March 16, 2022, after Mr. Schuck died in Module 7D, a deputy who went to Mr. Rupard's door "did not get a response" and asked then-Deputy Michael Johnson to help with a welfare check. Exh. 10 (Johnson deposition) at 58:4–22, 59:9–15. Johnson described what happened:

> I called Rupard's name from the door and he had not responded at that time, so we asked for the door to be opened. We both stepped into the cell. I called his name one more time. He did not respond, so I went up. He was laying on the bed and I gave his shoulder a push with one of my hands and just called his name. He gave an angry response and so we backed back out.

*Id*. at 61:6–13. The "angry response" "really wasn't a word. It was just like a grunt."

*Id*. at 61:14–16. Mr. Rupard's face was under a blanket, so "there was no face-to-face." *Id*. at 62:4–16. Johnson did not document the welfare check, and he does not recall the condition of the cell. *Id*. at 59:1–3, 62:18–23.

The testimony of deputies assigned to Module 7D in Mr. Rupard's final three days explains why hourly checks produced no response. ECF No. 321-3, p. 17–25, 32-34. Deputy Andrew Torres testified that on a safety check "we basically look for . . . any signs of life," and that he understood nothing else to be required. Exh. 11 (Torres deposition) at 11:6–13. "[F]or every safety check, all we're looking for is just some sort of proof of life." *Id*. at 37:8–12. Deputy Miguel Aguilera spends "about five seconds" at a cell on a safety check, enough to "make sure they're alive and well, make sure their chest is rising, if they're sleeping." Exh. 12 (Aguilera deposition) at 21:1–10. Asked, "Are you looking at the condition of the cell?" he answered, "No." *Id*. at 21:11–12. Deputy Linda Gutierrez looks into a cell for "[m]aybe like four seconds" if the person is moving around. Exh. 13 (Gutierrez deposition) at 69:6–11. Deputy Jeff Amado testified that deputies do not look for maintenance issues or at the cleanliness of a cell during safety checks or counts: "all we're looking for is medical distress, trauma or criminal activity." Exh. 14 (Amado deposition) at 19:13–17, 23:2–17. Johnson, who was training Deputy Torres that week, testified that a safety check does not require "a face-to-face observation of the inmate" or observation of "the physical condition of the inmate." Exh. 10 (Johnson deposition) at 10:9–16; ECF No. 321-3, p. 21-22. And Deputy Gustavo Martinez agreed that he has seen people in the jail during safety checks who were emaciated to the point of "skin and bones," but testified that he did not understand it to be his job to report that to medical staff, because it is "not within my profession or my duties in which I was trained to be able to determine whether somebody in that state would require medical attention." Exh. 15 (G. Martinez deposition) at 22:12–23:11, 24:2–6.

The images of Rupard's cell and body confirm beyond a doubt that had deputies

spared more than the briefest glances, they would have been compelled to act. ECF No 321-4, p. 91-95. Shown photographs of Cell 17 as it was found, deputies agreed that it called for action. Deputy Viladiu testified that the condition of the cell "was bad and not normal"; that a person living in those conditions "has some mental health concerns and . . . should be evaluated by a mental health professional"; and that a deputy who observed those conditions on a safety check was responsible for notifying mental-health staff. Exh. 7 (Viladiu deposition) at 45:10–46:12, 72:21–73:1.

The autopsy photos show that Mr. Rupard's own physical condition was even more shocking. ECF No. 321-4, p. 110-115. Mr. Rupard's dire need for medical care should have been obvious to deputies. Deputy Mace told homicide investigators that "during walks I noticed that [Mr. Rupard] typically would be standing there barefoot and shirtless." Exh. 16 (Mace interview audio); Exh. 17 (Mace interview transcript), p. 7. Shown a photograph of Mr. Rupard's body, Deputy Viladiu testified that a living person who looked that way would be "a medical emergency." Exh. 7 (Viladiu deposition) at 53:4–22. And yet, the correctional-practices expert retained by defendant Dr. Cruz found "no evidence in this case that such referrals were made to Dr. Cruz." Exh. 18 (Adams report) at 14.

Experts retained on both sides agree that the condition of the cell, by itself, should have prompted a response. Raney explained that "unsanitary conditions are a sign of serious mental illness in jails"; that Mr. Rupard's cell "contained about nine days' worth of food containers, along with other likely biological filth"; and that "[t]he longer the accumulation was, the more obvious it should have been." ECF No. 321-3, p. 46-47. "[E]ach deputy and supervisor who conducted a safety check, soft count, hard count, or supervisor inspection that included looking into Rupard's cell in the hours and days before his death had a legal and ethical obligation to correct its condition before it got to the state that it was on March 17, 2022." *Id.* at 47. The condition of the cell was "an indication that somebody should have done something to verify his

health." Exh. 19 (Raney deposition) at 60:15–20. William Adams, the expert retained by Dr. Cruz, reached the same conclusion:

> It is my opinion to a reasonable degree of certainty that the emaciated appearance Mr. Rupard presented with, condition of the cell at the time of Mr. Rupard's death, and presence of uneaten food and feces present, along with the smell, such conditions would/should have been sufficient to draw the attention of any person passing by the area of his cell and triggered an immediate healthcare and mental health request.

Exh. 18 (Adams report) at 15; Exh. 20 (Adams deposition) at 51:22–52:8. Adams also watched video of eight of the logged checks. Exh. 20 (Adams deposition) at 43:10–45:21; Exh. 21 (video of logged checks). Although he could not tell from the video what the deputies saw inside the cell, he testified that the checks "did not comport with my understanding of SDSO's policies," and that he did not believe "the officers remained at any of the cells long enough during those checks to make an accurate assessment as to the mental and physical well-being." Exh. 20 (Adams deposition) at 45:22–46:24. Cells and people in that condition, he testified, "should trigger an immediate response." *Id.* at 52:17–53:3. "There is no reason, in my estimation, that the conditions described in this incident did not trigger immediate action on the part of deputies." Exh. 18 (Adams report) at 16.

### C. The County never gave Mr. Rupard the nursing and clinician visits its policy requires for segregated people.

Medical Services Division Policy G.2.1 requires that people in segregation [redacted]." Exh. 22 (Policy G.2.1) at COSD 006313. The policy applies based on a person's living conditions, not their security status or classification: "[redacted] *Id.* The County did not follow the policy anyway — the staff charged with these visits did not even know the policy

existed. Its mental-health program manager, Melissa Quiroz, could not identify anyone "in charge of making sure" that the policy was followed and did not know whether anyone had ever been disciplined for violating it. Exh. 23 (Quiroz Rule 30(b)(6) deposition) at 125:18–25, 126:1–10, 126:22–127:18. The treating psychiatrist, Dr. Anthony Cruz, who is himself a QMHP, testified that he "was never asked to do" the weekly segregation visits, and that the list of patients he saw each day was typically drawn from "the psych sick call list." Exh. 24 (Cruz deposition) at 101:22–102:11, 117:3–17, 117:25–118:3. Christina Goodall, the clinician who saw Mr. Rupard, testified that her visits were "completely the sick call" and that she had never heard of the policy's "established frequency." Exh. 25 (Goodall deposition) at 107:3–109:12, 110:2–9, 111:2–14. And the Director of Nursing, Serina Rognlien-Hood, could recall no record that nursing staff monitored Mr. Rupard three days a week at any point in his incarceration. Exh. 26 (Rognlien-Hood deposition) at 100:15–23.

