EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
PETER BIBRING: SBN 223981
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

JEREMIAH A. LOWE (CA SBN 239166)
*jeremiah@lowelawapc.com*
LOWE LAW, APC
402 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 878-2725
Facsimile: (619) 878-2737

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ESTATE OF LONNIE RUPARD,

Plaintiff,

v.

COUNTY OF SAN DIEGO, *et al.*,

Defendants.

CASE NO. 23-CV-1357-CAB-JAC

**EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT COUNTY OF SAN DIEGO, OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY ADJUDICATION, VOL. 1 OF 3**

Judge: Hon. Cathy Ann Bencivengo

Date: December 18, 2026

**PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT**

## INDEX OF EXHIBITS

| Exhibit | Description | Volume | Ex. Page |
|---|---|---|---|
| 1 | Autopsy Report, Lonnie Rupard, San Diego County Medical Examiner (COSD 002085–2106) | 1 | 6 |
| 2 | Orders of Incompetency, 2015 and 2019 (COSD 003055, 003256) | 1 | 29 |
| 3 | Follow-Up Investigative Report II, Det. Blumenshine, Mar. 16, 2023 (COSD 001656–1677) | 1 | 32 |
| 4 | San Diego County Sheriff's Department Detention Services Bureau Policy I.64 (COSD 006088–6090) | 1 | 55 |
| 5 | Rule 30(b)(6) Deposition of Lt. Aaron Boorman, Jan. 16, 2026 (excerpts) | 1 | 59 |
| 6 | San Diego County Sheriff's Department Detention Services Bureau Policy I.43 (COSD 006343–6345) | 1 | 77 |
| 7 | Deposition of Dep. Jason Viladiu, Feb. 2, 2026 (excerpts) | 1 | 82 |
| 8 | Reports of Dr. Nicolas Badre, M.D. (COSD 000153–158) | 1 | 101 |
| 9 | Deposition of Nicolas Badre, M.D., Dec. 19, 2025 (excerpts) | 1 | 108 |
| 10 | Deposition of Sgt. Michael Johnson, Feb. 27, 2026 (excerpts) | 1 | 123 |
| 11 | Deposition of Dep. Andrew Torres, Apr. 13, 2026 (excerpts) | 1 | 131 |

| Exhibit | Description | Volume | Ex. Page |
|---|---|---|---|
| 12 | Deposition of Dep. Miguel Aguilera, Apr. 13, 2026 (excerpts) | 1 | 139 |
| 13 | Deposition of Dep. Linda Gutierrez, Dec. 11, 2024 (excerpts) | 1 | 146 |
| 14 | Deposition of Dep. Jeff Amado, Jan. 29, 2026 (excerpts) | 1 | 151 |
| 15 | Deposition of Dep. Gustavo Martinez, Jan. 29, 2026 (excerpts) | 1 | 157 |
| 16 | Audio recording of interview of Dep. Thomas Mace, Dec. 20, 2023 (COSD 000371) (to be lodged with the Court) | 1 | 163 |
| 17 | Transcript of interview of Dep. Thomas Mace, Dec. 20, 2023 (COSD 000371) | 1 | 164 |
| 18 | Expert Report of Will Adams | 2 | 6 |
| 19 | Deposition of Gary Raney (excerpts) | 2 | 41 |
| 20 | Deposition of Will Adams, Sept. 24, 2026 (excerpts) | 2 | 45 |
| 21a-h | Video recordings of logged safety checks (to be lodged with the Court) | 2 | 56 |
| 22 | San Diego County Sheriff's Department Detention Services Bureau Policy G.2.1 (Oct. 30, 2020) (COSD 006313–6314) | 2 | 57 |
| 23 | Rule 30(b)(6) Deposition of Melissa Quiroz, Jan. 8, 2026 (excerpts) | 2 | 60 |
| 24 | Deposition of Anthony Cruz, M.D., Mar. 3, 2026 (excerpts) | 2 | 66 |

| Exhibit | Description | Volume | Ex. Page |
|---|---|---|---|
| 25 | Deposition of Christina Goodall, Dec. 16, 2024 (excerpts) | 2 | 73 |
| 26 | Deposition of Serina Rognlien-Hood, Mar. 26, 2026 (excerpts) | 2 | 81 |
| 27 | Expert Report of Homer Venters, M.D., July 10, 2026 | 2 | 86 |
| 28 | Expert Report of Lori Roscoe | 2 | 150 |
| 29 | San Diego County Sheriff's Department News Release, Sheriff Bill Gore Announces Retirement, Jan. 19, 2022 | 2 | 182 |
| 30 | San Diego County Sheriff's Department News Release, Anthony Ray Appointed Interim Sheriff, Mar. 22, 2022 | 2 | 185 |
| 31 | Defendant Kelly Martinez's Revised Responses to Plaintiff Estate's Interrogatories, Set One | 3 | 6 |
| 32 | Defendant William Gore's Revised Responses to Plaintiff Estate's Interrogatories, Set One | 3 | 72 |
| 33 | San Diego County Sheriff's Department News Release, Mar. 2, 2023 (RUP001161–1164) | 3 | 120 |
| 34 | Deposition of Det. Max Blumenshine, Jan. 7, 2026 (excerpts) | 3 | 125 |
| 35 | Line-Up Training re 11-53 Safety Checks, May 1, 2021 (COSD 006245–6246) | 3 | 129 |
| 36 | Deposition of Cpl. Blade Romans, Jan. 13, 2025 (excerpts) | 3 | 132 |

| Exhibit | Description | Volume | Ex. Page |
|---|---|---|---|
| 37 | Expert Report of Kathryn Wild, RN | 3 | 136 |
| 38 | Rebuttal Expert Report of Homer Venters, M.D., Aug. 5, 2026 | 3 | 160 |
| 39 | Rebuttal Expert Report of Jackie Clark | 3 | 179 |
| 40 | Rebuttal Expert Report of Glindmeyer | 3 | 199 |

# EXHIBIT 1

Autopsy Report, Lonnie Rupard, San Diego County Medical Examiner (COSD 002085–2106)

# County of San Diego

GLENN N. WAGNER, D.O.
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

STEVEN C. CAMPMAN, M.D.
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | 2022-01007 |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/18/2022 0132 | 3/18/2022 0209 | 3/18/2022 0252 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022 2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

ADDRESS (STREET, CITY, STATE, ZIP)
200 W Arbor Dr, San Diego, California, 92103

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022 Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| Ronnie Rupard | Son | 3/18/2022 | |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, Florentina Rupard, and his ex-wife, Justina Lopez. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, "Ana", with whom he had a son named Ronnie Rupard. The decedent also had a son with Justina, named Justino Rupard. He had a third child who was reported to have died in October 2018 of muscular dystrophy, who was named Lonnie Rupard. The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet, The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

**Signed:** ______________________________
**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** ______________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH: PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing: SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH: HOMICIDE

AUTOPSY SUMMARY:

I. History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
   A. Malnutrition and dehydration.
      1. Height 69 inches, weight 105 pounds with a body mass index of 15.5.
      2. Subcutaneous fat thickness 0.1 cm.
      3. Decreased skin turgor.
      4. Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
   B. Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
   C. Superficial pressure sores of back and right foot.

II. SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III. Pulmonary emphysema, moderate.

IV. Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V. Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI. Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation Report FA-22-0000070.

VII. Resuscitation-related injuries.
  A. Anterior rib fractures.
  B. Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of hemopericardium.

OPINION: According to investigative information and review of records provided by the San Diego County Sheriff's Department, on the early morning hours of December 19, 2021, this 46-year-old man was arrested by National City Police for a parole violation, and directly booked into San Diego Central Jail. The arresting officer reported the decedent had a history of psychotic disorders with combative, assaultive, or hostile behavior. During intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165 pounds, respectively. He answered "no" to all the general medical assessment questions, mental health screening questions, suicide risk assessment, substance use assessments, and miscellaneous assessments. During intake medical examination by a staff nurse, his vital signs were stable. He was described as alert and oriented x2, disheveled in appearance, and verbally abusive but directable. He refused a COVID-19 test. He was placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric illness on extensive medications, prior treatment at Patton State Hospital and maintenance on mediations during previous incarceration. Psychiatry was onsite but decedent refused evaluation. It was rescheduled for December 23, 2021; however, it was rescheduled several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation. The progress note stated that he had a history of unspecified schizophrenia and other psychotic disorders, antisocial personality disorder, and stimulant use disorder from a previous record dated July 11, 2020. It also stated that he had a past medical history of "seizures or tbi," (traumatic brain injury) per a record dated February 6, 2020. The evaluation occurred cell-side. The psychiatrist noted he had fair hygiene, was shirtless but wearing pants, and was standing by the cell door. During the interview, he was irritable and uncooperative. He yelled and was verbally aggressive. His mood was unable to be assessed due to lack of cooperation. He was deemed in no apparent distress, with no signs of being a danger to self or others. The psychiatrist's plan was to offer/start previous

psychiatric medications including Haldol, Cogentin, and Valproic acid. Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests. No signs requiring immediate psychiatric intervention were noted at the visit. Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications. Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued. It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment. The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips. His breathing was even and unlabored. He repeatedly stated “I don’t need a medic. Leave me alone, if you touch me, I’ll kill you.” For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders. Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional. He was evaluated cell-side, standing at the front door. He was uncooperative stating “I am fine, I don’t want to talk to you.” He was unable to be fully assessed due to refusal and/or inability to cooperate. His cell was clean with some debris. Empty food trays were inside his cell. He was free of any urine, feces, or flooding, and was moderately groomed. He did not appear in any acute distress and there were no immediate safety concerns. There was no threat to self or others and no distressing symptoms or major impairment. The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist. The visit occurred cell-side. During that visit, multiple attempts were made to engage him in conversation, but he

refused to answer questions, rambled incoherently, and became verbally aggressive. The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell. He appeared to be in no acute distress. His cell room was “relatively clean, no flooding/gassing or smearing of feces.” The toilet was covered with a cloth and the content could not be visualized. When he was again offered psychiatric medications, he continued to yell. Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed. He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours. At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing. The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered. Medics arrived and attached the Lucas CPR assist device. The decedent was in asystole and changed to ventricular tachycardia. He was shocked a total of three times and then remained in pulseless electrical activity. The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead. Deputies noted his cell was soiled with feces. Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial. The psychiatrist noted the cell was dirty with trash throughout. The toilet was full of excrement and the room was malodorous. There was feces on the floor and food smeared on the walls. The decedent was described as unkempt and dirty himself. During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head. The psychiatrist’s diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records. The psychiatrist’s final opinion was that he suffered from severe mental illness and was not competent to stand trial. He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, for a twisted left ankle injury. Imaging was negative for fracture, soft tissue swelling or other abnormality.

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region. There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens). Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: The body is received in a white body pouch sealed with tamper resistant read seal number "4950349." The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993." A yellow disposable tarp covers the body. The body is resting on a green fitted sheet. The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number. A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened. There are no evidence bags on the head, hands, and feet. A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES: I am assisted by Forensic Autopsy Specialist Stephen Hannum. Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY: The body is clad in a short-sleeve blue shirt with green tag. There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:

1. Blue stripped long-sleeve sweatshirt.
2. Pair of brown and black boots.
3. Disposable blue face mask.
4. Blue pants.
5. Gray tank top.
6. Black briefs.
7. White and yellow metal wristwatch.
8. In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:

1. An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2. An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3. A triangular defibrillator electrode is on the mid chest. An oval defibrillator electrode is on the mid chest. A rectangular defibrillator electrode is on the lateral left chest.

A rectangular defibrillator electrode is adhered to the cut shirt.
4. EKG electrodes are on the chest and abdomen.
5. A pulse oximetry monitor is on the left index finger.
6. Disposable blood pressure cuff is secured around the left upper arm.
7. A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:
1. Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

2. A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3. A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS: Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES: Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw. Livor mortis is posterior, purple-red and nonblanching to pressure. The body is cool (refrigeration). There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula. Just lateral to this are areas of pink-tan skin slippage. Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch. A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest. A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region. Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch. A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region. Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow. The center of the lesion has tan fibrinous material. A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow. It is covered with a tan soft fibrinous material.

## INJURIES, EXTERNAL AND INTERNAL

*There are blunt force injuries of the head, neck, torso, and extremities. They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A. BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp. A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline. A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead. A scabbed red-brown 1/16 inch

diameter abrasion is on the mid forehead. A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow. A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow. A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead. A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead. A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow. A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum. A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter. A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek. A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit. A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek. An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin. A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right. A similar 1 cm in diameter defect is on the left frontal skull. There is no defect on the inner table of the skull. The bone of the skull is thickened. There are no skull fractures. There is no epidural or subdural hemorrhage. The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter. A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible. A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch. Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B. <u>BLUNT FORCE INJURY OF TORSO</u>:

A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle. A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle. A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch. Pink-red ecchymosis is on the mid chest. Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter. Two linear partially interrupted partially scabbed tan pink-red

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back. A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back. Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs. There is hemorrhage in the anterior mediastinal soft tissue. There pericardial sac is lacerated. The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration. There is 75 mL of liquid blood in the pericardial sac. These injuries are consistent with attempted cardiopulmonary resuscitation.

C. <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:

Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow. A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint. A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint. A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter. A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint. A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint. There is loss of the distal aspect of the nail on the left 2nd finger. There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches. No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches. A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus. A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The diaphragm is intact. The abdominal fat pannus measures 0.1 cm. There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation. There are no pericardial adhesions. There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities. There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM: The heart weighs 280 grams. There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations. The remaining epicardial surface is smooth and glistening. The heart has an overall normal shape. The coronary arteries have a normal origin and follow a right dominant course. They are widely patent. There is no atherosclerotic stenosis. The ventricles are not dilated. The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively. The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis. The endocardial surfaces and four cardiac valves are unremarkable. The coronary ostia are patent.

The aorta is elastic without atherosclerosis. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right lung weighs 480 grams, and the left weighs 1030 grams. Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe. There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces. The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM: The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass. The gallbladder contains 10 mL of green, viscid bile without calculi. The mucosa is unremarkable. The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM: The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern. There are

no lymph node enlargements. Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles. There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus. The ulcer base is tan-green with no hemorrhage. The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine. There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage. The appendix is present.

GENITOURINARY SYSTEM: The right kidney weighs 140 grams, and the left weighs 150 grams. The capsules strip with ease from the smooth, red-brown subcapsular surfaces. The corticomedullary architecture is unremarkable. The pelves are not dilated. The ureters maintain uniform caliber into an unremarkable urinary bladder. The bladder contains 130 mL of dark yellow urine. The prostate gland is symmetrical and unremarkable. The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM: The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts. The adrenal glands have the usual golden cortical ribbon and unremarkable medullae. The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM: The skeletal system is normally developed. The ribs are not brittle. The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section. The clavicles, sternum, vertebrae, and pelvis are without fracture. The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD: Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage. Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone. The skull is thickened on the cross section. There is no epidural or subdural hemorrhage. The skull is otherwise normally formed. There are no skull fractures.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1290 grams. The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK: There is an endotracheal tube in situ. The trachea and larynx are patent and lined by smooth, tan mucosa. The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture. The anterior strap muscles and paratracheal soft tissues are without hemorrhage. The cervical vertebrae are intact without hemorrhage or fracture. The tongue has no bite mark or hemorrhage.

## SPECIMENS

TOXICOLOGY: The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY: Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY: Portions of tissues and major organs are retained in formalin. Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS: Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS: Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

## MICROSCOPIC EXAMINATION

HEART (2 sections): Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates. There are few scattered chronic inflammatory cells in the epicardial adipose tissue. The epicardial and myocardial vessels are unremarkable.

LIVER (1 section): Section shows normal hepatic architecture. There is sinusoidal congestion. There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections): Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis. The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils. Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung. There is no hyaline membrane formation. The airways of the right lung are unremarkable. There are no chronic bronchial asthmatic changes. The vessels are congested without thrombosis. There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3). Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4). There is no significant fibrin deposition and no hyaline membrane formation. Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli. There is no foreign material noted in the areas of inflammation. The large bronchi are unremarkable. The vessels are congested and unremarkable.

KIDNEY (1 section): Section shows rare senescent glomeruli. The glomeruli are otherwise unremarkable. The tubular epithelium is autolyzed. There is no tubulointerstitial fibrosis or inflammation. The vessels are congested and unremarkable.

BS:cmh
D: 3/19/22 T: 3/21/22
Rev. 2/27/23 cmh

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

# TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed: ______________________________
06/27/2022 Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

Exhibit 1
Page 26

# Outside Brain Autopsy Final Reports

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Final Diagnosis**

1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

## Case Information/Discussion

| | |
|---|---|
| Outside Case Number: | 2022-01007 |
| Date of Examination: | June 20, 2022 |
| Forensic Pathologist: | Bethann Schaber, MD |
| Originating Laboratory: | County of San Diego Medical Examiner's Department |

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

*Verified by: Jeremy Kieth Deisch*
*Date: 25-JUL-22 08:35 (Electronically signed)*
*JKD*

**Neuropathology Gross**

| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal<br>Cerebellum: Parasagittal<br>Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |

## *Outside Brain Autopsy Final Reports*

| | | | |
|---|---|---|---|
| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| | |
|---|---|
| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1: Dura mater, pineal gland
A2: Right orbitofrontal region with contusion
A3: Right orbitofrontal region with contusion
A4: Right hippocampus, mammillary bodies
A5: Left hippocampus
A6: Right frontal lobe parasagittal
A7: Midbrain
A8: Pons
A9: Medulla, right cerebellar hemisphere
A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

# EXHIBIT 2

Orders of Incompetency, 2015 and 2019 (COSD 003055, 003256)

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

[X] COUNTY COURTHOUSE, 220 W. BROADWAY, SAN DIEGO, CA 92101-3814
[ ] NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92083-6695
[ ] EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941
[ ] SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649

FOR COURT USE ONLY

F I L E D
MICHAEL M. RODDY
Clerk of the Superior Court

June 26, 2015

By ______ , Deputy

PEOPLE OF THE STATE OF CALIFORNIA
VS. PLAINTIFF,
LONNIE NEWTON RUPARD
DEFENDANT

MH MH 111419

CRIMINAL CASE NUMBER
CS 278931 01;

BBW04401;

## JUDGMENT OF MENTAL INCOMPETENCY AND ORDER FOR COMMITMENT (Penal Code 1370 & 1372(a)(2))

The above case came on regularly for hearing this date. Based upon the evidence presented the Court finds that the defendant is mentally incompetent.

