EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
PETER BIBRING: SBN 223981
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

JEREMIAH A. LOWE (CA SBN 239166)
*jeremiah@lowelawapc.com*
LOWE LAW, APC
402 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 878-2725
Facsimile: (619) 878-2737

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ESTATE OF LONNIE RUPARD,<br>Plaintiff,<br>v.<br>COUNTY OF SAN DIEGO, *et al.*,<br>Defendants. | CASE NO. 23-CV-1357-CAB-JAC<br><br>**EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT COUNTY OF SAN DIEGO, OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY ADJUDICATION, VOL. 2 OF 3**<br><br>Judge: Hon. Cathy Ann Bencivengo<br><br>Date: December 18, 2026<br><br>**PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT** |

# INDEX OF EXHIBITS


| Exhibit | Description | Volume | Ex. Page |
|---|---|---|---|
| 1 | Autopsy Report, Lonnie Rupard, San Diego County Medical Examiner (COSD 002085–2106) | 1 | 6 |
| 2 | Orders of Incompetency, 2015 and 2019 (COSD 003055, 003256) | 1 | 29 |
| 3 | Follow-Up Investigative Report II, Det. Blumenshine, Mar. 16, 2023 (COSD 001656–1677) | 1 | 32 |
| 4 | San Diego County Sheriff's Department Detention Services Bureau Policy I.64 (COSD 006088–6090) | 1 | 55 |
| 5 | Rule 30(b)(6) Deposition of Lt. Aaron Boorman, Jan. 16, 2026 (excerpts) | 1 | 59 |
| 6 | San Diego County Sheriff's Department Detention Services Bureau Policy I.43 (COSD 006343–6345) | 1 | 77 |
| 7 | Deposition of Dep. Jason Viladiu, Feb. 2, 2026 (excerpts) | 1 | 82 |
| 8 | Reports of Dr. Nicolas Badre, M.D. (COSD 000153–158) | 1 | 101 |
| 9 | Deposition of Nicolas Badre, M.D., Dec. 19, 2025 (excerpts) | 1 | 108 |
| 10 | Deposition of Sgt. Michael Johnson, Feb. 27, 2026 (excerpts) | 1 | 123 |
| 11 | Deposition of Dep. Andrew Torres, Apr. 13, 2026 (excerpts) | 1 | 131 |

| Exhibit | Description | Volume | Ex. Page |
|---|---|---|---|
| 12 | Deposition of Dep. Miguel Aguilera, Apr. 13, 2026 (excerpts) | 1 | 139 |
| 13 | Deposition of Dep. Linda Gutierrez, Dec. 11, 2024 (excerpts) | 1 | 146 |
| 14 | Deposition of Dep. Jeff Amado, Jan. 29, 2026 (excerpts) | 1 | 151 |
| 15 | Deposition of Dep. Gustavo Martinez, Jan. 29, 2026 (excerpts) | 1 | 157 |
| 16 | Audio recording of interview of Dep. Thomas Mace, Dec. 20, 2023 (COSD 000371) (to be lodged with the Court) | 1 | 163 |
| 17 | Transcript of interview of Dep. Thomas Mace, Dec. 20, 2023 (COSD 000371) | 1 | 164 |
| 18 | Expert Report of Will Adams | 2 | 6 |
| 19 | Deposition of Gary Raney (excerpts) | 2 | 41 |
| 20 | Deposition of Will Adams, Sept. 24, 2026 (excerpts) | 2 | 45 |
| 21a-h | Video recordings of logged safety checks (to be lodged with the Court) | 2 | 56 |
| 22 | San Diego County Sheriff's Department Detention Services Bureau Policy G.2.1 (Oct. 30, 2020) (COSD 006313–6314) | 2 | 57 |
| 23 | Rule 30(b)(6) Deposition of Melissa Quiroz, Jan. 8, 2026 (excerpts) | 2 | 60 |
| 24 | Deposition of Anthony Cruz, M.D., Mar. 3, 2026 (excerpts) | 2 | 66 |

| Exhibit | Description | Volume | Ex. Page |
|---|---|---|---|
| 25 | Deposition of Christina Goodall, Dec. 16, 2024 (excerpts) | 2 | 73 |
| 26 | Deposition of Serina Rognlien-Hood, Mar. 26, 2026 (excerpts) | 2 | 81 |
| 27 | Expert Report of Homer Venters, M.D., July 10, 2026 | 2 | 86 |
| 28 | Expert Report of Lori Roscoe | 2 | 150 |
| 29 | San Diego County Sheriff's Department News Release, Sheriff Bill Gore Announces Retirement, Jan. 19, 2022 | 2 | 182 |
| 30 | San Diego County Sheriff's Department News Release, Anthony Ray Appointed Interim Sheriff, Mar. 22, 2022 | 2 | 185 |
| 31 | Defendant Kelly Martinez's Revised Responses to Plaintiff Estate's Interrogatories, Set One | 3 | 6 |
| 32 | Defendant William Gore's Revised Responses to Plaintiff Estate's Interrogatories, Set One | 3 | 72 |
| 33 | San Diego County Sheriff's Department News Release, Mar. 2, 2023 (RUP001161–1164) | 3 | 120 |
| 34 | Deposition of Det. Max Blumenshine, Jan. 7, 2026 (excerpts) | 3 | 125 |
| 35 | Line-Up Training re 11-53 Safety Checks, May 1, 2021 (COSD 006245–6246) | 3 | 129 |
| 36 | Deposition of Cpl. Blade Romans, Jan. 13, 2025 (excerpts) | 3 | 132 |

| Exhibit | Description | Volume | Ex. Page |
|---|---|---|---|
| 37 | Expert Report of Kathryn Wild, RN | 3 | 136 |
| 38 | Rebuttal Expert Report of Homer Venters, M.D., Aug. 5, 2026 | 3 | 160 |
| 39 | Rebuttal Expert Report of Jackie Clark | 3 | 179 |
| 40 | Rebuttal Expert Report of Glindmeyer | 3 | 199 |

# EXHIBIT 18

Expert Report of Will Adams

# EXHIBIT B

# Will Adams

July 15, 2026

Alexandra Sennet, Esq.
Tressler LLP
400 Continental Blvd Suite 6125
El Segundo, CA 90245

**RECORD REVIEW**

RE: Estate of Lonnie Rupard
Case Name: Estate of Rupard v. COSD, et al.
Claim #: 23CV1357-CAB-JAC
Date of Loss: 03/17/2022

Dear Alexandra Sennet,

**CURRICULUM VITAE:**

I am the owner and lead consultant of Correctional Litigation Solutions (CLS). CLS is a consulting firm that provides expert testimony and consulting services on policies, procedures, and general prison information, including accepted standards, correctional systems, prisons, jails' best practices, and industry standards. The firm also provides services on general law enforcement use-of-force issues. My business address, contact information, and fee schedule are as follows:

WILL ADAMS
Correctional Litigation Solutions
16692 Hallmark Trail
Monument, CO 80132
will.adams@corrlitsolutions.com

**FEE SCHEDULE:**

| | |
|---|---|
| Records Review/Consult/Report | $450 per hour |
| Deposition Testimony (4-hour Minimum) | $450 per hour |
| Travel (Excluding Trial Days) | $350.00 per hour |
| Mileage (Current Federal Rate) | 72.5¢ per mile |
| Trial Testimony | $3200.00 per day |

**PROFESSIONAL HISTORY:**

I began my employment with the California Department of Corrections (CDCR) on January 4, 1988. I attended the Basic Correctional Officer Academy shortly thereafter.

On June 1, 1993, I was promoted to Correctional Sergeant. As a sergeant, I supervised the Prison Facilities, Prison Yards, Prison Kitchen, Watch Office, Central Control, Receiving and Release,

Inmate Transportation, Mental Health Unit, and Outside Patrol. I served two years as an In-Service Training Sergeant. During that period, I was one of the institution sergeants who assisted in the design and development of the current direct-impact munitions and riot-control procedures for which CDCR is now respected in the law enforcement community.

As a sergeant, I was responsible for the daily training and evaluation of correctional officers and for ensuring that officers performed their tasks in the housing units and facility areas in accordance with policies, procedures, and guidelines. I served as a Facility Program Sergeant. Program supervisors are responsible for the day-to-day operations of custody facilities, including inmate program and activity groups, yard programs, inmate housing units, kitchens, medical clinics, satellite libraries, mental health offices, chapels, property rooms, and work processing areas, as well as elevated positions containing armed officers.

On January 1, 2001, I was promoted to Correctional Lieutenant. As a lieutenant, I served as the second-line supervisor for all Correctional Officers and the first-line supervisor for all sergeants. I routinely supervised facilities housing an average daily population of 1,200 inmates, 20 correctional officers, and 2 sergeants, often cross-covering a second facility.

I served as Watch Commander, overseeing the entire prison after business hours. I served as the escape commander and, as needed, the interim emergency commander. While in that position, I was responsible for 4700 inmates and all staff members on institutional grounds.

I served as a Visiting Lieutenant and was a trainee member of the Special Emergency Response Team (SERT). I commanded the R. J. Donovan Correctional Facility Honor Guard.

I served as a Correctional Lieutenant at the R. J. Donovan Correctional Facility in San Diego, CA, and at the Wasco State Prison – Reception Center in Wasco, CA.

On November 26, 2006, I was promoted to Correctional Counselor II Specialist, Appeals Coordinator, at Kern Valley State Prison (KVSP) in Delano, CA. I served in that position until accepting an assignment as Facility Captain at KVSP in 2007. I served out of class as a captain for six months and then accepted the position of Litigation Coordinator (returning to CCII Specialist as a lateral transfer) in late 2007.

During my time as a Litigation Coordinator, I was utilized by the California Department of Corrections and Rehabilitation's Office of Legal Affairs and the California Department of Justice, Office of the Attorney General, as a prison expert, including prison administration, prison gangs, use of force, inmate politics and behaviors, inmate cultural norms, housing unit operations, and various other matters. I served as an expert in several trials. I provided consulting services to the California DOJ and CDCR on multiple matters requiring my intimate knowledge of, and long-term experience with, prison administration and operations.

On September 1, 2014, I retired from service with the CDCR, having served almost 27 years in peace officer positions at three department institutions and in several special details away from the institutions, including the CDCR Training Academy. The minority of my career was spent in administration, giving me a breadth of operational experience and consistent contact with inmates

and staff over the years. Even during my time in administrative positions, I remained qualified as a peace officer and continued to train correctional officers, sergeants, lieutenants, and other prison staff as needed.

Throughout my career, and continuing through this day, I have served as an expert witness in California state courts regarding general prison matters, prison and jail administration, interpretation of CDCR documents, CDCR policies and procedures, use of force, narcotic distribution and smuggling in the prison setting, prison gangs, prison disruptive (street gang) activities, custody operations, and protection of confidential informants, documents, and information under the control of CDCR. Such testimony has taken place in the counties of San Bernardino, San Diego, Los Angeles, Kern, Riverside, Kings, Tulare, Santa Cruz, Del Norte, and Monterey, among others.

I have provided expert testimony in Federal Court regarding prison and jail administration, confidential informant protection, confidential record protection, prison disciplinary process, general prison culture and operations, rules and policies, prison gang culture, emergency response, less lethal and deadly force with firearms and launchers, inmate cultural norms, prison and jail intake and booking procedures, bloodborne pathogens, officer safety tactics, inmate/staff relations, and use of force applications and options,.

Most often, my expertise in use-of-force policy and procedure is provided in Federal Courts. I have testified in the U.S. Eastern, Central, and Southern District Courts of California. I have provided expert reports and consulting services in the Northern District of California, the District of New Mexico, the District of Mississippi, the District of Arizona, the Western District of New York, the Eastern District of Pennsylvania, the District of Minnesota, the District of Maryland, and the Eastern District of North Carolina. My services have been provided for plaintiff and defense cases.

**TRAINING/ EXPERIENCE:**

I served as a master trainer in the following:

- Use of Force Policy and Procedures
- Tactical Alarm Response
- Def. Tech. / Federal Arms Factory Certified Impact Munitions Instructor
- Bloodborne Pathogens
- Electrified Fence Master Trainer
- Electrified Fence Trainer for Master Trainers
- Emergency Response Procedures
- Escape Procedures

- Inmate Staff Relations
- Litigation Procedures
- Range Safety Officer

I have been certified by the CDCR in the following:

- FEMA Emergency Response, National Incident Management System
- CDCR Internal Affairs Investigation
- Cardiopulmonary Resuscitation
- Rules Violation Report Hearing Officer
- Rules Violation Report Senior Hearing Officer
- Basic First Aid
- Basic Supervision
- Advanced Supervision
- Sergeant’s Academy
- Lieutenant’s Academy
- Classroom Presentation Skills
- CDCR Emergency Operations- Conflict Management

CURRENT AND PRIOR PROFESSIONAL MEMBERSHIPS INCLUDE

- California Narcotic Officers’ Association
- Fraternal Order of Police, San Diego Lodge# 10
- California Correctional Peace Officers Association
- Chief Job Steward, California Correctional Peace Officers Association
- California Correctional Peace Officers Association, Retired Chapter

- Correctional Peace Officers Foundation
- Lifetime Member, American Legion, Post #26, Bakersfield, CA
- Meudell Oildale Lodge #695, Free and Accepted Masons, Bakersfield, CA
- Kiwanis International, Golden Empire Club, Bakersfield, CA
- American Correctional Association
- Aircraft Owners and Pilots Association
- American Radio Relay League
- Committee Member, Citizens Bond Oversight Committee, Bakersfield City School District
- Chapter President, California Correctional Supervisors' Association

My presentations and list of cases in which I have provided consulting services or expert testimony are outlined in my curriculum vitae, attached hereto as Exhibit "A".

**PUBLICATIONS:**

All publications written within the past ten years are listed below: The more recent articles can be found on the website www.corrlitsolutions.com.

Use of Force and the Death of George Floyd, July 29, 2020, www.corrlitsolutions.com.

Shot in the Back: Police Use of Force from Behind, September 2, 2020. www.corrlitsolutions.com.

Body Cameras in Prison, Good or Bad? September 10, 2020, www.corrlitsolutions.com.

**METHODS:**

I have been asked to review the above-titled case to provide an opinion as to whether the actions of, and the procedures used by, the defendant were consistent with a national standard for correctional facilities, consistent with San Diego County Sheriff's Department (SDSD) jail policies and procedures (P&Ps), and American Correctional Association (ACA) standards, policies, and procedures, and met a standard of care consistent with my training and experience.

My opinions are based on a dispassionate review of all available evidence, as listed below and in the footnotes of this report, and on independent conclusions drawn from my training and experience as a correctional peace officer.

In conducting this dispassionate review, I have relied on my experience and training as an officer and

supervisor as well as knowledge gained through administrative and managerial positions throughout my 26-year career. In this case, there are voluminous documents, and my opinions are based on an overall review of the documents, with specific parts cited to indicate where I obtained information.

My review of policies and procedures (P&Ps) is based, as much as possible, on the policies and procedures in effect at the time of the incident referred to in this report, specifically at or near the dates and times when the events described herein occurred. For instance, in this case, reference to a policy connected to the event will be made to the version of the document provided in discovery, based on a good-faith understanding that those policies and procedures were in place at the time of this incident.

I intend to conduct a review of the events and documents provided to me in this case without regard to remuneration or others' opinions. My opinions and conclusions are not dependent upon any compensation. My opinions in this case are my own and are provided without any influence from the parties.

I reserve the right to amend my opinions and to produce additional reports should additional information become available, if it was not provided at the time of this writing, and if it is sufficiently persuasive to cause me to amend the opinions recorded herein.

In this report, I am not opining on the defendants' intent unless some item of evidence informs me of intent, or providing testimony as a fact witness. However, I have analyzed the facts and drawn the types of inferences I typically made during my career, based on my 26+ years of experience, education, training, and information and research conducted as the owner of Correctional Litigation Solutions since September 2014.

In forming my opinions in this report, I am drawing upon my experiences and training as an officer and supervisor of a housing unit and in various prison facilities and correctional institutions, and upon my experience in forming, implementing, and training correctional officers and staff about safety and security responsibilities, response plans, emergency plans, safety inspections, and housing unit observation rounds. Specific to the incident in this lawsuit, I draw upon my training and experience as a housing unit officer and sergeant, as well as second-line supervision of housing units, and as a Facility Captain over a 6-unit facility at three CDCR prison sites.

My opinions regarding the cooperative relationship that must be maintained between custodial officers and mental health professionals are borne of my experience and training as a correctional officer and as a sergeant of a facility housing mentally disordered offenders, as well as supervising custodial functions at the mental health treatment unit at the R. J. Donovan Correctional Facility in San Diego, California. I have also supervised prison facilities and administrative segregation (now known as restrictive housing) units that house inmates with mental health needs, as well as receiving and release where inmates are in- and out-processed from prison facilities.

The American Correctional Association (ACA) is a nationwide association that provides accepted best practices for prisons and jails around the United States. Member agencies undergo biannual audits and receive compliance reports that rate their adherence to the ACA-recommended practices. The ACA is not an enforcement agency, but rather sets a basic standard that agencies throughout the

**1450 Sutter St. #516, San Francisco, CA 94109**
**(833) 774 3723 ext. 102 FAX: (415) 520 5411**

USA strive to meet. As such, I utilize ACA standards to establish a national standard and to conduct my analysis in this case.

In this report, I will conduct a comparative analysis of the SDSD's policies and procedures and the American Correctional Association (ACA) recommended standards against the actions and activities of the defendant in this case. This analysis will provide the reader with a comparison of the events with the state and nationally accepted best practices in California and the ACA.

This report is based on information currently available to me. I reserve the right to expand or supplement my opinions as my analysis continues, information becomes available to me, including any matters that Plaintiff raises in this case, opinions or testimony provided by Plaintiff's or Defendants' expert(s), and/or in light of any relevant orders from the Court.

I also understand that I may be asked to give rebuttal testimony or provide a rebuttal expert report on any issues not covered in this report. I further reserve the right to respond in a rebuttal report to opinions advanced by any expert that Plaintiffs offer regarding P&Ps and prison/jail administration.

In this report, I may refer to injuries sustained by incarcerated people or to certain rights inmates possess, based on the training and experience I have gained throughout my career as a correctional peace officer and as an expert/consultant in prison and jail matters. Such references should not be construed as medical or legal conclusions. I will provide no opinions in this case on medical or legal issues, as I am not a medical professional or attorney. I reserve those matters for the trier of fact.

Likewise, I may refer to officers' duty to protect inmates and others from harm. Such a duty is known to me through my experience and training, not from the in-depth study of constitutional law. I leave to the court and jury any determinations regarding legal matters, including innocence, guilt, culpability, and any other such questions that may need to be decided in this case.

In forming my opinions, I have relied on my training and experience, as well as my review of the policies and/or procedures of the SDSD, ACA, NCCHC and my training and experience as a peace officer in correctional facilities from January 4, 1988, until my honorable retirement on September 1, 2014, as well as, comparative analysis of correctional agency policies and procedures from several states and counties I have reviewed in my duties as a consultant and corrections expert since I retired from the CDCR on September 1, 2014.[1]

In this report, I am not opining as a fact witness. However, I have analyzed the facts and drawn the types of inferences I typically made during my career, based on my 26+ years of experience, education, and training in the CDCR, as well as information and research conducted during my time as the owner of Correctional Litigation Solutions.

My opinion in this case is strictly and narrowly tailored to pertain to the defendant, Dr. Anthony Cruz,

---

I have also reviewed the recommended standards of the American Correctional Association and utilized my general understanding of prison policies and procedures gleaned from my 26+ years' experience in CDCR Institutions in multiple peace officer roles. I am assuming that the policies and procedures provided in discovery in this case were the policies in effect at or near the time of the events leading to this lawsuit and/or that they are not substantially different from those in effect at the time. To the extent such documents were not provided, I have reviewed publicly available copies.

D.O., and his professional activities as a contracted psychiatrist for the County of San Diego. Dr. Cruz was an employee of Liberty Healthcare at the time he was involved, in a limited capacity, in the events leading to this lawsuit.

Generally, I will opine on the duty of officers to protect inmates in their daily care and the duty of correctional staff to protect such inmates from harm in any form. I will opine upon the necessity for correctional deputies to communicate their observations of detainees in their care to healthcare and mental health professionals.

Remarks in this report regarding legal, mental health, or medical issues are based on common knowledge known to the layperson. They are not intended to be taken as expert opinion on my part. I will, however, opine on the cooperative, collaborative relationship that must exist in the correctional setting between deputies and mental health professionals, and the duty of deputies to report changes in behavior, health, and personal hygiene to mental health staff and others as such changes develop.

There are hundreds of pages of discovery produced in this case. To maintain brevity for both the reader and the writer, I will list the specific documents I rely on in the footnotes throughout this report.

It is noted that many of the documents in this case contain a Bates number. For this report, I will describe the documents as needed and refer directly to the assigned Bates number as I present them.

The documents I have reviewed in this case include those listed below.

1. Complaint.

2. American Correctional Association, *Performance-Based Standards and Expected Practices for Adult Correctional Institutions, March 2021, Fifth Edition.* American Correctional Association and the Commission on Accreditation for Corrections, in cooperation with the Committee on Performance-Based Standards, March 2021.

3. National Commission on Correctional Health Care (NCCHC), *Standards for Mental Health Services in Correctional Facilities,* 2015 Edition, Reprinted March, 2024.

4. Deposition of Jon Montgomery, D.O.

5. Deposition of Lieutenant Aaron Boorman.

6. Deposition of Lieutenant Gino Matrone.

7. Deposition of Deputy Bernardo Jose Romero.

8. Deposition of Deputy Gustavo Martinez.

9. Deposition of Deputy Jeff Ryan Miko Amado.

10. Deposition of Deputy Jason Viladiu.

11. Deposition of Deputy Ernesto Aguirre.
12. Deposition of Deputy Corporal Thomas Randall Mace.
13. Deposition of Bethann Schaber, M.D.
14. Deposition of Detective Max Blumenshine.
15. Deposition of Nicolas Badre, M.D.
16. Deposition of Melissa Quiroz, PMK 30(B)(6).
17. Deposition of Anthony Cruz, M.D.
18. Deposition of Serina Rognlein-Hood.
19. Deposition of Linda Gutierrez.
20. Deposition of Christina Goodall.
21. Autopsy Report.
22. Birth Certificate.
23. Confidential Initial Disclosures (COSD) 000026 – 00050.
24. Death Certificate.
25. Medical Examiner Report.
26. Ronnie Criminal Case.
27. Toxicology Report.
28. 2024.08.28 Internal Affairs Unit.
29. Area Activities Summary Report (3.16.22 - 3.17.22).
30. Area Activities Summary (12.19.21 - 3.17.22).
31. Citizens' Law Enforcement Review Board Employee Response Form & Pictures.
32. Contact Report All Staff -- All Contact.
33. Incident Reports (1.30.22 - 2.19.22).

34. Incident Reports dtd 2.01.22 (COSD).
35. Inmate History Summary Report.
36. NEF # 184 - Pltfs Third Amended Complaint with exhibits.
37. Regional Crime Report dtd 3.19.22 (COSD000381 - COSD000403).
38. Autopsy Photos.
39. Cell Photos COSD 001452 – COSD 001472.
40. Cell Photos (1) COSD 001507 – 001536.
41. Cell Photos (2) COSD 001538 – 001546.
42. [Final] Estate's Response to Wereski's Requests for Production (Set One).
43. [Final] Estate's Supplemental Response to Aguilera's Interrogatories (Set One).
44. [Final] Estate's Supplemental Response to Aguirre's Interrogatories (Set One).
45. [Final] Estate's Supplemental Response to Aguirre's Requests for Production (Set One).
46. [Final] Estate's Supplemental Response to Amado's Interrogatories (Set One).
47. [Final] Estate's Supplemental Response to Amado's Requests for Production (Set One).
48. [Final] Estate's Supplemental Response to G. Martinez's Interrogatories (Set One) .
49. [Final] Estate's Supplemental Response to G. Martinez's Requests for Production (Set One).
50. [Final] Estate's Supplemental Response to Gutierrez's Interrogatories (Set One).
51. [Final] Estate's Supplemental Response to Gutierrez's Requests for Production (Set One).
52. [Final] Estate's Supplemental Response to James' Interrogatories (Set One).
53. [Final] Estate's Supplemental Response to James' Requests for Production (Set One).
54. [Final] Estate's Supplemental Response to Johnson's Interrogatories (Set One).
55. [Final] Estate's Supplemental Response to Johnson's Requests for Production (Set One).
56. [Final] Estate's Supplemental Response to Romans' Interrogatories (Set One).

57. [Final] Estate's Supplemental Response to Romans' Requests for Production (Set One).
58. [Final] Estate's Supplemental Response to Romero's Interrogatories (Set One).
59. [Final] Estate's Supplemental Response to Romero's Requests for Production (Set One).
60. [Final] Estate's Supplemental Response to Torres' Interrogatories (Set One).
61. [Final] Estate's Supplemental Response to Torres' Requests for Production (Set One).
62. [Final] Estate's Supplemental Response to Viladiu's Interrogatories (Set One).
63. [Final] Estate's Supplemental Response to Viladiu's Requests for Production (Set One).
64. [Final] Estate's Supplemental Response to Wereski's Interrogatories (Set One).
65. [Final] Estate's Supplemental Response to Wereski's Requests for Production (Set One).
66. [Final] POS 04.10.26.
67. [Final] POS 06.01.2026.
68. [Final] Estate's Response to Montgomery's Interrogatories (Set One).
69. 2026.06.02 Pltf Final Supplemental Response Verifications.
70. San Diego Central Jail Staff Schedule (2.01.22 - 3.17.22).
71. San Diego Central Jail Schedule (dtd 3.17.22).
72. COSD 6928-COSD 6937.
73. COSD 6938-COSD 6942.
74. COSD 6943-COSD 6944.
75. Guards Records COSD 001818-002026.
76. CONFIDENTIAL COSD 000026-000150.
77. COSD 000152-00368.
78. COSD 000375-001135.
79. COSD 001136-001590.

80. COSD 001591-001737.

81. COSD 002027-006087.

**INCIDENT BACKGROUND INFORMATION:**

The events giving rise to this lawsuit took place at the San Diego Central Jail (SDCJ), located at 1173 Front Street, San Diego, CA. The SDCJ is operated by the San Diego Sheriff's Department.

Incarcerated Person (IP) Lonnie Rupard was found unresponsive in his cell (7D17) at SDCJ. Mr. Rupard was transported to the University of California Medical Center (UCSD) and pronounced dead in the emergency room. It is alleged that Mr. Rupard's medical and mental health conditions were ignored by SDCJ staff while he was housed at SDCJ.[2]

The San Diego Coroner's Office ruled the cause of death pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia. Contributing factors were noted as SARS-COV-2 (COVID -19) viral infection; pulmonary emphysema; and duodenal ulcer. The manner of death was ruled as a homicide.

**ACTIVITIES OF DR. A. CRUZ:**

Dr. Cruz was not assigned as the primary medical provider for Mr. Rupard. He was, however, a psychiatrist working for Liberty Medical, who was tasked with outpatient psychiatric support for the inmate population at SDCJ.

On December 20th, 2021, the day after his intake and booking on December 19th, 2021, Mr. Rupard was scheduled for a follow-up appointment with the psychiatrist. Because Dr. Mian Jan, a psychiatrist with Liberty who only conducted telehealth conferences, was unable to interview Mr. Rupard due to Mr. Rupard's refusal to cooperate with telehealth, Dr. Cruz was asked to conduct the interview.[3]

On December 29, 2021, after two prior attempts to schedule Mr. Rupard for the initial intake interview, Dr. Cruz was able to evaluate Mr. Rupard. The interview took place in front of Mr. Rupard's cell door.[4] Mr. Rupard was uncooperative during the interview. Even so, Dr. Cruz initiated a psychiatric treatment plan for Mr. Rupard.

Dr. Cruz conducted a Psychiatric Chart Review on January 20, 2022.[5]

Dr. Cruz next saw Mr. Rupard on February 22, 2022. At that time, Dr. Cruz recorded that he attempted to establish communication with Mr. Rupard several times, but Mr. Rupard refused. Dr. Cruz attempted to talk to Mr. Rupard about the benefits of restarting medications, but Mr. Rupard yelled when he did so.

---

[2] Bates Confidential COSD 006434, See also: Complaint.

[3] See: Complaint at page 15, Cruz Deposition: Pages 224, 225. See also: Cruz Deposition, Exhibit 14.

[4] See Complaint, Dr. Cruz Deposition: Page 231, 232.

[5] See Cruz Deposition: Page 252. See also Complaint at page 17.

After this encounter, Dr. Cruz did not see Mr. Rupard again.

It is my opinion, based upon my training and experience, that there is a cooperative environment that must exist between custody staff, meaning sworn deputies who are uniformed staff members or persons charged with the safe care and treatment of incarcerated people and mental health/medical providers.

It is my opinion that the open communication between custody and mental health staff is essential because mental health staff are not generally allowed to enter and move about in areas such as housing units and around cells due to safety concerns.

Corrections staff members are provided with specialized training and equipment designed to promote their safety and ensure their ability to forcefully control incarcerated people should the need arise. Psychiatrists, such as Dr. Cruz, receive no such training and are not certified as peace officers, unlike the deputies at SDCJ.

Based upon my experience and training, because the deputies at SDCJ had the most personal contact with Mr. Rupard, it was incumbent upon them to communicate their observations to the appropriate staff. For instance, should Mr. Rupard violate policies or procedures, they would make a disciplinary report and send it up through the appropriate chain of command to ensure that Mr. Rupard received disciplinary action as appropriate. If the deputies saw Mr. Rupard engaging in battery against another person, the deputies would intervene, sometimes using force, and write incident reports to their superiors through the chain of command.

Likewise, if deputies observed that Mr. Rupard was under any form of physical or psychological distress, they would be required to make a medical or mental health referral to the appropriate staff to ensure that Mister Rupard was seen, in this case, by a qualified mental health professional. I have seen no indication, in this case, that such a referral was made regarding Mr. Rupard to any qualified mental health professional, including Dr. Cruz.

It is my opinion that, as a national standard, all prisons and jails conduct counts and security checks at least hourly. In some jurisdictions, as was the case with SDCJ, a count could double as a security check.[6]

It is my opinion that security checks are performed hourly for multiple reasons which may include controlling contraband, identifying violent behavior, discovering rules and security violations inside cells, reducing and interdicting sexual predatory behaviors in cells, assessing sanitation status of the cell, assessing the health, safety, and welfare have any inmate in the cell, and observing incarcerated persons inside the cell to ensure they are maintaining an acceptable level of personal hygiene.

While all of these things are important and should never be ignored, the one most important reason for conducting security checks is to determine if incarcerated people inside the cell are in need of medical or mental health assistance.

[6] Bates: CONFIDENTIAL COSD 001159.

It is my opinion that deputies conducting security checks must remain at the cell long enough to determine whether any person inside the cell is in need of immediate or urgent medical or mental health care.

It is important for the reader to understand that I have not been asked to opine upon the conduct of security checks and counts by SDSD deputies in this case. My opinions regarding effective security checks and counts are given so that the reader might understand what is expected of deputies when they perform such checks.

It is my opinion that if the deputies who performed security checks and counts at Mr. Rupard's cell made a thorough observation of his physical and mental condition and took note of any decline in those conditions over time, they should have reported their observations to a qualified mental health professional or healthcare professional as described above.

Often, the only way such professionals can know if an incarcerated person is becoming increasingly ill or increasingly showing signs or symptoms of mental health problems is for those deputies observing the incarcerated person to make referrals or request Mental Health services for the incarcerated person. I have seen no evidence in this case that such referrals were made to Dr. Cruz and therefore, there was no way for him to be made aware that Mr. Rupard's condition was worsening over time.

In his deposition, Lt. Gino Matrone testified that deputies did not report anything to him about Mr. Rupard, nor did they report the condition of his cell or that he had not been eating and was very thin.[7]

In his deposition, Deputy Bernardo Jose Romero did not indicate he made a referral for mental health concerns to Dr. Cruz or any other Qualified Mental Health Provider (QMHP) regarding the condition of Mr. Rupard or Mr. Rupard’s living conditions.

In his deposition, Deputy Gustavo Martinez did not indicate he made any report or referral for medical or mental health evaluation to Dr. Cruz or any other QMHP regarding Mr. Rupard.

In his deposition, Deputy Jeff Ryan Micu Amado did not indicate he made any referral or report for mental health or medical evaluation to Dr. Cruz or any other QMHP regarding Mr. Rupard.

In his deposition, Deputy Jason Viladiu did not indicate he referred Mr. Rupard for mental health or medical evaluation to Dr. Cruz or any other QMHP.

In his deposition, Deputy Ernesto Aguirre did not indicate he made any report or referral for medical or mental health evaluation to Dr. Cruz or any other QMHP regarding Mr. Rupard.

In his deposition, Corporal Thomas Randall Mace did not indicate he made any referral for mental health evaluation of Mr. Rupard to Dr. Cruz or any other QMHP.

In his deposition, Dr. Cruz stated that he was dependent on deputies and other staff to inform him of

[7] Matrone Deposition: Pages 26 – 28, 51 - 53

any issues that might arise regarding the mental health of patients.[8]

In his deposition, Dr. Cruz was shown an autopsy photograph of Mr. Rupard and was asked if deputies or anyone else at the county ever notified him that Mr. Rupard was in the physical state that was shown in the photo. Dr. Cruz answered, "No."[9]

It is my opinion that communication must occur between mental health and non-mental health staff in order to provide for the best possible safety, security, and clinical outcomes for incarcerated person/patients.

The National Commission on Correctional Health Care (NCCHC) sets a national standard for mental health services in correctional facilities. NCCHC standard MH-E-09, "Continuity and Coordination of Mental Health Care During Incarceration," recognizes the need for non-mental health correctional staff to improve outcomes. The standard states, in part, *"**Coordinated care integrates medical, dental, mental health, and nursing, along with other specialty consultations and in collaboration with custody staff, to help improve clinical outcomes.**"*

It is my opinion that Dr. Cruz could only remain apprised of the mental health status of Mr. Rupard if others working in the housing unit who had contact with Mr. Rupard communicated his status to Dr. Cruz. This is, based upon my training and experience, a normal and everyday procedure and expectation throughout correctional systems.

