EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
PETER BIBRING: SBN 223981
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

JEREMIAH A. LOWE (CA SBN 239166)
*jeremiah@lowelawapc.com*
LOWE LAW, APC
402 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 878-2725
Facsimile: (619) 878-2737

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ESTATE OF LONNIE RUPARD,

Plaintiff,

v.

COUNTY OF SAN DIEGO, *et al.*,

Defendants.

CASE NO. 23-CV-1357-CAB-JAC

**EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT COUNTY OF SAN DIEGO, OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY ADJUDICATION, VOL. 3 OF 3**

Judge: Hon. Cathy Ann Bencivengo

Date: December 18, 2026

**PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT**

## INDEX OF EXHIBITS



| Exhibit | Description | Volume | Ex. Page |
|---|---|---|---|
| 1 | Autopsy Report, Lonnie Rupard, San Diego County Medical Examiner (COSD 002085–2106) | 1 | 6 |
| 2 | Orders of Incompetency, 2015 and 2019 (COSD 003055, 003256) | 1 | 29 |
| 3 | Follow-Up Investigative Report II, Det. Blumenshine, Mar. 16, 2023 (COSD 001656–1677) | 1 | 32 |
| 4 | San Diego County Sheriff's Department Detention Services Bureau Policy I.64 (COSD 006088–6090) | 1 | 55 |
| 5 | Rule 30(b)(6) Deposition of Lt. Aaron Boorman, Jan. 16, 2026 (excerpts) | 1 | 59 |
| 6 | San Diego County Sheriff's Department Detention Services Bureau Policy I.43 (COSD 006343–6345) | 1 | 77 |
| 7 | Deposition of Dep. Jason Viladiu, Feb. 2, 2026 (excerpts) | 1 | 82 |
| 8 | Reports of Dr. Nicolas Badre, M.D. (COSD 000153–158) | 1 | 101 |
| 9 | Deposition of Nicolas Badre, M.D., Dec. 19, 2025 (excerpts) | 1 | 108 |
| 10 | Deposition of Sgt. Michael Johnson, Feb. 27, 2026 (excerpts) | 1 | 123 |
| 11 | Deposition of Dep. Andrew Torres, Apr. 13, 2026 (excerpts) | 1 | 131 |

| Exhibit | Description | Volume | Ex. Page |
|---|---|---|---|
| 12 | Deposition of Dep. Miguel Aguilera, Apr. 13, 2026 (excerpts) | 1 | 139 |
| 13 | Deposition of Dep. Linda Gutierrez, Dec. 11, 2024 (excerpts) | 1 | 146 |
| 14 | Deposition of Dep. Jeff Amado, Jan. 29, 2026 (excerpts) | 1 | 151 |
| 15 | Deposition of Dep. Gustavo Martinez, Jan. 29, 2026 (excerpts) | 1 | 157 |
| 16 | Audio recording of interview of Dep. Thomas Mace, Dec. 20, 2023 (COSD 000371) (to be lodged with the Court) | 1 | 163 |
| 17 | Transcript of interview of Dep. Thomas Mace, Dec. 20, 2023 (COSD 000371) | 1 | 164 |
| 18 | Expert Report of Will Adams | 2 | 6 |
| 19 | Deposition of Gary Raney (excerpts) | 2 | 41 |
| 20 | Deposition of Will Adams, Sept. 24, 2026 (excerpts) | 2 | 45 |
| 21a-h | Video recordings of logged safety checks (to be lodged with the Court) | 2 | 56 |
| 22 | San Diego County Sheriff's Department Detention Services Bureau Policy G.2.1 (Oct. 30, 2020) (COSD 006313–6314) | 2 | 57 |
| 23 | Rule 30(b)(6) Deposition of Melissa Quiroz, Jan. 8, 2026 (excerpts) | 2 | 60 |
| 24 | Deposition of Anthony Cruz, M.D., Mar. 3, 2026 (excerpts) | 2 | 66 |

| Exhibit | Description | Volume | Ex. Page |
|---|---|---|---|
| 25 | Deposition of Christina Goodall, Dec. 16, 2024 (excerpts) | 2 | 73 |
| 26 | Deposition of Serina Rognlien-Hood, Mar. 26, 2026 (excerpts) | 2 | 81 |
| 27 | Expert Report of Homer Venters, M.D., July 10, 2026 | 2 | 86 |
| 28 | Expert Report of Lori Roscoe | 2 | 150 |
| 29 | San Diego County Sheriff's Department News Release, Sheriff Bill Gore Announces Retirement, Jan. 19, 2022 | 2 | 182 |
| 30 | San Diego County Sheriff's Department News Release, Anthony Ray Appointed Interim Sheriff, Mar. 22, 2022 | 2 | 185 |
| 31 | Defendant Kelly Martinez's Revised Responses to Plaintiff Estate's Interrogatories, Set One | 3 | 6 |
| 32 | Defendant William Gore's Revised Responses to Plaintiff Estate's Interrogatories, Set One | 3 | 72 |
| 33 | San Diego County Sheriff's Department News Release, Mar. 2, 2023 (RUP001161–1164) | 3 | 120 |
| 34 | Deposition of Det. Max Blumenshine, Jan. 7, 2026 (excerpts) | 3 | 125 |
| 35 | Line-Up Training re 11-53 Safety Checks, May 1, 2021 (COSD 006245–6246) | 3 | 129 |
| 36 | Deposition of Cpl. Blade Romans, Jan. 13, 2025 (excerpts) | 3 | 132 |

| Exhibit | Description | Volume | Ex. Page |
|---|---|---|---|
| 37 | Expert Report of Kathryn Wild, RN | 3 | 136 |
| 38 | Rebuttal Expert Report of Homer Venters, M.D., Aug. 5, 2026 | 3 | 160 |
| 39 | Rebuttal Expert Report of Jackie Clark | 3 | 179 |
| 40 | Rebuttal Expert Report of Glindmeyer | 3 | 199 |

# EXHIBIT 31

Defendant Kelly Martinez's Revised Responses to Plaintiff Estate's Interrogatories, Set One

**Rada Feldman, Esq. (State Bar No. 285931)**
**Adam A. Ainslie, Esq. (State Bar No. 311427)**
**Nicholas R. Colletti, Esq. (State Bar No. 283947)**
**Robert S. Kahn, Esq. (State Bar No. 231277)**
**COLLINS + COLLINS LLP**
**2011 Palomar Airport Road, Suite 207**
**Carlsbad, CA 92011**
**(760) 274-2110 - FAX (760) 274-2111**
**Email: rfeldman@ccllp.law**
**Email: aainslie@ccllp.law**
**Email: ncolletti@ccllp.law**
**Email: rkahn@ccllp.law**

Attorneys for Defendants,
COUNTY OF SAN DIEGO, BILL GORE, KELLY MARTINEZ, JON MONTGOMERY, CHRISTINA GOODALL (sued as CHRISTINA ANOSIKE), MIGUEL AGUILERA, JASON VILADIU, GUSTAVO MARTINEZ, JEFF AMADO, ERNESTO AGUIRRE, TREYVONNE JAMES (sued in duplicate J. TREYVONNE), BERNARDO ROMERO, MICHAEL JOHNSON, ANDREW TORRES, ALLEN WERESKI, BLADE ROMANS, AND LINDA GUTIERREZ

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ESTATE OF LONNIE RUPARD;<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE CORPORATION; CHRISTINA GOODALL (SUED AS | CASE NO. 3:23-cv-1357-CAB-BLM<br>***Assigned to Hon. Cathy Ann Bencivengo Magistrate Hon. Barbara L. Major in Dept. 15A***<br><br>**DEFENDANT KELLY MARTINEZ'S RESPONSES TO PLAINTIFF THE ESTATE OF LONNIE RUPARD'S INTERROGATORIES, SET ONE (REVISED)**<br><br>**Complaint Filed: 07/26/2023**<br>**Trial Date: 02/08/2027** |

CHRISTINA ANOSIKE) , IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; DEFENDANT DEPUTIES DOES 1-10, DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10.

Defendants.

**PROPOUNDING PARTY:** Plaintiff the ESTATE OF LONNIE RUPARD

**RESPONDING PARTY:** Defendant KELLY MARTINEZ

**SET NUMBER:** One (1)

Defendant, KELLY MARTINEZ ("Responding Party"), hereby submits her responses and objections to Plaintiff, THE ESTATE OF LONNIE RUPARD's ("PLAINTIFF" or "Propounding Party"), Interrogatories, Set One (Revised), as follows:

## RESPONSES TO INTERROGATORIES

**PLAINTIFF'S INTERROGATORY NO. 1**:

Did YOU read any of the State Auditor's Report 2021-109?

**PLAINTIFF'S RESPONSE TO INTERROGATORY NO. 1**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham,* 473 U.S. 159,165 (1985)

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

The Interrogatory is thus improper because it is duplicative. It is identical to the interrogatory propounded on Defendant County of San Diego. Responding Party does not have personal knowledge regarding the requested information. County of San Diego has responded to this interrogatory.

Objectionable to the extent this Interrogatory seeks disclosure of information subject to protection under the apex doctrine. Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and Plaintiff made no showing the information to be gained is not available through other sources and is not repetitive of requests to County. Further objection, this Interrogatory is duplicative of prior requests, e.g., Interrogatory Nos. 8-11, propounded in Plaintiff Justino Rupard's Interrogatories, Set 2 to Defendant County (See Plaintiff Justino Rupard's Interrogatories to Defendant County, Set 2), and thus it is unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on grounds it is fully duplicative, redundant, and excessive of prior requests in this action and seeks discovery sought from County.

Responding Party further objects that this Interrogatory is vague, oppressive, unduly burdensome, and overbroad. Further, this Interrogatory is unintelligible as phrased and calls for speculation, particularly the term "any" is vague and ambiguous and as to "the State Auditor's Report 2021-109" referenced and as written, this Interrogatory requires speculation about what information is sought. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further objection on the ground and to the extent that it seeks or potentially seeks information protected by attorney-client privilege and/or attorney work-product doctrine, and/or the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure 26(b)(3). This

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Interrogatory is harassing in that it seeks information equally available to propounding party who has personal knowledge of the information sought and who is in possession of prior responses and documents produced in this case which contains the same information. Further, the requested information is overbroad, unduly burdensome and equally available to Plaintiff to ascertain same information from the records identified and provided in discovery in this action and/or publicly available.

Objection to the extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).)

**PLAINTIFF'S SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought. The Interrogatory is overly broad, indefinite as to time, and without reasonable limitation in its scope. The Interrogatory is vague regarding the meaning of "read," and no specific portion of the report is identified. Responding Party cannot respond to this Interrogatory as phrased. Further objection made that, as written, this Interrogatory may have multiple meanings in the context of this action. This Interrogatory calls for speculation about legal effect

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

and expert opinion. Objection to the extent the matter requested is protected under the attorney-client privilege and/or attorney work product privilege doctrine.

Notwithstanding, Responding Party answers as follows:

Yes, Responding Party has read the 2021-109 California State Auditor Report.

**PLAINTIFF'S REVISED INTERROGATORY NO. 1**:

Did YOU read any of the State Auditor's Report 2021-109?

**RESPONSE TO REVISED INTERROGATORY NO. 1**:

Objection. Aside from her objection regarding impossibility, Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Yes, Responding Party has read the 2021-109 California State Auditor Report.

**PLAINTIFF'S INTERROGATORY NO. 2**:

If that answer to Interrogatory No. 1 is yes, what part or parts of the Report did you read?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 2**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, objection to the extent this Interrogatory seeks information subject to protection under the apex doctrine, as Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and Plaintiff made no

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

showing the information to be gained is not available through other sources and is not repetitive of requests to County. Further, this Interrogatory is duplicative of prior requests, e.g., Interrogatory Nos. 8-11, propounded in Plaintiff Justino Rupard's Interrogatories, Set 2 to Defendant County (See Plaintiff Justino Rupard's Interrogatories to Defendant County, Set 2), and thus it is unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on grounds it is fully duplicative, redundant, and excessive of prior requests in this action and seeks discovery sought from County.

Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible as phrased and calls for speculation, particularly the undefined term "you" and phrase "what part or parts of the Report" call for speculation about what is referenced, and as written, this Interrogatory may have multiple meanings in the context of this action and Interrogatory. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, objection to this Interrogatory on the ground and to the extent that it seeks or potentially seeks documents and information that are protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure 26(b)(3).

Objection to the extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid.

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).)

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 2**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought. The Interrogatory is overly broad, indefinite as to time, and without reasonable limitation in its scope. The Interrogatory is vague regarding the meaning of "read," and no specific portion of the report is identified. Responding Party cannot respond to this Interrogatory as phrased. Further objection made that, as written, this Interrogatory may have multiple meanings in the context of this action. This Interrogatory calls for speculation about legal effect and expert opinion. Objection to the extent the matter requested is protected under the attorney-client privilege and/or attorney work product privilege doctrine.

Notwithstanding, Responding Party answers as follows:

Yes, Responding Party has read the 2021-109 California State Auditor Report. Assuming this Interrogatory refers to the entirety of 2021-109 California State Auditor Report, as phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought.

**PLAINTIFF'S REVISED INTERROGATORY NO. 2**:

If that answer to Interrogatory No. 1 is yes, what part or parts of the Report did you read?

**RESPONSE TO REVISED INTERROGATORY NO. 2**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Assuming this Interrogatory refers to the entirety of 2021-109 California State Auditor Report, Yes, Responding Party has read the 2021-109 California State Auditor Report.

**PLAINTIFF'S INTERROGATORY NO. 3**:

Did YOU discuss the State Auditor Report 2021-109 with San Diego Sheriff's Office ("SDSO") personnel?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 3**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, objection to this Interrogatory on grounds it seeks information subject to protection under the apex doctrine, as Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and Plaintiff made no showing the information to be gained is not available through other sources and is not repetitive of requests to County. Further, this Interrogatory is duplicative of prior requests, e.g., Interrogatory Nos. 8-11, propounded in Plaintiff Justino Rupard's Interrogatories, Set 2 to Defendant County (See Plaintiff Justino Rupard's Interrogatories to Defendant County, Set 2), and thus unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on grounds it is fully duplicative, redundant, and excessive of prior requests in this action and seeks discovery sought from County.

///

Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, as written, this Interrogatory may have multiple meanings in the context of this action and Interrogatory and calls for speculation about legal effect and expert opinion. Further, objection to this Interrogatory on the ground it seeks or potentially seeks documents and information that are protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure 26(b)(3).

Objection to the extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).)

**<u>SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 3</u>**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

The Interrogatory is vague and compound as no specific portion of the report is identified and no SDSO personnel referenced is identified. Further objection that, as

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

written, this Interrogatory may have multiple meanings in the context of this action. This Interrogatory calls for speculation about legal effect and expert opinion. Objection to the extent the matter requested is protected under the attorney-client privilege and/or attorney work product privilege doctrine.

Notwithstanding, Responding Party answers:

Assuming this Interrogatory refers to the entirety of 2021-109 California State Auditor Report, Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought, particularly the SDSO personnel referenced is not identified.

**PLAINTIFF'S REVISED INTERROGATORY NO. 3**:

Between February 3, 2022 and March 17, 2022, did you discuss, either in person or in writing, any San Diego Sheriff's Department change in policy or procedure in response to the State Auditor Report with any SDSD personnel, excluding attorney client communications.

**RESPONSE TO REVISED INTERROGATORY NO. 3**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Not applicable as to Responding Party outside of their official capacity. To the extent this Interrogatory seeks any attorney-client privileged information regarding CIRB, the interrogatory is objectionable.

**PLAINTIFF'S INTERROGATORY NO. 4**:

If the answer to Interrogatory No. 3 is yes, with which SDSO Sheriff's personnel did you discuss the Report with?

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 4**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, objection to this Interrogatory on grounds it seeks information subject to protection under the apex doctrine, as Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and Plaintiff made no showing the information to be gained is not available through other sources and is not repetitive of requests to County. Further, this Interrogatory is duplicative of prior requests, e.g., Interrogatory Nos. 8-11, propounded in Plaintiff Justino Rupard's Interrogatories, Set 2 to Defendant County (See Plaintiff Justino Rupard's Interrogatories to Defendant County, Set 2), and thus unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on grounds it is fully duplicative, redundant, and excessive of prior requests in this action and seeks discovery sought from County.

Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, objection to this Interrogatory on the ground it seeks or potentially seeks documents and information that are protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure 26(b)(3).

Objection to the extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).)

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges, and further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043. Further disclosure would violate privacy rights of individuals, including California Constitution, Article 1, Section 1.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 4**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

This Interrogatory is vague and compound as no specific portion of the report is identified and the SDSO personnel referenced is not identified. Further objection that, as written, this Interrogatory may have multiple meanings in the context of this action and Interrogatory. This Interrogatory calls for speculation about legal effect and expert opinion. Objection to the extent the matter requested is protected under the attorney-client privilege and/or attorney work product privilege doctrine. Responding Party objects to the extent this Interrogatory seeks the mental processes and privileged discussions with counsel on grounds of attorney-client privilege, attorney work product, and official information privilege. The "Sheriff's Department personnel" are not identified. Responding Party cannot respond to this Interrogatory as phrased.

Notwithstanding, Responding Party answers:

Assuming this Interrogatory refers to the entirety of 2021-109 California State Auditor Report, Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought.

**PLAINTIFF'S REVISED INTERROGATORY NO. 4**:

If the answer to Interrogatory No. 3 is yes, with which personnel did you discuss the change in policy or procedure.

**RESPONSE TO REVISED INTERROGATORY NO. 4**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Not applicable as to Responding Party outside of their official capacity. To the extent this Interrogatory seeks any attorney-client privileged information regarding CIRB, the interrogatory is objectionable.

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**PLAINTIFF'S INTERROGATORY NO. 5**:

In the time between February 3, 2022 and the death of Lonnie Rupard on March 17, 2022, did YOU order any changes in the conduct of the medical checks of persons housed in Administrative Segregation at the San Diego County jails?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 5**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, and there is no showing the information to be gained is not available through other sources such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and is not repetitive of requests to County and to extent seeks same information already requested and/or responded to Plaintiff's prior interrogatory/document requests to County (See Plaintiff Justino Rupard's Interrogatories/Requests for Documents to Defendant County, Set 2).

Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, as written, this Interrogatory may have multiple meanings in the context of this action and Interrogatory and calls for speculation about legal effect and expert opinion. Further objection to this

Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure 26(b)(3).

Objection to the extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).)

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges, and further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 5**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

This Interrogatory is vague and compound as to the terms "changes" and "medical checks." Further objection that, as written, this Interrogatory may have multiple meanings in the context of this action and Interrogatory. This Interrogatory calls for speculation about legal effect and expert opinion. Objection to the extent the matter requested is protected under the attorney-client privilege and/or attorney work product privilege doctrine. Further objection to Plaintiff's claim against Responding Party based on personal capacity. Responding Party is not a proper party to this litigation in such capacity. Responding Party was not personally involved in, present during, or knew of any alleged failures or the constitutional violations alleged in this action. Rather, the claim relates only to her role as supervisory official and Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. Responding Party does not have personal knowledge regarding the acts of unidentified subordinates, and Responding Party had no personal involvement and no direct participation in any alleged failures resulting in Decedent's death on March 17, 2022. Plaintiff's allegations attempt to hold Responding Party individually liable under a respondeat superior theory of liability, which is improper.

Notwithstanding, Responding Party answers:

Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought, particularly the term "medical checks," which is undefined.

**PLAINTIFF'S REVISED INTERROGATORY NO. 5**:

In the time between February 3, 2022 and the death of Lonnie Rupard on March 17, 2022, did YOU take any steps to ensure that the nursing staff conducted wellness checks of persons housed in Administrative Segregation in the San Diego County jails three times a week.

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**RESPONSE TO REVISED INTERROGATORY NO. 5**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

No, not applicable as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 6**:

In the time between February 3, 2022 and the death of Lonnie Rupard on March 17, 2022, did YOU take steps to ensure that mental health personnel evaluated persons in Administrative Segregation at the San Diego County jails on a regular basis?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 6**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and there is no showing the information to be gained is not available through other sources and is not repetitive of requests to County. Further, this Interrogatory is duplicative of prior requests Plaintiff propounded to Defendant County (See Plaintiff Justino Rupard's Interrogatories/Document Requests to Defendant County), and thus unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

grounds it is fully duplicative, redundant, and excessive of prior requests in this action and seeks discovery sought from County.

Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, as written, this Interrogatory may have multiple meanings in the context of this action and calls for speculation about legal effect and expert opinion. Responding Party further objects to this Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure 26(b)(3).

Objection to the extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).)

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges, and further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043.

**<u>SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 6</u>**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

This Interrogatory is vague and compound as to the terms "steps" and "evaluated." Further objection that, as written, this Interrogatory may have multiple meanings in the context of this action and Interrogatory. This Interrogatory calls for speculation about legal effect and expert opinion. Objection to the extent the matter requested is protected under the attorney-client privilege and/or attorney work product privilege doctrine.

Further objection to Plaintiff's claim against Responding Party based on personal capacity. Responding Party is not a proper party to this litigation in such capacity. Responding Party was not personally involved in, present during, or knew of any alleged failures or the constitutional violations alleged in this action. Rather, the claim relates only to her role as supervisory official and Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. Responding Party does not have personal knowledge regarding the acts of unidentified subordinates, and Responding Party had no personal involvement and no direct participation in any alleged failures resulting in Decedent's death on March 17, 2022. Plaintiff's allegations attempt to hold Responding Party individually liable under a respondeat superior theory of liability, which is improper. Responding Party objects to extent this Interrogatory seeks the mental processes and

privileged discussions with counsel on grounds of attorney-client privilege, attorney work product, and official information privilege.

Responding Party further objects that disclosure of the requested information is duplicative. Further, the requested information is overbroad, unduly burdensome, and equally available for Plaintiff to ascertain the same information from the records identified and provided herewith.

Notwithstanding, Responding Party answers:

Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought, particularly the term "evaluated," which is undefined. Responding Party has no personal knowledge on which to base a response, and Responding Party refers the Propounding Party to the documents produced by County under FRCP Rule 33(d) in this action including the Sheriff's Department Procedures for the Medical Services Division.

**PLAINTIFF'S REVISED INTERROGATORY NO. 6**:

In the time between February 3, 2022 and the death of Lonnie Rupard on March 17, 2022, did YOU take steps to ensure that QMHPs conducted weekly visits to persons in Administrative Segregation at the San Diego County jails.

**RESPONSE TO REVISED INTERROGATORY NO. 6**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

No, not applicable as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 7**:

If your answer to Interrogatory No. 6 is yes, describe what you did.

///

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 7**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, objection to the extent this Interrogatory seeks information subject to protection under the apex doctrine, as Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as, deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and Plaintiff made no showing the information to be gained is not available through other sources and is not repetitive of requests to County. Further, this Interrogatory is duplicative of Plaintiff's prior requests propounded to Defendant County (See Plaintiff Justino Rupard's Interrogatories/Requests to Defendant County, Set 2), and therefore it is unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on grounds it is fully duplicative, redundant, and excessive of prior requests in this action and seeks discovery sought from County.

Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible as phrased and calls for speculation, particularly the undefined terms "you" and phrase "you did." Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, as written, this Interrogatory may have multiple meanings in the context of this action and Interrogatory and calls for speculation about legal effect and expert opinion. Responding Party further objects to this Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege,

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure 26(b)(3).

Objection to the extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).)

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges, and further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 7**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

what information is being sought. Notwithstanding, not applicable. See above responses to Interrogatory Nos. 5-6. Responding Party is not a proper party to this litigation based on personal capacity. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Responding Party was not personally involved in, present during, or knew of any alleged failures or the constitutional violations alleged in this action. Rather, the claim relates only to her role as supervisory official and Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. Responding Party does not have personal knowledge regarding the acts of unidentified subordinates, and Responding Party had no personal involvement and no direct participation in any alleged failures resulting in Decedent's death on March 17, 2022.

**PLAINTIFF'S REVISED INTERROGATORY NO. 7**:

If YOUR answer to Interrogatory No. 6 is yes, describe what you did.

**RESPONSE TO REVIED INTERROGATORY NO. 7**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Not applicable as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 9**:

Between February 3, 2022 and the death of Lonnie Rupard on March 17, 2022, did YOU order any additional training to be given to SDSO deputies on conducting 11-53 safety checks at the San Diego County jails?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 9**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had

personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and there is no showing the information to be gained is not available through other sources and is not repetitive of requests to County. Further, this Interrogatory is duplicative of prior requests Plaintiff propounded to Defendant County (See Plaintiff Justino Rupard's Interrogatories/Requests to Defendant County, Set 2), and thus unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on grounds it is fully duplicative, redundant, and excessive of prior requests in this action and seeks discovery sought from County.

Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, as written, this Interrogatory may have multiple meanings in the context of this action and calls for speculation about legal effect and expert opinion. Responding Party further objects to this Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure 26(b)(3).

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Objection to the extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).)

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges, and further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 9**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

This Interrogatory is vague and compound as to the term "additional training." Further objection that, as written, this Interrogatory may have multiple meanings in the context of this action. This Interrogatory calls for speculation about legal effect and expert opinion. Objection to the extent the matter requested is protected under the attorney-client privilege and/or attorney work product privilege doctrine. Further

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

objection that, as written, this Interrogatory may have multiple meanings in the context of this action and Interrogatory.

Further objection to Plaintiff's claim against Responding Party based on personal capacity. Responding Party is not a proper party to this litigation in such capacity. Responding Party was not personally involved in, present during, or knew of any alleged failures or the constitutional violations alleged in this action. Rather, the claim relates only to her role as supervisory official and Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. Responding Party does not have personal knowledge regarding the acts of unidentified subordinates, and Responding Party had no personal involvement and no direct participation in any alleged failures resulting in Decedent's death on March 17, 2022. Plaintiff's allegations attempt to hold Responding Party individually liable under a respondeat superior theory of liability, which is improper.

Notwithstanding, Responding Party answers:

Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought, particularly the term "additional training," which is undefined.

**<u>PLAINTIFF'S REVISED INTERROGATORY NO. 9</u>**:

Between February 3, 2022 and the death of Lonnie Rupard on March 17, 2022, did YOU instruct that supplemental training be given to SDSO deputies on 11-53 safety check procedure at the San Diego County jails?

**<u>RESPONSE TO REVISED INTERROGATORY NO. 9</u>**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

No, not applicable as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 10**:

Between February 3, 2022 and the death of Lonnie Rupard on March 17, 2022, did YOU order any subordinate to review videos of hard counts, soft counts and 11-53 safety checks at the San Diego Central Jail?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 10**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and there is no showing the information to be gained is not available through other sources and is not repetitive of requests to County. Further, this Interrogatory is duplicative of prior requests Plaintiff propounded to Defendant County (See Plaintiff Justino Rupard's Interrogatories/requests to Defendant County, Set 2), and thus unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on grounds it is fully duplicative, redundant, and excessive of prior requests in this action and seeks discovery sought from County.

Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

needs of the case under FRCP 26(b)(1). Further, as written, this Interrogatory may have multiple meanings in the context of this action and calls for speculation about legal effect and expert opinion. Responding Party further objects to this Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure 26(b)(3).

Objection to extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).)

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges, and further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043. Further disclosure would violate privacy rights of individuals, including California Constitution, Article 1, Section 1.

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 10**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

This Interrogatory is vague and compound as to the terms "subordinate" and "review." Further objection that, as written, this Interrogatory may have multiple meanings in the context of this action and Interrogatory. This Interrogatory calls for speculation about legal effect and expert opinion. Objection to the extent the matter requested is protected under the attorney-client privilege and/or attorney work product privilege doctrine.

Further objection to Plaintiff's claim against Responding Party based on personal capacity. Responding Party is not a proper party to this litigation in such capacity. Responding Party was not personally involved in, present during, or knew of any alleged failures or the constitutional violations alleged in this action. Rather, the claim relates only to her role as supervisory official and Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. Responding Party does not have personal knowledge regarding the acts of unidentified subordinates, and Responding Party had no personal involvement and no direct participation in any alleged failures resulting in Decedent's death on March 17, 2022. In essence, Plaintiff's allegations attempt to hold Responding Party individually liable under a respondeat superior theory of liability, which is improper.

Notwithstanding, Responding Party answers:

Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought, particularly the term "subordinate," which is undefined.

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**PLAINTIFF'S REVISED INTERROGATORY NO. 10**:

Between February 3, 2022 and the death of Lonnie Rupard on March 17, 2022, did YOU instruct any SDSD employee to review videos of hard counts, soft counts and/or 11-53 safety checks at the San Diego Central Jail for compliance with department policy and/or state law.

**RESPONSE TO REVISED INTERROGATORY NO. 10**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

No, not applicable as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 11**

If the answer to Interrogatory No. 10 is yes, whom did YOU order to review videos of hard counts, soft counts and 11-53 safety checks at the San Diego Central Jail?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 11**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and there is no showing the information to be gained is not available through other sources

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

and is not repetitive of requests to County. Further, this Interrogatory is duplicative of prior requests Plaintiff propounded to Defendant County (See Plaintiff Justino Rupard's Interrogatories to Defendant County, Set 2), and thus unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on grounds it is fully duplicative, redundant, and excessive of prior requests in this action and seeks discovery sought from County.

Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, as written, this Interrogatory may have multiple meanings in the context of this action and calls for speculation about legal effect and expert opinion. Responding Party further objects to this Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure 26(b)(3).

Objection to extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).)

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 11**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

This Interrogatory is vague and compound as to the terms "order," "safety checks," and "review." Further objection that, as written, this Interrogatory may have multiple meanings in the context of this action and Interrogatory. This Interrogatory calls for speculation about legal effect and expert opinion. Objection to the extent the matter requested is protected under the attorney-client privilege and/or attorney work product privilege doctrine.

Further objection to Plaintiff's claim against Responding Party based on personal capacity. Responding Party is not a proper party to this litigation in such capacity. Responding Party was not personally involved in, present during, or knew of any alleged failures or the constitutional violations alleged in this action. Rather, the claim relates only to her role as supervisory official and Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. Responding Party does not have personal knowledge regarding the acts of unidentified subordinates, and Responding Party had no personal

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

involvement and no direct participation in any alleged failures resulting in Decedent's death on March 17, 2022. Plaintiff's allegations attempt to hold Responding Party individually liable under a respondeat superior theory of liability, which is improper.

Notwithstanding, Responding Party answers:

Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought, particularly the term "review," which is undefined.

**PLAINTIFF'S REVISED INTERROGATORY NO. 11**:

If the answer to Interrogatory No. 10 is yes, whom did YOU instruct to review videos of hard counts, soft counts and 11-53 safety checks at the San Diego Central Jail?

**RESPONSE TO REVISED INTERROGATORY NO. 11**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Not applicable as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 12**:

If the answer to Interrogatory No. 10 is yes, for which housing units at the San Diego Central Jail did YOU order subordinates to review videos of hard counts, soft counts and 11-53 safety checks?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 12**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her

alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and there is no showing the information to be gained is not available through other sources and is not repetitive of requests to County. Further, this Interrogatory is duplicative of prior requests Plaintiff propounded to Defendant County (See Plaintiff Justino Rupard's Interrogatories to Defendant County, Set 2), and thus unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on grounds it is fully duplicative, redundant, and excessive of prior requests in this action and seeks discovery sought from County.

Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, as written, this Interrogatory may have multiple meanings in the context of this action and calls for speculation about legal effect and expert opinion. Responding Party further objects to this Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure 26(b)(3).

Objection to extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).)

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043. Further disclosure would violate privacy rights of individuals, including California Constitution, Article 1, Section 1.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 12**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

This Interrogatory is vague and compound as to the terms "subordinates" and "review." Further objection that, as written, this Interrogatory may have multiple meanings in the context of this action and Interrogatory. This Interrogatory calls for speculation about legal effect and expert opinion. Objection to the extent the matter requested is protected under the attorney-client privilege and/or attorney work product privilege doctrine.

Further objection to Plaintiff's claim against Responding Party based on personal capacity. Responding Party is not a proper party to this litigation in such capacity. Responding Party was not personally involved in, present during, or knew of any alleged failures or the constitutional violations alleged in this action. Rather, the claim relates only to her role as supervisory official and Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. Responding Party does not have personal knowledge regarding the acts of unidentified subordinates, and Responding Party had no personal involvement and no direct participation in any alleged failures resulting in Decedent's death on March 17, 2022. Plaintiff's allegations attempt to hold Responding Party individually liable under a respondeat superior theory of liability, which is improper.

Notwithstanding, Responding Party answers:

Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought, particularly the terms "subordinate" and "review," which are undefined.

**<u>PLAINTIFF'S REVISED INTERROGATORY NO. 12</u>**:

If the answer to Interrogatory No. 10 is yes, for which housing units at the San Diego Central Jail did YOU instruct any SDSD employees to review videos of hard counts, soft counts and 11-53 safety checks?

**<u>RESPONSE TO REVISED INTERROGATORY NO. 12</u>**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Not applicable as to Responding Party.

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**PLAINTIFF'S INTERROGATORY NO. 15**:

After the death of Hayden Schuck, did YOU order a medical check for persons housed in Administrative Segregation at the San Diego County jails?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 15**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and there is no showing the information to be gained is not available through other sources and is not repetitive of requests to County. Further, this Interrogatory is duplicative of prior requests Plaintiff propounded to Defendant County (See Plaintiff Justino Rupard's Interrogatories/Requests to Defendant County, Set 2 and also Subpoena for the Schuck matter), and thus unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on grounds it is fully duplicative, redundant, and excessive of prior requests in this action and seeks discovery sought from County.

Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1) and is cumulative or duplicative. Further, as written, calls for speculation about legal effect and expert opinion. Responding Party

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

further objects to this Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure 26(b)(3).

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by Plaintiff. Seeks confidential information protected from disclosure by the attorney-client privilege and the attorney work-product doctrine, as well as by the deliberative process, self-critical analysis and official information privileges.

Objection to extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).) Further disclosure would violate privacy rights of individuals, including California Constitution, Article 1, Section 1.

**<u>SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 15</u>:**

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

This Interrogatory is vague and compound as to the term "medical check." Further objection that, as written, this Interrogatory may have multiple meanings in the context of this action and Interrogatory. This Interrogatory calls for speculation about legal effect and expert opinion. Objection to the extent the matter requested is protected under the attorney-client privilege and/or attorney work product privilege doctrine.

Further objection to Plaintiff's claim against Responding Party based on personal capacity. Responding Party is not a proper party to this litigation in such capacity. Responding Party was not personally involved in, present during, or knew of any alleged failures or the constitutional violations alleged in this action. Rather, the claim relates only to her role as supervisory official and Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. Responding Party does not have personal knowledge regarding the acts of unidentified subordinates, and Responding Party had no personal involvement and no direct participation in any alleged failures resulting in Hayden Schuck's Death. Plaintiff's allegations attempt to hold Responding Party individually liable under a respondeat superior theory of liability, which is improper.

Responding Party further objects that disclosure of the requested information is violative of the privacy of persons who are not a party to the instant litigation and seeks disclosure of confidential and privileged information pertaining to personnel records. Further, the requested information is overbroad, unduly burdensome, and equally available for Plaintiff to ascertain the same information from the records identified and provided herewith.

**PLAINTIFF'S REVISED INTERROGATORY NO. 15**:

After the death of Hayden Schuck through the date of May 31, 2022, did YOU instruct any Sheriff's Department employee to conduct a wellness check of persons housed in Administrative Segregation at the San Diego County jails?

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**RESPONSE TO REVISED INTERROGATORY NO. 15**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

No, not applicable as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 16**:

Between February 3, 2022 and the death of Lonnie Rupard on March 17, 2022, did YOU ever personally meet with Dr. Jon Montgomery to discuss improvement in healthcare provided at the San Diego County jails?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 16**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and there is no showing the information to be gained is not available through other sources and is not repetitive of requests to County. The information sought is repetitive and duplicative of the discovery to County, and seeks same information already requested and/or responded to Plaintiff's prior interrogatory/requests to County (See Plaintiff Justino Rupard's Interrogatories to Defendant County, Set 2). Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad,

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, as written, calls for speculation about legal effect and expert opinion. Responding Party further objects to this Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, and Federal Rules of Civil Procedure 26(b)(3).

Objection to the extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2, contains information relating to mortality review(s) protected from disclosure pursuant to peer review privilege under Cal. Evid. Code § 1157 and self-critical analysis privilege. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).) Additionally, confidential and protected from disclosure pursuant to Federal Health Insurance Portability and Accountability Act (HIPAA).

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043. Further disclosure would violate privacy rights of individuals, including California Constitution, Article 1, Section 1.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 16**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought, particularly since no subject or timeframe is identified.

**PLAINTIFF'S REVISED INTERROGATORY NO. 16**:

Between February 3, 2022 and the death of Lonnie Rupard on March 17, 2022, did YOU ever personally meet with Dr. Jon Montgomery to discuss changes in medical care, including mental health care, provided at the San Diego County jails?

**RESPONSE TO REVISED INTERROGATORY NO. 16**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Responding Party met with Dr. Montgomery in her official capacity as Sheriff only. To extent this Interrogatory seeks any attorney-client privileged information regarding CIRB, this is objectionable.

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**PLAINTIFF'S INTERROGATORY NO. 17**:

If the answer to Interrogatory No. 16 is yes, how many times did you personally meet with Dr. Jon Montgomery to discuss improvement in healthcare provided at the San Diego County jails?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 17**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and there is no showing the information to be gained is not available through other sources and is not repetitive of requests to County. The information sought is repetitive and duplicative of the discovery to County, and seeks same information already requested and/or responded to Plaintiff's prior interrogatory to County (See Plaintiff Justino Rupard's Interrogatories to Defendant County, Set 2). Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, as written, calls for speculation about legal effect and expert opinion. Responding Party further objects to this Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege,

attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence Rule 501-502, and Federal Rules of Civil Procedure 26(b)(3).

Objection to extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).) Further disclosure would violate privacy rights of individuals, including California Constitution, Article 1, Section 1.

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043.

**<u>SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 17</u>**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought.

**PLAINTIFF'S REVISED INTERROGATORY NO. 17**:

If the answer to Interrogatory No. 16 is yes, how many times did you personally meet with Dr. Jon Montgomery to discuss changes in medical care, including mental healthcare, provided at the San Diego County jails?

**RESPONSE TO REVISED INTERROGATORY NO. 17**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Responding Party met with Dr. Montgomery in her official capacity as Sheriff only. To extent this Interrogatory seeks any attorney-client privileged information regarding CIRB, this is objectionable.

**PLAINTIFF'S INTERROGATORY NO. 18**:

If the answer to Interrogatory No. 16 is yes, for how long was your meeting or meetings with Dr. Jon Montgomery?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 18**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and there is no showing the information to be gained is not available through other sources and is not repetitive of requests to County. The information sought is repetitive and duplicative of the discovery to County, and seeks same information already requested and/or responded to Plaintiff's prior interrogatory to County (See Plaintiff Justino Rupard's Interrogatories to Defendant County, Set 2). Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1) and is cumulative or duplicative. Further, as written, calls for speculation about legal effect and expert opinion. Responding Party further objects to this Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure Rule 26(b)(3).

Objection to extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).) Further

disclosure would violate privacy rights of individuals, including California Constitution, Article 1, Section 1.

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 18**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought.

**PLAINTIFF'S REVISED INTERROGATORY NO. 18**:

If the answer to Interrogatory No. 16 is yes, for how long did you meet with Dr. Jon Montgomery?

**RESPONSE TO REVISED INTERROGATORY NO. 18**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Not applicable.

**PLAINTIFF'S INTERROGATORY NO. 19**:

If the answer to Interrogatory No. 16 is yes, what changes in jail health care did you discuss with Dr. Jon Montgomery?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 19**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and there is no showing the information to be gained is not available through other sources and is not repetitive of requests to County. The information sought is repetitive and duplicative of the discovery to County, and seeks same information already requested and/or responded to Plaintiff's prior interrogatory to County (See Plaintiff Justino Rupard's Interrogatories to Defendant County, Set 2). Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, as written, calls for speculation about legal effect and expert opinion. Responding Party further objects to this Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege,

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure Rule 26(b)(3).

Objection to extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).) Further disclosure would violate privacy rights of individuals, including California Constitution, Article 1, Section 1.

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 19**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought.

**PLAINTIFF'S REVISED INTERROGATORY NO. 19**:

If the answer to Interrogatory No. 16 is yes, what changes in jail medical care, including mental healthcare, did you discuss with Dr. Jon Montgomery?

**RESPONSE TO REVISED INTERROGATORY NO. 19**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Responding Party met with Dr. Montgomery in her official capacity as Sheriff only. To extent this Interrogatory seeks any attorney-client privileged information regarding CIRB, this is objectionable.

**PLAINTIFF'S INTERROGATORY NO. 20**:

Have YOU ever read the NCCHC study of the San Diego County jail system?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 20**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham,* 473 U.S. 159,165 (1985).

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

there is no showing the information to be gained is not available through other sources and is not repetitive of requests to County. Further, this Interrogatory is duplicative of prior requests Plaintiff propounded to Defendant County (See Plaintiff Justino Rupard's Interrogatories to Defendant County, Set 2, Nos. 14-22), and thus unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on grounds it is fully duplicative, redundant, and excessive of prior requests in this action and seeks discovery sought from County. Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, as written, calls for speculation about legal effect and expert opinion. Responding Party further objects to this Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure Rule 26(b)(3).

Objection to extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).) Further

disclosure would violate privacy rights of individuals, including California Constitution, Article 1,
Section 1.

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043.

**<u>SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 20</u>**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

Objection. This Interrogatory is overly broad, indefinite as to time, and without reasonable limitation in its scope. Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought as no portion of the report is identified.

Notwithstanding, Responding Party has read the NCCHC study of the San Diego County jail system.

**<u>PLAINTIFF'S REVISED INTERROGATORY NO. 20</u>**:

Have YOU ever read the NCCHC study of the San Diego County jail system?

///

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 20**:

Objection. Aside from her objection regarding impossibility, Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Yes.

**PLAINTIFF'S INTERROGATORY NO. 21**:

If the answer to Interrogatory No. 20 is yes, when did you read the NCCHC study of the San Diego County jail system?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 21**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and there is no showing the information to be gained is not available through other sources and is not repetitive of requests to County. Further, this Interrogatory is duplicative of prior requests Plaintiff propounded to Defendant County (See Plaintiff Justino Rupard's Interrogatories to Defendant County, Set 2, Nos. 14-22), and thus unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on grounds it is fully duplicative, redundant, and excessive of prior requests in this action

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

and seeks discovery sought from County. Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, as written, calls for speculation about legal effect and expert opinion. Responding Party further objects to this Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure Rule 26(b)(3).

Objection to extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).) Further disclosure would violate privacy rights of individuals, including California Constitution, Article 1, Section 1.

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by

Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges, and further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 21**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

Objection. This Interrogatory is overly broad, indefinite as to time, and without reasonable limitation in its scope.

Responding Party answers as follows: In January 2017, the San Diego County Sheriff's Department contracted with the National Commission on Correctional Health Care (NCCHC) to conduct a technical review of County's jails' medical and mental health delivery to compare our current model to their national standards. NCCHC's report is publicly available on the Sheriff's Department website. Responding Party read the NCCHC's report which is publicly available on the Sheriff's Department website.

**PLAINTIFF'S REVISED INTERROGATORY NO. 21**:

If the answer to Interrogatory No. 20 is yes, can you give your best estimate of when you first read the NCCHC study?

**RESPONSE TO REVISED INTERROGATORY NO. 21**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

2017.

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**PLAINTIFF'S INTERROGATORY NO. 22**:

If the answer to Interrogatory No. 20 is yes, what part or parts of the NCCHC study of the San Diego County jail system did you read?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 22**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and there is no showing the information to be gained is not available through other sources and is not repetitive of requests to County. Further, this Interrogatory is duplicative of prior requests Plaintiff propounded to Defendant County (See Plaintiff Justino Rupard's Interrogatories to Defendant County, Set 2, Nos. 14-22), and thus unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on grounds it is fully duplicative, redundant, and excessive of prior requests in this action and seeks discovery sought from County. Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1). Further, as written, calls for speculation about legal effect and expert opinion. Responding Party further objects to this Interrogatory on the ground it seeks or potentially seeks documents and

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

information protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure Rule 26(b)(3).

Objection to extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).)

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges, and further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 22**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Objection. This Interrogatory is overly broad, indefinite as to time, and no portion of the report is identified.

Responding Party answers: In January 2017, the San Diego County Sheriff's Department contracted with the National Commission on Correctional Health Care (NCCHC) to conduct a technical review of County's jails' medical and mental health delivery to compare our current model to their national standards. NCCHC's report is publicly available on the Sheriff's Department website. Yes, Responding Party has read the NCCHC's report.

**<u>PLAINTIFF'S REVISED INTERROGATORY NO. 22</u>**:

If you read the NCCHC study, did you read the entire study?

**<u>RESPONSE TO REVISED INTERROGATORY NO. 22</u>**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Yes, Responding Party has read the NCCHC's report.

**<u>PLAINTIFF'S INTERROGATORY NO. 23</u>**:

Did the San Diego County Sheriff obtain NCCHC accreditation at any time between 2017 and the present?

**<u>RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 23</u>**:

Objection. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on her official duties and her alleged failure to act in her official capacity. As such the allegations are against the County of San Diego. *Kentucky v. Graham*, 473 U.S. 159,165 (1985).

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Further, this Interrogatory is objectionable on grounds it seeks information subject to protection under the apex doctrine, and Sheriff Kelly Martinez has no unique, first-hand knowledge that cannot be obtained through less burdensome means, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6), and there is no showing the information to be gained is not available through other sources, is not repetitive of requests to County, and that Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further, this Interrogatory is duplicative of prior requests Plaintiff propounded to Defendant County (See Plaintiff Justino Rupard's Interrogatories to Defendant County, Set 2, Nos. 14-22), and thus unreasonably cumulative and duplicative under FRCP 26(b)(2) and objectionable on grounds it is fully duplicative, redundant, and excessive of prior requests in this action and seeks discovery sought from County.

Further, this Interrogatory is vague, ambiguous, oppressive, unduly burdensome, and overbroad, and is unintelligible and compound/conjunctive as phrased and calls for speculation. Further objection, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence. Further, this Interrogatory seeks information that is not proportional to the needs of the case under FRCP 26(b)(1) and is cumulative or duplicative. Further, as written, calls for speculation about legal effect and expert opinion. Responding Party further objects to this Interrogatory on the ground it seeks or potentially seeks documents and information protected by attorney-client privilege, attorney work-product doctrine, and the official information privilege pursuant to Federal Rules of Evidence, Rule 501-502, California Evidence Code §§ 1040 et seq., and Federal Rules of Civil Procedure Rule 26(b)(3).

Objection to extent seeks confidential communication and information protected from disclosure pursuant to the California State Auditor confidentiality provisions of Cal. Gov't Code §§ 8545.2(b) and 8545-8545.2. Also, protected from disclosure

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code. § 1157); California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043); and California attorney-client privilege (Cal. Evid. Code §§ 952, 954) and work-product doctrine (Cal. Code Civ. Proc., §§ 2018.020, 2018.030).)

Overbroad in that the Interrogatory is not limited to similar incidents, without reasonable limitation in either time or scope. Seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and information that is not proportional to the needs of this case and to the size and scope of the controversy; post-incident documents and/or information are irrelevant to any cause of action pled by Plaintiff. Seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges, and further seeks disclosure of privileged material that is subject to disclosure only as provided under California Penal Code § 832.7 and Evidence Code § 1043.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 23**:

Responding Party incorporates by reference her initial response and objections to this Interrogatory served February 27, 2026, as though set forth fully herein.

Subject to and without waiving the foregoing objections, Responding Party supplements her response as follows:

Responding Party answers: In January 2017, the San Diego County Sheriff's Department contracted with the National Commission on Correctional Health Care (NCCHC) to conduct a technical review of County's jails' medical and mental health delivery to compare the current model to their national standards. NCCHC's report is publicly available on the Sheriff's Department website. Further, Responding Party elects to produce business records under Fed. R. Civ. P. 33(d) in lieu of providing a written answer: See following publicly available information available on the Sheriff's Department's website: https://www.sdsheriff.gov/home/showpublisheddocument/825.

The National Commission on Correctional Health Care (NCCHC) Resources, Inc., "Technical Assistance Report: San Diego Sheriff's Department," January 2017 referred to herein does not state what this Interrogatory states or purports to refer to and/or quote. The 2017 NCCHC report states recommendations regarding compliance were made for 26 of the 38 NCCHC standards applicable to the San Diego Central Jail facility. Further, objection to extent this Interrogatory implies recommendations were not implemented and insofar as inapplicable as NCCHC updated and revised their standards in 2018 and recommendations had been implemented as of subject timeframe at-issue, and insofar this Interrogatory implies Responding Party personally participated in doing or reviewing compliance of unidentified subordinate Sheriff's Department staff or deputies' conduct.

**PLAINTIFF'S REVISED INTERROGATORY NO. 23**:

Did the San Diego County Sheriff's Department obtain NCCHC accreditation at any time between 2017 and the present?

**RESPONSE TO REVISED INTERROGATORY NO. 23**:

Objection. Responding Party incorporates by reference her initial and supplemental responses and objections to this Interrogatory, served March 20, 2026 and April 15, 2026 as though set forth fully herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

In January 2017, the San Diego County Sheriff's Department contracted with the National Commission on Correctional Health Care (NCCHC) to conduct a technical review of County's jails' medical and mental health delivery to compare the current model to their national standards. NCCHC's report is publicly available on the Sheriff's Department website. Further, Responding Party elects to produce business records under Fed. R. Civ. P. 33(d) in lieu of providing a written answer: See following publicly available information available on the Sheriff's Department's website: https://www.sdsheriff.gov/home/showpublisheddocument/825.

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

The National Commission on Correctional Health Care (NCCHC) Resources, Inc., Technical Assistance Report: San Diego Sheriff's Department," January 2017 referred to herein does not state what this Interrogatory states or purports to refer to and/or quote. The 2017 NCCHC report states recommendations regarding compliance were made for 26 of the 38 NCCHC standards applicable to the San Diego Central Jail facility. Further, objection to the extent this Interrogatory implies recommendations were not implemented and insofar as inapplicable as NCCHC updated and revised their standards in 2018 and recommendations had been implemented as of the subject timeframe at-issue, and insofar this Interrogatory implies Responding Party personally participated in doing or reviewing compliance of unidentified subordinate Sheriff's Department staff or deputies' conduct.

DATED: June 30, 2026 COLLINS + COLLINS LLP

By: ______________________________

ROBERT S. KAHN
RADA FELDMAN
ADAM A. AINSLIE
NICHOLAS R. COLLETTI
Attorneys for Defendants,
COUNTY OF SAN DIEGO, BILL GORE, KELLY MARTINEZ, JON MONTGOMERY, CHRISTINA GOODALL (sued as CHRISTINA ANOSIKE), MIGUEL AGUILERA, JASON VILADIU, GUSTAVO MARTINEZ, JEFF AMADO, ERNESTO AGUIRRE, TREYVONNE JAMES (sued in duplicate J. TREYVONNE), BERNARDO ROMERO, MICHAEL JOHNSON, ANDREW TORRES, ALLEN WERESKI, BLADE ROMANS, AND LINDA GUTIERREZ

# VERIFICATION

**STATE OF CALIFORNIA, COUNTY OF SAN DIEGO**

I am a party to the above-entitled action or proceeding; I have read the foregoing document entitled **DEFENDANT KELLY MARTINEZ'S RESPONSES TO PLAINTIFF THE ESTATE OF LONNIE RUPARD'S INTERROGATORIES, SET ONE (REVISED)** and know the contents thereof; and I certify that the same is true of my own knowledge, except as to those matters which are therein stated upon my information or belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 29, 2026, at San Diego, California.

Kelly Martinez

25163

COLLINS + COLLINS LLP
790 E. Colorado Blvd., Suite 600,
Pasadena, CA 91101
T: (626) 243-1100
F: (626) 243-1111

**PROOF OF SERVICE**
**(CCP §§ 1013(a) and 2015.5; FRCP 5)**

State of California, )
) ss.
County of Los Angeles. )

I am employed in the County of Los Angeles. I am over the age of 18 and not a party to the within action. My business address is 790 E. Colorado Boulevard, Suite 600, Pasadena, CA 91101.

On this date, I served the foregoing document described as **DEFENDANT KELLY MARTINEZ'S RESPONSES TO PLAINTIFF THE ESTATE OF LONNIE RUPARD'S INTERROGATORIES, SET ONE (REVISED)** on the interested parties in this action by placing same in a sealed envelope, addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ **(BY MAIL)** - I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail in Pasadena, California to be served on the parties as indicated on the attached service list. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Pasadena, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **(BY CERTIFIED MAIL)** – I caused such envelope(s) with postage thereon fully prepaid via Certified Mail Return Receipt Requested to be placed in the United States Mail in Pasadena, California.

☐ **FEDERAL EXPRESS** - I caused the envelope to be delivered to an authorized courier or driver authorized to receive documents with delivery fees provided for.

☒ **(BY ELECTRONIC FILING AND/OR SERVICE)** – I served a true copy, with all exhibits, electronically on designated recipients listed on the attached service list.

☐ **(ELECTRONIC SERVICE PER CODE CIV. PROC., § 1010.6)** – By prior consent or request or as required by rules of court (Code Civ. Proc., § 1010.6 (amended Jan. 1, 2021); Code Civ. Proc., § 1013(g); Cal. Rules of Court, rule 2.251(a)).

☐ **(BY PERSONAL SERVICE)** - I caused such envelope(s) to be delivered by hand to the office(s) of the addressee(s).

---

Executed on June 30, 2026 at Pasadena, California.

☐ **(STATE)** - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ **(FEDERAL)** - I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Evelyn Greve
Evelyn Greve
egreve@ccllp.law

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**ESTATE OF LONNIE RUPARD ET AL. V. COUNTY OF SAN DIEGO ET AL.**
**Case Number: 3:23-cv-1357-CAB-BLM**
**CCLLP File Number: 25163**

**SERVICE LIST**

Jeremiah A. Lowe
LOWE LAW, LLP
402 W. Broadway, Suite 1720
San Diego, CA 92101
T: (619) 878-2725 - F: (619) 878-2737
jeremiah@lowelawapc.com
laura@lowelawapc.com
**ATTORNEYS FOR PLAINTIFF JUSTINO RUPARD and the Estate of Lonnie Rupard**

Eugene G. Iredale
Julia Yoo
Sarah Musumeci
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
T: (619) 233-1525 - F: (619) 233-3221
egiredale@iredalelaw.com
jyoo@iredalelaw.com
smusumeci@iredalelaw.com
admin@iredalelaw.com
creherman@iredalelaw.com
gjun@iredalelaw.com
sbrockett@iredalelaw.com
pbibring@iredalelaw.com
**ATTORNEYS FOR PLAINTIFF JUSTINO RUPARD**

Corey E. Krueger
Annie Barberian
Kimberlyn Brooke Pinkerton
TRESSLER LLP
400 Continental Blvd., Suite 6125
El Segundo, CA 90245
T: (310) 203-4800 - F: (323) 486-2704
ckrueger@tresslerllp.com
abarberian@tresslerllp.com
jpatterson@tresslerllp.com
ladocket@tresslerllp.com
kpinkerton@tresslerllp.com
**ATTORNEYS FOR DEFENDANTS ANTHONY CRUZ, M.D. and LIBERTY HEALTHCARE OF CALIFORNIA, INC.**

# EXHIBIT 32

Defendant William Gore's Revised Responses to Plaintiff Estate's Interrogatories, Set One

**Rada Feldman, Esq. (State Bar No. 285931)**
**Adam A. Ainslie, Esq. (State Bar No. 311427)**
**Nicholas R. Colletti, Esq. (State Bar No. 283947)**
**Robert S. Kahn, Esq. (State Bar No. 231277)**
**COLLINS + COLLINS LLP**
**2011 Palomar Airport Road, Suite 207**
**Carlsbad, CA 92011**
**(760) 274-2110 - FAX (760) 274-2111**
**Email: rfeldman@ccllp.law**
**Email: aainslie@ccllp.law**
**Email: ncolletti@ccllp.law**
**Email: rkahn@ccllp.law**

Attorneys for Defendants,
COUNTY OF SAN DIEGO, BILL GORE, KELLY MARTINEZ, JON MONTGOMERY, CHRISTINA GOODALL (sued as CHRISTINA ANOSIKE), MIGUEL AGUILERA, JASON VILADIU, GUSTAVO MARTINEZ, JEFF AMADO, ERNESTO AGUIRRE, TREYVONNE JAMES (sued in duplicate J. TREYVONNE), BERNARDO ROMERO, MICHAEL JOHNSON, ANDREW TORRES, ALLEN WERESKI, BLADE ROMANS, AND LINDA GUTIERREZ

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ESTATE OF LONNIE RUPARD;

Plaintiff,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE CORPORATION; CHRISTINA GOODALL (SUED AS

CASE NO. 3:23-cv-1357-CAB-BLM
***Assigned to Hon. Cathy Ann Bencivengo***
***Magistrate Hon. Barbara L. Major in Dept. 15A***

**DEFENDANT BILL GORE'S RESPONSES TO PLAINTIFF THE ESTATE OF LONNIE RUPARD'S INTERROGATORIES, SET ONE (REVISED)**

**Complaint Filed:** **07/26/2023**
**Trial Date:** **02/08/2027**

CHRISTINA ANOSIKE) , IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; DEFENDANT DEPUTIES DOES 1-10, DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10.

Defendants.

**PROPOUNDING PARTY:** Plaintiff the ESTATE OF LONNIE RUPARD

**RESPONDING PARTY:** Defendant BILL GORE

**SET NUMBER:** One (1)

Defendant, BILL GORE ("Responding Party"), hereby submits responses and objections to Plaintiff, THE ESTATE OF LONNIE RUPARD's ("PLAINTIFF" or "Propounding Party"), Interrogatories, Set One (Revised), as follows:

**RESPONSES TO INTERROGATORIES**

**PLAINTIFF'S INTERROGATORY NO. 1**:

On how many occasions did YOU speak personally to the Chief Medical Officer ("CMO") Jon Montgomery about the subject of jail medical care during his tenure and before your resignation/retirement?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 1**:

Objection. This Interrogatory is vague, ambiguous, unduly burdensome, and overbroad in time and scope, particularly the phrase "the subject of jail medical care," which is not defined and overly broad in scope and time, and general reference to "jail medical care" and "during his tenure" is not limited to timeframe or subject matter and as phrased, calls for speculation because no limit to relevant time or this subject action, Decedent, or alleged incident. Responding Party is not a proper party to this litigation.

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Further, this Interrogatory is objectionable because it seeks information subject to protection under the apex doctrine, and Sheriff Gore has no unique, first-hand knowledge that cannot be obtained through less burdensome means, and there is no showing the information to be gained is not available through other sources and is not repetitive of requests to County. Objection is made on the grounds Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this interrogatory is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further objection, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). Further objection to the extent this Interrogatory potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further, to extent it seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, and California peer review privilege (Cal. Evid. Code § 1157).

**<u>SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 1</u>**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought.

**<u>PLAINTIFF'S REVISED INTERROGATORY NO. 1</u>**:

Please provide your best recollection of the number of times on which you personally spoke to CMO Jon Montgomery between April 2019 and February 3, 2022 on the subject of jail medical care, including mental health care.

**<u>RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 1</u>**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Responding Party spoke with Dr. Montgomery in their official capacity as Sheriff. As to the remainder, Responding Party cannot recall how many times he personally spoke with Dr. Montgomery.

**PLAINTIFF'S INTERROGATORY NO. 2**:

Please estimate the total length of time YOU personally spent in speaking with CMO Montgomery regarding the provision of jail health services during his tenure and before YOUR resignation/retirement?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 2**:

Objection. This Interrogatory is vague, ambiguous, unduly burdensome, and overbroad in time and scope, particularly the undefined term "provision of jail health services," place no limitation on relevant timeframe or subject matter or this action or Decedent. This Interrogatory is also overly broad and unduly burdensome because it is not limited in scope by time, subject matter, or type of communication, and seeks an estimate of time spent over an unspecified period without temporal or categorical limitation. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and that Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further objection, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). Further objection to the extent this Interrogatory potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further, to extent it seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, and California peer review privilege (Cal. Evid. Code § 1157).

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 2**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought.

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**PLAINTIFF'S REVISED INTERROGATORY NO. 2**:

Please estimate the total length of time you personally spent speaking with CMO Jon Montgomery regarding jail medical care, including mental healthcare, between April 2019 and February 3, 2022.

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 2**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Responding Party spoke with Dr. Montgomery in their official capacity as Sheriff. As to the remainder, Responding Party cannot recall how much time he spent personally speaking with Dr. Montgomery.

**PLAINTIFF'S INTERROGATORY NO. 3**:

At any time before YOUR resignation/retirement, did YOU state in any public forum that the Sheriff's Department would seek to obtain NCCHC accreditation?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 3**:

Objection. This Interrogatory is vague, ambiguous, unduly burdensome, and overbroad in time and scope, particularly the terms "public forum" and "seek to obtain NCCHC accreditation," which are not defined and subject to multiple interpretations. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory on the grounds Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and that Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). Further objection to the extent this Interrogatory potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 3**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought. Notwithstanding, Responding Party

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

answers: In January 2017, the San Diego County Sheriff's Department contracted with the National Commission on Correctional Health Care (NCCHC) to conduct a technical review of County's jails' medical and mental health delivery to compare our current model to their national standards. NCCHC's report is publicly available on the Sheriff's Department website.

**PLAINTIFF'S REVISED INTERROGATORY NO. 3**:

At any time between January 2016 and before February 3, 2022, did YOU state in any public forum or publication that the Sheriff's Department would seek to obtain NCCHC accreditation?

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 3**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Yes. Responding Party made such statement(s) in their official capacity as Sheriff.

