# EXHIBIT D

# Deposition Transcript

Case Number: 23CV1357 CAB BLM
Date: March 26, 2026

In the matter of:

# ESTATE OF LONNIE RUPARD v COUNTY OF SAN DIEGO, et al.

# Serina Rognlien-Hood

## Confidential

CERTIFIED COPY

Reported by:
Solomon Rodgers Jr.

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

10:36:58 higher -- their education is a little bit higher than an LVN. So they can do different assignments in our facility. They can do, like, the intake, they can do RN sick call, where LVNs can't -- their scope is a little lower; they can't do that. So just making sure that they're working within their scope, staying within that scope. When they're doing those assignments, that supervisor would make sure they're not working under scope.

10:37:25 Q Now may I put that same question to you with respect to the LVNs now?

10:37:31 A So the LVNs, they can do our med pass, they can go out and, you know, hand out glasses, they can assist the doctors. So we're just making sure that they can assist a nurse in working in MOB, they can do our rounds, so we're just making sure that they're working within their scope.

10:37:48 Q Now, you told me that at one point, you were the director of nursing?

10:37:54 A Correct.

10:37:54 Q May I ask when you became the director of nursing?

10:37:58 A I believe it was December of 2020.

10:37:59 Q Would you tell me, when you became the director of nursing, was there a set of duties that

10:38:05 you were given as part of that job?
10:38:08 A Yes.
10:38:09 Q Tell me what they were.
10:38:10 A It was to oversee the supervisors at the facilities.
10:38:18 Q And when you say, "the facilities," that would include, among other locations, the downtown jail?
10:38:25 A Yes.
10:38:27 Q May I ask: In the time period of 2021 and 2022, were there -- one -- was there one supervisor, more than one supervisor at the central jail?
10:38:42 A There was more than one.
10:38:44 Q How many?
10:38:45 A Two.
10:38:46 Q And could you tell me, were the supervisor's duties at that time, '21 and '22, the same as you have described your duties when you were a supervisor?
10:38:59 A Yes.
10:39:05 Q At some point, you became the deputy director?
10:39:09 A Yes.
10:39:11 Q May I ask when that was?

individual capacity.

THE WITNESS: When you say, "structural?"

BY MR. IREDALE:

Q In other words, was there an organizational chart in existence which would show the lines of authority for the various people who worked in medical services division?

A Yes, there was.

Q Tell me, first of all, if you can give me generally a break down of the medical service providers in the medical services division. And now, would you just take this set of questions that I'm going to be asking as specifically referring to '21 and '22, that time period?

A So we had county staff, and we had -- I know we always contracted our medical services out and our mental health services out.

Q Now, same question, what county staff medical services division? You mentioned RNs and LVNs.

A Yes.

Q And of course, you as the --

A Director of nursing at the time.

Q Who else?

A And our mental health clinicians were

10:55:14 county staff.

10:55:14 Q And the mental health clinicians were given an acronym?

10:55:21 A QMHPs, I believe, was the acronym they go by.

10:55:26 Q Now any other county employees in medical services division other than what we've touched on?

10:55:35 A Dr. Montgomery is at county and he's our CMO.

10:55:40 Q And would you tell me, Dr. Montgomery, what was his role, what was his obligation or duty during that time with respect to medical services division?

10:55:52 MS. FELDMAN: I'm going to refer to the standing objection to the extent it calls for individual questioning -- or individual capacity questioning and outside of the scope of her role 30(b)(6) designated topics; therefore, not binding on the county.

10:56:09 THE WITNESS: He saw -- oversees our clinical roles to make sure all of our clinical rules -- the clinical providers are following their rules.

10:56:18 BY MR. IREDALE:

10:56:18 Q So he had general oversight

BY MR. IREDALE:

Q Go ahead.

A Yes.

Q In this case, was the health staff notified that Mr. Rupard was losing weight?

MS. FELDMAN: Outside the scope of her rule 30(b)(6) designated topics, individual capacity questioning, and calls for speculation. Incomplete hypothetical. Assumes facts. And to the extent it calls for any exert opinion.

BY MR. IREDALE:

Q Do you remember the question?

A Yes.

Q What was the question?

MS. FELDMAN: Well, you don't have to repeat the question. If you know the question and you can give an answer, you can answer.

MR. IREDALE: No. Do not instruct the witness.

MS. FELDMAN: Well, no. You can't ask her, "What was the question?"

BY MR. IREDALE:

Q Do you remember what the question was?

MS. FELDMAN: No, that's harassing.