As a result, a QMHP saw Mr. Rupard only once in roughly ninety days — a five-to-ten-minute contact at his cell on February 9, 2022. Exh. 27 (Venters report) at 22. Staff requested another QMHP wellness check on February 23, but "no further documented wellness checks or psychiatric evaluations occurred prior to his death." Exh. 28 (Roscoe report) at 6. The last nursing entry, on February 20, was a records review for lockdown clearance, not an examination. *Id*. at 16.

### D. The State Auditor warned the County about perfunctory safety checks six weeks before Mr. Rupard died.

On February 3, 2022 — six weeks before Mr. Rupard died — the California State Auditor issued a report to the Governor and the Legislature titled "San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody." State Auditor's Report, ECF No. 321-5, p. 79. The Auditor reported that 185 people had died in the County's jails from 2006 through 2020, "more than in nearly any other county across the State," and it reviewed thirty of

those deaths in detail. *Id.* at 85. Its transmittal letter summarized what it found:

> From 2006 through 2020, 185 people died in San Diego County's jails—one of the highest totals among counties in the State. The high rate of deaths in San Diego County's jails compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. In fact, our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths. These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody.

*Id.* at 81. The Auditor identified safety checks as a central failure:

> In addition to providing adequate health care, performing safety checks is a key component of ensuring the well-being of individuals in detention facilities. Conducting these checks—which state law requires hourly through direct visual observation—is the Sheriff's Department's most consistent means of monitoring for medical distress and criminal activity. Nonetheless, in our review of 30 in-custody deaths, we found instances in which deputies performed these checks inadequately. For example, based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module. When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours.

*Id.* at 86. The report gave an example drawn from the Department's own records:

> 2 a.m. Deputy quickly walked past each cell and glanced twice into the individual's cell but moved on after the second glance.
>
> 3 a.m. Deputy stopped briefly at the individual's cell, glancing through the window for a split second.

> 4 a.m. Deputy walked quickly past the individual's cell without breaking stride, glancing through the window for less than a second.
>
> 5 a.m. Deputies found the individual unresponsive in their cell during a safety check, with signs of having died several hours earlier.

*Id*. at 109. The Auditor traced the problem both to the Department's policy and to its failure to enforce that policy:

> Sworn staff conducted safety checks inadequately in part because of weaknesses in the Sheriff's Department's policy. Its safety check policy does not require sworn staff to determine whether individuals are alive and well by taking steps such as by observing the rise and fall of their chest. We recognize that acquiring proof of life in some situations is difficult and that waking up incarcerated individuals every hour could be detrimental to their well-being. However, as described in the case example above, a safety check that does not involve any meaningful observation of an individual is ineffective and inadequate.
>
> The Sheriff's Department's assistant sheriff of detentions indicated that the department's policy is sufficient but that individual sworn staff members do not always follow it.

*Id*. The Auditor warned that "[u]ntil it strengthens its safety check policy and formalizes a process for ensuring that sworn staff adhere to this policy, the San Diego Sheriff's Department risks further instances of delayed responses to medical emergencies or other crises." *Id*. at 110. It recommended that the Department revise its policy "to include the requirement for staff to check that an individual is still alive," and that supervisors audit "at least two randomly selected safety checks from each prior shift," including "video footage," "to determine whether the safety checks were performed adequately." *Id*. at 138-139.

The concerns over safety checks did not come as news to the County. The Auditor found that the Department "ha[d] also not implemented certain key

recommendations from external oversight entities," including recommendations "that involved enhancing its safety checks and improving the way it communicates incarcerated individuals' mental health needs to its staff." *Id.* at 87. In 2020, for example, the Citizens' Law Enforcement Review Board (CLERB) recommended that the Department "require additional steps in safety checks of individuals residing in special mental health housing to ensure that they are alive and well," but the Department "stated it would not implement this recommendation." *Id.* at 123. And "many of the lawsuits we reviewed that San Diego County settled have highlighted some of the same problems at the Sheriff's Department that we have identified related to inadequate safety checks, mental health treatment, and medical care." *Id.* at 125. The Auditor's conclusion was blunt: "Until the Sheriff's Department implements meaningful change to improve its provision of medical and mental health care in its detention facilities, it will continue to jeopardize the safety and lives of individuals in its custody." *Id.* at 85.

**E. The County did nothing in response before Mr. Rupard died.**

The Department's leadership knew of the Auditor's findings before the report became public. The Auditor "met with the staff of the Sheriff's Department, including the Sheriff and other executive management personnel, on numerous occasions during the audit to ensure they were fully briefed on our findings, conclusions, and recommendations." *Id.* at 199. The Department submitted a written response questioning the report's accuracy, which the Auditor called "unfounded." *Id.* at 167–198, 200. The Auditor observed that the Department "has failed to implement key recommendations from external entities, including recommendations from the San Diego County Grand Jury, CLERB, Disability Rights California, and a suicide prevention consultant," and added: "[W]e are concerned about whether the Sheriff's Department will make meaningful changes to address these systemic weaknesses." *Id.* at 203-04.

That concern proved justified. Sheriff William Gore retired on February 3, 2022, the day the report was released. Exh. 29 (January 2022 news release) at 1; Exh. 30 (March 2022 news release) at 2. On March 22, 2022, the Department announced that "Undersheriff Kelly Martinez has been serving as Acting Sheriff since Gore's retirement," and that she would continue until an interim sheriff appointed by the Board of Supervisors took office on April 5, 2022. Exh. 30 (March 2022 news release) at 1–2. Martinez admits that she has read the entire report. Exh. 31 (Martinez interrogatory responses) at 5, 7–8. Plaintiff asked her what she did between February 3, 2022 and Mr. Rupard's death on March 17, 2022. Asked whether she took "any steps to ensure that the nursing staff conducted wellness checks of persons housed in Administrative Segregation in the San Diego County jails three times a week," she answered: "No, not applicable as to Responding Party." *Id.* at 16–17. Asked whether she took "steps to ensure that QMHPs conducted weekly visits to persons in Administrative Segregation at the San Diego County jails," she answered: "No, not applicable as to Responding Party." *Id.* at 20. Asked whether she instructed "that supplemental training be given to SDSO deputies on 11-53 safety check procedure," she answered: "No, not applicable as to Responding Party." *Id.* at 26–27. Asked whether she instructed "any SDSD employee to review videos of hard counts, soft counts and/or 11-53 safety checks at the San Diego Central Jail for compliance with department policy and/or state law" — the kind of review the Auditor had just recommended — she answered: "No, not applicable as to Responding Party." *Id.* at 30. And asked whether, "[a]fter the death of Hayden Schuck through the date of May 31, 2022," she instructed any employee "to conduct a wellness check of persons housed in Administrative Segregation at the San Diego County jails," she gave the same answer. *Id.* at 39–40.