The Court further finds:

[ ] Antipsychotic medication may be given to the defendant as prescribed by a treating psychiatrist pursuant to the defendant's consent. If the defendant refuses to or withdraws consent for antipsychotic medication, after the treating psychiatrist complies with the provisions of this code, the defendant shall be returned to court for a hearing regarding whether antipsychotic medication shall be administered involuntarily.

[X] The defendant lacks capacity to make a decision regarding antipsychotic medication. The defendant's mental disorder requires medical treatment with antipsychotic medication, and if the defendant's mental disorder is not treated with antipsychotic medication, it is possible that serious harm to the physical or mental health of the patient will result.

[ ] The defendant is a danger to others in that the defendant has inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm on another while in custody; or the defendant had inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm on another that resulted in his or her being taken into custody; and the defendant presents, as a result of mental disorder or mental defect, a demonstrated danger of inflicting substantial physical harm on others.

[ ] The people have charged the defendant with a serious crime against the person or property of another; involuntary administration of antipsychotic medication is substantially likely to render the defendant competent to stand trial; the medication is unlikely to have side effects that will interfere with the defendant's ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner; less intrusive treatments are unlikely to have substantially the same results; and antiphychotic medication is in the patient's best medical interest in light of his or her medical condition.

WHEREFORE, **IT IS ORDERED** that said defendant is committed to Patton State Hospital, or such other institution as may be directed by the Director, State Department of Health, for care and treatment until such time as provided by law or until further order of the Court.

The Sheriff shall redeliver the defendant to the court without any further order from the court upon receiving from the state hospital or treatment facility a copy of a certificate of restoration.

The maximum sentence on the most serious offense is 3 years. Commit to Patton State Hospital for 3 years. Defendant is to be given credit for time served of 70 days.

Date June 26, 2015

HONORABLE STEVEN E. STONE Judge of the Superior Court

Atty:
Sheriff (2)
PO
DA
Deft
Dup(2)
Patton

CLERK'S CERTIFICATE

The foregoing is a full, true and correct copy of the original on file in this office.

MICHAEL M. RODDY
CLERK OF THE SUPERIOR COURT

Date: 6-26-15

by ______ , Deputy

| | |
|---|---|
| [SUPERI]OR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO<br>☐ CENTRAL COURTHOUSE, 1100 UNION STREET, SAN DIEGO, CA 92101-3814<br>☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92083-6695<br>☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941<br>☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649 | *FOR COURT USE ONLY*<br>**FILED**<br>**MICHAEL M. RODDY**<br>**Clerk of the Superior Court**<br>May 17, 2019<br>By **M. Cooper**, Deputy |
| PEOPLE OF THE STATE OF CALIFORNIA<br>*VS.* PLAINTIFF,<br>LONNIE RUPARD<br>DEFENDANT | MH MH 115794 |
| **JUDGMENT OF MENTAL INCOMPETENCY AND ORDER FOR COMMITMENT (Penal Code 1370 & 1372(a)(2))** | CRIMINAL CASE NUMBER<br>CS 305746 01; S305009<br>BCD61101; MISD |

The above case came on regularly for hearing this date. Based upon the evidence presented the Court finds that the defendant is mentally incompetent.

The Court further finds:

☐ Antipsychotic medication may be given to the defendant as prescribed by a treating psychiatrist pursuant to the defendant's consent. If the defendant refuses to or withdraws consent for antipsychotic medication, after the treating psychiatrist complies with the provisions of this code, the defendant shall be returned to court for a hearing regarding whether antipsychotic medication shall be administered involuntarily.

☒ The defendant lacks capacity to make a decision regarding antipsychotic medication. The defendant's mental disorder requires medical treatment with antipsychotic medication, and if the defendant's mental disorder is not treated with antipsychotic medication, it is possible that serious harm to the physical or mental health of the patient will result.

☐ The defendant is a danger to others in that the defendant has inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm on another while in custody; or the defendant had inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm on another that resulted in his or her being taken into custody; and the defendant presents, as a result of mental disorder or mental defect, a demonstrated danger of inflicting substantial physical harm on others.

☐ The people have charged the defendant with a serious crime against the person or property of another; involuntary administration of antipsychotic medication is substantially likely to render the defendant competent to stand trial; the medication is unlikely to have side effects that will interfere with the defendant's ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner; less intrusive treatments are unlikely to have substantially the same results; and antiphychotic medication is in the patient's best medical interest in light of his or her medical condition.

WHEREFORE, **IT IS ORDERED** that said defendant is committed to Patton State Hospital, or such other institution as may be directed by the Director, State Department of Health, for care and treatment until such time as provided by law or until further order of the Court.

The Sheriff shall redeliver the defendant to the court without any further order from the court upon receiving from the state hospital or treatment facility a copy of a certificate of restoration.

The maximum sentence on the most serious offense is 4 YEARS. Commit to Patton State Hospital for 2 YEARS. Defendant is to be given credit for time served of 130 days.

**ALBERT T. HARUTUNIAN III**

Date: May 17, 2019 HONORABLE ALBERT T. HARUTUNIAN, III Judge of the Superior Court

Atty:
Sheriff (2)
PO
DA
Deft
Dup(2)
Patton

**CLERK'S CERTIFICATE**

The foregoing is a full, true and correct copy of the original on file in this office.

**MICHAEL M. RODDY**
**CLERK OF THE SUPERIOR COURT**

Date: MAY 17 2019 by [signature], Deputy

Exhibit 2
Page 31

SUPCT MH-23(Rev. 3-06) **JUDGMENT OF MENTAL INCOMPETENCY AND ORDER FOR COMMITMENT**

CC: Medical

 100070

# EXHIBIT 3

Follow-Up Investigative Report II, Det. Blumenshine, Mar. 16, 2023 (COSD 001656–1677)

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)

**Case Number:** 22111838



**<u>Follow Up Report II</u>**

**<u>Origin:</u>**

On Thursday, March 17, 2022, at 2246 hours, Inmate Lonnie Rupard (10/1/75) was found unresponsive in his cell. Deputies and medical staff attempted lifesaving measures until paramedics arrived. Inmate Rupard was transferred to UCSD Hospital before being pronounced deceased at 2351 hours by Dr. Allen.

On Thursday, March 18, 2022, at about 0200 hours, San Diego County Sheriff's Homicide responded and assumed control of the investigation. I was assigned as the lead investigator at that time.

As documented in my initial follow up report:

Inmate Rupard had a history of psychotic and assaultive behavior while in the San Diego County jail system.

Inmate Rupard's cell was full of feces and food trays (both empty and full). The toilet had been filled with feces, food, and food trays. The water was operable, but the cell intercom had been tampered with and was difficult to hear through.

Inmate Rupard was unable to be processed at the hospital as he had been released to the medical examiner's office prior to Homicide's arrival.

Video of March 17, 2022, was reviewed, showing multiple checks by deputies. Inmate Rupard never left his cell, and no movement was observed inside the cell. The logs were consistent with what was seen on video.

On Sunday, March 19, 2022, the autopsy of Lonnie Rupard was conducted. Rupard was 69 inches in height and weighed 105 pounds. Inmate Rupard appeared severely malnourished.

A cursory review of the medical records was conducted, and a copy was turned over to Dr. Schaber at the Medical Examiner's Office.

On Tuesday, June 7, 2022, I completed my preliminary investigation into the in-custody death.

| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | ID# [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | ID# [redacted] | 3/16/2023 |

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**



**Investigation:**

I conducted a review of Rupard's California and Federal criminal history. His criminal history dates back to the 90's between California and Texas. For details, refer to the attached criminal history printouts and crime reports.

**Criminal History:**

On Saturday, January 8, 2019, Rupard was arrested for PC 245(A)(1), PC 594(B)(2)(A) by the National City Police Department. Rupard threw a rock through the victim's vehicle while the car was stopped at a stop light. The assault was unprovoked.

During Rupard's sentencing, it was discovered he had a criminal history dating back to 1993. Within that time period, he had obtained convictions related to battery, accessory, resisting arrest, evading a police officer, violation of a court order, robbery, assault with a deadly weapon, making terrorist threats, and causing injury to an elderly person.

On Monday, February 14, 2020, Rupard pled guilty to PC 245(A)(4) with a prior prison commit. Rupard was sentenced to 4 years prison.

On Tuesday, May 18, 2021, Rupard was released to the San Diego County Probation Department.



CDC# BM0722 Date: 05/18/2021

On Monday, August 23, 2021, Rupard was contacted at the Imperial Beach Pier reference a call for service of an intoxicated male (CAD#E7321231). Rupard was cooperative and cordial with deputies. He willingly provided his identifying information and allowed them to take photographs, taking off his own shirt.



Rupard was then arrested on the following dates:

8/25/21 – Probation violation



9/11/21 – Probation violation



9/14/21 – Under the influence of narcotics



10/20/21 – Probation violation



12/19/21 – Probation violation



On Sunday, December 19, 2021, at about 0100 hours, Officer Shafer #0523 with the National City Police Department was conducting a traffic stop. A nearby transient approached the vehicle and threw a bag at it. Officer Shafer recognized the transient as Lonnie Rupard. After concluding his traffic stop, he conducted a records check and saw Rupard had a felony warrant. Officer Shafer and his partners attempted to contact and arrest Rupard who immediately fled. A foot pursuit ensued. Officer Shafer was ultimately able to catch Rupard who had turned to face him. Officer Shafer tackled Rupard to the ground and arrested him without incident.

**Investigation Continued:**

On Wednesday, October 19, 2022, at 0815 hours, I asked Lieutenant Kopchak if any hygiene inspections were done. Lieutenant Kopchak notified me the last logged hygiene inspection was on March 5, 2022. However, after a review of the video, it appeared the inspection was not completed. Additionally, the housing unit log was not completed regarding as to why the hygiene inspection was not completed. That investigation into the lack of hygiene inspections falls under the Internal Affairs purview and as such I will not be investigating the policy violations.

Rupard's housing block, 7D, was classified as COVID quarantine and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health.

On Wednesday, October 19, 2022, at 1003 hours, I requested a copy of the psychiatric evaluation of Lonnie Rupard by Doctor Nicolas Badre. In reviewing the court paperwork

and the visitation logs, I could see Rupard had been visited by Dr. Badre for a psychiatric evaluation.

On Wednesday, October 19, 2022, at 1152 hours, I received a copy of the Forensic Psychiatry Clinic report on Mental Competency by Dr. Nicolas Badre. I also received the Forensic Psychiatry Clinic Report on Involuntary Medication to Restore Competency report by Dr. Nicolas Badre. I reviewed both reports and discovered the following.

> Dr. Badre went to see Lonnie Rupard while in custody at the San Diego Central Jail at the direction of the Honorable Judge Cindy David. Dr. Badre was present to examine Rupard for mental competency to stand trial.
>
> Dr. Badre reviewed Rupard's jail psychiatric records.
>
> Dr. Badre spoke with Rupard at his cell at the recommendation of jail mental health staff and floor deputies.
>
> *The cell was dirty with trash throughout. The toilet was full of excrement and the room was very malodorous.*
>
> *The defendant was unkempt and dirty himself. He was lying in bed in an uncomfortable manner with a blanket over his head.*
>
> *There were feces on the floor. There was food smeared on the wall.*
>
> *It required the food flap and a very loud introduction on my part to get the defendant's attention.*
>
> Dr. Badre attempted to interview Rupard. Rupard was hostile, continually referring to Dr. Badre as "dog", asking for water, and insulting him. Rupard ultimately placed a blanket over his head and ignored Dr. Badre.
>
> Dr. Badre wrote his Findings and Opinions at follows:
>
> *Given the information I have, it is my opinion with reasonable medical certainty that the defendant is unable to have a rational and factual understanding of the charges and is unable to assist counsel in a rational manner.*

> *While the defendant's lack of cooperation is likely in part volitional. I think that is motivated by underlying disorganization of thought, which would be consistent with prior evaluation that diagnosed him to be psychotic.*
>
> *The defendant suffers from mental illness, displaying active signs of mental illness, including disorganized thinking. Those symptoms of mental illness disable the defendant from being able to have a rational understanding of the charges and assist legal counsel.*
>
> *I would recommend that the defendant be referred to a station hospital or JBCT program for restoration to competency.*
>
> Dr. Badre's report was dated March 24, 2022, which is 7 days after Rupard died.

On Wednesday, February 8, 2023, at about 1300 hours, Dr. Schaber called me to discuss the in-custody death of Inmate Rupard. Dr. Schaber requested assistance in reviewing and understand the San Diego Sheriff Medical Records and acronyms used.

**<u>Medical Records Review:</u>**

On Sunday, December 19, 2021, at 0118 hours, National City Police Department (NCPD) arrested Lonnie Rupard (10/1/75) at 100 W. 8th Street in National City. Rupard had a felony warrant for his arrest due to a probation violation. Rupard was reported to medical staff by officers regarding his assaultive behavior. It was noted in his evaluation he did not sustain any injuries, had no suicidal ideations, but did have psychotic disorders. His height was listed as 72 inches and weight was listed as 165 pounds. Rupard denied narcotics use and refused a COVID-19 test.

On Sunday, December 19, 2021, Rupard refused to take his medication during the booking process. Over the course of his incarceration, his refusal was documented many more times.

> On Thursday, December 30, 2021. (3 times)
> On Friday, December 31, 2021. (2 times)
> On Saturday, January 1, 2022. (2 times)
> On Sunday, January 2, 2022.
> On Monday, January 3, 2022.
> On Tuesday, January 4, 2022.
> On Wednesday, January 5, 2022. (2 times)

On Thursday, January 6, 2022.
On Saturday, January 8, 2022. (2 times)
On Sunday, January 9, 2022. (2 times)
On Monday, January 10, 2022.
On Tuesday, January 11, 2022. (2 times)
On Wednesday, January 12, 2022.
On Thursday, January 13, 2022. (2 times)
On Friday, January 14, 2022. (2 times)
On Saturday, January 15, 2022. (2 times)
On Sunday, January 16, 2022.
On Monday, January 17, 2022. (2 times)
On Tuesday, January 18, 2022.
On Wednesday, January 19, 2022. (2 times)
On Thursday, January 20, 2022.

On Sunday, December 19, 2021, Rupard had his vital signs checked twice.

At 0251 hours, Rupard had blood pressure of 128/82 with a pulse of 90.
At 1136 hours, Rupard had blood pressure of 120/74 with a pulse of 110.

Rupard's vital signs were never checked again until his death on March 17, 2022.

On Monday, December 20, 2021, Rupard had a psychiatric sick call but refused. It was rescheduled for December 23, 2021. Rupard's chart reflected he had a history of extensive medication use and Patton State Hospital commits.

On Friday, December 24, 2021, Rupard's psychiatrist visit was canceled due to time constraints.

On Tuesday, December 28, 2021, Rupard's psychiatrist visit was canceled due to time constraints.

On Wednesday, December 29, 2021, Rupard was seen by Psychiatrist A. Cruz. Rupard was brought to medical screening by deputies. He was described as "alert, oriented, disheveled in appearance, and verbally abusive but directable." Rupard refused a COVID-19 test. Rupard stated, "You're a nurse, I'm a PA. What do we got? I want nothing!"

On Thursday, January 20, 2022, Psychiatrist A. Cruz documented a review of Rupard's chart. Due to his consistent refusal of medication, Haldol, Cogentin, and Valproic Acid (VPA) were discontinued. Cruz noted Rupard already had a psychiatric appointment scheduled for follow up.

On Saturday, January 29, 2022, Rupard was contacted after a use of force by deputies. RN C. Romero noted that Rupard stated, "I don't need a medic. Leave me alone, if you touch me I'll kill you." The medical assessment was terminated for safety. Deputy A. Wanzer [redacted] was present with RN Romero.

On Wednesday, February 9, 2022, Mental Health Clinician (MHC) C. Anosike contacted Rupard at his cell for a Wellness Check. Rupard was standing at the cell door. He stated, "I am fine. I don't want to talk to you" and "go away". Deputies reported to Anosike that Rupard will often speak to himself in unintelligible words. Anosike noted Rupard's cell was clean with the exception of some debris. Rupard had empty food trays inside his cell. There was no urine, feces, or flooding. No immediate safety concerns were noted.

On Sunday, February 20, 2022, RN C. Romero noted Rupard was on lockdown per Sergeant F. Burkey [redacted]. RN Romero noted, "no contraindication noted."

On Tuesday, February 22, 2022, RN L. Kreiss noted "Psych SC noted, no new orders" in Rupard's file.

On Tuesday, February 22, 2022, Psychiatrist A. Cruz evaluated Rupard while inside his cell. Cruz was outside the cell as Rupard was inside.