It is my opinion to a reasonable degree of certainty that the emaciated appearance Mr. Rupard presented with, condition of the cell at the time of Mr. Rupard's death, and presence of uneaten food and feces present, along with the smell, such conditions would/should have been sufficient to draw the attention of any person passing by the area of his cell and triggered an immediate healthcare and mental health request.

It is my opinion to a reasonable degree of certainty that had such a request been made, Dr. Cruz and other medical providers would have had the opportunity to intervene with life-saving treatments for Mr. Rupard.

It is my opinion to a reasonable degree of certainty that Dr. Cruz reasonably expected staff members in contact with Mr. Rupard, especially custody staff, to make a referral to him or other QMHPs when those staff members became aware of conditions like those that are noted by the medical examiner as causing Mr. Rupard's death.

**CONCLUSIONS:**

It is my overall opinion to a reasonable degree of certainty based upon my training and experience that Dr. Cruz was dependent upon deputies and other staff who had contact with Mr. Rupard for reports of any negative changes in his mental health status, health, and behaviors. Absent a cooperative and collaborative effort on the part of deputies who had regular contact with Mr. Rupard,

[8] Cruz Deposition: Pages 256-257.
[9] Cruz Deposition: Pages 324 – 325.

Dr. Cruz could not have known of Mr. Rupard's deteriorating condition.

It has been my training and experience that officers must maintain constant care to identify issues of mental health that may be recognized by an incarcerated person's lack of hygiene, unsanitary conditions, presence of feces in and around a cell, rapid weight loss, bizarre, unusual behavior, and several uneaten meals. When officers/deputies recognize these factors (especially when several are present at the same time), immediate steps must be taken to have the incarcerated person evaluated by mental health and healthcare professionals, the cell must be cleaned and sanitized, and the cell must be made safe for human habitation.

There is no reason, in my estimation, that the conditions described in this incident did not trigger immediate action on the part of deputies. Minus that action, Dr. Cruz could not be aware of the need for intervention.

I have reviewed only the documents described above and provided by the parties.

I have not carried out any independent investigation into this case.

This report and my opinions here are based only on the documents and materials I have been provided, and on the publicly available recommended standards of the ACA and NCCHC.

I understand that additional information may be provided to me before the close of discovery in this case, and that I may be asked to provide an updated or supplemental report. All opinions in this report are held to a reasonable degree of certainty.

I have relied on my professional experience while preparing my report. Based on my 26 years of experience at the CDCR, I have direct knowledge and administrative experience in the development of corrections policies and procedures, including classification procedures and policies, prison operations in maximum and medium custody facilities such as level four and three housing units, administrative segregation units, receiving and release units, and specialized units to include supervision of correctional officers in psychiatric services units and R&R operations.

I have served at officer, supervisory, management, and administrative levels in level-three and level-four institutions. I am aware of the policies and procedures essential to maintaining and enhancing safety and security in the correctional facility setting, including the collaborative efforts between mental health, medical, and custody staff that are required to protect the life, safety, and security of incarcerated people, and promote the best health and mental health outcomes for incarcerated patients.

I have performed and supervised the reception, intake, and release of inmates in the correctional environment. I have supervised officers and operations in a mental health unit in the prison setting, including teaching the importance of effective security checks and communication between custody, medical, and mental health staff. I have also instructed correctional staff in the duty to protect the lives, safety, and security of incarcerated people.

This expert report is based solely upon the facts available at the time of this writing. I am competent and willing to testify about the above, if asked to do so. All opinions expressed here are my own,

based on my extensive training and experience from the beginning of my career with CDCR to the present. I reserve the right to amend this opinion should more facts become available that are not available at the time of this writing.

Respectfully,

William Adams

William Adams
Correctional Counselor II, CDCR (Ret.) Owner/Consultant
Correctional Litigation Solutions

# WILL ADAMS
## Correctional Litigation Solutions

Tel. No. 760-889-0436
Email: will.adams@corrlitsolutions.com
www.corrlitsolutions.com


## LITIGATION COORDINATOR AND CORRECTIONAL COUNSELOR II SPECIALIST (Retired)

I was employed by CDCR on January 4, 1988. I began my career as a Correctional Officer and have held the positions of Officer, Sergeant, Lieutenant, Captain, and Correctional Counselor II Specialist. I retired on September 1, 2014. I have coordinated and testified regarding litigation matters on a broad range of cases, including Proposition 36, SB-9, Miller Habeas, Juvenile Life Without Parole, Albino Hearings, Juvenile Transfer Hearings, Capital Punishment Cases, and cases involving the protection of confidential law enforcement documents. I have consulted on hundreds of cases during my seven years as a litigation coordinator, assisting civil case plaintiffs and defense counsel, as well as criminal prosecution and defense. In addition to the cases listed below, I have consulted in camera with the courts on prison matters, prison life, and other prison-related issues to assist the courts in understanding prison procedures, operations, and law enforcement operations in the prison setting.

My current fee is $450.00 per hour. I am currently receiving this fee for all new cases in all states where I provide services. My prior fee was $400.00 per hour. Please see my fee schedule for additional information. On occasion, I lower my fee for pro-bono cases.

**BACKGROUND**

1/4/88 Correctional Officer

6/1/93 Correctional Sergeant

1/1/01 Correctional Lieutenant

11/30/06 Correctional Counselor II Specialist

9/1/14 Retired

I spent six months as a Facility Captain (out of classification) at KVSP in 2008, then returned to the CCII Specialist role.

I have been recognized in State Court as an expert in general prison administration, prison issues, prison narcotics trafficking, prison gang activities, use of force, inmate weapon manufacturing, and inmate in-custody culture and behavior.

I have been recognized as an expert witness by the Federal Courts regarding Use of Force policy, confidential CDCR records, general prison policies and procedures, disciplinary process, impact munitions, and CDCR Confidential Informant protection requirements/ procedures.

I have served as lead investigator and provided expert testimony in several criminal trials.

**PROFESSIONAL CONFERENCES AND PRESENTATIONS**

On June 19, 2015, I was a presenter at the University of Southern California, Gould School of Law, Post-Conviction Justice Project, Juvenile Life Without Parole Sentencing Forum. I presented information to the attendees as a guest speaker regarding the topics Use of Prison Experts in Criminal Cases and Prison Gang Activity and Culture.

## EXPERT WITNESS TESTIMONY / PRISON EXPERT CONSULTING

***Carpenter v. Sullivan*****,** *USDC, Eastern District of California*, Case No. 1:07-cv-00114 SAB (PC) USDC, Eastern District of California, (**Testified**) (Civil, Defense w/ Ca. OAG, Verdict for Defense)

***Carter v. Fernandez*****,** *USDC, Eastern District of California,* Case No. 1:08-cv-01841-SKO (PC) (**Testified**) (Civil, Defense – Ca. OAG, Verdict for Defense)

***Hackworth v. Torres*****,** *USDC, Eastern District of California,* Case No. 1:06-cv-00773 RC (Civil, Defense, Consultant – CA OAG)

***James v. Wilber***, et al., *USDC, Eastern District of California,* Case No. 1:08-cv-00351 (Civil, Defense, Consultant – CA OAG)

***Thomas v. Garcia*****,** *USDC, Eastern District of California*, Case No. 1:08-CV-0689 JLT (PC) (**Testified**) (Civil, Defense – Ca. OAG, Verdict for Defense)

***Pullium v. Lozano*****,** *USDC, Eastern District of California,* Case No. 1:07-cv-00964 (E.D. Cal.) (**Testified**) (Defense – Ca. OAG, Verdict for Defense)

***Anderson v. Hansen***, *USDC, Eastern District of California,* Case No. 1:09-cv-01924-LJO-MJS (**Testified**) (Civil, Defense – Ca. OAG, Verdict for Defense)

***Paris v. Brazil*****,** *USDC, Eastern District of California,* Case No. 2:12-cv-02383 CDK P (**Testified**) (Civil, Defense – Ca. OAG, Verdict for Defense)

***Montgomery v. Sanchez****, USDC, Eastern District of California*, Case No. 1:13-cv-0247 RRB (Civil, Defense, Consultant – CA OAG)

***Taylor v. Ohanneson*****,** *USDC, Eastern District of California*, Case No. 1:11-cv-0538 LJO SAB (Civil, Defense, Consultant – CA OAG)

***Hernandez v. Hernandez****, USDC, Eastern District of California*, Case No. 1:13-cv-1625-AWI-MJS (PC) (Civil, Defense, Consultant – CA OAG)

***Johnson v. Rodriguez*****,** *USDC, Eastern District of California*, Case No. 1:12-cv-00820-AWI-SAB (Civil, Defense, Consultant – CA OAG)

***Kinnamon v. Latia*****,** *USDC, Eastern District of California*, Case No. 1:12-cv-01325-AWI DLB (PC) (Civil, Defense, Consultant – CA OAG)

***Quezada v. Lindsey*****,** *USDC, Eastern District of California*, Case No. 1:10-cv-01402-AWI-SAB (Civil, Defense, Consultant – CA OAG)

***Gooden v. Baptista*****,** *USDC, Northern District of California*, Case No. 5:13-cv-00352-LHK (Civil, Defense, Consultant – CA OAG)

***Lamon v. Adams****, USDC, Eastern District of California*, Case No. 1:09-cv-00205 LJO-JLT (PC) (Civil, Defense, Consultant – CA OAG)

***Mannings v. Palermo*****,** *USDC, Eastern District of California*, Case No. 1:09-cv-00205 LJO-JLT (PC) (Civil, Defense, Consultant – CA OAG)

***Williams v. Steglinski*****,** *USDC, Eastern District of California*, Case No. 1:12-cv-0786-AWI SAB (PC) (**Testified**) (Civil, Defense – Ca. OAG, Verdict for Defense)

***Martinez v. Allison****, USDC, Eastern District of California*, Case No. 1:11-cv-01749 RRB (**Testified**) (Civil, Defense – Ca. OAG, Verdict for Defense)

***Washington v. Samuels,*** *USDC, Eastern District of California*, Case No. 1:12-cv-01404-SAB (PC) (**Testified**) (Defense – Ca. OAG, Verdict for Defense)

***Adame v. Mariscal,*** *USDC, Eastern District of California*, Case No. 1:14-cv-01596-SAB (Civil, Defense, Consultant – CA OAG)

***Garcia v. Juarez,*** *USDC, Eastern District of California,* Case No. 1:12-cv-00750-AWI-GSA (Civil, Defense, Consultant – CA OAG)

***Hypolite v. Zamora,*** *Eastern District of California, Case No.* 1:14-cv-1199-LJO-SAB USDC, (Testified) (Civil, Defense – Ca. OAG, Verdict for Defense)

***King v. Deathriage,*** *USDC Eastern District of California*, Case No. 1:14-cv-00111-GSA (PC) (Consultant) (Civil, Defense – Ca. OAG, Verdict for Defense)

***Mueller v. Hawaii,*** *Superior Court of Hawai'i (Honolulu)* Case No. 1:17-cv-00571-HG-RLP (Civil, Plaintiff, Consultant)

***Romero v. New Mexico,*** *USDC, District of New Mexico* Case No. 1:17-cv-00724 (Dist. of New Mexico) (Civil, Plaintiff, Consultant, Case Dismissed)

***Schauwecker v. Arizona,*** *USDC, District of Arizona*, Case No. 2:18-cv-01062-PHX-JJT-BSB (Civil, Plaintiff, Consultant)

***Valson v. Lopez,*** *Superior Court of California, County of Kern,* Case No. S-1500-CL-279245 (Civil, Defense, Consultant – CA OAG)

***Carranza v. California Department of Corrections and Rehabilitation,*** *Superior Court of California, County of San Bernardino – Rancho Cucamonga*, Case No. CIVRS1201373 (Prison Expert) (Testified at Deposition, August 2017) (Plaintiff Expert in Employment Case, Settlement reached.)

***Tilei v. California Department of Corrections and Rehabilitation,*** *USDC, Northern District of California,* Case No. 12-cv-1688-PJH (Civil, Plaintiff, Consultant, Settlement reached before trial.)

***People v. Govind,*** *Superior Court of California, County of San Diego*, Case No. SCS166437 (Testified, Criminal, Prosecution, Investigator, Acquitted)

**People v. Moreno & Robles,** *Superior Court of California, County of Kern, Case No. DF008466B* (Testified) (Criminal Case, Testified as Expert for Prosecution, Correctional Officer Moreno Convicted, Correctional Officer Robles Acquitted)

***People v. Venya,*** *Superior Court of California, County of Los Angeles, Case No. TA126680* (Testified 3/20/17) (Criminal Case, Prosecution, Disposition Unknown)

***People v. Arana,*** *Superior Court of California, County of Los Angeles,* Case No. TA049253 (Prison Expert)

***People v. Aston,*** *Superior Court of California, County of Riverside,* Case No. HEF970146 (**Testified 10/16/15**) (Criminal, Defense, Disposition Unknown)

***People v. Lewis,*** *Superior Court of California, County of Riverside,* Case No. INF058881 (Prison Expert)

***People v. Goree****, Superior Court of California, County of Los Angeles,* Case No. BA 245379 (Court Appointed Consultant, Defense, Criminal, Prison Expert, **Testified 6/28/16,** Defendant Retained in Prison)

***People v. Gonzales,*** *Superior Court of California, County of Riverside,* Case No. SWF1401712 (Prison Expert, Defense, Criminal)

***People v. Guinn,*** *Superior Court of California, County of Riverside,* Case No. CR38392 (Prison Expert, Defense, Criminal)

***People v. Jackson,*** *Superior Court of California, County of Riverside,* Case No. RIF1401943 (Prison Expert, Defense, Criminal)

***People v. Kimbrough****, Superior Court of California, County of Riverside,* Case No. RIF1311963 (Prison Expert, Defense, Criminal)

***People v. Pulido,*** *Superior Court of California, County of San Mateo,* Case No. SCO29805A (Prison Expert, Defense, Criminal)

***People v. Watson,*** *Superior Court of California, County of San Diego,* Case No. SCD215231 (Prison Expert, Defense, Criminal)

***People v. Cardin****, Superior Court of California, County of Riverside,* Case No. SWF017487 (Prison Expert, Defense, Criminal)

***People v. DeLuna****, Superior Court of California, County of Sacramento,* Case No. 95F02423 (Prison Expert/**Testified at trial 12/9/16**) (Criminal Case, Defense, Verdict Unknown)

***People v. Gallegos,*** *Superior Court of California, County of Riverside,* Case No. CR-58553 (Prison Expert/**Testified at trial 10/4/16**) (Criminal Case, Defense, Verdict Unknown)

***People v. Rowe,*** *Superior Court of California, County of San Diego,* Case No. SCE199406 (Prison Expert, Defense, Criminal)

***People v. Winn,*** *Superior Court of California, County of Los Angeles,* Case No. KA038352 (Prison Expert, Defense, Criminal)

***People v. Cheybun****, Superior Court of California, County of Riverside,* Case No. RIF1409956 (Prison Expert, Defense, Criminal)

***People v. Kirchner****, Superior Court of California, County of San Diego,* Case No. CRN26291 (Prison Expert, Defense, Criminal, Capital Case)

***People v. Moore****, Superior Court of California, County of San Mateo,* Case No. SCO31458B (Prison Expert/Consultant/**Testified at trial 9/22/16**) (Criminal, Defense, Finding for Defendant)

***People v. Ramazzini,*** *Superior Court of California, County of Santa Clara,* Case No. CR35134 (Prison Expert/ **Testified at trial 10/23/18**) (Criminal, Defense, Defendant Retained in Prison)

***People v. Pithyakorn****, Superior Court of California, County of Los Angeles,* Case No. BA447659 (Prison, Inmate Culture, & Politics Expert/**Testified at trial 12/12/16**) (Criminal, Defense, Defendant Acquitted)

***People v. Raines,*** *Superior Court of California, County of Riverside,* Case No. RIF 133614 (Prison Expert, Defense, Criminal)

***People v. Villa****, Superior Court of California, County of San Mateo,* Case No. SCO71801A Prison Expert/**Testified 6/25/17)** (Criminal, Defense, Verdict Unknown)

***In re: Roy Ayala Jr.****, Superior Court of California, County of Stanislaus,* Case No. 140233 (Prison Expert, Defense, Criminal)

***People v. Alfred,*** *Superior Court of California, County of Los Angeles,* Case No. BA324848 (Prison Expert, Defense, Criminal)

***People v. Johnson****, Superior Court of California, County of Los Angeles,* Case No. NA020150 (Prison Expert, Defense, Criminal)

***People v. Lucero,*** *Superior Court of California, County of Riverside*, Case No. RIF123822 (Prison Expert/**Testified 9/28/18**) (Criminal, Defense, Verdict Unknown)

***People v. Russell**, Superior Court of California, County of San Mateo,* Case No. SC031458A (Prison Expert, Defense, Criminal)

***People v. Gutierrez**, Superior Court of California, County of Riverside,* Case No. RIF128721 (Prison Expert/**Testified 5/4/18**) (Criminal, Defense, Verdict Unknown)

***In Re: Joel A. Salinas on Habeas Corpus,** Superior Court of California, County of Los Angeles,* Case No. NA039263 (Prison Expert, Defense, Criminal)

***Appeal of David Hicks,** State of California, State Personnel Board* Case No. 14-1578 (Prison Alarm Response Expert, Employment, Administrative Law Court, **Testified for Appellant Hicks, 2015**, Partial Finding for Appellant)

***Appeal of Barney Huyck**, State of California, State Personnel Board* Case No. 14-1682K, 14-1766K, 14-1767K (Consolidated) (Consultant, Prison Expert)

***People v. Asprilla,** Superior Court of California, County of Los Angeles,* Case No. VA056356 (Prison Expert, Defense, Criminal)

***People v. Fulker,** Superior Court of California, County of Los Angeles,* Case No. NA038054-01 (Prison Expert, Defense, Criminal)

***People v. Hottinger,** Superior Court of California, County of Los Angeles,* Case No. BA132937-01 (Prison Expert, Defense, Criminal)

***People v. Huff**, Superior Court of California, County of Contra Costa,* Case No. 05-161622-2 (Prison Expert, Defense, Criminal)

***People v. Matas**, Superior Court of California, County of Los Angeles,* Case No. BA056631 (Prison Expert, Defense, Criminal)

***People v. Ozaeta,** Superior Court of California, County of Los Angeles,* Case No. GA025203 (Prison Expert, Defense, Criminal)

***People v. Sandoval**, Superior Court of California, County of Los Angeles,* Case No. BA448920-02 (Prison Expert, Inmate/Gang Politics Expert/**Testified at trial 7/10/18**) (Criminal, Defense, Defendant Acquitted)

***People v. Taylor**, Superior Court of California, County of Solano,* Case No. VC20664 (Prison Expert, Defense, Criminal)

***People v. Williams****, Superior Court of California, County of San Mateo,* Case No. SC031443-A (Prison Expert, Defense, Criminal)

***People v. Bumphus****, Superior Court of California, County of Los Angeles,* Case No. NA048613-03 (Prison Expert/**Testified at trial 12/19/19**) (Criminal, Defense, Finding for Defendant)

***People v. Hennig****, Superior Court of California, County of Solano,* Case No. FCR189160 (Prison Expert, Defense, Criminal)

***People v. Gutierrez****, Superior Court of California, County of Solano,* Case No. FC13192 (Prison Expert, Defense, Criminal)

***People v. Zaragoza****, Superior Court of California, County of Los Angeles,* Case No. KA048005 (Prison Expert/**Testified at trial 3/12/2020**) (Criminal, Defense, Unknown Verdict)

***People v. Gaines****, Superior Court of California, County of Los Angeles,* Case No. TA063063 (Prison Expert, Defense, Criminal)

***People v. Jones****, Superior Court of California, County of Los Angeles,* Case No. VA018101 (Prison Expert, Defense, Criminal)

***People v. Thompson****, Superior Court of California, County of Kern,* Case No. SCO59851A (Prison Expert, Defense, Criminal)

***People v. Isauro Aguirre,*** *Superior Court of California, County of Los Angeles,* Case No. BA425180 **Capital Case** (Prison Expert/Inmate Politics, Gang Politics, Inmate Job Availability, **Testified 12/5/17**) (Criminal, Defense Sentencing Phase Only, Verdict Capital Punishment)

***People v. Black,*** *Superior Court of California, County of San Diego,* Case No. C5303930 (Prison Expert, Defense, Criminal)

***People v. Leyva,*** *Commutation of Sentence, Report of Prison Performance/Rehabilitation* (Prison Expert, Defense, Criminal)

***People v. Martinez****, Superior Court of California, County of Stanislaus,* Case No. 1498584 (Prison Expert, Defense, Criminal)

***People v. McCutcheon****, Superior Court of California, County of Contra Costa,* Case No. 5-100762-4 (Prison Expert, Defense, Criminal)

***People v. Sundberg****, Superior Court of California, County of San Diego,* Case No. CS290694 (Prison Expert, Defense, Criminal)

***People v. Battreall****, Superior Court of California, County of San Diego,* Case No. SCD278999 (Prison Expert, Defense, Criminal, Sentence Reduction)

***In Re: Hargis,*** *Superior Court of California, County of Kern,* Case No. JW119331-01 (Prison Expert/**Testified at Juvenile Resentencing Hearing 3/21/22**) (Criminal, Defense, Finding for Defendant)

***People v. Augustin Acosta****, Superior Court of California, County of Los Angeles,* Case No. MAO13724-01 (Prison Expert, Defense, Criminal)

***Samaniego v. C.D.C.R.,*** *USDC, Eastern District of California,* Case No. 2:19-cv-02606 TLN KJN (E. D. Cal.) (Civil, Defense, Consultant)

***People v. Secrease****, Superior Court of California, County of Solano,* Case No. VC43681 (Criminal, Defense, Prison Expert). **Testified** at the Juvenile Transfer Hearing on **10/12/23.**

***People v. Kons,*** *Superior Court of California, County of Los Angeles,* Case No.MA077627-7 (Prison Expert/**Testified at trial 1/5/22**) (Criminal, Defense, Defendant Acquitted)

***In Re: Blay,*** *Superior Court of California, County of Marin,* Case No. JV2690A (Prison Expert/**Testified at trial 5/5/2022**) (Criminal, Defense, Finding for defendant)

***In Re: Green****, Superior Court of California, County of Kern,* Case No. JW090568-02 (Prison Expert, Criminal, Defense, **Testified at Juvenile Hearing 10/5/22**, Defendant retained in prison)

***Strauss vs. CDCR****, Superior Court of California, County of Solano*, Case No. FCS053459 (Prison Expert, Civil, Plaintiff) Case dismissed at Summary Judgment.

***Weaver vs. CDCR****, Superior Court of California, County of Kings*, Case No. 18C0082 (Prison Expert) (Civil, Plaintiff, **Testified at Deposition on August 16, 2022**, **Testified at Trial on 5/26/2023**) Defense verdict.

***Carranza vs. Brown,*** *USDC, Southern District of California,* Case No. 3:14-cv-00773-GPS-AGS (Prison Administration, Use of Force Expert) (Civil, Plaintiff, **Testified at Deposition, 9/21/2020, Testified at Trial**, **1/26-27/2023**, Defense Verdict)

***People vs. Sims,*** *Superior Court of California, County of San Diego,* Case No. CS323291 (Prison Expert/Consultant) (Criminal, Defense, Settlement reached at trial)

***Sernas vs. Unknown Cantrell et al.,*** *USDC, District of Arizona,* Case No. CIV-19-00730-PHX-DJH-(ESW) (Prison Expert, Plaintiff, **Testified at Deposition, 1/5/2023**) **Case settled at trial, 12/9/2025.**

***Vaughn vs. Hampton, et al.****, USDC, Southern District of California,* Case No. 3:19-cv-01687-H-KSC (Civil, Plaintiff, Prison Administration and Policy Expert/Consulting, **Testified at Deposition 11/12/2020**, **Case settled before trial.**)

***Vaughn vs. Parker,*** *USDC, Southern District of California,* Case No. 3:18-cv-02098-JAH-MDD (Civil, Plaintiff, Prison Administration Expert/Consulting). **The case settled before trial in June 2024.**

***Anderson vs. Alameda County****, USDC, Northern District of California, Oakland Division,* Case No.3:22-cv-01577-DMR (Civil, Plaintiff, Prison Administration Expert/Consulting, **Case reached Settlement before trial**.)

***O'Neal vs. Clay County et al.****, USDC, Northern District of Mississippi, Aberdeen Division,* Case No. 1:21-cv-114-SA-DFAS (Civil, Plaintiff, Prison Administration Expert/Consulting)

***Harrison vs. Plains Regional, et al****., USDC, Eastern District of New Mexico,* Case No. 1:21-cv-00395-KWR/JFR (Civil, Plaintiff, Prison Administration Expert/Consulting, **Testified at Deposition 5/19/23**)

***Williams vs. Baker, et al****, USDC, Eastern District of California,* Case No. 1:16-cv-01540-DAD-HBK (Civil, Defense, Prison Administration & Use of Force, Expert/Consulting for USDOJ/US Attorney) **Trial 7/3/2025, Finding for Defendant. No Testimony at trial.**

***Herrera vs. The Geo Group et al.****, USDC, District of New Mexico,* Case No. 2:21-cv-00922-DHU-CG (Civil, Plaintiff, Prison Administration Expert/Consultant, Settlement Reached before trial.)

***Ortiz vs. Saidhamad et al.***, *USDC, District of Arizona,* Case No. 2:22-cv-01471-DLR-MHB (Civil, Plaintiff, Prison Administration Expert/Duty to Protect, Consulting, **Testified at Deposition 8/14/2024). Case settled before trial, October 31, 2025.**

***Smith vs. Baugh, et al***., *USDC, Western District of New York,* Case No. 1:16-cv-00906-LJV (Civil, Plaintiff, Prison Administration Expert/Consulting, **Testified at Deposition 10/20/23**). **Case settled before trial, 2024.**

***Pena vs. Cibola County et al.***, *USDC, District of New Mexico,* Case No. 1:22-cv-00516-JHR-KK (Civil, Plaintiff, Prison Administration Expert/Consulting). **Testified at Deposition 12/19/2025.**

***People vs. McKnight***, *Superior Court of California, County of Los Angeles,* Case No. TAO47574-01 (Criminal, Defense, Prison Administration Expert/Consulting) Finding for Mr. McKnight.

***Hernandez vs. City of Philadelphia,*** *USDC, Eastern District of Pennsylvania,* Case No. 22-0027 (Civil, Plaintiff, Use of Force/Prison Expert/Prison Administration Expert/Consulting). Settlement reached before trial.

***Ortega vs. USA***, *USDC, Eastern District of California,* Case No. 1:19-cv-00999-JLT-EPG (Civil, Defense, Use of Force, Prison Administration Expert/Consulting for USDOJ/US Attorney). Settlement reached before trial.

***Garcia vs. City of Farmersville et al.,*** *USDC, Eastern District of California,* Case No. 1:21-cv-00482-JLT-EPG (Civil, Defense, Prison /Jail Administration Expert/Consultant, Testified at Deposition, 7/13/23). Case settled before trial, May 13, 2026.

***Ponce vs. County of Tulare et al,*** *USDC, Eastern District of California,* Case No. 1:23-cv-00500-JLT-SKO (Civil, Defense, Prison Administration and Procedures Expert/Consulting)

***Moya vs. Coleman, et al,*** *USDC, District of Arizona,* Case No. 2:22-cv-00394-JAT-ESW (Civil, Plaintiff, Prison Administration Expert/Consulting, **Testified at Deposition, 3/13/24**). The case was **settled before trial** in June 2024.

***Chipps vs. Alaska Dept. of Corrections, et al.*** *In the Superior Court for the State of Alaska, Third Judicial District at Anchorage*, Case No. 3AN-21-06142 CI (Civil, Plaintiff, Prison Administration Expert/Consulting, **Testified at deposition on 7/15/2024.** Defense Verdict, did not testify at trial).

***Hehrer vs. Clinton County et al,*** *USDC, Western District of Michigan, Southern Division,* Case No. 1:20-cv-01079-JTN-RSK (Civil, Plaintiff, Prison Administration/Expert, **Testified at Deposition on 9/6/23**.

***Jovante Valentine vs. Torres-Quezada,*** *et al., USDC, Northern District of California,* Case No. 4:22-cv-01520-JSW (PR) (Civil, Plaintiff, Prison Expert, Use of Force, Inmate Politics, Tactical Alarm Response). Testified at Deposition on 3/1/2024. Testified at Trial on 9/16/2024 and 9/17/2024. Verdict for Plaintiff.

***Valeria Corbin, Administrator of the Estate of Joshua Patterson, vs. Bucks County, et al.,*** *USDC, Eastern District of Pennsylvania,* Case No. 2:23-cv-02784-WB (Civil, Plaintiff, Prison Administration, Inmate/Detainee/ Search & Facility Intake Operations, Introduction of Dangerous Contraband/Smuggling/Narcotics Prevention). Case settled before deposition or trial.

***Darryl Dunsmore vs. M. Thomas, Correctional Officer,*** *USDC Eastern District of CA,* Case No. 2:17-cv-2355 AC P (Civil, Plaintiff, Prison Administration & Operations, Use of Force). Case settled before trial in June 2024.

***Torres vs. Paredes, et al.,*** *USDC Southern District of CA,* Case No. 3:22-cv-0448-JES-JLB (Civil, Plaintiff, Prison Administration & Duty to Protect, **Testified at Deposition 5/17/24**). Case settled before trial in August 2025.

***Knight vs. Ashtabula County, et al.,*** *USDC Northern Division of Ohio, Eastern Division,* Case No. 1:23-cv-10193 (Civil, Plaintiff, Wrongful Death, Correctional Administration, Contraband Prevention, Safety and Welfare Monitoring). **Case dismissed before deposition/trial.**

***Estate of Maurice Monk vs. Wellpath, LLC et al.,*** *USDC, Northern District of CA,* Case No. 3:22-cv-40437 TSH (Civil, Plaintiff, Wrongful Death, Medication Pass Procedures for Officers, Correctional Administration, Inmate Safety and Welfare Checks). **Case settled before deposition 03/2025**.

***Estate of Angel Navarro vs. Tulare County Sheriff's Department, et al.,*** *Superior Court for the State of California, County of Tulare,* Case No. 300879. (Civil, Defense, Wrongful Death, Officer Emergency Response, Safety and Security Checks). **Case settled before trial.**

***Matthew Pagan vs. Edward McMahon et al.,*** *USDC, Eastern District of North Carolina, Southern Division,* Case No. 7:22-cv-1-FL. (Civil, Plaintiff, Negligence,

Wrongful Injury, Emergency Response, Use of Force, Access to Medical Care) **Testified at deposition July 9, 2025.**

***Estate of Yuriy Palaszeski vs. County of Stanislaus et al.,*** *USDC, Eastern District of California***,** Case No. 2:24-CV-01974-DJC-JDP**.** (Civil, Plaintiff, Wrongful Death) Corrections expert/consultant only, no testimony. Case **Settled** before deposition or trial. Notice received 10/20/2025.

***Daniel Bess vs. Joshua Peffley,*** *USDC, Northern District of California,* Case No. 3:22-cv-00341-JSC. (Civil, Plaintiff, Prison Administration and Procedures) **Testified at deposition on January 24, 2025.** Case Settled February 5, 2026.

***People vs. Roitfarb,*** *Superior Court of the State of California, County of Los Angeles,* Case No. BA457171-01(Criminal, Defense, Consulting Only, Post-Sentence Process of CDCR, CDCR Classification System)

***People vs. Webber,*** *Superior Court of California, County of San Mateo,* Case No. SCO67084 (Criminal, Defense, Juvenile Court, Prison Adjustment, Expert Report Only)

***Estate of Julien Deveroux vs. County of Kern, et al.,*** *USDC, Eastern District of California,* Case No. 1:23-cv-00239-CDB (Civil, Plaintiff, Prison/Jail Expert) (Summary Judgment Granted, Re-filed in State Court). **Testified at deposition on May 12, 2026.**

***Coderre vs. Burton, et al.,*** *USDC Eastern District of California,* Case No. 2:21-cv-00965-TLN-DMC (Civil, Plaintiff, Prison Administration Expert). Case settled before trial, October 20, 2025.

***Estate of Conrad Madrid vs. County of Tulare, et al.,*** *USDC, Eastern District of California,* Case No. 1:24-cv-00351-BAM (Civil, Defense, Custody Procedures Expert)

***Mack vs. Bucks County and Officer Smythe,*** *USDC, Eastern District of Pennsylvania,* Case No. 23-4386 (Civil, Defense, Use of Force and Correctional Administration Expert).

***Edwards vs. Swarthout,*** *USDC Eastern District of California,* Case No. 2:13:cv-2218 JAM DAD (Civil, Plaintiff, Prison Administration and Operations Expert – Modified Programs) Case Settled before trial, September 15, 2025.

***In Re: Valles,*** *Superior Court of California, County of San Joaquin*, Case No. JJC-JV-DE-2021-0325 (Criminal, Defense, Prison Expert).

***People vs. Tooker,*** *Superior Court of the State of California, County of Marin,* Case No. SC197709-SF-001971-A AES. (Criminal, Defense, Expert Report only).

***DeSoucy vs. County of San Bernardino et al***., *USDC, Central District of California,* Case No. 5:23-cv-01287-JGB-MAA (Civil, Defense, Jail Intake Procedures, In processing. Prison Expert).

***Akinola vs. Stafford-Schroyer***, *et al., USDC District of Maryland*, Case No.1:22-cv-00657-DKC. (Civil, Plaintiff, Prison Administration, Duty to Protect/Escort Procedures)

***Campbell vs. Mbah***, *et al., USDC District of Maryland,* Case No. 1:23-cv-00478-SAG. (Civil, Plaintiff, Use of Force, Prison Expert)

***Ellis vs. Arias et al.,*** *USDC, Southern District of California,* Case No. 3:24-cv-00713-WQH-AHG (Civil, Plaintiff, Failure to Protect, Prison Expert, R&R Expert). **Testified at deposition on March 12, 2026.**

***L. T. et al. vs. U. S. Immigration and Customs Enforcement, et al.,*** *USDC, Central District of California,* Case No. 5:26 – cv-00322. (Plaintiff, Civil, Living Conditions, Prison Administration, Prison/Jail Expert)

***ODale vs. Day et al.,*** *USDC District of Nevada,* Case No. 2:25-cv-01984-APG-NJK. (Plaintiff, Wrongful Death in Custody, Use of Force, Prison Expert).