**PLAINTIFF'S INTERROGATORY NO. 7**:

What, if anything, did YOU do to determine whether inmates in County Jail Administrative Segregation were accorded regular visits by a nurse during their segregation?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 7**:

Objection. This Interrogatory is vague, ambiguous, unintelligible, compound, unduly burdensome, and overbroad in time and scope, particularly the terms "determine," "regular visits," and "nurse," which are not defined and unclear in context of this Interrogatory and action. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent.

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). This Interrogatory is also compound, as it seeks information regarding multiple distinct actions or inactions in a single interrogatory. Further, this Interrogatory is not limited in scope by time or subject matter, rendering it overly broad and unduly burdensome. Further objection to the extent this Interrogatory potentially seeks information

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further to extent it seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, and California peer review privilege (Cal. Evid. Code § 1157).

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 7**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Objection, Responding Party is not a proper party to this litigation to extent of Plaintiff's claim against Responding Party based on his personal capacity. Responding Party was not personally involved in, present during, or knew of any alleged failures or the constitutional violations alleged in this action. Responding Party has no personal knowledge on which to base a response. Responding Party refers the Propounding Party to the jail and medical records for Lonnie Rupard produced by County under FRCP Rule 33(d).

**PLAINTIFF'S REVISED INTERROGATORY NO. 7**:

Between February 3, 2019 and February 3, 2022, what, if anything, did you do to find out whether inmates in County jail administrative segregation were seen three times a week by nurses to check the state of their health.

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 7**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

No as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 8**:

What, if anything, did YOU do to determine whether inmates in County Jail Administrative Segregation were given regular psychiatric consultation?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 8**:

Objection. This Interrogatory is vague, ambiguous, unintelligible, compound, unduly burdensome, and overbroad in time and scope, particularly the term "regular psychiatric consultation" which is not defined and the meaning is unclear in the context of this Interrogatory and action. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable

on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). Further, this Interrogatory is overly broad and unduly burdensome because it is not limited in scope by time or subject matter and is unintelligible as phrased and calls for speculation about what information is responsive and thus, unduly burdensome. Further objection to the extent this Interrogatory potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further to extent it seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, and California peer review privilege (Cal. Evid. Code § 1157). Further, as written, this Request calls for speculation about legal effect and expert opinion.

**<u>SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 8</u>**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Objection, Responding Party is not a proper party to this litigation to extent of Plaintiff's claim against Responding Party based on his personal capacity. Responding Party was not personally involved in, present during, or knew of any alleged failures or the constitutional violations alleged in this action. Responding Party has no personal knowledge on which to base a response. Responding party refers the

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Propounding Party to the jail and medical records for Lonnie Rupard produced by County under FRCP Rule 33(d).

**PLAINTIFF'S REVISED INTERROGATORY NO. 8**:

What, if anything, did you do to determine if inmates in County jail administrative segregation were seen weekly by a qualified mental health professional.

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 8**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

Notwithstanding, and preserving all objections, Responding Party responds as follows:

No as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 10**:

In YOUR last year in office, did YOU ever review any policies and procedures RELATING TO jail medical care?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 10**:

Objection. This Interrogatory is vague, ambiguous, unintelligible, compound, unduly burdensome, and overbroad in time and scope, particularly the terms "review," "policies and procedures," and "jail medical care," and it is unclear what level or form of review is being sought, what specific policies and procedures are at issue, and what constitutes a sufficient relationship to "jail medical care." Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S.

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). Further, this Interrogatory is also overly broad and not limited in scope by time or subject matter as it does not specify which policies or procedures or what aspect of "jail medical care" is at issue. Further objection to extent this Interrogatory potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further to extent it seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Such information is

protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, and California peer review privilege (Cal. Evid. Code § 1157).

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 10**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought. The "policies and procedures" are not identified. Responding party cannot respond to this request as phrased.

**PLAINTIFF'S REVISED INTERROGATORY NO. 10**:

Between February 3, 2019 and February 3, 2022, did you read any medical services division policies and procedures?

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 10**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

This interrogatory is not applicable as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 11**:

If the answer to Interrogatory No. 10 is yes, which policies and procedures did YOU review?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 11**:

Objection. This Interrogatory is vague, ambiguous, unintelligible, compound, unduly burdensome, and overbroad in time and scope, particularly the terms "policies

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

and procedures" and "review," which are not defined and may be interpreted in multiple ways. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1).

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Further objection to extent this Interrogatory potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further to extent it seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, and California peer review privilege (Cal. Evid. Code § 1157).

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 11**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Not applicable, Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought. The "policies and procedures" are not identified. Responding party cannot respond to this request as phrased.

**PLAINTIFF'S REVISED INTERROGATORY NO. 11**:

If the answer to Interrogatory No. 10 is yes, which medical services division policies and procedures did you read?

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 11**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

This interrogatory is not applicable as to Responding Party.

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**PLAINTIFF'S INTERROGATORY NO. 12**:

In YOUR last year in office, did YOU ever review any policies and procedures RELATING TO jail mental health care?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 12**:

Objection. This Interrogatory is vague, ambiguous, unintelligible, compound, unduly burdensome, and overbroad in time and scope, particularly the terms "review," "policies and procedures," and "jail mental health care," which are not defined and could encompass a broad and indeterminate scope of activities and documents. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further, this Interrogatory seeks information that is not relevant to this action, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to needs of the case under FRCP 26(b)(1). Further objection to extent this Interrogatory potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further to extent it seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, and California peer review privilege (Cal. Evid. Code § 1157).

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 12**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer this Interrogatory without speculation as to what information is being sought. The "policies and procedures" are not identified. Responding party cannot respond to this request as phrased.

**PLAINTIFF'S REVISED INTERROGATORY NO. 12**:

Between February 3, 2019 and February 3, 2022, did you ever read any MSD and/or DSB policies and procedures relating to jail mental health care?

///

///

///

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 12**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

This interrogatory is not applicable as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 13**:

If the answer to Interrogatory No. 12 is yes, which policies and procedures did YOU review?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 13**:

Objection. This Interrogatory is vague, ambiguous, unintelligible, compound, unduly burdensome, and overbroad in time and scope, particularly term "policies and procedures." Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be

obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further, this Interrogatory seeks information not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). Further, it is overly broad and unduly burdensome because it is not limited in scope by subject or category of policies/procedures and requires speculation as to what is responsive. Further objection to extent this Interrogatory potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further to extent it seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, and California peer review privilege (Cal. Evid. Code § 1157).

**<u>SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 13</u>**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Not applicable, Responding Party cannot answer this Interrogatory as written. As phrased, it is impossible for Responding Party to answer

this Interrogatory without speculation as to what information is being sought. The "policies and procedures" are not identified. Responding party cannot respond to this request as phrased.

**PLAINTIFF'S REVISED INTERROGATORY NO. 13**:

If the answer to interrogatory No. 12 is yes, which MSD and/or DSB policies and procedures relating to jail mental health care did you read?

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 13**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

This interrogatory is not applicable as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 18**:

Please describe in detail what, if anything, YOU did as County Sheriff in the last year of YOUR tenure to supervise the provision of medical and mental health services to jail inmates?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 18**:

Objection. This request is vague and ambiguous as to the terms "supervise" and "provision of medical and mental health services," which are not defined and subject to multiple interpretations. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved

in, present during, or knew of any alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and that Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further objection, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). Further, this Interrogatory is overly broad and unduly burdensome because it is not limited in scope by time, subject matter, or specific actions, seeks information "in detail" regarding all actions taken and thus calls for speculation about what information is responsive. Further, as written, calls for speculation about legal effect and expert opinion. Further objection to extent this Interrogatory potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further, to extent it potentially seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges and that is not equally available in

public records. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, and California peer review privilege (Cal. Evid. Code § 1157).

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 18**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Objection, Responding Party is not a proper party to this litigation. Responding Party was not personally involved in, present during, or knew of any alleged failures or the constitutional violations alleged in this action. Responding Party has no personal knowledge on which to base a response, and Responding Party refers the Propounding Party to the documents produced by County under FRCP Rule 33(d) in this action including the Sheriff's Department Procedures for the Medical Services Division.

**PLAINTIFF'S REVISED INTERROGATORY NO. 18**:

Please describe in detail what, if anything, YOU did as County Sheriff between February 3, 2019 and February 3, 2022 to supervise the provision of medical and mental health services to jail inmates?

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 18**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

This interrogatory is not applicable as to Responding Party.

///

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**PLAINTIFF'S INTERROGATORY NO. 19**:

Please describe in detail what, if anything, YOU did as County Sheriff in the last year of YOUR tenure to supervise the conduct of safety checks and inmate counts.

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 19**:

Objection. This request is vague and ambiguous as to the terms "supervise," "conduct of safety checks," and "inmate counts," which are undefined and may have multiple meanings. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and that Plaintiff has not exhausted less intrusive discovery methods,

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further objection, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). Further objection, this Interrogatory is compound and improperly asks multiple questions as a single Interrogatory, and thus, improper under FRCP 33(a)(1). Further, it is overly broad and unduly burdensome as phrase "describe in detail" is not limited to specified actions, scope, or subject matter and encompasses "the last year" without limitation to relevant time, scope, or alleged incident subject of this action. Further, as written, this Interrogatory calls for speculation about legal effect and expert opinion. Further objection to extent this Interrogatory potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further, to extent it potentially seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges and that is not equally available in public records. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege and deliberative process privileges.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 19**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Objection, Responding Party is not a proper party to this litigation. Responding Party was not personally involved in, present during, or knew of any alleged failures or the constitutional violations alleged in this action. Notwithstanding and subject to the foregoing, Responding Party answers: Under Sheriff's Department Procedures, deputies at each facility perform counts and safety checks. Responding

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Party refers Propounding Party to documents produced by County under FRCP Rule 33(d) in this action including the Sheriff's Department Procedures and deposition testimony taken in this action regarding the information sought.

**PLAINTIFF'S REVISED INTERROGATORY NO. 19**:

Please describe in detail what, if anything, YOU did as County Sheriff between February 3, 2019 and February 3, 2022 to supervise conduct of safety checks and inmate counts.

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 19**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

This interrogatory is not applicable as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 20**:

Please describe YOUR involvement, if any, in supervising or overseeing the conduct of jail hygiene inspections.

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 20**:

Objection. This Interrogatory is vague, ambiguous, unintelligible, compound, unduly burdensome, and overbroad in time and scope, particularly the terms "supervising," "overseeing," and "jail hygiene inspections," which are not defined and may have multiple meanings. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and that Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). Further, this Interrogatory is compound and improperly asks multiple questions as a single Interrogatory, and thus, improper under FRCP 33(a)(1). Further, it is overly broad and unduly burdensome because it is not limited in scope by relevant time, subject matter, or specified conduct. Further, as written, calls for speculation about legal effect and expert opinion. Further objection to extent this Interrogatory potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further, to extent it potentially seeks confidential information protected from disclosure by the deliberative

process, self-critical analysis and official information privileges and that is not equally available in public records. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis and deliberative process privileges.

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 20**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Objection, Responding Party is not a proper party to this litigation. Responding Party was not personally involved in, present during, or knew of any alleged failures or the constitutional violations alleged in this action. Notwithstanding and subject to the foregoing, Responding Party answers: Under Sheriff's Department Procedures, deputies at each facility perform counts and safety checks. Responding Party refers Propounding Party to documents produced by County under FRCP Rule 33(d) in this action including the Sheriff's Department Procedures and deposition testimony taken in this action regarding the information sought.

**PLAINTIFF'S REVISED INTERROGATORY NO. 20**:

Please describe YOUR involvement, if any, as County Sheriff between February 3, 2019 and February 3, 2022 in supervising or overseeing the conduct of jail hygiene inspections.

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 20**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

This interrogatory is not applicable as to Responding Party.

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**PLAINTIFF'S INTERROGATORY NO. 21**:

Please describe YOUR involvement, if any, in ensuring that jail inmates were housed in sanitary conditions.

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 21**:

Objection. This Interrogatory is vague, ambiguous, unintelligible, compound, unduly burdensome, and overbroad in time and scope, particularly the term "housed in sanitary conditions." Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and that Plaintiff has not exhausted less intrusive discovery methods,

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further objection, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). Further, this Interrogatory is overly broad, unintelligible as written and unduly burdensome because it is not limited to relevant scope, time, subject matter, or the alleged incident subject of this action and calls for speculation about what information is responsive. Further, as written, calls for speculation about legal effect and expert opinion. Further objection to extent this Interrogatory potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further, to extent it potentially seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges and that is not equally available in public records. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis and deliberative process privileges.

**<u>SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 21</u>**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Objection, Responding Party is not a proper party to this litigation. Responding Party was not personally involved in, present during, or knew of any alleged failures or the constitutional violations alleged in this action. Notwithstanding and subject to the foregoing, Responding Party answers: Under Sheriff's Department Procedures, deputies at each facility perform counts and safety checks and hygiene inspections. Responding Party refers Propounding Party to documents produced by County under FRCP Rule 33(d) in this action including the Sheriff's Department

Procedures and deposition testimony taken in this action regarding the information sought.

**PLAINTIFF'S REVISED INTERROGATORY NO. 21**:

Between February 3, 2019 and February 3, 2022, please describe YOUR involvement, if any, in ensuring that jail inmates were housed in sanitary conditions.

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 21**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

This interrogatory is not applicable as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 22**:

State whether, in the course of YOUR tenure, YOU ever disciplined Sheriff's employees for their failure to afford proper medical care to a County jail inmate.

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 22**:

Objection. This Interrogatory is vague, ambiguous, unintelligible, compound, unduly burdensome, and overbroad in time and scope, particularly the terms "disciplined" and "proper medical care," which are not defined and are subject to multiple interpretations. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional violations and the claim relates

only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). Further, overly broad and unduly burdensome because not limited in scope to relevant time, subject matter, or alleged conduct and encompasses period of "YOUR tenure" and calls for speculation about what information is responsive and meaning of "discipline." Further objection to this Interrogatory to the extent that it seeks information that implicates the privacy rights of third parties. Further, as written, calls for speculation about legal effect and expert opinion. Further objection to extent this Interrogatory seeks or potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further, to extent it potentially seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

privileges and that is not available in public records. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code § 1157); and California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043).

**<u>SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 22</u>**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Objection, Responding Party is not a proper party to this litigation. The interrogatory is improper because it is duplicative. Responding Party does not have personal knowledge regarding the requested information. County of San Diego has responded to this request. Responding Party cannot answer this Interrogatory as written. The "employees" and/or "County jail inmate" are not identified. Responding party cannot respond to this request as phrased.

**<u>PLAINTIFF'S REVISED INTERROGATORY NO. 22</u>**:

Between February 3, 2019 and February 3, 2022, state whether YOU ever involved in any way in the imposition of discipline of any Sheriff's Department employee for their failure to provide timely and appropriate medical care, including mental health care, to a County jail inmate?

**<u>RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 22</u>**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

This interrogatory is not applicable as to Responding Party.

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

**PLAINTIFF'S INTERROGATORY NO. 23**:

If the answer to Interrogatory No. 22 is yes, please describe the circumstances of the case or cases.

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 23**:

Objection. This Interrogatory is vague, ambiguous, unintelligible, compound, unduly burdensome, and overbroad in time and scope, particularly the term "cases." Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

ranking officials and/or designees under FRCP 30(b)(6). Further, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). Further, overly broad and unduly burdensome because not limited in scope to relevant time, subject matter, or specified conduct and encompasses period of "YOUR tenure" and calls for speculation about what information is responsive and meaning of "discipline." Further objection to this Interrogatory on the ground and to the extent that it seeks information that implicates the privacy rights of third parties and protected by third-party individual privacy. Further, as written, calls for speculation about legal effect and expert opinion. Further objection to extent this Interrogatory seeks or potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further, to extent it potentially seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges and that is not available in public records. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code § 1157); and California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043).

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 23:**

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Objection, the Responding Party is not a proper party to this litigation. The interrogatory is improper because it is duplicative. Responding Party

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

does not have personal knowledge regarding the requested information. Not applicable, Responding Party cannot answer this Interrogatory as written.

**PLAINTIFF'S REVISED INTERROGATORY NO. 23**:

If the answer to Interrogatory No. 22 is yes, please describe the circumstances of the case or cases and the discipline imposed.

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 23**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

Notwithstanding, and preserving all objections, Responding Party responds as follows:

This interrogatory is not applicable as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 24**:

During YOUR tenure as Sheriff, did YOU ever impose discipline, or authorize discipline, on any SDSD employee in connection with a jail death?

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 24**:

Objection. This Interrogatory is vague, ambiguous, unintelligible, compound, unduly burdensome, and overbroad in time and scope, particularly the terms "impose discipline," "authorize discipline," and "SDSD employee," which are not defined and may be interpreted in multiple ways. Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional

violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). Further, this Interrogatory is compound and improperly asks multiple questions as a single Interrogatory, and thus, improper under FRCP 33(a)(1) because it seeks information regarding both the imposition and authorization of discipline, which are distinct actions. Further, overly broad and unduly burdensome because it is not limited in scope by time, subject matter, or specific incidents, and seeks information regarding any and all jail deaths during the entirety of Sheriff Bill Gore's tenure as Sheriff, regardless of relevance to this action. Further objection to this Interrogatory to the extent that it seeks information that implicates the privacy rights of third parties. Further, as written, calls for speculation about legal effect and expert opinion. Further objection to extent this Interrogatory seeks or potentially seeks

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further, to extent it potentially seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges and that is not available in public records. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code § 1157); and California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043).

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 24**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his response as follows: Objection, Responding Party is not a proper party to this litigation. The interrogatory is improper because it is duplicative. Responding Party does not have personal knowledge regarding the requested information. County of San Diego has responded to this request. Responding Party cannot answer this Interrogatory as written. The "jail death" is not identified. Responding party cannot respond to this request as phrased.

**PLAINTIFF'S REVISED INTERROGATORY NO. 24**:

Between February 3, 2017 through February 3, 2022 were you ever involved in any way in the imposition of discipline on any Sheriff's Department employee in connection with the death of an inmate while in the custody of a County jail facility.

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 24**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Notwithstanding, and preserving all objections, Responding Party responds as follows:

This interrogatory is not applicable as to Responding Party.

**PLAINTIFF'S INTERROGATORY NO. 25**:

If the answer to Interrogatory No. 24 is yes, please describe the circumstances of the case or cases and the discipline imposed.

**RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 25**:

Objection. This Interrogatory is vague, ambiguous, unintelligible, compound, unduly burdensome, and overbroad in time and scope, particularly the terms "discipline" and "cases." Responding Party is not a proper party to this litigation. Plaintiff does not allege that the Responding Party had any direct contact with Decedent or had personal knowledge of the care or treatment provided to Decedent. Rather, Plaintiff's allegations against the Responding Party are based on his official duties and his alleged failure to act in his official capacity. As such the allegations are against County of San Diego. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Further, Responding Party is not a proper party to litigation to the extent Plaintiff asserts Sheriff Gore is being sued in his personal capacity. Sheriff Gore was not personally involved in, present during, or knew of any alleged constitutional violations and the claim relates only to his role as supervisory official. Sheriff Gore cannot be liable for acts of unidentified subordinates and Sheriff Gore had no personal involvement and no direct participation in any alleged failures resulting in decedent's death on March 17, 2022. Sheriff Gore cannot be held individually liable under a respondeat superior theory of liability. Objection is made to this Interrogatory because Plaintiff has not shown Sheriff Gore has unique personal knowledge of material facts or issues in the case that cannot reasonably be obtained from other sources such that his response to this request is "essential" to the case, and to extent there is no showing Sheriff Gore's testimony "is necessary to obtain relevant information that is not available from another source" and is "essential to the case at hand," or that Sheriff Gore "has first-hand information that

cannot reasonably be obtained from other sources." This Interrogatory is objectionable on grounds that Sheriff Gore has no unique first-hand, non-repetitive knowledge relevant to action, and Plaintiff has not exhausted less intrusive discovery methods, such as deposing lower-ranking officials and/or designees under FRCP 30(b)(6). Further, this Interrogatory seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, cumulative and/or duplicative and can be obtained from a more convenient, less burdensome, or less expensive source, and not proportional to the needs of the case under FRCP 26(b)(1). Further, it is overly broad and unduly burdensome because not limited in scope to relevant time, subject matter, or specified conduct and encompasses "YOUR tenure" and calls for speculation about what information is responsive with respect to meaning of "discipline." Further objection to this Interrogatory on the ground and to the extent that it seeks information that implicates the privacy rights of third parties. Further, as written, calls for speculation about legal effect and expert opinion. Further objection to extent this Interrogatory seeks or potentially seeks information protected by attorney-client privilege, attorney work-product doctrine, and/or the official information privilege. Further, to extent it potentially seeks confidential information protected from disclosure by the deliberative process, self-critical analysis and official information privileges and that is not available in public records. Such information is protected from disclosure pursuant to California state law and federal law under official information and law enforcement privileges (Fed. R. Evid. 501); self-critical analysis privilege, deliberative process privilege, California peer review privilege (Cal. Evid. Code § 1157); and California governmental privilege statutes (Cal. Pen. Code § 832.7; Cal. Evid. Code § 1043).

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 25**:

Responding Party incorporates by reference his initial response and objections to this Interrogatory served March 20, 2026 as though set forth fully herein. Subject to and without waiving the foregoing objections, Responding Party supplements his

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

response as follows: Objection, Responding Party is not a proper party to this litigation. The interrogatory is improper because it is duplicative. Responding Party does not have personal knowledge regarding the requested information. County of San Diego has responded to this request. Not applicable, Responding Party cannot answer this Interrogatory as written. The "jail death" is not identified. Responding party cannot respond to this request as phrased.

**PLAINTIFF'S REVISED INTERROGATORY NO. 25**:

If the answer to Interrogatory No. 24 is yes, please describe the circumstances of the case or cases and the discipline imposed.

**RESPONSE TO PLAINTIFF'S REVISED INTERROGATORY NO. 25**:

Objection. Responding Party incorporates by reference their initial and supplemental responses and objections to the interrogatory, served March 20, 2026 and April 15, 2026 as though fully set forth herein.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

COLLINS + COLLINS LLP
2011 Palomar Airport Rd., Suite 207, Carlsbad, CA 92011
T: (760) 274-2100
F: (760) 274-2111

Notwithstanding, and preserving all objections, Responding Party responds as follows:

This interrogatory is not applicable as to Responding Party.

DATED: June 30, 2026

COLLINS + COLLINS LLP

By: ______________________________

ROBERT S. KAHN
RADA FELDMAN
ADAM A. AINSLIE
NICHOLAS R. COLLETTI
Attorneys for Defendants,
COUNTY OF SAN DIEGO, BILL GORE, KELLY MARTINEZ, JON MONTGOMERY, CHRISTINA GOODALL (sued as CHRISTINA ANOSIKE), MIGUEL AGUILERA, JASON VILADIU, GUSTAVO MARTINEZ, JEFF AMADO, ERNESTO AGUIRRE, TREYVONNE JAMES (sued in duplicate J. TREYVONNE), BERNARDO ROMERO, MICHAEL JOHNSON, ANDREW TORRES, ALLEN WERESKI, BLADE ROMANS, AND LINDA GUTIERREZ

# VERIFICATION

**STATE OF CALIFORNIA, COUNTY OF SAN DIEGO**

I am a party to the above-entitled action or proceeding; I have read the foregoing document entitled **DEFENDANT BILL GORE'S RESPONSES TO PLAINTIFF THE ESTATE OF LONNIE RUPARD'S INTERROGATORIES, SET ONE (REVISED)** and know the contents thereof; and I certify that the same is true of my own knowledge, except as to those matters which are therein stated upon my information or belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 29th, 2026, at San Diego, California.

Bill Gore

Bill Gore

COLLINS + COLLINS LLP
790 E. Colorado Blvd., Suite 600,
Pasadena, CA 91101
T: (626) 243-1100
F: (626) 243-1111

**PROOF OF SERVICE**
**(CCP §§ 1013(a) and 2015.5; FRCP 5)**

State of California, )
) ss.
County of Los Angeles. )

I am employed in the County of Los Angeles. I am over the age of 18 and not a party to the within action. My business address is 790 E. Colorado Boulevard, Suite 600, Pasadena, CA 91101.

On this date, I served the foregoing document described as **DEFENDANT BILL GORE'S RESPONSES TO PLAINTIFF THE ESTATE OF LONNIE RUPARD'S INTERROGATORIES, SET ONE (REVISED)** on the interested parties in this action by placing same in a sealed envelope, addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ **(BY MAIL)** - I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail in Pasadena, California to be served on the parties as indicated on the attached service list. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Pasadena, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **(BY CERTIFIED MAIL)** – I caused such envelope(s) with postage thereon fully prepaid via Certified Mail Return Receipt Requested to be placed in the United States Mail in Pasadena, California.

☐ **FEDERAL EXPRESS** - I caused the envelope to be delivered to an authorized courier or driver authorized to receive documents with delivery fees provided for.

☒ **(BY ELECTRONIC FILING AND/OR SERVICE)** – I served a true copy, with all exhibits, electronically on designated recipients listed on the attached service list.

☐ **(ELECTRONIC SERVICE PER CODE CIV. PROC., § 1010.6)** – By prior consent or request or as required by rules of court (Code Civ. Proc., § 1010.6 (amended Jan. 1, 2021); Code Civ. Proc., § 1013(g); Cal. Rules of Court, rule 2.251(a)).

☐ **(BY PERSONAL SERVICE)** - I caused such envelope(s) to be delivered by hand to the office(s) of the addressee(s).

---

Executed on June 30, 2026 at Pasadena, California.

☐ **(STATE)** - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ **(FEDERAL)** - I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Evelyn Greve
egreve@ccllp.law

**ESTATE OF LONNIE RUPARD ET AL. V. COUNTY OF SAN DIEGO ET AL.**
**Case Number: 3:23-cv-1357-CAB-BLM**
**CCLLP File Number: 25163**

**SERVICE LIST**

Jeremiah A. Lowe
LOWE LAW, LLP
402 W. Broadway, Suite 1720
San Diego, CA 92101
T: (619) 878-2725 - F: (619) 878-2737
jeremiah@lowelawapc.com
laura@lowelawapc.com
**ATTORNEYS FOR PLAINTIFF JUSTINO RUPARD and the Estate of Lonnie Rupard**

Eugene G. Iredale
Julia Yoo
Sarah Musumeci
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
T: (619) 233-1525 - F: (619) 233-3221
egiredale@iredalelaw.com
jyoo@iredalelaw.com
smusumeci@iredalelaw.com
admin@iredalelaw.com
creherman@iredalelaw.com
gjun@iredalelaw.com
sbrockett@iredalelaw.com
pbibring@iredalelaw.com
**ATTORNEYS FOR PLAINTIFF JUSTINO RUPARD**

Corey E. Krueger
Annie Barberian
Kimberlyn Brooke Pinkerton
TRESSLER LLP
400 Continental Blvd., Suite 6125
El Segundo, CA 90245
T: (310) 203-4800 - F: (323) 486-2704
ckrueger@tresslerllp.com
abarberian@tresslerllp.com
jpatterson@tresslerllp.com
ladocket@tresslerllp.com
kpinkerton@tresslerllp.com
**ATTORNEYS FOR DEFENDANTS ANTHONY CRUZ, M.D. and LIBERTY HEALTHCARE OF CALIFORNIA, INC.**

# EXHIBIT 33

San Diego County Sheriff's Department News Release, Mar. 2, 2023 (RUP001161–1164)

## Most Recent News Releases

# In-Custody Death Finding

***Medical Examiner releases report on Lonnie Rupard.***

**Post Date:** 03/02/2023 9:30 AM

46-year-old Lonnie Newton Rupard was in custody at San Diego Central Jail when he was found unresponsive in his cell on March 17, 2022. Sheriff's Deputies and Medical Staff performed lifesaving measures until he was transported to a hospital where he later died.

We extend our earnest sympathies to Mr. Rupard's family and friends during this very difficult time. We share in your grief for this immense loss. A Sheriff's family liaison is working with Mr. Rupard's family to update them on the investigation and support them as best as we possibly can.

Today, the San Diego County Medical Examiner's Office (M.E.) released its autopsy report. Mr. Rupard's preliminary cause of death is pneumonia, malnutrition and dehydration with COVID-19 viral infection, pulmonary emphysema and duodenal ulcer as contributing factors. The M.E. ruled his manner of death as homicide. We thank the M.E.'s Office for its thorough report and respect its findings.

As part of its process, the Sheriff's Internal Affairs Unit began an investigation in April of last year. Investigators are looking into the circumstances surrounding Mr. Rupard's death to determine any violation of department policy and procedure.

The Sheriff's Homicide Unit is also investigating the incident and will submit its findings to the District Attorney's Office for review. We will also provide our findings to the U.S. Attorney's Office for review by its Civil Rights Unit regarding any potential violations related to Mr. Rupard's death.

Since this incident, which occurred March 2022, several changes and advancements have been implemented within the Detention Services Bureau to help identify when a person in custody may need additional medical and mental health care. These changes have helped staff recognize when a vulnerable individual may not be able to advocate for themselves and staff need to intervene on their behalf.

- Wellness Checks – These checks are comprised of a Multi-Disciplinary Group (MDG) including sworn staff, mental health providers, nurses, correctional counselors and classification deputies. This group conducts one-on-one visits with incarcerated persons deemed most vulnerable. The wellness checks give deputies an additional opportunity to conduct hygiene inspections and allow maintenance staff to address any concerns about the cell or housing unit. The living conditions and hygiene of an individual can be an indicator that they may be in crisis. Mental health clinicians and nurses assess the individual for any mental health or medical concerns and route them to the appropriate service provider for follow-up and recovery. These checks are done twice a week at George Bailey Detention Facility and San Diego Central Jail. They are conducted once a week at Las Colinas Detention and Reentry Facility and Vista Detention Facility.

- Collaborative Care Meetings – Each week, a multi-disciplinary group from each of the facilities meets to discuss individuals in custody who may need additional care and/or may be at risk for harm. Staff members develop a course of action tailored to the individual's needs. These individuals could be those who receive Wellness Checks each week or an incarcerated person who may be behaving in a manner that is indicative of a possible mental health crisis or medical need.

- Sharing of Critical Information for Continuity of Care – It is common for forensic psychiatrists to provide mental health services or assessments to incarcerated persons within our facilities. For increased collaboration and continuity of care, the Sheriff's Department has required the psychiatrist to provide a briefing to Sheriff's Mental Health Staff prior to leaving the jail. This enables Sheriff's Staff to provide the appropriate care to an individual immediately, instead of waiting for a written report in two weeks' time. We are also working to streamline the timely sharing of mental health information and medical records from the California Department of State Hospitals when they transfer people into our custody.

- Conservatorship – We established a process to request conservatorship of a person in our custody who is unable to care for themselves. Conservatorship allows the court to order medical decisions on behalf of a person who refuses or is not able to take care of themselves.