///

12:04:04 BY MR. IREDALE:
12:04:04 Q Can you tell me what question you're going to be answering?
12:04:04 MS. FELDMAN: No, that's harassing. If she remembers the question, she can answer.
12:04:07 MR. IREDALE: Stop.
12:04:07 MS. FELDMAN: You're not -- you cannot ask my witness --
12:04:12 MR. IREDALE: This is disruptive.
12:04:13 MS. FELDMAN: To repeat back the question to you, that is not a proper question. Okay? Let's make that clear.
12:04:17 BY MR. IREDALE:
12:04:18 Q Can you answer the question, please?
12:04:22 A Not that I'm aware of.
12:04:25 Q All right. Now if we could go to Exhibit 3, this states, "Under procedure, medical staff can be notified by the patient, sworn staff, counselor, religious leaders, referrals from family, attorneys, et cetera."
12:04:56 Was any such notification ever given to the medical staff?
12:05:02 MS. FELDMAN: For Lonnie Rupard?
12:05:05 MR. IREDALE: Yes.
12:05:06 MS. FELDMAN: Standing objection. Calls

for an individual capacity questioning. Nonbinding on county and is outside the scope of Rule 30(b)(6)

MR. IREDALE: Okay. You can just say, "Standard objection, stated objection." That's why we went through that whole thing this morning.

MS. FELDMAN: But you're going into specifics --

MR. IREDALE: You're just doing --

MS. FELDMAN: You're outside the scope of your designated topics and I'm objecting. This is a new, different objection.

MR. IREDALE: Just say, "Standing objection." You're covered.

MS. FELDMAN: But it's not the standing objection.

BY MR. IREDALE:

Q Have the question in mind?

A Yes.

Q Would you answer it?

A Not that I'm aware of.

Q So it also says, "Notification: The following will be notified of a patient that is stating they are on a hunger strike." And among the people who are notified is the director of nursing services.

12:05:55 Do you see that?
12:05:55 A Yes, I see that.
12:05:57 Q Were you ever notified?
12:05:59 MS. FELDMAN: Standing objection. Outside the scope of her rule 30(b)(6) testimony. Not binding.
12:06:06 BY MR. IREDALE:
12:06:07 Q Go ahead.
12:06:08 A No.
12:06:08 Q All right. It says, "After notification evaluation, the medical staff shall evaluate and assess the patient. RN staff will do an assessment to evaluate the medical and psychiatric history. The assessment is to include weight and vital signs."
12:06:29 Do you see that?
12:06:30 A Yes.
12:06:30 Q Was any such ever done, to your knowledge?
12:06:34 MS. FELDMAN: Standing objection. Calls for individual capacity questioning and it's outside the scope of the rule 30(b)(6) designated topics. Calls for expert opinion.
12:06:41 MR. KRUEGER: I'm very sorry, Gene. I just couldn't quite hear you when you asked the

BY MR. KRUEGER:

Q My hypothetical is, a deputy sees something that gives him or her reason to suspect that a hunger strike exists. Maybe they're wrong, maybe they're right, but they need to take action; am I correct?

MS. FELDMAN: I'm just going to object to the extent that you're asking her about sworn staff conduct and that's --

MR. KRUEGER: That's fine.

MS. FELDMAN: -- not part of her testimony, but she can testify about nursing.

BY MR. IREDALE:

Q Go ahead.

A So if nursing knows someone is on a hunger strike.

Q Um-hmm.

A Then nursing will do an assessment, get weight, get vital signs if the patient is willing. At that point, we schedule for psychiatry and for MD sick call. Then we wait for those providers to give us the following -- the orders to whatever is next in their care plan.

Q Got it. Okay. When you say, "schedule" -- and I'm going to stick to psychiatry

because my client is a psychiatrist -- if you schedule a psych sick call, is that a computer function, is that calling somebody on the telephone, is that writing a note or an email; how does that work?

A Well, we have to schedule in the computer.

Q Okay.

A But we can also -- if we -- we can say, hey, we're scheduling this person, but it has to be in the computer for it to be scheduled.

Q Okay. Once it is scheduled in the computer, are you personally familiar with the process by which that appointment is brought to the attention of a psychiatrist as a, like, here, this is a patient you need to see?

MS. FELDMAN: Vague and ambiguous.

BY MR. KRUEGER:

Q Do you understand my question? I can reframe it.

A Yeah.

Q Sure. So a psych sick call appointment is made, correct?

A Um-hmm.

Q And for the psychiatrist to know that he

I, SERINA ROGNLIEN-HOOD, hereby declare under penalty of perjury that I have read the foregoing transcript. Corrections, if any, were noted in ink, and the same is now a full, true and correct transcript of my testimony.

Executed this _______ day of _____________, 2026, at _________________________________, California.

_________________________________
SERINA ROGNLIEN-HOOD

I, SOLOMON RODGERS JR, CSR No. 14948, do hereby declare:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the

testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

_____ That the witness was requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

_____ Signature is Waived

_____ The changes made by the witness are appended to the transcript.

_____ No request was made that the transcript be reviewed pursuant to Section 30(e)of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this 10th day of April, 2026.

SOLOMON RODGERS JR, CSR #14948