Former Sheriff Gore's answers about the three years before the report were no different. Asked what he did between February 3, 2019 and February 3, 2022 "to find out whether inmates in County jail administrative segregation were seen three times a

week by nurses to check the state of their health," and what he did "to determine if inmates in County jail administrative segregation were seen weekly by a qualified mental health professional," he answered each time: "No as to Responding Party." Exh. 32 (Gore interrogatory responses) at 11–12, 14. Asked to describe what he did in that period "to supervise conduct of safety checks and inmate counts," he answered: "This interrogatory is not applicable as to Responding Party." *Id.* at 28.

**F. The County changed its practices only after Mr. Rupard died.**

After Mr. Rupard died, the County changed its practices. Deputy Torres testified that deputies are now "almost immediately going inside cells and cleaning them right away." Exh. 11 (Torres deposition) at 42:24–43:1. Before, he explained, cleaning could wait: "we would come back and clean at the end of the shift," but now "we are just doing it right away. . . . There's no delay in it." *Id.* at 43:17–25. Deputy Gutierrez testified that the County "increased the wellness checks to check certain modules." Exh. 13 (Gutierrez deposition) at 99:9–11.

The Department described the changes itself. On March 2, 2023, the day the Medical Examiner released its report ruling Mr. Rupard's death a homicide, the Department issued a news release. Exh. 33 (March 2023 news release) at RUP001161. It announced:

> Since this incident, which occurred March 2022, several changes and advancements have been implemented within the Detention Services Bureau to help identify when a person in custody may need additional medical and mental health care. These changes have helped staff recognize when a vulnerable individual may not be able to advocate for themselves and staff need to intervene on their behalf.

*Id.* The first change the Department listed was a new program of "Wellness Checks":

> These checks are comprised of a Multi-Disciplinary Group (MDG) including sworn staff, mental health providers, nurses, correctional counselors and classification deputies. This group conducts one-on-one visits with incarcerated

> persons deemed most vulnerable. The wellness checks give deputies an additional opportunity to conduct hygiene inspections and allow maintenance staff to address any concerns about the cell or housing unit. The living conditions and hygiene of an individual can be an indicator that they may be in crisis. Mental health clinicians and nurses assess the individual for any mental health or medical concerns and route them to the appropriate service provider for follow-up and recovery. These checks are done twice a week at George Bailey Detention Facility and San Diego Central Jail.

*Id*. The Department also announced weekly "Collaborative Care Meetings" at each facility "to discuss individuals in custody who may need additional care and/or may be at risk for harm"; a new requirement that a forensic psychiatrist who evaluates a person in the jail "provide a briefing to Sheriff's Mental Health Staff prior to leaving the jail," so that staff can "provide the appropriate care to an individual immediately, instead of waiting for a written report in two weeks' time"; and "a process to request conservatorship of a person in our custody who is unable to care for themselves." *Id.* at RUP001162. "We have instituted many changes in the last year," the Department said. *Id*.

## IV. ARGUMENT

The Sheriff is "required by statute to take charge of and keep the county jail and the prisoners in it," and is thus "answerable for the prisoner's safekeeping." *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc), *abrogated on other grounds by Farmer v. Brennan*, 511 U.S. 825 (1994). "[H]aving stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer,* 511 U.S. at 833.

Municipal liability under *Monell* has four elements: the plaintiff was deprived of a constitutional right; the municipality had a policy or custom; the policy or custom amounts to deliberate indifference to that right; and the policy or custom was the

moving force behind the violation. *Gordon II*, 6 F.4th at 973. The County's own witnesses and documents, and the defendants' own experts, establish each one.

### A. The County deprived Mr. Rupard of his Fourteenth Amendment right to adequate monitoring and care.

#### 1. The checks the County's deputies gave Mr. Rupard were not constitutionally adequate checks.

The County logged a check of Mr. Rupard's cell every hour, "on time and accurate." Exh. 3 (March 2023 investigative report) at COSD 001673. But a log entry is not a safety check. The question under *Gordon II* is whether each check was "sufficient to determine whether [the detainee's] presentation indicates the need for medical treatment." 6 F.4th at 973. The deputies' testimony answers that question clearly.

The deputies who worked Module 7D in Mr. Rupard's last days testified that they were not trying to determine anything of the kind. "[F]or every safety check, all we're looking for is just some sort of proof of life." Exh. 11 (Torres deposition) at 37:8–12. Deputy Aguilera spends "about five seconds" at a cell; Deputy Gutierrez, "[m]aybe like four seconds." Exh. 12 (Aguilera deposition) at 20:25-21:10; Exh. 13 (Gutierrez deposition) at 69:6–11. Asked whether he looks at the condition of the cell, Deputy Aguilera answered, "No." Exh. 12 (Aguilera deposition) at 21:11–12. The deputy who was training Deputy Torres that week testified that a safety check requires neither "a face-to-face observation of the inmate" nor observation of "the physical condition of the inmate." Exh. 10 (Johnson deposition) at 10:9–16; ECF No. at 21-22. The video shows what that looked like at Cell 17: again and again, a deputy "paused at Rupard's door," sometimes "shined a flashlight inside," and walked on. *Id.* at 32-34. The correctional-practices expert retained by defendant Dr. Cruz watched eight of the logged checks and did not believe that "the officers remained at any of the cells long enough during those checks to make an accurate assessment as to the mental and physical well-being" of the person inside. Exh. 20 (Adams deposition) at 45:22–46:24.

The one time a deputy went into the cell confirms the policy of deliberate indifference. On March 16, the day before Mr. Rupard died, a deputy got no response at his door. Exh. 10 (Johnson deposition) at 58:4–22. Two deputies entered; one pushed Mr. Rupard's shoulder and called his name; Mr. Rupard, his face under a blanket, made a sound that "really wasn't a word. It was just like a grunt"; and the deputies "backed back out." *Id*. at 61:4–16, 62:4–16. They did not document the check. *Id*. at 59:1–3. A man who would be dead the next day of pneumonia, malnutrition and dehydration grunted from under a blanket, and the deputies understood that sufficed.