> "Today, multiple attempts were made to engage the Pt in conversation, however he refused to answer questions and rambled incoherently and became verbally aggressive. Pt was observed through his cell door window. Pt was awake, alert, shirtless (wearing pants), initially sitting on his bed then kneeled on his cell floor and appeared to be in no acute distress. Cell room was relatively clean, no flooding/gassing or smearing of feces. However, toilet seat was covered with cloth. No s/s of Pt being a danger to self or others. Regarding psychotropic medication, Pt continued to yell when offered psych meds. No s/s of Pt being a danger to self or others at this time."

Cruz ultimately noted that Rupard refused all medication and assistance. A follow up appointment was scheduled for 6 to 7 weeks.

For complete details of the medical interactions, refer to Rupard's medical record.

**Investigation Continued:**

A review of Rupard's court history was reviewed and shared with Doctor Schaber.

**Court History Review:**

On Monday, December 27, 2021, Rupard had court for his probation revocation. Rupard refused to appear on his 9th custody day. His probation was preliminarily revoked.

On Tuesday, December 28, 2021, Rupard had court for his probation revocation. Rupard was ordered to remain remanded into the custody of the Sheriff with a future court date of January 3, 2022.

On Monday, January 3, 2022, Rupard had court for his probation revocation. His parole remained preliminarily revoked, and he remained remanded into the custody of the Sheriff. Rupard refused to appear in court, his future court date was set for January 7, 2022.

On Friday, January 7, 2022, Rupard had court for his probation revocation. His parole remained preliminarily revoked and he remained remanded into the custody of the Sheriff. Rupard refused to appear in court, his future court date was set for January 13, 2022.

On Thursday, January 13, 2022, Rupard had court for his probation revocation. His parole remained preliminarily revoked and he remained remanded into the custody of the Sheriff. Rupard refused to appear in court, his future court date was set for January 24, 2022.

On Monday, January 24, 2022, Rupard had court for his probation revocation. His parole remained preliminarily revoked and he remained remanded into the custody of the Sheriff. Rupard refused to appear in court, his future court date was set for February 1, 2022.

On Tuesday, February 1, 2022, Rupard had court for his probation revocation. His parole was formally revoked, and he remained remanded into the custody of the Sheriff. He had a future "intervening hearing" scheduled for March 18, 2022.

> *"Proceedings suspended pursuant to PC1370.02. Mental competency examination on 03/09/22 at 8:00 am by Forensics. PC 1370.02 hearing on 03/24/22 at 9:00 am Department 1203 of the Central Division. The Sheriff is Ordered to transport the parolee to and from the examination."*

**Investigation Continued:**

On Wednesday, February 8, 2023, Dr. Schaber and I concluded our conversation that the likely cause of death was malnourishment and dehydration while the manner of death was natural. Dr. Schaber informed me there was a possibility the final ruling of the case could be homicide. I notified Dr. Schaber I would like to interview her if it was ruled homicide since I would be tailoring my investigation upon her findings.

On Tuesday, February 14, 2022, at Dr. Schaber's request, I sent her a summary of Rupard's arrest history and court appearances. Dr. Schaber and I spoke again about the case regarding questions of hospital visits, court visits, and jail abbreviations.

On Friday, February 17, 2023, I received a copy of Falck – Prehospital Patient Record for Rupard after my request for records in April of 2022.

> Falck records showed Rupard was asystole (no pulse) upon arrival.

On Tuesday, February 21, 2023, I sent Dr. Schaber a copy of Rupard's Falck – Prehospital Patient Record.

On Monday, February 27, 2023, I was notified the medical examiner's office was likely going to rule Rupard's cause of death as homicide. I later spoke with Dr. Schaber and discussed her findings at length. From our discussion, I learned she did not believe any specific act caused Rupard's death. But rather the lack of medical care from the Sheriff's Department contributed to his death. We both agreed that from the review of the records, multiple individuals were attempting to help Rupard, including deputies, doctors, and nurses. However, there was not enough help fast enough.

On Monday, February 27, 2023, I notified my supervisor, Sergeant Wilson #6013, in the change of investigation type.

On Tuesday, February 28, 2023, I received a copy of the City of San Diego Fire-Rescue Incident Detail Report after my request for records in April of 2022.

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Event:** In Custody Death | **Case Number:** 22111838
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)



On Wednesday, March 1, 2023, at 1401 hours, I contacted the Sheriff's Nursing Director Rognlien-Hood #[redacted] and requested a copy of the Patton State Hospital records for Rupard. During our correspondence, Nursing Director Rognlien-Hood stated she would attempt to get the records from Patton State Hospital.

On Thursday, March 2, 2023, at 0902 hours, I received a copy of Rupard's Medical Examiner Report #2022-01007. The report's opinions and conclusions were as Dr. Schaber had read them off to me, the only change was the manner of death now read Homicide.

| | |
|---|---|
| **Cause of Death:** | Pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia |
| Contributing: | SARS-COV-2 (COVID-19) viral infection; pulmonary emphysema; duodenal ulcer |
| **Manner of Death:** | Homicide |

On Thursday, March 2, 2023, at 1300 hours, Sergeant Wilson and I met with Sergeant Madden #[redacted] from Internal Affairs (IA). Sergeant Madden notified us internal affairs had been notified of possible misconduct due to the state of the decedent's cell. The IA investigation had been tolled (placed on hold) pending the completion of Sheriff's Homicide investigation. I notified Sergeant Madden the in-custody death had been changed to a homicide. Sergeant Madden added the investigation would continue to be tolled pending a review of criminal charges and civil judgements.

On Monday, March 6, 2023, I began contacting staff at the San Diego Central Jail to acquire surveillance video from the 3-month period Rupard was in custody. Deputy Hann [redacted] is the Corporal in charge of the San Diego Central Jail Administration. He reviewed the surveillance video and determined it was no longer available. The video was saved for approximately 6 months back. He also pulled the surveillance video hard drive which was used to save critical incidents. Deputy Hann confirmed the video for this case had not been saved.

On Monday, March 6, 2023, at 1330 hours, I contacted Lieutenant Kopchak [redacted] the In Custody Death Advocate and Department Investigation Coordinator. I requested he attempt to locate any potential surveillance video he may have saved during his investigation.

| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 3/16/2023 |



CONFIDENTIAL COSD 001667

On Monday, March 6, 2023, at 1410 hours, I submitted a request for the National City Police Department (NCPD) reports and body worn camera from the arrest of Lonnie Rupard on 12/19/2021.

On Monday, March 6, 2022, I reviewed Rupard's Jail Information Management System (JIMS). The records showed numerous dayroom refusals, food refusals, and documented incidents.

Inmate Rupard had multiple incidents while in custody in San Diego dating back to 2009. The following are from his most recent time in custody.

**Jail Information Management System (JIMS):**

On Thursday, December 23, 2021, Rupard used dayroom.

On Saturday, December 25, 2021, Rupard used dayroom.

On Monday, December 27, 2021, Rupard refused breakfast.

On Monday, December 27, 2021, Rupard refused dayroom.

On Saturday, January 1, 2022, Rupard used dayroom.

On Monday, January 3, 2022, Rupard refused dayroom.

On Saturday, January 8, 2022, Rupard refused dayroom.

On Saturday, January 15, 2022, Rupard used dayroom.

On Tuesday, January 18, 2022, Rupard refused dayroom.

On Saturday, January 22, 2022, Rupard used dayroom. *(Rupard was logged as refusing dayroom one hour later)*

On Monday, January 24, 2022, Rupard refused dayroom.

On Wednesday, January 26, 2022, Rupard refused dayroom.

On Friday, January 28, 2022, Rupard refused dinner.

On Saturday, January 29, 2022, Rupard took his food flap hostage during a hygiene inspection. Rupard spit at and tried to grab multiple deputies, resulting in a use of force. For details, see Incident#224004460 by Deputy J. Mendoza[redacted]

On Saturday, January 29, 2022, Deputy A. [redacted] to assist Deputy Mendoza with Inmate Rupard. Rupard was wearing "day-glo greens" despite being a mainline inmate. Rupard was handcuffed through the door and instructed to sit down as deputies entered the cell. Deputy Wanzer was explaining to Rupard why he was not allowed to wear greens when "Rupard became upset and yelled "I will fucking kill you!"" Rupard stood up to face Deputy Wanzer. Deputy Wanzer took Rupard to the ground. Rupard's "day-glo green" clothing was removed and he was given a new pair of "blues." Rupard sustained a small abrasion to the top of his head. Nurse [redacted] responded to evaluate Rupard. Rupard's handcuffs were removed, and he was left in his cell. Deputies attempted to photograph Rupard for his injuries, but he was uncooperative. For details, refer to Case #22104241. The below photographs were taken by deputies as Rupard hid from the camera.





On Sunday, January 30, 2022, Rupard was placed on lockdown as a result of his rule violation.

On Tuesday, February 1, 2022, Rupard refused breakfast.

On Tuesday, February 1, 2022, Rupard refused a shower. *(A shower is offered to inmates on lockdown. They are allowed time to come out of their cell and shower but are not allowed to spend time in the dayroom.)*

On Friday, February 4, 2022, Rupard utilized his shower time.

On Sunday, February 6, 2022, Rupard refused dayroom.

On Tuesday, February 8, 2022, Rupard refused dayroom.

On Thursday, February 10, 2022, Rupard refused dayroom.

On Saturday, February 12, 2022, Rupard used dayroom.

On Monday, February 14, 2022, Rupard refused dayroom.

On Tuesday, February 15, 2022, Rupard refused lunch.

On Thursday, February 17, 2022, Rupard refused dayroom.

On Friday, February 18, 2022, Rupard refused breakfast.

On Friday, February 18, 2022, Rupard refused dayroom.

On Friday, February 18, 2022, Rupard used dayroom.

On Saturday, February 19, 2022, Rupard used dayroom. During dayroom, Rupard refused to lock down. He took off his shirt and clenched his fist. Rupard threw the trash can at the gate door where deputies were standing. Numerous deputies from the facility responded to assist with controlling Rupard. After multiple deputies responded, the gate was opened and Rupard complied with commands. He was placed back in his cell and placed on lockdown for his rule violation. For details, refer to Incident #224007616 by Deputy J. Gonzalez[redacted]

On Sunday, February 20, 2022, Rupard was in lockdown.

On Tuesday, March 1, 2022, Rupard refused dayroom.

On Thursday, March 3, 2022, Rupard refused dayroom.

On Thursday, March 3, 2022, Rupard refused lunch.

On Sunday, March 6, 2022, Rupard refused dayroom.

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**



On Tuesday, March 8, 2022, Rupard refused dayroom.

On Thursday, March 10, 2022, Rupard refused dayroom.

On Saturday, March 12, 2022, Rupard refused lunch.

On Sunday, March 13, 2022, Rupard refused dayroom.

On Monday, March 14, 2022, Rupard had a professional visit with Nicolas Badre.

On Thursday, March 17, 2022, Rupard refused dayroom.

For complete details, refer to the Inmate History Summary Report.

**<u>Investigation Continued:</u>**

On Tuesday, March 7, 2023, at 1324 hours, Lieutenant Kopchak notified he did not have any of the video saved. However, he did locate screenshots he had saved showing Rupard alive and in the dayroom at various times of his stay in custody.

The screenshots were of the surveillance video on February 19, 2022, when Rupard took the dayroom hostage, refusing to lock down and throwing objects. For details, refer to Incident Report #224007616.





On Wednesday, March 8, 2023, I noted a discrepancy in my initial follow up report. I had drawn a diagram to depict the location of the cell in the module, circling the wrong cell.

Below is the new diagram with the correct cell circled.

[redacted]

# SAN DIEGO SHERIFF'S DEPARTMENT
## Follow-up Investigative Report

**Event:** In Custody Death
**Victim:** Lonnie Rupard
**Location:** 1173 Front Street (SDCJ), San Diego
**Date Occurred:** March 17, 2022 (Thursday)

**Case Number:** 22111838



On Thursday, March 9, 2023, a more extensive video review from the incident was done. The 24 hours of video surveillance for Module 7D was reviewed in full. It was confirmed all security checks (11-53) were done on time and accurate. It was also noted all deputies conducted the hard count, soft count, food pass, and temperature checks accurately.

During the review, I never observed movement through the window into Cell 17.

Also, during the review, I observed another inmate contact Rupard through the door to his cell. During Inmate Chism's dayroom, he could be seen for a short time at the cell door to Cell 17 (2046 hours). Chism had told detectives he knows Rupard and went to talk to him. He saw Rupard moving in bed, but Rupard did not respond to him. Chism noted Rupard had been quiet for the past week. He believed Rupard had died due to "methane gas poisoning." For details, refer to detective Magana Jr[redacted] follow up report.




| | | | |
|---|---|---|---|
| Reporting Officer: | Det. M. Blumenshine | [redacted] | MCD - HOMICIDE |
| Approved By: | Sgt. J. Wilson | [redacted] | 3/16/2023 |

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**



On Friday, March 10, 2023, at 0719 hours, NCPD Records provided the arrest report and use of force report for NCPD Case#2106992.

> On Sunday, December 19, 2021, at about 0100 hours, NCPD Officer Shafer [redacted] was conducting a traffic stop at the ARCO gas station at 133 W 8th Street in National City. During the traffic stop, Rupard was observed throwing a bag at the stopped vehicle and shouting incoherently at it.
>
> Additionally, units were called to assist with controlling Rupard while the stop was conducted. At the conclusion of the stop, officers conducted a record check of Rupard who they knew through prior contacts. Upon finding a felony warrant for his arrest, officers devised a plan to take him into custody as he had since walked away from them.
>
> As officers approached Rupard from multiple directions, he took off running and a pursuit ensued. As officers caught up to Rupard, he turned to face them. Rupard was tackled to the ground and placed into handcuffs without incident.
>
> Rupard was later booked by NCPD Officer Shafer into the San Diego Central Jail.
>
> For details, refer to NCPD Report #2106992.

On Wednesday, March 15, 2023, at 0941 hours, NCPD Records provided the body worn camera from the arrest of Rupard. The video and the reports were attached to the case file.

On Thursday, March 16, 2023, Detective Van Lingen notified me she had surveillance video of Module 7 D from 3/15/21 to 3/16/21. I copied the surveillance from her case and attached it to my case. That video has not been reviewed.

**Case Review:**

Rupard was released from the California State Prison system in May of 2021. He was turned over to San Diego County Probation on AB-109 status.

In August of 2021, Rupard was contacted by patrol deputies. Rupard was cooperative, cordial, and even fist bumped one deputy who used to work detentions.

Rupard was arrested later in the month. He was subsequently arrested multiple additional times between August and December. Each arrest showing a likely mental health decline.

Rupard was arrested by National City Police Department on December 19, 2021. Rupard was observed throwing a bag at a vehicle an NCPD Officer had stopped for a traffic violation. An Officer later conducted a records check and found Rupard had a warrant. As they attempted to contact him, a foot pursuit and use of force ensued. Rupard was shouting incoherently during his arrest and appeared delusional.

Since Rupard's release from state custody in May of 2018, he appeared to be suffering a mental health decline as seen in the difference of contacts and photographs throughout his law enforcement contacts.

Rupard was booked into custody at 165 pounds on 12/19/21.

Rupard was in COVID quarantine and administrative segregated (ad-seg) housing. This was done because of his jail history as well as his current mental state. Due to Rupard's psychiatric issues, he was unable to peacefully interact around other inmates and was therefore unable to have the standard program of a regular mainline inmate. In his level of housing, it was expected he would be given more psychiatric care.

A review of the video, logs, incident reports, criminal reports, and statements show deputies were very familiar with Rupard. It was often a use of force when contacting him due to his behavior. Rupard had two major incidents in his 3 months of recent custody time. One when he obtained the wrong outfit, took the food flap hostage, and spit at deputies resulting in a use of force. And one when he took the dayroom hostage, refusing to lock down and throwing objects. It was because of his history that deputies required a team to go into his cell to evaluate him, presumably in case he was faking and setting up an ambush. (On February 13, 2021, two inmates lured a deputy into their cell under feigned cooperation. They proceeded to assault that deputy, resulting in assault charges for both inmates.)

Rupard's safety, as well as that of staff, was a concern for all involved. Most contacts noted volatile and aggressive behavior coupled with the documented prior uses of force.

Rupard was found deceased on March 17, 2022. Homicide responded and took over the investigation.

Rupard's cell was in a dismal state, however, not uncommon of for housing of inmates with psychiatric history. Rupard had roughly 28 meal containers in his cell at the time of his death (~ 9 days' worth of trash). In review of the containers, most had been opened and many of the food items were missing. While there was food on the floor, table, and bed of the cell, it would not account for the food missing from the food trays. The food was either eaten or flushed down the toilet. There was feces in the cell, on the bed, floor, blanket, and in the toilet. However, it appeared the feces was smeared and moved. Suggesting the feces on the floor and bed originated from about three separate defecations. It was unknown how much feces had been backed up in the toilet as it was also full of food wrappers and trash, clogging the toilet. The condition of Rupard's cell, while visibly upsetting, was not a factor in his death.

During my processing of the scene, I noted many similar behavior types in the module. Most inmates yelled incoherently. The inmate in Cell 20 made violent sexual statements at my forensic evidence technicians and continually referred to me as a "Viking." Most other inmates were yelling incoherently. Some of the cells had trash in them.

Rupard's logs show he had been continually refusing his dayroom time, which offers a possible explanation for the trash buildup in his room. An inmate is allowed to clean their cell during their one hour of dayroom. Their cell is opened to the dayroom with trash bins where they can come and go freely during their time. Inmates are also allowed to pass their trash through their food flaps to trustees. If Rupard refused to come out of his cell, and refused to give his trash to trustees, he would have nowhere to throw out his trash.