***Hailey-Means vs. City of New York***, *USDC Southern District of New York*, Case No. 17-cv-05375 (SHS). Civil, Plaintiff,

***People vs. Wood,*** *Superior Court of CA, County of Santa Clara,* Case No. C1766176. (Criminal, Defense, Prison Adjustment, File Review, Report, Prison Expert).

***Overfield vs. Wellpath, L. L. C., et al.,*** *USDC Eastern District of California,* Case No. 2:24-cv-00199-TLN-AC, (Civil, Plaintiff, Prison/Jail Expert)

**TRAINING EXPERIENCE**

I have been a trainer and/or master trainer in the following:

- Use of Force Policy and Procedures (Master)
- Tactical Alarm Response (Master)
- Def. Tech. / Federal Arms Factory Certified Impact Munitions Instructor (Master)
- Inmate Transportation/Hospital Coverage (Trainer)

- Mechanical Restraint Application and Techniques (Trainer)
- Officer Safety Tactics (Trainer)
- Conflict Management (Trainer)
- Blood Borne Pathogens (Master)
- Electrified Fence Master Trainer (Master)
- Electrified Fence Trainer for Master Trainers (Master)
- Emergency Procedures (Trainer)
- Escape Procedures (Trainer)
- Inmate Staff Relations (Trainer)
- Litigation Procedures (Trainer)
- Range Safety Officer (Trainer)

I have been certified in the following:

- Disciplinary Hearing Officer
- Senior Disciplinary Hearing Officer
- FEMA Emergency Response
- CDC Internal Affairs Investigation
- Cardiopulmonary Resuscitation
- Basic First Aid
- Basic Supervision
- Advanced Supervision
- Sergeant's Academy
- Lieutenant's Academy
- Classroom Presentation Skills
- CDCR Emergency Operations- Conflict/Crisis Management
- Defense Technology/Federal Laboratories Factory Certified Impact Weapons and Munitions Instructor
- Equal Employment Opportunity (EEO) Counselor

**CURRENT AND PRIOR PROFESSIONAL AND COMMUNITY MEMBERSHIPS INCLUDE**

- California Narcotic Officers' Association
- Fraternal Order of Police, San Diego, Lodge #10
- Former Chapter President, Founding Member, California Correctional Supervisors' Organization (San Diego, Chapter 7)
- Former Job Steward, California Correctional Peace Officers Association
- Former Chief Job Steward, California Correctional Peace Officers Association

- Former Equal Employment Opportunity Counselor, R. J. Donovan Correctional Facility, San Diego, California
- California Correctional Peace Officers' Foundation
- California Correctional Peace Officers Association, Retired Chapter
- Member, American Legion, Post 26, Bakersfield, CA
- Lifetime Member, American Legion Post 209, Colorado Springs, CO
- Meudell Oildale Lodge No. 695, Free and Accepted Masons, Bakersfield, CA
- Kiwanis International Club, Bakersfield, California
- American Correctional Association
- Aircraft Owners and Pilots Association
- American Radio Relay League
- Committee Member, Citizens' Bond Oversight Committee, Bakersfield City School District, Bakersfield, CA.
- Member of the Board, Trinity Anglican Church, Bakersfield, CA
- Centurian Daylight Lodge No. 195, Ancient Free and Accepted Masons, Monument, CO.
- Member of The Board, Jackson Creek North Homeowner's Association, Monument, CO.

# EXHIBIT 19

Deposition of Gary Raney (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ESTATE OF LONNIE RUPARD, By and Through His Successors-In-Interest Justino Rupard & Ronnie Rupard; etc., et al., | ) | |
| Plaintiffs, | ) | |
| versus | ) | No. 3:23-cv-1357 CAB-JAC |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; etc., et al., | ) | |
| Defendants. | ) | |

REMOTE DEPOSITION OF

GARY L. RANEY

THURSDAY, SEPTEMBER 3, 2026

LESLI KELIGIAN,
CERTIFIED SHORTHAND REPORTER NO. 6006, RPR

11:45:22 ask a better question.
11:45:30 Where do you believe the custodial -- the custody security staff failed to perform their duties aside from the condition of the cell?
11:45:39 What evidence do you believe there is that they failed to do their duties with security checks?
11:45:47 A Again, I think the jury will find that likely unreasonable as the days passed by that nobody saw his physical condition and malnourishment enough to do something about it.
11:46:05 Whether they -- I can't say whether they're going to determine they saw it and ignored it or whether they never saw it. That would be up to them.
11:46:14 But my point is that the lack of proper safety checks that should have, as we discussed, well being, skin and breath, something over these days, and then the condition of cell both being likely harmful, but also an indication that somebody should have done something to verify his health.
11:46:40 Q Okay. Do you believe the security checks were regular and well documented?
11:46:51 A No.
11:46:52 Q Why?
11:46:56 A We don't know who checked on him when.

I, LESLI KELIGIAN, CSR No. 6006, RPR, certify: that the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was duly sworn; and that the transcript is a true record of the testimony so given.

Witness review, correction and signature was
(X) by code. ( ) requested.
( ) waived. ( ) not requested.
( ) not handled by the deposition officer due to party stipulation.

The dismantling, unsealing or unbinding of the original transcript will render the reporter's certificate null and void.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

Dated this 14th day of September, 2026.

Lesli Keligian
LESLI KELIGIAN, CSR No. 6006

# EXHIBIT 20

Deposition of Will Adams, Sept. 24, 2026 (excerpts)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF LONNIE RUPARD, THROUGH ITS COURT-APPOINTED ADMINISTRATOR TERRI LOPEZ | CASE NO. 23CV1357 CAB BLM |
| Plaintiff, | Assigned for All Purposes: Judge: Hon. Cathy Ann Bencivengo |
| v. | Courtroom: 15A |
| COUNTY OF SAN DIEGO; et al.; | Magistrate Judge: Janet A. Cabral |
| Defendants. | PLAINTIFF'S NOTICE OF DEPOSITION OF DEFENDANTS' EXPERT WILL ADAMS AND REQUEST FOR PRODUCTION OF DOCUMENTS |
| | Date: September 24, 2026<br>Time: 10:00 a.m.<br>Location: Remote |

---

ORAL AND VIDEOTAPED DEPOSITION OF

WILL ADAMS

THURSDAY, SEPTEMBER 24, 2026

VIA VIDEOCONFERENCE

---

Oral deposition of WILL ADAMS, produced as a witness at the instance of Plaintiffs, and duly sworn was taken in the above-styled and numbered cause on September 24, 2026 from 12:02 PM to 1:41 PM Central before Nephtali Diaz, Stenographic Court Reporter in the State of Texas, and Notary in and for the State of Texas, reported by machine shorthand method, pursuant to

A. Yes, sir, that's correct.
Q. May we go to the next page, page 14 of your report?
A. Okay, sir.
Q. I need to ask some questions. In this regard it states: "It is my opinion the deputies conducting security checks must remain at the cell long enough to determine whether any person inside the cell is in need of immediate or urgent medical or mental health care."
I want to show you, if I could, an exhibit that we have prepared of the certain -- of the safety checks that occurred on the video. We'll mark this as Exhibit 3.
(Exhibit 3 was marked.)
Q. (By Mr. Iredale) And let me, if I could, in order to orient you and counsel, describe what it is.
These are excerpts from the videos of the jail together with entries in the area activities log showing the time of the beginning of the 1153 and the person or persons who are signed in for that 1153.
It will last about a minute and a half to two minutes, and so what I'm gonna do is play it and ask you, if you can, to watch it and then I'll have some questions for you in light of your report and this additional video evidence.

MS. MUSUMECI: Gene, do you want me to just play each clip back to back or are you gonna stop in between?

MR. IREDALE: Back to back. Play all of -- all of the eight.

MS. MUSUMECI: Okay.

MR. KRUEGER: I've lost screen share. I don't know about anybody else. Okay.

MR. IREDALE: You should -- you should have it back at this point.

MR. KRUEGER: Yes, thank you.

MR. IREDALE: Just for counsel's information, these are sequential, so these are --

MR. KRUEGER: Ah.

MR. IREDALE: -- eight separate ones.

MR. KRUEGER: Sorry. I thought we were looking at one file. I see you're switching between. I got it.

MR. IREDALE: Yes, and I apologize. That was what I recalled, but apparently it's not in that format.

MS. MUSUMECI: That's the eight.

MR. IREDALE: All right.

Q. (By Mr. Krueger) I need to ask you some questions about the video in light of some statements

you made in your report.

A. Okay.

Q. You note, and I'm referring now to page 14: "It is my opinion that if the deputies who performed security checks and counts at Mr. Rupard's cell made a thorough observation of his physical and mental condition and took note of any decline in those conditions over time, they should have reported their observations to a qualified mental health professional or healthcare professional, as described above."

And that is your opinion at this time as well?

A. Yes, it is.

Q. Now you saw the eight excerpts and the cell in which Mr. Rupard was held, you understand, was D17 which was the upper tier of the module and the first video sequence had the red circle drawn around it, and you've observed now eight of the safety checks, so-called safety checks that were done.

In your opinion, were those sufficient to make the thorough observation of his physical and mental condition that would allow an assessment to be made?

A. In my opinion, I think I would have to qualify the opinion first by saying I don't know what they saw inside the cell. In my opinion, from the outside looking at it, I don't think they spent sufficient time

at the cell front to adequately determine the -- both what was happening, what should be happening during the count and/or what should be happening during a security check, keeping in mind that usually in most states, in most counties, counts, a security count, a formal count also classifies as a security check because it requires staff members to stay at the cell front.

That being said, those checks that I saw did not comport with my understanding of SDSO's policies nor would it -- would I say that I believe that the officers remained at any of the cells long enough during those checks to make an accurate assessment as to the mental and physical well-being.

Again, I don't know what they saw. So the qualification, that is if an officer walks by and sees an inmate inside the cell doing jumping jacks, the video won't show me that, but -- and it also doesn't tell me what the status of it was as far as the physical condition of the cell. You know, was it clean? Was it dirty? What odors were emanating from the cell?

But basically, the fact that the officers passed or the deputies passed by so quickly would lead me, in most cases, to say that wasn't long enough to really discern what was going on inside the cell.

Q. Fair enough.

it it remains your opinion today?
A. Yes, sir.
Q. Could I ask you to describe: Are officers trained that such conditions, without getting into psychiatric esoteric -- that such conditions may be indicative of a mental health problem that requires referral immediately?
A. Yes. Officers receive training for how to conduct security checks as well as recognition of inmates who may be suffering from physical and mental health issues, and within that training are some of the things that I've listed: An individual who's living in such conditions that most people would not feel comfortable living in it, living in and around their own feces; again, as I noted earlier, not eating meals, being emaciated. All of those things are things that officers are trained to look for in order to determine if this individual's in need of mental or medical, I guess, response or help.
Q. Thank you.
Let me now go to page 15 of your report. You say: "It is my opinion to a reasonable degree of certainty that the emaciated appearance Mr. Rupard presented with, condition of the cell at the time of Mr. Rupard's death, and presence of uneaten food and

feces present along with the smell, such conditions, would/should have been sufficient to draw the attention of any person passing by the area of his cell and triggered an immediate healthcare and mental health request."

Let me stop right there. That remains your opinion today?

A. Yes, sir.

Q. I noted in your report that you reviewed the deposition of multiple of the correctional officers.

A. Yes, sir.

Q. Do you recall in several of those where the correctional officers stated that the health conditions including feces within the cell were not uncommon in that module?

A. Yes, I do remember that, words to that effect.

Q. And is permitting that set of conditions of hygiene to remain over time as a not uncommon manner consistent with proper correctional practice?

A. No, sir, not at all. At any time an officer -- cells in that condition, inmates in those conditions, it should trigger an immediate response. As soon as the count is completed, as soon as security checks are completed, officers should be back at the cell determining what's going on, what's happening inside the

cell, taking notes and then utilizing those notes to talk to a supervisor, to summon nurses, to summon mental health people.

Q. Thank you so much.

Now I'm going to refer briefly to some things in your rebuttal report and ask some additional questions in that regard, and I believe you noted that you had no quarrel with Mr. Gary Raney's report and, in fact, agreed with one of his opinions regarding poor sanitation and feces which should have prompted the deputies to contact mental health.

A. Yes, sir. I believe that was my opinion.

Q. With respect to Mr. Cappitelli's report, I think you noted some areas of disagreement in light of the evidence you reviewed in your assessment. You, on page 2 of your rebuttal, said that he had opined that the deputies were, quote, attentive and conscientious in their interactions with Mr. Rupard during his incarceration up to and including hours, minutes, preceding his death, and you said that you disagreed. Could you tell me the basis for your disagreement.

A. The basis for my disagreement has to do with the -- starting with the condition of the cell. My definition of attentive and conscientious goes to being attentive not only trying to complete the task of doing

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ESTATE OF LONNIE RUPARD, THROUGH ITS COURT-APPOINTED ADMINISTRATOR TERRI LOPEZ | * | CASE NO. 23CV1357 CAB BLM |
| | * | |
| | * | Assigned for All Purposes: |
| | * | Judge: Hon. Cathy Ann Bencivengo |
| Plaintiff, | * | Courtroom: 15A |
| | * | Magistrate Judge: Janet A. Cabral |
| v. | * | |
| | * | |
| COUNTY OF SAN DIEGO; et al.; | * | PLAINTIFF'S NOTICE OF DEPOSITION OF DEFENDANTS' EXPERT WILL ADAMS AND REQUEST FOR PRODUCTION OF DOCUMENTS |
| Defendants. | * | |
| | * | |
| | * | Date: September 24, 2026 |
| | * | Time: 10:00 a.m. |
| | * | Location: Remote |

---

REPORTER'S CERTIFICATE

ORAL AND VIDEOTAPED DEPOSITION OF

WILL ADAMS

THURSDAY, SEPTEMBER 24, 2026

VIA VIDEOCONFERENCE

---

I, Nephtali Diaz, a STENOGRAPHIC COURT REPORTER in the State of Texas and NOTARY in and for the State of Texas, hereby certify to the following:

That the witness, WILL ADAMS, was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness;

That the deposition transcript was duly submitted on __________________ to the witness or to the attorney for the witness for examination, signature, and return to me by _______________________.

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and the amount of time used by each party at the time of the deposition:

Mr. Iredale (1 hr, 25 mins)
Attorney for Plaintiffs
Ms. Musumeci (0 hr, 0 min)
Attorney for Plaintiffs
Ms. Park (0 hr, 2 mins)
Attorney for Defendants
Mr. Krueger (0 hr, 0 min)
Attorney for Defendants

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action. Certified to by me on this 8th day of October 2026.

Nephtali Diaz

# EXHIBIT 21a-h

Video recordings of logged safety checks

**To be lodged with the Court.**

# EXHIBIT 22

San Diego County Sheriff's Department Detention Services Bureau Policy G.2.1 (Oct. 30, 2020) (COSD 006313–6314)

# LODGED CONDITIONALLY UNDER SEAL

Page withheld from the public filing.

**LODGED CONDITIONALLY UNDER SEAL**

Page withheld from the public filing.

# EXHIBIT 23

Rule 30(b)(6) Deposition of Melissa Quiroz, Jan. 8, 2026
(excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

---o0o---

| | |
|---|---|
| JUSTINO RUPARD, INDIVIDUALLY AND RONNIE RUPARD, INDIVIDUALLY,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE OF CALIFORNIA, INC; CHRISTINA ANOSIKE, IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; AGUILERA, M., VILADIU, J., MARTINEZ, G., SCHMITZ, D., AMADO, J., MACE, T., ACKERMAN, M., KEY, K., MOSER, M., AGUIRRE, E., JAMES, T., ROMERO, B., JOHNSON, M., TORRES, A., DELANEY, C., TREYVONNE, J., EVERSOLL, T., WERESKI, A., ROMANS, B., GUTIERREZ, L. IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTIES DOES 1-20; DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10,<br><br>Defendants. | Case No.: 23CV1357 CAB BLM<br><br>Fed.R.Civ.P30(b)(6) |

03:37 exactly as you suggested.
03:37 Now, who was responsible, if you know, for
03:37 ensuring that this policy was adhered to?
03:37 MS. FELDMAN: Vague and ambiguous.
03:37 THE WITNESS: I'm not sure. I'm not sure.
03:37 BY MR. IREDALE:
03:37 Q. All right. And when it says, [redacted]
03:37 did that apply to persons who had been
03:38 diagnosed as suffering with a psychiatric ailment,
03:38 as well as persons who were simply in solitary
03:38 confinement?
03:38 MS. FELDMAN: Objection. Compound.
03:38 THE WITNESS: It's not really talking
03:38 about -- it's not getting into details about that.
03:38 BY MR. IREDALE:
03:38 Q. Okay. Now, to your knowledge, has anybody
03:38 ever been disciplined for a violation of this
03:38 policy?
03:38 A. Oh, I don't know.
03:38 Q. And let me ask this question with respect
03:38 to the policies of the Medical Services Division:
03:38 Is there a person within the division whose
03:38 responsibility it is to ensure that the conduct of

the personnel is in accordance with the policies?
MS. FELDMAN: Vague and ambiguous.
THE WITNESS: I don't know a person. I don't know.
BY MR. IREDALE:
Q. Is there somebody in charge of making sure that these policies and procedures are adhered to?
MS. FELDMAN: Vague and ambiguous.
THE WITNESS: I can't identify a single person to say that that's as you stated.
BY MR. IREDALE:
Q. If somebody violates the policy and the procedure in the Medical Services Division, are they subject to discipline?
MS. FELDMAN: Vague and ambiguous and to the extent it's outside the scope of her testimony.
MR. KRUEGER: Join and incomplete hypothetical.
MR. IREDALE: Your answer?
THE WITNESS: I don't know.
BY MR. IREDALE:
Q. Let me ask you this: Has anybody, to your knowledge, in the years 2021 or '22 ever been violated -- ever been disciplined for violating the policy requiring monitoring three times a week by

03:40 nursing staff for people in segregation?
03:40 MS. FELDMAN: Objection. Outside the
03:40 scope of her testimony. Nursing staff would be
03:40 Serena.
03:40 THE WITNESS: I don't know if people have
03:40 been disciplined.
03:40 BY MR. IREDALE:
03:40 Q. Let's ask then about the QMHP. Has a QMHP
03:40 ever been disciplined for failing to a minimum of
03:40 one time a week monitor someone in administrative
03:40 segregation?
03:40 MS. FELDMAN: Objection. Lacks
03:40 foundation.
03:40 MR. IREDALE: To your knowledge.
03:40 MS. FELDMAN: Lacks foundation.
03:40 Incomplete hypothetical.
03:40 MR. IREDALE: Your answer, ma'am?
03:40 THE WITNESS: I don't know.
03:41 BY MR. IREDALE:
03:41 Q. Now, let me go on, [redacted]
03:41
03:41
03:41
03:41
03:41

CERTIFICATE OF REPORTER
---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [ X ] was [  ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e).)

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 18th of January, 2026.

Nicole O'Neil

Nicole O'Neil, CSR No. 10774

# EXHIBIT 24

Deposition of Anthony Cruz, M.D., Mar. 3, 2026 (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD, )
Plaintiff, )
vs. ) Case No.: 23CV1357 CAB BLM
COUNTY OF SAN DIEGO, et al., )
Defendants. )

VIDEOTAPED DEPOSITION OF ANTHONY CRUZ, M.D.

TUESDAY, MARCH 3, 2026; 10:08 A.M.

SAN DIEGO, CALIFORNIA

Reported by Debra D. Smalley, RMR, CSR No. 8513

MR. KRUEGER: We'll shoot for that, yes. Certainly.

MR. IREDALE: Okay.

VIDEOGRAPHER: We are off the record. The time is 12:18 p.m. Pacific Time.

(Off the record)

(LUNCH RECESS)

VIDEOGRAPHER: We are back on the record. The time is 1:10 p.m. Pacific Time.

BY MR. IREDALE:

Q Dr. Cruz, I was told that you have recalled now the name of Rogelio whom you used the nickname Roger for.

A Roger.

Q Would you tell me what his last name is?

A Avila. A-v-i-l-a.

Q Thank you so much.

MS. FELDMAN: Sorry, can you repeat that.

MR. IREDALE: Avila, A-v-i-l-a.

THE WITNESS: Yes.

BY MR. IREDALE:

Q Now, you had mentioned before we took our break that it was Rogelio Avila who made the list of patients for you to see, and he would triage the number of patients and list them in the order that he would ask

you to see them.
Did I understand that right?
MS. FELDMAN: Objection to the extent it calls for speculation.
MR. KRUEGER: Might misstate testimony, but go ahead and tell him.
THE WITNESS: It was -- every day was case by case, depending if he was getting informed by other clinicians. He would triage, but typically, he would just go by the psych sick call list that was in TechCare and go by that list to prepare the list of that morning.
BY MR. IREDALE:
Q Now, in that regard, do you know, was any record kept of the source of the referral for the TechCare list?
MR. KRUEGER: Calls for speculation.
THE WITNESS: Can you repeat the question.
BY MR. IREDALE:
Q Yes.
So you told me one of the sources for that list would be court orders?
A Yes.
Q Another source would be other clinicians?
A Correct.
Q Another source would be sick call?
A Yes.

health provider, any QMHP, was supposed to see them once a week. I re -- I recall that.
Q Now, may I just ask, were you a QMHP?
A I was a QMHP, yes.
Q Were you ever given -- I will suspend for a moment.
A Sorry.
Q It's -- no, no. It's an intractable problem.
A Okay. I will not touch it.
Q All right. Let's start again.
A Yes.
Q All right. My question to you is, were you ever given notification that, as a QMHP, you were being asked to see one or more inmate patients in segregation because they were required to be seen once a week?
A I was never required, as an outpatient psychiatry provider, to do those.
Q Now, this is a question about whether you know. You may know, you may not know.
A Yeah.
Q Do you know how the QMHPs were told that inmates -- this particular inmate is in ad seg and needs to be seen within this week?
Do you know how that was done?
A All I know is that the mental health clinicians

were -- that was their duty. That was not my duty. I was never asked to do it. I would have gladly done it, but I never was asked to do it.

Q Here's what I need to ask --

A Yeah.

Q -- you now.

As an administrative matter, you worked for Liberty, and I take it that, technically, your supervisor or boss was Dr. Ysla --

A Yes.

Q -- would that be fair to say?

A Yes. That's correct.

Q Now, some QMHPs also worked for Liberty. I believe at least two.

Am I right?

A Yes.

Q And their boss was Dr. Ysla?

A Yes.

Q The other QMHPs were County employees?

A Yes.

Q Do you know who their boss was?

MR. KRUEGER: Vague as to the category, but answer if you know.

THE WITNESS: Yeah.

There were different chief mental health

REPORTER'S CERTIFICATION

I, Debra D. Smalley, Registered Merit Reporter, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenograhically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript (X) was ( ) not required.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: March 22, 2026.

Debra D. Smalley

DEBRA D. SMALLEY, RMR
CSR NO. 8513

# EXHIBIT 25

Deposition of Christina Goodall, Dec. 16, 2024 (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JUSTINO RUPARD, individually, and RONNIE RUPARD, individually,

Plaintiffs,

vs.

COUNTY OF SAN DIEGO; BILL GORE, in his individual capacity, et al.,

Defendants.

Case No. 23-cv-1357-CAB-BLM

VIDEO DEPOSITION OF CHRISTINA GOODALL

DECEMBER 16, 2024

CARLSBAD, CALIFORNIA

Job No. 1312500

Pages 1 - 200

Reported by

Cynthia J. Vega, CA CSR 6640, RMR, RDR, CCRR 95

A. To support an individual with the condition that they may have had.

Q. Now, under this procedure for segregated inmates, section 2 under procedure reads as follows, [redacted] Let me stop right there.

As I understand your testimony thus far, you don't remember ever having specific training in this policy and procedure?

A. I remember being trained by my supervisor and staff, like mental health clinicians.

Q. I'm speaking now about this specific policy that we marked as Exhibit 16 --

A. Okay.

Q. -- that is headed "Segregated inmates." Do you see that?

A. Uh-huh.

Q. Now, my question is: Did you ever see that in connection with your work at the county jail?

MS. FELDMAN: See this policy section?

MR. IREDALE: Yes.

THE WITNESS: I don't remember.

BY MR. IREDALE:

Q. All right. Were you ever in any form

02:08:51 taught that [redacted]
02:08:59
02:09:01 A. It was based on when they were presented on
02:09:04 my sick call list.
02:09:08 Q. The phrase established frequency, have you
02:09:12 ever heard of it?
02:09:13 A. No.
02:09:14 Q. In any context in your employment?
02:09:16 A. Yes. Yeah.
02:09:18 Q. What was that context?
02:09:20 A. To check up on individuals when there was a
02:09:23 sick call presented.
02:09:27 Q. And sick call would be presented based on
02:09:30 the person's requesting to see someone in medical?
02:09:35 A. In mental health.
02:09:37 Q. In mental health?
02:09:37 A. Or staff in the jail.
02:09:39 Q. Well, was there, at any time that you were
02:09:42 there at the county jail, a procedure by which there
02:09:48 was an established regular review by you as a mental
02:09:55 health clinician of patients in segregation?
02:09:59 MS. FELDMAN: Objection. Lacks foundation.
02:10:02 THE WITNESS: It was when they would come
02:10:03 on my sick call list. That's what I was talking

about.
BY MR. IREDALE:
Q. In other words, there was no procedure by which you would see them without regard to whether they requested a visit on a weekly basis?
A. It would be if they would show up on my sick call list.
Q. And they would get on your sick call list because they would request?
A. Or staff members.
Q. They or staff members would request that?
A. Yes.
Q. My question is simply this. Without regard to a specific request --
A. Yeah.
Q. -- was there ever any procedure you were taught that with respect to inmates in ad seg they were to be seen on an established, regularized basis?
A. I don't remember that, sir.
Q. And you never did that, to your recollection; is that correct?
MS. FELDMAN: Objection. Asked and answered.
///

02:10:56 BY MR. IREDALE:
02:10:56 Q. Your answer? In other words, did you ever see anybody in ad seg on every week or every two weeks or every month without respect to whether they were on the sick call or not?
02:11:07 A. It wasn't -- it was more the sick call.
02:11:12 Q. Right. It was completely the sick call; right?
02:11:15 A. Yes. That was the policy.
02:11:18 Q. All right. Let me then go to subsection A. This says, [redacted]
02:11:45 That's what the document says. But with respect to that, you were never told "We want you to see the people in ad seg once a week every week" or words to that effect; right?
02:12:03 MS. FELDMAN: Vague and ambiguous.
02:12:05 BY MR. IREDALE:
02:12:05 Q. Do you understand the question?
02:12:06 A. Can you repeat it?
02:12:07 Q. Sure. Were you ever told "We want you to do a weekly round of the people in ad seg to do a

wellness check"?
A. It was individuals on my sick call list.
Q. Right.
A. Yeah.
Q. But not everybody?
A. Not everybody.
Q. For instance, you saw Lonnie Rupard on one occasion; right?
A. Yes.
Q. And that was the only time you saw him?
A. Yes.
Q. You were never asked to go around and see him every week; right?
A. No.
Q. Nor, to your knowledge, was anybody else on the mental health staff; right?
MS. FELDMAN: Objection. Calls for speculation.
MR. KRUEGER: Join.
BY MR. IREDALE:
Q. Your answer?
A. I can't speculate.
Q. Are you listening to the objection and then just repeating back the objection as your answer?
A. I'm listening to your question and

CERTIFIED SHORTHAND REPORTER'S CERTIFICATE

I, Cynthia J. Vega, a Certified Shorthand Reporter for the State of California, do hereby certify:

That the witness in the foregoing deposition was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported by me stenographically and were transcribed through computerized transcription under my direction; and the foregoing is a true and correct record of the testimony and proceedings taken at that time.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

IN WITNESS WHEREOF, I have subscribed my name this 30th day of December, 2024.

Reading and Signing was requested.

Cynthia J. Vega, CA CSR No. 6640, RMR

# EXHIBIT 26

Deposition of Serina Rognlien-Hood, Mar. 26, 2026 (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF LONNIE RUPARD, ) CASE NO. 23CV1357 CAB BLM
)
Plaintiff, )
)
v. )
)
COUNTY OF SAN DIEGO, et al., )
)
Defendants. )
________________________________)

*CONTAINS CONFIDENTIAL QUESTION, ANSWERS & EXHIBITS*

VIDEOTAPED DEPOSITION OF SERINA ROGNLIEN-HOOD

MARCH 26, 2026

10:23 a.m.

REPORTED BY: SOLOMON RODGERS JR CSR No. 14948

MS. FELDMAN: Standing objection. Individual capacity questioning. Does not bind the county. Outside the scope of rule 30(b)(6) scope.

THE WITNESS: Not that I can recall.

BY MR. IREDALE:

Q Section 2 then says, [redacted]

That's what the policy provides?

A Yes.

Q Any record that the nursing staff monitored Mr. Rupard three days a week during the time he was in custody from December 19, 2021, through the date of his death, 17 March, 2022?

MS. FELDMAN: Standing objection as to the individual capacity questioning outside the scope of the rule 30(b)(6) topics and calls for speculation. Lacks foundation. Lacks personal knowledge.

THE WITNESS: Not that I can recall.

BY MR. IREDALE:

Q This then goes ahead to say that,

I, SERINA ROGNLIEN-HOOD, hereby declare under penalty of perjury that I have read the foregoing transcript. Corrections, if any, were noted in ink, and the same is now a full, true and correct transcript of my testimony.

Executed this _______ day of _____________, 2026, at _________________________________, California.

_________________________________
SERINA ROGNLIEN-HOOD

I, SOLOMON RODGERS JR, CSR No. 14948, do hereby declare:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the

testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

_____ That the witness was requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

_____ Signature is Waived

_____ The changes made by the witness are appended to the transcript.

_____ No request was made that the transcript be reviewed pursuant to Section 30(e)of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this 10th day of April, 2026.

SOLOMON RODGERS JR, CSR #14948

# EXHIBIT 27

Expert Report of Homer Venters, M.D., July 10, 2026

# Exhibit 1

# Review of Care for Lonnie Rupard in the San Diego County Jail

## Introduction and Qualifications

I am a physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. This work included and resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous individual cases of medical release, the formulation of health-related policies, as well as testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

After my fellowship training, I became the Deputy Medical Director of the Correctional Health Services of New York City. This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care. I was subsequently promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer of the New York City jails. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, substance use treatment, quality improvement, re-entry and morbidity and mortality reviews, as well as all training and oversight of physicians, nursing, and pharmacy staff. In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices, including correctional officer responses to patients in distress, assessment after use of force injuries and medical observation and care for people in solitary confinement/segregation settings. My responsibilities during this time included review and approval of all medical and mental health policies, including those relating to intake health assessments, chronic care and sick call, emergency responses, mental health and substance abuse care, infirmary care, and transfer of patients for higher levels of care.

During this time, I worked closely with correctional leadership to provide training to correctional staff on traumatic brain injuries and other common injuries that occur during use of force. I have provided input on security policies and provided training for security staff relating to how correctional staff should recognize signs of illness and injury among incarcerated people. Part of my work in leading a jail health service has been to provide training to both health and security staff on how to safeguard patient confidentiality and ensure the delivery of care to patients in

both general population and solitary confinement/segregation housing areas. These trainings have included topics ranging from how security staff should recognize and urgently report health concerns to the medical staff, and how medical staff should work with security staff on provision of care and monitoring of high-risk patients.

In March 2017, I left Correctional Health Services of New York City to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges, and law enforcement staff on forensic evaluation and documentation, analysis of mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

Between December 2018 and April 2020, I served as the Senior Health Fellow and President of Community Oriented Correctional Health Services ("COCHS"), a nonprofit organization that promotes evidence-based improvements to correctional practices across the United States.

I have worked as a medical expert in cases involving correctional health since 2017. Several of the cases I have offered expert reports for relate to deaths that have occurred in the San Diego Jails.

During the COVID-19 pandemic, I worked on numerous COVID-19 responses in detention settings. During this time, I have conducted dozens of court-ordered inspections of detention facilities to assess the adequacy of their COVID-19 responses in ICE detention centers, county jails, and state and federal prisons. I was named as an independent monitor for COVID-19 response for both the Connecticut State Prisons and the Hawaii Department of Corrections, and I was named as COVID-19 inspector by a Federal Court for the Bureau of Prisons facility in Lompoc, California.

I have been named as Federal Court-appointed monitor for the health services in the Santa Barbara, California County Jail, the Fluvanna Prison for Women in the Virginia Department of Corrections and the Criminal Justice Complex in St. Thomas, United States Virgin Islands and the Cumberland County Jail. I have been retained by the U.S. Department of Justice and several State Attorney General's offices in their investigations into the adequacy of health services in jail and prison settings.

I have published two books on correctional health, both published by Johns Hopkins University Press; *Life and Death in Rikers Island (2019*) and *Outbreak Behind Bars* (2025).