At the San Diego County Sheriff's Department, we are committed to the safety of the people entrusted in our care. We are resolved in our core values of recognizing the dignity and value of every human life. We have instituted many changes in the last year, as well as initiated several investigations to ensure policies and procedures are being followed. These improvements and transparency in communicating with the public uphold our culture of accountability. We will never shy away from demanding more from ourselves for more targeted reforms that advance the well-being of people in our custody.

# Hallazgo de Muerte Bajo Custodia

*Oficina del Médico Forense publica un informe sobre Lonnie Rupard.*

Lonnie Newton Rupard, de 46 años, estaba bajo custodia en la Cárcel Central de San Diego cuando lo encontraron inconsciente en su celda el 17 de marzo de 2022. Los oficiales del Alguacil y el personal médico tomaron medidas para salvarle la vida hasta que lo transportaron a un hospital donde murió más tarde.

Extendemos nuestras más sinceras condolencias a la familia y los amigos del Sr. Rupard durante este momento tan difícil. Compartimos su dolor por esta inmensa pérdida. Un enlace familiar del Alguacil está trabajando con la familia del Sr. Rupard para actualizarlos sobre la investigación y apoyarlos lo mejor que podamos.

Hoy, la Oficina del Médico Forense del Condado de San Diego (M.E.) publicó su informe de autopsia. La causa preliminar de muerte del Sr. Rupard es neumonía, desnutrición y deshidratación con infección viral por COVID-19, enfisema pulmonar y úlcera duodenal como factores contribuyentes. El ME dictaminó su forma de muerte como homicidio. Agradecemos a la Oficina del M.E. por su completo informe y respetamos sus hallazgos.

Como parte de su proceso, la Unidad de Asuntos Internos del Aheriff inició una investigación en abril del año pasado. Los investigadores están investigando las circunstancias que rodearon la muerte del Sr. Rupard para determinar cualquier violación de la política y el procedimiento del departamento.

La Unidad de Homicidios del Alguacil también está investigando el incidente y presentará sus hallazgos a la Oficina del Fiscal de Distrito para su revisión. También proporcionaremos nuestros hallazgos a la Oficina del Fiscal Federal para que los revise la Unidad de Derechos Civiles con respecto a cualquier posible violación relacionada con la muerte del Sr. Rupard.

Desde este incidente, que ocurrió en marzo de 2022, se han implementado varios cambios y avances dentro de la Oficina de Servicios de Detención para ayudar a identificar cuándo una persona bajo custodia puede necesitar atención médica y de salud mental adicional. Estos cambios han ayudado al personal a reconocer cuándo una persona vulnerable no puede defenderse por sí misma y el personal debe intervenir en su nombre.

- Controles de Bienestar - estos controles están compuestos por un grupo multidisciplinario (MDG) que incluye personal juramentado, proveedores de salud mental, enfermeras, consejeros correccionales y ayudantes de clasificación. Este grupo realiza visitas individuales con las personas encarceladas consideradas más vulnerables. Los controles de bienestar brindan a los oficiales del Alguacil una oportunidad adicional para realizar inspecciones de higiene y permiten que el personal de mantenimiento aborde cualquier inquietud sobre la celda o la unidad de vivienda. Las condiciones de vida e higiene de un individuo pueden ser un indicador de que puede estar en crisis. Los médicos y enfermeros de salud mental evalúan a la persona en busca de problemas médicos o de salud mental y la derivan al proveedor de servicios adecuado para el seguimiento y la recuperación. Estos controles se realizan dos veces por semana en el Centro de Detención George Bailey y en la Cárcel Central de San Diego. Se llevan a cabo una vez por semana en el Centro de Detención y Reingreso de Las Colinas y en el Centro de Detención de Vista.

- Reuniones de Atención Colaborativa - cada semana, un grupo multidisciplinario de cada una de las instalaciones se reúne para hablar sobre las personas bajo custodia que pueden necesitar atención adicional y/o pueden estar en riesgo de sufrir daños. Los miembros del personal desarrollan un curso de acción adaptado a las necesidades del individuo. Estas personas pueden ser aquellas que reciben Controles de Bienestar cada semana o una persona encarcelada que puede estar comportándose de una manera que sea indicativa de una posible crisis de salud mental o necesidad médica.

- Compartir Información Crítica para la Continuidad de la Atención - es común que los psiquiatras forenses brinden servicios de salud mental o evaluaciones a personas encarceladas dentro de nuestras instalaciones. Para una mayor colaboración y continuidad de la atención, el Departamento del Alguacil ha requerido que el psiquiatra brinde una sesión informativa al Personal de Salud Mental del Alguacil antes de salir de la cárcel. Esto permite que el personal del Alguacil brinde la atención adecuada a una persona de inmediato, en lugar de esperar un informe escrito dentro de dos semanas. También estamos trabajando para agilizar el intercambio oportuno de información de salud mental y registros médicos del Departamento de Hospitales Estatales de California cuando transfieren personas bajo nuestra custodia.

- Tutela - establecimos un proceso para solicitar la tutela de una persona bajo nuestra custodia que no puede cuidar de sí misma. La tutela le permite a la corte ordenar decisiones médicas en nombre de una persona que se niega o no puede cuidar de sí misma.

En el Departamento del Alguacil del Condado de San Diego, estamos comprometidos con la seguridad de las personas confiadas a nuestro cuidado. Estamos resueltos en nuestros valores fundamentales a reconocer la dignidad y el valor de cada vida humana. Hemos instituido muchos cambios en el último año, así como también iniciado varias investigaciones para garantizar que se sigan las políticas y los procedimientos. Estas mejoras y la transparencia en la comunicación con el público mantienen nuestra cultura de responsabilidad. Nunca evitaremos exigirnos más a nosotros mismos por reformas más específicas que promuevan el bienestar de las personas bajo nuestra custodia.

*Return to full list >>*

**SUBSCRIBE**

Subscribe to receive updates.

Email

Email Address

SUBMIT

# EXHIBIT 34

Deposition of Det. Max Blumenshine, Jan. 7, 2026 (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

---o0o---

JUSTINO RUPARD, INDIVIDUALLY AND RONNIE RUPARD, INDIVIDUALLY,

Plaintiffs,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE OF CALIFORNIA, INC; CHRISTINA ANOSIKE, IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; AGUILERA, M., VILADIU, J., MARTINEZ, G., SCHMITZ, D., AMADO, J., MACE, T., ACKERMAN, M., KEY, K., MOSER, M., AGUIRRE, E., JAMES, T., ROMERO, B., JOHNSON, M., TORRES, A., DELANEY, C., TREYVONNE, J., EVERSOLL, T., WERESKI, A., ROMANS, B., GUTIERREZ, L. IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTIES DOES 1-20; DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10,

Defendants.

Case No.: 23CV1357 CAB BLM

objections.

BY MR. IREDALE:

Q. The only request for the videotape you made was for the 24 hours preceding the death. Right?

A. Correct.

Q. And you happened to get some other videotape because another person had died on that same module just shortly before. Right?

MS. FELDMAN: Misstates prior testimony.

BY MR. IREDALE:

Q. Am I right?

A. That is how I got the video.

Q. Did you find any evidence from any source that any deputy had reported to a superior officer, to the watch commander or anybody else, that this was a man who was emaciated before his death?

MS. FELDMAN: Assumes facts not in evidence.

THE WITNESS: I did not.

BY MR. IREDALE:

Q. No. Let me refer you to page 11. It refers on this page to a conversation you had with Dr. Schaber. Do you see that?

A. Yes.

CERTIFICATE OF REPORTER

---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [ X ] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e).)

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 14th of January, 2026.

Nicole O'Neil

Nicole O'Neil, CSR No. 10774

# EXHIBIT 35

Line-Up Training re 11-53 Safety Checks, May 1, 2021 (COSD 006245–6246)

[redacted]

[redacted]

# EXHIBIT 36

Deposition of Cpl. Blade Romans, Jan. 13, 2025 (excerpts)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

---o0o---

| | |
|---|---|
| JUSTINO RUPARD, INDIVIDUALLY AND RONNIE RUPARD, INDIVIDUALLY,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; LIBERTY HEALTHCARE OF CALIFORNIA, INC; CHRISTINA ANOSIKE, IN HER INDIVIDUAL CAPACITY; ANTHONY CRUZ, MD, IN HIS INDIVIDUAL CAPACITY; BEN SAMONTE, IN HIS INDIVIDUAL CAPACITY; MAY NG, IN HER INDIVIDUAL CAPACITY; AGUILERA, M., VILADIU,J. MARTINEZ, G., SCHMITZ, D., AMADO, J., MACE, T., ACKERMAN, M., KEY, K., MOSER, M., AGUIRRE, E., JAMES, T., ROMERO, B., JOHNSON, M., TORRES, A., DELANEY, C., TREYVONNE, J., EVERSOLL, T., WERESKI, A., ROMANS, B., GUTIERREZ, L. IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTIES DOES 1-20; DEFENDANT MEDICAL PROVIDERS DOES 1-10; DEFENDANT SUPERVISOR DOES; 1-10,<br><br>Defendants.<br>_______________________________ | )Case No.: 23CV1357 CAB<br>)BLM |

Thursday. I believe I only worked Thursday. I don't recall my schedule back then. This was an overtime shift. I don't remember how many I picked up.

BY MR. LOWE:

Q. Do you recall what would the sort of, previous day have been that you last worked up until this shift on March 17th, if you recall?

A. I believe March 17th was Thursday, if I'm not mistaken. My regular shift every week is Monday and Tuesday.

Q. Okay. During this time frame around March 17th, were you always assigned to housing unit seven?

A. I believe that was my assignment for the day.

Q. Not that particular day, but I'm kind of, getting more general now. Let's say the week you would have worked before, Monday and Tuesday, would you also have been in housing unit seven?

A. Deployments rotate. I have no permanent assignment. It's random for us every day. We don't know where we are going to work until we get there that day.

Q. Was there anything unique about housing unit seven in terms of the inmates?

MS. FELDMAN: Seven D?

MR. LOWE: Seven D.

THE WITNESS: Seven D, in general, I believe

CERTIFICATE OF REPORTER
---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken remotely before at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [ X ] was [  ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e).)

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 18th of January, 2025.

Nicole O'Neil

Nicole O'Neil, CSR No. 1077448

# EXHIBIT 37

Expert Report of Kathryn Wild, RN

# EXHIBIT E

EXHIBIT E

**Kathryn J. Wild, RN, MPA, CCHP-RN**
**36374 N La Moneda Ln, Queen Creek, AZ 85140**
**Phone: 909-720-0961**

# Expert Report

## I. INTRODUCTION

My name is Kathryn J. Wild. My business address is 36374 N La Moneda Ln, Queen Creek, AZ 85140. I was retained on behalf of the County of San Diego to consult in the case of *Estate of Lonnie Rupard, Through its Court-Appointed Administrator Terri Lopez; Justino Rupard Individually; and Ronnie Rupard Individually v County of San Diego; Bill Gore, in his Official Capacity; Kelly Martinez, in her Individual Capacity; Jon Montgomery, DO, in his Individual Capacity; Liberty Healthcare of California, Inc.; Christina Anosike, in her Individual Capacity; Anthony Cruz, MD, in his Individual Capacity; Aguilera M. Viladiu, J. Martinez, G. Amado, J. Mace, T. Aguirre, E. James, T. Romero, B. Johnson, M. Torres, A. Treyvonne, J. Wereski, A. Romans, B. Gutierrez, L. in their Individual Capacities, Defendant Deputies, Does 15-20, Defendant Medical Providers Does 1-10. Case# 3:23-cv-01357-CAB-BLM.*

I have been retained to evaluate the care and treatment provided to Lonnie Rupard by San Diego Sheriff's nursing personnel and QMHP staff while incarcerated at the San Diego Central Jail (SDCJ). My analysis focuses on the reasonableness of the care delivered, adherence to the correctional healthcare standard of care, the policies and procedures followed, and the potential for any indifference to Mr. Rupard's healthcare needs.

I am a licensed registered nurse with a master's degree in public administration and Certified as a Corrections Healthcare Professional - RN by the National Commission on Correctional Healthcare (NCCHC) concerning the delivery of specialized nursing care in correctional facilities. I have worked in the field of Corrections Healthcare for over 40 years as a Registered Nurse, and Health Services Administrator responsible for the administration of healthcare, training and supervision of healthcare employees, as well as the formation and implementation of policy applicable to staff who provide healthcare to persons housed in corrections facilities. My Curriculum Vitae, testimony history, and fee schedule are attached.

I am retained as an expert witness who is knowledgeable and experienced in the provision, training, supervision and monitoring of healthcare administered to prisoners housed in the setting of a correctional facility, including but not limited to the areas of providing direct nursing care in a correctional setting, corrections nursing care, corrections healthcare, corrections healthcare administration, corrections healthcare policy formation and implementation, and the implementation and maintenance of policies and procedures that comply with national corrections standards, including but not limited to those by the NCCHC, the American Corrections Association (ACA), and the Prison Rape Elimination Act (PREA). I have served as an accreditation surveyor for the Institute for Medical Quality (IMQ) providing accreditation surveys in Local Detention Facilities and Juvenile Halls. In addition, I have provided many Local Detention Facilities with on-site preparation for NCCHC and ACA accreditation surveys and am very familiar with the standards for the delivery of healthcare in correctional settings.

## II. MATERIALS REVIEWED

In preparation for forming the opinions expressed below, in addition to my experience in the correctional healthcare field, I have reviewed the following materials:

1. Plaintiff's Third Amended Complaint,
2. San Diego Jail Medical Records,
3. ME Report,
4. Probation Reports,
5. Emails (COSD 6417-6432),
6. San Diego Central Jail – Nurse Deployment Logs (COSD 18110-18123),
7. San Diego Medical Services Division Policies and Procedures,
8. Mortality Review,
9. Depositions,
   a. County Mental Health Clinician Christina Goodall (Anosike),
   b. County Medical Examiner Dr. Schaber,
   c. Liberty HealthCare Psychiatrist Dr. Anthony Cruz,
   d. County's 309(b)(6) Witness Serina Rognlien Hood,
   e. Dr. Nicolas Badre,
   f. County's 30(b)(6) Witness Melissa Quiroz, mental health/psychiatry procedures,
   g. Dr. Francis Ysla, with Exhibits,
   h. Dr. Sandeep Jouhal, with Exhibits,
   i. Justin Rupard, Son,
   j. Terri Lopez,
   k. Jon Montgomery, DO, Volume I & II,
   l. Rebecca Jean Kloker, MD,
10. San Diego County Sheriff's Department Medical Services Division: Medical & Psychiatric Services Operations Manual (COSD 006128-006241),
    a. MSD.C.4 – Consent for Treatment (11/2021),
    b. MSD.P.8 – Psychiatric Stabilization Unit (PSU) (10/2019 & 1/2022),
    c. MSD.P.15 – PSU Admission Types (2/2025 & 1/2022),
    d. MDS.D.4 – Detention Outpatient Psychiatric (11/2021),
    e. MSD.S.6 – Mental Health Clinician Function – PSU (1/2022) and MSD.S.6 – Social Services (3/2013),
    f. MSD.M.10 – Mental Disordered Individuals Emergency (2/2022),
    g. MSD.P.17 – PSU Psychiatric Holds – Civil Commits (1/2022),
    h. E.9.2 – State Hospital Returns (7/2020),
11. San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures,
    a. M.25 – Psychiatric Stabilization Unit,
12. San Diego County Sheriff's Department Medical Services Division; Mental & Psychiatric Services Operations Manual, Mentally Disordered Individuals, Medical Observation Beds, Sick Calls, Psychiatric Stabilization Units, Hunger Strikes, Nursing Documentation, Refusal Procedures (COSD 006258-006375),
13. San Diego Sheriff's Department Medical Records; Intake Question Forms, Medical Charts, Refusals to Accept Medical Care (COSD 002107-003389),
14. San Diego Sheriff's Department Detention Services: All Facilities JIMS Records, Medications Administration, Appointment Records, Progress Notes (COSD 003390-004177),
15. Confidential COSD 006417-006432,
16. Confidential COSD 006437,

17. Videos & Photos,
18. California Board of Nursing – RN Nurse Practice Act,
19. California Code of Regulations, Title 15, Minimum Standards for Local Detention Facilities,
20. National Commission on Correctional Health Care (NCCHC) – Standards for Health Services in Jails (2018 Edition)

## III. SUMMARY OF DOCUMENT REVIEW

| Time | Provider/Service | Comments |
|---|---|---|
| **Sunday, December 19, 2021** | | |
| @ 0251 | Medical Clearance<br>Ben Samonte, RN<br>COSD 27-28 | BP 128/82, T 98, P 90, R 16, SPO2 99%, height 6'0", weight 165 lbs. The arrestee denied swallowing or hiding any drugs in any body cavity. He was fit to continue the booking process. |
| @ 0253 | Receiving Screening<br>Ben Samonte, RN<br>COSD 29-48 | Mr. Rupard was brought in by National City Police. Officer Shafer was not aware of any illness or injury, current suicidal ideation, signs that the arrestee was under the influence of drugs and/or alcohol. The arrestee was noted to be verbally abusive and combative. He had not been treated by medical personnel in the field. No acute mental health crisis requiring immediate emergency intervention was identified during the receiving screening; however, the nurse documented the patient's history of psychotic disorder and appropriately initiated a psychiatric referral.<br><br>The patient was noted with psychotic disorders and denied any current medications. There was no noted infectious or contagious disease. The patient denied any medical conditions. Mr. Rupard denied wishing he was dead and had no actual thoughts of killing himself. He denied all the suicide risk questions and denied using drugs and/or alcohol. He was scheduled for a 2nd Stage Nurse Evaluation/NAP. |
| @ 2336 | RN Progress Note<br>May Ng, RN<br>COSD 58 | S: "You're a nurse, I'm a PA. What do we got? I want nothing."<br><br>O: BP 120/74, P 110, R 18, T 98.0, SPO2 97%. I/P brought to med screen by sworn. Alert, oriented x 2, disheveled in appearance, verbally abusive but directable. NAD, VSS, breathing even and unlabored. IP refused COVID test.<br>IP informed to notify staff of any changes in health condition. IP continues to be verbally abusive with the nurse. |

| | | |
|---|---|---|
| **Monday, December 20, 2021** | | |
| | Psych Sick Call Referral COSD 49 | History of extensive meds, Patton, Patient has history of psych and was on medications during previous incarceration, please evaluate. |
| **Thursday, December 23, 2021** | | |
| | Psych Sick Call Refusal COSD 49 | Patient refused Tele-psychiatry visit |
| **Friday, December 24, 2021** | | |
| @ 1435 | Psychiatrist Note Anthony Cruz, MD COSD 59 | Brief Psych SC Note: Patient was scheduled for an initial evaluation, however due to time constraints, patient was unable to be seen. Patient will be rescheduled for Psych SC intake. |
| **Monday, December 27, 2021** | | |
| | PCMS Contact Report | Patient refused to go to court |
| **Tuesday, December 28, 2021** | | |
| | PCMS Contact Report | Patient refused to go to court |
| @ 1607 | Psychiatrist Note Anthony Cruz, MD COSD 59 | Brief Psych SC Note: Patient was scheduled for an initial evaluation, however due to time constraints, patient was unable to be seen. Patient will be rescheduled for Psych SC intake. |
| **Wednesday, December 29, 2021** | | |
| @ 1036 | RN Note Paul Santella, RN COSD 58 | Psych encounter noted. Meds verified in eMAR |
| @ 1837 | Psychiatric Note Anthony Cruz, MD COSD 59-60 | Initial Evaluation: 46 year old booked on 12/19/21 for charges of "PRCS REVOCATION". Next court date on 1/3/22. Patient is seen today for psych initial sick call and psychotropic medications evaluation to address history of psychosis and psych med treatment.<br><br>Patient is currently housed at SDCJ-7D and was evaluated today by the physician at cell-side in a non-confidential environment. Patient was made aware of the nature/purpose of the evaluation and refused to participate.<br><br>Patient was last seen on 7/11/20 during a prior incarceration and was diagnosed with Unspecified Schizophrenia spectrum and other psychotic disorder, antisocial personality disorder, stimulant use disorder, with a plan to continue Haldol Decanoate IM 200 mg Q4th and 22nd of every month, and Depalene 500 mg BID, Vistaril 25 mg BID and increase Cogentin 1 mg QAM and 2 mg QHS.<br><br>On 7/11/20, several attempts were made to engage the patient in conversation, however patient yelled, rambled incoherently |

| | | |
|---|---|---|
| | | at times and was verbally aggressive throughout the interview. Patient was observed through his cell window, awake, alert, shirtless standing by door and appeared to be in no acute distress. Cell was relatively clean. Empty food trays were visible. Unable to assess due to lack of patient cooperation.<br>Today patient presents to the clinic irritable and uncooperative with today's visit. Patient had history of psychosis, substance use, suicidality, psychiatric hospitalizations and psychotropic medication treatment. No s/s of patient being a danger to self or others at this time. Due to patient's presentation, psych history, and potential for decompensation, will start/offer previous psych meds. Discussed current treatment plan with patient.<br><br>Plan: Start/Offer:<br><br>• Haldol 5 mg BID<br>• Cogentin 1 mg BID<br>• Valporic Acid 500 mg BID<br>• Encourage medication compliance<br>• Patient did not consent to labs at this visit.<br><br>Return to clinic in 4-5 weeks or sooner if needed. |
| | Anthony Cruz, MD Deposition | Dr. Cruz testified (**page 154**) that he saw empty food trays in Mr. Rupard's cell and was able to get confirmation from deputies that he was eating at least some of his meals.<br><br>Dr. Cruz testified (**page 239**) that he was the psychiatrist responsible for creating a psychiatric treatment and care plan for Mr. Rupard. |
| **Thursday, December 30, 2021** | | |
| @ 1200 | Med Refusal COSD 70 | Patient refused medications |
| @ 2323 | Med Refusal COSD 72 | Patient refused medications |
| **Friday, December 31, 2021** | | |
| @ 1026 | Med Refusal COSD 74 | Patient refused medications |
| @ 2301 | Med Refusal COSD 76 | Patient refused medications |
| **January 1 - 20, 2022** | | |
| | Med Refusal COSD 78-135 | Mr. Rupard refused all medication attempts through this time period. |
| **Monday, January 3, 2022** | | |
| | PCMS Contact Report | Patient refused to go to court |

| | | |
|---|---|---|
| **Friday, January 7, 2022** | | |
| | PCMS Contact Report | Patient refused to go to court |
| **Thursday, January 13, 2022** | | |
| | PCMS Contact Report | Patient refused to go to court |
| **Saturday, January 15, 2022** | | |
| | Referral to Psych COSD 49 | Multiple refusal of psych meds. Please evaluate. |
| **Thursday, January 20, 2022** | | |
| @ 1906 | Psychiatric Note Anthony Cruz, MD COSD 60 | Per psych chart review, patient consistently refuses psych meds. At this time, will discontinue Haldol, Cogentin and VPA.<br>Psych SC follow-up is already scheduled. |
| **Friday, January 21, 2022** | | |
| @ 1207 | RN Note Paul Santella, RN COSD 58 | Psych encounter noted. Meds verified in eMAR |
| **Monday, January 24, 2022** | | |
| | PCMS Contact Report | Patient refused to go to court |
| **Sunday, January 29, 2022** | | |
| @ 1124 | RN Note Carrie Romero, RN COSD 58 | Patient seen on housing for s/p use of force. Per deputies, patient was taken down, no taser deployment. Noted with laceration between eyebrows not actively bleeding. Unable to further assess due to patient repeatedly stating, "I don't need a medic. Leave me alone. If you touch me, I'll kill you." Irritable, breathing even and unlabored, noted with small abrasion to left side of face and some possible blood on lips. Assessment terminated for safety. |
| **Tuesday, February 1, 2022** | | |
| | PCMS Contact Report | Patient refused to go to court |
| | Referral to QMHP COSD 49 | Mr. Rupard was referred to the QMHP.<br>I/P had D/I. Please assess. |
| **Wednesday, February 9, 2022** | | |
| @ 0952 | QMHP Progress Note C. Anosike, MHC COSD 52 | I/P remains successfully housed in 7D quarantine, has coexisted with his peers with no reported aggression, violence or erratic behaviors. MHC observed IP standing at the cell door. The MCH introduced self and explained the reason for the meeting. IP was uncooperative AEB (as evidenced by) stating, "I'm fine. I don't want to talk to you." MHC observed IP not engaging in SIB. Unable to fully assess IP due to his refusal and/or inability to cooperative. IP did not answer any further MHC's questions despite multiple attempts from writer trying to engage IP. IP then began speaking in unintelligible |

| | | |
|---|---|---|
| | | words, IP stated, "go away." Deputies on the 7th floor report IP will often speak to himself in unintelligible words. IP's cell was clean and had some debris. MHC observed empty food trays inside of his cell. IP's cell was free from urine, feces or flooding. IP was moderately groomed. MHC spoke with deputies on the 7th floor who reported IP had been engaging in life preserving treatments and had not engaged in any SIB (self-injurious behavior). IP does not demonstrate any acute distress or immediate safety concerns. He had not engaged in any behavior that would suggest harm to himself or others while under observation. There are no distressing symptoms or major impairment requiring ISP or PSU referral. He will continue to be monitored for safety concerns and GD.<br>Unable to assess fully due to refusal and/or inability to cooperate. No intervention indicated. |
| **Sunday, February 20, 2022** | | |
| @ 1656 | RN Note<br>Carrie Romero, RN<br>COSD 59 | Per deputy 5144, patient is on lockdown, no contraindication noted. |
| **Tuesday, February 22, 2022** | | |
| @ 1853 | Psychiatric Note<br>Anthony Cruz, MD<br>COSD 61-62 | Next court date 3/9/22 (SUPEF); 3/18/22 (SD162). Legal status PC1368. Patient is seen today for Psych SC F/U. Patient last seen 12/29/21 by this provider and is currently not prescribed psychotropic medications (meds were discontinued due to consistent refusals).<br><br>Today multiple attempts were made to engage the patient in conversation, however he refused to answer questions and rambled incoherently and became verbally aggressive. Patient was observed through his cell door window. Patient was awake, alert, shirtless (wearing pants), initially sitting on the bed and then kneeled on his cell floor and appeared to be in no acute distress. Cell room was relatively clean, no flooding/gassing or smearing of feces. However, toilet seat was covered with cloth. No signs or symptoms of patient being a danger to self or others. Regarding psychotropic medication, patient continued to yell when offered psych meds. No signs or symptoms of patient being a danger to self or others at this time.<br><br>Patient offered psychotropic medication, however patient refuses meds. Patient understands that all treatments offered today are voluntary and adherence/refusal is independent of housing, privileges or other inmate services. |

| | | |
|---|---|---|
| | | Due to patient's presentation, psychiatric history, legal status, PC1368, and potential for decompensation, will continue to monitor and offer treatment.<br><br>Return to clinic 6-7 weeks, or sooner if needed. |
| | Anthony Cruz, MD Deposition | When asked if he did anything to check on the welfare of Mr. Rupard from January 20th until February 22nd, Dr. Cruz testified (**page 164**) that he relied on the clinicians and deputies to tell him if there had been any decompensation or knowing that he already had a follow up appointment, so he did not feel that he needed to see him sooner, because he had not heard any type of report from the clinicians or deputies saying that Mr. Rupard needed to be seen sooner.<br><br>Dr. Cruz also testified (**page 171**) that the two evaluations he had with Mr. Rupard (12/29/21 & 2/22/22) he did not meet the criteria for a 5150 placement in the PSU. |
| @ 2146 | RN Note<br>Lauren Kreiss, RN<br>COSD 59 | Psych SC noted, no new orders. |
| **Wednesday, February 23, 2022** | | |
| | Sick Calls - QMHP<br>COSD 152 | A QMHP wellness check was scheduled for this date. Mr. Rupard was seen the day prior by Dr. Cruz who is a QMHP. |
| | NCCHC Definitions | A QMHP (qualified mental health professional) is defined to include psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and other who by their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients. |
| **Friday, March 11, 2022** | | |
| | PCMS Contact Report | The offender's case will be dismissed when he goes to court on 3/18/22. The undersigned reached out to the CTC to make arrangements for his release so he can be linked to MH treatment. |
| **Monday, Monday, March 14, 2022** | | |
| @ 0812 | CLERB Interview<br>Dr. Nicolas Badre<br>COSD 343 | Dr. Badre visited Mr. Rupard in his role as a forensic evaluator. He visited Mr. Rupard to conduct a court-ordered Penal Code 1370 evaluation. The visit occurred while the inmate was in his cell and it was malodorous and unhygienic. Dr. Badre was outside the cell. There was feces outside of the toilet. |
| | Court-Ordered Evaluation for Competency<br>Dr. Nicolas Badre<br>COSD 136-141 | **Findings**: In Dr. Badre's opinion, the defendant suffers from severe mental illness. The defendant lacks the capacity to make decisions regarding antipsychotic medication. The mental disorder requires medical treatment with antipsychotic medication at this time. If the defendant's mental disorder is not treated with antipsychotic medication, it is possible that serious harm to the physical and mental health of the defendant will result. |

| | | |
|---|---|---|
| | This was not received until 3/24/22 after Mr. Rupard's death. | Dr. Badre recommended that the defendant be referred to a state hospital or JBCT program for restoration to competency. |
| **Thursday, March 17, 2022** | | |
| @ 0753 | RN Note<br>L. Mendoza, RN<br>COSD 59 | Medical Coordinator – Pharmacy Liaison Notes: Per email notification by CRP, patient is scheduled to release on 3/19/22 but is pending the outcome from his court hearing on 3/18/22 to Probation/CTC – 3880 Rosecrans St. San Diego, CA 92110 – Has no psych/critical meds. |
| @ 2253 | Mandown Assessment<br>Anil Kumar, RN<br>COSD 67 | Patient found lying on the floor in the supine position, unresponsive to verbal and tactile stimuli. When medical arrived at scene deputies were providing CPR and already called 911. Blood Sugar = 75. Patient moved outside of cell and CPR continued. |
| @ 2309 | ER Referral<br>D. Phelps, RN<br>COSD 65-66 | Mandown, unresponsive, non-breathing, applied AED, no shock advised. Continue CPR. 911 called and referred to UCSD. |
| @ 2351 | UCSD Medical Center<br>Time of Death | Mr. Rupard was pronounced dead by Dr. Allen at UCSD Hospital. |
| **Saturday, March 19, 2022** | | |
| | Autopsy | **Cause of Death**: Pneumonia, Malnutrition, and Dehydration in the setting of neglected Schizophrenia<br>**Contributing**: SARS-COV-2 (COVID-19) Viral Infection; pulmonary emphysema; Duodenal Ulcer |

## IV. DISCUSSION AND OPINIONS

It is my opinion, to a reasonable degree of nursing certainty, that the nursing care and mental health services provided by the San Diego County Sheriff's Department nursing staff and County Qualified Mental Health Providers (QMHPs) to Mr. Lonnie Rupard met the applicable correctional healthcare standard of care. My opinions are based upon my education, training, more than forty years of correctional healthcare experience, and my review of the materials identified in this report.

The opinions expressed herein are limited to the conduct of the Sheriff's Department nursing staff and County QMHPs. I have not been retained to render opinions regarding the psychiatric standard of care applicable to Dr. Anthony Cruz or Liberty Healthcare psychiatrists.