Courts have had no difficulty recognizing that checks like these fall short of what the Constitution requires. In *Gordon II*, the deputy was too far away to see. 6 F.4th at 967. Here the deputies stood at the door and, by their own account, looked for nothing but life. In *Frary v. Cnty. of Marin*, 81 F. Supp. 3d 811 (N.D. Cal. 2015), deputies logged hourly checks as completed from a tower from which little or none of the detainee's bunk could be seen, and the court denied summary judgment to both the deputy and the county: "A reasonable official in Deputy Johnson's position would have understood that placing an inmate with a perceived medical need in a cell where the inmate cannot be seen, and then not taking any other precautions to monitor or observe that inmate, is not taking reasonable measures to abate the risk to that inmate and effectively causes the delay or denial of medical care." *Id.* at 820, 828. In *Medina v. Cnty. of Los Angeles*, No. CV 19-3808-GW-Ex, 2020 WL 3964793, at *6, *16 (C.D. Cal. Mar. 9, 2020), the court denied summary judgment where deputies scanned barcodes to log safety checks that they did not perform. And in an unpublished decision last year, the Ninth Circuit affirmed a jury's finding of liability against a jail's medical contractor where officers assigned to watch a sick detainee "briefly observe[d] inmates through a small window in the cell door every 30 minutes and check[ed] for signs of life," in observations that "lasted five to ten seconds," during which, one officer testified, "there was no way for him to determine in that time whether an inmate was

sleeping or was in the process of dying." *Est. of Hill ex rel. Grube v. NaphCare, Inc.*, No. 23-2741, 2025 WL 1588738, at *2 (9th Cir. June 5, 2025) (mem.). That describes the County's safety checks exactly. As the State Auditor told the County six weeks before Mr. Rupard died, "a safety check that does not involve any meaningful observation of an individual is ineffective and inadequate." ECF No. 321-5, 109.

**2. Mr. Rupard's need for help was obvious to anyone who looked, but no one acted.**

The constitutional standard asks whether a reasonable official would have appreciated the risk. *Russell*, 31 F.4th at 739. Here the risk was obvious to anyone who laid eyes on either Mr. Rupard or the conditions of his cell.

Mr. Rupard spent 89 days in the County's custody. He weighed 165 pounds when he arrived and 105 pounds when he died. The autopsy photos show his shocking physical condition at the time of his death — a condition that should have been obvious to deputies, had they given him the attention the Constitution requires, or to nursing or mental health staff, had they performed the required checks. Deputy Mace told homicide investigators that "during walks I noticed that he, he typically would be standing there barefoot and shirtless." Exh. 16 (Mace interview audio); Exh. 17 (Mace interview transcript). Mr. Rupard lost more than a third of his body weight in a cell that deputies came to at least twenty-four times a day. His cell held roughly twenty-eight meal containers, more than nine days of trash, and feces on the bed, the floor and the blanket and in the toilet, from "about three separate defecations." Exh. 3 (March 2023 investigative report) at COSD 001676. Three days before he died, a County forensic psychiatrist who came to his cell with a deputy at his side recorded that it "was dirty with trash throughout," that the "toilet was full of excrement and the room was very malodorous," that "[t]here were feces on the floor," and that there was "food smeared on the wall." Exh. 8 (Badre reports) at COSD 000154; Exh. 9 (Badre deposition) at 101:9–16. On the morning of March 16, what appeared to be his breakfast was still

sitting on the port in his door more than three hours after it was delivered. ECF No. 321-3, p. 32.

Shown photographs of Cell 17, Deputy Viladiu testified that its condition "was bad and not normal"; that a person living that way "has some mental health concerns and . . . should be evaluated by a mental health professional"; and that a deputy who saw it on a safety check was responsible for notifying mental-health staff. Exh. 7 (Viladiu deposition) at 45:10–46:12, 72:21–73:1. A living person who looked as Mr. Rupard did would be "a medical emergency." *Id.* at 53:4–22. The experts on both sides agree as well. Dr. Cruz's expert concluded that Mr. Rupard's "emaciated appearance," the "condition of the cell," the "uneaten food and feces," and "the smell" were "sufficient to draw the attention of any person passing by the area of his cell and triggered an immediate healthcare and mental health request." Exh. 18 (Adams report) at 15. "There is no reason, in my estimation, that the conditions described in this incident did not trigger immediate action on the part of deputies." *Id.* at 16.

Despite Mr. Rupard's obvious need, no one acted. "[A]t least 15-20 different deputies or ranking staff members" worked Module 7D in the roughly five days before Mr. Rupard died, and "none of them took any action to care for Rupard, clean his cell, or ensure he was not in medical distress." ECF No. 321-3, p. 48. The Department's homicide detective found no evidence that any deputy ever reported to a superior that Mr. Rupard was emaciated. Exh. 34 (Blumenshine deposition) at 156:14–20. One deputy explained why he would not have: although he has seen people in the jail who were "skin and bones," he did not understand it to be his job to tell medical staff, because that was "not within my profession or my duties in which I was trained." Exh. 15 (G. Martinez deposition) at 22:12–23:11, 24:2–6. Plaintiff's corrections expert, a former elected sheriff, put the question that the County has never answered: "How did someone who was in jail, and supposedly checked on a minimum of 24 times a day, essentially starve to death?" ECF No. 321-3, p. 48.

The Constitution does not permit jail staff to stand by, idly watching, while a man wastes away. Jail officials violate the Fourteenth Amendment when they fail to provide "life-saving measures to an inmate in obvious need." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 679 (9th Cir. 2021) (quotation omitted). That duty is not confined to medical staff. In *Schomer v. Narvaiza*, No. 3:23-cv-00390-ART-CSD, 2026 WL 892542 (D. Nev. Mar. 31, 2026), a 26-year-old man died in a county jail of "complications from dehydration." *Id.* at *1, *4. Deputies saw him "lying on the floor in an unnatural position, not responding verbally," and waited roughly an hour to call an ambulance. *Id.* at *4, *12. The court denied the deputies summary judgment. "State actors cannot delegate their own constitutional responsibilities to medical personnel," *id.* at *8, and "a reasonable jury could find that the urgency of Keaton's condition should have been obvious even without medical training," *id.* at *11.

Nor does the duty depend on a request for help. In *Singleton v. Clark Cnty.*, No. 3:24-cv-05392-TMC, 2025 WL 359015 (W.D. Wash. Jan. 31, 2025), a 28-year-old pretrial detainee "exhibited signs of mental and physical deterioration, and by the end had lost approximately 50 pounds." *Id.* at *1. According to the complaint, a nurse noted that her "room was messy with food found on the floor and fecal matter spread onto the door window," but wrote that she "did not appear to be in any acute distress." *Id.* at *5. The court held that the plaintiffs "plausibly allege[d] that [the nurse's] failure to escalate [her] psychiatric needs or to seek treatment for her was objectively unreasonable under the circumstances." *Id.* at *14.