During the autopsy, Rupard weighed 105 pounds. Rupard weighed 60 pounds less than when he was booked into custody 89 days prior.

After a lengthy discussion with Dr. Schaber, I requested an explanation regarding the manner of Rupard's death in detail. I explained I am required to conduct an investigation to determine who is at fault. Dr. Schaber noted the Medical Examiner's Officer does not determine criminal or civil liability/fault. However, she did state the methods for care were the problem and based upon our discussion no fault with a specific individual was noted.

It is apparent that care was continually offered to Rupard throughout his time in custody, as was noted by the Medical Examiner's Office. In my review of our records: deputies reported to medical staff issues with Rupard, nurses continually checked on Rupard, and Rupard's psychiatrist continually evaluated him. Despite all that, he ultimately died while

in custody of the Sheriff's Department. Rupard refused his medication, refused to communicate with medical staff, and refused to allow himself to be evaluated.

Based on the facts determined from my investigation, as well as my knowledge and understanding of jail operations and procedures, I do not believe probable cause exists to charge any involved individuals. The case in its entirety will be turned over to the District Attorney's Special Operations Division, as per all Homicides. Additionally, a copy of the case will be turned over to the U.S. Attorney's Office, and the Federal Bureau of Investigations.

This concluded my involvement in this investigation at this time.

# EXHIBIT 4

San Diego County Sheriff's Department Detention Services Bureau Policy I.64 (COSD 006088–6090)

[redacted]

[redacted]

[redacted]

# EXHIBIT 5

Rule 30(b)(6) Deposition of Lt. Aaron Boorman, Jan. 16, 2026 (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

---o0o---

| | |
|---|---|
| JUSTINO RUPARD, INDIVIDUALLY AND RONNIE RUPARD, INDIVIDUALLY,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE OF CALIFORNIA, INC; CHRISTINA ANOSIKE, IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; AGUILERA, M., VILADIU, J., MARTINEZ, G., SCHMITZ, D., AMADO, J., MACE, T., ACKERMAN, M., KEY, K., MOSER, M., AGUIRRE, E., JAMES, T., ROMERO, B., JOHNSON, M., TORRES, A., DELANEY, C., TREYVONNE, J., EVERSOLL, T., WERESKI, A., ROMANS, B., GUTIERREZ, L. IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTIES DOES 1-20; DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10,<br><br>Defendants. | Case No.: 23CV1357 CAB BLM<br><br>Fed.R.Civ.P.30(b)(6) |

Q. Let me ask you what you did in order to prepare to testify as the sheriff's designee on topic number one, other than speak with counsel, which I presume you did?

MS. FELDMAN: I will object to the extent it calls for any attorney-client privilege.

THE WITNESS: To prepare for this I reviewed the policies and procedures that were in place at that time during this incident.

BY MR. IREDALE:

Q. And anything else in that regard with respect to one?

A. In respect to the safety checks, hard counts, and soft counts, stipulating those three things that I am testifying for.

Q. Let me go now to question number two.

A. Uh-huh.

Q. Same question: What did you do to prepare to testify on that particular subject?

A. I reviewed the training that was in place at that time, the documents of the training, and the training bulletins that were in place at that time.

Q. And then may I go to Item No 3. With respect to that subject, what, if anything, did you do to prepare to testify as the County's designee?

Let me stop right there. "Sworn staff," could you tell me what that means in this context as you understand it?

A. Sworn staff would be any deputy working that location.

Q. It says, "All counts require sworn staff to verify each inmate's well-being through verbal or physical acknowledgement from the inmate."

Let me stop right there and ask you: As you understand the policy, the meaning of "inmate's well-being"?

A. So the inmate's well-being would be along the lines of what comes further down in there, assessing for medical or physical distress, any kind of trauma noted. That would be in guidelines of the well-being of the individual.

Q. Very good. Let's go down to the "Procedure" now. It has a series of definitions, "Verbal or physical acknowledgement."

Would you mind describing to me what the "Policy" part provides in that regard?

A. For the verbal or physical acknowledgement as it pertains to counts, you're looking for the individual to either physically move to acknowledge, or if you're dealing with the individual and trying

to do your count, they could also verbally say something to you, which then that gives you the response needed to show that, that person is basically -- their well-being is there, and they are alive, conscious.

Q. And apropos of that in this context, I take it in the course of your career at one point you were a sworn deputy?

A. Yes.

Q. Conducted many such counts yourselves?

A. Yes.

Q. Hundreds? Thousands?

MS. FELDMAN: I will object to the extent that if you're going to separate this deposition and ask him questions --

MR. IREDALE: I'm not. I'm just ensuring the background and foundation for testimony as the 30(b)(6).

MS. FELDMAN: That's fine.

BY MR. IREDALE:

Q. I don't want to press you too much. Fair to say many hundreds?

A. I've probably done quite a few counts in my time, yes.

Q. Fair enough.

who's suffering from medical distress among others things.

A. Yes. By getting that verbal or physical acknowledgement, that should help you or determine that that individual is not suffering from any kind of medical trauma or distress.

Q. Now, the soft count is discussed here, and you've explained that to me. Tell me now, if you could -- Section 1 C is the definition of a hard count. Would you in your own words tell me what hard count means?

A. So hard count is similar to soft count. You're performing similar items to it. You're still getting that verbal/physical acknowledgement. You're still counting. The addition of hard count is what you have now is you're using the count sheet or other document to verify who that person is. You're also utilizing their wrist band. If an individual can't produce a wristband because of where they are housed or maybe they do have an issue where they can't exactly get to the window to show that wristband, that's where the count sheet comes into place. It has an actual picture on it of the evacuation sheet. You can utilize that to confirm that person's identity.

list.

Q. I take your point. There's no given distance taught in training. In other words, the training doesn't say, you should be 12 inches from the person when you examine their face, but is the training, to your knowledge, such that in order for the deputy in the absence of a wristband to comply with the policy, must be sufficiently able to verify that the facial features match, whatever that distance is?

A. So in the first part of that question, there's no actual distance noted in training. The expectation is that you can physically look at that individual and look at the photo that you have and be able to determine that person is the same person.

Q. Now, could I refer you to page two of that exhibit? It says, "Soft counts shall be conducted during the following time periods," and then it gives four time periods between 0400 and 0500 for the night shift; 0600 to 0700 hours, day shift; 1700 to 1800 hours, day shift; and then 1830 to 1930 hours, which is on the night shift. Let me stop right there.

Those, of course, are in military time designations?

A. Yes.
Q. So is it the policy that there will be soft counts conducted four times a day?
A. Yes. With those outlying -- it's more designed by how it shows on here. It's showing after that, night shift, day shift. It's pretty much a soft count at the beginning of day shift, a soft count at the close of day shift, a soft count at the beginning of night shift, and then a soft count at the close of night shift.
Q. And there are typically two shifts of deputies working per 24-hour period.
A. Correct.
Q. Let me now go to hard counts. Would you distinguish for me the difference between the procedures involved in soft counts and hard counts as you understand the policy?
A. As previously noted, the soft count consists of getting a number and also checking on the -- or getting that physical or verbal acknowledgement. The main change from the hard count to the soft count is verifying that individual's identity against the count sheet and checking the wristband.
Q. And then under B 2, there's a notation

about the times when hard counts are to be conducted. It says, "1000 to 1200, day hard count; 2100 to 2300, night hard count."

Was that the policy, as you understood it, in '21 and '22?

A. Yes.

MR. IREDALE: Now, I would like to give you Exhibit No. 3.

(Exhibit 3 was marked for identification.)

BY MR. IREDALE:

Q. I will provide it to you and give a copy to counsel. This is headed, "SDSD Detention Services Bureau, San Diego Central Jail Green Sheet." The date is August 17th, 2020. The number is I.43.C.1. The subject is: Inmate Count Procedure.

Let me stop right there and ask: Do you recognize this document?

A. Yes.

Q. Would you tell me what it is?

A. This is the San Diego Central Jail Green Sheet for the day mentioned, August 17th of 2020.

Q. Would you tell me what a green sheet is in county jail parlance?

A. So as previously shown in the previous

taking away those outside things that could interfere with the process, because the TVs can be loud in the module, so you turn them off so we can perform our duties. It's also in between dayroom times a lot of time on those schedules, so by turning those things off, you're not having individuals going to watch the TV, go on the phones. You're getting it to where you can perform those duties efficiently.

Q. May I refer you to item C? I just need to read this sentence and ask a question.

"All counts in cell housing in SDCJ will be conducted in conjunction with a safety check."

Do you see that?

A. Uh-huh, yes.

Q. We're going to discuss safety checks in a moment, but is it fair to say that typically there is a safety check performed roughly one time every hour?

A. Within the hour, yes.

Q. And so that would be approximately 24 safety checks per 24-hour period?

A. If the math matches, that would be your minimum, yes.

Q. And so at least at the Central Jail what

they are providing is that you don't need to do a separate safety check if at the same time you are also doing a count. You can do both of those and satisfy both requirements of the policy with the one inspection.

A. By what it states here, yes. You can perform the check and the count at the same time, which will also -- which will fall under both categories of the policy, yes.

Q. Now, did you check to see whether as the policy itself which we discussed in two, at other facilities has a different practice? In other words, at any of the other facilities, if you know, is there a separate safety check, and in addition to that, the hard and soft counts instead of having 24 checks per day, you have 30, if you know?

MS. FELDMAN: Objection. Vague and ambiguous as to time.

THE WITNESS: I do not know.

BY MR. IREDALE:

Q. Let's go down, if we could, to the second page, E. This, I think, albeit in slightly different words restates the policy regarding hard count procedure.

"The deputies conducting the count shall

BY MR. IREDALE:

Q. And then in '21 and '22, was there any requirement to log the conclusion time of the safety check?

A. To my recollection of the policy, no.

Q. And then let me just ask you: There's a numerical designation for 11-53?

A. Yes.

Q. What does 11-53 mean?

A. I don't know exactly what it means, but basically just coordinates with the safety check.

Q. It's a reference --

A. It's a reference to a safety check, yes.

Q. Now I need to read the last sentence of the policy itself.

"In addition to observing the safety and welfare of inmates, sworn staff shall also be attentive to security and maintenance issues as well as environmental factors, for example, temperature, odors, cleanliness, while conducting safety checks."

I need to ask some questions about the particular parts of that, and this time I will ask my question one by one. When it says, "safety and welfare of inmates," you're understanding of what that means?

A. So that references back to the observing the individuals -- directly observing the individuals for medical distress or trauma.

Q. And then it refers to the sworn staff -- and sworn staff is just a generic term generally for deputies?

A. Correct. Sworn staff encompasses, basically, all deputies, the supervisors, anybody who is a law enforcement or detentions officer.

Q. It says, "Sworn staff shall also be attentive to security and maintenance issues."

What does "security and maintenance" mean?

A. So it sort of, coincides with a little bit of the next section, but so you're looking at -- when you are going in, you are getting a totality of the circumstances. You may walk through and see that maybe some water is running or there's a leak. That's noting an issue that needs to be taken care of as you are doing your safety check. Security issues would fall under the fact of you're going in there, and, you know, you see somebody getting in a fight. Also, you may see something in regards to like a door not securing, or there may be something that could be a security aspect that we need to handle in a cell. That would be your

security aspects.

Q. Maintenance?

A. The maintenance is, like I said, the possibility of a leak, maybe the water flowing, maybe an overflowing toilet. Those might be things where you need to get maintenance involved and make note of it.

Q. There's a reference here to environmental factors that includes, among other things, odors and cleanliness. The significance of those two things as you understand it with respect to the policy?

A. So environmental factors like odors, you may go into a module and you may smell something out of the norm. That needs to be looked at, because you don't know what it could be. It could be smoke. It could be jail-made alcohol. The cleanliness you're looking at the condition of the dayroom, the cells, the module area, so you're assessing that to see if there's anything that needs to be cleaned up or addressed in regards to general cleanliness.

Q. Thank you. For this exhibit, Exhibit 7, I need to refer you to the bottom of page two and the top of page three, and then I will ask you some questions about that portion.

For logging of safety checks, that

document, sir? Doesn't it say that? Well, fair enough. It says, "may be logged." "Items that necessitate documentation include, but are not limited to." Is your understanding that "necessitate" means if this is viewed -- facility damage is viewed, it must be put in the 11-53 note?

THE WITNESS: So with the verbiage "necessitate," yes, it should be logged after the check, if it is noted.

BY MR. IREDALE:

Q. Alright. Then five says, "Maintenance issue: Clogged toilet, running water."

That also is something that says necessitates documentation?

A. Correct.

Q. Let's go now, if we could, to Section D. There's a reference to the supervisor's log review. Would you explain what supervisor's log review is as used in this policy and procedure?

A. For the supervisor's log review, you're going to have two separate ones, one completed by the sergeant and one completed by the lieutenant. So for -- as stated in the policy, the supervisor log review by the sergeant is completed -- there's two completed within their shift, and in reviewing

that, they are looking at the entirety of the log to ensure that anything that needs to be logged is logged and logged appropriately. They are also looking at the safety checks to ensure that they were logged in the appropriate times and also logged properly with the proper designators, either the last name or ARJIS of the deputy, and then it moves onto the watch commander's aspect, which they overview the entire log as well, and they are also looking at the safety checks to ensure that they are done in the appropriate time and manner. Basically they will use the drop down supervisor log review, notate that they reviewed the log, and if they see any discrepancies, they will make a notation in the notes field.

Q. So as I understand it, the procedure calls for a review during every shift by the sergeant?

A. There will be two reviews by the sergeant in a shift.

Q. Is there a typical time for those two reviews?

A. There's nothing written in policy. It just depends on the supervisor, and also it depends on the activities of the day. Depending on what's going on, it could change when they do their log

times.

Q. And then there is in addition to the two sergeant's review, every shift a review by the lieutenant?

A. Correct.

Q. And then in addition to that, there is also for every shift a review by the watch commander?

A. Well, the lieutenant and watch commander are the same. Sorry.

Q. Forgive me. Because you were saying you're aware a lieutenant, but not necessarily always a watch commander. I apologize, but in this regard, the second review is done by the lieutenant/watch commander who is the same person?

A. Yes. The watch commander/lieutenant -- the lieutenant is the watch commander of that team during that shift.

Q. Thank you so much.

MR. IREDALE: Let me now give you Exhibit 8.

(Exhibit 8 was marked for identification.)

BY MR. IREDALE:

Q. This is a single sheet with writing on both sides, which is "Line-Up Training For 11-53

# CERTIFICATE OF REPORTER

---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [ X ] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e).

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 22nd of January, 2026.

Nicole O'Neil

Nicole O'Neil, CSR No. 10774

# EXHIBIT 6

San Diego County Sheriff's Department Detention Services Bureau Policy I.43 (COSD 006343–6345)

[redacted]

COSD 006343

EXHIBIT
10
Blumenshine

[redacted]

COSD 006344

[redacted]

COSD 006345

# EXHIBIT 7

Deposition of Dep. Jason Viladiu, Feb. 2, 2026 (excerpts)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD, )
Plaintiff, )
vs. ) CASE NO. 23CV1357 CAB BLM
COUNTY OF SAN DIEGO, et al., )
Defendants. )

---

REMOTE VIDEOTAPED/ORAL DEPOSITION

DEPUTY JASON VILADIU

FEBRUARY 2, 2026

---

REMOTE VIDEOTAPED/ORAL DEPOSITION OF DEPUTY JASON VILADIU, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 2nd day of February, 2026, from 1:15 p.m. to 3:24 p.m., before Maribel C. Torres, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine via Zoom, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

expert opinion; incomplete hypothetical; lacks foundation.

You can answer.

A. Based on what I was trained for, you know, I would do my best to identify any medical distress situations like I discussed, and I would notify medical personnel if I felt it was necessary.

Q. (BY MR. LOWE) And so, stated a little differently, though, you understood that one of the purposes, the reasons you do a safety check, is to identify if there is an individual inmate who may be in medical distress such that you can then summon medical attention for them, correct?

A. Yes, correct.

Q. All right. The same with respect to, if an individual is going through what you observed to be a potential mental health crisis, did you understand that, as part of the safety check, you are looking for if an individual is demonstrating some signs that they may be having a mental health crisis such that you can summon mental health care for them?

A. Yes.

MR. COLLETTI: Let me give the objection. Give me a moment to jump in there, please.

THE WITNESS: Sorry.

Q. And, in addition, was it your understanding that, as part of the safety checks, that you are required to look at the inmate's condition of their cell?

A. Yes.

Q. And what was your understanding as to the reason or reasoning for observing the condition of an inmate's cell?

A. It indicated how they were caring for themselves, and I guess hygiene was important, you know, to try to maintain the hygiene of the incarcerated person.

Q. Were you required to document if an inmate was living in unsanitary conditions?

MR. COLLETTI: Objection to the term "unsanitary conditions" as vague and ambiguous; lacks foundation; calls for speculation; calls for expert opinion; incomplete hypothetical.

You can answer the question.

A. If we noticed a dirty cell, it wouldn't necessarily be documented.

Q. (MR. LOWE) What requirements did you have as a deputy if you identified a cell that was what you believed to be unsanitary?

MR. COLLETTI: Same objections.