**Role and Methods**

I have been retained by the Estate of Mr. Rupard to assess the adequacy of care he received in the San Diego Jail leading up to his death in 2022. I have also been retained to assess whether any failures to deliver the standard of care to Mr. Rupard reflect potentially systemic problems with

care in this facility. In order to formulate my opinions in this case I have reviewed the following information:

- San Diego County Jail medical records (COSD 000026-000150, 0026887-002801)for Mr. Rupard.
- Medical Examiner's report and autospyon the death of Mr. Rupard.
- Floor evacuation list for Module 7B on 3/18/22.
- Deposition testimony of Jon Mongomery, initial and follow up.
- Deposition testimony of Anthony Cruz
- Deposition testimony of Serina Rognlien-Hood
- Deposition testimony of Melissa Quiroz
- Deposition testimony of Michael Johnson
- Deposition testimony of Francis Ysla
- Deposition testimony of Dr. Sandeep Jouhal.
- Deposition testimony of Dr. Jean Kloker
- Complaint in Case No: 23CV1357 CAB BLM.
- Incident and Hearing Reports from 1/29/22 incident (COSD 000670-672, 000904-913) and 2/19/22 incident (COSD 000443-445)
- Job postings for San Diego Sheriff's Chief Medical Officer and Medical Services Administrator roles.
- San Diego Sheriff's Classification Navigator Report for Mr. Rupard.
- San Diego Sheriff's Department Policies;
    - "Segregated Inmates", G.2.1, 10/30/20.
    - "Refusal Procedures", MSD.R.5 1/6/22 and 7/14/16.
    - "Psychiatric Stabilization Unit (PSU)", MSD.P.8, dated 10/2/19 and1/24/22.
    - Psychiatric Stabilization Units" M25 dated 3/27/20.
    - "Psych Stabilization Unit-Admission Types" MSDP.15 dated 1/31/22.
    - Mental Health Evaluation and Screen MDS.E.5.1 dated 6/23/20.

- San Diego Sheriff's Follow-up Investigative Reports (I, II, III) regarding Mr. Rupard's death, from Det. Blumenshine.
- Dr. Montgomery's notes regarding Mr. Rupard's death.
- DOJ Death in Custody Reporting Form for Mr. Rupard.
- Contract between Liberty Healthcare and San Diego County (555357)
- California State Auditor's Report on San Diego County Sheriff's Department, February 2022.

**Medical Timeline**

Mr. Rupard was incarcerated in the San Diego Jail on 12/19/21 at the age of 46. Medical Clearance, General Informed Consent and Receiving Screening forms are present signed by RN Samonte between 2:20 and 2:55 am. These documents include notation that Mr. Rupard was willing but unable to sign these forms, without explanation as to why. These forms also have checked boxes for the following observations;

- Combative, assaultive or extremely hostile behavior
- Chronic conditions, psychotic disorders

These forms also document Mr. Rupard as not taking any medications, not having any history of suicide attempts or substance withdrawal. The area for past medical or psychiatric hospitalizations is left unchecked on the receiving screening form. The receiving screening form appears to lack any field to document whether or not prior jail medical records have been reviewed as part of the screening. The housing area disposition of the receiving screening is left without any housing area type checked.

A nursing note for COVID-19 test is present at 11:36 pm the same day. In this encounter, the nurse documents Mr. Rupard's refusal noting that he is verbally abusive and disheveled, and oriented only x 2. His pulse at this encounter is 110 but this is not addressed in either the assessment or plan of this encounter.

The request for other information (other medical records) appears to be checked as not indicated.

On12/20/21, a psychiatric sick call encounter is present with the information in the encounter reason "Refused tele 12/23 - denies that he will come. H/O extensive meds, Patton. Pt has hx of psych and was on medications during previous incarceration, please eval." This encounter is marked completed on 12/29/21.

On 12/24/21, Psychiatrist Cruz enters a note into Mr. Rupard's medical records with the information "Pt was scheduled for an initial evaluation, however due to limited time constraints, Pt was unable to be seen. Pt will be scheduled for Psych SC intake."

On 12/28/21, Psychiatrist Cruz enters a note into Mr. Rupard's medical records with the information "Pt was scheduled for an initial evaluation, however due to limited time constraints, Pt was unable to be seen. Pt will be scheduled for Psych SC intake."

On 12/29/21, a note is present from Dr. Cruz in Mr. Rupard's medical records. This note documents that Cruz attempted to see Mr. Rupard cell side, in a nonconfidential manner, and that Mr. Rupard refused to participate in this encounter. In this note, Dr. Cruz documents that Mr. Rupard was last seen by the jail mental health services during a previous incarceration on 7/11/20, with observations from that time including the following:

"Today multiple attempts were made to engage the Pt in conversation, however Pt yelled, rambled incoherently at times and was verbally aggressive throughout the interview. Pt was observed through his cell door window."

This note by Dr. Cruz on 12/29/21 includes the following diagnoses:

- Unspecified schizophrenia and other psychotic disorder by history
- Antisocial personality disorder by history
- Stimulant use disorder by history

The plan includes offering the medications Haldol, Cogentin andValproic Acid. The rationale for this plan is documented as "Due to Pt's presentation, psych hx, and potential for decompensation…"

This plan also includes that the next encounter will be "4-5 wks or sooner, if needed"

A nursing note on the same day records that "Psych encounter noted. Meds verified in eMAR."

On 1/15/22, a "psych chart review" note is present with the reason that "Inmate has been refusing medication." This encounter is marked completed on 1/20/22.

On 1/20/22, a note is present from Dr. Cruz stating that "Pt consistently refuses psych meds. At this time, will discontinue Haldol, Cogentin and VPA. Psych f/u is already scheduled." No assessment of decision making capacity for Mr. Rupard is present in this note.

On 1/29/22 at 11:24 am, a nursing note documents that Mr. Rupard was seen on the housing area floor after a use of force and that he had sustained head trauma.

Pt seen on housing floor s/p use of force. Per deputies, pt was taken down, no taser deployment. Noted w/laceration between eyebrows not actively bleeding, unable to further assess d/t patient repeatedly stating "I don't need a medic. Leave me alone, if you touch me I'll kill you" irritable, breathing even and unlabored. noted w/small abrasion to L side of face and some possible blood on lips. Assessment terminated for safety.

No vital signs are present and no assessment or plan are present in this encounter and no follow up is present later in the day with either a physician, nurse practitioner, physician assistant or nurse. No assessment of decision making capacity for Mr. Rupard is present in this note. There is no assessment of any type in this note, including any assessment that Mr. Rupard is "cleared" to return to his cell. The list of vital signs and sick calls for Mr. Rupard's medical record lack any entry for the day 1/29/22. The final words of this 3 line note by Nurse Romero are "Assessment terminated for safety".

On 2/1/22, an entry is present attributed to the QMHP with the information "IP has D/I. Pls assess. This encounter is marked completed on 2/9/22.

On 2/2/22, an entry for Chronic Care, Psychotic Disorders is present with no completion date. On 2/2/22, an entry for "Psychiatry Sick Call" is present with the reasons of "Refused 12/18. Last seen 12/29, f/u in 4-5 wks or sooner, started (offer) Haldol, VPA, Cogentin" This encounter

is marked completed on 2/22/22. A nursing entry from RN Kreiss at 9:46 pm documents that "Psych SC noted, no new orders." No assessment of decision making capacity for Mr. Rupard is present in this note.

A nursing note is present on 2/20/21 which includes one sentence, "per dep 5144 pt is on lockdown, no contraindication noted." No assessment of Mr. Rupard or review of his medical and psychiatric history is documented in this note. No mention of his facial/head trauma from three weeks earlier is made in this note.

On 2/23/22, an entry for QMPH Wellness Check is present in the medical records of Mr. Rupard. There is no completion date for this encounter.

On 3/17/22, note is present in the medical records from RN Mendoza that records Mr. Rupard is scheduled to be released the following two days and also states "no psych/critical meds".

An emergency room referral note is present in Mr. Rupard's medical records later the same day, at 11:09 pm. This note indicates that Mr. Rupard was found unresponsive in his cell, not breathing and without a pulse, that CPR was initiated and 911 transfer to an outside hospital initiated. A mandown assessment from 1:09 the following morning documents that nursing staff were alerted to respond to Mr. Rupard's cell at 10:50 pm, arrived at 10:53 pm and continued CPR which had been initiated by custody staff.

Refusal forms are listed in Mr. Rupard's medical records separate from the daily medication administration records, which show daily records of administration followed by a list of refusals for each medication including Benztropine (Cogentin), Haloperidol (Haldol) and Valproic Acid (Depakene). The MAR records show that Mr. Rupard's medications have administrations entered in between 12/29/21 pm and 1/20/22 am. His MAR documents that he refused medications occurred on all 22 am administrations and all 22 pm administrations, a total of 44 medication administrations. No medications were documented as being administered during this period.

There are 33 medication refusal forms present in Mr. Rupard's medical records during this time period, leaving 11 administrations unaccounted for. None of the medication refusal forms have Mr. Rupard's signature on them and none of them include any assessment of his understanding the risks/benefits of his refused medications or his decisional capacity.

During his 3 months of incarceration, Mr. Rupard's medical records show that the only vital signs recorded in his care occurred on 12/19/21, with an initial set taken at approximately 3 am within normal limits and a second set 20 hours later showing an abnormally elevated heart rate. The only weight for Mr. Rupard is documented on 12/19/21, at 165 lbs.

Review of the medication administration records refusals and signatures for consent for Mr. Rupard shows the following refusals of care or refusals to sign medical consent forms. Each part of his medical records has been reviewed for the presence of a signed refusal form and also for

the presence of assessment of decisional capacity or documentation that Mr. Rupard understood the risks and benefits of his refusal.

A general informed consent form is present from Mr. Rupard's entry to the jail on 12/19/21.

- [ ] Refused
- [ ] Patient accepts treatment, but declines to sign waiver
- [x] Patient is willing to sign, but unable to sign

There is no explanation from the nurse who completed the form as to whether Mr. Rupard appeared to have decision making capacity or understood the risks and benefits of consenting to care. There is no explanation of why this nurse perceived that Mr. Rupard was willing but unable to sign this form.

A nursing note for "medical services" is present on the same day, without any detail as to the type of medical services being offered or provided and without any explanation as to whether this form reflects a consent or actual offering of specific medical services. This form includes the checked box that Mr. Rupard is willing but unable to sign the form without any documentation as to why or whether he understands the risks and benefits of what is being offered.

I have also reviewed medical records for Mr. Rupard's 2019 incarceration in the San Diego Jails that mention his order for involuntary medication. One psychiatric progress note is present on 6/19/19 from Dr. Ysla which mentions Mr. Rupard's involuntary medication order. This note documents that Mr. Rupard was seen cell side "for safety concerns" and that he was seen by Dr. Ysla one month earlier, when Mr. Rupard was similarly not taking any medications. This encounter documents the following about Mr. Rupard, "On approach pt does not engage with the interview. He is clothed though he rambles nonsensically."

An order is present on the next page of Mr. Rupard's medical records for injection of the antipsychotic medication Haldol with the instruction "-court ordered, cannot refuse" as well as "rtc in 2wks". Mr. Rupard's medical records show that the Haldol was forcibly administered on 6/23/19 and at least one subsequent time on 7/6/19. Multiple notes by clinicians and at least one psychologist during this time document that Mr. Rupard was being held in an administrative segregation cell starting in February 2019.

The documents I have reviewed indicate that Mr. Rupard underwent a similar process in 2015, of involuntary medication order being imposed after he refused psychotropic medication.

**Review of Additional Information**

I have reviewed the Medical Examiner's report of Mr. Rupard's death. The Medical Examiner's report contains the following summary:

> Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions. Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

This report includes the following details about Mr. Rupard's access to care after his 2/22/22 cell side encounter with a psychiatrist.

> On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.
>
> No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

I reviewed San Diego Sheriff's Department Incident and Hearing Reports for two incidents involving Mr. Rupard, one on 1/29/22 and another occurring three weeks later on 2/19/22. The incident report and hearing report for the 1/29/22 incident indicate that Mr. Rupard was alleged to have been disrespectful towards staff, had made threats towards staff or incarcerated people, had refused to comply with instructions and had "took his food flap hostage";

> While conducting hygiene inspections in the 7th Floor "D" module, an inmate I later identified as Rupard, took his food flap hostage, spit and tried to grab at multiple deputies resulting in a use of force.

The incident report also lists inmate rights as part of this disciplinary process including the following:

Officer for disposition, you have the following rights:

1. The right to have a written copy of the charges(s) against you at least 24 hours prior to appearing before the Disciplinary Hearing Officer.

2. If you are illiterate or unable to represent yourself, you have the right to have a full-time member of the staff who is reasonably available to represent you before the Disciplinary Hearing Officer.

3. The right to call witnesses (or present written statements of unavailable witnesses) and to present documentary evidence in your behalf provided institutional safety would not be jeopardized.

4. The right to present a statement or to remain silent. Your silence may be used to draw an adverse inference against you. However, your silence alone may not be used to support a finding that you committed a prohibited act.

5. The right to be advised of the Disciplinary Hearing Officer's decision and the facts supporting the decision in writing.

6. The right to appeal the decision of the Disciplinary Hearing Officer by means of the Grievance procedure within 10 calendar days once notified of disposition.

7. I also have the right to an immediate hearing before the Disciplinary Hearing Officer if I sign a waiver.

The incident report also includes the following details:

> On 01/29/2022, Incarcerated person Rupard was provided a copy of the incident report and advised of their right to a disciplinary hearing. When offered the opportunity to appear at the Disciplinary Hearing, Incarcerated person Rupard refused to sign the disciplinary hearing rights waiver form and verbally abused the serving deputy.
>
> I find Rupard's behavior is disruptive, and he will not comply during the hearing.
>
> I find Incarcerated person Rupard guilty of the above-mentioned violation(s).
>
> I based my decision on the deputy's statement and interaction with Rupard
>
> Recommending five (5) days of Disciplinary Isolation.

There is no documentation on this form as to whether Mr. Rupard understood these charges or whether any representation was actually offered to him in responding to these charges. In addition, there is no documentation in the incident or hearing reports that Mr. Rupard's serious mental illness was ever considered as a potential cause of his behaviors. There is no documentation in the incident or hearing reports that any mental health staff were asked whether Mr. Rupard's serious mental illness was a potential cause of his behaviors.

One of the incident reports, written by Officer Wanzer, documents that Mr. Rupard sustained an abrasion on the top of his head during the use of force. This report includes the following description of Nurse Romero's interaction with Mr. Rupard:

> INJURIES:
>
> Rupard sustained a small abrasion on the top of his head. Nurse Romero (0710) medically evaluated Rupard and cleared him to remain in his cell.

I have also reviewed an incident report dated 2/19/22. An officer's description of the incident is included below:

At Approximately 1440 hours, Rupard was ignoring Deputies to return to his cell and lock down. Rupard was pacing back and forth and screaming to other incarcerated people with his shirt off and clinched fist. Deputy Costelow (3804) instructed Rupard to lock down numerous times. Ruppard would not comply with instructions. Ruppard threw the Module (D) trash at the gate door and threw the trash can at the module gate where Deputy Costelow, Deputy Spearman (3674) and I were standing. Deputy Gaspar (4313) broadcasted for available deputies to the 7th Floor Staging area for further assistance.

Once Sergeant Burkey #5144 and additional deputies arrived on scene, Deputy Costelow requested for Module (D) gate to be opened. Once the gate was opened Deputy Costelow secured handcuffs on Rupard and escorted him to cell 17. The handcuffs were removed through the cuffing port. No force was used.

This incident report states that Mr. Rupard is believed to be in violation of the following jail rules:

101 Inmates shall treat members of facility staff in a civil fashion.
102 Inmates shall obey staff instructions.
103 Inmates shall not threaten, assault or attempt to intimidate any other inmate or any
member of the jail staff.
105 Inmates shall not take part in aggressive or boisterous activity.
109 Inmates shall not maliciously throw any object.
701 Inmates shall not engage in any activity that impairs or interferes with the operation of the facility.

The incident report lists the same inmate rights as referenced above. There is no documentation on this form as to whether Mr. Rupard understood these charges or whether any representation was actually offered to him in responding to these charges. In addition, there is no documentation in the incident or hearing reports that Mr. Rupard's serious mental illness was ever considered as a potential cause of his behaviors. There is no documentation in the incident or hearing reports that any mental health staff were asked whether Mr. Rupard's serious mental illness was a potential cause of his behaviors.

I have reviewed the Follow-up Investigative Reports of the Sheriff's Department (I-III) regarding Mr. Rupard's death. Report I documents that Mr. Rupard was treated as being in Administrative Segregation because of his mental health status: "Rupard's housing block, 7D, was classified as COVID quarantine and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health."

The third report documents that D module was not included in the cleaning/hygiene protocols of the jail for high risk inspection and cleaning, and that this omission on module D "…would provide an explanation for the reason it was not being cleaned by deputies." The interview with Lieutenant Matrone detailed in this reports documents that while some cleanings occurred in the module D cells around Mr. Rupard, Mr. Rupard's cell was not cleaned.

I have reviewed photographs taken of Mr. Rupard's cell at the time he was found in distress on 3/17/22. They show his cell to be covered with trash, food and fecal material in full view of the cell entrance where the photos were taken.



I have reviewed autopsy photos of Mr. Rupard. These photos show that Mr. Rupard was cachectic at the time of his death, clearly having suffered a level of malnutrition or wasting that much of his fat and muscle tissue had disappeared. This wasting is easily seen in a lateral view of Mr. Rupard's ribs and hip area.



I have reviewed the San Diego Sheriff's policy titled "Psychiatric Stabilization Unit (PSU)", MSD.P.8, dated 10/2/19 and1/24/22 as well two policies titled "Psychiatric Stabilization Units" M25 dated 3/27/20 and "Psych Stabilization Unit-Admission Types" MSDP.15 dated 1/31/22.

I have reviewed the San Diego Sheriff's policy titled "Segregated Inmates", G.2.1, dated 10/30/2020. [redacted]

I have reviewed the refusal policies of the San Diego Sheriff's Department, "Refusal Procedures", MSD.R.5 1/6/22 and 7/14/16. Both the 2016 and 2022 policies mandate the following in section VIII of the policy;

"In all instances of refusal, physicians and nurses shall document health education provided and patient's understanding of the counseling."

I have reviewed several policies relating to PSU placement and operations (see Information Reviewed above). One common element to the PSU policies is that the unit is clearly identified as being an appropriate setting for patients who may pose a threat to themselves, others, or who are gravely disabled. These policies make clear that patients may be transferred into the PSU via voluntary or involuntary transfers and that a variety of clinical and Court-ordered triggers exist for PSU transfer. These policies also clearly identify that a Psychiatrist will be the staff member to initiate and to approve transfer. For example, the PSU Admission Types policy that was in place when Dr. Cruz saw Mr. Rupard on 2/22/22 (MDS.P15) has the following admission process;

PROCEDURE

I. Admission Procedure
   A. Referring provider will provide patient information to the unit's attending psychiatrist or on-call attending psychiatrist.
   B. Unit's attending psychiatrist or on-call attending psychiatrist in collaboration with referring psychiatrist will determine admission into the unit.
   C. Referring psychiatrist will initiate routine PSU admission orders.

One of the relevant requirements for patients admitted to the PSU (from PSU MDS.P.8) is that they all must receive a nursing assessment in their first 24 hours on the unit and a medical assessment within 24-72 hours.

I have reviewed the deposition transcripts of Dr. Jon Montgomery. Dr. Montgomery was the Chief Medical officer of the San Diego Sheriff's Department starting in 2019. He testified in his first deposition that between December 2021 and March 2022, his role included acting as "a medical advisor" and that he "acted as the health services administrator." Dr. Montgomery testified that during this time, the medical care in the jail was being provided by a vendor, Contracted Health Care Partners.

Dr. Montgomery testified in his first deposition that he reported to the jail's Health Services Administrator, or when that position was unfilled, he reported to a Captain in the Sheriff's Department and acted as the Health Services Administrator himself.

Dr. Montgonery was asked in his first deposition about how he supervised the providers working the jail and whether his role included oversight of the quality of care provided by the medical vendor, CHP. His responses included the following: "As these are independently licensed, board-certified doctors under -- under the California Medical Board, they are individually licensed.· They do not require immediate direct supervision."

When asked again in his first deposition about supervising or monitoring the quality of care provided in the jails by this outside vendor, Dr. Montgomery testified that he viewed his role as monitoring productivity and numbers of patient encounters. But when asked specifically whether he did anything to examine the quality of the care that was administered, Dr. Montgomery testified "That goes back to the supervisory role.· That's more -- far more specific than oversight.· · · · ·So, no, I did not do that."

When asked in his first deposition specifically about whether any audits of the quality of care provided by CHP staff were done by Dr. Montgomery or anyone in the Sheriff's Office, Dr. Montgomery testified "But, again, specifically about quality, that would be proxy for individualized assessments." When asked for specific examples of what the audits he referenced did encompass, he testified that examples included the number of encounters per month and the number of patients seen.

When asked in his first deposition whether there were any quality assurance or quality improvement meetings or discussions involving Dr. Montgomery and Dr. Freedland, the Medical Director of CHP during 2021 and 2022, Dr. Montgomery testified as follows;

"All right.· And did you have meetings with him in the year 2021 on the subject of QA/QI for CHP personnel?

ATo your point of time, 2021 to 2022, I spoke with him several times, yes.· The topics of those conversations would vary.· I can't say if it was related to QA/QI.

Q Did you ever have any regular meetings with him to discuss issues of QA and QI for the CHP doctors who · · · · ·MS. FELDMAN:· In 2021?

BY MR. IREDALE:

Q· That time period, 2021-2022?

A Sorry.· Again, the question again specifically to request -- asking about QA/QI?

Q Yes,· Did you have any meetings with him to discuss that subject during '21 and '22?

A As I just said, I don't know if I -- I talked with him on numerous occasions, but I don't recall if it was about QA/QI.

Q Was there any memorialization of concerns that you expressed to him, if any, about the quality of the care provided by CHP personnel?

MS. FELDMAN:· Assumes facts.

THE WITNESS:· You're asking if any conversation was memorialized and documented?

BY MR. IREDALE:

Q Yes.

A I don't believe so.· No."

When asked in his first deposition about his involvement in oversight of the mental health services in the jails, Dr. Montgomery testified as follows:

"Q What, if anything, did you have to do with mental health services at the jail?

A I was not involved."

When asked again in his first deposition about having any role in oversight of the quality of care being provided by outside vendors, Dr. Montgomery testified as follows:

"Q All right.· Let me let you know I'm referring now, in these following questions, to the time period of the years 2021 and 2022. As chief medical officer, were you responsible in any way for monitoring the quality of care provided by private medical contractors?

A During that stated time frame, individually, no. I was not monitoring the quality of the private contractors. Their hierarchy was providing oversight over their individual employees."

Dr. Montgomery testified that he was part of the mortality review for Mr. Rupard and that he wrote the summary for this meeting.

When asked who the Director of Nursing reported to in 2021 and 2022, Dr. Montgomery testified "I don't know exactly."

When asked whether he had a role in auditing of the provision of medical and mental health care by Sheriff's employees, Dr. Montgomery testified as follows;

"Q How about auditing?· Were you involved in any audits of the provision of mental health and medical care by sheriff's employees?

A No.· That was not my role...”

When asked in his first deposition whether any changes were instituted in medical or mental health practices as a result of Mr. Rupard’s death, Dr. Montgomery testified as follows:

“There's -- I don't recall if any changes were specifically attributed to this death.· But there are a number of changes that are -- that are always in process.”

Dr. Montgomery testified in his first deposition that he did review the entire report of the Medical Examiner regarding Mr. Rupard’s death.

When asked whether he had identified any recommendations for changes in policies or procedures specifically as a result of 30 day death reviews, Dr. Montgomery testified as follows:

“In the last two years.· Again, the same premise.· · · · ·Yes, as we said, that we've been making ongoing changes regardless of the -- the -- I cannot say whether or not it was associated with an in-custody death or not, but we've been making changes to policies and procedures.”

I reviewed the second or follow-up deposition of Dr. Montgomery. In his second deposition, Dr. Montgomery testified that part of his responsibilities was to monitor quality assurance.

Dr. Montgomery was asked in this deposition whether it was his job to oversee the jail physicians. He testified that “No. Those jail clinic physicians would be independently licensed and credentialed and would be falling under their collaborative agreement with their contracted medical director.”

He testified as follows regarding this issue if jail physician oversight;

“Q. All right. When you obtained your position as chief medical officer, were you told that one of the duties was to oversee the jail clinic physicians?

A. Not with words to that effect, no.

Q. Well, in the very bulletin that specified the job that offered the job with the advertised salary rates, you don't recall that overseeing the jail clinic physicians was one of the duties?

MS. FELDMAN: Object as to form.

Q. Your answer?

A. I don't recall the specific components of that description specifically talking about overseeing clinic physicians as part of the job description.

Q. So in 2022, did you oversee the jail clinic physicians? Yes or no?

A. No. I did not provide direct oversight over the jail clinical physicians, as you say.”

Dr. Montgomery testified that he did provide oversight “making sure that the clinics were staffed and that the clinics were being run.”

Dr. Montgomery testified that he did have conversations with the medical director of the physician group, Dr. Freedland, but when asked about discussion of any quality concerns ever being discussed, he testified as follows;

“Q. Not one? Do you recall any problem with quality provided by jail clinic physicians that you discussed with Dr. Freedland?

A. In 2021/2022? No, sir, I don't recall offhand.

Q. How about at any time?

A. Not at the present time.”

Asked specifically about issues with care ever being discussed, Dr. Montgomery testified as follows;

“Q. No. My question is, do you recall any a single instance of a particular discussion of any issue concerning the care provided by jail clinic physicians with Dr. Freedland in any year up to the present time?

MS. FELDMAN: Objection as to form.

THE WITNESS: Right now, no.”

Dr. Montgomery testified that he was aware of the job posting for his position that was shown as an exhibit during his second deposition and that he read the job responsibilities before he took the job.

Dr. Montgomery testified that he was working as the interim Medical Services Administrator in late 2021 into 2022 and that this was the position that his role of Chief Medical Officer reported to. He testified that part of the Medical Services Administrator role was to monitor and evaluate the performance of contractors. When asked specifically about monitoring or oversight of Liberty Healthcare, Dr, Montgomery testified “No, I was not involved with any direct coordination with Liberty Healthcare. I was actually assisting -- it was Captain Duke at the time who was the sworn component who was servicing that element of the medical services administrator role.” When asked whether he ever learned the obligations of Liberty Healthcare in their contract for providing care, Dr. Montgomery testified “No, I did not work on the mental health components to address those given elements.”

When he was asked about the mortality review that occurred within a 30 day time period, unrelated to the CIRB process, Dr. Montgomery testified as follows:

Q. After the conclusion of the CURB investigation,

were there any changes in the practices or policies of

the medical services division?

MS. FELDMAN: Objection as to form.

THE WITNESS: I don't know. I'm not a member

of CURB, and I'm not privy to any of the CURB results.

BY MR. IREDALE:

Q. So you, yourself, have no knowledge of the

ultimate determination of the CURB investigation; is

that correct?

A. That's correct.

When he was asked about the NCCHC policies relating to mortality reviews, Dr. Montgomery testified that he was the responsible health authority referred to in the NCCHC policy. He was asked "What, if anything, did you do to improve care as a result of your review of Mr. Rupard's death, if anything?" His answer was "Myself? I did not do anything."

Dr. Montgomery was asked about a finding in the 2019 NCCHC audit that there was no peer review process in place for physicians, psychiatrists, or psychologists. When he was asked in this deposition whether he had implemented such a process in 2022, Dr. Montgomery testified "No" and that no such process was in place in 2022 for either medical or psychiatric contract providers.

Dr. Montgomery was asked twice whether he agreed with the findings in the Medical Examiner's report regarding the cause of death for Mr. Rupard and testified as follows;

"Q. I'm sorry. Do you disagree that Mr. Rupard died of dehydration, malnutrition and pneumonia?

MS. FELDMAN: Objection as to form.

MR. KRUEGER: Join.

THE WITNESS: Just to clarify, those are findings that was not the cause component that those were contributing to. And yes, I agree those were listed as part of the report."

He also testified as follows;

"Q. Based on your review, do you quarrel that was the cause of his death?

MS. FELDMAN: Objection as to form.

MR. KRUEGER: Join.

THE WITNESS: I just said they were contributing to. They weren't the cause. He didn't say that they were the cause. We could certainly go ahead and look at the medical examiner report."

I have reviewed the deposition testimony of Serina Rognlien-Hood. Ms. Rognlien-Hood testified that she was a Deputy Director in the San Diego Sheriff's Department and that her role was "oversee the nursing directors who oversee the supervisors who oversee the care of the detention facilities.· So I oversee the nursing care of the detention facilities." Ms. Rognlien-Hood testified that the refusal policy in place in 2021 and 2022 required that patients who refuse medication or health encounters have their refusal documented on a refusal form with the patient's signing the form or the nurse or provider signing and an additional witness if the patient refused to sign. In addition, she testified that the first time a patient refused a medication for a serious health problem (as specified in the refusal policy as "indicated for a serious medical/psych condition") then the process detailed in the refusal policy including filling out a refusal form, clinical documentation and a provider referral were required.

I have reviewed the deposition testimony of Anthony Cruz, D.O. Dr. Cruz testified that he trained as a psychiatrist and that his role in the San Diego Jails started in March 2020. Dr. Cruz testified that when he went to see Mr. Rupard 12/29/21 for a psychiatric sick call encounter, he was not able to make an independent assessment of Mr. Rupard's diagnosis because he "…was not able to speak with him and get a full interview…". Dr. Cruz testified that the treatment plan after his encounter with Mr. Rupard included administration of intramuscular injection of the antipsychotic medication Haldol

Dr. Cruz characterized his earlier encounter July 11, 2020 with Mr. Rupard as follows;

"Immediately I got confronted with yelling, cussing, lots of profane language.· Definitely could hear "I do not want f'ing medication."· And then when I say "rambling incoherently," I knew he was Filipino so I could almost sense that he was speaking in some Tagalog, so I was trying to speak to him Tagalog, also. I'm Filipino, also, so I was trying to build rapport, but he continued to scream, it did not help, and so he just -- I recall him just constantly yelling and being angry to just get away.· 'I do not want meds.'· And my deputy at that time -- yeah, wanted to conclude the interview because it was escalating, yeah."

Dr. Cruz testified that when he attempted to speak with Mr. Rupard, it was through the cracks or gaps in hinges of the locked cell door, "Where the handle -- the hinges are, that's the best place to speak to the inmate."

Dr. Cruz confirmed in his testimony that he documented Mr. Rupard as facing the potential for decompensation on 12/29/21 and that he ordered the withdrawal of medication orders for Mr. Rupard due to noncompliance 1/20/22. When asked whether he took any steps to check on Mr. Rupard for decompensation between 1/20/22 when medications were terminated and the next scheduled encounter, Dr. Cruz testified that "I relied on my clinicians, my deputies, to tell me if there -- if he had been decompensating or knowing that he already had a follow-up appointment,

so I did not feel that I needed to see him sooner because I had not heard any type of report from my clinicians, my deputies, saying that this person needs to be seen sooner."

He testified that a nurse and clinician would have been going to see Mr. Rupard during this time and he believed he would have been informed by them or custody staff if Mr. Rupard appeared to be decompensating, was psychotic or had food and trash around his cell.

When Dr. Cruz was asked what a hunger strike is, he responded "Someone that we were concerned about refusing to eat for whatever reason.· They could be on strike.·"

Dr. Cruz was asked "So I take it that you assumed that if somebody was not eating or was losing large amounts of weight the sworn staff would notify you?"

He responded that 'They would notify me, notify medical."

When asked whether all patients in the PSU were there for a 5150 hold, Dr. Cruz testified that this was the case most but not all of the time. When asked for an example of a person who might be in the PSU for a non-5150 reason, he cited psychogenic polydipsia, a condition of excessive water intake.[1] He testified that he had the authority to admit patients to the PSU in 2022.

Dr. Cruz testified that his next encounter with Mr. Rupard on 2/22/22 occurred through a locked cell door, lasted several minutes and that he documented being unable to assess Mr. Rupard for multiple parts of the psychiatric exam he was attempting to conduct including mood and affect, thought content and perception. He agreed that he documented Mr. Rupard as yelling and incoherent at times and that he was possibly responding to internal stimuli. He confirmed that he gave a diagnosis by history in this encounter and that he was not able to give a current diagnosis.

Dr. Cruz testified that he was unaware of Mr. Rupard's death until he was notified about the current lawsuit. When asked whether medical competency evaluations for patients were available in the jail medical records, Dr. Cruz testified that "It's hard to recall.· Typically they would, but sometimes they didn't, so it was difficult to find.· So I can't say if they were uploaded into the person's medical -- electronic medical record. If I had access to them."

When asked whether he had reviewed prior records that showed Mr. Rupard previously refusing to take medications in jail in 2015 and 2019, or records documenting that Mr. Rupard had previously been ordered for involuntary medication, Dr. Cruz responded to each of these questions with "No". Dr. Cruz was asked if he had reviewed a specific court order regarding Mr. Rupard stating, "The defendant lacks capacity to make a decision regarding antipsychotic medication.· The defendant's mental disorder requires medical treatment with antipsychotic medication, and if the defendant's mental disorder is not treated with antipsychotic medication, it is possible that serious harm to the physical or mental health of the patient will result." Dr. Cruz

[1] https://bestpractice.bmj.com/topics/en-us/865.

testified that he had not reviewed this information when he was treating Mr. Rupard in 2021 and 2022.

Dr. Cruz testified that at the time he was seeing Mr. Rupard, he had the ability to admit patients to the jail PSU and that there were mechanisms to obtain an order for involuntary medication administration in the PSU. He agreed with the definition of gravely mentally disabled as including the inability to take care of basic needs for survival.

Dr. Cruz testified that he has seen reports similar to the ones written by Dr. Badre regarding Mr. Rupard, but when asked if Dr. Badre's specific report was available for him to review, he testified "I can't say for a fact. I do not recall."

Dr. Cruz testified during deposition that his diagnosis of Mr. Rupard on 12/29/21 was based entirely on historical information. Dr. Cruz testified that his workflow as the sole outpatient psychiatrist at the time he was Mr. Rupard in 2021 and 2022 involved being given a hard copy of patients to see, and him handing that hard copy back to an assistant with notations about the time for return visits or other dispositions such as "not seen." He testified that he would use a list of electronic medical record to document the individual patient encounter notes.

Dr. Cruz testified that when he arrived in the jail, Mr. Rupard was scheduled for a telepsychiatry encounter on 12/20/21 with Dr. Jan, but that he refused to come to that appointment. He testified that he came to see Mr. Rupard as a result of the original encounter with Dr. Jan not occurring. Dr. Cruz also testified that there were multiple barriers to seeing patients including a lack of security staff or not being allowed onto a housing area.