Correctional nurses are responsible for performing nursing assessments, identifying medical and mental health concerns, initiating appropriate referrals, implementing provider orders, administering prescribed medications, documenting refusals, monitoring patients during nursing encounters, communicating significant clinical findings, and documenting their observations. Similarly, County QMHPs are responsible for conducting mental health assessments within their professional scope, documenting clinical observations, obtaining collateral information, assessing for acute safety concerns, making appropriate referrals, and communicating significant mental health findings through the established correctional healthcare system.

Neither correctional nurses nor County QMHPs possess independent authority to diagnose psychiatric illness, prescribe or discontinue psychotropic medications, determine whether an inmate meets the legal criteria for involuntary psychiatric treatment, admit an inmate to the Psychiatric Stabilization Unit (PSU), or independently establish the inmate's psychiatric treatment plan. Those responsibilities require physician-level psychiatric judgment and remained the responsibility of the treating psychiatrist.

The correctional healthcare standard of care requires that the conduct of nurses and County QMHPs be evaluated based upon the information reasonably available to them during the encounters for which they were responsible. It does not require nurses or QMHPs to independently create medical encounters, psychiatric evaluations, housing classifications, or other clinical contacts outside of the established correctional healthcare system. Likewise, the standard of care does not impose responsibility upon nurses or QMHPs for physician-level psychiatric decisions or institutional processes that were outside their authority or control.

## ***Opinion No. 1 – Nursing Intake Assessment and Initial Referral***

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-E-02 – "Receiving Screening"** states that receiving screening be performed on all inmates on arrival at the intake facility to ensure that emergent and urgent health needs are met. This standard is intended to fulfill four purposes; 1) to identify and meet any urgent health needs of those admitted, 2) to identify and meet any known or easily identifiable health needs that require medical intervention before the health assessment, 3) to identify and isolate any inmates who appear potentially contagious, and (4) to appropriately obtain a medical clearance when necessary.

The **California Administrative Code, Title 15 – Minimum Standards for Local Detention Facilities, Division 1, Chapter 1, Subchapter 4, § 1207. "Medical Receiving Screening"** states that a screening shall be completed in accordance with written procedures and shall include but not be limited to medical and mental health problems, developmental disabilities, and communicable diseases, including, but not limited to, tuberculosis and other airborne diseases. The screening shall be performed by licensed health personnel or trained facility staff.

The nursing care provided at intake met the applicable correctional nursing standard of care.

Upon booking on **Sunday, December 19, 2021**, Registered Nurse Ben Samonte completed the receiving screening, obtained baseline vital signs and weight, documented Mr. Rupard's psychiatric history, completed an appropriate suicide screening, documented the absence of acute medical illness requiring emergency intervention, and appropriately initiated referral for further psychiatric evaluation together with a second-stage nursing evaluation.

Although Mr. Rupard was verbally abusive and uncooperative, the nursing documentation demonstrates that staff appropriately recognized his psychiatric history and initiated the proper referral process. Nurses are not expected to independently diagnose schizophrenia or formulate psychiatric treatment plans during an intake screening. Their responsibility is to recognize

potential mental health concerns and initiate the appropriate referral process, which occurred in this case.

## ***Opinion No. 2 – Medication Administration and Nursing Responsibilities***

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-D-02 – "Medication Services"** states that medications are provided in a timely, safe, and sufficient manner. Prescription medications are given only by order of a physician, dentist, or other legally authorized individual.

Following Dr. Cruz's psychiatric evaluation on **Wednesday, December 29, 2021**, psychotropic medications were prescribed and repeatedly offered by nursing staff. The medical record documents that nursing personnel consistently attempted medication administration and appropriately documented each refusal.

The nursing staff fulfilled their professional responsibilities by carrying out the psychiatrist's orders, attempting medication administration, documenting Mr. Rupard's repeated refusals, and generating an additional psychiatric referral after continued medication noncompliance.

Repeated refusal of psychotropic medication does not authorize correctional nurses to administer medications involuntarily, discontinue prescribed medications, substitute alternative treatment, or independently initiate involuntary psychiatric treatment proceedings. Those decisions remain physician-level psychiatric decisions.

The medical records demonstrate that the nursing staff appropriately communicated the continued medication refusals through the established referral process, after which Dr. Cruz independently reviewed the refusals and elected to discontinue the medications on **Thursday, January 20, 2022**. That decision represented a psychiatric treatment decision made by the treating psychiatrist rather than by nursing staff.

## ***Opinion No. 3 – County QMHP Assessment and Mental Health Responsibilities***

The County QMHPs acted within the applicable standard of care and within the scope of their professional responsibilities.

The **Wednesday, February 9, 2022**, evaluation performed by Mental Health Clinician Christina Anosike demonstrates an appropriate attempt to evaluate Mr. Rupard despite his refusal and inability to meaningfully participate in the assessment. Ms. Anosike documented her direct observations, Mr. Rupard's appearance, grooming, behavior, speech, environmental conditions within the cell, collateral information obtained from custody staff, and the patient's refusal to engage despite repeated attempts.

She documented that deputies reported Mr. Rupard continued participating in life-preserving activities, had not exhibited self-injurious behavior, and had not demonstrated behaviors suggesting imminent danger to himself or others. She further documented that his cell contained empty food trays, was relatively clean, and lacked conditions suggesting severe neglect.

The inability to complete a comprehensive mental health assessment was caused by Mr. Rupard's refusal and inability to cooperate rather than any failure by the County QMHP to perform the assessment. A QMHP cannot manufacture a meaningful psychiatric interview when an inmate refuses to communicate despite repeated reasonable efforts to engage him. Importantly, the County QMHP did not possess independent authority to prescribe psychotropic medications, order involuntary psychiatric treatment, admit Mr. Rupard to the Psychiatric Stabilization Unit, or modify the psychiatrist's treatment plan. Those physician-level psychiatric decisions remained the responsibility of Dr. Cruz.

## ***Opinion No. 4 – Psychiatric Treatment Decisions***

Many of the allegations contained within the Complaint concern psychiatric treatment decisions that were outside the scope of both nursing and County QMHP practice.

The records and Dr. Cruz's deposition establish that he was responsible for developing Mr. Rupard's psychiatric treatment plan. Dr. Cruz independently evaluated Mr. Rupard, prescribed psychotropic medications, later discontinued those medications after reviewing the medication refusals, determined whether Mr. Rupard met criteria for Psychiatric Stabilization Unit placement, and remained responsible for determining whether involuntary psychiatric treatment or additional psychiatric intervention was indicated.

Accordingly, criticisms regarding psychiatric diagnosis, psychotropic medication management, determination of grave disability, involuntary psychiatric treatment, or Psychiatric Stabilization Unit admission should not be attributed to the Sheriff's Department nursing staff or County QMHPs. Nothing in the nursing or QMHP records demonstrates that either discipline possessed authority to override Dr. Cruz's psychiatric treatment decisions.

This allocation of responsibility is consistent with the testimony of Chief Medical Officer Dr. Jon Montgomery, who testified that mental health services operated under separate mental health leadership and that psychiatric treatment decisions remained the responsibility of the treating psychiatrist rather than Sheriff's Department nursing staff.

## ***Opinion No. 5 – January 29, 2022, Nursing Assessment***

Registered Nurse Carrie Romero appropriately responded following the reported use-of-force incident and attempted to assess Mr. Rupard's condition.

Her documentation reflects observable facial injuries while also documenting that Mr. Rupard repeatedly threatened to kill her if she attempted further assessment. Under those circumstances, termination of the examination for personal safety was both reasonable and consistent with accepted correctional nursing practice.

Correctional nurses are not required to place themselves at unreasonable risk of physical harm in order to complete an assessment when an inmate refuses care and threatens violence.

## *Opinion No. 6 – Segregation Monitoring*

The plaintiff alleges that nursing staff and QMHPs failed to perform required segregation wellness checks.

The San Diego Sheriff's Department policy requires periodic nursing and QMHP wellness checks for inmates who have been classified and entered into the administrative segregation monitoring process. Based upon the records reviewed, including the testimony of Director of Nursing Serina Rognlien-Hood, Mr. Rupard was never classified as an administrative segregation inmate. Consequently, he was never entered into the electronic workflow that generated the scheduled nursing and QMHP wellness checks.

The evidence reviewed demonstrates that the automated segregation wellness-check process depended upon an inmate first being classified as an administrative segregation inmate. Mr. Rupard was not so classified and therefore was not entered into the workflow that generated scheduled nursing and QMHP wellness checks.

Neither nursing staff nor County QMHPs possessed independent authority to classify inmates for administrative segregation or independently initiate the automated segregation monitoring process. Accordingly, nursing personnel and County QMHPs had no notice that Mr. Rupard should have been included in the administrative segregation wellness-check process.

## *Opinion No. 7 – Weight Loss and Nutritional Decline*

The plaintiff further alleges that nursing staff failed to recognize Mr. Rupard's progressive weight loss and deteriorating nutritional status.

The nursing record demonstrates limited direct nursing encounters following intake, consisting primarily of medication administration attempts, psychiatric support documentation, the January 29 post-use-of-force assessment, and routine nursing documentation.

There is no documentation that nursing staff observed repeated meal refusals, that Mr. Rupard declared a hunger strike, or that hunger strike criteria were met. To the contrary, Dr. Cruz testified that he observed empty food trays in Mr. Rupard's cell and confirmed with custody staff that Mr. Rupard was consuming at least some of his meals. Likewise, the February 9 QMHP evaluation documented empty food trays and collateral information indicating Mr. Rupard continued participating in life-preserving activities. There is no documentation that nursing staff observed progressive inability to ambulate, inability to obtain food or water, repeated meal refusals, or other objective findings during their encounters that would reasonably have required initiation of hunger strike procedures or additional nursing intervention.

Plaintiffs contend that Mr. Rupard experienced significant weight loss prior to his death, however, I will leave that to the medical experts to discuss. Having said that, the applicable correctional healthcare standard of care requires that the conduct of each individual nurse and QMHP be evaluated based upon the information reasonably available during each respective encounter—not through hindsight after the patient's death.

## Conclusion

Mr. Rupard suffered from a chronic psychotic illness characterized by repeated refusal to cooperate with psychiatric evaluations, repeated refusal of prescribed psychotropic medications, and limited participation in healthcare encounters.

The records demonstrate that nursing staff appropriately identified psychiatric concerns, initiated referrals, implemented physician orders, repeatedly attempted medication administration, documented medication refusals, and responded appropriately during the nursing encounters that occurred. Likewise, the County QMHP appropriately attempted to evaluate Mr. Rupard, documented her observations, obtained collateral information, assessed for acute safety concerns, and communicated through the established correctional mental health process.

Whether different psychiatric treatment decisions, involuntary treatment proceedings, psychotropic medication management, or Psychiatric Stabilization Unit placement would have altered Mr. Rupard's ultimate outcome are physician-level psychiatric issues outside the scope of my opinions.

The applicable correctional healthcare standard of care requires evaluation of the conduct of nurses and QMHPs based upon the information reasonably available to them during their individual encounters with the patient. It does not permit retrospective assignment of responsibility by combining information accumulated over several months or by relying upon knowledge obtained only after Mr. Rupard's death.

Based upon my review of the records, I find no evidence that the Sheriff's Department nursing staff or County QMHPs failed to provide care that met the applicable correctional healthcare standard of care. Rather, they performed the duties that fell within their respective professional scopes by recognizing mental health concerns, initiating appropriate referrals, implementing physician orders, documenting medication refusals, attempting appropriate mental health evaluations, documenting their observations, and communicating through the established correctional healthcare system.

This case should not be analyzed by asking what we know today after Mr. Rupard's death. It must be analyzed by asking what information was reasonably available to each nurse and each County QMHP at the time of each individual encounter, and whether those professionals acted reasonably within their respective scopes of practice. In my opinion, they did.

Accordingly, it is my opinion, to a reasonable degree of nursing certainty, that the conduct of the Sheriff's Department nursing staff and County Qualified Mental Health Providers complied with the applicable correctional healthcare standard of care and did not constitute indifference to Mr. Rupard's serious medical or mental health needs.

My opinions in this case are based on many years of education and experience in the correctional health field, and upon the materials provided to me for review. I reserve the right to modify or supplement this report in the event additional materials are provided in this matter. My opinions herein are expressed within a reasonable degree of nursing certainty.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed July 15, 2026, in Queen Creek, Arizona.*

Kathryn J. Wild, RN, MPA, CCHP-RN

**Kathryn J. Wild, R.N., M.P.A., C.C.H.P.-R.N.**
[redacted]

## PROFESSIONAL EXPERIENCE

Kathryn J. Wild — 1993 – Present
*Consultant*

Orange County Health Care Agency — 2010 – 2013
Correctional Health Services, Santa Ana, CA
*Deputy Agency Director*

San Bernardino County Sheriff's Department, San Bernardino, CA — 1995 – 2010
*Health Services Administrator*

Orange County Health Care Agency — 1985 – 1993
Correctional Medical Services, Santa Ana, CA
*Senior Comprehensive Care Nurse*

Saint Joseph Hospital, Orange, CA — 1980 – 1985
*LVN/Registered Nurse – Medical Surgical Unit*

## EDUCATION

**Fellow** – California Healthcare Foundation (CHCF) Leadership Fellowship – 2007/2009
**Masters in Public Administration** – National University, San Diego, CA (2005)
**Management Leadership Academy (MLA),** San Bernardino County (1998)
**Bachelor of Science – Health Services Management,** University of La Verne, La Verne, CA (1998)
**Associates Degree in Nursing** – Rancho Santiago College, Santa Ana (1984)

## PROFESSIONAL CERTIFICATIONS, AWARDS AND COMMITTEES

- Co-Chair – Medical/Mental Health Workgroup Adult Titles 15 Regulation Revision (Minimum Jail Standards), California Board of State and Community Corrections (January 2016)
- California Healthcare Foundation (CHCF) – Health Care Leadership Program, Cohort VII – 2007/2009 Fellowship
- 2008 Woman of Distinction – Assemblyman Bill Emerson's 4th Annual 63rd District's - Women of Distinction Awards
- 2007 Distinguished Service Award – American Correctional Health Services Association (ACHSA)
- Certified Correctional Healthcare Professional (CCHP) since 1991
- Certified Correctional Healthcare Professional – RN (CCHP-RN) since 2014
- Institute for Medical Quality (IMQ) – Correctional Accreditation Surveyor
- Outstanding Mental Health Advocate Award – The California Coalition for Mental Health - 2003

Revised: June 1, 2026

## PROFESSIONAL AFFILIATIONS

- American Correctional Health Services Association (ACHSA) – Director 2002 - 2004
- California/Nevada Chapter ACHSA – Past President 2003/2004
- Forensic Mental Health Association (FMHA)
- American Correctional Association (ACA)
- American Jail Association (AJA)
- National Commission on Correctional Health Care (NCCHC)
- Academy of Correctional Health Professionals
- Visiting Nurse Association of Inland Counties (VNAIC) – Director 1999 – 2003
- American Correctional Nurses Association (ACNA)

## PRESENTATIONS

| | |
|---|---|
| September 2017 | *"Clinical Management for High Risk Patients in this Litigious Setting"*<br>- California/Nevada Chapter of ACHSA – San Jose, CA |
| January 2015 | "*Correctional Health Care News Round Up"*<br>- Correctional Nurse.net - Podcast |
| October 2013 | *"Managing Nursing Sick Call to Reduce Risk"*<br>- National Commission on Correctional Health Care – Nashville, TN |
| April 2013 | *"10 Ways Correctional Nurses Can End Up in Court"*<br>- National Commission on Correctional Health Care – Denver, CO |
| April 2013 | *"Managing Nursing Sick Call to Reduce Risk"*<br>- Correctional Health Care Webinar – OmniSure Consulting Group |
| October 2012 | *"How to Create and Implement Safe and Effective Nursing Protocols"*<br>- National Commission on Correctional Health Care – Las Vegas |
| March 2009 | *"Nursing Forum – Administrative Issues"*<br>- American Correctional Health Services Association – Orlando, FL |
| April 2008 | *"Medical Issues – Custody and Medical: Working Together"*<br>- American Jail Association – Denver, CO |
| May 2007 | *"Forming a Partnership – Mental Health Courts"*<br>- American Jail Association – Nashville, TN |
| April 2005 | *"Case Management in a Large County Jail"*<br>- National Commission on Correctional Health Care – Las Vegas |
| November 2003 | *"Contemporary Health Care Issues in Corrections"*<br>- California State Sheriff's Association – Sacramento, CA |

## PUBLICATIONS/PUBLICATION REVIEW

Enchanted Mountain Press Publications – Textbook Chapter Review: **"Correctional Healthcare Patient Safety Handbook: Reduce Clinical Error, Manage Risk, and Improve Quality",** "Recipient of Care", December 2013

Smith, Sue and Wild, Kathy. **"Best Practices in Nursing Sick Call Management (Part 2)"** CorrectCare, The Magazine of the National Commission on Correctional Health Care. Fall 2013: 12-13, 25.

Smith, Sue and Wild, Kathy. **"Understanding Legal Risk with Sick Call Administration."** A Risk Management Bulletin: Omnisure Risk Management Consulting. Fall 2013

Smith, Sue and Wild, Kathy. **"Best Practices in Nursing Sick Call Management (Part 1)"** CorrectCare, The Magazine of the National Commission on Correctional Health Care. Summer 2013: 12-14.

Hurst, Norm and Wild, Kathy. **"Forming a Partnership for Successful Mental Health Courts."** American Jails. November/December 2007: 23-27.

Hurst, Norm and Wild, Kathy. "**Working Together: Health and Security Side by Side**." The State of Corrections: ACA Annual Conference Proceedings. 2006: 189 – 195.

# Kathryn J. Wild, RN, MPA, CCHP-RN
## Legal Cases – Depositions/Trials
### 2023 - 2026

Trials:

1. May 2025 **John Scalia, individually and as successor-in-interest of Decedent Kimberly Morrissey-Scalia v County of Kern, et al.,** US District Court Eastern District of California, Case # 1:17-CV-01097-LJO-SKO – Attorney Sanjay Schmidt - Plaintiff

2. April 2025 **Javier Tapia v NaphCare, Inc**., United States District Court Western District of Washington at Seattle, Case #2:22-cv-01141-KKE – Attorney Jake Dean – Defense

3. February 2025 **Georgia Eugenia Thomas v Southern Health Partners (SHP)**, United States District Court for the Eastern District of Kentucky Northern Division at Covington, Case # 2:21-cv-012 (WOB-CJS) – Attorney Bradley Fyffe - Defense

4. December 2024 **Shawn R. Porio v City of Tustin, Orange County Fire Authority, County of Orange, et al.** United States District Court Central District of California, Case #8:22-cv-812-CJC-ADS – Attorney Craig Smith - Defense

Depositions:

1. June 2026 **Tony Rogers v Renata Lowery and Wexford Health Sources, INC and Latoya Hughes.** United States District Court Southern District of Illinois, Case #3:23-cv-001936-MAB – Attorney Nick Childress – Defense

2. June 2026 **Babin v John Montgomery (Baxter County),** U.S. District Court Western District of Arkansas Harrison Division, Case #3:24-cv-03057-TLB – Attorney Chris Stevens – Defense

3. March 2026 **Brian Newman, as Independent Administrator of the Estate of Torry Lamont Newman v Smith County, Texas (Turn Key Health Clinics), et al.,** U.S. District Court for the Eastern District of Texas, Tyler Division, Case # 6:24-cv-00144 JCB-JDL – Attorney Sean Snider, Defense

4. October 2025 **I'Esha Shelton Short, spouse of Timothy Short, deceased v St. Charles County, Missouri, et al.,** U.S. District Court for the Eastern District of Missouri Eastern Division, Case #4:22-cv-001117-SEP – Attorney Wes Smith, Defense

5. September 2025 **Eric Bernard, A/K/A Terrell King v Illinois Department of Corrections, and Wexford Health Sources, Inc**., U.S. District Court Northern District of Illinois, Case #20-cv-5368 – Attorney Joe Lombardo – Defense

6. September 2025 **Eric Bernard, A/K/A Terrell King v Illinois Department of Corrections, and Wexford Health Sources, Inc**., U.S. District Court Northern District of Illinois, Case #20-cv-50413 – Attorney Stephen Gorski – Defense

7. August 2025 **Amy Hernandez, as Administrator of the Estate of Alex Alvarez, deceased v Wexford Health Sources, Inc., et al**., U.S. District Court Southern District of Illinois, Case #3:22-cv-566 NJE – Attorney Rodney Sharp – Defense

8. August 2025 **Kizzie Simms, as Special Administrator of the Estate of Gregory Neil Davis, deceased v Board of County Commissioners for Oklahoma County, et al.,** U.S District Court for the Western District of Oklahoma, Case #CIV-23-780-R – Attorney Tate Roush – Defense

9. May 2025 **Susan Ann Smith, as successor in interest to Decedent Sean Conroy v County of Orange, et al.,** U.S. District Court for the Central District of California, Case #: 8:23-cv-02426-DOC-KES – Attorney Nicholas Colletti – Defense

10. March 2025 **Schomer v Elko County, et al**., U.S. District Court District of Nevada, Case #2:23-cv-00390-ART-CSD, Attorney William Schuller – Plaintiff

11. January 2025 **The Estate of Jane Carhuff v City of Puyallup, et al**., Superior Court of the State of Washington in and for the County of Pierce, Case #: 23-2-04148-3, Attorney Thomas Balerud – Plaintiff

12. October 4, 2024 **Mikeco Desir, O/B/O Kevin Desir, Deceased v Sheriff Gregory Tony, et al.** United States District Court – Southern District of Florida, Case #0:23-cv-60499-AHS – Attorney Jeffrey Lawley – Defense

13. May 2024 **Javier Tapia v NaphCare, Inc**., United States District Court Western District of Washington at Seattle, Case #2:22-cv-01141-KKE – Attorney Jake Dean – Defense

14. March 2024 **Ashley Myers, individually and as Co-Personal Representative of the Estate of Lorri Gayle Tedder, Courtney Vaughn, individually and as Co-Personal Representative of the Estate of Lorri Gayle Tedder v Board of County Commissioners of Rogers County, et. al.,** United States District Court for the Northern District of Oklahoma, Case #22-cv-00119-TCK-JFJ – Attorney Anthony Winter - Defense

15. March 2024 **Cassandra Oliver v South Central Correctional Center (SCCC), et al.,** United States District Court Western District of Missouri Southern Division, Case #6:21-cv-03226-MDH - Attorney Tad Eckenrode – Defense

16. September 2023 **James Bingham v Jefferson County, Iowa, and Jefferson County Health Center, Iowa District Court for Jefferson County**, Case #LALA004446, James Palmer – Defense

17. September 2023 **Dontel Deon Crowder v McLean County, et al.** In the Eleventh Judicial Circuit of Illinois McLean County, Illinois, Case #: 2020L0000173, Carrie Haas – Defense

18. June 2023 **Gaven Picciano v Clark County, et al.** U.S. District Court Western District of Washington at Tacoma, # 3:20-cv-06106-DGE – Mason Ji - Defense

19. February 2023 **Georgia Eugenia Thomas v Southern Health Partners, INC,** U.S. District Court Eastern District of Kentucky Northern Division at Covington, # 2:21-cv-00012-WOB-CJS – Bradley Fyffe - Defense

20. January 2023 **Michelle L. Puki, as Personal Representative of the Estate of Lori Langton v Okanogan County, et al.**, U.S. District Court Eastern District of Washington at Spokane, # 2:20-cv-00411-SMJ - Alexander Dietz - Plaintiff

**Kathryn J. Wild, RN, MPA, CCHP-RN**
**36374 N La Moneda, Queen Creek, AZ 85140**
**Phone: 909-720-0961**
**kwild@usa.net**

---

# Fee Schedule 2026

## Professional Services – Kathryn J. Wild, RN, MPA, CCHP-RN

| Service | Fee | |
|---|---|---|
| Retainer – Initial Review of Discovery | $ 4,500.00 | Non-Refundable |
| Conference calls, meetings, site visits, report development, document review | $ 450.00 | Per hour |
| Deposition | $ 500.00 | Per hour (Minimum of 2 hours) |
| Trial Daily Rate | $ 3,500.00 | Daily Rate |
| Travel Time | $ 200.00 | Per hour of travel |
| Travel Expenses (airfare, transportation, lodging, meals) | | Actual cost |
| Travel Expenses (mileage) | $.56 per mile | As applicable |
| Incidental Expenses (postage, etc.) | | Actual cost |

# EXHIBIT 38

Rebuttal Expert Report of Homer Venters, M.D., Aug. 5, 2026

# Rebuttal Report Regarding Care for Lonnie Rupard in the San Diego County Jail

## Introduction

I am a correctional health expert and Court-appointed monitor/investigator of health services in jail and prison settings. I have been retained by the Estate of Mr. Rupard to assess the adequacy of care he received in the San Diego Jail leading up to his death in 2022. I submitted an initial report regarding the care he received, which included the following three findings;

1. The San Diego Jail and their health staff failed to provide basic mental health care to Mr. Rupard.
2. The San Diego Jail and their health staff failed to provide basic medical care, including injury assessment/care and segregation rounds.
3. The San Diego Jail failed to conduct a clinical mortality review after Mr. Rupard's death.

I have reviewed the following reports submitted by the Defendant's and provide rebuttal below in areas of these reports that relate to my original findings:

- Kathryn Wild, RN
- Mace Beckson, MD
- Kristina Tyler, PhD
- John Hiserodt, MD, PhD
- Alan Abrams, MD
- Rudolph Bedford, MD

I have also provided specific citations below to any additional information that I relied on in writing this rebuttal report.

Dr. Abrams appears to have provided care as a prison psychiatrist between 1997 and 2003 and has subsequently worked in community psychiatry and law since that time. I do not see any evidence in his CV that he has ever worked as a physician in a jail or has even been appointed as a Director of Mental Health, Psychiatry or other health leader in a jail. It appears he has never been appointed by any Court or State as a monitor to assess or monitor any standard of care in a jail or prison setting.

None of the other physicians who submitted expert reports from the defendants appear to have any experience providing care or conducting oversight of the adequacy of care in correctional settings. There does not appear to be any physician among the defense experts who has ever worked as a physician in a jail or has been appointed by any Court or State as a monitor to assess any standard of care in a jail or prison setting.

The psychologist, Dr. Tyler, similarly appears to lack any experience in providing mental health care in a jail or prison setting. Nurse Wild has experience as a correctional health nurse and Director of Nursing. I do not see any experience listed by Ms. Wild being appointed by any Court or State as a monitor to assess any standard of care in a jail or prison setting.

Below, I have provided review of the defense reports as they relate to the three opinions detailed in my original report. Finding #1: The San Diego Jail and their health staff failed to provide basic mental health care to Mr. Rupard. This finding from my original report included the following specific failures of the jail's mental health care provided to Mr. Rupard;

- Failure to conduct a psychiatric assessment for Mr. Rupard for 10 days despite documented history of serious mental illness and current documentation of "combative, assaultive or extremely hostile" behavior and "psychotic disorders" when he arrived in jail.
- Failure to review (and for San Diego County and Liberty Health care have a system that ensures review) of prior psychiatric care/involuntary medication from prior incarcerations of Mr. Rupard.
- Reliance on nonconfidential cell-side encounters for psychiatric and mental health encounters.
- Failure to transfer Mr. Rupard for a higher level of assessment and care despite ongoing lack of cooperation in care or taking medications, incoherent rambling, verbal aggression and "potential for decompensation" while locked in a cell.
- Lack of coordination between behavioral health and psychiatric staff.
- Failure of mental health staff to respond to disciplinary actions by security staff with information about Mr. Rupard's serious mental illness.
- Failure to follow basic standard of care regarding medication and care refusals.
- Several of these failures clearly represented systemic problems with how health services were provided at the time Mr. Rupard was incarcerated in the jail, including the following;
    - Failure of San Diego County and Liberty Healthcare to develop a system that detects missed initial psychiatric encounters and ensures a timely patient assessment.
    - Failure of San Diego County and Liberty Healthcare to develop a system that triggers review of prior psychiatric care and involuntary medication orders from prior incarcerations.
    - Failure of San Diego County to independently oversee the adequacy of care provided by Liberty Healthcare psychiatrists.

My opinions in this finding that San Diego Jail failures to provide mental health care to Mr. Rupard represented gross breaches of the correctional standard of care were supported by policies and guidelines of the National Commission of Correctional Health Care and cited

throughout my initial report. These opinions are also supported by my own experience as a physician who has worked in jail settings, conducted hundreds of encounters with patients in segregation status, who has led peer reviewed analysis and quality assurance reviews of the physical health risks of solitary confinement/isolation/segregation and who has been appointed by multiple courts to monitor and work to improve health services in jail and prison settings based on correctional standards of care. Multiple defense reports offered opinions about the adequacy of the mental health care received by Mr. Rupard, and I have categorized my review of these reports into care provided by Dr. Cruz, care provided by mental health/QMHP staff and review of the evidence for systemic versus individual failures.

Nurse Wild does not appear to offer opinions regarding the care provided by Dr. Cruz.

Dr. Beckson's report identifies several failures in the care provided by Dr. Cruz to Mr. Rupard including the following;

- Dr. Cruz failed to provide appropriately close follow-up and treatment for this severely ill medication-refusing patient.
- Dr. Cruz discontinued Mr. Rupard's medication orders in response to the latter's medication refusals, despite Mr. Rupard's serious mental illness and need for psychiatric treatment, and without maintaining close follow-up.
- Mr. Rupard was incarcerated in jail without medication or psychiatric treatment for three months.
- Dr. Cruz failed to place Mr. Rupard on a W.I.C. 5150 72- hour hold as gravely disabled due to his mental disorder.
- Dr. Cruz failed to admit Mr. Rupard to the San Diego County Jail's Psychiatric Stabilization Unit (PSU), an LPS-designated psychiatric inpatient unit in which Mr. Rupard could have been involuntarily hospitalized, where he could have received inpatient psychiatric care and involuntary medication administration if necessary.

Dr. Beckson offers the opinion that "While not the sole cause, Dr. Cruz's failure to meet the standard of care substantially contributed to Mr. Rupard's demise."

In discussing Mr. Rupard's physical decline without complaint or even without being noticed as he was kept in a locked cell, Dr. Beckson describes the following;

> "It is my opinion that Mr. Rupard's severe psychosis was the basis for this phenomenon. Specifically, Mr. Rupard, due to his delusional state (i.e., being divorced from reality) and his severely disorganized thinking, did not experience, interpret, and/or respond appropriately to his medical/physical problems, as would a rational, non-psychotic jail inmate. He lacked the mental capacity to appreciate his medical problems and access the medical resources that were available. Without hearing a complaint, a communication of physical distress or request for help, and without Mr. Rupard manifesting objective

> evidence of physical distress, the various observers of Mr. Rupard would assume that there was no medical problem."