The County's violations here are starker than either *Schomer* or *Singleton.* The deputies in *Schomer* waited an hour. The County's deputies walked past Mr. Rupard for days. The nurse in *Singleton* saw a fouled cell once. Here the trash and feces accumulated for more than a week in front of every deputy who came to the door. Nothing about Mr. Rupard's illness excuses the County. The Medical Examiner attributed his death to "neglected schizophrenia." Exh. 1 (autopsy report) at COSD

002094. And basic measures required to keep Mr. Rupard safe were eminently feasible. After his death the County announced changes meant to help staff "recognize when a vulnerable individual may not be able to advocate for themselves and staff need to intervene on their behalf," and it acknowledged that "[t]he living conditions and hygiene of an individual can be an indicator that they may be in crisis." Exh. 33 (March 2023 news release) at RUP001161. Every deputy who looked into Cell 17 could see those conditions. No reasonable jury could find that Mr. Rupard received the monitoring and care that the Fourteenth Amendment requires.

### B. The deprivation resulted from two County customs.

The question on this motion is not which deputy is to blame. It is why deputy after deputy, over many days, all did the same thing, failing in the same way to provide Mr. Rupard the basic care he so obviously needed. The answer is that they were doing what the County's deputies and clinicians ordinarily do, according to the County's established customs and practices.

A custom is a practice "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Gordon II*, 6 F.4th at 974 (citation omitted). It need not be written, and it may contradict what is written: "a plaintiff can show a custom or practice of violating a written policy; otherwise an entity, no matter how flagrant its actual routine practices, always could avoid liability by pointing to a pristine set of policies." *Castro*, 833 F.3d at 1075 n.10. A custom may be proved by the testimony of the entity's own employees about what they routinely do and by evidence that the entity did nothing about it. *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802–03 (9th Cir. 2018); *Castro*, 833 F.3d at 1075–76 & n.10.

#### 1. The County's deputies treat a safety check as a glance for "proof of life."

The County's written policy is not in dispute. Policy I.64 requires a deputy to [redacted]

[redacted]" Exh. 4 (Policy I.64) at COSD 006088–89. The County's Rule 30(b)(6) designee confirmed each requirement. Exh. 5 (Boorman Rule 30(b)(6) deposition) at 46:23–48:20. State law likewise required "at least hourly safety checks of inmates through direct visual observation of all inmates." *Gordon II*, 6 F.4th at 966–67 & n.3 (quoting former Cal. Code Regs. tit. 15, § 1027); ECF No. 321-5, p. 86. State law also requires the County to maintain "an acceptable level of cleanliness" through "a regular schedule of housekeeping tasks and inspections to identify and correct unsanitary . . . conditions." Cal. Code Regs. tit. 15, § 1280. The County's own training ties the safety check to state law. Exh. 35 (safety-check training) at COSD 006245.

The County's actual custom and practice differed sharply from written policy, as established by four kinds of undisputed evidence:

First, multiple deputies describe the practice of perfunctory checks that looked for little more than signs of life as simply the way they performed their job. Deputy Torres testified that on a safety check "we basically look for . . . any signs of life," and that he understood nothing else to be required. Exh. 11 (Torres deposition) at 11:6–13, 37:8–12. Deputy Amado testified that deputies do not look for maintenance problems or at the cleanliness of a cell during safety checks: "all we're looking for is medical distress, trauma or criminal activity." Exh. 14 (Amado deposition) at 19:13–17, 23:2–17. Deputies Aguilera and Gutierrez look for four or five seconds. Exh. 12 (Aguilera deposition) at 21:1–12; Exh. 13 (Gutierrez deposition) at 69:6–11. Deputy Martinez did not understand it to be his job to report an emaciated person to medical staff. Exh. 15 (G. Martinez deposition) at 22:12–23:11, 24:2–6. And that is how deputies trained others to do the job: the deputy who was training Deputy Torres that week testified that a check requires neither a face-to-face observation nor attention to the person's physical condition. Exh. 10 (Johnson deposition) at 10:9–16; ECF No. 321-3, p. 21-22. Six deputies who worked Module 7D in Mr. Rupard's last days described their checks in

these terms.[1]

Second, the practice was uniform. A cell does not accumulate nine days of trash and feces, in a module that deputies walk every hour, because one deputy was careless. At least fifteen to twenty deputies and ranking staff worked the module in Mr. Rupard's last five days, and not one acted. ECF No. 321-3, p. 48. That is, as Plaintiff's expert concluded, "a pattern and practice of ignoring filth and inhumane care that was accepted within the SDSO." *Id.*

Third, the County's supervision did not catch it. Policy I.64 [redacted] Exh. 4 (Policy I.64) at COSD 006090; Exh. 5 (Boorman Rule 30(b)(6) deposition) at 50:16–52:5. Yet even after Mr. Rupard died, the Department's homicide detective watched the video and pronounced every check "on time and accurate." Exh. 3 (March 2023 investigative report) at COSD 001673. The County measured whether a check was logged on time, not whether anyone looked.

Fourth, and most importantly, the State Auditor found the same practice throughout the County's jails. Reviewing video from ***thirty*** in-custody deaths, the Auditor "observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride," and found that when staff eventually looked more closely, "some of these individuals showed signs of having been dead for several hours." ECF No. p. 321-5, p. 86. The Department's assistant sheriff for detentions told the Auditor that "individual sworn staff members

[1] Deputies at the Central Jail are not assigned to a single floor or module; their assignments change from shift to shift throughout the jail. Exh. 11 (Torres deposition) at 75:8–22; Exh. 36 (Romans deposition) at 46:18–20 ("Deployments rotate. I have no permanent assignment. It's random for us every day."); Exh. 12 (Aguilera deposition) at 31:20–32:2 ("we don't typically work the same floor every single day"); Exh. 7 (Viladiu deposition) at 55:18–21 (floor assignments "rotated"); Exh. 14 (Amado deposition) at 18:21–23. The deputies' testimony about how they conduct safety checks therefore describes their practice throughout the jail, not in one module or unit.

do not always follow" the safety-check policy. *Id.* at 109. The Auditor urged the Department to "formalize[] a process for ensuring that sworn staff adhere to this policy." *Id.* at 110. And in 2020 the Department had declined an oversight board's recommendation to "require additional steps in safety checks of individuals residing in special mental health housing to ensure that they are alive and well." *Id.* at 123.