MR. COLLETTI: Calls for speculation; calls for expert opinion; he's not a person that's knowledgeable.
You can answer.
A. So if the individual is not able to care for himself, then that would make me concerned for that individual and call a mental health professional to talk to him.
Q. (MR. LOWE) Okay. And so you understood, though, it's part of your job that one of the things you're looking for is, if the cell is in such a condition that it would give you concern whether that individual is well enough to take care of themselves, and you'd be looking at that as part of your safety check, fair?
A. Yes.
Q. And you understood that an unsanitary cell could be indication that that individual needs mental health care for their own safety, true?
MR. COLLETTI: Incomplete hypothetical.
A. Yes.
Q. (MR. LOWE) And it's my understanding that, as part of these safety checks, when you were assigned to a particular floor, that you would be required to do the safety checks every hour, correct?

A. At least once an hour.

Q. All right. And fair to say each of those safety checks, you were required to do those things that we already talked about, which was looking at the physical condition of the inmate, looking at their sort of mental state and whether they're coherent, looking at their cell conditions, true?

A. Yes.

MR. COLLETTI: Mis- -- objection to it misstates prior testimony, but you can answer.

Q. (MR. LOWE) I think you did, but --

A. Yes.

Q. Okay. And you worked on -- well, let me back up. Prior to this deposition, I don't want to get into any substance or communications you had your attorney, but did you have an opportunity to meet with an attorney?

A. Yes.

Q. Okay. I don't want to get into, again, any communications you had with your attorney, but what documents, if any, did you review in preparation for your deposition?

A. The only document that we reviewed was the area activity log.

Q. All right. And we'll go through that with you

check that I see on -- on your shift appears to be at 19:55 military hours or 7:55 p.m., correct?
A. Correct.
Q. And, again, you would have been doing safety checks in module 7-D?
A. I would -- I believe it was for the whole 7th floor, correct, including module D.
Q. Okay. Thank you. I appreciate that.
The 7th floor includes modules A through E, correct?
A. Correct.
Q. And so when it's indicated Floor 7, but doesn't have a specific module identified, that would mean that it's the entirety of the 7th floor including modules A through E?
MR. COLLETTI: Objection to the extent it calls for speculation.
Q. (MR. LOWE) Is that correct?
A. I don't remember how that was logged exactly, but I would assume that that would mean the whole 7th floor.
Q. All right. Same with respect to a safety check at what would be 8:53 p.m. or 20:53 military time, you did a safety check on the 7th floor at that time, on March 15th?

A. Yes.
Q. And then going to the next safety check I see that you would have a performed was a 9:49 p.m., 21:49 military time on March 15th, correct?
A. Correct.
Q. And then you also performed the safety check on March 15th at 10:47 p.m., 22:47 military time?
A. Yes.
Q. And each of these times with Deputy Aguilera, do you know if at this time, were you a training officer?
A. I was not.
Q. Okay. And at any time, were you, during this time frame, were you being trained by anyone?
A. No.
Q. All right.
MR. COLLETTI: Was that a -- I didn't quite catch the answer to that. Was that a no?
THE VIDEOGRAPHER: No.
MR. COLLETTI: Thank you.
Q. (MR. LOWE) And then the next -- the next I see here would be on March 16th at 2:36 in the morning, you would have a done a safety check at that time, correct?
A. Right.

Q. And then again at 3:24 a.m. you would have done a safety check?
A. Correct.
Q. And then again at 4:21 a.m.?
A. Correct.
Q. All right. Let me -- so it appears to be -- maybe I'm -- oh, I think I may have missed one. You did a safety check -- I apologize -- you did a safety check also going back on March 15th at 23:43, and you also did a safety check at -- on March 16th at 12:41 a.m.?
A. Correct.
Q. All right. And then we -- we talked about it, you did one at 3:24 a.m. and 4:21 a.m. on March 16th, correct?
A. Yes.
Q. All right. And I'm looking quickly to see, was there any other safety checks that you performed on March 16th prior to your shift ending, which would be at 6:00 a.m. Looks like did you a shift -- I'm sorry, you did a safety check at 6:00 a.m., and that would be your last safety check, and you had done a safety check at 5:20 a.m., correct?
A. Yes, that's correct.
Q. All right. I apologize for jumping around there.

All right. And to the best of your understanding and understanding of what's on the area activities' summary would be, to your knowledge, a true and accurate representation of the times in which you would have done your safety checks on floor seven on March 15th and March 16th, correct?

A. Correct.

Q. Did you work March 17th?

A. I don't recall.

Q. Do you recall working the shift when Hayden Shuck's body was discovered in his cell unresponsive on March 16th?

MR. COLLETTI: Objection --

A. I don't recall.

MR. COLLETTI: -- as to speculation; assumes facts not in evidence and lacks foundation.

But you can answer.

Q. (MR. LOWE) Do you recall --

A. I don't.

Q. Okay, thank you.

Do you recall speaking with any detective on March 16th following Hayden Shuck's death?

A. I don't believe I spoke to anyone.

Q. Do you recall being interviewed by any detective following Lonnie Rupard's death?

MR. COLLETTI: Same objection.
A. True.
Q. (MR. LOWE) When you see the condition of the cell of an inmate as we see in 1535, this is another photo again of Mr. Rupard's cell on March 17th, with a toilet full of what appears to be excrement, what is your responsibility as a deputy?
A. To get them into a cell with a working toilet and water.
Q. Would you also agree that, when you look at in conjunction with the sink and toilet and feces on the bed, that this is somebody who should be referred for a mental health evaluation?
MR. COLLETTI: Calls for speculation; incomplete hypothetical; lacks foundation; assumes facts not in evidence; calls for an expert opinion.
But you can answer.
A. Yeah, I believe if he's in those kind of conditions, he has some mental health concerns and should be -- and should be evaluated by a mental health professional.
Q. (MR. LOWE) And you understood that you are a key player in terms of -- in terms of a role within the jail to notify mental health when you observe something that suggests an individual needs mental health

evaluation, right?

MS. MUSUMECI: Objection to the term "key player" as vague and ambiguous; calls for an expert opinion.

But you can answer if you understand.

Q. (MR. LOWE) I'll -- I'll reask the question.

You understood that it was your job as a deputy, when doing an 1153 safety check, that when you observe somebody who's living in feces with a condition that we just walked through and Mr. Rupard's condition, it's your job as a deputy to notify mental health, true?

A. True.

Q. All right. I want to show you next in order that photo COSD_1528, appears to be food containers and food that is -- and trash in the cell. My question to you is, as part of your safety checks, are you looking in the cell to see if there's uneaten food that may indicate an inmate is not eating?

MR. COLLETTI: Vague as to time; incomplete hypothetical; calls for speculation; lacks foundation.

You can answer.

A. Yeah, I wouldn't know if he's eating or not eating.

Q. (BY MR. LOWE) But my question is, are you --

MR. COLLETTI: Same objections.
A. To contact medical staff and have them evaluate Mr. Rupard.
Q. (MR. LOWE) Because you would understand, as a human being and as a deputy, that when somebody is that skinny, that in and of itself is somebody who is in potential medical distress, true?
MR. COLLETTI: Calls for expert opinion; calls for speculation; incomplete hypothetical; assumes facts not in evidence.
You can answer.
A. If he was looking like that, yes, that would be a medical emergency.
Q. (MR. LOWE) And by that, we're talking -- I'm not talking about the fact that he's dead. I'm talking about the fact that, as skinny as he is, I'm talking about the fact -- seeing his chest the way it looks with his body weight the way it is. If you saw a human being alive who is that skinny, you would understand that's somebody who is in medical distress, true?
MR. COLLETTI: Asked and answered.
A. True.
Q. (BY MR. LOWE) And, as you sit here today, is it fair to say you still have no recollection of ever seeing Lonnie Rupard -- well, strike that.

five minutes, if that's all right.

THE VIDEOGRAPHER: We are now off the record. The time is 2:33 p.m. Pacific Time.

(Recess from 2:33 to 2:41.)

THE VIDEOGRAPHER: We are now on the record. The time is 2:41 p.m. Pacific Time.

Q. (BY MR. LOWE) Prior to March 15th and 16th that we've gone through, had you ever performed any safety checks at Mr. Rupard's cell?

A. I believe I would have.

Q. With respect to --

MR. COLLETTI: If I may, just a belated objection to the extent it calls for speculation, but...

Q. (MR. LOWE) And I should say that maybe why do you believe that you would have had some safety checks at Mr. Rupard's cell on 7-D prior to March 15th?

MR. COLLETTI: Same objection.

A. I don't remember the schedule where I worked on what floors, but it rotated. It's very possible I was working on the 7th floor on a previous occasion when Rupard was there.

Q. (MR. LOWE) All right. And the area activities summary would be the best way to determine if you were doing safety checks of the 7th floor where Lonnie Rupard was housed, correct?

check, do you have any ability to smell the cell itself?
MR. COLLETTI: Incomplete hypothetical.
A. I have the ability to smell as I'm walking by a cell, and sometimes odor would emanate from a cell.
Q. (MR. LOWE) All right. And so when you're doing a safety check, can you do a safety check walking by?
MR. COLLETTI: Objection, calls for speculation; vague and ambiguous as to the phrase "walking by."
But if you understand it, you can answer.
A. During a safety check, I would stop and look in the cell.
Q. (MR. LOWE) Okay. And so when you would stop and look in a cell, when you're stopped in a cell, if the cell is malodorous, is that such that you, when you're standing and doing a safety check, that you are attentive to the smell?
MR. COLLETTI: Same objections, but you can answer.
A. Yeah, I would notice a smell in certain cells.
Q. (MR. LOWE) And why would it be important, if at all, as part of a safety check to identify if there's any malodorous smell emanating from the cell?
MR. COLLETTI: Calls for speculation;

You can answer.

A. It was not clean.

Q. (MR. LOWE) Okay. And would you consider the photos that we went through today to be photos of an unsanitary living cell, living condition?

MR. COLLETTI: Same objections.

A. Yes.

Q. (MR. LOWE) And was that the condition that we looked at in terms of the actual cell conditions, was that something that was very uncommon, or is that conditions, as we walked through today, something that is more commonplace?

MR. COLLETTI: Same objections.

I assume you're still on -- in the time frame that we were in. I don't want to make that objection if I misheard you, but to the extent it's not, that objection as well.

MR. LOWE: Correct. I'm looking at that time frame from that period of time, general period of time.

Q. (BY MR. LOWE) Were -- were cells appearing as they did in the photos we just went through for other cell mates or was that unique to Lonnie Rupard?

MR. COLLETTI: Same objection.

A. The condition of Rupard's cell in the

photographs was bad and not normal.

Q. (BY MR. LOWE) All right.

MR. LOWE: I don't have any other questions for you, Deputy Viladiu. I appreciate your time here today.

I will pass it back along if any counsel has any follow-up questions before we conclude the deposition.

MS. SENNET: I don't have any questions. Thank you.

MR. COLLETTI: I do just have one quick question or maybe one question that's sort of broken up.

EXAMINATION

BY MR. COLLETTI:

Q. Just with regard to the checks, you're aware of what a hard count is, correct?

A. Correct.

Q. Is that -- is a hard count a check where you would attempt to confirm the inmate, who the inmate is inside the cell?

A. Yes.

Q. So with that being said, and you -- strike that.

And you would perform a hard count during your shift, correct?

STATE OF TEXAS )
COUNTY OF TARRANT )

REPORTER'S CERTIFICATE

REMOTE VIDEOTAPED/ORAL DEPOSITION OF

DEPUTY JASON VILADIU

FEBRUARY 2, 2026

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

That the witness did not request to review the transcript and make any changes to the transcript pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 18th day of February, 2026.

Maribel Torres
Texas Certified Stenographer #8597
Expiration Date: 10/31/2027
Steno Agency, Inc.
Firm Registration No. 47
315 W. 9th Street, Suite 807
Los Angeles, California 90015
(888)707-8366
concierge@steno.com

# EXHIBIT 8

Reports of Dr. Nicolas Badre, M.D. (COSD 000153–158)

**COUNTY OF SAN DIEGO**
Health and Human Services Agency

**BEHAVIORAL HEALTH SERVICES**
3255 Camino del Rio, San Diego, California 92108

Forensic Psychiatry Clinic
330 W. Broadway #481
San Diego, CA 92101
619-531-3047

**FORENSIC PSYCHIATRY CLINIC**
**REPORT ON MENTAL COMPETENCY**

| | |
|---|---|
| Name: Lonnie Rupard | Court: 1203 3/24/22 |
| Client #: | Judge: Hon. Cindy Davis |
| DOB: 10/1/75 | Examiner: Dr. Nicolas Badre |
| Case ID#: CPR210150 | Date of evaluation: 3/14/22 |

## REASON FOR REFERRAL

The defendant is facing revocation of community supervision. The court issued an order for an examination of mental competency to stand trial.

## SOURCES OF INFORMATION

This evaluation is based on the following information:

1. Interview of the defendant
2. District attorney files
3. Jail psychiatric record

## REVIEW OF RECORDS

### Incident

According to a police report, on 11/29/21 the defendant was released from custody after a 90 days revocation. He was required to present to the community transition center (CTC) on release, but absconded. He also failed to report to probation within 2 days of release.

Jail Psychiatric Record

On 1/20/22, the defendant was seen for psychiatric evaluation. The defendant was noted to be irritable, disorganized, and uncooperative. The defendant was diagnosed with unspecified psychosis, antisocial personality disorder, and stimulant use disorder. The treatment included starting Haldol (antipsychotic), Valproic acid (mood stabilizer), and Cogentin.

## STATEMENT OF NON-CONFIDENTIALITY

I informed the defendant that the interview was not confidential and that the information gathered would be used in a report submitted to the court.

## INTERVIEW

I interviewed the defendant at his cell at the recommendation of jail mental health staff and the floor deputies.

The cell was dirty with trash throughout. The toilet was full of excrement and the room was very malodorous.

The defendant was unkempt and dirty himself. He was laying in bed in an uncomfortable manner with a blanket over his head.

There were feces on the floor. There was food smeared on the wall.

It required the food flap and a very loud introduction on my part to get the defendant's attention.

Once I had his attention, I asked the defendant why he was incarcerated, he answered "Water dog."

I told the defendant again that I was here to evaluate him for competency, he answered "I am home, dog."

I asked the defendant how he intended to proceed with his court proceedings, he answered, "Who gives a fuck?"

I asked the defendant about his charges, he answered "dog."

I told the defendant my understanding of the accusations against him, he answered, "don't give a shit."

I asked the defendant about sentencing, he answered, "you're stupid."

The defendant placed the blanket over his hand, and was mute when asked other questions.

## MENTAL STATUS EXAMINATION

I interviewed the defendant at his cell at the recommendation of jail mental health staff and the floor deputies.

The cell was dirty with trash throughout. The toilet was full of excrement and the room was very malodorous.

The defendant was unkempt and dirty himself. He was laying in bed in an uncomfortable manner with a blanket over his head.

There were feces on the floor. There was food smeared on the wall.

He did not answer questions of orientation. His speech was pressured and mostly incoherent when he spoke.

His mood was down, and his affect was flat. His thought content presented as impoverished. His thought process was disorganized. His insight and judgment were poor.

## DIAGNOSTIC IMPRESSION

Psychosis Not Otherwise Specified
Stimulant use disorder per record

## FINDINGS and OPINIONS

Given the information I have, it is my opinion with reasonable medical certainty that the defendant is unable to have a rational and factual understanding of the charges, and is unable to assist counsel in a rational manner.

While the defendant's lack of cooperation is likely in part volitional. I think that it is motivated by underlying disorganization of thought, which would be consistent with prior evaluation that diagnosed him to be psychotic.

The defendant suffers from mental illness, displaying active signs of mental illness, including disorganized thinking. Those symptoms of mental illness disable the defendant from being able to have a rational understanding of the charges and assist legal counsel.

I would recommend that the defendant be referred to a state hospital or JBCT program for restoration to competency.

Nicolas Badre, M.D.
Staff Forensic Psychiatrist

**COUNTY OF SAN DIEGO**
Health and Human Services Agency

**BEHAVIORAL HEALTH SERVICES**
3255 Camino del Rio, San Diego, California 92108

Forensic Psychiatry Clinic
330 W. Broadway #481
San Diego, CA 92101
619-531-3047

# FORENSIC PSYCHIATRY CLINIC REPORT ON INVOLUNTARY MEDICATION TO RESTORE COMPETENCY

| | |
|---|---|
| Name: Lonnie Rupard | Court: 1203 3/24/22 |
| Client #: | Judge: Hon. Cindy Davis |
| DOB: 10/1/75 | Examiner: Dr. Nicolas Badre |
| Case ID#: CPR210150 | Date of evaluation: 3/14/22 |

## REASON FOR EVALUATION:

I have evaluated the defendant for mental competency. I opined that the defendant was not competent to stand trial. The purpose of this evaluation is to address involuntary medication to restore competency.

## FINDINGS:

In my opinion, the defendant suffers from severe mental illness. The defendant lacks the capacity to make decisions regarding antipsychotic medication. The mental disorder requires medical treatment with antipsychotic medication at this time. If the defendant's mental disorder is not treated with antipsychotic medication, it is possible that serious harm to the physical or mental health of the defendant will result.

Administration of antipsychotic medication is likely to restore the defendant's competency to stand trial. Monitored medications are unlikely to interfere with the defendant's ability to understand the nature of the current proceedings or to assist counsel in a rational manner. Less





CONFIDENTIAL COSD 000157

intrusive treatments are unlikely to have the same result. Antipsychotics are in the defendant's best medical interest in light of the medical condition.

I would recommend that the defendant be given medications involuntarily under Penal Code Section 1370.

Nicolas Badre, M.D.
Staff Forensic Psychiatrist

# EXHIBIT 9

Deposition of Nicolas Badre, M.D., Dec. 19, 2025 (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD,

Plaintiff,

vs. No. 23CV1357 CAB BLM

COUNTY OF SAN DIEGO, et al.,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF NICOLAS BADRE, M.D.