Dr. Cruz testified that he was the only psychiatrist who saw Mr. Rupard during his incarceration in 2021-2022, but that he was also unsure whether other psychiatrists could have been tasked with seeing Mr. Rupard. When asked about other psychiatrists, Dr. Cruz testified "I can't vouch if he was scheduled for another time or someone else attempted -- you know, there were other potential psychiatrists that could have seen him, but these are the times that I assessed him." Dr. Cruz testified that he assumed mental health clinicians were seeing Mr. Rupard.

I have  reviewed the deposition testimony of Christina Goodall, a therapist in the San Diego jail. She testified that she had one encounter with Mr. Rupard during his 2021-2022 incarceration as part of a sick call encounter and that she was not aware of any plan to have him seen weekly or more often.

When she was asked whether seeing patients in administrative segregation was driven by individual sick call requests or whether there was some plan for regular clinician visits for patients in segregation, Ms. Goodall testified as follows;

"…was there ever any procedure you were taught that with respect to inmates in ad seg they were to be seen on an established, regularized basis?

A.I don't remember that, sir."

When asked to clarify this approach, whether there was ever a time she would see people on a weekly or regular basis or whether it was strictly driven by sick calls, Ms. Goodall testified as follows;

Q. "Your answer?· In other words, did you ever see anybody in ad seg on every week or every two weeks or every month without respect to whether they were on the sick call or not?

A.It wasn't -- it was more the sick call.

Q.Right.· It was completely the sick call; right?

A.Yes.· That was the policy."

Ms. Goodall testified to the gatekeeping role she served in referring patient concerns to a psychiatrist;

"Q.So your job as the QMHP was to exercise that gatekeeping function of referral to a psychiatrist in the event you believe somebody fell under the definitions, as you were taught, of gravely mentally disabled?

A.· ·Yes.· Recommendation to a psychiatrist."

Ms. Goodall testified that the sole encounter she had with Mr. Rupard was cell side and that she could not recall whether she reviewed any records from previous incarcerations in the jail before she saw him. She testified that she did not recall reviewing any past medical records after the encounter, which lasted approximately 5-10 minutes. She stated that she was unaware of when or for what reason a patient would be weighed in the jail, "I wouldn't know because that's out of my scope." When asked about her encounter with Mr. Rupard on 2/9/22, Ms. Goodall testified that she was unsure why Mr. Rupard was added to her sick call list to conduct a wellness check. She testified that Mr. Rupard was in administrative segregation when she saw him and that this was reflected in her encounter designation of "segregation/confinement" in her note.

"Q.When you say "He will continue to be monitored for safety concerns and GD," tell me what GD means.

A.Gravely disabled.

Q.And may I ask, with respect to this continuing monitoring, was that to be done by yourself?

A.And the psychiatrist -- more under the psychiatrist."

She testified that for multiple parts of her planned assessment, she was unable to assess Mr. Rupard. Ms. Goodall testified that for one of the areas of her note, she believed at the time of the deposition that she actually intended to click on "appropriate to situation" instead of "impoverished" for thought content.

Ms. Goodall testified that sometime after her initial encounter with Mr. Rupard, he did appear on her sick call list but that she did not see him because the sick call was completed when he saw the psychiatrist. She testified that she never discussed Mr. Rupard with Dr. Cruz.

I reviewed the deposition testimony of Melissa Quiroz, a mental health counselor who testified regarding policies and procedures regarding sick calls as well as ensuring adequate treatment for inmates suffering from schizophrenia and mental health and psychiatric care of inmates refusing food and/or fluids all during the years 2020-2022. She testified to the policies and procedures regarding transfer into the PSU and oversight of the quality of psychiatric care to inmates by Sheriff's employees and private contractors during the same time period. Ms. Quiroz testified that she started working as a mental health clinician in the San Diego Sheriff's Department in 2016 and subsequently became the Chief Mental Health Clinician and then became the Group Program Manager in the jail.

Ms. Quiroz testified that she was unaware whether patients with schizophrenia were housed in administrative segregation on Module 7D. She testified that she did not know whether patients with mental illness were housed in administrative segregation on Module 7D.

Ms. Quiroz testified that she was aware of the segregation policy that required mental health and nursing wellness checks for patients in segregation settings and that she had reviewed Mr. Rupard's medical records, but she was unable to recall if any of these checks were in the medical records of Mr. Rupard; "I can't confirm or – I can't confirm or deny if it was in the note.· I do not recall that being in the note."

I have reviewed the deposition testimony of Dr. Francis Ysla, the Chief Psychiatrist for Liberty Healthcare, the company that provided mental health services in the San Diego jails. Dr Ysla testified that he was not aware of Mr. Rupard's death until the lawsuit was filed after his death, sometime in 2025. Dr. Ysla testified that Liberty Healthcare provided care in the San Diego Jails until June 2022. When asked whether he could think of any psychiatrist besides Dr. Cruz that would provide on-site outpatient psychiatric services at the Central Jail when Mr. Rupard was held there, Dr. Ysla testified "In person, no, but we did have a tele-psychiatrist." Dr. Ysla testified that he provided oversight for all the psychiatry services provided by Liberty Healthcare. He testified that "A lot of the times we use the PSU as a way to obtain an involuntary medication order." Dr. Ysla testified that he had not seen the clinical notes of Dr. Cruz regarding Mr. Rupard's care and that "I don't recall being aware of his case at the time that he was incarcerated. But again, we may have discussed this case at some point. I just don't recall." Dr. Ysla testified that he was provided policies and procedures regarding medical and psychiatric care in the jails by San Diego County and that he had the role of providing guidance on the policies and procedures for new hires at Liberty during orientation. He also testified that he recalled a specific requirement for patients in administrative segregation to be monitored; "I believe the policy stated that a mental health clinician was required to see that individual with some frequency, which I don't know." He also testified that he believed this requirement was for

County personnel. Dr. Ysla testified that he discussed individual cases with Dr. Montgomery in which the County identified discrepancies in care documentation.

When he was asked whether there were any QI/QA audits or discussions of psychiatric care in the final year of the Liberty contract at the San Diego jails, Dr. Ysla testified as follows;

"Q. Now, can you tell me if you recall any discussions of QA-QI as it related to psychiatric provision of care by Liberty during that last year of those QA-QI meetings?

A. No.

Q. Are you saying no such occurred or you can't remember any?

A. I don't recall there being any specific topics of psychiatry for QI-QA during those meetings during the last year."

Dr. Ysla testified that he was never notified by any County official about Mr. Rupard's death. He did testify that he had participated in approximately eight reviews of care for patients who died in the San Diego County jail, but that this was an "internal" review with "Corporate headquarters". When asked whether he ever discussed any of these reviews of patient deaths in the County Jail with the Jail's Chief Medical Officer, Dr. Montgomery, he testified "No".

I have reviewed the deposition testimony of Dr. Sandeep Jouhal. Dr. Jouhal testified that she worked as a psychiatrist for Liberty Healthcare between 2017 and January 2022 working in the PSU. She also testified that he was unaware of Mr. Rupard's name and learned of his case in the news two months after he left the Sheriff's' Department. She testified that early in his time running the PSU, she was the sole person to admit patients but that over time, other psychiatrists and also clinicians could admit patients to the PSU. She testified as follows;

"Q. And when you say the qualified mental health professionals who work in the jail, are you referring to psychiatrists who can admit, without needing additional authorization, a patient into the PSU?

A. No. I'm referring to the mental health clinicians and the psychologists who worked, you know, on an outpatient basis and who were routinely seeing the patients in the outpatient setting, as well as the psychiatrists. So it could be any one of them."

Dr. Jouhal testified that one pathway of PDU admission could involve when a patient was "…neglecting yourself and not eating, not drinking, and not having the insight to engage in any kind of treatment." When asked about refusal to take medications as part of the PSU admission criteria, she testified that "That would happen more often than not, and in that case, you had to actually clinically assess the patient to see how decompensated he is. And if he's not taking care of himself, of his basic needs, then he would be admitted to PSU. But not every patient who refused medication met the criteria."

She testified that PSU admission could depend on non-psychiatrist detecting when a patient was decompensating; "Like, the mental health clinicians and psychologists, as well, they used to see patients more frequently than the outpatient psychiatrist, so they were the ones who would pick up whether the patient is decompensating. And then they would go to the outpatient psychiatrist and raise the alarm, like alert them or express their concerns."

Dr. Jouhal testified that meeting criteria for grave disability and PSU admission was "not difficult" and gave the following as an example; "If a patient was making threats to harm others but in the context of a mental illness, then they were a danger to others, so they were admitted. And for grave disability, if a grave disability, basically, if they're not able to – if they're not taking care of their basic needs. They're not eating or they're just neglecting themselves, not doing their ADLs, activities of daily living, then they would meet the criteria for grave disability."

Dr. Jouhal testified that January 2020 jail medical records for Mr. Rupard did show that he had been diagnosed with schizophrenia and psychosis while at Patton State Hospital. She also testified that she ordered continuation of three medications that were started at the State Hospital, an anti-psychotic medication, a mood stabilizer and a medication to combat extrapyramidal side effects. When asked about whether it was important to quickly review and order these medications for Mr. Rupard when he returned from Patton State Hospital, Dr. Jouhal testified "Yes. Because we were trying to continue their care and we did not want them to miss any dose."

Dr. Jouhal testified that she was not surprised when she learned of Mr. Rupard's death "given the conditions of the jail". When asked to explain this lack of surprise, she cited another death of a patient before Mr. Rupard died who had not been eating or drinking and was found dead in his cell by custody staff. She testified that "A few months prior to this news, while I was working, I don't recall any names or anything, but an inmate had died in George Bailey Detention Facility. He had not been eating and drinking, and three days later, the custody found him dead. So that was a reflection of the kind of care."

I have reviewed the deposition testimony of Dr. Jean Kloker. Dr. Kloker testified that she is a psychiatrist who worked via *locum tenens* assignment for Liberty Healthcare in the San Diego Jail between February and May of 2022. Dr. Kloker testified that she worked in the PSU and that she was unaware of Mr. Rupard's death until shortly before the deposition but was generally aware of multiple deaths occurring;

"Q. So it's true that you learned of his death about two months ago when you found out about this case?

A. Well, specifically, I knew there had been several losses, but I didn't -- I did not remember that one specifically, since I had no contact with..."

Dr. Kloker testified that during her time working in the San Diego Jail, she was the only PSU psychiatrist. She testified that she was not involved in deciding who would be transferred into the PSU. “I had nothing to do with anything that happened before they physically arrived in the PSU.” When asked whether it would her role to admit a patient to the PSU, she testified “It would have been someone else.” I have reviewed the deposition testimony of Michael Johnson. Mr. Johnsons testified that he worked as a Sargeant in the Sheriff’s Department, including working in the jail. Seargent Johnson testified that aside from formal Administrative Segregation status, a person could be confined to their cell for 23 hours per day for other security reasons. He testified that “·One example would be when there was a rule violation report written on them and they were in a lockdown status.” He testified that “If somebody was in their cell for 23 hours a day, that could be a number of different things.”

Sargeant Johnson testified that he was asked to help conduct a safety check on Mr. Rupard the day before his death, March 16th 2022, one day before he died. He testified that another person had died in the Module 7D and that a detective had asked for a welfare or safety check on Mr. Rupard. Sargeant Johnson testified as follows about the check on Mr. Rupard;

“A.I remember that he came down to ask me if we could do one.· We went up to the cell, up to I believe it was No. 17.· I called Rupard's name from the door and he had not responded at that time, so we asked for the door to be opened. We both stepped into the cell.· I called his name one more time.· He did not respond, so I went up. He was laying on the bed and I gave his shoulder a push with one of my hands and just called his name.· He gave an angry response and so we backed back out.

Q. What was the angry response?

A.It really wasn't a word.· It was just like a grunt.· It was just a sound.”

Sargeant Johnson was asked multiple questions about the condition of Mr. Rupard’s cell, and he responded that he did not recall to all of the questions about odor, trash, feces, food, the sink and toilet. He testified that prior to March 16th and 17th, Mr. Rupard acted aggressively towards him;

“In general, he was relatively aggressive. We -- I remember serving meals to him just at the door. We opened the little portal to pass food in.· He would swipe at it.· He would yell and scream at the door.· He liked to spit at the window. So just general aggressive behavior.

Q.And did you observe any of that behavior on March 16th or March 17th?

A.Not that I recall.· I just remember the one welfare check where we went in to check with him.· He made the one sound and just because of his prior aggressive behavior, we're like, okay, let's step out. Just make sure everything stays safe.”

I have reviewed the floor evacuation sheet for Module 7D on 3/18/22. This 5 page document appears to contain information about 16 people held on Module 7D on 3/18/22. Among the 16 people listed in this document, 14 are designated as “Ad Seg” while one is designated as

"Protective Custody" and one has no designation. Two of the people designated as "Ad Seg" also have a designation of prior suicide attempt.

I have reviewed the job position postings for San Diego Sheriff's Chief Medical Officer and Medical Services Administrator. The Chief Medical Officer position role starts with the description that this staff member will be hired "To direct all clinical functions of the Sheriff's Department Medical Services…" The role is also described as being "responsible for all clinical/medical decisions within the Sheriff's Detention Medical Services, and all policies and operations concerning patient care, welfare, and treatment."

The specific examples of duties for this role include the following listed as "Essential Functions";

1. Directs and coordinates, through subordinates all clinical and related activities, including direction of the provision of all medical services.
2. Supervises medical staff.
3. Monitors quality assurance and utilization review policies, procedures, and methodologies.
4. Oversees the jail clinic physicians.
5. Evaluates existing services, identifies needs, and develops long-range program/service plans, including goal setting, program design and evaluation, and policy development.
6. Oversees the provisions of staff training to develop professional skills of medical personnel.
7. Serves as liaison between professional staff and hospitals for exchange of information and services, state and national hospitals, medical associations, community and advocacy organizations, volunteer groups, law enforcement, and other professional organizations, to encourage higher professional standards.
8. Represents and protects interests of the Sheriff's Detentions Medical Services.
9. Performs other duties as assigned.

The Medical Services Administrator job description describes this role as follows; "Under the direction of an Assistant Sheriff, this position is responsible for recommending, formulating, and implementing policies that provide comprehensive, integrated, and cost effective health services to inmates in Sheriff's detention facilities." Specific responsibilities of this role include the following:

- Formulates and implements policy and procedures relating to all aspects of health care and services provided to inmates in Sheriff's detention facilities
- Provides direction to all County and contracted professional, technical, and support staff to ensure compliance with State law
- Reviews, investigates, analyzes, and recommends policies, procedures, services, and other changes to minimize complaints and claims of inadequate medical care against the County by persons in custody
- Facilitates integrated and comprehensive medical services in conjunction with medical records, dietary, laundry, and housekeeping operations
- Negotiates and finalizes program/service contracts; monitors, records, and evaluates the performance of contractors

I have reviewed the Classification Navigator Report for Mr. Rupard. This document has a section for alerts and has the following information:

Alerts: PREVIOUS SUICIDE ATTEMPT. This document also appears to classify Mr. Rupard as a general population inmate. The Administrative Segregation section of this document "Ad-Seg Review History" is blank with no entries and subsequent fields for entry of "Ad-Seg" dates to and from specific times are all blank. The section on classification update questions includes a series of updates on 12/20/21 and 2/3/22 with identical responses to each entry date, including yes responses to "Institutional behavior problems".

I have reviewed the California State Auditor's Report on the San Diego Sheriff's Department from February 2022, published shortly before Mr., Rupard died and based on information collected prior to that time. This report identifies multiple systemic problems with how Dan Diego Sherifff's Department delivers health services. The executive summary of this report includes the following "Significant deficiencies in the Sheriff's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails."

I have reviewed a brief set of notes reviewing Mr. Rupard's timeline that were created by Dr. Montgomery. This 3 page free text document includes some of the clinical timeline of Mr. Rupard and includes several broad issue areas such as effectiveness of clinical policies and earlier intervention with "Pending" or "Under review" for all of these areas. This document does not have any date and does not have any documentation of meetings or reviewers or how/whether the document will be utilized in a clinical mortality review or quality committee function. The only area of this document that appears to reference deficiencies or gaps in care for Mr. Rupard reads as follows: "Notes: No medical engagements really on file. Psych has not evaluated this person for some time. Many comments of 'continue to monitor'."

**Findings**

The following represent my major opinions regarding the treatment that Mr. Rupard received in the San Diego Jail leading up to his death.

<u>Failure to provide basic mental health care</u>

Review of the available information in this case clearly establishes that Mr. Rupard exhibited signs and symptoms of serious mental illness when he arrived at the San Diego Jail. These failures were part of systemic deviations in the standard of care by San Diego County and Liberty Healthcare.

When Mr. Rupard arrived in the San Diego Jail, health staff documented obvious signs and symptoms of serious mental illness, including the following during his receiving screening on 12/19/21 at approximately 3 am;

- Combative, assaultive or extremely hostile behavior
- Chronic conditions, psychotic disorders

Although this receiving screening documented clear signs of mental illness, it was deficient in several ways including the following about Mr. Rupard;

- Not taking any medications.
- No history of suicide attempts.
- Area for past medical or psychiatric hospitalizations is left unchecked.
- Housing area disposition of the receiving screening is left without any housing area type checked.

Despite these deficiencies in the receiving screening, a psychiatric sick call clearly establishes the severity of Mr. Rupard's psychiatric illness the next day, and also document his refusal to engage in the encounter; "Refused tele 12/23 - denies that he will come. H/O extensive meds, Patton. Pt has hx of psych and was on medications during previous incarceration, please eval."

As this point, Mr. Rupard required an urgent psychiatric assessment that included an in person evaluation and prescribing of medications, all of which would require a psychiatrist. Given Mr. Rupard's lack of orientation to person, place and time at approximately 11 pm 12/19/21 and the signs and symptoms recorded earlier in the day, this sick call should have led to an urgent assessment by a psychiatrist within 24 hours, even if it meant transfer to an outside facility.

Instead, the mental health staff in the San Diego Jail started a passive and completely ineffective set of tasks that never resulted in Mr. Rupard receiving the mental health care that he obviously required. The mental health staff in the San Diego Jail repeatedly documented Mr. Rupard's dire needs for care and their own inability or refusal to provide that care, never once transferring him to an outside facility for any psychiatric assessment or treatment.

The only mental health note that has basic content areas including an assessment and plan occurs on 12/29/21, 10 days after Mr. Rupard arrived in the San Diego Jail. This encounter note is written by a psychiatrist, Dr. Cruz, but it documents that Mr. Rupard was seen in a non-confidential manner at his cell door. This note describes Mr. Rupard as rambling incoherently and being verbally aggressive. Multiple fields of this note include the psychiatrist documenting being "unable to assess due to lack of Pt cooperation". The plan section of this note clearly articulates that Mr. Rupard faces a "…potential for decompensation" The clinical plan from this encounter incudes offering Mr. Rupard three medications, Cogentin, Haldol and Valproic Acid and a return visit in "4-5 wks or sooner prn". The fact that this psychiatrist was unable to complete their initial assessment of Mr. Rupard but still chose to defer the next visit to more than a month later represents a gross deviation from the standard of care.

Mr. Rupard's medical records show one other psychiatrist note on 2/22/22. Like the initial note, this encounter is non confidential, cell side, and documents multiple areas the provider is "unable to assess" and that Mr. Rupard is "rambling incoherently" and refusing to participate. This note occurs 65 days into Mr. Rupard's incarceration and does not result in Mr. Rupard being taken to a confidential setting where he receives an actual psychiatric assessment. Instead, this

psychiatrist decides that Mr. Rupard can simply be held in the same cell with a plan for no medications and “rtc: 6-7 wks or sooner, if needed”. This represents a gross deviation from the standard of care because Mr. Rupard was exhibiting ongoing signs and symptoms of untreated mental illness and mental health staff had still been unable to complete an initial psychiatric assessment. Faced with their ongoing inability to complete these essential steps, mental health staff should have transferred Mr. Rupard to a higher level of care either in a true mental health unit within the jail or via outside assessment if needed.

Part of the failures in the care that mental health staff provided to Mr. Rupard is rooted on their contact with him through a locked cell door. This is a completely inadequate approach and their failure to have a face to face, confidential encounter with him should have resulted in him being transferred to a place where this could occur. Put another way, inability to provide the standard of care in a jail setting does eliminate the patient’s need for care, it requires that they are transferred to a setting where they can receive the standard of care. The 2016 NCCHC policy statement on solitary confinement and the 2018 NCCHC jail standards make this exact point.

From the 2016 NCCHC policy statement; “Principles of respect and medical confidentiality must be observed for patients who are in solitary confinement. Medical examinations should occur in clinical areas where privacy can be ensured. Patients should be examined without restraints and without the presence of custody staff unless there is a high risk of violence. In situations where this cannot occur, the patient’s privacy, dignity, and confidentiality should be maintained as much as possible. If custody staff must be present, they should maintain visual contact, but remain at a distance that provides auditory privacy.”

In the 2018 NCCHC Standards for Health Services in Jails, the very first compliance indicator in the mental health standard is that “Patients’ mental health needs are addressed on-site or by referral to appropriate alternative facilities.”

Mr. Rupard’s level of mental health needs is not uncommon in a jail setting. The shocking aspect of his case is that instead of transferring him to an outside setting for a higher level of assessment and care, mental health staff repeatedly documented their own inability to see him, assess him and initiate treatment. It is a routine matter for jail health services to encounter patients they simply cannot provide care to, but they are absolutely obligated to transfer those patients to a setting where assessment and care can be provided, not give up and document the patient’s demise. This is a basic standard of care included in the ACA and NCCHC guidelines and is one of the most important principles for jail health services to act on. This is also an essential area of oversight, to ensure that quality assurance and quality improvement work regularly determines whether patients needing a higher level of care are transferred in a timely manner. The failure to ensure a higher level of assessment and care for Mr. Rupard is all the more shocking because his jail medical records clearly indicate that staff had secured an order for involuntary medication in June 2019 and that he had been transferred to Patton State Psychiatric Hospital from the jail.

I believe that Dr. Cruz erred in his approach to Mr. Rupard because he documented that Mr. Rupard may decompensate on 12/29/21, then at the next encounter, withdrew his medications

and scheduled a follow-up encounter 6-7 weeks in the future. Dr. Cruz recognized that Mr. Rupard may deteriorate during their first encounter, and this outcome that was even more predictable once Mr. Rupard's medication noncompliance was documented by Dr. Cruz and they were stopped altogether. The second time Mr. Rupard was seen by Dr. Cruz, his assessment was again incomplete as well as being nonconfidential. There is no evidence that Dr. Cruz even attempted to see Mr. Rupard in a confidential clinical setting instead of seeing him non-confidentially through a locked cell door. Dr. Cruz should have triggered a transfer to the PSU or at least ensured a follow up psychiatric encounters in the week after the 2/22/22 encounter to monitor whether the decompensation he warned about was occurring and whether Mr. Rupard was in a psychiatric emergency.

But individual failures by Dr. Cruz were compounded by multiple systemic deficiencies in the San Diego jails that allowed Mr. Rupard to fall through the cracks in the health system. One of the most harmful systemic failures to Mr. Rupard was the lack of effective system to ensure that prior mental health records were incorporated into care for newly incarcerated patients. Dr. Cruz testified that he was familiar with the standards for grave disability and that he was familiar with the process for involuntary medication. But he also testified that he had not reviewed Mr. Rupard's history of involuntary medication in 2015 and 2019 incarcerations and he testified that access to this information as not consistently available or reviewed in his role as a jail psychiatrist. Dr. Cruz testified about his lack of consistent access to prior psychiatric assessments including the assessment of Dr. Badre as well as prior orders for involuntary medication for Mr. Rupard. This gap in information proved extremely consequential for Mr. Rupard because Dr. Cruz testified during deposition that his diagnosis of Mr. Rupard on 12/29/21 was based entirely on historical information. But this reliance on historical information omitted the critical information from 2015 and 2919 that showed how gravely disabled Mr. Rupard was and how he required involuntary medication. To the extent Dr. Cruz did assess whether Mr. Rupard needed PSU transfer, he did so without review critical information about Mr. Rupard and without any clear policy or procedure in place to ensure review of this information. The San Diego Sheriff's Department should have instituted a system that allowed consistent access to essential medical information from prior jail stays for patients with grave mental illness and prior involuntary medication, required documentation of review for providers, and tracked compliance via quality assurance. Creating a clear workflow that required psychiatrists to review this type of critical information was also the responsibility of Liberty Healthcare and their lead psychiatrist, Dr. Ysla. Dr. Ysla testified that he was the supervisor for the jail based psychiatrists such as Dr. Cruz and providing clear training and oversight to ensure that potentially life-saving information was reviewed and integrated into care was an essential task. Being forcibly medicated and being transferred for inpatient psychiatric care are two sentinel events that should appear as flags or alerts when a patient returns to jail since this is information that indicates a serious, potentially fatal health problem.

The testimony of Dr. Cruz reveals another systemic problem that delayed care for Mr. Rupard. Arriving in the jail on 12/19/21, Mr. Rupard was scheduled for a telepsychiatry encounter the following day, which was appropriate for his serious mental illness. But when Mr. Rupard refused to engage with the telepsychiatry assessment, his care was delayed multiple times, exactly the opposite of what was needed. Medical records show that Dr. Cruz was unable to see Mr. Rupard on 12/24/21 and again on 12/28/21 due to "time constraints". As a result, a patient with prior history of grave mental illness and involuntary medication in this jail was left without psychiatric assessment and care for 9 days, a gross deviation from the standard of care. The barriers reported by Dr. Cruz are common in jail settings, and there must be a system in place to ensure that when an individual provider cannot see a patient, the missed appointment is tracked and another provider is assigned or the patient is transferred for outside assessment and care. The testimony of Dr. Cruz and the case medical records make clear that no such system was in effect for Mr. Rupard.

I have reviewed the contract between San Diego County and Liberty Healthcare. One provision of the contract obligates Liberty Healthcare and San Diego County to report delays is provision of services to each other if they are aware of them. The contract requires reporting if "…any actual or potential situation is delaying or threatens to delay the timely performance of this contract…". Another section of this contract establishes the staffing for psychiatrists as 7.73 full time equivalent (FTE) plus one FTE for the Chief Psychiatrist, resulting in 8.73 FTE for the four sites being covered. I have not seen any reporting about the delays in psychiatric assessments for Mr. Rupard from Liberty Healthcare to San Diego County in the information I have reviewed. Not only are delays are clearly documented in Mr. Rupard's medical records on 12/24/21 and 12/28/21, but these notes also identify the reason for the delays as "time constraints" of Dr. Cruz. These delays in care caused by inadequate psychiatric time and resources should have been reported to the County by Liberty, but because these delays are so clearly documented in Mr. Rupard's medical records, they should have also been identified as part of any competent clinical mortality review by the County.

Ms. Quiroz was not only identified as the expert to testify for the County's clinicians and mental health workers, she was specifically identified as the person who would testify about "Sheriff's Department regarding oversight of the quality of psychiatric care to inmates by Sheriff's Department Employees and private contractors…" But when she was asked about this function, oversight of the quality of health care provided by the private contractor Liberty, Ms. Quiroz testified as follows;

"Q.· And in this regard, what did you do to check the process by which he oversaw the quality of that care?

MS. FELDMAN:· Vague and ambiguous.

THE WITNESS:· I do not oversee the contract, the Liberty Healthcare contract.· Dr. Ysla does."

These delays in care for Mr. Rupard's serious mental illness reflect gross failures by the County and Liberty Healthcare because neither developed a system to detect missed appointments that resulted in an expedited encounter either in the jail our at an outside facility.

The need to assess and treat patients with acute mental health needs off site when on-site care cannot occur is a basic correctional standard of care. This basic standard of care is clearly articulated in the NCCHC Standard for Health Services in Jails; "Patients who require acute mental health services beyond those available on-site are transferred to an appropriate facility."[2] This same sentence also appears in San Diego Jail's policy on Mental Health Evaluation and Screen MDS.E.5.1 dated 6/23/20. The San Diego Sheriff's Department should have instituted a system that ensured that patients with a history of grave mental illness and involuntary medication who missed their initial psychiatric assessment were seen within 24 hours, either by another psychiatrist on site or at an outside facility. Compliance with this requirement should have been tracked via quality assurance. The failure to ensure Mr. Rupard received a timely psychiatric encounter reflects a gross deficiency by Dr. Ysla and Liberty Healthcare as well as Dr. Montgomery and the County. As the vendor who is responsible for staffing and providing psychiatric assessments, Liberty and Dr. Ysla should have implemented a system that ensured a refused or missed initial assessment did not simply lead to 9 or 10 days of delays, especially for a patient with serious illness.

The testimony of Dr. Cruz revealed a third systemic problem that was part of the harm to Mr. Rupard. When asked about how or whether other staff, either mental health or custody, would be checking on Mr. Rupard in between the psychiatric encounters, he testified that he assumed that those staff members would inform him if Mr. Rupard decompensated further. He testified "You know, I would rely on them saying like he – knowing he's going to refuse medication, but still, I would rely on their -- knowing that they would be seeing – seeing him on a regular basis, hey, if he's not doing well, maybe I should see him sooner and try to -- again, try to encourage him to take medication, but I never received any, you know, notification from any staff saying "Hey, you need to see him sooner.· Maybe you need to try him on, you know, medication again, or see him and assess him." Although I believe the Dr. Cruz erred in not scheduling a prompt follow up between himself and Mr. Rupard after the two unsuccessful, nonconfidential & incomplete encounters on 1/29/21 and 2/22/22, it is also apparent that the jail system was not coordinating care between the psychiatrists and the other staff who should have had more regular contact with Mr. Rupard. Dr. Cruz testified that he assumed other staff were seeing Mr. Rupard regularly and will communicate concerns to him, but no mental health encounters with social work or other mental health staff occurred during this time. For a patient with known serious mental illness, there is a need for mental health staff to see and assess the patient in between psychiatric encounters, which may be occur monthly or even less often for patients stable on their

[2] NCCHC Mental Health Screening and Evaluation. J.E.05. Health Services in Jails, 2018.

medications. The goal of these encounters is to monitor symptoms and overall health of patients but the testimony of Dr. Cruz reveals that he assumed other staff would be seeing Mr. Rupard and inform him of any deterioration. The disconnect between how the jail's mental health system operated and the assumptions of Dr. Cruz' were apparent in this exchange during his deposition. Dr. Cruz answered a question about supporting counseling that might help with medication compliance as follows; "As far as -- I knew that mental health clinicians were seeing him, so they would potentially, you know, speak to him about medication, you know.· He was already getting follow-up by other providers, other mental health clinicians.· I never had to tell them to go "Hey, please tell this guy to -- to start medication."· They're -- they would be assessing him.

Q That's not accurate; right?

A What's that?

Q What you just said is not true because you, as the psychiatrist --

A Yeah.

Q The only psychiatrist -- outpatient psychiatrist on site at San Diego Central Jail at the time – were the only one who had authority to order psychiatric medication for a patient or discontinue psychiatric medication for a patient; is that correct?"

This exchange underscores that just as no system existed in the jail to ensure a psychiatric encounter occurred in a timely manner for patients like Mr. Rupard with serious mental illness, there was no system in place to ensure that the same patients with serious mental illness would automatically be seen on a regular basis by non-psychiatric clinicians. Dr. Cruz explained how clinician encounters in between psychiatric encounters were important for medication compliance, "So I am not saying that mental health clinicians can tell patients 'You need to start medications.' They can assess them and say 'Hey, are you interested in restarting your medication.· Not saying that they can prescribe or discontinue medication. That is my role.· Their role is assess them, determine if they're interested in medication, but not to prescribe or discontinue medication." In fact, the coordination of psychiatric care with clinician encounters is a basic approach in jail settings but it requires policies and procedures that ensure both type of encounters occur, and that case conferencing occurs, especially for patients with serious mental illness.

The testimony of mental health counselor Ms. Goodall was that seeing clinicians' patients was strictly driven by sick calls. This is contrary to the requirement that patients in segregation be seen regularly by mental health clinicians and it also reflects a reality that was obviously unknown to Dr. Cruz. The disconnect between the Liberty Healthcare staff and the County's mental health clinicians reflects a gross failure by the Liberty Healthcare leadership including Dr. Ysla, who testified that he was the one responsible for training and orienting psychiatrists to their actual roles in the jail. He specifically testified that "In my role as medical director, I provided guidance on the policies and procedures for new hires."

The lack of coordination between the psychiatric provider and mental health clinicians in Mr. Rupard's care is consistent with the erroneous claim by a County mental health supervisor, Ms. Quinoz, who testified that Mr. Rupard had a treatment plan in his medical records. By definition, a treatment plan includes an assessment of the patient's health problems and a plan for how the care will be delivered, including the roles of the health staff involved in the care. This is very different than the note in Mr. Rupard's records from Dr. Cruz, which makes no mention of mental health clinicians, nursing checks or any other aspects of ongoing mental health plan of care. This distinction is at the core of Mr. Rupard's preventable death, because the lack of a true treatment plan meant that there was no ongoing record of the care he needed and what was being missed. A basic treatment plan for his should have included a plan for assessment in a confidential setting and completion of the actual psychiatric assessment that was never completed by Dr. Cruz. A treatment plan should have also included the role of clinicians in seeing Mr. Cruz, how often they would see him and what their role was in his care. The NCCHC defines a treatment plan as "A treatment plan is a series of written statements specifying a patient's course of therapy and the roles of qualified health care professionals in carrying it out."

The failure to provide mental health care to Mr. Rupard reflect a failure to follow basic standards of care and the County's own policies regarding refusals of medication. I have reviewed the refusal policies of the San Diego Sheriff's Department, "Refusal Procedures", MSD.R.5 1/6/22 and 7/14/16. Both the 2016 and 2022 policies mandate the following in section VIII of the policy;

"In all instances of refusal, physicians and nurses shall document health education provided and patient's understanding of the counseling."