I agree with the basic opinion of Dr. Beckson that Mr. Rupard did not receive the standard of care from Dr. Cruz. However, as I make clear in my initial report and below, these failures reflect more than individual errors by Dr. Cruz and are the product of the systemic problems with the care and oversight of the San Diego Jail.

Dr. Tyler's report primarily addresses the adequacy of care provided by Ms. Goodall.

John Hiserodt, MD, PhD. Dr. Hiserodt is a pathologist who does not appear to offer any opinions that bear on this area of my original report.

Dr. Abrams' report largely focuses on asserting that Dr. Cruz provided adequate care to Mr. Rupard. Before rebutting his specific claims, it is important to note that Dr. Abrams appears to lack any experience or expertise in assessing or implementing correctional standards of care in a jail setting. Aside from his brief time working in a prison, which ended 23 years ago, I see no other role as a provider, leader or Court monitor of any correctional facility. This gap in his expertise is significant because the last of the "Additional Opinions" listed in Dr. Abrams' report is the following;

"Standards for NCCHC accreditation are not the standards of care in correctional psychiatry. Meeting the NCCHC standards shows performance well above the standards of care in correctional psychiatry."

This statement by Dr. Abrams is completely undercut with review of the actual policies of the San Diego Sheriff's Department. Many of the County's own policies state that they are "In Compliance With" a specific NCCHC policy, with or without additional standards of California Title 15 or other standards. (see below).

| **SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION** | | **Operations Manual** | |
|---|---|---|---|
| SUBJECT: | SEGREGATED INMATES | DATE: | 10/30/2020 |
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | G.2.1 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 1 |
| RELATED SECTIONS: | DSB J.3 | | |
| IN COMPLIANCE WITH: | NCCHC J-G-02 | | |

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | | Operations Manual | |
|---|---|---|---|
| SUBJECT: | EMERGENCY PSYCHOTROPIC MEDICATION | DATE: | 1/25/2022 |
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | G.3.1 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 1 |
| RELATED SECTIONS: | MSD G.3.2 | | |
| IN COMPLIANCE WITH: | NCCHC J-G-03 | | |

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | | Operations Manual | |
|---|---|---|---|
| SUBJECT: | PHYSICIAN'S ORDERS | DATE: | 2/3/2020 |
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | A.3.2 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 1 |
| RELATED SECTIONS: | MSDA.3.1 | | |
| IN COMPLIANCE WITH: | CCR, Title 15, Section 1216; NCCHC J-A-03 | | |

In his report, Dr. Abrams simply ignores the County's own reliance on the NCHCC as an important source of their own correctional standards of care. Dr. Abrams' report does include a 6-page list of references, but there is no actual citation, footnote or endnote in his report to indicate which of his specific opinions, if any, is supported by a specific publication. Furthermore, I have reviewed the publications he lists as "References" and cannot find a single manuscript that deals with correctional standards of care. Similarly, the publications that Dr. Abrams lists as his own stop at 2010 and lack any publication that demonstrated familiarity or expertise in correctional standards of care.

One specific opinion that Dr. Abrams offers about the care provided to Mr. Rupard by Dr. Cruz is that the encounters on 12/29/21 and 2/22/22 were "well within the standard of care for correctional psychiatry." As I have detailed above, it does not appear that Dr. Abrams has ever worked in a jail or been asked to take a role by a jail or Court in determining what the correctional standard of care is. In my original report, I offered specific citations that support my opinions that these encounters were deficient. The NCCHC's Suicide Prevention Guidelines clearly detail the dangers of reliance on nonconfidential encounters when assessing patient's for their risk factors; "Ensure reasonable privacy and confidentiality during the screening and assessment processes. Experience has demonstrated that it is not unusual for an otherwise suicidal inmate to deny suicidal ideation when questioned in a physical environment that lacks privacy and confidentiality."[1] This same guideline states that "Effective suicide risk assessment requires that the assessment be conducted in a private and confidential setting, not cell-front."

[1] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ncchc.org/wp-content/uploads/Suicide_Prevention_Resource_Guide.pdf.

Mr. Rupard was not suicidal but he was rambling incoherently and neither Dr. Cruz nor other health staff were ever able to complete their assessments with him. There is no documentation that Dr. Cruz even made an effort to see Mr. Rupard in a confidential setting. The NCCHC jail standards clearly direct health services to keep their exchanges of health information with patients private.[2] I have similarly cited NCCHC Standards in my opinion about the need for Mr. Rupard to be assessed in a higher level of care when Dr. Cruz was unable to complete key parts of his assessment of Mr. Rupard and the need for review of Mr. Rupard's prior hospitalization and outpatient records.[3]

Dr. Abrams includes an opinion in his report that Mr. Rupard's death was unrelated to his untreated mental illness, "I do not see any evidence that Mr. Rupard's mental illnesses in December 2021, January 2022 or February 2022, had any relationship to his death from medical causes in March 2022." This opinion demonstrates an extreme lack of understanding of how preventable deaths occur in a jail setting. As in the community, patients with serious mental illness arrive in jail with high burdens of physical health problems. Unlike community settings, however, jails may lock these patients into an isolation cell where their physical health can deteriorate to the point of death. This practice of placing a patient with untreated serious mental illness in an isolation cell creates a risk of death that directly ties untreated psychiatric illness to the outcome of death from medical problems, including infection, untreated chronic illness and even malnutrition and starvation. For Mr. Rupard, it is clear that he was locked in a cell for 89 days, that he was never treated with any psychiatric medication or transferred to a higher level of care (unlike prior incarcerations in the same jail) and that when the door of his cell was finally opened on the day of his medical emergency, he had lost alarming amount of weight and was close to death from starvation, dehydration and pneumonia. In 2025, the New Yorker published a review of this problem, starvation deaths in county jails, that detailed the intimate connection between death from a physical health decline and untreated mental illness.[4] In my career leading a jail health service, and, acting as a Court appointed monitor and investigating jail standards of care on behalf of the U.S. Department of Justice, I have encountered multiple deaths that fall into this category, of patients who die from an undetected physical health problem while locked in a cell with untreated psychiatric illness. The dangers of isolation/confinement leading to morbidity and mortality among patients with serious mental illness led us to eliminate this practice in the NYC jail system in 2014 and create therapeutic alternatives that included regular nursing and medical assessment of patients.[5]

Several of Dr. Abrams' opinions about the conduct or care provided by Dr. Cruz appear to be red herrings for Dr. Cruz' fundamental failure to conduct an adequate psychiatric assessment and transfer Mr. Rupard to a higher level of care. For example, Dr. Abrams' opinions #19, #20, #28

---

[2] NCCHC Privacy of Care J.A.07 Health Services in Jails, 2018.
[3] NCCHC Mental Health Screening and Evaluation. J.E.05. Health Services in Jails, 2018.
[4] https://www.newyorker.com/magazine/2025/04/21/starved-in-jail.
[5] https://pubmed.ncbi.nlm.nih.gov/26848667/.

deal with the lack of any law to require weighing or taking vital signs of a patient and the lack of hunger strike request for Mr. Rupard. I do not offer any legal opinions, but the central failure in Mr. Rupard's care from Dr. Cruz was that Dr. Cruz never completed his full psychiatric assessment in a confidential manner and never transferred Mr. Rupard to a setting where this could occur. These were part of numerous individual and systemic failures that contributed to Mr. Rupard's preventable death, which I detailed in my initial report.

Dr. Abrams' report includes the following statement, "There is no evidence that Mr. Rupard had any mental health deterioration until the examination by Dr. Badre on March 14, 2022. At this point, Mr. Rupard was already medically ill." This statement is contradicted by Mr. Rupard's medical records which clearly show the following documented observations from nursing staff on his first day of detention;

- Combative, assaultive or extremely hostile behavior
- Chronic conditions, psychotic disorders

The only way to construe that Mr. Rupard's mental health did not deteriorate during his months locked in a cell of the San Diego jail is to acknowledge that he arrived in a state of psychosis and simply remained in that untreated, uncontrolled state. This appears to be what occurred, and represents multiple serious failures in Mr. Rupard's care.

Rudolph Bedford, MD. Dr. Bedford is a gastroenterologist and does not appear to offer any opinions on this area of my original report.

As I detailed in my original report, I believe that the care provided by Dr. Cruz and the mental health service was substandard because he documented on 12/29/21 that Mr. Rupard may decompensate but never completed his full assessments of Mr. Rupard and never conduced any assessment of him in a confidential setting. This inability to actually complete his assigned work should have prompted him to transfer Mr. Rupard to a setting where this could occur, either inside the jail's mental health units or at an outside facility. This error was continued or repeated after Dr. Cruz' encounter on 2/22/22 with Mr. Rupard. Simply looking at a patient through a locked door, especially when that patient is not able or willing to complete a basic interview, is a grossly deficient approach to assessment by a physician. This weakness is also highlighted in my original report and as detailed by the NCCHC.

In his report, Dr, Abrams acknowledges that a nurse recorded Mr. Rupard's weight as 165 lbs. when he arrived on 12/1921, but then attempts to cast doubt on the weight measurement with the following statements;

> "…there is no note about how this measure was made"
>
> "…what did Mr. Rupard actually weigh when he was booked into SDCJ in December 2021- *it appears that his weight was by report not by measurement and at present I do not believe it is possible to know exactly what Mr. Rupard weighed up until his autopsy. However the booking photo suggests he weighed less than 165 lbs.*;"

A similar statement is presented in the report of Dr. Hiserodt about the appearance of Mr. Rupard in his booking photo, offering a theory that Mr. Rupard's weight was less than what was recorded. In his deposition testimony (p 153), Detective Blumenshine offers a theory that nursing staff may simply record the same weight from a prior intake when a person arrives in jail without actually taking their weight, but if this were the case with Mr. Rupard, his weight would have been listed as 190 lbs., which was the weight recorded in his prior 1/8/19 intake. The other defense experts, including Nurse Wild and Dr. Bedford, along with the County's Deputy Medical Examiner, Dr. Schaber, do not offer any opinions that the weight of 165 lbs. for Mr. Rupard on 12/19/21 was not accurate. I have not seen any information that would cause me to believe the Nurse who took Mr. Rupard's vital signs did so incorrectly or inaccurately.

Finding #2. Failure to provide basic medical care, including injury assessment/care and segregation rounds. This finding from my original report included the following specific failures:

- Failure to address Mr. Rupard's tachycardia and altered mental status on 12/19/21.
- Failure to adequately assess Mr. Rupard for injuries on 1/29/22.
- Lack of nursing and mental health rounds in administrative segregation as required by the standard of care in correctional health care and San Diego's own jail policies.

The only report that appears to address the areas of care involved in the first two of these failures is the report from Nurse Wild. Nurse Wild's report lists the encounter between RN Ng and Mr. Rupard at 11:36 pm on 12/19/21 where his pulse was 110 and his level of orientation was diminished, but in her review of the initial nursing encounters, Nurse Wild simply states that Mr. Rupard received the standard of care. This is untrue because when a nurse documents abnormal vital signs, including tachycardia and diminished level of orientation, they must take action to ensure an immediate medical assessment. Even Nurse Wild's review of the intake process makes the statement that nurses cannot make their own independent diagnosis and treatment plan. I agree with this position, but it is precisely because of this scope of service that nurses must take action to trigger immediate medical assessment/care when a patient has diminished orientation and tachycardia. A mental health referral is not a response to this combination of abnormal signs because jail admission often involves potentially fatal medical emergencies that must be assessed. Nurse Wild does not even mention these abnormal signs in her review of the receiving screening process and this undercuts her claim that the nursing care Mr. Rupard received in the initial day of his incarceration met the standard of care. I have led large medical and nursing services in a jail setting and been a Court appointed monitor of medical and nursing care in jail and prison settings, and when nursing staff fail to trigger medical assessment of patients with multiple abnormal vital signs, they have failed to provide the standard of care. Based on the information I have reviewed, it is unclear to me whether this failure represented an individual error or a systemic problem since the adequacy of nursing care, including correct use of standardized nursing protocols, is a responsibility of the Chief Medical Officer, the Director of Nursing and individual nursing staff. The need for nursing protocols to trigger referral to higher level assessment and care is also clearly identified in the NCCHC's Standard on Nursing

Assessment Protocols and Procedures; "Nursing assessment protocols are not intended to replace the referral of patients to licensed prescribers for clinical evaluation."[6]

Regarding my original opinion that Mr. Rupard did not receive adequate assessment and care when he was injured during a use of force on 1/29/22, Nurse Wild asserts that Mr. Rupard received adequate care. In my original report, I reviewed this encounter as follows;

> "No vital signs are present and no assessment or plan are present in this encounter and no follow up is present later in the day with either a physician, nurse practitioner, physician assistant or nurse. No assessment of decision making capacity for Mr. Rupard is present in this note. There is no assessment of any type in this note, including any assessment that Mr. Rupard is "cleared" to return to his cell. The list of vital signs and sick calls for Mr. Rupard's medical record lack any entry for the day 1/29/22. The final words of this 3 line note by Nurse Romero are "Assessment terminated for safety".

The failure to obtain vital signs and to have medical staff conduct an assessment for the severity of blows to the head sustained by Mr. Rupard represents a breach in the standard of care because vital signs should be part of any injury assessment and having sustained some blow to the face or head, it was important to determine whether Mr. Rupard had sustained any traumatic brain injury.

I agree with Nurse Wild's statement that "Correctional nurses are not required to place themselves at unreasonable risk of physical harm in order to complete an assessment when an inmate refuses care and threatens violence." But this statement, like her prior statement about nurses not being able to make their own independent diagnosis, sidesteps the specific failure of the nurse. Faced with an injury encounter that cannot be completed, the Nurse was obligated to do something to ensure Mr. Rupard was fully assessed, not simply stop her encounter and leave Mr. Rupard to be locked in a cell without further assessment and care for the injuries she just attempted to assess.

I believe that this substandard care for Mr. Rupard does reflect a mix of individual and systemic failures because basic nursing training should have led RN Romero to trigger a medical assessment when she documented "Unable to further assess…" and "Assessment terminated for safety", but the County should have a basic injury template for assessing patients (including those injured during use of force) that gives clear guidance on cases that require medical assessment including encounters that cannot be completed and those involving potentially serious injury including blows to the head.

In her defense of the nursing care in Mr. Rupard's case, Nurse Wild states in her report that the care for Mr. Rupard should be judged "by asking what information was reasonably available" at the time of each individual encounter. With respect to my opinions about inadequate nursing care when Mr. Rupard had abnormal signs documented by nursing staff on the day of his arrival on 12/19/21 and the aborted/incomplete injury assessment after his use of force on 1/29/22, these criticism are specifically about the lack of action by nurses after they themselves documented

[6] NCCHC J-E-08 Standard on Nursing Assessment Protocols and Procedures. Standards for Health Services in Jails. 2018.

abnormal signs and an inability to complete their assigned work. Nurse Wild has completely ignored this evidence in her report and her caution about judging care in hindsight does not apply to my criticisms of actions taken by these nurses based on their own documentation.

The next area of deficiency included the finding from my original report dealt with the failure to conduct regular nursing and mental health rounds as required by the standard of care in correctional health as well as the policies of the San Diego Sheriffs' Department. In order to come to the conclusion that Mr. Rupard was held in administrative segregation and that he required regular rounds from mental health and nursing staff to monitor his health status, I relied on the following sources of information;

1. Medical Records of QMHP Goodall 2/9/21.
2. Nursing note 2/20/21 documents "per dep 5144 pt is on lockdown, no contraindications noted".
3. Deposition of QMHP Goodall who testified that Mr. Rupard was in Ad. Seg.
4. Detective Blumenshire; "Rupard was not classified as ad-seg but was treated as such because of his mental health."
5. Floor evacuation sheet for 7D on 3/18/22 showing people with mental health issues are also in "Ad Seg".
6. Policy definition (Segregated Inmates G.2.1)-those isolated from the general population and who receive services and activities apart from other inmates- regardless of the reason for the segregation.
7. Ms. Quiroz' testimony that she was unsure if mentally ill persons were kept in Ad. Seg on 7D and was unsure if Mr. Rupard's records indicate he was in Ad. Seg. and also unsure if patients with serious mental illness are held on the 7D quarantine unit.

Review of these sources information makes very clear that while Mr. Rupard may not have been labelled as being in administrative segregation in the jail's computer classification system, he was clearly being locked in his cell and confined under the actual conditions of administrative segregation. In fact, this is the conclusion reached by Detective Blumenshire in the third follow-up report regarding Mr. Rupard's death when he concluded "Rupard was not classified as ad-seg but was treated as such because of his mental health". This is a crucial part of understanding Mr. Rupard's death. Losing track of patients with serious mental illness who are moved into punishment settings is a sadly common feature of preventable deaths in jail settings. One feature of these preventable deaths can involve a disconnect between a computer entry about status or location and what really happened to the patient. The health risks of isolation come from the experience of the patient, not the official designation in a computer system. In fact, this point is clearly articulated in San Diego's own policy on segregated inmates which I reviewed in my original report as follows;

> "I have reviewed the San Diego Sheriff's policy titled 'Segregated Inmates', G.2.1, dated 10/30/2020. This policy defines people in segregation status as "those isolated from the general population and who receive services and activities apart from other inmates" regardless of the reason for the segregation. This policy mandates that people in segregation status "shall be monitored three days a week by nursing staff and a minimum of once a week by a qualified mental health provider (QMHP)."

Very much like the report of Detective Blumenshine, the jail's own policy makes clear that the experience of isolation by a patient "regardless of the reason for the segregation" is what determines the need for the rounds that never occurred in Mr. Rupard's case. This distinction between what Mr. Rupard actually experienced and what was entered into the jail's computer system is a crucial weakness or omission in the defense reports I review below.

Nurse Wild bases her opinion that nursing and mental health staff did not fail in their obligations to Mr. Rupard on the following observation: "The evidence reviewed demonstrates that the automated segregation wellness-check process depended upon an inmate first being classified as an administrative segregation inmate. Mr. Rupard was not so classified and therefore was not entered into the workflow that generated scheduled nursing and QMHP wellness checks." This leads her to make the opinion that follows:

"Neither nursing staff nor County QMHPs possessed independent authority to classify inmates for administrative segregation or independently initiate the automated segregation monitoring process. Accordingly, nursing personnel and County QMHPs had no notice that Mr. Rupard should have been included in the administrative segregation wellness-check process."

There are several factual omissions in this opinion of Nurse Wild's. First, the QMHP Goodall testified in her deposition that she knew Mr. Rupard was in administrative segregation. Second, there is evidence in the medical records of Mr. Rupard that he was being held in lockdown and administrative segregation or confinement status.

- On 2/9/22, QMHP Goodall attempts but does not complete a wellness check with Mr. Rupard and documents that he is on the 7D quarantine unit but also documents that he is being held in "Segregation/Confinement".
- On 2/20/22, Nurse Romero documents Mr. Rupard being on "lockdown"

Nurse Wild ignores this evidence in providing her opinion. I agree with Nurse Wild that the nursing and mental health staff did not control the computer classification process, but she has ignored readily available evidence that Mr. Rupard was actually being held in isolation or segregation status. Like Nurse Wild's earlier opinions regarding nursing staff who encounter a problem with their ability to provide care, when these staff came to know (and document) that Mr. Rupard was being held in the conditions of administrative segregation, they were obligated to take action to notify their supervisors to make sure he was seen as needed.

Dr. Tyler's report asserts that Mr. Rupard was not in administrative segregation and consequently, that there was no obligation to conduct nursing and mental health rounds. As with Nurse Wild's report, the sources of information that Dr. Tyler relies on to draw this conclusion are far more limited than what I reviewed and cited in my report. Her conclusion about this part of Mr. Rupard's treatment ignores key information. For example, Dr Tyler mentions the opinion of Detective Blumenshine that Mr. Rupard was not technically in administrative segregation, but omits the extremely relevant opinion contained in the Detective's report that "Rupard's housing block, 7D, was classified as COVID quarantine and ad-seg housing. Rupard was not classified as ad-seg but was treated as such because of his mental health."

Dr. Tyler also includes several other inaccuracies or significant omissions in her discussion of Mr. Rupard's segregation status. For example, she writes that "Ms. Goodall's own note dated February 9, 2022, Mr. Rupard was not classified as administrative segregation. Ms. Goodall's note actually stated that he was in "quarantine."

Even a cursory review of this medical record shows that Ms. Goodall wrote that she saw Mr. Rupard on "7D Quarantine" and also that the box for housing type clearly was checked as "confinement/segregation"


Housing Assignment

- [ ] Mainline
- [ ] Mainline Protective Custody
- [x] Segregation/Confinement
- [ ] Psychiatric
- [ ] Medical

Emotional Response to Incarceration:

IP remains successfully housed in 7D quarantine, has coexisted with his peers with no reported aggression, violence or erratic behaviors. MHC observed IP

This is entirely consistent with the opinion of Detective Blumenshire (that was ignored by Dr Tyler) that Mr. Rupard was being kept in administrative segregation without the actual computer designation. This is also consistent with the testimony of Sergeant Johnson that people were kept in administrative segregation on this unit and that there were multiple ways that a person could be held in isolation, confined to their cell for 23 hours per day. This is another source of information that was ignored by Dr. Tyler.

In addition, it is not evident whether Dr. Tyler even reviewed the Sherriff's policy on Segregation (G.2.1, 10/30/2020). This is the policy that not only mandates the regular nursing/mental health rounds but also clearly states that the condition of isolation/segregation establishes the need to follow the policy not the formal designation of status:

> *Segregated inmates* – are those isolated from the general population and who receive services and activities apart from other inmates. Facilities may refer to such conditions as administrative segregation, protected custody, or disciplinary segregation. For the purpose of this standard, the living and confinement conditions define the segregated status, not the reason an inmate was placed in segregation.

Dr. Tyler's opinion that Mr. Rupard was not being held in segregation ignores this very clear definition in the San Diego Sherrif's own policies.

Dr. Tyler acknowledges that Ms. Goodall testified that she knew Mr. Rupard was in administrative segregation but offers no rational for how her testimony on this question is reconcilable with Dr. Tyler's contrary opinion,

As a practical matter, there is no evidence anywhere in Mr. Rupard's medical records that he was being held in medical quarantine, which is routinely used for a patient in the first week or two of their admission or after exposure to a known or suspected case of a communicable disease.

Both Dr. Tyler and Nurse Wild also appear to ignore the multiple references to "lockdown" in Detective Blumenshine's report on Mr. Rupard.

The failure to conduct regular nursing and mental health for Mr. Rupard appears to involve two systemic failures, both of which go unacknowledged by the defense experts. First, it appears that regular adherence to the basic requirement to conduct these rounds was not in place. Second, it appears that despite clear knowledge by security and health staff that patients were held in administrative segregation status in Housing Module 7D, also used for other purposes, the leadership of the jail ignored this reality and failed to ensure that rounds occurred for patients held in administrative segregation on this specific housing area.

The failure to even conduct scheduled rounds for patients in administrative segregation is detailed the testimony of QMHP Goodall, who was asked whether there was a standard requirement to do so. In my original report, I detailed to following from her deposition testimony;

> When she was asked whether seeing patients in administrative segregation was driven by individual sick call requests or whether there was some plan for regular clinician visits for patients in segregation, Ms. Goodall testified as follows;
>
> "…was there ever any procedure you were taught that with respect to inmates in ad seg they were to be seen on an established, regularized basis?
>
> A.I don't remember that, sir."
>
> When asked to clarify this approach, whether there was ever a time she would see people on a weekly or regular basis or whether it was strictly driven by sick calls, Ms. Goodall testified as follows;
>
> Q. "Your answer?· In other words, did you ever see anybody in ad seg on every week or every two weeks or every month without respect to whether they were on the sick call or not?
>
> A.It wasn't -- it was more the sick call.
>
> Q.Right.· It was completely the sick call; right?
>
> A.Yes.· That was the policy."

As regards the second systemic failure, the lack of recognition or action by leadership that 7D was utilized for administrative segregation for some patients, there is ample evidence of this fact that is simply ignored in reports of the defense experts. In his deposition testimony, Sergeant Johnson, the custody training officer who worked in the Sheriff's Department since 2018, described very clearly how housing 7D was used for administrative segregation and other types of 23 hour cell isolation.

"Q.· ·Okay.· Now, let's talk about the Housing Unit 7D.· During that timeframe, do you recall if there were ad seg cells in Housing Unit 7D?

A.· ·D Module was mixed.· There were some ad seg cells in there, yes.

Q.· ·All right.· And what is ad seg?

A.· ·That was administrative segregation."

In this same testimony, Sergeant Johnson detailed multiple scenarios whereby a patient could be confined to their cell for 23 hours per day without having the administrative segregation label applied to their computer status; "If somebody was in their cell for 23 hours a day, that could be a number of different things."

The depth of this systemic problem was apparent in the testimony of Ms. Quiroz, who was offered by the County as an expert in the jail's mental health practices and held the title of Chief Mental Health Clinician and then became the Group Program Manager in the jail. She testified that she did not know whether patients with mental illness were held in administrative segregation on the 7D housing area. This information was ignored by all of the defense experts and indicates that as a mental health provider with patients in administrative segregation, QMHP Goodall lacked the knowledge, training and supervision to ensure this policy was followed. This failure of the jail's health service to even know where its own mental health patients are being held in isolation or segregation status is a profound abdication of their duty to provide basic health care, since being in isolation status increases the risk of death. This is such a basic part of correctional health standards of care that the NCCHC issued guidance on conducting these types of rounds in 2016. Both their jail and prison standards include clear language about this need. The American Correctional Association also includes this need in their correctional standards.[7]

Dr. Beckson is the only other defense expert who referenced Mr. Rupard's segregation status. Dr. Beckson's report asserts that Dr. Cruz testified that Mr. Rupard was being held in segregation conditions. While I do agree that Mr. Rupard was being held in administrative segregation conditions, and met the policy and standard of care requirement for regular nursing and mental health encounters, I based my opinion on the information cited above.

Dr. Abrams' report is silent on a critical feature of Mr. Rupard's death, the lack of regular nursing and mental health rounds while he was held in administrative segregation. This silence is surprising, because several of the references he lists (but does not link to any specific opinion) clearly establish the increased risk of medical and physical health problems among people with serious mental illness.[8] This higher burden of physical health problems among patients with

---

[7] 5-ACI-4B-28 (new 2018) Restrictive Housing, Health Care Screening. American Correctional Association Standards March 2021.

[8] Chesney E, Goodwin GM, Fazel S. Risks of all-cause and suicide mortality in mental disorders: a meta-review. World Psychiatry. 2014;13:153–60. doi: 10.1002/wps.20128.. and Lawrence D., Kisely S., Pais J. The epidemiology of excess mortality in people with mental illness. Can J Psychiatry 2010; 55: 752-760.

serious mental illness is well known in correctional settings and is part of the reason that dedicated nursing rounds are a requirement for people in segregation settings. In fact, my own experience in the design and implementation of alternatives to solitary confinement for patients with serious mental illness in jails is that the higher burden of medical problems for these patients requires increased nursing resources even when patients are moved from solitary settings to therapeutic units.[9] The publications that Dr. Abrams lists support the idea that Mr. Rupard was part of a cohort of people who share a higher burden of physical health problems and hence, he was in even more obvious need of the scheduled nursing rounds that were mandated by jail policy and correctional standards of care.

Dr. Abrams' silence on Mr. Rupard being held in a locked cell ignores a second serious issue, the health risks that solitary confinement/isolation impose on a patient. These risks are well-established and patients with serious mental illness should not be held in these settings. The 2016 NCCHC policy statement clearly articulates the risks as follows: "Juveniles, mentally ill individuals, and pregnant women should be excluded from solitary confinement of any duration."[10] In my own work as Chief Medical Officer of the NYC Correctional Health System, we identified this practice as especially dangerous for our patients with mental illness and we designed alternative and therapeutic housing areas. This approach was not limited to people who needed medication over objection or who were a grave threat to themselves or others, and was utilized to eliminate the practice of having patients with serious mental illness deteriorate in a solitary or isolation cell. Exposure to solitary confinement/isolation is a new health risk that San Diego County Jail introduced to Mr. Rupard, a risk that Dr. Abrams' report ignored. The reports of the other defense experts also ignored this systemic health risk, including the reports of Dr. Tyler and Dr. Beckson.

<u>Finding #3. The San Diego Jail failed to conduct a clinical mortality review after Mr. Rupard's death. In my initial report, I detailed the evidence of serious flaws and deficiencies in the County's approach to mortality review for Mr. Rupard's death. This opinion was supported by review and citation of the following sources of information;</u>

- <u>The NCCHC Standard for Clinical Mortality Review.</u>
- <u>Dr. Montgomery's testimony regarding the mortality review process.</u>
- <u>Dr. Ysla's testimony regarding the mortality review process.</u>
- <u>California State Auditor's Report from 2022.</u>

---

Crisanti AS, Love EJ. Mortality among involuntarily admitted psychiatric patients: a survival analysis. Soc Psychiatry Psychiatr Epidemiol. 1999 Dec;34(12):627-33. doi: 10.1007/s001270050185. PMID: 10703272. And
[9] https://pubmed.ncbi.nlm.nih.gov/26848667/.
[10] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ncchc.org/wp-content/uploads/Solitary-Confinement-Isolation.pdf.

The relevance of the NCCHC standards regarding clinical mortality review was detailed in my original report, but this standard clearly identifies that within 30 days, a clinical mortality review should be led by a physician who was not part of the care team, should create findings and corrective actions that are connected to the facility quality committee and should ask at least the three following questions;

- Could the medical response at the time of death be improved?
- Was an earlier intervention possible?
- Notes created by Dr. Montgomery regarding Mr. Rupard's death.
- Independent of the cause of death, is there a way to improve care?

Review of the testimony of Dr.s Ysla and Montgomery, as well as the notes taken by Dr. Montgomery regarding Mr. Rupard's death make clear that San Diego County did not meet these basic criteria for conducting a clinical mortality review. Not only did Dr. Montgomery's brief set of notes fail to meet these basic criteria for a clinical mortality review, but Dr. Ysla testified that he never discussed jail deaths with Dr. Montgomery and he wasn't even aware of Mr. Rupard's death during the period of March-June 2022, a period of three months between Mr. Rupard's death and responsibility of Liberty Inc. for provision of psychiatric care in the Jail.

The failures of the San Diego Jail to adequately review and correct problems after patient deaths was also identified by the California State Auditor's Report of February 3, 2022. specifically addressed the systematic failures in the Sheriff's flawed process of investigating in custody deaths. This report included the following opinions;

- The Sheriff's Department Has Not Consistently Implemented the Meaningful Changes Necessary to Respond to the Deaths of Individuals in its Custody

  The Sheriff's Department has not responded to incarcerated individuals' deaths in a matter that demonstrates commitment to improving and safety at its detention facilities. Every death of an individual in its custody should require a thorough review to determine whether changes to its processes are warranted. Nonetheless, the department's reviews of deaths are insufficient and have not always led to meaningful corrective action. (p. 33)
- However, the Sheriff's Department did not sufficiently document the results or recommendations from its 30-day medical reviews. For 22 of the 30 cases we reviewed, the Sheriff's Department was unable to provide us with documentation from these reviews that detailed any findings or conclusions about clinical care given; identified whether any concerns required further study; or stated whether changes to policies, procedures, or practices warranted. The documents we obtained for the most of these 22 cases were either presentation slides or meeting agendas. Neither type of document included findings about cases or recommended changes to policies, procedures, or practices. For some of the more recent cases in 2019 and 2020, the Sheriff's Department provided us with the chief medical officer's and medical staff members' typed notes, which included conclusions about the medical care its staff had provided to the incarcerated individuals as well as some recommendations. However, most of these

> reviews did not document whether the recommendations led to the department taking action, or whether the recommendations had been implemented. (p. 34)

The systemic failure in San Diego County's review of deaths among jail patients is an alarming deviation from the standard of care because it hampers or precludes learning form past errors to prevent future deaths.