It is hard to imagine stronger proof of a custom. In *Castro*, the en banc court affirmed a verdict against Los Angeles County for a practice of monitoring a sobering cell less closely than its own rules required. 833 F.3d at 1075–76 & n.10. In *Frary*, the court held that "a reasonable jury could find that the record demonstrates that the County's policy and practice of allowing tower checks as a replacement for more regular and direct monitoring was the moving force behind the violation." 81 F. Supp. 3d at 836. And in the unpublished *Hill* decision, the Ninth Circuit affirmed liability for a custom of "using medically untrained jail guards to monitor . . . patients in need of medical monitoring," through brief checks for "signs of life," noting that a custom "need not be . . . written down." 2025 WL 1588738, at *2. The custom here is established by the testimony of the County's own jail staff, its own video, and a state audit of its own records and facilities.

**2. The County does not provide the nursing and mental-health rounds that its policy requires for people held in segregation.**

Policy G.2.1 requires that [redacted] Exh. 22 (Policy G.2.1) at COSD 006313. Had the County followed that policy, nurses and mental-health clinicians would have been at Mr. Rupard's door every week.

The County's witnesses establish a second County practice of departing entirely from these written policies, too. The treating psychiatrist, a qualified mental health provider, "was never asked to do" the weekly visits, and his daily list was typically drawn from "the psych sick call list." Exh. 24 (Cruz deposition) at 101:22–102:11,

117:3–17, 117:25–118:3. The clinician who saw Mr. Rupard described her visits as "completely the sick call" and had never heard of the policy's "established frequency." Exh. 25 (Goodall deposition) at 108:6–8, 110:7–9. The County's mental-health program manager could not identify anyone "in charge of making sure" that the policy was followed and did not know whether anyone had ever been disciplined for violating it. Exh. 23 (Quiroz Rule 30(b)(6) deposition) at 125:18–21, 126:6–10, 126:22–127:18. The Director of Nursing could recall no record that nursing staff monitored Mr. Rupard three days a week. Exh. 26 (Rognlien-Hood deposition) at 100:15–23. A written policy that the clinicians have never heard of and that no one is charged with enforcing is not the County's practice. The County's practice for providers was to work from the sick-call list.

That practice fails anyone too sick to ask for help. A mental-health clinician saw Mr. Rupard once in roughly ninety days, for five to ten minutes at his cell on February 9, 2022. Exh. 27 (Venters report) at 22. Staff requested another wellness check on February 23, but "no further documented wellness checks or psychiatric evaluations occurred prior to his death." Exh. 28 (Roscoe report) at 6. The last nursing entry, on February 20, was a records review, not an examination. *Id*. at 16.

The Ninth Circuit has already sent this County to a jury on a similar practice. In *Sandoval*, the County placed a man who had overdosed in a cell for which there was "no standing obligation . . . for a nurse to routinely monitor," and left him there for hours; the Ninth Circuit reversed summary judgment for the County on the *Monell* claim. 985 F.3d at 681–83. Other courts agree that looking in on a mentally ill person in segregation is no substitute for care. *Fricano v. Lane Cnty.*, No. 6:16-cv-01339-MC, 2018 WL 2770643, at *11 (D. Or. June 8, 2018) (denying summary judgment where "a jury could find that observation and assessment, without more, do not constitute treatment for purposes of the Due Process Clause"). And a court in this District has distinguished a clinician's debatable clinical judgment from a failure to perform a

required assessment at all, denying qualified immunity to a jail clinician who "was responsible for and yet failed to perform [a] follow-up assessment for four days." *Morton v. Cnty. of San Diego*, No. 21-cv-1428-MMA-DDL, 2024 WL 5126281, at *28–29 (S.D. Cal. Dec. 16, 2024).[2]

The County will likely contend that Policy G.2.1 was never "triggered" because Mr. Rupard was not formally entered into the administrative-segregation workflow. Exh. 37 (Wild report) at 13. The policy's text forecloses that argument: "[redacted] Exh. 22 (Policy G.2.1) at COSD 006313. So does the County's evidence. The Department classified Module 7D as "ad-seg housing," and Mr. Rupard "was treated as such because of his mental health." Exh. 3 (March 2023 investigative report) at COSD 001660. The clinician's own note recorded that he was held in "segregation/confinement." Exh. 38 (Venters rebuttal report) at 11. And the nursing expert retained by Dr. Cruz agreed that the absence of a formal classification did not "relieve[]" staff of the duty to monitor him, because "[t]he standard of care is determined by the patient's clinical circumstances and housing environment, not by whether the patient was entered into an automated scheduling system." Exh. 39 (Clark rebuttal report) at 13–14. A county cannot avoid its obligations to its sickest prisoners

---

[2] Even under the more deferential standards of the Eighth Amendment, prisons must provide mental health care that meets minimum constitutional requirements. *Disability Rts. Mont., Inc. v. Batista*, 930 F.3d 1090 (9th Cir. 2019); *Doty v. Cnty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) (holding that "[t]he requirements for mental health care are the same as those for physical health care needs"); *see also Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995); *Coleman v. Wilson*, 912 F. Supp. 1282, 1320–22 (E.D. Cal. 1995) (finding a violation of the Eighth Amendment related to inmates not receiving proper mental health care in administrative segregation); *see generally Brown v. Plata,* 563 U.S. 493 (2011). *Disability Rights Montana* upheld the validity of a complaint that "described a distressing pattern of placing mentally ill prisoners in solitary confinement for 'weeks and months at a time' without significant mental health care." 930 F.3d at 1098.

by declining to write down that it has segregated them. *Castro*, 833 F.3d at 1075 n.10.

**C. The County was deliberately indifferent.**

The third element asks whether the County's customs reflect deliberate indifference to the rights of the people in its jails. That standard is objective. *Castro*, 833 F.3d at 1076. The question is not what any official believed, but whether "the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens." *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 396 (1989) (O'Connor, J., concurring in part and dissenting in part)) (emphasis omitted). Here the notice was actual, it came from two sources, and the County's response to it is not in dispute.

**1. The County's own policies establish that it knew the risk.**

In *Castro*, Los Angeles County checked on the people in a sobering cell only every thirty minutes, although its own building code and station manual required closer supervision. 833 F.3d at 1075–77. The en banc court held that those written requirements settled the question of the county's knowledge:

> The County Board of Supervisors' affirmative adoption of regulations aimed at mitigating the risk of serious injury to individuals housed in sobering cells, and a statement to the same effect in the station's manual, conclusively prove that the County knew of the risk of the very type of harm that befell Castro.

*Id.* at 1077. The court held that a county "necessarily has knowledge of its own ordinances." *Id.*

The County's policies here show the same actual notice of risk. Policy I.64 exists so that deputies will see [redacted] Exh. 4 (Policy I.64) at COSD 006088. The County's designee explained its purpose: "directly observing the individuals for medical distress or trauma." Exh. 5

(Boorman Rule 30(b)(6) deposition) at 46:23–47:3. Policy G.2.1 [redacted] Exh. 22 (Policy G.2.1) at COSD 006313. That the County adopted those rules shows it understands the risks from locking a person alone in a cell and never checking on their welfare. Like the county in *Castro*, it cannot claim ignorance of the risk that its own rules were written to prevent.