Carlsbad, California

Friday, December 19, 2025

Reported by: SUSAN SWAN, RPR, CRR, CCRR, CSR No. 7338

JOB No. 2246385
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

A. (Witness nods head)

Q. But your full-time work commenced upon the conclusion of your residency?

A. That is correct.

Q. And so you have experience in treating persons for psychiatric issues in the County jail?

A. That is correct, sir.

Q. Now, at some point, you began to work directly for the County of San Diego?

MS. FELDMAN: So the question is, Prior to that, just him working at San Diego County Jail?

MR. IREDALE: Yes.

MS. FELDMAN: Not for the County? To clarify. Understood.

BY MR. IREDALE:

Q. Let me just ask you: How are you now employed?

A. I work for the County of San Diego.

Q. When did you begin to work for the County of San Diego?

A. Sometime in 2017.

Q. And could you tell me the title of the position that you have for your work with the County?

A. Temporary expert professional.

Q. And have you been a temporary expert professional since 2017?

A. Correct.

Q. So that's a long time for a temporary expert position, but you started with that and that is technically still your title?

A. Correct.

Q. Tell me, if you would, what the work as a temporary expert professional for the County involves for you.

A. Sure. So I work at a clinic that's usually referred to as a "Forensic Evaluation Unit," FEU, at times called "Adult Forensics."

We receive court orders from the court to perform evaluations, with a vast majority of those being competency evaluation. And we conduct those evaluations, and that is the job.

Q. By this time in your career, would it be a reasonable estimate to say you've done more than 1,000 competency evaluations in the course of your work?

A. That is a reasonable thing to say.

Q. Would it be pushing it to say 2,000 or more competency evaluations?

A. Because I don't keep track, I wouldn't be comfortable making that sort of estimate.

Q. Fair enough. Can you give me an estimate during that period of time on the average number of

BY MR. IREDALE:

Q. Did you write, among other things:

"The defendant was noted to be irritable, disorganized, and uncooperative"?

MS. FELDMAN: Misstates the document.

THE WITNESS: That was my understanding of the record.

BY MR. IREDALE:

Q. And did you find in your interview that Mr. Rupard was irritable?

A. I don't recall making such a note.

Q. Did you find that to be the case, whether you made a note or not?

A. It would be -- I described his mood and affect.

Q. And would you agree it was irritable?

A. I described his mood as down and his affect as flat.

Q. Would you describe him as being uncooperative?

A. Yes. Or I did.

Q. Now, you note there that "The cell was dirty with trash throughout."

Did I read that properly?

A. Yes.

Q. You, of course, on or about that date were doing multiple interviews?

A. I believe so.
Q. I need to ask you if you can just recall what you saw when you said the cell was dirty with trash throughout?
A. It's been too long. I do not recall any more than just the statement that was made.
Q. You note "The toilet was full of excrement"?
A. Correct.
Q. You made that observation yourself?
A. It is my general practice when I am commenting on feces to confirm with the deputy.
Q. And did you confirm it with the deputy?
A. I don't recall.
Q. Let me ask you this: In the jail, at least when dealing with psychotic people from time to time, is there either smearing or inappropriate placement of excrement within the cell?
A. Yes. That would be fair to say.
Q. Could you tell me psychologically what the impetus for that is, as you understand it?
A. Probably the simplest way of describing it, one of the symptoms of psychosis is disorganized behavior, best explained as incoherent behavior, and that would fall within that.
Q. You note "The room was very malodorous." Very

malodorous meaning it smelled very bad?

A. Correct.

Q. "The defendant was unkempt and dirty himself." Is that something that you often make note of, the personal appearance of the person being evaluated?

A. Yes.

Q. I need to show you Exhibit 5.

MS. FELDMAN: I'll object to lacks foundation. Lacks personal knowledge. Do you have a copy?

MR. IREDALE: Sure.

(Exhibit 5 marked)

BY MR. IREDALE:

Q. This is a photograph that was taken on or about the 18th of March, which is some four days after you saw Mr. Rupard. Do you recognize the face of the person shown there?

A. Not well, no.

Q. I will show you Exhibit 6.

(Exhibit 6 marked)

MS. FELDMAN: Same objections. Lacks foundation. Lacks personal knowledge.

BY MR. IREDALE:

Q. I am showing you an autopsy photo that was taken some four days after you saw Mr. Rupard on the 14th and just asking: That appearance doesn't seem

to you to be familiar? Or do you recognize that as being the person that you spoke with?

MS. FELDMAN: Which question? Compound.

MR. IREDALE: Let's break it down. That's the first correct objection today.

BY MR. IREDALE:

Q. Does that appear, Exhibit 6, to be a photograph of the person to whom you spoke?

A. I believe so.

Q. Did you make a notation that he was emaciated at the time?

A. No. Not that I recall.

Q. You note that there were feces on the floor as well as the toilet being full of excrement?

A. Correct.

Q. And food smeared on the wall?

A. Correct.

Q. Is the smearing of food in any way associated also with psychosis?

MR. KRUEGER: Incomplete hypothetical. Go ahead.

THE WITNESS: That is how I interpreted it on that time. There can be other explanations.

BY MR. IREDALE:

Q. "It required the food flap and very loud

do they know the name of the facility, do they know the year, those kinds of questions.

Q. You note here, again, under Mental Status Examination, among other things, "The cell was dirty"?

A. Yes.

Q. And there was trash throughout the cell?

A. Yes.

Q. That "the room was very malodorous." It smelled very bad?

A. Correct.

Q. And that the toilet was filled with excrement?

A. Correct.

Q. Now, I need to ask you -- understanding that given the passage of time, you may not recall with precision to whom you spoke.

In circumstances in which you perceive the situation that you perceived this person to be in, do you speak with jail personnel to make a suggestion or to give information about the current status of that person?

A. So the practice -- we have discussed this as a clinic. The practice of the clinic is that our opinions and our entire formulation is the property of the court. It is not for us to give.

However, in cases where we have concern for

somebody's safety, if the jail is not providing treatment for this person, we will inform them that this person is of concern to us.

If the jail is providing care for that person, we generally don't do so under the understanding that they are receiving care.

Q. Well, in this case, did you have concerns about the welfare of Mr. Rupard?

A. Yes.

Q. And in this case, did you think given what you saw -- the dirty room, the trash throughout, the excrement in the toilet, the excrement on the floor, the food smeared on the wall, the incoherence of Mr. Rupard -- did you think it was necessary or appropriate to bring this to the attention of someone at the jail?

A. Well, a couple of things. One, is it was my understanding he was receiving care from the providers at the jail.

Another thing is this person had been made attention to me by the jail, so I was not -- I was under the understanding that they were reaching out to me because they were concerned for him.

And then thirdly, there was a deputy that was present with me at the time.

Q. You said they were reaching out to you. Who specifically reached out to you from the jail?

A. Jennifer Alonso.

Q. And what did Ms. Alonso say regarding the status of Mr. Rupard?

A. I don't recall.

Q. Well, was it a communication other than the e-mail communications we have discussed? Did you have a phone call with her?

A. I don't recall.

Q. So when you say they were reaching out, "they" is Jennifer Alonso?

A. Correct.

Q. No one else?

A. Well, when I approached the jail, what I do -- what I always have to do if I see a defendant is I have to ask to see them in a private evaluation room.

They told me he couldn't come because he was -- he had the problems that he was having.

Q. They told you he couldn't come to the private evaluation. "They" in this case is whom?

A. This would be the front clerical staff of the jail and the deputies that accompanied me that day.

Q. Both of them?

A. I don't recall for this specific of who.

Q. Let me ask you specifically -- why don't we mark this as Exhibit No. 6.

MR. KRUEGER: Gene, I have one of the photos as 6. Wouldn't this be 7?

MR. IREDALE: Thank you for letting me know that. You are exactly right. This will be 7. Let me give you a moment to look at that, and after you have reviewed it, would you let me know, please.

THE WITNESS: Okay.

(Exhibit 7 marked)

BY MR. IREDALE:

Q. Now, this is a document that is headed "Citizens Law Enforcement Review Board, Employee Response Form."

Did I accurately quote the title of the document?

A. Yes.

Q. And did you fill out a portion of the document in response to the questions that are set forth in it?

A. The parts in red.

Q. May I ask how it came to be that you filled out the document? Were you contacted by someone?

A. I don't recall.

Q. You were asked some questions about this visit at the jail on the 14th of March 2022.

Is that fair to say?

A. Yes.

Q. And you explained that you did visit Mr. Rupard at 8:12 a.m., or thereabouts, on that date?

A. Yes.

Q. You said that the purpose of your visit was to conduct the court-ordered Penal Code 1370 evaluation?

A. Yes.

Q. You explained to them, as you have explained here today, that the interview was conducted from outside the cell?

A. Yes.

Q. You were asked the condition of the location, where the visit took place and asked to explain in detail. Your response was:

"The cell was malodorous and was unhygienic, there was feces outside the toilet"?

A. Yes.

Q. "Were deputies present during your visit? Please identify."

You said:

"I do not recall the names of the deputies present"?

A. Yes.

Q. Forgive me. I don't mean to quibble and some

time has passed. But as best you recall, was there one deputy or more than one who was accompanying you during your interview?

A. I don't recall. I suspect maybe I recalled better then. It was some time ago. There may have been more than one.

At the time with COVID, it was quite complicated to do a cell-side evaluation.

Q. And you also said, when asked the purpose of the deputies, you said:

"The deputies provided a security escort. Since I was in a custodial setting, the deputy was by my side for the entirety of the interview."

Is that true?

A. Yes.

Q. You were asked in Question 4 the following question:

"During or after your visit, did you inform any sworn personnel of any concerns concerning the condition of Rupard or his cell? Please identify and explain in detail."

And then your answer there appears in red on the exhibit?

A. Yes.

REPORTER'S CERTIFICATION

I, Susan Swan, RPR, CRR, CCRR, a Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 30th day of December, 2025.

Susan Swan

Susan Swan, RPR, CRR, CCRR

CSR No. 7338

# EXHIBIT 10

Deposition of Sgt. Michael Johnson, Feb. 27, 2026 (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF LONNIE RUPARD,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | Case No.<br>2023CV1357 CAB BLM |

REMOTE DEPOSITION OF SERGEANT MICHAEL JOSEPH JOHNSON

Taken on behalf of the Plaintiff

DATE TAKEN: Friday, February 27, 2026

TIME: 10:11 a.m. to 1:11 p.m.

PLACE: Via Zoom / StenoConnect

Examination of the witness taken in machine shorthand before:

Marsha J. Husted, CSR, CCR, RPR
Steno
concierge@steno.com
(888)707-8366

MS. FELDMAN: Objection to the extent it misstates his testimony.

A. For obvious signs, that would be if somebody is bleeding, if they are physically telling me that they're having chest pains. If somebody is displaying signs of like a seizure. Like very obvious signs that there is a medical problem going on within the cell.

BY MR. LOWE:

Q. When you're doing a safety check, is there some requirement that there be a face-to-face observation of the inmate?

A. No.

Q. When you're doing a safety check, is there any requirement that you're observing the physical condition of the inmate?

A. No.

Q. When you're doing a safety check, are you making any determination -- or not determination.

Are you evaluating if an inmate may be in some type of mental distress?

MS. FELDMAN: Mental distress?

MR. LOWE: Yes.

MS. FELDMAN: Vague and ambiguous, calls for expert opinion.

A. I don't quite understand the question. Could

Q. Is that a welfare check of Mr. Rupard?

A. Correct.

Q. What time did you do a welfare check?

A. I don't know the specific time, but there was another incident in the module on that day and I had come up to the floor and I was guard duty just for the module and one of the DIU detectives had gone up to the cell to try to contact Rupard and he had come down, asking if we could do a welfare check. So it was sometime during the day, but I don't specifically remember the exact time.

Q. Who was the individual who requested the welfare check?

A. That was Deputy Weber.

Q. Do you know why specifically Deputy Weber was asking you to do a welfare check of Mr. Rupard on the 16th?

A. He -- because of the other incident that was in the module, he was doing witness checks and he had gone up to the door to talk to Mr. Rupard and he did not get a response, so he wanted to -- us to go into the cell to -- just to check on him.

Q. All right. Did you do this welfare check of -- on Mr. Rupard with anybody else or were you alone?

A. It was me and Deputy Weber.

Q. Did you document this welfare check in any way?

A. No.

Q. Okay. And as you sit here, you don't recall approximately -- do you have any recollection of approximately what time this welfare check was?

A. I would guess it would be early afternoon, but I don't have a specific time.

Q. What was the incident that you're referring to that happened earlier in the day that caused the welfare check to be done?

A. There was an in-custody death down on the bottom tier.

Q. Same housing unit, 7D, correct?

A. Correct.

Q. All right. Were you interviewed as it relates to that other inmate's death?

A. No.

Q. Were you ever interviewed as it relates to Lonnie Rupard's death?

A. No.

Q. Were you requested to be interviewed by a Detective Blumenshine?

MS. FELDMAN: Vague and ambiguous as to time.

A. I don't recognize the name.

Q. And so let's talk about this welfare check on March 16th with Deputy Weber. What do you recall about that welfare check?

A. I remember that he came down to ask me if we could do one. We went up to the cell, up to I believe it was No. 17. I called Rupard's name from the door and he had not responded at that time, so we asked for the door to be opened.

We both stepped into the cell. I called his name one more time. He did not respond, so I went up. He was laying on the bed and I gave his shoulder a push with one of my hands and just called his name. He gave an angry response and so we backed back out.

Q. What was the angry response?

A. It really wasn't a word. It was just like a grunt. It was just a sound.

Q. Okay. So when you went and touched his shoulder, he grunted.

Did -- at any time during the welfare check, did you have any back-and-forth conversation with Mr. Rupard?

A. No.

Q. When you tapped his shoulder, was he under the blanket or over the blanket?

A. Can you resay that?

Q. Yeah. When you were -- entered his cell, was he over the blanket or under the blanket?

A. He was under a blanket.

Q. Okay. Was his face outside of the blanket or underneath the blanket?

A. His face was under the blanket.

Q. Could you see any portion of his body when you shook Mr. Rupard?

A. I don't specifically recall if anything was out.

Q. Okay. So as you sit here today, you don't recall making any face-to-face contact as part of this welfare check; is that fair?

MS. FELDMAN: Misstates testimony.

A. His face, as best as I recall, was covered with the blanket so there was no face-to-face.

BY MR. LOWE:

Q. Did you make any observations of his cell conditions on March 16th when you did this welfare check?

A. I don't recall.

Q. Do you recall the cell being malodorous?

A. I don't recall.

Q. Do you recall if there were feces on his bedding?

REPORTER'S CERTIFICATE

The undersigned, being empowered to administer oaths and affirmations remotely pursuant to Section 30(F)(1) of the Federal Rules of Civil Procedure, do hereby certify that the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings prior to testifying was placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; and that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of the attorney(s) or any of the parties.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case before completion of the proceedings, review of the transcript was not requested.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: March 10, 2026.

Marsha J. Husted

MARSHA J. HUSTED RPR No. 834396

# EXHIBIT 11

Deposition of Dep. Andrew Torres, Apr. 13, 2026 (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CASE NO.: 23CV1357 CAB BLM

ESTATE OF LONNIE RUPARD,

Plaintiff,

vs.

COUNTY OF SAN DIEGO, et al,

Defendants.

_______________________________________________________/

REMOTE VIDEOTAPED DEPOSITION OF

DEPUTY ANDREW SANTIAGO TORRES

DATE TAKEN: Monday, April 13, 2026

TIME: 1:53 p.m. PT - 4:23 p.m. PT

PLACE: Remotely via Videoconference

Examination of the witness taken before:

Maureen Uebelacker, RPR, FPR

officer and they teach you how to log, how to conduct 1153s and facility policies and rules.

Q. And what, if anything, do you recall from that training about how you are supposed to do a 1153 safety check?

A. So 1153 is to be conducted every 50 to 55 minutes, and we basically look for a -- any signs of life. We stop at the cell, each cell, and then we go on to the next cell.

Q. And so other than looking for signs of life, did you have an understanding as to anything else that is required of you in performing safety checks?

A. No.

Q. And what are you -- what were you trained to look for in terms of signs of life?

A. Any signs of movement, either just a visual look, a verbal, a hand movement, chest rise and fall.

Q. Were you trained to look for if an inmate is in medical distress?

MR. COLLETTI: Objection to the term "medical distress" as vague and ambiguous and are calling for a legal or expert -- legal conclusion or expert opinion.

You can answer, if you understand.

their face and you would be able to assess at least visually that aspect of it from doing a safety check, correct?

MR. COLLETTI: Calls for speculation, vague and ambiguous as phrased.

If you understand the question, you can answer.

THE WITNESS: So for every safety check, all we're looking for is just some sort of proof of life. So sometimes they'll have a blanket over them, so it can be difficult to see what their body is, body weight, or how they look like.

BY MR. LOWE:

Q. Okay. To -- to be fair, you're saying like for any one specific safety check, they may not -- they may be under the covers or they may not -- you may not be able to -- to see their -- their face on a given safety check, true?

A. Yes.

Q. But throughout the course of the day, each day there should be at least one check as part of that hard count where you do see their face, correct?

A. Yes.

Q. All right. And so when you're looking at that individual, if you're doing a hard count and you

THE WITNESS: There has been trainings by mental health staff to improve our safety checks.

BY MR. LOWE:

Q. Okay. When -- when did that retraining occur?

A. I can only give a rough estimate.

Q. That's fine.

A. I want to say within the last three or -- three or two years, two or three years.

Q. Okay. Was it after Mr. Rupard's death?

MR. COLLETTI: Objection.