Several elements of Mr. Rupard's care fail to meet this standard. One of the first red flags in this area of care is the form labelled "General Informed Consent" completed at the time of his arrival at approximately 3 am on 12/19/21. The topic of this form is "Informed Consent" and it includes consent and voluntary agreements about medications, confidentiality, photographs, mandatory reporting and many other elements of consenting to care. There is no signature from Mr. Rupard but the box that is checked reads "Patient is willing to sign, but is unable." There is no explanation as to why Mr. Rupard cannot sign this form despite being willing. This entry implies that Mr. Rupard has a physical barrier to signing such as disability, but there is no evidence that this was the case. In fact, his receiving screening at the same time clearly identifies the following about him;

- Combative, assaultive or extremely hostile behavior
- Chronic conditions, psychotic disorders

This indicates that he likely was not able to engage in care or could not give informed consent because he may not have understood the risks and benefits of what he was being asked to consent to. Documenting that Mr. Rupard was willing but unable to sign a medical consent form when he is simultaneously documented as being combative, assaultive, extremely hostile and potential psychotic is a breach of basic medical practice. This deviation from standard medical practice occurs in the first hours of Mr. Rupard's incarceration in the San Diego Jail and is followed by dozens more contacts between health staff and Mr. Rupard that continue to sidestep

or ignore his ability to understand the risks and benefits of various offers of assessment and treatment.

Mr. Rupard's initial encounter note from a psychiatrist occurred 10 days after he arrived in jail on 12/29/21. This encounter was through a locked cell door, not confidential, and documents that the mental health provider was unable to assess Mr. Rupard for multiple parts of the encounter, that he was rambling incoherently and refusing to participate. The last sentence of this encounter note is "Patient understands that all treatments offered today are voluntary and adherence/refusal is independent of housing, privileges or other inmate services." The notion that Mr. Rupard was able to understand the nature of the treatment being offered or the relationship between treatment and jail programs and service is not credible given the actual documentation of this provider that Mr. Rupard was rambling incoherently, refusing to participate and verbally aggressive.

Mr. Rupard's second encounter note from a psychiatrist occurred on 2/22/22. This encounter was through a locked cell door, not confidential, and documents that the mental health provider was unable to assess Mr. Rupard for multiple parts of the encounter, that he was rambling incoherently and refusing to participate. This note states "Potential benefit, risks, side effects, alternatives discussed, including no medication." Again, the notion that Mr. Rupard was able to understand the nature of the treatment being offered or the risk and benefits of medications through a locked cell door and while he was refusing to even engage in assessment with this psychiatrist is not credible.

During Mr. Rupard's 89 days in the San Diego Jail system, his medical records document that he refused medications on 44 instances and that he refused some or part of his clinical assessments & care virtually every time he was approached through a locked cell door. During this time, there is not a single documented effort by health staff to see him in a confidential settings where his true understanding of risks and benefits could be assessed as required by the County's own policies. Communicating with a patient about the risks and benefits of their refusals of care is a standard of care in both community and correctional health and is specifically included in the NCHCC standard on Informed Consent and Right to Refuse.[3]

Based on the information I have reviewed, it is clear that security staff responded to clear and obvious symptoms of untreated mental illness with a punishment response by San Diego Sheriff's Department custody staff, placing Mr. Rupard in segregation/solitary confinement.

There were two separate incidents, on 1/29/22 and again on 2/19/22, when Mr. Rupard was involved in a use of force and punished for clear symptoms of his untreated mental illness. The Incident Report from 1/29/22 documented that Mr. Rupard was "holding his food flap hostage" as well as spitting and grabbing at multiple deputies. This reports also documents that when deputies were unable to even give the actual report to Mr. Rupard due to him being verbally abusive.

[3] NCCHC Informed Consent and Right to Refuse, J-G-05. 2018.

The second incident occurred three weeks later and included documentation by custody staff that Mr. Rupard was "pacing back and forth screaming to other incarcerated people with his shirt off and clenched fist". The same day, a nursing note is present in Mr. Rupard's medical records which includes one sentence, "per dep 5144 pt is on lockdown, no contraindication noted." No assessment of Mr. Rupard or review of his medical and psychiatric history is documented in this note. No mention of his facial/head trauma from three weeks earlier is made in this note.

San Diego Jail custody staff were aware of Mr. Rupard's mental health history because his prior suicide attempt was documented on the custody team's Classification Navigator Report. But there is no evidence that custody staff ever considered the potential that mental illness was causing or was a mitigating factor in Mr. Rupard's behaviors. By the time of the first incident, Mr. Rupard has been held in the jail for 42 days without taking any medications. By the time of the second incident, 63 days had passed.

San Diego custody staff should have developed a system to inquire with mental health staff whether the behaviors they were responding to were symptoms of untreated mental illness. This basic step is present in other correctional settings and ensures that patients with mental illness to not deteriorate in a punishment setting because their untreated health problem is becoming predictably worse over time. In the U.S. Bureau of Prisons (BOP), the Inmate Discipline policy clearly articulates the need to consider mental illness as a potential cause of behavioral problems including rules violations. The BOP Inmate Discipline policy from 2020 has an entire section on mental illness and includes the following;

"You will not be disciplined for conduct committed when, as the result of a severe mental disease or defect, you were unable to appreciate the nature and quality, or wrongfulness of the act. The UDC or DHO will make this decision based on evidence, including evidence presented by mental health staff."[4]

It is allowable for mental health staff to share information with custody staff when asked for consideration of this specific question, whether mental illness should be considered as a cause of behavioral problems in the context of infraction or punishment hearings. The NCCHC jail standards clearly establish the role of mental health staff in "advocating for mitigating circumstances in cases of medical and mental health disorders".[5] An even earlier NCCH document from 2015 also makes this same case "A policy and procedure should be developed and implemented relevant to the provision of mental health input into the disciplinary process with a focus on assessing potential mitigating factors that contributed to the inmate's alleged

---

[4] BOP Inmate Discipline Policy, 11/18/2020, at chrome extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.prisonpolicy.org/scans/disciplinepolicies/federal 5270009cn1.pdf?_gl=1*vms1hf*_gcl_au*MTAzMDA4NDE2Ny4xNzc5OTg3Mjg3*_ga*MTU4NDcxNDk3My4xNzc5OTg3Mjg3*_ga_3ZZXPJN7M4*czE3Nzk5ODcyODckbzEkZzAkdDE3Nzk5ODcyODckajYwJGwwJGgw.

[5] Therapeutic Relationship, Forensic Information and Disciplinary Action, J-G-04. NCCHC Jail Standards 2018.

disciplinary infraction."[6] None of the segregation policies I have reviewed include any of these basic policies and procedures to integrate mitigating factors into the efforts of custody staff to punish patients with mental illness via solitary confinement/segregation. The failures of the Sheriff's Department to create a policy and procedure for seeking out this basic input represents a systemic failure that is evident in Mr. Rupard's case. One additional feature of these custody failures is that there is no evidence that Mr. Rupard was ever offered representation or that anyone bothered to determine whether he understood or even heard any of the various rights he was supposedly afforded in the County's infraction/punishment process. Much to the contrary, the incident and hearing reports make clear that there was no meaningful communication with Mr. Rupard.

<u>Failure to provide basic medical care, including injury assessment/care and segregation rounds.</u>

Based on the information I have reviewed, Mr. Rupard needed multiple types of medical care and monitoring of his physical health that he was denied while in the San Diego Jails before his death in 2022. The first clear failure to meet the standard of medical care for Mr. Rupard occurred on 12/19/21, the day Mr. Rupard arrived in the jail. During his receiving screening at approximately 3 am, Mr. Rupard's vital signs were essentially normal. Approximately 20 hours later, a partial set of vital signs is present with a markedly increased heart rate of 110 beats per minute. These vital signs appear in conjunction with a nursing note to offer a COVID-19 test to Mr. Rupard. There was no clinical acknowledgement of this abnormal vital sign and no efforts to assess what was the potential cause of the tachycardia. This encounter documents that Mr. Rupard is only "oriented x 2" which established that of the cardinal three parts of quick orientation (person, place and time) he is not able to state all three. As a result, this note documents that Mr. Rupard had altered mental status and had tachycardia, a combination of abnormal findings that require a provider to assess him for serious medical problem or even potential medical emergency. Documenting these findings without taking action to ensure that they are immediately assessed represents a deviation from the standard of care because abnormal vital signs and lack of orientation obtained by nursing staff must be addressed. This is a common issue when people arrive in jail who may be experiencing intoxication, withdrawal, medication interruption, infection, dehydration, and other treatable but potentially fatal problems.

Another failure in Mr. Rupard's medical care occurred on 1/29/22. At 11:24 that am, a single nursing note is present that documents that Mr. Rupard was injured during a use of force and that he sustained at least 2 injuries, a laceration between his eyebrows and "some possible blood on lips". This encounter note records that Mr. Rupard was seen in the housing area and that the nurse was "unable to further assess" because of Mr. Rupard acting hostile and refusing care. There is no mention in this note of any plan for further assessment of Mr. Rupard for the two injuries that were observed and for assessment of other potential injuries. No vital signs are present in this encounter. This represents a gross deviation from the standard of care because the nurse clearly documented multiple injuries to the head, and also documented being unable to complete the encounter. This is a circumstance where the nurse was obligated to refer Mr. Rupard to a provider to complete the

[6] Mental Health Considerations for Segregated Inmates. NCCHC 2015 at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ncchc.org/wp-content/uploads/Segregated-Inmates-2015.pdf.

encounter, assess the full extent of his head trauma and other injuries and determine whether a higher level of assessment or care was needed outside the jail. Instead, these records indicate that Mr. Rupard was simply returned to his cell without further evaluation. This encounter is also troubling because a custody report from the same time documents that the nurse "cleared him to remain in his cell" but no such clearance is even mentioned in the nurse's note.

Another gross deficiency in the medical care provided to Mr. Rupard is the lack of nursing and mental health rounds to check on his health status. These rounds are required by San Diego Sheriff's policies but they never occurred for Mr. Rupard. The Segrega [redacted] rements were ignored by both the nursing and mental health services.

There is no doubt that Mr. Rupard was being held in solitary/segregation or lockdown status. The encounter note by Ms. Goodall clearly documented his as being in administrative segregation on Module 7D. The nursing note on clearly identified him as being on "lockdown" status. The third follow up report of Detective Blumenshine goes even further and asserts that Mr. Rupard was not only held in administrative segregation status, but that he was held in that cell restriction because of his mental illness; "reviewed the Follow up Investigative Reports of the Sheriff's Department (I-III) regarding Mr. Rupard's death. Report I documents that Mr. Rupard was treated as being in Administrative Segregation because of his mental health status; "Rupard's housing block, 7D, was classified as COVID quarantine and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health."

The deposition testimony of Sargent Johnson was that there were multiple ways that a person could be confined to a cell for 22 or more hours per day in the San Diego jails at this time, and he specifically mentioned both of these mechanisms, administrative segregation and lockdown.

Segregation rounds are required by both the American Correctional Association (ACA) and the NCCHC, which are the two major organizations that promulgate standards in correctional healthcare. The ACA policies mandate that facilities have a written policy, procedure, and practice provide that inmates in restrictive housing receive daily visits from the senior correctional supervisor in charge, daily health care rounds from a qualified health care professional (unless medical attention is needed more frequently), and visits from members of the program staff at least weekly. (5-ACI-4B-12, New Aug. 2018).

The NCCHC standards similarly mandate as an essential standard that people in restrictive housing cells in jail receive daily rounds by a health care professional. The 2018 NCCHC jail standards mandate that segregation rounds occur either daily or three times per week if a person is locked in a cell but does come out for some interaction with others.[7] These rounds are also required by the San Diego Sheriff's own policies and procedures but it is clear that no effective mechanism exists to ensure that they occur because no segregation rounds are documented in Mr. Rupard's medical records.

[7] https://www.ncchc.org/standards-q-a-qualification-of-segregation-status/.

The necessity for these rounds is not linked to the reason a person is locked in a segregated cell but instead is tied to the status of being locked in the cell. The NCCHC explains this in the following manner, "Segregated inmates are those who are isolated from the general population and who receive services and activities apart from others. Whether you call it administrative segregation, protective custody, or disciplinary segregation, standard G02 Segregated Inmates is about the conditions of living and confinement, not the reason for the segregation or what the area is called."[8] In addition, the NCCHC standards make clear that when a person needs medical assessment or care, "arrangements must be made for triage, examination, and treatment in an appropriate clinical setting."[9]

Likewise, in the U.S. Bureau of Prisons, there is a clear expectation that anyone held in a segregation or isolation setting will be checked on daily by health staff. Since 2011, the inmate handbook in this system includes the following regarding segregated housing cells: "A health services staff member will visit you daily to provide necessary medical care."[10] In my experience, state prisons and county jails across the country have similar requirements for segregated inmates to be checked regularly by a member of the medical staff.

In 2016, the NCCHC published a specific policy statement on segregation and solitary confinement which clearly identified the risks of isolation and the need for daily monitoring of isolated patients by health staff.[11] This policy document documented that the need for monitoring is linked to detecting physical health deterioration including inadequate eating or drinking, something directly relevant to Mr. Rupard's case. The 2016 policy statement from the NCCHC identified the following needs;

- Health care staff should evaluate individuals in solitary confinement upon placement and thereafter, on at least a daily basis. They should provide them with prompt medical assistance and treatment as required.
- Health care staff must advocate so that individuals are removed from solitary confinement if their medical or mental health deteriorates or if necessary services cannot be provided.
- Health care staff should ensure that the hygiene and cleanliness of individuals in solitary confinement and their housing areas are maintained; that they are receiving sufficient food, water, clothing, and exercise; and that the heating, lighting, and ventilation are adequate.

The lack of basic segregation rounds for Mr. Rupard appears to reflect a systemic failure in the San Diego Jails, not a single instance. The testimony by the County's expert on the quality of mental health care did not know in her deposition whether people with schizophrenia or who have mental health problems are even held in administrative segregation. This is an egregious admission

---

[8] NCCHC Segregated Inmates Standard J-G-02, 2018 and https://www.ncchc.org/spotlight-on-the-standards/segregated-inmates/.
[9] NCCHC Segregated Inmates Standard J-G-02, 2018.
[10] https://www.bop.gov/policy/progstat/5270_010.pdf.

[11] NCCHC Policy Statement on Solitary Confinement (Isolation), 2016, at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ncchc.org/wp-content/uploads/Solitary-Confinement-Isolation.pdf.

because Mr. Rupard was consistently held in segregation status in his final and also his prior jail incarcerations. For the County's expert designee on the quality of jail mental health care, Ms. Quinoz, to not know whether patients with mental illness are placed into these settings represents a profound failure of the County. The follow-up report of Detective Blumenshine actually makes the assertion that Mr. Rupard was not held in this setting in spite of his mental illness, but because of it. The County's ability to detect deterioration of their seriously mentally ill patients in solitary/segregation settings is impossible if they do not know where or whether patients with mental illness are exposed to these conditions. The evacuation list from Module 7D that I reviewed clearly showed that at least two other patients with a history of suicide attempt were held on 7D in administrative segregation status.

One of the harmful consequences of failing to track the presence of patients with serious mental illness in segregation/solitary settings is that being locked in a cell most or all of the day creates barriers to all health assessments and care. The NCCHC Policy Statement on Solitary Confinement includes this overview of how being in segregation/solitary creates barriers to health care:

"While correctional health care providers often encounter obstacles in the performance of their duties, there are specific challenges to the provision of health care to individuals in solitary confinement. Solitary confinement often makes it more difficult for patients to access care. Many facilities require that individuals in solitary confinement be shackled and accompanied by two officers when they are out of their cells. Many times, they must be body searched upon leaving and returning to their cells. As a result, health care staff may decide to perform their evaluations at cell-front, through bars or slots in the doors, either for their own or the patient's ease. Alternatively, clinical encounters may occur with the patient in a metal cage or behind a glass partition. Even when patients are taken to the medical clinic for evaluation, they often remain in restraints with custody officers in close proximity. Such arrangements are not respectful of an individual's dignity, interfere with privacy and confidentiality, and hamper or prevent the clinician from performing an adequate evaluation."

These systemic failures in monitoring the health of patients in segregation/solitary confinement settings are apparent in the testimony of the Chief Medical Officer of the entire jail health service, Dr. Montgomery. His job description clearly assigns him the role of being responsible for the adequacy of all health services in the jail system. The Chief Medical Officer position role starts with the description that this staff member will be hired "To direct all clinical functions of the Sheriff's Department Medical Services…" The role is also described as being "responsible for all clinical/medical decisions within the Sheriff's Detention Medical Services, and all policies and operations concerning patient care, welfare, and treatment."

But when he was asked about his involvement in oversight of the mental health services in the jails, Dr. Montgomery testified as follows:

"Q. What, if anything, did you have to do with mental health services at the jail?

A I was not involved."

When he was about having any role in oversight of the quality of care being provided by outside vendors, Dr. Montgomery testified as follows:

“Q All right.· Let me let you know I'm referring now, in these following questions, to the time period of the years 2021 and 2022. · · · · ·As chief medical officer, were you responsible in any way for monitoring the quality of care provided by private medical contractors?

A During that stated time frame, individually, no. I was not monitoring the quality of the private contractors. · · · · ·Their hierarchy was providing oversight over their individual employees.”

This lack of involvement in monitoring the adequacy of care by the person charged with that very role highlights the deep dysfunction in the health service that contributed to Mr. Rupard’s death.

The failure of health staff to monitor Mr. Rupard’s health status caused him to deteriorate and die without being weighed, without having his vital signs checked and without any of the basic nurse rounds occurring to detect his decline. The Medical Examiner’s report on Mr. Rupard’s death clearly dehydration and malnutrition as major elements in his death. Mr. Rupard weighed 165 lbs. when he arrived in the San Diego Jail and at the time of his death, 105 lbs. He had lost 36% of his body weight over 89 days locked inside a cell.

The competency report conducted at the door of Mr. Rupard’s cell on 3/14/22, three days before his death, documented that his cell was covered with feces on the floor and wall and that trash was spread throughout the cell and Mr. Rupard was psychotic and not competent to stand trial, unkempt, dirty and covered with a blanket. The day before his death, 3/16/22, a custody officer entered Mr. Rupard’s cell for a wellness check. It is noteworthy that this check was not prompted by any health staff or custody staff initiating an actual status check on Mr. Rupard’s health, but instead because another person had died on this segregation unit and a homicide detective was seeking to interview potential witnesses. On the day before his death, the custody officer who entered Mr. Rupard’s cell notices a dramatic difference that his usually aggressive and hostile demeanor was absent and the officer was only able to elicit a single “grunt” when he prodded Mr. Rupard. This information about a clear and obvious decline of Mr. Rupard’s health was never known to the mental health or medical staff because they failed to comply with their own policies and the standards of correctional health to check on Mr. Rupard.

Dr. Montgomery testified that the Medical Examiner’s report did not identify dehydration, malnutrition and pneumonia as the causes of Mr. Rupard’s death. This is simply untrue. On p37 of the report, the following is clearly recorded;

CAUSE OF DEATH: PNEUMONIA, MALNUTRITION, AND DEHYDRATION
IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Even the initial summary of findings by Dr. Schaber clearly identifies these three causes of death, on p11 of the report.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting

These three causes of death reflect medical problems that likely occurred over a range of days to weeks. The malnutrition and muscle wasting likely occurred over weeks while acute viral pneumonia was a likely a much more acute process.[12] Patients who are malnourished have a higher risk of death from COVID-19 complications including pneumonia.[13] The Medical Examiner clearly identified these processes as actual causes of Mr. Rupard's death and I do not understand why Dr. Montgomery was unable or unwilling to agree with those findings. The more acute phase of Mr. Rupard's decline and death is relevant because of the failure of health staff conduct the required weekly mental health checks and three times per week nursing checks.

The physical decline of Mr. Rupard was completely detectable and addressable but it required nursing and medical staff to check on his wellbeing, assess him and follow the most basic standard of care including ensuring that he was eating, drinking, not injured and not suffering from untreated injuries or new medical problems. If staff felt unable to care for Mr. Rupard, or felt unable to assess him, they were obliged to transfer him to the hospital for assessment and treatment. But his medical records indicate a complete lack of nursing or medical assessments after his brief injury note until the day he died.

Failure of Dr. Montgomery and San Diego to conduct basic peer review of jail health staff.

One essential standard of care in correctional settings is to conduct peer review or clinician to clinician review of work conducted by all health professionals. This essential function is described in the NCCHC J-C-02 and details two levels of review; one for routine review the work conducted for all health staff by another health professional with equal or greater level of training, and another process that is discipline-specific and is initiated and overseen by the

---

[12] https://www.npr.org/sections/goatsandsoda/2016/01/20/463710330/what-happens-to-the-body-and-mind-when-starvation-sets-in and chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://pmc.ncbi.nlm.nih.gov/articles/PMC11065092/pdf/rmmj-15-2-e0010.pdf and chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://pmc.ncbi.nlm.nih.gov/articles/PMC11065092/pdf/rmmj-15-2-e0010.pdf.

[13] https://pmc.ncbi.nlm.nih.gov/articles/PMC11537834/ and https://pmc.ncbi.nlm.nih.gov/articles/PMC12348880/.

Responsible Health Authority.[14] Dr Montgomery testified that he worked in the role of the Responsible Health Authority during the time Mr. Rupard was held in the jail. He testified that no peer to peer review process had been implemented in the jail. This is an example of a gross systemic deficiency that increases the likelihood that health staff who do not follow basic policies and procedures will repeat their errors without any intervention. In the case of Mr. Rupard, it is clear that no health staff were conducting the required nursing and mental health encounters representing failures by two different disciplines of the health care team.

<u>Failure to conduct a clinical mortality review</u>

None of the information I have reviewed in this case indicates that the County has conducted a clinical mortality review of Mr. Rupard's death. When a person dies in a jail setting, one of the essential steps that must be taken is for a physician who was not part of the patient's care to lead a clinical mortality review. This process is separate from the administrative review and when indicated, the psychological autopsy. The NCCHC standard for this task (Procedures in the Event of Inmate Death) mandates that the clinical mortality review should physician led and must review the appropriateness of care.[15] This standard clearly establishes that the clinical mortality review should occur within 30 days and be part of the health system's quality improvement process because it is essential to disseminate findings and corrective actions to staff and track implementation in the facility's quality committee. The standard also includes three questions that should be answered in the clinical mortality review;

- Could the medical response at the time of death be improved?
- Was an earlier intervention possible?
- Independent of the cause of death, is there a way to improve care?

The standard includes the following; "Corrective actions identified through the review process are implemented and monitored through the quality improvement program for systemic issues and through the patient safety program for staff-related issues."

I have reviewed a brief set of notes reviewing Mr. Rupard's timeline that were created by Dr. Montgomery but that do not represent a clinical mortality review. These notes lack documentation of a meeting that includes records of attendees, documentation of findings and corrective actions with the timelines for implementation and names of health leadership that will take on the responsibilities for tracking and implementation of corrective actions. I have reviewed the DOJ reporting form which communicates some demographic and other information about Mr. Rupard to the U.S. Department of Justice but likewise does not constitute a mortality review. Neither of these represents a clinical mortality review.

During his deposition, Dr. Montgomery was asked whether nursing staff and mental health clinicians had conducted their required assessments of Mr. Rupard as per the segregation policy

---

[14] NCCHC J-C-02 Clinical Performance Enhancement. Standards for Health Services in Jails. 2018.
[15] NCCHC J-A-10 2014.

requirements. He was unable to simply state yes or no to these questions and gave the following response:

"As we commented on, is that the nursing review has been conducted by nursing staff. And the mental health element of the review that would be in a position to evaluate the actions of the QMHPS, was conducted. I was not involved in that part."

This lack of required checks by health staff is a very simple deficiency to see in Mr. Rupard's medical records, whether during his weeks in segregation he received three nursing assessments and one mental health clinician assessment per week documented in his medical records. In addition, the notes that Dr. Montgomery compiled appear to list each of the very few health contacts that Mr. Rupard had, and there is no record of the required three times per week nursing and weekly mental health clinician assessments in his notes.

In some County and State level systems, an oversight body may conduct a review of deaths in a jail or prison. In other settings, a legal or administrative investigation may occur that is internal and reviews multiple areas of the death case. None of these various reviews replaces the need for a clinical mortality review within 30 days if they are not physician-led, if they are not part of the quality improvement committee of the facility, and if they do not produce findings and corrective actions that are disseminated among staff and tracked in the quality improvement committee. I have not seen any document that represents a basic clinical mortality review for Mr. Rupard's case. In addition, the testimony of Dr. Ysla, the head psychiatrist for Liberty Healthcare, further indicates that the County was not conducting clinical mortality reviews. Dr. Ysla testified that he discussed approximately eight jail deaths of jail patients with his "corporate headquarters" in the final year of the contract with San Diego Jail (ended in June 2022 per his testimony) but also testified that he never discussed deaths with Dr. Montgomery, the County's Chief Medical Officer for the jail. Mr. Rupard died in March 2022, and a clinical mortality review would have occurred win 30 days and would have also identified findings and corrective actions that were then linked to the facility QI/QA process. Dr. Ysla testified that not only did he not discuss any of the jail deaths with Dr. Mongomery; he was not even aware of Mr. Rupard's death until much later when he was notified about the lawsuit. This indicates that Dr. Ysla spent the months of March-June not even aware that a patient in his care died. This reflects parallel failures of the County for failing to conduct a clinical mortality review that included the staff who provided care and linked back to the QI/QA apparatus of the jail, but it is also a stunning failure of Liberty Healthcare's leadership, admitting they were unaware that one of their own patients with serious mental illness had died.

The goal of clinical mortality review is to identify gaps in care or areas of improvement and prevent future deaths via corrective action plans. The failure of San Diego County to conduct a clinical mortality review for Mr. Rupard's death is even more stunning in the context that another patient with serious mental illness had also recently died in the San Diego Jail in a very similar manner. Publicly available press reports indicate that Daniel Marroquin was a patient with serious mental illness who died from excessive water intake while locked in a San Diego Jail cell in May 2021, a time when Liberty Healthcare was providing psychiatric care.[16] I have not

[16] https://www.sandiegouniontribune.com/2025/08/05/san-diego-county-to-pay-4m-to-mother-of-man-who-died-by-suicide-in-jail/.

reviewed any records in that case, but if it is true that this man did have serious mental illness, that he died from lack of nutrition or excessive water intake and that he was held in segregation, the testimony of Dr. Ysla that he had not discussed any deaths with Dr. Montgomery in the final year of the Liberty contract is a damning admission of negligence by both the County and Liberty Healthcare. In addition, Dr. Ysla's testimony that no QI/QA audits of any psychiatric care occurred in the final year of the Liberty contract is further evidence of the lack of attention paid to the most vulnerable patients in the jail system by both Liberty Healthcare and the County.

Dr. Montgomery's second deposition clarified the systemic failures in the jail's clinical mortality review process. He testified that he created some initial notes but that he was essentially not involved in any further process to determine failures and corrective action plans in response to Mr. Rupard's death and implement them in the jail. He testified that the confidential CIRB process did not yield any feedback to him after that process was completed. This shows a total breakdown of the most essential part of a clinical mortality review that findings and corrective actions be connected into the jail quality committee.

My own findings of gross deficiency in the San Diego Jail's approach to reviewing patient deaths is consistent with the findings in the State Auditor's Report. This report included the following: "For 22 of the 30 cases we reviewed, the Sheriff's Department was unable to provide us with documentation from these reviews that detailed any findings or conclusions about the clinical care given, identified whether any concerns required further study, or stated whether changes to policies, procedures, or practices are warranted. We believe that if the Sheriff's Department properly documented the 30-day medical reviews, it could better identify and track instances when it did not provide sufficient medical and mental health follow up care before an individual's death, such as those we discuss in Chapter 1."

**Summary**

The death of Mr. Rupard was not only preventable, but the information I have reviewed in his case indicates that both individual and systemic errors caused his death in the San Diego Jail. While the findings and opinions I present here are my own, they are very consistent with the alarming findings of the State Auditor in review of multiple cases, "Throughout Chapter 1 we provide numerous examples of deficiencies in the department's policies and procedures that likely contributed to the deaths of some incarcerated individuals and how these policies and procedures do not align with certain best practices used by comparable counties and other entities. Specifically, in the examples on pages 21 through 24, we describe how the Sheriff's Department did not consistently follow up with individuals who needed medical and mental health services, and that lack of attention may have contributed to their deaths."

The failures I have identified by the San Diego Sheriff's Department and their vendor Liberty Healthcare resulted in Mr. Rupard being locked in a cell for almost 90 days and not receiving any medication or a single completed or confidential psychiatric assessment. During this time, he

became ill and experienced malnutrition, eventually dying from a combination of pneumonia, malnutrition and dehydration. One of the Liberty psychiatrists who worked in the PSU testified that she was not surprised when she learned of Mr. Rupard's death "given the conditions of the jail". When asked to explain this lack of surprise, she cited another death of a patient before Mr. Rupard died who had not been eating or drinking and was found dead in his cell by custody staff. She testified that "A few months prior to this news, while I was working, I don't recall any names or anything, but an inmate had died in George Bailey Detention Facility. He had not been eating and drinking, and three days later, the custody found him dead. So that was a reflection of the kind of care."

These gross deviations from correctional health standards of care include failures by the San Diego Sheriff's Department and their vendor, Liberty Healthcare. One set of failures involved the denial of basic mental health care to Mr. Rupard including delays in his psychiatric assessment, inadequate assessment via incomplete and nonconfidential cell-side encounters and failures to review prior medical records. Jail medical records clearly identified that Mr. Rupard had required involuntary medication and Patton State Hospital during a recent incarceration but the testimony of Dr. Cruz revealed that these records were not part of the historical information he used despite being unable to complete his assessments of Mr. Rupard in 2022. A second set of failures include a lack of basic medical care and monitoring including lack of segregation rounds by nursing and mental health staff as clearly required by standards of care and the County's own policies. A third gross failure involved a complete lack of peer review, resulting in the Responsible Health Authority, Dr. Montgomery, not monitoring the adequacy of care provided by jail health professionals.

A final set of failures relate to the lack of any clinical mortality review which should have occurred within 30 days of Mr. Rupard's death should have connected and corrective action plans to the facility quality improvement process and should have been led by a physician. Instead, the head psychiatrist for Liberty Healthcare testified that he never discussed any of the deaths in the final year of their contract for jail psychiatric services with the Sheriff Department's Chief Medical Officer and Responsible Health Authority, Dr. Montgomery.

Executed on this 14th of July, 2026 in Port Washington, New York.

Homer Venters, MD, MS

[redacted]

*Professional Profile*

- Physician / epidemiologist focused on the intersection of health, criminal justice and human rights.
- Leader in provision and improvement of health services to patients with criminal justice involvement.
- Successful implementer of nations' first large jail electronic health record.
- Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

*Professional Experience*

**Correctional Health Expert**, 3/2016-present

- Independent correctional health monitor/expert
  - Cumberland County Jail, NJ (ongoing). Serve as independent, court-appointed monitor of health services in a County Jail.
  - Fluvanna Women's Correctional Center, VA (ongoing). Serve as independent, court-appointed health services monitor in a women's prison.
  - Santa Barbara County Jail, CA (ongoing). Serve as independent, court-appointed monitor of health services in a County Jail Complex.
  - VI Department of Corrections (ongoing). Serve as independent, court-appointed monitor of health services in St. Thomas detention facility.
  - U.S. District Court Eastern District of NY, Case No. 1:22-cr-00486, 2025.
  - U.S. District Court Central District of CA, Case No. 2:20-cv-04450 (COVID-19, 2020-2022).
  - HI Department of Corrections (COVID-19, 2021-2022).
  - CT Corrections Department (COVID-19, 2020).
- U.S. Department of Justice, Civil Rights Investigations medical expert, 2019-present. Work with the USDOJ to investigate correctional health conditions and provide recommendations for addressing.
- State Attorney's General, provide expert consultation and investigation regarding correctional Health (CA, NY, IL).
- Other litigation, see testimony below.

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-4/30/20.

- Lead COCHS efforts to provide technical assistance, policy guidance.
- Oversee operations and programmatic development of COCHS.
- Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018

- Lead COCHS efforts to expand Health Services in Jails.
- Develop strategy for non-profit models of jail diversion/health care.

**Director of Programs,** Physicians for Human Rights, 3/17-11/18.

- Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
- Expand forensic documentation of mass killings and war crimes.
- Develop and support sexual violence capacity development with physicians, nurses and judges.

- Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.

- Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.
- Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.
- Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).
- Reduced overall mortality in the nation's second largest jail system.
- Increased operating budget from $140 million to $160 million.
- Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.

- Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
- Implemented nation's first large jail electronic medical record for 1,400 staff and 75,000 patients in a jail.
- Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.
- Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.

- Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
- Direct all aspects of response to infectious outbreaks of H1N1, Legionella, Clostridium Difficile.
- Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.

- Developed training program with Montefiore Social internal medicine residency program.
- Directed and delivered health services in multiple jail settings.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

*Education and Training*

**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.

**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert Einstein University7/2004-5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

*Academic Appointments, Licensure*

Adjunct Faculty, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D. New York (2007-present).

*Print articles and public testimony (last 15 years)*

Testimony: United States House of Representatives Subcommittee on Crime, Terrorism, and Homeland Security, Judiciary Committee 1/21/22.

Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails, New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction. NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

*Peer Reviewed Publications (last 15 years)*

**Venters H.** Preventing Another Fifty Years of Mass Incarceration: How Bioethics Can Help. *Hastings Center Report*. 2023 April; 53(6).

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. *Lancet Planet Health*. 2019 Mar;3(3):e144-e153.

K. Parmar, Jennifer Leigh, Ernest Thomas, Douglass Curry, **Homer Venters**, Andra Gilbert, Tamaryn Nelson, Ed Lester. Qualitative evidence of crimes against humanity: the August 2017 attacks on the Rohingya in northern Rakhine State, Myanmar *Confl Health*. 2019; 13: 41. Published online 2019 Sep 16.