Dr. Abrams makes several references to the dangers of outcome or hindsight bias. The essence of this kind of bias is that it is easier to look backwards with full information than it is to predict something in the moment without that information. This is not relevant to Mr. Rupard's case because the failures leading up to Mr. Rupard's death involve failures to look at information that the jail had at their disposal. Mr. Rupard had already been treated multiple times in the San Diego Jails and his decompensation was not an outcome that was a distant possibility, it had already occurred. Twice. On prior admissions to the jail, he had been mentally unstable and psychotic, and was transferred to an outside facility for medication. This was clearly documented when he was booked into December 19, 2021 but individual and systemic failure led to this information not being reviewed and/or acted on. After those relative successes, Mr. Rupard arrived in the jail in December 2021, and despite staff not being able to complete their work, he was instead was kept in a locked cell, never transferred to a higher level of care and he experienced nearly three months of physical and psychiatric decompensation. Similarly, staff knew that Mr. Rupard was in segregation but failed to do the required nursing and mental health rounds to monitor his health. The Liberty psychiatrist assumed (incorrectly) that Mr. Rupard was being monitored by mental health staff. Criticism of these failure does not amount to hindsight bias. These findings are well-founded critiques that the individual and systemic failures of the San Diego Sherrif's Department and Liberty Health jail failed to act in a manner that they had already twice seen the need for.

None of the defense reports mentioned the County's failure to conduct an adequate clinical mortality review for Mr. Rupard.

**Summary**

The expert reports submitted by the defense counsel regarding Mr. Rupard's death in the San Diego Jail contain some opinions with which I agree, and others with which I disagree and have provided rebuttal to. None of the information I have reviewed in the reports has changed my confidence in my core three findings;

<u>Finding #1: The San Diego Jail and their health staff failed to provide basic mental health care to Mr. Rupard.</u>

<u>Finding #2. Failure to provide basic medical care, including injury assessment/care and segregation rounds.</u>

Finding #3. The San Diego Jail failed to conduct a clinical mortality review after Mr. Rupard's death.

The failure of these reports to identify any systemic problems in the care provided to Mr. Rupard is alarming, and mirrors the failures of San Diego County and their vendor, Liberty Inc. to ensure that a vulnerable patient like Mr. Rupard receives timely and adequate health care. The notion that Mr. Rupard's death was an unfortunate but unavoidable outcome is incorrect. The Autopsy report of the Deputy Medical Examiner makes this abundantly clear. The death of Mr. Rupard resulted from a combination of individual and systemic failures including the failure to review his prior treatment with forced medication, the failure to coordinate between the various parts of the health services, the failure to track and expedite his psychiatric assessment including transfer to a higher level of care and the failure to conduct the mandated nursing and mental health rounds because he was being held in segregation/isolation conditions. These failures reflect gross departures from the correctional standard of care by the County of San Diego and their psychiatric provider, Liberty Inc..

Executed on this 4th of August, 2026 in Port Washington, New York.



Homer Venters, MD, MS

# EXHIBIT 39

Rebuttal Expert Report of Jackie Clark

**REBUTTAL EXPERT REPORT**

**Case:** Rupard v. County of San Diego

**Case Number:** 3:23-cv-01357-CAB-BLM

**Expert:** Jackie Clark

**Date:** August 1, 2026

## I. Assignment

I have been retained as a rebuttal witness by counsel representing Defendant Dr. Anthony Cruz in the matter involving the death of Mr. Lonnie Rupard. I have been asked to evaluate the care and treatment provided to Mr. Rupard by San Diego County Sheriff's Department nursing personnel and mental health clinicians during his incarceration as the basis of how the Nurse Expert Kathryn J. Wild formed her options and conclusions in this case.

My analysis is limited to the responsibilities and actions of nursing staff and mental health clinicians functioning within the Sheriff's Department. Specifically, I will evaluate whether the care provided by these disciplines met the applicable standards of nursing and mental health practice, as well as compliance with relevant Sheriff's Department policies, procedures, and accepted correctional health care practices.

## II. INTRODUCTION AND SUMMARY OF OPINIONS

This report is submitted in accordance with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. The opinions expressed herein are based upon my education, training, experience, and review of the materials identified in this report. I reserve the right to supplement or modify these opinions should additional records, testimony, or other discoverable information become available.

My opinions are based upon more than forty years of experience as a Registered Nurse in California, with extensive experience in correctional healthcare, correctional mental health, healthcare administration, and correctional healthcare policy development. Throughout my career, I have served in positions ranging from direct patient care in psychiatric facilities to nursing supervision, healthcare administration, and executive leadership. I was responsible for managing healthcare services within the largest jail systems in the United States, overseeing the delivery of medical and mental healthcare to an inmate population that exceeded 18,000 individuals, including more than 3,500 inmates diagnosed with serious mental illness.

In addition to my correctional leadership experience, I have served as a federal court monitor responsible for evaluating correctional healthcare systems operating under federal consent decrees. In those roles, I have evaluated compliance with correctional healthcare standards, developed healthcare policies and procedures, assessed access to medical and mental healthcare, and reviewed the adequacy of clinical care delivered to incarcerated individuals. Throughout my

career, I have trained and supervised nurses, physicians, psychiatrists, psychologists, and mental health clinicians regarding their professional responsibilities within a correctional environment.

One of the fundamental principles I have consistently emphasized is that correctional healthcare professionals serve as patient advocates. Although correctional facilities necessarily operate within a secure environment, the professional responsibilities of nurses, physicians, psychiatrists, and mental health clinicians remain unchanged. Healthcare staff have an independent obligation to recognize clinical deterioration, communicate significant findings, advocate for appropriate treatment, and escalate concerns through the appropriate clinical chain of command when a patient's condition continues to worsen or when existing treatment is ineffective. In my experience, high-quality correctional healthcare depends upon continuous communication and coordination among nursing staff, mental health clinicians, physicians, psychiatrists, and custody staff. Correctional healthcare cannot function effectively when each discipline operates independently.

After reviewing the records, depositions, policies, and expert reports in this matter, it is my opinion, to a reasonable degree of nursing certainty, that Mr. Rupard's death was not the result of a single isolated clinical decision. Rather, it resulted from a series of missed opportunities by multiple members of the correctional healthcare team to recognize, communicate, and respond to his progressive psychiatric deterioration over the course of his incarceration.

Most importantly, in my opinion, the greatest system failure in this case involved the lack of ongoing nursing and mental health monitoring during Mr. Rupard's prolonged confinement in administrative segregation. The purpose of routine clinical rounds in administrative segregation is not simply to satisfy a policy requirement. Such rounds exist because individuals housed in restrictive settings are at increased risk for medical and psychiatric deterioration and may be unable or unwilling to recognize their need for treatment or request medical attention. Routine nursing and mental health contacts are intended to identify clinical deterioration before it progresses to a medical or psychiatric emergency.

Mr. Rupard remained housed in administrative segregation for approximately eighty-nine days. During that period, there were repeated opportunities for nursing staff and mental health clinicians to observe his worsening condition, reassess his clinical status, communicate significant findings to the treating psychiatrist, and advocate for additional intervention. In my opinion, the failure to provide consistent nursing and mental health monitoring substantially reduced the likelihood that his deterioration would be recognized and appropriately treated in a timely manner.

The deposition testimony of Qualified Mental Health Professional Ms. Goodall further supports this opinion. Ms. Goodall testified that mental health contacts were primarily driven by inmate sick-call requests rather than regularly scheduled mental health rounds. In my professional opinion, such a reactive approach is inconsistent with accepted correctional mental health practice for inmates housed in restrictive settings, particularly those with known psychiatric illness. Individuals experiencing serious mental illness, psychosis, or significant cognitive impairment often lack the insight necessary to request care. Reliance solely upon inmate-initiated sick-call requests is therefore inadequate to identify progressive psychiatric deterioration.

Taken together, the records demonstrate a correctional healthcare system that failed to function as an integrated multidisciplinary team. Rather than recognizing patterns of deterioration over

time and communicating those observations among nursing, mental health, medical, psychiatric, and custody staff, each encounter was treated largely as an isolated event. In my opinion, the applicable correctional standard of care required continuous assessment, effective interdisciplinary communication, timely reassessment, and appropriate escalation of clinical concerns. Those standards were not met in Mr. Rupard's case, resulting in repeated missed opportunities to identify and respond to his progressive psychiatric deterioration.

## III. Materials Reviewed

In preparation for formulating the opinions expressed in this report, I reviewed records and materials provided to me by counsel, including, but not limited to, the following:

- Expert report of Dr. Homer Venter.
- Expert report of Dr. Daphne Glindmeyer
- Expert report of Mr. Raney (Correctional Expert)
- Expert report of Katherine J. Wild, R.N. (Nursing Expert).
- Expert report of Mr. Paul Cappitelli (Correctional Practices Expert).
- Expert report of DNP Dr. Lori Rosce.( Provider and Nurse Expert)
- Report of Dr. Beth Ann Schaber, San Diego County Medical Examiner.
- Deposition testimony of Dr. Anthony Cruz.
- Deposition testimony of Dr. Nicholas Badre.
- Deposition testimony of Dr. Francis Ysla.
- Deposition testimony of Dr. Sandeep Jouhal
- Deposition testimony of Dr. Jon Montgomery
- Deposition testimony of Goodall (San Diego County Mental Health Professional)
- Deposition testimony of Dr. Rebecca Kloker

  .
- San Diego County Sheriff's Department Medical Division Medical and Psychiatric Services Operations Manual (Bates Nos. 006128–006241), including policies and procedures pertaining to the Psychiatric Services Unit (PSU) and Stabilization Unit. Medical records, mental health records, custody records, investigative materials, and other discovery documents produced in this matter.

I also reviewed other records and materials that I considered relevant in forming my opinions. The materials identified above are representative of the documents reviewed and are not intended to be an exhaustive list of every record considered.

## IV. Summary of Plaintiff's Opinions

.

## V. Rebuttal Opinions

### Opinion No. 1

The National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails, Section J-E-02, *Receiving Screening*, states that receiving screening shall be performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are identified and addressed. The standard is intended to fulfill four purposes: 1. To identify and meet any urgent health needs of those admitted. 2. To identify and meet any known or readily identifiable health needs that require medical intervention before the comprehensive health assessment.3. To identify and isolate any inmate who appears potentially contagious. 4.To appropriately obtain a medical clearance when necessary.

The California Code of Regulations, Title 15, Minimum Standards for Local Detention Facilities, Division 1, Chapter 1, Subchapter 4, Section 1207, *Medical Screening*, states that the screening shall be conducted in accordance with written procedures and shall include, but not be limited to, medical and mental health problems, developmental disabilities, and communicable diseases, including, but not limited to, tuberculosis and other airborne diseases.

The screening shall be performed by licensed health care personnel or trained facility staff. Nursing care provided during the intake process shall meet applicable correctional nursing standards.

**Opinion No. 1 Rebuttal**

In reviewing the intake documentation, I noted that the nurse documented that Mr. Rupard was willing to sign the intake consent but was unable to do so. This documentation is clinically significant and raises an important question regarding the reason for his inability to sign the consent. The record does not explain why he was unable to sign the consent form or whether this was due to altered mental status, cognitive impairment, psychosis, emotional distress, intoxication, physical limitations, or another clinical condition. Such a finding should have prompted additional nursing assessment, documentation, and communication, as it may have reflected an abnormal clinical presentation requiring further evaluation.

Additionally, the intake documentation reflects that Mr. Rupard had a pulse of 110 beats per minute at the time of booking, which is consistent with tachycardia. An elevated heart rate may be associated with a variety of underlying conditions, including physiological stress, anxiety, intoxication, withdrawal, dehydration, pain, infection, or an evolving medical or psychiatric condition. The accepted correctional nursing standard of care requires that abnormal vital signs be reassessed to determine whether the abnormality persists, improves, or worsens and to guide appropriate clinical decision-making. I found no documentation that Mr. Rupard's elevated pulse was repeated or reassessed during the intake process. The absence of a repeat assessment represents a missed opportunity to further evaluate his clinical condition and determine whether additional medical evaluation, monitoring, or intervention was warranted.

**Opinion No. 2 Medication Management**

According to the nurse expert retained by the County of San Diego, the National Commission on Correctional Health Care (NCCHC) standards require that medication services provide medications in a timely, safe, and sufficient manner. The expert further states that medications are provided only pursuant to an order from a physician, dentist, or other legally authorized healthcare provider.

The nurse expert opines that following Dr. Cruz's psychiatric evaluation on December 29, 2021, psychotropic medications were prescribed for Mr. Rupard. The expert states that nursing staff repeatedly offered the prescribed medications and that the medications continued to be offered through January 20, 2022, which was the date the psychiatrist discontinued the medications.

**Rebuttal to Opinion No. 2 – Medication Management**

I disagree with the conclusion that the medication management provided to Mr. Rupard fully met the accepted correctional nursing standard of care.

The record shows that psychotropic medications were ordered for Mr. Rupard twice daily following Dr. Cruz's psychiatric evaluation. While the nurse expert states that nursing staff repeatedly offered the medications through January 20, 2022, the medical record raises concerns regarding the accuracy and completeness of the medication refusal documentation.

Mr. Rupard was then evaluated again by Dr. Cruz on February 22, 2022.

The health record contains multiple medication refusal forms; however, the refusal forms reviewed do not contain Mr. Rupard's signature acknowledging refusal of the medications. According to Dr. Venter's expert report, there were 33 medication refusal forms documented in Mr. Rupard's medical record, none of which were signed by Mr. Rupard. Additionally, 11 refusal forms were missing from the record. As a result, it is unclear whether Mr. Rupard refused the medications on those dates or whether the medications were not offered and appropriately documented.

The absence of patient signatures on the refusal documentation, combined with missing refusal forms, raises concerns regarding whether nursing staff followed established medication administration and refusal documentation policies. Accurate documentation of medication refusals is essential in a correctional setting, particularly when a patient is prescribed psychiatric medications and repeatedly refuses treatment.

Furthermore, accepted correctional healthcare practices, including NCCHC standards, recognize the importance of additional clinical follow-up when a patient repeatedly refuses prescribed medications. When a patient refuses psychiatric medications over multiple days, nursing staff should not simply continue documenting refusals; rather, the pattern of refusal should be communicated to the appropriate provider and a referral or clinical reassessment should be initiated to determine the reason for refusal and whether intervention is needed.

In this case, nursing documentation reflects continued refusals and requests that Dr. Cruz discontinue the medications. However, the record does not demonstrate that nursing staff initiated an appropriate clinical referral to evaluate the ongoing medication refusals or assessed whether Mr. Rupard's refusal represented a change in his psychiatric condition.

Additionally, the nursing documentation does not identify any observed decompensation, increased agitation, aggression, or behavioral changes from Mr. Rupard's presentation at intake. However, the absence of documented behavioral changes does not eliminate the need for appropriate nursing follow-up when a patient repeatedly refuses prescribed psychiatric medications.

In my opinion, the issue is not whether nursing staff had a valid medication order or whether medications were initially prescribed. The issue is whether nursing staff appropriately monitored, documented, escalated, and responded to repeated psychiatric medication refusals in accordance with accepted correctional nursing practice.

**Opinion No. 3 – Qualified Mental Health Professional Evaluation**

According to the nurse expert retained by the County of San Diego, the County's nurses and qualified mental health professionals acted within the appropriate standard of care and within the scope of their professional responsibilities.

The nurse expert opines that on February 9, 2022, a mental health evaluation was performed by qualified mental health clinician Christina Anosike. The expert states that Ms. Anosike made an appropriate attempt to evaluate Mr. Rupard despite his refusal and inability to meaningfully participate in the assessment.

The expert further states that Ms. Anosike documented her direct observations of Mr. Rupard's appearance, grooming, behavior, speech, and the environmental conditions of his cell. The expert notes that Ms. Anosike obtained collateral information from custody staff, including reports that Mr. Rupard participated in life-preserving activities, had not engaged in self-injurious behavior, and had not demonstrated behaviors suggesting an imminent danger to himself or others.

The expert further notes that Ms. Anosike documented that Mr. Rupard's food tray was empty, his cell was relatively clean, and there were no environmental conditions suggesting severe neglect.

The nursing expert concludes that the inability to complete a comprehensive mental health assessment was due to Mr. Rupard's refusal and inability to cooperate rather than a failure by the County's qualified mental health professional.

**Rebuttal to Opinion No. 3 – Qualified Mental Health Professional Evaluation**

I disagree with the conclusion that the qualified mental health professional fully met the expected standard of care based solely on the fact that an attempt was made to evaluate Mr. Rupard and that collateral information was obtained.

In correctional mental health settings, qualified mental health professionals provide most of the day to day direct mental health services to the incarcerated population. Depending on their licensure and credentials, qualified mental health professionals, including licensed clinical social workers, marriage and family therapists, and psychologists, are responsible for conducting clinical assessments, providing individual counseling and therapeutic interventions, developing treatment plans, identifying changes in mental health status, and making recommendations regarding the ongoing course of mental health care. Psychiatrists in correctional settings primarily provide psychiatric evaluation and medication management; however, effective mental health treatment requires communication and collaboration between the qualified mental health professional and the psychiatric provider.

In Mr. Rupard's case, the record reflects that he was not engaging with the mental health clinician and that he had remained in the Administrative Segregation Unit (ASU) for approximately one month with continued inability or unwillingness to participate in a meaningful mental health assessment. While the clinician appropriately documented her observations and obtained collateral information from custody staff, the ongoing lack of engagement itself was clinically significant and warranted additional intervention.

When a patient is unable or unwilling to participate in mental health services over an extended period, the qualified mental health professional has an obligation to communicate those concerns to the treating psychiatrist and collaborate regarding the patient's ongoing care, risk assessment, and treatment approach. The record does not demonstrate that Ms. Anosike communicated Mr. Rupard's continued lack of engagement, prolonged ASU placement, or inability to complete a meaningful assessment to Dr. Cruz.

The issue is not whether Mr. Rupard had the right to refuse participation or whether the clinician should have forced an assessment that the patient would not complete. Rather, the issue is whether the qualified mental health professional Ms. Goodall appropriately responded to the clinical circumstances presented, including the prolonged inability to assess the patient, by escalating concerns, collaborating with the psychiatric provider, and developing an appropriate plan for continued mental health care. In The deposition testimony of Qualified Mental Health Professional (QMHP) Ms. Goodall further supports my opinions regarding the deficiencies in the mental health care provided to Mr. Rupard. Ms. Goodall testified that there was no established practice of conducting routine or regularly scheduled mental health contacts with inmates housed in administrative segregation or other restrictive housing. Instead, mental health encounters were primarily driven by inmate sick call requests. Such a reactive approach fails to recognize that individuals with serious mental illness, impaired judgment, psychosis, or cognitive deterioration may be incapable of recognizing their need for treatment or initiating a request for care. Reliance solely on sick call requests is therefore inadequate for identifying clinically deteriorating patients in restrictive housing.

Ms. Goodall also testified that she served as the gatekeeper for referrals to psychiatry and was responsible for determining when patients should be referred for psychiatric evaluation, including those who appeared gravely disabled. Despite serving in this critical role, she testified that she could not recall reviewing Mr. Rupard's prior incarceration records or previous medical or mental health records before conducting her only encounter with him, which lasted approximately five to ten minutes. Without reviewing the available historical information, it would have been difficult to appreciate patterns of chronic mental illness, prior psychiatric treatment, previous episodes of decompensation, or other clinically significant information necessary to perform a comprehensive mental health assessment and determine the need for psychiatric intervention.

When considered together with the repeated observations documented by custody staff, nursing personnel, and other clinicians, this testimony further demonstrates that Mr. Rupard's deteriorating mental condition was not evaluated through a comprehensive, longitudinal clinical process. Rather than integrating available historical information with the numerous contemporaneous observations of worsening psychiatric symptoms, the mental health response remained fragmented and episodic. In my opinion, this represented a significant departure from accepted correctional mental health practice and contributed to the failure to recognize the

severity of Mr. Rupard's psychiatric deterioration and the need for timely psychiatric intervention.

In my opinion, the absence of documented communication with the psychiatrist and the lack of a coordinated treatment approach represent a gap in the expected standard of correctional mental health practice.

**Opinion No. 4 – Psychiatric Treatment Decisions**

According to the nurse expert retained by the County of San Diego, many of the allegations contained in the complaint involve psychiatric treatment decisions that were outside the scope of practice of both the nursing staff and the County's qualified mental health professionals.

The nurse expert opines that the medical record and the deposition testimony of Dr. Anthony Cruz establish that Dr. Cruz was solely responsible for developing Mr. Rupard's psychiatric treatment plan. The expert states that Dr. Cruz independently evaluated Mr. Rupard, prescribed psychotropic medications, later discontinued those medications after reviewing the documented medication refusals, determined whether Mr. Rupard met the criteria for placement in the Psychiatric Stabilization Unit, and remained responsible for determining whether involuntary psychiatric treatment or other psychiatric interventions were indicated.

The nurse expert further states that this allocation of responsibility is consistent with the deposition testimony of Chief Medical Officer Dr. John Montgomery, who testified that mental health services operated under separate mental health leadership and that psychiatric treatment decisions remained the responsibility of the treating psychiatrist rather than the Sheriff's Department staff.

**Rebuttal to Opinion No. 4 – Psychiatric Treatment Decisions**

I agree that the treating psychiatrist is ultimately responsible for psychiatric diagnoses, prescribing psychotropic medications, determining whether medications should be continued or discontinued, and making decisions regarding involuntary treatment or placement in a psychiatric stabilization unit. However, I disagree with the implication that these responsibilities relieve nursing staff and qualified mental health professionals of their own independent clinical responsibilities.

Correctional mental health care is delivered through a multidisciplinary team approach. The psychiatrist is one member of that team and relies on qualified mental health professionals and nursing staff to provide ongoing assessment, monitoring, treatment, and communication regarding the patient's clinical status. In California correctional facilities, nursing staff provide healthcare services twenty-four hours a day, while qualified mental health professionals serve as the primary mental health clinicians responsible for conducting assessments, providing individual and group therapy, crisis intervention, crisis management, developing treatment plans, monitoring patients' clinical progress, and communicating significant findings to the treating psychiatrist.

It is neither realistic nor consistent with accepted correctional mental health practice to conclude that the psychiatrist alone is responsible for all aspects of a patient's mental health care. In many county jail systems, including this case, there is a single psychiatrist responsible for the psychiatric care of a large inmate population. The psychiatrist necessarily depends upon timely and accurate communication from nursing staff and qualified mental health professionals regarding changes in a patient's condition, repeated medication refusals, lack of engagement in treatment, behavioral deterioration, functional decline, or other clinically significant concerns that may warrant reassessment or modification of the treatment plan.

Mr. Rupard had been housed in the Administrative Segregation Unit for an extended period and had demonstrated an ongoing inability or unwillingness to engage in meaningful mental health treatment. Under these circumstances, nursing staff and qualified mental health professionals had an independent responsibility to continue monitoring his condition, document clinically significant observations, communicate concerns to the treating psychiatrist, and advocate for reassessment when indicated. Those responsibilities are not delegated exclusively to the psychiatrist.

Furthermore, patients housed in administrative segregation require structured and ongoing clinical monitoring. Nursing staff were expected to conduct regular health assessments, and qualified mental health professionals were expected to conduct routine mental health contacts consistent with facility policy and accepted correctional mental health practice. The record does not demonstrate that these ongoing clinical responsibilities were consistently fulfilled or that clinically significant concerns were effectively communicated to Dr. Cruz to assist him in making informed psychiatric treatment decisions.

In my opinion, while Dr. Cruz remained responsible for the ultimate psychiatric treatment decisions, the quality of those decisions depended upon the timely assessment, documentation, collaboration, and communication provided by the multidisciplinary treatment team. The record demonstrates deficiencies in that collaborative process, which contributed to gaps in Mr. Rupard's ongoing mental health care.

**Opinion No. 5 – Nursing Assessment Following the January 29, 2022, Use of Force Incident**

According to the nurse expert retained by the County of San Diego, the nursing care provided by Registered Nurse Carrie Romo following the January 29, 2022, use of force incident met the accepted correctional nursing standard of care.

The nurse expert opines that RN Romo appropriately responded to evaluate Mr. Rupard following the reported use of force and attempted to assess his condition. The expert notes that RN Romo documented observable facial injuries and further documented that Mr. Rupard repeatedly threatened to kill her if she attempted to continue the assessment. The expert concludes that, under those circumstances, terminating the examination for personal safety was both reasonable and consistent with accepted correctional nursing practice. The expert further states that correctional nurses are not required to place themselves at unreasonable risk of physical harm in order to complete an assessment when an incarcerated individual refuses care or threatens violence.

**Rebuttal to Opinion No. 5 – Nursing Assessment Following the January 29, 2022, Use of Force Incident**

I agree that correctional nurses are not required to place themselves in situations that present an unreasonable risk of physical harm. The personal safety of healthcare staff is an important consideration and, if a patient is actively threatening with violence, it is appropriate for the nurse to discontinue the immediate hands-on assessment until it can be performed safely.

However, the termination of the initial assessment does not end the nurse's professional responsibility. Accepted correctional nursing practice requires that when an assessment cannot be completed because of safety concerns, reasonable steps should be taken to ensure that the patient receives a timely medical evaluation once it is safe to do so.

In this case, Mr. Rupard had been involved in a use-of-force incident and RN Romo documented observable facial injuries. Although the record reflects that the assessment was discontinued after Mr. Rupard reportedly threatened the nurse, there is no documentation that a subsequent hands-on nursing assessment was attempted once the immediate safety concerns had been resolved. Likewise, there is no documentation that the need for a follow-up assessment was communicated to the oncoming nursing shift or referred to another nurse or qualified mental health professional for continued evaluation.

Patients involved in a use-of-force incident require appropriate medical follow-up to assess for injuries that may not be apparent from visual observation alone. A visual assessment from outside the cell is not a substitute for a complete nursing assessment when one can be safely performed. If the initial assessment is interrupted because of safety concerns, the nurse should document the need for reassessment and ensure continuity of care through communication with other members of the healthcare team.

In my opinion, the issue is not whether RN Romo appropriately protected her personal safety. I agree that she should not have been expected to place herself at risk. Rather, the issue is whether appropriate measures were taken to ensure that Mr. Rupard received a timely follow-up medical assessment after the immediate threat had passed. The record does not demonstrate that such follow-up occurred or that responsibility for the assessment was communicated to another healthcare provider. In my opinion, this represents a departure from accepted correctional nursing practice and continuity of care.

**Opinion No. 6 – Segregation Monitoring**

According to the nurse expert retained by the County of San Diego, the plaintiff alleges that nursing staff and qualified mental health professionals failed to perform the required segregation wellness checks.

The nurse expert states that the San Diego Sheriff's Department policy requires periodic nursing and qualified mental health professional wellness checks for incarcerated individuals who have been classified and entered into the administrative segregation monitoring process. Based upon the records reviewed, including the deposition testimony of Director of Nursing Serena Hood, the expert opines that Mr. Rupard was never formally classified as an administrative segregation inmate. Consequently, he was never entered into the electronic workflow that automatically generated the required nursing and qualified mental health wellness checks.

The nurse expert concludes that because Mr. Rupard was never classified as an administrative segregation inmate, he was not entered into the electronic workflow responsible for scheduling the required nursing and qualified mental health wellness checks.

Also, there is the report from Correctional Expert Cappellti opines that custody staff bear no responsibility for Mr. Rupard's death because they are not mental health clinicians and were allegedly unaware of his psychiatric diagnosis.

I disagree with that conclusion. This opinion conflates the responsibility to diagnose or treat a medical or psychiatric condition with the separate and well-established responsibility of correctional staff to recognize obvious signs of inmate deterioration and to promptly notify appropriate medical or mental health personnel.

Custody staff assigned to administrative segregation are required to conduct routine welfare and safety checks. These checks are not performed solely to verify that an inmate is alive; they are intended to identify conditions that threaten the inmate's health, safety, or well-being and to ensure that appropriate action is taken when concerning observations are made. This responsibility exists regardless of whether an inmate carries a mental health diagnosis.

According to the available records, Mr. Rupard remained housed in administrative segregation for approximately three months. An additional concern is the explanation provided for the absence of nursing assessments during the approximately three months the decedent was housed in the administrative segregation unit. I understand that facility personnel indicated that the decedent was not identified in the jail's tracking system as an administrative segregation inmate and that, consequently, nursing staff were not aware that he was subject to the monitoring requirements associated with that housing status. I do not find this explanation sufficient to account for the absence of documented nursing assessment. Regardless of whether the decedent was appropriately identified in the electronic tracking system, he was physically housed in the administrative segregation unit and therefore was readily identifiable as an individual requiring observation while in that setting. Moreover, the facility's explanation that the decedent was housed in this unit for medical isolation rather than for a disciplinary or custody-related reason raises an additional clinical concern. If the decedent was placed in isolation because of COVID, or some other medical related concerns, his placement for a purported medical or infectious-disease-related reason would not eliminate the need for health-care observation; rather, it would reasonably heighten the importance of appropriate clinical monitoring. At a minimum, the circumstances should have prompted nursing staff to identify the reason for his placement, assess his clinical status, and document appropriate observations, including vital signs and other relevant assessments consistent with his clinical circumstances.

The available record does not demonstrate that these assessments occurred on a consistent basis during the approximately three-month period. Consequently, there was little objective clinical information available to the health care team regarding the decedent's physical condition during this period. This is particularly significant in retrospect given the reported concerns regarding nutrition, possible weight loss, and the eventual findings of dehydration and pneumonia at death. Regular nursing observation and assessment could have provided opportunities to identify changes in physical condition, nutritional status, hydration, respiratory status, or other signs of deterioration and to communicate those findings to the appropriate medical or mental health provider.

In my opinion, the absence of the decedent's name from an electronic tracking system should not, by itself, be viewed as an adequate explanation for the absence of clinical assessment when the individual was physically present in a restricted housing or isolation unit. The failure to identify, assess, and document the patient's clinical status represents a missed opportunity for the health care system to recognize deterioration and initiate appropriate evaluation or escalation of care. Rather, they would have evolved over time and would have been readily observable by deputies conducting the required welfare and safety checks.