**2. The State Auditor told the County that its deputies were not following the policy and that people were dying.**

On February 3, 2022, the State Auditor reported that the County's deputies were performing safety checks with a one-second glance; that some of the people in those cells were later found to have been dead for hours; that Department policy did not require deputies even to determine whether a person was alive; and that the Department's own assistant sheriff acknowledged that staff "do not always follow" the policy. ECF No. 321-5, p. at 86, 109. The Auditor warned that until the Department changed, it "risks further instances of delayed responses to medical emergencies or other crises," and "will continue to jeopardize the safety and lives of individuals in its custody." *Id.* at 85, 110.

The Department did not have to wait for publication to learn this. The Auditor "met with the staff of the Sheriff's Department, including the Sheriff and other executive management personnel, on numerous occasions during the audit to ensure they were fully briefed on our findings, conclusions, and recommendations." *Id.* at 199. The Department's written response is printed in the report itself. *Id.* at 167–198. And the report describes warnings that the Department had already received and rejected, including the 2020 recommendation to strengthen safety checks in mental-health housing. *Id.* at 87, 123.

The Auditor's report puts notice to the County beyond dispute. Reports to a sheriff describing systemic failures in his jails put him on notice of them. *Starr v. Baca*,

652 F.3d 1202, 1209, 1216 (9th Cir. 2011) (allegations that sheriff "was given notice, in several reports, of systematic problems in the county jails" stated a claim of deliberate indifference); *Greer v. Cnty. of San Diego*, 726 F. Supp. 3d 1058, 1079 (S.D. Cal. 2023) (reports, including a county grand jury report, gave this County "notice that its existing training, supervision, and discipline practices were not adequate"). And two courts in this District have treated this very report as evidence that this County knew of the deficiencies it describes. In *Arroyo*, the court denied the County summary judgment on a *Monell* claim arising from inadequate safety checks, relying on the Auditor's finding of "multiple instances of sworn staff who spent no more than one second glancing into an individual's cell, sometimes without breaking stride as they walked through the housing module." *Est. of Arroyo ex rel. Wilson v. Cnty. of San Diego*, No. 3:21-cv-01956-RBM-SBC, 2026 WL 810042, at *25 (S.D. Cal. Mar. 24, 2026). In *Dunsmore v. San Diego Cnty. Sheriff's Dep't*, No. 20-cv-00406-AJB-DDL, 2025 WL 2315038, at *14 (S.D. Cal. Aug. 11, 2025), the court rejected the County's argument that the report and others like it were stale, because they "demonstrate that Defendants were aware of the severe deficiencies in the Jail's medical system at the time they were published." This report was published six weeks before Mr. Rupard died.

**3. The County did nothing.**

"[C]ontinued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Connick*, 563 U.S. at 62 (quoting *Bryan Cnty*, 520 U.S. at 407). Such a policy is "one of inaction: wait and see if someone complains." *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (per curiam).

In California, the Sheriff makes the County's policy for its jails. *Cortez v. Cnty. of Los Angeles*, 294 F.3d 1186, 1187 (9th Cir. 2002) (sheriff "acts as the final

policymaker for the County . . . in establishing and implementing policies and procedures for the safekeeping of inmates in the county jail"). From February 3, 2022 until after Mr. Rupard died, that was Acting Sheriff Kelly Martinez. Exh. 30 (March 2022 news release) at 2. She has read the Auditor's report. Exh. 31 (Martinez interrogatory responses) at 5, 7–8. Plaintiff asked what she did between the day the report was released and the day Mr. Rupard died. Did she instruct that deputies receive supplemental training on safety checks? "No, not applicable as to Responding Party." *Id*. at 26–27. Did she instruct anyone to review video of safety checks for compliance with policy, as the Auditor had just recommended? "No, not applicable as to Responding Party." *Id*. at 30. Did she take any steps to ensure that nurses and mental-health clinicians made the segregation visits? "No, not applicable as to Responding Party." *Id*. at 16–17, 20. Her predecessor, asked what he did in the three preceding years to find out whether those visits were happening, answered: "No as to Responding Party." Exh. 32 (Gore interrogatory responses) at 11–12, 14. Asked what he did to supervise the conduct of safety checks, he answered that the question was "not applicable." *Id*. at 28.

Whatever "not applicable" means, the answer to each question is clearly no. Told by the State that its deputies were not looking into the cells, the County did nothing — until Mr. Rupard died. Then its deputies began "almost immediately going inside cells and cleaning them right away," and the Department instituted twice-weekly wellness checks by teams of deputies, nurses and mental-health clinicians. Exh. 11 (Torres deposition) at 42:24–43:1; Exh. 33 (March 2023 news release) at RUP001161. Had the County done that six weeks earlier, it might have saved Mr. Rupard's life.

**4. No prior identical death was required, and this was not a single incident.**

The County may say that no one had died of malnutrition and dehydration in its jail before. But liability under *Monell* "does not require proof of a prior injury. A

constitutional injury can be substantially certain to follow from a practice even if an injury has yet to occur. Otherwise, every *Monell* defendant would get 'one free . . . pass' for policies or practices that are substantially certain to violate an individual's constitutional rights." *Sandoval*, 985 F.3d at 682 (quotation omitted).

The County will also invoke *Gordon II*, which affirmed summary judgment for Orange County on the *Monell* claim even as it recognized the right to direct-view safety checks. But the reason was a failure of proof that does not exist here: "the record lacks evidence of any other event involving similar conduct or constitutional violations." 6 F.4th at 974. Here, the State Auditor documented "multiple instances" of the same conduct in the deaths it reviewed. ECF No. 321-5, p. 86. Six deputies described the conduct as their ordinary practice. And fifteen to twenty deputies and supervisors engaged in it at Mr. Rupard's door alone. ECF No. 321-3, p. 48. *Gordon II* establishes Mr. Rupard's right to direct-view safety checks as part of the County's constitutional obligation to provide for his safety. Nothing in it protects a county that was told its checks were dangerously inadequate and kept performing them the same way.

**D. Each custom was the moving force behind Mr. Rupard's death.**

*Monell* requires "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Castro*, 833 F.3d at 1075 (quotation omitted). The link here is direct and obvious, as experts on both sides agree. The Medical Examiner recognized that Mr. Rupard died as the result of his treatment by the County in ruling the death a homicide caused by "pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia." Exh. 1 (autopsy report) at COSD 002094. The Department has said of the Medical Examiner's report that it "respect[s] its findings." Exh. 33 (March 2023 news release) at RUP001161. Mr. Rupard did not die suddenly. He died over weeks, in a cell that County employees were required to look into every hour and to visit with a nurse three times a week.