THE WITNESS: Yes.

MR. COLLETTI: It calls for speculation.

BY MR. LOWE:

Q. What changes, if any, have been -- were made in terms of what was to be done as part of that safety check following Mr. Rupard's death?

MR. COLLETTI: Vague as to time.

THE WITNESS: We are doing a lot more health -- mental health staff notifications, medical notifications. I know there's been improvements in the medical and mental health side, but I can't speak for them because I don't know what exactly. But on our side, I would say we are almost immediately going inside cells and

cleaning them right away.

BY MR. LOWE:

Q. And that was something that was not happening before Mr. Rupard's death, correct?

MR. COLLETTI: Objection to the extent it misstates his testimony, calls for speculation, argumentative as phrased.

You can answer.

Incomplete hypothetical as well.

THE WITNESS: Yes, cleaning -- cleaning was happening relatively fast too before Mr. Rupard.

BY MR. LOWE:

Q. Well, I guess my question, then, is, what -- what's changed? I was trying to understand what has changed before and after his death. So I go back to the original question, is, what's changed?

A. So let's go back to the cleaning. So essentially I could continue my 1153, and there could be some sort of other emergency happen or something else that would take priority over that, then we would come back and clean at the end of the shift. Now we're kind of immediately just -- we are just doing it right away.

Q. Okay.

A. There's no delay in it.

90 cells?

A. Yes.

Q. Okay. And then there's a -- assuming it's at full capacity, there's one cell -- one per -- one inmate per cell so that's about 90, 90 inmates per floor, correct?

A. Yes.

Q. And are you assigned -- when you -- when you have a shift, are you assigned to a specific floor every time you come in?

A. No.

Q. Did you -- was that a "no"?

A. No.

Q. Okay. Are you -- you're -- and what I mean by that question, just to be clear, is, you're not assigned -- you don't have like Deputy Torres is the Floor 6 detention's deputy, correct?

A. Correct.

Q. So you could be assigned to Floor 6 on one shift, the next shift Floor 7, the next shift Floor 2, so on and so forth, correct?

A. Yes.

Q. Okay. So are you seeing the same inmates on a day -- or actually I should say on a shift-to-shift basis?

# CERTIFICATE OF REPORTER

I, Maureen Uebelacker, Registered Professional Reporter, Florida Professional Reporter, and Notary Public in and for the State of Florida at large, certify that I was authorized to and did stenographically report the remote deposition of Deputy Andrew Santiago Torres, pages 1 through 89; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties to this cause, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED THIS day, April 27, 2026.

Maureen Uebelacker, RPR, FPR
Registered Professional Reporter,
Florida Professional Reporter

# EXHIBIT 12

Deposition of Dep. Miguel Aguilera, Apr. 13, 2026 (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CASE NO.: 23CV1357 CAB BLM

ESTATE OF LONNIE RUPARD,

Plaintiff,

vs.

COUNTY OF SAN DIEGO, et al,

Defendants.

_______________________________________________________/

REMOTE VIDEOTAPED DEPOSITION OF DEPUTY MIGUEL AGUILERA

DATE TAKEN: Monday, April 13, 2026

TIME: 10:00 a.m. PT - 12:31 p.m. PT

PLACE: Remotely via Videoconference

Examination of the witness taken before:

Maureen Uebelacker, RPR, FPR

what is -- what do you mean by "nonresponsive"?

MR. COLLETTI: Objection to the extent it calls for speculation or medical expert opinion.

But you can answer, if you understand.

THE WITNESS: Yeah, by nonresponsive I mean them not moving, I don't see their chest rising, or them not talking to me.

BY MR. LOWE:

Q. And so if you are doing a safety check, let's -- let's talk about daytime hours. You're doing a safety check. Are you making an effort to speak with the inmate while you are doing the safety check?

MR. COLLETTI: Incomplete hypothetical.

You can answer.

THE WITNESS: Not during every safety check. I am -- I am at least looking for signs of life during every safety check, but I do recall trying to speak to them during every soft and hard count.

BY MR. LOWE:

Q. Okay. Let's talk about how long you would spend as part of your safety checks when you're performing a safety check. This is a check that you do how often?

A. Typically, once every hour.

Q. All right. And when you do this safety

check, how long are you spending with the inmate as part of this safety check?

A. From what I recall, about five seconds.

Q. And in this sort of five-second timeframe when you're doing a safety check, can you walk me through what you are doing in that five seconds?

A. Yeah. When I walk up to the cell, I look in through their window, make sure they're alive and well, make sure their chest is rising, if they're sleeping. And, yeah.

Q. Are you looking at the condition of the cell?

A. No.

Q. Is that something that you understood was part of your job was to identify if the cell was sanitary?

MR. COLLETTI: Objection to the term "sanitary" as vague and ambiguous, calling for a legal and/or expert opinion.

But you can answer, if you understand.

THE WITNESS: Yes.

BY MR. LOWE:

Q. Okay. And -- and what did you understand your job to be with respect to identifying if a cell was unsanitary such that it needed to be cleaned?

MR. COLLETTI: Same objections.

BY MR. LOWE:

Q. Okay.

A. Uh-huh.

Q. And is -- is that something that is part of when you're doing safety checks you can identify if an individual looks, I'll just say, emaciated or too skinny such that they should be evaluated by medical?

MR. COLLETTI: Calls for speculation. The witness is not a medical professional. Incomplete hypothetical, vague and ambiguous as to the term "emaciated."

You can answer.

MR. LOWE: And I'll -- I'm just going to pause on that and I just would just caution on speaking objections.

BY MR. LOWE:

Q. Do you understand the question?

A. I do, yes.

Q. Okay. You can answer the question.

A. Yeah, it's honestly pretty hard just because we don't typically work the same floor every single day, so we're around different inmates every single day. So if I was to be in one floor consistently, then I feel like it would be something I can identify. But since I -- I'm working different floors everyday around

different inmates, it would be something that would be kind of hard to identify.

Q. And so because you're working different floors and you might not see somebody every single day, if you see somebody who looks emaciated, do you ignore it?

MR. COLLETTI: Argumentative, vague and ambiguous to the term "emaciated."

But you can -- you can answer.

THE WITNESS: Can you define the term emaci- -- whatever, I'm sorry, yeah, whatever term you used, would you be able to define that?

BY MR. LOWE:

Q. Yes. I -- I think perhaps. Have you ever seen a documentary on the Holocaust?

A. No, I have not.

Q. Have you ever seen any documentary on any starvation in Africa?

A. No, no, not that I recall, no.

Q. Have you ever seen any documentary where -- where somebody is -- can be seen where their chest cavity, the actual ribs are showing and their stomach is concaved.

A. I'm not sure if I've seen any documentaries, but I'm sure I have seen pictures.

CERTIFICATE OF REPORTER

I, Maureen Uebelacker, Registered Professional Reporter, Florida Professional Reporter, and Notary Public in and for the State of Florida at large, certify that I was authorized to and did stenographically report the remote deposition of Deputy Miguel Aguilera, pages 1 through 94; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties to this cause, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED THIS day, April 24, 2026.

Maureen Uebelacker, RPR, FPR
Registered Professional Reporter,
Florida Professional Reporter

# EXHIBIT 13

Deposition of Dep. Linda Gutierrez, Dec. 11, 2024 (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

```
JUSTINO RUPARD,                  )
INDIVIDUALLY AND RONNIE          )
RUPARD, INDIVIDUALLY             )
                                 )
            Plaintiffs,          )
                                 )
     vs.                         )CASE NO.
                                 )23CV1357 CAB BLM
COUNTY OF SAN DIEGO; BILL        )
GORE, IN HIS INDIVIDUAL          )
CAPACITY; KELLY MARTINEZ, IN     )
HER INDIVIDUAL CAPACITY;         )
CORRECTIONAL HEALTHCARE          )
PARTNERS (CHP); JON              )
MONTGOMERY, DO, IN HIS           )
INDIVIDUAL CAPACITY; LIBERTY     )
HEALTHCARE OF CALIFORNIA, INC;   )
CHRISTINA ANOSIKE, IN HER        )
INDIVIDUAL CAPACITY; ANTHONY     )
CRUZ, MD, IN HIS INDIVIDUAL      )
CAPACITY; BEN SAMONTE, IN HIS    )
INDIVIDUAL CAPACITY; MAY NG,     )
IN HER INDIVIDUAL CAPACITY;      )
AGUILERA, M., VILADIU, J.        )
MARTINEZ G., SCHMITZ D.,         )
AMADO, J., MACE, T., ACKERMAN,   )
M., KEY, K., MOSER, M.,          )
AGUIRRE, E., JAMES, T.,          )
ROMERO, B., JOHNSON, M.,         )
TORRES, A., DELANEY, C.,         )
TREYVONNE, J., EVERSOLL, T.,     )
WERESKI, A., ROMANS, B.,         )
GUTIERREZ, L. IN THEIR           )
INDIVIDUAL, CAPACITIES,          )
DEFENDANT DEPUTIES DOES 1-20,    )
DEFENDANT MEDICAL PROVIDERS      )
DOES 1-10; DEFENDANT             )
SUPERVISOR DOES; 1-10.           )
                                 )
            Defendants.          )
```

---

You know, I can see all that, but sometimes it depends on the body the way the body is positioned and it looks like, you know, it's just a certain look that the person is when they had a heart attack or a stroke, if they are bleeding, lacerations, wounds.

Q. How long do you typically look into a cell to make that type of a determination?

A. To make that determination -- well, say for instance if the person sometimes are moving around, I wouldn't be there that long. Maybe like four seconds and observing physically from head to toe.

Q. Okay. If they are not giving you any kind of verbal response, how long would you typically look before you get some type of physical movement?

MS. FELDMAN: Vague and ambiguous.

THE WITNESS: It would be a definite until I get that person to move, to say something to acknowledge me.

BY MR. LOWE:

Q. And are you talking to them? What are you saying?

A. I'm telling them to move your hands, move your feet. I need to know if you are alive and if they don't respond and they still don't wake up, some of them are heavy sleepers, I'll go inside the cell and I'll have

She is not a Rule 36 witness and lacks foundation, lacks personal knowledge, calls for expert opinion.

BY MR. LOWE:

Q. You can still answer. It's if you are understanding is what have they done that you are aware of for you as a deputy to help make sure that this doesn't happen again?

MS. FELDMAN: Same objections.

THE WITNESS: I know they increased the wellness checks to check certain modules. I don't recall which modules they are and I don't know the frequency.

BY MR. LOWE:

Q. Okay. Has there been any refresher training -- actually, let me ask a more foundational question.

Was this case ever talked about and outside of counsel, was this case ever talked about as a teaching point to make sure that there aren't individuals that are starving to death in jail?

A. This case, no.

Q. Okay.

A. No, they don't know about it. We have so many new deputies. They don't know about it.

Q. Okay. Is there anything you are aware of other than you've talked about the frequency of wellness checks following Mr. Rupard's death in hopes to prevent

I, Jessica Bell Gonzales, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated 1/01/2025

JESSICA BELL GONZALES
CSR No. 12300

# EXHIBIT 14

Deposition of Dep. Jeff Amado, Jan. 29, 2026 (excerpts)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF LONNIE RUPARD,<br>PLAINTIFF,<br>VS.<br>COUNTY OF SAN DIEGO, ET AL,<br>DEFENDANTS. | CASE NO.: 23CV1357 CAB BLM |

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

DEPUTY JEFF RYAN MICU AMADO

THURSDAY, JANUARY 29, 2026

SAN DIEGO, CALIFORNIA

STENOGRAPHICALLY REPORTED BY:

LAURA MATEO, C.S.R. 13410

notify nurses or bring them to medical or if they're getting assaulted by another incarcerated person to stop the fight and then get them treated if they want to be treated.

Q. What, to your knowledge, is considered medical distress?

MR. COLLETTI: Calls for an expert opinion, but you can answer. Calls for speculation, too.

THE WITNESS: If they're having a hard time breathing, having chest pains.

BY MR. LOWE:

Q. Are you -- as part of your job in determining if an inmate is safe, are you looking for any obvious signs of weight loss or being emaciated?

MR. COLLETTI: Objection. Lacks foundation. Calls for speculation. Calls for an expert opinion. Assumes facts not in evidence. Incomplete hypothetical. You can answer the question.

THE WITNESS: No. But at the same time, I don't see the inmates on a daily basis. I might see them once during my whole rotation.

BY MR. LOWE:

Q. When you go through training initially, are

you trained in terms of how to do a 1153 safety check?
A. Yes.
Q. Can you please provide what your understanding is in terms of the protocol you are to follow when doing an 1153 safety check?
A. When we conduct an 1153 safety check, you're stopping at every cell, looking to see if there is any medical distress, trauma or criminal activity. And you're also getting verbal or physical acknowledgement from the person that's inside.
Q. When you are doing an 1153 safety check, are you required to look into the cell to determine if there are any maintenance issues that need to be addressed?
A. Not during our 1153.
Q. In what context or in what scenario are you looking into a cell for the purpose of determining if there are any issues for which maintenance needs to be addressed?
A. During inspections or if one of the incarcerated person tells me there is something wrong with their cell.
Q. When you say during inspections, what

is assigned to that cell.
Q. Are you looking at the cleanliness of the cell when you are doing hard counts and soft counts?
MR. COLLETTI: Objection. Calls for expert opinion. Incomplete hypothetical. But you can answer.
THE WITNESS: During our soft and hard count, which is also conducted with the 1153 safety checks, all we're looking for is medical distress, trauma or criminal activity.
BY MR. LOWE:
Q. So if I understand you correctly, you are not looking at the cleanliness of the cell as part of your hard counts or soft counts; is that correct?
MR. COLLETTI: Asked and answered. You can answer though.
THE WITNESS: Yes.
BY MR. LOWE:
Q. Let's talk about 1153 safety checks. What are those?
THE WITNESS: They are checks that are conducted.
MR. COLLETTI: You can answer, but I believe that's what you started with. Go ahead.
THE WITNESS: The checks that are conducted

I, Laura Mateo, C.S.R. No. 13410, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness declared under penalty of perjury; that the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed under my direction and supervision; that the foregoing is a full, true and correct transcript of my shorthand notes so taken and of the testimony so given;

That before completion of the deposition, review of the transcript [X] was [ ] was not requested; [ ] that the witness has failed or refused to approve the transcript.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 16th day of February, 2026.



____________________________
LAURA MATEO

# EXHIBIT 15

Deposition of Dep. Gustavo Martinez, Jan. 29, 2026 (excerpts)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD, )
)
PLAINTIFF, )
)
VS. ) CASE NO.:
) 23CV1357 CAB BLM
COUNTY OF SAN DIEGO et al, )
)
DEFENDANTS. )
____________________________________)

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

DEPUTY GUSTAVO MARTINEZ

THURSDAY, JANUARY 29, 2026

SAN DIEGO, CALIFORNIA

STENOGRAPHICALLY REPORTED BY:

LAURA MATEO, C.S.R. 13410

or not somebody is in fact starving to death, do you believe it's incumbent on you as the deputy to then report it to medical so that somebody who does know how to evaluate that makes that evaluation?

MR. COLLETTI: Objection. Same objections raised. Also, argumentative as phrased. You can answer.

THE WITNESS: Once again, I wouldn't be able to determine that unless I'm assigned to that floor permanently.

BY MR. LOWE:

Q. I'm specifically talking about when you're assigned to a floor and when you're doing your walks on the floor and you see somebody on the housing floor for which you're doing a safety check. If you identify somebody to be emaciated and when I say emaciated, I'm talking about skin and bones; right? Where somebody -- their stomach is concave. Their chest is concave. They look like they have no muscle; right? They are completely emaciated, like somebody in a concentration camp.

Are you familiar with that in terms of seeing victims of a concentration camp when I say emaciated? I'm talking about that level of emaciated. Okay? Are you following me?

A. Yes.
Q. Have you seen people look like that in the San Diego County Jail when you're doing your 1153 safety checks?
A. Yes.
Q. When you see somebody that looks like that when you're doing an 1153 safety check, do you understand that to be your job to report that to medical?
MR. COLLETTI: Same objections.
THE WITNESS: No.
BY MR. LOWE:
Q. Is it fair to say that you were never told or trained to, in fact, report that to medical when somebody looks emaciated to the point of starvation; is that a fair characterization?
MR. COLLETTI: Same objections. Objection to the extent that it misstates his testimony, but you can answer.
THE WITNESS: No.
BY MR. LOWE:
Q. I'm assuming when you say no, I want to make sure no, that was -- that was an incorrect characterization or no, you were not trained on identifying if somebody is so severely emaciated

that they need medical attention?
A. Once again, I wouldn't be able to determine that. It's not within my profession or my duties in which I was trained to be able to determine whether somebody in that state would require medical attention.
Q. Following Lonnie Rupard's death, was there ever any training provided to you regarding identification of somebody who is completely skin and bones like they are in a concentration camp and getting that individual medical attention or just referring for medical attention?
A. No.
Q. Do you have a recollection of Lonnie Rupard?
A. No.
Q. Did you ever give an interview following Lonnie Rupard's death with a Detective Bloominshine?
A. No.
Q. Were you ever asked by Detective Bloominshine for an interview that you recall?
A. No.
Q. I'm going to share my screen here. This is Bates Numbered COSD001264. I've been using the term "emaciated" with an abdomen that's concaved and a

I, Laura Mateo, C.S.R. No. 13410, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness declared under penalty of perjury; that the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed under my direction and supervision; that the foregoing is a full, true and correct transcript of my shorthand notes so taken and of the testimony so given;

That before completion of the deposition, review of the transcript [x] was [ ] was not requested; [ ] that the witness has failed or refused to approve the transcript.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 10th day of February, 2026.