Messner N, Woods A, Petty A, Parmar PK, Leigh J, Thomas E, Curry D, **Venters H**, Gilbert A, Nelson T, Lester E. Qualitative evidence of crimes against humanity: the August 2017 attacks on the Rohingya in northern Rakhine State, Myanmar. Confl Health. 2019 Sep 16;13:41.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated. *J Health Care Poor Underserved*. 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**. Feasibility of Treating Hepatitis C in a Transient Jail Population. *Open Forum Infect Dis*. 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care*. 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health*. April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, **Venters H.** Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

Granski M, Keller A, **Venters H**. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health*. 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health*. 2015. 9/17/15.

Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization*. 2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters**. Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved.* 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care.* 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health: Patient safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

*Honors and Presentations (past 15 years)*

**Invited Presentation,** National Association of County & City Health Officials. Outbreaks Behind Bars, together with the Centers for Disease Control, 6/17/26, Webinar. Johns Hopkins School of Public Health,

**Invited Presentation,** Johns Hopkins School of Public Health, Health in Prisons lecture. Baltimore, MD, 4/27/26.
**Invited Presentation,** Tulane University Book Festival, Outbreak Behind Bars. New Orleans, LA, 3/27/26.

**Invited Presentation,** University of North Carolina, Institute for Global Health and Infectious Diseases, Outbreak Behind Bars, Raleigh NC, 1/16/26.

**Invited Presentation,** Duke University School of Law and School of Medicine, Correctional Health and Outbreak Prevention, Durham, NC 1/15/26.

**Invited presentation,** Yale Law School/Liman Colloquium, Punishment and Health. Yale Law School, New Haven, CT. 11/6/25.

**Invited Presentation,** Johns Hopkins Bloomberg School of Public Health, Outbreaks and Dual Loyalty Behind Bars, Baltimore MD. 5/5/25.

**Invited presentation,** University of Texas LBJ School of Public Affairs, Conference on Deaths in Custody, Austin Tx. 11/15/24.

**Invited presentation,** Yale Law School/Liman Colloquium, Death investigation and models of carceral care. Yale Law School, New Haven, CT. 4/9/24.

**Invited presentation,** United Nations Office of Drugs and Crime, Presentation on Custodial Death Investigation. Malina, Philippines (remote), 3/18/24.

**Invited presentation,** Jail and Prison Health and Human Rights, Oklahoma University School of Health Sciences, 2/13/22.

**Invited presentation,** COVID-19 and Carceral Health, Stanford University Schools of Engineering and Public Health, 2/23/22.

**Invited presentation,** Screening and treatment for sexually transmitted infections in justice. National Academy of Sciences Committee on Law and Justice, remote, September14th, 2020.

**Invited presentation,** Vaccination for COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, August 20th, 2020.

**Invited Presentation,** Documenting Deaths in Custody, National Association for Civilian Oversight of Law Enforcement (NACOLE), remote, August 3rd, 2020.

**Invited Presentation,** Decarceration and Health. Radcliffe Institute/Harvard University. Policy Series. Remote. 6/23/20.

**Invited presentation,** COVID-19 in correctional settings. Briefing for U.S. Senate Staff, sponsored by The Sentencing Project, remote, May 29, 2020

**Invited presentation,** COVID-19 in correctional settings. Briefing for Long Island Voluntary Organizations Active in Disaster , sponsored by The Health & Welfare Council of Long Island, remote, May 29, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, May 12, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Association of Counties, Justice and Public Safety Committee, remote, April 1, 2020.

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina, postponed.

**TedMed Presentation**, Correctional Health, Boston MA, March 15, 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American*

*Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

*Teaching & Other Health & Activities*

**Reviewer, Deaths in Custody Report,** National Academies of Sciences, Engineering and Medicine, Published 12/2025.

**Member, Biden-Harris COVID-19 Health Equity Task Force,** 2/26/21-10/31/21
Work with Task Force members to provide President Biden with interim recommendations to address COVID-19 Health inequities.

**United Nations Office of the High Commissioner of Human Rights,** Istanbul Protocol, contributor to 2022 updated protocol.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-2020.

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Draconculiasis Eradication, Togo West Africa, June 1990- December 1991.

*Books*

**Venters H.** *Outbreaks Behind Bars.* Johns Hopkins University Press. 4/2025.

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/2019.

*Chapters in Books*

Beichner-Thomas and **Venters H**. Worldwide Incarceration of Women. In ***Global Women's Health: Advancing Health Equity with Public Health Approaches.*** Springer Press, Expected 10/25.

**Venters H.** COVID-19 and the Struggle for Health Behind Bars. In *Excessive Punishment*. Columbia University Press, 2024.

**Venters H.** Asylum Evaluation in Detention Settings. In *Asylum Medicine: A Clinician's Guide*. Springer Publishing 2022.

**Venters H.** Mythbusting Solitary Confinement in Jail. In *Solitary Confinement Effects, Practices, and Pathways toward Reform*. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In *Decarceration*. Ernest Drucker, New Press, 2017.

*Prior Testimony and Deposition (Since 7/15/2022)*

- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 11/14/22 (Video testimony).
- Derrick Jones et al. v. City of St. Louis, Missouri et al., Case No. 4:21-cv-600. 3/17/23 Expert for Plaintiffs (Video deposition).
- Wilson v. San Diego, CA., Case No. 3:20-cv-0457-BAS-DEB. Expert for plaintiffs 5/8/23 (Video deposition).
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 5/30/23 (Video testimony).
- Harris v. Georgia DOC, Case No. 5:18-CV-365-TES. Expert for plaintiffs 6/15/23.
- Maney v. Oregon DOC, Case No. 6:20-cv-00570. Expert for plaintiffs 9/15/23.
- Serna v. San Diego, CA., Case No. 20-CV-2096-LAB-DDL. Expert for plaintiffs 10/27/23 (Video deposition).
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 11/17/23 (Video testimony).
- Carty v. Governor Bryan 3:94-cv-00078 Court appointed monitor. Hearing 4/30/24.
- Enyart v. San Bernardino 5:23-cv-00540. Expert for plaintiffs 5/8/23 (Video deposition) 5/21/24 testify at trial.
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 7/17/24 (Video testimony).
- Reed v. Wexford 3:20-cv-01139-SPM. Expert for plaintiffs. Deposition 9/26/24. Garden City, NY.
- Porio v. City of Tustin Case No. 8:22-CV-812-RGK Expert for plaintiffs. (Video deposition) 11/21/24, trial testimony 12/11/25, 1/22/25.
- Boyer v. ACH 20-CV-1123. Expert for plaintiffs 1/11/25 (Video deposition).

- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 1/30/25 (Video testimony).
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 2/5/25, Camden, NJ.
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 7/3/25, Camden, NJ.
- McCoy v. County of San Diego. Case No. No. 22cv1724- BTM-SBC. Expert for plaintiffs 7/18/25 (Video deposition).
- Cardew v. New York Department of Corrections and Community Supervision. Case No 21-cv-6557. Expert for plaintiffs 7/29/25 (Video deposition).
- Scott v. City of Baton Rouge. Case No. 3:22-cv-488. Expert for plaintiffs 7/30/25 (Video deposition).
- Scott v. Clarke. case 3:12CV36. Court appointed monitor. Hearing 8/01/25 (Video testimony).
- Vargas v. USA/Geo. Case No. 5:23-cv-00380-JWH-SP (CA). Expert for plaintiffs 08/18/25 (Video deposition).
- Rogers v. Columbia County (AK). Case 1:24-cv-01036-SOH. Expert for plaintiffs 12/9/25 (Video deposition).
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 12/19/25, Camden, NJ (Video testimony).
- Jung v. City of Philadelphia. Expert for plaintiffs. Trial testimony 2/25/26. Philadelphia PA.
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 2/27/26, Camden, NJ (Video testimony).
- Carty v. Governor Bryan, St. Thomas USVI. 3:94-cv-00078. Court appointed monitor, remote status hearing, 4/15/26.
- Paul v. New York Department of Corrections and Community Supervision. Case No 9:21-cv-000476. Expert for plaintiffs 5/20/26 (Video deposition).
- U.S.A. v. Cumberland County, NJ, 1:23-cv-02655. Court appointed monitor. Hearing 6/26/26, Camden, NJ (Video testimony).

**Rate Sheet for Dr. Homer Venters**

Hourly rate for all work, $600/hr.

Travel time, $300/hr. plus travel expenses.

Per Diem, GSA rates utilized, available at https://www.gsa.gov/travel/plan-book/per-diem-rates

Expenses, including lodging, travel, receipts provided with invoices.

# EXHIBIT 28

Expert Report of Lori Roscoe

# Exhibit 4

CHC
CORRECTIONAL HEALTHCARE CONSULTANTS LLC

**EXPERT WITNESS REPORT OF LORI E. ROSCOE, DNP, PhD, APRN, ANP-C, CCHP-RN REGARDING Lonnie Rupard.**

The Estate of Lonnie Rupard v. County of San Diego, et al.
U.S. District Court Southern District of California, No. 3:23-cv-1357-CAB-BLM

I have been retained to render opinions regarding the care and treatment of Mr. Lonnie Rupard while he was detained at the San Diego Central Jail December 2021 through his death on March 17, 2022. My opinions are based upon my knowledge, education, training and experience, and the materials, records, and testimony I reviewed regarding this matter.

**EXPERIENCE AND QUALIFICATIONS:**

I am an Advanced Practice Registered Nurse and certified Adult Nurse Practitioner with more than 35 years of experience in nursing and three decades of experience in correctional healthcare. I began working in correctional healthcare in 1995 and have served in a variety of clinical and administrative roles within correctional health systems.

My academic preparation includes a Bachelor's Degree in Education, a Bachelor of Science in Nursing, a Master of Public Administration with a healthcare concentration, a Master of Science in Nursing, a Doctorate in Healthcare Administration, and a Doctor of Nursing Practice degree.

I am certified by the National Commission on Correctional Health Care (NCCHC) as a Certified Correctional Health Professional (CCHP) and as a Certified Correctional Health Professional – Nurse (CCHP-N). I am currently the principal of Correctional HealthCare Consultants, LLC. Throughout my career I have worked for private correctional healthcare contractors, including Correct Care Solutions and CorrectHealth, LLC, as well as county

and state programs, and academic subcontractors such as the Medical College of Georgia. My work in correctional healthcare has included service as a correctional facility Health Services Administrator, Regional Administrator, Associate Program Director, Executive Director of Clinical Services, nurse practitioner, and registered nurse.

In my administrative and clinical leadership roles, I have been responsible for healthcare policy and procedure development; supervision of healthcare staff including providers, registered nurses, licensed practical nurses, and ancillary personnel; staff education and training for healthcare and custody staff; Continuous Quality Improvement programs; and healthcare program fiscal management. Through Correctional HealthCare Consultants, LLC, I continue to provide healthcare program evaluation, operational consultation, and transitional leadership services to correctional health systems.

I hold active registered nurse licensure in California, Kentucky, Washington, Virginia, and Georgia. I am licensed as an Advanced Practice Registered Nurse (nurse practitioner) in California, Kentucky, Virginia, and Georgia.

I served as a member of the American Nurses Association expert workgroup that reviewed and revised the *Correctional Nursing: Scope and Standards of Practice*, most recently published in 2021 (third edition). Under the auspices of the American Correctional Nurses Association, work is currently underway on the fourth edition, anticipated for publication in 2026.

I am a member of the National Commission on Correctional Health Care Multidisciplinary Education Committee and a member of both the Nursing Committee and Healthcare Committee of the American Correctional Association. I serve as a peer reviewer for the *Journal of Correctional Health Care*.

I was also invited to serve on the 2026 NCCHC Standards Advisory Task Force, which reviewed and edited the *Standards for Health Services in Jails* and the *Standards for Health Services in Prisons*, published in August 2025 and effective January 2026.

I am a founding member and President-Elect of the American Correctional Nurses Association.

A complete listing of my education, training, and professional experience is contained in my Curriculum Vitae, attached to this report as **Exhibit A.**

**COMPENSATION AND PRIOR TESTIMONY:**

I have attached to this report as **Exhibit B** a list of all cases in which I have testified in deposition or at trial in the last four years. I currently receive compensation of $400 per hour for case review and expert report production, with an initial retainer of $5000 for up to 10 hours of work. I receive $650 per hour compensation for deposition and court testimony, with a four-hour daily minimum and travel time reimbursed at $275 per hour as applicable. Travel expenses are charged per actual cost.

**DOCUMENTATION REVIEWED:**

Please see **Exhibit C**, attached.

**SUMMARY OF FACTS:**

On December 19, 2021, Lonnie Rupard was arrested by National City Police for a parole violation and booked into the San Diego Central Jail. Arresting personnel were aware of Mr. Rupard's psychiatric history, including psychotic disorder, and that information was relayed to jail staff at the time of intake. During the intake screening performed by registered nurse (RN) Samonte, Mr. Rupard was documented as disheveled in appearance, verbally abusive but redirectable, and oriented to person and place. His pulse was elevated at 110 beats per minute. He refused COVID testing. Nursing documentation identified a nursing diagnosis of

"alteration in health maintenance." Mr. Rupard weighed approximately 165 pounds at intake and was subsequently housed in general population.

On December 20, 2021, a request was generated for psychiatric evaluation due to Mr. Rupard's extensive psychiatric history, including prior treatment at Patton State Hospital and previous prescription of psychotropic medication. An initial psychiatric evaluation was scheduled for December 24, 2021; however, the encounter did not occur because of "time constraints." A second scheduled psychiatric intake evaluation on December 28, 2021, likewise, did not occur due to "time constraints."

On December 29, 2021, psychiatrist Anthony Cruz conducted an initial psychiatric evaluation of Mr. Rupard cell-side in a non-confidential environment. Mr. Rupard refused to participate meaningfully in the assessment. Documentation described him as verbally aggressive, rambling incoherently, disorganized, irritable, and uncooperative. He was noted to be shirtless, standing at the cell door, and was described as a poor historian. Dr. Cruz documented prior diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, antisocial personality disorder, and stimulant use disorder. Records reviewed by Dr. Cruz reflected more than ten prior psychiatric hospitalizations, including recent hospitalization at Patton State Hospital, as well as prior treatment with Haldol Decanoate, Zyprexa, Klonopin, Depakene, and Cogentin. Documentation further reflected a prior history of suicide attempts, including overdose.

During the December 29 psychiatric evaluation, Mr. Rupard's thought processes were documented as disorganized, with pressured speech, incoherent rambling, and he was irritable and verbally aggressive. Although much of the mental status examination could not be completed due to lack of cooperation, Dr. Cruz documented concern for psychosis, psychiatric decompensation, and Mr. Rupard's extensive psychiatric history. Haldol, Cogentin, and Valproic acid were prescribed. Laboratory testing was declined.

Between December 2021 and January 2022, Mr. Rupard repeatedly refused psychiatric medications and was at times noted to be unable or unwilling to sign medical refusal forms.

On January 20, 2022, Dr. Cruz conducted a psychiatric chart review documenting that Mr. Rupard had consistently refused psychiatric medications. At that time, Mr. Rupard's psychotropic medications, including Haldol, Cogentin, and Valproic acid, were discontinued. The medical record does not reflect referral to the Psychiatric Stabilization Unit (PSU) or another higher level of psychiatric care following the discontinuation of these medications.

On January 29, 2022, following a use-of-force incident involving deputies, RN Romero evaluated Mr. Rupard in the housing unit. Nursing documentation included that deputies reported Mr. Rupard had been "taken down." He was observed with a laceration between his eyebrows, abrasions to the face, and blood present on his lips. Mr. Rupard repeatedly refused assessment and threatened staff if touched. The nursing assessment was terminated for safety reasons.

On February 1, 2022, jail staff requested that Mr. Rupard be evaluated by a qualified mental health professional (QMHP) due to concerns regarding his mental status and functioning.

On February 9, 2022, a mental health wellness check was conducted by QMHP Anosike. Deputies reported that Mr. Rupard was frequently speaking to himself in unintelligible words. Documentation of the encounter reflected impoverished thought processes, inability or refusal to cooperate fully with assessment, and unintelligible speech.

On February 20, 2022, RN Romero documented that Mr. Rupard was placed on lockdown status, noting only that there were "no contraindications" to the placement. The record does not identify the reason for the lockdown or include any accompanying nursing assessment

of Mr. Rupard's psychiatric condition, functional ability, hygiene, nutritional status, vital signs, or ability to care for himself.

On February 22, 2022, Dr. Cruz again evaluated Mr. Rupard cell-side in a non-confidential environment. Documentation reflected that Mr. Rupard was no longer prescribed psychotropic medication because the medications previously ordered had been discontinued following repeated refusals. During the encounter, Mr. Rupard again refused meaningful participation, rambled incoherently, yelled at staff, and became verbally aggressive. He was described as alert and oriented only to person, with disorganized thought processes and poor grooming. Dr. Cruz documented that Mr. Rupard may have been responding to internal stimuli. Although his toilet was noted to be covered with cloth, the cell was otherwise described as relatively clean at that time. Dr. Cruz again documented Mr. Rupard's history of psychosis, psychiatric hospitalization, suicidality, and potential for psychiatric decompensation. The treatment plan documented continued monitoring and offering medications, with follow-up planned in six to seven weeks or sooner if needed. No description of what "need" would require sooner follow-up was documented.

On February 23, 2022, another request was made for Mr. Rupard to be evaluated by a qualified mental health professional. Documentation reflects that this request was not completed and no further documented wellness checks or psychiatric evaluations occurred prior to his death, except for the competency evaluation by Dr. Badre.

On March 14, 2022, court-appointed psychiatrist Nicolas Badre, MD, evaluated Mr. Rupard for competency to stand trial. Dr. Badre documented significantly deteriorated living conditions within the cell, including trash scattered throughout, feces present on the floor, a toilet filled with excrement, smeared food on the walls, and a strong malodor. Mr. Rupard himself was described as dirty, unkempt, incoherent, and severely disorganized. Dr. Badre determined that Mr. Rupard was not competent to stand trial and recommended transfer to a state hospital as well as involuntary antipsychotic medication treatment.

Between March 14 and March 17, 2022, the health record does not reflect that Mr. Rupard received psychiatric medications, was transferred to a higher level of psychiatric care, underwent medical evaluation, had vital signs obtained, was weighed, or received any intervention regarding the deteriorated sanitary conditions of his cell.

On March 17, 2022, Mr. Rupard was reportedly last observed alive during routine safety checks at approximately 2146 hours. At approximately 2212 hours, deputies conducting a welfare check briefly looked into Mr. Rupard's cell for several seconds before continuing to the next cell without entering the cell, rendering aid, or summoning medical personnel. Mr. Rupard was subsequently found in his cell at approximately 2248 hours not breathing (without a rise and fall of his chest). Cardiopulmonary resuscitation was initiated and emergency medical services were activated. Mr. Rupard was transported to UCSD Medical Center, where he was pronounced deceased at 2351 hours.

The policies and procedures of the San Diego County Central Jail pertinent to Mr. Rupard's medical care and treatment include *MSD.G.2.1 – Segregated Inmates* (Revised 1/5/2022); *MSD.N.4 – Nursing Documentation* (Revised 1/13/2022); *MSD.R.5 – Refusal Procedures* (Revised 1/6/2022) and *M.29 – Hunger Strikes* (Revised 10/21/2020). The associated standards by the NCCHC (2018) *include J-G-01: Segregated Inmates; J-A-08: Health Records; and J-G-05: Informed Consent and Right to Refuse*.

According to testimony from Serina Rognlien-Hood, Director of Nursing at the time, the County policy regarding incarcerated persons housed in segregation [redacted] The NCCHC standard *J-G-01: Segregated*

*Inmates* includes that same monitoring schedule and includes the documentation of these rounds and interactions with patients in their health record. Ms. Rognlien-Hood testified that she could not recall any documentation indicating that healthcare staff had been notified of Mr. Rupard's segregation placement, nor could she identify documentation demonstrating that the required nursing segregation monitoring occurred during Mr. Rupard's incarceration.

In February 2022, the California State Auditor's Office disseminated a report regarding the audit conducted as directed by the Joint Legislative Audit Committee of the San Diego County Sheriff's Department (Sheriff 's Department) to determine the reasons for in-custody deaths of incarcerated individuals and identify the steps it took to address these deaths. Its results suggested that systemic deficiencies had undermined the Sheriff's Office's ability to ensure the health and safety of the incarcerated persons in its custody. Its findings addressed medical, mental health and custody issues, and included the following nursing-related suggestions:

- Revise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity level rating it assigns to individuals to all detention staff overseeing them.
- Create a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process.
- Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.
- Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request.

- Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines necessary health care.

**DISCUSSION AND OPINIONS:**

It is my opinion, to a reasonable degree of nursing certainty, that the nursing and healthcare provided to Mr. Lonnie Rupard during his incarceration at the San Diego Central Jail failed to meet the accepted standard of nursing care and accepted correctional healthcare practices. The care provided also failed to comply with the facility's own policies regarding refusal management, monitoring of incarcerated persons housed in administrative segregation, and recognition of deteriorating health conditions.

Although Mr. Rupard had significant psychiatric illness, the nursing and medical issues presented in this case were not limited to psychiatric treatment decisions. Rather, the record reflects progressive deterioration in Mr. Rupard's physical functioning, self-care, hygiene, communication, and ability to meet his basic health and nutritional needs. These changes created foreseeable medical risks requiring ongoing nursing assessment, monitoring, reassessment, escalation of care, and provider notification.

**Failure to Escalate Monitoring Following Medication Refusals**

On January 20, 2022, Mr. Rupard’s psychiatric medications were discontinued because of repeated refusals. MSD.R.5, the facility’s Refusal Procedures policy, required nursing assessment, documentation of refusal reasoning, review of the acuity of the patient’s condition, counseling regarding risks and benefits, and referral to a physician or psychiatric provider when refusals involved serious medical or psychiatric conditions.

At the time medications were discontinued, Mr. Rupard already demonstrated substantial impairment, including incoherent speech, disorganized thought processes, inability to cooperate with assessment, verbal aggression, impaired communication, and a

documented history of schizophrenia-spectrum disorder, suicidality, and repeated psychiatric hospitalization. Despite these findings, the medical record reflects no increase in nursing monitoring, no structured reassessment plan, no nutritional or hydration monitoring, and no escalation to a higher level of medical or psychiatric care. Importantly, once medications were discontinued, Mr. Rupard no longer had routine medication administration encounters with nursing staff. In correctional settings, medication administration frequently serves as one of the few consistent opportunities for direct nursing observation of incarcerated persons with severe mental illness. Such encounters allow nurses to assess physical appearance, weight changes, hygiene, nutritional status, cognition, mobility, responsiveness, and ability to care for oneself. Following the discontinuation of medications, those regular informal nursing observations effectively ceased.

More likely than not, continued routine nursing contact would have revealed Mr. Rupard's progressive deterioration. A reasonable and prudent correctional nurse observing worsening hygiene, impaired functioning, inability to care for oneself, probable weight loss, or evidence of nutritional decline would promptly initiate further medical evaluation and reassessment and then notify a provider of the findings.

**Failure to Recognize That Inability to Participate in Assessment Was Clinically Significant**

Throughout the record, healthcare staff repeatedly documented that Mr. Rupard was unable to be assessed, "uncooperative," incoherent, verbally aggressive, or unwilling to participate meaningfully in encounters. However, Mr. Rupard's inability to meaningfully participate in assessment was itself evidence of significant impairment and should not have resulted in reduced monitoring or abandonment of further evaluation efforts, but instead should have prompted increased objective assessment, provider notification, and development of an appropriate treatment plan.

Correctional nursing care requires adaptation of assessment techniques for incarcerated persons who are severely mentally ill, psychotic, disorganized, cognitively impaired, or unable to participate fully in traditional interview-based evaluations. In such patients, objective nursing observations become especially important, including observation of appearance, hygiene, nutritional status, hydration, mobility, environmental conditions, responsiveness, and overall functioning. Rather than increasing monitoring and objective reassessment in response to Mr. Rupard's inability to participate in care, the record shows progressively decreasing healthcare contact and limited objective medical evaluation despite obvious evidence of deterioration.

**Failure to Adequately Monitor a Segregated and Isolated Incarcerated Person**

The San Diego County policy regarding segregated incarcerated persons, *MSD.G.2.1 – Segregated Inmates*, [redacted]

On February 20, 2022, nursing documentation reflected that Mr. Rupard was placed on lockdown status, with RN Romero documenting only that there were "no contraindications" to the placement. At that time, Mr. Rupard already exhibited evidence of severe deterioration, including disorganized thought processes, incoherent speech, refusal of medications, impaired communication, and inability to meaningfully cooperate with assessment.

Despite the segregation monitoring requirements, the medical record does not reflect consistent nursing wellness checks, serial medical monitoring, nutritional assessment, hydration assessment, serial vital signs, or weight monitoring after placement in lockdown

or segregation status. There is likewise no indication that healthcare staff identified and escalated Mr. Rupard's progressive deterioration, despite increasingly obvious evidence of failing self-care and impaired functioning.

The facility's segregation policy existed specifically because isolated incarcerated persons are at increased risk for worsening psychiatric symptoms, malnutrition and dehydration, deterioration in hygiene and functioning, delayed recognition of illness, and inability to independently seek medical care.

These risks are especially pronounced in incarcerated persons suffering from severe psychotic disorders, disorganized thought processes, or significant psychiatric decompensation. Such individuals may be unable to appropriately communicate medical needs, recognize worsening illness, maintain adequate nutrition or hydration, engage in basic hygiene, or independently seek healthcare attention. In correctional settings, isolation and segregation may further reduce opportunities for healthcare observation and intervention, making regular nursing monitoring and reassessment critically important safeguards against unrecognized deterioration.

More likely than not, had the segregation monitoring policy been meaningfully implemented for Mr. Rupard, healthcare staff would have directly observed his deteriorating physical appearance, worsening hygiene, inability to care for himself, and probable weight loss. A reasonable and prudent nurse observing these findings would conduct a nursing reassessment and nutritional evaluation, including vital sign and weight measurements, and would immediately escalate care to a provider. More likely than not, a prudent provider getting report about Mr. Rupard would immediately consider transferring Mr. Rupard to a higher level of care. At a minimum, a reasonable provider would have contacted the psychiatric staff to discuss Mr. Rupard's care and treatment plan.

The testimony of Serina Rognlien-Hood supports the conclusion that established segregation monitoring policies were not followed in Mr. Rupard's care. The applicable policy required nursing staff to monitor segregated incarcerated persons three times weekly and required healthcare review upon placement in segregation. While RN Romero did a health record review and did not identify any contraindications to Mr. Rupard being placed in lockdown, Mr. Rupard's psychological condition itself was a contraindication to lockdown.

In addition, there is no evidence that the required three times weekly nursing assessments and wellness checks occurred. Dr. Cruz testified he expected nurses to follow the policies and procedures and assumed that Mr. Rupard was being monitored by nursing staff per policy *MSD.G.2.1 – Segregated Inmates* (Revised 1/5/2022), although he acknowledged he did nothing to check and verify this was occurring.

Had nursing staff performed the required segregation rounds, it is more likely than not that Mr. Rupard's progressive deterioration would have been identified substantially earlier. Mr. Rupard experienced obvious and progressive physical decline, including poor intake, severe weight loss, weakness, and declining functional status. Reasonable and prudent correctional nursing staff performing regular segregation monitoring would have recognized these findings as clinically significant and requiring further medical evaluation, escalation of care, and provider notification. The failure to perform required segregation monitoring substantially reduced opportunities for clinical observation, reassessment, intervention, and escalation of care and constituted a significant deviation from the standard of nursing care.

**Failure to Recognize and Evaluate Nutritional Decline and Failing Health**

The facility's Hunger Strike policy, *M.29 – Hunger Strikes* specifically recognized that incarcerated persons may not verbally declare a hunger strike and that refusal of meals alone may indicate inadequate nutritional intake requiring healthcare intervention. The

policy required staff observation, healthcare staff notification, weight monitoring, hydration monitoring, and medical evaluation based upon identified findings and needs.

Although there is evidence suggesting that Mr. Rupard was not maintaining adequate nutritional intake, healthcare staff failed to identify and appropriately respond to evidence of nutritional decline by initiating the Hunger Strike policy and associated monitoring procedures. At autopsy, Mr. Rupard weighed 105 pounds, a remarkable weight loss of 60 pounds in approximately three months that would have been obvious to staff if he was being monitored per policy. This constituted a significant deviation from the standard of nursing care.

By March 2022, Mr. Rupard exhibited profound deterioration in functioning and self-care. Conditions documented about his cell included feces on the floor, smeared food on the walls, overflowing human waste in the toilet, severe disorganization, poor hygiene, and inability to adequately communicate or care for himself. These conditions were not merely environmental or disciplinary concerns; they were objective clinical indicators of severe psychiatric decompensation, inability to perform activities of daily living, possible nutritional compromise, and failing health requiring immediate healthcare reassessment and intervention.

Regardless of whether healthcare staff had access to Dr. Badre's subsequent written report prior to Mr. Rupard's death, the conditions documented during the March 14 evaluation reflected observable conditions existing within Mr. Rupard's housing environment and ongoing deterioration that would have been visible to staff interacting with or monitoring him.

Despite these findings, the medical record contains no evidence of serial weight monitoring, nutritional assessment, hydration assessment and monitoring, calorie tracking, intake monitoring, or systematic evaluation for malnutrition or physical decline. There is likewise

no indication that custody or healthcare staff documented meal refusal patterns or monitored alternative food intake as contemplated by policy.

Importantly, Mr. Rupard's severe psychosis, impaired communication, segregation, and inability to care for himself substantially increased the risk that nutritional decline and medical deterioration would go unrecognized absent active monitoring by healthcare staff. More likely than not, had the Hunger Strike and Segregation monitoring policies been appropriately implemented, healthcare staff would have identified evidence of physical decline, obtained objective clinical data including serial weights and vital signs, escalated concerns to a provider, and initiated additional medical intervention prior to Mr. Rupard's death. The failure to initiate the Hunger Strike and Segregation policies constituted significant deviation from the standard of nursing care.

**Progressive and Foreseeable Deterioration**

Mr. Rupard's deterioration was not confined to a single isolated event. Rather, the record reflects repeated opportunities over a period of weeks for custody and healthcare staff to recognize worsening functioning, impaired self-care, disorganization, possible nutritional decline and dehydration, and failing health. The cumulative significance of these observations warranted increasing medical attention and reassessment rather than decreasing healthcare contact and continued segregation.

Importantly, the facility's own policies regarding segregation monitoring, refusals, and hunger strikes collectively recognized that incarcerated persons who are segregated, mentally ill, refusing treatment, or unable to adequately care for themselves require increased observation and ongoing healthcare assessment. These policies existed specifically to identify deterioration in incarcerated persons who may be unable or unwilling to independently request medical assistance and obtain the required care.

Mr. Rupard demonstrated progressive and foreseeable deterioration requiring ongoing nursing monitoring, objective reassessment, escalation of care, and provider notification, but that did not occur. The last nursing entry in the health record occurred on February 20, 2022, and was not a physical evaluation of his status, but rather a record review for contraindications to placing Mr. Rupard in lockdown. The documented monitoring and reassessment contemplated by the facility's own policies did not occur and staff failed to identify and appropriately respond to Mr. Rupard's progressively worsening condition.

These cumulative failures substantially delayed recognition of Mr. Rupard's deteriorating condition by healthcare staff, reduced opportunities for timely medical intervention, and significantly increased the risk of serious harm and death.

My opinions, conclusions and findings are made to a reasonable degree of administrative, provider, and nursing certainty and are based upon my knowledge, education, training and experience, and the records, materials, and testimony I reviewed regarding this matter. I hereby reserve the right to amend, supplement, or withdraw my opinion based upon future discovery and depositions of the relative parties that may be provided to me.

Respectfully Submitted on July 15, 2026.

Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-N

# Curriculum Vitae

Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN
[redacted]

## PROFILE

An innovative Healthcare Manager, certified as an Advanced Practice Registered Nurse, a Correctional Health Professional, and a Correctional Registered Nurse, with 31 years of experience in Correctional Health Care and 37 years of Registered Nursing experience. An expert on National Commission on Correctional Health Care and American Correctional Association standards, and policy and procedure development and compliance. An educator of both nurses and correctional officers. A seasoned Continuous Quality Improvement professional. An experienced correctional health expert legal witness, including case review, expert report authoring, and deposition/trial testimony.

## EDUCATION

**Doctor of Nursing Practice**
University of Alabama, 2017

**Master of Science in Nursing, Adult Nurse Practitioner**
South University, 2014

**Doctor of Health Care Administration**
Madison University, 2006

**Master of Public Administration, Health Care concentration**
University of Hartford, 1994

**Bachelor of Science in Nursing**
University of Connecticut, 1989

**Bachelor of Science in Education, Secondary Education and Sociology majors**
Southern Connecticut State University, 1978

## AWARDS

DAISY Team and Correctional Nurse Leadership Award – November 2025

Margaret Collatt Service Award - 2023 – Academy of Correctional Health Professionals

High Honors - South University - 2014

Award for Academic Excellence – University of Hartford 1994

Woodruff Fellow 1992 – 1994 – University of Hartford

## EXPERIENCE

**Correctional HealthCare Consultants LLC**

**January 2007 – present – Managing Member**

**American Correctional Nurses Association** – (2020 – present), Co-Founder and Member of the Correctional Nursing workgroup currently reviewing and editing the *Correctional Nursing*: *Scope and Standards of Practice, 4th edition,* to be published 2026. President-Elect 2025-2026.

**National Commission on Correctional Health Care Jail and Prison Expert Advisory Task Force for the 2026 Standards** – 2024 – present.

**Independent Content Expert Reviewer** for Doctoral Nursing Student thesis regarding medication administration and Continuity of Care in a Jail setting - Aspen College – 2023-present

**Phoebe Putney Health System – Dougherty County Jail - Georgia** – (2023 – 2024) Healthcare program consultant

**Marion County, KY – Jailer J. Barry Brady** – (2018-present) Healthcare program transitional and ongoing consultation services

**Boone County, KY – Jailer Jason Maydak** – (2018-present) Healthcare program development, transition services and consultation services

**Laurel County, KY – Jailer Jamie Mosley –** (2017-2024; 2025 - current) Healthcare Program Evaluation, ongoing program development, and consultation services

**Preceptor for MSN Nurse Practitioner students from Georgia State University** – (2016 – 2017) Semester of Nurse Practitioner experience in a correctional setting

**CorHealth Solutions, LLC – Dr. D. Brent Cherry** – (2016) - Correctional Health Program Development and contract initiation consultation- Somerset, KY

**National Commission on Correctional Health Care Multi-Disciplinary Education Committee** (2019 – present)

**Journal of Correctional Health Care,** peer reviewer (2019 – present)

**University of Connecticut School of Nursing** (2014 - 2016) – Expert Nurse panelist for a research study regarding the Correctional nurse and stress being conducted by Dr. Denise Panosky.