The significance of these observations does not depend upon a deputy's knowledge of psychiatric diagnoses. Any reasonable correctional officer performing routine welfare checks would recognize that an inmate who is living in such conditions, appears to be physically deteriorating, and is failing to maintain even minimal personal hygiene requires immediate referral to medical and/or mental health staff. Deputies are not expected to diagnose the underlying cause of the deterioration; they are expected to recognize obvious indicators that an inmate's health or safety may be at risk and to notify qualified healthcare personnel for evaluation.

California Title 15 and generally accepted correctional practices establish that custody staff have an affirmative responsibility to communicate significant changes in an inmate's physical condition, behavior, or living environment to healthcare staff. This communication is an essential component of the correctional system's multidisciplinary approach to inmate care. The obligation to report obvious signs of deterioration exists independently of any clinical training and does not require knowledge of an inmate's specific diagnosis.

In my opinion, the issue is not whether deputies should have recognized the symptoms of a particular psychiatric illness. Rather, the issue is whether repeated welfare and safety checks should have resulted in timely notification to medical or mental health staff after deputies observed—or reasonably should have observed—Mr. Rupard's progressively deteriorating physical condition and the increasingly hazardous condition of his cell. Based on the information I have reviewed, there were multiple objectively observable indicators that warranted referral and intervention well before Mr. Rupard was found unresponsive.

Accordingly, I disagree with the correctional expert's conclusion that custody staff had no responsibility because they lacked mental health training or knowledge of Mr. Rupard's diagnosis. Their responsibility arose not from an obligation to provide clinical care, but from their duty to observe, report, and initiate appropriate referral when confronted with obvious signs that an inmate's health and safety were at serious risk.

The correctional expert further states that custody staff "**do not track or monitor any medical or mental health issues for incarcerated individuals**". While deputies are not responsible for monitoring an inmate's clinical treatment or making medical or psychiatric decisions, they are unquestionably responsible for monitoring the welfare and safety of inmates assigned to their care. This distinction is significant. Routine welfare and safety checks are a fundamental correctional function designed to ensure that inmates are alive, safe, and not exhibiting obvious signs of illness, injury, distress, or deterioration requiring intervention. These checks require deputies to observe the inmate's appearance, behavior, responsiveness, and living conditions

and, when concerning conditions are identified, to promptly notify medical or mental health staff for evaluation.

An inmate's obvious physical deterioration, inability to maintain basic hygiene, significant changes in appearance or functioning, or the presence of grossly unsanitary living conditions are not clinical diagnoses—they are objective observations that any reasonable correctional officer can recognize. Deputies are not expected to determine the underlying medical or psychiatric cause of these observations. Their responsibility is to recognize that the inmate's welfare may be compromised and to initiate the appropriate referral to qualified healthcare professionals.

In Mr. Rupard's case, the documented conditions of his confinement—including his profound weight loss, apparent inability to care for himself, and the severely unsanitary condition of his cell—were matters directly related to inmate welfare and institutional safety. These were objectively observable conditions that fell squarely within the scope of routine welfare and safety checks conducted by custody staff. In my opinion, these observations should have prompted timely notification to medical and mental health personnel, regardless of whether deputies had knowledge of Mr. Rupard's psychiatric history or clinical diagnosis.

The responsibility of custody staff is not limited to maintaining security. Modern correctional practice recognizes that deputies serve as the front-line observers of inmate welfare because they have the most frequent and consistent contact with incarcerated individuals. They are often the first to observe significant changes in an inmate's physical condition, behavior, hygiene, or living environment. Their responsibility is not to diagnose illness or determine an inmate's level of clinical care, but rather to recognize objectively observable signs that an inmate's health or safety may be compromised and to communicate those observations without delay to qualified healthcare professionals for assessment.

This distinction is central to my disagreement with the correctional expert's opinion. The issue is not whether deputies should have diagnosed Mr. Rupard's psychiatric illness or understood the medical significance of his symptoms. Rather, the issue is whether deputies fulfilled their independent correctional duty to conduct meaningful welfare and safety checks and to report the obvious and progressive deterioration in Mr. Rupard's condition. In my opinion, the deputies' responsibility to observe, document, and report serious concerns existed independently of any knowledge of Mr. Rupard's diagnosis and independently of the medical staff's responsibility to evaluate and treat him. The correctional standard of care requires both systems—custody and healthcare—to perform their respective roles, and the failure of one does not excuse the failure of the other.

**Rebuttal to Opinion No. 6 – Segregation Monitoring**

I disagree with the conclusion that the absence of a formal administrative segregation classification relieved nursing staff and qualified mental health professionals of their responsibility to provide ongoing clinical monitoring.

Whether Mr. Rupard was formally entered into the Sheriff's Department's electronic administrative segregation workflow is an administrative issue and does not determine the applicable clinical standard of care. The relevant issue is that Mr. Rupard was housed under

conditions consistent with administrative segregation. He remained confined to his cell for the vast majority of each day, had limited out-of-cell time, and during his incarceration received disciplinary sanctions that further support his placement in a restrictive housing environment.

Accepted correctional healthcare practice recognizes that individuals housed in administrative segregation or similarly restrictive housing require enhanced medical and mental health monitoring because prolonged isolation may adversely affect both physical and psychological well-being. The responsibility to provide those assessments is based on the patient's housing conditions and clinical needs, not solely on whether an electronic workflow has been activated.

Under accepted correctional nursing practice, nursing staff are expected to conduct regular wellness rounds for patients housed in administrative segregation, generally no less than three times per week, documenting the patient's physical condition, mental status, behavior, appearance, and the condition of the cell, while identifying any changes that require additional medical or mental health evaluation.

Similarly, qualified mental health professionals are expected to conduct routine mental health contacts, generally at least weekly, documenting the patient's mental status, level of functioning, response to confinement, and any evidence of psychiatric deterioration or decompensation. When clinically significant findings are identified, those concerns should be promptly communicated to the appropriate medical or psychiatric provider for further evaluation and intervention.

The fact that Mr. Rupard may not have been formally entered into an electronic administrative segregation monitoring system does not eliminate these professional responsibilities. Healthcare staff have an independent obligation to recognize patients housed in restrictive settings, ensure that required clinical assessments are completed, and communicate concerns through the multidisciplinary treatment team.

In my opinion, reliance on an administrative or electronic classification process does not excuse the failure to provide the level of nursing and mental health monitoring expected for a patient who was, in practice, housed under administrative segregation conditions. The standard of care is determined by the patient's clinical circumstances and housing environment, not by whether the patient was entered into an automated scheduling system.

**Opinion No. 7 – Weight Loss and Nutritional Decline**

According to the nurse expert retained by the County of San Diego, the plaintiff alleges that nursing staff failed to recognize Mr. Rupard's progressive weight loss and deteriorating nutritional status.

The nurse expert opines that, following the intake assessment, nursing encounters with Mr. Rupard were limited and consisted primarily of medication administration attempts, psychiatric support documentation, January 29, 2022, post-use-of-force assessment, and routine nursing documentation.

The expert further states that the nursing records do not document repeated meal refusals, a declared hunger strike, or that Mr. Rupard met the criteria for initiation of the facility's hunger strike protocol. The expert notes that Dr. Cruz testified he observed empty food trays in Mr. Rupard's cell and confirmed with custody staff that Mr. Rupard was consuming at least some of

his meals. Similarly, the February 9, 2022, qualified mental health professional evaluation documented empty food trays within Mr. Rupard's cell.

The nurse expert concludes that there is no documentation indicating that nursing staff observed a progressive inability to ambulate, an inability to obtain food or water, or other findings that would have alerted nursing staff to progressive weight loss or nutritional decline prior to Mr. Rupard's death, despite the plaintiff's allegation that he experienced significant weight loss before his death.

**Rebuttal to Opinion No. 7 – Weight Loss and Nutritional Decline**

I disagree with the conclusion that nursing staff met the applicable standard of care with respect to recognizing and responding to Mr. Rupard's progressive weight loss and nutritional decline.

The absence of documentation that Mr. Rupard repeatedly refused meals or formally declared a hunger strike does not establish that he was receiving adequate nutrition or that his nutritional status was being appropriately monitored. Likewise, observations of empty food trays or reports from custody staff that he consumed portions of his meals are not substitutes for ongoing clinical nursing assessment.

The record reflects that Mr. Rupard remained housed in a restrictive environment for a prolonged period. Throughout that time, there is little evidence that nursing staff performed meaningful, hands-on clinical assessments to evaluate his physical condition, hydration status, nutritional intake, weight, or overall medical condition. There is no documented evidence that serial weights were obtained, vital signs were routinely reassessed, hydration was evaluated, or that a comprehensive nursing assessment was performed to determine whether his physical condition was changing over time.

The County's position is inconsistent. On one hand, it asserts that Mr. Rupard was not formally housed in administrative segregation and therefore was not subject to the required segregation monitoring process. On the other hand, the record reflects that he remained confined under highly restrictive conditions that substantially limited his movement and clinical access. If the County contends that his housing status was based upon medical or other clinical considerations rather than administrative segregation, then the need for ongoing nursing and mental health assessments becomes even more critical. Regardless of the terminology used to describe his housing assignment, his prolonged confinement required routine clinical nursing and QMHP monitoring.

The record further suggests that much of the interaction with Mr. Rupard occurred through the food port of his cell. While there are circumstances in which this may be appropriate for brief encounters or when immediate safety concerns exist, it is not an adequate substitute for periodic comprehensive nursing assessments of a patient who had been confined under restrictive conditions for an extended period. There is no documentation that meaningful efforts were made to conduct a complete medical assessment in a controlled environment, including obtaining vital signs, measuring weight, assessing hydration and nutritional status, or evaluating his overall physical condition. When security concerns exist, correctional facilities routinely employ procedures that allow patients to be safely removed from their cells, including the assistance of trained custody staff, so that necessary medical evaluations can be completed. The record does not demonstrate that these alternatives were utilized.

Correctional nurses and qualified mental health professionals have an ongoing responsibility to assess, monitor, document, and communicate changes in a patient's clinical condition. That responsibility does not cease because a patient is housed in a restrictive setting or presents behavioral challenges. Patients confined under these circumstances often require closer clinical observation, not less.

In my opinion, the available medical record demonstrates missed opportunities to perform appropriate clinical assessments, monitor Mr. Rupard's nutritional and physical status, recognize evidence of deterioration, and communicate those findings to the treating providers. These omissions represent departures from accepted correctional nursing and correctional mental health practice.

**Nurse expert conclusion:**

The nursing expert concluded that the nursing staff and qualified mental health professionals met the applicable correctional standard of care. She stated that the actions of individual clinicians should be evaluated based on the information reasonably available to them at the time of each encounter and that retrospective review should not assign responsibility based on information obtained after Mr. Rupard's death. The nurse expert opined that correctional healthcare encounters should be evaluated within the context of each provider's individual role and scope of practice. She concluded that nursing staff appropriately identified psychiatric concerns, initiated referrals, and implemented physician orders. She further concluded that the qualified mental health professional appropriately attempted to evaluate Mr. Rupard, documented observations, obtained collateral information, assessed for acute safety concerns, and communicated through the established correctional mental health process.

The nurse expert characterized Mr. Rupard as suffering from a chronic psychotic illness involving repeated refusal of medications, refusal of psychiatric evaluations, and limited participation in healthcare encounters. She concluded that these behaviors did not demonstrate that nursing staff or qualified mental health professionals failed to provide care consistent with applicable correctional health standards.

The nurse expert further opined that decisions regarding psychiatric treatment, voluntary treatment proceedings, or psychotropic medication management were physician-level psychiatric issues outside the scope of her nursing opinion. She stated that the record did not demonstrate that different psychiatric treatment decisions or medication management would have altered Mr. Rupard's ultimate outcome.

The nurse expert emphasized that the appropriate analysis should focus on what information was reasonably available to each nurse and mental health professional at the time of their respective encounters and whether those individuals acted reasonably within their respective scopes of practice. Based upon her review of the record, she concluded that there was no evidence that the Sheriff's Department nursing staff or county qualified mental health professionals failed to meet the applicable correctional health standard of care.

The nurse expert also concludes that there is no evidence that different psychiatric treatment decisions or medication management would have altered the outcome. That conclusion extends beyond the scope of a nursing standard-of-care opinion and enters the realm of medical causation

and psychiatric decision-making. My opinions are limited to whether the nursing care and the correctional health system complied with accepted correctional nursing standards.

Although nurses appropriately documented certain encounters and submitted referrals, documentation alone does not establish that the standard of care was met. The critical issue is whether the repeated indicators of psychiatric deterioration prompted appropriate escalation, effective communication with psychiatric providers, ongoing reassessment, and advocacy for interventions commensurate with Mr. Rupard's worsening clinical condition. In my opinion, the record demonstrates missed opportunities for earlier recognition of clinical deterioration and more effective interdisciplinary intervention.

The nurse expert's analysis also fails to recognize the collaborative nature of correctional healthcare. Correctional psychiatrists do not personally evaluate every patient daily. Rather, they appropriately rely upon nursing staff, qualified mental health professionals, and custody staff who have substantially greater day-to-day contact with patients to monitor the patient's condition and communicate clinically significant changes requiring physician attention. This interdisciplinary model is a fundamental component of correctional healthcare and is essential to ensuring continuity of care.

Based upon the records I reviewed, Dr. Cruz evaluated Mr. Rupard and thereafter appropriately relied upon the established monitoring process within the facility. It was reasonable for Dr. Cruz to expect that nursing staff and mental health clinicians, who were routinely evaluating Mr. Rupard, along with custody staff conducting regular welfare checks while he was housed in administrative segregation, would communicate any significant deterioration in his psychiatric or medical condition requiring additional physician evaluation. Physicians practicing in correctional settings must necessarily rely upon this multidisciplinary system of communication to ensure that emerging clinical concerns are promptly identified and addressed.

The record reflects that nursing staff notified Dr. Cruz that Mr. Rupard was refusing his psychotropic medications and requested that those medications be discontinued. However, I found no comparable communication advising Dr. Cruz that Mr. Rupard was exhibiting progressive psychiatric and medical deterioration, persistent refusal of food and fluids creating a significant risk of dehydration or malnutrition, or other clinical findings indicating that his condition had deteriorated to the point that urgent psychiatric reassessment was necessary. Had those concerns been recognized and communicated, they would have provided the treating psychiatrist with additional clinical information upon which to determine whether further evaluation or intervention was warranted.

Importantly, a patient's refusal of antipsychotic medication, standing alone, does not inevitably result in life-threatening starvation or dehydration. Many individuals suffering from chronic psychotic illnesses refuse psychotropic medications yet continue to maintain adequate nutrition, hydration, and basic functioning despite persistent psychotic symptoms. Medication refusal, by itself, is therefore not synonymous with imminent medical collapse. Rather, it is the responsibility of the multidisciplinary treatment team to recognize when a patient's condition is

progressively deteriorating beyond medication refusal alone and to promptly communicate those significant clinical changes to the treating psychiatrist.

Finally, I disagree with the suggestion that this case cannot be evaluated by considering the cumulative information available over time. Correctional nursing practice depends upon continuity of care and review of the patient's longitudinal clinical course. Nurses are expected to review and incorporate information already available in the medical record, including prior nursing assessments, psychiatric evaluations, medication refusals, mental health referrals, behavioral observations, housing status, and the patient's overall clinical trajectory. Evaluating the progression of Mr. Rupard's illness over time is not hindsight bias; rather, it reflects the process by which competent correctional clinicians are expected to assess risk, recognize patterns of deterioration, communicate significant findings, monitor the effectiveness of existing interventions, and advocate for additional evaluation when clinically indicated. In my opinion, the evidence demonstrates that the continuity of care process and interdisciplinary communication essential to correctional healthcare were not fully carried out, resulting in missed opportunities to recognize and communicate Mr. Rupard's worsening condition.

## VII. Opinions

At the time of Mr. Rupard's booking and at Dr. Cruz's initial psychiatric evaluation approximately ten days later, Dr. Cruz did not have the benefit of complete and accurate clinical information. Specifically, the prior court-ordered psychiatric medication regimen had not been effectively communicated or incorporated into the available medical record in a manner that would have alerted the treating psychiatrist to its significance. Based on the information reasonably available to him at the time of his evaluation, it is my opinion that Dr. Cruz exercised appropriate clinical judgment in modifying Mr. Rupard's medication regimen.

Importantly, Dr. Cruz's treatment plan did not end with that initial encounter. His documentation specifically directed that Mr. Rupard be reevaluated as clinically indicated and sooner if his condition worsened. Dr. Cruz testified that, consistent with correctional mental health practice, he did not independently schedule follow-up appointments. Rather, psychiatrists relied upon mental health clinicians, nursing staff, and other members of the interdisciplinary treatment team to identify patients requiring earlier reassessment and to place them on the psychiatrist's schedule.

There is no evidence that Dr. Cruz was informed of Mr. Rupard's progressive psychiatric deterioration or that he received referrals describing worsening psychosis, increasing functional decline, refusal to eat or drink, inability to care for himself, or other clinical changes requiring urgent psychiatric reassessment.

In my opinion, this case does not represent a failure of Dr. Cruz to meet the psychiatric standard of care. Rather, it reflects a systemic failure of the correctional health care delivery system. Correctional mental health care depends upon effective communication and coordination among psychiatrists, mental health clinicians, nursing staff, medical providers, and custody personnel. As Mr. Rupard's condition progressively deteriorated over the ensuing weeks, multiple opportunities existed for members of the interdisciplinary team to recognize his decompensation, communicate their concerns, and initiate an urgent psychiatric reassessment. Those opportunities

were repeatedly missed. The failure to recognize, communicate, and respond to Mr. Rupard's obvious clinical deterioration represents a breakdown in the coordinated team approach required to safely manage individuals with serious mental illness in a correctional setting.

Date: September 2, 2026

**VIII. Curriculum Vitae**

Attached

**IX. Compensation**

Attached

# EXHIBIT 40

Rebuttal Expert Report of Glindmeyer

# Daphne Glindmeyer, M.D.

[redacted]

August 7, 2026

Lowe Law, APC
Attn: Jeremiah Lowe, Esq.
402 West Broadway Street Suite 1720
San Diego, California 932101

Re: Estate of Lonnie Rupard v. County of San Diego, et al.
Case No: 23CV1357 CAB BLM

Dear Mr. Lowe,
I am writing to provide rebuttal opinions to the three defense expert reports proffered in the above noted case. As I submitted a report in this matter dated July 13, 2026 that included my professional qualifications, that information will not be reiterated here. My overall opinions and summary will be repeated.

<u>Statement of Opinion:</u>
Mr. Lowe requested my opinions in the above noted case. My opinions are based on my skill, education, training, experience, knowledge of medical and scientific literature, other materials reasonably relied upon by members of my medical specialty, and my review of the case information available at this time. Should additional information become available that modifies my opinions and conclusions, an addendum will be authored.

To provide this opinion, information regarding this case including case pleadings, depositions, photographs, medical/mental health, and other records were reviewed. Based on the available information, it is my opinion, to a reasonable degree of psychiatric certainty, that there were significant deviations from the standard of care regarding the psychiatric treatment, mental health treatment, and monitoring provided to Mr. Rupard during his incarceration at the San Diego County Jail.

Mr. Rupard was seriously mentally ill with diagnoses including unspecified schizophrenia and other psychotic disorders, but due to inadequate mental health treatment, he experienced an extended duration of untreated psychosis and an exacerbation of

psychotic symptoms, with significant functional impairment. His death occurred due to a confluence of events and system failures that were identifiable and preventable, yet in deviations from the standard of care, were not addressed.

Mr. Rupard was increasingly psychotic. He was not engaged in mental health treatment per an individualized treatment plan. He was not consistently monitored by mental health staff despite his housing in administrative segregation. Despite his deterioration and increased psychotic symptoms, he was not considered for a forced medication protocol or a 5150 designation and transfer to the Psychiatric Stabilization Unit.

Facility staff of all disciplines (e.g. sworn staff, medical staff, mental health staff, and psychiatry) failed to monitor Mr. Rupard, failed to recognize his deteriorating condition, failed to intervene on his behalf, and failed to escalate his treatment to a higher level of care (e.g., the PSU). Given the documentation of his experiencing psychotic symptoms, mental health staff should have intervened. Mr. Rupard was documented as psychotic. He did not have the capacity to make appropriate decisions regarding his care. Further, Mr. Rupard's severe deterioration was documented by Dr. Badre in his evaluation of 3.14.22. Based on Dr. Badre's description of Mr. Rupard's cell and his hygiene, it is obvious that any one of the jail staff would have recognized Mr. Rupard's grave disability.

Had Mr. Rupard been properly evaluated, monitored and treated, his death would have been prevented. Unfortunately, the failures ultimately resulted in Mr. Rupard's death due to "Pneumonia, Malnutrition and Dehydration in the setting of neglected Schizophrenia. Contributing: SARS-COV-2 (COVID-19) Viral infection; pulmonary emphysema; duodenal ulcer." The Medical Examiner indicated Mr. Rupard's death was "homicide" due to "ineffective delivery of...care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide."

Defense Expert Rebuttal:

1. Report of Mace Beckson, M.D. dated July 14, 2026 included the following opinions:
    a. "Mr. Rupard's past psychiatric history makes it likely that, had he not died in March 2022, his clinical prognosis would have been guarded."

       Response: Mr. Rupard's medical records indicated that when treated with psychotropic medication, Mr. Rupard responded to treatment, had resolution of his psychotic symptoms, and improved insight into his illness. As such, had he received adequate care inclusive of long-acting injectable medication, his prognosis would have improved substantially.

b. "Based on statistics in the published scientific literature, had Mr. Rupard not died in March 2022, he likely would have had a substantial reduced life expectancy."

   Response: While there is scientific literature, cited by Dr. Beckson, demonstrating that these conditions are associated with increased mortality at the population level, as Dr. Beckson noted, the available evidence does not support a reliable determination of an individual person's life expectancy based solely on these diagnoses.

   The study cited by Dr. Beckson in support of reduced life expectancy describes average outcomes observed across large populations. These studies identify statistical associations between serious mental illness, substance use disorders, and increased mortality, but do not establish the life expectancy of any particular individual. Population-based mortality estimates are influenced by numerous variables, including age, sex, race, socioeconomic status, access to healthcare, smoking history, obesity, cardiovascular disease, diabetes, infectious disease, treatment adherence, remission or recovery from substance use, and the severity and duration of psychiatric illness. These factors vary substantially among individuals and limit the ability to extrapolate group averages to a single person.

   Although schizophrenia, bipolar disorder, and chronic substance use disorders have been associated with reduced lifespan, the magnitude of risk is heterogeneous. Many individuals with these diagnoses experience long-term stability, sustained recovery, and life expectancies approaching or in some cases exceeding those of the general population when medical and psychiatric illnesses are effectively treated.

   Moreover, assigning a qualitative reduction in life expectancy requires consideration of comprehensive medical information beyond psychiatric expertise alone. An individualized life expectancy assessment ordinarily incorporates objective medical evaluation, actuarial life tables, and analysis of established mortality determinants. Without such an analysis, any opinion regarding an individual's life expectancy is speculative.

2. Report of Kristina Tyler, Ph.D. QME dated July 15, 2026:
   a. Response: The basis of Dr. Tyler's opinions regarding the adequacy of the behavioral health care Mr. Rupard received at SDCJ relies on the distinction between his housing classification, asserting that because Mr. Rupard was assigned to "quarantine" rather than "administrative segregation," he was not entitled to the behavioral health interventions required for inmates in administrative segregation. This opinion suggests that it is acceptable for an individual with a documented serious mental

illness to remain in an isolated housing environment without regular behavioral health assessment or intervention solely because of the label assigned to the housing status.

This position is inconsistent with the applicable standard of care. SDCJ was aware of Mr. Rupard's history of severe and persistent mental illness, yet he received only a single documented behavioral health clinical contact during his 89-day incarceration. During this period, he remained housed in an isolation-type environment with no behavioral health monitoring or treatment. In my opinion, this represents a significant deviation from the standard of care.

Moreover, SDCJ's own policy does not support limiting mental health monitoring based on the specific classification assigned to an isolated individual. The policy states that "inmates who are segregated and receive services and activities apart from other inmates shall be monitored three days a week by nursing staff and a minimum of once a week by a qualified mental health provider (QMHP)." The policy does not distinguish between administrative segregation, quarantine, or any other form of segregated housing. Rather, the triggering criterion is removal from the general population and receipt of services apart from other inmates. Accordingly, Mr. Rupard's placement in an isolated housing environment should have prompted the required nursing and mental health monitoring regardless of the administrative designation assigned to his housing status.

Response: Dr. Tyler opined that Ms. Goodall's assessment of Mr. Rupard met the applicable standard of care. However, Dr. Tyler did not account for Ms. Goodall's failure to escalate Mr. Rupard's treatment despite documenting significant signs and symptoms consistent with an exacerbation of psychosis. This omission undermines Dr. Tyler's conclusion that Ms. Goodall's assessment and clinical management satisfied the standard of care.

b. Response: For additional rebuttal information, please refer to my initial report in this action dated July 13, 2026.

3. Report of Alan A. Abrams M.D., J.D., FCLM dated July 14, 2026:
   a. Response: I disagree with Dr. Abram's opinions. The rationale for my disagreement is found in my original report dated July 13, 2026; however, I will include some discrete discussion below:
      i. Dr. Abrams did not consider the measure of Mr. Rupard's weight per the SDCJ medical clearance documented 12.19.21, where it was noted he weighed 165 pounds at intake.
      ii. Dr. Abrams did not consider Mr. Rupard's prior mental health history which included similar deteriorations in his mental health including

psychotic symptoms, failing to maintain his hygiene by collecting feces in the toilet [SDCJ medical chart 5.4.19], requiring transfer to and treatment in the state hospital, and the need for involuntary medications. Further, Dr. Abrams did not consider Mr. Rupard's history of a positive response to treatment with psychotropic medications including a resolution of psychosis.

iii. Dr. Abrams did not consider documentation of Mr. Rupard's psychotic symptoms including irritability, incoherent mumbling, verbal aggression, and disorganized thought process as evidence of mental health deterioration. In my opinion, Mr. Rupard's mental health was in a state of decline from the time of his admission to the SDCJ and only deteriorated further in the setting of isolation and lack of treatment with psychotropic medications.

iv. Dr. Abrams opined that being in a "psychotic state" is not a legal basis for involuntary treatment. Dr. Abrams did not consider the sequelae of an extended duration of psychosis and the negative results thereof. He opined that Mr. Rupard, who was obviously psychotic, "was fully responsible for rejecting treatment of his mental illness." This is an inaccurate statement. Dr. Abrams improperly equated medication refusal with informed refusal. Mr. Rupard was floridly psychotic and unable to appreciate the impact of his refusal. Further, Dr. Cruz did not attempt to meet with Mr. Rupard to educate him, to discuss the consequences of his refusal, or to assess his decision-making capacity and the need to consider intervention rather, in the absence of a clinical encounter, and in a deviation from the standard of care, discontinued Mr. Rupard's psychotropic medications.

v. Dr. Abrams indicated that Mr. Rupard did not die as a result of "neglected Schizophrenia" as opined by the County Medical Examiner. This opinion is outside of Dr. Abrams scope of expertise. The Medical Examiner is responsible for determining the cause and manner of an individual's death. In my opinion, in Mr. Rupard's case, psychiatric illness and the lack of psychiatric treatment and intervention were substantial contributing factors to Mr. Rupard's mental and physical health deterioration

vi. Dr. Abrams mischaracterized the National Commission on Correctional Health Care (NCCHC) Standards. These standards are the professional standards governing the delivery of medical and mental health care in U.S. correctional facilities. These standards are recognized as defining the standard of correctional health care.

vii. Dr. Abrams stated several times that Dr. Cruz's psychiatric treatment of Mr. Rupard is "well within the standard of care in correctional psychiatry." This implies that the standard of care is somehow different in corrections relative to the general population.

The standard of psychiatric care in correctional settings is the same as the standard of care in the community. Incarceration does not diminish a patient's right to clinically appropriate psychiatric evaluation and treatment. The standard of psychiatric care applicable in correctional facilities is the same professional standard that governs psychiatric practice in the community. The American Psychiatric Association and the National Commission on Correctional Health Care (NCCHC), recognize that incarcerated individuals are entitled to mental health care that is clinically appropriate and consistent with accepted psychiatric practice.

Accordingly, the core obligations of a psychiatrist remain unchanged regardless of practice setting. These include conducting appropriate diagnostic evaluations, developing differential diagnoses, recognizing clinical deterioration, monitoring response to treatment, prescribing evidence-based medications, assessing suicide risk, responding to psychiatric emergencies, documenting clinical reasoning, and modifying treatment when a patient's condition worsens. A psychiatrist practicing in a correctional facility is expected to exercise the same degree of knowledge, skill, and clinical judgment that would be expected of a reasonably prudent psychiatrist treating a similar patient in the community.

viii. Dr. Abrams opined on Mr. Rupard's life expectancy. For my response to this, please refer to the discussion in section 1. b. above.

Summary:

In summary, Mr. Rupard was seriously mentally ill with diagnoses including unspecified schizophrenia and other psychotic disorders, but due to inadequate mental health treatment, he experienced an extended duration of untreated psychosis and an exacerbation of psychotic symptoms, with significant functional impairment. His death occurred due to a confluence of events and system failures that were identifiable and preventable, yet in deviations from the standard of care were not addressed.

Mr. Rupard was increasingly psychotic. He was not engaged in mental health treatment per an individualized treatment plan. He was not consistently monitored by mental health staff despite his housing in administrative segregation type housing. Despite his deterioration and increased psychotic symptoms, he was not considered for a forced medication protocol or a 5150 designation and transfer to the Psychiatric Stabilization Unit.

Facility staff of all disciplines (e.g. sworn staff, medical staff, mental health staff, and psychiatry) failed to monitor Mr. Rupard, recognize his deteriorating condition, intervene on his behalf, and escalate his treatment to a higher level of care (e.g., the PSU). Given

the documentation of his experiencing psychotic symptoms, mental health staff should have intervened. Mr. Rupard was documented as psychotic. He did not have the capacity to make appropriate decisions regarding his care. Further, Mr. Rupard's severe deterioration was documented by Dr. Badre in his evaluation of 3.14.22. Based on Dr. Badre's description of Mr. Rupard's cell and his hygiene, it is obvious that any one of the jail staff would have recognized Mr. Rupard's grave disability.

Had Mr. Rupard been properly evaluated, monitored and treated, his death would have been prevented. Unfortunately, the failures ultimately resulted in Mr. Rupard's death due to "Pneumonia, Malnutrition and Dehydration in the setting of neglected schizophrenia. Contributing: SARS-COV-2 (COVID-19) Viral infection; pulmonary emphysema; duodenal ulcer." The Medical Examiner indicated Mr. Rupard's death was "homicide" due to "ineffective delivery of…care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide."

Please note the above opinions are provided to a reasonable degree of psychiatric certainty. If additional information or collateral documentation becomes available, I reserve the right to change my opinions based on such, and that will be submitted as an addendum to this report. Should you have any questions, or require any further information regarding these opinions, please contact me at 504.392.8348.

Submitted by:

Daphne Glindmeyer, M.D., D.F.A.P.A.
Board Certified Child, Adolescent, and Adult Psychiatrist
Board Certified Forensic Psychiatrist