Had the deputies' checks been remotely adequate, they would have helped him.

Plaintiff's corrections expert concluded that had staff monitored Mr. Rupard's well-being and kept his cell reasonably clean, "it is more likely than not that they would have recognized his deteriorating physical health." ECF No. 321-3, p. 46. Dr. Cruz's expert agrees that his appearance and the condition of his cell should have "triggered an immediate healthcare and mental health request." Exh. 18 (Adams report) at 15. That is the causal chain the Ninth Circuit accepted in *Castro*, where "the absence of frequent visual checks and the lack of audio monitoring clearly made the risk of serious harm to such prisoners substantial." 833 F.3d at 1076.

Had the nursing and mental-health rounds occurred, clinicians would have helped him. Plaintiff's nursing expert concluded that "[h]ad nursing staff performed the required segregation rounds, it is more likely than not that Mr. Rupard's progressive deterioration would have been identified substantially earlier," and that his 60-pound weight loss "would have been obvious to staff if he was being monitored per policy." Exh. 28 (Roscoe report) at 13, 14. Dr. Venters found that Mr. Rupard "was locked in a cell for 89 days" and, when the door was finally opened, "was close to death from starvation, dehydration and pneumonia." Exh. 38 (Venters rebuttal report) at 6. Dr. Glindmeyer concluded that "[h]ad Mr. Rupard been properly evaluated, monitored and treated, his death would have been prevented." Exh. 40 (Glindmeyer rebuttal report) at 2. The defense experts do not disagree. The nursing expert retained by Dr. Cruz agreed that the failure to monitor him "substantially reduced the likelihood that his deterioration would be recognized and appropriately treated in a timely manner." Exh. 39 (Clark rebuttal report) at 2.

Any of these protections might have sufficed. A person housed in isolation in the County's jail has three safeguards against dying unnoticed in a cell: (1) deputies who are supposed to conduct a proper safety check every hour; (2) a nurse who is supposed to conduct three evaluations each week; and (3) a mental health clinician, who is required to assess the person once each week. The County's actual custom and

practice denied Mr. Rupard all three.

**E. The record leaves nothing for a jury to decide.**

**1. The County's own evidence supplies every fact on which the motion rests.**

Plaintiff recognizes that whether a municipality's custom reflects deliberate indifference is often left to a jury. In *Arroyo*, the same decision that treated the Auditor's report as evidence of notice against this County, the court denied the plaintiffs' motion for partial summary judgment, observing that the question "is typically a jury question." 2026 WL 810042, at *22. But summary judgment is nonetheless required whenever "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

*Arroyo* shows why this case is different. There, the detainee "acted normally" for seven hours before he swallowed his face mask, a safety check was interrupted by a use-of-force incident and never completed, and the court found that the parties were "merely arguing over competing evidence." *Arroyo*, 2026 WL 810042, at *12, *22. Here there is no competing evidence. What the deputies did on a safety check comes from the deputies. What the cell looked like comes from the undisputed testimony of the court-appointed psychiatrist and the homicide unit's photographs. What a deputy who saw it should have done comes from the County's deputies and the defendants' experts. What the County's policies required comes from its Rule 30(b)(6) designee. What the Auditor told the County comes from the Auditor's report, and what the Sheriff did in response comes from the Sheriff's sworn answers. Plaintiff does not ask the Court to weigh any witness's credibility or to choose between competing accounts. The evidence here comes from the County and its staff, and it establishes the County's liability.

**2. The County's changes after Mr. Rupard's death confirm that it could have acted.**

After Mr. Rupard died, the County had its deputies clean cells "almost immediately," "increased the wellness checks," and adopted twice-weekly wellness checks by teams that include nurses and mental-health clinicians, because "[t]he living conditions and hygiene of an individual can be an indicator that they may be in crisis." Exh. 11 (Torres deposition) at 42:24–43:1; Exh. 13 (Gutierrez deposition) at 99:9–11; Exh. 33 (March 2023 news release) at RUP001161. Plaintiff offers that evidence for permitted purposes. Federal Rule of Evidence 407 bars evidence of subsequent remedial measures to prove "negligence" or "culpable conduct," but the Court "may admit this evidence for another purpose, such as . . . if disputed . . . the feasibility of precautionary measures." Fed. R. Evid. 407. If the County will not concede that prompt cleaning and regular rounds were feasible in early 2022, the evidence is admissible to prove that they were. *Id*; *Gauthier v. AMF, Inc.*, 788 F.2d 634, 637 (9th Cir.), *amended on denial of reh'g*, 805 F.2d 337 (9th Cir. 1986). And the Ninth Circuit has held, in a case against this County, that "[a] jury could view" such a change "as an acknowledgement by the County that its prior practices . . . were insufficient." *Sandoval*, 985 F.3d at 683. Plaintiff does not rely on the changes to establish the customs, which are proved by the Auditor's findings, the County's logs and video, and the testimony of its deputies and clinicians. That respects the limit the Ninth Circuit drew in *Gordon II*, 6 F.4th at 974 & n.7.

**F. In the alternative, the Court should grant partial summary judgment on each element that is not genuinely disputed.**

Plaintiff respectfully submits that the facts on which its *Monell* claim rests are not subject to reasonable dispute and it is entitled to summary judgment on its entire claim. However, if the Court concludes that any element of Plaintiff's *Monell* claim presents a triable question, it should resolve the rest now. Under Rule 56(a), a party may move for summary judgment on a "part of each claim," and the Court may

therefore adjudicate individual elements of the *Monell* claim. Fed. R. Civ. P. 56(a); *Rookaird*, 908 F.3d at 455. In the event the Court does not grant summary judgment against the County on the entire *Monell* claim, Plaintiff respectfully requests partial summary judgment on each element of its *Monell claim* as to which the Court finds no genuine dispute, including: (1) that Mr. Rupard was deprived of his Fourteenth Amendment right to adequate monitoring and care; (2) that the County had a custom of conducting safety checks that did not involve meaningful observation of the person or the cell; (3) that the County had a custom of not providing nursing and mental-health rounds for people held in segregation, despite the requirements of Policy G.2.1; (4) that either or both of those customs amounted to deliberate indifference; and (5) that they were the moving force behind Mr. Rupard's death. Establishing these elements on which there is no material dispute of fact as a matter of law now will narrow the issues for trial and speed resolution of the case.

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant summary judgment against the County of San Diego on *Monell* liability. In the alternative, Plaintiff requests that the Court grant partial summary judgment on each element of the claim that is not genuinely disputed.

Respectfully submitted,

DATED: November 13, 2026

IREDALE & YOO, APC
EUGENE G. IREDALE
JULIA YOO
SARAH MUSUMECI

/s/ Eugene G. Iredale

Eugene G. Iredale
Attorneys for Plaintiff