LAURA MATEO

# EXHIBIT 16

Audio recording of interview of Dep. Thomas Mace, Dec. 20, 2023 (COSD 000371)

**To be lodged with the Court.**

# EXHIBIT 17

Transcript of interview of Dep. Thomas Mace, Dec. 20, 2023
(COSD 000371)

# COSD 000371 - Dep Mace, Thomas 12-20-23 (Blumenshine)

Tue, May 06, 2025 2:55PM • 17:26

**SUMMARY KEYWORDS**
Deputy Thomas Mace, Sheriff's Department, training phase, inmate behavior, in-custody death, mental health issues, safety and security walk, food flap hostage, inmate status report, qualified mental health professional, wellness checks, seventh floor, ad seg module, soft count, hard count.

**SPEAKERS**
Detective Blumenshine, Deputy Thomas Mace

**Detective Blumenshine**
All right it is Wednesday, December 20, 1209 hours, Detective Blumenshine with Sheriff's Homicide in Sergeant Pike's office, 10th floor of SDCJ, interviewing, can you spell first name for me?

**Deputy Thomas Mace**
Thomas, T, H, O, M, A, S.

**Detective Blumenshine**
And then last name?

**Deputy Thomas Mace**
Mace, M, A, C, E.

**Detective Blumenshine**
And ARJIS?

**Deputy Thomas Mace**
4324.

**Detective Blumenshine**
And what is your title?

**Deputy Thomas Mace**
I'm a Deputy.

**Detective Blumenshine**

How long have you been with the Sheriff's Department?

**Deputy Thomas Mace**
December 2, I was sworn in, of 2020.

**Detective Blumenshine**
2020?

**Deputy Thomas Mace**
2021 I'm sorry.

**Detective Blumenshine**
2021 okay. Since you've been with the Sheriff's Department, have you had any specialty assignments?

**Deputy Thomas Mace**
I was given an out course position.

**Detective Blumenshine**
What does that mean?

**Deputy Thomas Mace**
Helping get a list of people going to and from court. And then they come down to the first floor. You upload them on the bus with trans, shortly after that, I got involved in the administrative process and got pulled back to administrative duty.

**Detective Blumenshine**
Okay, so kind of like managing the court bodies from the jails side?

**Deputy Thomas Mace**
Yes.

**Detective Blumenshine**
Okay. Any other positions or anything like that?

**Deputy Thomas Mace**
No I did PERT training, so I'm a PERT Deputy now (unintelligible).

**Detective Blumenshine**
Okay, so then, okay, so let's draw your attention back to March of 2022, and this is going to be specifically for, oh, it's something I, I have to put it on recording. I know I told you this before, but if you don't recall anything, just say you don't recall, if you don't remember, say you don't remember, if you don't know, say you don't know. Don't guess or try. If you can fill in the blanks, then you're more than welcome to do that. But I always encourage people not to guess. Just tell me what you know or what you can remember. And then, obviously this is voluntary, so if you don't want to answer something, let


Transcribed by https://otter.ai

me know, if you change your mind at any time, let me know or anything like that. Okay, so drawing your attention back to March of 22, I had shown you like the area activity list, which shows that you are worked 3/16, in day check, day shift checks are 1153s, anyways, and I didn't see anything on the 17th. So do you recall the 16th?

**Deputy Thomas Mace**
Bits and pieces of it, not everything.

**Detective Blumenshine**
And why is that?

**Deputy Thomas Mace**
I was still in training, and I was trying to soak everything up. The seventh floor was a little bit chaotic, and I just remember it being a little bit overwhelming.

**Detective Blumenshine**
Was there a particular incident, don't go into detail that, that you recall?

**Deputy Thomas Mace**
I don't recall any specific incident. I just, there was a lot to be done on that floor, so it was very busy day.

**Detective Blumenshine**
You had told me about inmate shock.

**Deputy Thomas Mace**
Correct.

**Detective Blumenshine**
Did that occur on that day?

**Deputy Thomas Mace**
No, no, that was almost a year later.

**Detective Blumenshine**
From Rupard's in-custody death?

**Deputy Thomas Mace**
I believe it was after Rupard’s in-custody death.

**Detective Blumenshine**
Okay but as far as, like, any particular incidents, do you remember anything that stands out to you? I know it's been over a year.


Transcribed by https://otter.ai

**Deputy Thomas Mace**
No, I don't.

**Detective Blumenshine**
Specifically to, drawing your attention to 3/16 we saw on the area activity list is when you worked seventh floor. And then, from what I also saw in the area activity list, and correct me if I'm wrong, it looks like maybe the last time you worked there was potentially the 12th, or at least did a check there.

**Deputy Thomas Mace**
Yeah, I don't recall any, any specifics as far as the deployments where I was working during training.

**Detective Blumenshine**
Fair enough. And so you had made mention that you were on training. So what, at that time, which was March of 22 what phase of training?

**Deputy Thomas Mace**
Phase two with Deputy Amado at the time, he's a corporal now.

**Detective Blumenshine**
Okay and so what are, what are you doing? What is phase two?

**Deputy Thomas Mace**
Phase two is where I actually count as a deputy on the floor, and my TO is just supervising me, kind of learning my own style, interacting with people, and they're just kind of watching me, try to manage the floor, and helping me along the way to figuring out how I'm going to operate.

**Detective Blumenshine**
Are you being directly supervised?

**Deputy Thomas Mace**
Typically, your training officer during phase two will be on the floor with you. They could be in the control tower, or they could be working the floor with you, but they're not directly telling you what to do all the time. Whereas on phase one, they will, you will just be shadowing them.

**Detective Blumenshine**
Okay, so that's, so phase one is the learning phase. How long is phase one?

**Deputy Thomas Mace**
I believe it's 20, 21 days. I might have that mixed up with a, phase two. It's, one of them's 27, one of them is 21.

**Detective Blumenshine**
Okay so is that, I guess in the shift deployment, it's like two months then?


Transcribed by https://otter.ai

**Deputy Thomas Mace**
Yeah, because we work about 15 days a month.

**Detective Blumenshine**
Okay, and so you're in phase two, you're basically on training and Amado is your training officer, and you had me mentioned that you are, I guess, still learning at this point, which it makes sense, that you're on training. So nothing, nothing, that stands out to you prior to me showing you like the area activity list, did you remember anything at all about that day? Okay, so is it safe to say that before looking at that you had no independent recollection of that day?

**Deputy Thomas Mace**
That's correct.

**Detective Blumenshine**
Okay, while you were there and doing checks, did you do you recall on that day, again if you don't recall, then just say you don't recall, but do you recall any one asking for help or anything that caught your attention that was alarming at that time?

**Deputy Thomas Mace**
No, I don't recall any, anyone asking for help.

**Detective Blumenshine**
Okay are you familiar with Lonnie Rupard?

**Deputy Thomas Mace**
I am now, since his in-custody death.

**Detective Blumenshine**
Oh, okay, so prior to his death, had you, did you know who he was, or have any interactions with him?

**Deputy Thomas Mace**
I know that I was briefed that he could be difficult to work with. He liked to take the food flap hostage, and he could be dangerous if you were to open the door. So don't open the door if you don't absolutely need to.

**Detective Blumenshine**
And, and when you say briefed, is that like a pass down or?

**Deputy Thomas Mace**
Yeah, so like, typically, when we go to the floor, the team that we're relieving will tell you like any incidents that they encountered, or anybody who specifically may have caused issues for them, or who was hard to work with. They will typically give you the pass down on, on who's, who's needed to be looked out for.

 Transcribed by https://otter.ai

**Detective Blumenshine**
And so you kind of gave like a generic what was told to you. Do you remember like specifics, such as who said it or what specifically was said?

**Deputy Thomas Mace**
No, I don't recall that.

**Detective Blumenshine**
Okay, just is it, would it be safe to say that it was the prior shift that told you that?

**Deputy Thomas Mace**
Yes.

**Detective Blumenshine**
Okay, would it have been your training officer?

**Deputy Thomas Mace**
He, he would have been there with me when we got the brief. That's part of phase two. Is they kind of watch how you interpret things and how you would plan to address those things moving forward.

**Detective Blumenshine**
Okay, do you remember at all, if like, any plan was come up to address that, or anything like that, or?

**Deputy Thomas Mace**
No I don’t remember.

**Detective Blumenshine**
Okay. And so, then you remember possibly the pass down. But do you remember at all which cell he was in, or anything about if you saw him?

**Deputy Thomas Mace**
I’m pretty sure he was in David 17. I'm, and that's just because after he passed away, you know, when I was, it was, it was a big deal. You know, a lot of us who were on training, was the very first time someone that we had worked with, you know, potentially had passed away. So we talked about it in briefing like, hey, this stuff happened, if you see homicide or detectives here, you know.

**Detective Blumenshine**
So, so was there a debrief for this incident then already?

**Deputy Thomas Mace**
I remember having a conversation and briefing about in-custody death and the process. Mainly because every time something critical happens, we will debrief it and find a way to be better.

**Detective Blumenshine**


Transcribed by https://otter.ai

Okay so prior, prior to all the stuff that happened, like the news and the briefing and all that stuff, did you remember and other than the pass down. So I got the pass down, but before his death, did was there any other, anything else that you can remember interaction wise?

**Deputy Thomas Mace**
I don't recall anything specific about him.

**Detective Blumenshine**
Do you remember seeing like any feces or food or anything in his cell?

**Deputy Thomas Mace**
I do remember that his cell was dirty.

**Detective Blumenshine**
But is that because you saw it or just heard about it?

**Deputy Thomas Mace**
No it's because I, during walks I noticed that he, he typically would be standing there barefoot and shirtless, and it's not unusual for people with the experience I've gained recently that, to have a cell that may be a little bit more dirty, if they have some mental health issues going on, but it wasn't anything that I felt needed immediate attention, and I, it didn't prompt me to do anything specific.

**Detective Blumenshine**
Okay. And so let's, let's talk about that. If, if you felt that it was, you know, like it needed immediate attention or something to that effect, what would you have done?

**Deputy Thomas Mace**
So I typically would write, like an Inmate Status Report, an ISR, notify the sergeant, and then I have the email for the psych deputies, clinic deputies, and then the, usually the QMHP, have them come talk to them.

**Detective Blumenshine**
QMHP, what does that stand for?

**Deputy Thomas Mace**
Qualified Mental Health Professional.

**Detective Blumenshine**
Okay, yeah, and so, so you had mentioned, or correct me if I'm wrong, but you had said you saw, but nothing was that alarming, it's not that uncommon, correct?

**Deputy Thomas Mace**
Right.

**Detective Blumenshine**
So then, in regards to uncommon, I guess my question would be, if you can summarize, I'm not asking for a specific number, but like, how common, or how, how often would you say that you see a, similar circumstances?

**Deputy Thomas Mace**
I would, I would say, working in the housing floors on a daily basis, you see someone who may be struggling with mental health issues, and maybe they're not keeping themselves as clean as they should, or they have an inability to just use the paper bag as a trash bag, and they'll just throw their food trays on the ground, and it's something that we deal with on a weekly basis now that we'll go through and sweep out cells and clean just to make sure that people are having a normal environment to live in.

**Detective Blumenshine**
Well, and it sounds like there's new policies and procedures to address that, right?

**Deputy Thomas Mace**
Right, yeah, the wellness checks, I typically work the sixth floor, on the third floor, which are a little bit more managed on the deputy side, and the expectations for the permanent four teams are higher for each other, where we do that, regardless of the wellness checks.

**Detective Blumenshine**
Okay. And do it? Do you remember? Were there any well wellness checks or anything like that on that day that you worked?

**Deputy Thomas Mace**
I don't recall.

**Detective Blumenshine**
Okay, and so I kind of covered, like, the frequency, I guess, of the other inmates, and like, what you would do if it was alarming, and so what I guess, would constitute alarming to you? Or needing to do that, ISR and call the qualified someone?

**Deputy Thomas Mace**
If someone you know, typically, if someone has more than three food trays in their stuff, because, you know, they get three meals a day. If they've got three food trays in there, I know that they just haven't maybe come out for day room or taken their trash out that day. If they have more than a day's worth of trash built up in there, if they're playing with their own feces, or if they look maybe distraught and in need of help, or unable to maintain a conversation with me, then I would kind of seek that next level of help.

**Detective Blumenshine**
Okay, do, and so for Rupard specifically, you had mentioned that, I guess you described it as dirty, right?


Transcribed by https://otter.ai

**Deputy Thomas Mace**
Yeah.

**Detective Blumenshine**
Do you remember any specifics, like how many food trays, or how much feces, or anything like that?

**Deputy Thomas Mace**
I don't remember the exact number of food trays, or I don't remember any feces at all. What I remember about him, is that he typically had a mattress on the ground, blankets were kind of strewn throughout the cell, and he was, the, I can picture him standing there, barefoot, shirtless.

**Detective Blumenshine**
Do, and so, you have, and how did he look, like barefoot and shirtless? If you could describe him.

**Deputy Thomas Mace**
Longer black hair, little bit tan, you know, I remember he had like a, his eyes were bigger, you know, like some people, in proportion to his face, his eyes were big. But other than that, I don't really remember anything else about him.

**Detective Blumenshine**
Okay. Do you remember, have you, do you remember any conversations or words exchanged between you two?

**Deputy Thomas Mace**
No, I, I don't remember any conversations that I had with him at all.

**Detective Blumenshine**
Okay. And so then I want you to tell me what you recall about, is seventh floor specialized housing at all?

**Deputy Thomas Mace**
Now, now the seventh floor is, is a permanent team. And seven David went from like mainline housing to now it's an Ad Seg module, an Ad Set module, where people who can't conform to the minimum jail signature are housed.

**Detective Blumenshine**
Okay, at that, back in 2022 was it considered mainline?

**Deputy Thomas Mace**
I believe it was mainline housing.

**Detective Blumenshine**
Okay, but was Rupard mainline?


Transcribed by https://otter.ai

**Deputy Thomas Mace**
I don't recall what, he, what classification he was.

**Detective Blumenshine**
Okay, do you recall if he came out on his own, or anything like that?

**Deputy Thomas Mace**
I don't recall him, whether or not he participated in day or not.

**Detective Blumenshine**
Okay and so you had mentioned, or actually, I had actually mentioned, and you confirmed, I believe that a lot of what you did that day was 1153s, can you explain to me what an 1153 is?

**Deputy Thomas Mace**
An 1153 is like a safety and security walk that we do every 55 minutes, to make sure that everybody is alive and well, there's no criminal activity, there's no nothing in the cell that's broken that needs repair. And just to help make sure that everyone's good, the facility is good, and there's no like circumstances that we, require we take action immediately.

**Detective Blumenshine**
Okay and so do you remember if you did soft count or hard count that day?

**Deputy Thomas Mace**
I don't recall doing it, but that's typically, you know, we do that every single day.

**Detective Blumenshine**
Okay, and so what is soft count?

**Deputy Thomas Mace**
Soft count is just verifying somebody's alive and well, and getting a number on each module of, to match what the operation status board would say how many people we should have.

**Detective Blumenshine**
So like, are you just looking for bodies during a soft count?

**Deputy Thomas Mace**
During soft count, we're just, it's like a regular 1153 and we're counting, so verifying all the regular 1153 things, but also counting the number of people in each module.

**Detective Blumenshine**
Okay, and then what is a hard count?

**Deputy Thomas Mace**

Hard count is an 1153 and verifying that each person is wearing their wristband and alive and well, and that their wristband matches who they actually are.

**Detective Blumenshine**
Okay and if someone's in their own individual cell, do you guys go in to confirm that?

**Deputy Thomas Mace**
It depends on the person. If they're agitated or display any kind of assaultive behavior, typically we're not going to pop the door and have a fight to do hard count, especially if you can look at the person and match the on the hard counting that shows a picture of them. So if I can look at him and say, yeah, that's him, I'm not going to pop the door and have a fight with the guy just to check his wristband.

**Detective Blumenshine**
And so, you had mentioned earlier that you had gotten a pass down that Rupard has, has a history of taking the food flap hostage. What does that mean to you?

**Deputy Thomas Mace**
So, if I open the food flap or the food portal to speak to him or give him meds or pass food, he typically would stick his hands out and not let you close it.

**Detective Blumenshine**
Okay is that all that was passed down? Was there any assaulted behavior or anything like that?

**Deputy Thomas Mace**
Not that I can recall.

**Detective Blumenshine**
Okay. I think that is it for me. Is there anything that you can remember about Rupard or that day?

**Deputy Thomas Mace**
Not, not specifically, no.

**Detective Blumenshine**
Okay, any questions or anything like that.

**Deputy Thomas Mace**
No.

**Detective Blumenshine**
All right, cool. End Time, 1226, hours.


Transcribed by https://otter.ai

DECLARATION OF MATHIAS J. CIEN-MAYER

I, MATHIAS J. CIEN-MAYER, declare that:
The preceding transcript is a true and correct transcription of the audio recording of the interview of Deputy Thomas Mace by Det. Blumenshine, recorded on December 20, 2023, transcribed in reference to Estate of Lonnie Rupard, Through its Court Appointed Administrator Terri Lopez; And Justino Rupard v. County of San Diego, et al., Case No. 23CV1357 CAB BLM, in the United States District Court for the Southern District of California. AI was used in the process and corrected to the best of my ability to hear and understand the audio recording. I am not related to any party to this action, nor am I financially interested in the outcome of this action. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 13th day of January 2026.

s/ Mathias Cien-Mayer

MATHIAS J. CIEN-MAYER, Declarant.


Transcribed by https://otter.ai