**American Nurses Association –** Member of the Correctional Nursing workgroup responsible for reviewing and editing the *Correctional Nursing*: *Scope and Standards of Practice* – latest version published November 2020.

**The Correctional Nurse Educator** (2010-present) – Developed and maintain an online educational site where nurses can earn continuing education credits in topics specifically related to correctional nursing. Accredited as a Provider by the California, Florida, Georgia, South Carolina and other Boards of Nursing.

**Medical Association of Georgia** (2007-2017) – Accreditation auditor for the Corrections Division.

**Legal casework** (2007-present) - Multiple cases for both Defendants and Plaintiffs.

**American Correctional Health Services Association –** Executive Director – 2011-2012

**Correct Health, LLC –** DeKalb County Jail (2008-2009) - Operational review, Management staff mentoring, CQI Program expansion and Annual Review, Procedures and Post Order development, nursing staff mentoring and education**.**

**Comprehensive Nursing Care, Inc.** (2007 - 2009) **–** Development of successful bid proposal for Medical Nursing Services at Hall County Jail – continued association to develop and execute a complete Nursing orientation program, written procedures for staff, Nursing Assessment Protocols, corresponding Nursing Treatment Notes and Blood Borne Pathogen Exposure Plan, CQI Program and ongoing Staff and Management mentoring.

**The Community Health Center, West Palm Beach, FL**

July 2018 – 2023 – Nurse Practitioner

Nurse Practitioner volunteer provider at this Free Clinic – evaluate, diagnose and treat patients presenting to the clinic with a wide range of illnesses and injuries, including chronic illnesses such as diabetes, hypertension, seizure disorder and hyperthyroidism; women's health issues; mental illness; and acute conditions like infections; sprains and minor injuries. Preceptor for Nurse Practitioner, Physician Assistant, Medical and RN students.

**Correct Care Solutions, Nashville, TN**

September 2014 – January 2018 – Nurse Practitioner, Georgia

In collaboration with the Medical Director, provision of the full range of medical services for the patients at the facility, including sick call, urgent/emergent and chronic care. Interpretation of lab results and diagnostic studies ordered through the facility.

**CorrectHealth LLC, Atlanta, Georgia**

January 2013 – June 2013 – Director of Clinical Support

Responsible for Clinical Services Education, Infection Control, Continuous Quality Improvement, and Accreditation. Daily clinical practice and staff contact. Exclusively responsible for the clinical education of staff at 33 sites, which included working side-by-side with staff, conducting needs assessments and evaluations, and the research of evidence based practices and guidelines to ensure staff were adhering to nationally approved standards of care.

January 2012- January 2013 – Executive Director of Clinical Services

Responsible for all aspects of Clinical Services, including Education, Infection Control, Continuous Quality Improvement, Health Information and Accreditation. Policy and Procedure review and development. Responsible for nursing and ancillary staff. Visited sites and interacted with clients on a regular basis.

July 2009 – December 2011 – Director of Special Projects

Participated in projects with the Georgia Department of Corrections; Project Coordinator and Lead Surveyor for an audit of all healthcare services for the Maricopa County Jail, Phoenix, Arizona; Developed projects and procured funding for the CorrectHealth Community Development Center (non-profit); Project Manager for a Special Study for the Wyoming Department of Corrections regarding healthcare access, medical cost and potential efficiencies; internal operations auditing and staff development. Within CorrectHealth, major responsibility for the clinical education of staff, including nurses, providers and ancillary staff. This included working side-by-side with staff, conducting needs assessments and evaluations, and evidence-based practices and guidelines research to ensure staff adherence to nationally approved standards of care.

**Georgia Correctional Health Care, Georgia Department of Corrections**

2006 - 2007 – Staff Nurse/PRN - Georgia Diagnostic and Classification Prison

**Correctional Medical Services, St. Louis, Missouri**

2004 - 2006 - Health Service Administrator - DeKalb County Jail (GA)

2004 - Utilization Management Nurse (interim) - New Jersey Department of Corrections contract

2000 - 2002 - Associate Program Director – New Jersey Department of Corrections contract

1996 - 1998 - Associate Program Director – Massachusetts Department of Corrections contract

1995 - 1996 - Health Services Administrator - Framingham Women's Prison (MA)

**New Britain Technical Institute, New Britain, CT** 1998 - 1999 – Instructor, LPN program

---

## PRESENTATIONS/LECTURES/PUBLICATIONS

---

**Building Effective Nursing Orientation and Competency Programs with NPD Principles.** Presented April 2026 at the Spring NCCHC Conference, New Orleans, LA.

**Understanding Nursing Scope of Practice in Correctional Settings: A Provider-Focused Perspective.** Presented March 19, 2026 via webinar for the American College of Correctional Physicians.

**The Art of Saying No: Real Strategies for Real Situations.** Presented at the Fall 2025 NCCHC Conference, Baltimore, MD. November 4, 2025

**American Correctional Nurses Association** webinar **Advanced Wound Care Therapy for the Correctional Environment, Moderator** presented July 29, 2025.

**"How to Achieve Success as a Correctional Nurse Manager"** a series of 5 webinars held February 5th, 12th, 19th, and March 5th and 12th, 2025 for the National Commission on Correctional Healthcare - Lead Nurse Planner and presenter week 3, ***Clinical Processes*** and week 5, ***Capstone*** *presentation*.

**American Correctional Nurses Association** webinar "**Are You Ready to Advance Your Career? Principles of Correctional Nursing Leadership"** a panel discussion held February 6, 2025.

**American College of Correctional Physicians, Case Histories in Correctional Medicine, Webinar Moderator** presented August 21, 2024 .

**A Comprehensive Look at Correctional Healthcare Documentation: The Critical Importance of Medical and Behavioral Healthcare Documentation.** Academy of Correctional Health Professionals, webinar presented August 6, 2024.

**Case Studies in Correctional Nursing: Practice, Standards and Leadership** presented at the National Commission on Correctional Health Care Spring 2024 Conference April 27-30, 2024 in St. Louis, MO.

**APRN Challenges: Staying Current on Treatment Guidelines** presented at the National Commission on Correctional Health Care Spring 2024 Conference April 27-30, 2024 in St. Louis, MO.

**American Correctional Nurses Association webinar presenter, "What Do the Correctional Nursing: Scope and Standards of Practice Mean to Me?"** Presented February 1, 2024.

**American College of Correctional Physicians, Webinar Moderator, "Compassion and Care--War Stories from the Trenches--Case Histories in Correctional Medicine"** presented November 16, 2023.

**“Bringing High Quality Healthcare to the Incarcerated – Lessons from a Nurse Educator”** presented at The Western American Correctional Health Services Association conference October 25-27, 2023 in Sacramento, CA.
**The American Correctional Nurses Association, OPEN FORUM: All Things Intake** conducted June 20th, 2023; **Scope of Practice for Correctional Nurses** conducted July 20th, 2023; **Withdrawal** conducted October 19, 2023; **Systemic Racism**, December 2023; **Recruitment and Retention** January 2024; February 2024; March 2024; April 2024; … March 2025; and ongoing. ** This is a monthly ACNA activity**
**“Components of a Correctional Healthcare Program”** presented to the Kentucky Jailer’s Association during its Educational Conference June 8, 2023, in Covington, Kentucky.

**“The Lived Experiences of Advanced Practice Registered Nurses in Correctional Settings”** presented at the National Commission on Correctional Health Care Spring 2023 Conference in New Orleans, Louisiana.

**“Components of a Correctional Healthcare Program”** presented to the newly elected Jailers at the Kentucky Jailers Association Conference December 9, 2022, in Lexington, Kentucky.

**“APRN Transformational Leadership”** presented at the National Commission on Correctional Health Care Spring 2022 Conference in Atlanta, Georgia.

**“How to Achieve Success as a Correctional Nurse Manager”** a series of 4 webinars for the National Commission on Correctional Healthcare by the Nurse Advisory Council – Lead Nurse Planner and presenter week 3, Clinical Processes, held August 3rd, 10th, 17th and 24th 2021.
Also Presented April 10, 2022, as a Pre-Conference half day session to the Spring National Conference of the National Commission on Correctional Health Care in Atlanta, Georgia.

**“Professional Practice in Our Post-COVID World: A Correctional Nurse Conversation”** presented at the Virginia Department of Correction Nursing Conference Keynote speaker July 13, 2021.

**“Honoring Our Practice in a Post-COVID World: A Correctional Nursing Conversation”** presented at the Wisconsin Department of Correction Health Services Administrators’ meeting June 17, 2021.

**“How APRNs Can Add Value to Your Correctional Healthcare Operation”** presented at the National Commission on Correctional Health Care Spring 2021 Virtual Conference.

**“Patient Advocacy for the Correctional Nurse”** and **“Skin Assessment for the Correctional Nurse”** presented at the National Conference of the National Commission on Correctional Health Care in Ft. Lauderdale, FL. October 2019.

**“Clinical Decision Making in Correctional Nursing”; “Advanced Practice Registered Nurses in Corrections: Roundtable”** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN. April 2019.

**“Clinical Judgment for the Correctional Nurse”** presented at the National Conference of the National Commission on Correctional Health Care in Las Vegas, NV, October 2018 and in Atlanta, GA, May 2017.

**“A Seizure Disorder Primer for the Correctional Nurse”** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN, April 2016.

**“A Hypertension Primer for the Correctional Nurse”** and **“The Nurse’s Role in Chronic Care Management”** presented at the National Conference of the National Commission on Correctional Health Care in Dallas, TX, October 2015.

**“A Diabetic Primer for the Correctional Nurse”** presented at the National Conference of the National Commission on Correctional Health Care in New Orleans, LA, April 2015.

Guest Expert Panelist, American Association of Legal Nurse Consultants webinar **"Civil Rights Litigation"** held nation-wide on October 30, 2014.

**"The Nurse's Role in Chronic Care Management"** presented at the National Conference of the National Commission on Correctional Health Care in Atlanta, GA, April 2014.

Guest Expert panelist, Omnisure webinar **"The Unscheduled Encounter: Reducing Liability and Risk",** held nation-wide on December 4, 2013**.**

**"The New ANA Scope and Standards of Practice for Correctional Nurses: Implementation Standard", "The New ANA Scope and Standards of Practice for Correctional Nurses: Communication Standard"** and **"The Essentials of Nursing Leadership: Capstone Presentation"** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN, October 2013.

**"Unscheduled Encounters: Managing the Nursing Curbside Consult"** and **"The New ANA Scope and Standards of Practice for Correctional Nurses: Implementation Standard"** presented at the National Conference of the National Commission on Correctional Health Care in Denver, CO, April 2013.

**"Unscheduled Encounters: Managing the Nursing Curbside Consult"** presented at the National Conference of the National Commission on Correctional Health Care in Las Vegas, NV, October 2012.

**"Children and Prescription Drug Abuse" –** CHAMPS Instructor School, Georgia Sheriff's Association, June 2012.

**"Con Games: Inmate Manipulation"** presented at the Nursing Forum, American Correctional Health Services Association's National Conference in San Antonio, TX, April 2012.

**"HIV Awareness", "Universal Precautions"** and **"Inmate Medical Services"** at the DeKalb County Sheriff's Office 111th Jail Academy, February 2011 through the 124th Jail Academy, August 2014.

**"Crisis Intervention Training"** co-presenter at the American Correctional Health Services Association Georgia Conference, Savannah, Georgia, November 2009.

**"Nursing Forum: Legal Parameters and Best Practice"** at the American Correctional Health Services Association National Conference, Orlando, Florida, March 2009.

**"Dilemmas in Correctional Nursing"** at the American Correctional Health Services Association National Conference, Reno, NV, June 2007.

## PUBLICATIONS

Zucker, D., Reagan, L., Clifton, J., Abdulhamed, A., Roscoe, L., Wright, R., Penix, D., Shelton, D., and Loeb, S. (2022). **NPs caring for people who are incarcerated and negatively impacted by social determinants of health**. *The Nurse Practitioner (47)* 6, 38 - 46. Wolters Kluwer Health, INC, DOI-10.1097/01.NPR.0000829804.16627.7b

Roscoe, L., Smith, S., and Shelton, D. (2023). **Translating the Essentials for correctional nursing practice and professional development.** *The Journal of Continuing Education in Nursing, 54(9).* Doi: 10.3928/00220124-20230816-14.

Shelton, D., Roscoe, L., Kaptanovic, T., and Smith, S. (2025). **The correctional nursing workforce crisis: An innovative solution to meet the challenge**. *Journal of Correctional Health Care,* Doi: 10.1089/jchc.24.09.0079.

## LICENSES AND CERTIFICATIONS

Advanced Practice Registered Nurse/Nurse Practitioner –California (NP95006810), Georgia (RN179490), Kentucky (3012955), Virginia (0024178346) and Florida (Autonomous Practice APRN9485060 - retired),

Certified Adult Nurse Practitioner – American Academy of Nurse Practitioners National Certification Board (A0614010 – expiration June 2029)

Registered Nurse licensure - Washington, California, Kentucky, Virginia, Georgia and Florida (retired)

Certified Correctional Health Professional – Certified Correctional Nurse – NCCHC

Certified Provider of Continuing Education – California Board of Registered Nursing and others

Certified Guest Instructor - Georgia Peace Officer Standards and Training Council

BLS Healthcare Provider

## MEMBERSHIPS

American Correctional Nurses Association - Founding Member and President-Elect 2025-2026

American Association of Nurse Practitioners - member

American College of Correctional Physicians – member and Virtual Education Committee

American Correctional Association – member and Health Care Committee and Correctional Nursing Committee

American Jail Association - member

Western American Correctional Health Services Association (WACHSA) - member

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN

**2022 - 2026**

**Paul James, James & Carter PLC**
**Little Rock, AR**

Michelle "Missy" Babin Special Administratrix estate of Larry Charles Babin, deceased, Plaintiff, vs John Montgomery, et al, Defendant.

*Plaintiff* - **ongoing litigation**

**Katharine Tapp, Poppe Law Group**
**Sandra Spurgeon, Spurgeon Law Group**
**Lexington, KY**

David Hammonds, estate of Robinson et al Plaintiff vs. Southern Health Partners, Adair County, et al, Defendants

*Plaintiff* - **ongoing litigation**

**Anne Vankirk, Dubin Law Group**
**Seattle, WA**

Nicole McClure, an individual, Plaintiff, vs. Washington State Patrol, a department of the State of Washington; Thurston County, a political subdivision of the State of Washington, et al., Defendant.

*Plaintiff* - **ongoing litigation**

**Linda Le Jones, Clark Von Plonski Anders**
**Dallas, TX**
**Josh Maness, Law Offices of Josh Maness**
**Waskom, TX**

Brian Newman, as Independent Administrator of the Estate of Terry Lamont Newman, deceased, et al., v. Smith County, TX et al.

*Plaintiff* - **ongoing litigation**

**Edward J. McNelis and Whit Long, Emroch & Kilduff**
**Richmond, VA**

Deandre R. Alston v. CHS TX, INC, d/b/a YesCare Corp., et al

*Plaintiff* - **settled 2025**

**Jason Hicks, Chris Hammons, Laird, Hammons, Laird, PLLC**
**Oklahoma City, OK**

Kizzie Simms, individually and as Special Administrator of the Estate of Gregory Neil Davis, Plaintiff, vs. Board Of County Commissioners For Oklahoma County; Board Of Trustees For The Oklahoma County Criminal Justice Authority; Greg Williams, individually, Turn Key Health Clinics, LLc, et al.

*Plaintiff* - **trial April 2026**

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN

**2022 - 2026**

**Sarah Mansfield, Wesley Clark and Frank Brazil, Brazil Clark PLLC**
**Nashville, TN**

Jason Michael Clark, ex rel Conservator Richard Gary Clark, Plaintiff v Fentress County, Sheriff Michael Reagon, Candy Norman (aka Candy Price), Fast Access Healthcare, Anthony Baird, Nerissa Owens, Defendants
*Plaintiff* - **settled 2025**

**Marko Duric, Sandberg Phoenix**
**St. Louis, MO**
**Shauna Reitz, Loizzi Law Offices, LLC**
**Chicago, IL**

Amy Hernandez, as Administrator of the Estate of Alex Alvarez, deceased, Plaintiff, v. Vippin Shah, MD, Deena Seed, Amy Frey, Amy Thurman, Pamela Ward and Wexford Health Sources, Inc Defendants.
*Plaintiff* - **ongoing litigation**

**Paul K. Croley II, Law Offices of Croley & Foley**
**Lexington, KY**

Tammy Webb, as Administratrix of the Estate of Terri Beth Mays, deceased v. Whitley County, KY, Brian Lawson, et al.
*Plaintiff* - **ongoing litigation**

**Anika Ades, MacDonald Hoague & Bayless**
**Seattle, WA**

Ryan Kelty, Plaintiff, v. Walla Walla County, Rebecca Groom, Nadean Pulfer, et al.
*Plaintiff* - **settled 2025**

**Derek Franseen, Walsh & Franseen**
**Edmond, OK**

Blake Williams, Plaintiff, v. Heather Hasenmyer, individual
*Plaintiff* - **ongoing litigation**

**F. Davis Poisson III and Noah Abrams,** Poisson and Bower
**Raleigh, NC**

Kahleel Truesdale, Plaintiff v. Quality Mobile X-Ray, Wellpath LLC, et al Defendant
*Plaintiff* - **ongoing litigation**

**Paul K. Croley II, Law Offices of Croley & Foley**
**Lexington, KY**

Keri Burnette, as Administratrix of the Estate of Aaron K Burnette, deceased v. Whitley County
*Plaintiff* - **ongoing litigation**

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN

**2022 - 2026**

**Aurora Randolph, ALR Civil Rights LLC**
**Denver, CO**

Kisha Birts, Plaintiff, vs. Colorado Department of Corrections, Rita Winn, NP, et al. Defendants.
*Plaintiff* - **settled 2026**

**Brian Tanner, Griffin, Turner, Tanner & Clarkson**
**Savannah, GA**

Patsy Ann Amaro, as mother of Johnny Warren Conley;
Jake Calvin Conley, as father of Johnny Warren Conley; et al v. Dr. Myra Pope, et al
*Plaintiff* **- settled 2026**

**Anna Holland Edwards, Holland, Holland Edwards & Grossman, LLC**
**Denver, CO**

Estate of Cristo Jesus Canett, by and through its personal representative Elizabeth Naranjo v. Wellpath LLC, Board of County Commissioners of the County of El Paso, CO; Sheriff Joseph Roybal, Anthony Lupo, individually; et al.
*Plaintiff* **- ongoing litigation**

**Anna Holland Edwards, Holland, Holland Edwards & Grossman, LLC**
**Denver, CO**

Estate of Amy Lynn Cross v. Turn Key Health Clinics LLC, Board of County Commissioners, Weld County, et al
*Plaintiff* **- settled 2025**

**Thomas Day, Eagan Flanagan and Cohen**
**Springfield, MA**

MAURA O'NEILL, as administrator of the Estate of Madelyn E. Linsenmeir, Plaintiff, v. CITY OF SPRINGFIELD, et al. Defendants
*Defendant Hampton County Sheriff's Office* - Defendant - **settled 2025**

**Jason Hicks, Chris Hammons, Laird, Hammons, Laird, PLLC**
**Oklahoma City, OK**

Ashley Meyers, et al v. Board of County Commissioners of Rogers County, et al
*Plaintiff* **- closed**

**William Murray, Jaden Rhea, Bailey & Wyant, PLLC**
**Charleston, WV**

Joyce Horner as Administratrix of Estate of Noah Morris v. PrimeCare Medical of WV, INC and the WV Division of Corrections and Rehabilitation (DCR).
*Defendant DCR* - **ongoing litigation**

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN

**2022 - 2026**

**Todd Schroeder, McKeen and Associates**
**Detroit, MI**
Timothy Griswold as the personal representative of the estate of John E. Griswold of v. Trinity Health; County of Livingston; et al
*Plaintiff* - **ongoing litigation**

**Anna Holland Edwards, Erica Grossman, Holland, Holland Edwards & Grossman, LLC**
**Denver, CO**
Estate of Kelroy Newman, Plantiffs v Board of County Commissioners of the County of Montezuma, CO; Sheriff Steven Nowlin; et al
*Plaintiff* - **settled 2026**

**Frederick J. Schlosser, Gates, Wise, Schlosser and Goebel**
**Springfield, IL**
Smith v. County of Macon, et al.
*Plaintiff* - **settled 2025**

**Rachel Fuerst, Henson Fuerst, PA**
**Raleigh, NC**
Estate of Caveness v. Gray, et al.
*Plaintiff* - **settled 2023**

**Mark Krudys, The Krudys Law Firm, PLC**
**Richmond, VA**
Boley v. Armor Correctional Health Services, Inc., et al.
*Plaintiff* - ***Trial December 2022***

**John Coletti, Paulson Coletti Trial Attorneys PC**
**Portland, OR**
Thomsen v. NaphCare, Inc, et al
*Plaintiff* - ***settled 2024***

**Carolyn Trier, Trier Law Office, LLC**
**Fort Wayne, IN**
Rittenhouse v. Wells County et al
*Plaintiff* - ***settled 2024***

**Michael Crow, Beasley, Allen, Crow**
**Montgomery, AL**
Robert Edward Taylor, v. Eric Starr et al
*Plaintiff* - ***settled 2024***

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN

**2022 - 2026**

**Erik Heipt, Budge & Heipt, PLLC**
**Seattle, WA**
Mary Margaret Mathis v. Southwestern Correctional LLC et al
*Plaintiff* - ***settled 2023***

**Amy Miller, Miller Olsen, PLLCC**
**Seattle, WA**
Michael Eugene Searles, v. Washington State Department of Corrections
*Plaintiff* - ***settled 2023***

**Kevin Young, Peterson & Associates, P.C.**
**Kansas City, MO**
Gary Burke, et al. Plaintiffs vs. Butler County, et al. Defendants
*Plaintiff* - ***settled 2023***

**Paul Dworak & Jeffery Storms, Newmark Storms Dworak Law Office; and**
**Jeffrey Montpetit, Sieben Carey**
**Minneapolis, MN**
Janessa Novak, Special Administrator vs. Michael McIlvain, Douglas County, MEnD et al
*Plaintiff* - ***settled 2023***

**Samuel Daheim, Connolly Law Offices, PLLC**
**Tacoma, WA**
Daniel Bailey, as Personal Representative of the Estate of Michael Joseph Bailey, deceased vs. the City of Kent, Defendant
*Plaintiff* - ***settled 2022***

**Edwin Budge and Hank Balson, Budge & Heipt, PLLC**
**Seattle, WA**
The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, Individually, Plaintiff v. NaphCare, Inc.; Hannah Gubitz, Individually; and Spokane County, a political subdivision of the State of Washington, Defendants
*Plaintiff* - ***trial July 2022***

Third Amended Complaint;
Depositions of Kloker, Montgomery, Blumenshine, Badre, Cruz (with errata), Schaber, Quiroz, Goodall (Anoseke), Rognlien-Hood; Jouhal, and Ysla;
COSD 000375-380 Badre Reports;
COSD 001216-1442 Autopsy Photos of Lonnie Rupard;
COSD 001510-1547 Photos of Rupard's Cell;
COSD 001633-1636 Follow Up Investigative Report re Autopsy – Det. Blumenshine;
COSD 001637-1649 Follow Up Investigative Report by Det. Blumenshine 06.07.2022;
COSD 001656-1677 Follow Up Investigative Report II by Det. Blumenshine 03.16.2023;
COSD 002085-2106 Autopsy Report (Unredacted);
COSD 006108-6109 MSD.M.10 Mentally Disordered Individuals – Emergency Transportation 02.24.2011;
COSD 006126-6127 M.29 Hunger Strikes 10.21.2020;
COSD 006128-6130 MSD.N.4 Nursing Documentation 01.13.2022;
COSD 006131-6133 MSD.N.4 Nursing Documentation 09.15.2016;
COSD 006134-6142 MSD.P.8 Psychiatric Stabilization Unit (PSU) 10.02.2019;
COSD 006143-6151 MSD.P.8 Psychiatric Stabilization Unit (PSU) 01.24.2022;
COSD 006152-6154 MSD.P.13 Staff Training for 5150 Certification 01.18.2022;
COSD 006155-6157 MSD.P.13 Staff Training for 5150 Certification 06.23.2020;
COSD 006158-6161 MSD.P.15 Psych Stabilization Unit – Admission Types 01.31.2022;
COSD 006162-6165 MSD.P.16 Psych Stabilization Unit – Admission Types 02.13.2015;
COSD 006166-6167 MSD.P.16 on PSU 4011.6 Procedures 01.18.2022;
COSD 006168-6169 MSD.P.16 on PSU 4011.6 Procedures 03.22.2013;
COSD 006170-6173 MSD.P.17 PSU Psychiatric Holds – Civil Commits 01.18.2022;
COSD 006174-6177 MSD.P.17 on PSU Psychiatric Holds – Civil Commits 09.30.2014;
COSD 006190-6194 MSD.P.19 PSU – Welfare and Inst. Code 5270 09.30.2014;
COSD 006211-6213 MSD.R.5 Refusal Procedures 01.06.2022;
COSD 006214-6216 MSD.R.5 Refusal Procedures 07.14.2016;
COSD 006224-6227 MSD.S.6 Mental Health Clinicians Function – PSU 1.18.2022;
COSD 006262-6264 MSD.A.1.3 Health Care Services 02.03.2020;
COSD 006265-6266 MSD.A.3.2 Physician's Orders 01.18.2022;
COSD 006267-6268 MSD.A.3.2 Physician's Orders 02.03.2020;
COSD 006269 MSD.A.3.2 Physician's Orders 01.12.2022;
COSD 006270 MSD.C.1 Classification of Patients 03.22.2005;
COSD 006271-6273 MSD.C.4 Consent for Treatment 11.15.2021;
COSD 006274-6276 MSD.C.4 Consent for Treatment 10.30.2015;
COSD 006280 MSD.C.10 Court Orders 01.12.2022;
COSD 006281 MSD.C.10 Court Orders 10.30.1015;

COSD 006292-6299 MSD.E.2.1 Receiving Screening 06.23.2020;
COSD 006300-6301 MSD.E.5.1 Mental Health Screen and Evaluation 02.01.2022.
COSD 006302-6303 MSD.E.5.1 Mental Health Screen and Evaluation 06.23.2020;
COSD 006304-6305 MSD.E.9.2 State Hospital Returnees 07.21.2020;
COSD 006311-6312 MSD.G.2.1 Segregated Inmates 01.05.2022;
COSD 006313-6314 MSD.G.2.1 Segregated Inmates 10.30.2020;
COSD 006315-6317 MSD.G.3.1 Emergency Psychotropic Medication 01.25.2022;
COSD 006318-6320 MSD.G.3.1 Emergency Psychotropic Medication 04.07.2020;
COSD 006321-6325 MSD.G.3.2 Psychotropic Medication 11.15.2021;
COSD 006326-6330 MSD.G.3.2 Psychotropic Medication 04.24.2020;
COSD 006331-6334 MSD.H.8 Use and Disclosure of Psychotherapy Notes 04.15.2003;
COSD 006335-6336 MSD.H.12 Hunger Strikes 06.15.2015;
COSD 006437 Confidential Excel of Sick Calls and Referrals;
COSD 6780-COSD 6880 Training on Medical Issues and Universal Precautions;
COSD 7084-7116 Addressing Training on Mental Health Issues in Jails;
COSD 7206-7222 Training on PSU Orientation;
COSD 7223-7241 Training on Medical Issues and Universal Precautions;
COSD 7253-COSD 7269 Training Materials – Roles and Responsibilities ACO;
National Commission on Correctional Health Care (NCCHC) Report January 2017;
California State Auditor's Report February 2022;
CLERB 01-30-24 Final Findings Report (Redacted);
Confidential COSD 000026-000150 Lonnie Rupard Jail Medical Records;
Confidential COSD 006376-006416 Autopsy and Notes from ME's Office (Redacted);
COSD 00106-107 MSD.M.10 Mentally Disordered Individuals – Emergency 02.01.2022 and ;
COSD 000266-274 Blumenshine Report.

.

# EXHIBIT 29

San Diego County Sheriff's Department News Release, Sheriff Bill Gore Announces Retirement, Jan. 19, 2022

San Diego County Sheriff

Bureaus » Media Relations

# Sheriff Bill Gore Announces Retirement

**Post Date:**01/19/2022 2:30 PM






After 51 years in law enforcement, San Diego County Sheriff Bill Gore has announced his plan to retire effective February 3, 2022.

Sheriff Gore began his law enforcement career in 1970 with the Federal Bureau of Investigation (FBI). He rose to the rank of Assistant Director in Washington, D.C. and also served as the Special Agent in Charge of the FBI field offices in San Diego and Seattle.

After 32 years with the FBI, he retired and worked for one year as the Chief Investigator and Special Advisor to newly elected San Diego County District Attorney Bonnie Dumanis.

In 2004, then-Sheriff Bill Kolender appointed him as the Assistant Sheriff overseeing the Law Enforcement Services Bureau. In 2006, he was appointed as the

Undersheriff, overseeing the Sheriff's Department's daily operations.

Gore was appointed Sheriff in 2009 by the Board of Supervisors and elected to that position three times by the citizens of San Diego County.




The following is a statement from Sheriff Gore: "*Serving as your Sheriff for the last 12 years has been one of the most rewarding experiences of my law enforcement career. I will always be grateful to the residents of this county for their continued confidence and support during my tenure. It has also been my honor to have had the daily support from the extraordinary men and women of this department who sacrifice every day for the citizens of San Diego County.*

*Likewise, my wife has made many sacrifices in support of my career, including nine moves around the country and the challenges involved in three county-wide elections. In retirement, I will have the opportunity to give my full attention and support to her as she has done for me during our 43 years of marriage.*

*I have been truly blessed to have had a long career in public safety surrounded by some of the finest professionals in this country. I am also grateful for the many friendships I have developed in San Diego and around the country. I look forward to many wonderful years with those friends and my family."*

Sheriff Gore has dedicated his life to public safety in San Diego and nationally. Few individuals have devoted more time, energy and service to others. The Sheriff's Department is grateful for his service and his many accomplishments. We wish him and his family all the best in their next chapter. He will be greatly missed.

*Return to full list >>*

# EXHIBIT 30

San Diego County Sheriff's Department News Release, Anthony Ray Appointed Interim Sheriff, Mar. 22, 2022

San Diego County Sheriff

Bureaus » Media Relations

# Anthony Ray Appointed Interim Sheriff

***Interim Sheriff Ray's appointment begins April 5.***

**Post Date:**03/22/2022 2:30 PM






Assistant Sheriff Anthony Ray has been appointed as Interim Sheriff for the San Diego County Sheriff's Department.

On Tuesday, March 22, the San Diego County Board of Supervisors unanimously voted to select Ray as Interim Sheriff during a special public hearing.

As Interim Sheriff, Ray will finish former Sheriff Bill Gore's term in office. Gore retired on February 3. Undersheriff Kelly Martinez has been serving as Acting Sheriff since Gore's retirement.

"I am extremely honored and humbled to be appointed as the Interim Sheriff of the San Diego County Sheriff's Department and am grateful to the Board of Supervisors for affording me this opportunity to lead our department," says Ray. "I will continue to serve our communities, expand our partnerships with local advocacy groups, continue the improvements to our jails and keep public safety at the forefront of our daily operations."

Ray currently serves as Assistant Sheriff for the Human Resources and Court Services Bureaus. He brings more than 30 years of law enforcement experience, both in patrol and detentions, to his new role as Interim Sheriff.

Ray joined the Sheriff's Department in August 1991. He is a graduate from the 11th Corrections Academy. In 1995, he graduated from the 28th Regional Law Enforcement Academy.

As a deputy, Ray was assigned to the Las Colinas Men's Detention Facility, George Bailey Detention Facility, as well as the Santee Sheriff's Station and Law Enforcement Support.

In 2005, Ray was promoted to sergeant where he worked at the Santee Sheriff's Station, as well as the Division of Inspectional Services. In 2008, he was promoted to the rank of lieutenant and was assigned to the Sheriff's Communications Center, the Lemon Grove Sheriff's Substation and the San Diego Law Enforcement Coordination Center.

Ray was promoted to Captain in 2014 and oversaw the Sheriff's Personnel Division and the Santee Sheriff's Station.

In 2017, he was promoted to Commander in the Sheriff's Law Enforcement Services Bureau, where his responsibilities included overseeing Emergency Services, Crime Analysis, Crime Prevention, Licensing, Crime Lab, Property and Evidence, Communications Center, Information-Led Policing, Records and Volunteer Services. In 2018, he became Commander for the Human Resources Bureau and was responsible for Personnel, Training, Internal Affairs, Risk Management, Payroll and Labor Relations.

In 2020, Ray was promoted to Assistant Sheriff overseeing the Human Resources and Court Services Bureaus.

Ray's appointment as Interim Sheriff will take effect April 5. At that time, Acting Sheriff Kelly Martinez will resume her duties as Undersheriff.

"I look forward to working with Interim Sheriff Anthony Ray on prioritizing hiring and retention of quality staff, public safety and safety in our jails," says Acting Sheriff Martinez. "It is critical the Sheriff's Department and these priorities continue to move forward and I am confident that will happen under his leadership."

Interim Sheriff Ray will serve in this position until the elected Sheriff takes office in January 2023.

Ray is a graduate of the Federal Bureau of Investigation (FBI) National Academy in Quantico, Virginia, as well as the Naval Postgraduate School's Leadership Program. He holds a bachelor's degree in Business Management from the University of Phoenix and a Master of Business Administration from the University of Phoenix.




Return to full list >>